No. 21-1858

# In the United States Court of Appeals for the Fourth Circuit

IN RE: KAISER GYPSUM COMPANY, INC., ET AL.,

*Debtors.*

TRUCK INSURANCE `EXCHANGE,

*Appellant,*

v.

IN RE: KAISER GYPSUM COMPANY, INC.
HANSON PERMANENTE CEMENT, INC.,

*Appellees*,

and

LEHIGH HANSON, INC.

*Appellee,*

and

OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS;
FUTURE CLAIMANTS' REPRESENTATIVE

*Appellees.*

On Appeal from the United States District Court for the Western
District of North Carolina, No. 20-cv-537 (Hon. Graham C. Mullen)

## JOINT APPENDIX – VOLUME I

Michael A. Rosenthal
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  (212) 351-4000
Facsimile:  (212) 351-4035
mrosenthal@gibsondunn.com

Allyson N. Ho
*Counsel of Record*
Robert B. Krakow
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
Telephone:  (214) 698-3100
Facsimile:  (214) 571-2934
aho@gibsondunn.com
rkrakow@gibsondunn.com

COUNSEL FOR APPELLANT TRUCK INSURANCE EXCHANGE

Gregory M. Gordon
JONES DAY
2727 North Harwood Street,
Suite 500
Dallas, Texas 75201
Telephone: (214) 220-3939
gmgordon@jonesday.com

C. Kevin Marshall
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
ckmarshall@jonesday.com

Paul M. Green
JONES DAY
717 Texas, Suite 3300
Houston, Texas 77002
pmgreen@jonesday.com

Ross R. Fulton
John R. Miller, Jr.
RAYBURN COOPER &
     DURHAM, P.A.
227 West Trade Street, Suite 1200
Charlotte, North Carolina 28202
Telephone: (704) 334-0891
rfulton@rcdlaw.net
jmiller@rcdlaw.net

COUNSEL FOR DEBTORS-APPELLEES KAISER GYPSUM COMPANY, INC. AND
HANSON PERMANENTE CEMENT, INC.

[ADDITIONAL COUNSEL LISTED ON FOLLOWING PAGES]

Mark A. Nebrig
MOORE & VAN ALLEN PLLC
100 N. Tryon St., Suite 4700
Charlotte, North Carolina 28202
Telephone: (704) 331-3602
marknebrig@mvalaw.com

COUNSEL FOR DEFENDANT-APPELLEE LEHIGH HANSON, INC.

Sara Wyche Higgins
HIGGINS & OWENS, PLLC
Suite 530
5925 Carnegie Boulevard
Charlotte, North Carolina 28209
Telephone: (704) 366-4607
shiggins@higginsowens.com

Kevin C. Maclay
Todd E. Phillips
James P. Wehner
CAPLIN & DRYSDALE
Suite 1100
1 Thomas Circle, NW
Washington, D.C. 20005
Telephone: (202) 862-7841
kmaclay@capdale.com
tphillips@capdale.com
jwehner@capdale.com

Felton Edward Parrish
ALEXANDER RICKS, PLLC
Suite 100
1420 East 7th Street
Charlotte, North Carolina 28204
Telephone: (980) 334-2001
felton.parrish@alexanderricks.com

COUNSEL TO APPELLEE THE OFFICIAL COMMITTEE OF
ASBESTOS PERSONAL INJURY CLAIMANTS

Edwin J. Harron
Sharon M. Zieg
YOUNG, CONAWAY, STARGATT
    & TAYLOR
Rodney Square North
P. O. Box 391
Wilmington, Delaware 19899
Telephone: (302) 571-6600
eharron@ycst.com
szieg@ycst.com

COUNSEL TO APPELLEE THE FUTURE CLAIMANTS' REPRESENTATIVE

# TABLE OF CONTENTS

**JA Page**

## VOLUME I (DISTRICT COURT FILINGS)

Docket Report, U.S. District Court for the Western District of
North Carolina, *In re Kaiser Gypsum Company, Inc.*,
No. 20-cv-537-GCM ....................................................................JA00001

Order Recommending Entry of Proposed Findings of Fact and
Conclusions of Law and Order Confirming Joint Plan of Reorganization
by United States Bankruptcy Judge J. Craig Whitley.
(filed Sept. 28, 2020) (Dkt. 1) ........................................................JA00010
       Ex. A: Proposed Findings ......................................................JA00014
       Ex. B: Proposed Confirmation Order ..................................JA00089

Truck's Objections to Proposed Findings of Fact and Conclusions of
Law (filed Nov. 4, 2020) (Dkt. 25)..................................................JA00493

Brief in Support of Objection of Truck to Proposed Findings of Fact and
Conclusions of Law (filed Nov. 4, 2020) (Dkt. 26) ........................JA00497

Future Claimants' Representative's Brief in Response to Objection of
Truck to Proposed Findings of Fact and Conclusions of Law
(filed Dec. 4, 2020) (Dkt. 32) .........................................................JA00575

Official Committee of Asbestos Personal Injury Claimants' Brief in
Response to Objection of Truck to Proposed Findings of Fact and
Conclusions of Law (filed Dec. 4, 2020) (Dkt. 33).........................JA00613

Reply Brief in Support of Objection of Truck to Proposed Findings of
Fact and Conclusions of Law (filed Dec. 31, 2020) (Dkt. 34)........JA00662

**VOLUME II (DISTRICT COURT FILINGS, CONT'D)**

Notice of Filing of Joint Record Index and Excerpts from Joint Record Documents (filed Jan. 11, 2021) (Dkts. 36–46)[1] ..........................JA00694

      Truck Insurance Exchange's Responses and Objections to Debtors' First Set of Interrogatories (A000639 - A000651)......JA00709

      Truck Insurance Exchange's Responses and Objections to the Official Committee of Asbestos Personal Injury Claimants' and the Future Claimants' Representative's First Set of Interrogatories and Requests for Production of Documents (A000664 - A000677)...................................................JA00722

      Truck Insurance Exchange's Responses and Objections to the Official Committee of Asbestos Personal Injury Claimants' and the Future Claimants' Representative's Second Set of Interrogatories and Requests for Production of Documents (A000678 - A000690)...................................................JA00736

      Truck Insurance Exchange's Responses to the Official Committee of Asbestos Personal Injury Claimants' First Set of Interrogatories and Requests for Production of Documents (A000691 - A000712)...................................................JA00749

      Truck Insurance Exchange's Responses to the Official Committee of Asbestos Personal Injury Claimants' Second Set of Interrogatories and Requests for Production of Documents (A000713 - A000719)...................................................JA00771

---

[1] These documents were included in the joint appendix of record materials and additional evidence submitted to the district court in connection with the district court's consideration of the Plan. The numbers in parentheses identify the bates ranges assigned to these documents in the district court appendix. The documents listed here were not filed on the bankruptcy court docket. Documents that were filed as part of the record in the district court but were also previously filed in the bankruptcy court docket are located in volume IV – XII of this Joint Appendix according to their position on the bankruptcy court docket.

Official Committee of Asbestos Personal Injury Claimants' and the Future Claimants' Representative's Notice of Deposition of Truck Insurance Exchange (A000720 - A000730)......JA00778

1974 Truck Insurance Policy to Kaiser (A001124 - A001197) ..................................................................................JA00789

Reservation of Rights Letter to Kaiser Concerning Cooperation and Assistance Dated April 3, 2019 (A001748 - A001750) ..................................................................................JA00863

Truck Insurance Exchange's Complaint for Declaratory Relief (A007504 - A007534)....................................................JA00866

Deposition of Scott Hoyt (A007576 - A007626) ...................JA00897

Deposition of Lester Brickman (A007628 - A007651).........JA00948

Deposition of Charles Bates (A007653 - A007677)..............JA00972

Sepco Asbestos Personal Injury Trust Distribution Procedures, attached as Exhibit A to Order Confirming the Second Amended Plan of Reorganization, as Modified, for Sepco Corporation Under Chapter 11 of the Bankruptcy Code, and Report and Recommendation to the District Court, *In re Sepco Corp.*, No. 16-50058 (Bankr. N.D. Ohio Mar. 24, 2020), Dkt. No. 732 (A007678 - A007733) .............................JA00997

Garlock Settlement Facility Amended and Restated Claims Resolution Procedures, *In re Garlock Sealing Techs. LLC,* Case No. 17-cv-00275-GCM (W.D.N.C.), Dkt. No. 13-1 (A007734 - A007815)....................................................JA01053

Filings in *In re Bestwall LLC*, Case No. 17-BK-31795 (Bankr. W.D.N.C.), Dkt. Nos. 1236, 1237, 1321, 1327, 1328 (A007816 - A007962)....................................................JA01135

Transcript of Confirmation Hearing, *In re Leslie Controls, Inc.*, No. 10-12199 (CSS) (Bankr. D. Del. Oct. 26, 2010), Dkt. No. 381 (A007963 - A008043)..............................JA01282

**VOLUME III (DISTRICT COURT FILINGS, CONT'D)**

Findings of Fact, Conclusions of Law and Order Confirming the First Amended Plan of Reorganization of Leslie Controls, Inc. Under Chapter 11, *In re Leslie Controls, Inc.*, No. 10-12199 (CSS) (Bankr. D. Del. Oct. 28, 2010), Dkt. No. 382 (A008044 - A008100) ............................JA01363

Order Confirming Sixth Am. Joint Plan of Reorganization of Thorpe Insulation Co. and Pacific Insulation Co., *In re Thorpe Insulation Co.*, No. 2:07-bk-19271-BB (Bankr. C.D. Cal. May 8, 2013) (A008101 - A008129) ....................................................................................JA01420

Order Confirming Am. and Restated Second Am. Plan of Reorganization of Plant Insulation Co. as Modified § 5.2.6, *In re Plant Insulation Co.*, No. 09-31347 (Bankr. N.D. Cal. Mar. 3, 2014), Dkt. No. 2722 (A008130 - A008150)...................................................JA01439

Transcript of District Court Plan Confirmation Proceedings (dated June 25, 2021) (Dkt. 50).....................................JA01470

District Court's Findings of Fact and Conclusions of Law Regarding Confirmation of the Joint Plan of Reorganization (signed July 27, 2021) (Dkt. 51)........................................................................JA01558

District Court's Order Confirming the Joint Plan of Reorganization (signed July 27, 2021) (Dkt. 52)....................................JA01632

Ex. A: Plan.........................................................................JA01667
Ex. B: Modifications ..........................................................JA01743
Ex. C: Confirmation Notice ................................................JA01824
Ex. D: Confirmation Notice—Publication Version ..............JA01833

Joint Opposition of the Official Committee of Asbestos Personal Injury Claimants and the Future Claimants' Representative to the Emergency Motion of Truck for Stay Pending Appeal (filed Aug. 5, 2021) (Dkt. 55)...........................................................................JA01838

Debtors' Objection to Truck Insurance Exchange's Motion for Stay
Pending Appeal of the Findings of Fact and Conclusions of Law and
Order Confirming Joint Plan of Reorganization (filed Aug. 5, 2021)
(Dkt. 56)......................................................................................JA01851

Truck's Notice of Appeal (filed Aug. 6, 2021) (Dkt. 58)................JA01875

**JA Page**

## VOLUME IV (BANKRUPTCY COURT FILINGS)

Docket Report, U.S. Bankruptcy Court for the Western District of
North Carolina, *In re Kaiser Gypsum Company, Inc.*,
No. 16-31602....................................................................................JA01877

Declaration of Charles E. McChesney II in Support of First Day
Pleadings (filed Sep. 30, 2016) (Dkt. 13).......................................JA02218

Lawrence Fitzpatrick CV (filed Oct. 11, 2016) (Dkt. 68, Ex. A)...JA02241

Order Appointing Official Committee of Asbestos Personal Injury
Claimants (filed Oct. 19, 2016) (Dkt. 100)....................................JA02245

Agreed Order Amending the Interim DIP Financing Order
(filed Apr. 10, 2017) (Dkt. 444) ....................................................JA02249

Transcript for Hearing on Truck Motion for Relief from Stay in
Connection with California Insurance Coverage Action (dated May 2,
2017) (Dkt. 499)..............................................................................JA02253

Notice of Filing of Plan Term Sheet (filed Mar. 6, 2018) (Dkt. 854)
......................................................................................................JA02306

Chapter 11 Plan of Reorganization Proposed by Truck
(filed Apr. 13, 2018) (Dkt. 887) ....................................................JA02323

Transcript for Hearing on Motion for Relief from Stay in Connection with Asbestos Personal Injury Claims (dated May 10, 2018) (Dkt. 950) ....................................................................................JA02379

Order Granting Motion of the Debtors, the Official Committee of Asbestos Personal Injury Claimants and the Future Claims Representative to Lift the Stay (filed Aug. 9, 2018) (Dkt. 1108)....................................................................................JA02527

**JA Page**

## VOLUME V (BANKRUPTCY COURT FILINGS, CONT'D)

First Amended Disclosure Statement for First Amended Chapter 11 Plan of Reorganization Proposed by Truck Insurance Exchange (filed Sept. 25, 2018) (Dkt. 1204)............................................................JA02543

Objection of Truck to Motion for Approval of Debtors' Disclosure Statement (filed Nov. 06, 2018) (Dkt. 1302)..................................JA02893

Declaration of Charles McChesney II In Support of Debtor's Objection to First State Companies' Renewed Motion to Dismiss (filed Dec. 03, 2018) (Dkt. 1361).....................................................JA02925

Order Approving Settlement with Armstrong World Industries, Inc. (filed Mar. 15, 2019) (Dkt. 1556)....................................................JA02936

Amended Order Granting Debtors' Motion for Reconsideration of the Court's Oral Ruling on the Debtors' Motion for an Order Approving Settlement with Owens Corning Fibreglas Corporation (filed Mar. 15, 2019) (Dkt. 1558)....................................................JA02938

Order Approving Settlement with the Boeing Company (filed Apr. 18, 2019) (Dkt. 1601)..........................................................................JA02941

Order Approving Settlement with the City of Seattle (filed Apr. 18, 2019) (Dkt. 1602)..........................................................................JA02943

Order Approving Settlement with the Port of Seattle(filed Apr. 18, 2019) (Dkt. 1603)..........................................................................JA02945

Order Approving Settlement with King County, Washington (filed Apr. 18, 2019) (Dkt. 1604)....................................................JA02947

Order Approving Settlement with the Oregon Department of Environmental Quality (filed May 7, 2019) (Dkt. 1625) ..............JA02949

Fifth Amended Chapter 11 Plan of Reorganization Proposed by Truck (filed May 30, 2019) (Dkt. 1665) ...................................................JA02951

Fifth Amended Truck Disclosure Statement (filed May 30, 2019) (Dkt. 1666)....................................................................................JA03015

**JA Page**

**VOLUME VI (BANKRUPTCY COURT FILINGS, CONT'D)**

Third Amended Joint Plan of Reorganization (filed May 30, 2019) (Dkt. 1668)....................................................................................JA03210

Second Supplemental Objection of Truck Insurance Exchange to Motion for Approval of Debtors' Disclosure Statement (filed Jun. 6, 2019) (Dkt. 1682)....................................................................................JA03429

Transcript for Hearing on Approval of Disclosure Statements filed by Truck and the Debtors (dated Sept. 4, 2019) (Dkt. 1785) ............JA03587

Order Approving Settlement with the United States (filed Sept. 12, 2019) (Dkt. 1789) ...................................................JA03690

Kaiser Gypsum Asbestos Personal Injury Trust Distribution Procedures (filed Sep. 25, 2019) (Dkt. 1818)....................................................JA03692

Kaiser Gypsum Asbestos Personal Injury Trust Agreement (filed Oct. 21, 2019) (Dkt. 1868)....................................................JA03738

**VOLUME VII (BANKRUPTCY COURT FILINGS, CONT'D)**

Disclosure Statement for the Third Amended Joint Plan of
Reorganization of Kaiser Gypsum Company, Inc. and Hanson
Permanente Cement, Inc. (filed Oct. 21, 2019) (Dkt. 1869).........JA03791

Order (I) Approving the Debtors' Disclosure Statement, (II)
Establishing Procedures for Solicitation and Tabulation of Votes to
Accept or Reject Proposed Joint Plan of Reorganization and (III)
Scheduling a Hearing on Confirmation of Proposed Joint Plan of
Reorganization and Approving Related Notice Procedures
(filed Oct. 23, 2019) (Dkt. 1875)....................................................JA03923

Declaration of Anna Jadonath Regarding Publication of Notice of (I)
Deadline for Casting Votes to Accept or Reject Proposed Joint Plan of
Reorganization, (II) Hearing to Consider Confirmation of Proposed
Joint Plan of Reorganization and (III) Related Matters
(filed Nov. 14, 2019) (Dkt. 1903)...................................................JA03987

Order Approving Settlement with Ash Grove Cement Company
(filed Nov. 20, 2019) (Dkt. 1908)...................................................JA04117

Objection of Truck to Confirmation of the Third Amended Joint Plan of
Reorganization (filed Feb. 24, 2020) (Dkt. 2070).........................JA04119

**VOLUME VIII (BANKRUPTCY COURT FILINGS, CONT'D)**

Notice of Filing of Exhibits to Objection by Truck to Confirmation of the
Third Amended Joint Plan of Reorganization) (filed February 24, 2020)
(Dkt. 2072)......................................................................................JA04159
    Ex. L: Sample Truck Policy.................................................JA04486
    Ex. Q: Slip Op. in *Congoleum Corp. v. Ace American Insurance*,
    No. MID-L-8908-01 (N.J. Super. Ct. May 18, 2007)............JA04814

Declaration of Kevin O'Neal Holdeman, CPA, in Support of
Confirmation of the Third Amended Joint Plan of Reorganization
(filed Mar. 13, 2020) (Dkt. 2145)....................................................JA04839


**JA Page**

**VOLUME IX (BANKRUPTCY COURT FILINGS, CONT'D)**

Joint Omnibus Reply of the Official Committee of Asbestos Personal
Injury Claimants and the Future Claimants' Representative in
Response to Objections to the Third Amended Joint Plan of
Reorganization (filed Jun. 15, 2020) (Dkt. 2274)..........................JA04845

Debtors' Memorandum of Law in Support of Third Amended Joint Plan
(filed June 15, 2020) (Dkt. 2275)....................................................JA04891

Notice of Filing of Redline Version of Third Amended Joint Plan of
Reorganization Debtors Reflecting Settlement Reached with Certain
Excess Insurance Carriers (filed June 23, 2020) (Dkt. 2304) ......JA05068

Truck's Response to Reply of Debtors to Omnibus Objections to Truck
Insurance Exchange Claim Nos. 42 and 43 (filed July 1, 2020)
(Dkt. 2328).....................................................................................JA05149

Declaration of Lawrence Fitzpatrick in Support of Confirmation of
Third Amended Joint Plan of Reorganization of Kaiser Gypsum
Company, Inc. and Hanson Permanente Cement, Inc.
(filed July 1, 2020) (Dkt. 2336) .....................................................JA05158

Testimonial Declaration of Truck Insurance Exchange Witness Charles
E. Bates (filed July 1, 2020) (Dkt. 2337)......................................JA05183

Testimonial Declaration of Truck Insurance Exchange Witness Lester
Brickman (filed July 1, 2020) (Dkt. 2338) ....................................JA05257

Testimonial Declaration of Truck Insurance Exchange Witness Scott R.
Hoyt (filed July 1, 2020) (Dkt. 2339).............................................JA05390

Affidavit of David L. Neale (filed July 1, 2020) (Dkt. 2340).........JA05405

Bittner Declaration in Support of Third Amended Joint Plan of
Reorganization on Behalf of Kaiser Gypsum Company, Inc.
(filed July 1, 2020) (Dkt. 2341-1) .................................................JA05414

Plan Projections, Exhibit A to Bittner Declaration (filed July 1, 2020)
(Dkt. 2341-1)..................................................................................JA05426

Liquidation Analysis, Exhibit B to Bittner Declaration
(filed July 1, 2020) (Dkt. 2341-1) .................................................JA05433

McChesney Declaration in Support of Third Amended Joint Plan of
Reorganization on Behalf of Kaiser Gypsum Company, Inc.
(filed July 1, 2020) (Dkt. 2341-2) .................................................JA05444

**JA Page**

**VOLUME X (BANKRUPTCY COURT FILINGS, CONT'D)**

Debtors' Motion for an Order Approving Non-Material Modifications to
the Joint Plan of Reorganization (filed July 1, 2020) (Dkt. 2342)
.......................................................................................................JA05463

Declaration of James Daloia of Prime Clerk LLC Regarding the
Solicitation of Votes and Tabulation of Ballots Cast on the Third
Amended Joint Plan of Reorganization of Kaiser Gypsum Company, Inc.
and Hanson Permanente Cement, Inc. (filed July 1, 2020) (Dkt. 2343)
.......................................................................................................JA05554

Declaration of Cameron R. Azari, Esq. on Implementation of Notice
Regarding the Joint Plan of Reorganization of Kaiser Gypsum
Company, Inc. and Hanson Permanente Cement, Inc.
(filed July 2, 2020) (Dkt. 2345) .....................................................JA05562

Consolidated Response of Truck Insurance Exchange to the Briefs in
Support of Confirmation Filed by the Plan Proponents
(filed July 7, 2020) (Dkt. 2359) .....................................................JA05686

Notice of Joint Deposition Designations (filed July 14, 2020)
(Dkt. 2370)....................................................................................JA05706

Joint Reply of the Official Committee of Asbestos Personal Injury
Claimants and the Future Claimants' Representative in Response to
Truck's Consolidated Response to Plan Proponents' Confirmation Briefs
(filed July 16, 2020) (Dkt. 2376)....................................................JA05720

Debtors' Reply to Consolidated Response of Truck Insurance Exchange
(filed July 16, 2020) (Dkt. 2377)....................................................JA05730

Transcript for Hearing on Confirmation of the Debtors' Joint Plan of
Reorganization (dated July 20, 2020) (Dkt. 2420).......................JA05758
      Cross Examination of Charles E. McChensey, II................JA05833
      Redirect Examination of Charles E. McChensey, II...........JA05909
      Cross Examination of Lawrence Fitzpatrick.......................JA05914

**JA Page**

## VOLUME XI (BANKRUPTCY COURT FILINGS, CONT'D)

Transcript for Hearing on Confirmation of the Debtors' Joint Plan of
Reorganization (dated July 22, 2020) (Dkt. 2426).......................JA05970

Order Allowing, In Part, the Claims of Truck Insurance Exchange
(Claims Nos. 42 and 43) (filed Aug. 17, 2020) (Dkt. 2438)...........JA06168

Transcript for Hearing in Connection with Oral Ruling on Confirmation
of the Debtors' Joint Plan of Reorganization (dated Aug. 13, 2020)
(Dkt. 2439)....................................................................................JA06178

Notice of Filing of (I) Proposed Findings of Fact and Conclusions of Law
Regarding Confirmation of the Joint Plan of Reorganization and (II)
Proposed Order Confirming the Joint Plan of Reorganization, as
Modified, filed on behalf of Kaiser Gypsum Company, Inc.
(filed Aug. 25, 2020) (Dkt. 2442)...................................................JA06214

Third Amended Joint Plan of Reorganization (filed Sept. 24, 2020)
(Dkt. 2481) ...................................................................................JA06330

    Exhibit I.A.16 – Asbestos Personal Injury Trust Agreement
    ...........................................................................................JA06417

    Exhibit I.A.19 – Asbestos Personal Injury Trust Distribution
    Procedures .........................................................................JA06471

**JA Page**

## VOLUME XII (BANKRUPTCY COURT FILINGS, CONT'D)

Order Recommending Entry of Proposed Findings of Fact and
Conclusions of Law and Order Confirming Joint Plan of Reorganization
(filed Sept. 28, 2020) (Dkt. 2486) ..................................................JA06605

Order Approving Debtors' (I) Settlement with Allianz Underwriters
Insurance Company and Fireman's Fund Insurance Company and (II)
Sale of Transferred Interests in Connection with Insurance Policies
Related Thereto (filed Oct. 14, 2020) (Dkt. 2516).........................JA07088

Order Approving Debtors' (I) Settlement with Certain Underwriters at
Lloyd's, London, Certain London Market Insurance Companies,
Continental Insurance Company, Columbia Casualty Company and
National Fire Insurance Company of Hartford and (II) Sale of
Transferred Interests in Connection with Insurance Policies Related
Thereto (filed Oct. 14, 2020) (Dkt. 2517) ......................................JA07095

Order Approving Debtors' (I) Settlement with Munich Reinsurance
America, Inc. and Executive Risk Indemnity, Inc. and (II) Sale of
Transferred Interests in Connection with Insurance Policies Related
Thereto (filed Oct. 14, 2020) (Dkt. 2518) ......................................JA07102

Order Approving Debtors' (I) Settlement with Insurance Company of
The State of Pennsylvania and National Union Fire Insurance
Company and (II) Sale of Transferred Interests on Connection with
Insurance Policies Related Thereto (filed Oct. 14, 2020) (Dkt. 2519)
...........................................................................................................JA07109

Order Approving Debtors' (I) Settlement With Transport Insurance
Company and (II) Sale of Transferred Interests in Connection With

Insurance Policies Related Thereto (filed Oct. 14, 2020)
(Dkt. 2520) ...............................................................................JA07116

Order Approving (I) Settlement with Insurance Westchester Fire
Insurance Company and Westchester Surplus Lines Insurance
Company and (II) Sale of Transferred Interests in Connection with
Insurance Policies Related Thereto (filed Oct. 14, 2020)
(Dkt. 2521)................................................................................JA07123

Order Approving Debtors' (I) Settlement with Westport Insurance
Corporation and (II) Sale of Transferred Interests in Connection with
Insurance Policy Related Thereto (filed Oct. 14, 2020)
(Dkt. 2522)................................................................................JA07130

Order Approving Debtors' (I) Settlement with Truck and (II) Sale of
Transferred Interests in Connection with Insurance Policies Related
Thereto (filed Oct. 14, 2020) (Dkt. 2523) .....................................JA07136

Order Approving Debtors' (I) Settlement with Hartford Insurance
Company, First State Insurance Company, New England Insurance
Company and Twin City Fire Insurance Company and (II) Sale Of
Transferred Interests in Connection with Insurance Policies Related
Thereto (filed Oct. 14, 2020) (Dkt. 2524) .....................................JA07143

Order Approving Debtors' (I) Settlement with Allstate Insurance
Company and (II) Sale of Transferred Interests in Connection with
Insurance Policies Related Thereto (filed Oct. 14, 2020) (Dkt. 2525)
 ...................................................................................................JA07150

Order Approving Debtors' Settlement with Associated International
Insurance Company and TIG Insurance Company (filed Oct. 14, 2020)
(Dkt. 2526)................................................................................JA07157

Transcript for Hearing (Status Conference dated Sept. 26, 2020)
(Dkt. 1826)................................................................................JA07160

## VOLUME XIII (FILINGS FROM DISTRICT COURT PROCEEDING TO WITHDRAW THE REFERENCE)

Docket Report, U.S. District Court for the Western District of North Carolina, *Truck Insurance Exchange v. Kaiser Gypsum Company, Inc. et al*, No. 19-cv-00467-GCM ...................................................JA07218

Truck's Motion to Withdraw the Reference of Adversary Proceeding to the Bankruptcy Court (filed Sept. 19, 2019) (Dkt. 1)...................JA07222

Memorandum of Law in Support Truck Insurance Exchange's Motion to Withdraw the Reference of Adversary Proceeding to the Bankruptcy Court (filed Sept. 19, 2019) (Dkt. 1-1)...........................................JA07226

Order Staying Motion to Withdraw the Reference of Adversary Proceeding to the Bankruptcy Court (filed Oct. 1, 2019) (Dkt. 3) .......................................................................................JA07257

**Query**    **Reports**    **Utilities**    **Help**    **Log Out**

APPEAL,CLOSED

# U.S. District Court
## Western District of North Carolina (Charlotte)
## CIVIL DOCKET FOR CASE #: 3:20-cv-00537-GCM

In re: Kaiser Gypsum Company Inc., et al
Assigned to: Senior Judge Graham Mullen
Related Case: 3:19-cv-00467-GCM
Case in other court: NCWB, 16-31602 (joint adm)
                     4th Circuit, 21-01858
Cause: 28:0157 Motion for Withdrawal of Reference

Date Filed: 09/28/2020
Date Terminated: 08/26/2021
Jury Demand: None
Nature of Suit: 423 Bankruptcy Withdrawl
Jurisdiction: Federal Question

**Plaintiff**

**Truck Insurance Exchange**            represented by    **Matthew Glenn Bouslog**
Gibson, Dunn & Crutcher LLP
3161 Michelson Drive, Suite 1200
Irvine, CA 92612
(949) 451-4030
Fax: (949) 475-4640
Email: mbouslog@gibsondunn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael L. Martinez**
Grier Wright Martinez, PA
521 E. Morehead Street
Suite 440
Charlotte, NC 28202
704-375-3720
Fax: 704-332-0215
Email: mmartinez@grierlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Rosenthal**
Gibson, Dunn & Crutcher, LLP
200 Park Avenue
New York, NY 10166
212-351-3969
Email: mrosenthal@gibsondunn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Russell H. Falconer**
Gibson, Dunn & Crutcher LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
214.698.3170

Email: RFalconer@gibsondunn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert B. Krakow**
Gibson, Dunn & Crutcher, LLP
2001 Ross Ave, Suite 2100
Dallas, TX 75201
214-698-3124
Fax: 214.571.2900
Email: rkrakow@gibsondunn.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Kaiser Gypsum Company, Inc.**          represented by   **C. Richard Rayburn , Jr.**
Rayburn Cooper & Durham, P.A.
227 West Trade St.
Suite 1200
Charlotte, NC 28202
7043340891
Fax: 7043771897
Email: rrayburn@rcdlaw.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gregory M. Gordon**
Jones Day
2727 N. Harwood
Dallas, TX 75201
214-220-3939
Fax: 214-969-5100
Email: gmgordon@jonesday.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John R. Miller , Jr.**
Rayburn, Cooper & Durham, P.A.
227 West Trade Street, Suite 1200
Charlotte, NC 28202
704/334-0891
Fax: 704/377-1897
Email: jmiller@rcdlaw.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul M. Green**
Jones Day
717 Texas Suite 3300
Houston, TX 77002
832.239.3892

JA00002

Fax: 832.239.3600
Email: pmgreen@jonesday.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Philip E. Cook**
The Cook Law Firm
601 S. Figueroa Street, Suite 2050
Los Angeles, CA 90017
213-988-6100
Email: pcook@cooklawfirm.la
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ross Robert Fulton**
Rayburn, Cooper & Durham, P.A.
227 W. Trade St.
Suite 1200
Charlotte, NC 28202
704-334-0891
Fax: 704-377-1897
Email: rfulton@rcdlaw.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Rush**
Jones Day
2727 N Harwood
Dallas, TX 75201
214-220-3939
Fax: 214-969-5100
Email: asrush@jonesday.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Hanson Permanente Cement, Inc.**　　　represented by　**C. Richard Rayburn , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gregory M. Gordon**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John R. Miller , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul M. Green**
(See above for address)

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Philip E. Cook**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ross Robert Fulton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Rush**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Lehigh Hanson, Inc.**                    represented by **Douglas Ronald Ghidina**
Moore & Van Allen PLLC
100 North Tryon Street
Suite 4700
Charlotte, NC 28202-4003
704-331-3504
Fax: 704-339-5804
Email: dougghidina@mvalaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Hillary Bridgers Crabtree**
Moore & Van Allen PLLC
Bank of America Corporate Center
100 North Tryon Street, Suite 4700
Charlotte, NC 28202
704-331-3571
Fax: 704-339-5968
Email: hillarycrabtree@mvalaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/28/2020 | 1 | Order Recommending Entry of Proposed Findings of Fact and Conclusions of Law and Order Confirming Joint Plan of Reorganization by United States Bankruptcy Judge J. Craig Whitley. (Attachments: # 1 Proposed Findings, # 2 Proposed Confirmation Order) (thh) Modified text on 9/29/2020 (thh). (Entered: 09/28/2020) |
| 09/28/2020 | | Notice to Paul M. Green: Pursuant to Local Rule 83.1 you are required to **Register** for ECF at www.ncwd.uscourts.gov. Deadline by 10/5/2020. (thh) (Entered: 09/28/2020) |
| 10/01/2020 | 2 | NOTICE of Appearance by Michael L. Martinez on behalf of Truck Insurance Exchange (Martinez, Michael) (Entered: 10/01/2020) |

JA00004

| 10/01/2020 | [3](#) | NOTICE *of Co-Counsel Appearance for Michael A. Rosenthal, Robert B. Krakow, Allyson N. Ho, Russell H. Falconer, Matthew G. Bouslog, and David W. Casazza, each of Gibson, Dunn & Crutcher LLP* by Truck Insurance Exchange re [2](#) Notice of Appearance (Martinez, Michael) (Entered: 10/01/2020) |
|---|---|---|
| 10/01/2020 | [4](#) | MOTION for Leave to File Excess Pages *Concerning Forthcoming Briefs* ( Responses due by 10/15/2020 ), MOTION Establish Briefing Schedule that Includes Reply Brief Deadline re [1](#) MOTION Order Recommending Entry of Proposed Findings of Fact and Conclusions of Law and Order Confirming Joint Plan of Reorganization by Truck Insurance Exchange. (Martinez, Michael) (Entered: 10/01/2020) |
| 10/02/2020 | [5](#) | NOTICE of Appearance by Felton Parrish on behalf of Lawrence Fitzpatrick (Parrish, Felton) (Entered: 10/02/2020) |
| 10/15/2020 | [6](#) | RESPONSE in Opposition re [4](#) MOTION for Leave to File Excess Pages *Concerning Forthcoming Briefs* MOTION Establish Briefing Schedule that Includes Reply Brief Deadline re [1](#) MOTION Order Recommending Entry of Proposed Findings of Fact and Conclusions of Law and Order Confirming Joint Plan of Reorganization by Hanson Permanente Cement, Inc., Kaiser Gypsum Company, Inc.. Replies due by 10/22/2020 (Fulton, Ross) (Entered: 10/15/2020) |
| 10/15/2020 | [7](#) | RESPONSE in Opposition re [4](#) MOTION for Leave to File Excess Pages *Concerning Forthcoming Briefs* MOTION Establish Briefing Schedule that Includes Reply Brief Deadline re [1](#) MOTION Order Recommending Entry of Proposed Findings of Fact and Conclusions of Law and Order Confirming Joint Plan of Reorganization by Lawrence Fitzpatrick, Official Committee of Asbestos Personal Injury Claimants. Replies due by 10/22/2020 (Parrish, Felton) (Entered: 10/15/2020) |
| 10/16/2020 | [8](#) | REPLY to Response to Motion re [4](#) MOTION for Leave to File Excess Pages *Concerning Forthcoming Briefs* MOTION Establish Briefing Schedule that Includes Reply Brief Deadline re [1](#) MOTION Order Recommending Entry of Proposed Findings of Fact and Conclusions of Law and Order Confirming Joint Plan of Reorganization by Truck Insurance Exchange. (Martinez, Michael) (Entered: 10/16/2020) |
| 10/20/2020 | [9](#) | NOTICE of Appearance by Edwin J. Harron on behalf of Lawrence Fitzpatrick (Harron, Edwin) (Entered: 10/20/2020) |
| 10/21/2020 | [10](#) | NOTICE of Appearance by Amanda Rush on behalf of Hanson Permanente Cement, Inc., Kaiser Gypsum Company, Inc. (Rush, Amanda) (Entered: 10/21/2020) |
| 10/22/2020 | [11](#) | NOTICE *of Filing of Affidavit of Service* by Hanson Permanente Cement, Inc., Kaiser Gypsum Company, Inc. re [6](#) Response in Opposition to Motion, (Attachments: # [1](#) Exhibit A)(Fulton, Ross) (Entered: 10/22/2020) |
| 10/27/2020 | [12](#) | NOTICE of Appearance by Sara Wyche Higgins on behalf of Official Committee of Asbestos Personal Injury Claimants (Higgins, Sara) (Entered: 10/27/2020) |
| 10/27/2020 | [13](#) | NOTICE *of Appearance of Caplin & Drysdale Attorneys admitted pro hac vice* by Official Committee of Asbestos Personal Injury Claimants (Higgins, Sara) (Entered: 10/27/2020) |
| 10/28/2020 | [14](#) | NOTICE of Appearance by Douglas Ronald Ghidina on behalf of Lehigh Hanson, Inc. (Ghidina, Douglas) (Entered: 10/28/2020) |
| 10/28/2020 |  | Minute Entry: TELEPHONE CONFERENCE held before Senior Judge Graham Mullen. Attorney's on Call: C. Richard Rayburn, Jr., Gregory Gordon, John Miller, Jr., Paul Green, Ross Fulton, Amanda Rush, Felton Parrish, Douglas Ghidina, Sally Higgins. (eef) (Entered: 10/28/2020) |
| 10/28/2020 | [15](#) | NOTICE of Appearance by Andrew Thomas Houston on behalf of Official Committee of |

| | | |
|---|---|---|
| | | Unsecured Creditors of Kaiser Gypsum Company, Inc., et al. (Houston, Andrew) (Entered: 10/28/2020) |
| 10/28/2020 | [16](#) | NOTICE of Appearance by Robert B. Krakow on behalf of Truck Insurance Exchange (Krakow, Robert) (Entered: 10/28/2020) |
| 10/28/2020 | [17](#) | NOTICE of Appearance by Andrew Thomas Houston on behalf of Official Committee of Unsecured Creditors of Kaiser Gypsum Company, Inc., et al. (Houston, Andrew) (Entered: 10/28/2020) |
| 10/28/2020 | [18](#) | NOTICE of Appearance by Andrew Thomas Houston on behalf of Official Committee of Unsecured Creditors of Kaiser Gypsum Company, Inc., et al. (Houston, Andrew) (Entered: 10/28/2020) |
| 10/28/2020 | [19](#) | NOTICE of Appearance by Andrew Thomas Houston on behalf of Official Committee of Unsecured Creditors of Kaiser Gypsum Company, Inc., et al. (Houston, Andrew) (Entered: 10/28/2020) |
| 10/29/2020 | [20](#) | **ORDER granting [4](#) MOTION for Leave to File Excess Pages Concerning Forthcoming Briefs ( Responses due by 10/15/2020 ), MOTION Establish Briefing Schedule that Includes Reply Brief Deadline. Signed by Senior Judge Graham Mullen on 10/28/2020. (eef)** (Entered: 10/29/2020) |
| 10/29/2020 | [21](#) | NOTICE of Appearance by Matthew Glenn Bouslog on behalf of Truck Insurance Exchange (Bouslog, Matthew) (Entered: 10/29/2020) |
| 10/29/2020 | [22](#) | NOTICE of Appearance by Michael A. Rosenthal on behalf of Truck Insurance Exchange (Rosenthal, Michael) (Entered: 10/29/2020) |
| 10/29/2020 | [23](#) | NOTICE of Appearance by Russell H. Falconer on behalf of Truck Insurance Exchange (Falconer, Russell) (Entered: 10/29/2020) |
| 10/29/2020 | [24](#) | NOTICE *of Appearance of Robert Horkovich and Mark Garbowski* by Official Committee of Asbestos Personal Injury Claimants, et al. (Higgins, Sara) Modified text on 11/2/2020 (eef). (Entered: 10/29/2020) |
| 11/02/2020 | | Notice to Robert Horkovich: Pursuant to Local Rule 83.1 you are required to **Register** for ECF at [www.ncwd.uscourts.gov](http://www.ncwd.uscourts.gov). Deadline by 11/9/2020. Please include Bankruptcy case number where you were granted Pro Hac Admission. (eef) (Entered: 11/02/2020) |
| 11/02/2020 | | Notice to Mark Garbowski: Pursuant to Local Rule 83.1 you are required to **Register** for ECF at [www.ncwd.uscourts.gov](http://www.ncwd.uscourts.gov). Deadline by 11/9/2020. Please include Bankruptcy case number where you were granted Pro Hac Admission. (eef) (Entered: 11/02/2020) |
| 11/04/2020 | [25](#) | RESPONSE in Opposition re [1](#) MOTION Order Recommending Entry of Proposed Findings of Fact and Conclusions of Law and Order Confirming Joint Plan of Reorganization by Truck Insurance Exchange. (Martinez, Michael) (Entered: 11/04/2020) |
| 11/04/2020 | [26](#) | MEMORANDUM/BRIEF *in Support of Truck's Objections to Proposed Findings of Fact and Conclusions of Law* by Truck Insurance Exchange re: [25](#) Response in Opposition (Martinez, Michael) (Entered: 11/04/2020) |
| 11/04/2020 | [27](#) | CERTIFICATE OF SERVICE by Truck Insurance Exchange re [25](#) Response in Opposition, [26](#) Memorandum (Martinez, Michael) (Entered: 11/04/2020) |
| 11/20/2020 | [28](#) | CERTIFICATE OF SERVICE by Truck Insurance Exchange re [25](#) Response in Opposition, [26](#) Memorandum *[Supplement to Prior COS]* (Martinez, Michael) (Entered: 11/20/2020) |
| 12/04/2020 | [29](#) | RESPONSE re [25](#) Response in Opposition by Lehigh Hanson, Inc.. (Ghidina, Douglas) |

| | | (Entered: 12/04/2020) |
|---|---|---|
| 12/04/2020 | [30](#) | CERTIFICATE OF SERVICE by Lehigh Hanson, Inc. re [29](#) Response (Ghidina, Douglas) (Entered: 12/04/2020) |
| 12/04/2020 | [31](#) | RESPONSE re [25](#) Response in Opposition, [26](#) Memorandum by Hanson Permanente Cement, Inc., Kaiser Gypsum Company, Inc.. (Fulton, Ross) (Entered: 12/04/2020) |
| 12/04/2020 | [32](#) | RESPONSE in Opposition re [25](#) Response in Opposition *to Objection of Truck Insurance Exchange to the Bankruptcy Courts Proposed Findings of Fact and Conclusions of Law Regarding Confirmation of the Joint Plan of Reorganization Of Kaiser Gypsum Company, Inc. And Hanson Permanente Cement, Inc.* by Lawrence Fitzpatrick. (Parrish, Felton) (Entered: 12/04/2020) |
| 12/04/2020 | [33](#) | RESPONSE in Opposition re [25](#) Response in Opposition *to the Objection of Truck Insurance Exchange to the Bankruptcy Court's Proposed Findings of Fact and Conclusions of Law Regarding Confirmation of the Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc., as Modified* by Official Committee of Asbestos Personal Injury Claimants. (Maclay, Kevin) (Entered: 12/04/2020) |
| 12/31/2020 | [34](#) | MEMORANDUM/BRIEF *Reply Brief in Support of Objection to Proposed Findings of Fact and Conclusions of Law* by Truck Insurance Exchange re: [25](#) Response in Opposition (Martinez, Michael) (Entered: 12/31/2020) |
| 01/08/2021 | [35](#) | Miscellaneous Filing by Truck Insurance Exchange. *Notice of Filing of Joint Record Index* (Martinez, Michael) (Entered: 01/08/2021) |
| 01/11/2021 | [36](#) | AMENDED DOCUMENT by Truck Insurance Exchange. Amendment to [35](#) Miscellaneous Filing *Notice of Filing of Joint Record Index* (Martinez, Michael) (Entered: 01/11/2021) |
| 01/11/2021 | [37](#) | Miscellaneous Filing by Truck Insurance Exchange. re: [36](#) Amended Document *Joint Record Documents - A000001 through A000545* (Martinez, Michael) (Entered: 01/11/2021) |
| 01/11/2021 | [38](#) | Miscellaneous Filing by Truck Insurance Exchange. re: [37](#) Miscellaneous Filing *Joint Record Documents - A000546 through A000620* (Martinez, Michael) (Entered: 01/11/2021) |
| 01/11/2021 | [39](#) | Miscellaneous Filing by Truck Insurance Exchange. re: [36](#) Amended Document *Joint Record Documents - A000621 through A001023* (Martinez, Michael) (Entered: 01/11/2021) |
| 01/11/2021 | [40](#) | Miscellaneous Filing by Truck Insurance Exchange. re: [36](#) Amended Document *Joint Record Documents - A001024 through A001363* (Martinez, Michael) (Entered: 01/11/2021) |
| 01/11/2021 | [41](#) | Miscellaneous Filing by Truck Insurance Exchange. re: [36](#) Amended Document *Joint Record Documents - A001364 through A001667* (Martinez, Michael) (Entered: 01/11/2021) |
| 01/11/2021 | [42](#) | Miscellaneous Filing by Truck Insurance Exchange. re: [36](#) Amended Document *Joint Record Documents - A001668 through A001974* (Martinez, Michael) (Entered: 01/11/2021) |
| 01/11/2021 | [43](#) | Miscellaneous Filing by Truck Insurance Exchange. re: [36](#) Amended Document *Joint Record Documents - A001975 through A003987* (Martinez, Michael) (Entered: 01/11/2021) |
| 01/11/2021 | [44](#) | Miscellaneous Filing by Truck Insurance Exchange. re: [36](#) Amended Document *Joint* |

| | | |
|---|---|---|
| | | *Record Documents - A003988 through A006012* (Martinez, Michael) (Entered: 01/11/2021) |
| 01/11/2021 | [45](#) | Miscellaneous Filing by Truck Insurance Exchange. re: [36](#) Amended Document *Joint Record Documents - A006013 through A008150* (Martinez, Michael) (Entered: 01/11/2021) |
| 01/11/2021 | [46](#) | Miscellaneous Filing by Truck Insurance Exchange. re: [36](#) Amended Document *Joint Record Documents - A008151 through A008203* (Martinez, Michael) (Entered: 01/11/2021) |
| 03/31/2021 | [47](#) | **ORDER Setting Hearing on [1](#) Order Recommending Entry of Proposed Findings of Fact and Conclusions of Law and Order Confirming Joint Plan of Reorganization : Hearing set for 6/25/2021 10:00 AM in Courtroom, 401 W Trade St, Charlotte, NC 28202 before Senior Judge Graham Mullen.. Signed by Senior Judge Graham Mullen on 3/31/2021. (eef)** (Entered: 03/31/2021) |
| 04/13/2021 | [48](#) | NOTICE of Appearance by Hillary Bridgers Crabtree on behalf of Lehigh Hanson, Inc. (Crabtree, Hillary) (Entered: 04/13/2021) |
| 06/15/2021 | [49](#) | NOTICE of Appearance by Philip E. Cook on behalf of Hanson Permanente Cement, Inc., Kaiser Gypsum Company, Inc. (Cook, Philip) (Entered: 06/15/2021) |
| 06/25/2021 | | Minute Entry: MOTION HEARING held before Senior Judge Graham Mullen. Re [1](#) MOTION Order Recommending Entry of Proposed Findings of Fact and Conclusions of Law and Order Confirming Joint Plan of Reorganization. Motion taken under advisement, order to issue. Plaintiffs attorney: Robert B. Krakow, Michael L. Martinez. Defendants attorney: Gregory M. Gordon, Kevin MaClay, Ed Harron. Court reporter: C. Nuccio. (eef) (Entered: 06/25/2021) |
| 07/27/2021 | [50](#) | TRANSCRIPT of Motion Hearing held on 6/25/21 before Judge Mullen. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** Release of Transcript Restriction set for 10/22/2021. (Reporter: Cheryl Nuccio, 704-350-7494) (Entered: 07/27/2021) |
| 07/28/2021 | [51](#) | **FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING CONFIRMATION OF THE JOINT PLANOF REORGANIZATION OF KAISER GYPSUM COMPANY, INC. AND HANSON PERMANENTE CEMENT, INC., AS MODIFIED. Signed by Senior Judge Graham Mullen on 7/27/2021. (eef)** (Entered: 07/28/2021) |
| 07/28/2021 | [52](#) | **ORDER CONFIRMING THE JOINT PLAN OF REORGANIZATION OF KAISER GYPSUM COMPANY, INC. AND HANSON PERMANENTE CEMENT, INC., AS MODIFIED. Signed by Senior Judge Graham Mullen on 7/27/2021. (eef)** (Entered: 07/28/2021) |
| 07/30/2021 | [53](#) | MOTION to Stay re [52](#) Order *Pending Appeal* by Truck Insurance Exchange. Responses due by 8/13/2021 (Martinez, Michael) (Entered: 07/30/2021) |
| 08/02/2021 | [54](#) | Exhibit by Truck Insurance Exchange. Exhibit to [53](#) Motion to Stay *[Proposed] Order Granting Plaintiff's Motion for Stay Pending Appeal* (Martinez, Michael) (Entered: 08/02/2021) |
| 08/05/2021 | [55](#) | RESPONSE in Opposition re [53](#) MOTION to Stay re [52](#) Order *Pending Appeal* by |

|  |  | Lawrence Fitzpatrick, Official Committee of Asbestos Personal Injury Claimants. Replies due by 8/12/2021 (Parrish, Felton) (Entered: 08/05/2021) |
| --- | --- | --- |
| 08/05/2021 | [56](#) | RESPONSE in Opposition re [53](#) MOTION to Stay re [52](#) Order *Pending Appeal* by Hanson Permanente Cement, Inc., Kaiser Gypsum Company, Inc.. Replies due by 8/12/2021 (Fulton, Ross) (Entered: 08/05/2021) |
| 08/06/2021 | [57](#) | **ORDER denying [53](#) Motion to Stay re [52](#) Order Pending Appeal. Signed by Senior Judge Graham Mullen on 8/6/2021. (eef)** (Entered: 08/06/2021) |
| 08/06/2021 | [58](#) | NOTICE OF APPEAL as to [51](#) Order, [52](#) Order by Truck Insurance Exchange. Filing fee $ 505, receipt number 0419-5153388. *Use this link www.ca4.uscourts.gov to retrieve 4th Circuit case opening documents, i.e. Appearance of Counsel, Docketing Statement, Disclosure Statement, and Transcript Order Form.* Note: Your Transcript Order Form must be served on the District Court as well as the Circuit Court. (Attachments: # [1](#) Affidavit of Service)(Martinez, Michael) (Entered: 08/06/2021) |
| 08/09/2021 | [59](#) | Transmission of Notice of Appeal to US Court of Appeals re [58](#) Notice of Appeal. (eef) (Entered: 08/09/2021) |
| 08/09/2021 | [60](#) | USCA Case Number 21-1858 for [58](#) Notice of Appeal, USCA Case Manager: Kirsten Hancock. (hms) (Entered: 08/10/2021) |

| PACER Service Center | | | |
| --- | --- | --- | --- |
| Transaction Receipt | | | |
| 09/18/2021 21:26:08 | | | |
| PACER Login: | Gibson01 | Client Code: | 92219-00082 |
| Description: | Docket Report | Search Criteria: | 3:20-cv-00537-GCM |
| Billable Pages: | 7 | Cost: | 0.70 |

JA00009





J. Craig Whitley
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| KAISER GYPSUM COMPANY, INC., *et al.,*[1] | : | Case No. 16-31602 (JCW) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

## ORDER RECOMMENDING ENTRY OF PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND
## <u>ORDER CONFIRMING JOINT PLAN OF REORGANIZATION</u>

## <u>RECITALS</u>

A.      WHEREAS, Kaiser Gypsum Company, Inc. and Hanson Permanente

Cement, Inc. (together, the "<u>Debtors</u>") proposed the Third Amended Joint Plan of Reorganization

of Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc., dated July 20, 2020

[D.I. 2481] (as may be further modified and amended, the "<u>Plan</u>");[2]

---

[1]      The Debtors are the following entities (the last four digits of their respective taxpayer identification
numbers follow in parentheses):  Kaiser Gypsum Company, Inc. (0188) and Hanson Permanente Cement,
Inc. (7313).  The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

[2]      Capitalized terms and phrases used herein have the meanings given to them in the Plan.

B.      WHEREAS, on July 20, 2020 and July 22, 2020 the Court held a hearing

to consider confirmation of the Plan (the "Confirmation Hearing"), and on August 13, 2020

(the "August 13 Hearing") the Court issued an oral ruling setting forth certain proposed findings

of fact and conclusions of law and recommending confirmation the Plan;

C.      WHEREAS, at the August 13 Hearing, the Court directed the Debtors to

submit proposed findings of fact and conclusions of law and a proposed order confirming the

Plan consistent with its ruling;

D.      WHEREAS, on August 25, 2020, the Debtors filed proposed findings of

fact and conclusions of law (the "Initial Findings") and a proposed confirmation order

(the "Initial Confirmation Order") [D.I. 2442];

E.      WHEREAS, certain parties objected [D.I. 2446, 2447, 2456] (collectively,

the "Insurer Objections") to portions of the Initial Findings and the Initial Confirmation Order on

the basis that the Initial Findings and Initial Confirmation Order were inconsistent with the

Court's oral ruling;

F.      WHEREAS, on September 17, 2020, the Court held a hearing at which it

addressed the Insurer Objections, to the extent they were not consensually resolved, and made

additional modifications to the Initial Findings (as modified, the "Proposed Findings") and the

Initial Confirmation Order (as modified, the "Proposed Order");

G.      WHEREAS, section 524(g)(3)(A) of the Bankruptcy Code requires "the

order confirming the plan of reorganization [pursuant to section 524(g)] [to be] issued or

affirmed by the district court that has jurisdiction over the reorganization case"  11 U.S.C.

§ 524(g)(3)(A);

H.      WHEREAS, at the Confirmation Hearing and the August 13 Hearing, the

parties and the Court agreed that, in light of the requirements of section 524(g)(3)(A) of the

Bankruptcy Code, this Court would recommend that the United States District Court for the

Western District of North Carolina (the "District Court") adopt the Proposed Findings and enter

the Proposed Order, following *de novo* review of all Proposed Findings to which specific written

objection is made, pursuant to Rule 9033 of the Federal Rules of Bankruptcy Procedure;

I.      WHEREAS, the Proposed Findings are attached hereto as Exhibit A;

J.      WHEREAS, the Proposed Order is attached hereto as Exhibit B;

The Court finding that (a) it has jurisdiction over this matter pursuant to 28 U.S.C.

§§ 157 and 1334 and (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), IT IS

HEREBY ORDERED THAT:

1.      The Court directs the Clerk of this Court to docket this Order and its

attachments in this Court and transmit a copy of this Order, the Proposed Findings and the

Confirmation Order to the District Court.

2.      The Court recommends that the District Court adopt the Proposed

Findings attached hereto as Exhibit A and issue the Confirmation Order attached hereto as

Exhibit B.

3.      Pursuant to Rule 9033(c) of the Federal Rules of Bankruptcy Procedure,

the deadline for filing objections to the Proposed Findings and Proposed Order is twenty-eight

days from the entry of this Order, and the deadline for parties to respond to such objections is

fifty-six days from the entry of this Order.

4.      The Debtors are authorized to take all actions necessary or appropriate to

implement the relief granted in this Order.

5.      This Court shall retain jurisdiction to hear and determine all matters

arising from or related to the interpretation, implementation or enforcement of this Order.


This Order has been signed electronically.                    United States Bankruptcy Court
The Judge's signature and Court's seal
appear at the top of the Order.

**EXHIBIT A**

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| KAISER GYPSUM COMPANY, INC., *et al.,*[1] | : | Case No. 16-31602 (JCW) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**REGARDING CONFIRMATION OF THE JOINT PLAN**
**OF REORGANIZATION OF KAISER GYPSUM COMPANY, INC.**
**AND HANSON PERMANENTE CEMENT, INC., AS MODIFIED**

---

[1]     The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  Kaiser Gypsum Company, Inc. (0188) and Hanson Permanente Cement, Inc. (7313).  The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

# TABLE OF CONTENTS

**Page**

I.    FINDINGS OF FACT ................................................................................................ 5

    A.    HISTORY OF THE DEBTORS' ASBESTOS PERSONAL INJURY AND
        ENVIRONMENTAL LIABILITIES ................................................................ 5

        1.    Background ............................................................................................ 5

        2.    General Overview of the Debtors' Manufacture and Sale of
            Products Alleged to Contain Asbestos ................................................. 6

        3.    History of the Debtors' Asbestos Personal Injury Litigation .................... 7

        4.    Asbestos Personal Injury Insurance and Coverage Litigation ................. 8

        5.    The Debtors' Environmental Liabilities .................................................... 9

        6.    Environmental Insurance ....................................................................... 10

    B.    PREPETITION DISCUSSIONS WITH REPRESENTATIVES OF
        ASBESTOS CLAIMANTS ............................................................................. 10

    C.    DEBTORS' DECISION TO FILE THE REORGANIZATION CASES ........... 11

    D.    APPOINTMENT OF THE CREDITORS' COMMITTEE, THE
        ASBESTOS PERSONAL INJURY COMMITTEE AND FUTURE
        CLAIMANTS' REPRESENTATIVE ............................................................. 12

    E.    RESOLUTION OF THE REORGANIZATION CASES ................................. 12

        1.    Settlement Regarding Asbestos Personal Injury Claims ........................ 12

        2.    Settlements Regarding Environmental Claims ....................................... 13

        3.    Settlement with Lehigh Hanson .............................................................. 16

        4.    Sufficient Funds to Pay All Allowed General Unsecured Claims ........... 16

    F.    MODIFICATIONS TO THE PLAN ............................................................... 17

    G.    COMPLIANCE WITH THE REQUIREMENTS OF SECTION 1129 OF
        THE BANKRUPTCY CODE .......................................................................... 17

        1.    Section 1129(a)(1) — Compliance of the Plan with Applicable
            Provisions of the Bankruptcy Code ...................................................... 17

        2.    Section 1129(a)(2) — Compliance with Applicable Provisions of
            the Bankruptcy Code ............................................................................. 22

        3.    Section 1129(a)(3) — Proposal of the Plan in Good Faith ...................... 22

        4.    Section 1129(a)(4) — Court Approval of Certain Payments as
            Reasonable ............................................................................................. 27

JA00016

## TABLE OF CONTENTS
(continued)

Page

5.   Section 1129(a)(5) — Disclosure of Identity of Proposed Management, Compensation of Insiders and Consistency of Management Proposals with the Interests of Creditors and Public Policy ................................................................................... 28

6.   Section 1129(a)(6) — Approval of Rate Changes .................................... 28

7.   Section 1129(a)(7) — Best Interests of Holders of Claims and Interests ................................................................................................... 28

8.   Section 1129(a)(8) — Acceptance of the Plan by Each Impaired Class ....................................................................................................... 29

9.   Section 1129(a)(9) — Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code ............................... 29

10.  Section 1129(a)(10) — Acceptance By at Least One Impaired, Non-Insider Class ................................................................................... 30

11.  Section 1129(a)(11) — Feasibility of the Plan ........................................ 30

12.  Section 1129(a)(12) — Payment of Bankruptcy Fees ............................ 32

13.  Section 1129(a)(13) — Retiree Benefits ................................................. 32

14.  Section 1129(d) — Purpose of Plan ........................................................ 32

H.   THE ASBESTOS PERSONAL INJURY TRUST AND THE ASBESTOS PERMANENT CHANNELING INJUNCTION COMPLY WITH SECTION 524(g) OF THE BANKRUPTCY CODE ......................................... 32

1.   The Asbestos Personal Injury Trust Satisfies the Requirements of Section 524(g)(2)(B)(i) of the Bankruptcy Code ................................... 32

2.   The Asbestos Personal Injury Trust Satisfies the Requirements of Section 524(g)(2)(B)(ii) of the Bankruptcy Code .................................. 36

3.   The Extension of the Asbestos Permanent Channeling Injunction to Third Parties Is Appropriate ................................................................... 40

4.   The Rights of Persons That Might Subsequently Assert an Asbestos Personal Injury Claim That Is a Demand Addressed by the Asbestos Permanent Channeling Injunction and Transferred to the Asbestos Personal Injury Trust Were Represented by the Future Claimants' Representative ........................................................... 42

5.   Entry of the Asbestos Permanent Channeling Injunction Is Fair and Equitable with Respect to Future Asbestos Claimants ............................ 43

I.   COMPREHENSIVE SETTLEMENT OF CLAIMS AND CONTROVERSIES ...................................................................................... 45

J.   SATISFACTION OF CONDITIONS TO CONFIRMATION .......................... 45

Case 3:20-cv-00537-GCM   Document 1-1   Filed 09/28/20   Page 4 of 75   JA00017

# TABLE OF CONTENTS
(continued)

Page

K.   THE PLAN IS INSURANCE NEUTRAL .......................................................... 51

  1.   Truck Has No Interest in the Asbestos Personal Injury Trust ................. 53

  2.   Even If it Had Standing, Truck's Arguments about the Plan's
       Treatment of Its Breach Claim Are Overruled ......................................... 53

L.   TRUCK'S COURSE OF CONDUCT BEFORE THE BANKRUPTCY
     COURT .......................................................................................................... 55

II.   CONCLUSIONS OF LAW ..................................................................................... 57

A.   JURISDICTION AND VENUE ....................................................................... 57

B.   APART FROM ISSUES RELATED TO INSURANCE NEUTRALITY,
     TRUCK LACKS STANDING TO OBJECT TO THE PLAN ............................ 58

C.   ENTRY OF THE PLAN FINDING IS PROPER ................................................ 59

  1.   Truck Has Received All Necessary Procedural Protections .................... 59

  2.   As a Matter of Law, the Debtors' Acts and/or Omissions Leading
       Up to and During the Reorganization Cases Did Not Breach the
       Assistance and Cooperation Clause or Any Other Express
       Provision of the Truck Policies ................................................................. 61

  3.   As a Matter of Law, the Debtors' Acts and/or Omissions Leading
       Up to And During the Reorganization Cases Did Not Breach the
       Covenant of Good Faith and Fair Dealing Implied Into the Truck
       Policies ....................................................................................................... 66

D.   MODIFICATIONS TO THE PLAN .................................................................. 68

E.   EXEMPTIONS FROM TAXATION .................................................................. 68

F.   COMPLIANCE WITH SECTION 1129 OF THE BANKRUPTCY CODE ...... 69

G.   COMPLIANCE WITH SECTION 524(g) OF THE BANKRUPTCY
     CODE ............................................................................................................. 69

H.   TRANSFER OF BOOKS AND RECORDS TO THE ASBESTOS
     PERSONAL INJURY TRUST ......................................................................... 69

I.   APPROVAL OF THE SETTLEMENTS AND RELEASES PROVIDED
     UNDER THE PLAN ........................................................................................ 70

III.   CONCLUSION ....................................................................................................... 70

JA00018

## INTRODUCTION

WHEREAS, Kaiser Gypsum Company, Inc. and Hanson Permanente Cement,

Inc. (together, the "Debtors" and, as reorganized entities after emergence, the "Reorganized

Debtors") proposed the Third Amended Joint Plan of Reorganization of Kaiser Gypsum

Company, Inc. and Hanson Permanente Cement, Inc., dated October 14, 2019 [Conf. Exhibit 1][2]

(as amended by the modifications set forth in the blackline of the Plan in Exhibit B attached to

the Confirmation Order, and as may be further amended, the "Plan");[3]

WHEREAS, on October 23, 2019, the Bankruptcy Court signed its Order

(I) Approving the Debtors' Disclosure Statement, (II) Establishing Procedures for Solicitation

and Tabulation of Votes to Accept or Reject Proposed Joint Plan of Reorganization and

(III) Scheduling a Hearing on Confirmation of Proposed Joint Plan of Reorganization and

Approving Related Notice Procedures [Conf. Exhibit 16] (the "Disclosure Statement Order"), by

which the Bankruptcy Court, among other things, approved the Debtors' proposed disclosure

statement (the "Disclosure Statement"), established procedures for the solicitation and tabulation

of votes to accept or reject the Plan and scheduled a hearing to consider Confirmation of the Plan

for March 30, 2020, which hearing was continued to and held on July 20, 2020 and July 22,

---

[2]    "D.I." refers to docket entries in the Debtors' lead bankruptcy case, 16-31602.

[3]    Capitalized terms and phrases used herein have the meanings given to them in the Plan.  The rules of
interpretation set forth in Section I.B.1 of the Plan apply to these Findings of Fact and Conclusions of Law
(the "Findings and Conclusions") and to the order confirming the Plan (the "Confirmation Order"), which is
being issued concurrently herewith.  In addition, in accordance with Section I.A of the Plan, any term used
in the Plan, these Findings and Conclusions or the Confirmation Order that is not defined in the Plan, these
Findings and Conclusions or the Confirmation Order, but that is used in the Bankruptcy Code or the
Bankruptcy Rules, has the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as
applicable.  A copy of the Plan (without the exhibits thereto) is attached to the Confirmation Order as
Exhibit A and is incorporated herein by reference.

2020, with the Bankruptcy Court giving its oral ruling on August 13, 2020 (the "Confirmation

Hearing");

WHEREAS, affidavits of service were executed by Prime Clerk LLC, the

Bankruptcy Court-appointed notice, claims and solicitation agent ("Prime Clerk"), with respect

to the mailing of notice of the Confirmation Hearing and solicitation materials in respect of the

Plan in accordance with the Disclosure Statement Order (collectively, the "Affidavits of

Service") and were filed with the Bankruptcy Court [D.I. 1892, 1904, 1911, 1938, 1947, 1948,

2007, 2042, 2168, 2172, 2178];[4]

WHEREAS, the Declaration of Anna Jadonath [D.I. 1903] (the "Publication

Declaration") was filed with the Bankruptcy Court on November 14, 2019, regarding the

publication of the Notice of (I) Deadline for Casting Votes to Accept or Reject Proposed Joint

Plan of Reorganization, (II) Hearing to Consider Confirmation of Proposed Joint Plan of

Reorganization and (III) Related Matters and/or the other forms of publication notice approved

by the Bankruptcy Court as set forth in the Disclosure Statement Order;

WHEREAS, the Declaration of Cameron R. Azari, Esq. on Implementation of

Notice Regarding the Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson

Permanente Cement, Inc. [Conf. Exhibit 21] (the "Notice Declaration") was filed with the

Bankruptcy Court on July 1, 2020, attesting to publication notice of the Plan;

WHEREAS, the Declaration of James Daloia of Prime Clerk LLC Regarding the

Solicitation of Votes and Tabulation of Ballots Cast on the Third Amended Joint Plan of

Reorganization of Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc. [Conf.

---

[4]    The Affidavits of Service were filed on November 6, 2019, November 14, 2019, November 20, 2019,
December 17, 2019, January 2, 2020, January 6, 2020, February 7, 2020, February 14, 2020, March 24,
2020, March 30, 2020 and April 20, 2020.

Exhibit 20] (the "Voting Agent Declaration") was filed with the Bankruptcy Court on July 1,

2020, attesting to the results of the tabulation of the properly executed and timely received

Ballots for the Plan as follows:

> **Class 4 Claimants.** The Debtors received 24,310 acceptances out
> of 24,310 votes from holders of Class 4 Asbestos Personal Injury
> Claims, with Class 4 claimants who voted in favor of the Plan
> holding Claims in the amount of $2,439,570,176.00 for voting
> purposes only, such acceptances being 100 percent in number and
> 100 percent in amount of all ballots received from holders of
> Class 4 Asbestos Personal Injury Claims (Voting Agent Decl.
> ¶ 10.);

WHEREAS, the Debtors made non-material modifications to the Plan, which are

set forth in Exhibit B attached to the Confirmation Order (collectively, the "Modifications");

WHEREAS, Truck Insurance Exchange ("Truck") filed an objection to the Plan

[D.I. 2070] and a consolidated response to the Plan Proponents' briefing [D.I. 2359] (together,

the "Objection"), as well as various affidavits in support of its Objection [Conf. Exhibits 37, 65-

67];

WHEREAS, the Objecting Excess Insurers made the Objecting Excess Insurers'

Objections, and voluntarily withdrew them when the Plan was modified to insert, among other

things,  Section IV.M.3.a., entitled, "Settlement with Truck;"

WHEREAS, the Debtors filed a memorandum of law in support of Confirmation

of the Plan [D.I. 2275] and a reply to Truck's consolidated response [D.I. 2377], and the

Asbestos Personal Injury Committee (the "ACC") and the Future Claimants' Representative

(the "FCR") filed an omnibus reply in support of the Plan [D.I. 2274] and a joint reply to Truck's

consolidated response [D.I. 2376] (collectively, the "Memoranda of Law");

WHEREAS, the declarations of Kevin O'Neal Holdeman [Conf. Exhibit 23], John

D. Bittner [Conf. Exhibit 22], Charles E. McChesney II [Conf. Exhibit 19] and Lawrence

Fitzpatrick [Conf. Exhibit 18] were submitted in support of the Plan (collectively,

the "Declarations");

WHEREAS, the Court has reviewed the Plan, the Disclosure Statement, the

Disclosure Statement Order, the Voting Agent Declaration, the Affidavits of Service, the

Publication Declaration, the Notice Declaration, the Memoranda of Law, the Declarations and

the other pleadings before the Court in connection with the Confirmation of the Plan, including

the objections filed to the Plan;[5]

WHEREAS, the Court has considered the arguments of counsel made on the

record at the Confirmation Hearing;

WHEREAS, the Court has considered all evidence presented and admitted into

the record at the Confirmation Hearing;

WHEREAS, the Court has taken judicial notice of the papers and pleadings on

file in these Reorganization Cases, including any related adversary proceedings;

WHEREAS, the Court, after due deliberation and for sufficient cause, finds that

the evidence admitted in support of the Plan at the Confirmation Hearing is persuasive and

credible;

NOW, THEREFORE, the Court enters the following Findings of Fact and

Conclusions of Law with respect to Confirmation of the Plan.[6]

---

[5]    Truck's Objection was the only unresolved objection as of the Confirmation Hearing.

[6]    The Bankruptcy Court made additional findings and conclusions on the record at the Confirmation Hearing,
which findings and conclusions are adopted and fully incorporated herein.

## I.     FINDINGS OF FACT.[7]

### A.     HISTORY OF THE DEBTORS' ASBESTOS PERSONAL INJURY AND ENVIRONMENTAL LIABILITIES.

#### 1.     Background.

Debtor HPCI owns the Permanente Property, which consists of more than 3,400 acres of land that includes a cement plant, rock plant and quarry (including the minerals) located in Santa Clara County, California.  (McChesney Decl. ¶ 10.)  HPCI leases the Permanente Property to its non-debtor affiliate Lehigh Southwest Cement Company ("Lehigh Southwest"), pursuant to a July 1, 2008 Master Agreement Regarding Permanente Cement Plant, Quarry and Rock Plant and a July 1, 2008 Quarry Mineral Lease Agreement (together, the "Permanente Leases")  (Id.)  Under the Permanente Leases, HPCI receives rent, royalties and other payments from Lehigh Southwest, which, in turn, operates the cement plant, rock plant and quarry and assumes responsibility for the Permanente Property's operating costs.  (Id.)  The Permanente Leases further provide that HPCI is obligated to fund capital expenditures for the cement plant, quarry and rock plant, and reclamation obligations related to the quarry.  (Id.)  In accordance with an agreement reached with the ACC, the FCR and the Creditors' Committee, and as approved by the Bankruptcy Court in its April 10, 2017 Agreed Order Amending the Interim DIP Financing Order [Conf. Exhibit 24], HPCI has not been paying its obligations to fund capital

---

[7]     These Findings and Conclusions constitute the Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52.  Any finding of fact shall constitute a finding of fact even if it is referred to as a conclusion of law, and any conclusion of law shall constitute a conclusion of law even if it is referred to as a finding of fact.

CA00023

expenditures and reclamation under the Permanente Leases, subject and without prejudice to

Lehigh Southwest's right to accrue those ongoing obligations.  (Id.)

The Debtors are wholly-owned, indirect subsidiaries of Lehigh Hanson, Inc.

("Lehigh Hanson").  (Id. ¶ 9.)  Lehigh Hanson is not a Debtor in these Reorganization Cases.

(Id.)  HPCI is the direct parent of Kaiser Gypsum, non-debtor Permanente Cement Company and

two operating non-debtor subsidiaries,  Hanson Micronesia Cement, Inc. and Hanson

Permanente Cement of Guam, Inc. (together, the "Operating Subsidiaries"), which distribute and

sell cement in key markets in the Pacific region, including Saipan and Guam.  (Id.)  Lehigh

Hanson provides the funding required by the Operating Subsidiaries.  (Id.)  Non-debtor

Permanente Cement Company has no assets or operations.  (Id.)

Kaiser Gypsum currently has no material tangible assets or business operations,

other than managing its significant, legacy asbestos-related and environmental liabilities

described below.  (Id. ¶ 11.)  Under the Plan, the Debtors' non-debtor affiliate, Lehigh Cement

Company LLC ("Lehigh Cement"), will transfer to Kaiser Gypsum its interests in certain real

property located in Kosse, Limestone County, Texas and Kunkletown, Monroe County,

Pennsylvania (together, the "Real Properties"), together with Lehigh Cement's rights under

certain leases related to the Real Properties.  (Id.)  Based on the Projections, Kaiser Gypsum is

expected to generate net cash flows of approximately $68,000 and $93,000 in 2020 and 2021,

respectively.  (Bittner Decl. ¶ 30.)

2.      **General Overview of the Debtors' Manufacture and Sale of Products
        Alleged to Contain Asbestos.**

Kaiser Gypsum's principal business consisted of manufacturing and marketing

gypsum plaster, gypsum lath and gypsum wallboard.  (Declaration of Charles E. McChesney II

in Support of First Day Pleadings [Conf. Exhibit 36] (the "First Day Declaration") ¶ 25.)

In connection with its wallboard business, Kaiser Gypsum marketed, manufactured and sold products categorized as "wallboard accessories," which included joint compounds, texture paints and other similar products used to laminate wallboard or cover radiant heat surfaces and cables.  (McChesney Decl. ¶ 12.)  Certain versions of these wallboard accessories included asbestos during varying time periods.  (Id.)  In addition to wallboard accessory products, Kaiser Gypsum manufactured mineral fiberboard products, which are used for acoustical ceiling tile and lay-in board that also contained asbestos.  (Id.)  By 1978, Kaiser Gypsum had sold substantially all its assets and ceased to be involved in any product manufacturing.  (Id.)

HPCI's primary business was the manufacture and sale of Portland cement products, which is a fine powdery substance that is mixed with water and an aggregate, such as gravel or sand, to form concrete.  (Id. ¶ 13.)  HPCI made two types of products—"masonry cement," and "plastic cement"—that in certain versions and at certain times contained asbestos. (Id.)

### 3. History of the Debtors' Asbestos Personal Injury Litigation.

The Debtors' asbestos-related liabilities arise from their manufacture and sale of certain products that contained asbestos.  (McChesney Decl. ¶ 12.)  Although asbestos was removed from each of the Debtor's products, the Debtors have been the subject of thousands of lawsuits.  (Id. ¶ 14.)  Since 1978, one or both of the Debtors have been named in more than 38,000 asbestos-related lawsuits.  (Id.)  As of August 31, 2016, the Debtors were named as defendants in approximately 14,000 asbestos-related bodily injury lawsuits pending in courts across the country.  (Id.)

4.      **Asbestos Personal Injury Insurance and Coverage Litigation.**

Truck issued a Comprehensive General Liability policy, renewed annually, that covered the Debtors from January 1, 1965 through April 1, 1983 (collectively, the "Truck Policies").  (McChesney Decl. ¶ 15.)  As a result of over 19 years of litigation,[8] it is now settled that:  (a) Truck must defend each covered Asbestos Personal Injury Claim (without eroding coverage) and indemnify the Debtors for such claims up to the $500,000 per claim limit of the Truck Policy year selected by the Debtors;[9] and (b) the Debtors' excess insurers are obligated under their policies (each an "Excess Policy") to respond to an Asbestos Personal Injury Claim and indemnify the Debtors for amounts in excess of the $500,000 Truck policy limit.  (Id.)  The Excess Policy obligated to respond corresponds to the Truck policy year selected by the Debtors.  (Id.)  In addition, there exists certain excess coverage available to pay asbestos claims outside the policy periods of the Truck Policies, and the Plan includes an exhibit list identifying all known available excess insurance policies that provide coverage for asbestos claims.  (Plan Exhibit IV.M.3, List of Asbestos-Only Policies.)

In December 2013, the Debtors and certain of their excess insurers entered into a confidential coverage in place agreement (the "Excess CIP Agreement") with respect to the Debtors' excess coverage.  (Id. ¶ 16.)  The Excess CIP Agreement provides, among other things, that:  (a) the excess insurers that are party to the Excess CIP Agreement will provide coverage for the Asbestos Personal Injury Claims in amounts above Truck's primary policy limit of

---

[8]      Certain issues in asbestos coverage litigation are the subject of an appeal pending in the California Court of Appeal (No. B278091); however, those issues do not address (and will not alter) the fundamental aspects of the Debtors' coverage for Asbestos Personal Injury Claims under the Truck Policies.

[9]      Although the per-occurrence limit and deductibles under the Truck Policies vary, virtually all Asbestos Personal Injury Claims have triggered a policy year with a $5,000 deductible and a $500,000 per claim primary product liability insurance limit.  (McChesney Decl. ¶ 15, n.4.)

$500,000, notwithstanding the insolvencies of certain excess insurers; and (b) the Debtors will pay to the excess insurers some portion of any funds distributed from insolvent asbestos insurers in accordance with a formula set forth in the Excess CIP Agreement.  (Id.)

Although the Debtors successfully established insurance coverage for substantially all of the Asbestos Personal Injury Claims before filing for bankruptcy, they still faced substantial costs and risks associated with asbestos-related lawsuits.  (Id. ¶ 17.)  The Debtors were obligated to pay policy deductibles, owing more than $3 million in deductibles as of the Petition Date, and faced liability for uninsured judgments and claims, including punitive damages.  (Id.)  In at least three prepetition cases, juries awarded punitive damages against the Debtors in amounts ranging from $100,000 to $20,000,000.  (Id.)

### 5.    The Debtors' Environmental Liabilities.

One or both of the Debtors also have alleged environmental liabilities arising from formerly owned and/or operated properties located in St. Helens, Oregon and Seattle, Washington.[10]  (McChesney Decl. ¶ 18.)

Both Debtors owned and operated facilities in the Seattle area during periods between 1929 and 1987.  (Id. ¶ 20.)  HPCI operated a cement plant, and owned and operated a ready-mix cement plant and a bulk cement receiving, storage and distribution facility.  (Id.)  Kaiser Gypsum owned and operated the same cement plant, as well as a gypsum plant and a gypsum accessories facility.  (Id.)  All of these facilities were on or adjacent to the Lower Duwamish Waterway, an industrial waterway near Seattle, Washington.  (Id.)  By 1978, Kaiser Gypsum had sold all of its operations in the Seattle area, and by 1987, HPCI had sold all of its facilities in Seattle.  (Id.)

---

[10]    HPCI never owned or operated the St. Helens plant.  (McChesney Decl. ¶ 18, n.5.)

-9-

In 1956, Kaiser Gypsum acquired a fiberboard manufacturing facility in

St. Helens, Oregon that produced ceiling tiles, ceiling panels and related products.  (Id. ¶ 19.)  In

1978, Kaiser Gypsum sold the plant to Owens Corning Fiberglas Corporation ("Owens

Corning").  (Id.)  In 1987, the plant was sold to Armstrong World Industries, Inc. ("Armstrong"),

which closed the plant in 2018.  (Id.)

A five-mile stretch of the Lower Duwamish Waterway is a United States

Environmental Protection Agency (the "EPA") Superfund site (the "Lower Duwamish Superfund

Site" and, together with the aforementioned former Seattle area facilities adjacent to the Lower

Duwamish Superfund Site and the St. Helens site, the "Two Sites") involving approximately

120 potentially responsible parties ("PRPs"), including the Debtors.  (Id. ¶ 21.)

### 6.     Environmental Insurance.

The Debtors believe that they have liability insurance that provides coverage for

their environmental liabilities relating to their formerly owned plants in Seattle and St. Helens.

(Id. ¶ 22.)  On September 29, 2016, the Debtors filed suit against their environmental insurers in

state court in Oregon seeking coverage for defense and indemnity costs incurred and to be

incurred with respect to their environmental liabilities at the Two Sites.  (Id.)

### B.     PREPETITION DISCUSSIONS WITH REPRESENTATIVES OF
###        ASBESTOS CLAIMANTS.

Prior to the Petition Date, an ad hoc committee of asbestos personal injury

claimants (the "Ad Hoc Committee") consisting of law firms that have filed Asbestos Personal

Injury Claims against the Debtors was formed to engage in discussions with the Debtors

regarding the terms of a consensual plan of reorganization.  (First Day Decl. ¶ 46.)  Following its

formation, the Ad Hoc Committee retained bankruptcy counsel, insurance counsel, a financial

advisor and an asbestos estimation consultant.  (Id.)  The Ad Hoc Committee's work prepetition

included gathering, review and analysis of information regarding the Debtors.  In that regard, the

Ad Hoc Committee delivered to the Debtors a series of information requests and, in response

thereto, the Debtors provided the Ad Hoc Committee with numerous documents and other

information.  (Id.)  Prior to the Petition Date, the Debtors and the Ad Hoc Committee also agreed

on the selection of Lawrence Fitzpatrick as the FCR.  (Id.)  Mr. Fitzpatrick retained his own

counsel and an estimation consultant.  (Id.)  The Debtors provided the FCR and his professionals

with the same information they furnished to the Ad Hoc Committee.  (Id.)

Prepetition meetings and other communications occurred among some or all of

the Debtors, Truck, the Ad Hoc Committee and the FCR.  (First Day Decl. ¶ 47.)

Communications between the Debtors and certain of the excess carriers also took place.  (Id.)

Among other things, the parties discussed the filing of the Reorganization Cases and potential

paths forward to a consensual plan.  (Id.)  Although all the parties indicated a desire to reach

agreement on a consensual reorganization plan, due to time constraints, the parties were not able

to engage in substantive discussions regarding the terms of a plan prior to the Petition Date.  (Id.)

## C.    DEBTORS' DECISION TO FILE THE REORGANIZATION CASES.

The Debtors filed these Reorganization Cases to fairly and permanently resolve

their legacy asbestos and environmental liabilities.  (McChesney Decl. ¶ 23.)  Resolving these

liabilities in accordance with the Plan will benefit both the Debtors and their creditors by, among

other things, (a) eliminating the ongoing costs, administrative burdens, risks and distractions that

the Debtors have been subjected to from these decades-old liabilities, and (b) providing for

(i) the  liquidation in the tort system and the payment of current and future Asbestos Personal

Injury Claims from the Asbestos Personal Injury Trust and the Debtors' asbestos insurers and

(ii) the payment in full on the Plan's Effective Date of all Allowed General Unsecured Claims,

including Allowed Environmental Claims.  (Id.)

**D.    APPOINTMENT OF THE CREDITORS' COMMITTEE, THE ASBESTOS
PERSONAL INJURY COMMITTEE AND FUTURE CLAIMANTS'
REPRESENTATIVE.**

On October 14, 2016, the Bankruptcy Court entered an order appointing the

Creditors' Committee pursuant to section 1102 of the Bankruptcy Code.  [D.I. 84].  On August

30, 2019, the Creditors' Committee filed a motion [D.I. 1771] indicating that members Owens

Corning and Armstrong were retiring from the committee and requesting Ash Grove Cement

Company ("Ash Grove") be substituted as a member of the committee for such retiring members.

On October 17, 2019, the Bankruptcy Court entered an order [D.I. 1864] granting the Creditors'

Committee's motion.  On October 19, 2016, the Bankruptcy Court entered an order appointing

the ACC pursuant to section 1102 of the Bankruptcy Code.  [D.I. 100]  With the assistance of

counsel and other advisers, the ACC has been active in all aspects of the Debtors' cases,

including numerous investigations and ultimately the negotiation of the Term Sheet leading to

the Plan.

In addition, by order dated October 19, 2016 [D.I. 99], the Bankruptcy Court

approved the appointment of Lawrence Fitzpatrick as the FCR.  Mr. Fitzpatrick has extensive

experience with the resolution of asbestos-related personal injury claims and asbestos bankruptcy

cases.  (Fitzpatrick Decl. ¶¶ 4-10.)  With the assistance of counsel and other advisors,

Mr. Fitzpatrick has been involved in all aspects of the Debtors' Reorganization Cases.

**E.    RESOLUTION OF THE REORGANIZATION CASES.**

**1.    Settlement Regarding Asbestos Personal Injury Claims.**

On October 20, 2017, the Debtors and Lehigh Hanson reached an agreement in

principle with the ACC and the FCR on the treatment of present and future Asbestos Personal

Injury Claims.  (McChesney Decl. ¶ 26.)  The Plan implements that settlement by, among other

things, providing for the creation and funding of the Asbestos Personal Injury Trust to resolve

-12-

Asbestos Personal Injury Claims pursuant to section 524(g) of the Bankruptcy Code.  (Id.)  The

Asbestos Personal Injury Trust to be created under the Plan will be funded with a $49 million

cash payment by the Debtors or Lehigh Hanson, a $1 million Payment Note, the first $12 million

of net recovery on Phase 1 Claims, if any (after the Asbestos Personal Injury Trust Appellate

Costs have been deducted) and the assignment of the Debtors' rights under insurance policies

covering Asbestos Personal Injury Claims.  (Id.; Fitzpatrick Decl. ¶ 16.)  The Plan provides that,

with respect to the Debtors' Insured Asbestos Claims, the insurer's defense rights will be

preserved and asbestos claimants will be permitted to continue to assert actions against the

Reorganized Debtors in name only in the tort system to collect available insurance.  (Plan

§§ III.B.4., IV.L, IV.Q.)  The Asbestos Personal Injury Trust will fairly and equitably satisfy the

Asbestos Personal Injury Claims in accordance with the Asbestos Personal Injury Trust

Distribution Procedures, described below.

### 2.    Settlements Regarding Environmental Claims.

The Debtors successfully negotiated settlement agreements with the Oregon

Department of Environmental Quality (the "DEQ") regarding the St. Helens site and the United

States regarding the Lower Duwamish Superfund Site.  (McChesney Decl. ¶ 29.)  The Debtors

also reached settlement agreements with other environmental creditors, multiple insurers and

several co-PRPs regarding the Two Sites.  (Id.)

In particular, the Debtors have negotiated and the Bankruptcy Court has approved

settlements with (a) Armstrong [D.I. 1556], pursuant to which Armstrong withdrew its proofs of

Claim with respect to the St. Helens site and paid the Debtors $1 million; (b) Owens Corning

[D.I. 1558], pursuant to which Owens Corning's proofs of Claim were deemed withdrawn and

Owens Corning was deemed to waive and release any Claims against the Debtors related to the

St. Helens site; (c) the DEQ [D.I. 1625], pursuant to which the Debtors agreed to pay in full an

Allowed General Unsecured Claim in the amount of $67 million; (d) the City of Seattle

(the "City") [D.I. 1602], pursuant to which the City will have an Allowed General Unsecured

Claim in the amount of $80,951.87 against each of the Debtors; (e) the Port of Seattle

(the "Port") [D.I. 1603], pursuant to which the Port will have an Allowed General Unsecured

Claim in the amount of $81,815.22 against each of the Debtors; (f) King County, Washington

(the "County") [D.I. 1604], pursuant to which the County will have an Allowed General

Unsecured Claim in the amount of $85,255.87 against each of the Debtors; (g) The Boeing

Company ("Boeing") [D.I. 1601], pursuant to which Boeing will have an Allowed General

Unsecured Claim in the amount of $137,500.00 against each of the Debtors; and (h) Ash Grove

[D.I. 1908], pursuant to which Ash Grove will have an Allowed General Unsecured Claim in the

amount of $8,618.42 against each of the Debtors.  (McChesney Decl. ¶ 30.)

        In addition, the Bankruptcy Court entered an order [D.I. 1789] approving the

Debtors' settlement with the United States, on behalf of the EPA and the United States

Department of Interior, acting through the U.S. Fish and Wildlife Service (the "DOI"), and the

United States Department of Commerce, acting through the National Oceanic and Atmospheric

Administration (the "NOAA"), pursuant to which the Debtors agreed to the allowance and

payment in full of the following general unsecured claims:  (a) Proof of Claim No. 10 (EPA) in

the amount of $1,300,000 against Kaiser Gypsum; (b) Proof of Claim No. 11 (EPA) in the

amount of $1,300,000 against HPCI; (c) Proof of Claim No. 9 (NOAA) in the amount of

$200,000 against Kaiser Gypsum; (d) Proof of Claim No. 6 (NOAA) in the amount of $200,000

against HPCI; (e) Proof of Claim No. 7 (DOI) in the amount of $200,000 against Kaiser

Gypsum; and (f) Proof of Claim No. 8 (DOI) in the amount of $200,000 against HPCI.  (Id.

¶ 31.)  The Debtors' agreement with the United States also resolved the following claims filed by

Ash Grove on behalf of the United States:  (a) Proof of Claim No. 648 (EPA) in the amount of

$325,000 against Kaiser Gypsum; (b) Proof of Claim No. 653 (EPA) in the amount of $325,000

against HPCI; (c) Proof of Claim No. 651 (NOAA) in the amount of $50,000 against Kaiser

Gypsum; (d) Proof of Claim No. 650 (NOAA) in the amount of $50,000 against HPCI; (e) Proof

of Claim No. 649 (DOI) in the amount of $50,000 against Kaiser Gypsum; and (f) Proof of

Claim No. 652 (DOI) in the amount of $50,000 against HPCI.  (Id.)

        Under applicable law and in accordance with the terms of the settlements with the

DEQ and the United States, the Debtors received contribution protection with respect to the

matters addressed in each settlement concerning the Two Sites.  (McChesney Decl. ¶ 32.)

        The Debtors also reached settlement agreements with the following insurers to

resolve disputes with respect to environmental insurance coverage, which have been approved by

the Bankruptcy Court (the "Environmental Insurance Settlements"):  (a) London Market Insurers

and Continental Insurance Company, Columbia Casualty Company, and National Fire Insurance

Company of Hartford; (b) Insurance Company of the State of Pennsylvania and National Union

Fire Insurance Company of Pittsburgh, PA; (c) Truck; (d) Westchester Fire Insurance Company

and Westchester Surplus Lines Insurance Company; (e) Hartford Fire Insurance Company, First

State Insurance Company, New England Insurance Company and Twin City Fire Insurance

Company; (f) Munich Reinsurance America, Inc. and Executive Risk Indemnity, Inc.;

(g) Transport Insurance Company, as successor in interest to Transport Indemnity Company;

(h) Allstate Insurance Company, as successor in interest to Northbrook Excess and Surplus

Insurance Company f/k/a Northbrook Insurance Company; (i) Westport Insurance Corporation,

formerly known as Employers Reinsurance Corporation; and (j) Allianz Underwriters Insurance

Company and Fireman's Fund Insurance Company.  (McChesney Decl. ¶ 33.)  In addition, the

Debtors negotiated a further settlement agreement with Associated International Insurance

Company and Transamerica Premier Ins. Co. and TIG Insurance Company [D.I. 2136], which

has been approved by the Bankruptcy Court.  (Id.)  Pursuant to these settlements, the insurers

will pay the Debtors a total of approximately $50.8 million to buy back certain of the Debtors'

rights to environmental insurance coverage free and clear of all liens, claims, encumbrances and

interests.  (Id.)  These settlements will not affect coverage for Asbestos Personal Injury Claims.

(Id.)

### 3.     Settlement with Lehigh Hanson.

Finally, the Debtors reached an agreement with Lehigh Hanson, pursuant to

which Lehigh Hanson has agreed to contribute up to $28.15 million, minus the amount of the

Insolvent Insurers Proceeds to which the Debtors are determined to be entitled, for the payment

of Allowed General Unsecured Claims under the Plan.  (Id. ¶ 34; Plan § IV.E.)

### 4.     Sufficient Funds to Pay All Allowed General Unsecured Claims.

As a result of all the agreements described above, the Debtors will have sufficient

funds to pay all Allowed General Unsecured Claims in full.  (Bittner Decl. ¶ 24; McChesney

Decl. ¶ 35.)  The Debtors estimate that the aggregate amount of Allowed General Unsecured

Claims is approximately $72,569,631.[11]  (Bittner Decl. ¶ 22; McChesney Decl. ¶ 35.)  As a result

of the Environmental Insurance Settlements and the agreement with Lehigh Hanson, the Debtors

will have available funds sufficient to pay that amount.  (Bittner Decl. ¶ 24; McChesney Decl.

¶ 35.)

---

[11]     This figure does not include any amounts with respect to the currently disputed Claims held by Glacier
Northwest, Inc. but includes an amount of $465,140.83 to reflect the amount at which the disputed Truck
Claim was resolved by the Bankruptcy Court in advance of the Confirmation Hearing.

### F.     MODIFICATIONS TO THE PLAN.

The Modifications to the Plan do not materially or adversely affect or change the

treatment of any Claim against or Interest in any Debtor and fully comply with all applicable

provisions of the Bankruptcy Code and Rules.

### G.     COMPLIANCE WITH THE REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE.

#### 1.     Section 1129(a)(1) — Compliance of the Plan with Applicable Provisions of the Bankruptcy Code.

The Plan complies with all applicable provisions of the Bankruptcy Code, as

required by section 1129(a)(l) of the Bankruptcy Code, including sections 1122 and 1123 of the

Bankruptcy Code.

##### a.     Sections 1122 and 1123(a)(1)-(4) — Classification and Treatment of Claims and Interests.

i.     The Plan, which constitutes a separate plan of

reorganization for each of the Debtors, meets the classification requirements of sections 1122(a)

and 1123(a)(1)-(4) of the Bankruptcy Code.  Article II of the Plan classifies Claims and Interests

into seven separate categories.  (Plan art. II.)  In particular, Article II of the Plan segregates into

separate Classes Priority Claims (Class 1), Secured Claims (Class 2), General Unsecured Claims

(Class 3), Asbestos Personal Injury Claims (Class 4), Surety Bond Claims (Class 5),

Intercompany Claims (Class 6) and Stock Interests (Class 7).  The number of Classes reflects the

diverse characteristics of those Claims and Interests, and the legal rights under the Bankruptcy

Code of each of the holders of Claims or Interests within a particular Class are substantially

similar to other holders of Claims or Interests within that Class.  (McChesney Decl. ¶ 37.)

ii.     In accordance with section 1123(a)(2) of the Bankruptcy

Code, Article III of the Plan identifies and describes each Class of Claims or Interests that is not

impaired under the Plan.  In particular, Article III of the Plan indicates that Classes 1-3 and 5-7

are unimpaired.  (Plan art. III.)

                       iii.      In accordance with section 1123(a)(3) of the Bankruptcy

Code, Article III of the Plan identifies and describes each Class of Claims or Interests that is

impaired under the Plan.  In particular, section III.B.4 of the Plan states that Class 4 (Asbestos

Personal Injury Claims) are impaired and provides for the treatment of that class.  (Plan

§ III.B.4.)

                       iv.      In accordance with section 1123(a)(4) of the Bankruptcy

Code, the Plan provides the same treatment for each Claim or Interest of a particular Class unless

the holder of such a Claim or Interest agrees to less favorable treatment.  (Plan art. III.)

         **b.**      **Section 1123(a)(5) — Adequate Means for Implementation of
the Plan.**

In accordance with the requirements of section 1123(a)(5) of the Bankruptcy

Code, Article IV and various other provisions of the Plan provide adequate means for the Plan's

implementation.  Specifically, the Plan provides for:  (a) except as otherwise provided in the Plan

and subject to the Restructuring Transactions, the Debtors' continued corporate existence and the

vesting of all property of the respective Estates of the Debtors and any property acquired by a

Debtor or Reorganized Debtor under the Plan in the appropriate Reorganized Debtor under

section IV.A of the Plan; (b) the consummation of the Restructuring Transactions under section

IV.B of the Plan; (c) certain real estate and lease transactions under section IV.C of the Plan;

(d) the adoption of the corporate constituent documents that will govern the Reorganized Debtors

and the identification of the initial boards of directors of the Reorganized Debtors under section

IV.D of the Plan; (e) sufficient cash resources to make all plan distributions pursuant to section

IV.E of the Plan; (f) the creation of, and transfer of certain assets to, the Asbestos Personal Injury

CTA00036

Trust under section IV.F of the Plan; (g) the appointment of the Asbestos Personal Injury Trustee

under section IV.H of the Plan; (h) the funding of the Asbestos Personal Injury Trust under

section IV.K.2 of the Plan; (i) the transfer of and preservation of rights of action by the

Reorganized Debtors, and the release of certain rights of action against the Debtors, under

section IV.R of the Plan; (k) the release of all mortgages, deeds of trust, liens or other security

interests against the property of the Estate under section IV.S of the Plan; (l) the authorization to

execute various documents and to enter into various transactions to effectuate the Plan and the

exemption from certain transfer taxes under section IV.T of the Plan; and (m) the direction to

comply with QSF Regulations under section IV.V of the Plan.  Accordingly, the Plan fully

complies with the requirements of section 1123(a)(5) of the Bankruptcy Code.

> **c.**      **Section 1123(a)(6) — Prohibition Against the Issuance of
> Nonvoting Equity Securities and Adequate Provisions for
> Voting Power of Classes of Securities.**

The Plan provides that the certificates of incorporation of each Reorganized

Debtor will prohibit the issuance of nonvoting equity securities to the extent required under

section 1123(a) of the Bankruptcy Code.  (Plan § IV.D.1.)  Accordingly, the Plan fully complies

with the requirements of section 1123(a)(6) of the Bankruptcy Code.

> **d.**      **Section 1123(a)(7) — Selection of Directors and Officers in a
> Manner Consistent with the Interests of Creditors and Equity
> Security Holders and Public Policy.**

The Plan complies with section 1123(a)(7) of the Bankruptcy Code and ensures

that the selection of the officers and directors of each of the Reorganized Debtors is consistent

with the interests of creditors and equity security holders and with public policy.  Under section

IV.D.2 of the Plan, the initial boards of directors of each of the Reorganized Debtors will consist

of the directors and officers of each Debtor immediately prior to the Effective Date.  (Plan

§ IV.D.2.)  Further, this section of the Plan provides that directors and officers will serve from

and after the Effective Date until a successor is duly elected or appointed and qualified or until

their earlier death, resignation or removal in accordance with the terms of the certificates of

incorporation and by-laws or similar constituent documents of the applicable Reorganized

Debtor and applicable state law.  (Id.)  The Plan's provisions with respect to the selection of

directors and officers are consistent with the interests of creditors and public policy.

### e.        Section 1123(b) — Discretionary Provisions.

Section 1123(b) of the Bankruptcy Code identifies various discretionary

provisions that may be included in a plan of reorganization, but are not required.  For example, a

plan may impair or leave unimpaired any class of claims or interests and provide for the

assumption or rejection of executory contracts and unexpired leases.  11 U.S.C. § 1123(b)(l)-(2).

A plan also may provide for:  (a) "the settlement or adjustment of any claim or interest belonging

to the debtor or to the estate;" (b) "the retention and enforcement by the debtor, by the trustee, or

by a representative of the estate appointed for such purpose, of any such claim or interest,"

11 U.S.C. § 1123(b)(3)(A)-(B); or (c) "the sale of all or substantially all of the property of the

estate, and the distribution of the proceeds of such sale among holders of claims or interests."

11 U.S.C. § 1123(b)(4).  Finally, a plan may "modify the rights of holders of secured claims . . .

or . . . unsecured claims, or leave unaffected the rights of holders of any class of claims" and may

"include any other appropriate provision not inconsistent with the applicable provisions of

[title 11]."  11 U.S.C. § 1123(b)(5)-(6).

As described above, the Plan provides for the impairment of Class 4, while

leaving all other Classes of Claims and Interests unimpaired.  The Plan thus modifies the rights

of the holders of certain Claims and leaves the rights of others unaffected.  (Plan art. IV.)  In

particular, Asbestos Personal Injury Claims will be channeled to the Asbestos Personal Injury

Trust for resolution as set forth in the Asbestos Personal Injury Trust Agreement and the related

TA00038

Asbestos Personal Injury Trust Distribution Procedures.  (Plan § III.B.4.)  The Plan also provides for (a) the assumption, assumption and assignment or rejection of executory contracts and unexpired leases to which the Debtors are parties (Plan art. V) and (b) the retention and enforcement of certain claims by the Debtors (Plan § IV.R).

Finally, in accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan includes numerous other provisions necessary for its implementation that are consistent with the Bankruptcy Code, including:  (a) Article IV of the Plan providing for (i) the creation of the Asbestos Personal Injury Trust and (ii) the appointment of the Asbestos Personal Injury Trustee; (b) Article VI of the Plan governing Distributions on account of Allowed Claims; (c) Article VII of the Plan establishing procedures for resolving Disputed Claims and making Distributions on account of such Disputed Claims once resolved; (d) Article IX of the Plan regarding the discharge of Claims and injunctions against certain actions; and (e) Article X of the Plan regarding retention of jurisdiction by the Bankruptcy Court over certain matters after the Effective Date.  Accordingly, the Plan fully complies with section 1123(b) of the Bankruptcy Code.

### f.    Section 1123(d) — Cure of Defaults.

The Plan provides for the satisfaction of Cure Amount Claims associated with each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan in accordance with section 365(b)(l) of the Bankruptcy Code.  (Plan § V.B.)  Additionally, in accordance with Article III of the Plan, certain Claims may be Reinstated.  All Cure Amount Claims and Reinstated Claims will be determined in accordance with the underlying agreements and applicable non-bankruptcy law, and pursuant to the procedures established in the Plan or, to extent applicable, any separate orders of the Bankruptcy Court.  (Plan §§ III.B, V.B.)

Accordingly, the Plan fully complies with the requirements of section 1123(d) of the Bankruptcy Code.

### 2. Section 1129(a)(2) — Compliance with Applicable Provisions of the Bankruptcy Code.

The Debtors have complied with all applicable provisions of the Bankruptcy Code, as required by section 1129(a)(2) of the Bankruptcy Code, including section 1125 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018. The Disclosure Statement and the procedures by which the ballots for acceptance or rejection of the Plan were solicited and tabulated were fair, properly conducted and in accordance with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018 and the Disclosure Statement Order. Votes with respect to the Plan were solicited in good faith and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order. The Debtors, the Reorganized Debtors, Lehigh Hanson, the ACC and the FCR, their respective members and each of their respective directors, officers, employees, agents and professionals, acting in such capacity, have acted in "good faith," within the meaning of section 1125(e) of the Bankruptcy Code.

### 3. Section 1129(a)(3) — Proposal of the Plan in Good Faith.

Section 1129(a)(3) of the Bankruptcy Code requires that a plan of reorganization be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). A plan is considered proposed in good faith "if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the [Bankruptcy] Code." Hanson v. First Bank of S.D., 828 F.2d 1310, 1315 (8th Cir. 1987); see also In re SGL Carbon Corp., 200 F.3d 154, 165 (3d Cir. 1999) (the good faith standard in section 1129(a)(3) requires that there must be "'some relation'" between the chapter 11 plan and the "reorganization-related

purposes" that chapter 11 was designed to serve); <u>In re Zenith Elecs. Corp.</u>, 241 B.R. 92, 107

(Bankr. D. Del. 1999) ("The good faith standard requires that the plan be proposed with honesty,

good intentions and a basis for expecting that a reorganization can be effected with results

consistent with the objectives and purposes of the Bankruptcy Code." (quotation marks

omitted)); <u>In re New Valley Corp.</u>, 168 B.R. 73, 80 (Bankr. D.N.J. 1994) ("It is generally held

that a plan is proposed in good faith if there is a reasonable likelihood that the plan will achieve a

result consistent with the objectives and purpose of the Bankruptcy Code.").  The requirement of

good faith must be viewed in light of the totality of the circumstances surrounding the

formulation of a chapter 11 plan.  <u>See</u> <u>McCormick v. Bane One Leasing Corp. (In re</u>

<u>McCormick)</u>, 49 F.3d 1524, 1526 (11th Cir. 1995) ("The focus of a court's inquiry is the plan

itself, and courts must look to the totality of the circumstances surrounding the plan…keeping in

mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a

fresh start.").

In determining whether the plan will succeed and accomplish goals consistent

with the Bankruptcy Code, courts look to the terms of the reorganization plan itself.  <u>See</u> <u>In re</u>

<u>Sound Radio, Inc.</u>, 93 B.R. 849, 853 (Bankr. D.N.J. 1988) (concluding that the good faith test

provides the court with significant flexibility and is focused on an examination of the plan itself,

rather than other, external factors), <u>aff'd</u> <u>in</u> <u>part</u>, <u>remanded</u> <u>in</u> <u>part</u> <u>on</u> <u>other</u> <u>grounds</u>, 103 B.R. 521

(D.N.J. 1989), <u>aff'd</u>, 908 F.2d 964 (3d Cir. 1990).  The plan proponent must show, therefore, that

the plan has not been proposed by any means forbidden by law and that the plan has a reasonable

likelihood of success.  <u>See</u> <u>In re Century Glove, Inc.</u>, Civ. A. Nos. 90-400-SLR, 90-401-SLR,

1993 WL 239489, at *4 (D. Del. Feb. 10, 1993) ("A court may only confirm a plan for

reorganization if…the 'plan has been proposed in good faith and not by any means forbidden by

law….'  Moreover, 'where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied[.]'"); see also Fin. Sec. Assur. Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship), 116 F.3d 790, 802 (5th Cir. 1997) (same).  Whether a plan has been proposed in good faith turns on whether it "'will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'"  In re Am. Capital Equip., LLC, 688 F.3d 145, 156 (3d Cir. 2012).

 The Plan serves valid bankruptcy objectives—it is the product of extensive arms'-length negotiations among the ACC, the FCR, the Debtors and numerous other parties, reflects a consensual resolution of the Debtors' asbestos and environmental liabilities and maximizes the value of assets available to satisfy claims.  In re Michener, 342 B.R. 428, 434 (Bankr. D. Del. 2006); Am. Capital Equip., LLC, 688 F.3d at 156 (explaining that the two "'recognized' policies, or objectives, [of Chapter 11] are 'preserving going concerns and maximizing property available to satisfy creditors'").  That the Plan maximizes the value of assets is demonstrated by the fact that creditor recoveries are greater than could be realized if the Debtors were to liquidate.  (Bittner Decl. ¶ 20; Liquidation Analysis.[12])

 To arrive at this juncture, the Debtors actively involved their creditor constituencies in the Plan-formulation process.  (McChesney Decl. ¶ 39.)  The Debtors provided substantial information to all constituencies and, thereafter, reached numerous settlements that will be implemented through the Plan.  (Id.)  As described above and in the Disclosure Statement and the McChesney Declaration, the Debtors engaged in arms'-length negotiations with many

---

[12] The Liquidation Analysis is attached as Exhibit IV to the Disclosure Statement and was admitted into the record at the Confirmation Hearing.  [Conf. Exhibit 22-B.]

-24-

TA00042

parties in interest over the course of these cases and the Plan reflects agreements among the

Debtors, Lehigh Hanson, the ACC, the FCR, the EPA, the DEQ and the Debtors' insurers and

other constituents.  (Id.)  The Debtors' good faith in proposing the Plan is evidenced by these

negotiations and agreement and further by the unanimous support of the holders of Class 4

Claims, the only Class entitled to vote on the Plan.  See Voting Agent Declaration; see also

Eagle-Picher, 203 B.R. at 274 (finding that a plan of reorganization was proposed in good faith

when, among other things, it was based on extensive arms'-length negotiations among the plan

proponents and other parties in interest).  Accordingly, the requirements of section 1129(a)(3) of

the Bankruptcy Code have been fully satisfied.

Truck made a number of arguments that the Plan was not proposed in good faith.

For the reasons set forth below, Truck lacks standing to make these arguments, but even if Truck

had standing, the arguments would fail.

Contrary to Truck's contention, the Plan does not violate the spirit and purpose of

section 524(g).  The Court finds no requirement that all of a debtor's asbestos liabilities must be

resolved by a section 524(g) trust, as opposed to being resolved in the tort system.  Here,

moreover, the Debtors have effectively unlimited insurance.  Under these circumstances, the fact

that the Trust resolves only uninsured claims is not contrary to section 524(g).

Truck argued that the Plan represented a collusive and improper agreement to

send claims back to the tort system.  The argument that resolving asbestos cases in the tort

system is unfair or constitutes bad faith is rejected.  Bankruptcy courts routinely grant relief from

the automatic stay to allow claimants and creditors to pursue insurance in state court.[13]  In its

---

[13]     Bankr. Hr'g Tr. (8/13/2020) 29:11-19.  Moreover, other Section 524(g) plans of reorganization have been
approved that provided for tort claims to be sent back to the tort system.  See, e.g., In re Thorpe Insulation
Co., Case No. 07-19271(BB) (Bankr. C.D. Cal. May 8, 2013) (providing that asbestos claimants can

-25-

argument, Truck relied heavily on Judge Hodges' findings in <u>Garlock</u>.  This Court is concerned

for the same reasons that the bankruptcy court was concerned in <u>Garlock</u>, but this Court does not

read <u>Garlock</u> as an indictment of the tort system or a ruling that a party cannot get a fair trial in

state and federal courts.  Truck's arguments also hinged on speculation as to future events, such

as what would happen in state courts, and are unsupported.  This Court is not inclined to indict

its colleagues on the state benches, nor does the Court believe that a bankruptcy court in North

Carolina is necessary to protect state courts from fraud.  The findings in <u>Garlock</u> have been

widely debated, and indeed some state legislatures have taken steps to address these issues.  State

courts and litigants will obviously be alert to what has been proposed in this case and can take

their own actions.

   Bankruptcy is not intended to relieve insurers of their contractual liabilities, or to

improve their position under their insurance contracts in the tort system.[14]  It is not within the

province of this Court to mandate to state courts and other federal courts what kind of discovery

is required in asbestos cases.  The remedy Truck seeks—a requirement that before an asbestos

claimant can sue in state court they must provide pre-suit discovery that is not mandated in other

forums and not for the benefit of the Asbestos Personal Injury Trust—is essentially legislative in

---

commence actions in the tort system consistent with the other provisions of the plan and distribution
procedures); <u>In re Plant Insulation Co.</u>, 485 B.R. 203, 213 (N.D. Cal. 2012), <u>rev'd on other grounds</u>,
734 F.3d 900 (9th Cir. 2013), and <u>aff'd</u>, 544 F. App'x 669 (9th Cir. 2013) ("Alternatively, under the Plan,
asbestos injury claimants retain their right to pursue Plant and Non–Settling Insurers by filing a tort action,
subject to several conditions."); <u>In re Burns & Roe Enters., Inc.</u>, Nos. 00-41610, 05-47946 (RG) 2009 WL
438694, at *4 (D.N.J. Feb. 23, 2009) ("The Trust may authorize individual claimants, whose claims are
potentially covered by policies issued by CNA, to commence litigation in the tort system."); <u>see</u> <u>also</u> <u>In re
Sound Shore Med. Ctr</u>., Case No. 13-22840 (Bankr. S.D.N.Y. Oct. 2, 2013), ECF No. 367 (permitting
claims to return to tort system); <u>In re UTGR, Inc. d/b/a Twin River</u>, Case No. 09-12418 (Bankr. R.I. Mar.
19, 2010), ECF No. 610 (same).

[14]  Further, the Truck Policies expressly state that the Debtors' bankruptcy does not relieve Truck of its
obligations under the Truck Policies.  Conf. Exhibit 30, 1974 Truck Policy at TRK0000587 ("Bankruptcy
or insolvency of the insured or of the insured's estate shall not relieve the company of any of its obligations
hereunder.").

TRA00044

nature, and is inappropriate.  The Court hereby rejects this burdensome and unprecedented attempt to impair the rights of asbestos claimants to pursue their claims in the tort system.

Finally, the Court rejects Truck's argument it was unfairly denied an opportunity to negotiate with the parties both pre and post-petition.  While the preference in bankruptcy is for parties to negotiate, there is no requirement that a plan satisfy the desires of an insurer. Furthermore, the evidence establishes that no substantive Plan negotiations occurred prepetition. Thus, Truck was not excluded.  (First Day Decl. ¶ 47.)  Postpetition, all parties were free to negotiate, but Truck did not.  Hr'g Tr. (7/20/2020) at 153:18-154:8.  Truck attempted to negotiate only after the Plan Proponents had already reached an agreement in the form of the Term Sheet. Id. at 154:2-8.  The Debtors, the ACC, the FCR and Truck then participated in mediation to determine whether there was a resolution that could be reached that would involve Truck.  Id. at 154:9-18.  It is not surprising that Truck found it difficult to negotiate with the parties to reduce its unlimited obligations under the Truck Policies to a fixed or otherwise limited amount. That is certainly no basis for an objection.  Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code have been fully satisfied.

### 4.    Section 1129(a)(4) — Court Approval of Certain Payments as Reasonable.

In accordance with section 1129(a)(4) of the Bankruptcy Code, all fees to which parties may be entitled in connection with the Reorganization Cases, including Professionals' Fee Claims, are subject to the approval of the Bankruptcy Court.  (Plan § III.A.1.)  Although the Bankruptcy Court has authorized the interim payment of the fees and expenses incurred by Professionals in connection with the Reorganization Cases, all such fees and expenses remain subject to final review for reasonableness by the Bankruptcy Court.  (Id.)  Finally, the Plan provides that the Bankruptcy Court will retain jurisdiction after the Effective Date to hear and

determine all applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan.  (Plan art. X.)  Accordingly, the Plan fully complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

5.      **Section 1129(a)(5) — Disclosure of Identity of Proposed Management, Compensation of Insiders and Consistency of Management Proposals with the Interests of Creditors and Public Policy.**

The Debtors have disclosed all information required by section 1129(a)(5) of the Bankruptcy Code, including the names of the Reorganized Debtors' officers and directors. (Disclosure Statement § III.A.2; Plan § IV.D.2.)  The appointment of the proposed directors and officers, each of who is highly qualified and experienced, is consistent with the interests of the holders of Claims and Interests and with public policy.

6.      **Section 1129(a)(6) — Approval of Rate Changes.**

Section 1129(a)(6) of the Bankruptcy Code is not applicable because the Debtors' current businesses do not involve the establishment of rates over which any regulatory commission has or will have jurisdiction after Confirmation.  (McChesney Decl. ¶ 42.)

7.      **Section 1129(a)(7) — Best Interests of Holders of Claims and Interests.**

Each holder of a Claim in the sole impaired Class (Class 4) has accepted the Plan or, as demonstrated by the Liquidation Analysis, will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  (Bittner Decl. ¶ 12; Liquidation Analysis.)  Thus, the Plan satisfies the requirement of section 1129(a)(7)(A) of the Bankruptcy Code.

Case 3:20-cv-00537-GCM   Document 1-1   Filed 09/28/20   Page 33 of 75

8. **Section 1129(a)(8) — Acceptance of the Plan by Each Impaired Class.**

Pursuant to section 1129(a)(8) of the Bankruptcy Code, all classes of Claims and Interests have either accepted the Plan or are unimpaired. (Voting Agent Decl. ¶ 10.) Specifically, Class 4, the only class entitled to vote on the Plan, unanimously voted in favor of the Plan. (Id.) Classes 1-3 and 5-6 are unimpaired under the Plan and, therefore, are deemed to have accepted the Plan. (Plan § III.B; Disclosure Statement Order ¶ II.B.) Accordingly, the Debtors have satisfied section 1129(a)(8) of the Bankruptcy Code.

9. **Section 1129(a)(9) — Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code.**

The Plan also meets the requirements regarding the payment of Administrative Claims, Priority Claims and Priority Tax Claims, as set forth in section 1129(a)(9) of the Bankruptcy Code.

Section III.A.1 of the Plan provides that, subject to certain bar dates and unless otherwise agreed by the holder of an Administrative Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Administrative Claim shall receive, in full satisfaction of its Administrative Claim, cash equal to the allowed amount of such Administrative Claim either: (a) as soon as practicable after the Effective Date; or (b) if the Administrative Claim is not allowed as of the Effective Date, thirty (30) days after the date on which such Administrative Claim becomes allowed by a Final Order or a Stipulation of Amount and Nature of Claim. In addition, Administrative Claims based on ordinary course liabilities shall be satisfied by the applicable Reorganized Debtor pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claims, without any further action by the holder of such Administrative Claims or further approval of the Bankruptcy Court.

Further, Section III.B.l of the Plan provides that Priority Claims against any Debtor (which include Claims entitled to priority other than Administrative Claims and Priority Tax Claims) will be paid on the Effective Date in an amount equal to the Allowed Claim. Section III.A.2 of the Plan provides that, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor or Reorganized Debtor, on the Effective Date or as soon as practicable after the date when such Claim becomes an Allowed Claim, each Allowed Priority Tax Claim will receive payment in full of the allowed amount of the Priority Tax Claim.

### 10.    Section 1129(a)(10) — Acceptance By at Least One Impaired, Non-Insider Class.

As shown in the Voting Agent Declaration and as reflected in the record of the Confirmation Hearing, at least one Class of Claims that is impaired under the Plan has voted to accept the Plan, determined without including the acceptance by any insider, with respect to all Reorganized Debtors under the Plan.  (Voting Agent Decl. ¶ 10.)  Specifically, Class 4 Claims (Asbestos Personal Injury Claims), which is not an insider Class and is the only impaired Class under the Plan, has voted unanimously to accept the Plan.  (Id.)

### 11.    Section 1129(a)(11) — Feasibility of the Plan.

On or about the Effective Date, non-debtor Lehigh Cement Company LLC will transfer its interest in the Real Properties located in Kosse, Limestone County, Texas and Kunkletown, Monroe County, Pennsylvania, together with its rights under certain leases with a third party related to the Real Properties, to Kaiser Gypsum.  (Plan § IV.C; Bittner Decl. ¶ 30; McChesney Decl. ¶ 11.)  The leases are expected to generate net cash flow for Kaiser Gypsum of approximately $68,000 in 2020 and $93,000 in 2021, as demonstrated in the projections attached Exhibit III to the Disclosure Statement and admitted into evidence at the Confirmation Hearing [Conf. Exhibit 22-A] (the "Plan Projections").  (Plan Projections; Bittner Decl. ¶ 30.)  HPCI will

continue to own its non-Debtor operating subsidiaries (Hanson Micronesia Cement, Inc. and

Hanson Permanente Cement of Guam, Inc.), and the Permanente Property. (Bittner Decl. ¶ 30.)

HPCI is expected to generate net cash flows from the Permanente Property and the operating

subsidiaries of approximately $6.5 million and $2.6 million in 2020 and 2021, respectively.

(Plan Projections; Bittner Decl. ¶ 30.)

   The Reorganized Debtors will have the ability to fund their ongoing operations

from cash flow generated by the businesses they directly or indirectly own. (Bittner Decl. ¶ 30;

Plan Projections.) Kaiser Gypsum's lease arrangements for the Real Properties will ensure that it

will generate positive cash flow into the future. (Id.) HPCI's Permanente Plant lease

arrangement with non-debtor Lehigh Southwest, coupled with cash flow from its non-debtor

subsidiaries, similarly shows that HPCI will generate positive cash flow into the future. (Id.)

Additionally, each of the Debtors is ultimately owned by Lehigh Hanson, which has the financial

wherewithal to provide any additional funding needed by either entity. (Bittner Decl. ¶ 32.)

Finally, the Debtors have sufficient cash and access to financing, in combination with (a) Lehigh

Hanson's cash and access to financing and (b) the proceeds of insurance, to fund the obligations

imposed by the Plan. (Id. ¶ 34.)

   Overall, (a) the Plan provides a feasible means of completing a reorganization of

the Reorganized Debtors' businesses, and (b) there is a more than reasonable assurance that the

Reorganized Debtors will be able to satisfy all of their obligations under the Plan. (Id. ¶ 33.)

Accordingly, the Plan satisfies the feasibility standard of section 1129(a)(11) of the Bankruptcy

Code.

12.     **Section 1129(a)(12) — Payment of Bankruptcy Fees.**

The Plan complies with section 1129(a)(12) by providing that all fees payable

pursuant to 28 U.S.C. § 1930 will be paid in cash on or before the Effective Date.

(Plan § III.A.l.b.)

13.     **Section 1129(a)(13) — Retiree Benefits.**

Section 1129(a)(13) of the Bankruptcy Code is not applicable because the Debtors

do not maintain any retiree benefits, as defined in section 1114 of the Bankruptcy Code.

(McChesney Decl. ¶ 42.)

14.     **Section 1129(d) — Purpose of Plan.**

The principal purpose of the Plan is not avoidance of taxes or avoidance of the

requirements of section 5 of the Securities Act of 1933.  (Id. ¶ 40.)

H.     **THE ASBESTOS PERSONAL INJURY TRUST AND THE ASBESTOS
       PERMANENT CHANNELING INJUNCTION COMPLY WITH SECTION
       524(g) OF THE BANKRUPTCY CODE.**

The Plan comports with the Bankruptcy Code's requirements for issuance of an

injunction to enjoin entities from taking legal action to recover, directly or indirectly, payment in

respect of asbestos-related claims or demands against the Reorganized Debtors.

1.     **The Asbestos Personal Injury Trust Satisfies the Requirements of
       Section 524(g)(2)(B)(i) of the Bankruptcy Code.**

a.     ***Section 524(g)(2)(B)(i)(I)*** requires that an asbestos trust assume

the liabilities of a debtor that, as of the petition date, has been named as a defendant in actions to

recover damages for asbestos-related claims. 11 U.S.C. § 524(g)(2)(B)(i)(I).  The Plan satisfies

this requirement by its express terms, which state that "the Asbestos Personal Injury Trust shall

assume liability and responsibility, financial and otherwise, for all Asbestos Personal Injury

Claims."  (Plan § IV.K.3.)  By assuming the Debtors' asbestos liability, the Asbestos Personal

Injury Trust will be responsible for resolving Uninsured Asbestos Claims and the portion of

Insured Asbestos Claims that is not covered by an Asbestos Insurance Policy.  (See Plan § IV.O.;

Asbestos Personal Injury Trust Distribution Procedures §§ 2.2, 5.2, 5.3.)

        b.    **Section 524(g)(2)(B)(i)(II)** requires that the trust "be funded in

whole or in part by the securities of 1 or more debtors involved in such plan and by the

obligation of such debtor or debtors to make future payments, including dividends."  11 U.S.C.

§ 524(g)(2)(B)(i)(II).  The Plan satisfies this requirement by providing that the Asbestos Personal

Injury Trust will be funded in part by the Payment Note.  (Plan § IV.K.2.b.)  Pursuant to section

101(49) of the Bankruptcy Code, a "security" includes, among other things, a note.  11 U.S.C.

§ 101(49).  The Payment Note requires the Reorganized Debtors to make a payment of

$1 million on or before the fifth anniversary of the Effective Date.  This obligation is secured by

the Pledge of 100% of the equity of each Reorganized Debtor.  (Plan § I.A.104.)  Accordingly,

the issuance of the Payment Note, of which both Debtors are co-obligors, nominally satisfies

section 524(g)(2)(B)(i)(II)'s requirement that the trust be funded "in part by the securities of 1 or

more debtors and by the obligation of such debtor or debtors to make future payments, including

dividends."[15]

---

[15]    There is an argument that the note is pretextual, given its short term and small amount. See In re
Congoleum Corp., 362 B.R. 167, 177 (Bankr. D.N.J. 2007). However, other courts have confirmed such
plans, particularly, where, as here, the note is only a minor part of the funding to pay claims and/or where
none of the affected parties object .  See In re W. Asbestos Co., 313 B.R. 832, 851 (Bankr. N.D. Cal. 2003)
(in the context of a plan in which an insurer was contributing approximately $740 million in cash to the
asbestos trust, noting that "the Plan also provides that MacArthur will contribute to the Trust a promissory
note for $500,000, payable over five years… [and] requires MacArthur to make payments to the Trust
pursuant to the note" and concluding that the note and payment pursuant thereto "are sufficient to satisfy 11
U.S.C. § 524(g)(2)(B)(i)(II)."); In re J T Thorpe Co., 308 B.R. 782, 788-89 (Bankr. S.D. Tex. 2003)
(finding that the "[p]lan complies with Section 524(g)(2)(B)(i)" when trust is "to be funded in part by a
Promissory Note for $2.3 million" and "in part by proceeds received pursuant to the terms of the Asbestos
Insurance Action Recoveries, the Asbestos In-Place Insurance Coverage, the Asbestos Insurance Settlement
Agreements, and by the Asbestos Insurance Policies"); In re Leslie Controls, Inc., Case No. 10-12199
(CSS) (Bankr. D. Del. Jan. 10, 2011), Second Conformed First Amended Plan of Reorganization of Leslie
Controls, Inc. §§ 1.93, 1.94, 9.3(h), (i) (in the context of a trust funded with, among other things, $74

To the extent section 524(g)(2)(B)(i)(II) may contain a "ongoing business" requirement, the Plan satisfies it. Here, both Debtors have ongoing business operations. HPCI owns the Permanente Property, a more than 3,400 acre property in California that includes a cement plant, rock plant and quarry, which it leases to a non-debtor affiliate, Lehigh Southwest. (McChensey Decl. ¶ 10.) Lehigh Southwest pays rent, royalties and other payments to HPCI, and Lehigh Southwest is responsible for ongoing operating costs on that property, HPCI remains responsible for capital expenditures and reclamation operations related to the property. (Id.) HPCI also owns equity in operating subsidiaries that distribute and sell cement in the Pacific region. (Id. ¶ 9.) The Permanente Property and these equity interests will vest in Reorganized HPCI, which will continue to manage these assets. (Plan § IV.A.) As set forth in the Plan Projections, HPCI's net cash flows will exceed $6.5 million in 2020 and $2.6 million in 2021. (Plan Projections; Bittner Decl. ¶ 30.)

Additionally, non-debtor Lehigh Cement Company LLC will transfer its interests in the Real Properties, together with its rights under certain leases related to the Real Properties, to Kaiser Gypsum. (McChensey Decl. ¶ 11; Plan § IV.C.) The leases related to the Real Properties are expected to generate net cash flows for Kaiser Gypsum of approximately

---

million in cash, satisfying section 524(g)(2)(B)(ii)(II), in part, through the contribution of a $1 million promissory note) and In re Leslie Controls, Inc., Case No. 10-12199 (CSS) (Bankr. D. Del. Jan. 10, 2011), Findings of Fact, Conclusions of Law, and Order Confirming the Second Conformed First Amended Plan of Reorganization of Leslie Controls, Inc. § U.3 (concluding that plan complies with section 524(g)(2)(B)(i)(II) of the Bankruptcy Code and confirming plan).

This Court has done so as well, albeit, in an uncontested confirmation hearing. See In re Garlock Sealing Techs. LLC, No. 3:17-CV-00275-GCM, 2017 WL 2539412, at *20 (W.D.N.C. June 12, 2017) (confirming plan where the trust was to be funded, in part, by deferred contributions in the amount of $60 million which was to be paid by a reorganized debtor no later than the first anniversary of the plan's effective date and cash contributions totaling $400 million (citing Plan §§ 7.3.2 and 7.8(1); Plan Ex. H, I, and J)). We need not address this issue. For not only is the Note a small part of the total funding, but the parties with an interest in the Trust (asbestos personal injury claimants, the ACC, the FCR and the Debtors) support the Plan. Truck has objected but has no interest in the Trust and thus no standing to make this argument.

$68,000 in 2020 and $93,000 in 2021, as set forth in the Plan Projections.  (Plan Projections;

Bittner Decl. ¶ 30.)

       c.    ***Section 524(g)(2)(B)(i)(III)*** requires that the trust "own, or by the

exercise of rights granted under such plan would be entitled to own if specified contingencies

occur, a majority of the voting shares" of each debtor."  11 U.S.C. § 524(g)(2)(B)(i)(III).  The

Plan satisfies this requirement.  The Plan provides that, upon the Effective Date, the Asbestos

Personal Injury Trust will receive a Payment Note in the principal amount of $1 million secured

by a Pledge of 100% of the equity in the Reorganized Debtors.  (Plan §§ IV.K.2.b, I.A.98,

I.A.104.)  If the Reorganized Debtors fail to pay the Payment Note in full on or before the fifth

anniversary of the Effective Date, the Asbestos Personal Injury Trust can foreclose on the Pledge

of the Reorganized Debtors' equity and become the 100% owner of the Reorganized Debtors.

(Id.)  This structure also complies with the language of section 524(g)(2)(B)(i)(III).[16]

       d.    ***Section 524(g)(2)(B)(i)(IV)*** requires an asbestos trust "to use its

assets or income to pay claims and demands."  11 U.S.C. § 524(g)(2)(B)(i)(IV).  Here, the

Asbestos Personal Injury Trust will assume all liability and responsibility for all Asbestos

Personal Injury Claims (Plan § IV.K.3.) and will use its assets, which will include the Debtors'

assigned asbestos insurance rights, to resolve Asbestos Personal Injury Claims and Demands in

accordance with the Plan, the Asbestos Personal Injury Trust Distribution Procedures and the

Confirmation Order (Plan § IV.F.), thus satisfying the requirements of section

524(g)(2)(B)(i)(IV).

       e.    ***The Debtors are Entitled to a Discharge.***  The Debtors are entitled

to a discharge under section 1141 of the Bankruptcy Code.  Pursuant to section 1141(d)(3) of the

---

[16]    See supra note 15.

CA00053

Bankruptcy Code:  "The confirmation of a plan does not discharge a debtor if – (A) the plan

provides for the liquidation of all or substantially all of the property of the estate; (B) the debtor

does not engage in business after consummation of the plan; and (C) the debtor would be denied

a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title."

11 U.S.C. § 1141(d)(3).  None of these factors is present here.

First, the Plan does not provide for the liquidation of all or substantially all

of the property of the estate.  The Debtors are transferring certain of their rights under insurance

policies to the Asbestos Personal Injury Trust but HPCI is retaining its other assets and Kaiser

Gypsum is acquiring additional assets.  As described above, the Permanente Property will vest in

Reorganized HPCI, and HPCI will also retain its equity interest in its subsidiaries.  Reorganized

Kaiser Gypsum will become the owner of the Real Properties.  These assets, and the income that

the Reorganized Debtors will obtain from them, is projected to be significant.  Additionally, as

explained above, the Reorganized Debtors will engage in business following confirmation of the

Plan.  Notwithstanding the foregoing, no release or discharge of any of the Parties or any

Reorganized Debtor, or any of their respective present or former directors, officers, employees,

members, subsidiaries, predecessors, successors, attorneys, accountants, investment bankers,

financial advisors, appraisers, representatives and agents, or the DIP Lender, in each case acting

in such capacity, shall diminish, reduce or eliminate the duties or obligations of any Asbestos

Insurer under any Asbestos Personal Injury Insurance Asset.

### 2. The Asbestos Personal Injury Trust Satisfies the Requirements of Section 524(g)(2)(B)(ii) of the Bankruptcy Code.

Section 524(g)(2)(B)(ii) of the Bankruptcy Code requires the Court to make

certain factual findings to support the issuance of a channeling injunction under

section 524(g)(1)(A).  As set forth below, the Debtors' history, the nature of asbestos-related

JA00054

litigation and the facts of these Reorganization Cases all support the findings required for the

issuance of the Asbestos Permanent Channeling Injunction under section 524(g)(1)(A) of the

Bankruptcy Code.

a.    ***Section 524(g)(2)(B)(ii)(I)*** requires the court to find that "the

debtor is likely to be subject to substantial future demands for payment arising out of the same or

similar conduct or events that gave rise to the claims that are addressed by the injunction."

11 U.S.C. § 524(g)(2)(B)(ii)(I).

Here, the Debtors' asbestos-related liabilities arise from their manufacture

and sale of certain products that contained asbestos.  (McChesney Decl. ¶ 12.)  Since 1978, one

or both of the Debtors have been named in more than 38,000 asbestos-related lawsuits.  (Id. ¶ 14)

As of August 31, 2016, the Debtors were defendants in approximately 14,000 pending

asbestos-related bodily injury lawsuits pending in courts across the country.  (Id.)

Based on the substantial number of asbestos-related personal injury

lawsuits that were filed in the past and were continuing to be filed prior to the Petition Date, the

Debtors would likely be subject to substantial future Demands for payment arising from the same

or similar conduct or events that gave rise to the Asbestos Personal Injury Claims.  (Id. ¶ 43;

Fitzpatrick Decl. ¶ 36.)  Accordingly, section 524(g)(2)(B)(ii)(I) is satisfied.

b.    ***Section 524(g)(2)(B)(ii)(II)*** requires a court to find that "the actual

amounts, numbers, and timing of such future demands cannot be determined."  11 U.S.C.

§ 524(g)(2)(B)(ii)(II).  The Debtors are unable to predict with any degree of confidence the

amounts, numbers and timing of future Demands in respect of alleged asbestos-related personal

injuries.  (McChesney Decl. ¶ 43.)  Accordingly, section 524(g)(2)(B)(ii)(II) is satisfied.

JA00055

c.     ***Section 524(g)(2)(B)(ii)(III)*** requires a finding that "pursuit of such demands outside the procedures prescribed by such plan is likely to threaten the plan's purpose to deal equitably with claims and future demands."  11 U.S.C. § 524(g)(2)(B)(ii)(III). Under the Plan, all asbestos claimants, current and future, will receive equitable treatment in accordance with the Asbestos Trust Distribution Procedures.  Without the Plan, there is a risk that present claimants will be treated more favorably than future claimants because the potential for uninsured judgments, including punitive damages, could leave the Debtors without sufficient assets to make equivalent payments to future claimants.  (McChesney Decl. ¶ 44; Fitzpatrick Decl. ¶ 37.)  Thus, the requirements of section 524(g)(2)(B)(ii)(III) are met.

d.     ***Section 524(g)(2)(B)(ii)(IV)*** requires a court to find that, as part of the confirmation process, the terms of the channeling injunction proposed, including "any provisions barring actions against third parties," are set forth in the plan of reorganization and the disclosure statement in support of the plan.  11 U.S.C. § 524(g)(2)(B)(ii)(IV)(aa).  A court must also find that "a separate class or classes of the claimants whose claims are to be addressed by a trust described in clause (i) is established and votes, by at least 75 percent of those voting, in favor of the plan."  11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).  As part of the Confirmation process in these cases, the Debtors included the terms of the Asbestos Permanent Channeling Injunction, including provisions therein barring actions against any Protected Party, in both the Plan and the Disclosure Statement.  (Plan § IX.B.2; Disclosure Statement § VII.Q.2.)  The Debtors also designated Class 4 under the Plan for all Asbestos Personal Injury Claims.  (Plan §§ III.B; Disclosure Statement § VII.Q.2.)  The voting Claim holders in Class 4 unanimously accepted the Plan.  (Voting Agent Decl. ¶ 10.)

e.      ***Section 524(g)(2)(B)(ii)(V)*** requires a court to find that

the trust will operate through mechanisms such as
structured, periodic, or supplemental payments, pro
rata distributions, matrices, or periodic review of
estimates of the numbers and values of present
claims and future demands, or other comparable
mechanisms, that provide reasonable assurance that
the trust will value, and be in a financial position to
pay, present claims and future demands that involve
similar claims in substantially the same manner.

11 U.S.C. § 524(g)(2)(B)(ii)(V).  Here, the Asbestos Personal Injury Trust will pay Asbestos

Personal Injury Claims in accordance with the Asbestos Personal Injury Trust Distribution

Procedures set forth in Exhibit I.A.19 to the Plan, which contain mechanisms that provide

reasonable assurance that the Asbestos Personal Injury Trust will value, and be in a financial

position to pay, present Asbestos Personal Injury Claims and future asbestos-related Demands

that involve similar claims in substantially the same manner.  (Fitzpatrick Decl. ¶ 41.)

Specifically, the Asbestos Personal Injury Trust Distribution Procedures

provide for the processing and payment of the uninsured portions of Insured Asbestos Claims

and the Uninsured Asbestos Claims that would have been paid by the Debtors prepetition, on an

impartial, first-in-first-out basis.  To ensure substantially equivalent treatment of all present and

future Asbestos Personal Injury Claims, the Asbestos Personal Injury Trustee will be required to

determine, with the consent of the Trust Advisory Committee and the FCR, the percentage of

value that holders of present and future Asbestos Personal Injury Claims are likely to receive

from the Asbestos Personal Injury Trust (the "Payment Percentage").  This determination will

take account of estimates of payments related to Uninsured Amounts, the value of the Asbestos

Personal Injury Trust Assets, and projected expenses.  Further, at least once every three years,

the Asbestos Personal Injury Trustee will be required to reconsider the then-applicable Payment

Percentage based on current information.  In determining whether to adjust the Payment

Percentage, the Asbestos Personal Injury Trustee is obligated to assess the liability forecast on

which the Payment Percentage is based against the claims filed and the Asbestos Personal Injury

Trust's corresponding payment history.  Each Distribution made to an asbestos claimant will

reflect the Payment Percentage in effect at the time of such Distribution.  To further ensure

equitable treatment of similarly-situated claims, in the event the Asbestos Personal Injury

Trustee determines it appropriate to increase the Payment Percentage, the Asbestos Personal

Injury Trustee will be required to make supplemental payments to all asbestos claimants who

previously liquidated their Asbestos Personal Injury Claims based on a lower Payment

Percentage.

   Accordingly, the Asbestos Personal Injury Trust Distribution Procedures

provide reasonable assurance that the Asbestos Personal Injury Trust will value, and be in a

financial position to pay, present Asbestos Personal Injury Claims and future asbestos-related

Demands in substantially the same manner.  As a result, the Plan and the Asbestos Personal

Injury Trust Distribution Procedures contemplated therein satisfy the requirements of

section 524(g)(2)(B)(ii)(V).

   **3.**    **The Extension of the Asbestos Permanent Channeling Injunction to
Third Parties Is Appropriate.**

   Sections 524(g)(3)(A) and 524(g)(4)(A)(ii) of the Bankruptcy Code designate

certain entities that are protected by a channeling injunction entered pursuant to

section 524(g)(1)(A).  Specifically, section 524(g)(3)(A) provides that

> (ii) no entity that pursuant to such plan or thereafter becomes a
> direct or indirect transferee of, or successor to any assets of, a
> debtor or trust that is the subject of the injunction shall be liable
> with respect to any claim or demand made against such entity by
> reason of its becoming such a transferee or successor; and

> (iii) no entity that pursuant to such plan or thereafter makes a loan
> to such a debtor or trust or to such a successor or transferee shall,

TA00058

> by reason of making the loan, be liable with respect to any claim or
> demand made against such entity, nor shall any pledge of assets
> made in connection with such a loan be upset or impaired for that
> reason.

11 U.S.C. § 524(g)(3)(A)(ii)-(iii).  Consistent with that section, the Plan contemplates

that the Asbestos Permanent Channeling Injunction will be extended to protect the

following:

> Entities that, pursuant to the Plan or on or after the Effective Date,
> become a direct or indirect transferee of, or successor to, any assets
> of any Debtor or Reorganized Debtor, or the Asbestos Personal
> Injury Trust, but only to the extent that liability is asserted to exist
> by reason of such Entity becoming such a transferee or successor
> [Plan § I.A.109.h.]; and

> Entities that, pursuant to the Plan or on or after the Effective Date,
> make a loan to any Debtor or Reorganized Debtor, or the Asbestos
> Personal Injury Trust or to a successor to, or transferee of, any
> assets of any Debtor or Reorganized Debtor, or the Asbestos
> Personal Injury Trust, but only to the extent that liability is asserted
> to exist by reason of it becoming such a lender[.] [id. § I.A.109.i.].

> In addition to the entities protected by virtue of section 524(g)(3)(A),

section 524(g)(4)(A)(ii) provides that a channeling injunction entered pursuant to

section 524(g)(1)(A):

> may bar any action directed against a third party who is
> identifiable from the terms of such injunction (by name or as part
> of an identifiable group) and is alleged to be directly or indirectly
> liable for the conduct of, claims against, or demands on the debtor
> to the extent such alleged liability of such third party arises by
> reason of—

> (I) the third party's ownership of a financial interest in the debtor, a
> past or present affiliate of the debtor, or a predecessor in interest of
> the debtor;

> (II) the third party's involvement in the management of the debtor
> or a predecessor in interest of the debtor, or service as an officer,
> director or employee of the debtor or a related party;

(III) the third party's provision of insurance to the debtor or a related party; or

(IV) the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party, including but not limited to —

(aa) involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction; or

(bb) acquiring or selling a financial interest in an entity as part of such a transaction.

11 U.S.C. § 524(g)(4)(A)(ii).  As required by section 524(g)(4)(A)(ii), each Protected Party under the Plan is either identifiable from the terms of the injunction or is a member of an identifiable group.  (Plan § I.A.109.)  In addition, the Plan defines Protected Party to include those parties that fit within the categories listed in section 524(g)(4)(A) of the Bankruptcy Code.  (Id.)  Each Protected Party under the Plan therefore falls within the groups designated in sections 524(g)(3)(A) and 524(g)(4)(A)(ii) as third parties to whom a channeling injunction may be extended.  Accordingly, the Court may extend the Asbestos Permanent Channeling Injunction to protect all Protected Parties from liability for any Asbestos Personal Injury Claims.

> **4.     The Rights of Persons That Might Subsequently Assert an Asbestos Personal Injury Claim That Is a Demand Addressed by the Asbestos Permanent Channeling Injunction and Transferred to the Asbestos Personal Injury Trust Were Represented by the Future Claimants' Representative.**

In accordance with section 524(g)(4)(B)(i) of the Bankruptcy Code, the FCR was appointed as part of proceedings leading to issuance of the Asbestos Permanent Channeling Injunction for the purpose of protecting the rights of all persons, whether known or unknown, that might subsequently assert, directly or indirectly, against any Debtor an Asbestos Personal Injury Claim that is a Demand addressed in the Asbestos Permanent Channeling Injunction and

transferred to the Asbestos Personal Injury Trust.  Accordingly, the Debtors have met the

requirements of section 524(g)(4)(B)(i) of the Bankruptcy Code.

> **5.     Entry of the Asbestos Permanent Channeling Injunction Is Fair and Equitable with Respect to Future Asbestos Claimants.**

Section 524(g)(4)(B)(ii) of the Bankruptcy Code requires a court to determine that

entry of the channeling injunction, and the protection from liability that is afforded to the parties

named therein, "is fair and equitable with respect to the persons that might subsequently assert

such demands, in light of the benefits provided, or to be provided, to such trust on behalf of such

debtor or debtors or such third party."  11 U.S.C. § 524(g)(4)(B)(ii).

On the Effective Date:  (a) the Reorganized Debtors and/or Lehigh Hanson on

behalf of and as a contribution to such Reorganized Debtors will pay an aggregate of $49 million

in cash to the Asbestos Personal Injury Trust; (b) the Reorganized Debtors, as co-obligors, shall

issue the Payment Note to the Asbestos Personal Injury Trust; (c) the Reorganized Debtors shall

transfer the Phase 1 Claims to the Asbestos Personal Injury Trust, free and clear of any liens,

claims or encumbrances, including any rights of setoff based on any liability of the Debtors;[17]

and (d) the Reorganized Debtors shall transfer the Asbestos Personal Injury Insurance Assets to

the Asbestos Personal Injury Trust.  (Plan § IV.K.2.)

In addition, notwithstanding any other provisions of the Plan, no release or

discharge of any of the Parties, the Creditors' Committee or any Reorganized Debtor, or any of

their respective present or former directors, officers, employees, members, subsidiaries,

---

[17]     The Debtors or the Reorganized Debtors shall pay all Debtor Appellate Costs.  The Asbestos Personal
Injury Trust shall pay all Asbestos Personal Injury Trust Appellate Costs.  If the Asbestos Personal Injury
Trust ultimately obtains any recovery with respect to Phase 1 Claims, whether as a result of settlement or
judgment that exceeds $12 million, the Asbestos Personal Injury Trust shall remit to the Debtors or the
Reorganized Debtors any amounts remaining, in excess of $12 million, after the Asbestos Personal Injury
Trust Appellate Costs have been deducted from the full recovery amount.  (Plan § IV.K.2.c.)

7A00061

predecessors, successors, attorneys, accountants, investment bankers, financial advisors,

appraisers, representatives and agents, or the DIP Lender, in each case acting in such capacity,

shall diminish, reduce or eliminate the duties or obligations of any Asbestos Insurer under any

Asbestos Personal Injury Insurance Asset.  (Plan IV.R.3.c).

       Further, under the Plan, holders of Insured Asbestos Claims may initiate, continue

and/or prosecute suit against the Reorganized Debtors in the tort system to obtain the benefit of

insurance coverage under the Asbestos Insurance Policies, unless and until the Asbestos Personal

Injury Trust, with the consent of the TAC and the FCR, has settled (other than pursuant to the

Excess CIP Agreement) all rights to coverage for Asbestos Personal Injury Claims applicable to

the Asbestos Personal Injury Claim of a particular holder.[18]  In the event that a holder of an

Insured Asbestos Claim commences such an action, the complaint may name the applicable

Reorganized Debtor(s) as a defendant(s) and shall be deemed by operation of law to be an action

against the applicable Reorganized Debtor(s).  Notwithstanding the foregoing, the Reorganized

Debtors shall have no obligation to answer, appear or otherwise participate in the action in any

respect other than as set forth in the Plan and as may be necessary to maintain coverage under the

Asbestos Insurance Policies, and any judgment that may be obtained in the action cannot be

enforced against the assets of the Reorganized Debtors, other than from the Asbestos Insurance

Policies.  (Plan IV.O.1).

       In light of the substantial contributions made to the Asbestos Personal Injury

Trust on behalf of all Protected Parties, entry of the Asbestos Permanent Channeling Injunction,

and the naming of the Protected Parties therein, is fair and equitable with respect to persons that

---

[18]    In the event such a settlement occurs, such holder of an Insured Asbestos Claim shall pursue payment of its Asbestos Personal Injury Claim from the Asbestos Personal Injury Trust in accordance with the Asbestos Personal Injury Trust Distribution Procedures.

CFA00062

might subsequently assert future asbestos-related Demands.  Accordingly, the Debtors have

satisfied the requirements of section 524(g)(4)(B)(ii).

      I.      **COMPREHENSIVE SETTLEMENT OF CLAIMS AND
CONTROVERSIES.**

Pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019,

and in consideration for the Distributions and other benefits provided under the Plan, the

provisions in the Plan, including the settlement of certain estate claims set forth in Section

IV.R.2 and the releases set forth in Section IV.R.3, constitute a good-faith compromise and

settlement of all claims or controversies relating to the rights that a holder of a Claim or Interest

may have with respect to any Claim, Asbestos Personal Injury Claim or Interest or any

Distribution to be made pursuant to the Plan on account of any Allowed Claim, Asbestos

Personal Injury Claim or Interest.

      J.      **SATISFACTION OF CONDITIONS TO CONFIRMATION.**

1.      Section VIII.A of the Plan contains conditions precedent to Confirmation

that must be satisfied or duly waived pursuant to Section VIII.C of the Plan.  The conditions

precedent set forth in Sections VIII.A.1 through VIII.A.5 of the Plan have been satisfied.

2.      Concerning the establishment of the Asbestos Personal Injury Trust and

issuance of the Asbestos Permanent Channeling Injunction, the Court specifically finds:

a.      The Asbestos Permanent Channeling Injunction is to be

implemented in connection with the Plan and the Asbestos Personal Injury Trust.

b.      The Asbestos Personal Injury Trust, as of the Effective Date, shall

assume all liability and responsibility, financial and otherwise, for all Asbestos Personal Injury

Claims, and, upon such assumption, no Protected Party shall have any liability or responsibility,

financial or otherwise, therefor. Provided, however, the Plan provides that holders of Insured

JA00063

Asbestos Claims may initiate, continue and/or prosecute suits against the Reorganized Debtors in

the tort system to obtain the benefit of insurance coverage under the Asbestos Insurance Policies,

unless and until the Asbestos Personal Injury Trust, with the consent of the TAC and the FCR,

has settled (other than pursuant to the Excess CIP Agreement) all rights to coverage for Asbestos

Personal Injury Claims applicable to the Asbestos Personal Injury Claim of a particular holder, in

which event such holder shall pursue payment of its Asbestos Personal Injury Claim from the

Asbestos Personal Injury Trust in accordance with the Asbestos Personal Injury Trust

Distribution Procedures.

In the event that a holder of an Insured Asbestos Claim commences such

an action, the complaint may name the applicable Reorganized Debtor(s) as a defendant(s) and

shall be deemed by operation of law to be an action against the applicable Reorganized

Debtor(s).

c.      Notwithstanding the foregoing, the Reorganized Debtors shall have

no obligation to answer, appear or otherwise participate in the action in any respect other than as

set forth in the Plan and as may be necessary to maintain coverage under the Asbestos Insurance

Policies, and any judgment that may be obtained in the action cannot be enforced against the

assets of the Reorganized Debtors, other than from the Asbestos Insurance Policies.

d.      As of the Petition Date, each Debtor had been named as a

defendant in a personal injury or wrongful death action seeking recovery for damages allegedly

caused by the presence of, or exposure to, asbestos or asbestos-containing products.

e.      The Asbestos Personal Injury Trust will be funded in whole or in

part by securities of the Reorganized Debtors and by the obligation of such Reorganized Debtors

-46-

or Debtors to make future payments, which payments may be funded by contributions from

Lehigh Hanson to the Reorganized Debtors.

> f.      The Asbestos Personal Injury Trust, by the exercise of rights

granted under the Plan, will be entitled to own, if specified contingencies occur, a majority of the

voting shares of each of the Reorganized Debtors.

> g.      The Asbestos Personal Injury Trust shall use its assets or income to

pay Asbestos Personal Injury Claims, including Demands.

> h.      Each of the Debtors is likely to be subject to substantial future

Demands for payment arising out of the same or similar conduct or events that gave rise to the

Claims that are addressed by the Asbestos Permanent Channeling Injunction.

> i.      The actual amounts, numbers and timing of such future Demands

cannot be determined.

> j.      Pursuit of such Demands outside the procedures prescribed by the

Plan is likely to threaten the Plan's purpose to deal equitably with Claims and future Demands.

> k.      The terms of the Asbestos Permanent Channeling Injunction,

including any provisions barring actions against third parties pursuant to section 524(g)(4)(A) of

the Bankruptcy Code, are set out in the Plan.

> l.      The Plan establishes, in Class 4 (Asbestos Personal Injury Claims),

a separate class of the claimants whose Claims are to be addressed by the Asbestos Personal

Injury Trust.

> m.      At least two-thirds in amount and 75% in number of those voting

Claims in Class 4 (Asbestos Personal Injury Claims) have voted in favor of the Plan.

-47-

n.      Pursuant to court orders or otherwise, the Asbestos Personal Injury

Trust shall operate through mechanisms, such as structured, periodic or supplemental payments,

pro rata distributions, matrices or periodic review of estimates of the numbers and values of

Asbestos Personal Injury Claims, that provide reasonable assurance that the Asbestos Personal

Injury Trust shall value, and be in a financial position to pay, Asbestos Personal Injury Claims,

including Demands, in substantially the same manner.

o.      Each Protected Party is identifiable from the terms of the Asbestos

Permanent Channeling Injunction by name or as part of an identifiable group, and each Protected

Party is or may be alleged to be directly or indirectly liable for the conduct of, Claims against or

Demands on a Debtor to the extent that such alleged liability arises by reason of one or more of

the following:

i.      such Entity's ownership of a financial interest in any Debtor

or Reorganized Debtor, or any past or present Affiliate of any Debtor or Reorganized

Debtor, or any predecessor in interest of any Debtor or Reorganized Debtor;

ii.      such Entity's involvement in the management of any

Debtor, Reorganized Debtor or predecessor in interest of any Debtor or Reorganized

Debtor;

iii.      such Entity's service as an officer, director or employee of

any Debtor, Reorganized Debtor, any past or present Affiliate of any of Debtor or

Reorganized Debtor, or any predecessor in interest of any Debtor or Reorganized Debtor

or Entity that owns or at any time has owned a financial interest in any Debtor,

Reorganized Debtor, or any predecessor in interest of any Debtor or Reorganized Debtor;

or

iv.       such Entity's involvement in a transaction changing the

corporate structure, or in a loan or other financial transaction affecting the financial

condition, of any Debtor, Reorganized Debtor, any past or present Affiliate of any Debtor

or Reorganized Debtor, any predecessor in interest of any Debtor or Reorganized Debtor

or of an Entity that owns or at any time has owned a financial interest in any Debtor,

Reorganized Debtor, any past or present affiliate of any Debtor or Reorganized Debtor,

or any predecessor in interest of any Debtor or Reorganized Debtor, including

(A) involvement in providing financing (debt or equity) or advice to an Entity involved in

such a transaction or (B) acquiring or selling financial interest in any Entity as part of

such transaction.

p.       The FCR was appointed as part of proceedings leading to issuance

of the Asbestos Permanent Channeling Injunction for the purpose of protecting the rights of all

persons, whether known or unknown, that might subsequently assert, directly or indirectly,

against any Debtor an Asbestos Personal Injury Claim that is a Demand addressed in the

Asbestos Permanent Channeling Injunction and transferred to the Asbestos Personal Injury Trust.

q.       Identifying each Protected Party (by name or as part of an

identifiable group, as applicable) in the Asbestos Permanent Channeling Injunction is fair and

equitable with respect to individuals that might subsequently assert Demands against each such

Protected Party, in light of the benefits provided, or to be provided, to the Asbestos Personal

Injury Trust by or on behalf of any such Protected Party.

r.       The Plan and the Asbestos Personal Injury Trust Documents

comply with section 524(g) of the Bankruptcy Code in all respects.

s.      The Plan and Exhibits are a fair, equitable and reasonable

resolution of the liability of the Debtors for the Asbestos Personal Injury Claims.

t.      The FCR has adequately and completely fulfilled his duties,

responsibilities and obligations as the representative for the individuals referred to in finding

Section I.J.p above in accordance with section 524(g) of the Bankruptcy Code.

u.      Adequate and sufficient notice of the Plan and the Confirmation

Hearing, as well as all deadlines for objecting to the Plan, has been given to (i) all known

creditors and holders of Interests, (ii) parties that requested notice in accordance with Bankruptcy

Rule 2002 (including the ACC and the FCR), (iii) all parties to Executory Contracts and

Unexpired Leases, (iv) all taxing authorities listed on the Debtors' Schedules or in the Debtors'

Claims database, in each case, (v) the Department of the Treasury by service upon the District

Director of the IRS, (vi) state attorney generals and state departments of revenue for states in

which any of the Debtors have conducted business, and (vii) the Securities and Exchange

Commission, (A) in accordance with the solicitation procedures governing such service and (B)

in substantial compliance with Bankruptcy Rules 2002(b), 3017 and 3020(b).  Such transmittal

and service were adequate and sufficient, and no other or further notice is or shall be required.

v.      The Debtors' conduct in connection with and throughout these

Reorganization Cases, including, but not limited to, their negotiations with the ad hoc committee

of asbestos personal injury claimants and the prepetition future claimants' representative, and the

commencement of these Reorganization Cases, as well as the drafting, negotiation, proposing,

confirmation, and consummation of the Plan, and their opposition to any other plan of

reorganization, does not and has not violated any Asbestos Insurer Cooperation Obligations

contained in any Asbestos Insurance Policies, nor was such conduct a breach of any express or

implied covenant of good faith and fair dealing.  The Objecting Excess Insurers' consent to this

finding in the particular facts and circumstances of these Reorganization Cases is expressly

without prejudice to the rights of any party to contend that such a finding is or is not appropriate

in any subsequent bankruptcy case not involving these Debtors.  (This provision is referred to

herein as the "Plan Finding.")

    **K.**    **THE PLAN IS INSURANCE NEUTRAL.**

        The Plan is insurance neutral.  Specifically, the Plan's insurance neutrality

provision found in section IV.Q expressly preserves all "Insurer Coverage Defenses," which is

defined to include "all defenses at law or in equity that any Asbestos Insurer may have under

applicable non-bankruptcy law to provide insurance coverage to or for Asbestos Personal Injury

Claims" and states that the transfer of insurance rights to the Asbestos Personal Injury Trust

"shall not affect the liability of any Asbestos Insurer."  (Plan §§ I.A.84, IV.Q.)  The Plan also

states that "the discharge and release of the Debtors and Reorganized Debtors from all Claims

and the injunctive protection provided to the Debtors, Reorganized Debtors and Protected Parties

with respect to Claims as provided herein shall not affect the liability of any Asbestos Insurer."

(Id. § IV.Q.)  Thus, the Plan neither increases Truck's obligations nor impairs its prepetition

contractual rights under the Truck Policies.  The Plan simply restores Truck to its position

immediately prior to the Petition Date.

        Moreover, the Plan expressly provides that the Reorganized Debtors will continue

to fulfill their cooperation obligations arising under the Asbestos Insurance Policies, including

the Truck Policies.  (Plan § IV.L.1 ("The Reorganized Debtors shall have a continuing obligation

to satisfy the Assistance and Cooperation, Inspection and Audit, and Notice of Occurrence

Provisions set out in the Asbestos Insurance Policies."), IV.L.2 ("Enforcement of Reorganized

Debtors' Obligations to Cooperate with Respect to Insurance Matters")).  Thus, although the

Asbestos Insurers may not argue that the Debtors' conduct in filing and prosecuting these

Reorganization Cases, or in pursuing and consummating the restructuring provided under the

Plan, breached the Asbestos Insurer Policies, its rights to pursue coverage defenses to individual

Asbestos Personal Injury Claims for any alleged post-Effective Date violations by the

Reorganized Debtors remain intact.  Put differently, the Plan restores each insurer to the position

it was in immediately prior to the Petition Date, with its rights and obligations under the

applicable Asbestos Insurer Policies left undisturbed, as if the Debtors' bankruptcy had never

occurred.  Such treatment does not diminish Truck's rights or increase its burdens under the

Truck Policies.

Truck has limited standing to object to the Plan solely on the grounds that the

Plan is not insurance neutral, including, within that limited context, that the Debtors are in

violation of the Assistance and Cooperation Clause and are therefore not entitled to the Plan

Finding.  However, because the Plan is insurance neutral and returns Truck to the tort system

exactly as it was prepetition, Truck does not have standing to advance confirmation issues such

as contentions that:  the Plan is collusive and not in good faith; the Debtors are not entitled to a

discharge; or the elements of 11 U.S.C. § 524(g) are not met.  Nor does Truck obtain standing to

object to confirmation because it is also a creditor in this case.  Truck is an unsecured creditor,

and unsecured creditors are unimpaired under the Plan.

Despite finding and concluding that the Plan is insurance neutral and that Truck

lacks standing to object to the Plan on the grounds set forth herein, the Court has considered

Truck's objections and, in light of the record before it, alternatively finds and concludes that

Truck's objections lack merit and should be overruled in their entirety for the reasons stated

herein and in the Bankruptcy Court's oral ruling made on the record at the hearing held August

13, 2020.[19]

### 1.    Truck Has No Interest in the Asbestos Personal Injury Trust.

Truck objects to the Plan on the basis that the Asbestos Personal Injury Trust does

not comply with the structure and funding requirements of section 524(g) of the Bankruptcy

Code.  Truck, however, will not be entitled to any Distributions from the Asbestos Personal

Injury Trust, nor do the terms of the trust have an effect on the Truck's obligations under the

Asbestos Insurance Policies.[20]  Due to the absence of any injury to its interests, Truck lacks

standing to argue that the Asbestos Personal Injury Trust fails to satisfy the requirements of

section 524(g) of the Bankruptcy Code.

### 2.    Even If it Had Standing, Truck's Arguments about the Plan's Treatment of Its Breach Claim Are Overruled.

Truck contends that the Plan violates the Assistance and Cooperation Clause[21] in

its policies (as well as an implied covenant of good faith and fair dealing), resulting in the loss of

coverage under the Truck Policies.  As such, Truck objects to the Plan Finding.

Addressing first this Court's jurisdiction, because the Plan Finding deals with core

matters, it can be made by this Court.  It is undisputed that the Debtors had insurance coverage as

of the Petition Date.  Accordingly, the finding is a bankruptcy matter arising in Title 11 because

it would have no existence outside of bankruptcy.  The actions that Truck contends violate the

---

[19]    The Bankruptcy Court permitted Truck to fully participate in the confirmation process, including
participating in pre-hearing discovery, filing pre-hearing briefs, and in presenting argument and evidence at
the Confirmation Hearing.

[20]    In the event the Asbestos Personal Injury Trust and Truck reach a post-Confirmation agreement, the
agreement is subject to Section IV.M.3.a of the Plan and notice to the Objecting Excess Asbestos Insurers
and approval by the Bankruptcy Court.  (Plan § I.A.120.)

[21]    Defined below.

-53-

Truck Policies and relieve it of its obligations under those policies all relate to whether the Plan should have been confirmed, the legality of its provisions, the good faith of the Plan Proponents, and the conduct of the parties during the Reorganization Cases case.  Those are all core bankruptcy matters.  Travelers Cas. and Sur. Co. v. Skinner Engine Co., Inc. (In re Am. Capital Equip., LLC), 325 B.R. 372, 377-78 (W.D. Pa. 2005).

These issues do not need to be decided in the adversary proceeding Truck filed in the District Court.  The Truck adversary is effectively a bankruptcy confirmation objection.  But it relates to core matters, meaning those issues do not need to be decided in the Truck adversary.  In any case, resolving the merits of Truck's contention do not implicate any jury trial right.  There is no disputed issue of fact.

That the finding addresses a state law contract is of no moment.  Core proceedings often deal with state-law rights, and contract rights, in particular.  Any bankruptcy plan deals with contract rights, and often modifies them.  And in this case, this adjudication of these rights would not exist outside of a bankruptcy environment, so they are core.

Truck's contention that the Plan impairs its contract rights is based on a false premise:  the notion that its contract gives it the right to collaterally attack elsewhere a confirmation ruling and make determinations of the propriety of the parties' conduct in the course of this case.  Such rights never existed under the Truck Policies, and to the extent they did, they would be preempted by the Bankruptcy Code.  See, e.g., In re Federal-Mogul Glob. Inc., 684 F.3d 355, 382 (3d Cir. 2012).

Finally, the Plan does not violate the Truck policy.  Truck is an insurer who contracted to defend the Debtors' asbestos claims in the state and federal court system, and Truck is being sent back to defend these claims in the court system.  This does not violate the Truck

-54-

policies.  Nor does the Assistance and Cooperation Clause in the Truck Policies require the

Debtors to take strategic direction from their insurer in bankruptcy.  <u>Admiral Ins. Co. v. Grace</u>

<u>Indus., Inc.</u>, 409 B.R. 275, 283 (E.D.N.Y. 2009) ("[T]he cooperation clause only required Grace

to assist in the ultimate disposition of the actual claims, not to take on a partner to make litigation

decisions solely regarding Grace's own bankruptcy reorganization.").  Here, that the Plan did not

contain features that Truck would have preferred does not violate the terms of the Truck Policies.

## L.   TRUCK'S COURSE OF CONDUCT BEFORE THE BANKRUPTCY COURT.

Truck raised its confirmation objection with the Bankruptcy Court before refiling

it as the Complaint (as defined below), including in its First Amended Disclosure Statement for

the First Amended Truck Plan [D.I. 1204 at 2] and in a confirmation objection filed on

November 6, 2018 [Conf. Exhibit 95 at 19-20].  Truck later sent a "reservation of rights" letter to

the Debtors' counsel, dated April 3, 2019, asserting that the Debtors had, solely as a result of

their efforts in furtherance of the Reorganization Cases, breached the "Assistance and

Cooperation Clause" in the Truck Policies and threatening to deny coverage if the Debtors did

not capitulate and either support Truck's competing plan or revise the Plan to benefit Truck.

[Conf. Exhibit 62].  Truck raised its objection again on June 6, 2019, as a supplemental objection

to a prior version of the Plan and Disclosure Statement [D.I. 1682], arguing that the Debtors

must file an adversary proceeding to resolve the dispute.  Then, approximately ten months after

first raising its objection and on the eve of the Bankruptcy Court's September 4, 2019 ruling on

Truck's and the Debtors' competing disclosure statements, Truck filed its Complaint for

Declaratory Relief [Adv. Proc. 19-3052, D.I. 1] (the "<u>Complaint</u>"),[22] alleging that its

---

[22]   The Complaint requests declaratory judgments that the Debtors breached their duty of assistance and
cooperation, as well as the implied covenants of good faith and fair dealing, under the Truck Policies and

confirmation objection was a state-law insurance dispute that was non-core and must be tried

before a jury in the District Court.  Truck then filed its Motion to Withdraw the Reference of

Adversary Proceeding to the Bankruptcy Court [Civ. No. 19-0467-GCM, D.I. 1] and its brief in

support [Civ. No. 19-0467-GCM, D.I. 1-1] ("Truck's Adversary Brief").[23]  The District Court

stayed the matter until the Bankruptcy Court ruled on the Plan.  Order [Civ. No. 19-0467-GCM,

D.I. 3].

      Contrary to Truck's assertions,[24] the Complaint is not an insurance coverage

action that happened to take place at the same time as the Reorganization Cases.  It is a

declaratory judgment action filed by the Debtors' primary general liability insurer seeking to

avoid any and all liability for Insured Asbestos Personal Injury Claims under the Truck Policies

(the primary asset of the Debtors' estates), based solely on the Debtors' actions in support of the

Reorganization Cases and confirmation of the Plan.  See, e.g., In re Am. Capital Equip., 325 B.R.

at 377-78 ("Travelers itself has framed the issues in its declaratory judgment complaint such that

the claims and rights that it asserts could arise only in the context of this bankruptcy case and

would not exist independent of the bankruptcy environment.  As such, we find that the adversary

proceeding is core.").  The Plan Finding is a necessary part of the confirmation process given

that the right to receive the proceeds of the Truck Policies comprises the majority of the ultimate

value of the Asbestos Personal Injury Trust Assets.  See id.  Because of this, Confirmation of the

Plan must include a ruling that Truck cannot use the Reorganization Cases and actions taken in

---

that, as a consequence, Truck is relieved of its contractual obligations under the policies.  The Complaint
also requests a declaratory judgment that the Debtors are not entitled to the Plan Finding.

[23]    Truck incorporated its Adversary Brief into the terms of its Objection.  Objection [D.I. 2070] at 25.

[24]    Truck asserts that it never raised the allegations in its Complaint as a confirmation objection.  As the
Bankruptcy Court found, however, Truck inserted its coverage-based arguments into the confirmation
process.  Bankr. Hrg Tr. 25:10-15 ("This was a variety of threats being made to block confirmation or to
avoid coverage until [Truck] got what it wants in the confirmation process.").

furtherance of such cases as a defense to coverage after the Plan is confirmed or to collaterally attack the Confirmation Order with another court.

The record clearly shows that Truck's Complaint, its Objection and the Plan Finding are each inextricably intertwined with both each other and the Plan confirmation process, including findings and conclusions the Court must make regarding whether the Plan and the Plan Proponents have complied with the applicable provisions of the Bankruptcy Code under section 1129(a)(1) and (2); whether the Plan has an adequate means of implementation and was proposed in good faith and not by any means forbidden by law under sections 1123(a)(5) and 1129(a)(3); whether the Plan is feasible under section 1129(a)(11); and whether the Plan meets the requirements of section 524(g). These are all statutory-based confirmation matters that fall within the jurisdiction of this Court under 28 U.S.C. § 1334 and that must be raised in the context of the Reorganization Cases. See, e.g., Special Metals Corp., 317 B.R. at 330-331 (debtors' confirmed plan was res judicata upon liability of insurers and precluded insurers from asserting that they had been relieved of their contractual obligations under policies). That the Plan Finding addresses a matter of state law is of no moment. See 28 U.S.C. § 157(b)(3) ("A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law.")

## II.    CONCLUSIONS OF LAW.

### A.    JURISDICTION AND VENUE.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. The Debtors were and are qualified to be debtors under section 109 of the Bankruptcy Code. Venue of the Reorganization Cases is proper under 28 U.S.C. §§ 1408 and continues to be proper.

B.    **APART FROM ISSUES RELATED TO INSURANCE NEUTRALITY, TRUCK LACKS STANDING TO OBJECT TO THE PLAN.**

While there is no requirement that a section 524(g) plan be insurance neutral,

because the Plan is insurance neutral (see Section I.K. above), Truck lacks standing to object to

Confirmation of the Plan.  See, e.g. In re Pittsburgh Corning Corp., 417 B.R. 289, 317 (Bankr.

W.D. Pa. 2006) (finding plan insurance neutral and, therefore, insurers had no standing to object

to confirmation); In re Combustion Eng'g, Inc., 391 F.3d at 218, as amended (Feb. 23, 2005)

(holding that insurers lacked standing insofar as the plan did not affect their rights); Mt.

McKinley Ins. Co. v. Pittsburgh Corning Corp., 518 B.R. 307, 329 (W.D. Pa. 2014) (concluding

that the insurer's "arguments that it has standing are without merit" because "[t]he plan did not

dramatically increase the 'quantum of liability,' harm . . . [insurer's] contractual rights, or increase

its administrative burdens"); J T Thorpe Co., No. 02-41487-H5-11, 2003 WL 23354129, at *1

(Bankr. S.D. Tex. Jan. 30, 2003) (noting that the district court had affirmed the bankruptcy

court's prior ruling sustaining the debtors' objection to insurers' standing to object to the

disclosure statement and the plan); In re Fuller-Austin Insulation, No. 98-2038-JJF, 1998 WL

812388, at *1 (D. Del. Nov. 10, 1998) (holding that insurers lacked standing to object to both the

approval of the disclosure statement and the plan itself because the plan preserved insurers' rights

in coverage litigation).[25]

Even absent insurance neutrality, Truck lacks standing to object to the structure

and funding of the Asbestos Personal Injury Trust because Truck has no interest in the trust and

---

[25]    Truck holds a General Unsecured Claim against the Estates; however, that Claim will be paid in full under
the Plan.  Plan § III.B.3.  Truck is not raising its objection as the holder of an unimpaired Claim, but as an
insurer that is not satisfied with the outcome of the Reorganization Cases, despite the fact that the Plan is
insurance neutral.  But a debtor is not required to take on a partner in its bankruptcy case or to make
litigation decisions for the benefit of insurers.  See Bankr. Hr'g Tr. (8/13/2020) at 18:12-19:1.

the trust will have no effect on its legal or pecuniary interests (see Section I.K. above).[26]  In

objecting to the Plan on this basis, Truck is impermissibly asserting the rights of third-party

asbestos claimants.  See Combustion Eng'g, Inc, 391 F.3d at 248 ("While . . . [insurers] argue

that § 524(g)(2)(B)(i)(II) is not satisfied, they do not have standing to raise this matter."); In re

A.P.I., Inc., 331 B.R. 828, 867 (Bankr. D. Minn. 2005) ("[T]he insurers cannot be heard in

objection to the plan on its conformity with either § 524(g)(2)(B)(i)(II) or (i)(III)."), aff'd sub

nom.  OneBeacon Am. Ins. Co. v. A.P.I., Inc., 2006 WL 1473004 (D. Minn. May 25, 2006).

## C.   ENTRY OF THE PLAN FINDING IS PROPER.

### 1.   Truck Has Received All Necessary Procedural Protections.

Truck argues that Bankruptcy Rule 7001(2) requires that any ruling regarding its

Complaint, Objection and the Plan Finding be made in the context of an adversary proceeding,

not a contested confirmation hearing.  Truck Adversary Brief [Adv. Proc. 19-3052, D.I. 5-1] at 2

(citing FED. R. BANKR. P. 7001(2) ("The following are adversary proceedings: . . . a proceeding

to determine the validity, priority, or extent of a lien or other interest in property….")).

Bankruptcy Rule 7001(2) does not require this result.  Neither Truck's Complaint nor Objection

(a) challenges the Debtors' ownership of the Truck Policies, (b) alleges that Truck holds a

competing interest in the Truck Policies or (c) argues that Truck is entitled to the proceeds of the

Truck Policies.  To the contrary, Truck alleges that the Debtors' conduct in furtherance of the

Reorganization Cases breached the Truck Policies.  These breach of contract claims do not

---

[26]   Courts consider standing on claim-by-claim basis.  See Friends of the Earth, Inc. v. Laidlaw Envtl. Servo
(TOC), Inc., 528 U.S. 167, 185 (2000) (standing "is determined on an ad hoc basis, and party "must
demonstrate standing separately for each form of relief sought"); accord Rosen v. Tenn. Comm'r of Fin. &
Admin., 288 F.3d 918, 928 (6th Cir. 2002) ("It is black-letter law that standing is a claim-by-claim issue.");
Sentinel Trust Co. v. Newcare Health Corp. (In re Newcare Health Corp.), 244 B.R. 167, 172 (BAP 1st Cir.
2000) ("In bankruptcy, a party may have standing for some matters and not for others.") (citing In re
Tascosa Petroleum Corp., 196 B.R. 856 (D. Kan. 1996)).

-59-

require the Court to determine the validity, priority or extent of a lien or other interest in property.  See, e.g., U.S. Brass Corp., 110 F.3d 1216, 1268 (7th Cir. 1997) ("The issue in these cases is the scope of the insurance policies, an issue of contractual interpretation, not their ownership.").

Because an adversary proceeding is not required, Truck's Complaint and Objection were properly considered in connection with the Confirmation Hearing.  See Ralls v. Decktor Pet Ctrs, Inc., 177 B.R. 420, 428 (D. Mass. 1995) ("Matters not listed in Rule 7001 proceed via a 'contested matter' hearing."); In re Aegis Mortg. Corp., Adv. No. 08-50237, 2008 WL 2150120, at *7 (Bankr. D. Del. May 22, 2008) ("Scott cannot seek to enforce this claim for money damages through an adversary proceeding because the relief he seeks is not of a type enumerated in Rule 7001."); see also In re Duncan, 448 F.3d 725, 727 n.1 (4th Cir. 2006) (describing an adversary proceeding as an action brought "for one or more of the reasons specified in Bankruptcy Rule 7001.").

Moreover, the fundamental components of due process are the right to be heard after notice that is reasonably calculated under the circumstances to apprise a party of the pendency of a matter and adequate to afford that party an opportunity to object.  Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950).  The contested Confirmation Hearing before the Bankruptcy Court, coupled with this Court's de novo review process, satisfies these requirements.  The record shows that Truck received notice and an opportunity to be heard, filed written objections to the Plan that mirrored those contained in the Complaint,[27] participated in approximately six months of confirmation-related discovery that included matters surrounding

---

[27]   Truck's Objection incorporates and repeats the same arguments it made in support of its motion to withdraw the reference regarding its Complaint.  Obj. at 25.

the Debtors' alleged breach of the Truck Policies and presented evidence and argument at the

Confirmation Hearing.  See, e.g., Objection [D.I. 2070, supporting exhibits at D.I. 2072]; Conf.

Exhibits 6-12 (Truck's responses and objections to discovery requests), 29-36 (the Debtors and

Truck's joint exhibits), 37-74 (Truck's exhibits admitted into evidence), 55-61 (responses and

objections to Truck's discovery requests); see generally Bankr. Hr'g Trans. August 13, 2020.[28]

       The record clearly reflects that Truck has received all procedural protections

necessary to permit this Court or the Bankruptcy Court to dispose of Truck's Complaint and

Objection in the context of Plan confirmation upon *de novo* review of the Bankruptcy proposed

findings of fact and conclusions of law.  Truck's alleged right to a jury trial does not change this

analysis.  See, e.g., Barber v. Kimbrell's, Inc., 577 F.2d 216, 221 n.12 (4th Cir. 1978) ("[W]here

summary judgment is properly granted, no Seventh Amendment issue arises."); Smith v.

Kitchen, 156 F.3d 1025, 1029 (10th Cir. 1997) (holding that when a plaintiff fails to plead

sufficient facts to overcome a motion to dismiss, there are "no facts to be 'tried' by a jury").

     **2.**     **As a Matter of Law, the Debtors' Acts and/or Omissions Leading Up
to and During the Reorganization Cases Did Not Breach the
Assistance and Cooperation Clause or Any Other Express Provision
of the Truck Policies.**

       Truck's relationship to the Debtors is governed solely by contract.

Aerojet-General Corp. v. Transport Indemn. Co., 17 Cal. 4th 38, 76 (1997).[29]  "[I]nterpretation of

---

[28]    Bankruptcy Rule 9014, which governs contested matters, requires that the fundamental requisites of due
process be satisfied in the same manner as in an adversary proceeding.  See FED. R. BANKR. P. 9014(b)
("The motion shall be served in the manner provided for service of a summons and complaint by Rule
7004[.]").  Bankruptcy Rule 9014 also incorporates a significant portion of the rules governing adversary
proceedings.  Id. Rule 9014(c), (d).

[29]    The parties agree that as applied to coverage for Asbestos Personal Injury Claims, California law governs
interpretation of the Truck Policies.  See, e.g., D.I. 2438 (Court order submitted by agreement of the parties
applying California law to policy dispute); D.I. 2328 at 7 (Truck conceding California law applies to
application of statute of limitations under Debtors' insurance policy claims); D.I. 5-1 (Adv. Pro. Case
19-03052) at 12 (Truck stating its policy rights are controlled by California law).

TA00079

an insurance policy is a question of law."  Waller v. Truck Ins. Exch., 11 Cal. 4th 1, 18 (1995);

Bank of the West v. Superior Court, 2 Cal. 4th 1254, 1264 (1992) (despite special features,

ordinary rules of contract interpretation apply to insurance contracts).  Where possible, the Court

infers the parties' intent solely from the written provisions of the insurance policy.  AIU Ins. Co.

v. Superior Court, 51 Cal. 3d 807, 822 (1990); see Bank of the West, 2 Cal. 4th at 1264 (where

policy language "is clear and explicit, it governs").

Truck contends that, upon Confirmation, the Debtors' actions in furtherance of

their Reorganization Cases will constitute a breach of the Assistance and Cooperation Clause in

the Truck Policies. See, e.g., Conf. Exhibit 95, Objection to Motion for Approval of Debtors'

Disclosure Statement at 19-20; Conf. Exhibit 62, April 3 Reservation of Rights Letter;

Complaint ¶¶ 16-17, 64-68, Prayer ¶¶ (a)-(b); Hoyt Dep. at 74:4-75:25.[30]  That provision, in its

entirety, provides as follows:

> **8.  ASSISTANCE AND COOPERATION OF THE INSURED**
> The insured shall cooperate with the Company [Truck], and upon
> the Company's request, shall attend hearings and trials and shall
> assist in affecting settlements, securing and giving evidence,
> obtaining the attendance of witnesses and in the conduct of suits.
> The insured shall not, except at his own cost, voluntarily make any
> payment, assume any obligation or incur any expense other than
> for such immediate medical and surgical relief to others as shall be
> imperative at the time of the occurrence.

Conf. Exhibit 30, 1974 Truck Policy at TRK 0000586 (the "Assistance and Cooperation

Clause").[31]

---

[30]  Although Truck's Objection alleges that these breaches already have occurred (see generally, D.I. 2070)
Truck's Rule 30(b)(6) corporate witness, Scott Hoyt, clarified that the Debtors' breach of their policy
obligations only will occur at the time a plan is confirmed without fraud protection mechanisms like those
imposed in In re Garlock Sealing Techs., LLC, 504 B.R. 71 (Bankr. W.D.N.C. 2014) ("Garlock").
See Hoyt Dep. at 28:6-29:7; 177:16-180:11; 192:13-195:6.

[31]  The Assistance and Cooperation Clause is included within Asbestos Insurer Cooperation Obligations as
that term is defined in the Plan.

This Court has jurisdiction to apply well-settled rules of insurance policy interpretation to evaluate the Assistance and Cooperation Clause and to determine whether and how they apply to the Debtors' conduct in these bankruptcy proceedings.  See E.M.M.I. Inc. v. Zurich Am. Ins. Co., 32 Cal. 4th 465, 470 (2004) ("The proper question is whether the [provision or] word is ambiguous in the context of this policy and the circumstances of this case").  Although Truck argues that this involves "an inherently factual finding" or will result in a "novel legal ruling on state law insurance policy coverage issues" (D.I. 2359 at 11), Truck admits that that "[t]he relevant part of the Assistance and Cooperation provision of the Truck policies is straightforward" and that Truck "seeks only to hold the Debtors to their *enumerated* policy obligations."  D.I. 2359 at 11, 13 (emphasis added).  This Court can determine the Debtors' obligations under the Assistance and Cooperation Clause as a matter of contractual interpretation "solely from the written provisions of the insurance policy."  AIU Ins. Co., 51 Cal. 3d at 822; Bank of the West, 2 Cal. 4th at 1264; see Bankr. Hr'g Tr. at 25:23-25 Conf. Exhibit 7, Truck's Responses and Objections to Debtors' First Set of Requests for Production ("The meaning of the [Assistance and Cooperation] Clause is set by its text and by relevant case law.  The interpretation of the [Assistance and Cooperation] Clause is a legal question for the Court on which no discovery is required or appropriate.").

Truck asks the Court to construe the term "cooperate" to require Debtors to undertake, in their own bankruptcy proceedings, to secure certain disclosures that Truck claims are necessary to prevent alleged or assumed fraud.  Such an interpretation offends well-settled rules of insurance policy interpretation.

First, the specific examples of things that the Debtors are obligated to do under the Assistance and Cooperation Clause establish that assistance and cooperation must be

provided, when requested by Truck, in connection with Truck's defense efforts in individual suits (i.e., attending hearings and trials, affecting settlements, securing and giving evidence, obtaining the attendance of witnesses and "in the conduct of suits").  A plain reading of the Truck Policies evidences that the parties, at the time of contracting, intended the Assistance and Cooperation Clause to apply to the enumerated activities, as well as other activities of like kind, "in the conduct of suits."  See Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 338 (9th Cir. 1996) (applying California law, interpreting policy language narrowly in the context in which it appears); Martin Marietta Corp. v. Ins. Co. of N. Am., 40 Cal. App. 4th 1113, 1126 (1995) ("where general words follow a specific enumeration, the general words should not be construed in their broadest sense but should be read as applying to the same general class of things as the specifically enumerated things").

Although cooperation can refer to several things, it always relates to the defense of individual cases in the context of liability insurance.  For instance, courts "have construed cooperation provisions to impose an obligation to:  (a) provide the insurer with a full and truthful account of the occurrence, and to satisfy the insurer's reasonable request for information on the underlying details of the case; (b) assist the insurer by forwarding notices, summonses, pleadings or other suit papers, so that the insurer may promptly prepare a defense against a third-party complaint; (c) submit to an examination under oath, or otherwise make himself available for trial, as the insurer conducts his defense; and (d) cooperate in the substantive aspects of his defense, such as filing third-party actions when requested and avoiding settlement without the

approval of the insurer."  Kallis, et al., Policyholder's Guide to the Law of Ins. Coverage § 24.03

(1st ed. 2019 Supp. 2012).[32]

Second, Truck contends that the Debtors have breached the Truck Policies by

"colluding" with litigation adversaries (i.e., the ACC and the FCR) to negotiate and sponsor a

plan that would require Truck to defend current and future Asbestos Personal Injury Claims

against the Debtors without access to certain exposure evidence that Truck wants, such as

Garlock-style "fraud prevention measures" that could have been included in the plan.  D.I. 2070

at 27-31.  However, the typical pattern giving rise to a claim of improper collusion by an insured

is where, in the context of a third-party lawsuit, the insured agrees with the claimant to an

amount of liability, stipulates to judgment and then assigns to the claimant the right to satisfy

that judgment from an insurance policy, combined with a covenant by the claimant not to sue the

insured.  See, e.g., Safeco Ins. Co. of Amer. v. Parks, 170 Cal. App. 4th 992, 1013 (2009)

("[C]ollusion occurs when the insured and the third party claimant work together to manufacture

a cause of action for bad faith against the insurer or to *inflate the third party's recovery* to

artificially increase damages flowing from the insurer's breach . . . .  The insurer may raise

collusion as a defense in a subsequent bad faith action.") (emphasis added); Andrade v. Jennings,

54 Cal. App. 4th 307, 327 (1997) ("Collusive assistance in the procurement of a judgment not

only constitutes a breach of the cooperation clause but also is a breach of the covenant of good

faith and fair dealing.").  There is no prejudice to Truck here.  Rather, the Plan returns Asbestos

Personal Injury Claims to the tort system and places Truck in the same position it was in before

the Debtors' bankruptcy.  See Hoyt Dep. 108:17-109:15.

---

[32]     Truck admits that before these bankruptcy proceedings, the Debtors always had fulfilled their
defense-related obligations under the Assistance and Cooperation Clause.  Hoyt Dep. at 19:2-20:13, 27:13-
29:7.

Third, the Assistance and Cooperation Clause is not reasonably susceptible to the meaning that Truck advocates—i.e., that the Assistance and Cooperation Clause can be used to control the Debtors' conduct in their own bankruptcy.  Admiral Ins. Co. v. Grace Indus., Inc., 409 B.R. 275, 283 (E.D.N.Y. 2009) ("[T]he cooperation clause only required Grace to assist in the ultimate disposition of the actual claims, not to take on a partner to make litigation decisions solely regarding Grace's own bankruptcy reorganization.").  Belying Truck's novel argument, case law interpreting and applying this standard form policy language repeatedly and consistently measures cooperation in the context of individual suits.[33]

> ### 3.  As a Matter of Law, the Debtors' Acts and/or Omissions Leading Up to And During the Reorganization Cases Did Not Breach the Covenant of Good Faith and Fair Dealing Implied Into the Truck Policies.

Truck's argument that, upon Confirmation, the Debtors' actions in furtherance of their Reorganization Cases will constitute a breach of the covenant of good faith and fair dealing implied by law into the Truck Policies is even weaker.

Under California law, "[t]here is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement."  Comunale v. Traders & Gen. Ins. Co., 50 Cal.2d 654, 658 (1958).  However, the duty of good faith and fair dealing cannot impose upon an insured any obligation that differs from the insured's express obligations under the policy.

---

[33]  For instance, an insurer's duty to indemnify is excused only if its ability to provide a defense in an underlying case has been substantially prejudiced by an insured's failure to cooperate.  Truck Ins. Exch. v. Unigard Ins. Co., 79 Cal. App. 4th 966, 976 (2000); Campbell v. Allstate Ins. Co., 60 Cal. 2d 303, 307 (1963).  In such a case, the insurer would have to prove that if the insured had cooperated, there was a substantial likelihood the trier of fact would have found in the insured's favor.  Billington v. Interins. Exch. of S. Cal., 71 Cal. 2d 728, 737 (1969).  Because of this, prejudice resulting from an insured's alleged failure to cooperate cannot be determined until the outcome of the underlying case is known.  United Servs. Auto. Ass'n v. Martin, 120 Cal. App. 3d 963, 966 (1981) ("Logically, the required showing of prejudice cannot be made while the main tort action is still pending, its outcome uncertain, and therefore declaratory relief against the injured persons at this stage is inappropriate.").

Moreover, the California Supreme Court has rejected the concept of "reverse bad faith" asserted against a policyholder as a defense to coverage.  See Kransco v. Amer. Empire Surplus Lines Ins. Co., 23 Cal. 4th 390, 407 (2000), as modified (July 26, 2000); see also Endurance Amer. Specialty Ins. Co. v. Lance-Kashian & Co., CV F 10–1284 LJO DLB, 2010 WL 3619476 (E.D. Cal. Sept. 13, 2010); Hale v. Provident Life & Acc. Ins. Co., 2003 WL 1510463 (Cal. Ct. App. Mar.  25, 2003).  Indeed, Truck (through its coverage counsel) admits that such a claim cannot stand under California law.  Hoyt Dep. at 126:10-16 ("Q. …you are aware that the California Supreme Court has rejected the concept of reverse bad faith as a defense [to] coverage in California, yes?  A. I believe that is correct.").

Finally, the covenant of good faith and fair dealing implied into the Truck Policies requires any policy interpretation to be consistent with Truck's obligations—i.e., Truck must refrain from doing anything that would injure the Debtors' right to receive the benefits of the insurance agreement (Waller, 11 Cal. 4th at 36), requiring Truck to "'give at least as much consideration to the welfare of its insured as it gives to its own interests.'"  Vu v. Prudential Property & Cas. Ins. Co., 26 Cal. 4th 1142, 1150 (2001) (citation omitted); Egan v. Mut. of Omaha Ins. Co., 24 Cal.3d 809, 818-19 (1979) ("For the insurer to fulfill its obligation not to impair the right of the insured to receive the benefits of the agreement, it again must give at least as much consideration to the latter's interests as it does to its own.").  Bankruptcy is not intended to relieve insurers of their contractual liabilities or to improve their position under their insurance contracts in the tort system.

In sum, as a matter of law, the Debtors' conduct in connection with and throughout these Reorganization Cases does not and has not violated any Asbestos Insurer Cooperation Obligations, including the Assistance and Cooperation Clause contained in the

Truck Policies, nor was such conduct a breach of any implied covenant of good faith and fair

dealing in those policies.

### D.  MODIFICATIONS TO THE PLAN.

The Modifications (i) do not adversely change, in any material respect, the

treatment under the Plan of any Claims or Interests and (ii) comply in all respects with

Bankruptcy Rule 3019.  Pursuant to section 1127(b) of the Bankruptcy Code and Bankruptcy

Rule 3019, the Modifications do not require additional disclosure under section 1125 of the

Bankruptcy Code or the re-solicitation of acceptances or rejections of the Plan under section

1126 of the Bankruptcy Code, nor do they require that holders of Claims against or Interests in

the Debtors be afforded an opportunity to change previously cast acceptances or rejections of the

Plan as Filed with the Bankruptcy Court.  Disclosure of the Modifications through the Debtors'

service of its motion to modify the Plan [D.I. 2342] and as made on the record at the

Confirmation Hearing constitute due and sufficient notice thereof under the circumstances of the

Reorganization Cases.  Accordingly, the Plan (as modified) is properly before the Court and all

votes cast with respect to the Plan prior to the Modifications shall be binding and shall be

deemed to be cast with respect to the Plan as modified.

### E.  EXEMPTIONS FROM TAXATION.

Pursuant to section 1146(a) of the Bankruptcy Code, the following shall not be

subject to any stamp Tax or similar Tax:  (i) the creation of any Encumbrances; (ii) the making

or assignment of any lease or sublease; (iii) the execution and implementation of the Asbestos

Personal Injury Trust Agreement, including the creation of the Asbestos Personal Injury Trust

and any transfers to or by the Asbestos Personal Injury Trust; (iv) any Restructuring Transaction;

or (v) the making or delivery of any deed or other instrument of transfer under, in furtherance of

or in connection with the Plan, including any merger agreements, agreements of consolidation,

restructuring, disposition, liquidation or dissolution, deeds, bills of sale or assignments,

applications, certificates or statements executed or filed in connection with any of the foregoing

or pursuant to the Plan.

### F. COMPLIANCE WITH SECTION 1129 OF THE BANKRUPTCY CODE.

As set forth in Section I.G above, which is incorporated fully herein, the Plan

complies in all respects with the applicable requirements of section 1129 of the Bankruptcy

Code.

### G. COMPLIANCE WITH SECTION 524(g) OF THE BANKRUPTCY CODE.

As set forth in Section I.H above, which is incorporated fully herein, the Plan

complies in all respects with the applicable requirements of section 524(g) of the Bankruptcy

Code.

### H. TRANSFER OF BOOKS AND RECORDS TO THE ASBESTOS PERSONAL INJURY TRUST.

Section IV.J. of the Plan provides that, prior to the Effective Date, the Debtors

will establish a repository containing all their the books and records that are necessary for the

defense of Asbestos Personal Injury Claims, and shall make that repository available to the

Entities that are responsible for the processing or defense of Asbestos Personal Injury Claims,

and that are entitled to review, copy or use such documents.  The transfer of these materials is

essential to the Plan and to the implementation of the Asbestos Personal Injury Trust and the

preservation of its assets.  (McChesney Decl. ¶ 49.)  To the extent the Debtors or Reorganized

Debtors, as applicable, provide the Asbestos Personal Injury Trust access to any privileged books

and records, such access shall not result in the destruction or waiver of any applicable privileges

pertaining to such books and records, and each of the Reorganized Debtors and the Asbestos

JA00087

Personal Injury Trust shall retain the right to assert any applicable privilege with respect to such

books and records.

> **I.      APPROVAL OF THE SETTLEMENTS AND RELEASES PROVIDED
> UNDER THE PLAN.**

The settlement of certain estate claims set forth in section IV.R.2 of the Plan and

the releases set forth in Section IV.R.3 of the Plan, including the releases of nondebtor parties

pursuant to the general releases in Section IV.R.3.c, are (i) integral to the terms, conditions and

settlements contained in the Plan, (ii) appropriate in connection with the Debtors' reorganization

and (iii) supported by reasonable consideration.  In light of all of the circumstances, settlement of

certain estate claims in Section IV.R.2 of the Plan and the releases in Section IV.R.3 of the Plan

are fair, equitable and in the best interests of the Estates.

## III.    CONCLUSION.

For the foregoing reasons, the Bankruptcy Court submits these Proposed Findings

of Fact and Conclusions of Law to the District Court and recommends confirmation of the Plan.

A proposed form of Confirmation Order is attached to these Proposed Findings of Fact and

Conclusions of Law as Annex A.

| | |
|---|---|
| These Findings and Conclusions have been signed electronically.  The Judge's signature and the Court's seal appear at the top of the document. | United States Bankruptcy Court |

NAI-1514152678v6

TA00088

# **EXHIBIT B**

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

|  | : |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| KAISER GYPSUM COMPANY, INC., et al.,[1] | : | Case No. 16-31602 (JCW) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

## PROPOSED ORDER CONFIRMING THE JOINT PLAN OF REORGANIZATION OF KAISER GYPSUM COMPANY, INC. AND HANSON PERMANENTE CEMENT, INC., AS MODIFIED

---

[1] The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Kaiser Gypsum Company, Inc. (0188) and Hanson Permanente Cement, Inc. (7313). The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

# TABLE OF CONTENTS

**Page**

I. GENERAL PROVISIONS REGARDING CONFIRMATION OF THE PLAN AND APPROVAL OF PLAN-RELATED DOCUMENTS ................................................. 5

    A. MODIFICATIONS TO THE PLAN ...................................................... 5

    B. CONFIRMATION OF THE PLAN ....................................................... 5

    C. CONDITIONS TO CONFIRMATION  AND CONSUMMATION OF THE PLAN ........................................................................................ 6

    D. EFFECTS OF CONFIRMATION ......................................................... 6

    E. APPROVAL, MODIFICATION AND EXECUTION OF PLAN-RELATED DOCUMENTS ................................................................. 7

II. CLAIMS BAR DATES AND OTHER CLAIMS MATTERS ................................ 8

    A. GENERAL BAR DATE FOR ADMINISTRATIVE CLAIMS ..................... 8

    B. BAR DATES FOR CERTAIN ADMINISTRATIVE CLAIMS ................... 8

        1. Professional Compensation ............................................... 8

        2. Ordinary Course Liabilities ............................................... 9

    C. BAR DATE FOR REJECTION DAMAGES CLAIMS ............................. 9

III. APPROVAL OF EXECUTORY CONTRACT AND UNEXPIRED LEASE PROVISIONS AND RELATED PROCEDURES ........................................... 10

IV. MATTERS RELATING TO IMPLEMENTATION OF THE PLAN ........................... 10

    A. ACTIONS IN FURTHERANCE OF THE PLAN ................................... 10

    B. CREATION OF ASBESTOS PERSONAL INJURY TRUST ..................... 12

    C. TRANSFERS OF PROPERTY TO, AND ASSUMPTION OF CERTAIN LIABILITIES BY, THE ASBESTOS PERSONAL INJURY TRUST .............. 13

        1. Transfer of Books and Records to the Asbestos Personal Injury Trust ........................................................................ 13

        2. Funding the Asbestos Personal Injury Trust ........................... 14

        3. Assumption of Certain Liability and Responsibility by the Asbestos Personal Injury Trust .......................................... 14

        4. Indemnification by the Asbestos Personal Injury Trust .............. 15

    D. RELEASE OF ENCUMBRANCES .................................................... 15

    E. EXEMPTIONS FROM TAXATION ................................................... 15

V. SETTLEMENTS, RELEASES AND EXCULPATION PROVISIONS ....................... 16

VI. OBJECTIONS TO CONFIRMATION ....................................................... 17

-i-

JA00091

# TABLE OF CONTENTS

(continued)

**Page**

  A. RESOLUTION OF THE INFORMAL OBJECTION OF THE UNITED
    STATES DEPARTMENT OF JUSTICE ............................................................. 17

  B. OVERRULING OF CERTAIN OBJECTIONS TO CONFIRMATION ........... 18

VII. DISCHARGE AND INJUNCTIONS ........................................................................... 21

  A. DISCHARGE OF CLAIMS ................................................................................. 21

  B. INJUNCTIONS...................................................................................................... 21

    1. Issuance of the Asbestos Permanent Channeling Injunction ................... 21

    2. Protected Parties Under the Asbestos Permanent Channeling
      Injunction ........................................................................................................ 22

    3. The Asbestos Permanent Channeling Injunction...................................... 24

    4. The Environmental Injunction ................................................................. 25

    5. General Injunctions Related to Discharge or Releases Granted
      Pursuant to the Plan ................................................................................. 26

VIII. DISSOLUTION OF THE ASBESTOS PERSONAL INJURY COMMITTEE
  AND DISCHARGE OF THE FUTURE CLAIMANTS' REPRESENTATIVE ............. 28

IX. RETENTION OF JURISDICTION ............................................................................. 28

  A. RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT .......... 28

  B. JURISDICTION RELATING TO ASBESTOS PERSONAL INJURY
    CLAIMS ................................................................................................................ 29

X. WAIVER OF THE STAY OF BANKRUPTCY RULE 3020(e) ................................... 29

XI. NOTICE OF ENTRY OF CONFIRMATION ORDER ................................................ 29

XII. ORDER OF THE COURT............................................................................................ 30

XIII. RECOMMENDATION TO THE DISTRICT COURT ................................................ 31

JA00092

## **TABLE OF EXHIBITS**

| **Exhibit** | **Exhibit Name** |
|---|---|
| A | Plan |
| B | Modifications |
| C | Confirmation Notice |
| D | Confirmation Notice — Publication Version |

## **INTRODUCTION**

WHEREAS, Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc. (together, the "Debtors" and, as reorganized entities after emergence, the "Reorganized Debtors"), proposed the Third Amended Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc., dated October 14, 2019 [Conf. Exhibit 1],[2] as amended by the non-material modifications and clarifications set forth on the blackline of the Plan in Exhibit B attached hereto and incorporated herein by reference (as it may be amended, the "Plan");[3]

WHEREAS, on October 23, 2019, the Bankruptcy Court entered its Order (I) Approving the Debtors' Disclosure Statement, (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Proposed Joint Plan of Reorganization and (III) Scheduling a Hearing on Confirmation of Proposed Joint Plan of Reorganization and Approving Related Notice Procedures [Conf. Exhibit 16] (the "Disclosure Statement Order"), by which the Bankruptcy Court, among other things, approved the Debtors' proposed disclosure statement (the "Disclosure Statement");

WHEREAS the Disclosure Statement Order established procedures for the solicitation and tabulation of votes to accept or reject the Plan and scheduled a hearing to

---

[2]    "D.I." refers to docket entries in the Debtors' lead bankruptcy case, 16-31602.

[3]    Capitalized terms and phrases used herein have the meanings given to them in the Plan.  The rules of interpretation set forth in Section I.B.1 of the Plan apply to the Findings of Fact and Conclusions of Law (the "Findings and Conclusions"), which are being issued concurrently herewith, and to this Order (this "Confirmation Order").  In addition, in accordance with Section I.A of the Plan, any term used in the Plan or this Confirmation Order that is not defined in the Plan or this Confirmation Order, but that is used in the Bankruptcy Code or the Bankruptcy Rules, has the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

A copy of the Plan (without exhibits) is attached hereto as Exhibit A and incorporated herein by reference. Failure to reference or incorporate a specific portion of the Plan, the Plan's exhibits or Plan-Related documents (as defined in Section IV.A. below) in this Confirmation Order does not affect the validity of enforceability of such provision under the terms of this Confirmation Order.

consider Confirmation of the Plan for March 30, 2020, which hearing was continued to and held

on July 20, 2020 and July 22, 2020, with the Bankruptcy Court giving its oral ruling on August

13, 2020 (the "Confirmation Hearing");

WHEREAS, affidavits of service were executed by Prime Clerk LLC, the

Bankruptcy Court appointed notice, claims and solicitation agent ("Prime Clerk"), with respect to

the mailing of notice of the Confirmation Hearing and solicitation materials in respect of the Plan

in accordance with the Disclosure Statement Order (collectively, the "Affidavits of Service") and

were filed with the Bankruptcy Court [D.I. 1892, 1904, 1911, 1938, 1947, 1948, 2007, 2042,

2168, 2172, 2178];[4]

WHEREAS, the Declaration of Anna Jadonath [D.I. 1903] (the "Publication

Declaration") was filed with the Bankruptcy Court on November 14, 2019, regarding the

publication of the Notice of (I) Deadline for Casting Votes to Accept or Reject Proposed Joint

Plan of Reorganization, (II) Hearing to Consider Confirmation of Proposed Joint Plan of

Reorganization and (III) Related Matters and/or the other forms of publication notice approved

by the Bankruptcy Court as set forth in the Disclosure Statement Order;

WHEREAS, the Declaration of Cameron R. Azari, Esq. on Implementation of

Notice Regarding the Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson

Permanente Cement, Inc. [Conf. Exhibit 21] (the "Notice Declaration") was filed with the

Bankruptcy Court on July 1, 2020, attesting to publication notice of the Plan;

WHEREAS, the Declaration of James Daloia of Prime Clerk LLC Regarding the

Solicitation of Votes and Tabulation of Ballots Cast on the Third Amended Joint Plan of

---

[4]     The Affidavits of Service were filed on November 6, 2019, November 14, 2019, November 20, 2019,
December 17, 2019, January 2, 2020, January 6, 2020, February 7, 2020, February 14, 2020, March
24, 2020, March 30, 2020 and April 20, 2020.

Reorganization of Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc.

[Conf. Exhibit 20] (the "Voting Agent Declaration") was filed with the Bankruptcy Court on July

1, 2020, attesting to the results of the tabulation of the properly executed and timely received

Ballots for the Plan as follows:

> **Class 4 Claimants**.  The Debtors received 24,310 acceptances out
> of 24,310 votes from holders of Class 4 Asbestos Personal Injury
> Claims, with Class 4 claimants who voted in favor of the Plan
> holding Claims in the amount of $2,439,570,176.00 for voting
> purposes only, such acceptances being 100 percent in number and
> 100 percent in amount of all ballots received from holders of
> Class 4 Asbestos Personal Injury Claims (Voting Agent Decl.
> ¶ 10.);

WHEREAS, the Debtors made non-material modifications to the Plan, which are

set forth in Exhibit B attached hereto (collectively, the "Modifications");

WHEREAS, Truck Insurance Exchange ("Truck") filed an objection to the Plan

[D.I. 2070] and a consolidated response to the Plan Proponents' briefing [D.I. 2359] (together,

the "Objection"), as well as various affidavits in support of its Objection [Conf. Exhibits 37-53,

65-67] (the "Truck Affidavits");

WHEREAS, the Objecting Excess Insurers made the Objecting Excess Insurers'

Objections, and voluntarily withdrew them when the Plan was modified to insert, among other

things,  Section IV.M.3.a., entitled, "Settlement with Truck;"

WHEREAS, the Debtors filed a memorandum of law in support of Confirmation

of the Plan [D.I. 2275] and a reply to Truck's consolidated response [D.I. 2377], and the

Asbestos Personal Injury Committee and the Future Claimants' Representative filed an omnibus

reply in support of the Plan [D.I. 2274] and a joint reply to Truck's consolidated response

[D.I. 2376] (collectively, the "Memoranda of Law");

WHEREAS, the declarations of Kevin O'Neal Holdeman [Conf. Exhibit 23], John

D. Bittner [Conf. Exhibit 22], Charles E. McChesney II [Conf. Exhibit 19] and Lawrence

Fitzpatrick [Conf. Exhibit 18] were submitted in support of the Plan (collectively,

the "Declarations");

WHEREAS, the Court has reviewed the Plan, the Disclosure Statement, the

Disclosure Statement Order, the Voting Agent Declaration, the Affidavits of Service, the

Publication Declaration, the Notice Declaration, the Memoranda of Law, the Declarations, the

Truck Affidavits and all other pleadings before the Court in connection with the Confirmation of

the Plan, including the objections filed to the Plan;[5]

WHEREAS, the Court has considered the arguments of counsel made on the

record at the Confirmation Hearing;

WHEREAS, the Court has considered all evidence presented and admitted into

the record at the Confirmation Hearing;

WHEREAS, this Court has taken judicial notice of the papers and pleadings on

file in these Reorganization Cases, including any related adversary proceedings;

WHEREAS the Court has made a *de novo* review of the record, including the

Bankruptcy Court's proposed findings of fact and conclusions of law submitted in this matter;

WHEREAS, this Court has separately entered the Findings and Conclusions,

including the findings that (a) this Court has jurisdiction over this matter pursuant to 28 U.S.C.

§§ 157 and 1334, (b) the Debtors were and are qualified to be debtors under section 109 of

the Bankruptcy Code and (c) venue of the Reorganization Cases is proper pursuant to 28 U.S.C.

§ 1408, and continues to be proper; and

---

[5]     Truck filed the only objection that remained unresolved as of the Confirmation Hearing.

WHEREAS, the Findings and Conclusions establish just cause for the relief granted herein;

THE COURT HEREBY ORDERS THAT:

## I.   GENERAL PROVISIONS REGARDING CONFIRMATION OF THE PLAN AND APPROVAL OF PLAN-RELATED DOCUMENTS.

### A.   MODIFICATIONS TO THE PLAN.

Pursuant to section 1127(a) of the Bankruptcy Code and Rule 3019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Modifications are authorized and approved in all respects.

### B.   CONFIRMATION OF THE PLAN.

The Plan and all exhibits thereto are CONFIRMED in each and every respect, pursuant to section 1129 of the Bankruptcy Code; provided, however, that if there is any direct conflict between the terms of the Plan or any exhibit thereto and the terms of this Confirmation Order, the terms of this Confirmation Order shall control.  All objections to the Plan, other than those withdrawn with prejudice (subject to Section IV.M.3.a of the Plan) in their entirety prior to, or on the record at, the Confirmation Hearing are either resolved on the terms set forth herein or overruled in their entirety.  This Court's basis for overruling Truck's objections in their entirety are set forth in the Findings and Conclusions.  The Findings and Conclusions are hereby incorporated by reference in their entirety, as if they were fully set forth herein.[6]

---

[6]   The Court has considered and overruled each objection to the Plan raised by Truck, whether as part of its Complaint for Declaratory Relief [Adv. Proc. 19-3052, D.I. 1] or its objections filed with the Bankruptcy Court.

## C.    CONDITIONS TO CONFIRMATION AND CONSUMMATION OF THE PLAN.

Nothing in this Confirmation Order or in the Findings and Conclusions shall in any way affect the provisions of Article VIII of the Plan, which includes provisions regarding (i) the conditions precedent to Confirmation of the Plan and to the Effective Date of the Plan, (ii) the waiver of any such conditions and (iii) the effect that the nonoccurrence of such conditions may have with regard to the Plan and this Confirmation Order.  Upon the satisfaction or waiver of the conditions contained in Section VIII.B of the Plan and the occurrence of the Effective Date, substantial consummation of the Plan, within the meaning of section 1127 of the Bankruptcy Code, shall be deemed to occur.

## D.    EFFECTS OF CONFIRMATION.

Subject to section I.C of this Confirmation Order, notwithstanding any otherwise applicable law, immediately upon the entry of this Confirmation Order, the terms of the Plan and this Confirmation Order shall be binding upon all Entities, including the Debtors, the Reorganized Debtors, any and all holders of Claims, Demands or Interests (irrespective of whether such Claims or Interests are impaired under the Plan or whether the holders of such Claims or Interests accepted, rejected or are deemed to have accepted or rejected the Plan), any and all nondebtor parties in interest, including nondebtor parties to Executory Contracts and Unexpired Leases with any of the Debtors and any and all Entities who are parties to or are subject to the settlements, compromises, releases, waivers, discharges and injunctions described herein and in the Findings and Conclusions and the respective heirs, executors, administrators, trustees, affiliates, officers, directors, agents, representatives, attorneys, beneficiaries, guardians, successors or assigns, if any, of any of the foregoing.

### E. APPROVAL, MODIFICATION AND EXECUTION OF PLAN-RELATED DOCUMENTS.

1.      The Plan and all exhibits thereto, substantially in the form as they exist at the time of the entry of this Confirmation Order, including the documents relating to the Asbestos Personal Injury Trust, are approved in all respects.

2.      All relevant parties, including the Debtors and the Asbestos Personal Injury Trustee, shall be authorized, without further action by this Court or the Bankruptcy Court, to execute the applicable Plan-Related Documents (as such capitalized term is defined in Section IV.A of this Confirmation Order) and make modifications to such documents in accordance with the Plan's terms, including Section XI.D of the Plan, and the terms of the Plan-Related Documents, if applicable, between the time of entry of this Confirmation Order and the Effective Date of the Plan.

3.      The Parties[7] are hereby authorized to amend or modify the Plan at any time prior to the substantial consummation of the Plan, but only in accordance with section 1127 of the Bankruptcy Code and Section XI.D of the Plan.  In addition, without the need for a further order or authorization of this Court or the Bankruptcy Court, or further notice to any Entities, but subject to the express provisions of this Confirmation Order and Section XI.D of the Plan, the Parties shall be authorized and empowered to make modifications to the documents Filed with this Court or the Bankruptcy Court, including exhibits to the Plan and documents forming part of the evidentiary record at the Confirmation Hearing, consistent with the terms of such documents in their reasonable business judgment as may be necessary.

---

[7]      As defined in Plan Section 1.A.96.

-7-

## II.     CLAIMS BAR DATES AND OTHER CLAIMS MATTERS.

### A.     GENERAL BAR DATE FOR ADMINISTRATIVE CLAIMS.

Except as otherwise provided in Section III.A.1.d.i of the Plan and Section II.B below, unless previously Filed, requests for payment of Administrative Claims must be Filed with the Bankruptcy Court and served on the Reorganized Debtors at the addresses set forth in Section XI.K of the Plan no later than sixty (60) days after the Effective Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date shall be forever barred from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or their respective property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests must be Filed and served on the requesting party by 120 days after the Effective Date.

### B.     BAR DATES FOR CERTAIN ADMINISTRATIVE CLAIMS.

#### 1.     Professional Compensation.

Professionals or other Entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, this Confirmation Order, the Fee Order or other order of the Bankruptcy Court a Final Fee Application no later than ninety (90) days after the Effective Date.  A Professional may include any outstanding, non-Filed monthly or interim request for payment of a Fee Claim pursuant to the Fee Order in its Final Fee Application.  Objections to any Final Fee Application must be Filed with the Bankruptcy Court and served on the Reorganized Debtors and the requesting party by the later of (i) eighty (80) days after the Effective Date and (ii) thirty (30) days after the Filing of the applicable Final Fee Application.  To the extent necessary, this Confirmation Order shall amend and supersede any previously

entered order of the Bankruptcy Court, including the Fee Order, regarding the payment of Fee

Claims.  Any pending, Filed interim requests for a Fee Claim pursuant to the Fee Order shall be

resolved in the ordinary course in accordance with the Fee Order or, if sooner, in connection with

the particular Professional's Final Fee Application.  All fees outstanding and payable under the

Fee Order, shall be paid promptly by the Debtors, and/or the DIP Lender, after the order

approving the respective fees and expenses is entered.

### 2.      Ordinary Course Liabilities.

Holders of Administrative Claims based on liabilities incurred by a Debtor in the

ordinary course of its business, including any Intercompany Claims that are Administrative

Claims, Administrative Claims of governmental units for Taxes (including Tax audit Claims

relating to Tax years or portions thereof commencing after the Petition Date) and Administrative

Claims arising from those contracts and leases of the kind described in Section V.E of the Plan,

shall not be required to File or serve any request for payment of such Administrative Claims.

Such Administrative Claims shall be satisfied pursuant to Section III.A.1.c of the Plan.

### C.      BAR DATE FOR REJECTION DAMAGES CLAIMS.

Notwithstanding anything in the Bankruptcy Court's Order Establishing Bar Dates

for Filing Proofs of Claim Other Than Asbestos Personal Injury Claims and Approving Related

Relief [D.I. 553] to the contrary, if the rejection of an Executory Contract or Unexpired Lease

pursuant to Section V.C of the Plan gives rise to a Claim by the other party or parties to such

contract or lease, such Claim shall be forever barred and shall not be enforceable against the

Debtors, the Reorganized Debtors, their respective successors or their properties unless a Proof

of Claim is Filed with the Bankruptcy Court and served on the Reorganized Debtors at the

addresses set forth in Section XI.K of the Plan, on the latter to occur of (i) sixty (60) days after

the Effective Date and (ii) thirty (30) days after the date of the entry of an order rejecting such

Executory Contract or Unexpired Lease.

### III.    APPROVAL OF EXECUTORY CONTRACT AND UNEXPIRED LEASE PROVISIONS AND RELATED PROCEDURES.

A.    The Executory Contract and Unexpired Lease provisions of Article V of the Plan

are hereby approved.

B.    This Confirmation Order shall constitute an order of the Court approving the

assumptions and rejections described in Sections V.A and V.C of the Plan, pursuant to

section 365 of the Bankruptcy Code, as of the Effective Date.

### IV.    MATTERS RELATING TO IMPLEMENTATION OF THE PLAN.

### A.    ACTIONS IN FURTHERANCE OF THE PLAN.

1.    Pursuant to section 10-1008 of the Arizona Revised Statutes and

section 55-14A-01 of the North Carolina Business Corporation Act and other comparable

provisions of the laws of the States of Arizona and North Carolina or any other state governing

corporations or other legal entities (collectively, the "State Reorganization Effectuation

Statutes"), as applicable, and section 1142 of the Bankruptcy Code, without further action by this

Court or the Bankruptcy Court or the respective stockholders or directors of any Debtor or

Reorganized Debtor, the Debtors, the Reorganized Debtors and any officers of the appropriate

Debtor or Reorganized Debtor (the "Responsible Officers"), are authorized to:  (i) take any and

all actions necessary or appropriate to implement, effectuate and consummate the Plan, this

Confirmation Order and the transactions contemplated thereby or hereby, including those

transactions identified in Article IV of the Plan and (ii) execute and deliver, adopt or amend, as

the case may be, any contracts, instruments, releases and agreements necessary to implement,

Case 3:20-cv-00537-GCM   Document 1-2   Filed 09/28/20   Page 15 of 40   JA00103

effectuate and consummate the Plan (collectively, the "Plan-Related Documents"), including

those contracts, instruments, releases and agreements identified in Article IV of the Plan.

2.     To the extent that, under applicable non-bankruptcy law, any of the

foregoing actions would otherwise require the consent or approval of the stockholders or

directors of any of the Debtors or Reorganized Debtors, this Confirmation Order shall, pursuant

to section 1142 of the Bankruptcy Code and the State Reorganization Effectuation Statutes,

constitute such consent or approval, and such actions are deemed to have been taken by

unanimous action of the stockholders or directors of the appropriate Debtor or Reorganized

Debtor.

3.     The approvals and authorizations specifically set forth in this

Confirmation Order are nonexclusive and are not intended to limit the authority of any Debtor or

Reorganized Debtor or Responsible Officer to take any and all actions necessary or appropriate

to implement, effectuate and consummate the Plan, this Confirmation Order or the transactions

contemplated thereby or hereby, subject to provisions in the Plan that require the Debtors or

Reorganized Debtors to seek approval from other Parties.  In addition to the authority to execute

and deliver, adopt or amend, as the case may be, the contracts, instruments, releases and other

agreements specifically approved in this Confirmation Order, each of the Debtors and the

Reorganized Debtors is authorized and empowered, without further action by this Court or the

Bankruptcy Court or such Debtors' or Reorganized Debtor's stockholders or directors, to take any

and all such actions as any of its Responsible Officers may determine are necessary or

appropriate to implement, effectuate and consummate the Plan, this Confirmation Order or the

transactions contemplated thereby or hereby, subject to provisions in the Plan that require the

Debtors or Reorganized Debtors to seek approval from other Parties.

## B.    CREATION OF ASBESTOS PERSONAL INJURY TRUST.

1.    On the Effective Date, the Asbestos Personal Injury Trust shall be created in accordance with the Plan and the Asbestos Personal Injury Trust Agreement.  The Asbestos Personal Injury Trust and the Asbestos Personal Injury Trustee are authorized and empowered to receive the property to be transferred to the Asbestos Personal Injury Trust pursuant to Section IV.K of the Plan.

2.    Pursuant to the State Reorganization Effectuation Statutes, as applicable, and other appropriate provisions of applicable state laws governing corporations and other legal Entities and section 1142(b) of the Bankruptcy Code, without further action by this Court or the Bankruptcy Court or the stockholders or directors of any Reorganized Debtor, the Reorganized Debtors are authorized and directed to execute, deliver and perform their obligations under the Asbestos Personal Injury Trust Agreement and to execute, deliver, file and record all such other contracts, instruments, agreements and documents and take all such other actions as any of the Responsible Officers of the Reorganized Debtors may determine are necessary, appropriate or desirable in connection therewith.  The Asbestos Personal Injury Trust Agreement, as in effect on the Effective Date, shall be substantially in the form of Exhibit I.A.16 to the Plan.  The Asbestos Personal Injury Trust Distribution Procedures shall be substantially in the form of Exhibits I.A.19 to the Plan.  On the Effective Date, the acknowledgment and release requirements set forth in the Order Lifting the Automatic Stay as to Certain Asbestos Personal Injury Claims [D.I. 1108] (the "Stay Order") will be no longer applicable and parties shall comply with the Asbestos Personal Injury Trust Distribution Procedures; provided, however, any acknowledgement and release or related documents executed prior to the Effective Date pursuant to the Stay Order will remain in full force and effect as to the Protected Parties; provided further,

however, that Uninsured Asbestos Claims may be brought against the Asbestos Personal Injury

Trust consistent with the Asbestos Personal Injury Trust Distribution Procedures.

### C.    TRANSFERS OF PROPERTY TO, AND ASSUMPTION OF CERTAIN LIABILITIES BY, THE ASBESTOS PERSONAL INJURY TRUST.

#### 1.    Transfer of Books and Records to the Asbestos Personal Injury Trust.

a.    As described in Section IV.J of the Plan, prior to or on the

Effective Date, the Debtors shall establish, or cause to be established, a repository containing all

the Debtors' books and records that are necessary for the defense of Asbestos Personal Injury

Claims, including, without limitation, the historical asbestos personal injury claims database

maintained by the Debtors, deposition transcripts, product identification evidence, information

regarding sale and use of the products, claims settlement and payment information, and indexes

and summaries relating to any such documents, and shall make that repository available to the

Entities that are responsible for the processing or defense of Asbestos Personal Injury Claims,

and that are entitled to review, copy or use such documents.[8]

b.    Pursuant to the Plan and this Confirmation Order, to the extent the

Debtors or Reorganized Debtors, as applicable, provide the Asbestos Personal Injury Trust

access to any privileged books and records, such access shall not result in the destruction or

waiver of any applicable privileges pertaining to such books and records.  Further, pursuant to

the Plan and this Confirmation Order, none of the Debtors, the Reorganized Debtors, Lehigh

Hanson, or any of Lehigh Hanson's affiliates shall be liable for violating any confidentiality or

privacy protections as a result of transferring the books and records to the Asbestos Personal

---

[8]    For the avoidance of doubt, the Asbestos Personal Injury Trust shall have access to materials in the repository only to the extent it is the Entity defending or processing (which term shall not include the mere payment of the deductible portion of an Asbestos Personal Injury Claim) an Uninsured Asbestos Claim or a particular Asbestos Personal Injury Claim, and such determination shall be made by the Reorganized Debtors on a claim-by-claim basis.

Injury Trust, and the Asbestos Personal Injury Trust shall, upon receipt of the books and records,

take appropriate steps to comply with any such applicable protections.

> ### 2.     Funding the Asbestos Personal Injury Trust.

The Reorganized Debtors and/or Lehigh Hanson shall fund the Asbestos Personal

Injury Trust in accordance with Section IV.K.2 of the Plan.

> ### 3.     Assumption of Certain Liability and Responsibility by the Asbestos Personal Injury Trust.

Subject to the provisions of the Plan, on the Effective Date, upon creation of the

Asbestos Personal Injury Trust, the Asbestos Personal Injury Trust, in consideration for the

property transferred to the Asbestos Personal Injury Trust pursuant to Section IV.K of the Plan

and in furtherance of the purposes of the Asbestos Personal Injury Trust and the Plan, shall

assume all liability and responsibility, financial or otherwise, for all Asbestos Personal Injury

Claims, and the Reorganized Debtors and the Protected Parties shall have no liability or

responsibility, financial or otherwise, therefor, except that Holders of Insured Asbestos Claims

may bring actions against the Reorganized Debtors to obtain the benefit of insurance coverage as

set forth in Plan IV.O.1 and no release or discharge of any of the Parties, the Creditors'

Committee or any Reorganized Debtor, or any of their respective present or former directors,

officers, employees, members, subsidiaries, predecessors, successors, attorneys, accountants,

investment bankers, financial advisors, appraisers, representatives and agents, or the DIP Lender,

in each case acting in such capacity, shall diminish, reduce or eliminate the duties or obligations

of any Asbestos Insurer under any Asbestos Personal Injury Insurance Asset.

Except as otherwise provided in the Plan, the Asbestos Personal Injury Trust

Agreement and the Asbestos Personal Injury Trust Distribution Procedures, the Asbestos

Personal Injury Trust shall have all defenses, cross-claims, offsets, recoupments and rights of

indemnification, contribution, subrogation and similar rights regarding such Asbestos Personal

Injury Claims that the Debtors, the Reorganized Debtors or applicable Protected Parties have or

would have had under applicable law.

### 4.      Indemnification by the Asbestos Personal Injury Trust.

To the fullest extent provided in the Plan, the Asbestos Personal Injury Trust shall

protect, defend, indemnify and hold harmless each Protected Party from and against any

Asbestos Personal Injury Claim; provided, however, the sole and exclusive remedy for the

Asbestos Personal Injury Trust's failure to satisfy the indemnification, defense and hold harmless

obligations under this Section shall be the right of the Protected Parties to assert money damage

claims against the Asbestos Personal Injury Trust.

### D.      RELEASE OF ENCUMBRANCES.

Except as otherwise provided in the Plan or in any contract, instrument, release or

other agreement or document entered into or delivered in connection with the Plan, on the

Effective Date and concurrently with the applicable Distributions made pursuant to Article VI of

the Plan, all Encumbrances against the property of any Estate shall be fully released and

discharged, and all of the right, title and interest of any holder of such Encumbrances, including

any rights to any collateral thereunder, shall revert to the applicable Reorganized Debtor and its

successors and assigns.

### E.      EXEMPTIONS FROM TAXATION.

Pursuant to section 1146(a) of the Bankruptcy Code, the following shall not be

subject to any stamp Tax or similar Tax:  (i) the creation of any Encumbrances; (ii) the making

or assignment of any lease or sublease; (iii) the execution and implementation of the Asbestos

Personal Injury Trust Agreement, including the creation of the Asbestos Personal Injury Trust

and any transfers to or by the Asbestos Personal Injury Trust; (iv) any Restructuring Transaction

and (v) the making or delivery of any deed or other instrument of transfer under, in furtherance

of or in connection with the Plan, including any merger agreements, agreements of consolidation,

restructuring, disposition, liquidation or dissolution, deeds, bills of sale or assignments,

applications, certificates or statements executed or filed in connection with any of the foregoing

or pursuant to the Plan, including any merger agreements, agreements of consolidation,

restructuring, disposition, liquidation or dissolution, deeds, bills of sale or assignments,

applications, certificates or statements executed or filed in connection with any of the foregoing

or pursuant to the Plan.

## V.     SETTLEMENTS, RELEASES AND EXCULPATION PROVISIONS.

A.      The Plan settlement, release, exculpation and injunction provisions as set forth in,

among others, sections IV.R.2,  IV.R.3, IX.B, XI.A and XI.C of the Plan are approved in all

respects, are incorporated herein in their entirety, are so ordered and shall be immediately

effective on the Effective Date without further action by this Court, the Bankruptcy Court, any of

the parties to such provisions or any other party.

B.      As of June 30, 2020, the Debtors held $2,881,300.27 of Insolvent Insurers

Proceeds, which amount is held in a segregated bank account in accordance with the Bankruptcy

Court's February 16, 2018 Order Approving Settlement of Claim Against Insolvent Insurers

[D.I. 837].  At the Effective Date, an amount equal to 64.2% of such Insolvent Insurers Proceeds

shall be allocated and distributed pursuant to the Excess CIP Agreement (with 50% of the

Debtors' share under the Excess CIP Agreement distributed to the Trust and the remainder

distributed to the Debtors or Reorganized Debtors), and the remainder shall be utilized to satisfy

Allowed General Unsecured Claims pursuant to the Plan.  In the event that the Debtors or

Reorganized Debtors receive additional Insolvent Insurers Proceeds, 64.2% of such additional

Insolvent Insurer Proceeds shall be allocated and distributed pursuant to the Excess CIP

Agreement (with 100% of the Debtors or Reorganized Debtors' share under the Excess CIP

Agreement distributed to the Trust), and with the remaining proceeds to be distributed to the

Reorganized Debtors.

## VI.   OBJECTIONS TO CONFIRMATION.

### A.   RESOLUTION OF THE INFORMAL OBJECTION OF THE UNITED STATES DEPARTMENT OF JUSTICE.

1.     The informal objection to Confirmation lodged by the United States

Department of Justice, to the extent not satisfied by the Modifications, is hereby resolved on the

terms and subject to the conditions set forth below.  The compromise contemplated by such

resolution is fair, equitable and reasonable, in the best interests of the Debtors and their

respective Estates and creditors and expressly approved pursuant to Bankruptcy Rule 9019.

2.     Nothing in this Confirmation Order or the Plan discharges, releases,

precludes or enjoins:  (i) any police or regulatory liability to a governmental unit as defined in

11 U.S.C. § 101(27) ("Governmental Unit") of the United States or of a State that is not a Claim

as defined in section I.A.32 of the Plan; (ii) any Claim of a Governmental Unit of the United

States arising on or after the Effective Date; (iii) any liability to a Governmental Unit of the

United States or of a State under police and regulatory statutes or regulations that any entity

would be subject to as the owner or operator of property after the Effective Date; or (iv) any

liability to a Governmental Unit on the part of any Person other than the Debtors or Reorganized

Debtors.  Nor shall anything in this Confirmation Order or the Plan enjoin or otherwise bar a

Governmental Unit of the United States or of a State from asserting or enforcing, outside this

Court, any liability described in the preceding sentence.  Nothing in this Confirmation Order or

the Plan shall affect any valid setoff or recoupment rights of the United States.  Nothing in this

Confirmation Order divests any tribunal of any jurisdiction it may have under police or

regulatory law to interpret this Confirmation Order or the Plan or to adjudicate any defense

asserted under this Confirmation Order or the Plan.  Notwithstanding the foregoing, nothing in

this paragraph will in any way limit or alter the terms of the Asbestos Permanent Channeling

Injunction set forth in Article IX.B.2 of the Plan or the Environmental Injunction set forth in

Article IX.B.3 of the Plan.

> **B.      OVERRULING OF CERTAIN OBJECTIONS TO CONFIRMATION.**

All objections not otherwise addressed herein or previously withdrawn are hereby

overruled in their entirety.

> 1.      <u>Objection of Truck Insurance Exchange</u>.

Truck objected to Confirmation on several grounds.  The Court has considered the

Truck Objection, the Truck Affidavits, the Memoranda of Law, the statements of counsel, briefs

and all other testimony and evidence admitted as part of the Confirmation Hearing.  For the

reasons stated by the Bankruptcy Court on the record at the hearing of August 13, 2020, and set

forth in the Findings and Conclusions, incorporated herein, the Court overrules Truck's

objections in their entirety.

As reflected in the Findings and Conclusions, the Court has made the following

findings and conclusions:[9]

> a.      Because the Plan is insurance neutral and returns Truck to the tort
>
> system exactly as it was prepetition, Truck does not have standing
>
> to advance confirmation issues such as contentions that:  the Plan
>
> is collusive and not in good faith; the Debtors are not entitled to a

---

[9]      Failure of this Order to restate or specifically address any other finding or conclusion contained in the Findings and Conclusions shall not affect the validity of enforceability of such finding or conclusion.  Any finding of fact shall constitute a finding of fact even if it is referred to as a conclusion of law, and any conclusion of law shall constitute a conclusion of law even if it is referred to as a finding of fact.

discharge; or the elements of 11 U.S.C. § 524(g) are not met.
Truck also lacks standing to object to the structure and funding of
the Asbestos Personal Injury Trust because Truck has no interest in
the trust and the trust will have no effect on its legal or pecuniary
interests.

b.   The Plan does not violate the spirit and purpose of section 524(g)
of the Bankruptcy Code.  The Court finds no requirement that all
of a debtor's asbestos liabilities must be resolved by a section
524(g) trust, as opposed to being resolved in the tort system.

c.   The Court rejects Truck's argument that resolving asbestos cases in
the tort system is unfair or constitutes bad faith.  This Court is
concerned for the same reasons that the bankruptcy court was
concerned in Garlock, but this Court does not read Garlock as an
indictment of the tort system or a ruling that a party cannot get a
fair trial in state and federal courts.  This Court is not inclined to
indict its colleagues on the state benches, nor does the Court
believe that a bankruptcy court in North Carolina is necessary to
protect state courts from fraud.  It is not within the province of this
Court to mandate to state courts and other federal courts what kind
of discovery is required in asbestos cases.  The findings in Garlock
have been widely debated, and indeed some state legislatures have
taken steps to address these issues.  State courts and litigants will

obviously be alert to what has been proposed in this case and can take their own actions.

    d.    The Court has the jurisdiction and authority to make the finding at Plan art. VIII.A.3.u (the "Plan Finding").  The Plan Finding deals with core matters that arise under the Bankruptcy Code and could only arise in the context of a bankruptcy case, including findings and conclusions the Court must make regarding whether the Plan and the Plan Proponents have complied with the applicable provisions of the Bankruptcy Code under section 1129(a)(1) and (2); whether the Plan has an adequate means of implementation and was proposed in good faith and not by any means forbidden by law under sections 1123(a)(5) and 1129(a)(3); whether the Plan is feasible under section 1129(a)(11); and whether the Plan meets the requirements of section 524(g).  These are all statutory-based confirmation matters that fall within the jurisdiction of this Court under 28 U.S.C. § 1334 and that must be raised in the context of the Reorganization Cases.

    e.    The Plan Finding is proper.  Truck's contention that the Plan impairs its contractual rights is based on a false premise:  the notion that its contract gives it the right to collaterally attack elsewhere a confirmation ruling and make determinations of the propriety of the parties' conduct in the course of this case.  Such

-20-

 JA00113

rights never existed under the Truck Policies, and to the extent they

did, they would be preempted by the Bankruptcy Code.

## VII.   DISCHARGE AND INJUNCTIONS.

### A.   DISCHARGE OF CLAIMS.

1.      The Plan discharge provisions as set forth in Section IX.A of the Plan are

approved in all respects, are incorporated herein in their entirety, are so ordered and shall be

immediately effective on the Effective Date of the Plan without further action by this Court, the

Bankruptcy Court or any other party.

2.      To the extent set forth in the Plan, as of the Effective Date, pursuant to

sections 524 and 1141 of the Bankruptcy Code, the Reorganized Debtors shall be discharged of

all Claims and other debts and liabilities against the Debtors, in accordance with Section IX.A of

the Plan.  Notwithstanding the foregoing or anything else in the Plan or this Confirmation Order,

no release or discharge of any of the Parties or any Reorganized Debtor, or any of their

respective present or former directors, officers, employees, members, subsidiaries, predecessors,

successors, attorneys, accountants, investment bankers, financial advisors, appraisers,

representatives and agents, or the DIP Lender, in each case acting in such capacity, shall

diminish, reduce or eliminate the duties or obligations of any Asbestos Insurer under any

Asbestos Personal Injury Insurance Asset.

### B.   INJUNCTIONS.

1.      **Issuance of the Asbestos Permanent Channeling Injunction.**

In connection with the creation of the Asbestos Personal Injury Trust, the

Asbestos Permanent Channeling Injunction shall be, and hereby is, issued as of the Effective

Date, pursuant to section 524(g) of the Bankruptcy Code.

Case 3:20-cv-00537-GCM   Document 1-2   Filed 09/28/20   Page 26 of 40   JA00114

### 2. Protected Parties Under the Asbestos Permanent Channeling Injunction.

In connection with the Asbestos Permanent Channeling Injunction, "Protected Party" means any of the following parties:

        a.     the Debtors;

        b.     the Reorganized Debtors;

        c.     the Protected Affiliates;

        d.     Lehigh Hanson;

        e.     current and former directors, officers, and employees of the Debtors, the Reorganized Debtors and the Protected Affiliates, including, without limitation, Lehigh Hanson, solely in their capacity as such;

        f.     as of February 15, 2018, current and former shareholders of the Debtors, the Reorganized Debtors and the Protected Affiliates, including, without limitation, Lehigh Hanson, solely in their capacity as such;

        g.     current and former in-house and outside attorneys, accountants, auditors, tax advisors and other professionals who have provided services to the Debtors, the Reorganized Debtors or the Protected Affiliates, including, without limitation, Lehigh Hanson, solely in their capacity as such;

        h.     Entities that, pursuant to the Plan or on or after the Effective Date, become a direct or indirect transferee of, or successor to, any assets of any Debtor or Reorganized Debtor, or the Asbestos Personal Injury Trust, but only to the extent that liability is asserted to exist by reason of such Entity becoming such a transferee or successor;

i.       Entities that, pursuant to the Plan or on or after the Effective Date, make a loan to any Debtor or Reorganized Debtor, or the Asbestos Personal Injury Trust or to a successor to, or transferee of, any assets of any Debtor or Reorganized Debtor, or the Asbestos Personal Injury Trust, but only to the extent that liability is asserted to exist by reason of it becoming such a lender;

j.       Entities, other than Asbestos Insurers, that are alleged to be directly or indirectly liable for the conduct of, claims against, or Demands on any Debtor or Reorganized Debtor, or the Asbestos Personal Injury Trust, to the extent that such alleged liability arises by reason of one or more of the following:

(i)     such Entity's ownership of a financial interest in any Debtor or Reorganized Debtor, or any past or present affiliate of any them, or any predecessor in interest of any of them;

(ii)    such Entity's involvement in the management of any Debtor, Reorganized Debtor or any predecessor in interest of any of them;

(iii)   such Entity's service as an officer, director or employee of any Debtor or Reorganized Debtor, any past or present affiliate of any of them, any predecessor in interest of any of them, or of any entity that owns or at any time has owned a financial interest in any Debtor or Reorganized Debtor, any past or present affiliate of any of them, or any predecessor in interest of any of them;

(iv)   such Entity's provision of insurance to any Debtor, Reorganized Debtor, any past or present affiliate of any of them, or any predecessor in interest of any of them, or any entity that owns or at any time has owned a financial interest in any Debtor or Reorganized Debtor, any past or present affiliate of any of them, or any predecessor in interest of any of them; and

(v)    such Entity's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of any Debtor, Reorganized Debtor, any past or present affiliate of any of them, any predecessor in interest of any of them, or any

entity that owns or at any time has owned a financial interest in any Debtor or Reorganized Debtor, any past or present affiliate of any of them, or any predecessor in interest of any of them.

k.      each Settling Asbestos Insurer.

**3.      The Asbestos Permanent Channeling Injunction.**

Pursuant to section 524(g) of the Bankruptcy Code, all Entities shall be permanently and forever stayed, restrained and enjoined from taking any actions against any Protected Party for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any Asbestos Personal Injury Claim, all of which shall be channeled to the Asbestos Personal Injury Trust for resolution as set forth in the Asbestos Personal Injury Trust Agreement and the related Asbestos Personal Injury Trust Distribution Procedures, including:

a.      commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including a judicial, arbitral, administrative or other proceeding) in any forum against any Protected Party or any property or interests in property of any Protected Party;

b.      enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree or other order against any Protected Party or any property or interests in property of any Protected Party;

c.      creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Protected Party or any property or interests in property of any Protected Party;

d.      setting off, seeking reimbursement of, contribution from or

subrogation against, or otherwise recouping in any manner, directly or indirectly, any

amount against any liability owed to any Protected Party or any property or interests in

property of any Protected Party; and

e.      proceeding in any manner in any place with regard to any matter

that is subject to resolution pursuant to the Asbestos Personal Injury Trust Documents,

except in compliance therewith.

For the avoidance of doubt, (a) the Asbestos Permanent Channeling Injunction

shall not affect any claims or causes of action under Sections IV.L.1. and IV.L.2. of the Plan and

(b) no Entity shall be so stayed, enjoined, or restrained from initiating or continuing a suit or

other proceeding against any Debtor in name only for the purpose of recovering on an Asbestos

Personal Injury Claim from a Non-Settling Asbestos Insurer.

**4.      The Environmental Injunction.**

In consideration of the undertakings of the Settled Environmental Insurers, and

other consideration, and pursuant to their respective settlements with the Debtors and to preserve

and promote further the agreements between and among the Debtors and any Settled

Environmental Insurers, and pursuant to section 105 of the Bankruptcy Code:

a.      any and all Environmental Claims shall be treated, administered,

determined and resolved under the procedures and protocols under the Plan as the sole

and exclusive remedy with respect to Environmental Claims; and

b.      all Entities are hereby permanently stayed, enjoined, barred and

restrained from doing any of the following against the Settled Environmental Insurers:

(i)      commencing or continuing in any manner any action or
other proceeding of any kind with respect to any
Environmental Claim against any of the Settled

Environmental Insurers or against the property of any of Settled Environmental Insurers;

(ii)     commencing or continuing in any manner any contribution, indemnity or other equitable action or other similar proceeding relating to the environmental settlements made in this bankruptcy case against any of the Settled Environmental Insurers or against the property of any of Settled Environmental Insurers;

(iii)     enforcing, attaching, collecting or recovering, by any manner or means, from any of the Settled Environmental Insurers, or the property of any of the Settled Environmental Insurers, any judgment, award, decree, payment or order relating to any Environmental Claim against any of the Settled Environmental Insurers; and

(iv)     creating, perfecting or enforcing any lien of any kind relating to any Environmental Claim against any of the Settled Environmental Insurers, or the property of the Settled Environmental Insurers.

The Environmental Injunction set forth in Section IX.B.3 of the Plan is an integral part of the Plan and is essential to the Plan's consummation and implementation. The Environmental Injunction shall inure to the benefit of the Settled Environmental Insurers, but shall not apply to any Debtor or Reorganized Debtor.

For the avoidance of doubt, the Environmental Injunction shall not apply to Asbestos Personal Injury Claims or to Asbestos Insurance Policy Claims arising from the payment of, or obligations arising from, Asbestos Personal Injury Claims.

**5.     General Injunctions Related to Discharge or Releases Granted Pursuant to the Plan.**

a.     **No Action on Account of Discharged Claims**.

In addition to the Asbestos Permanent Channeling Injunction and the Environmental Injunction set forth above, except as provided in the Plan or this Confirmation Order, as of the Effective Date, all Entities that have held, currently hold or may hold a Claim or

other debt or liability that is discharged pursuant to the terms of the Plan shall be permanently

enjoined from taking any of the following actions on account of any such discharged Claim, debt

or liability:  (i) commencing or continuing in any manner any action or other proceeding against

any Debtor, Reorganized Debtor or any of its property, other than to enforce any right to a

Distribution pursuant to the Plan; (ii) enforcing, attaching, collecting or recovering in any

manner any judgment, award, decree or order against the Debtors, the Reorganized Debtors or

their respective property, other than as permitted pursuant to (i) above; (iii) creating, perfecting

or enforcing any lien or encumbrance against any Debtor or Reorganized Debtor, or any of its

property; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt,

liability or obligation due to any Debtor or Reorganized Debtor and (v) commencing or

continuing any action, in any manner, in any place that does not comply with or is inconsistent

with the provisions of the Plan.

b.   <b>No Actions on Account of Released Claims</b>.

In addition to the Asbestos Permanent Channeling Injunction and the

Environmental Injunction set forth above, except as provided in the Plan or this Confirmation

Order, as of the Effective Date, all Entities that have held, currently hold or may hold any claims,

commitments, obligations, suits, judgments, damages, demands, debts, causes of action or

liabilities that are released pursuant to the Plan shall be permanently enjoined from taking any of

the following actions against any released Entity, or any of its property, on account of such

released claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of

action or liabilities:  (i) commencing or continuing in any manner any action or other proceeding;

(ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or

order; (iii) creating, perfecting or enforcing any Encumbrance; (iv) asserting a setoff, right of

subrogation or recoupment of any kind against any debt, liability or obligation due to any

released Entity and (v) commencing or continuing any action, in any manner, in any place that

does not comply with or is inconsistent with the provisions of the Plan.

## VIII.   DISSOLUTION OF THE ASBESTOS PERSONAL INJURY COMMITTEE AND DISCHARGE OF THE FUTURE CLAIMANTS' REPRESENTATIVE.

In accordance with Section XI.B of the Plan, on the Effective Date, the Asbestos

Personal Injury Committee and the Creditors' Committee shall dissolve and the members of the

Asbestos Personal Injury Committee and the Creditors' Committee shall be released and

discharged from all duties and obligations arising from or related to the Reorganization Cases.

Similarly, on the Effective Date, the Future Claimants' Representative shall be deemed released

and discharged from all duties and obligations from or related to the Reorganization Cases.

Subject to Section XI.B of the Plan, the Professionals retained by each of the Asbestos Personal

Injury Committee and the members thereof, the Creditors' Committee and the members thereof

and by the Future Claimants' Representative shall not be entitled to assert any Fee Claim for any

services rendered or expenses incurred by them in their capacity as such after the Effective Date,

except for services rendered and expenses incurred in connection with any applications for

allowance of compensation and reimbursement of expenses pending on the Effective Date or

Filed and served after the Effective Date pursuant to Section III.A.1.d.ii.A.

## IX.   RETENTION OF JURISDICTION.

### A.   RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT.

Notwithstanding the entry of this Confirmation Order and the occurrence of the

Effective Date, pursuant to Article X of the Plan, the Bankruptcy Court shall retain such

jurisdiction over the Reorganization Cases after the Effective Date as is legally permissible,

including jurisdiction over the matters described in Sections X.A.1 through X.A.17 of the Plan.

**B.    JURISDICTION RELATING TO ASBESTOS PERSONAL INJURY
CLAIMS.**

Notwithstanding anything to the contrary in Article X of the Plan, the resolution

of Asbestos Personal Injury Claims and the forum in which such resolution will be determined

shall be governed by and in accordance with the Asbestos Personal Injury Trust Distribution

Procedures.

**X.    WAIVER OF THE STAY OF BANKRUPTCY RULE 3020(E).**

Pursuant to Bankruptcy Rule 3020(e), this Confirmation Order shall not be stayed

and shall be immediately effective upon entry on the docket of the Court.

**XI.    NOTICE OF ENTRY OF CONFIRMATION ORDER.**

A.    Pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c), the Reorganized Debtors

are directed to serve, within twenty (20) business days after the occurrence of the Effective Date,

a notice of the entry of this Confirmation Order, which shall include notice of the Bar Dates

established by the Plan and this Confirmation Order and notice of the Effective Date,

substantially in the form attached hereto as <u>Exhibit C</u> and incorporated herein by reference

(the "<u>Confirmation Notice</u>"), on all parties that received notice of the Confirmation Hearing;

<u>provided</u>, <u>however</u>, that, with respect to Asbestos Personal Injury Claims, the Reorganized

Debtors shall be obligated to serve the Confirmation Notice only on counsel to holders of

Asbestos Personal Injury Claims, to the extent that the holders of such Claims are represented by

known counsel, unless such counsel requests otherwise in writing within ten (10) days of service

of the Confirmation Notice.

B.    As soon as practicable after the entry of this Confirmation Order, the Reorganized

Debtors shall make copies of this Confirmation Order and the Confirmation Notice available on

the website established by Prime Clerk for these Reorganization Cases, available at

https://cases.primeclerk.com/kaisergypsum/.

      C.      No later than twenty (20) Business Days after the Effective Date, the Reorganized

Debtors are directed to publish the version of the Confirmation Notice attached hereto as

Exhibit D once in (i) the national editions of *The Wall Street Journal and USA Today* and

(ii) various regional newspapers.[10]

## XII.    ORDER OF THE COURT.

      The Plan is hereby confirmed in its entirety pursuant to section 1129 of the

Bankruptcy Code, and the Asbestos Permanent Channeling Injunction and Environmental

Injunction are hereby issued pursuant to section 524(g) of the Bankruptcy Code.

      THIS ORDER IS HEREBY DECLARED TO BE IN
RECORDABLE FORM AND SHALL BE ACCEPTED BY ANY
RECORDING OFFICER FOR FILING AND RECORDING
PURPOSES WITHOUT FURTHER OR ADDITIONAL
ORDERS, CERTIFICATIONS OR OTHER SUPPORTING
DOCUMENTS.

---

[10]    The regional newspapers are:  Arizona Republic (Arizona); Honolulu Star-Advertiser (Hawaii); San Antonio Express News (Texas); Dallas Morning News (Texas); Seattle Times (Washington); San Jose Mercury News (California); Pittsburgh Post-Gazette (Pennsylvania); Austin American-Statesman (Texas); Portland Oregonian (Oregon); Orange County Register (California); San Bernardino Sun (California); Florida Times-Union (Florida); Spokesman-Review (Washington); Alaska Dispatch News (Alaska); Helena Independent Record (Montana); Camden Courier Post (New Jersey); Burlington County Times (New Jersey); Bellingham Herald (Washington); Bismarck Tribune (North Dakota); Columbian (Washington); Daily Review (California); East County Times (California); Eureka Times Standard (California); Fairbanks Daily News-Miner (Alaska); Idaho State Journal (Idaho); Kodiak Daily Mirror (Alaska); Meridian Press (Idaho); St. Helens Chronicle (Oregon); Tacoma News Tribune (Washington); Times Journal (Oregon); Tri-City Herald (Washington); Tyler Morning Telegraph (Texas); Whittier Daily News (California); Los Angeles Times (California); Albuquerque Journal (New Mexico) and WamPinRock News (Oregon).

## XIII.   RECOMMENDATION TO THE DISTRICT COURT.

The Bankruptcy Court hereby recommends that the District Court enter this

Confirmation Order.

| This Proposed Order has been signed electronically.  The Bankruptcy Judge's signature and Bankruptcy Court's seal appear at the top of the Proposed Order. | United States Bankruptcy Court |
|---|---|

# EXHIBIT A

## JOINT PLAN OF REORGANIZATION OF KAISER GYPSUM COMPANY, INC. AND HANSON PERMANENTE CEMENT, INC.

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **Kaiser Gypsum Company, Inc.,** *et al.,* | : | **Case No. 16-31602 (JCW)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |
| | : | |
| **Kaiser Gypsum Company, Inc.** | : | **Case No. 16-31602 (JCW)** |
| **Hanson Permanente Cement, Inc.** | : | **Case No. 16-31614 (JCW)** |
| | : | |
| | : | **THIRD AMENDED JOINT PLAN OF** |
| | : | **REORGANIZATION OF KAISER** |
| | : | **GYPSUM COMPANY, INC. AND HANSON** |
| | : | **PERMANENTE CEMENT, INC.** |
| | : | |

Edwin Harron
Sharon Zieg
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
         - and -
Felton Parrish
HULL & CHANDLER
1001 Morehead Square Drive, Suite 450
Charlotte, North Carolina 28203

ATTORNEYS FOR FUTURE CLAIMANTS'
REPRESENTATIVE

Kevin C. Maclay
Todd E. Phillips
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle N.W., Suite 1100
Washington, D.C. 20005
         - and -
Sally Higgins
HIGGINS & OWENS,
524 East Boulevard
Charlotte, North Carolina 28203

ATTORNEYS FOR OFFICIAL COMMITTEE OF
ASBESTOS PERSONAL INJURY CLAIMANTS

Ben Hawfield, Jr.
MOORE & VAN ALLEN
100 North Tryon Street, Suite 4700
Charlotte, North Carolina 28202

ATTORNEYS FOR LEHIGH HANSON, INC.

Dated:  July 20, 2020

C. Richard Rayburn, Jr. (NC 6357)
John R. Miller, Jr. (NC 28689)
RAYBURN COOPER & DURHAM, P.A.
1200 Carillon
227 West Trade Street
Charlotte, North Carolina 28202
Telephone: (704) 334-0891
Facsimile: (704) 377-1897
E-mail:  rrayburn@rcdlaw.net
            jmiller@rcdlaw.net
            -and-
Gregory M. Gordon (TX 08435300)
Amanda S. Rush (TX 24079422)
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
E-mail:  gmgordon@jonesday.com
            asrush@jonesday.com
            -and-
Paul M. Green (TX 24059854)
JONES DAY
717 Texas, Suite 3300
Houston, Texas  77002
Telephone:  (832) 239-3939
Facsimile:  (832) 239-3600
E-mail:  pmgreen@jonesday.com

ATTORNEYS FOR DEBTORS

NAI-1505596661v15

JA00126

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

ARTICLE I   DEFINED TERMS, RULES OF INTERPRETATION AND
COMPUTATION OF TIME ..................................................................... 1

    A.   Defined Terms .......................................................................................... 1

    B.   Rules of Interpretation and Computation of Time ............................... 18

        1.   Rules of Interpretation ................................................................ 18

        2.   Computation of Time .................................................................. 19

ARTICLE II   CLASSES OF CLAIMS AND INTERESTS ...................................... 19

ARTICLE III   TREATMENT OF CLAIMS AND INTERESTS ............................ 20

    A.   Unclassified Claims ............................................................................... 20

        1.   Payment of Administrative Claims ............................................ 20

            a.   Administrative Claims in General ................................. 20

            b.   Statutory Fees ................................................................ 20

            c.   Ordinary Course Liabilities ........................................... 20

            d.   Bar Dates for Administrative Claims ............................ 20

        2.   Payment of Priority Tax Claims ................................................. 21

            a.   Priority Tax Claims in General ...................................... 21

            b.   Other Provisions Concerning Treatment of Priority Tax
Claims ............................................................................ 21

    B.   Classified Claims ................................................................................... 22

        1.   Class 1 Claims (Priority Claims) ............................................... 22

        2.   Class 2 Claims (Secured Claims) ............................................... 22

        3.   Class 3 Claims (General Unsecured Claims) ............................. 22

        4.   Class 4 Claims (Asbestos Personal Injury Claims) ................... 22

        5.   Class 5 Claims (Surety Bond Claims) ....................................... 23

        6.   Class 6 Claims (Intercompany Claims) ..................................... 23

        7.   Class 7 Interests (Stock Interests) ............................................. 23

ARTICLE IV   MEANS FOR IMPLEMENTATION OF THE PLAN ....................... 23

    A.   Continued Corporate Existence and Vesting of Assets in the Reorganized
Debtors ................................................................................................... 23

    B.   Restructuring Transactions .................................................................... 24

    C.   Transfers and Lease Transactions .......................................................... 24

JA00127

# TABLE OF CONTENTS
## (continued)

**Page**

D. Corporate Governance, Directors and Officers, Employment-Related Agreements and Compensation Programs and Corporate Action ...................... 24

   1. Certificates of Incorporation and By-Laws of the Reorganized Debtors .................................................................................................. 24

   2. Directors and Officers of the Reorganized Debtors ................................ 25

   3. Employee Arrangements of the Reorganized Debtors ............................ 25

   4. Corporate Action ................................................................................... 25

E. Obtaining Cash for Plan Distributions ................................................................ 25

F. Creation of Asbestos Personal Injury Trust ........................................................ 26

G. Authority of the Asbestos Personal Injury Trust ................................................ 26

H. Appointment of Asbestos Personal Injury Trustee and Delaware Trustee ......... 26

I. Appointment of Future Claimants' Representative and TAC Members .............. 26

J. Document Repository .......................................................................................... 27

K. Transfers of Property to and Assumption of Certain Liabilities by the Asbestos Personal Injury Trust ........................................................................... 28

   1. Expenses of the Asbestos Personal Injury Trust ..................................... 28

   2. Funding the Asbestos Personal Injury Trust ........................................... 28

      a. Initial Payment .......................................................................... 28

      b. Payment Note ............................................................................ 28

      c. Phase 1 Claims .......................................................................... 28

      d. Asbestos Personal Injury Insurance Assets ................................ 28

   3. Assumption of Certain Liability and Responsibility by the Asbestos Personal Injury Trust .............................................................. 29

   4. Indemnification by the Asbestos Personal Injury Trust ........................... 29

   5. Authority of the Debtors ......................................................................... 29

L. Cooperation with Respect to Insurance Matters .................................................. 29

   1. Obligation to Cooperate with Respect to Insurance Matters ................... 29

   2. Enforcement of Reorganized Debtors' Obligations to Cooperate with Respect to Insurance Matters .......................................................... 30

M. Compromise of Insurance Policies ..................................................................... 33

   1. Dual Policies ......................................................................................... 33

   2. Separate Limit Policies .......................................................................... 33

Case 3:20-cv-00537-GCM   Document 1-2   Filed 09/28/20   Page 40 of 40   JA00128

**TABLE OF CONTENTS**
(continued)

3.   Insurance Policies that Provide Coverage for Asbestos Personal
Injury Claims but not for Environmental Claims ................................... 33

a.   Settlement with Truck.................................................................. 34

4.   Insurance Policies that Provide Coverage for Environmental
Claims but not for Asbestos Personal Injury Claims .............................. 35

5.   Amendment of Insurance Policy Exhibits .............................................. 35

N.   Truck Obligations Regarding Deductibles.......................................................... 35

O.   Liquidation of Asbestos Personal Injury Claims ............................................... 36

1.   Insured Asbestos Claims........................................................................ 36

2.   Uninsured Asbestos Claims ................................................................... 36

P.   Limitations On Judgment Recovery From Non-Settling Asbestos Insurers........ 37

Q.   Insurance Neutrality........................................................................................... 37

R.   Preservation of Rights of Action; Settlement of Claims and Releases................ 38

1.   Preservation of Rights of Action by the Reorganized Debtors............... 38

2.   Settlement of Certain Estate Claims ...................................................... 38

3.   Releases................................................................................................. 39

a.   General Releases of Debtors and Reorganized Debtors ............. 39

b.   Release by the Debtors, Reorganized Debtors and Lehigh
Hanson ....................................................................................... 39

c.   General Releases by Holders of Claims or Interests................... 40

d.   Injunction Related to Releases.................................................... 40

S.   Release of Encumbrances .................................................................................. 41

T.   Effectuating Documents; Further Transactions; Exemption from Certain
Transfer Taxes ................................................................................................... 41

U.   Determination of the Insolvent Insurers Proceeds Dispute................................. 41

V.   Compliance with QSF Regulations..................................................................... 41

W.   Surety Bond Obligations.................................................................................... 41

ARTICLE V   TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES.............................................................................................. 42

A.   Executory Contracts and Unexpired Leases to Be Assumed............................... 42

1.   Assumption Generally ........................................................................... 42

2.   Assumptions of Executory Contracts and Unexpired Leases................. 42

# TABLE OF CONTENTS
### (continued)

**Page**

|  |  |  |  |
|---|---|---|---|
|  | 3. | Approval of Assumptions and Assumption Procedures | 43 |
| B. | Payments Related to the Assumption of Executory Contracts and Unexpired Leases | | 44 |
| C. | Executory Contracts and Unexpired Leases to Be Rejected and Rejection Procedures | | 44 |
| D. | Obligations to Indemnify Directors, Officers and Employees | | 45 |
| E. | Contracts and Leases Entered Into After the Petition Date | | 45 |
| F. | Insurance Policies | | 45 |
|  | 1. | Assumed Insurance Policies | 45 |
|  | 2. | Reservation of Rights | 46 |
| ARTICLE VI | PROVISIONS GOVERNING DISTRIBUTIONS | | 46 |
| A. | Distributions for Claims Allowed as of the Effective Date | | 46 |
| B. | General Unsecured Claims Escrows | | 46 |
| C. | Method of Distributions to Holders of Claims | | 47 |
| D. | Compensation and Reimbursement for Services Related to Distributions | | 47 |
| E. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | | 47 |
|  | 1. | Delivery of Distributions | 47 |
|  | 2. | Undeliverable Distributions Held by Disbursing Agents | 47 |
|  |  | a. Holding and Investment of Undeliverable Distributions | 47 |
|  |  | b. After Distributions Become Deliverable | 48 |
|  |  | c. Failure to Claim Undeliverable Distributions | 48 |
| F. | Distribution Record Date | | 48 |
|  | 1. | No Recognition of Transfers after the Distribution Record Date | 48 |
|  | 2. | Treatment of Certain Transfers | 48 |
| G. | Means of Cash Payments | | 48 |
| H. | Timing and Calculation of Amounts to Be Distributed | | 49 |
|  | 1. | Timing of Distributions Under the Plan | 49 |
|  | 2. | Allowed Claims | 49 |
|  | 3. | Compliance with Tax Requirements | 49 |
|  |  | a. Withholding and Reporting | 49 |
|  |  | b. Backup Withholding | 49 |

# TABLE OF CONTENTS
### (continued)

**Page**

      c.      Obligations of Distribution Recipients ......................................... 50

I.      Setoffs ....................................................................................................... 50

J.      Allocation of Payments............................................................................ 50

ARTICLE VII  PROCEDURES FOR RESOLVING DISPUTED CLAIMS............................ 51

A.      Prosecution of Objections to Claims........................................................ 51

      1.      Objections to Claims..................................................................... 51

      2.      Authority to Prosecute Objections .............................................. 51

      3.      Authority to Amend Schedules.................................................... 51

B.      Treatment of Disputed Claims ................................................................. 51

C.      Distributions on Account of Disputed Claims Once Allowed............................. 51

ARTICLE VIII  CONDITIONS PRECEDENT TO CONFIRMATION
        AND CONSUMMATION OF THE PLAN .................................... 52

A.      Conditions to Confirmation ..................................................................... 52

B.      Conditions to the Effective Date .............................................................. 56

C.      Waiver of Conditions to Confirmation or the Effective Date............................. 57

D.      Effect of Nonoccurrence of Conditions to the Effective Date............................ 57

ARTICLE IX  DISCHARGE, INJUNCTION AND SUBORDINATION RIGHTS................. 57

A.      Discharge of Claims................................................................................. 57

B.      Injunctions............................................................................................... 58

      1.      General Injunctions....................................................................... 58

          a.      No Actions on Account of Discharged Claims........................... 58

          b.      No Actions on Account of Released Claims............................... 58

          c.      Recipients of Distribution Deemed to Consent .......................... 59

      2.      Asbestos Permanent Channeling Injunction ......................... 59

          a.      Asbestos Permanent Channeling Injunction ............................... 59

      3.      Environmental Injunction ........................................................... 60

C.      Subordination Rights ............................................................................... 61

ARTICLE X  RETENTION OF JURISDICTION................................................................. 61

A.      Retention of Jurisdiction.......................................................................... 61

B.      Consent to Jurisdiction............................................................................ 62

# TABLE OF CONTENTS
### (continued)

**Page**

C.   Jurisdiction of Litigating Asbestos Personal Injury Claims ................................ 63

ARTICLE XI  MISCELLANEOUS PROVISIONS .................................................................... 63

A.   DEQ Settlement ........................................................................................... 63

B.   Dissolution of the Creditors' Committee and the Asbestos Personal Injury
Committee ..................................................................................................... 63

C.   Limitation of Liability .................................................................................. 63

1.   Liability for Actions in Connection with the Reorganization Cases ....... 63

2.   Rights of Action in Connection with the Reorganization Cases .............. 64

D.   Modification of the Plan and Exhibits ................................................................. 64

E.   Headings ....................................................................................................... 64

F.   Severability ................................................................................................... 65

G.   Successors and Assigns ..................................................................................... 65

H.   Service of Certain Plan Exhibits ......................................................................... 65

I.   Effective Date Actions Simultaneous ................................................................. 65

J.   Asbestos Personal Injury Trust Annual Report .................................................. 65

K.   Service of Documents ......................................................................................... 65

1.   The Debtors and the Reorganized Debtors ............................................. 66

2.   Future Claimants' Representative ............................................................ 66

3.   The Asbestos Personal Injury Committee ................................................ 66

4.   The Creditors' Committee ......................................................................... 67

5.   The Bankruptcy Administrator for the Western District of North
Carolina ..................................................................................................... 67

6.   Lehigh Hanson, Inc .................................................................................... 67

## TABLE OF EXHIBITS[1]

Exhibit I.A.6          Asbestos Insurance Policies

Exhibit I.A.16         Asbestos Personal Injury Trust Agreement

Exhibit I.A.19         Asbestos Personal Injury Trust Distribution Procedures

Exhibit I.A.47         Delaware Trustee

Exhibit I.A.60         Dual Policies

Exhibit I.A.98         Form of Payment Note

Exhibit I.A.108        List of Protected Affiliates

Exhibit I.A.119        Separate Limit Policies

Exhibit I.A.120        List of Settling Asbestos Insurance Companies

Exhibit IV.B           Description of Certain Restructuring Transactions

Exhibit IV.H           Trustee of Asbestos Personal Injury Trust

Exhibit IV.M.3         List of Asbestos-Only Policies

Exhibit IV.M.4         List of Environmental-Only Policies

Exhibit V.C            Schedule of Executory Contracts and Unexpired Leases to Be Rejected

---

[1]     To the extent not attached to and Filed with the Plan, Plan Exhibits shall be Filed and made available for review on the web site of Prime Clerk LLC ("Prime Clerk"), the Debtors' claims and noticing agent, at https://cases.primeclerk.com/kaisergypsum no later than ten (10) days before the deadline to object to confirmation of the Plan.  The Debtors also will serve such Exhibits on their then current Bankruptcy Rule 2002 service list no later than ten (10) days before the deadline to object to confirmation of the Plan. The Debtors reserve the right to modify, amend, supplement, restate or withdraw any of the Exhibits after they are Filed.  The Debtors shall File and shall make available on Prime Clerk's web site all modified, amended, supplemented or restated Exhibits as promptly as possible.

# INTRODUCTION

The Parties propose the following joint plan of reorganization for the resolution of the outstanding claims and demands against and equity interests in the Debtors pursuant to sections 524(g) and 1121(a) of title 11 of the United States Code.  The Parties are co-proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code, and the Plan is supported by the following principal stakeholders, or representatives of such stakeholders, in the chapter 11 cases:  the Debtors, the Debtors' indirect parent company, Lehigh Hanson, Inc., the Asbestos Personal Injury Committee and the Future Claimants' Representative.  Reference is made to the Debtors' disclosure statement, filed contemporaneously with the Plan, for a discussion of the history, businesses, results of operations, historical financial information, projections and properties of the Debtors, and for a summary and analysis of the Plan.  There also are other agreements and documents, which are or will be Filed with the Bankruptcy Court, that are referenced in the Plan or the Debtors' Disclosure Statement and that will be available for review.

# ARTICLE I

## DEFINED TERMS, RULES OF INTERPRETATION
## AND COMPUTATION OF TIME

### A.    Defined Terms

As used in the Plan, capitalized terms have the meanings set forth below.  Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, has the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.    **"Administrative Claim"** means a Claim for costs and expenses of administration allowed under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the respective Estates and operating the businesses of the Debtors (such as wages, salaries, commissions for services and payments for leased equipment and premises), including Claims under the DIP Credit Agreement; (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under sections 330(a), 331 or 503 of the Bankruptcy Code, including Fee Claims; and (c) all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930.

2.    **"Affiliate"** means an "affiliate," as defined in section 101(2)(B) of the Bankruptcy Code, of the Debtors.

3.    **"Allowed Claim"** means:

a.    a Claim (other than an Asbestos Personal Injury Claim) that (i) has been listed by a particular Debtor on its Schedules as other than disputed, contingent or unliquidated and (ii) is not a Disputed Claim;

      b.     a Timely Claim (other than an Asbestos Personal Injury Claim) that is not a Disputed Claim;

      c.     a Timely Claim (other than an Asbestos Personal Injury Claim) that is liquidated and allowed:  (i) in any Stipulation of Amount and Nature of Claim executed by the Debtors or Reorganized Debtors and Claim holder; (ii) in any contract, instrument or other agreement entered into in connection with the Plan and, if prior to the Effective Date, approved by the Bankruptcy Court; (iii) in a Final Order; or (iv) pursuant to the terms of the Plan; or

      d.     a Claim (other than an Asbestos Personal Injury Claim) listed by a particular Debtor on its Schedules as other than disputed, contingent or unliquidated or a Timely Claim that the Debtors or Reorganized Debtors determine prior to the Claims Objection Bar Date (i) will not be subject to an objection or to an amendment to the Schedules and (ii) will be satisfied in accordance with the terms of the Plan on or after the Effective Date.

**4.**     **"Allowed . . . Claim"** means an Allowed Claim in the particular Class or category specified.

**5.**     **"Asbestos Coverage Litigation"** means the case captioned *Truck Insurance Exchange v. Kaiser Cement and Gypsum Corporation*, Court of Appeal of the State of California, Second Appellate District, Court of Appeal No. B278091, Superior Court No. BC249550.

**6.**     **"Asbestos Insurance Policies"** means those insurance policies alleged by HPCI or any other party in the Asbestos Coverage Litigation and described on Exhibit I.A.6, as well as any other insurance policy of the Debtors providing, or potentially providing, for coverage for Asbestos Personal Injury Claims.

**7.**     **"Asbestos Insurance Policy Claim"** means any claim against any Asbestos Insurer based on, arising under, or related to any Asbestos Insurance Policy or settlement related to any Asbestos Insurance Policy, including any claim for contribution, reimbursement, indemnity or subrogation, or bad faith refusal to settle related to any Asbestos Insurance Policy.

**8.**     **"Asbestos Insurer"** means any Entity that has issued an Asbestos Insurance Policy and each of its affiliates, predecessors in interest, and agents, but only in relation to such Asbestos Insurance Policies, including those insurers who issued, subscribed to, or have acquired the obligations of an issuing or subscribing insurer through assignment, conveyance, merger, acquisition or other legal theory.

**9.**     **"Asbestos Insurer Cooperation Obligations"** means, collectively, the Assistance and Cooperation, Inspection and Audit, and Notice of Occurrence provisions set out in the Asbestos Insurance Policies.

**10.**     **"Asbestos Permanent Channeling Injunction"** means an order or orders of the Bankruptcy Court or the District Court, or the Bankruptcy Court and the District Court acting jointly and, if the Confirmation Order is entered by the Bankruptcy Court, affirmed by the District Court, in accordance with, and pursuant to, section 524(g) of the Bankruptcy Code permanently

and forever staying, restraining and enjoining any Entity from taking any actions against any Protected Party for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any Asbestos Personal Injury Claim, all of which shall be channeled to the Asbestos Personal Injury Trust for resolution as set forth in the Asbestos Personal Injury Trust Agreement and the related Asbestos Personal Injury Trust Distribution Procedures.

11.     **"Asbestos Personal Injury Claim"** means any and all Debtor Claims on account of or relating to death, bodily injury, sickness, disease, emotional distress, fear of cancer, medical monitoring or other personal injuries whatsoever (whether physical, emotional or otherwise) arising out of, based upon or resulting from, directly or indirectly, in whole or in part, Conduct, to the extent arising, directly or indirectly, from Conduct (including Conduct of any other Entity for whose Conduct the Debtors have or are alleged to have liability, but in all cases only to the extent of any of the Debtors' liability for such Conduct), including without limitation (a) any and all Asbestos Personal Injury Indirect Claims and (b) any and all Debtor Claims under agreements entered into by or on behalf of the Debtors prior to the Petition Date in settlement of Asbestos Personal Injury Claims.  For the purpose of this definition, Asbestos Personal Injury Claims shall not include any claim by any present or former employee of any of the Debtors for benefits under a policy of workers' compensation insurance or for benefits under any state or federal workers' compensation statute or other statute providing compensation to an employee from an employer. For avoidance of doubt, an Asbestos Personal Injury Claim excludes any liability of the Protected Parties that is not liability of the Debtors, including, but not limited to, any liability of the Protected Parties (other than the Debtors) for their own asbestos or asbestos-containing products.

12.     **"Asbestos Personal Injury Committee"** means the Official Committee of Asbestos Personal Injury Claimants appointed pursuant to an order of the Bankruptcy Court entered on October 19, 2016 in the Reorganization Cases pursuant to section 1102 of the Bankruptcy Code and any duly appointed successors, as the same may be reconstituted from time to time.  The members as of the date of the Plan are:  Cleophus Rice, c/o Armand J. Volta, Jr., The Law Offices of Peter G. Angelos; Larry Eugene Watson, c/o Alan R. Brayton, Brayton Purcell LLP; Jerry Gabrel, c/o John D. Cooney, Cooney & Conway; Bernard Kunes, II, Individually and as Special Administrator of the Estate of Bernard Kunes, Deceased, c/o Beth Gori, Gori Julian & Associates, P.C.; Margaret Tocco, Individually and as Special Administrator of the Estate of Peter Tocco, Deceased, c/o Perry J. Browder, Simmons Hanly Conroy LLC; Ronald Earl Auen and Sherrie Auen, c/o Steven Kazan, Kazan, McClain, Satterley & Greenwood; Stanley J. Anderson c/o Connie J. Anderson – POA, c/o James L. Ferraro, Kelley & Ferraro, LLP; Lauren Lougher, as Administratrix of the Estate of John Lougher, Deceased, c/o Joseph W. Belluck, Belluck & Fox, LLP; Marta Poling-Goldenne, As Successor-In-Interest to David Poling-Goldenne, Deceased c/o Peter A. Kraus, Waters & Kraus, LLP; Patricia Hoff, Individually and as Personal Representative of David Hoff, Deceased, c/o Matthew P. Bergman, Bergman Draper Ladenburg, PLLC; Lois Annette Beach, c/o Joseph F. Rice, Motley Rice LLC.  The committee is chaired by Mr. Cooney.

13.     **"Asbestos Personal Injury Indirect Claim"** means any and all Debtor Claims asserted by a party that is not an Asbestos Insurer for contribution, reimbursement, subrogation or indemnification, or any other indirect or derivative recovery, on account of or with respect to any Asbestos Personal Injury Claim.  Notwithstanding the foregoing, any Protected Party

Indemnification Claim shall not be deemed to be or treated as an Asbestos Personal Injury Indirect Claim or an Asbestos Personal Injury Claim, and the Asbestos Personal Injury Trust shall pay such claims in accordance with the terms of the Asbestos Personal Injury Trust Documents and the Plan.

14. **"Asbestos Personal Injury Insurance Assets"** means (a) all of the Debtors' rights related to or arising under their Asbestos Insurance Policies (but not the policies themselves) to the fullest extent that those rights are related to coverage for Asbestos Personal Injury Claims, and (b) all claims and causes of action that the Debtors or Reorganized Debtors have, or may have in the future, against any Asbestos Insurer that are related to the Debtors' asbestos-containing products or the Asbestos Personal Injury Claims, including, but not limited to, claims or causes of action for a bad-faith refusal to settle.  For the avoidance of doubt, Asbestos Personal Injury Insurance Assets include all rights to coverage and insurance proceeds under the Asbestos Insurance Policies that are related to coverage for Asbestos Personal Injury Claims, together with all rights to insurance coverage and insurance proceeds related to Asbestos Personal Injury Claims under any settlement agreements and/or other agreements or stipulations, including without limitation the Excess CIP Agreement, as well as the right, on behalf of the Debtors, to compromise with or grant a full release to one or more of the Asbestos Insurers of any such insurance rights, whether under any such policy or settlement agreement.

15. **"Asbestos Personal Injury Trust"** means the trust that is to be established pursuant to section 524(g) of the Bankruptcy Code and in accordance with the Plan, the Confirmation Order and the Asbestos Personal Injury Trust Agreement, which trust will satisfy the requirements of section 524(g) of the Bankruptcy Code and section 468B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder.

16. **"Asbestos Personal Injury Trust Agreement"** means that certain Asbestos Personal Injury Trust Agreement, executed by the Debtors and the Asbestos Personal Injury Trustee, substantially in the form of Exhibit I.A.16.

17. **"Asbestos Personal Injury Trust Appellate Costs"** means if the Asbestos Personal Injury Trust determines to continue pursuing the Phase 1 Claims following the entry of a decision by the California Court of Appeal or, if there is a remand by that court, the Superior Court, completely resolving the Phase 1 Claims in favor of Truck, including through any further appeals or post-decision motions, all costs of pursuing the Phase 1 Appeal, including reasonable attorneys' fees and expenses incurred by the Asbestos Personal Injury Trust from that point forward.

18. **"Asbestos Personal Injury Trust Assets"** means, collectively: (a) $49.0 million in cash; (b) the Payment Note; (c) the Phase 1 Claims; and (d) the Asbestos Personal Injury Insurance Assets.

19. **"Asbestos Personal Injury Trust Distribution Procedures"** means the Asbestos Personal Injury Trust Distribution Procedures, to be implemented by the Asbestos Personal Injury Trust pursuant to the terms and conditions of the Plan and the Asbestos Personal Injury Trust Agreement governing the resolution of Asbestos Personal Injury Claims, substantially in the form of Exhibit I.A.19.

20.    **"Asbestos Personal Injury Trust Documents"** means, collectively:  (a) the Asbestos Personal Injury Trust Agreement; (b) the Asbestos Personal Injury Trust Distribution Procedures; and (c) the other agreements, instruments and documents governing the establishment and administration of the Asbestos Personal Injury Trust, as the same may be amended or modified from time to time, in accordance with the terms thereof.

21.    **"Asbestos Personal Injury Trust Expenses"** means, as to the Asbestos Personal Injury Trust, all costs, Taxes and expenses of or imposed on such trust, including but not limited to: (a) compensation expenses of such trust; (b) legal, accounting and other professional fees and expenses of such trust; (c) other disbursements and expenses relating to the implementation and operation of such trust; and (d) Asbestos Personal Injury Trust Appellate Costs.

22.    **"Asbestos Personal Injury Trust Termination Date"** means the date on which the Asbestos Personal Injury Trust terminates as set forth in the Asbestos Personal Injury Trust Agreement.

23.    **"Asbestos Personal Injury Trustee"** means the person appointed to serve as trustee of the Asbestos Personal Injury Trust to administer Asbestos Personal Injury Claims pursuant to the terms of the Asbestos Personal Injury Trust Agreement, or as subsequently may be appointed pursuant to the terms of the Asbestos Personal Injury Trust Agreement.

24.    **"Bankruptcy Administrator"** means the Bankruptcy Administrator for the Western District of North Carolina.

25.    **"Bankruptcy Code"** means title 11 of the United States Code, as in effect on the Petition Date or thereafter amended with retroactive applicability to the Reorganization Cases.

26.    **"Bankruptcy Court"** means the United States Bankruptcy Court for the Western District of North Carolina having jurisdiction over the Reorganization Cases.

27.    **"Bankruptcy Rules"** means, collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended with retroactive applicability to the Reorganization Cases.

28.    **"Bar Date"** means the applicable bar date by which a proof of Claim or a request for payment of an Administrative Claim must be or must have been Filed, as established by an order of the Bankruptcy Court, including the Confirmation Order.

29.    **"Business Day"** means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)), the day after Thanksgiving and any date on which the Bankruptcy Court is closed by law or order.

30.    **"By-Laws"** means, with respect to a Reorganized Debtor, the by-laws, regulations or other comparable document of such Reorganized Debtor, to be amended and restated in accordance with Section IV.D.1.

**31.** **"Certificate of Incorporation"** means, with respect to any Reorganized Debtor, the articles or certificate of incorporation or other comparable document of such Reorganized Debtor, to be amended and restated in accordance with Section IV.D.1.

**32.** **"Claim"** means a "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

**33.** **"Claims Objection Bar Date"** means, for all Claims (other than Asbestos Personal Injury Claims) the latest of: (a) 120 days after the Effective Date; (b) 60 days after the Filing of a proof of Claim for such Claim; and (c) such other period of limitation as may be specifically fixed by the Plan, the Confirmation Order, the Bankruptcy Rules or an order of the Bankruptcy Court.

**34.** **"Class"** means a class of Claims or Interests, as described in Article II, pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

**35.** **"Conduct"** means the presence of or exposure to asbestos or asbestos containing products or things alleged to have been designed, marketed, manufactured, fabricated, constructed, sold, supplied, produced, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, distributed, or in any other way made available, or present at any premises owned, leased, occupied or operated, by either of the Debtors or any other Entity for whose products, acts, omissions, business, or operations either of the Debtors has liability or is alleged to have liability.

**36.** **"Confirmation"** means the entry of the Confirmation Order on the docket of the District Court.

**37.** **"Confirmation Date"** means the date on which the Bankruptcy Court and the District Court acting jointly, or the District Court enters the Confirmation Order on its docket.

**38.** **"Confirmation Hearing"** means, collectively, the hearing or hearings held by the Bankruptcy Court or the District Court on Confirmation of the Plan, as such hearing or hearings may be continued from time to time.

**39.** **"Confirmation Order"** means the order of the District Court, the Bankruptcy Court and the District Court acting jointly, or, if an order is entered by the Bankruptcy Court, the order of the District Court affirming the Bankruptcy Court's order, that confirms the Plan pursuant to section 1129 of the Bankruptcy Code.

**40.** **"Creditors' Committee"** means the Official Committee of Unsecured Creditors appointed pursuant to an order of the Bankruptcy Court entered on October 14, 2016 in the Reorganization Cases pursuant to section 1102 of the Bankruptcy Code and any duly appointed successors, as the same may be reconstituted from time to time.  The members as of the date of the Plan are:  The Boeing Company and Ash Grove Cement Company.

**41.** **"Cure Amount Claim"** means a Claim based upon a Debtor's defaults pursuant to an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by that Debtor under section 365 of the Bankruptcy Code.

42.    **"Debtor Appellate Costs"** means the Truck Appeal Costs together with the First Stage Costs.

43.    **"Debtor Claims"** means any and all claims, commitments, obligations, suits, judgments, damages (whether compensatory, exemplary, punitive or otherwise), Demands, debts, causes of action and liabilities of any kind or nature, of or against the Debtors or any Protected Party, to the full extent, but only to the extent, of the Debtors' liability, whether liquidated or unliquidated, fixed or contingent, direct or indirect, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, now existing or hereafter arising, in law, equity or otherwise, including, without limitation, under any legal or equitable theory. whatsoever, including without limitation piercing the corporate veil, alter ego, successor liability, fraudulent conveyance, fraudulent concealment, conspiracy, enterprise liability, market share, joint venture, loss of consortium, medical monitoring, negligence, failure to warn, wrongful death, survivorship, or any other legal or equitable theory.

44.    **"Debtors"** means, together, the above-captioned debtors and debtors in possession identified on the cover page to this Plan.

45.    **"Deductible"** means (a) $5,000 per paid Asbestos Personal Injury Claim for all paid claims with a first exposure date on or before December 31, 1975; (b) $50,000 per paid Asbestos Personal Injury Claim for all paid claims with a first exposure date between January 1, 1976 and March 31, 1981, inclusive; and (c) $100,000 per paid Asbestos Personal Injury Claim for all claims with a first exposure date between April 1, 1981 and March 31, 1983, inclusive.

46.    **"Deficiency Claim"** means a General Unsecured Claim for the difference between (a) the aggregate amount of an Allowed Claim and (b) the value received on account of the portion of such Allowed Claim that is a Secured Claim.

47.    **"Delaware Trustee"** means the Entity or Entities appointed to serve as the "Delaware Trustee" for the Asbestos Personal Injury Trust pursuant to Section IV.H and the terms of the Asbestos Personal Injury Trust Agreement, as identified in Exhibit I.A.47, or as subsequently may be appointed pursuant to the terms of the Asbestos Personal Injury Trust Agreement.

48.    **"Demand"** means a "demand," as defined in section 524(g)(5) of the Bankruptcy Code, against any Debtor.

49.    **"DEQ"** means the Oregon Department of Environmental Quality.

50.    **"DEQ Settlement"** means the settlement among the Debtors, Lehigh Hanson and DEQ as approved by the DEQ Settlement Order and further documented in the Consent Judgment entered in the Circuit Court of the State of Oregon for the County of Columbia; provided that the DEQ Settlement shall be subject to and governed by the terms and conditions of the Consent Judgment and the Term Sheet, and that all conditions to the effectiveness of the DEQ Settlement set forth therein shall have been satisfied or waived in writing; and, provided further, that in the event of any inconsistency between the terms of the DEQ Settlement, as so defined, and the DEQ Settlement Order, the terms and conditions of the DEQ Settlement shall govern.

51.    **"DEQ Settlement Order"** means the Order Approving Settlement with the Oregon Department of Environmental Quality entered by the Bankruptcy Court on May 7, 2019.

52.    **"DIP Credit Agreement"** means, collectively:  (a) that Debtor-in-Possession Loan and Security Agreement; (b) all amendments thereto and extensions thereof; and (c) all security, guaranty and other documents and agreements related to the documents identified in (a) and (b), including, without limitation, any termination letters.

53.    **"DIP Lender"** means Lehigh Hanson, Inc., a Delaware corporation, as the lender under the DIP Credit Agreement.

54.    **"Disbursing Agent"** means any of the Reorganized Debtors, in their capacity as a disbursing agent pursuant to Section VI.C., or any Third Party Disbursing Agent, but shall not include any disbursing agent for or with respect to the Asbestos Personal Injury Trust.

55.    **"Disclosure Statement"** means the written disclosure statement that relates to the Plan, including the exhibits thereto, approved by the Bankruptcy Court as containing adequate information pursuant to section 1125 of the Bankruptcy Code and Rule 3017 of the Bankruptcy Rules, as such disclosure statement may be amended, modified, or supplemented from time to time.

56.    **"Disputed Claim"** means (other than with respect to an Asbestos Personal Injury Claim):

            a.    if no proof of Claim has been Filed by the applicable Bar Date or has otherwise been deemed timely Filed under applicable law, (i) a Claim that is listed on a Debtor's Schedules as disputed, contingent or unliquidated or (ii) a Claim that is not listed on a Debtor's Schedules; or

            b.    if a Timely Claim, a Claim for which an objection, complaint or request for estimation has been Filed by the applicable Debtor, Reorganized Debtor or, prior to the Confirmation Date, any other party in interest, by the Claims Objection Bar Date, and such objection has not been withdrawn or denied by a Final Order.

57.    **"Distribution"** means one or more payments or distributions under the Plan of cash, notes, interests or other property, as applicable, to the holders of Allowed Claims (other than Asbestos Personal Injury Claims or distributions made to the Asbestos Personal Injury Trust).

58.    **"Distribution Record Date"** means the Confirmation Date.

59.    **"District Court"** means the United States District Court for the Western District of North Carolina having jurisdiction over these Reorganization Cases.

60.    **"Dual Policies"** means those insurance policies described on Exhibit I.A.60 which provide or may provide coverage for Asbestos Personal Injury Claims and Environmental Claims under a shared combined aggregate limit.

**61.** **"Effective Date"** means the earliest possible date, as determined by the Debtors, the Asbestos Personal Injury Committee and the Future Claimants' Representative, that is a Business Day on or after the date on which all conditions to the effective date in Section VIII.B. have been met or waived pursuant to Section VIII.C.

**62.** **"Encumbrance"** means, with respect to any asset, any mortgage, lien, pledge, charge, security interest, assignment or encumbrance of any kind or nature in respect of such asset (including any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction).

**63.** **"Entity"** means an individual, corporation, partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization or government or any political subdivision thereof, or other person or entity.

**64.** **"Environmental Claim"** means a Claim of any Entity against any Debtor: (a) relating to alleged violations of, or noncompliance with, or liability arising under any federal or state environmental laws or regulations; or (b) relating to Pollution (defined as actual, alleged, or threatened pollution, contamination, damage, injury, or harm to any land, soil, watercourse, surface water, ground water, body of water, the air and/or atmosphere and/or any other tangible thing, or to any person or other living thing, relating to the actual, alleged, or threatened release, discharge, disposal, application, distribution, use or escape (including emission or seepage) of smoke, vapor, soot, fumes, acids, alkalis, chemicals, liquids, gases, waste materials, oil, petroleum or petroleum derivatives, other irritants, contaminants or pollutants from any facility, structure, vehicle, premises, landfill, disposal site or other property owned or operated by the Debtors or at or to which such substances were generated, stored, transported, distributed, sold, produced, or disposed of by the Debtors or for which the Debtors may be liable by contract or by statute, or otherwise, including all sites or locations referenced in the actions pending in California state court and Oregon state court to determine insurance coverage, regardless of whether substances were known to be, or, in fact, were hazardous, contaminating or polluting substances at any particular time), including:  (i) any Claim of actual, alleged, threatened, or feared personal injury, bodily injury, sickness, or disease; (ii) any Claim of actual, alleged, threatened, or feared property damage, including damage, destruction, loss of use, diminished value or any economic loss; (iii) any Claim relating to actual, alleged, threatened, or feared damage to, destruction of, or limitation or loss of use of natural resources; (iv) any Claim seeking to compel (through injunctive or equitable relief or otherwise), the enforcement of federal, state or local statutes, rules, regulations, ordinance or government directive or the testing, study, investigation, prevention or remediation of actual, alleged, threatened, or feared Pollution or any Claim for such costs; (v) any Claim for nuisance, trespass, interference with quiet enjoyment of property, bad faith, sanctions, punitive or exemplary damages, statutory fines, or penalties; or (vi) any Claim for costs or expenses incurred by any Entity for the testing study, investigation, prevention, or remediation of actual, alleged, threatened, or feared Pollution, or incurred in order to comply with any environmental statute, rule, regulation, ordinance, or government directive.  For the avoidance of doubt, Asbestos Personal Injury Claims and Asbestos Insurance Policy Claims do not fall within the definition of Environmental Claims.

65.    **"Estate"** means, as to each Debtor, the estate created for that Debtor in its Reorganization Case pursuant to section 541 of the Bankruptcy Code.

66.    **"Escrow Agent"** means the escrow agent designated to administer and make distributions from the General Unsecured Claims Escrows.

67.    **"Executory Contract and Unexpired Lease"** and **"Executory Contract or Unexpired Lease"** means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code and the Confirmation Order.

68.    **"Excess CIP Agreement"** means that certain December 2013 Excess Coverage In Place Settlement Agreement.

69.    **"Fee Claim"** means a Claim under sections 330(a), 331, 503 or 1103 of the Bankruptcy Code for compensation of a Professional or other Entity for services rendered or expenses incurred in the Reorganization Cases.

70.    **"Fee Order"** means the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals entered by the Bankruptcy Court on November 7, 2016.

71.    **"File," "Filed" or "Filing"** means file, filed or filing with the Bankruptcy Court, the District Court or their authorized designees, as applicable, in the Reorganization Cases.

72.    **"Final Fee Application"** means an application for final allowance of the Professional's aggregate Fee Claim as described in Section III.A.1.d.ii.A.

73.    **"Final Order"** means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction that has been entered on the docket in any Reorganization Case or the docket of any other court of competent jurisdiction, and has not been reversed, stayed, modified or amended, and as to which (a) the time to appeal or seek certiorari or move for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or (b) any appeal that has been taken or any petition for certiorari that has been filed timely has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied.

74.    **"First Stage Costs"** means all costs of pursuing the Phase 1 Claims, including reasonable attorneys' fees and expenses, incurred by the plaintiff until the earlier of (a) the entry of a decision by the California Court of Appeal in the Phase 1 Appeal or, if there is a remand by that court, the California Superior Court, resolving the Phase 1 Claims or (b) a settlement of the Phase 1 Claims.

75.    **"Future Claimants' Representative"** means Lawrence Fitzpatrick (or any court appointed alternative or successor), the legal representative for persons who might subsequently assert Demands against any of the Debtors, who was appointed pursuant to order of the Bankruptcy Court dated October 19, 2016.

**76.**    **"General Unsecured Claim"** means a Deficiency Claim and any Claim that is not a Cure Amount Claim, Administrative Claim, Priority Tax Claim, Priority Claim, Secured Claim, Asbestos Personal Injury Claim, or Intercompany Claim.

**77.**    **"General Unsecured Claims Escrows"** means two escrow accounts funded through (a) settlement amounts paid by Settled Environmental Insurers and (b) the Lehigh Hanson General Unsecured Claim Contribution held by the Escrow Agent to facilitate distributions to holders of Allowed General Unsecured Claims.  On the Effective Date, the funds deposited into the General Unsecured Claims Escrows will total the aggregate amount of all Allowed General Unsecured Claims as of the Effective Date.

**78.**    **"HeidelbergCement"** means HeidelbergCement AG.

**79.**    **"HPCI"** means Debtor Hanson Permanente Cement, Inc., an Arizona corporation.

**80.**    **"Insolvent Insurers Proceeds"** means the proceeds of the Debtors' claims for insurance coverage against OIC Run-Off Limited (formerly The Orion Insurance Company plc) and The London and Overseas Insurance Company Limited (formerly The London and Overseas Company plc), which proceeds are being or will be held by the Debtors in a separate bank account.

**81.**    **"Insolvent Insurers Proceeds Dispute"** means the dispute among the Asbestos Personal Injury Committee, the Future Claimants' Representative, certain insurers and the Creditors' Committee regarding to what extent the Debtors or other parties are entitled to the Insolvent Insurers Proceeds.

**82.**    **"Insurance Policies"** means the insurance policies covering or potentially covering the Asbestos Personal Injury Claims and the Environmental Claims, as described in Exhibits I.A.6, I.A.60, I.A.119, IV.M.3 and IV.M.4.

**83.**    **"Insured Asbestos Claim"** means an Asbestos Personal Injury Claim that is covered by any Asbestos Insurance Policy.

**84.**    **"Insurer Coverage Defenses"** means all defenses at law or in equity that any Asbestos Insurer may have under applicable non-bankruptcy law to provide insurance coverage to or for Asbestos Personal Injury Claims that have been channeled to and assumed by the Asbestos Personal Injury Trust pursuant to the Plan, except for (a) any defense that the transfer of the Debtors' rights as to Asbestos Personal Injury Insurance Assets pursuant to the Plan is invalid or unenforceable or otherwise breaches the terms of such coverage and (b) any defense that the drafting, proposing, confirmation or consummation of a plan of reorganization (as opposed to the terms, operation, effect or unreasonableness of any of the Plan or the Exhibits to the Plan) and/or the discharge and/or release of the Debtors from liability for Asbestos Personal Injury Claims pursuant to the Plan operates to, or otherwise results in, the elimination of or the reduction in any obligation such insurers may have under such transferred rights as to the Asbestos Personal Injury Insurance Assets.

85.     **"Intercompany Claim"** means any Claim, including an Administrative Claim, by HeidelbergCement or any direct or indirect subsidiary of HeidelbergCement, including a Debtor, against a Debtor.

86.     **"Interest"** means the rights of any holder of the stock of any Debtor and the rights of any Entity to purchase or demand the issuance of any of the stock of any Debtor, including: (a) redemption, conversion, exchange, voting, participation and dividend rights; (b) liquidation preferences; and (c) rights under stock options and warrants.

87.     **"Inter-Insurer rights"** means the rights of one Asbestos Insurer to recover from any other Asbestos Insurer based on theories of contribution, indemnity, subrogation or other right to reimbursement, whether those rights are based upon contract, statute, equity or case law.

88.     **"Internal Revenue Code"** means title 26 of the United States Code, 26 U.S.C. § 1 *et seq*.

89.     **"IRS"** means the Internal Revenue Service of the United States of America.

90.     **"Kaiser Gypsum"** means Debtor Kaiser Gypsum Company, Inc., a North Carolina corporation.

91.     **"Lehigh Hanson"** means Lehigh Hanson, Inc., a Delaware corporation.

92.     **"Lehigh Hanson General Unsecured Claim Contribution"** means a payment of Lehigh Hanson into the General Unsecured Claims Escrows in an amount no less than the total amount of all Allowed General Unsecured Claims as of the Effective Date, less the amount contributed to the General Unsecured Claims Escrows by the Settled Environmental Insurers, less any amount contributed to the General Unsecured Claims Escrows by the Debtors, but not to exceed the amount specified in Section IV.E of this Plan.

93.     **"Non-Settling Asbestos Insurer"** means any Asbestos Insurer who is not a Settling Asbestos Insurer.

94.     **"Objecting Excess Insurers"** means Certain Underwriters at Lloyd's, London, Certain London Market Companies, Columbia Casualty Company, National Fire Insurance Company of Hartford, The Continental Insurance Company, Granite State Insurance Company, Lexington Insurance Company, The Insurance Company of the State of Pennsylvania, Evanston Insurance Company, TIG Insurance Company, Allstate Insurance Company, solely as successor in interest to Northbrook Excess & Surplus Insurance Company, formerly Northbrook Insurance Company, First State Insurance Company, New England Reinsurance Company, Allianz Underwriters Insurance Company, Fireman's Fund Insurance Company, and Westchester Fire Insurance Company.

95.     **"Objecting Excess Insurers' Objections"** means the Plan objections and motions to dismiss, set out in docket numbers 919, 1053, 2066, 2067, 2069, 2071, 2073 and 2075 of the Bankruptcy Court docket, and any objections to any post-confirmation settlement with Truck.

96.     **"Parties"** means, collectively, the Debtors, Lehigh Hanson, the Asbestos Personal Injury Committee and the Future Claimants' Representative.

97.     **"Payment Default"** means the failure by the Reorganized Debtors to pay the Payment Note in full on or before the fifth anniversary of the Effective Date.

98.     **"Payment Note"** means a note, issued to the Asbestos Personal Injury Trust by the Reorganized Debtors as co-obligors in the principal amount of $1.0 million, in substantially the form of Exhibit I.A.98.  As reflected in Exhibit I.A.98, the Payment Note will (a) beginning on the second anniversary of the Effective Date, bear interest at a rate of 10 percent per annum; (b) mature on the fifth anniversary of the Effective Date; (c) be secured by the Pledge; and (d) provide for payment in full of the principal amount of the Payment Note on or before the Payment Note's maturity date.  As further reflected in Exhibit I.A.98, upon the occurrence of a Payment Default, the Asbestos Personal Injury Trust may, upon written notice to the Reorganized Debtors, foreclose on the Pledge.  During the period in which the Payment Default has occurred and is continuing interest will accrue at a per annum rate of 10 percent on the amount of the unpaid principal.  A Payment Default shall not provide a basis for the Asbestos Personal Injury Trust to contend that a material breach of the Plan has occurred or that any Protected Party is no longer entitled to the protections provided to such Protected Party pursuant to the Plan, including without limitation the protections of the Asbestos Permanent Channeling Injunction, the related indemnification by the Asbestos Personal Injury Trust, and the settlement of the Estates' claims.

99.     **"Permanente Property"** means HPCI's cement plant, rock plant and quarry (including the minerals) located in Santa Clara County, California.

100.     **"Petition Date"** means September 30, 2016.

101.     **"Phase 1 Appeal"** means HPCI's appeal of the January 5, 2015 Statement of Decision in the Asbestos Coverage Litigation that is pending in the California Court of Appeal under Case No. B278091.

102.     **"Phase 1 Claims"** means those claims of HPCI (asserted on its own and on Kaiser Gypsum's behalf) against Truck for Truck's withholding of deductible amounts in July 2007, as alleged by HPCI in its Cross-Complaint against Truck in the Asbestos Coverage Litigation, and as tried to the court in November 2014 and reflected in a January 5, 2015 Statement of Decision, and as encompassed within the Phase 1 Appeal.

103.     **"Plan"** means this joint plan of reorganization for the Debtors and all Exhibits attached hereto or referenced herein, as the same may be amended, modified or supplemented.

104.     **"Pledge"** means 100 percent of the equity of each Reorganized Debtor.

105.     **""Priority Claim"** means a Claim that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code that is not an Administrative Claim or a Priority Tax Claim.

106.     **"Priority Tax Claim"** means a Claim that is entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.

107.    **"Professional"** means any professional employed in the Reorganization Cases pursuant to sections 327, 328 or 1103 of the Bankruptcy Code or any professional or other Entity seeking compensation or reimbursement of expenses in connection with the Reorganization Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

108.    **"Protected Affiliates"** means the parties identified on Exhibit I.A.108.

109.    **"Protected Party"** means any of the following parties:

a.    the Debtors;

b.    the Reorganized Debtors;

c.    the Protected Affiliates;

d.    Lehigh Hanson;

e.    current and former directors, officers, and employees of the Debtors, the Reorganized Debtors and the Protected Affiliates, including without limitation Lehigh Hanson, solely in their capacity as such;

f.    as of February 15, 2018, current and former shareholders of the Debtors, the Reorganized Debtors and the Protected Affiliates, including without limitation Lehigh Hanson, solely in their capacity as such;

g.    current and former in-house and outside attorneys, accountants, auditors, tax advisors and other professionals who have provided services to the Debtors, the Reorganized Debtors and the Protected Affiliates, including without limitation Lehigh Hanson, solely in their capacity as such;

h.    Entities that, pursuant to the Plan or on or after the Effective Date, become a direct or indirect transferee of, or successor to, any assets of any Debtor or Reorganized Debtor, or the Asbestos Personal Injury Trust, but only to the extent that liability is asserted to exist by reason of such Entity becoming such a transferee or successor;

i.    Entities that, pursuant to the Plan or on or after the Effective Date, make a loan to any Debtor or Reorganized Debtor, or the Asbestos Personal Injury Trust or to a successor to, or transferee of, any assets of any Debtor or Reorganized Debtor, or the Asbestos Personal Injury Trust, but only to the extent that liability is asserted to exist by reason of it becoming such a lender;

j.    Entities, other than Asbestos Insurers, that are alleged to be directly or indirectly liable for the conduct of, claims against, or Demands on any Debtor or Reorganized Debtor, or the Asbestos Personal Injury Trust, to the extent that such alleged liability arises by reason of one or more of the following:

1.   such Entity's ownership of a financial interest in any Debtor or Reorganized Debtor, or any past or present affiliate of any them, or any predecessor in interest of any of them;

2.   such Entity's involvement in the management of any Debtor, Reorganized Debtor or any predecessor in interest of any of them;

3.   such Entity's service as an officer, director or employee of any Debtor or Reorganized Debtor, any past or present affiliate of any of them, any predecessor in interest of any of them, or of any entity that owns or at any time has owned a financial interest in any Debtor or Reorganized Debtor, any past or present affiliate of any of them, or any predecessor in interest of any of them;

4.   such Entity's provision of insurance to any Debtor, Reorganized Debtor, any past or present affiliate of any of them, or any predecessor in interest of any of them, or any entity that owns or at any time has owned a financial interest in any Debtor or Reorganized Debtor, any past or present affiliate of any of them, or any predecessor in interest of any of them; and

5.   such Entity's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of any Debtor, Reorganized Debtor, any past or present affiliate of any of them, any predecessor in interest of any of them, or any entity that owns or at any time has owned a financial interest in any Debtor or Reorganized Debtor, any past or present affiliate of any of them, or any predecessor in interest of any of them.

k.      each Settling Asbestos Insurer.

**110.   "Protected Party Indemnification Claims"** mean any and all claims, including claims for related fees and costs, of a Protected Party under the indemnification described in Section IV.K.4.

**111.   "Quarterly Distribution Date"** means the last Business Day of the month following the end of each calendar quarter after the Effective Date; provided, however, that if the Effective Date is within forty-five (45) days of the end of a calendar quarter, the first Quarterly Distribution Date shall be the last Business Day of the month following the end of the first calendar quarter after the calendar quarter including the Effective Date.

**112.   "Recovery Actions"** means, collectively and individually, preference actions, fraudulent conveyance actions and other claims or causes of action under sections 510, 544, 547, 548, 549, 550 and 553(b) of the Bankruptcy Code and other similar state law claims and causes of action.

JA00148

113.   **"Reinstated"** or **"Reinstatement"** means the treatment of a Claim or Interest, at the applicable Reorganized Debtor's sole discretion, in accordance with one of the following:

a.   The legal, equitable and contractual rights to which such Claim or Interest entitles the holder will be unaltered; or

b.   Notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default:

i.   any such default that occurred before the applicable Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, will be cured;

ii.   the maturity of such Claim or Interest as such maturity existed before such default will be reinstated;

iii.   the holder of such Claim or Interest will be compensated for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and

iv.   the legal, equitable or contractual rights to which such Claim or Interest entitles the holder of such Claim or Interest will not otherwise be altered.

114.   **"Reorganization Case"** means:  (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor in the Bankruptcy Court; and (b) when used with reference to all Debtors, the chapter 11 cases pending for the Debtors in the Bankruptcy Court.

115.   **"Reorganized . . ."** means, when used in reference to a particular Debtor, such Debtor on and after the Effective Date.

116.   **"Restructuring Transactions"** means, collectively, those mergers, consolidations, restructurings, dispositions, liquidations, dissolutions or other transactions that the Debtors or Reorganized Debtors determine to be necessary or appropriate to effect a corporate restructuring of their respective businesses or otherwise to simplify the overall corporate structure and intercompany arrangements of the Reorganized Debtors, including without limitation the Restructuring Transactions set forth on Exhibit IV.B.

117.   **"Schedules"** means the schedules of assets and liabilities and the statements of financial affairs Filed by the Debtors, as required by section 521 of the Bankruptcy Code, as the same may have been or may be amended, restated, modified or supplemented.

118.   **"Secured Claim"** means a Claim (other than an Asbestos Personal Injury Claim) that is secured by a lien on property in which an Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest

in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to sections 506(a) and, if applicable, 1129(b) of the Bankruptcy Code.

119.    **"Separate Limit Policies"** means those insurance policies described on Exhibit I.A.119 that provide or may provide coverage for Asbestos Personal Injury Claims and Environmental Claims under separate limits applicable to Asbestos Personal Injury Claims and Environmental Claims.

120.    **"Settling Asbestos Insurer"** means each Asbestos Insurer listed on Exhibit I.A.120 and any Asbestos Insurer that, after the Confirmation Hearing, enters into a settlement with the Asbestos Personal Injury Trust that (a), in the determination of the Asbestos Personal Injury Trust, the TAC and the Future Claimants' Representative, justifies treating such Asbestos Insurer as a Protected Party and (b) is approved by the Bankruptcy Court.

121.    **"Settled Environmental Insurers"** means any Entity that has subscribed or issued an insurance policy that provides coverage for Environmental Claims, which has bought back such coverage from the Debtors pursuant to a settlement agreement approved by the Bankruptcy Court, and is protected by the environmental injunction as set forth in Section IX.B.3 and a bar order under section 363 of the Bankruptcy Code.

122.    **"Stock Interests of . . ."** means, when used with reference to a particular Debtor, the Interests issued by such Debtor.

123.    **"Stipulation of Amount and Nature of Claim"** means a stipulation or other agreement between the applicable Debtor or Reorganized Debtor and a holder of a Claim (other than an Asbestos Personal Injury Claim) or Interest establishing the allowed amount or nature of such Claim or Interest that is (a) entered into in accordance with any Claim settlement procedures established in these Reorganization Cases; (b) permitted or contemplated by the Plan or (c) approved by order of the Bankruptcy Court.

124.    **"Surety Bond Claims"** means, collectively, (a) proof of Claim number 4 filed by Zurich American Insurance Company; (b) proof of Claim number 5 filed by Fidelity & Deposit Company of Maryland; and (c) proof of Claim numbers 22 and 25 filed by Lexon Insurance Company and Bond Safeguard Company.

125.    **"Surety Bond Program"** means, collectively, the (a) Debtors' surety bonds maintained in the ordinary course of business; (b) surety payment and indemnity agreements, setting forth a surety's rights against the Debtors, and the Debtors' obligations to pay and indemnify such surety from any loss, cost, or expense that the surety may incur, in each case, on account of the issuance of any surety bonds on behalf of the Debtors; (c) surety collateral agreements governing collateral, if any, in connection with the Debtors' surety bonds; and/or (d) ordinary course premium payments to the sureties for the Debtors' surety bonds.

126.    **"Surety Bond Obligations"** means all the Debtors' obligations arising under the Surety Bond Program.

127.   **"TAC"** means the Trust Advisory Committee for the Asbestos Personal Injury Trust.

128.   **"Tax"** means:  (a) any net income, alternative or add-on minimum, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, license, property, environmental, withholding or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other Entity.

129.   **"Third Party Disbursing Agent"** means an Entity designated by Reorganized HPCI to act as a Disbursing Agent pursuant to Section VI.C.

130.   **"Timely Claim"** means a Claim (other than an Asbestos Personal Injury Claim) for which a proof of Claim or request for payment of Administrative Claim was Filed by the applicable Bar Date or is otherwise determined to be timely Filed by a Final Order of the Bankruptcy Court.

131.   **"Truck"** means Truck Insurance Exchange.

132.   **"Truck Appeal Costs"** means if Truck continues litigation in respect of the Phase 1 Claims following the entry of a decision by the California Court of Appeal, or if there is a remand by that court, the Superior Court, resolving the Phase 1 Claims in favor of the plaintiff, in whole or part, all costs of pursuing the Phase 1 Claims, including reasonable attorneys' fees and expenses, until such litigation is finally resolved either by (a) a court decision or (b) settlement.

133.   **"Uninsured Asbestos Claim"** means an Asbestos Personal Injury Claim for which there is no coverage provided by any Asbestos Insurance Policy.

## B.   Rules of Interpretation and Computation of Time

### 1.   Rules of Interpretation

For purposes of the Plan, unless otherwise provided herein:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or Exhibit Filed or to be Filed means such document or Exhibit, as it may have been or may be amended, modified or supplemented pursuant to the Plan or Confirmation Order; (d) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors, assigns and affiliates; (e) all references in the Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Plan; (f) the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) the words "includes" or "including" are not limiting; (h) captions and headings to Articles and Sections are inserted for convenience of

reference only and are not intended to be a part of or to affect the interpretation of the Plan;
(i) subject to the provisions of any contract, certificate of incorporation, by-laws, or similar
constituent document, instrument, release or other agreement or document entered into or
delivered in connection with the Plan, the rights and obligations arising under the Plan will be
governed by, and construed and enforced in accordance with, federal law, including the
Bankruptcy Code and the Bankruptcy Rules; and (j) the rules of construction set forth in
section 102 of the Bankruptcy Code shall apply.

## 2.    Computation of Time

In computing any period of time prescribed or allowed by the Plan, the provisions of
Bankruptcy Rule 9006(a) shall apply.

## ARTICLE II

## CLASSES OF CLAIMS AND INTERESTS

Claims and Interests, except Administrative Claims, and Priority Tax Claims, are placed
in Classes as follows:

| Class | Claims or Interests |
|-------|---------------------|
| Class 1 | Priority Claims |
| Class 2 | Secured Claims |
| Class 3 | General Unsecured Claims |
| Class 4 | Asbestos Personal Injury Claims |
| Class 5 | Surety Bond Claims |
| Class 6 | Intercompany Claims |
| Class 7 | Stock Interests |

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, and
Priority Tax Claims, as described in Section III.A., have not been classified and thus are
excluded from the foregoing Classes.  A Claim or Interest is classified in a particular Class only
to the extent that the Claim or Interest qualifies within the description of that Class and is
classified in other Classes to the extent that any remainder of the Claim or Interest qualifies
within the description of such other Classes.

# ARTICLE III

## TREATMENT OF CLAIMS AND INTERESTS

A.    **Unclassified Claims**

1.    **Payment of Administrative Claims**

a.    **Administrative Claims in General**

Except as specified in this Section III.A.1., and subject to the bar date provisions herein, unless otherwise agreed by the holder of an Administrative Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Administrative Claim shall receive, in full satisfaction of its Administrative Claim, cash equal to the allowed amount of such Administrative Claim either (i) as soon as practicable after the Effective Date or (ii) if the Administrative Claim is not allowed as of the Effective Date, thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order or a Stipulation of Amount and Nature of Claim is executed by the applicable Reorganized Debtor and the holder of the Administrative Claim.

b.    **Statutory Fees**

On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930, as determined at the Confirmation Hearing by the Bankruptcy Court or the District Court, as applicable, shall be paid in cash equal to the amount of such Administrative Claims.  All fees payable pursuant to 28 U.S.C. § 1930 shall be paid by the Reorganized Debtors in accordance therewith until the closing of the Reorganization Cases pursuant to section 350(a) of the Bankruptcy Code.

c.    **Ordinary Course Liabilities**

Allowed Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business (including any Intercompany Claims that are Administrative Claims, Administrative Claims of governmental units for Taxes and Administrative Claims arising from those contracts and leases of the kind described in Section V.E.) shall be satisfied by the applicable Reorganized Debtor pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claims, without any further action by the holders of such Administrative Claims or further approval of the Bankruptcy Court.

d.    **Bar Dates for Administrative Claims**

i.    **General Bar Date Provisions**

Except as otherwise provided in Section III.A.1.d.ii., unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors, pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than sixty (60) days after the Effective Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such

Administrative Claims and that do not File and serve such a request by the applicable Bar Date shall be forever barred from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or their respective property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests must be Filed and served on the requesting party no later than 120 days after the Effective Date.

### ii.    Bar Dates for Certain Administrative Claims

#### A.    Professional Compensation

Professionals or other Entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Fee Order or other order of the Bankruptcy Court a Final Fee Application no later than (ninety) 90 days after the Effective Date. A Professional may include any outstanding, non-Filed monthly or interim request for payment of a Fee Claim pursuant to the Fee Order in its Final Fee Application.  Objections to any Final Fee Application must be Filed and served on the Reorganized Debtors and the requesting party by the later of (1) eighty (80) days after the Effective Date or (2) thirty (30) days after the Filing of the applicable Final Fee Application.  To the extent necessary, the Confirmation Order shall amend and supersede any previously entered order of the Bankruptcy Court, including the Fee Order, regarding the payment of Fee Claims.  Any pending, Filed interim requests for a Fee Claim pursuant to the Fee Order shall be resolved in the ordinary course in accordance with the Fee Order or, if sooner, in connection with the particular Professional's Final Fee Application.

#### B.    Ordinary Course Liabilities

Holders of Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business, including any Intercompany Claims that are Administrative Claims, Administrative Claims of governmental units for Taxes and Administrative Claims arising from those contracts and leases of the kind described in Section V.E., shall not be required to File or serve any request for payment of such Administrative Claims.  Such Administrative Claims shall be satisfied pursuant to Section III.A.1.c.

### 2.    Payment of Priority Tax Claims

#### a.    Priority Tax Claims in General

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of its Priority Tax Claim, payment in full of the allowed amount of the Priority Tax Claim on the later of the Effective Date or as soon as practicable after the date when such Claim becomes an Allowed Claim.

#### b.    Other Provisions Concerning Treatment of Priority Tax Claims

Notwithstanding the provisions of Section III.A.2.a., any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the holder for actual pecuniary loss shall be treated as a Class 3 Claim, and the

holder (other than as the holder of a Class 3 Claim) may not assess or attempt to collect such penalty from the Reorganized Debtors or their respective property.

## B.     Classified Claims

**1.     Class 1 Claims (Priority Claims) are unimpaired.**  On the Effective Date, each holder of an Allowed Claim in Class 1 shall receive cash in an amount equal to such Allowed Claim unless the holder of such Claim agrees to less favorable treatment.

*2.*     **Class 2 Claims (Secured Claims) are unimpaired.**  On the Effective Date, unless otherwise agreed by the holder of an Allowed Claim in Class 2 and the applicable Debtor or Reorganized Debtor, each holder of a Claim in Class 2 shall receive treatment in accordance with Option A or B below, at the option of the applicable Debtor or Reorganized Debtor.  Any Allowed Deficiency Claim of a holder of an Allowed Secured Claim shall be entitled to treatment as an Allowed Class 3 Claim.

> **Option A:**  Claims in Class 2 that are Allowed Claims and with respect to which the applicable Debtor or Reorganized Debtor elects Option A shall be paid in full in cash.

> **Option B:**  Claims in Class 2 that are Timely Claims and with respect to which the applicable Debtor or Reorganized Debtor elects Option B shall be Reinstated.

**3.     Class 3 Claims (General Unsecured Claims) are unimpaired.**  On the Effective Date, each holder of an Allowed Claim in Class 3 shall receive cash in an amount equal to such Allowed Claim including any post-petition interest as ordered by the Bankruptcy Court unless the holder of such Claim agrees to less favorable treatment.

**4.     Class 4 Claims (Asbestos Personal Injury Claims) are impaired**.  On the Effective Date, all Asbestos Personal Injury Claims shall be channeled to the Asbestos Personal Injury Trust, which shall be funded pursuant to Section IV.K.2.  All Asbestos Personal Injury Claims shall be resolved pursuant to the terms of Section IV.O.1 and Section IV.O.2., the Asbestos Personal Injury Trust Agreement, the Asbestos Personal Injury Trust Distribution Procedures and any other Asbestos Personal Injury Trust Document.  Except as provided in Section IV.O.1, pursuant to section 524(g) of the Bankruptcy Code, the Plan and the Confirmation Order shall permanently and forever stay, restrain and enjoin any Entity from taking any actions against any Protected Party for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any Asbestos Personal Injury Claim, all of which shall be channeled to the Asbestos Personal Injury Trust for resolution as set forth in the Asbestos Personal Injury Trust Agreement and the related Asbestos Personal Injury Trust Distribution Procedures, including permanently and forever staying, restraining and enjoining any Entity from any of the following, with respect to Asbestos Personal Injury Claims:

> a.     commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including a judicial, arbitral, administrative or other proceeding) in any forum against any Protected Party or any property or interests in property of any Protected Party;

b.     enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree or other order against any Protected Party or any property or interests in property of any Protected Party;

c.     creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Protected Party or any property or interests in property of any Protected Party;

d.     setting off, seeking reimbursement of, contribution from or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; and

e.     proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the Asbestos Personal Injury Trust Documents, except in compliance therewith.

For the avoidance of doubt, no Entity shall be so stayed, enjoined, or restrained from initiating or continuing a suit or other proceeding against any Debtor in name only for the purpose of recovering on an Asbestos Personal Injury Claim from a Non-Settling Asbestos Insurer.

**5.     Class 5 Claims (Surety Bond Claims)  are unimpaired.**  On the Effective Date, each Surety Bond Claim in Class 5 shall be Reinstated.

**6.     Class 6 Claims (Intercompany Claims) are unimpaired.**  On the Effective Date, each Intercompany Claim in Class 6 shall be Reinstated.

**7.     Class 7 Interests (Stock Interests) are unimpaired.**  On the Effective Date, Stock Interests of the Debtors shall be Reinstated, and holders of such Stock Interests shall retain such Interests, subject to the Restructuring Transactions provisions of Section IV.B.

## ARTICLE IV

## MEANS FOR IMPLEMENTATION OF THE PLAN

**A.     Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided herein (and subject to the Restructuring Transactions provisions of Section IV.B.), each Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate corporate or other legal Entity, with all the powers of a corporation or other legal Entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable state law.  Except as otherwise provided herein (and subject to the Restructuring Transactions provisions of Section IV.B.), as of the Effective Date, all property of the respective Estates of the Debtors, and any property acquired by a Debtor or Reorganized Debtor under the Plan, will vest in the applicable Reorganized Debtor, free and clear of all Claims, Encumbrances and Interests.

For the avoidance of doubt, the funds deposited into the General Unsecured Claims Escrows will be used solely to make distributions to holders of Allowed General Unsecured Claims, and the Debtors and Reorganized Debtors will not hold any legal or equitable interest in such funds deposited in the General Unsecured Claims Escrows, in accordance with Section VI.B, below. On and after the Effective Date, each Reorganized Debtor may operate its businesses and may use, acquire and dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including fees and expenses relating to the preparation of Professional fee applications) without application to the Bankruptcy Court.

**B.      Restructuring Transactions**

On or after the Confirmation Date, the applicable Debtor or Reorganized Debtor may take such actions as the Debtors or Reorganized Debtors determine to be necessary or appropriate to effectuate, implement and consummate the Restructuring Transactions, including without limitation the Restructuring Transactions set forth on Exhibit IV.B.; provided, however, that no Restructuring Transactions other than the Restructuring Transactions set forth on Exhibit IV.B. shall be implemented prior to the Effective Date without the written consent of the Asbestos Personal Injury Committee and the Future Claimants' Representative, which consent shall not be unreasonably withheld.  The actions to effectuate, implement and consummate the Restructuring Transactions may include:  (1) the execution and delivery of appropriate agreements or other documents that carry out the provisions of the Plan and that satisfy the applicable requirements of applicable state law; and (2) the filing of appropriate instruments pursuant to applicable state law.

**C.      Transfers and Lease Transactions**

On or after the Confirmation Date, non-debtor Lehigh Cement Company LLC will transfer its interest in certain real property located in Kosse, Limestone County, Texas and Kunkletown, Monroe County, Pennsylvania (together, the "Real Properties"), together with its rights under certain leases related to the Real Properties, to Kaiser Gypsum.  The actions to effectuate, implement and consummate these transactions may include:  (1) the execution and delivery of appropriate agreements or other documents containing terms that are consistent with the provisions of the Plan and that satisfy the applicable requirements of applicable state law; and (2) the filing of appropriate instruments pursuant to applicable state law.

**D.      Corporate Governance, Directors and Officers, Employment-Related Agreements and Compensation Programs and Corporate Action**

**1.      Certificates of Incorporation and By-Laws of the Reorganized Debtors**

As of the Effective Date, the Certificate of Incorporation and the By-Laws of each Reorganized Debtor will be in such form as the Debtors may determine.  The initial Certificate of Incorporation and By-Laws of each Reorganized Debtor, among other things, shall prohibit

the issuance of nonvoting equity securities to the extent required by section 1123(a) of the Bankruptcy Code.  After the Effective Date, each such Entity shall be permitted to amend and restate its Certificate of Incorporation or By-Laws pursuant to applicable state law and the terms and conditions of such constituent documents.

### 2.       Directors and Officers of the Reorganized Debtors

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, the initial directors and officers of each Reorganized Debtor shall be the directors and officers of such Debtor immediately prior to the Effective Date.  Each such director and officer shall serve from and after the Effective Date until his or her successor is duly elected or appointed and qualified or until his or her earlier death, resignation or removal in accordance with the terms of the Certificate of Incorporation and By-Laws of the relevant Reorganized Debtor (as the same may be amended after the Effective Date) and applicable state law.

### 3.       Employee Arrangements of the Reorganized Debtors

As of the Effective Date, the Reorganized Debtors shall be authorized to:  (a) maintain, amend or revise existing employment, indemnification and other arrangements with their active and retired directors, officers and employees, subject to the terms and conditions of any such agreement; and (b) enter into new employment, indemnification and other arrangements with active and retired directors, officers and employees; all as determined by the board of directors of the applicable Reorganized Debtor.

### 4.       Corporate Action

Pursuant to section 1142 of the Bankruptcy Code, section 10-1008 of the Arizona Revised Statutes and section 55-14A-01 of the North Carolina Business Corporation Act, the following (which shall occur and be deemed effective as of the date specified in the documents effectuating the same or, if no date is so specified, the Effective Date) shall be authorized and approved in all respects and for all purposes without any requirement of further action by stockholders or directors of any of the Debtors or the Reorganized Debtors or by any other Entity:  (a) the initial Certificates of Incorporation and By-Laws of the Reorganized Debtors; (b) the initial directors and officers of the Reorganized Debtors; (c) the Distribution of cash pursuant to the Plan; (d) the creation of the Asbestos Personal Injury Trust, and the funding thereof; (e) other corporate actions that are necessary or appropriate to effectuate, implement and consummate the provisions of the Plan, including the Restructuring Transactions provisions of Section IV.B.; and (f) the adoption, execution, delivery and performance of all contracts, instruments, releases and other agreements and documents related to any of the foregoing (including the Asbestos Personal Injury Trust Agreement and the Payment Note).

## E.       Obtaining Cash for Plan Distributions

All cash payments to be made pursuant to the Plan shall be funded by the applicable Reorganized Debtor.  All cash necessary for a Reorganized Debtor to fund such cash payments pursuant to the Plan shall be obtained through a combination of one or more of the following: (1) such Reorganized Debtor's cash balances and cash generated by the operations of such Reorganized Debtor; (2) any Tax refunds actually received by such Reorganized Debtor;

(3) contributions to or on behalf of such Reorganized Debtor by Lehigh Hanson; (4) proceeds of certain of the Debtors' insurance policies or (5) such other means of financing or funding as determined by the board of directors of such Reorganized Debtor.

On the Effective Date, Lehigh Hanson shall contribute to the Reorganized Debtors, as necessary to satisfy Allowed General Unsecured Claims, up to $28.15 million in cash minus the amount of the Insolvent Insurers Proceeds to which the Debtors are entitled.

## F.    Creation of Asbestos Personal Injury Trust

As of the Effective Date, the Asbestos Personal Injury Trust shall be created.  The Asbestos Personal Injury Trust is intended to be one or more "qualified settlement funds" within the meaning of the Treasury Regulations issued under section 468B of the Internal Revenue Code.  The purpose of the Asbestos Personal Injury Trust shall be to, among other things: (1) resolve all asserted Asbestos Personal Injury Claims in accordance with the Plan, Asbestos Personal Injury Trust Agreement, the Asbestos Personal Injury Trust Distribution Procedures and the Confirmation Order; (2) preserve, hold, manage, maximize and liquidate the assets of the Asbestos Personal Injury Trust for use in resolving Asbestos Personal Injury Claims; and (3) qualify at all times as one or more qualified settlement funds.  On the Effective Date, all right, title, and interest in and to the Asbestos Personal Injury Trust Assets, and any proceeds thereof, will be transferred to, and vested in, the Asbestos Personal Injury Trust, free and clear of all Claims, Demands, Stock Interests, Encumbrances, and other interests of any Entity, without any further action of the Bankruptcy Court or any Entity.

## G.    Authority of the Asbestos Personal Injury Trust

As of the Effective Date, without any further action of the Bankruptcy Court or any Entity, except as otherwise expressly set forth in the Plan, the Asbestos Personal Injury Trust shall be empowered to initiate, prosecute, defend, and resolve all legal actions and other proceedings related to or arising from any asset, liability, or responsibility of the Asbestos Personal Injury Trust, including but not limited to any actions arising from or related to the Asbestos Personal Injury Insurance Assets and the Phase 1 Claims.

## H.    Appointment of Asbestos Personal Injury Trustee and Delaware Trustee

On the Confirmation Date, effective as of the Effective Date, in accordance with the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures, the Entities selected jointly by the Asbestos Personal Injury Committee and the Future Claimants' Representative to serve as the Asbestos Personal Injury Trustee (as identified in Exhibit IV.H) and the Delaware Trustee shall be appointed to serve as the Asbestos Personal Injury Trustee for the Asbestos Personal Injury Trust.  All subsequent Asbestos Personal Injury Trustees and Delaware Trustees shall be appointed in accordance with the terms of the Asbestos Personal Injury Trust Agreement.

## I.    Appointment of Future Claimants' Representative and TAC Members

The Future Claimants' Representative shall serve as the legal representative for the purpose of protecting the shared interests of holders of Demands pursuant to the terms of the

Asbestos Personal Injury Trust Agreement, on and after the Effective Date, and shall have the functions and rights provided in the Asbestos Personal Injury Trust Documents. The initial members of the TAC will be identified in the Asbestos Personal Injury Trust Agreement.

**J.     Document Repository**

Prior to or on the Effective Date, the Debtors shall establish a repository containing all the books and records of the Debtors that are necessary for the defense of Asbestos Personal Injury Claims, including without limitation the historical asbestos personal injury claims database maintained by the Debtors, deposition transcripts, product identification evidence, information regarding sale and use of the products, claims settlement and payment information, and indexes and summaries relating to any such documents, and shall make that repository available to the Entities that are responsible for the processing or defense of Asbestos Personal Injury Claims, and that are entitled to review, copy or use such documents. For the avoidance of doubt, the Asbestos Personal Injury Trust shall have access to materials in this repository only to the extent it is the Entity defending or processing (which term shall not include the mere payment of the deductible portion of an Asbestos Personal Injury Claim) an Uninsured Asbestos Claim or a particular Asbestos Personal Injury Claim, and such determination shall be made by the Reorganized Debtors on a claim-by-claim basis. Any dispute over whether the Asbestos Personal Injury Trust shall have access to the materials in this repository shall be resolved by the Bankruptcy Court. Notwithstanding anything to the contrary herein, holders of Asbestos Personal Injury Claims may pursue and obtain information stored in this repository through discovery to the full extent permitted by applicable law. The Asbestos Personal Injury Trust shall be obligated to compensate the Reorganized Debtors for all out-of-pocket costs reasonably incurred after the Effective Date in connection with establishing and maintaining the repository.

Notwithstanding the foregoing or any other provisions of the Plan, the sole and exclusive remedy for the Asbestos Personal Injury Trust's failure to reimburse such out-of-pocket costs, or for its failure to pay any other amounts due to the Reorganized Debtors, shall be the right of the Reorganized Debtors to assert money damage claims against the Asbestos Personal Injury Trust, and such failure shall not relieve the Reorganized Debtors of any of their obligations hereunder, or otherwise, to the extent such obligations exist.

Pursuant to the Plan and the Confirmation Order, to the extent the Debtors or Reorganized Debtors, as applicable, provide access to the Asbestos Personal Injury Trust to any privileged books and records, such access shall not result in the destruction or waiver of any applicable privileges pertaining to such books and records. If the preservation of privilege pertaining to such books and records is challenged or disapproved by the Bankruptcy Court or the District Court and if the Asbestos Personal Injury Trust determines that it needs access to such information, the Reorganized Debtors will, at the sole cost and expense of the Asbestos Personal Injury Trust (which cost and expense shall be reasonable), enter into arrangements to permit the Asbestos Personal Injury Trust to have access to such books and records, to the extent such access does not result in the destruction or waiver of any applicable privileges. Further, pursuant to the Plan and the Confirmation Order, none of the Debtors, the Reorganized Debtors, Lehigh Hanson, or any Affiliates shall be liable for violating any confidentiality or privacy protections as a result of providing the Asbestos Personal Injury Trust access to the books and

records, and the Asbestos Personal Injury Trust shall take appropriate steps to comply with any such applicable protections.

### K. Transfers of Property to and Assumption of Certain Liabilities by the Asbestos Personal Injury Trust

#### 1. Expenses of the Asbestos Personal Injury Trust

The Asbestos Personal Injury Trust shall pay all Asbestos Personal Injury Trust Expenses.  The Reorganized Debtors shall have no obligation to pay such expenses, except for Debtor Appellate Costs.

#### 2. Funding the Asbestos Personal Injury Trust

On the Effective Date, the Reorganized Debtors and/or Lehigh Hanson, as applicable, shall transfer to the Asbestos Personal Injury Trust the Asbestos Personal Injury Trust Assets as follows:

##### a. Initial Payment

One or more of the Reorganized Debtors and/or Lehigh Hanson on behalf of and as a contribution to such Reorganized Debtors will pay an aggregate of $49.0 million in cash to the Asbestos Personal Injury Trust.

##### b. Payment Note

The Reorganized Debtors, as co-obligors, shall issue the Payment Note to the Asbestos Personal Injury Trust.

##### c. Phase 1 Claims

The Reorganized Debtors shall transfer to the Asbestos Personal Injury Trust the Phase 1 Claims, free and clear of any liens, claims or encumbrances, including any rights of setoff based on any liability of the Debtors.  The Debtors or the Reorganized Debtors shall pay all Debtor Appellate Costs.  The Asbestos Personal Injury Trust shall pay all Asbestos Personal Injury Trust Appellate Costs.  If the Asbestos Personal Injury Trust ultimately obtains any recovery with respect to Phase 1 Claims, whether as a result of settlement or judgment that exceeds $12 million, the Asbestos Personal Injury Trust shall remit to the Debtors or the Reorganized Debtors any amounts remaining, in excess of $12 million, after the Asbestos Personal Injury Trust Appellate Costs have been deducted from the full recovery amount.

##### d. Asbestos Personal Injury Insurance Assets

The Reorganized Debtors shall transfer to the Asbestos Personal Injury Trust the Asbestos Personal Injury Insurance Assets.

### 3. Assumption of Certain Liability and Responsibility by the Asbestos Personal Injury Trust

Subject to the provisions of the Plan, and in consideration for the transfer of the Asbestos Personal Injury Trust Assets to the Asbestos Personal Injury Trust pursuant to Section IV.K.2. and in furtherance of the purposes of the Asbestos Personal Injury Trust and the Plan, the Asbestos Personal Injury Trust shall assume liability and responsibility, financial and otherwise, for all Asbestos Personal Injury Claims.  The Asbestos Personal Injury Trust shall have all defenses, cross-claims, offsets and recoupment rights, as well as rights of indemnification, contribution, subrogation and similar rights, and any other rights regarding Uninsured Asbestos Claims that any Debtor, Reorganized Debtor or Protected Party has or would have had under applicable law.

### 4. Indemnification by the Asbestos Personal Injury Trust

The Asbestos Personal Injury Trust shall protect, defend, indemnify and hold harmless each Protected Party from and against any Asbestos Personal Injury Claim; provided, however, the sole and exclusive remedy for the Asbestos Personal Injury Trust's failure to satisfy the indemnification, defense and hold harmless obligations under this Section shall be the right of the Protected Parties to assert money damage claims against the Asbestos Personal Injury Trust.

### 5. Authority of the Debtors

Effective on the Confirmation Date, the Debtors shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary or appropriate to enable the Reorganized Debtors to implement effectively the provisions of the Plan and the Asbestos Personal Injury Trust Agreement.

## L. Cooperation with Respect to Insurance Matters

### 1. Obligation to Cooperate with Respect to Insurance Matters

The Reorganized Debtors will cooperate with the Asbestos Personal Injury Trust and use reasonable efforts to take or cause to be taken all actions and to do or cause to be done all things that the Asbestos Personal Injury Trust may reasonably consider necessary to effectuate the transfer of the Asbestos Personal Injury Insurance Assets to the Asbestos Personal Injury Trust. By way of illustration and not limitation, the Reorganized Debtors will be obligated:  (a) to provide the Asbestos Personal Injury Trust with copies of insurance policies and settlement agreements included within or relating to the Asbestos Personal Injury Insurance Assets; (b) to provide the Asbestos Personal Injury Trust with other information in the Reorganized Debtors' possession, custody or control that is reasonably necessary to the Asbestos Personal Injury Trust's efforts with respect to insurance coverage for Asbestos Personal Injury Claims; (c) to execute further assignments or allow the Asbestos Personal Injury Trust to pursue claims relating to the Asbestos Personal Injury Insurance Assets in a Reorganized Debtor's name (subject to appropriate disclosure of the fact that the Asbestos Personal Injury Trust is doing so and the reasons why it is doing so), including by means of arbitration, alternative dispute resolution proceedings or litigation; and (d) to facilitate actions to enforce judgments obtained by the claimants or the Asbestos Personal Injury Trust against Asbestos Insurers, if necessary.

To the extent that any transfer or portion of a transfer of the Asbestos Personal Injury Insurance Assets to the Asbestos Personal Injury Trust is determined to be invalid by a court of competent jurisdiction, upon request of the Asbestos Personal Injury Trust and at the cost of the Asbestos Personal Injury Trust, the Reorganized Debtors shall:  (a) take all reasonable actions, including those as may be requested by the Asbestos Personal Injury Trust, with respect to such assets, including, but not limited to, prosecution of any insurance coverage and/or breach of contract action or other action, for the benefit of, and to the extent reasonably requested by, the Asbestos Personal Injury Trust; and (b) immediately transfer any amounts recovered under or on account of any such assets to the Asbestos Personal Injury Trust.  The Asbestos Personal Injury Trust will be obligated to compensate the Reorganized Debtors for all out-of-pocket costs reasonably incurred on or after the Effective Date in connection with providing assistance to the Asbestos Personal Injury Trust pursuant to this Section, including without limitation out-of-pocket costs and expenses, consultant and expert fees, and attorneys' fees.  Any acts taken pursuant to this Section shall not be deemed to waive and shall not constitute a waiver of any applicable privilege, confidence, or work product protection as against any third party.  The Reorganized Debtors shall have a continuing obligation to satisfy the Assistance and Cooperation, Inspection and Audit, and Notice of Occurrence Provisions set out in the Asbestos Insurance Policies.  Any out-of-pocket costs incurred by the Reorganized Debtors in carrying out such obligations shall be reimbursed by the Asbestos Personal Injury Trust.  The sole and exclusive remedy for the Asbestos Personal Injury Trust's failure to reimburse such out-of-pocket costs shall be the right of the Reorganized Debtors to assert money damage claims against the Asbestos Personal Injury Trust.

**2.      Enforcement of Reorganized Debtors' Obligations to Cooperate with Respect to Insurance Matters**

a.      The Reorganized Debtors shall have a continuing obligation to satisfy the Asbestos Insurer Cooperation Obligations.  Any out-of-pocket costs incurred by the Reorganized Debtors in carrying out the Asbestos Insurer Cooperation Obligations shall be reimbursed by the Asbestos Personal Injury Trust.  The Reorganized Debtors' obligations under this provision shall be ongoing until such time when all Asbestos Insurance Policies have either been settled or exhausted.

b.      If an Asbestos Personal Injury Insurance Asset does not provide coverage for an Asbestos Personal Injury Claim pursued against the Reorganized Debtors in the tort system pursuant to Section IV.O.1. because a court determines in a Final Order that the Reorganized Debtors failed to satisfy or otherwise perform any of the Asbestos Insurer Cooperation Obligations, the Asbestos Personal Injury Trust, the TAC, the Future Claimants' Representative, and the holder (the "Denied Asbestos Personal Injury Claimant") of the applicable Asbestos Personal Injury Claim (the "Denied Asbestos Personal Injury Claim"), each individually or in any combination jointly, may seek (1) specific performance directing the Reorganized Debtors to cure their breach of the Asbestos Insurer Cooperation Obligations, and/or (2) payment from the Reorganized Debtors for the judgment or settlement amount of the Denied Asbestos Personal Injury Claim.

Regardless of which remedy is sought, the party may also seek payment from the Reorganized Debtors for reasonable attorneys' fees expended in pursuing such relief from the Reorganized Debtors.

c.      Within forty-five (45) calendar days of receiving notice that an Asbestos Insurer contests coverage for an Asbestos Personal Injury Claim asserted against the Reorganized Debtors because the Reorganized Debtors are alleged to have failed to satisfy or otherwise perform the Asbestos Insurer Cooperation Obligations (a "Notice"), the Asbestos Personal Injury Trust and the holder of such Asbestos Personal Injury Claim shall provide to the Reorganized Debtors any documents or information they respectively received from the Asbestos Insurer denying, rejecting or disclaiming coverage.  If such information is not provided to the Reorganized Debtors within forty-five (45) days of receipt, then the Reorganized Debtors shall have no obligations under Section IV.L.2 with respect to such Asbestos Personal Injury Claim, unless the failure to provide such information as required did not unfairly prejudice the Reorganized Debtors.

d.      Within forty-five (45) calendar days of receiving a Notice, the Reorganized Debtors shall provide to the Asbestos Personal Injury Trust and the holder of the applicable Asbestos Personal Injury Claim (1) any documents or information they received from the Asbestos Insurer denying, rejecting or disclaiming coverage and (2) any documentation or other information they have within their possession, custody, or control regarding the Reorganized Debtors' efforts to satisfy any of the Asbestos Insurer Cooperation Obligations in respect of the applicable Asbestos Personal Injury Claim.  The Asbestos Personal Injury Trust or the holder of the Asbestos Personal Injury Claim or both may assert an action against the Asbestos Insurer seeking coverage for the Asbestos Personal Injury Claim, and shall provide timely notice to the Reorganized Debtors of any action seeking such coverage.  The Reorganized Debtors agree that a finding that they failed to satisfy or otherwise perform any of the Asbestos Insurer Cooperation Obligations may be made regardless of whether they are a named party in any such action and agree to be bound by any such finding in a Final Order.  In the event that the action brought against the Asbestos Insurer pursuant to this Section IV.L.2.d results in a Final Order providing that the Asbestos Insurer does not have a coverage obligation for the Asbestos Personal Injury Claim and the basis for the finding that there is no such coverage obligation may be because the Reorganized Debtors failed to satisfy or otherwise perform any of the Asbestos Insurer Cooperation Obligations, then the Asbestos Personal Injury Trust or the holder of the Asbestos Personal Injury Claim or both may bring a subsequent direct action against the Reorganized Debtors for the sole purpose of seeking the finding described in Section IV.L.2.b.

e.      In the event any of the parties identified in Section IV.L.2.b as having rights with respect to a Denied Asbestos Personal Injury Claim seeks payment or specific performance related to a Denied Asbestos Personal Injury

Claim, the Reorganized Debtors shall, within thirty (30) calendar days of receiving notice of the Denied Asbestos Personal Injury Claim, either (a) remit payment of (i) the judgment or settlement amount of the Denied Asbestos Personal Injury Claim to the Asbestos Personal Injury Trust or the Denied Asbestos Personal Injury Claimant, as applicable, and if payment of the amount of the Denied Asbestos Personal Injury Claim is made to the Asbestos Personal Injury Trust, the Asbestos Personal Injury Trust shall in turn remit payment to the Denied Asbestos Personal Injury Claimant, and (ii) reasonable attorneys' fees expended in enforcing the rights provided in Section IV.L.2, except for any attorneys' fees expended in connection with a direct action against the Reorganized Debtors permitted by Section IV.L.2.d (collectively, the "Legal Fees") to the appropriate party, or (b) attempt to cure the breach of the Asbestos Insurer Cooperation Obligations.  If the Reorganized Debtors successfully cure their breach such that the Asbestos Insurer reverses its previous denial of coverage and pays the Denied Asbestos Personal Injury Claim in full, the Reorganized Debtors shall have no obligation to pay the Denied Asbestos Personal Injury Claim; the Reorganized Debtors shall, however, remain liable for paying the Legal Fees, and shall remit payment of such Legal Fees to the appropriate party.  If the Reorganized Debtors are unable to cure their breach of the Asbestos Insurer Cooperation Obligations, the Reorganized Debtors shall pay to the Asbestos Personal Injury Trust or the Denied Asbestos Personal Injury Claimant, as applicable, the judgment or settlement amount of the Denied Asbestos Personal Injury Claim and shall remit the Legal Fees to the appropriate party.

f.    Lehigh Hanson shall fully guarantee the Reorganized Debtors' performance of any payment obligations they incur with respect to the Asbestos Insurance Policies, including, but not limited to, any obligations the Reorganized Debtors incur under Section IV.L.2 and shall pay directly to the Reorganized Debtors, within fourteen (14) calendar days of receiving notice of the Reorganized Debtors' failure to pay a Denied Asbestos Personal Injury Claim and related Legal Fees or otherwise, the amount of any such payment obligation so that the Reorganized Debtors may distribute the funds. Notwithstanding the foregoing, payment obligations of the Reorganized Debtors under this paragraph shall not include any obligation the Asbestos Personal Injury Trust has expressly assumed hereunder, including the Deductibles and any obligations for which the Asbestos Personal Injury Trust has agreed hereunder to reimburse the Reorganized Debtors.

g.    Nothing in Section IV.L.2 is intended to preclude, limit, or otherwise impair, any other claims, causes of action, or remedies that may be available to the Asbestos Personal Injury Trust, the TAC, the Future Claimants' Representative, or any holders of Asbestos Personal Injury Claims, under otherwise applicable non-bankruptcy law or the Plan and its Exhibits, related to Asbestos Personal Injury Claims.  In particular, nothing in Section IV.L.2 is intended to bar or preclude holders of Asbestos Personal Injury Claims from pursuing any action directly against Asbestos Insurers

related to Asbestos Personal Injury Claims or Denied Asbestos Personal
Injury Claims, including actions under Section 11580 of the California
Insurance Code and its subdivisions, or any related or similar statute in any
jurisdiction.

**M.    Compromise of Insurance Policies**

### 1.    Dual Policies

The Reorganized Debtors or their assignee(s) shall not compromise any part of the Dual
Policies absent the prior written consent of the TAC, the Future Claimants' Representative and
the Asbestos Personal Injury Trust, such consent not to be unreasonably withheld, and the
Asbestos Personal Injury Trust (conditioned on the express consent of the TAC and the Future
Claimants' Representative) shall not compromise any part of the Dual Policies absent the prior
written consent of the Reorganized Debtors or their assignee(s), such consent not to be
unreasonably withheld.  If a dispute arises as to whether a party's lack of consent is reasonable,
such dispute may be presented to the Bankruptcy Court for resolution.  After the Effective Date,
should the Bankruptcy Court or appellate court, if applicable, find in favor of the party
withholding consent, the other party shall pay the reasonable attorneys' fees and costs of the
party withholding consent.

### 2.    Separate Limit Policies

The Reorganized Debtors or their assignee(s) are entitled to settle that portion of the
Separate Limit Policies that does not provide coverage for Asbestos Personal Injury Claims.  The
TAC, Future Claimants' Representative and the Asbestos Personal Injury Trust are entitled to
notice and review of any proposed settlement but may only object on the grounds that the
proposed settlement releases or otherwise impairs coverage for Asbestos Personal Injury Claims.
Also with respect to Separate Limit Policies, the Asbestos Personal Injury Trust (conditioned on
the express consent of the TAC and the Future Claimants' Representative) is entitled to settle that
portion of the Separate Limit Policies that does not provide coverage for Environmental Claims.
The Reorganized Debtors or their assignee(s) are entitled to notice and review of any proposed
settlement but may object only on the grounds that the proposed settlement releases or otherwise
impairs coverage for Environmental Claims.  If a dispute arises as to whether a proposed
settlement releases or otherwise impairs coverage for Asbestos Personal Injury Claims, or
Environmental Claims, as applicable, such dispute may be presented to the Bankruptcy Court for
resolution.  After the Effective Date, should the Bankruptcy Court, or appellate court if
applicable, find in favor of the objecting party, the other party shall pay the reasonable attorneys'
fees and costs of the objecting party.

### 3.    Insurance Policies that Provide Coverage for Asbestos Personal Injury Claims but not for Environmental Claims

With respect to insurance policies that provide coverage for Asbestos Personal Injury
Claims but not for Environmental Claims (a list of such policies is attached as Exhibit IV.M.3),
and also any policies that may provide coverage for Asbestos Personal Injury Claims, but not for
Environmental Claims that are not included on Exhibits I.A.60, I.A.119, IV.M.3 and IV.M.4, the

Asbestos Personal Injury Trust (conditioned on the express consent of the TAC and the Future Claimants' Representative) may settle such Asbestos Personal Injury Insurance Assets and the Reorganized Debtors or their assignee(s) shall have no standing to object.

### a.     Settlement with Truck

If the Asbestos Personal Injury Trust seeks approval of a settlement with Truck, the Objecting Excess Insurers may object to approval of such settlement (notice, hearing, and the Court's approval of which are required before Truck may become a "Settling Asbestos Insurer"). The Objecting Excess Insurers may object to the settlement to the same extent and on the same grounds that they could have objected (a) to the settlement if the settlement had been reached, and approval of it had been sought before Confirmation and (b) to the Plan had such a settlement been set forth in the Plan; without limiting the foregoing, any objections based on projections with respect to events that had not occurred as of the Confirmation Hearing shall be based on information that was known or knowable as of the Confirmation Hearing.  The Objecting Excess Insurers may not argue that either the Bankruptcy Court or the District Court lacked jurisdiction to confirm the Plan; provided, however, for the avoidance of doubt, the objections set forth in the preceding sentence are preserved.  The Asbestos Personal Injury Trust may oppose the Objecting Excess Insurers' Objections and assert any additional arguments or bases for opposition to such objections on any ground, including grounds that were or could have been advanced by the Debtors, the Asbestos Personal Injury Committee or the Future Claimants' Representative in opposition to the Objecting Excess Insurers' Objections.  The relief available to the Objecting Excess Insurers, if one or more of them prevails on one or more such objection(s), shall be limited, to (a) denying the  motion to approve the settlement with Truck; (b) granting the Objecting Excess Insurers adequate protection of their Inter-Insurer Rights, if any, against Truck; and/or (c) modifying the Asbestos Permanent Channeling Injunction to exclude any restriction on the Objecting Excess Insurers' pursuing their Inter-Insurer Rights, if any, against Truck, in all cases subject to the Court's determination that such relief is appropriate under principles of law and equity.  For the avoidance of doubt, and not by way of limitation, none of the Objecting Excess Insurers' Objections will be deemed moot because of substantial consummation of the Plan, Confirmation of the Plan, the Plan becoming final and non-appealable, or the closing of the Reorganization Cases.  For the avoidance of doubt, the Objecting Excess Insurers shall not be entitled to, and shall not seek, any other relief with respect to a settlement with Truck against the Debtors, the Reorganized Debtors, Lehigh Hanson or any of their affiliates, nor any relief with respect to the implementation, effectiveness, or consummation of the Plan (as long as the Plan is not materially altered before Confirmation).  The Objecting Excess Insurers' agreement not to seek such relief, however, shall not operate to limit the relief that may be available to the Objecting Excess Insurers against the Asbestos Personal Injury Trust, or to the Asbestos Personal Injury Trust.

Upon the filing by the Asbestos Personal Injury Trust of a motion to approve a settlement with Truck, the Asbestos Personal Injury Trust shall move the Court to set a status conference on such motion on a date that is no less than twenty (20) days after the filing of such motion, or such other date as directed by the Court, without prejudice to the rights of any party to seek a longer or shorter period of time based upon the facts and circumstances that might then exist.  At the status conference, any party may request that the Court set a briefing schedule for any objections to the motion, set an evidentiary hearing to consider the merits of the motion and any

objections thereto (unless no party requests an evidentiary hearing), establish a schedule for discovery relating to the motion and any objections thereto, and any other party may object to such request.

Any settlement between the Asbestos Personal Injury Trust and Truck shall not contain any provision that excuses Truck from its obligation to continue to defend the underlying asbestos personal injury cases until such time as any order approving such settlement (if any such order is entered) has become a Final Order.  Further, and notwithstanding anything else contained in the Plan or the Confirmation Order, unless and until the Court enters an order (which has become a Final Order) approving a Truck settlement that might provide otherwise (and without prejudice to the rights of the Objecting Excess Insurers' rights to object to the entry of such an order as provided above), the Objecting Excess Insurers' rights under the law, the Excess CIP Agreement, and the Asbestos Insurance Policies that relate to the defense of the underlying asbestos claims are preserved against Truck if it ceases defending any of the underlying asbestos cases.

### 4.     Insurance Policies that Provide Coverage for Environmental Claims but not for Asbestos Personal Injury Claims

With respect to insurance policies that provide coverage for Environmental Claims but not for Asbestos Personal Injury Claims (a list of such policies is attached as Exhibit IV.M.4) and any policies that may provide coverage for Environmental Claims but not for Asbestos Personal Injury Claims that are not included on Exhibits I.A.60, I.A.119, IV.M.3 and IV.M.4, the Reorganized Debtors or their assignee(s) may settle such policies and the TAC, Future Claimants' Representative and the Asbestos Personal Injury Trust shall have no standing to object.

### 5.     Amendment of Insurance Policy Exhibits

If a dispute regarding the lists of Dual Policies and Separate Limit Policies arises after the Confirmation Hearing, it may be presented to the Bankruptcy Court.  After the Confirmation Hearing, Exhibits I.A.60, I.A.119, IV.M.3 and IV.M.4 may only be amended by written agreement of the Parties, or if after the Effective Date, the Asbestos Personal Injury Trust, the Reorganized Debtors and Lehigh Hanson.  For any Insurance Policy not previously included as an Exhibit to this Plan that the Asbestos Personal Injury Trust, the Reorganized Debtors or Lehigh Hanson contend should be added to Exhibits I.A.60, I.A.119, IV.M.3 and IV.M.4 after Confirmation, and about which there is a dispute among such parties, such dispute may be presented to the Bankruptcy Court for resolution.

### N.     Truck Obligations Regarding Deductibles

Notwithstanding any provision in any Asbestos Insurance Policy to the contrary, Truck shall have no obligation to pay, and shall not pay, any Deductible under any applicable Asbestos Insurance Policy to holders of Asbestos Personal Injury Claims or any other Entity.  The Asbestos Personal Injury Trust shall satisfy such Deductible to holders of Insured Asbestos Claims in accordance with the terms, provisions and procedures of the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures.  Other than

with respect to Deductibles, the Asbestos Personal Injury Trust shall not assume responsibility pursuant to the Plan for any other expenses owed to Truck, or that may become owed to Truck in the future, in connection with Asbestos Personal Injury Claims.

**O.      Liquidation of Asbestos Personal Injury Claims**

**1.      Insured Asbestos Claims**

Holders of Insured Asbestos Claims may initiate, continue and/or prosecute suit against the Reorganized Debtors in the tort system to obtain the benefit of insurance coverage under the Asbestos Insurance Policies, unless and until the Asbestos Personal Injury Trust, with the consent of the TAC and the Future Claimants' Representative, has settled (other than pursuant to the Excess CIP Agreement) all rights to coverage for Asbestos Personal Injury Claims applicable to the Asbestos Personal Injury Claim of a particular holder, in which event such holder shall pursue payment of its Asbestos Personal Injury Claim from the Asbestos Personal Injury Trust in accordance with the Asbestos Personal Injury Trust Distribution Procedures.  In the event that a holder of an Insured Asbestos Claim commences such an action, the complaint may name the applicable Reorganized Debtor(s) as a defendant(s) and shall be deemed by operation of law to be an action against the applicable Reorganized Debtor(s).  Notwithstanding the foregoing, the Reorganized Debtors shall have no obligation to answer, appear or otherwise participate in the action in any respect other than as set forth in this Plan and as may be necessary to maintain coverage under the Asbestos Insurance Policies, and any judgment that may be obtained in the action cannot be enforced against the assets of the Reorganized Debtors, other than from the Asbestos Insurance Policies.  Such actions may be filed in any court where the applicable Debtor would have been subject to in personam jurisdiction as of the Petition Date or any other court of competent jurisdiction and process may be served upon a person or entity appointed by the Reorganized Debtors to serve as agent, who shall tender such actions to Truck or, if appropriate, to any other applicable Asbestos Insurers in compliance with the notice provisions of the applicable Asbestos Insurance Policies.  Nothing in this Section IV.O. is intended to affect any cause of action or right to bring a cause of action held by any holder of an Asbestos Personal Injury Claim directly against any Asbestos Insurer.  The portion of any Insured Asbestos Claim that is not covered by any Asbestos Insurance Policy shall be paid in accordance with the terms, provisions and procedures of the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures.

**2.      Uninsured Asbestos Claims**

Each Uninsured Asbestos Claim will be determined and paid in accordance with the terms, provisions and procedures of the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures.  The sole recourse of a holder of an Uninsured Asbestos Claim on account of such Claim will be to the Asbestos Personal Injury Trust and such holder will have no right whatsoever at any time to assert its Uninsured Asbestos Claim against any Protected Party.

**P.**    **Limitations On Judgment Recovery From Non-Settling Asbestos Insurers**

To the extent that any Non-Settling Asbestos Insurer has an Asbestos Insurance Policy Claim against one or more Settling Asbestos Insurers with respect to an Asbestos Personal Injury Claim that it could have asserted against such Settling Asbestos Insurers but for the Asbestos Permanent Channeling Injunction provided under the Plan (hereafter, "Contribution Claims"), the judgment liability (if any) of the Non-Settling Asbestos Insurer to the holder of such Asbestos Personal Injury Claim shall be reduced dollar-for-dollar by the amount (if any) of the Contribution Claims established pursuant to this Section IV.P.  The court hearing the Asbestos Personal Injury Claim shall employ such procedures as that court determines are appropriate to determine prior to entry of judgment the validity and amount of any Contribution Claims (and the corresponding reduction in the amount of the holder's recovery) as if, and to the same extent, they were asserted against the Settling Asbestos Insurers.  The holder of the Asbestos Personal Injury Claim may assert the legal or equitable rights, if any, of the Settling Asbestos Insurers in the action.  The Bankruptcy Court may modify this judgment reduction provision or grant such other relief in any order approving a settlement with any Asbestos Insurer as appropriate and necessary to adequately protect the Inter-Insurer Rights, if any, of any Non-Settling Asbestos Insurer.

**Q.**    **Insurance Neutrality**

Nothing in the Plan, any Exhibit to the Plan, the Confirmation Order, any finding of fact and/or conclusion of law with respect to the Confirmation of the Plan, or any order or opinion entered on appeal from the Confirmation Order shall limit the right of any Asbestos Insurer to assert any Insurer Coverage Defense; provided, however, that (a) the transfer of rights in and under the Asbestos Personal Injury Insurance Assets to the Asbestos Personal Injury Trust is valid and enforceable and transfers such rights under the Asbestos Personal Injury Insurance Assets as the Debtors may have, and that such transfer shall not affect the liability of any Asbestos Insurer, and (b) the discharge and release of the Debtors and Reorganized Debtors from all Claims and the injunctive protection provided to the Debtors, Reorganized Debtors and Protected Parties with respect to Claims as provided herein shall not affect the liability of any Asbestos Insurer, except to the extent that any such Asbestos Insurer is also a Settling Asbestos Insurer.  Notwithstanding anything in this Section IV.Q. to the contrary, nothing in this Section IV.Q. shall affect or limit, or be construed as affecting or limiting, (a) the binding effect of the Plan and the Confirmation Order on the Debtors, the Reorganized Debtors, the Asbestos Personal Injury Trust or the beneficiaries of the Asbestos Personal Injury Trust or (b) the protection afforded to any Settling Asbestos Insurer by the Asbestos Permanent Channeling Injunction.  Further, nothing in this Section IV.Q. is intended or shall be construed to preclude otherwise applicable principles of res judicata or collateral estoppel from being applied against any Asbestos Insurer with respect to any issue that is actually litigated by such Asbestos Insurer as part of its objections to Confirmation of the Plan.

**R.      Preservation of Rights of Action; Settlement of Claims and Releases**

**1.      Preservation of Rights of Action by the Reorganized Debtors**

Except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code and to the fullest extent possible under applicable law, the Reorganized Debtors shall retain and may enforce, and shall have the right to enforce, any claims, demands, rights and causes of action that any Debtor or Estate may hold against any Entity, including any Recovery Actions. The Reorganized Debtors or their successors or assignees may pursue such retained claims, demands, rights or causes of action, as appropriate, in accordance with the best interests of the Reorganized Debtors or their successors or assignees holding such claims, demands, rights or causes of action. Further, the Reorganized Debtors retain their right to File and pursue, and shall have the sole right to File and pursue, any adversary proceedings against any trade creditor or vendor related to debit balances or deposits owed to any Debtor.

**2.      Settlement of Certain Estate Claims**

        a.      Pursuant to Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided under the Plan, any and all claims against the Protected Parties that are or would have been property of the Debtors' Estates or could have been brought by the Debtors' Estates, including without limitation Recovery Actions and any claims based upon a legal or equitable theory of liability in the nature of veil piercing, alter ego, successor liability, vicarious liability, fraudulent transfer, malpractice, breach of fiduciary duty, waste, fraud or conspiracy, except for Intercompany Claims, shall be deemed settled, released and extinguished. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims and the Bankruptcy Court's finding that such compromise or settlement is in the best interest of the Debtors, Reorganized Debtors and their respective Claim and Interest holders and is fair, equitable and reasonable.

        b.      Pursuant to Bankruptcy Rule 9019 and in consideration for the releases and other benefits provided under the Plan, any and all claims against the holders of Asbestos Personal Injury Claims who received payments in respect of their claims from the Debtors, Lehigh Hanson, or any predecessor or affiliate of the Debtors or Lehigh Hanson prior to Petition Date, and their professionals (but only with respect to their representation of or work for such holders in connection with such payments), that are or would have been property of any of the Debtors' Estates or could have been brought by any of the Debtors' Estates or any Protected Party, including without limitation Recovery Actions, and any claims based upon a legal or equitable theory of liability, in each case arising out of, based upon or resulting from payments to holders of Asbestos Personal Injury Claims from the Debtors, Lehigh Hanson or any predecessor or affiliate of the Debtors or Lehigh Hanson prior to the Petition Date, shall be deemed settled, released and extinguished. The entry

of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims and the Bankruptcy Court's finding that such compromise or settlement is in the best interest of the Debtors, the Reorganized Debtors and their respective Claim and Interest holders and is fair, equitable and reasonable.

### 3.       Releases

#### a.       General Releases of Debtors and Reorganized Debtors

**Except as otherwise expressly set forth in the Plan, and except to the extent it would diminish, reduce or eliminate the duties or obligations of any Asbestos Insurer under any Asbestos Personal Injury Insurance Asset, as of the Effective Date, the Debtors and the Reorganized Debtors are released from all claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, arising out of, based upon or resulting from, directly or indirectly, in whole or in part, any act, omission, transaction or other occurrence taking place on or prior to the Effective Date.   Notwithstanding the foregoing, the releases set forth in this paragraph will not become effective with respect to holders of General Unsecured Claims until the General Unsecured Claims Escrows have been funded as set forth herein.**

#### b.       Release by the Debtors, Reorganized Debtors and Lehigh Hanson

**1.       Without limiting any other provision of the Plan, as of the Effective Date, the Debtors and the Reorganized Debtors, on behalf of themselves and their respective affiliates, Estates and successors and assigns, and any and all Entities who may purport to claim by, through, for or because of them, shall be deemed to forever release, waive and discharge all claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, against each of the present and former directors, officers, employees, attorneys, accountants, investment bankers, financial advisors, appraisers, representatives and agents of the Debtors, the DIP Lender and DEQ, in each case acting in such capacity, arising out of, based upon or resulting from, directly or indirectly, in whole or in part, any act, omission, transaction or other occurrence taking place on or prior to the Effective Date with respect to the Reorganization Cases, the Plan or the DEQ Settlement, except for the liability of any Entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.**

**2.       Without limiting any other provision of the Plan, as of the Effective Date, the Debtors, the Reorganized Debtors and Lehigh Hanson, on behalf of themselves and their respective affiliates, Estates and successors and assigns, and any and all Entities who may purport to claim by, through, for or because of them, shall be deemed to forever release,**

waive and discharge all claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, against holders of Asbestos Personal Injury Claims who received payments in respect of their claims from the Debtors, Lehigh Hanson, or any predecessor or affiliate of the Debtors or Lehigh Hanson prior to Petition Date, and their professionals (but only with respect to their representation of or work for such holders in connection with such payments), including without limitation Recovery Actions, in each case arising out of, based upon or resulting from payments to holders of Asbestos Personal Injury Claims from the Debtors, Lehigh Hanson or any predecessor or affiliate of the Debtors or Lehigh Hanson prior to Petition Date.

### c.   General Releases by Holders of Claims or Interests

Without limiting any other provision of the Plan or the Bankruptcy Code, as of the Effective Date, in consideration for, among other things, the obligations of the Debtors and the Reorganized Debtors under the Plan, each holder of a Claim or Interest that votes in favor of the Plan or is deemed to accept the Plan shall be deemed to forever release, waive and discharge all claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, against any of the Parties, the Creditors' Committee or any Reorganized Debtor, or any of their respective present or former directors, officers, employees, members, subsidiaries, predecessors, successors, attorneys, accountants, investment bankers, financial advisors, appraisers, representatives and agents, or the DIP Lender, in each case acting in such capacity, arising out of, based upon or resulting from, directly or indirectly, in whole or in part, any act, omission, transaction or other occurrence taking place on or prior to the Effective Date and in any way relating to the Reorganization Cases or the Plan (which release shall be in addition to the discharge of Claims provided herein and under the Confirmation Order and the Bankruptcy Code)  Notwithstanding the foregoing, no release or discharge of any of the Parties, the Creditors' Committee or any Reorganized Debtor, or any of their respective present or former directors, officers, employees, members, subsidiaries, predecessors, successors, attorneys, accountants, investment bankers, financial advisors, appraisers, representatives and agents, or the DIP Lender, in each case acting in such capacity, shall diminish, reduce or eliminate the duties or obligations of any Asbestos Insurer under any Asbestos Personal Injury Insurance Asset.

### d.   Injunction Related to Releases

Except as otherwise expressly provided in the Plan, including in Section IV.O.1., the Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively or otherwise, of any claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities released pursuant to the Plan.

**S.      Release of Encumbrances**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to Article VI, all Encumbrances against the property of any Estate shall be fully released and discharged, and all of the right, title and interest of any holder of such Encumbrances, including any rights to any collateral thereunder, shall revert to the applicable Reorganized Debtor and its successors and assigns.

**T.      Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes**

Each officer of each Debtor and Reorganized Debtor shall be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements and documents and take such actions as may be necessary or appropriate to effect and implement the provisions of the Plan, including the Restructuring Transactions provisions of Section IV.B.  The secretary or any assistant secretary of each Debtor or Reorganized Debtor shall be authorized to certify or attest to any of the foregoing actions.  Pursuant to section 1146(a) of the Bankruptcy Code, the following shall not be subject to any stamp Tax or similar Tax:  (1) the creation of any Encumbrances; (2) the making or assignment of any lease or sublease; (3) the execution and implementation of the Asbestos Personal Injury Trust Agreement, including the creation of the Asbestos Personal Injury Trust and any transfers to or by the Asbestos Personal Injury Trust; (4) any Restructuring Transaction; or (5) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale or assignments, applications, certificates or statements executed or filed in connection with any of the foregoing or pursuant to the Plan.

**U.      Determination of the Insolvent Insurers Proceeds Dispute**

The Confirmation Order shall approve the agreed resolution of the Insolvent Insurers Proceeds Dispute.

**V.      Compliance with QSF Regulations**

The Debtors and the Reorganized Debtors shall take all actions required of them as "transferor," and the Asbestos Personal Injury Trustees shall take all actions required of them as "administrator," pursuant to Treasury Regulations promulgated under section 468B of the Internal Revenue Code.  Pursuant to such Treasury Regulations, the Asbestos Personal Injury Trustees as "administrator" shall be responsible for all tax reporting and withholding requirements in respect of distributions made from the Asbestos Personal Injury Trust.

**W.      Surety Bond Obligations**

Notwithstanding any other provisions of the Plan, on the Effective Date, all rights of any party related to the Surety Bond Program shall not be altered by the Plan.  The applicable Reorganized Debtor hereby reaffirms and ratifies the Surety Bond Obligations arising under the

Surety Bond Program, which shall continue to be in full force and effect, and the Surety Bond Obligations are not discharged or released by the Plan in any way.  On the Effective Date, all liens and security interests, if any, granted pursuant to or in connection with the Surety Bond Program shall have the priorities established in respect thereof under applicable non-bankruptcy law, and shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination pursuant to the Plan or the Confirmation Order.  The Surety Bond Program and all Surety Bond Obligations shall be treated by the Reorganized Debtors in the ordinary course of business as if the Reorganization Cases had not been commenced.  For the avoidance of any doubt, and with a reservation of rights to all parties, any agreements related to the Surety Bond Program to which a Debtor is party will vest in the applicable Reorganized Debtor, and to the extent such agreements are considered to be executory contracts, then, notwithstanding anything contained in Article V to the contrary, the Plan will constitute a motion to assume such agreements, and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code.  Nothing in the Plan shall affect in any way any surety's rights against any non-debtor, or any non-debtor's rights against a surety, including under the Surety Bond Program or with regard to the Surety Bond Obligations.

## ARTICLE V

## TREATMENT OF EXECUTORY
## CONTRACTS AND UNEXPIRED LEASES

**A.      Executory Contracts and Unexpired Leases to Be Assumed**

**1.       Assumption Generally**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, including the Restructuring Transactions provisions of Section IV.B., on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the applicable Debtor or Reorganized Debtor shall assume each of its respective Executory Contracts and Unexpired Leases other than those listed on Exhibit V.C; provided, however, that the Debtors reserve the right, at any time prior to the Effective Date, to amend Exhibit V.C to:  (a) delete any Executory Contract or Unexpired Lease listed therein, thus providing for its assumption pursuant hereto; or (b) add any Executory Contract or Unexpired Lease to Exhibit V.C, thus providing for its rejection pursuant to this Section V.A.1.  The Debtors shall provide notice of any amendments to Exhibit V.C to the parties to the Executory Contracts or Unexpired Leases affected thereby and to the parties on the then-applicable service list in the Reorganization Cases.  Nothing herein shall constitute an admission by a Debtor or Reorganized Debtor that any contract or lease is an Executory Contract or Unexpired Lease or that a Debtor or Reorganized Debtor has any liability thereunder.

**2.       Assumptions of Executory Contracts and Unexpired Leases**

Each Executory Contract or Unexpired Lease assumed under Section V.A.1. shall include any modifications, amendments, supplements or restatements to such contract or lease.

### 3.     Approval of Assumptions and Assumption Procedures

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions described in Section V.A.1., pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.  The procedures for assumption of an Executory Contract or Unexpired Lease are as follows:

a.       After the entry of the Confirmation Order, the Debtors shall serve upon each party to an Executory Contract or Unexpired Lease being assumed pursuant to the Plan notice of:  (i) the contract or lease being assumed or assumed and assigned; (ii) the Cure Amount Claim, if any, that the applicable Debtor believes it would be obligated to pay in connection with such assumption; and (iii) the procedures for such party to object to the assumption or assumption and assignment of the applicable contract or lease or the amount of the proposed Cure Amount Claim.

b.       Any Entity wishing to object to (i) the proposed assumption of an Executory Contract or Unexpired Lease under the Plan or (ii) the proposed amount of the related Cure Amount Claim must File and serve on counsel to the Debtors a written objection setting forth the basis for the objection within twenty (20) days of service of the notice described in Section V.A.3.a.

c.       If no objection to the proposed assumption or Cure Amount Claim is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease:  (i) the proposed assumption of the Executory Contract or Unexpired Lease shall be approved in accordance with the Plan and the Confirmation Order, effective as of the Effective Date, without further action of the Bankruptcy Court; and (ii) the Cure Amount Claim identified by the Debtors in the notice shall be fixed and shall be paid in accordance with the Plan on or after the Effective Date, without further action of the Bankruptcy Court, to the appropriate contract or lease party identified on the notice.

d.       If an objection to the proposed assumption or Cure Amount Claim is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease, the Debtors or Reorganized Debtors, as applicable, and the objecting party may resolve such objection by stipulation, without further action of the Bankruptcy Court.

e.       If an objection to the proposed assumption or Cure Amount Claim is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease and the parties are unable to resolve such objection:  (i) the Debtors or Reorganized Debtors may File a reply to such objection no later than thirty (30) days after the Filing and service of such objection and ask the Bankruptcy Court to schedule a hearing on the particular objection and the related reply at an appropriate time; or (ii) the Debtors or Reorganized Debtors, as applicable, may designate the

Executory Contract or Unexpired Lease underlying such objection for rejection pursuant to Section V.C. and amend Exhibit V.C. accordingly.

**B.      Payments Related to the Assumption of Executory Contracts and Unexpired Leases**

To the extent that a Cure Amount Claim constitutes a monetary default, such Cure Amount Claim associated with each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the Debtor or Reorganized Debtor assuming such contract or lease or the assignee of such Debtor or Reorganized Debtor, if any:  (1) by payment of the Cure Amount Claim in cash on the Effective Date or (2) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease.  Pursuant to section 365(b)(2)(D) of the Bankruptcy Code, no Cure Amount Claim shall be allowed for a penalty rate or other form of default rate of interest.  If there is a dispute regarding:  (1) the amount of any Cure Amount Claim; (2) the ability of the applicable Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (3) any other matter pertaining to assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.  For assumptions of Executory Contracts or Unexpired Leases between Debtors, the Reorganized Debtor assuming such contract may cure any monetary default (1) by treating such amount as either a direct or indirect contribution to capital or Distribution (as appropriate) or (2) through an intercompany account balance in lieu of payment in cash.

**C.      Executory Contracts and Unexpired Leases to Be Rejected and Rejection Procedures**

On the Effective Date, each Executory Contract and Unexpired Lease listed on Exhibit V.C shall be rejected pursuant to section 365 of the Bankruptcy Code.  Each contract and lease listed on Exhibit V.C shall be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease.  Listing a contract or lease on Exhibit V.C shall not constitute an admission by a Debtor or Reorganized Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that a Debtor or Reorganized Debtor has any liability thereunder.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.  The appropriate procedures for rejection of an Executory Contract or Unexpired Lease are as follows:

1.      After the entry of the Confirmation Order, the Debtors shall serve upon each party to an Executory Contract or Unexpired Lease being rejected pursuant to the Plan notice of such proposed rejection.

2.      Any Entity wishing to object to the proposed rejection of an Executory Contract or Unexpired Lease under the Plan must File and serve on counsel to the Debtors a written objection setting forth the basis for the objection within twenty (20) days of service of the notice described in Section V.C.1.

3.      If no objection to the proposed rejection is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease, the proposed rejection of the applicable Executory Contract or Unexpired Lease shall be approved in accordance with the Plan and the Confirmation Order, effective as of the Effective Date, without further action of the Bankruptcy Court.

4.      If an objection to the proposed rejection is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease, the Debtors or Reorganized Debtors, as applicable, and the objecting party may resolve such objection by stipulation, without further action of the Bankruptcy Court.

5.      If an objection to the proposed rejection is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease and the parties are unable to resolve such objection, the Debtors or Reorganized Debtors, as applicable, may File a reply to such objection no later than thirty (30) days after the Filing and service of such objection and ask the Bankruptcy Court to schedule a hearing on the particular objection and the related reply at an appropriate time.

## D.      Obligations to Indemnify Directors, Officers and Employees

The obligations of each Debtor or Reorganized Debtor to indemnify any individual serving as one of its directors, officers or employees prior to or following the Petition Date by reason of such individual's prior or future service in such a capacity or as a director, officer or employee of any Debtor or other Entity, to the extent provided in the applicable Certificate of Incorporation or By-Laws, by statutory law or by written agreement, policies or procedures of or with such Debtor, shall be deemed and treated as executory contracts that are assumed by the applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date.  Accordingly, such indemnification obligations shall survive and be unaffected by entry of the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before or after the Petition Date.

## E.      Contracts and Leases Entered Into After the Petition Date

Notwithstanding any other provision of the Plan, and subject to the Restructuring Transactions provisions of Section IV.B., contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, shall be performed by the Debtor or Reorganized Debtor liable thereunder in accordance with the terms and conditions of such contracts and leases in the ordinary course of its business. Accordingly, such contracts and leases and other obligations (including any assumed Executory Contracts and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

## F.      Insurance Policies

### 1.      Assumed Insurance Policies

The Debtors do not believe that the insurance policies issued to any Debtor, including the Insurance Policies, prior to the Petition Date constitute executory contracts.  To the extent such

insurance policies are considered to be executory contracts, then, notwithstanding anything contained in Article V to the contrary, the Plan will constitute a motion to assume such insurance policies, which include but are not limited to the Debtors' workers' compensation and liability, product and property insurance policies maintained by The Home Insurance Company, and authorize the Reorganized Debtors to pay all future obligations, if any, in respect thereof. Subject to the occurrence of the Effective Date, the entry of the Confirmation Order will constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtors, their respective estates and all parties in interest in the Reorganization Cases.  Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective date, no payments are required to cure any defaults of any Debtor existing as of the Confirmation Date with respect to each such insurance policy.

## 2.    Reservation of Rights

Nothing contained in the Plan will constitute a waiver of any claim, right or cause of action that a Debtor, a Reorganized Debtor or the Asbestos Personal Injury Trust, as the case may be, may hold against the insurer under any policy of insurance or insurance agreement, except to the extent the insurer is a Settling Asbestos Insurer.

## ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS

### A.    Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan, Distributions to be made on the Effective Date to holders of Claims that are Allowed Claims as of the Effective Date shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than:  (1) sixty (60) days after the Effective Date or (2) such later date when the applicable conditions of Section V.B. (regarding cure payments for Executory Contracts and Unexpired Leases being assumed), Section VI.E.2. (regarding undeliverable Distributions) or Section VI.G.3. (regarding compliance with Tax requirements) are satisfied.  Distributions on account of Claims that become Allowed Claims after the Effective Date shall be made pursuant to Section VI.H.2.  Any Claim that is disallowed by order of the Bankruptcy Court (or the District Court) prior to the Effective Date shall be deemed expunged (to the extent not already expunged) as of the Effective Date without the necessity for further Bankruptcy Court approval and the holder of any such Claim shall not be entitled to any Distribution under the Plan.

### B.    General Unsecured Claims Escrows

On the Effective Date, the General Unsecured Claims Escrows shall be fully funded.  The Debtors and Reorganized Debtors will not hold any legal or equitable interest in the funds deposited in the General Unsecured Claims Escrows and such funds shall not be considered property of the Reorganized Debtors and any liens, charges, Claims, Encumbrances and Interests granted under the Plan shall not extend to an interest in the funds held in the General Unsecured Claims Escrow.  The funds in the General Unsecured Claims Escrow shall be reserved solely for

the benefit of the holders of Class 3 General Unsecured Claims, including any General Unsecured Claims that are Disputed Claims, pending determination of their entitlement thereto under the terms of the Plan.  To the extent there are funds remaining in any General Unsecured Claims Escrow after payment in full of all Allowed General Unsecured Claims in accordance with the Plan (the "Remaining Funds"), Lehigh Hanson shall hold an interest in those funds and may request one or more distributions from the Escrow Agent for payment of the Remaining Funds.

## C.     Method of Distributions to Holders of Claims

The Reorganized Debtors or Third Party Disbursing Agents as the Reorganized Debtors may employ in their sole discretion shall make all Distributions of cash and other instruments or documents required under the Plan.  Each Disbursing Agent shall serve without bond, and any Disbursing Agent may employ or contract with other Entities to assist in or make the Distributions required by the Plan.

## D.     Compensation and Reimbursement for Services Related to Distributions

Each Third Party Disbursing Agent providing services related to Distributions pursuant to the Plan shall receive from the Reorganized Debtors, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services.  These payments shall be made on terms agreed to with the Reorganized Debtors and shall not be deducted from Distributions to be made pursuant to the Plan to holders of Allowed Claims receiving Distributions.

## E.     Delivery of Distributions and Undeliverable or Unclaimed Distributions

### 1.     Delivery of Distributions

Distributions to holders of Allowed Claims (other than Asbestos Personal Injury Claims) shall be made by a Disbursing Agent (a) at the addresses set forth on the respective proofs of Claim Filed by holders of such Claims, (b) at the addresses set forth in any written certification of address change delivered to the Disbursing Agent (including pursuant to a letter of transmittal delivered to a Disbursing Agent) after the date of Filing of any related proof of Claim, or (c) at the addresses reflected in the applicable Debtor's Schedules if no proof of Claim has been Filed and the Disbursing Agent has not received a written notice of a change of address.

### 2.     Undeliverable Distributions Held by Disbursing Agents

#### a.     Holding and Investment of Undeliverable Distributions

If any Distribution to a holder of an Allowed Claim is returned to a Disbursing Agent as undeliverable, no further Distributions shall be made to such holder unless and until the applicable Disbursing Agent is notified by written certification of such holder's then-current address.  Undeliverable Distributions shall remain in the possession of the applicable Disbursing Agent pursuant to this Section VI.E.2.a. until such time as a Distribution becomes deliverable. Undeliverable cash shall be held in segregated bank accounts in the name of the applicable Disbursing Agent for the benefit of the potential claimants of such funds.  Any Disbursing Agent

holding undeliverable cash shall invest such cash in a manner consistent with the Reorganized Debtors' investment and deposit guidelines.

### b.   After Distributions Become Deliverable

On each Quarterly Distribution Date, the applicable Disbursing Agent shall make all Distributions that become deliverable to holders of Allowed Claims (other than Asbestos Personal Injury Claims) during the preceding calendar quarter, to the extent not distributed earlier at the discretion of the applicable Disbursing Agent.

### c.   Failure to Claim Undeliverable Distributions

Any holder of an Allowed Claim that does not assert a claim pursuant to the Plan for an undeliverable Distribution to be made by a Disbursing Agent within one year after the later of (i) the Effective Date and (ii) the last date on which a Distribution was attempted to be made to such holder shall have its claim for such undeliverable Distribution discharged and shall be forever barred from asserting any such claim against the Reorganized Debtors or their respective property.  Unclaimed Distributions shall become property of the respective Reorganized Debtor, free of any restrictions thereon, including the right of any state or other government to escheat such property, and any such Distributions held by a Third Party Disbursing Agent shall be returned to the applicable Reorganized Debtor.  Nothing contained in the Plan shall require any Debtor, Reorganized Debtor or Disbursing Agent to attempt to locate any holder of an Allowed Claim.

## F.   Distribution Record Date

### 1.   No Recognition of Transfers after the Distribution Record Date

A Disbursing Agent shall have no obligation to recognize the transfer or sale of any interest or participation in, any Claim that occurs after the close of business on the Distribution Record Date and shall be entitled for all purposes herein to recognize and make Distributions only to those holders of Allowed Claims that are holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date.

### 2.   Treatment of Certain Transfers

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date shall be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

## G.   Means of Cash Payments

Except as otherwise specified herein, cash payments made pursuant to the Plan to holders of Claims shall be in United States currency by checks drawn on a domestic bank selected by the Reorganized Debtors or Lehigh Hanson, as applicable, or, at the option of the Reorganized Debtors or Lehigh Hanson, as applicable, by wire transfer from a domestic bank; provided,

however, that cash payments to foreign holders of Allowed Claims may be made, at the option of the Reorganized Debtors or Lehigh Hanson, as applicable, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

## H.    Timing and Calculation of Amounts to Be Distributed

### 1.    Timing of Distributions Under the Plan

Any Distribution to be made by any Debtor or Reorganized Debtor pursuant to the Plan shall be deemed to have been timely made if made within sixty (60) days after the time therefor specified in the Plan.  Except as otherwise provided in the Plan, no interest shall accrue or be paid with respect to any Distribution as a consequence of such Distribution not having been made on the Effective Date.  However, and for the avoidance of doubt, the funding of (a) the Asbestos Personal Injury Trust pursuant to Section IV.K.2 and (b) the General Unsecured Claims Escrows pursuant to Section VI.B shall occur on the Effective Date.

### 2.    Allowed Claims

On the Effective Date, each holder of an Allowed Claim (other than an Asbestos Personal Injury Claim) shall receive the full amount of the Distributions that the Plan provides for Allowed Claims in the applicable Class.  On each Quarterly Distribution Date, Distributions also shall be made pursuant to Section VII.C. to holders of Disputed Claims in any such Class that were allowed during the preceding calendar quarter, to the extent not distributed earlier at the discretion of the applicable Disbursing Agent.  Such quarterly Distributions also shall be in the full amount that the Plan provides for Allowed Claims in the applicable Class.

### 3.    Compliance with Tax Requirements

#### a.    Withholding and Reporting

In connection with the Plan, to the extent applicable, each Disbursing Agent shall comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision of the Plan to the contrary, each Disbursing Agent shall be authorized to take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including applying a portion of any cash Distribution to be made under the Plan to pay applicable Tax withholding, requiring Claim holders to submit appropriate certifications or establishing other mechanisms such Disbursing Agent believes are reasonable and appropriate.  To the extent that any Claim holder fails to submit appropriate certifications required by a Disbursing Agent or to comply with any other mechanism established by a Disbursing Agent to comply with Tax withholding requirements, such Claim holder's Distribution may, in such Disbursing Agent's reasonable discretion, be deemed undeliverable and subject to Section VI.E.2.

#### b.    Backup Withholding

Without limiting the generality of the foregoing, in accordance with the Internal Revenue Code's backup withholding rules, a holder of a Claim may be subject to backup withholding with

respect to Distributions made pursuant to the Plan, unless the holder (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) provides at the applicable Disbursing Agent's request a completed IRS Form W-9 (or substitute therefor) on which the holder includes a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.  Among other things, to receive any post-petition interest, if requested by a Disbursing Agent, a holder of an Allowed Claim shall be required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.  Non-U.S. Allowed Claim holders may be required by the applicable Disbursing Agent to provide a completed IRS Form W-8BEN or W-8BEN-E, as applicable (or other applicable Form W-8 or successor form), to establish an exemption from or a treaty-reduced rate of withholding on interest distributed pursuant to the Plan.  Unless a Disbursing Agent, in its discretion, determines otherwise, no Distributions on account of post-petition interest shall be made to a holder of an Allowed Claim until such time as the holder of such Claim establishes exemption from withholding or provides the applicable IRS Form.

### c.      Obligations of Distribution Recipients

Notwithstanding any other provision of the Plan, each Entity receiving a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed on it by any governmental unit on account of such Distribution, including income, withholding and other Tax obligations.

## I.      Setoffs

Except with respect to claims of a Debtor or Reorganized Debtor released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Reorganized Debtors or, as instructed by the applicable Reorganized Debtor, a Third Party Disbursing Agent may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Claim (before any Distribution is made on account of such Claim) the claims, rights and causes of action of any nature that the applicable Debtor or Reorganized Debtor may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the applicable Debtor or Reorganized Debtor of any claim, right or cause of action that the Debtor or Reorganized Debtor may possess against such a Claim holder.

## J.      Allocation of Payments

Amounts paid to holders of Claims in satisfaction thereof shall be allocated first to the principal amounts of such Claims, with any excess being allocated to accrued but unpaid interest on such Claims.

# ARTICLE VII

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

**A.      Prosecution of Objections to Claims**

**1.      Objections to Claims**

Objections to Claims (other than Asbestos Personal Injury Claims) must be Filed and served on the holders of such Claims by the Claims Objection Bar Date, and, if Filed prior to the Effective Date, such objections will be served on the parties on the then-applicable service list in the Reorganization Cases.  If an objection has not been Filed to a proof of Claim or an amendment has not been made to the Schedules with respect to a scheduled Claim by the Claims Objection Bar Date, the Claim to which the proof of Claim or Schedules relates will be treated as an Allowed Claim if such Claim has not been earlier allowed.

**2.      Authority to Prosecute Objections**

After the Effective Date, the Reorganized Debtors shall have the authority to File (if applicable), settle, compromise, withdraw or litigate to judgment objections to all Claims (other than Asbestos Personal Injury Claims), including pursuant to any alternative dispute resolution or similar procedures approved by the Bankruptcy Court.  After the Effective Date, the Reorganized Debtors may settle, compromise or otherwise resolve any Disputed Claim or any objection or controversy relating to any Claim without approval of the Bankruptcy Court.

**3.      Authority to Amend Schedules**

The Debtors or the Reorganized Debtors shall have the authority to amend the Schedules with respect to any Claim (other than Asbestos Personal Injury Claims) and to make Distributions based on such amended Schedules without approval of the Bankruptcy Court.  If any such amendment to the Schedules reduces the amount of or changes the nature or priority of such Claim, the Debtor or Reorganized Debtor shall provide the holder of such Claim with notice of such amendment and such holder shall have twenty (20) days to File an objection to such amendment with the Bankruptcy Court.  If no such objection is Filed, the Debtor or Reorganized Debtor may proceed with Distributions based on such amended Schedules without approval of the Bankruptcy Court.

**B.      Treatment of Disputed Claims**

Notwithstanding any other provision of the Plan, no payments or Distributions shall be made on account of a Disputed Claim until such Claim becomes an Allowed Claim.

**C.      Distributions on Account of Disputed Claims Once Allowed**

On each Quarterly Distribution Date, the applicable Disbursing Agent shall make all Distributions on account of any Disputed Claim that has become an Allowed Claim during the preceding calendar quarter, to the extent not distributed earlier at the discretion of the applicable

Disbursing Agent.  Such Distributions shall be made pursuant to the provisions of the Plan governing the applicable Class.

## ARTICLE VIII

## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

### A.    Conditions to Confirmation

The following shall be conditions to Confirmation unless such conditions shall have been duly waived pursuant to Section VIII.C.:

1.    The Confirmation Order shall have been entered by the Bankruptcy Court and the District Court acting jointly, or by the Bankruptcy Court or the District Court acting separately (and, if the Confirmation Order is entered separately by the Bankruptcy Court, shall have been fully affirmed by the District Court), and shall be reasonably acceptable in form and substance to the Parties.

2.    The Plan shall be acceptable in all respects to the Parties, and all Exhibits to the Plan shall be (a) acceptable in all respects to the Parties and (b) consistent with section 524(g) of the Bankruptcy Code and the terms of the Plan.

3.    The Bankruptcy Court and the District Court acting jointly, or the Bankruptcy Court or the District Court acting separately shall have made the following findings, each of which shall be contained in the Confirmation Order and each of which, if the Confirmation Order is entered separately by the Bankruptcy Court, shall be fully affirmed by the District Court:

a.    The Asbestos Permanent Channeling Injunction is to be implemented in connection with the Plan and the Asbestos Personal Injury Trust.

b.    The Asbestos Personal Injury Trust, as of the Effective Date, shall assume all liability and responsibility, financial and otherwise, for all Asbestos Personal Injury Claims, and, upon such assumption, no Protected Party shall have any liability or responsibility, financial or otherwise, therefor.

c.    As of the Petition Date, each Debtor had been named as a defendant in a personal injury or wrongful death action seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products.

d.    The Asbestos Personal Injury Trust will be funded in whole or in part by securities of the Reorganized Debtors and by the obligation of the Reorganized Debtors to make future payments, which payments may be funded by contributions from Lehigh Hanson to the Reorganized Debtors.

e. The Asbestos Personal Injury Trust, by the exercise of rights granted under the Plan, would be entitled to own, if specified contingencies occur, a majority of the voting shares of each of the Reorganized Debtors.

f. The Asbestos Personal Injury Trust shall use its assets or income to pay Asbestos Personal Injury Claims, including Demands.

g. Each of the Debtors is likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Claims that are addressed by the Asbestos Permanent Channeling Injunction.

h. The actual amounts, numbers and timing of such future Demands cannot be determined.

i. Pursuit of such Demands outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with Claims and future Demands.

j. The terms of the Asbestos Permanent Channeling Injunction, including any provisions barring actions against third parties pursuant to section 524(g)(4)(A) of the Bankruptcy Code, are set out in the Plan.

k. The Plan establishes, in Class 4 (Asbestos Personal Injury Claims), a separate class of the claimants whose Claims are to be addressed by the Asbestos Personal Injury Trust.

l. At least two-thirds (2/3) in amount and 75% in number of those voting Claims in Class 4 (Asbestos Personal Injury Claims) have voted in favor of the Plan.

m. Pursuant to court orders or otherwise, the Asbestos Personal Injury Trust shall operate through mechanisms, such as structured, periodic or supplemental payments, pro rata distributions, matrices or periodic review of estimates of the numbers and values of Asbestos Personal Injury Claims, that provide reasonable assurance that the Asbestos Personal Injury Trust shall value, and be in a financial position to pay, Asbestos Personal Injury Claims, including Demands, in substantially the same manner.

n. Each Protected Party is identifiable from the terms of the Asbestos Permanent Channeling Injunction by name or as part of an identifiable group, and each Protected Party is or may be alleged to be directly or indirectly liable for the conduct of, Claims against or Demands on a Debtor to the extent that such alleged liability arises by reason of one or more of the following:

(i) such Entity's ownership of a financial interest in any Debtor, Reorganized Debtor, any past or present Affiliate of any

Debtor or Reorganized Debtor, or any predecessor in interest of any Debtor or Reorganized Debtor;

(ii)  such Entity's involvement in the management of any Debtor, Reorganized Debtor or predecessor in interest of any Debtor or Reorganized Debtor;

(iii)  such Entity's service as an officer, director or employee of any Debtor, Reorganized Debtor, any past or present Affiliate of any Debtor or Reorganized Debtor, or any predecessor in interest of any Debtor or Reorganized Debtor or Entity that owns or at any time has owned a financial interest in any Debtor, Reorganized Debtor, any past or present Affiliate of any Debtor or Reorganized Debtor, or any predecessor in interest of any Debtor or Reorganized Debtor; or

(iv)  such Entity's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of any Debtor, Reorganized Debtor, any past or present Affiliate of any Debtor or Reorganized Debtor, any predecessor in interest of any Debtor or Reorganized Debtor or of an Entity that owns or at any time has owned a financial interest in any Debtor, Reorganized Debtor, any past or present Affiliate of any Debtor or Reorganized Debtor, or any predecessor in interest of any Debtor or Reorganized Debtor, including (A) involvement in providing financing (debt or equity) or advice to an Entity involved in such a transaction or (B) acquiring or selling a financial interest in any Entity as part of such transaction.

o.      The Future Claimants' Representative was appointed as part of the proceedings leading to issuance of the Asbestos Permanent Channeling Injunction for the purpose of protecting the rights of all persons, whether known or unknown, that might subsequently assert, directly or indirectly, against any Debtor an Asbestos Personal Injury Claim that is a Demand addressed in the Asbestos Permanent Channeling Injunction and channeled to the Asbestos Personal Injury Trust.

p.      Identifying each Protected Party (by name or as part of an identifiable group, as applicable) in the Asbestos Permanent Channeling Injunction is fair and equitable with respect to individuals that might subsequently assert Demands against each such Protected Party, in light of the benefits provided, or to be provided, to the Asbestos Personal Injury Trust by or on behalf of any such Protected Party.

q.      The Plan and the Asbestos Personal Injury Trust Documents comply with section 524(g) of the Bankruptcy Code in all respects.

r.    The Plan and its Exhibits are a fair, equitable and reasonable resolution of the liability of the Debtors for the Asbestos Personal Injury Claims.

s.    The Future Claimants' Representative has adequately and completely fulfilled his duties, responsibilities and obligations as the representative for the individuals referred to in the finding set forth in Section VIII.A.3.o. above in accordance with section 524(g) of the Bankruptcy Code.

t.    Adequate and sufficient notice of the Plan and the Confirmation Hearing, as well as all deadlines for objecting to the Plan, has been given to (i) all known creditors and holders of Interests, (ii) parties that requested notice in accordance with Bankruptcy Rule 2002 (including the Asbestos Personal Injury Committee and the Future Claimants' Representative), (iii) all parties to Executory Contracts and Unexpired Leases, (iv) all taxing authorities listed on the Debtors' Schedules or in the Debtors' Claims database, in each case, (v) the Department of the Treasury by service upon the District Director of the IRS, (vi) state attorney generals and state departments of revenue for states in which any of the Debtors have conducted business, and (vii) the Securities and Exchange Commission, (A) in accordance with the solicitation procedures governing such service and (B) in substantial compliance with Bankruptcy Rules 2002(b), 3017 and 3020(b). Such transmittal and service were adequate and sufficient to bind, among other parties, any holder of an Asbestos Personal Injury Claim, and no other or further notice is or shall be required.

u.    The Debtors' conduct in connection with and throughout these Reorganization Cases, including, but not limited to, their negotiations with the ad hoc committee of asbestos personal injury claimants and the pre-petition future claimants' representative, and the commencement of these Reorganization Cases, as well as the drafting, negotiation, proposing, confirmation, and consummation of the Plan, and their opposition to any other plan of reorganization, does not and has not violated any Asbestos Insurer Cooperation Obligations contained in any Asbestos Insurance Policies, nor was such conduct a breach of any express or implied covenant of good faith and fair dealing.  The Objecting Excess Insurers' consent to this finding in the particular facts and circumstances of these Reorganization Cases is expressly without prejudice to the rights of any party to contend that such a finding is or is not appropriate in any subsequent bankruptcy case not involving these Debtors.

4.    The Bankruptcy Court and the District Court, as required, shall have entered the Asbestos Permanent Channeling Injunction, which may be included in the Confirmation Order, and the Asbestos Permanent Channeling Injunction and the Confirmation Order are reasonably acceptable to the Parties.

5.      The settlement with the United States, on behalf of the Environmental Protection
Agency and the United States Department of Interior, acting through the U.S. Fish and Wildlife
Service, and the United States Department of Commerce, acting through the National Oceanic
and Atmospheric Administration, the DEQ Settlement and the agreements with certain insurers
related to such Claims have been approved by the Bankruptcy Court.

## B.      Conditions to the Effective Date

The Effective Date shall not occur and the Plan shall not be consummated unless and
until each of the following conditions has been satisfied or duly waived pursuant to
Section VIII.C.

1.      The District Court or the Bankruptcy Court and the District Court acting jointly
shall have entered an order (contemplated to be part of the Confirmation Order) in form and
substance reasonably acceptable to the Parties approving and authorizing the Debtors and the
Reorganized Debtors to take all actions necessary or appropriate to effectuate, implement and
consummate the Plan and the Restructuring Transactions, including the execution, delivery and
performance of contracts, instruments, releases and other agreements or documents created in
connection with the Plan and the Restructuring Transactions.

2.      The Confirmation Order shall have been entered by the Bankruptcy Court and the
District Court acting jointly, or by the Bankruptcy Court or the District Court acting separately
(and, if the Confirmation Order is separately entered by the Bankruptcy Court, has been fully
affirmed by the District Court) and shall have become a Final Order.

3.      No request for revocation of the Confirmation Order under section 1144 of the
Bankruptcy Code shall have been made, or, if made, shall remain pending.

4.      The Confirmation Order and the Asbestos Permanent Channeling Injunction shall
be in full force and effect.

5.      No fact or circumstance shall prevent the Asbestos Personal Injury Trust from
receiving the Asbestos Personal Injury Trust Assets upon occurrence of the Effective Date.

6.      The Asbestos Personal Injury Trustees shall have been selected and shall have
executed and delivered the Asbestos Personal Injury Trust Agreement.

7.      The Asbestos Personal Injury Trust shall have been funded in accordance with
Section IV.K.2.

8.      Each of the documents and agreements contemplated by the provisions and
Exhibits of the Plan to be executed and delivered as of the Effective Date shall have been fully
executed and delivered in form and substance acceptable to the Debtors and to the Asbestos
Personal Injury Committee and Future Claimants' Representative and shall be fully enforceable
in accordance with their terms.

9.      A settlement agreement in a form acceptable to the Debtors regarding the Lower
Duwamish Waterway site and a consent judgment in a form acceptable to the Debtors regarding

the St. Helens site have each been approved by a court with jurisdiction to approve such settlement agreement or enter such consent judgment.

10.     All terms and conditions to the effectiveness of the DEQ Settlement, other than the occurrence of the Effective Date, shall have been satisfied or waived in writing.

The Effective Date shall occur as of 12:01 a.m., prevailing Eastern Time on the date that the Debtors or Reorganized Debtors file a notice with the Bankruptcy Court stating that the Effective Date has occurred because each of the conditions to the Effective Date has been satisfied or waived in accordance with the Plan.

## C.     Waiver of Conditions to Confirmation or the Effective Date

The conditions to Confirmation set forth in Section VIII.A. and the conditions to the Effective Date set forth in Section VIII.B. may be waived in whole or part in writing by the Debtors, subject to the consent of Lehigh Hanson, the Asbestos Personal Injury Committee and the Future Claimants' Representative, at any time without an order of the Bankruptcy Court or the District Court; provided, however, waiver of the condition to the Effective Date set forth in Section VIII.B.10. also requires the DEQ's consent.  Confirmation and the Effective Date will occur irrespective of whether any claims allowance process or related litigation has been completed.

## D.     Effect of Nonoccurrence of Conditions to the Effective Date

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Section VIII.C., then upon motion by the Debtors, Lehigh Hanson, the Asbestos Personal Injury Committee and/or the Future Claimants' Representative made before the time that each such condition has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order shall be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to this Section VIII.D., (1) the Plan shall be null and void in all respects, including with respect to the discharge of Claims; and (2) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims by or against, or any Interest in, the Debtors or (b) prejudice in any manner the rights, including any claims or defenses, of the Parties or any other party in interest.

## ARTICLE IX

## DISCHARGE, INJUNCTION
## AND SUBORDINATION RIGHTS

## A.     Discharge of Claims

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan shall be in exchange for and in complete satisfaction and discharge of all Claims, and including any interest accrued on Claims

from the Petition Date.  Except as provided in the Plan or in the Confirmation Order, Confirmation shall, as of the Effective Date, discharge the Debtors from all Claims or other liabilities that arose on or before the Effective Date and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (c) the holder of a Claim based on such debt has accepted the Plan.

In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination, as of the Effective Date, of a discharge of all Claims and other debts and liabilities against the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against a Debtor at any time, to the extent that such judgment relates to a discharged Claim, debt or liability.  Nothing contained in the foregoing discharge shall, to the full extent provided under section 524(e) of the Bankruptcy Code, affect the liability of any other Entity on, or the property of any other Entity for, any debt of the Debtors that is discharged under this Plan.

Notwithstanding any provision of the Plan to the contrary, Confirmation shall not discharge (1) the Debtors from any debt of a kind specified in 11 U.S.C. § 1141(d)(6) or (2) the Debtors' obligations under their settlement agreements with the Settled Environmental Insurers.

## B.      Injunctions

### 1.      General Injunctions

#### a.      No Actions on Account of Discharged Claims

Except as provided in the Plan, including in Section IV.O.1., or the Confirmation Order, as of the Effective Date, all Entities that have held, currently hold or may hold a Claim or other debt or liability that is discharged pursuant to the terms of the Plan shall be permanently enjoined from taking any of the following actions on account of any such discharged Claim, debt or liability:  (i) commencing or continuing in any manner any action or other proceeding against any Debtor or Reorganized Debtor, or any of its property, other than to enforce any right to a Distribution pursuant to the Plan; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against any Debtor or Reorganized Debtor, or any of its property, other than as permitted pursuant to (i) above; (iii) creating, perfecting or enforcing any lien or encumbrance against any Debtor or Reorganized Debtor, or any of its property; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any Debtor or Reorganized Debtor; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

#### b.      No Actions on Account of Released Claims

Except as provided in the Plan, including in Section IV.O.1., or the Confirmation Order, as of the Effective Date, all Entities that have held, currently hold or may hold any claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action or liabilities that are released pursuant to the Plan shall be permanently enjoined from taking any of

the following actions against any released Entity, or any of its property, on account of such released claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action or liabilities: (i) commencing or continuing in any manner any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any Encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any released Entity; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

### c.        Recipients of Distribution Deemed to Consent

By accepting Distributions pursuant to the Plan, each holder of an Allowed Claim receiving Distributions pursuant to the Plan shall be deemed to have specifically consented to the injunctions set forth in Section IX.B.

### 2.        Asbestos Permanent Channeling Injunction

### a.        Asbestos Permanent Channeling Injunction

**Pursuant to section 524(g) of the Bankruptcy Code, and except as otherwise provided in the Plan, including Section IV.O.1., the Plan and the Confirmation Order shall permanently and forever stay, restrain and enjoin any Entity from taking any actions against any Protected Party for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any Asbestos Personal Injury Claim, all of which shall be channeled to the Asbestos Personal Injury Trust for resolution as set forth in the Asbestos Personal Injury Trust Agreement and the related Asbestos Personal Injury Trust Distribution Procedures, including permanently and forever staying, restraining and enjoining any Entity from any of the following:**

**1.        commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including a judicial, arbitral, administrative or other proceeding) in any forum against any Protected Party or any property or interests in property of any Protected Party;**

**2.        enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree or other order against any Protected Party or any property or interests in property of any Protected Party;**

**3.        creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Protected Party or any property or interests in property of any Protected Party;**

**4.        setting off, seeking reimbursement of, contribution from or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; and**

5.      proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the Asbestos Personal Injury Trust Documents, except in compliance therewith.

For the avoidance of doubt, the Asbestos Permanent Channeling Injunction shall not affect any claims or causes of action under Sections IV.L.1. and IV.L.2. hereof.

3.      **Environmental Injunction**

In consideration of the undertakings of the Settled Environmental Insurers, and other consideration, and pursuant to their respective settlements with the Debtors and to preserve and promote further the agreements between and among the Debtors and any Settled Environmental Insurers, and pursuant to section 105 of the Bankruptcy Code:

a.      any and all Environmental Claims shall be treated, administered, determined and resolved under the procedures and protocols under the Plan as the sole and exclusive remedy with respect to Environmental Claims; and

b.      all Entities are hereby permanently stayed, enjoined, barred and restrained from doing any of the following against the Settled Environmental Insurers:

(i)      commencing or continuing in any manner any action or other proceeding of any kind with respect to any Environmental Claim against any of the Settled Environmental Insurers or against the property of any of Settled Environmental Insurers;

(ii)      commencing or continuing in any manner any contribution, indemnity or other equitable action or other similar proceeding relating to the environmental settlements made in this bankruptcy case against any of the Settled Environmental Insurers or against the property of any of Settled Environmental Insurers;

(iii)      enforcing, attaching, collecting or recovering, by any manner or means, from any of the Settled Environmental Insurers, or the property of any of the Settled Environmental Insurers, any judgment, award, decree, payment or order relating to any Environmental Claim against any of the Settled Environmental Insurers; and

(iv)      creating, perfecting or enforcing any lien of any kind relating to any Environmental Claim against any of the Settled Environmental Insurers, or the property of the Settled Environmental Insurers.

The injunction set forth set forth in this Section IX.B.3 (the "Environmental Injunction") is an integral part of the Plan and is essential to the Plan's consummation and implementation.  The Environmental Injunction shall inure to the benefit of the Settled Environmental Insurers, but shall not apply to any Debtor or Reorganized Debtor.

**For the avoidance of doubt, the Environmental Injunction shall not apply to Asbestos Personal Injury Claims, or to Asbestos Insurance Policy Claims arising from the payment of, or obligations arising from, Asbestos Personal Injury Claims.**

**C.      Subordination Rights**

The classification and manner of satisfying Claims and Interests under the Plan does not take into consideration subordination rights, and nothing in the Plan or Confirmation Order shall affect any subordination rights that a holder of a Claim may have with respect to any Distribution to be made pursuant to the Plan, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code or otherwise.

**ARTICLE X**

**RETENTION OF JURISDICTION**

**A.      Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Reorganization Cases after the Effective Date as is legally permissible, including jurisdiction to:

1.      Hear and determine any proceeding that involves the validity, applicability, construction, enforceability or modification of the Asbestos Permanent Channeling Injunction or the application of section 524(g) of the Bankruptcy Code to the Asbestos Permanent Channeling Injunction;

2.      Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim (other than Asbestos Personal Injury Claims) or Interest, including the resolution of any request for payment of any Administrative Claim or the resolution of any objections to the allowance, priority or classification of Claims (other than Asbestos Personal Injury Claims) or Interests;

3.      Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

4.      Resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including any Cure Amount Claims;

5.      Ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

6.      Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any application, involving the Debtors that may

be pending on the Effective Date or brought thereafter, including issues related to the Insolvent Insurers Proceeds Dispute;

7.      Enter such orders as may be necessary or appropriate to effectuate, implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements and documents entered into or delivered in connection with the Plan or the Confirmation Order;

8.      Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

9.      Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code;

10.     Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the effectuation, implementation, consummation or enforcement of the Plan or the Confirmation Order;

11.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or Distributions pursuant to the Plan are enjoined or stayed;

12.     Determine any other matters that may arise in connection with or relate to the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan or the Confirmation Order;

13.     Determine matters concerning state, local and federal Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for Taxes;

14.     Adjudicate any claims or causes of action under Section IV.L.2;

15.     Enforce remedies upon any default under the Plan;

16.     Hear and determine any other matters not inconsistent with the Bankruptcy Code; and

17.     Enter a final decree closing the Reorganization Cases.

## B.      Consent to Jurisdiction

Upon default under the Plan, the Parties consent to the jurisdiction of the Bankruptcy Court, and agree that it shall be the preferred forum for all proceedings relating to any such default.

## C. Jurisdiction of Litigating Asbestos Personal Injury Claims

Notwithstanding anything to the contrary in this Article X, the resolution of Asbestos Personal Injury Claims and the forum in which such claims will be litigated shall be governed by and in accordance with the Asbestos Personal Injury Trust Distribution Procedures.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

## A. DEQ Settlement

The DEQ Settlement, as defined herein and subject to the terms and conditions thereof, is incorporated in full in the Plan and shall remain in full force and effect following entry of the Confirmation Order, including the mutual general release among DEQ, Lehigh Hanson, certain affiliates of Lehigh Hanson and the Debtors. For the avoidance of doubt, in the event of any inconsistency between the DEQ Settlement, as defined herein, and any other provision of the Plan, the terms and conditions of the DEQ Settlement shall govern.

## B. Dissolution of the Creditors' Committee and the Asbestos Personal Injury Committee

On the Effective Date, the Creditors' Committee and the Asbestos Personal Injury Committee shall dissolve and the respective members of such committees shall be released and discharged from all duties and obligations arising from or related to the Reorganization Cases. The members of and the Professionals retained by the Creditors' Committee or the Asbestos Personal Injury Committee or by the Future Claimants' Representative shall not be entitled to assert any Fee Claim for any services rendered or expenses incurred after the Effective Date, except for services rendered and expenses incurred in connection with (i) any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or Filed and served after the Effective Date pursuant to Section III.A.1.d.ii.A and (ii) participation in an appeal from the Confirmation Order, but only to the extent the appeal raises issues specific to the treatment of creditors represented by the respective committee or Future Claimants' Representative.

Effective as of the Effective Date, the TAC shall succeed to, and exclusively hold, the attorney-client privilege and any other privilege held by the Asbestos Personal Injury Committee and shall enjoy the work product protections that were applicable or available to the Asbestos Personal Injury Committee before its dissolution. Further, the TAC shall be a party in interest on and after the Effective Date within the meaning of section 1109(b) of the Bankruptcy Code.

## C. Limitation of Liability

### 1. Liability for Actions in Connection with the Reorganization Cases

The Debtors, the Reorganized Debtors, the Future Claimants' Representative, the Asbestos Personal Injury Committee, the Creditors' Committee, the DIP Lender, Lehigh Hanson, DEQ, and their respective directors, officers, employees, affiliates, subsidiaries, predecessors,

successors, members, attorneys, accountants, investment bankers, financial advisors, appraisers, representatives and agents, acting in such capacity, shall neither have nor incur any liability to any Entity for any act taken or omitted to be taken in connection with, related to or arising out of the Reorganization Cases or the consideration, formulation, preparation, dissemination, Confirmation, effectuation, implementation or consummation of the Plan or Exhibits or any transaction proposed in connection with the Reorganization Cases or any contract, instrument, release or other agreement or document entered into or delivered, or any other act taken or omitted to be taken, in connection therewith; provided, however, that the foregoing provisions of this Section XI.C.1. shall have no effect on: (a) the liability of any Entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan; or (b) the liability of any Entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

## 2. Rights of Action in Connection with the Reorganization Cases

Notwithstanding any other provision of this Plan, no holder of a Claim or Interest, no other party in interest and none of their respective directors, officers, employees, affiliates, subsidiaries, predecessors, successors, members, attorneys, accountants, investment bankers, financial advisors, appraisers, representatives or agents shall have any right of action against any of the Debtors, the Reorganized Debtors, the Creditors' Committee, the Future Claimants' Representative, the Asbestos Personal Injury Committee, the DIP Lender, Lehigh Hanson, and DEQ or any of their respective directors, officers, employees, affiliates, subsidiaries, predecessors, successors, members, attorneys, accountants, investment bankers, financial advisors, appraisers, representatives and agents, acting in such capacity, for any act or omission in connection with, relating to or arising out of the Reorganization Cases or the consideration, formulation, preparation, dissemination, Confirmation, effectuation, implementation or consummation of the Plan or any transaction or document created or entered into, or any other act taken or omitted to be taken, in connection therewith, except for: (a) the liability of any Entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan; or (b) the liability of any Entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

## D. Modification of the Plan and Exhibits

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code, the Parties reserve the right to alter, amend or modify the Plan and the Exhibits to the Plan at any time before its substantial consummation.

## E. Headings

The headings used in the Plan are inserted for convenience only and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

### F.  Severability

After the Effective Date, any provision of the Plan, any Exhibit hereto, any instrument, agreement or other document executed in connection with the Plan, or the Confirmation Order, that is determined to be prohibited, unenforceable, or invalid by a court of competent jurisdiction or any other governmental Entity with appropriate jurisdiction may be deemed ineffective as to any jurisdiction in which such provision is prohibited, unenforceable, or invalidated to the extent of such prohibition, unenforceability, or invalidation, without invalidating the effectiveness of the remaining provisions of the Plan, the Plan Exhibits, any instruments, agreements, or other documents executed in connection with the Plan, or the Confirmation Order or affecting the validity or enforceability of such provision and such remaining provisions in any other jurisdiction.

### G.  Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

### H.  Service of Certain Plan Exhibits

Certain Exhibits are not being Filed or served with copies of the Plan.  The Debtors shall File such Exhibits no later than ten (10) days before the deadline to object to Confirmation. Once Filed, the Debtors shall make available for review the relevant Exhibits on their web site at https://cases.primeclerk.com/kaisergypsum.

### I.  Effective Date Actions Simultaneous

Unless the Plan or the Confirmation Order provides otherwise, actions required to be taken on the Effective Date shall take place and be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action. Actions required to be taken after the Effective Date or as soon as thereafter as is reasonably practicable shall be deemed to have been taken on the Effective Date.

### J.  Asbestos Personal Injury Trust Annual Report

Notwithstanding the closing of the Reorganization Cases under section 350 of the Bankruptcy Code, the Clerk of the Bankruptcy Court shall accept for filing the Asbestos Personal Injury Trust's annual report without the requirement that any party in interest file a request to reopen the case.

### K.  Service of Documents

Any pleading, notice or other document required by the Plan or Confirmation Order to be served on or delivered to the Debtors, the Reorganized Debtors, the Creditors' Committee, the Future Claimants' Representative, the Asbestos Personal Injury Committee or the Bankruptcy Administrator must be sent by overnight delivery service, courier service or messenger to:

1.      **The Debtors and the Reorganized Debtors**

C. Richard Rayburn, Jr.
John R. Miller, Jr.
RAYBURN COOPER & DURHAM, P.A.
1200 Carillon
227 West Trade Street
Charlotte, North Carolina 28202

        -and-

Gregory M. Gordon
Amanda Rush
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201

        -and-

Paul M. Green
JONES DAY
717 Texas, Suite 3300
Houston, Texas  77002

2.      **Future Claimants' Representative**

Edwin Harron
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801

        - and-

Felton Parrish
HULL & CHANDLER
1001 Morehead Square Drive, Suite 450
Charlotte, North Carolina 28203

3.      **The Asbestos Personal Injury Committee**

Kevin Maclay
Todd E. Phillips
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle N.W., Suite 1100
Washington, D.C. 20005

        - and-

Sally Higgins
HIGGINS & OWENS
524 East Boulevard
Charlotte, North Carolina 28203

**4.      The Creditors' Committee**

Ira L. Herman
BLANK ROME LLP
1271 Avenue of the Americas
New York, New York 10020

-and-

Jeffrey Rhodes
BLANK ROME LLP
1825 Eye Street NW
Washington, DC 20006

-and-

Andrew T. Houston
MOON WRIGHT & HOUSTON, PLLC,
121 W. Trade Street, Suite 1950
Charlotte, North Carolina 28202

**5.      The Bankruptcy Administrator for the Western District of North Carolina**

Alexandria Kenny
402 West Trade Street, Suite #200
Charlotte, North Carolina 28202

**6.      Lehigh Hanson, Inc.**

Ben Hawfield, Jr.
Hillary B. Crabtree
MOORE &VAN ALLEN
100 North Tryon Street, Suite 4700
Charlotte, North Carolina 28202

Dated:  July 20, 2020

Respectfully submitted,

HANSON PERMANENTE CEMENT
COMPANY

/s/ Charles E. McChesney II
Charles E. McChesney II
Vice President, Secretary and Director

ASBESTOS PERSONAL INJURY
COMMITTEE

KAISER GYPSUM COMPANY, INC.

/s/ Alan R. Brayton
Alan R. Brayton

/s/ Charles E. McChesney II
Charles E. McChesney II
Vice President, Secretary and Director

FUTURE CLAIMANTS'
REPRESENTATIVE

LEHIGH HANSON, INC.

/s/ Lawrence Fitzpatrick
Lawrence Fitzpatrick

/s/ Carol L. Lowry
Carol L. Lowry
Vice President and General Counsel

**Exhibit I.A.6**

Asbestos Insurance Policies

JA00202

**Policies Alleged to Cover Asbestos Personal Injury Claims**

| Insurer | Policy | Period |
|---|---|---|
| Truck Insurance Exchange | 350-40-00 | 12/31/1964-01/01/1968 |
| Truck Insurance Exchange | 350-40-00 | 01/01/1968-01/30/1971 |
| Truck Insurance Exchange | 350-40-00 | 01/30/1971-01/01/1974 |
| Truck Insurance Exchange | 350-40-00 | 01/01/1974-04/01/1980 |
| Truck Insurance Exchange | 350-40-00 | 04/01/1980-04/01/1981 |
| Truck Insurance Exchange | 350-40-00 (N0003 4000 as of 4/1/1982) | 04/01/1981-04/01/1983 |
| International Insurance Co. | 5220368118 | 05/01/1984-04/01/1985 |
| Highlands Insurance Company* | SR30068 | 10/01/1977–10/01/1978 |
| Highlands Insurance Company* | SR 30145 | 10/01/1978–04/01/1979 |
| Highlands Insurance Company* | SR 30315 | 04/01/1983–05/01/1984 |
| Highlands Insurance Company* | SR 30397 | 05/01/1984–04/01/1985 |
| Highlands Insurance Company* | SR 30398 | 05/01/1984–04/01/1985 |
| Lloyd's and/or London Market | 70107 (51910) | 03/01/1953–03/01/1954 |
| Lloyd's and/or London Market | 70108 (54151) | 03/01/1954–03/01/1955 |
| Lloyd's and/or London Market | 73158 (56155) | 03/01/1955–03/01/1956 |
| Lloyd's and/or London Market | 75211 (57956) | 03/01/1956–03/01/1957 |
| Lloyd's and/or London Market | 76128 (60090) | 03/01/1957–03/01/1958 |
| Lloyd's and/or London Market | 79409 | 03/01/1958–09/15/1958 |
| Lloyd's and/or London Market | 79882/83086 (63380) | 09/15/1958–12/31/1961 |
| Lloyd's and/or London Market | 79883/80900 (63381) | 09/15/1958–12/31/1961 |

*In Receivership

**Policies Alleged to Cover Asbestos Personal Injury Claims**

| Insurer | Policy | Period |
|---|---|---|
| Lloyd's and/or London Market | 79884/83024 (63382) | 09/15/1958–12/31/1961 |
| Lloyd's and/or London Market | 79885/83143 (63383) | 09/15/1958–12/31/1961 |
| Lloyd's and/or London Market | 61560/64564 (69700) | 12/31/1961–12/31/1964 |
| Lloyd's and/or London Market | 61561/64022 (69701) | 12/31/1961–12/31/1964 |
| Lloyd's and/or London Market | 031382000 (LUS1031 & LUS1031A) | 12/31/1964–01/01/1968 |
| Lloyd's and/or London Market | 031383000 (LUS1032 & LUS1032A) | 12/31/1964–01/01/1968 |
| Lloyd's and/or London Market | 031384000 (LUS1033 & LUS1033A) | 04/22/1965–01/01/1968 |
| Lloyd's and/or London Market | 025114000 (LUS1066 &LUS1066A) | 01/01/1968–01/31/1971 |
| Lloyd's and/or London Market | 025115000 025115100 (LUS1067 & LUS1067A) | 01/01/1968–01/31/1971 |
| Lloyd's and/or London Market | 025116000 (LUS1068 &LUS1068A) | 01/01/1968–01/31/1971 |
| Insurance Company of the State of Pennsylvania | 411-4919 | 01/30/1971–01/01/1974 |
| Insurance Company of the State of Pennsylvania | 411-4969 | 01/30/1971–01/01/1974 |
| Insurance Company of the State of Pennsylvania | 411-4970 | 07/13/1971–01/01/1974 |
| Lloyd's and/or London Market | 12-0053 & 12-0053A | 07/13/1971–01/01/1974 |
| Insurance Company of the State of Pennsylvania | 4174-5841 | 01/01/1974–01/01/1977 |
| Insurance Company of the State of Pennsylvania | 4174-5842 | 01/01/1974–01/01/1977 |

*In Receivership

**Policies Alleged to Cover Asbestos Personal Injury Claims**

| Insurer | Policy | Period |
|---|---|---|
| Insurance Company of the State of Pennsylvania | 4174-5843 | 01/01/1974–01/01/1977 |
| Insurance Company of the State of Pennsylvania | 4174-5844 | 01/01/1974–01/01/1977 |
| Insurance Company of the State of Pennsylvania | 4177-7436 | 01/01/1977–10/01/1977 |
| Insurance Company of the State of Pennsylvania | 4177-7437 | 01/01/1977–10/01/1977 |
| Insurance Company of the State of Pennsylvania | 4177-7438 | 01/01/1977–10/01/1977 |
| First State Insurance Company | 907085 | 10/01/1977–10/01/1978 |
| Northbrook Insurance Company | 63003630 | 10/01/1977–10/01/1978 |
| Lloyd's and/or London Market | 77DD2137 (PY024577) | 10/01/1977–10/01/1978 |
| Lexington Insurance Company | GC 550-2895 | 10/01/1977–10/01/1978 |
| Columbia Casualty Company | RDX 3652645 | 10/13/1977–10/01/1978 |
| Employers Reinsurance Corp. | PLE 21526 | 10/14/1977–10/01/1978 |
| New England Reinsurance Corporation | 684196 | 10/01/1978–04/01/1979 |
| Northbrook Insurance Company | 63005038 | 10/01/1978–04/01/1979 |
| Columbia Casualty Company | RDX 4169393 | 10/01/1978–04/01/1979 |
| Lexington Insurance Company | 5513539 | 10/01/1978–04/01/1979 |
| New England Reinsurance Corporation | 684465 | 04/01/1979–04/01/1980 |
| Northbrook Insurance Company | 63005578 | 04/01/1979–04/01/1980 |
| American Re-insurance Company | EUR 4007916 | 04/01/1979–04/01/1980 |
| Columbia Casualty Company | RDX 4169612 | 04/01/1979–04/01/1980 |

*In Receivership

**Policies Alleged to Cover Asbestos Personal Injury Claims**

| Insurer | Policy | Period |
|---|---|---|
| Lexington Insurance Company | 5513581 | 04/01/1979–04/01/1980 |
| Allianz | AU 5003139 | 12/07/1979–04/01/1981 |
| Fireman's Fund Insurance Company | XLX 1269069 | 12/07/1979–04/01/1981 |
| Lloyd's and/or London Market | PY008381 (LUS1294) | 04/01/1980–04/01/1981 |
| Old Republic Insurance Company | OZX 12430 | 04/01/1981–04/01/1982 |
| First State Insurance Company | 941233 | 04/01/1983–05/01/1984 |
| Associated International Insurance Company | XS103073 | 04/01/1983–05/01/1984 |
| First State Insurance Company | 933596 | 04/01/1983–05/01/1984 |
| Lloyd's and/or London Market | UQA0091 | 04/01/1983–05/01/1984 |
| Lloyd's and/or London Market | UQA0092 | 04/01/1983–05/01/1984 |
| London Guarantee & Accident Co. of New York | LX 2107763 | 04/01/1983–05/01/1984 |
| First State Insurance Company | 933597 | 04/01/1983–05/01/1984 |
| Continental Insurance Company | SRX 2101407 | 04/01/1983–04/01/1985 |
| International Insurance Company | 5220325908 | 04/01/1983–05/01/1984 |
| First State Insurance Company | 933598 | 04/01/1983–05/01/1984 |
| National Casualty Company | XU 000036 | 04/01/1983–05/01/1984 |
| Great Southwest Fire Insurance Company | XL 13756 | 04/01/1983–05/01/1984 |
| International Insurance Company | 5220325917 | 04/01/1983–05/01/1984 |
| Fireman's Fund Insurance Company | XLX 1482790 | 04/01/1983–05/01/1984 |

*In Receivership

**Policies Alleged to Cover Asbestos Personal Injury Claims**

| Insurer | Policy | Period |
|---|---|---|
| International Insurance Company | 5233172733 | 05/01/1984–04/01/1985 |
| Associated International Insurance Company | XS 106751 | 05/01/1984–04/01/1985 |
| Granite State Insurance Company | 6184-4363 | 05/01/1984–04/01/1985 |
| Transamerica Insurance Company | USE 1339-7785 | 05/01/1984–04/01/1985 |
| Lloyd's and/or London Market | 58548/84 | 05/01/1984–04/01/1985 |
| Lloyd's and/or London Market | 58549/84 | 05/01/1984–04/01/1985 |
| Lloyd's and/or London Market | 858550/84 | 05/01/1984–04/01/1985 |
| International Insurance Company | 5220368109 | 05/01/1984–04/01/1985 |
| London Guarantee & Accidental Co. of NY | LX 2110774 | 05/01/1984–04/01/1985 |
| National Union Fire Insurance Company of Pittsburgh, PA | BE1942522 | 04/01/1985-05/08/1985 |
| International Insurance Company | 523-4126148 | 05/08/1985-04/01/1986 |
| Granite State Insurance Company | 6185-5843 | 04/01/1985-04/01/1986 |
| Associated International Insurance Company | XS110594 | 04/01/1985-04/01/1986 |
| First State Insurance Company | Unknown | 04/01/1985-04/01/1986 |
| AIU Insurance Company | 75101851 | 07/01/1985-04/01/1986 |
| Landmark Insurance Company | FE 400 22 29 | 04/01/1985-04/01/1986 |
| Lexington Insurance Company | Unknown | 07/01/1985-04/01/1986 |
| Continental Insurance Company | SRX 2101361 | 04/01/1985-06/29/1985 |
| Transport Indemnity Company | TEL 900378 | 05/01/1984–04/01/1985 |

*In Receivership

**Policies Alleged to Cover Asbestos Personal Injury Claims**

**UNAVAILABLE EXCESS INSURER POLICIES**

| Insurer | Policy | Period |
|---|---|---|
| Pine Top Insurance Company | MLP 101684 | 12/07/1979–04/01/1981 |
| Transit Casualty Insurance Company | SCU 956483 | 04/01/1983–05/01/1984 |
| Integrity Insurance Company | XL 500280 | 04/01/1983–05/01/1984 |
| Integrity Insurance Company | 58551/84 | 05/01/1984–09/01/1985 |
| Transit Casualty Company | SCU 956816 | 05/01/1984–04/01/1985 |
| Midland Insurance Company | XL 724905 | 05/01/1984–04/01/1985 |
| Integrity Insurance Company | Unknown | 04/01/1985-06/10/1985 |
| Mission National Insurance Company | MN043615 | 04/01/1985-04/01/1986 |

*In Receivership

## <u>Amendment to Exhibit I.A.6</u>

Asbestos Insurance Policies

- Exhibit page 2:  Delete "025115100" from entry for "Lloyd's and/or London Market 025115000 025115100 (LUS1067 and LUS1067A)."

- Exhibit page 5:  Correct entry for Lloyd's and/or London Market "858550/84" to read "58550/84."

- Exhibit page 5:  Delete entry for "Continental Insurance Company SRX 2101361."

- Exhibit page 5:  Delete entry for "First State Insurance Company Unknown 04/01/1985-04/01/1986"

- Exhibit page 5:  Delete entry for International Insurance Company 523-4126148 05/08/1985-04/01/1986"

- Exhibit page 6:  Change policy period for "Integrity Insurance Company XL 500280" to 04/01/1983 – 04/01/1985.

**Exhibit I.A.16**

Asbestos Personal Injury Trust Agreement

**KAISER GYPSUM ASBESTOS PERSONAL INJURY TRUST AGREEMENT**

JA00211

# KAISER GYPSUM ASBESTOS PERSONAL INJURY TRUST AGREEMENT

## TABLE OF CONTENTS

**SECTION I AGREEMENT OF TRUST** ........................................................... 2

   **1.1**    **Creation and Name** ....................................................... 2

   **1.2**    **Purpose** ............................................................................ 3

   **1.3**    **Transfer of Assets** ........................................................ 4

   **1.4**    **Acceptance of Assets, Assumption of Liabilities and Certain Obligations** ............. 4

**SECTION II  POWERS AND TRUST ADMINISTRATION** ........................ 6

   **2.1**    **Powers** ............................................................................. 6

   **2.2**    **General Administration** ............................................... 9

   **2.3**    **Claims Administration** .............................................. 13

**SECTION III ACCOUNTS, INVESTMENTS, AND PAYMENTS** ............. 13

   **3.1**    **Accounts** ....................................................................... 13

   **3.2**    **Investments** ................................................................. 14

   **3.3**    **Source of Payments** .................................................... 16

**SECTION IV TRUSTEE; DELAWARE TRUSTEE** ................................... 17

   **4.1**    **Number** ......................................................................... 17

   **4.2**    **Term of Service** .......................................................... 17

   **4.3**    **Appointment of Successor Trustee** .......................... 18

   **4.4**    **Liability of Trustee, Members of the TAC and the FCR** ................. 19

   **4.5**    **Compensation and Expenses of Trustee and Delaware Trustee** ........... 19

   **4.6**    **Indemnification** ........................................................... 20

   **4.7**    **Lien** ................................................................................ 21

   **4.8**    **Trustee's Employment of Experts; Delaware Trustee's Employment of Counsel** 21

   **4.9**    **Trustee's Independence** .............................................. 22

   **4.10**  **Bond** .............................................................................. 22

   **4.11**  **Delaware Trustee** ........................................................ 22

i

**4.12    Medicare Reporting Obligations** ......................................................................... 24

**SECTION V TRUST ADVISORY COMMITTEE** ......................................................... 25

**5.1    Members** ......................................................................................................... 25

**5.2    Duties** .............................................................................................................. 25

**5.3    Term of Office** ............................................................................................... 26

**5.4    Appointment of Successor** ........................................................................... 28

**5.5    TAC's Employment of Professionals** .......................................................... 29

**5.6    Compensation and Expenses of the TAC** .................................................... 30

**5.7    Procedures for Consultation With and Obtaining the Consent of the TAC** ........ 31

**SECTION VI THE FCR** ............................................................................................... 33

**6.1    Duties** .............................................................................................................. 33

**6.2    Term of Office** ............................................................................................... 33

**6.3    Appointment of Successor** ........................................................................... 34

**6.4    FCR's Employment of Professionals** ......................................................... 34

**6.5    Compensation and Expenses of the FCR** ................................................... 36

**6.6    Procedures for Consultation with and Obtaining the Consent of the FCR** .......... 36

**SECTION VII GENERAL PROVISIONS** ................................................................... 38

**7.1    Irrevocability** ................................................................................................ 38

**7.2    Term; Termination** ....................................................................................... 39

**7.3    Amendments** .................................................................................................. 41

**7.4    Meetings** ........................................................................................................ 41

**7.5    Severability** ................................................................................................... 42

**7.6    Notices** ........................................................................................................... 42

**7.7    Successors and Assigns** ................................................................................ 43

**7.8    Limitation on Claim Interests for Securities Laws Purposes** ................... 43

**7.9    Entire Agreement; No Waiver** ..................................................................... 44

**7.10    Headings** ...................................................................................................... 44

**7.11    Governing Law** ............................................................................................ 44

**7.12    Settlor's Representative and Cooperation** ................................................ 45

**7.13    Dispute Resolution** ..................................................................................... 45

ii

7.**14**    **Enforcement and Administration**................................................................. 46

7.**15**    **Effectiveness** ........................................................................................ 46

7.**16**    **Counterpart Signatures**........................................................................ 46

Case 3:20-cv-00537-GCM    Document 1-2    Filed 09/28/20    Page 126 of 484    JA00214

## KAISER GYPSUM ASBESTOS PERSONAL INJURY TRUST AGREEMENT

This Kaiser Gypsum Asbestos Personal Injury Trust Agreement (this "**Trust Agreement**"), dated the date set forth on the signature page hereof and effective as of the Effective Date, is entered into, pursuant to the Third Amended Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc., dated as of May 30, 2019 (as it may be amended or supplemented, the "**Plan**"),[1] by Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc. (collectively referred to as the "**Debtors**," or the "**Settlors**"), the debtors and debtors-in-possession whose chapter 11 cases are being administered under Case No. 16-31602 in the Bankruptcy Court; the Future Claimants' Representative (the "**FCR**"); the Asbestos Claimants Committee (the "**ACC**"); [•] (the "**Delaware Trustee**"); the Trustee identified on the signature pages hereof (the "**Trustee**"); and the members of the Trust Advisory Committee identified on the signature pages hereof (the "**TAC**"); and

**WHEREAS**, the Debtors have reorganized under the provisions of chapter 11 of the Bankruptcy Code in the Reorganization Cases; and

**WHEREAS**, the Confirmation Order has been entered by the Bankruptcy Court and affirmed by the District Court; and

**WHEREAS**, the Plan provides, *inter alia*, for the creation of the Kaiser Gypsum Asbestos Personal Injury Trust (the "**Asbestos Trust**"); and

---

[1] All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Plan, and such definitions are incorporated herein by reference.  All capitalized terms not defined herein or defined in the Plan, but defined in the Bankruptcy Code or Rules, shall have the meanings ascribed to them by the Bankruptcy Code and Rules, and such definitions are incorporated herein by reference.

**WHEREAS**, pursuant to the Plan, the Asbestos Trust is to use its assets and income to satisfy Asbestos Personal Injury Claims ("**Asbestos Claims**"); and

**WHEREAS**, it is the intent of the Debtors, the Trustee, the ACC, the TAC, and the FCR that the Asbestos Trust be administered, maintained, and operated at all times through mechanisms that provide reasonable assurance that the Asbestos Trust will satisfy all Asbestos Claims pursuant to the Kaiser Gypsum Asbestos Personal Injury Trust Distribution Procedures (the "**TDP**") attached to the Plan as Exhibit I.A.19 in substantially the same manner, and in strict compliance with the terms of this Trust Agreement; and

**WHEREAS**, all rights of the holders of Asbestos Claims arising under this Trust Agreement and the TDP shall vest upon the Effective Date; and

**WHEREAS**, pursuant to the Plan, the Asbestos Trust is intended to qualify as a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code (the "**QSF Regulations**"); and

**WHEREAS**, the Bankruptcy Court and the District Court have determined that the Asbestos Trust and the Plan satisfy all the prerequisites for issuance of an injunction pursuant to section 524(g) of the Bankruptcy Code with respect to any and all Asbestos Claims, and such injunction has been entered in connection with the Confirmation Order;

**NOW, THEREFORE**, it is hereby agreed as follows:

## SECTION I

## AGREEMENT OF TRUST

**1.1** <u>**Creation and Name.**</u>  The Debtors as Settlors hereby create a trust known as the "Kaiser Gypsum Asbestos Personal Injury Trust," which is the Asbestos Personal Injury Trust

- 2 -

JA00216

provided for and referred to in the Plan.  The Trustee of the Asbestos Trust may transact the

business and affairs of the Asbestos Trust in the name of the Asbestos Trust, and references

herein to the Asbestos Trust shall include the Trustee acting on behalf of the Asbestos Trust.  It

is the intention of the parties hereto that the trust created hereby constitute a statutory trust under

Chapter 38 of title 12 of the Delaware Code, 12 Del. C. § 3801 et seq. (the "**Act**") and that this

document constitutes the governing instrument of the Asbestos Trust.  The Trustee and the

Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust

with the Delaware Secretary of State in the form attached hereto as Exhibit [•].

     **1.2**     **Purpose.**  Subject to the provisions of the Plan, the purpose of the Asbestos Trust

is to assume liability and responsibility for all Asbestos Claims, and, among other things to:  (a)

direct the processing, liquidation and payment of Asbestos Claims in accordance with the Plan,

the TDP, and the Confirmation Order, including allowing claimants with Insured Asbestos

Claims to pursue their Asbestos Claims in the tort system; (b) preserve, hold, manage, and

maximize the assets of the Asbestos Trust for use in paying and satisfying Asbestos Claims,

including Uninsured Asbestos Claims and the uninsured portion of Insured Asbestos Claims

pursued in the tort system; and (c) qualify at all times as a qualified settlement fund under the

QSF Regulations.  The Asbestos Trust is to use the Asbestos Trust's assets and income to pay

holders of Asbestos Claims in accordance with this Trust Agreement and the TDP in such a way

that such holders of Asbestos Claims are treated fairly, equitably, and reasonably in light of the

assets available to satisfy such claims, and to otherwise comply in all respects with the

requirements of a trust set forth in section 524(g)(2)(B) of the Bankruptcy Code.  In interpreting

and applying the provisions of this Trust Agreement and the TDP, the intent of the current and

future holders of Asbestos Claims shall be considered.

Case 3:20-cv-00537-GCM   Document 1-2   Filed 09/28/20   Page 129 of 483   JA00217

1.3    __Transfer of Assets__.  Pursuant to, and in accordance with, Section IV.K.2 of the

Plan, the Asbestos Trust has received the Asbestos Personal Injury Trust Assets ("**Asbestos**

**Trust Assets**") to fund the Asbestos Trust and settle or discharge Asbestos Claims in the manner

provided for under the TDP.  Pursuant to the Plan, the Asbestos Trust Assets will be issued or

transferred to the Asbestos Trust free and clear of any liens, security interests or other Claims by

the Debtors, the Reorganized Debtors, the other Protected Parties, any creditor, or other entity

except as otherwise provided in the Plan.  Sections IV.T. and VIII.B.8 of the Plan provides for

the Debtors and the Reorganized Debtors, among others, to execute and deliver such documents

to the Asbestos Trust as the Trustee may request to effectuate the transfer and assignment of any

Asbestos Trust Assets to the Asbestos Trust.

### 1.4    Acceptance of Assets, Assumption of Liabilities and Certain Obligations.

(a)    In furtherance of the purposes of the Asbestos Trust, the Asbestos Trust

hereby expressly accepts the transfer to the Asbestos Trust of the Asbestos Trust Assets and any

other transfers contemplated by the Plan in the time and manner as, and subject to the terms,

contemplated in the Plan.

(b)    In furtherance of the purposes of the Asbestos Trust, the Asbestos Trust

expressly assumes liability and responsibility for all Asbestos Claims in substitution for the

financial or other responsibility or liability of the Reorganized Debtors therefor.  Except as

otherwise provided in this Trust Agreement, the TDP or the Plan, the Asbestos Trust shall have

all defenses, cross-claims, offsets, and recoupments, as well as rights of indemnification,

contribution, subrogation, and similar rights, regarding such claims that the Debtors or the

Reorganized Debtors have or would have had under applicable law.  Regardless of the foregoing,

- 4 -

however, a claimant must meet otherwise applicable federal and state statutes of limitations and
repose, except as otherwise provided in the TDP.

(c)      Notwithstanding anything to the contrary herein, no provision herein or in
the TDP shall be construed or implemented in a manner that would cause the Asbestos Trust to
fail to qualify as a "qualified settlement fund" under the QSF Regulations.

(d)      Nothing in this Trust Agreement shall be construed in any way to limit
(i) the scope, enforceability, or effectiveness of Asbestos Permanent Channeling Injunction or
any other injunction or release issued or granted in connection with the Plan (collectively,
the "**Injunctions**"), or (ii) subject to the provisions of Section 1.4(b) above, the Asbestos Trust's
assumption of liability for Asbestos Claims pursuant to the Plan and the TDP.

(e)      The Asbestos Trust shall have liability for Protected Party Indemnification
Claims in accordance with Section IV.K.4 of the Plan.

(f)      To the extent required by the Plan, including Sections IV.J, IV.L.1. and
IV.L.2 of the Plan, the Asbestos Trust shall reimburse the Reorganized Debtors for out-of-pocket
costs incurred by the Reorganized Debtors.

(g)      In this Trust Agreement and the TDP the words "must," "will," and
"shall" are intended to have the same mandatory force and effect, while the word "may" is
intended to be permissive rather than mandatory.

(h)      To the extent required by the Act, the beneficial owners (within the
meaning of the Act) of the Asbestos Trust (the "**Beneficial Owners**") shall be deemed to be the
holders of Asbestos Claims; provided that (i) the holders of Asbestos Claims, as such Beneficial
Owners, shall have only such rights with respect to the Asbestos Trust and its assets as are set
forth in the TDP, and (ii) no greater or other rights, including upon dissolution, liquidation or

- 5 -

winding up of the Asbestos Trust (other than those set forth in the TDP), shall be deemed to

apply to the holders of Asbestos Claims in their capacity as Beneficial Owners.

## SECTION II

## POWERS AND TRUST ADMINISTRATION

**2.1**   **Powers**.

(a)     The Trustee is and shall act as the fiduciary to the Asbestos Trust in

accordance with the provisions of this Trust Agreement and the Plan.  The Trustee shall, at all

times, administer the Asbestos Trust and the Asbestos Trust Assets in accordance with the

purposes set forth in Section 1.2 above.  Subject to the limitations set forth in this Trust

Agreement, the Plan, or the TDP, the Trustee shall have the power to take any and all actions

that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the

Asbestos Trust and the Plan, including, without limitation, each power expressly granted in this

Section 2.1, any power reasonably incidental thereto and not inconsistent with the requirements

of Section 2.2, and any trust power now or hereafter permitted under the Act.

(b)     Except as required by applicable law, the TDP, the Plan, or otherwise

specified herein, the Trustee need not obtain the order or approval of any court in the exercise of

any power or discretion conferred hereunder.

(c)     Without limiting the generality of Section 2.1(a) above, and except as

limited below, the Trustee shall have the power to:

(i)     receive and hold the Asbestos Trust Assets and exercise all rights

with respect thereto, including the right to vote and sell any securities that are included in the

Asbestos Trust Assets;

(ii)     invest the monies held from time to time by the Asbestos Trust;

- 6 -

(iii)    sell, transfer, or exchange any or all of the Asbestos Trust Assets at such prices and upon such terms as the Trustee may consider proper and consistent with the other terms of this Trust Agreement;

(iv)    enter into leasing and financing agreements with third parties to the extent such agreements are reasonably necessary to permit the Asbestos Trust to operate;

(v)    pay liabilities and expenses of the Asbestos Trust;

(vi)    establish such funds, reserves, and accounts within the Asbestos Trust estate, as deemed by the Trustee to be useful in carrying out the purposes of the Asbestos Trust;

(vii)    sue and be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding;

(viii)    establish, supervise, and administer the Asbestos Trust in accordance with this Trust Agreement, the Plan, and the TDP;

(ix)    appoint such officers and hire such employees and engage such legal, financial, accounting, investment, auditing, and forecasting, and other consultants and agents as the business of the Asbestos Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in his or her discretion, deem advisable or necessary in order to carry out the terms of this Asbestos Trust;

(x)    pay reasonable compensation to any employees, legal, financial, accounting, investment, auditing, and forecasting, and other consultants, advisors, and agents, including those engaged by the Asbestos Trust in connection with its alternative dispute resolution activities;

- 7 -

(xi)      compensate the Trustee, the Delaware Trustee, the TAC members, and the FCR as provided below, and their employees, legal, financial, accounting, investment, and other advisors, consultants, independent contractors, and agents, and reimburse the Trustee, the Delaware Trustee, the TAC members, and the FCR all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xii)     execute and deliver such instruments as the Trustee considers proper in administering the Asbestos Trust;

(xiii)    enter into such other arrangements with third parties as are deemed by the Trustee to be useful in carrying out the purposes of the Asbestos Trust, provided such arrangements do not conflict with any other provision of this Trust Agreement, the Plan, or the TDP;

(xiv)    in accordance with Section 4.6 below, defend, indemnify, and hold harmless (and purchase insurance indemnifying) (A) the Trustee, the Delaware Trustee, the members of the TAC, and the FCR, and (B) the officers, employees, agents, advisors, consultants and representatives of the Asbestos Trust, and any directors, trustees, officers, employees, agents, advisors, consultants and representatives of the TAC and the FCR (everyone under (B) hereof being collectively referred to as the "**Additional Indemnitees**"), for any and all liability absent a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of Section 3806 of the Act;

(xv)     delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Asbestos Trust Assets to any one or more reputable individuals or recognized institutional investment advisors or investment managers without

- 8 -

JA00222

liability for any action taken or omission made because of any such delegation, except as provided in Section 4.4 below;

(xvi)   consult with the TAC and the FCR at such times and with respect to such issues relating to the conduct of the Asbestos Trust as the Trustee considers desirable;

(xvii)   make, pursue (by litigation or otherwise), collect, compromise or settle, in the name of the Asbestos Trust, any claim, right, action, or cause of action included in the Asbestos Trust Assets, including, but not limited to, insurance coverage or recoveries, before any court of competent jurisdiction;

(xviii)  settle any rights to insurance coverage under the Asbestos Insurance Policies with the consent of the FCR and the TAC; and

(xix)   modify the TDP with the consent of the FCR and the TAC.

(d)     The Trustee shall not have the power to guarantee any debt of any other Entity.

(e)     The Trustee agrees to take the actions of the Asbestos Trust required hereunder.

(f)     The Trustee shall give the TAC and the FCR prompt notice of any act performed or taken pursuant to Sections 2.1(c)(i), (iii), (vii), or (xv) above, and any act proposed to be performed or taken pursuant to Section 2.2(f) below.

### 2.2     **General Administration.**

(a)     The Trustee shall act in accordance with this Trust Agreement.

(b)     The Trustee shall (i) timely file such income tax and other returns and statements required to be filed and shall timely pay all taxes required to be paid by the Asbestos Trust, (ii) comply with all applicable reporting and withholding obligations, (iii) satisfy all

requirements necessary to qualify and maintain qualification of the Asbestos Trust as a qualified

settlement fund within the meaning of the QSF Regulations, and (iv) take no action that could

cause the Asbestos Trust to fail to qualify as a qualified settlement fund within the meaning of

the QSF Regulations.

(c)     The Trustee shall timely account to the Bankruptcy Court as follows:

(i)     The Trustee shall cause to be prepared and filed with the

Bankruptcy Court, as soon as available, and in any event within one hundred and twenty (120)

days following the end of each fiscal year, an annual report (the "**Annual Report**") containing

financial statements of the Asbestos Trust (including, without limitation, a balance sheet of the

Asbestos Trust as of the end of such fiscal year and a statement of operations for such fiscal

year) audited by a firm of independent certified public accountants selected by the Trustee and

accompanied by an opinion of such firm as to the fairness of the financial statements'

presentation of the cash and investments available for the payment of claims.  The Trustee shall

provide a copy of such Annual Report to the TAC and the FCR when such reports are filed with

the Bankruptcy Court.

(ii)     Simultaneously with the filing of the Annual Report, the Trustee

shall cause to be prepared and filed with the Bankruptcy Court a report containing a summary

regarding the number and type of claims disposed of during the period covered by the financial

statements.  The Trustee shall provide a copy of such report to the TAC and the FCR when such

report is filed.

(iii)     All materials required to be filed with the Bankruptcy Court by this

Section 2.2(c) shall be available for inspection by the public in accordance with procedures

established by the Bankruptcy Court.

JA00224

(d)     The Trustee shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year a budget and cash flow projections covering such fiscal year. The budget and cash flow projections shall include a determination of the Maximum Annual Payment if provided for in the TDP.  The Trustee shall provide a copy of the budget and cash flow projections to the TAC and the FCR.

(e)     The Trustee shall consult with the TAC and the FCR (i) on the general implementation and administration of the Asbestos Trust; (ii) on the general implementation and administration of the TDP; and (iii) on such other matters as may be required under this Trust Agreement, the Plan, and the TDP.

(f)     The Trustee shall be required to obtain the consent of the TAC and the FCR pursuant to the consent process set forth in Section 5.7(b) and 6.6(b) below, in addition to any other instances elsewhere enumerated, in order:

(i)     to determine, establish, or change the "Payment Percentage" described in Section 2.3 of the TDP as provided in Section 4.2 of the TDP;

(ii)     to establish and/or to change the "Claims Materials" to be provided to holders of Asbestos Claims under Section 6.1 of the TDP;

(iii)     to change the form of release to be provided pursuant to Section 7.5 of the TDP;

(vii)     to terminate the Asbestos Trust pursuant to Section 7.2 below;

(viii)     to settle the liability of any insurer under any insurance policy or legal action related thereto;

- 11 -

(ix)    to change the compensation of the members of the TAC, the FCR,

the Delaware Trustee or the Trustee, other than to reflect cost-of-living increases or to reflect

changes approved by the Bankruptcy Court as otherwise provided herein;

(x)    to take actions, outside the ordinary course of business, to

minimize any tax on the Asbestos Trust Assets; provided that no such action prevents the

Asbestos Trust from qualifying as a qualified settlement fund within the meaning of the QSF

Regulations or requires an election for the Asbestos Trust to be treated as a grantor trust for tax

purposes;

(xi)    to amend any provision of this Trust Agreement or the TDP in

accordance with the terms thereof;

(xii)    to acquire an interest in or to merge any claims resolution

organization formed by the Asbestos Trust with another claims resolution organization that is not

specifically created by this Trust Agreement or the TDP, or to contract with another claims

resolution organization or other entity that is not specifically created by this Trust Agreement or

the TDP, or permit any other party to join in any claims resolution organization that is formed by

the Asbestos Trust pursuant to the Trust Agreement or the TDP; provided that such merger,

acquisition, contract or joinder shall not (a) subject the Reorganized Debtors or any successors in

interest thereto, to any risk of having any Asbestos Claim asserted against it or them, or

(b) otherwise jeopardize the validity or enforceability of the Injunctions or any other injunction

or release issued or granted in connection with the Plan; and provided further that the terms of

such merger will require the surviving organization to make decisions about the allowability and

value of claims in accordance with Section 2.1 of the TDP, which require that such decisions be

Case 3:20-cv-00537-GCM    Document 1-2    Filed 09/28/20    Page 138 of 483
JA00226

based on the provisions of the TDP, or (c) cause the Asbestos Trust to fail to qualify as a "qualified settlement fund" under the QSF Regulations; or

(xiii)    if and to the extent required by Section 6.5 of the TDP, to disclose any information, documents, or other materials to preserve, litigate, resolve, or settle coverage, or to comply with an applicable obligation under an insurance policy or settlement agreement pursuant to Section 6.5 of the TDP.

(g)    The Trustee shall meet with the TAC and the FCR no less often than quarterly.  The Trustee shall meet in the interim with the TAC and the FCR when so requested by either.  Meetings may be held in person, by telephone conference call, or by a combination of the two.

(h)    The Trustee, upon notice from either the TAC or the FCR, if practicable in view of pending business, shall at the next meeting with the TAC or the FCR consider issues submitted by the TAC or the FCR.  The Trustee shall keep the TAC and the FCR reasonably informed regarding all aspects of the administration of the Asbestos Trust.

2.3    **Claims Administration**.  The Trustee shall promptly proceed to implement the TDP.

**SECTION III**

**ACCOUNTS, INVESTMENTS, AND PAYMENTS**

3.1    **Accounts**.

(a)    The Trustee may, from time to time, create such accounts and reserves within the Asbestos Trust estate as they may deem necessary, prudent, or useful in order to provide for the payment of expenses and payment of Asbestos Claims and may, with respect to

- 13 -

any such account or reserve, restrict the use of monies therein, and the earnings or accretions thereto.

(b)     The Trustee shall include a reasonably detailed description of the creation of any account or reserve in accordance with this Section 3.1 and, with respect to any such account, the transfers made to such account, the proceeds of or earnings on the assets held in each such account and the payments from each such account in the accounts to be filed with the Bankruptcy Court and provided to the TAC and the FCR pursuant to Section 2.2(c)(i) above.

**3.2     Investments**.  Investment of monies held in the Asbestos Trust shall be administered in the manner consistent with the standards set forth in the Uniform Prudent Investor Act, subject to the following limitations and provisions:

(a)     The Asbestos Trust may invest only in diversified equity portfolios whose benchmark is a broad equity market index such as, but not limited to, the S&P 500 Index, Russell 1000 Index, S&P ADR Index or MSCI EAFE Index.  The Asbestos Trust shall not acquire, directly or indirectly, equity in any entity (other than a Reorganized Debtor or any successor to a Reorganized Debtor) or business enterprise if, immediately following such acquisition, the Asbestos Trust would hold more than 5% of the equity in such entity or business enterprise.  The Asbestos Trust shall not hold, directly or indirectly, more than 5% of the equity in any entity (other than a Reorganized Debtor, or any successor to a Reorganized Debtor) or business enterprise.

(b)     The Asbestos Trust shall not acquire or hold any long-term debt securities unless (i) such securities are Asbestos Trust Assets under the Plan, (ii) such securities are rated "Baa" or higher by Moody's, "BBB" or higher by Standard & Poor's ("**S&P**"), or have been given an equivalent investment grade rating by another nationally recognized statistical rating

- 14 -

JA00228

agency, or (iii) have been issued or fully guaranteed as to principal and interest by the United

States of America or any agency or instrumentality thereof.  This restriction does not apply to

any pooled investment vehicles where pooled assets receive an investment grade rating (i.e.,

"BBB" rating or above) by a nationally recognized rating agency.

(c)     The Asbestos Trust shall not acquire or hold for longer than ninety (90)

days any commercial paper unless such commercial paper is rated "Prime-1" or higher by

Moody's or "A-1" or higher by S&P, or has been given an equivalent rating by another

nationally recognized statistical rating agency.

(d)     The Asbestos Trust shall not acquire any debt securities or other debt

instruments issued by any entity if, following such acquisition, the aggregate market value of all

such debt securities and/or other debt instruments issued by such entity held by the Asbestos

Trust would exceed 5% of the then current aggregate value of the Asbestos Trust's assets.  There

is no limitation on holding debt securities or other debt instruments issued or fully guaranteed as

to principal and interest by the United States of America or any agency or instrumentality

thereof.

(e)     The Asbestos Trust shall not acquire or hold any certificates of deposit in

an amount exceeding any federal insurance on such certificates of deposit unless all publicly

held, long-term debt securities, if any, of the financial institution issuing the certificate of deposit

and the holding company, if any, of which such financial institution is a subsidiary, meet the

standards set forth in Section 3.2(b) above.

(f)     The Asbestos Trust may acquire and hold any securities or instruments

issued by a Reorganized Debtor or any successor to a Reorganized Debtor or obtained as

- 15 -

JA00229

proceeds of litigation or otherwise to resolve disputes, without regard to the limitations set forth

in Subsections (a)-(e) above.

(g)    The Asbestos Trust shall not acquire or hold any repurchase obligations

unless, in the opinion of the Trustee, they are adequately collateralized.

(h)    The Asbestos Trust may allow its investment managers to acquire

prudently or hold derivative instruments, including, without limitation, options, futures and

swaps in the normal course of portfolio management.  Specifically, the Asbestos Trust may

acquire or hold derivatives to help manage or mitigate portfolio risk, including, without

limitation, interest rate risk and equity market risk.  Using derivative instruments to leverage a

portfolio to enhance returns (at a much greater risk to the portfolio) is prohibited.

(i)    The Asbestos Trust may lend securities on a short-term basis, subject to

adequate, normal and customary collateral arrangements.

(j)    Notwithstanding (a) above, the Asbestos Trust may acquire and hold an

equity interest in a claims resolution organization without limitation as to the size of the equity

interest acquired and held if prior to such acquisition, the Asbestos Trust complies with the

provisions of Section 2.2(f)(xii) hereof with respect to the acquisition.

### 3.3    <u>Source of Payments</u>.

(a)    All Asbestos Trust expenses and payments and all Asbestos Trust

liabilities with respect to Asbestos Claims shall be payable solely by the Trustee out of the

Asbestos Trust Assets.  Neither the Trustee, the Delaware Trustee, the TAC or FCR, or any of

the Additional Indemnitees, nor the Debtors, the Reorganized Debtors, or any other Protected

Party shall be liable for the payment of any Asbestos Trust expense or any other liability of the

Asbestos Trust, except to the extent provided in the Plan or Plan Documents.

- 16 -

(b)     The Trustee shall include a reasonably detailed description of any payments made in accordance with this Section 3.3 in the Annual Report.


## SECTION IV

### TRUSTEE; DELAWARE TRUSTEE

**4.1     Number.**  In addition to the Delaware Trustee appointed pursuant to Section 4.11, there shall initially be one (1) Trustee who shall be that person named on the signature page hereof; provided, however, that such number may be increased in the future if the Trustee, the TAC and the FCR agree to such an increase.  If the number of Trustees is increased, any newly created position will be filled by an individual selected by the Trustee, the TAC and the FCR jointly.

**4.2     Term of Service.**

(a)     The initial Trustee named pursuant to Section 4.1 above shall serve an initial term of three (3) years.  Thereafter each term of service shall be three (3) years. The initial Trustee shall serve from the Effective Date until the earliest of (i) the end of his or her term, (ii) his or her death, (iii) his or her mandatory retirement at the end of the year in which the Trustee reaches the age of 72 (unless, and for so long as, this mandatory retirement requirement is waived by the agreement of the TAC and the FCR), (iv) his or her resignation pursuant to Section 4.2(b) below, (v) his or her removal pursuant to Section 4.2(c) below, or (vi) the termination of the Asbestos Trust pursuant to Section 7.2 below.

- 17 -

(b)    The Trustee may resign at any time by written notice to the TAC and the FCR.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    The Trustee may be removed at the recommendation of the TAC and the FCR with the approval of the Bankruptcy Court, in the event that he or she becomes unable to discharge his or her duties hereunder due to accident or physical or mental deterioration, or for other good cause.  Good cause shall be deemed to include, without limitation, any substantial failure to comply with the general administration provisions of Section 2.2 above, a consistent pattern of neglect and failure to perform or participate in performing the duties of the Trustee hereunder, or repeated non-attendance at scheduled meetings.  Such removal shall require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

### 4.3    __Appointment of Successor Trustee.__

(a)    In the event of a vacancy in a Trustee position, whether by term expiration, death, retirement, resignation, or removal, the vacancy shall be filled by an individual nominated by the TAC and consented to by the FCR.  If the TAC and the FCR cannot agree on a successor Trustee, the Bankruptcy Court shall make the appointment.  Nothing in this Trust Agreement shall prevent the reappointment of an individual serving as a Trustee for an additional term or terms.

(b)    Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the successor Trustee without any further act.  No successor Trustee shall be

- 18 -

JA00232

liable personally for any act or omission of his or her predecessor Trustee.  No successor Trustee

shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(c)      Each successor Trustee shall serve until the earliest of (i) the expiration of

his or her term, (ii) his or her death, (iii) his or her mandatory retirement at the end of the year in

which the Trustee reaches the age of 72 (unless, and for so long as, this mandatory retirement

requirement is waived by the agreement of the TAC and the FCR), (iv) his or her resignation

pursuant to Section 4.2(b) above, (v) his or her removal pursuant to Section 4.2(c) above, or

(vi) the termination of the Asbestos Trust pursuant to Section 7.2 below.

4.4      **Liability of Trustee, Members of the TAC and the FCR.**  The Trustee, the

Members of the TAC and the FCR, and their respective Additional Indemnitees, shall not be

liable to the Asbestos Trust, to any individual holding an Asbestos Claim, or to any other person,

except for such individual's bad faith violation of the implied contractual covenant of good faith

and fair dealing within the meaning of Section 3806 of the Act.

4.5      **Compensation and Expenses of Trustee and Delaware Trustee.**

(a)      The Trustee shall receive a retainer from the Asbestos Trust for his or her

service as a Trustee in the amount of $50,000 per annum, paid annually.  Hourly time, as

described below, shall first be billed and applied to the annual retainer.  Hourly time in excess of

the annual retainer shall be paid by the Asbestos Trust.  For all time expended as Trustee,

including attending meetings, preparing for such meetings, and working on authorized special

projects, the Trustee shall receive the sum of $850 per hour.  All time shall be computed on a

decimal hour basis.  The Trustee shall record all hourly time to be charged to the Asbestos Trust

on a daily basis.  The hourly compensation payable to the Trustee hereunder shall be reviewed

every year by the Trustee and, after consultation with the members of the TAC and the FCR,

JA00233

appropriately adjusted by the Trustee for changes in the cost of living. The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement.

(b)     The Asbestos Trust will promptly reimburse the Trustee and the Delaware Trustee for all reasonable out-of-pocket costs and expenses incurred by the Trustee or the Delaware Trustee in connection with the performance of their duties hereunder.

(c)     The Asbestos Trust shall include a description of the amounts paid under this Section 4.5 in the Annual Report.

**4.6     <u>Indemnification</u>.**

(a)     The Asbestos Trust shall indemnify and defend the Trustee, the members of the TAC, the Delaware Trustee, and the FCR in the performance of their duties hereunder against any and all liabilities, expenses, claims, damages, or losses incurred by them in the performance of their duties hereunder or in connection with activities undertaken by them prior to the Effective Date in connection with the formation, establishment, or funding of the Asbestos Trust, unless such indemnified person has committed a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of Section 3806 of the Act. The Asbestos Trust may indemnify any of the Additional Indemnitees in the performance of their duties hereunder against any and all liabilities, expenses, claims, damages, or losses incurred by them in the performance of their duties hereunder or in connection with activities undertaken by them prior to the Effective Date in connection with the formation, establishment or funding of the Asbestos Trust, unless such indemnified person has committed a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of Section 3806 of the Act. Notwithstanding the foregoing, no individual shall be indemnified or

- 20 -

defended in any way for any liability, expense, claim, damage, or loss for which he or she is ultimately liable under Section 4.4 above.

(b)      Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trustee, a member of the TAC, the Delaware Trustee, the FCR or an Additional Indemnitee in connection with any action, suit, or proceeding, whether civil, administrative or arbitrative, from which they are indemnified by the Asbestos Trust pursuant to Section 4.6(a) above, shall be paid by the Asbestos Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trustee, the member of the TAC, the Delaware Trustee, the FCR or the Additional Indemnitee, to repay such amount in the event that it shall be determined ultimately by final order that that the Trustee, the member of the TAC, the FCR or the Additional Indemnitee is not entitled to be indemnified by the Asbestos Trust.

(c)      The Trustee must purchase and maintain reasonable amounts and types of insurance on behalf of an individual who is or was the Trustee, a member of the TAC, the FCR or an Additional Indemnitee, including against liability asserted against or incurred by such individual in that capacity or arising from his or her status as the Trustee, a TAC member, the FCR, or an Additional Indemnitee.

4.7      **Lien.**  The Trustee, members of the TAC, the FCR and the Additional Indemnitees shall have a first priority lien upon the Asbestos Trust Assets to secure the payment of any amounts due and payable to them pursuant to Section 4.6 above or any undisputed compensation.

4.8      **Trustee's Employment of Experts; Delaware Trustee's Employment of Counsel.**

(a)      The Trustee may, but shall not be required to, retain and/or consult with counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors

- 21 -

and such other parties deemed by the Trustee to be qualified as experts on the matters submitted

to them (the "**Trust Professionals**"), and in the absence of gross negligence, the written opinion

of or information provided by any such party deemed by the Trustee to be an expert on the

particular matter submitted to such party shall be full and complete authorization and protection

in respect of any action taken or not taken by the Trustee hereunder in good faith and in

accordance with the written opinion of or information provided by any such party.

(b)      The Delaware Trustee shall be permitted to retain counsel only in such

circumstances as required in the exercise of its obligations hereunder and compliance with the

advice of such counsel shall be full and complete authorization and protection for actions taken

or not taken by the Delaware Trustee in good faith in compliance with such advice.

4.9      **Trustee's Independence.**  The Trustee shall not, during the term of his or her

service, hold a financial interest in, act as attorney or agent for, or serve as any other professional

for a Reorganized Debtor.  The Trustee shall not act as an attorney for any person who holds an

asbestos claim.  For the avoidance of doubt, this Section shall not be applicable to the Delaware

Trustee.

4.10      **Bond.**  The Trustee and the Delaware Trustee shall not be required to post any

bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

4.11      **Delaware Trustee.**

(a)      There shall at all times be a Delaware Trustee to serve in accordance with

the requirements of the Act.  The Delaware Trustee shall either be (i) a natural person who is at

least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its

principal place of business in the State of Delaware in accordance with Section 3807 of the Act

or otherwise meets the requirements of applicable Delaware law and shall act through one or

- 22 -

JA00236

more persons authorized to bind such entity.  If at any time the Delaware Trustee shall cease to

be eligible in accordance with the provisions of this Section 4.11, it shall resign immediately in

the manner and with the effect hereinafter specified in Section 4.11(c) below.  For the avoidance

of doubt, the Delaware Trustee will only have such rights and obligations as expressly provided

by reference to the Delaware Trustee hereunder.

       (b)    The Delaware Trustee shall not be entitled to exercise any powers, nor

shall the Delaware Trustee have any of the duties and responsibilities, of the Trustee set forth

herein.  The Delaware Trustee shall be one of the trustees of the Asbestos Trust for the sole and

limited purpose of fulfilling the requirements of Section 3807 of the Act and for taking such

actions as are required to be taken by a Delaware Trustee under the Act.  The duties (including

fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to (i)

accepting legal process served on the Asbestos Trust in the State of Delaware and (ii) the

execution of any certificates required to be filed with the Secretary of State of the State of

Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act (acting

solely at the written direction of the Trustee) and there shall be no other duties (including

fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee.

To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary

duties) and liabilities relating thereto to the Asbestos Trust, the other parties hereto or any

beneficiary of the Asbestos Trust, it is hereby understood and agreed by the other parties hereto

that such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee

expressly set forth in this Trust Agreement.

       (c)    The Delaware Trustee shall serve until such time as the Trustee removes

the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is

- 23 -

appointed by the Trustee in accordance with the terms of Section 4.11(d) below. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustee; provided, that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustee in accordance with Section 4.11(d) below. If the Trustee does not act within such 60-day period, the Delaware Trustee may apply to the Court of Chancery of the State of Delaware for the appointment of a successor Delaware Trustee.

(d)   Upon the resignation or removal of the Delaware Trustee, the Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee and any undisputed fees and expenses due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of its duties and obligations under this Trust Agreement.

**4.12**   **Medicare Reporting Obligations**.

(a)   The Asbestos Trust shall register as a Responsible Reporting Entity ("**RRE**") under the reporting provisions of Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (Pub. L. 110-173) ("**MMSEA**") in order to fulfill the reporting requirements applicable to the funders of the Asbestos Trust.

- 24 -

(b)     The Asbestos Trust, acting as the RRE and reporting agent for its funders, shall, at its sole expense, timely submit all reports that are required under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated by the Asbestos Trust or with respect to contributions to the Asbestos Trust.  The Asbestos Trust, in its role as RRE and reporting agent, shall follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, "**CMS**") to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

(c)     The Trustee shall obtain prior to remittance of funds to claimants' counsel or to the claimant, if pro se, in respect of any Asbestos Claim a certification from the claimant to be paid that said claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Asbestos Claim.

## SECTION V

## TRUST ADVISORY COMMITTEE

**5.1**     **Members.**  The TAC shall consist of eleven (11) members, who shall initially be the persons named on the signature page hereof.

**5.2**     **Duties.**  The members of the TAC shall serve in a fiduciary capacity representing only all holders of present Asbestos Claims.  The TAC shall have no fiduciary obligations or duties to any party other than the holders of present Asbestos Claims.  The Trustee must consult with the TAC on matters identified in Section 2.2(e) above and in other provisions herein, and

- 25 -

 JA00239

must obtain the consent of the TAC on matters identified in Section 2.2(f) above.  Where

provided in the TDP, certain other actions by the Trustee are also subject to the consent of the

TAC.  Except for the duties and obligations expressed in this Trust Agreement and the

documents referenced herein (including the TDP), there shall be no other duties (including

fiduciary duties) or obligations, express or implied, at law or in equity, of the TAC.  To the

extent that, at law or in equity, the TAC has duties (including fiduciary duties) and liabilities

relating thereto to the Asbestos Trust, the other parties hereto or any beneficiary of the Asbestos

Trust, it is hereby understood and agreed by the other parties hereto that such duties and

liabilities are replaced by the duties and liabilities of the TAC expressly set forth in this Trust

Agreement and the documents referenced herein (including the TDP).

> **5.3** **Term of Office.**

(a)     The initial members of the TAC appointed in accordance with Section 5.1

above shall serve the staggered three-, four-, or five-year terms shown on the signature pages

hereof.  Thereafter, each term of office shall be five (5) years.  Each member of the TAC shall

serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 5.3(b)

below, (iii) his or her removal pursuant to Section 5.3(c) below, (iv) the end of his or her term as

provided above, or (v) the termination of the Asbestos Trust pursuant to Section 7.2 below.

(b)     A member of the TAC may resign at any time by written notice to the

other members of the TAC, the Trustee and the FCR.  Such notice shall specify a date when such

resignation shall take effect, which shall not be less than ninety (90) days after the date such

notice is given, where practicable.

(c)     A member of the TAC may be removed in the event that he or she

becomes unable to discharge his or her duties hereunder due to accident, physical deterioration,

- 26 -

mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, such as repeated non-attendance at scheduled meetings, or for other good cause.  Such removal shall be made at the recommendation of the remaining members of the TAC with the approval of the Bankruptcy Court.

5.4    <u>**Appointment of Successor.**</u>

(a)      If, prior to the termination of service of a member of the TAC other than

as a result of removal, he or she has designated in writing an individual to succeed him or her as

a member of the TAC, such individual shall be his or her successor.  If such member of the TAC

did not designate an individual to succeed him or her prior to the termination of his or her service

as contemplated above, such member's law firm may designate his or her successor.  If (i) a

member of the TAC did not designate an individual to succeed him or her prior to the

termination of his or her service and such member's law firm does not designate his or her

successor as contemplated above or (ii) he or she is removed pursuant to Section 5.3(c) above,

his or her successor shall be appointed by a majority of the remaining members of the TAC or, if

such members cannot agree on a successor, the Bankruptcy Court.  Nothing in this Trust

Agreement shall prevent the reappointment of an individual serving as a member of the TAC for

an additional term or terms, and there shall be no limit on the number of terms that a TAC

member may serve.

(b)      Each successor TAC member shall serve until the earlier of (i) the end of

the full term of five (5) years for which he or she was appointed if his or her immediate

predecessor member of the TAC completed his or her term, (ii) the end of the term of the

member of the TAC whom he or she replaced if his or her predecessor member did not complete

such term, (iii) his or her death, (iv) his or her resignation pursuant to Section 5.3(b) above,

(v**)** his or her removal pursuant to Section 5.3(c) above, or (vi**)** the termination of the Asbestos

Trust pursuant to Section 7.2 below.

(c)      No successor TAC member shall be liable personally for any act or

omission of his or her predecessor TAC member.  No successor TAC member shall have any

- 28 -

JPA00242

duty to investigate the acts or omissions of his or her predecessor TAC member.  No TAC member shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**5.5     TAC's Employment of Professionals**.

(a)     The TAC may but is not required to retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, and financial and investment advisors, and such other parties deemed by the TAC to be qualified as experts on matters submitted to the TAC (the "**TAC Professionals**").  The TAC and the TAC Professionals shall at all times have complete access to the Asbestos Trust's officers, employees and agents, as well as to the Trust Professionals, and shall also have complete access to all information generated by them or otherwise available to the Asbestos Trust or the Trustee provided that any information provided by the Trust Professionals shall not constitute a waiver of any applicable privilege.  In the absence of bad faith, the written opinion of or information provided by any TAC Professional or Trust Professional deemed by the TAC to be qualified as an expert on the particular matter submitted to the TAC shall be full and complete authorization and protection in support of any action taken or not taken by the TAC in good faith and in accordance with the written opinion of or information provided by the TAC Professional or Trust Professional.

(b)     The Asbestos Trust shall promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of legal counsel pursuant to this provision in connection with the TAC's performance of its duties hereunder.  The Asbestos Trust shall also promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of any other TAC Professional pursuant to this provision in connection with the TAC's performance of its duties

- 29 -

hereunder; *provided, however*, that (i) the TAC has first submitted to the Asbestos Trust a

written request for such reimbursement setting forth (A) the reasons why the TAC desires to

employ such TAC Professional, and (B) the basis upon which the TAC seeks advice independent

of the Trust Professionals to meet the need of the TAC for such expertise or advice, and (ii) the

Asbestos Trust has approved the TAC's request for reimbursement in writing, which approval

must not be unreasonably withheld, delayed, or denied.  If the Asbestos Trust agrees to pay for

the TAC Professional, such reimbursement shall be treated as an Asbestos Trust expense.  If the

Asbestos Trust declines to pay for the TAC Professional, it must set forth its reasons in writing.

If the TAC still desires to employ the TAC Professional at the Asbestos Trust's expense, the

TAC and the Trustee shall resolve their dispute pursuant to Section 7.13 below.

   (c) Notwithstanding Section 3333 of Title 12 of the Delaware Code, in the event

that the TAC retains counsel in connection with any matter whether or not related to any claim

that has been or might be asserted against the TAC and irrespective of whether the Asbestos

Trust  pays such counsel's fees and related expenses, any communications with such counsel

shall be deemed to be within the attorney-client privilege.

  **5.6**  <u>**Compensation and Expenses of the TAC.**</u> The members of the TAC shall not

receive compensation from the Asbestos Trust for their services as TAC members.  However, the

members of the TAC shall be reimbursed promptly for all reasonable out-of-pocket costs and

expenses incurred in connection with the performance of their duties hereunder. Such

reimbursement shall be deemed an Asbestos Trust expense.  The Asbestos Trust shall include a

description of the amounts paid under this Section 5.6 in the Annual Report to be filed with the

Bankruptcy Court and provided to the FCR and the TAC pursuant to Section 2.2(c)(i).

**5.7**     **Procedures for Consultation with and Obtaining the Consent of the TAC**.

    (a)     Consultation Process.

        (i)     In the event the Trustee is required to consult with the TAC pursuant to Section 2.2(e) above, the TDP, the Plan, or on other matters as provided herein, the Trustee shall provide the TAC with written advance notice of the matter under consideration, and with all relevant information concerning the matter as is reasonably practicable under the circumstances.  The Trustee shall also provide the TAC with such reasonable access to the Trust Professionals and other experts retained by the Asbestos Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such matter, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustee.

        (ii)     In determining when to take definitive action on any matter subject to the consultation procedures set forth in this Section 5.7(a), the Trustee shall take into consideration the time required for the TAC, if its members so wish, to engage and consult with its own independent counsel or advisors as to such matter.  In any event, the Trustee shall not take definitive action on any such matter which is subject to the consultation procedures set forth in this Section 5.7(a) until at least thirty (30) days after providing the TAC with the initial written notice that such matter is under consideration by the Trustee, unless such time period is waived by the TAC.

    (b)     Consent Process.

        (i)     In the event the Trustee is required to obtain the consent of the TAC pursuant to Section 2.2(f) above, the Plan, the TDP, or otherwise, the Trustee shall provide the TAC with a written notice stating that their consent is being sought pursuant to that

JA00245

provision, describing in detail the nature and scope of the action the Trustee proposes to take, and explaining in detail the reasons why the Trustee desires to take such action.  The Trustee shall provide the TAC as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances.  The Trustee shall also provide the TAC with such reasonable access to the Trust Professionals and other experts retained by the Asbestos Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such action, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustee.

(ii)     The TAC must consider in good faith and in a timely fashion any request for its consent by the Trustee, and must in any event advise the Trustee in writing of its consent or its objection to the proposed action within thirty (30) days of receiving the original request for consent from the Trustee, or within such additional time as the Trustee and the TAC may agree.  The TAC may not withhold its consent unreasonably.  If the TAC decides to withhold its consent, it must explain in detail its objections to the proposed action.  If the TAC does not advise the Trustee in writing of its consent or its objections to the action within thirty (30) days of receiving notice regarding such request (or the additional time period agreed to by the Trustee and the TAC), the TAC's consent to the proposed actions shall be deemed to have been affirmatively granted.

(iii)     If, after following the procedures specified in this Section 5.7(b), the TAC continues to object to the proposed action and to withhold its consent to the proposed action, the Trustee and the TAC shall resolve their dispute pursuant to Section 7.13.  However, the burden of proof with respect to the validity of the TAC's objection and withholding of its consent shall be on the TAC.

- 32 -

## SECTION VI

## THE FCR

**6.1**    **Duties**.   The initial FCR shall be the individual identified on the signature pages hereto.  He or she shall serve in a fiduciary capacity, representing only the interests of the holders of future Asbestos Claims for the purpose of protecting the rights of such persons.  The FCR shall have no fiduciary obligations or duties to any party other than holders of future Asbestos Claims.  The Trustee must consult with the FCR on matters identified in Section 2.2(e) above and on certain other matters provided herein, and must obtain the consent of the FCR on matters identified in Section 2.2(f) above.  Where provided in the TDP, certain other actions by the Trustee are also subject to the consent of the FCR.  Except for the duties and obligations expressed in this Trust Agreement and the documents referenced herein (including the TDP), there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the FCR.    To the extent that, at law or in equity, the FCR has duties (including fiduciary duties) and liabilities relating thereto to the Asbestos Trust, the other parties hereto or any beneficiary of the Asbestos Trust, it is hereby understood and agreed by the other parties hereto that such duties and liabilities are replaced by the duties and liabilities of the FCR expressly set forth in this Trust Agreement and the documents referenced herein (including the TDP).

**6.2**    **Term of Office**.

(a)    The FCR shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 6.2(b) below, (iii) his or her removal pursuant to Section 6.2(c) below, or (iv) the termination of the Asbestos Trust pursuant to Section 7.2 below.

- 33 -

JA00247

(b)      The FCR may resign at any time by written notice to the Trustee.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)      The FCR may be removed by the Bankruptcy Court in the event he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties hereunder, such as repeated non-attendance at scheduled meetings, or for other good cause.

(d)      No successor FCR shall be liable personally for any act or omission of his or her predecessor.  No successor FCR shall have any duty to investigate the acts or omissions of his or her predecessor.  No FCR shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**6.3**      **Appointment of Successor.**  A vacancy caused by resignation or death shall be filled with an individual nominated prior to the effective date of the resignation or the death by the resigning or deceased FCR, and a vacancy caused by removal of the FCR shall be filled with an individual selected by the Trustee in consultation with the TAC.  In the event a nominee has not been pre-selected, the successor shall be chosen by the Trustee in consultation with the TAC.

**6.4**      **FCR's Employment of Professionals.**

(a)      The FCR may, but is not required to, retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, and financial and investment advisors, and such other parties deemed by the FCR to be qualified as experts on matters submitted to the FCR (the "**FCR Professionals**").  The FCR and the FCR Professionals shall at all times have complete access to the Asbestos Trust's officers, employees and agents, as well as to the Trust

- 34 -

JA00248

Professionals, and shall also have complete access to all information generated by them or otherwise available to the Asbestos Trust or the Trustee provided that any information provided by the Trust Professionals shall not constitute a waiver of any applicable privilege.  In the absence of bad faith, the written opinion of or information provided by any FCR Professional or Trust Professional deemed by the FCR to be qualified as an expert on the particular matter submitted to the FCR shall be full and complete authorization and protection in support of any action taken, or not taken, by the FCR in good faith and in accordance with the written opinion of or information provided by the FCR Professional or Trust Professional.

(b)     The Asbestos Trust shall promptly reimburse, or pay directly if so instructed, the FCR for all reasonable fees and costs associated with the FCR's employment of legal counsel pursuant to this provision in connection with the FCR's performance of his or her duties hereunder.  The Asbestos Trust shall also promptly reimburse, or pay directly if so instructed, the FCR for all reasonable fees and costs associated with the FCR's employment of any other FCR Professionals pursuant to this provision in connection with the FCR's performance of his or her duties hereunder; *provided, however*, that (i) the FCR has first submitted to the Asbestos Trust a written request for such reimbursement setting forth (A) the reasons why the FCR desires to employ the FCR Professional, and (B) the basis upon which the FCR seeks advice independent of the Trust Professionals to meet the need of the FCR for such expertise or advice, and (ii) the Asbestos Trust has approved the FCR's request for reimbursement in writing, which approval must not be unreasonably withheld, delayed, or denied.  If the Asbestos Trust agrees to pay for the FCR Professional, such reimbursement shall be treated as an Asbestos Trust expense.  If the Asbestos Trust declines to pay for the FCR Professional, it must set forth its reasons in writing.  If the FCR still desires to employ the FCR

- 35 -

JA00249

Professional at the Asbestos Trust's expense, the FCR and the Trustee shall resolve their dispute

pursuant to Section 7.13 below.

(c)     Notwithstanding Section 3333 of Title 12 of the Delaware Code, in the

event that the FCR retains counsel in connection with any matter whether or not related to any

claim that has been or might be asserted against the FCR and irrespective of whether the

Asbestos Trust  pays such counsel's fees and related expenses, any communications with such

counsel shall be deemed to be within the attorney-client privilege.

**6.5**     **Compensation and Expenses of the FCR.**  The FCR shall receive compensation

from the Asbestos Trust in the form of payment at the FCR's normal hourly rate for services

performed.  The Asbestos Trust will promptly reimburse the FCR for all reasonable out-of-

pocket costs and expenses incurred by the FCR in connection with the performance of his or her

duties hereunder.  Such reimbursement or direct payment shall be deemed an Asbestos Trust

expense.  The Asbestos Trust shall include a description of the amounts paid under this Section

6.5 in the Annual Report to be filed with the Bankruptcy Court and provided to the FCR and the

TAC pursuant to Section 2.2(c)(i).

**6.6**     **Procedures for Consultation with and Obtaining the Consent of the FCR.**

(a)     Consultation Process.

(i)     In the event the Trustee is required to consult with the FCR

pursuant to Section 2.2(e) above, the TDP, the Plan, or on any other matters specified herein, the

Trustee shall provide the FCR with written advance notice of the matter under consideration, and

with all relevant information concerning the matter as is reasonably practicable under the

circumstances.  The Trustee shall also provide the FCR with such reasonable access to the Trust

Professionals and other experts retained by the Asbestos Trust and its staff (if any) as the FCR

- 36 -

may reasonably request during the time that the Trustee is considering such matter, and shall also

provide the FCR the opportunity, at reasonable times and for reasonable periods of time, to

discuss and comment on such matter with the Trustee.

(ii)     In determining when to take definitive action on any matter subject

to the consultation process set forth in this Section 6.6(a), the Trustee shall take into

consideration the time required for the FCR, if he or she so wishes, to engage and consult with

his or her own counsel or advisors as to such matter.  In any event, the Trustee shall not take

definitive action on any such matter which is subject to the consultation process set forth in this

Section 6.6(a) until at least thirty (30) days after providing the FCR with the initial written notice

that such matter is under consideration by the Trustee, unless such period is waived by the FCR.

(b)     Consent Process.

(i)     In the event the Trustee is required to obtain the consent of the

FCR pursuant to Section 2.2(f) above, the Plan, the TDP, or otherwise, the Trustee shall provide

the FCR with a written notice stating that his or her consent is being sought pursuant to that

provision, describing in detail the nature and scope of the action the Trustee proposes to take,

and explaining in detail the reasons why the Trustee desires to take such action.  The Trustee

shall provide the FCR as much relevant additional information concerning the proposed action as

is reasonably practicable under the circumstances.  The Trustee shall also provide the FCR with

such reasonable access to the Trust Professionals and other experts retained by the Asbestos

Trust and its staff (if any) as the FCR may reasonably request during the time that the Trustee is

considering such action, and shall also provide the FCR the opportunity, at reasonable times and

for reasonable periods of time, to discuss and comment on such action with the Trustee.

- 37 -

(ii)    The FCR must consider in good faith and in a timely fashion any request for his or her consent by the Trustee, and must in any event advise the Trustee in writing of his or her consent or objection to the proposed action within thirty (30) days of receiving the original request for consent from the Trustee, or within such additional time as the Trustee and FCR may agree.  The FCR may not withhold his or her consent unreasonably.  If the FCR decides to withhold consent, he or she must explain in detail his or her objections to the proposed action.  If the FCR does not advise the Trustee in writing of his or her consent or objections to the proposed action within thirty (30) days of receiving the notice from the Trustee regarding such consent (or the additional time period agreed to by the Trustee and the FCR), the FCR's consent shall be deemed to have been affirmatively granted.

(iii)    If, after following the procedures specified in this Section 6.6(b), the FCR continues to object to the proposed action and to withhold its consent to the proposed action, the Trustee and the FCR shall resolve their dispute pursuant to Section 7.13.  However, the burden of proof with respect to the validity of the FCR's objection and withholding of his or her consent shall be on the FCR.

**SECTION VII**

**GENERAL PROVISIONS**

**7.1    Irrevocability.**  To the fullest extent permitted by applicable law, the Asbestos Trust is irrevocable.

- 38 -

**7.2    Term; Termination.**

(a)    The term for which the Asbestos Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of Section 7.2 (b) – (d) below.

(b)    The Asbestos Trust shall automatically dissolve on the date (the "**Dissolution Date**") ninety (90) days after the first to occur of the following events:

(i)    the date on which the Trustee decides, with the consent of the TAC and the FCR, to dissolve the Asbestos Trust because (A) they deem it unlikely that new Asbestos Claims will be filed against the Asbestos Trust, (B) all Asbestos Claims duly filed with the Asbestos Trust have been liquidated and paid to the extent provided in this Trust Agreement and the TDP or have been disallowed by a final non-appealable order, to the extent possible based upon the funds available through the Plan, and (C) twelve (12) consecutive months have elapsed during which no new Asbestos Claim has been filed with the Asbestos Trust; or

(ii)    if the Trustee, with the consent of the TAC and the FCR, has procured and has in place irrevocable insurance policies and has established claims handling agreements and other necessary arrangements with suitable third parties adequate to discharge all expected remaining obligations and expenses of the Asbestos Trust in a manner consistent with this Trust Agreement and the TDP, the date on which the Bankruptcy Court enters an order approving such insurance and other arrangements and such order becomes a final order; or

(iii)    subject to the periods provided herein, the Asbestos Trust shall be perpetual to the fullest extent permitted by Delaware law, provided, however to the extent that any property of the Asbestos Trust is subject to a rule against perpetuities, then the Asbestos Trust shall terminate as to such property on the date on which twenty-one (21) years less ninety-

- 39 -

one (91) days pass after the death of the last survivor of all of the descendants of the late

Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date hereof, or

such other permissible last day of the applicable perpetuities period.

(c)     On the Dissolution Date or as soon as reasonably practicable, after the

wind-up of the Asbestos Trust's affairs by the Trustee and payment of all the Asbestos Trust's

liabilities have been provided for as required by applicable law including Section 3808 of the

Act, all monies remaining in the Asbestos Trust estate shall be given to such organization(s)

exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, which

tax-exempt organization(s) shall be selected by the Trustee using his or her reasonable

discretion; *provided, however*, that (i) if practicable, the activities of the selected tax-exempt

organization(s) shall be related to the treatment of, research on, or the relief of suffering of

individuals suffering from asbestos-related disorders, and (ii) the tax-exempt organization(s)

shall not bear any relationship to a Reorganized Debtor within the meaning of section 468B(d)(3)

of the Internal Revenue Code.  Notwithstanding any contrary provision of the Plan and related

documents, this Section 7.2(c) cannot be modified or amended.

(d)     Following the dissolution and distribution of the assets of the Asbestos

Trust, the Asbestos Trust shall terminate and the Trustee and the Delaware Trustee (acting solely

at the written direction of the Trustee) shall execute and cause a Certificate of Cancellation of the

Certificate of Trust of the Asbestos Trust to be filed in accordance with the Act.

Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the

Asbestos Trust as a separate legal entity shall continue until the filing of such Certificate of

Cancellation.

**7.3**    **Amendments.**

(a)    Amendments in General.  The Trustee, after consultation with the TAC and the FCR, and subject to the unanimous consent of the TAC and the FCR, may modify or amend this Trust Agreement.  The Trustee, after consultation with the TAC and the FCR, and subject to the consent of the TAC and the FCR, may modify or amend the TDP; *provided, however*, that no amendment to the TDP shall be inconsistent with the provisions limiting amendments to that document provided therein.  Any modification or amendment made pursuant to this Section must be done in writing.  Notwithstanding anything contained in this Trust Agreement or the TDP to the contrary, neither this Trust Agreement, the TDP, nor any document annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair, or modify (i) the applicability of section 524(g) of the Bankruptcy Code to the Plan and the Confirmation Order, (ii) the efficacy or enforceability of the Injunctions, or (iii) the Asbestos Trust's qualified settlement fund status under the QSF Regulations.  Any amendment affecting the rights, duties, immunities or liabilities of the Delaware Trustee shall require the Delaware Trustee's written consent.

(b)    Amendments Related to a Settlement with Truck.  In the event the Asbestos Trust, with the consent of the TAC and the FCR, reaches a settlement with Truck on or after the Effective Date that resolves Truck's asbestos insurance coverage, such settlement shall require the approval of the Bankruptcy Court.  To the extent such settlement requires a revision of the TDP, such revision shall likewise require the consent of the TAC and the FCR, and the approval of the Bankruptcy Court.

**7.4**    **Meetings.**  The Delaware Trustee shall not be required nor permitted to attend meetings relating to the Asbestos Trust.

7.5    **Severability.**  Should any provision in this Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Trust Agreement.

7.6    **Notices.**  Notices to persons asserting claims shall be given by first class mail, postage prepaid, at the address of such person, or, where applicable, such person's legal representative, in each case as provided on such person's claim form submitted to the Asbestos Trust with respect to his or her Asbestos Claim.

(a)    Any notices or other communications required or permitted hereunder to the following parties shall be in writing and delivered at the addresses designated below, or sent by e-mail or facsimile pursuant to the instructions listed below, or mailed by registered or certified mail, return receipt requested, postage prepaid, addressed as follows, or to such other address or addresses as may hereafter be furnished in writing to each of the other parties listed below in compliance with the terms hereof.

To the Asbestos Trust through the Trustee:

[•]

With a copy to:

[•]

To the Delaware Trustee:

[•]

To the TAC:

[•]

To the FCR:

Lawrence Fitzpatrick
100 American Metro Blvd., Suite 108

- 42 -

Hamilton, NJ 08619
Email: [•]
Phone: (609) 219-8862

With a copy to:

Edwin J. Harron, Esq.
Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, DE 19801
Email: eharron@ycst.com
Phone: (302) 571-6703

To the Reorganized Debtors:

 [•]

With a copy to:

[•]

(b)     All such notices and communications if mailed shall be effective when physically

delivered at the designated addresses or, if electronically transmitted, when the communication is

received at the designated addresses and confirmed by the recipient by return transmission.

7.7     **Successors and Assigns**.  The provisions of this Trust Agreement shall be

binding upon and inure to the benefit of the holders of Asbestos Claims, the Debtors, the

Asbestos Trust, the Trustee, and the Reorganized Debtors, and their respective successors and

assigns, except that neither the Debtors, the Asbestos Trust, the Trustee, nor the Reorganized

Debtors may assign or otherwise transfer any of its, or their, rights or obligations, if any, under

this Trust Agreement except, in the case of the Asbestos Trust and the Trustee, as contemplated

by Section 2.1 above.

7.8     **Limitation on Claim Interests for Securities Laws Purposes**.  Asbestos Claims,

and any interests therein (a) shall not be assigned, conveyed, hypothecated, pledged, or otherwise

transferred, voluntarily or involuntarily, directly or indirectly, except by will or under the laws of

- 43 -

descent and distribution; (b) shall not be evidenced by a certificate or other instrument; (c) shall

not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest;

provided, however, that clause (a) of this Section 7.8 shall not apply to the holder of a claim that

is subrogated to an Asbestos Claim as a result of its satisfaction of such Asbestos Claim.

7.9 **Entire Agreement; No Waiver.** The entire agreement of the parties relating to

the subject matter of this Trust Agreement is contained herein and in the documents referred to

herein (including, without limitation, the Plan and the TDP), and this Trust Agreement and such

documents supersede any prior oral or written agreements concerning the subject matter hereof.

No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate

as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege

hereunder preclude any further exercise thereof or of any other right, power or privilege. The

rights and remedies herein provided are cumulative and are not exclusive of rights under law or

in equity.

7.10 **Headings.** The headings used in this Trust Agreement are inserted for

convenience only and do not constitute a portion of this Trust Agreement, nor in any manner

affect the construction of the provisions of this Trust Agreement.

7.11 **Governing Law.** The validity and construction of this Trust Agreement and all

amendments hereto and thereto shall be governed by laws of the State of Delaware, and the

rights of all parties hereto and the effect of every provision hereof shall be subject to and

construed according to the laws of the State of Delaware without regard to the conflicts of law

provisions thereof that would purport to apply the law of any other jurisdiction; provided,

however, that the parties hereto intend that the provisions hereof shall control and there shall not

be applicable to the Asbestos Trust, the Trustee, the Delaware Trustee, the TAC, the FCR, or this

- 44 -

Trust Agreement, any provision of the laws (statutory or common) of the State of Delaware

pertaining to trusts that relate to or regulate in a manner inconsistent with the terms hereof: (a)

the filing with any court or governmental body or agency of trustee accounts or schedules of

trustee fees and charges; (b) affirmative requirements to post bonds for trustees, officers, agents,

or employees of a trust; (c) the necessity for obtaining court or other governmental approval

concerning the acquisition, holding or disposition of real or personal property; (d) fees or other

sums payable to trustees, officers, agents or employees of a trust; (e) the allocation of receipts

and expenditures to income or principal; (f) restrictions or limitations on the permissible nature,

amount or concentration of trust investments or requirements relating to the titling, storage or

other manner of holding of trust assets; (g) the existence of rights or interests (beneficial or

otherwise) in trust assets; (h) the ability of beneficial owners or other persons to terminate or

dissolve a trust; or (i) the establishment of fiduciary or other standards or responsibilities or

limitations on the acts or powers of trustees or beneficial owners that are inconsistent with the

limitations on liability or authorities and powers of the Trustee, the Delaware Trustee, the TAC,

or the FCR set forth or referenced in this Trust Agreement.  Section 3540 of the Act shall not

apply to the Asbestos Trust.

      **7.12**   **Settlors' Representative and Cooperation.**  The Reorganized Debtors are

hereby irrevocably designated as the Settlors, and they are hereby authorized to take any action

required of the Settlors by the Trustee in connection with the Trust Agreement.  The Reorganized

Debtors agree to cooperate in implementing the goals and objectives of this Trust Agreement.

      **7.13**   **Dispute Resolution.**  Any disputes that arise under this Trust Agreement or under

the TDP among the parties hereto shall be resolved by submission of the matter to an alternative

dispute resolution ("**ADR**") process mutually agreeable to the parties involved.  Should any party

- 45 -

JPA00259

to the ADR process be dissatisfied with the decision of the arbitrator(s), that party may apply to the Bankruptcy Court for a judicial determination of the matter.  Any review conducted by the Bankruptcy Court shall be *de novo*.  In any case, if the dispute arose pursuant to the consent provision set forth in Section 5.7(b) (in the case of the TAC) or Section 6.6(b) (in the case of the FCR), the burden of proof shall be on the party or parties who withheld consent to show that the objection was valid.  Should the dispute not be resolved by the ADR process within thirty (30) days after submission, the parties are relieved of the requirement to pursue ADR prior to application to the Bankruptcy Court.  If the Trustee determines that the matter in dispute is exigent and cannot await the completion of the ADR process, the Trustee shall have the discretion to elect out of the ADR process altogether or at any stage of the process and seek resolution of the dispute in the Bankruptcy Court.

       **7.14**    **Enforcement and Administration**.  The provisions of this Trust Agreement and the TDP attached hereto shall be enforced by the Bankruptcy Court pursuant to the Plan.  The parties hereby further acknowledge and agree that the Bankruptcy Court shall have exclusive jurisdiction over the settlement of the accounts of the Trustee and over any disputes hereunder not resolved by alternative dispute resolution in accordance with Section 7.13 above.

       **7.15**    **Effectiveness**.  This Trust Agreement shall not become effective until it has been executed and delivered by all the parties hereto.

       **7.16**    **Counterpart Signatures**.  This Trust Agreement may be executed in any number of counterparts and by different Parties on separate counterparts (including by facsimile or portable document format (pdf)), and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Trust Agreement this [•] day of [•], 2019.

**SETTLORS:**

**KAISER GYPSUM COMPANY, INC.**
**HANSON PERMANENTE CEMENT, INC.**

**ASBESTOS CLAIMANTS COMMITTEE**

By:_____

By:_____

Title:

**TRUSTEE**

**DELAWARE TRUSTEE**

[•]

_____
Name:  David F. Levi

By:_____
    Name:

    Title:

**FCR**

**TRUST ADVISORY COMMITTEE**

_____
Name:  Lawrence Fitzpatrick

_____
Name:  Joseph W. Belluck
Expiration Date of Initial Term:  [•] Anniversary of the date of this Trust Agreement

_____
Name:  Matthew P. Bergman

01:23725239.2

[Signature Pages to Trust Agreement]

JA00261

Expiration Date of Initial Term:  [•] Anniversary of the
date of this Trust Agreement

_____

Name:  Alan R. Brayton
Expiration Date of Initial Term:  [•] Anniversary of the
date of this Trust Agreement

_____

Name:  Perry J. Browder
Expiration Date of Initial Term:  [•] Anniversary of the
date of this Trust Agreement

_____

Name:  John D. Cooney
Expiration Date of Initial Term:  [•] Anniversary of the
date of this Trust Agreement

_____

Name:  James L. Ferraro
Expiration Date of Initial Term:  [•] Anniversary of the
date of this Trust Agreement

_____

Name:  Beth Gori
Expiration Date of Initial Term:  [•] Anniversary of the
date of this Trust Agreement

_____

Name:  Steven Kazan
Expiration Date of Initial Term:  [•] Anniversary of the
date of this Trust Agreement

[Signature Pages to Trust Agreement]

_____
Name:  Peter A. Kraus
Expiration Date of Initial Term:  [•] Anniversary of the
date of this Trust Agreement


_____
Name:  Joseph F. Rice
Expiration Date of Initial Term:  [•] Anniversary of the
date of this Trust Agreement


_____
Name:  Armand J. Volta, Jr.
Expiration Date of Initial Term:  [•] Anniversary of the
date of this Trust Agreement

[Signature Pages to Trust Agreement]

**Exhibit I.A.19**

Asbestos Personal Injury Trust Distribution Procedures

**KAISER GYPSUM ASBESTOS PERSONAL INJURY
TRUST DISTRIBUTION PROCEDURES**

# KAISER GYPSUM ASBESTOS PERSONAL INJURY
## TRUST DISTRIBUTION PROCEDURES

## TABLE OF CONTENTS

Section 1.        Introduction ................................................................................... 1

  1.1   Purpose. .................................................................................................... 1

  1.2   Interpretation. ........................................................................................... 1

Section 2.        Overview ....................................................................................... 2

  2.1   Asbestos Trust Goal. ................................................................................ 2

  2.2   Asbestos Claims Handling and Liquidation Procedures. ......................... 2

  2.3   Establishment and Application of the Payment Percentage. .................... 3

  2.4   Asbestos Trust's Determination of the Maximum Annual Payment. ........ 4

Section 3.        TDP Administration ..................................................................... 6

  3.1   Trust Advisory Committee and FCR. ...................................................... 6

  3.2   Consent and Consultation Procedures. ..................................................... 6

Section 4.        Payment Percentage ..................................................................... 7

  4.1   Uncertainty of Debtors' Asbestos Claims Liabilities. ............................. 7

  4.2   Computation of the Payment Percentage. ................................................ 7

  4.3   Applicability of the Payment Percentage. ................................................ 8

Section 5.        Resolution of Asbestos Claims. ................................................. 10

  5.1   Ordering, Processing and Payment of Asbestos Claims. ....................... 10

    5.1(a)        Ordering of Asbestos Claims. ................................................ 10

      5.1(a)(1) Establishment of FIFO Processing Queues. ....................... 10

      5.1(a)(2) Effect of Statutes of Limitation and Repose. ..................... 11

    5.1(b)        Payment of Asbestos Claims. ................................................ 12

  5.2   Resolution of Pre-Effective Date Liquidated Insured Asbestos Claims. ....... 12

    5.2(a)        Processing and Payment. ........................................................ 12

  5.3   Resolution of Unliquidated Insured Asbestos Claims. ........................... 13

    5.3(a)        Procedure for Litigating Unliquidated Insured Asbestos Claims. ..... 13

    5.3(b)        Tender to Truck or Applicable Asbestos Insurer. ................. 14

Case 3:20-cv-00537-GCM   Document 1-2   Filed 09/28/20   Page 178 of 491   JA00266

5.3(c)      Denied Insured Asbestos Claims.........................................................14

5.3(c)(1) Handling of Denied Insured Asbestos Claims Generally. ................................14

5.3(c)(2) Handling of Denied Insured Asbestos Claims Where Reorganized Debtors have Breached their Asbestos Insurer Cooperation Obligations......................16

5.4     Payment by the Asbestos Trust of the Portion of Insured Asbestos Claims Not Covered by any Asbestos Insurance Policy. ....................................................18

5.4(a)      Procedure....................................................................................18

5.4(b)      Proof of Resolution and Payment.......................................................18

5.4(c)      Releases. ...................................................................................19

5.4(d)      Applicable Deductible and Other Payments Due.....................................19

5.4(e)      Application of Payment Percentage. ..................................................19

5.4(f)      Ordering and Payment of Payments.....................................................20

5.5     Handling, Litigation, and Payment of Uninsured Asbestos Claims..............................20

5.5(a)      General. ....................................................................................20

5.5(b)      Extraordinary Claim Review Process ...................................................23

5.6     Payment of Judgments Reduced by Settling Asbestos Insurers' Shares........................26

5.7     Indirect Asbestos Claims.................................................................................27

5.8     Arbitration. ..................................................................................................28

5.8(a)      Establishment of ADR Procedures......................................................29

5.8(b)      Claims Eligible for Arbitration. .........................................................29

5.8(c)      Limitations on and Payment of Arbitration Awards. ...............................29

5.9     Litigation. ....................................................................................................29

5.10    Claims Audit Program....................................................................................30

Section 6.      Claims Materials .....................................................................................31

6.1     Claims Materials. ..........................................................................................31

6.2     Content of Claims Materials. ............................................................................32

6.3     Withdrawal or Deferral of Claims......................................................................32

6.4     Filing Requirements and Fees. ..........................................................................33

6.5     Confidentiality of Claimants' Submissions...........................................................33

6.6     English Language. ..........................................................................................34

Section 7.      General Guidelines for Liquidating and Paying Claims ...................................35

JA00267

7.1    Discretion to Vary the Order and Amounts of Payments in Event of Limited
       Liquidity......................................................................................................... 35

7.2    Punitive Damages............................................................................................ 35

7.3    Suits in the Tort System. ................................................................................ 35

7.4    Payment of Judgments for Money Damages................................................... 36

7.5    Releases. ......................................................................................................... 37

Section 8.         Miscellaneous .................................................................................. 37

8.1    Amendments.................................................................................................... 37

   8.1(a)        Amendments in General.................................................................... 37

   8.1(b)        Amendments Related to a Settlement with Truck............................. 37

8.2    Severability...................................................................................................... 38

8.3    Governing Law................................................................................................. 38

# KAISER GYPSUM ASBESTOS PERSONAL INJURY TRUST DISTRIBUTION PROCEDURES

The Kaiser Gypsum Asbestos Personal Injury Initial Trust Distribution Procedures (the "**TDP**") contained herein provide for resolving "**Asbestos Personal Injury Claims**"[1] as defined in the Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. ("**Kaiser Gypsum**") and Hanson Permanente Cement, Inc. ("**HPCI**") (together, the "**Debtors**"), dated as of July 27, 2018 (as it may be amended, modified or supplemented, the "**Plan**"),[2] as provided in and required by the Plan and the Kaiser Gypsum Asbestos Personal Injury Trust Agreement (the "**Trust Agreement**").  The Plan and Trust Agreement establish the Kaiser Gypsum Asbestos Personal Injury Trust (the "**Asbestos Trust**").  The Trustee of the Asbestos Trust (the "**Trustee**") shall implement and administer this TDP in accordance with the Trust Agreement.

## SECTION 1.

## INTRODUCTION

**1.1    Purpose.**  This TDP has been adopted pursuant to the Trust Agreement.  It is designed to provide fair, equitable and substantially similar treatment for all Asbestos Claims that may presently exist or may arise in the future.

**1.2    Interpretation.**  Except as expressly provided below, nothing in this TDP shall be deemed to create a substantive right for any claimant.  The rights and benefits provided herein to holders of Asbestos Claims shall vest in such holders as of the Effective Date.

---

[1]    Asbestos Personal Injury Claims shall be referred to herein as "**Asbestos Claims**."

[2]    Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Plan and the Trust Agreement.

# SECTION 2.

## OVERVIEW

**2.1  Asbestos Trust Goal.**  The goal of the Asbestos Trust is to treat all claimants similarly and equitably in accordance with the requirements of section 524(g) of the Bankruptcy Code.  This TDP furthers that goal by setting forth procedures that allow claimants with Insured Asbestos Claims to pursue their Asbestos Claims in the tort system, as they did prior to the Petition Date ("**Pre-Petition**"), and that provide for processing and paying both the uninsured portions of such claims, as well as the Uninsured Asbestos Claims that would have been paid by the Debtors Pre-Petition, on an impartial, first-in-first-out ("**FIFO**") basis, with the intention of paying all claimants over time as equivalent a share as possible of the value of (a) subject to Section 7.2 hereof, the portions of their Insured Asbestos Claims that are not covered by any Asbestos Insurance Policy and (b) their Uninsured Asbestos Claims that would have been paid by the Debtors Pre-Petition ((a) and (b) are collectively referred to herein as the "**Uninsured Amounts**").

**2.2  Asbestos Claims Handling and Liquidation Procedures.**  Insured Asbestos Claims shall be resolved primarily in the tort system as described in Section 5.3 below.  Once claimants obtain payment on a settlement, judgment, or some other final resolution of their claim in their favor in the tort system, they may then submit evidence of such payment or final resolution to the Asbestos Trust, which will resolve the portions of the Insured Asbestos Claims that are not covered by any Asbestos Insurance Policy subject to Section 7.2 hereof.[3]  Uninsured portions of claims shall be processed based on their place in the applicable FIFO Processing Queue to be established pursuant to Section 5.1 below.  The Asbestos Trust shall take all reasonable steps to

---

[3]  If an Insured Asbestos Claim is resolved in the tort system for less than the applicable deductible amount, the subject claimant does not need to submit evidence of payment to the Asbestos Trust as no payment will have been made.

2

resolve the uninsured portions of Insured Asbestos Claims as efficiently and expeditiously as possible.

Uninsured Asbestos Claims, if any, shall be processed based on their place in the applicable FIFO Processing Queue.  If the Asbestos Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the applicable tort system and would have been compensable by the Debtors Pre-Petition, the Asbestos Trust shall offer the claimant a settlement amount to be determined based on the values paid by the Debtors with respect to substantially similar claims in the tort system, which values shall be determined by reference to the Debtors' tort system history, including the valuation data contained in such history.  The Asbestos Trust shall take all reasonable steps to resolve Uninsured Asbestos Personal Claims as efficiently and expeditiously as possible.

Unresolved disputes involving the Asbestos Trust and the resolution of its liability with respect to Uninsured Amounts shall be subject to binding or non-binding arbitration as set forth in Section 5.8 below, at the election of the claimant, under ADR Procedures established by the Asbestos Trust.  Holders of Asbestos Claims that cannot be resolved by non-binding arbitration may enter the tort system as provided in Section 5.9 below.  If a claimant obtains a judgment against the Asbestos Trust in the tort system, such judgment shall be payable as provided in Section 7.4 below.

      **2.3**      **Establishment and Application of the Payment Percentage.**  The initial Payment Percentage (as defined and described in Sections 4.1 and 4.2 below) for all claims, or portions of claims, paid by the Asbestos Trust shall be established by the Trustee with the consent of the Trust Advisory Committee ("**TAC**") and the Future Claimants' Representative ("**FCR**") promptly after the Asbestos Trust is established.  After the uninsured amount of an Insured Asbestos Claim or the value of an Uninsured Asbestos Claim is determined pursuant to the procedures set forth herein,

3

the claimant shall ultimately receive a pro-rata share of that amount (subject to Section 7.2 hereof)

based on the Payment Percentage.  Pre-Effective Date Liquidated Insured Asbestos Claims (as

defined in Section 5.2 below) are included within the definition of Insured Asbestos Claims and

the deductible or other uninsured amount of such claim shall be subject to the Payment Percentage.

Each Asbestos Personal Injury Indirect Claim (an "**Indirect Asbestos Claim**") is either an Insured

Asbestos Claim or an Uninsured Asbestos Claim, depending upon the facts underlying the

particular Indirect Asbestos Claim, and the portion of the value of any such claim for which the

Asbestos Trust is responsible shall be subject to the Payment Percentage.

The Payment Percentage may be adjusted upwards or downwards from time to time by the

Asbestos Trust with the consent of the TAC and the FCR to reflect then-current estimates of the

Asbestos Trust's assets and its liabilities.  Because there is uncertainty in the prediction of both

the total amount of the Asbestos Trust's asbestos-related liabilities and the value of the Asbestos

Trust's assets over time, no guarantee can be made of any particular Payment Percentage that will

be applicable to a payment on any Asbestos Claim.

2.4    **Asbestos Trust's Determination of the Maximum Annual Payment.**  After

calculating the Payment Percentage, the Asbestos Trust shall model the cash flow, principal and

income year-by-year to be paid over its entire life to ensure that all present and future holders of

Asbestos Claims are compensated at the applicable Payment Percentage.  In each year, based

upon the model of cash flow, the Asbestos Trust shall be empowered to pay out the portion of its

funds payable for that year according to the model (the "**Maximum Annual Payment**").  The

Asbestos Trust's distributions to all claimants for that year shall not exceed the Maximum

Annual Payment.  The Payment Percentage and the Maximum Annual Payment figures are based

on projections over the lifetime of the Asbestos Trust.  If such long-term projections are revised,

the Payment Percentage may be adjusted accordingly, which would result in a new model of the

Asbestos Trust's anticipated cash flow and a new calculation of the Maximum Annual Payment

figures.

However, year-to-year variations in the Asbestos Trust's flow of claims or the value of its

assets, including earnings thereon, will not mean necessarily that the long-term projections are

inaccurate; they may simply reflect normal variations, both up and down, from the smooth curve

created by the Asbestos Trust's long-term projections.  If, in a given year, however, asset values,

including earnings thereon, are below projections, the Asbestos Trust may need to distribute less

in that year than would otherwise be permitted based on the original Maximum Annual Payment

derived from long-term projections.  Accordingly, the original Maximum Annual Payment for a

given year may be temporarily decreased if the present value of the assets of the Asbestos Trust as

measured on a specified date during the year is less than the present value of the assets of the

Asbestos Trust projected for that date by the cash flow model described in the foregoing paragraph.

The Asbestos Trust shall make such a comparison whenever the Trustee becomes aware of any

information that suggests that such a comparison should be made.  If the Asbestos Trust determines

that as of the date in question, the present value of the Asbestos Trust's assets is less than the

projected present value of its assets for such date, then it will remodel the cash flow year-by-year

to be paid over the life of the Asbestos Trust based upon the reduced value of the total assets as so

calculated and identify the reduced portion of its funds to be paid for that year, which will become

the Temporary Maximum Annual Payment (additional reductions in the Maximum Annual

Payment can occur during the course of that year based upon subsequent calculations).  If in any

year the Maximum Annual Payment was temporarily reduced as a result of an earlier calculation

and, based upon a later calculation, the difference between the projected present value of the

Asbestos Trust's assets and the actual present value of its assets has decreased, the Temporary Maximum Annual Payment shall be increased to reflect the decrease in the differential.  In no event, however, shall the Temporary Maximum Annual Payment exceed the original Maximum Annual Payment.  As a further safeguard, the Asbestos Trust's distribution to all claimants for the first nine months of a year shall not exceed 85% of the Maximum Annual Payment determined for that year.  If on December 31 of a given year, the original Maximum Annual Payment for such year is not in effect, the original Maximum Annual Payment for the following year shall be reduced proportionately.

## SECTION 3.

### TDP ADMINISTRATION

**3.1**    **Trust Advisory Committee and FCR.**    Pursuant to the Plan and the Trust Agreement, the Asbestos Trust and this TDP shall be administered by the Trustee in consultation with the TAC, which represents the interests of holders of present Asbestos Personal Injury Claims, and the FCR, who represents the interests of holders of Asbestos Personal Injury Claims that may be asserted in the future.  The Trustee shall obtain the consent of the TAC and the FCR on any amendments to this TDP pursuant to Section 3.2 below, and on such other matters as are otherwise required below or in Section 2.2(f) of the Trust Agreement.  The Trustee shall also consult with the TAC and the FCR on such matters as are provided below or in Section 2.2(e) of the Trust Agreement.

**3.2**    **Consent and Consultation Procedures.**    In those circumstances in which consultation or consent is required, the Trustee shall provide written notice to the TAC and the FCR of the specific amendment or other action that is proposed.  The Trustee shall not implement

NAI-1509172827v1

such amendment or take such action unless and until the parties have engaged in the Consultation

Process described in Sections 5.7(a) and 6.6(a), or the Consent Process described in Sections 5.7(b)

and 6.6(b), of the Trust Agreement, respectively.

## SECTION 4.

## PAYMENT PERCENTAGE

**4.1    Uncertainty of Debtors' Asbestos Claims Liabilities.**  As discussed above, there

is inherent uncertainty regarding the Asbestos Trust's total asbestos-related liabilities, as well as

the total value of the assets available to the Asbestos Trust to pay its expenses and liabilities with

respect to Uninsured Amounts.  Consequently, there is inherent uncertainty regarding the amounts

that holders of all Asbestos Claims shall receive from the Asbestos Trust.  To seek to ensure

substantially equivalent treatment of all present and future Asbestos Claims by the Asbestos Trust,

the Trustee must determine from time to time the percentage of value that holders of present and

future Asbestos Claims are likely to receive from the Asbestos Trust (the "**Payment Percentage**").

**4.2    Computation of the Payment Percentage.**  As provided in Section 2.3 above, the

initial Payment Percentage shall be set by the Trustee with the consent of the TAC and the FCR

promptly after the Asbestos Trust is established.  Thereafter, the Payment Percentage shall be

subject to change pursuant to the terms of this TDP and the Trust Agreement if the Trustee, with

the consent of the TAC and FCR, determines that an adjustment is required.  No less frequently

than once every three (3) years, with the first three-year period commencing on the first day of

January following the Effective Date, the Trustee shall reconsider the then applicable Payment

Percentage to assure that it is based on accurate, current information and may, after such

reconsideration, change the Payment Percentage if necessary with the consent of the TAC and the

FCR.  The Trustee shall also reconsider the then applicable Payment Percentage at shorter intervals

7

if they deem such reconsideration to be appropriate or if requested to do so by the TAC or the FCR. In any event, no less frequently than once every twelve (12) months, commencing one year after the date the Asbestos Trust first makes available the proof of claim forms and other claims materials required to file a claim with the Asbestos Trust, the Trustee shall compare the liability forecast on which the then applicable Payment Percentage is based with the actual claims filing and payment experience of the Asbestos Trust to date. If the results of the comparison call into question the ability of the Asbestos Trust to continue to rely upon the current liability forecast, the Trustee shall undertake a reconsideration of the Payment Percentage.

The Trustee must base his or her determination of the Payment Percentage on current estimates of payments related to Uninsured Amounts, the value of the assets of the Asbestos Trust, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds available to pay a comparable percentage of the Asbestos Trust's liability to holders of Asbestos Claims with respect to Uninsured Amounts. When making these determinations, the Trustee shall exercise common sense and flexibly evaluate all relevant factors.

### 4.3    Applicability of the Payment Percentage.

The Trust shall apply the Payment Percentage to all payments made to holders of Asbestos Claims. The payment to a claimant shall reflect the Payment Percentage in effect at the time of the payment. If a redetermination of the Payment Percentage has been proposed in writing by the Trustee to the TAC and the FCR but has not yet been adopted, the claimant shall receive the lower of the current Payment Percentage or the proposed Payment Percentage. However, if the proposed Payment Percentage is the lower amount but is not subsequently adopted, the claimant shall thereafter receive the difference between the lower proposed amount and the higher current

8

amount.  Conversely, if the proposed Payment Percentage is the higher amount and is subsequently adopted, the claimant shall thereafter receive the difference between the lower current amount and the higher adopted amount.

At least thirty (30) days prior to proposing in writing to the TAC and the FCR a change in the Payment Percentage, the Trustee shall issue a written notice to claimants or claimants' counsel indicating that the Trustee is reconsidering such Payment Percentage.

If the Trustee, with the consent of the TAC and the FCR, makes a determination to increase the Payment Percentage due to a change in the estimates of the Asbestos Trust's future assets and/or liabilities, the Trustee shall make supplemental payments to all claimants who previously liquidated their claims against the Asbestos Trust and received payments based on a lower Payment Percentage.  The amount of any such supplemental payment shall be the liquidated value of the claim in question times the newly adjusted Payment Percentage, less all amounts previously paid to the claimant with respect to the claim.

The Asbestos Trust's obligation to make a supplemental payment to a claimant shall be suspended in the event the payment in question would be less than $250.00, and the amount of the suspended payment shall be added to the amount of any prior supplemental payment/payments that was/were also suspended because it/they would have been less than $250.00.  However, the Asbestos Trust's obligation shall resume, and the Asbestos Trust shall pay any such aggregate supplemental payments due the claimant at such time that the total exceeds $250.00.

9

**SECTION 5.**

**RESOLUTION OF ASBESTOS CLAIMS.**

**5.1    Ordering, Processing and Payment of Asbestos Claims.**

**5.1(a)  Ordering of Asbestos Claims.**

**5.1(a)(1) Establishment of FIFO Processing Queues.**  The Asbestos Trust shall order claims that are sufficiently complete to be reviewed for processing purposes on a FIFO basis except as otherwise provided herein (the "**FIFO Processing Queue**").  The Asbestos Trust shall establish two FIFO Processing Queues:  (1) the Primary FIFO Processing Queue; and (2) the Uninsured FIFO Processing Queue.  All Insured Asbestos Claims shall be placed in the Primary FIFO Processing Queue, and all Uninsured Asbestos Claims, if any, shall be placed in the Uninsured FIFO Processing Queue.  The Asbestos Trust will have two processing queues because it is anticipated that the processing of Uninsured Asbestos Claims, if any, will require more extensive individualized review of a claimant's submission materials.

The claimant's position in the applicable FIFO Processing Queue shall be determined by the date the claim is filed with the Asbestos Trust.  If any claims are filed on the same date, the claimant's position in the Primary FIFO Processing Queue shall be determined by the date on which the applicable Asbestos Insurer(s) paid the claimant's claim or, if there was no payment required by such Asbestos Insurer(s), the date on which a settlement in claimant's favor was finalized, with earlier paid and resolved claims given priority over later paid claims, and the claimant's position in the Uninsured FIFO Processing Queue shall be determined by the date of the diagnosis of the asbestos-related disease, with claimants with earlier diagnosis dates given priority over later diagnosed claimants.  If any claims are filed and were either paid/resolved by

10

the applicable Asbestos Insurer(s) on the same date or diagnosed on the same date, the claimant's position in the applicable FIFO Processing Queue shall be determined by the claimant's date of birth, with older claimants given priority over younger claimants.

      **5.1(a)(2) Effect of Statutes of Limitation and Repose.**  All Uninsured Asbestos Claims, if any, must meet either (i) for claims first filed in the tort system against a Debtor or Reorganized Debtor, the applicable federal, state or foreign statutes of limitation and repose that were in effect at the time of the filing of the claim in the tort system, or (ii) for claims not filed against a Debtor or Reorganized Debtor in the tort system, the applicable federal, state or foreign statutes of limitation and repose that were in effect at the time of the filing with the Asbestos Trust.  However, the running of the relevant statute of limitation and repose shall be tolled as of the earliest of (A) the actual filing of the claim against a Debtor or Reorganized Debtor, whether in the tort system or by submission of the claim to a Debtor or Reorganized Debtor pursuant to an administrative settlement agreement; (B) the tolling of the claim against a Debtor by an agreement or otherwise; or (C) the Petition Date.  If an Uninsured Asbestos Claim meets any of the tolling provisions described in the preceding sentence and was not barred by the applicable federal, state or foreign statute of limitation and repose at the time of the tolling event, it shall be treated as timely filed if it is actually filed with the Asbestos Trust within three (3) years after the six-month anniversary of the date the Asbestos Trust first makes available the proof of claim form and other claims materials required to file a claim (the "**Initial Claims Filing Date**").  In addition, any Uninsured Asbestos Claim that was first diagnosed after the Petition Date, irrespective of the application of any relevant federal, state or foreign statute of limitation and repose, must be filed with the Asbestos Trust within three (3) years after the date of diagnosis or within three (3) years after the Initial Claims Filing Date, whichever occurs later.

NAI-1509172827v1

All claims for uninsured portions of Insured Asbestos Claims must be filed with the Asbestos Trust within three (3) years after the date on which the applicable Asbestos Insurer(s) paid (or, in the case of claims for which no payment was due from the applicable Asbestos Insurer(s), settled) the claimant's claim.

**5.1(b)  Payment of Asbestos Claims.**  All Asbestos Claims shall be paid in FIFO order based on the date the resolution of their claim with the Asbestos Trust becomes final as evidenced by the claimant's acceptance of an offer from the Asbestos Trust (the "**FIFO Payment Queue**"); all such payments are subject to the applicable Payment Percentage.

Where the claimant is deceased or incompetent, and the settlement and payment of his or her claim must be approved by a court of competent jurisdiction or through a probate process prior to acceptance of the claim by the claimant's representative, an offer made by the Asbestos Trust on the claim shall remain open so long as proceedings before that court or in that probate process remain pending, provided that the Asbestos Trust has been furnished with evidence that the settlement offer has been submitted to such court or is in the probate process for approval.  If the offer is ultimately approved by the court or through the probate process and accepted by the claimant's representative, the Asbestos Trust shall pay the claim in the amount so offered, subject to the Payment Percentage in effect at the time the offer was first made.

**5.2     Resolution of Pre-Effective Date Liquidated Insured Asbestos Claims.**

**5.2(a)  Processing and Payment.**  After a claimant receives payment from the applicable Asbestos Insurer(s) with respect to an Insured Asbestos Claim that was liquidated by a settlement or judgment prior to the Effective Date (or if no payment was required by the applicable Asbestos Insurer(s), after such settlement or judgment is finalized) (collectively "**Pre-Effective Date Liquidated Insured Asbestos Claims**"), the claimant may then seek payment for the

12

deductible portion of the claim from the Asbestos Trust in accordance with the procedures set forth in Section 5.4 below.

### 5.3     Resolution of Unliquidated Insured Asbestos Claims.

### 5.3(a)  Procedure for Litigating Unliquidated Insured Asbestos Claims.

Pursuant to Plan Section IV.O.1., claimants holding unliquidated Insured Asbestos Claims who wish to recover on such claims must sue the Reorganized Debtor(s) in the relevant tort system to obtain the benefit of insurance coverage under the Asbestos Insurance Policies.  The lawsuit may name as the defendant one or both of the Reorganized Debtors and shall be deemed by operation of law to be an action against the applicable Reorganized Debtor(s).  All lawsuits brought against the Reorganized Debtor(s) must be filed by the claimant in his or her own right and name and not as a member or representative of a class.  Service of process on the Reorganized Debtor(s) may be made, pursuant to applicable federal or state law where the lawsuit is filed, upon the following:

[insert address]

Any lawsuit naming the Reorganized Debtor(s) may be filed by claimants in the federal or state court of their choosing where the applicable Debtor(s) would have been subject to *in personam* jurisdiction as of the Petition Date, or any other court of competent jurisdiction, as permitted under applicable federal or state law.

Where a lawsuit that is still pending against the Debtor(s) was already pending prior to the Effective Date, the lawsuit may proceed, subject, however, to all defenses, including those based on venue, forum non conveniens, and jurisdiction.

The applicability of statutes of limitations and repose in all such lawsuits shall be determined under applicable state or federal law.  If a lawsuit involving the Debtor(s) was filed

13

prior to the Effective Date (even if the lawsuit was dismissed as a result of the filing of the Debtors'
bankruptcy cases), the filing date of such lawsuit shall be the operative date for purposes of the
applicable statute of limitations.

Prejudgment interest in all such lawsuits shall be subject to and calculated based on
applicable state or federal law, including any applicable limitations thereunder, and including
without limitation section 502 of the Bankruptcy Code.

**5.3(b) Tender to Truck or Applicable Asbestos Insurer.** The Reorganized
Debtor(s), or their agents, shall tender all actions filed pursuant to Section 5.3(a) to Truck
Insurance Exchange ("**Truck**") and, if appropriate, to any other applicable Asbestos Insurer. The
Reorganized Debtor(s) shall provide to Truck, or any other applicable Asbestos Insurer, such
information as is required under the terms and conditions of the Asbestos Insurance Policies and
the Excess CIP Agreement, if applicable. The Reorganized Debtor(s) shall have no obligation to
answer, appear, or otherwise participate in the action other than as expressly set forth in the Plan
and as may be necessary to maintain coverage under the Asbestos Insurance Policies.

All defenses and all contribution claims including those that could have been asserted by
the Debtor(s) prepetition shall be preserved and available to any Asbestos Insurer in regards to any
Insured Asbestos Claim.

**5.3(c)  Denied Insured Asbestos Claims.**

**5.3(c)(1) Handling of Denied Insured Asbestos Claims Generally.** In the
event that all applicable Asbestos Insurers deny coverage for an Insured Asbestos Claim or
otherwise reject or refuse to defend or pay an Insured Asbestos Claim (other than as a result of a
breach by Reorganized Debtors of their Asbestos Insurer Cooperation Obligations), the claimant
must first, pursue and obtain a judgment in the tort system against the Reorganized Debtor(s), in

14

name only, and then submit documentation evidencing the judgment to the Asbestos Trust.  Upon receiving such documentation, the Asbestos Trust, in consultation with the TAC and the FCR, shall, at its discretion, determine whether it will pursue payment of the judgment against the applicable Asbestos Insurer on the claimant's behalf or take no further action with respect to the claim.  In the event the Asbestos Trust does not choose to pursue payment of the judgment, it will be the obligation of the claimant to pursue the applicable Asbestos Insurer for payment of the judgment.

If an Asbestos Insurer provides notice to the Asbestos Trust and a claimant holding an Insured Asbestos Claim that such Asbestos Insurer contests coverage for the Insured Asbestos Claim because the Reorganized Debtors are alleged to have failed to satisfy or otherwise perform the Asbestos Insurer Cooperation Obligations (a "**Notice**"), within forty-five (45) calendar days of receiving such Notice, the Asbestos Trust and the claimant holding such claim shall provide to the Reorganized Debtors any documents or information they respectively received from the Asbestos Insurer denying, rejecting, or disclaiming coverage.  If such information is not provided within such forty-five (45) day period, the Reorganized Debtors shall have no obligations under Section IV.L.2. of the Plan with respect to such Insured Asbestos Claim unless the failure to provide such information as required did not unfairly prejudice the Reorganized Debtors.

Pursuant to Section IV.L.2.d. of the Plan, the Reorganized Debtors must, within forty-five calendar days of receiving a Notice, provide to the Asbestos Trust and the subject claimant (1) any documents or information the Reorganized Debtors received from the Asbestos Insurer denying, rejecting, or disclaiming coverage and (2) any documents or other information the Reorganized Debtors have within their possession, custody, or control regarding the Reorganized Debtors' efforts to satisfy any of the Asbestos Insurer Cooperation Obligations in respect of the subject

NAI-1509172827v1

claim.  The Asbestos Trust or the holder of the subject claim or both may assert an action against the Asbestos Insurer seeking coverage for the Insured Asbestos Claim.  If such an action results in a Final Order providing that the Asbestos Insurer does not have a coverage obligation for the subject claim and the basis for the finding that there is no coverage obligation *may* be because the Reorganized Debtors failed to satisfy or otherwise perform any of the Asbestos Insurer Cooperation Obligations, then the Asbestos Trust or the holder of the subject claim or both may bring a subsequent direct action against the Reorganized Debtors for the sole purpose of seeking a finding that the Reorganized Debtors failed to satisfy or perform any of the Asbestos Insurer Cooperation Obligations.

**5.3(c)(2) Handling of Denied Insured Asbestos Claims Where Reorganized Debtors have Breached their Asbestos Insurer Cooperation Obligations.**  If an Asbestos Insurer does not provide coverage for an Insured Asbestos Claim because a court determines in a Final Order that the Reorganized Debtors failed to satisfy or otherwise perform their Asbestos Insurer Cooperation Obligations, the Asbestos Trust, the TAC, the FCR, and the claimant, each individually or in any combination jointly, may, as outlined in Plan Section IV.L.2., seek (1) specific performance directing the Reorganized Debtors to cure the breach of their Asbestos Insurer Cooperation Obligations, and/or (2) payment from the Reorganized Debtors for the judgment or settlement amount of the Insured Asbestos Claim for which coverage has been denied by the Asbestos Insurer.  Regardless of which remedy is sought, the party may also seek payment from the Reorganized Debtors for reasonable attorneys' fees expended in pursuing relief from the Reorganized Debtors.

Where a party seeks payment or specific performance related to a Denied Insured Asbestos Claim, the Reorganized Debtors shall, within thirty (30) calendar days of receiving notice of the

16

Denied Insured Asbestos Claim, either (a) remit payment of (i) the judgment or settlement amount of the Denied Insured Asbestos Claim to the Asbestos Trust or the claimant, as applicable, and if payment of the value of the Denied Insured Asbestos Claim is made to the Asbestos Trust, the Asbestos Trust shall in turn remit payment to the claimant, and (ii) reasonable attorneys' fees expended in enforcing the right provided in Section IV.L.2. of the Plan, except for any attorneys' fees expended in connection with a direct action against the Reorganized Debtors permitted by Section IV.L.2.d. of the Plan (collectively, "**Legal Fees**") to the appropriate party, or (b) attempt to cure their breach of the Asbestos Insurer Cooperation Obligations.  If the Reorganized Debtors successfully cure their breach such that the Asbestos Insurer reverses its previous denial of coverage and pays the Denied Insured Asbestos Claim in full, the Reorganized Debtors shall have no further obligation to pay the Denied Insured Asbestos Claim; the Reorganized Debtors shall, however, remain liable for the Legal Fees and shall remit payment of such Legal Fees to the appropriate party.  If the Reorganized Debtors are unable to cure their breach of the Asbestos Insurer Cooperation Obligations, the Reorganized Debtors shall pay to the Asbestos Trust or the claimant, as applicable, the judgment or settlement amount of the Denied Insured Asbestos Claim and shall remit the Legal Fees to the appropriate party.

If the Reorganized Debtors pay the claimant directly on the Denied Insured Asbestos Claim in any manner as set forth in this Section, the Asbestos Trust shall have no further obligation or liability with respect to the claim, apart from payment of the deductible portion of the claim, which the claimant may pursue separately as described in Section 5.4 below.

**5.4** **Payment by the Asbestos Trust of the Portion of Insured Asbestos Claims Not Covered by any Asbestos Insurance Policy.**

**5.4(a)  Procedure.**  Once a claimant obtains payment from the applicable Asbestos Insurer(s) on the claimant's Insured Asbestos Claim (including a Pre-Effective Date Liquidated Insured Asbestos Claim or an insured Indirect Asbestos Claim) (or, if there was no payment required by the applicable Asbestos Insurer(s), the date on which a settlement in claimant's favor was finalized), the claimant may then seek payment from the Asbestos Trust of the portion of the Insured Asbestos Claim that is not covered by any Asbestos Insurance Policy subject to Section 7.2 hereof.

**5.4(b)  Proof of Resolution and Payment.**  Claimants must submit proof to the Asbestos Trust that their Insured Asbestos Claim has been fully and finally resolved and, if the settlement or judgment amount exceeded the amount of the applicable deductible, paid by the applicable Asbestos Insurer(s).  The Asbestos Trust, in consultation with the TAC and FCR, shall develop and establish criteria for submitting evidence of a resolved and paid claim and a claim form governing the submission of such proof.  The Asbestos Trust, in consultation with the TAC and the FCR, may require claimants to submit documents evidencing the following:  (1) exposure to  asbestos or asbestos-containing products designed, marketed, manufactured, fabricated, constructed, sold, supplied, produced, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, distributed, or in any other way made available by Kaiser Gypsum or Hanson or any other Entity for whose products, acts, omissions, business, or operations either of the Debtors has liability ("**Debtor Exposure**"); (2) a first exposure date that falls within the

18

Case 3:20-cv-00537-GCM    Document 1-2    Filed 09/28/20    Page 198 of 404    JA00286

Asbestos Insurer coverage periods; (3) evidence regarding the duration and circumstances of the Debtor Exposure; and (4) proof of diagnosis of an asbestos-related disease.

**5.4(c) Releases.** In addition to submitting proof of resolution or payment, claimants must also submit properly executed releases, as further described in Section 7.5 below through which the claimant fully releases the Asbestos Trust, along with any Settling Asbestos Insurers, from any liability or obligation of any kind arising from or related to the claimant's Asbestos Claim.

**5.4(d) Applicable Deductible and Other Payments Due.** After receiving all required documents, the Asbestos Trust shall then determine the applicable deductible amount for the claim submitted and any amount owed to the claimant by the Asbestos Trust as a result of payments, if any, to the Asbestos Trust by Settling Asbestos Insurers. Applicable deductibles for claims settled or paid by Truck shall be those established in the Truck Asbestos Insurance Policies and shall apply as follows:

- $5,000—For all claims with a first exposure date on or before December 31, 1975.
- $50,000—For all claims with a first exposure date between January 1, 1976 and March 31, 1981 (inclusive).
- $100,000—For all claims with a first exposure date between April 1, 1981 and March 31, 1983 (inclusive).

**5.4(e) Application of Payment Percentage.** After the Asbestos Trust determines the applicable deductible amount pursuant to the Asbestos Insurance Policies and any other amount owed to the claimant by the Asbestos Trust with respect to the subject claim as a result of payments, if any, to the Asbestos Trust by Settling Asbestos Insurers, the claimant shall ultimately receive a pro-rata share of the value of the aggregate amount owed by the Asbestos Trust to the claimant

19

based on the then applicable Payment Percentage described in Section 4.3 above.  The Payment Percentage shall apply equally to all Insured Asbestos Claims.

**5.4(f)  Ordering and Payment of Payments.**  Upon filing an Insured Asbestos Claim with the Asbestos Trust for a payment, the claimant will be placed in the Primary FIFO Processing Queue to be established by the Asbestos Trust pursuant to Section 5.1(a) above. Payments of amounts owed shall be made in accordance with the FIFO Payment Queue described in Section 5.1(b) above.

**5.5     Handling, Litigation, and Payment of Uninsured Asbestos Claims.**

**5.5(a) General.**    Consistent with Plan Section IV.O.2., claimants holding Uninsured Asbestos Claims must submit their claims directly to the Asbestos Trust.  The Trustee, in consultation with the TAC and FCR, shall develop and approve separate claim materials for Uninsured Asbestos Claims.   In any event, however, claimants must submit, at minimum, documents evidencing: (1) Debtor Exposure; (2) a first exposure date that falls outside the Asbestos Insurer coverage periods; (3) evidence regarding the duration and circumstances of the Debtor Exposure; and (4) proof of diagnosis of an asbestos-related disease.  In addition to submitting evidence of the above, claimants holding Uninsured Asbestos Personal Injury Claims must also make an offer of proof to the Asbestos Trust demonstrating that their Uninsured Asbestos Claim would be cognizable and valid in the applicable tort system and would have been compensable by the Debtors Pre-Petition.

Before making any payment to a claimant, the Asbestos Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical standards.  The Asbestos Trust may require the submission of X-rays, CT scans, detailed results of pulmonary function tests, laboratory tests, tissue samples, results of

20

medical examinations, or reviews of other medical evidence, and shall require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods and procedures to assure that such evidence is reliable. Medical evidence (i) that is of a kind shown to have been received in evidence by a state or federal judge at trial, (ii) that is consistent with evidence submitted to a Debtor to settle, for payment, similar disease cases prior to the Petition Date, or (iii) that is a diagnosis by a physician shown to have previously qualified as a medical expert with respect to the asbestos-related disease in question before a state, federal or foreign judge, is presumptively reliable, although the Asbestos Trust may seek to rebut the presumption. Notwithstanding the foregoing or any other provision of this Successor TDP, any medical evidence submitted by a physician or entity that the Asbestos Trust has determined, after consulting with the TAC and the FCR, to be unreliable shall not be acceptable as medical evidence in support of any Asbestos Claim.

The claimant must demonstrate meaningful and credible Debtor Exposure. That meaningful and credible exposure evidence may be established by an affidavit or sworn statement of the claimant, a co-worker, or a family member in the case of a deceased claimant (providing the Asbestos Trust finds such evidence reasonably reliable), by invoices, employment, construction or similar records, or by other credible evidence. The specific exposure information required by the Asbestos Trust to process a claim shall be set forth on the proof of claim form to be used by the Asbestos Trust. The Asbestos Trust may also require submission of other or additional evidence of exposure when it deems such to be necessary.

The Asbestos Trust shall, in its discretion, determine whether the evidence submitted and offer of proof are sufficient. If the Asbestos Trust concludes that the evidence and offer of proof are sufficient and that any other criteria established by the Trustee has been satisfied, the Asbestos

21

Trust shall determine the liquidated value of the claim, with reference to Debtors' Pre-Petition tort system history and the valuation data included in such history. The Asbestos Trust shall consider all of the valuation factors reflected in Debtors' tort system history, which may include: (i) the claimant's age, disability, employment status, disruption of household, family or recreational activities, dependents, special damages, and pain and suffering; (ii) the duration and circumstances of claimant's Debtor Exposure; (iii) the asbestos-related disease of the claimant; (iv) the claimant's jurisdiction and law firm; and (v) the industry of exposure. The Asbestos Trust shall then make a settlement offer to the claimant. If the claimant accepts the offer, the claimant must submit a release, in the form to be determined by the Asbestos Trust, and shall then accept payment from the Asbestos Trust in full and complete satisfaction of the claimant's Uninsured Asbestos Claim.

If the Trust denies the claim, or the claimant rejects the settlement offer, the claimant may pursue binding or nonbinding arbitration in accordance with the ADR Procedures set forth in Section 5.8 below to resolve disputes concerning whether the evidence submitted in support of the claim is sufficient, whether the claim would have been compensable in the tort system Pre-Petition, as well as the valuation of the claim based on comparison to the Debtors' Pre-Petition settlement history.

Claimants who elect non-binding arbitration and then reject their arbitral awards retain the right to institute a lawsuit in the tort system against the Asbestos Trust pursuant to Section 5.9 below. All lawsuits brought against the Asbestos Trust involving Uninsured Asbestos Claims must be filed by the claimant in his or her own right and name and not as a member or representative of a class and no such lawsuit may be consolidated with any other lawsuit. A claimant shall be eligible for payment of a judgment for monetary damages obtained in the tort system from the Asbestos Trust (subject to the Payment Percentage) as provided in Section

NAI-1509172827v1

7.4 below.  No award of punitive or exemplary damages shall be compensable by the Asbestos Trust.

### 5.5(b)  Extraordinary Claim Review Process.

**5.5(b)(1)   In General.   "Extraordinary Claim"** means an Uninsured Asbestos Claim that otherwise satisfies the requirements herein for payment by the Asbestos Trust and that is held by a claimant whose exposure to asbestos (i) occurred predominantly as a result of working in a manufacturing facility of the Debtor during a period in which the Debtor was manufacturing asbestos-containing product at that facility or (ii) was at least 75% the result of exposure to an asbestos-containing product or to conduct for which the Debtor has legal responsibility, and in either case there is little likelihood of a substantial recovery elsewhere.  Each such Extraordinary Claim shall be presented for Extraordinary Claim Review and, if valid shall be entitled to an award value that takes into account its Extraordinary Claim status, which value shall be multiplied by the applicable Payment Percentage.

Any dispute as to Extraordinary Claim status shall be submitted to a special Extraordinary Claims Panel established by the Asbestos Trust with the consent of the TAC and the FCR.  All decisions of the Extraordinary Claims Panel shall be final and not subject to any further administrative or judicial review.

**5.5(b)(2)     Additional Documentation and Information for Extraordinary Claim Review**. To be eligible for a payment under this TDP, the holder of an Uninsured Asbestos Claim submitted for Extraordinary Claim Review must provide the following additional information:

**5.5(b)(2)(i)     Requirement to Identify Other Claims**. A claimant seeking Extraordinary Claim Review must submit the information described in Section 5.5(b)(2)(ii) about all other claims asserted by the claimant that relate in any way

to the alleged injuries for which the claimant seeks compensation. Other claims about which information must be submitted include claims by the claimant, the claimant's decedent, and any present or past holder of the Uninsured Asbestos Claim. Other claims include, but are not limited to, the following: (a) lawsuits filed in any court, arbitration proceedings before any panel or tribunal, and administrative proceedings (such as workers' compensation claims) before any governmental or quasi-governmental body; (b) claims that were resolved or settled without the institution of litigation (such as pre-filing settlements reached after notification of the existence of a claim without the need to file a lawsuit); and (c) claims that have been submitted in bankruptcy proceedings or to other asbestos trusts or claim resolution facilities that resulted from bankruptcy proceedings.

**5.5(b)(2)(ii)   Information Required About Other Claims**. A claimant seeking Extraordinary Claim Review shall submit the following information for each other claim: (a) the name of the entity against whom the other claim was made, (b) the date of the other claim, and (c) the amounts of all payments received or to be received from the entity to whom the other claim was submitted.  The claimant must also submit copies of any documents submitted to or served upon any such entity containing information regarding the alleged injured party's contact with or exposure to asbestos or asbestos-containing products, including without limitation any claim forms submitted to other asbestos trusts or claim resolution facilities that resulted from bankruptcy proceedings (along with any attachments), ballots submitted by or on behalf of the claimant in any bankruptcy case, and any discovery response filed or served in tort litigation. The claimant shall also certify that, to the

24

best of his or her knowledge, at that time, with the exception of the other claims

that have been expressly disclosed and identified by the claimant, no other entity is

known to the claimant to be potentially responsible for the alleged injuries that are

the basis of the Extraordinary Claim.

**5.5(b)(2)(iii)   Authorization for Release of Information**. Any claimant seeking

Extraordinary Claim Review shall execute a release of information form in favor

of the Asbestos Trust, in the form attached as Appendix I, authorizing all other

asbestos trusts and claim resolution facilities against whom any such other claim

has been made or asserted based on the injured party's injury to release to the

Asbestos Trust all information submitted to it by such claimant or entity who made

such other claim and to disclose the status of any such claim and the amount and

date of any payment on the claim. The release of information form shall authorize

the Asbestos Trust to obtain all submissions made by the claimant or his or her

heirs, executors, successors, or assigns in the future to any other asbestos trust or

claim resolution facility. The Asbestos Trust may amend the form attached as

Appendix I from time to time to add newly established asbestos trusts or claim

resolution facilities. These authorizations will be used not only to verify

information provided in connection with particular Extraordinary Claims but also

in connection with the Asbestos Trust's periodic audits for fraud.

**5.5(b)(2)(iv)   Claimant Certification.**

(a)     If the claimant seeking Extraordinary Claim Review is or has been

represented by an attorney in any litigation or in the filing of other asbestos trust claims based on

the injury that forms the basis for the Extraordinary Claim, the claimant's attorney shall provide a

certification under penalty of perjury. The certification shall affirm that the attorney has fully

investigated the alleged injuries that are the basis of the Extraordinary Claim, including conferring

with any other attorneys who represent the claimant asserting the Extraordinary Claim with respect

to claims against other asbestos trusts or any other entity, and that no good-faith basis exists, at the

time the certification is executed, to bring a claim against any entity that is not identified in the

proof of claim form submitted to the Asbestos Trust by the claimant asserting the Extraordinary

Claim.

(b)    If the claimant seeking Extraordinary Claim Review has not been

represented by an attorney in any litigation or in the filing of other asbestos trust claims based on

the injury that forms the basis for the Extraordinary Claim, the claimant shall provide a certification

under penalty of perjury that he or she has fully investigated the alleged injuries that are the basis

of the Extraordinary Claim, and that no good-faith basis exists, at the time the certification is

executed, to bring a claim against any entity that is not identified in the proof of claim form

submitted to the Asbestos Trust by the claimant.

### 5.6    Payment of Judgments Reduced by Settling Asbestos Insurers' Shares.

If a claimant obtains a judgment in the tort system that exceeds the Truck per claim policy

limit or that otherwise requires payment from a Non-Settling Asbestos Insurer and the court

hearing the Insured Asbestos Claim reduces the claimant's judgment payable by the excess Non-

Settling Asbestos Insurer, dollar-for-dollar based on the share attributable to a Settling Asbestos

Insurer consistent with Plan Section IV.P., the claimant whose judgment has been reduced may

seek payment from the Asbestos Trust for the portion of the amount of the judgment reduction

attributable to the Settling Asbestos Insurer's share.  To obtain such payment, the claimant must

file with the Asbestos Trust proof of the judgment and proof of the court's reduction of the

26

judgment based on the Non-Settling Asbestos Insurer's assertion of its right to reduce the judgment attributable to the Settling Asbestos Insurer's share.  Once satisfied that sufficient proof of the judgment reduction has been submitted, the Asbestos Trust shall place the claim in the FIFO Payment Queue and the Asbestos Trust shall pay the amount of the judgment reduction attributable to the Settling Asbestos Insurer, subject to the then applicable Payment Percentage.

      **5.7**    **Indirect Asbestos Claims.**  An Indirect Asbestos Claim that is an Insured Asbestos Claim shall be subject to all of the procedures set forth herein with respect to Insured Asbestos Claims.  An Indirect Asbestos Claim that is an Uninsured Asbestos Claim shall be subject to all of the procedures set forth herein with respect to Uninsured Asbestos Claims and to the requirements set forth below.

      If an Indirect Asbestos Claim asserted against the Asbestos Trust is an Uninsured Asbestos Claim, it shall be treated as presumptively valid and paid by the Asbestos Trust subject to the applicable Payment Percentage if (a) such claim satisfied the requirements of any bar date for such claim established by the Bankruptcy Court, if applicable, and is not otherwise disallowed by section 502(e) of the Code or subordinated under section 509(c) of the Code, (b) the holder of such claim (the "**Indirect Claimant**") establishes to the satisfaction of the Trustee that (i) the Indirect Claimant has paid in full the liability and obligation of the Asbestos Trust to the individual claimant to whom the Asbestos Trust would otherwise have had a liability or obligation under this TDP (the "**Direct Claimant**"), (ii) the Uninsured Asbestos Claim of the Direct Claimant would be cognizable and valid in the applicable tort system and would have been compensable by the Debtors in the tort system Pre-Petition; (iii) the Direct Claimant and the Indirect Claimant have forever and fully released the Asbestos Trust from all liability to the Direct Claimant, and (iv) the claim is not otherwise barred by a statute of limitation and repose or by other applicable law, and

Case 3:20-cv-00537-GCM   Document 1-2   Filed 09/28/20   Page 207 of 404JA00295

(c) the Asbestos Trust has not yet paid the Direct Claimant. In no event shall any Indirect Claimant have any rights against the Asbestos Trust superior to the rights of the related Direct Claimant against the Asbestos Trust, including any rights with respect to the timing, amount or manner of payment.

If an Indirect Claimant cannot meet the presumptive requirements set forth above, including the requirement that the Indirect Claimant provide the Asbestos Trust with a full release of the Direct Claimant's claim, the Indirect Claimant may request that the Asbestos Trust review the Indirect Asbestos Claim individually to determine whether the Indirect Claimant can establish under applicable state law that the Indirect Claimant has paid all or a portion of a liability or obligation that the Asbestos Trust had to the Direct Claimant, which shall also require establishing that the Uninsured Asbestos Claim of the Direct Claimant would be cognizable and valid in the applicable tort system and would have been compensable by the Debtors in the tort system Pre-Petition. If the Asbestos Trust determines that the Indirect Claimant has established these things and the Asbestos Trust has not already paid the Direct Claimant, the Asbestos Trust shall reimburse the Indirect Claimant the amount of the liability or obligation so paid, subject to the then applicable Payment Percentage. However, in no event shall such reimbursement to the Indirect Claimant be greater than the amount to which the Direct Claimant would have otherwise been entitled under this TDP. In all such cases, the liquidated value of any Indirect Asbestos Claim paid by the Asbestos Trust to an Indirect Claimant shall be treated as an offset to or reduction of the full liquidated value of any Asbestos Claim that might be subsequently asserted by the Direct Claimant against the Asbestos Trust.

The Trustee may develop and approve a separate claim form for Indirect Asbestos Claims.

### 5.8 Arbitration.

**5.8(a)  Establishment of ADR Procedures.**  The Trustee, with the consent of the
TAC and the FCR, shall establish binding and non-binding arbitration procedures, as part of the
Alternative Dispute Resolution ("**ADR**") Procedures to be established by the Trustee with the
consent of the TAC and the FCR, for resolving disputes concerning the compensability and/or
valuation of Asbestos Claims by the Asbestos Trust.  With respect to all claims eligible for
arbitration, the claimant, but not the Asbestos Trust, may elect either non-binding or binding
arbitration.  The ADR Procedures may be modified by the Asbestos Trust with the consent of the
TAC and the FCR.

**5.8(b)  Claims Eligible for Arbitration.**  In order to be eligible for arbitration, the
claim processing process with respect to a claim must be complete and the claimant must have
also completed separately any processes required under the ADR Procedures.   The claim
processing process shall be treated as completed for these purposes when the claim has been
reviewed by the Asbestos Trust, the Asbestos Trust has made an offer on the claim, the claimant
has rejected the offer, and the claimant has notified the Asbestos Trust of the rejection in writing.
The claim processing process shall also be treated as completed if the Asbestos Trust has rejected
or denied the claim and has notified the claimant of the rejection or denial in writing.

**5.8(c)  Limitations on and Payment of Arbitration Awards.**  A claimant who
submits to arbitration and who accepts the arbitral award shall receive payments in the same
manner as one who accepts the Asbestos Trust's original offer on the claim.  Moreover, all
payments on arbitral awards shall be subject to the Payment Percentage.

**5.9     Litigation.**  Claimants who elect non-binding arbitration and then reject their
arbitral awards retain the right to institute a lawsuit in the tort system against the Asbestos Trust
pursuant to Section 7.3 below.  A claimant shall be eligible for payment of a judgment for monetary

NAI-1509172827v1

damages obtained in the tort system from the Asbestos Trust's available cash only as provided in Section 7.4 below.

    **5.10    Claims Audit Program.**  The Asbestos Trust, with the consent of the TAC and the FCR, may develop methods for auditing the reliability of medical evidence, including additional reading of X-rays, CT scans and verification of pulmonary function tests, as well as the reliability of evidence of exposure to asbestos, including exposure to asbestos, asbestos-containing-products, or conduct for which the Asbestos Trust has legal responsibility.  In the event that the Asbestos Trust reasonably determines that any individual or entity has engaged in a pattern or practice of providing unreliable medical or exposure evidence to the Asbestos Trust, it may decline to accept additional evidence from such provider in the future.

    The Asbestos Trust shall utilize the services of a third-party claims processing facility (the "**Claims Processor**") to assist in the evaluation of claims submitted to the Asbestos Trust and shall participate in a cross-trust audit program (the "**Cross-Trust Audit Program**").  The Cross-Trust Audit Program shall include a comparison of Uninsured Asbestos Claims filed with the Asbestos Trust against claims filed with all other asbestos trusts administered by the Claims Processor that participate in the Cross-Trust Audit Program, but shall include no fewer than four other trusts.  The filing of any Uninsured Asbestos Claim with the Asbestos Trust, regardless of the treatment sought, shall constitute consent for each other asbestos trust participating in the Cross-Trust Audit Program to release to the entity overseeing the Cross-Trust Audit Program (the "**Auditor**") all information submitted to such other asbestos trust by or on behalf of the claimant pursuant to the provisions of the Cross-Trust Audit Program and to disclose the status of any such claim and the amount and date of any payment on the claim to the Auditor.

NAI-1509172827v1

To the extent that the Asbestos Trust or the Auditor believes that it is relevant, nothing herein shall preclude the Asbestos Trust or the Auditor, in the Asbestos Trust's sole discretion, from reviewing or taking into consideration other claims filed against asbestos trusts in addition to those asbestos trusts involved in the Cross-Trust Audit Program when reviewing Uninsured Asbestos Claims.  Any claimant subject to the Asbestos Trust's Claims Audit Program or the Cross-Trust Audit Program shall cooperate and, in the case of claimants holding Uninsured Asbestos Claims, if requested, provide the Asbestos Trust or the Auditor with authorization to obtain from other asbestos trusts any information such claimant has submitted to such other asbestos trusts.

Further, in the event that an audit reveals that fraudulent information has been provided to the Asbestos Trust, the Asbestos Trust may penalize any claimant or claimant's attorney by rejecting the Asbestos Claim or by other means including, but not limited to, requiring the source of the fraudulent information to pay the costs associated with the audit and any future audit or audits, reordering the priority of payment of all affected claimants' Asbestos Claims, raising the level of scrutiny of additional information submitted from the same source or sources, refusing to accept evidence or claim submissions from the same source or sources, seeking the prosecution of the claimant or claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. § 152, and seeking sanctions from the Bankruptcy Court.

## SECTION 6.

## CLAIMS MATERIALS

**6.1    Claims Materials.**  The Asbestos Trust shall prepare suitable and efficient claims materials ("**Claims Materials**") for all Asbestos Claims, and shall provide such Claims Materials

NAI-1509172827v1

upon a written request for such materials to the Asbestos Trust.  In developing its claim filing procedures, the Asbestos Trust shall make every effort to provide claimants with the opportunity to utilize currently available technology at their discretion, including filing claims and supporting documentation over the internet and electronically by disk or CD-ROM.  The claim forms to be used by the Asbestos Trust shall be developed by the Trustee and submitted to the TAC and the FCR for approval; they may be changed by the Trustee with the consent of the TAC and the FCR.

6.2     **Content of Claims Materials.**  The Claims Materials shall include a copy of this TDP, such instructions as the Trustee shall approve, and a detailed claim form.  If requested by the claimant, the Asbestos Trust shall accept information provided electronically.

6.3     **Withdrawal or Deferral of Claims.**  A claimant can withdraw an Uninsured Asbestos Claim at any time upon written notice to the Asbestos Trust and file another claim subsequently without affecting the status of the claim for purposes of statutes of limitations or repose.  All such claims filed after withdrawal shall be given a place in the applicable FIFO Processing Queue based on the date of such subsequent filing.  A claimant can also request that the processing of his or her Asbestos Claim by the Asbestos Trust be deferred for a period not to exceed three (3) years without affecting the status of the claim for statute of limitations purposes, in which case the claimant shall retain his or her original place in the FIFO Processing Queue. Except for Asbestos Personal Injury Claims held by representatives of deceased or incompetent claimants for which court or probate approval of the Asbestos Trust's offer is required, a claim shall be deemed to have been withdrawn if the claimant neither accepts, rejects, nor initiates arbitration within one (1) year of the Asbestos Trust's written offer of payment or rejection of the claim.

  **6.4**  **Filing Requirements and Fees.** The Trustee shall have the discretion to determine, with the consent of the TAC and the FCR, whether a filing fee should be required for any Asbestos Claims.

  **6.5**  **Confidentiality of Claimants' Submissions.** All submissions to the Asbestos Trust by a holder of an Asbestos Claim, including a claim form and materials related thereto, shall be treated as made in the course of settlement discussions between the holder and the Asbestos Trust, and intended by the parties to be confidential and to be protected by all applicable state and federal privileges and protections, including but not limited to those directly applicable to settlement discussions. The Asbestos Trust will preserve the confidentiality of such claimant submissions, and shall disclose the contents thereof only, with the permission of the holder, to another trust established for the benefit of asbestos personal injury claimants pursuant to section 524(g) of the Bankruptcy Code or other applicable law, to such other persons as authorized by the holder, or in response to a valid subpoena of such materials issued by the Bankruptcy Court, a Delaware State Court, or the United States District Court for the District of Delaware.

  Furthermore, the Asbestos Trust shall provide counsel for the holder a copy of any such subpoena immediately upon being served; provided, however, that if a subpoena seeks records or information pertaining to more than fifty (50) claimants, the Asbestos Trust may instead first provide a copy of the subpoena to counsel for the TAC and the FCR and delay providing a copy of the subpoena to counsel for individual holders of Asbestos Claims until, in the Trustee's judgment, it appears likely that information or records relating to the holders may have to be produced in response to the subpoena. In such a case, the Asbestos Trust shall ensure that the notice that is provided to counsel for the holders allows such counsel sufficient time to object to the production. The Asbestos Trust shall on its own initiative or upon request of the claimant in

question take all necessary and appropriate steps to preserve said privileges before the Bankruptcy Court, a Delaware State Court, or the United States District Court for the District of Delaware and before those courts having appellate jurisdiction related thereto.

Notwithstanding anything in the foregoing to the contrary, with the consent of the TAC and the FCR, the Asbestos Trust may, in specific limited circumstances, disclose information, documents, or other materials reasonably necessary in the Asbestos Trust's judgment to preserve, litigate, resolve, or settle coverage, or to comply with an applicable obligation under an insurance policy or settlement agreement within the Asbestos Personal Injury Insurance Assets; provided, however, that the Asbestos Trust shall take any and all steps reasonably feasible in its judgment to preserve the further confidentiality of such information, documents and materials, and prior to the disclosure of such information, documents or materials to a third party, the Asbestos Trust shall receive from such third party a written agreement of confidentiality that (a) ensures that the information, documents and materials provided by the Asbestos Trust shall be used solely by the receiving party for the purpose stated in the agreement and (b) prohibits any other use or further dissemination of the information, documents and materials by the third party except as set forth in the written agreement of confidentiality.

Nothing in this TDP, the Plan or the Trust Agreement expands, limits or impairs the obligation under applicable law of a claimant to respond fully to lawful discovery in any underlying civil action regarding his or her submission of factual information to the Asbestos Trust for the purpose of obtaining compensation for asbestos-related injuries from the Asbestos Trust.

**6.6     English Language.**  All claims, claim forms, submissions, and evidence submitted to the Asbestos Trust or in connection with any claim or its liquidation shall be in the English language.

## SECTION 7.

## GENERAL GUIDELINES FOR LIQUIDATING AND PAYING CLAIMS

**7.1** **Discretion to Vary the Order and Amounts of Payments in Event of Limited Liquidity.** Consistent with the provisions hereof and subject to the FIFO Processing and Payment Queues and the Payment Percentage set forth above, the Trustee shall proceed as quickly as possible to liquidate valid Asbestos Claims, and shall make payments to holders of such claims in accordance with this TDP promptly as funds become available and as claims are liquidated, while maintaining sufficient resources to pay future valid claims in substantially the same manner.

Because the Asbestos Trust's assets and liabilities over time remain uncertain, and decisions about payments must be based on estimates that cannot be done precisely, such decisions may have to be revised in light of experiences over time, and there can be no guarantee of any specific level of payment to claimants. However, the Trustee shall use his or her best efforts to treat similar claims in substantially the same manner, consistent with his or her duties as Trustee, the purposes of the Asbestos Trust, and the practical limitations imposed by the inability to predict the future with precision.

In the event that the Asbestos Trust faces issues with respect to liquidity, the Trustee may, with the consent of the TAC and the FCR, (a) suspend the normal order of payment, (b) temporarily limit or suspend payments altogether, or (c) commence making payments on an installment basis.

**7.2** **Punitive Damages.** Punitive or exemplary damages, *i.e.*, damages other than compensatory damages, shall not be considered or paid by the Asbestos Trust on any Asbestos Claim, notwithstanding their availability, or award, in the tort system.

**7.3** **Suits in the Tort System.** If the holder of an Asbestos Claim disagrees with the Asbestos Trust's determination regarding the compensability or valuation of the subject Asbestos

35

Claim, and if the holder has first submitted the claim to non-binding arbitration as provided in Section 5.8 above, the holder may file a lawsuit against the Asbestos Trust in any court of competent jurisdiction.  Any such lawsuit must be filed by the claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit.  All defenses (including, with respect to the Asbestos Trust, all defenses that could have been asserted by the Debtors, except as otherwise provided in the Plan) shall be available to both sides at trial; however, the Asbestos Trust may waive any defense and/or concede any issue of fact or law.  If the claimant was alive at the time the initial Pre-Petition complaint was filed or on the date the claim form was filed with the Asbestos Trust, the case shall be treated as a personal injury case with all personal injury damages to be considered even if the claimant has died during the pendency of the claim.

  **7.4** **Payment of Judgments for Money Damages.**  If and when a claimant obtains a judgment in the tort system against the Asbestos Trust, the claim shall be placed in the FIFO Payment Queue based on the date on which the judgment became final.  Thereafter, the claimant shall receive from the Asbestos Trust an initial payment (subject to the applicable Payment Percentage) of an amount equal to the greater of (i) the Asbestos Trust's last offer to the claimant or (ii) the award that the claimant declined in non-binding arbitration; provided, however, that in no event shall such payment amount exceed the amount of the judgment obtained in the tort system.  The claimant shall receive the balance of the judgment, if any, in five (5) equal installments in years six (6) through ten (10) following the year of the initial payment (also subject to the applicable Payment Percentage in effect on the date of the payment of the subject installment).

NAI-1509172827v1

JA00304

Under no circumstances shall the Asbestos Trust pay exemplary or punitive damages or interest under any statute on any judgments obtained in the tort system as provided in Section 7.2 above.

**7.5    Releases.**  The Trustee shall, with the consent of the TAC and the FCR, determine the form and substance of the release to be provided to the Asbestos Trust.  As a condition to receiving any payment from the Asbestos Trust, a claimant or, in the case of an Indirect Asbestos Claim, an Indirect Claimant and the related Direct Claimant shall be required to execute such release.  The Trustee may modify the provisions of this release with the consent of the TAC and the FCR.

**SECTION 8.**

**<ins>MISCELLANEOUS</ins>**

**8.1    Amendments.**

**8.1(a) Amendments in General.**  Except as otherwise provided herein, the Trustee may amend, modify, delete, or add to any provisions of this TDP, provided the Trustee first obtains the consent of the TAC and the FCR pursuant to the consent process set forth in Sections 5.7(b) and 6.6(b) of the Trust Agreement.  Nothing herein is intended to preclude the TAC or the FCR from proposing to the Trustee, in writing, amendments to this TDP.  Any amendment proposed by the TAC or the FCR shall remain subject to Section 7.3 of the Trust Agreement.

**8.1(b) Amendments Related to a Settlement with Truck.**  In the event the Asbestos Trust, with the consent of the TAC and the FCR, reaches a settlement with Truck on or after the Effective Date that resolves Truck's asbestos insurance coverage, such settlement shall require the approval of the Bankruptcy Court.  To the extent such settlement requires a revision of

37

this TDP, such revision shall likewise require the consent of the TAC and the FCR, and the approval of the Bankruptcy Court.

8.2     **Severability.**   Should any provision contained in this TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability or operative effect of any and all other provisions of this TDP.  Should any provision contained in this TDP be determined to be inconsistent with or contrary to the Debtors' obligations to any Asbestos Insurer, the Asbestos Trust with the consent of the TAC and the FCR may amend this TDP and/or the Trust Agreement to make the provisions of either or both documents consistent with the duties and obligations of the Debtors to their Asbestos Insurers.

8.3     **Governing Law.**  Except for purposes of determining the validity and/or liquidated value of any Asbestos Claim, administration of this TDP shall be governed by, and construed in accordance with, the laws of the State of Delaware.  The law governing the determination of validity and/or liquidation of Asbestos Claims in the case of arbitration shall be the laws of the State of Delaware and in the case of litigation in the tort system shall be decided by the choice-of-law rules applicable in the state or federal court where the lawsuit is filed.

NAI-1509172827v1

**APPENDIX I: AUTHORIZATION FOR ASBESTOS TRUST TO OBTAIN TRUST RECORDS**

NAI-1509172827v1

JA00307

## **AUTHORIZATION FOR RELEASE OF RECORDS OF OTHER ASBESTOS TRUSTS AND CLAIM RESOLUTION FACILITIES**

TO WHOM IT MAY CONCERN:

The Claimant named below hereby authorizes each asbestos trust and claim resolution facility listed in the attachment hereto to provide directly to the Kaiser Gypsum Asbestos Personal Injury Trust (the "Asbestos Trust"), or any of its representatives, all submissions made by Claimant and (if different from the Claimant) the party whose injury forms the basis of the claim (the "Injured Party"), including claim forms, any attachments to claim forms, and any amended or supplemental claim forms. Claimant expressly acknowledges that the other asbestos trust or claim resolution facility may provide such documents directly to the Asbestos Trust and need not obtain any further authorization from the Claimant or his/her representatives.

A copy of this Authorization shall be as valid as the original. This Authorization contains no expiration date and may be exercised by the Asbestos Trust at any time. If Claimant's representative has signed this Authorization, a notarized power of attorney is attached.

Name of Claimant: _____

Social Security No.: _____

Date of Birth: _____

Name of Injured Party (if different from Claimant): _____

Social Security No.: _____

Date of Birth: _____

Name of representative for Claimant or Injured Party: _____

Signing party: _____

Signature: _____

Date: _____

Notarized:

Attachment: List of Asbestos Trusts and Claim Resolution Facilities

40

**List of Other Asbestos Trusts and Claim Resolution Facilities**

| | | |
|---|---|---|
| A&I Corp. Asbestos Bodily Injury Trust | Forty-Eight Insulations Qualified Settlement Trust | Raytech Corp. Asbestos Personal Injury Settlement Trust |
| A-Best Asbestos Settlement Trust | Fuller-Austin Asbestos Settlement Trust | Rock Wool Mfg Company Asbestos Trust |
| AC&S Asbestos Settlement Trust | G-I Asbestos Settlement Trust | Rutland Fire Clay Company Asbestos Trust |
| Amatex Asbestos Disease Trust Fund | H.K. Porter Asbestos Trust | Shook & Fletcher Asbestos Settlement Trust |
| APG Asbestos Trust | Hercules Chemical Company, Inc. Asbestos Trust | Skinner Engine Co. Asbestos Trust |
| API, Inc. Asbestos Settlement Trust | J.T. Thorpe Settlement Trust | Stone and Webster Asbestos Trust |
| Armstrong World Industries Asbestos Personal Injury Settlement Trust | JT Thorpe Company Successor Trust | Swan Asbestos and Silica Settlement Trust |
| ARTRA 524(g) Asbestos Trust | Kaiser Asbestos Personal Injury Trust | T H Agriculture & Nutrition, LLC Industries Asbestos Personal Injury Trust |
| ASARCO LLC Asbestos Personal Injury Settlement Trust | Keene Creditors Trust | Thorpe Insulation Company Asbestos Personal Injury Settlement Trust |
| Babcock & Wilcox Company Asbestos Personal Injury Settlement Trust | Lummus 524(g) Asbestos PI Trust | United States Gypsum Asbestos Personal Injury Settlement Trust |
| Bartells Asbestos Settlement Trust | Lykes Tort Claims Trust | United States Lines, Inc. and United States Lines (S.A.) Inc. Reorganization Trust |
| Brauer 524(g) Asbestos Trust | M.H. Detrick Company Asbestos Trust | United States Mineral Products Company Asbestos Personal Injury Settlement Trust |
| Burns and Roe Asbestos Personal Injury Settlement | Manville Personal Injury | UNR Asbestos-Disease |

41

| Trust | Settlement Trust | Claims Trust |
|---|---|---|
| C.E. Thurston & Sons Asbestos Trust | Muralo Trust | Utex Industries, Inc. Successor Trust |
| Celotex Asbestos Settlement Trust | NGC Bodily Injury Trust | Wallace & Gale Company Asbestos Settlement Trust |
| Combustion Engineering 524(g) Asbestos PI Trust | Owens Corning Fibreboard Asbestos Personal Injury Trust (OC Sub-Fund) | Western MacArthur-Western Asbestos Trust |
| Congoleum Plan Trust | Owens Corning Fibreboard Asbestos Personal Injury Trust (FB Sub-Fund) | W.R. Grace Trust |
| DII Industries, LLC Asbestos PI Trust | PLI Disbursement Trust | Pittsburgh Corning Trust |
| Eagle-Picher Industries Personal Injury Settlement Trust | Plibrico Asbestos Trust | Bondex Trust |
| Federal Mogul U.S. Asbestos Personal Injury Trust | Porter Hayden Bodily Injury Trust | Flintkote Company and Flintkote Mines Limited Asbestos Personal Injury Trust |
| MLC Asbestos Personal Injury Trust | Metex Asbestos Trust | Leslie Controls, Inc. Asbestos Personal Injury Trust |
| Plant Insulation Company Asbestos Settlement Trust | Quigley Co. Inc. Asbestos Personal Injury Trust | Yarway Asbestos Personal Injury Trust |
| GST Settlement Facility | Geo. V. Hamilton, Inc. Asbestos Trust | |

NAI-1509172827v1

**Exhibit I.A.47**

Delaware Trustee

NAI-1509410155v1

JA00311

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| KAISER GYPSUM COMPANY, INC., *et al.,*[1] | : | Case No. 16-31602 (JCW) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

**NOTICE OF PROPOSED DELAWARE TRUSTEE OF THE**
**KAISER GYPSUM ASBESTOS PERSONAL INJURY TRUST**

The Official Committee of Asbestos Personal Injury Claimants (the "ACC") and

Lawrence Fitzpatrick, the Legal Representative for Future Claimants (the "FCR"), hereby

provide notice that Wilmington Trust, National Association has been selected as the proposed

Delaware trustee of the Kaiser Gypsum Asbestos Personal Injury Trust (the "Trust") to be

established under the Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson

Permanente Cement, Inc.

---

[1] The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  Kaiser Gypsum Company, Inc. (0188) and Hanson Permanente Cement, Inc. (7313).  The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

*/s/ Kevin C. Maclay*
Kevin C. Maclay (admitted pro hac vice)
Todd E. Phillips (admitted pro hac vice)
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle, NW, Suite 1100
Washington, DC 20005
Telephone: (202) 862-5000
Facsimile: (202) 429-3301
kmaclay@capdale.com
tphillips@capdale.com

-and-

Sally W. Higgins  (N.C. Bar No. 22111)
HIGGINS & OWENS, PLLC
524 East Blvd
Charlotte, NC 28203
Telephone: (704) 366-4607
shiggins@higginsowens.com

Attorneys for the Official Committee of
Asbestos Personal Injury Claimants

*/s/ Sharon M. Zieg*
Edwin J. Harron (DE Bar No. 3396)
(admitted pro hac vice)
Sharon M. Zieg (NC Bar No. 29536)
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
eharron@ycst.com
szieg@ycst.com

-and-

Felton E. Parrish (NC Bar No. 25448)
HULL & CHANDLER, P.A.
1001 Morehead Square Drive, Suite 450
Charlotte, NC 28203
Telephone: 704-375-8488
Facsimile: 704-375-8487
fparrish@lawyercarolina.com

Attorneys for Lawrence Fitzpatrick, the Legal
Representative for Future Asbestos Claimants

**Exhibit I.A.60**

Dual Policies

# Policies with shared combined aggregate limit (Dual Policies)

| Insurance Company | Policy Number | Policy Period |
|---|---|---|
| Allstate/ Northbrook | 63003630 | 10/01/1977-10/01/1978 |
| Lexington | GC 550-2895 | 10/01/1977-10/01/1978 |
| Columbia Casualty | RDX 3652645 | 10/13/1977- 10/01/1978 |
| Employers Reinsurance | PLE 21526 | 10/14/1977- 10/01/1978 |
| Allstate/ Northbrook | 63 005 038 | 10/01/1978-04/01/1979 |
| Columbia Casualty | RDX 4169393 | 10/01/1978-04/01/1979 |
| Allstate/ Northbrook | 63 005 578 | 04/01/1979– 04/01/1980 |
| American Re-insurance | EUR 4007916 | 04/01/1979- 04/01/1980 |
| Columbia Casualty | RDX 4169612 | 04/01/1979- 04/01/1980 |
| Fireman's Fund | XLX 1269069 | 12/07/1979-04/01/1981 |

**Exhibit I.A.98**

Form of Payment Note

THIS NOTE HAS BEEN ISSUED PURSUANT TO SECTION 1145 OF THE U.S. BANKRUPTCY CODE, WHICH PROVIDES AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE STATUTES.

## SECURED NON-RECOURSE PAYMENT NOTE

### [●], 2020

This Secured Non-Recourse Payment Note (this "Note") is issued pursuant to the Third Amended Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc. (the "Plan"), debtors in the jointly administered chapter 11 case captioned In re Kaiser Gypsum Company, Inc., Case No. 16-31602 (JCW) pending in the United States Bankruptcy Court for the Western District of North Carolina (the "Bankruptcy Court"). The Plan was confirmed by an order of the Bankruptcy Court dated [●], 2020, which order was affirmed by an order of the United States District Court for the Western District of North Carolina dated [●], 2020. All capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Plan.

KAISER GYPSUM COMPANY, INC., a North Carolina corporation ("Kaiser Gypsum"), and HANSON PERMANENTE CEMENT, INC., an Arizona corporation ("HPCI" and, together with Kaiser Gypsum and each of their respective successors and assigns, the "Makers" and each, a "Maker"), hereby jointly and severally promise to pay the KAISER GYPSUM ASBESTOS PERSONAL INJURY TRUST (together with its successors and registered assigns, the "Payee") as co-obligors, the principal sum of $1,000,000 in accordance with the terms set forth herein.

SECTION 1.   Payments in Cash.  All payments to be made to the Payee under this Note shall be made in the lawful money of the United States of America in immediately available funds to the following trust account established and maintained by the Payee:

### [INSERT ACCOUNT INFORMATION]

SECTION 2.   Security.  This Note is secured by (a) a pledge of 100% of the shares of Kaiser Gypsum, pursuant to that certain pledge agreement, executed by HPCI in favor of the Payee (the "Kaiser Gypsum Pledge Agreement") and (b) a pledge of 100% of the shares of HPCI, pursuant to that certain pledge agreement, executed by KH 1 Inc. in favor of Payee (the "HPCI Pledge Agreement"), in each case, as further described therein and subject to the terms thereof.

SECTION 3.   Optional Prepayments.  The Makers may, at any time and from time to time, prepay all or any portion of this Note in accordance with Section 1 above.

SECTION 4.   Payment at Maturity.  The Makers shall repay all outstanding amounts due under this Note on or before the fifth anniversary of the Effective Date (the "Maturity Date"). In

any event, the entire principal balance of this Note, together with all accrued and unpaid interest, shall be due and payable on the Maturity Date.

SECTION 5.   Non-Recourse Obligations; Payment Default.  If the Makers fail to pay the principal balance of this Note, together with all accrued and unpaid interest, on the Maturity Date (a "Payment Default"), then the Payee shall be permitted to exercise its rights under the Kaiser Gypsum Pledge Agreement and the HPCI Pledge Agreement.  The Payee's sole remedy for nonpayment hereunder shall be to exercise its rights under the Kaiser Gypsum Pledge Agreement and the HPCI Pledge Agreement with respect to the Pledged Collateral (as defined therein).  The Payee shall only have recourse to the Pledged Collateral for payment of this Note, and no other assets of either Maker shall be subject to levy, execution or other enforcement procedure for satisfaction or payment of amounts owing under this Note.

SECTION 6.   Interest.  Prior to the second anniversary of the Effective Date, interest shall not accrue on the principal balance of this Note.  Commencing on the second anniversary of the Effective Date, interest shall accrue on the unpaid principal balance of this Note at the rate of 10% per annum.  For the avoidance of doubt, upon the occurrence of a Payment Default, interest will continue to accrue on any unpaid principal balance of this Note at the rate of 10% per annum from the Maturity Date until all amounts due under this Note are paid in full.  Interest under this Note will be calculated on the basis of a 365/366-day year and paid for the actual number of days elapsed.

SECTION 7.   Application of Partial Payments.  Any payment of this Note that is made in an amount less than the aggregate amount of the entire principal balance and all accrued and unpaid interest shall be applied first to any interest accrued to the date of the payment and then to reduce the principal amount then outstanding.

SECTION 8.   Record of Payment; Business Day.  The Payee shall record the amount of any payment received by it hereunder and the applicable dates with respect thereto, by such method as the Payee may generally employ, and such records of the Payee shall be rebuttably presumptive evidence of the amounts that remain owing and unpaid hereunder; *provided*, *however*, that failure to make any such entry shall in no way affect the Makers' obligations hereunder.  Whenever any payment to be made hereunder is due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day.

SECTION 9.   Notices.  Any notice or other communication hereunder shall be by hand delivery, overnight delivery via nationally recognized overnight delivery service or registered or certified United States mail with return receipt, postage prepaid, addressed to the party at its address specified below (or at any other address that the party may hereafter specify to the other parties in writing), and unless otherwise provided herein shall be deemed to have been given or made when delivered or, if sent via United States mail, when the return receipt therefor is signed by the receiver:

Payee:        [•]
              [•]
              [•]
              Attn:  [•]

Makers:         c/o Three Rivers Management, Inc.
                      600 River Ave., Suite 200
                      Pittsburgh, PA 15212
                      Attn:  Charles E. McChesney II, Esq.

SECTION 10. <u>Governing Law</u>.  This Note shall be deemed a contract made under the laws of the State of [●] without regard to principles of conflicts of laws.

SECTION 11. <u>Severability</u>.  If any one or more of the provisions contained in this Note are invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of all the remaining provisions will not in any way be affected or impaired.  If any one or more provisions contained in this Note are deemed invalid, illegal or unenforceable because of their scope or breadth, such provisions shall be reformed and replaced with provisions whose scope and breadth are valid under applicable law.

SECTION 12. <u>Assignment; Note Register</u>.  This Note shall bind each Maker and such Maker's successors and assigns and shall inure to the benefit of the Payee and its successors and assigns.  This Note may be assigned, in whole or in part, by the Payee and Payee shall provide written notice of any such assignment to the Makers.  The Makers shall maintain a written register setting forth the name and address of the Payee and each of its assigns, and the amounts owing to each hereunder.  This Note may be assigned, in whole or in part, by any Maker, but such Maker shall not be relieved of any of its obligations hereunder.

SECTION 13. <u>Tax Forms</u>.  By accepting this Note, the Payee (including any assignee thereof) agrees to deliver to Makers upon or prior to its receipt of this Note, a duly completed Internal Revenue Service Form W-9 (or applicable Form W-8) establishing a complete exemption from withholding tax, including backup withholding tax, and to subsequently provide to Makers an updated form upon the obsolescence or invalidity of any previously delivered form.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, each Maker has executed and delivered this Note on the date first written above.

KAISER GYPSUM COMPANY, INC.

By:_____

Name:_____

Title:_____

HANSON PERMANENTE CEMENT, INC.

By:_____

Name:_____

Title:_____

# PLEDGE AGREEMENT

This PLEDGE AGREEMENT, dated as of [•], 2020 (as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "Agreement"), made by HANSON PERMANENTE CEMENT, INC., an Arizona corporation, as pledgor (in such capacity and together with any successors in such capacity, "Pledgor"), in favor of the KAISER GYPSUM ASBESTOS PERSONAL INJURY TRUST (together with its permitted successors and assigns, the "Payee").

## RECITALS

A.     Kaiser Gypsum Company, Inc., a North Carolina corporation ("Kaiser Gypsum") and Pledgor, together with Kaiser Gypsum and each of their respective successors and assigns, the "Makers" and each, a "Maker"), have entered into that certain Secured Non-Recourse Payment Note, dated as of date hereof (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Payment Note"), in favor of the Payee.

B.     This Agreement is given by Pledgor in favor of the Payee to secure the payment of all of the Secured Obligations (as defined below).

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Pledgor and the Payee hereby agree as follows:

## ARTICLE I

## DEFINED TERMS

SECTION 1.1   Certain Terms Defined in UCC.   Unless otherwise defined herein, capitalized terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC.

SECTION 1.2   Certain Terms Defined in Payment Note.   Unless otherwise defined herein, capitalized terms used herein that are not defined in the UCC shall have the meanings ascribed to them in the Payment Note.

SECTION 1.3   Terms Defined Herein.   The following terms shall have the following meanings:

"Additional Pledged Shares" shall mean, collectively, with respect to Pledgor, all options, warrants, rights, equity interests and additional shares of capital stock of whatever class of the issuer of the Initial Pledged Shares or any other equity interest in such issuer, together with all rights, privileges, authority and powers of Pledgor relating to such interests issued by such issuer under any Organizational Document of such issuer, and the certificates, instruments and agreements representing such interests.

"<u>Distributions</u>" shall mean, collectively, with respect to Pledgor, all dividends, cash, options, warrants, rights, instruments, distributions, returns of capital or principal, income, interest, profits and other property, interests (debt or equity) or proceeds, including as a result of a split, revision, reclassification or other like change of the Securities Collateral, from time to time received, receivable or otherwise distributed to Pledgor in respect of or in exchange for any or all of the Securities Collateral.

"<u>Initial Pledged Shares</u>" shall mean, collectively, with respect to Pledgor, the issued and outstanding shares of capital stock of issuer described in <u>Schedule 1</u> hereto, together with all rights, privileges, authority and powers of Pledgor relating to such interests in such issuer or under any Organizational Document of such issuer, and the certificates, instruments and agreements representing such shares of capital stock and any and all interest of Pledgor in the entries on the books of any financial intermediary pertaining to the Initial Pledged Shares.

"<u>Organizational Documents</u>" shall mean, with respect to any person, the certificate or articles of incorporation and by-laws (or similar documents) of such person.

"<u>Pledged Shares</u>" shall mean, collectively, the Initial Pledged Shares and the Additional Pledged Shares.

"<u>Secured Obligations</u>" shall mean all payment obligations due, owing or incurred to the Payee by any Maker under or pursuant to the Payment Note, whether present or future, actual or contingent (and whether incurred by any Obligor alone or jointly, and whether as principal or surety or in some other capacity) together with all interest and other amounts accruing thereon.

"<u>Securities Collateral</u>" shall mean, collectively, the Pledged Shares and the Successor Interests.

"<u>Successor Interests</u>" shall mean, collectively, with respect to Pledgor, all shares of each class of the capital stock, interests or certificates owned by Pledgor of any successor corporation, limited liability company, partnership or other entity formed by or resulting from any consolidation or merger in which the issuer of the Pledged Shares is involved but does not survive.

"<u>UCC</u>" shall mean the Uniform Commercial Code as in effect from time to time in the State of [●].

ARTICLE II

GRANT OF SECURITY AND SECURED OBLIGATIONS

SECTION 2.1   <u>Grant of Security Interest</u>. As collateral security for the payment in full of all the Secured Obligations, Pledgor hereby pledges and grants to the Payee, a lien on and security interest in and to all of the right, title and interest of Pledgor in, to and under the following property, wherever located, whether now existing or hereafter arising or acquired from time to time (collectively, the "<u>Pledged Collateral</u>"):

        (a)     all Securities Collateral; and

(b)      all Proceeds and products of the Securities Collateral.

SECTION 2.2    Filings.  Pledgor hereby irrevocably authorizes the Payee at any time and from time to time to file in any relevant jurisdiction any initial financing statements, continuation statements and amendments thereto that contain the information required by Article 9 of the Uniform Commercial Code of each applicable jurisdiction for the filing of any financing statement, continuation statement or amendment covering the Pledged Collateral.

ARTICLE III

PERFECTION; SUPPLEMENTS; FURTHER ASSURANCES;
USE OF PLEDGED COLLATERAL

SECTION 3.1    Delivery of Certificated Securities Collateral.   Pledgor represents and warrants that all certificates, agreements or instruments representing or evidencing the Securities Collateral in existence on the date hereof have been delivered to the Payee in suitable form for transfer by delivery or accompanied by duly executed instruments of transfer or assignment in blank.   Pledgor hereby agrees that all certificates, agreements or instruments representing or evidencing Securities Collateral acquired by Pledgor after the date hereof shall promptly (and in any event within three Business Days) upon receipt thereof by Pledgor be delivered to and held by or on behalf of the Payee pursuant hereto.  All certificated Securities Collateral shall be in suitable form for transfer by delivery or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to the Payee.

SECTION 3.2    Supplements; Further Assurances.  Pledgor shall take such further actions, and execute and deliver to the Payee such additional assignments, agreements, supplements, powers and instruments, as the Payee may in its reasonable judgment deem necessary, wherever required by applicable law, in order to perfect, preserve and protect the security interest in the Pledged Collateral as provided herein and the rights and interests granted to the Payee hereunder, to carry into effect the purposes hereof or better to assure and confirm unto the Payee the Pledged Collateral or permit the Payee to exercise and enforce its rights, powers and remedies hereunder with respect to any Pledged Collateral.

ARTICLE IV

CERTAIN PROVISIONS CONCERNING SECURITIES COLLATERAL

SECTION 4.1    Pledge of Additional Securities Collateral.  Pledgor shall, upon obtaining any Securities Collateral, accept the same in trust for the benefit of the Payee and promptly (and in any event within ten business days thereafter) deliver to the Payee the certificates and other documents required under Section 3.1 in respect of the additional Securities Collateral that are to be pledged pursuant to this Agreement.

SECTION 4.2    Voting Rights; Distributions.  Unless a Payment Default has occurred and is continuing and the Payee has delivered notice to Pledgor providing that its rights under clauses (a) or (b) below shall cease:

(a)     Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Securities Collateral or any part thereof for any purpose not inconsistent with the terms or purposes hereof; and

(b)     Pledgor shall be entitled to receive and retain, and to utilize free and clear of the lien hereof, any and all Distributions; *provided*, *however*, that any and all such Distributions consisting of rights or interests in the form of Securities Collateral shall promptly (and in any event within ten business days after receipt thereof) be delivered to the Payee to hold as Pledged Collateral and shall, if received by Pledgor, be received in trust for the benefit of the Payee, be segregated from the other property or funds of Pledgor and be forthwith delivered to the Payee as Pledged Collateral in the same form as so received (with any necessary or reasonably requested endorsement).

## ARTICLE V

## REMEDIES

Upon the occurrence and during the continuance of any Payment Default, the Payee may from time to time exercise in respect of the Pledged Collateral, in addition to the other rights and remedies provided for herein or otherwise available to it, the following remedies:

(a)     sell, assign or otherwise liquidate, or direct Pledgor to sell, assign or otherwise liquidate, any and all Pledged Collateral or any part thereof, and take possession of the proceeds of any such sale, assignment or liquidation;

(b)     receive, retain and apply any Distributions to the Secured Obligations;

(c)     exercise any and all rights as beneficial and legal owner of the Pledged Collateral, including perfecting assignment of and exercising any and all voting, consensual and other rights and powers with respect to any Pledged Collateral; and

(d)     exercise any other rights and remedies of a secured party on default under the UCC (whether or not the UCC applies to the affected Pledged Collateral).

## ARTICLE VI

## MISCELLANEOUS

SECTION 6.1   <u>Continuing Security Interest; Assignment</u>.  This Agreement shall create a continuing security interest in the Pledged Collateral and shall (a) be binding upon Pledgor and its successors and assigns and (b) inure, together with the rights and remedies of the Payee hereunder, to the benefit of the Payee and each of its successors, transferees and assigns under the Payment Note.  No other persons (including any other creditor of Pledgor) shall have any interest herein or any right or benefit with respect hereto.

SECTION 6.2   <u>Termination Release</u>.  This Agreement shall terminate and the Pledged Collateral shall be released from the lien of this Agreement when the Secured Obligations shall have been paid in full.  Upon termination hereof, the security interests granted hereby shall

terminate and all rights to the Pledged Collateral shall revert to the applicable Pledgor or to such other person as may be entitled thereto pursuant to any applicable law.  Upon termination hereof, the Payee shall promptly, upon the written request and at the sole cost and expense of Pledgor, assign, transfer and deliver to Pledgor, against receipt and without recourse to or warranty by the Payee except to the extent that the Payee has not assigned or otherwise transferred its security interest in the Pledged Collateral, all of the Pledged Collateral as may be in possession of the Payee and shall not have been applied in satisfaction of the Secured Obligations.

SECTION 6.3   Modification in Writing.   No amendment, modification, supplement, termination or waiver of or to any provision hereof, nor consent to any departure by Pledgor therefrom, shall be effective unless in writing and signed by the Payee and Pledgor.   Any amendment, modification or supplement of or to any provision hereof, any waiver of any provision hereof and any consent to any departure by Pledgor from the terms of any provision hereof shall be effective only in the specific instance and for the specific purpose for which made or given. Except where notice is specifically required by this Agreement, no notice to or demand on Pledgor in any case shall entitle Pledgor to any other or further notice or demand in similar or other circumstances.

SECTION 6.4   Notices.   Unless otherwise provided herein, any notice or other communication herein required or permitted to be given shall be given in the manner and become effective as set forth in the Payment Note, as to Pledgor, addressed to it at the address of the Makers set forth in the Payment Note and as to the Payee, addressed to it at the address set forth in the Payment Note, or in each case at such other address as shall be designated by such party in a written notice to the other party complying as to delivery with the terms of this Section 6.4.

SECTION 6.5   Governing Law.  This Agreement shall be deemed a contract made under the laws of the State of [●] without regard to principles of conflicts of laws.

SECTION 6.6   Severability of Provisions.  Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

SECTION 6.7   Execution in Counterparts.  This Agreement and any amendments, waivers, consents or supplements hereto may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all such counterparts together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page of this Agreement by electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, Pledgor and the Payee have caused this Pledge Agreement to be duly executed and delivered by their duly authorized officers as of the date first above written.

HANSON PERMANENTE CEMENT, INC.,
as Pledgor


By: _____
    Name:
    Title:


KAISER GYPSUM ASBESTOS PERSONAL
INJURY TRUST, as Payee


By: _____
    Name:
    Title:  Trustee

Signature Page to Kaiser Gypsum Pledge Agreement

SCHEDULE I

INITIAL PLEDGED SHARES

| PLEDGOR | ISSUER | CLASS OF STOCK OR INTERESTS | PAR VALUE | CERTIFICATE NO(S). | NUMBER OF SHARES | PERCENTAGE OF ALL ISSUED CAPITAL OR OTHER EQUITY INTERESTS OF ISSUER |
|---|---|---|---|---|---|---|
| Hanson Permanente Cement, Inc. | Kaiser Gypsum Company, Inc. | Common Stock | | | | 100% |

# PLEDGE AGREEMENT

This PLEDGE AGREEMENT, dated as of [●], 2020 (as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "Agreement"), made by KH 1 INC., a Delaware corporation, as pledgor (in such capacity and together with any successors in such capacity, "Pledgor"), in favor of the KAISER GYPSUM ASBESTOS PERSONAL INJURY TRUST (together with its permitted successors and assigns, the "Payee").

## RECITALS

A.      Kaiser Gypsum Company, Inc., a North Carolina corporation ("Kaiser Gypsum") and Hanson Permanente Cement, Inc., an Arizona corporation (together with Kaiser Gypsum and each of their respective successors and assigns, the "Makers" and each, a "Maker"), have entered into that certain Secured Non-Recourse Payment Note, dated as of date hereof (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Payment Note"), in favor of the Payee.

B.      This Agreement is given by Pledgor in favor of the Payee to secure the payment of all of the Secured Obligations (as defined below).

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Pledgor and the Payee hereby agree as follows:

ARTICLE I

DEFINED TERMS

SECTION 1.1   Certain Terms Defined in UCC.   Unless otherwise defined herein, capitalized terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC.

SECTION 1.2   Certain Terms Defined in Payment Note.   Unless otherwise defined herein, capitalized terms used herein that are not defined in the UCC shall have the meanings ascribed to them in the Payment Note.

SECTION 1.3   Terms Defined Herein.   The following terms shall have the following meanings:

"Additional Pledged Shares" shall mean, collectively, with respect to Pledgor, all options, warrants, rights, equity interests and additional shares of capital stock of whatever class of the issuer of the Initial Pledged Shares or any other equity interest in such issuer, together with all rights, privileges, authority and powers of Pledgor relating to such interests issued by such issuer under any Organizational Document of such issuer, and the certificates, instruments and agreements representing such interests.

"<u>Distributions</u>" shall mean, collectively, with respect to Pledgor, all dividends, cash, options, warrants, rights, instruments, distributions, returns of capital or principal, income, interest, profits and other property, interests (debt or equity) or proceeds, including as a result of a split, revision, reclassification or other like change of the Securities Collateral, from time to time received, receivable or otherwise distributed to Pledgor in respect of or in exchange for any or all of the Securities Collateral.

"<u>Initial Pledged Shares</u>" shall mean, collectively, with respect to Pledgor, the issued and outstanding shares of capital stock of issuer described in <u>Schedule 1</u> hereto, together with all rights, privileges, authority and powers of Pledgor relating to such interests in such issuer or under any Organizational Document of such issuer, and the certificates, instruments and agreements representing such shares of capital stock and any and all interest of Pledgor in the entries on the books of any financial intermediary pertaining to the Initial Pledged Shares.

"<u>Organizational Documents</u>" shall mean, with respect to any person, the certificate or articles of incorporation and by-laws (or similar documents) of such person.

"<u>Pledged Shares</u>" shall mean, collectively, the Initial Pledged Shares and the Additional Pledged Shares.

"<u>Secured Obligations</u>" shall mean all payment obligations due, owing or incurred to the Payee by any Maker under or pursuant to the Payment Note, whether present or future, actual or contingent (and whether incurred by any Obligor alone or jointly, and whether as principal or surety or in some other capacity) together with all interest and other amounts accruing thereon.

"<u>Securities Collateral</u>" shall mean, collectively, the Pledged Shares and the Successor Interests.

"<u>Successor Interests</u>" shall mean, collectively, with respect to Pledgor, all shares of each class of the capital stock, interests or certificates owned by Pledgor of any successor corporation, limited liability company, partnership or other entity formed by or resulting from any consolidation or merger in which the issuer of the Pledged Shares is involved but does not survive.

"<u>UCC</u>" shall mean the Uniform Commercial Code as in effect from time to time in the State of [●].

ARTICLE II

GRANT OF SECURITY AND SECURED OBLIGATIONS

SECTION 2.1   <u>Grant of Security Interest</u>. As collateral security for the payment in full of all the Secured Obligations, Pledgor hereby pledges and grants to the Payee, a lien on and security interest in and to all of the right, title and interest of Pledgor in, to and under the following property, wherever located, whether now existing or hereafter arising or acquired from time to time (collectively, the "<u>Pledged Collateral</u>"):

(a)   all Securities Collateral; and

(b)      all Proceeds and products of the Securities Collateral.

SECTION 2.2   <u>Filings</u>.  Pledgor hereby irrevocably authorizes the Payee at any time and from time to time to file in any relevant jurisdiction any initial financing statements, continuation statements and amendments thereto that contain the information required by Article 9 of the Uniform Commercial Code of each applicable jurisdiction for the filing of any financing statement, continuation statement or amendment covering the Pledged Collateral.

## ARTICLE III

## PERFECTION; SUPPLEMENTS; FURTHER ASSURANCES; USE OF PLEDGED COLLATERAL

SECTION 3.1   <u>Delivery of Certificated Securities Collateral</u>.  Pledgor represents and warrants that all certificates, agreements or instruments representing or evidencing the Securities Collateral in existence on the date hereof have been delivered to the Payee in suitable form for transfer by delivery or accompanied by duly executed instruments of transfer or assignment in blank.  Pledgor hereby agrees that all certificates, agreements or instruments representing or evidencing Securities Collateral acquired by Pledgor after the date hereof shall promptly (and in any event within three Business Days) upon receipt thereof by Pledgor be delivered to and held by or on behalf of the Payee pursuant hereto.  All certificated Securities Collateral shall be in suitable form for transfer by delivery or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to the Payee.

SECTION 3.2   <u>Supplements; Further Assurances</u>.  Pledgor shall take such further actions, and execute and deliver to the Payee such additional assignments, agreements, supplements, powers and instruments, as the Payee may in its reasonable judgment deem necessary, wherever required by applicable law, in order to perfect, preserve and protect the security interest in the Pledged Collateral as provided herein and the rights and interests granted to the Payee hereunder, to carry into effect the purposes hereof or better to assure and confirm unto the Payee the Pledged Collateral or permit the Payee to exercise and enforce its rights, powers and remedies hereunder with respect to any Pledged Collateral.

## ARTICLE IV

## CERTAIN PROVISIONS CONCERNING SECURITIES COLLATERAL

SECTION 4.1   <u>Pledge of Additional Securities Collateral</u>.  Pledgor shall, upon obtaining any Securities Collateral, accept the same in trust for the benefit of the Payee and promptly (and in any event within ten business days thereafter) deliver to the Payee the certificates and other documents required under <u>Section 3.1</u> in respect of the additional Securities Collateral that are to be pledged pursuant to this Agreement.

SECTION 4.2   <u>Voting Rights; Distributions</u>.  Unless a Payment Default has occurred and is continuing and the Payee has delivered notice to Pledgor providing that its rights under clauses (a) or (b) below shall cease:

(a)    Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Securities Collateral or any part thereof for any purpose not inconsistent with the terms or purposes hereof; and

(b)    Pledgor shall be entitled to receive and retain, and to utilize free and clear of the lien hereof, any and all Distributions; *provided*, *however*, that any and all such Distributions consisting of rights or interests in the form of Securities Collateral shall promptly (and in any event within ten business days after receipt thereof) be delivered to the Payee to hold as Pledged Collateral and shall, if received by Pledgor, be received in trust for the benefit of the Payee, be segregated from the other property or funds of Pledgor and be forthwith delivered to the Payee as Pledged Collateral in the same form as so received (with any necessary or reasonably requested endorsement).

## ARTICLE V

## REMEDIES

Upon the occurrence and during the continuance of any Payment Default, the Payee may from time to time exercise in respect of the Pledged Collateral, in addition to the other rights and remedies provided for herein or otherwise available to it, the following remedies:

(a)    sell, assign or otherwise liquidate, or direct Pledgor to sell, assign or otherwise liquidate, any and all Pledged Collateral or any part thereof, and take possession of the proceeds of any such sale, assignment or liquidation;

(b)    receive, retain and apply any Distributions to the Secured Obligations;

(c)    exercise any and all rights as beneficial and legal owner of the Pledged Collateral, including perfecting assignment of and exercising any and all voting, consensual and other rights and powers with respect to any Pledged Collateral; and

(d)    exercise any other rights and remedies of a secured party on default under the UCC (whether or not the UCC applies to the affected Pledged Collateral).

## ARTICLE VI

## MISCELLANEOUS

SECTION 6.1    Continuing Security Interest; Assignment.    This Agreement shall create a continuing security interest in the Pledged Collateral and shall (a) be binding upon Pledgor and its successors and assigns and (b) inure, together with the rights and remedies of the Payee hereunder, to the benefit of the Payee and each of its successors, transferees and assigns under the Payment Note.    No other persons (including any other creditor of Pledgor) shall have any interest herein or any right or benefit with respect hereto.

SECTION 6.2    Termination Release.    This Agreement shall terminate and the Pledged Collateral shall be released from the lien of this Agreement when the Secured Obligations shall have been paid in full.    Upon termination hereof, the security interests granted hereby shall

terminate and all rights to the Pledged Collateral shall revert to the applicable Pledgor or to such other person as may be entitled thereto pursuant to any applicable law.  Upon termination hereof, the Payee shall promptly, upon the written request and at the sole cost and expense of Pledgor, assign, transfer and deliver to Pledgor, against receipt and without recourse to or warranty by the Payee except to the extent that the Payee has not assigned or otherwise transferred its security interest in the Pledged Collateral, all of the Pledged Collateral as may be in possession of the Payee and shall not have been applied in satisfaction of the Secured Obligations.

SECTION 6.3   Modification in Writing.   No amendment, modification, supplement, termination or waiver of or to any provision hereof, nor consent to any departure by Pledgor therefrom, shall be effective unless in writing and signed by the Payee and Pledgor.   Any amendment, modification or supplement of or to any provision hereof, any waiver of any provision hereof and any consent to any departure by Pledgor from the terms of any provision hereof shall be effective only in the specific instance and for the specific purpose for which made or given. Except where notice is specifically required by this Agreement, no notice to or demand on Pledgor in any case shall entitle Pledgor to any other or further notice or demand in similar or other circumstances.

SECTION 6.4   Notices.    Unless otherwise provided herein, any notice or other communication herein required or permitted to be given shall be given in the manner and become effective as set forth in the Payment Note, as to Pledgor, addressed to it at the address of the Makers set forth in the Payment Note and as to the Payee, addressed to it at the address set forth in the Payment Note, or in each case at such other address as shall be designated by such party in a written notice to the other party complying as to delivery with the terms of this Section 6.4.

SECTION 6.5   Governing Law.  This Agreement shall be deemed a contract made under the laws of the State of [●] without regard to principles of conflicts of laws.

SECTION 6.6   Severability of Provisions.  Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

SECTION 6.7   Execution in Counterparts.   This Agreement and any amendments, waivers, consents or supplements hereto may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all such counterparts together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page of this Agreement by electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, Pledgor and the Payee have caused this Pledge Agreement to be duly executed and delivered by their duly authorized officers as of the date first above written.

KH 1, INC.,
as Pledgor


By: _____
      Name:
      Title:


KAISER GYPSUM ASBESTOS PERSONAL
INJURY TRUST, as Payee


By: _____
      Name:
      Title:  Trustee

SCHEDULE I

## INITIAL PLEDGED SHARES

| PLEDGOR | ISSUER | CLASS OF STOCK OR INTERESTS | PAR VALUE | CERTIFICATE NO(S). | NUMBER OF SHARES | PERCENTAGE OF ALL ISSUED CAPITAL OR OTHER EQUITY INTERESTS OF ISSUER |
|---------|--------|------------------------------|-----------|---------------------|-------------------|----------------------------------------------------------------------|
| KH 1, Inc. | Hanson Permanente Cement, Inc. | Common Stock | | | | 100% |

## **Exhibit I.A.108**

List of Protected Affiliates

A.R.C. (Western) Limited
Al Manar Cement Holding S.a.s.
Amey Group Limited (The)
Amey Roadstone International Limited
Appleby Group Limited
ARC Aggregates Limited
ARC Building Limited
ARC Concrete (Anglia) Limited
ARC Concrete Limited
ARC Holdings Limited
ARC Land Holdings Limited
ARC Limited
ARC Property Investments Limited
ARC Slimline Limited
ARC South Wales Limited
ARC South Wales Mortar Limited
ARC South Wales Quarries Limited
ARC South Wales Surfacing Limited
Áridos Sanz S.L.U.
Attendflower Limited
B.V. Betoncentrale De Schelde
B.V. Betonmortelcentrale 'BEMA'
Banbury Alton Limited
Baustoffwerke Dresden GmbH & Co. KG
Beazer Limited
Beazer Services Limited
Beforebeam Limited
Beforeblend Limited
Berec Holdings B.V.
Beton Baguette Marcel S.A.
Béton Contrôle de l'Adour S.a.s.
Béton Contrôle du Pays Basque S.a.s.
Bickleylake Limited
Birchwood Concrete Products Limited
Birchwood Omnia Limited
Bonny Holding Ltd.
BravoBloc S.r.l.
BravoEnergy S.r.l.
Brazier Aggregates Limited
Bristol Sand and Gravel Company Limited
British Agricultural Services Limited
British Ever Ready Limited
Bulldog Company Limited
C.B.R. Finance S.A.
C.T.G. S.p.A.
Calcestruzzi S.p.A.

Calumite Limited
Cantera El Hoyon, S.A.U.
Canteras Mecánicas Cárcaba, S.A.U.
Carimat Béton S.A.
Castle Building Products Limited
Castle Cement (Chatburn) Limited
Castle Cement (Clyde) Limited
Castle Cement (Ketton) Limited
Castle Cement (Padeswood) Limited
Castle Cement (Pitstone) Limited
Castle Cement (Ribblesdale) Limited
Castle Cement Limited
Castle Lime Limited
Castle Pension Scheme Trustees Limited
CBR Baltic B.V.
CBR International Services S.A.
CBR Portland B.V.
Cem Invest Ltd
Cementrum I B.V.
Centro Administrativo y de Servicios de Malaga S.A.
CGF Capital B.V.
CHB Group Limited
CHB P H R Limited
CHB Products Limited
Chemical Manufacture and Refining Limited
Chester Road Sand and Gravel Company Limited
Ciment du Littoral S.a.s.
Ciments Calcia S.a.s.
Ciments Français S.a.s.
CIMFRA (China) Limited S.a.s.
Ciminter S.A.
City of London Heliport Limited
Civil and Marine (Holdings) Limited
Civil and Marine Limited
Civil and Marine Slag Cement Limited
Claughton Manor Brick Limited (The)
Clyde Cement Limited
Cocimar S.a.s.
Codesib S.a.s.
Coln Gravel Company Limited
Compagnie Financière et de Participations S.a.s.
Compagnie pour l'Investissement Financier en Inde S.a.s.
Compania General de Canteras, S.A.
Conbloc Limited
Concrete Italia S.r.l.
Conglomerantes Hidráulicos Especiales S.L.

Contiga Holding GmbH
Contiga Tinglev Montage GmbH
Creative Land Developers Limited
Cromhall Quarries, Limited
Cumbrian Industrials Limited
Delmorgal Limited
Desimpel Brick Limited
Devon Concrete Works, Limited
Dragages du Pont de St Leger S.a.s.
Dragages Transports & Travaux Maritimes S.a.s.
DUPAMIJ Holding GmbH
E & S Retail Limited
E Sub Limited
Effectengage Limited
ENCI B.V.
ENCI Holding N.V.
Ensign Park Limited
Essroc Netherlands Coöperatief U.A.
Eurarco France S.A.
Exakt Kiesaufbereitung GmbH
F.C. Precast Concrete Limited
Ferrersand Aggregates Limited
Fruitbat Company
Fulber Limited
Garonne Labo S.à.r.l
Granulats de la Drôme S.a.s.
Granulats de Lahontan
Granulats Ouest - GO S.a.s.
Greenwoods (St. Ives) Limited
Gruppo Italsfusi S.r.l.
GSM S.a.s.
Guidelink
Habfield Limited
Hanson (BB) Limited
Hanson (BBIN02) Limited
Hanson (CGF) (No. 1) Limited
Hanson (CGF) (No. 2) Limited
Hanson (CGF) Finance Limited
Hanson (CGF) Holdings Limited
Hanson (ER - No. 5) Limited
Hanson (ER - No. 10) Limited
Hanson (F) Limited
Hanson (FH) Limited
Hanson (FP) Limited
Hanson (LBC) Limited
Hanson (LBE) Limited

Hanson (MR) Limited
Hanson (NAIL) Limited
Hanson (RBMC) Limited
Hanson (SH) Limited
Hanson Aggregates (North) Limited
Hanson Aggregates Holding Nederland B.V.
Hanson Aggregates Limited
Hanson Aggregates Marine Limited
Hanson Aggregates Nederland B.V.
Hanson Aggregates South Wales Holdings Limited
Hanson Aggregates South Wales Limited
Hanson Aggregates UK Limited
Hanson America Holdings (1) Limited
Hanson America Holdings (2) Limited
Hanson America Holdings (3) Limited
Hanson America Holdings (4) Limited
Hanson Aruba Limited
Hanson Bath and Portland Stone Limited
Hanson Batteries Limited
Hanson Blocks North Limited
Hanson Brick Ltd
Hanson Building Materials Europe Limited
Hanson Building Materials Limited
Hanson Building Products (2003) Limited
Hanson Building Products Limited
Hanson Canada Limited
Hanson Clay Products Limited
Hanson Concrete Products Limited
Hanson Crewing Services Limited
Hanson Devon Designated Activity Company
Hanson Facing Bricks Limited
Hanson Finance (2003) Limited
Hanson Finance Limited
Hanson Financial Services Limited
Hanson Foods Limited
Hanson FP Holdings B.V.
Hanson Funding (G) Limited
Hanson Germany GmbH & Co. KG
Hanson Gerrard Limited
Hanson H4 Limited
Hanson H5
Hanson Hedging (Dollars) (1) Limited
Hanson Hedging (Dollars) (2) Limited
Hanson Hispania Hormigones SL
Hanson Hispania, S.A.U.
Hanson Holdings (1) Limited

Hanson Holdings (2) Limited
Hanson Holdings (3) Limited
Hanson Holdings Limited
Hanson Industrial (Engineering Holdings) Limited
Hanson Industrial Limited
Hanson International Holdings Limited
Hanson Island Management Limited
Hanson Land Development Limited
Hanson Limited
Hanson Marine Holdings Limited
Hanson Marine Limited
Hanson Overseas Corporation Limited
Hanson Overseas Holdings Limited
Hanson Packed Products Limited
Hanson Peabody Limited
Hanson Pioneer España, S.L.U.
Hanson Quarry Products Europe Limited
Hanson Quarry Products Holdings Limited
Hanson Quarry Products Overseas Limited
Hanson Quarry Products Trade Finance Limited
Hanson Quarry Products Transport Limited
Hanson Quarry Products Ventures Limited
Hanson Retail Limited
Hanson Ship Management Ltd
Hanson Thermalite Limited
Hanson TIS Holdings Limited
Hanson TIS Limited
Hanson Trust Limited
Hanson Trustees Limited
Harrisons Limeworks Limited
Hartsholme Property Limited
HB Hotels Limited
HC Asia Holding GmbH
HC Fuels Limited
HC Green Trading Limited
HC Hanson Holding B.V.
HC Italia SRL
HC Trading B.V.
HC Trading Malta Limited
HCT Holding Malta Limited
HeidelbergCement BP Limited
HeidelbergCement Canada Holding Limited
HeidelbergCement Central Europe East Holding B.V.
HeidelbergCement Euro I Limited
HeidelbergCement Euro II Limited
HeidelbergCement Euro III Limited

HeidelbergCement Finance Luxembourg S.A.

HeidelbergCement France S.A.S.

HeidelbergCement Grundstücksgesellschaft mbH & Co. KG

HeidelbergCement Holding Coöperatief U.A.

HeidelbergCement Holding S.à r.l.

HeidelbergCement Holdings Limited

HeidelbergCement International Holding GmbH

HeidelbergCement Logistik GmbH & Co. KG

HeidelbergCement Mediterranean Basin Holdings S.L.U.

HeidelbergCement Netherlands Holding B.V.

HeidelbergCement Reinsurance Luxembourg S.A.

HeidelbergCement UK Holding II Limited

HeidelbergCement UK Holding Limited

HeidelbergCement UK Limited

HeidelbergCement, Funk & Kapphan Grundstücksgesellschaft GmbH & Co. KG

Heidelberger Beton Donau-Naab GmbH & Co. KG

Heidelberger Beton GmbH

Heidelberger Betonelemente GmbH & Co. KG

Heidelberger Betonpumpen Rhein-Main-Nahe GmbH & Co. KG

Heidelberger Kalksandstein GmbH

Heidelberger Kalksandstein Grundstücks- und Beteiligungs-GmbH & Co. KG

Heidelberger Kieswerke Niederrhein GmbH

Heidelberger Kieswerke Rhein-Ruhr GmbH

Heidelberger KS Beteiligungen Deutschland GmbH & Co. KG

Heidelberger Sand und Kies GmbH

Heidelberger Sand und Kies Handel & Logistik GmbH

HIPS (Trustees) Limited

HK Holdings (No. 2) Limited

HK Holdings (No. 1) Limited

Holms Sand & Gravel Company (1985) (The)

Holms Sand & Gravel Company Limited (The)

Homes (East Anglia) Limited

Hormigones y Áridos, S.A.U.

Hormigones y Minas S.A.

Housemotor Limited

Houseprice Limited

Houserate Limited

HPL Albany House Developments Limited

HPL Estates Limited

HPL Investments Limited

HPL Properties Limited

HPL Property Limited

HPL West London Developments Limited

Hunziker  Kalksandstein AG

Hurst and Sandler Limited

Immobilière des Technodes S.a.s.

-6-

Imperial Foods Holdings Limited
Imperial Group Limited
Imperial Seafoods Limited
Ing. Sala S.p.A.
Interbulk Trading (IBT) S.A.
Intercom S.r.l.
Investcim S.a.s.
Irvine - Whitlock Limited
Italcementi Finance S.A.
Italcementi Ingegneria S.r.l.
Italcementi S.p.A.
J A Crabtree & Co Limited
J. Riera, S.A.
James Grant & Company (West) Limited
Judkins Limited
K.M. Property Development Company Limited
KalininCement Holding B.V.
Kazakhstan Cement Holding B.V.
Ketton Cement Limited
Kieswerk Maas-Roeloffs GmbH & Co KG
Kieswerk Maas-Roeloffs Verwaltungsgesellschaft mbH
Kieswerke Andresen GmbH
Kingston Minerals Limited
L.B. (Stewartby) Limited
Lehigh B.V.
Lehigh UK Limited
Les Sabliers de l'Odet S.a.s.
Lindustries Limited
Lithonplus GmbH & Co. KG
Localdouble Limited
M E Sub Limited
Mantle & Llay Limited
Marnee Limited
Marples Ridgway Limited
Matériaux et Béton du Nord S.à r.l.
Mebin B.V.
Mebin Leeuwarden B.V.
Menaf S.a.s.
Meppeler Betoncentrale B.V.
Mibau Baustoffhandel GmbH
Mibau Holding GmbH
Mibau Nederland B.V.
Mibau Nederland Holding B.V.
Midland Quarry Products Limited
Milton Hall (Southend) Brick Company Limited (The)
Minster Quarries Limited

Mixconcrete Holdings Limited
Mixconcrete Limited
Mold Tar Macadam Co.Limited
Morebeat Limited
Motioneager Limited
National Brick Company Limited
National Star Brick and Tile Holdings Limited
National Star Limited
NedCem Holding B.V.
Nuova Sacelit S.r.l.
Paderborner Transport - Beton - Gesellschaft mit beschränkter Haftung & Co. K.-G.
Palatina Insurance Ltd.
Paperbefore Limited
Parcib S.a.s.
Pencrete Limited
Picon Overseas Limited
Piedras y Derivados, S.A.U.
PILC Limited
Pimco 2945 Limited
Pinden Plant & Processing Co. Limited (The)
Pioneer Aggregates (UK) Limited
Pioneer Asphalts (U.K.) Limited
Pioneer Concrete (U.K.) Limited
Pioneer Concrete Holdings Limited
Pioneer International Group Holdings Limited
Pioneer Investments UK Limited
Pioneer Overseas Investments Limited
Pioneer Willment Concrete Limited
Premix Concrete Limited
Purfleet Aggregates Limited
Redshow Limited
Rezincote (1995) Limited
Ribblesdale Cement Limited
Roads Reconstruction Limited
Rostocker Zementumschlagsgesellschaft mbH
Rouennaise de Transformation S.a.s.
S Sub Limited
S Z G - Saarländische Zementgesellschaft mit beschränkter Haftung
S.A. Cimenteries CBR
Sabine Limited
Sablimaris S.a.s.
Sagrex B.V.
Sagrex France S.A.S.
Sagrex Holding B.V.
Sagrex Productie B.V.
Sailtown Limited

Saint Hubert Investments S.à r.l.

SAMA S.r.l. - in liquidazione

Samuel Wilkinson & Sons Limited

Sandwerke Biesern GmbH

Sax S.a.s.

Scancem Energy and Recovery Limited

Scancem International Limited

Scancem Recovery Limited

Scancem Supply Limited

SCE de la Grange d'Etaule

Seagoe Concrete Products Limited

Second City Properties Limited

Shapedirect Limited

SJP 1 Limited

Slotcount Limited

Small Lots (Mix-It) Limited

SMW Sand und Mörtelwerk GmbH & Co. KG

Sociedad Financiera y Minera, S.A.

Socli S.a.s.

Solrec Limited

SQ Corporation Limited

SQ Finance No 2 Limited

St Edouard S.à r.l.

ST JUDE S.à r.l.

ST MARIUS S.à r.l.

ST NICOLAS S.à r.l.

Stema Shipping (UK) Limited

Stema Shipping France S.a.s.

Stephen Toulson & Sons Limited

Stewartby Housing Association Limited

Supamix Limited

Technodes S.a.s.

Tercim S.a.s.

The Purfleet Ship to Shore Conveyor Company Limited

Thistleton Quarries Limited

Tillotson Commercial Motors Limited

Tillotson Commercial Vehicles Limited

Tilmanstone Brick Limited

Timesound

Tinglev Elementfabrik GmbH

TLQ Limited

TMC Pioneer Aggregates Limited

Tratel Affrètement S.a.s.

Tratel S.a.s.

Tunnel Cement Limited

U.D.S. Holdings B.V.

-9-

UDS (No 10)
UDS (No 3) Limited
UDS Corporation Limited
UDS Finance Limited
UDS Group Limited
UDS Holdings (1) Limited
UGI Group Limited
Unibéton S.a.s.
Unibéton-Var S.a.s.
United Gas Industries Limited
Uniwerbéton S.a.s.
V.E.A. Limited
V.O.F. 'Bouwdok Barendrecht'
Ventore S.L.
Viewgrove Investments Limited
Visionfocus Limited
Visionrefine Limited
Welbecson Group Limited
WIKA Sand und Kies GmbH & Co. KG)
Wineholm Limited
Abetong AB
AS Abetong
AS Kunda Nordic Tsement
BayKaz Beton LLP
BEKTAS Group LLP
Beton.Ata LLP
Betong Sör AS
Betongindustri AB
Betonpumpy a doprava SK a.s.
BETOTECH, s.r.o.
Björgun ehf
BM Valla ehf
Bukhtarma Cement Company LLP
Calumite s.r.o.
Carpat Beton Servicii Pompe SRL
Carpat Cemtrans S.R.L.
CaspiCement Limited Liability Partnership
Caspinerud Limited Liability Partnership
Cementa AB
Cementa Fastighets AB
Cementa sp. z o. o.
Českomoravský beton, a.s.
Českomoravský cement, a.s.
Českomoravský štěrk, a.s.
Contiga AB
Contiga AS

Contiga Holding AS
Contiga Tinglev A/S
Devnya Cement AD
DK Beton A/S
DK Cement A/S
Eignarhaldsfélagið Hornsteinn ehf.
Fastighets AB Limhamns Kalkbrott
Fastighets AB Lövholmen
Garkalnes Grants SIA
Górażdże Beton Sp. z o.o.
Górażdże Cement S.A.
Górażdże Kruszywa Sp. z o.o.
Halyps Building Materials S.A.
Hanson Iceland EHF
HC Betons SIA
HC Betoon AS, Estonia
HeidelbergBeton Ukraine Limited Liability Company
HeidelbergCement Africa Holding Kommanditbolag
HeidelbergCement Danmark A/S
HeidelbergCement Iceland EHF
HeidelbergCement Miljö AB
HeidelbergCement Northern Europe AB
HeidelbergCement Northern Europe Pumps & Trucks A/S
HeidelbergCement Norway a.s.
HeidelbergCement Romania SA
HeidelbergCement Services - LLP
HeidelbergCement Sweden AB
HeidelbergCement Ukraine Private Joint Stock Company
HeidelbergGranit Ukraine Limited Liability Company
Italmed Cement Company Ltd.
Kamenivo Slovakia a.s.
KSL Limited Liability Company
LLC 'HeidelbergCement Rus'
Lyulyaka Materials EAD
Magnatool AB
Mibau Polska Sp. z o.o.
Norbetong AS
Norbetong Pumping AS
Norcem AS
Nordic Precast Group AB
Norsk Stein AS
NorStone AS
OJSC "Slantsev Cement Factory "Cesla"
OOO "Norcem Kola"
OOO KaliningradCement
Open Joint Stock Company Gurovo-Beton

Precon Polska Sp.z.o.o.
Protenna AB
Recyfuel SRL
Renor AS
Rybalsky Quarry Limited Liability Company
Sand- och grusaktiebolaget Jehander
Scancem Central Africa Holding 1 AB
Scancem Central Africa Holding 2 AB
Scancem Central Africa Holding 3 AB
Scancem Central Africa Holding 4 AB
Scancem East OY AB
Scancem Holding AS
Scancem International DA
Sementsverksmidjan ehf
ShymkentCement JSC
SIA BALTIC SAULE
SIA SBC
SIA SBC Finance
SIA SBC Property
Splitt Chartering Aps
SSC Lithuania UAB
Stema Shipping A/S
TBG BETONMIX a. s.
TBG BETONPUMPY MORAVA s.r.o.
TBG SEVEROZÁPADNÍ ČECHY s.r.o.
TBG Slovensko, a. s.
TBG Východní Čechy s.r.o.
TBG VYSOČINA s.r.o.
TBG ZNOJMO s. r. o.
UAB Gerdukas
UAB HC Betonas
UAB Heidelberg Cement Klaipeda
Vulkan Cement AD
116 Sisquoc Property LLC
755 Portland Property LLC
8364 Fordyce Property LLC
Amangani SA
Amcord, Inc.
Anche Holdings Inc
Asian Carriers Inc.
Astravance Corp.
Beazer East, Inc.
Cadman (Black Diamond), Inc.
Cadman (Rock), Inc.
Cadman (Seattle), Inc.
Cadman Materials, Inc.

Cadman, Inc.
Calaveras Materials Inc.
Calaveras-Standard Materials, Inc.
Cambridge Aggregates Inc.
Campbell Concrete & Materials LLC
Campbell Transportation Services LLC
Cavenham Forest Industries LLC
Cindercrete Mining Supplies Ltd.
Cindercrete Products Limited
Civil and Marine Inc.
Commercial Aggregates Transportation and Sales, LLC
Constar LLC
Continental Florida Materials Inc.
Cowichan Corporation
Essex NA Holdings LLC
Essroc Holdings LLC
Ferndale Ready Mix & Gravel, Inc.
Greyrock, LLC
Gulf Coast Stabilized Materials LLC
Gypsum Carrier Inc
Hampshire Properties LLC
HAMW Minerals, Inc.
Hanson Aggregates LLC
Hanson Aggregates BMC, Inc.
Hanson Aggregates Davon LLC
Hanson Aggregates East LLC
Hanson Aggregates Mid-Pacific, Inc.
Hanson Aggregates Midwest LLC
Hanson Aggregates New York LLC
Hanson Aggregates Pacific Southwest, Inc.
Hanson Aggregates Pennsylvania LLC
Hanson Aggregates Southeast LLC
Hanson Aggregates WRP, Inc.
Hanson BC Limited
Hanson Building Materials America LLC
Hanson Green Limited
Hanson Marine Finance, Inc.
Hanson Marine Operations, Inc.
Hanson Ready Mix, Inc.
Hanson Structural Precast, Inc.
HBMA Holdings LLC
HBP Mineral Holdings LLC
HBP Property Holdings LLC
HC Trading International Inc.
HNA Investments
KH 1 Inc.

Lehigh Cement Company LLC
Lehigh Hanson Canada ULC
Lehigh Hanson ECC, Inc.
Lehigh Hanson Materials Limited
Lehigh Hanson Receivables LLC
Lehigh Hanson Services LLC
Lehigh Hanson, Inc.
Lehigh Northwest Cement Company
Lehigh Northwest Marine, LLC
Lehigh Portland Holdings, LLC
Lehigh Portland Investments, LLC
Lehigh Realty Company
Lehigh Southwest Cement Company
Lehigh White Cement Company
LHI Duomo Holdings LLC
Material Service Corporation
Mineral and Land Resources Corporation
Mission Valley Rock Co.
PCAz Leasing, Inc.
Pioneer International Overseas Corporation
Rimarcal Corporation
Sherman Industries LLC
Shrewsbury Properties LLC
Sinclair General Corporation
South Valley Materials, Inc.
Standard Concrete Products, Inc.
Three Rivers Management, Inc.
Tomahawk, Inc.
Vestur Insurance (Bermuda) Ltd
Asia Cement Energy Conservation Co., Ltd.
Asia Cement Products Co., Ltd.
Asia Cement Public Co., Ltd.
Bitumix Granite Sdn Bhd
Butra HeidelbergCement Sdn. Bhd.
Calga Sands Pty Ltd
CGF Pty Limited
Christies Stone Quarries Pty Ltd
COCHIN Cements Ltd.
Concrete Materials Laboratory Sdn Bhd
Consolidated Quarries Pty Ltd.
Excel Quarries Pty Limited
Fairfield Pre-Mix Concrete Pty Ltd
Galli Quarries Pty Limited
Gerak Harapan Sdn Bhd
Gulbarga Cement Limited
Hanson Australia (Holdings) Proprietary Limited

JA00349

Hanson Australia Cement (2) Pty Ltd
Hanson Australia Cement Pty Limited
Hanson Australia Funding Limited
Hanson Australia Investments Pty Limited
Hanson Australia Pty Limited
Hanson Building Materials (S) Pte Ltd
Hanson Building Materials Cartage Sdn Bhd
Hanson Building Materials Industries Sdn Bhd
Hanson Building Materials Malaysia Sdn Bhd
Hanson Building Materials Manufacturing Sdn Bhd
Hanson Building Materials Production Sdn Bhd
Hanson Building Materials Transport Sdn Bhd
Hanson Building Materials-KTPC Sdn Bhd
Hanson Building Materials-KTPC-PBPM Sdn Bhd
Hanson Building Materials-PBPM Sdn Bhd
Hanson Cement Holdings Pty Ltd
Hanson Concrete (M) Sdn Bhd
Hanson Construction Materials Pty Ltd
Hanson Finance Australia Ltd
Hanson Holdings (M) Sdn Bhd
Hanson Investment Holdings Pte Ltd
Hanson Landfill Services Pty Ltd
Hanson Pacific (S) Pte Limited
Hanson Precast Pty Ltd
Hanson Pty Limited
Hanson Quarries Victoria Pty Limited
Hanson Quarry Products (Batu Pahat) Sdn Bhd
Hanson Quarry Products (EA) Sdn Bhd
Hanson Quarry Products (Holdings) Sdn Bhd
Hanson Quarry Products (Kuantan) Sdn Bhd
Hanson Quarry Products (Kulai) Sdn Bhd
Hanson Quarry Products (Land) Sdn Bhd
Hanson Quarry Products (Masai) Sdn Bhd
Hanson Quarry Products (Northern) Sdn Bhd
Hanson Quarry Products (Pengerang) Sdn Bhd
Hanson Quarry Products (Perak) Sdn Bhd
Hanson Quarry Products (Premix) Sdn Bhd
Hanson Quarry Products (Rawang) Sdn Bhd
Hanson Quarry Products (Segamat) Sdn Bhd
Hanson Quarry Products (Tempoyak) Sdn Bhd
Hanson Quarry Products (Terengganu) Sdn Bhd
Hanson Quarry Products Sdn Bhd
HCT Services Asia Pte. Ltd.
HeidelbergCement Asia Pte Ltd
HeidelbergCement Bangladesh Limited
HeidelbergCement Holding HK Limited

HeidelbergCement India Limited
HeidelbergCement Myanmar Company Limited
Hymix Australia Pty Ltd
Jalaprathan Cement Public Co., Ltd.
Jalaprathan Concrete Co., Ltd.
Meghna Energy Limited
Naga Property Co., Ltd.
Pioneer Concrete (Hong Kong) Limited
Pioneer Concrete (Tasmania) Proprietary Limited
Pioneer Concrete (WA) Pty Ltd
Pioneer Concrete Services (Malaysia) S/B
Pioneer International (Labuan) Ltd
Pioneer International Holdings Pty Ltd
Pioneer North Queensland Pty Ltd
Plentong Granite Industries Sdn Bhd
PT Bahana Indonor
PT Bhakti Sari Perkasa Abadi
PT Dian Abadi Perkasa
PT Indocement Tunggal Prakarsa Tbk.
PT Indomix Perkasa
PT Jaya Berdikari Cipta
PT Lentera Abadi Sejahtera
PT Lintas Bahana Abadi
PT Makmur Abadi Perkasa Mandiri
PT Mandiri Sejahtera Sentra
PT Mineral Industri Sukabumi
PT Multi Bangun Galaxy
PT Pionirbeton Industri
PT Sahabat Muliasakti
PT Sari Bhakti Sejati
PT Tarabatuh Manunggal
PT Terang Prakarsa Cipta
PT Tigaroda Rumah Sejahtera
PT Tiro Abadi Perkasa
Rajang Perkasa Sdn Bhd
Realistic Sensation Sdn Bhd
Seas Co., Ltd.
Singha Cement (Private) Limited
Sitapuram Power Limited
Sofinaz Holdings Sdn Bhd
South Coast Basalt Pty Ltd
Tanah Merah Quarry Sdn Bhd
Valscot Pty Limited
Vaniyuth Co., Ltd.
Waterfall Quarries Pty Limited
West Coast Premix Pty Ltd

Yalkara Contracting Pty Ltd
Zuari Cement Ltd.
ACH Investments Limited
Africim S.A.
Al Mahaliya Ready Mix Concrete W.L.L.
Austral Cimentos Sofala, SA
Calcim S.A.
Cimbenin SA
CimBurkina S.A.
Ciments du Maroc S.A.
Ciments du Togo SA
DECOM Egyptian Co for Development of Building Materials S.A.E.
Gacem Company Limited
Ghacem Ltd.
GRANUBENIN SA avec CA
Gulf Ready Mix Concrete Company W.L.L.
Hanson (Israel) Ltd
Hanson Quarry Products (Israel) Ltd
Hanson Yam Limited Partnership
HC Madagascar
HC Trading FZE
Heidelberg Cement Afrique Service
HeidelbergCement Mediterranean Basin Holdings S.L.U. Palestine Ltd.
Helwan Cement Company S.A.E.
Hilal Cement Company KSCP
Industrie Sakia El Hamra "Indusaha" S.A.
Interbulk Egypt for Export S.A.E.
Kuwait German Company for RMC W.L.L.
La Cimenterie de Lukala S.A.R.L.
La Societe GRANUTOGO SA
Liberia Cement Corporation Ltd.
Mauritano-Française des Ciments S.A.
Pioneer Beton Muva Umachzavot Ltd
Procimar S.A.
Scantogo Mines SA
Sierra Leone Cement Corp. Ltd.
Suez Bags Company S.A.E.
Suez Cement Company S.A.E.
Suez for Transportation & Trade S.A.E.
Tadir Readymix Concrete (1965) Ltd
Teracem Limited
Tourah Portland Cement Company S.A.E.
TPCC Tanzania Portland Cement Company Ltd.
Union Cement Norcem C.o. (LLC)
Universal Company for Ready Mix Concrete Production S.A.E.
West Africa Quarries Limited

Atlantica de Graneles y Moliendas S.A.
Les Quatre Termes S.a.s.
Les Sables de Mezieres S.a.s.
Sas des Gresillons (S.a.s.)
SCI du Colombier
Société d'Extraction et d'Aménagement de la Plaine de Marolles SEAPM S.a.s.
Société Foncière de la Petite Seine S.a.s.
Terrell Materials LLC
Two Rivers Cement LLC
Lytton Unincorporated Joint Venture
ABE Deponie GmbH
bihek GmbH
Carrières Bresse Bourgogne S.A.
CaucasusCement Holding B.V.
Dragages et Carrières S.A.
Fraimbois Granulats S.à r.l.
GAM Greifswalder Asphaltmischwerke GmbH & Co. KG
H.H. & D.E. Drew Limited
Hanse-Asphalt Gesellschaft mbH
Heidelberger Beton Aschaffenburg GmbH & Co. KG
Heidelberger Beton Aue-Schwarzenberg GmbH & Co. KG
Heidelberger Beton Donau-Iller GmbH & Co. KG
Heidelberger Beton Elster-Spree GmbH & Co. KG
Heidelberger Beton Franken GmbH & Co. KG
Heidelberger Beton Kurpfalz GmbH & Co. KG
Heidelberger Betonpumpen Simonis GmbH & Co. KG
Humber Sand and Gravel Limited
Joyce Green Aggregates Limited
Les Calcaires Girondins S.a.s.
Les Graves de l'Estuaire S.a.s.
Mantovana Inerti S.r.l.
Mendip Rail Limited
North Tyne Roadstone Limited
Padyear Limited
Rewinn B.V.
SCL S.A.
Smiths Concrete Limited
Société des Calcaires de Souppes-sur-Loing - SCSL S.N.C.
Sodramaris S.N.C.
SPS S.a.s.
TBG Ilm-Beton GmbH & Co. KG
TBG Transportbeton GmbH & Co. KG Naabbeton
TBG Transportbeton Oder-Spree GmbH & Co. KG
Trapobet Transportbeton GmbH Kaiserslautern Kommanditgesellschaft
Valoise S.a.s.
WIKING Baustoff- und Transport GmbH & Co. Kommanditgesellschaft

Betong Øst AS
BT Topbeton Sp. z o.o.
CEMET S.A.
Closed Joint Stock Company "Mineral Resources Company"
Duna-Dráva Cement Kft.
PÍSKOVNY MORAVA spol. s r.o.
Pražské betonpumpy a doprava s.r.o.
TBG METROSTAV s.r.o.
TBG Plzeň Transportbeton s.r.o.
TBG SWIETELSKY s.r.o.
Vltavské štěrkopísky, s.r.o.
Allied Cement Company, d/b/a CPC Terminals (Limited Partnership Interest)
American Stone Company
BP General Partner Ltd.
Building Products & Concrete Supply Limited Partnership
California Commercial Asphalt, LLC
China Century Cement Ltd.
CPC Terminals, Inc
Groupe Ciment Quebec Inc.
Red Bluff Sand & Gravel, L.L.C.
Texas Lehigh Cement Company LP
Upland Ready Mix Ltd.
Alliance Construction Materials Ltd
Cement Australia Holdings Pty Ltd
Cement Australia Partnership
Cement Australia Pty Limited
Easy Point Industrial Ltd.
Jidong Heidelberg (Fufeng) Cement Company Limited
Jidong Heidelberg (Jingyang) Cement Company Limited
M&H Quarries Partnership
Metromix Pty Limited
Penrith Lakes Development Corporation Limited
Squareal Cement Ltd
Technically Designed Concrete Partnership
Western Suburbs Concrete Partnership
Akçansa Çimento Sanayi ve Ticaret A.S.
Béton Contrôle des Abers S.a.s.
Betonmortel Grevelingen B.V.
Betonmortelcentrale De Mark B.V.
Betonmortelfabriek Tilburg Bemoti B.V.
Betonpumpen-Service Niedersachsen GmbH & Co. KG
Betotech GmbH, Baustofftechnisches Labor
Betotech GmbH, Baustofftechnisches Labor
Betuwe Beton Holding B.V.
C.V. Projectbureau Grensmaas
Cementi della Lucania - F.lli Marroccoli fu Michele S.p.A.

Cugla B.V.

Demula N.V.

Dijon Béton S.A.

Donau Kies GmbH & Co. KG

DONAU MÖRTEL - GmbH & Co. KG

Ernst Marschall GmbH & Co. KG Kies- und Schotterwerke

Fase 3 B.V.

Fertigbeton (FBU) GmbH & Co Kommanditgesellschaft Unterwittbach

GENAMO Gesellschaft zur Entwicklung des Naherholungsgebietes Misburg-Ost mbH

Generalcave S.r.l. - in liquidazione

Hafenbetriebsgesellschaft mbH & Co KG Stade

Heidelberger Beton Gersdorf GmbH & Co. KG

Heidelberger Beton GmbH & Co Stuttgart KG

Heidelberger Beton Grenzland GmbH & Co. KG

Heidelberger Beton Inntal GmbH & Co. KG

Heidelberger Beton Karlsruhe GmbH &Co. KG

Heidelberger Beton Personal-Service GmbH

Heidelberger Fließestrich Südwest GmbH

Hessisches Bausteinwerk Dr. Blasberg GmbH & Co. KG

ISAR-DONAU MÖRTEL-GmbH & Co. KG

KANN Beton GmbH & Co KG

Kieswerke Flemmingen GmbH

Kieswerke Kieser GmbH & Co. KG

Kronimus Aktiengesellschaft

Kronimus SAS

KVB Kies- Vertrieb GmbH & Co. KG

Maasgrind B.V.

Matériaux de Boran S.A.

Materiaux Traites du Hainaut S.A.

MERMANS BETON N.V.

Misburger Hafengesellschaft mit beschränkter Haftung

Mittelschwäbische Transport- und Frischbeton- Gesellschaft mit beschränkter Haftung & Co. Kommanditgesellschaft

Münchner Mörtel GmbH & Co. KG

NCD Nederlandse Cement Deelnemingsmaatschappij B.V.

Nederlands Cement Transport Cetra B.V.

Panheel (Maatschappij tot Exploitatie van het Ontgrondingsproject Panheel) B.V.

Peene Kies GmbH

Raunheimer Quarzsand GmbH & Co. KG

Raunheimer Sand- und Kiesgewinnung Blasberg GmbH & Co. KG

RECIBETON S.A.

Recybel S.A.

Recyfuel S.A.

S.A.F.R.A. S.r.l. - in liquidazione

San Francesco S.c.a.r.l. in Liquidazione

Schwaben Mörtel GmbH u. Co. KG

Stinkal S.a.s.
Südbayerisches Portland-Zementwerk Gebr. Wiesböck & Co. GmbH
TBG Bayerwald Transportbeton GmbH & Co. KG
TBG Deggendorfer Transportbeton GmbH
TBG Pegnitz-Beton GmbH & Co. KG
TBG Transportbeton Caprano GmbH & Co. KG
TBG Transportbeton Gesellschaft mit beschränkter Haftung & Co. KG. Hohenlohe
TBG Transportbeton GmbH & Co. KG Betonpumpendienst
TBG Transportbeton GmbH & Co.KG Lohr-Beton
TBG Transportbeton Reichenbach GmbH & Co. KG
TBG Transportbeton Rhein-Donau-Raum GmbH & Co.KG
TBG Transportbeton Selb GmbH & Co. KG
TBG Transportbeton Werner GmbH & Co. KG
TBG Zusam-Beton GmbH & Co. KG
TBM Transportbeton-Gesellschaft mbH Marienfeld & Co. KG
Transbeton Gesellschaft mit beschränkter Haftung & Co Kommanditgesellschaft
Transportbeton Johann Braun GmbH & Co. KG
Transportbeton Meschede GmbH & Co. KG
V.o.F. Betoncentrale West-Brabant
Van Zanten Holding B.V.
Vlissingse Transportbeton Onderneming B.V.
Zement- und Kalkwerke Otterbein GmbH & Co. KG
BETONIKA plus s.r.o.
Centrum Technologiczne Betotech Sp. z o.o.
Devnya Finance AD
LOMY MOŘINA spol. s r.o.
PREFA Grygov a.s.
Ribe Betong AS
Sola Betong AS
SP Bohemia, k.s.
Tangen Eiendom AS
TBG Louny s.r.o.
TBG PKS a.s.
Vassiliko Cement Works Ltd.
Cemstone Products Company
Cemstone Ready-Mix, Inc.
Chandler Concrete/Piedmont, Inc.
Chaney Enterprises 2, LLC
Chaney Enterprises Limited Partnership
Innocon Inc.
Innocon Partnership
RF Properties East, LLC
RF Properties, LLC
Southstar Limited Partnership
Sustainable Land Use, LLC
Twin City Concrete Products Co.

PT Bhakti Sari Perkasa Bersama
PT Cibinong Center Industrial Estate
PT Makmur Lestari Indonesia
PT Pama Indo Mining
Asment Temara S.A.
Fortia Cement S.A.
Osho Cement (Pty) Ltd
Tecno Gravel Egypt S.A.E.
Azienda Agricola Lodoletta S.r.l.
Betotech Baustofflabor GmbH
CSPS Trustees Limited
Donau Kies Verwaltungs GmbH
Ecoinerti S.r.l. - in liquidazione
ENAS Research B.V.
Entreprise Lorraine d'Agriculture - ELDA S.à r.l.
Etablissement F.S. Bivois SARL
Greystone Ambient & Style GmbH & Co. KG
Greystone Ambient & Style Verwaltungsgesellschaft mbH
Hanson (ER-No 3) Limited
Hanson Aggregates Verwaltungs-GmbH
HeidelbergCement Construction Materials Italia S.r.l.
HeidelbergCement Grundstücksverwaltungsgesellschaft mbH
HeidelbergCement Logistik Verwaltungs-GmbH
HeidelbergCement Shared Services GmbH
HeidelbergCement Technology Center GmbH
HeidelbergCement, Funk & Kapphan Grundstücksverwaltungsgesellschaft mbH
Heidelberger Beton Aschaffenburg Verwaltungs-GmbH
Heidelberger Beton Aue-Schwarzenberg Verwaltungs-GmbH
Heidelberger Beton Donau-Naab Verwaltungsgesellschaft mbH
Heidelberger Beton Inntal Verwaltungs-GmbH
Heidelberger Betonelemente Verwaltungs-GmbH
Heidelberger Betonpumpen Rhein-Main-Nahe Verwaltungs-GmbH
Heidelberger Kalksandstein Grundstücks- und Beteiligungs-Verwaltungs-GmbH
Heidelberger KS Beteiligungen Deutschland Verwaltungsgesellschaft mbH
I.T.S. Toogood SPRL
Kalko B.V.
Kieswerke Kieser Verwaltungs-GmbH
KS-QUADRO Bausysteme GmbH
Lindustries (D) Limited
Lithonplus Verwaltungs-GmbH
Lombarda Calcestruzzi S.r.l.
MS "Wesertrans" Binnenschiffsreederei GmbH & Co. KG
MS "Wesertrans" Verwaltungsgesellschaft mbH
NOHA Norddeutsche Hafenumschlagsgesellschaft mbH
Paderborner Transport - Beton - Gesellschaft mit beschränkter Haftung
Rederij Cement-Tankvaart B.V.

SCI Bicowal
SCI de Balloy
SMW Sand und Mörtelwerk Verwaltungs-GmbH
Société Civile d'Exploitation Agricole de l'Avesnois
SPRL Ferme de Wisempierre
TBG Ilm-Beton Verwaltungs-GmbH
TBG Transportbeton Reichenbach Verwaltungs-GmbH
TBM Transportbeton-Gesellschaft mit beschränkter Haftung Marienfeld
Verwaltungsgesellschaft Baustoffwerke Dresden mbH
WIKA Sand und Kies Verwaltungs-GmbH
8 Vershin LLP
Agromir Sp. z o.o.
Agrowelt Sp. z o.o.
Azer-E.S. Limited Liability Company
Bukhtarma TeploEnergo LLP
Bukhtarma Vodokanal LLP
Center Cement Plus Limited Liability Partnership
Donau Kies Bohemia Verwaltungs, s.r.o.
Eurotech Cement S.h.p.k.
Fastighets AB Lövholmen 1
Fastighets AB Lövholmen 10
Fastighets AB Lövholmen 11
Fastighets AB Lövholmen 2
Fastighets AB Lövholmen 3
Fastighets AB Lövholmen 4
Fastighets AB Lövholmen 5
Fastighets AB Lövholmen 6
Fastighets AB Lövholmen 7
Fastighets AB Lövholmen 8
Fastighets AB Lövholmen 9
Fastighets Söder om Kalkbrottet 1 AB
Fastighets Söder om Kalkbrottet 2 AB
Fastighets Söder om Kalkbrottet 3 AB
Fastighets Söder om Kalkbrottet 4 AB
Fastighets Söder om Kalkbrottet Holding AB
Geo Nieruchomości Sp. z o.o.
Global IT Center, s.r.o.
Heidelberg Vostok-Cement LLP
MIXT Sp. z o.o.
OOO HC Yug
Podgrodzie Sp. z o.o.
Polgrunt Sp. z o.o.
SABIA spol. s r.o.
Shqiperia Cement Company Shpk
TRANS-SERVIS,spol. s r.o.
VAPIS stavební hmoty s.r.o.

Carroll Canyon Property LLC
Cementi Meridionali Ltd.
EPC VA 121, LLC
Hanson (ER-No 16) Inc.
Hanson Aggregates Contracting, Inc.
Hanson Aggregates Properties TX, LLC
HP&P SE Properties VA LLC
HSC Cocoa Property Reserve, LLC
HSPP Properties Ohio LLC
Industrial Del Fresno SA
Kidde Industries, Inc.
Lehigh Northeast Cement Company
Lehigh Portland New York LLC
Lucas Coal Company, Inc
Magnum Minerals, Inc.
Mediterranean Carriers, Inc.
Piedras y Arenas Baja SA de CV
PUSH NA Holdings, Inc.
Sherman-Abetong, Inc.
South Coast Materials Company
SunCrete Rooftile, Inc.
Total Limited
Hanson Holdings Australia Pty Ltd
Vesprapat Holding Co., Ltd.
Agadir Atlantique S.à r.l.
C.N.A. - Cimentos Nacionais de Angola S.A.
Cimento de Bissau, Limitada
Intercom Libya F.Z.C.
Suez for Import & Export Co S.A.E.
Terra Cimentos LDA
Alzagri NV
Baustoff- und Umschlags-GmbH
Béton Contrôle de l'Elorn S.à r.l.
Betonpumpen-Service Niedersachsen Verwaltungs-GmbH
C. & G. Concrete Limited
Calcaires de la Rive Gauche I SPRL
Cava delle Capannelle S.r.l.
DONAU MÖRTEL-Verwaltungs-GmbH
Eurocalizas S.L.
Fertigbeton (FBU) Gesellschaft mit beschränkter Haftung
GAM Greifswalder Asphaltmischwerke VerwaltungsGmbH
GIE des Terres de Mayocq
GIE GM
GIE Manche Est
GIE Sud Atlantique
Granulats Marins de Normandie GIE

Hafen- und Lagergesellschaft Greifswald mbH
Hafenbetriebs- und Beteiligungs-GmbH, Stade
Haitz Betonwerk GmbH & Co. KG
Haitz Betonwerk Verwaltungs-GmbH
Heidelberger Beton Donau-Iller Verwaltungs-GmbH
Heidelberger Beton Elster-Spree Verwaltungs-GmbH
Heidelberger Beton Franken Geschäftsführungs-GmbH
Heidelberger Beton Gersdorf Verwaltungs- und Beteiligungs-GmbH
Heidelberger Beton Grenzland Verwaltungs-GmbH
Heidelberger Beton Karlsruhe Verwaltungs-GmbH
Heidelberger Beton Kurpfalz Verwaltungs-GmbH
Heidelberger Beton Verwaltungs GmbH Stuttgart
Heidelberger Betonpumpen Simonis Verwaltungs-GmbH
Hormigones Mecanizados, S.A.
Hormigones Olatzi S.A
Hormigones Txingudi S.A.
ISAR-DONAU MÖRTEL-Verwaltungs-GmbH
Kalksandstein-Service Rhein-Main-Neckar GmbH
Kalksandsteinwerk Amberg GmbH & Co. KG
Kalksandsteinwerk Amberg Verwaltungs-GmbH
KANN Beton Verwaltungsgesellschaft mbH
Kieswerk Langsdorf GmbH
KVB Verwaltungs- und Beteiligungs-GmbH
Les Calcaires Sud Charentes SCI
Lippe-Kies GmbH & Co. KG
Lippe-Kies Verwaltungs GmbH
Maritime Logistics Agency S.r.l.
Medcem S.r.l.
Mittelschwäbische Transport- und Frischbeton Gesellschaft mit beschränkter Haftung
MTB Maritime Trading & Brokerage S.r.l.
Münchner Mörtel Verwaltungsges. mbH
MWK Kies Verwaltungs-GmbH
Neuciclaje S.A.
Nordhafen Stade-Bützfleth Verwaltungsgesellschaft mbH
Novhorvi S.A.
Otterbein Gesellschaft mit beschränkter Haftung
Raunheimer Quarzsand Verwaltungsgesellschaft mbH
Schwaben-Mörtel Beteiligungs GmbH
SCI de Barbeau
SCI des Granets
SCI Les Calcaires de Taponnat
SCRL du Port Autonome du Centre et de l'Ouest
Société Civile Bachant le Grand Bonval
TBG Bayerwald Verwaltungs-GmbH
TBG Pegnitz-Beton Verwaltungsgesellschaft mbH
TBG Pinzl GmbH & Co. KG

TBG Pinzl Verwaltung GmbH
TBG Transportbeton Caprano Verwaltungs-GmbH
TBG Transportbeton Gesellschaft mit beschränkter Haftung
TBG Transportbeton Lohr Verwaltungsgesellschaft mbH
TBG Transportbeton Oder-Spree Verwaltungs-GmbH
TBG Transportbeton Rhein-Donau-Raum Verwaltungs-GmbH
TBG Transportbeton Selb Verwaltungsgesellschaft mbH
TBG Transportbeton Verwaltungsgesellschaft mbH
TBG Transportbeton Werner Verwaltungsgesellschaft mbH
TBG Transportbeton Westpfalz GmbH & Co. KG
TBG Transportbeton Westpfalz Verwaltungs GmbH
Tournai Ternaire S.A.
Transbeton Gesellschaft mit beschränkter Haftung
Transportbeton Johann Braun Geschäftsführungs GmbH
Transportbeton Meschede Gesellschaft mit beschränkter Haftung
Urzeit Weide GbR
Verwaltungsgesellschaft mit beschränkter Haftung TRAPOBET Transportbeton Kaiserslautern
WIKING Baustoff- und Transport Gesellschaft mit beschränkter Haftung
AB Akmenès Cementas
Bukhtarma Teplo Tranzit LLP
Dobrotitsa BSK AD
Kalkkaia AS
Velkolom Čertovy schody, akciová společnost
KHB Venture LLC
Newbury Development Associates, LP
Newbury Development Management, LLC
Diversified Function Sdn Bhd
Pornphen Prathan Company Limited
Sanggul Suria Sdn Bhd
Ceval GIE
Italcementi for Cement Manufacturing - Libyan J.S.C.
Maestro Drymix S.A.
Suez Lime S.A.E.

JA00361

**Exhibit I.A.119**

Separate Limit Policies

JA00362

## The Separate Limit Policies

| Insurance Company | Policy Number | Policy Period |
|---|---|---|
| Lloyds and/or London Market | 79882/83086 (63380) | 09/15/1958–12/31/1961 |
| Lloyd's and/or London Market | 79883/80900 (63381) | 09/15/1958-12/31/1961 |
| Lloyd's and/or London Market | 79884/83024 (63382) | 09/15/1958-12/31/1961 |
| Lloyd's and/or London Market | 79885/83143 (63383) | 09/15/1958-12/31/1961 |
| Lloyd's and/or London Market | 61560/64564 (69700) | 12/31/1961-12/31/1964 |
| Lloyd's and/or London Market | 61561/64022 (69701) | 12/31/1961-12/31/1964 |
| Truck Insurance Exchange | 350-40-00 | 12/31/1964-01/01/1968 |
| Lloyds and/or London Market | 031382000 (LUS1031 & LUS1031A) | 12/31/1964–01/01/1968 |
| Lloyd's and/or London Market | 031383000 (LUS1032 & LUS1032A) | 12/31/1964-01/01/1968 |
| Lloyd's and/or London Market | 031384000 (LUS1033 & LUS1033A) | 04/22/1965-01/01/1968 |
| Truck Insurance Exchange | 350-40-00 | 01/01/1968-01/30/1971 |
| Lloyds and/or London Market | 025114000 (LUS1066 &LUS1066A) | 01/01/1968–01/31/1971 |
| Lloyd's and/or London Market | 025115000 025115100 (LUS1067 & LUS1067A) | 01/01/1968-01/31/1971 |
| Lloyd's and/or London Market | 025116000 (LUS1068 &LUS1068A) | 01/01/1968-01/30/1971 |
| Truck Insurance Exchange | 350-40-00 | 01/30/1971-01/01/1974 |

*In Receivership*

1

## The Separate Limit Policies

| Insurance Company | Policy Number | Policy Period |
|---|---|---|
| ICSOP | 411-4919 | 01/30/1971-01/01/1974 |
| ICSOP | 411-4969 | 01/30/1971-01/01/1974 |
| ICSOP | 411-4970 | 07/13/1971-01/01/1974 |
| Lloyd's and/or London Market | 12-0053 & 12-0053A | 07/13/1971-01/01/1974 |
| Truck Insurance Exchange | 350-40-00 | 01/01/1974-04/01/1980 |
| ICSOP | 4174-5841 | 01/01/1974-01/01/1977 |
| ICSOP | 4174-5842 | 01/01/1974-01/01/1977 |
| ICSOP | 4174-5843 | 01/01/1974-01/01/1977 |
| ICSOP | 4174-5844 | 01/01/1974-01/01/1977 |
| ICSOP | 4177-7436 | 01/01/1977-10/01/1977 |
| ICSOP | 4177-7437 | 01/01/1977-10/01/1977 |
| ICSOP | 4177-7438 | 01/01/1977-10/01/1977 |
| First State | 907085 | 10/01/1977-10/01/1978 |
| Lloyd's and/or London Market | 77DD2137C (PY024577) | 10/01/1977-10/01/1978 |
| Highlands* | SR30068 | 10/01/1977-10/01/1978 |
| New England Reinsurance | 684196 | 10/01/1978-04/01/1979 |
| Lexington | 5513539 | 10/01/1978-04/01/1979 |
| Highlands* | SR30145 | 10/01/1978-04/01/1979 |
| New England Reinsurance | 684465 | 04/01/1979-04/01/1980 |

*In Receivership

2

## The Separate Limit Policies

| Insurance Company | Policy Number | Policy Period |
|---|---|---|
| Lexington | 5513581 | 04/01/1979-04/01/1980 |
| Allianz | AU 5003139 | 12/07/1979-04/01/1981 |
| Pine Top | MLP 101684 | 12/07/1979-04/01/1981 |
| Truck Insurance Exchange | 350-40-00 | 04/01/1980-04/01/1981 |
| Lloyd's and/or London Market | PY008381 (LUS1294) | 04/01/1980-04/01/1981 |
| Truck Insurance Exchange | 350-40-00 (N0003 4000 as of 4/1/1982) | 04/01/1981-04/01/1983 |
| Old Republic Insurance Company | OZX 12430 | 04/01/1981–04/01/1982 |
| First State | 941233 | 04/01/1983-05/01/1984 |
| Associated International | XS103073 | 04/01/1983-05/01/1984 |
| Fireman's Fund | XLX 1482790 | 04/01/1983-05/01/1984 |
| First State | 933596 | 04/01/1983-05/01/1984 |
| First State | 933597 | 04/01/1983-05/01/1984 |
| First State | 933598 | 04/01/1983-05/01/1984 |
| Great Southwest Fire | XL 13756 | 04/01/1983-05/01/1984 |
| Highlands* | SR 30315 | 04/01/1983-05/01/1984 |
| International Ins. Co. | 5220325908 | 04/01/1983-05/01/1984 |
| International Ins. Co. | 5220325917 | 04/01/1983-05/01/1984 |
| Lloyd's and/or London Market | UQA0091 | 04/01/1983-05/01/1984 |
| Lloyd's and/or London Market | UQA0092 | 04/01/1983-05/01/1984 |

*In Receivership

3

## The Separate Limit Policies

| Insurance Company | Policy Number | Policy Period |
|---|---|---|
| National Casualty | XU 000036 | 04/01/1983-05/01/1984 |
| Continental Insurance | SRX 2101407 | 04/01/1983-04/01/1985 |
| Transit | SCU 956 483 | 04/01/1983-05/01/1984 |
| Integrity Insurance Company | XL 500280 | 04/01/1983–05/01/1984 |
| International Ins. Co. | 5233172733 | 05/01/1984-04/01/1985 |
| Associated International | XS 106751 | 05/01/1984-04/01/1985 |
| Granite State | 6184-4363 | 05/01/1984-04/01/1985 |
| Highlands Insurance Company* | SR 30398 | 05/01/1984–04/01/1985 |
| International Ins. Co. | 5220368109 | 05/01/1984-04/01/1985 |
| International Insurance Co. | 5220368118 | 05/01/1984-04/01/1985 |
| Lloyd's and/or London Market | 858550/84 | 05/01/1984-04/01/1985 |
| Transamerica | USE 1339-7785 | 05/01/1984-04/01/1985 |
| London Guarantee & Accident | LX 2110774 | 05/01/1984-05/01/1985 |
| Transport Indemnity Company | TEL 900378 | 05/01/1984-04/01/1985 |
| Transit Casualty Company | SCU 956 816 | 05/01/1984-04/01/1985 |
| Lloyd's and/or London Market | 834/58548/84; XS740072G | 05/01/1984-04/01/1985 |
| Lloyd's and/or London Market | 834/58549/84 | 05/01/1984-04/01/1985 |
| Highlands Insurance Company* | SR 30397 | 05/01/1984-04/01/1985 |
| Midland Insurance Company | XL 724905 | 05/01/1984-04/01/1985 |
| Integrity Insurance Company | 58551/84 | 05/01/1984–09/01/1985 |
| National Union Fire Insurance Company of Pittsburgh, PA | BE1942522 | 04/01/1985-05/08/1985 |

*In Receivership

4

## The Separate Limit Policies

| Insurance Company | Policy Number | Policy Period |
|---|---|---|
| International Insurance Company | 523-4126148 | 05/08/1985-04/01/1986 |
| Granite State Insurance Company | 6185-5843 | 04/01/1985-04/01/1986 |
| Associated International Insurance Company | XS110594 | 04/01/1985-04/01/1986 |
| Mission National Insurance Company | MN043615 | 04/01/1985-04/01/1986 |
| First State Insurance Company | Unknown | 04/01/1985-04/01/1986 |
| AIU Insurance Company | 75101851 | 07/01/1985-04/01/1986 |
| Landmark Insurance Company | FE 400 22 29 | 04/01/1985-04/01/1986 |
| Lexington Insurance Company | Unknown | 07/01/1985-04/01/1986 |
| Continental Insurance Company | SRX 2101361 | 04/01/1985-06/29/1985 |
| Integrity Insurance Company | Unknown | 04/01/1985-06/10/1985 |

*In Receivership*

5

301601373 v1
docs-11103887.8

### <u>Amendment to Exhibit I.A.119</u>

The Separate Limit Policies

- Exhibit page 1: Delete "025115100" from entry for "Lloyd's and/or London Market 025115000 025115100 (LUS1067 and LUS1067A)."

- Exhibit page 4: Change Lloyd's and/or London Market 858550/84 to 58550/84.

- Exhibit page 4: Change policy period for "Integrity Insurance Company XL 500280" to 04/01/1983 – 04/01/1985.

- Exhibit page 5:  Delete entry for "Continental Insurance Company SRX 2101361."

**Exhibit I.A.120**

List of Settling Asbestos Insurance Companies

None.

NAI-1511184493v2

**Exhibit IV.B**

Description of Certain Restructuring Transactions

On or after the Confirmation Date, non-debtor Lehigh Cement Company LLC will transfer its interest in certain real property located in Kosse, Limestone County, Texas and Kunkletown, Monroe County, Pennsylvania (together, the "Real Properties"), together with its rights under certain leases related to the Real Properties, to Kaiser Gypsum.  The documentation necessary to effectuate, implement and consummate these transactions will be substantially in the form attached hereto.

**NOTICE OF CONFIDENTIALITY RIGHTS:  IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

When recorded return to:

_____

_____

_____

## SPECIAL WARRANTY DEED

STATE OF TEXAS              §
                           §        KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF LIMESTONE         §

**THAT Lehigh Cement Company LLC**, a Delaware limited liability company ("Grantor"), for and in consideration of the sum of Ten and No/100 Dollars ($10.00) cash and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, paid by Kaiser Gypsum Company, Inc., a North Carolina corporation ("Grantee"), whose address is 300 E. John Carpenter Freeway, Irving, Texas 75062, HAS GRANTED, BARGAINED, SOLD and CONVEYED, and by these presents DOES GRANT, BARGAIN, SELL and CONVEY unto Grantee all of that certain real property situated in Limestone County, Texas, described on Exhibit A attached hereto and made a part hereof for all purposes (the "Land"), and all buildings, structures, parking areas and other improvements located thereon (if any), together with all related rights and appurtenances, including but not limited to all right, title and interest of Grantor in and to any land lying in the bed of any street, road, highway or alley (whether opened or proposed) adjoining the Land, any water or water rights benefiting the Land, any oil, gas and other minerals lying under the Land, any easements benefiting the Land, and any strips and gores adjoining the Land (the Land and all of such buildings, structures, parking areas and other improvements and other rights and appurtenances being collectively referred to herein as the "Property").

TO HAVE AND TO HOLD the Property unto Grantee, and Grantee's successors and assigns forever, and Grantor does hereby bind itself and its successors and assigns to WARRANT and FOREVER DEFEND all and singular the Property unto Grantee and Grantee's successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof, by, through or under Grantor.

*[Signature on following page]*

EXECUTED to be effective as of the _____ day of _____, 2020.

GRANTOR:

LEHIGH CEMENT COMPANY LLC,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

2

STATE OF _____           §
                                     §
COUNTY OF _____              §

      This instrument was ACKNOWLEDGED before me on _____, 2020, by
_____, _____ of _____, a
_____ _____, general partner of _____, a _____
limited partnership, on behalf of said limited partnership.


_____
Notary Public - State of _____

My Commission Expires:
_____

[seal]

3

JA00373

<u>Exhibit A</u>

Legal Description

[The Legal Description is currently being prepared and will be attached prior to recordation]

RECORDING REQUESTED BY
AND WHEN RECORDED RETURN TO:

_____
_____

Attention: _____

MAIL TAX STATEMENTS TO:
_____
_____

Attention:_____

_____

*(Above Space for Recorder's Use Only)*

APNs:_____

## GRANT DEED

STATE OF PENNSYLVANIA

COUNTY OF MONROE

     **THAT Lehigh Cement Company LLC**, a Delaware limited liability company ("<u>Grantor</u>"), for and in consideration of the sum of Ten and No/100 Dollars ($10.00) cash and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, paid by Kaiser Gypsum Company, Inc., a North Carolina corporation ("<u>Grantee</u>"), whose address is 300 E. John Carpenter Freeway, Irving, Texas 75062, HAS GRANTED, BARGAINED, SOLD and CONVEYED, and by these presents DOES GRANT, BARGAIN, SELL and CONVEY unto Grantee all of that certain real property situated in _____ municipality, _____ township, _____ borough, Monroe County, Pennsylvania, described on <u>Exhibit A</u> attached hereto and made a part hereof for all purposes (the "<u>Land</u>"), and all buildings, structures, parking areas and other improvements located thereon (if any), together with all related rights and appurtenances, including but not limited to all right, title and interest of Grantor in and to any land lying in the bed of any street, road, highway or alley (whether opened or proposed) adjoining the Land, any water or water rights benefiting the Land, any oil, gas and other minerals lying under the Land, any easements benefiting the Land, and any strips and gores adjoining the Land (the Land and all of such buildings, structures, parking areas and other improvements and other rights and appurtenances being collectively referred to herein as the "<u>Property</u>").

     TO HAVE AND TO HOLD the Property unto Grantee, and Grantee's successors and assigns forever, and Grantor does hereby bind itself and its successors and assigns to WARRANT and FOREVER DEFEND all and singular the Property unto Grantee and Grantee's

successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof, by, through or under Grantor.

*[Signature on following page]*

2

EXECUTED to be effective as of the _____ day of _____, 2020.

GRANTOR:

LEHIGH CEMENT COMPANY LLC,
a Delaware limited liability company

By: _____

Name: _____

Title: _____

3

STATE OF _____          §
                                   §
COUNTY OF _____             §

     On this, the _____day of _____, 2020, before me, _____, the

undersigned officer, personally appeared_____, known to me (or satisfactorily

proven) to be the person whose name is subscribed as attorney in fact for _____,

and acknowledged that he executed the same as the act of his principal for the purposes

therein contained.

In witness whereof, I hereunto set my hand and official seals.

_____


[seal]                             _____
                                   Title of Officer

My Commission Expires:
_____

<u>Exhibit A</u>

Legal Description

[The Legal Description is currently being prepared and will be attached prior to recordation]

## MINERAL LEASE ASSIGNMENT

THIS MINERAL LEASE ASSIGNMENT ("Assignment") is made this _____ day of _____, 2020 ("Effective Date") by and between Lehigh Cement Company LLC, a Delaware limited liability company ("Assignor"), and Kaiser Gypsum Company, Inc., a North Carolina corporation ("Assignee").

### W I T N E S S E T H:

A.    Assignor desires to assign to Assignee any and all of Assignor's right, title and interest in and to the leases described in Exhibit 1 attached hereto (individually, a "Lease" and collectively, the "Leases") and Assignee desires to accept such assignment, subject to and in accordance with, the terms and conditions set forth in this Assignment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    Assignor hereby assigns, sells, transfers, sets over and delivers unto Assignee all of Assignor's estate, right, title and interest in and to the Leases and Assignee hereby accepts such assignment.

2.    Assignor hereby covenants that Assignor will, at any time and from time to time upon written request therefor, execute and deliver to Assignee, Assignee's successors, nominees or assigns, such documents as Assignee or they may reasonably request in order to fully assign and transfer to and vest in Assignee or Assignee's successors, nominees and assigns the Leases, and to protect Assignee's or their right, title and interest in and to the Leases and the rights of Assignor intended to be transferred and assigned hereby, or to enable Assignee, Assignee's successors, nominees and assigns to realize upon or otherwise enjoy such rights in and to the Leases.

3.    Assignee hereby assumes the performance of all of the terms, covenants and conditions imposed upon Assignor as landlord under the Leases accruing or arising on or after the Effective Date.

4.    In the event of the bringing of any action or suit by a party hereto against another party hereunder by reason of any breach of any of the covenants, conditions, agreements or provisions on the part of the other party arising out of this Assignment, then in that event the prevailing party shall be entitled to have and recover of and from the other party all costs and expenses of the action or suit, including reasonable attorneys' fees.

5.    This Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument.

6.    This Assignment shall be binding upon and inure to the benefit of the successors, assignees, personal representatives, heirs and legatees of all the respective parties hereto.

7.    This Assignment shall be governed by, interpreted under, and construed and enforceable in accordance with, the laws of the state governing the applicable Lease in question.

IN WITNESS WHEREOF, Assignor and Assignee have executed and delivered this Assignment as of the day and year first written above.

"ASSIGNOR"

LEHIGH CEMENT COMPANY LLC,
a Delaware limited liability company

By: _____
Name: _____
Title: _____


"ASSIGNEE"

KAISER GYPSUM COMPANY, INC.,
a North Carolina corporation


By:_____
Name:_____
Title:_____

**Exhibit 1**

1. That certain Mineral Lease Agreement dated as of March 29, 2018, by and between Lehigh Cement Company, LLC, a Delaware limited liability company, as landlord, and Lehigh White Cement Company, a Pennsylvania general partnership, as tenant, for the tracts of land located in Kunkletown, Monroe County, Pennsylvania.

2. That certain Mineral Lease Agreement dated as of March 29, 2018, by and between Lehigh Cement Company, LLC, a Delaware limited liability company, as landlord, and Lehigh White Cement Company, a Pennsylvania general partnership, as tenant, for the tracts of land located in Kosse, Limestone County, Texas.

# **Exhibit IV.H**

Trustee Of Asbestos Personal Injury Trust

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| KAISER GYPSUM COMPANY, INC., *et al.,*[1] | : | Case No. 16-31602 (JCW) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

**NOTICE OF PROPOSED TRUSTEE OF THE**
**KAISER GYPSUM ASBESTOS PERSONAL INJURY TRUST**

The Official Committee of Asbestos Personal Injury Claimants (the "ACC") and

Lawrence Fitzpatrick, the Legal Representative for Future Claimants (the "FCR"), hereby

provide notice that the following individual has been selected as the proposed trustee of the

Kaiser Gypsum Asbestos Personal Injury Trust (the "Trust") to be established under the Joint

Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc.

In support hereof, the ACC and the FCR respectfully state as follows:

1.      The individual that has been designated as proposed trustee of the Trust is

David F. Levi.

2.      The biography of Mr. Levi is attached hereto as Exhibit A.

---

[1]      The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  Kaiser Gypsum Company, Inc. (0188) and Hanson Permanente Cement, Inc. (7313).  The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

*/s/ Kevin C. Maclay*
Kevin C. Maclay (admitted pro hac vice)
Todd E. Phillips (admitted pro hac vice)
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle, NW, Suite 1100
Washington, DC 20005
Telephone: (202) 862-5000
Facsimile: (202) 429-3301
kmaclay@capdale.com
tphillips@capdale.com

-and-

Sally W. Higgins  (N.C. Bar No. 22111)
HIGGINS & OWENS, PLLC
524 East Blvd
Charlotte, NC 28203
Telephone: (704) 366-4607
shiggins@higginsowens.com

Attorneys for the Official Committee of
Asbestos Personal Injury Claimants

*/s/ Sharon M. Zeig*
Edwin J. Harron (DE Bar No. 3396)
(admitted pro hac vice)
Sharon M. Zeig (NC Bar No. 29536)
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
eharron@ycst.com
szieg@ycst.com

-and-

Felton E. Parrish (NC Bar No. 25448)
HULL & CHANDLER, P.A.
1001 Morehead Square Drive, Suite 450
Charlotte, NC 28203
Telephone: 704-375-8488
Facsimile: 704-375-8487
fparrish@lawyercarolina.com

Attorneys for Lawrence Fitzpatrick, the Legal
Representative for Future Asbestos Claimants

**EXHIBIT A**

David F. Levi is the Levi Family Professor of Law and Judicial Studies and Director of the Bolch
Judicial Institute. Levi was previously the James B. Duke and Benjamin N. Duke Dean of the
School of Law from 2007 to 2018. Before coming to Duke, he was the Chief United States
District Judge for the Eastern District of California with chambers in Sacramento. He was
appointed as a United States district judge by President George H. W. Bush in 1990.  Prior to
serving on the bench, he was the United States Attorney for the Eastern District of California.
He was appointed to this position by President Ronald Reagan in 1986.

A native of Chicago, Levi earned his A.B. in history and literature, magna cum laude, from
Harvard College. He entered Harvard's graduate program in history, specializing in English legal
history and serving as a teaching fellow in English history and literature. He graduated Order of
the Coif in 1980 from Stanford Law School, where he was also president of the Stanford Law
Review. Following graduation, he was a law clerk to Judge Ben C. Duniway of the U.S. Court of
Appeals for the Ninth Circuit, and then to Justice Lewis F. Powell, Jr., of the U.S. Supreme
Court.

Levi has served as chair of two Judicial Conference committees by appointment of the Chief
Justice. He was chair of the Civil Rules Advisory Committee (2000-2003) and chair of the
Standing Committee on the Rules of Practice and Procedure (2003-2007); he was reappointed to
serve as the academic member of Standing Committee (2009-2015). He was the first president
and a founder of the Milton L. Schwartz American Inn of Court, now the Schwartz-Levi
American Inn of Court, at the King Hall School of Law, University of California at Davis. He
was chair of the Ninth Circuit Task Force on Race, Religious and Ethnic Fairness and was an
author of the report of the Task Force. He was president of the Ninth Circuit District Judges
Association (2003-2005).

In 2007, Levi was elected a fellow of the American Academy of Arts and Sciences. From 2010
to 2013, he served on the board of directors of Equal Justice Works. In 2014, he was appointed
chair of the American Bar Association's Standing Committee on the American Judicial System,
and in 2015, he was named co-chair of the North Carolina Commission on the Administration of
Law and Justice. He currently serves on the Board of the National Parks Conservation
Association.

He became president of the American Law Institute (ALI) in 2017 after serving as a member of
the ALI Council and an advisor to the ALI's Federal Judicial Code Revision and Aggregate
Litigation projects.

Levi is an independent director of the Las Vegas Sands.  He is chair of the nominating and
governance committee and a member of the compliance committee.  Levi is one of three court
appointed trustees of the Asarco and THAN Asbestos Trusts.  He serves as the court appointed
Future Representative of the J.T. Thorpe Settlement Trust, Thorpe Insulation Company Asbestos
Settlement Trust, the Western Asbestos Settlement Trust, and the Plant Asbestos Settlement
Trust.  Levi is a member of FedArb, which provides mediation and arbitration services.

Levi is the co-author of Federal Trial Objections (James Publishing 2002) and Federal Civil Procedure Manual (Juris 2015) as well as several law review articles.   At Duke Law, he has taught courses on judging, ethics, and legal history.

## **Exhibit IV.M.3**

List of Asbestos-Only Policies

JA00388

POLICIES THAT PROVIDE COVERAGE FOR ASBESTOS PERSONAL INJURY
CLAIMS BUT NOT ENVIRONMENTAL PROPERTY DAMAGE

| Insurer | Policy | Period |
|---|---|---|
| Lloyd's and/or London Market | 70107 (51910) | 03/01/1953-03/01/1954 |
| Lloyd's and/or London Market | 70108 (54151) | 03/01/1954-03/01/1955 |
| Lloyd's and/or London Market | 73158 (56155) | 03/01/1955-03/01/1956 |
| Lloyd's and/or London Market | 75211 (57956) | 03/01/1956-03/01/1957 |
| Lloyd's and/or London Market | 76128 (60090) | 03/01/1957-03/01/1958 |
| Lloyd's and/or London Market | 79409 | 03/01/1958-09/15/1958 |
| London Guarantee & Accident | LX 2107763 | 04/01/1983-05/01/1984 |

# **Exhibit IV.M.4**

List of Environmental-Only Policies

POLICIES THAT PROVIDE COVERAGE FOR ENVIRONMENTAL PROPERTY
DAMAGE BUT NOT FOR ASBESTOS PERSONAL INJURY CLAIMS

| CHART 1: POLICIES ISSUED SOLVENT INSURERS | | |
|---|---|---|
| Insurer | Policy Number | Period |
| Lloyd's and/or London Market | A21669 | 10/03/1940–10/03/1941 |
| Lloyd's and/or London Market | A23094 | 10/03/1941–10/03/1942 |
| Lloyd's and/or London Market | A26547 | 10/03/1942–10/03/1943 |
| Lloyd's and/or London Market | A31026 | 10/03/1943–10/03/1944 |
| Lloyd's and/or London Market | A34351 | 10/03/1944–10/03/1945 |
| Lloyd's and/or London Market | A37678 | 10/03/1945–10/03/1946 |
| Lloyd's and/or London Market | A40951 | 10/03/1946–10/03/1947 |
| Lloyd's and/or London Market | A46172 | 10/03/1947–10/03/1948 |
| Fireman's Fund Insurance Company | XAC 115695 | 12/31/1947–04/01/1950 |
| Lloyd's and/or London Market | A50630 | 10/03/1948–10/03/1949 |
| Lloyd's and/or London Market | X4580 | 10/03/1949–10/03/1950 |
| Fireman's Fund Insurance Company | XAC 135553 | 04/01/1950–04/01/1953 |
| Lloyd's and/or London Market | 67309 | 09/17/1950–09/17/1953 |
| Lloyd's and/or London Market | T2190 | 10/03/1950–10/03/1951 |
| Lloyd's and/or London Market | T2482 | 10/03/1951–10/03/1952 |
| Lloyd's and/or London Market | T2715 | 10/03/1952–09/15/1953 |
| Fireman's Fund Insurance Company | XAC 152458 | 04/01/1953–04/01/1954 |
| Lloyd's and/or London Market | T2890 | 09/15/1953–09/15/1954 |
| Lloyd's and/or London Market | Unknown | 09/17/1953–09/15/1955 |
| Lloyd's and/or London Market | 73974; S5781 | 09/17/1953–09/15/1955 |
| Fireman's Fund Insurance Company | XAC 159347 | 04/01/1954–05/29/1955 |
| Lloyd's and/or London Market | T3147 | 09/15/1954–09/15/1955 |
| Lloyd's and/or London Market | T. 3461 | 01/01/1955–01/01/1956 |
| Fireman's Fund Insurance Company | GAC 103118 | 05/29/1955–05/29/1957 |

POLICIES THAT PROVIDE COVERAGE FOR ENVIRONMENTAL PROPERTY
DAMAGE BUT NOT FOR ASBESTOS PERSONAL INJURY CLAIMS

| CHART 1: POLICIES ISSUED SOLVENT INSURERS | | |
|---|---|---|
| **Insurer** | **Policy Number** | **Period** |
| Lloyd's and/or London Market | Unknown | 09/15/1955–09/15/1958 |
| Lloyd's and/or London Market | 78500 | 09/15/1955–09/15/1958 |
| Lloyd's and/or London Market | T. 3727 | 01/01/1956–01/01/1957 |
| Lloyd's and/or London Market | T. 4044 | 01/01/1957–01/01/1958 |
| Fireman's Fund Insurance Company | GAC 104027 | 05/29/1957–01/01/1958 |
| Fireman's Fund Insurance Company | GAC 104099 | 01/01/1958–1/01/1959 |
| Lloyd's and/or London Market | T.4507 | 01/01/1958–09/01/1958 |
| Lloyd's and/or London Market | T. 4699 (LL63250) | 09/01/1958–02/01/1959 |
| Lloyd's and/or London Market | T. 4755 | 11/01/1958–11/01/1959 |
| Fireman's Fund Insurance Company | GAC 104129 | 1/01/1959–01/01/1960 |
| Lloyd's and/or London Market | 4699/60 & 4899/61 | 02/01/1959–09/15/1959 |
| Lloyd's and/or London Market | T. 4774 (65520) | 09/15/1959–09/15/1960 |
| Lloyd's and/or London Market | T. 5098/5099 | 11/01/1959–01/01/1961 |
| Fireman's Fund Insurance Company | CL712111 | 01/01/1960–04/01/1960 |
| Fireman's Fund Insurance Company | Unknown | 04/01/1960–12/31/1961 |
| Lloyd's and/or London Market | T. 5054 (67476) | 09/15/1960–09/15/1961 |
| Lloyd's and/or London Market | LL 69260 (5433) | 09/15/1961–09/15/1962 |
| Lloyd's and/or London Market | T5395 | 09/15/1961–09/15/1962 |
| Lloyd's and/or London Market | LL69261; T5395 | 09/15/1961–09/15/1962 |
| Fireman's Fund Insurance Company | PC1-237800 | 12/31/1961–12/31/1964 |
| Lloyd's and/or London Market | LO61715 | 09/15/1962–09/15/1963 |
| Cravens, Dargan for Lloyd's and/or London Market | LC71361 | 09/15/1962–09/15/1963 |

2

POLICIES THAT PROVIDE COVERAGE FOR ENVIRONMENTAL PROPERTY
DAMAGE BUT NOT FOR ASBESTOS PERSONAL INJURY CLAIMS

| CHART 1: POLICIES ISSUED SOLVENT INSURERS | | |
|---|---|---|
| **Insurer** | **Policy Number** | **Period** |
| Cravens, Dargan for Lloyd's and/or London Market | LC71671 | 09/15/1963–09/15/1964 |
| Cravens, Dargan for Lloyd's and/or London Market | LC71671/A | 09/15/1964–09/15/1965 |
| Transcontinental | UMB 006496626 | 04/01/1980–04/01/1981 |
| Northbrook | 63 006 576 | 04/01/1980–04/01/1981 |
| Lexington | 5514410 | 04/01/1980–04/01/1981 |
| American Excess | EUL 507331 | 04/01/1980–04/01/1981 |
| Landmark | FE4001206 | 04/01/1981–04/01/1982 |
| Lloyd's and/or London Market | PY027581 | 04/01/1981–04/01/1982 |
| Lloyd's and/or London Market | PY027381 (LUS 1324) | 04/01/1981–04/01/1983 |
| Lloyd's and/or London Market | PY027481 | 04/01/1981–04/01/1983 |
| Fireman's Fund Insurance Company | XLX 137 27 13 | 04/01/1981–04/01/1983 |
| Lloyd's and/or London Market | LUS1355 | 04/01/1982–04/01/1983 |
| Landmark Insurance Company | FE 400 12 34 | 04/01/1982–04/01/1983 |
| Harbor Insurance Company | HI 16363 | 04/01/1982–04/01/1983 |
| Twin City Fire Insurance Company | TXS 100347 | 04/01/1982–04/01/1983 |
| Highlands Insurance Company | SR 30269 | 04/01/1982–04/01/1983 |
| Home Indemnity Company | GA987013 | 04/01/1983-04/01/1985 |
| Lloyd's and/or London Market | 57546/83 | 04/01/1983–04/01/1985 |
| Lloyd's and/or London Market | 834/58550/84 XS740074G | 05/01/1984–04/01/1985 |
| AIU | 75–100337 | 05/01/1984–04/01/1985 |
| National Union Fire Insurance Company of Pittsburgh, PA | GLA9150324; GLA9150326 | 04/01/1985-04/01/1988 |
| The Aetna Casualty & Surety Company | 05 XN 185 SCA | 07/01/1985–04/01/1986 |

3

POLICIES THAT PROVIDE COVERAGE FOR ENVIRONMENTAL PROPERTY
DAMAGE BUT NOT FOR ASBESTOS PERSONAL INJURY CLAIMS

| CHART 1: POLICIES ISSUED SOLVENT INSURERS | | |
|---|---|---|
| **Insurer** | **Policy Number** | **Period** |
| | | |
| CHART 2: POLICIES ISSUED BY NOW INSOLVENT INSURERS | | |
| **Insurer** | **Policy Number** | **Period** |
| Mutual Fire Marine & Inland Insurance Company | EL104518 | 04/01/1981–04/01/1982 |
| Pine Top Insurance Company | MLP102700 | 04/01/1981–04/01/1982 |
| Industrial Indemnity Company | JE 831–2723 | 04/01/1981–04/01/1983 |
| Mutual Fire Marine & Inland Insurance Company | EL104678 | 04/01/1982–04/01/1983 |
| Integrity Insurance Company | XL 50 02 80 | 04/01/1983–04/01/1985 |

301601375 v1
docs-11104102.9

JA00394

## <u>Amendment to Exhibit IV.M.4</u>

List of Environmental-Only Policies

- Exhibit page 1:  Change title of chart to "Chart 1: Policies Issued By Solvent Insurers"

- Exhibit page 1:  Delete entry for "Lloyd's and/or London Market Unknown 09/17/1953–09/15/1955"

- Exhibit page 2:  Delete entry for "Lloyd's and/or London Market Unknown 09/15/1955–09/15/1958"

- Exhibit page 2: "Lloyd's and/or London Market T.3727" - change policy period to 09/15/1956-09/15/1957.

- Exhibit page 2: "Lloyd's and/or London Market T.4044" - change policy period to 09/15/1957-09/15/1958.

- Exhibit page 2: "Lloyd's and/or London Market T. 4699 (LL63250)" - change policy period to 09/15/1958-09/15/1959.

- Exhibit page 2:  Delete entry for "Lloyd's and/or London Market T.4755 11/01/1958–11/01/1959."

- Exhibit page 2:  Add "Lloyd's and/or London Market LL65521 9/15/1959-09/15/1960."

- Exhibit page 2: Delete entry for "Lloyd's and/or London Market 4699/60 & 4899/61."

- Exhibit page 2:  Delete entry for "Lloyd's and/or London Market T.5098/5099."

- Exhibit page 2: Delete entry for "Lloyd's and/or London Market T5395 09/15/1961 - 09/15/1962"

- Exhibit page 2:  For Lloyd's and/or London Market LO61715, add footnote indicating that "Hartford Fire Insurance Company (as obligor of certain policies issued by London & Edinburgh Insurance Company Ltd.) is responsible for 71% of LO61715."

- Exhibit page 2: Change entry for "Cravens, Dargan for Lloyd's and/or London Market" to read "Hartford Fire Insurance Company (as obligor of certain policies issued by London & Edinburgh Insurance Company Ltd.)" for LC71361.

1

- Exhibit page 3:  Change entry for "Cravens, Dargan for Lloyd's and/or London Market" to read "Hartford Fire Insurance Company (as obligor of certain policies issued by London & Edinburgh Insurance Company Ltd.)" for LC71671.

- Exhibit page 3:  Change entry for "Cravens, Dargan for Lloyd's and/or London Market" to read "Hartford Fire Insurance Company (as obligor of certain policies issued by London & Edinburgh Insurance Company Ltd.)" for LC71671/A.

- Exhibit page 3: Delete entry for "Lloyd's and/or London Market 57546/83."

- Exhibit page 3: Delete entry for "Lloyd's and/or London Market 834/58550/84 XS740074G."

- Exhibit page 3: Add entry for "International Insurance Company 523-4126148 05/08/1985-04/01/1986"

- Exhibit page 4: Move entry for "Industrial Indemnity Insurance Company JE 831-2723" from Chart 2 to Chart 1.

- Exhibit page 4: Delete entry for "Integrity Insurance Company XL 50 02 80" under Chart 2.

NAI-1513843280v1

## **Exhibit V.C.**

Schedule of Executory Contracts and Unexpired Leases to Be Rejected

None as of July 20, 2020.

# <u>EXHIBIT B</u>

## MODIFICATIONS TO THE JOINT PLAN OF REORGANIZATION OF KAISER GYPSUM COMPANY, INC. AND HANSON PERMANENTE CEMENT, INC.

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

|  |  |  |
|---|---|---|
| In re: | : | **Chapter 11** |
|  | : |  |
| **Kaiser Gypsum Company, Inc.,** *et al.,* | : | **Case No. 16-31602 (JCW)** |
|  | : |  |
| **Debtors.** | : | **(Jointly Administered)** |
|  | : |  |

|  |  |  |
|---|---|---|
| **Kaiser Gypsum Company, Inc.** | : | **Case No. 16-31602 (JCW)** |
| **Hanson Permanente Cement, Inc.** | : | **Case No. 16-31614 (JCW)** |
|  | : |  |
|  | : | **THIRD AMENDED JOINT PLAN OF** |
|  | : | **REORGANIZATION OF KAISER** |
|  | : | **GYPSUM COMPANY, INC. AND** |
|  | : | **HANSON PERMANENTE CEMENT, INC.** |
|  | : |  |

Edwin Harron
Sharon Zieg
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
- and-
Felton Parrish
HULL & CHANDLER
1001 Morehead Square Drive, Suite 450
Charlotte, North Carolina 28203

ATTORNEYS FOR FUTURE CLAIMANTS'
REPRESENTATIVE

Kevin C. Maclay
Todd E. Phillips
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle N.W., Suite 1100
Washington, D.C. 20005
- and-
Sally Higgins
HIGGINS & OWENS,
524 East Boulevard
Charlotte, North Carolina 28203

ATTORNEYS FOR OFFICIAL COMMITTEE OF
ASBESTOS PERSONAL INJURY CLAIMANTS

Ben Hawfield, Jr.
MOORE & VAN ALLEN
100 North Tryon Street, Suite 4700
Charlotte, North Carolina 28202

ATTORNEYS FOR LEHIGH HANSON, INC.

C. Richard Rayburn, Jr. (NC 6357)
John R. Miller, Jr. (NC 28689)
RAYBURN COOPER & DURHAM, P.A.
1200 Carillon
227 West Trade Street
Charlotte, North Carolina 28202
Telephone: (704) 334-0891
Facsimile: (704) 377-1897
E-mail:  rrayburn@rcdlaw.net
               jmiller@rcdlaw.net
-and-
Gregory M. Gordon (TX 08435300)
Amanda S. Rush (TX 24079422)
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
E-mail:  gmgordon@jonesday.com
               asrush@jonesday.com
-and-
Paul M. Green (TX 24059854)
JONES DAY
717 Texas, Suite 3300
Houston, Texas  77002
Telephone:  (832) 239-3939
Facsimile:  (832) 239-3600
E-mail:  pmgreen@jonesday.com

ATTORNEYS FOR DEBTORS

Dated: ~~October 14~~July 20, ~~2019~~2020

# TABLE OF CONTENTS

**Page**

ARTICLE I     DEFINED TERMS, RULES OF INTERPRETATION AND
              COMPUTATION OF TIME ................................................................. 1

    A.     Defined Terms ................................................................................. 1

    B.     Rules of Interpretation and Computation of Time ......................... 18

        1.     Rules of Interpretation ............................................................ 18

        2.     Computation of Time ......................................................... ~~18~~19

ARTICLE II    CLASSES OF CLAIMS AND INTERESTS .................................. 19

ARTICLE III   TREATMENT OF CLAIMS AND INTERESTS ....................... ~~19~~20

    A.     Unclassified Claims ................................................................. ~~19~~20

        1.     Payment of Administrative Claims ................................... ~~19~~20

            a.     Administrative Claims in General .......................... ~~19~~20

            b.     Statutory Fees ...................................................... 20

            c.     Ordinary Course Liabilities ................................... 20

            d.     Bar Dates for Administrative Claims ..................... 20

        2.     Payment of Priority Tax Claims .......................................... 21

            a.     Priority Tax Claims in General ............................... 21

            b.     Other Provisions Concerning Treatment of Priority Tax
                Claims ................................................................... 21

    B.     Classified Claims .................................................................. ~~21~~22

        1.     Class 1 Claims (Priority Claims) ...................................... ~~21~~22

        2.     Class 2 Claims (Secured Claims) ...................................... ~~21~~22

        3.     Class 3 Claims (General Unsecured Claims) ..................... 22

        4.     Class 4 Claims (Asbestos Personal Injury Claims) ........... 22

        5.     Class 5 Claims (Surety Bond Claims) ............................... 23

        6.     Class 6 Claims (Intercompany Claims) ............................. 23

        7.     Class 7 Interests (Stock Interests) ..................................... 23

ARTICLE IV    MEANS FOR IMPLEMENTATION OF THE PLAN .................. 23

    A.     Continued Corporate Existence and Vesting of Assets in the Reorganized
        Debtors ................................................................................ 23

    B.     Restructuring Transactions .................................................... ~~23~~24

    C.     Transfers and Lease Transactions ......................................... 24

# TABLE OF CONTENTS
## (continued)

| | | | Page |
|---|---|---|---|

D.   Corporate Governance, Directors and Officers, Employment-Related Agreements and Compensation Programs and Corporate Action ......... 24

    1.   Certificates of Incorporation and By-Laws of the Reorganized Debtors ......... 24

    2.   Directors and Officers of the Reorganized Debtors ......... ~~24~~25

    3.   Employee Arrangements of the Reorganized Debtors ......... ~~24~~25

    4.   Corporate Action ......... 25

E.   Obtaining Cash for Plan Distributions ......... 25

F.   Creation of Asbestos Personal Injury Trust ......... ~~25~~26

G.   Authority of the Asbestos Personal Injury Trust ......... 26

H.   Appointment of Asbestos Personal Injury Trustee and Delaware Trustee ......... 26

I.   Appointment of Future Claimants' Representative and TAC Members ......... 26

J.   Document Repository ......... ~~26~~27

K.   Transfers of Property to and Assumption of Certain Liabilities by the Asbestos Personal Injury Trust ......... ~~27~~28

    1.   Expenses of the Asbestos Personal Injury Trust ......... ~~27~~28

    2.   Funding the Asbestos Personal Injury Trust ......... ~~27~~28

        a.   Initial Payment ......... 28

        b.   Payment Note ......... 28

        c.   Phase 1 Claims ......... 28

        d.   Asbestos Personal Injury Insurance Assets ......... 28

    3.   Assumption of Certain Liability and Responsibility by the Asbestos Personal Injury Trust ......... ~~28~~29

    4.   Indemnification by the Asbestos Personal Injury Trust ......... ~~28~~29

    5.   Authority of the Debtors ......... 29

L.   Cooperation with Respect to Insurance Matters ......... 29

    1.   Obligation to Cooperate with Respect to Insurance Matters ......... 29

    2.   Enforcement of Reorganized Debtors' Obligations to Cooperate with Respect to Insurance Matters ......... 30

M.   Compromise of Insurance Policies ......... ~~32~~33

    1.   Dual Policies ......... ~~32~~33

**TABLE OF CONTENTS**
(continued)

|  |  |  | Page |
|---|---|---|---|
| | 2. | Separate Limit Policies | 33 |
| | 3. | Insurance Policies that Provide Coverage for Asbestos Personal Injury Claims but not for Environmental Claims | 33 |
| | | a. Settlement with Truck | 3334 |
| | 4. | Insurance Policies that Provide Coverage for Environmental Claims but not for Asbestos Personal Injury Claims | 35 |
| | 5. | Amendment of Insurance Policy Exhibits | 35 |
| N. | | Truck Obligations Regarding Deductibles | 35 |
| O. | | Liquidation of Asbestos Personal Injury Claims | 3536 |
| | 1. | Insured Asbestos Claims | 3536 |
| | 2. | Uninsured Asbestos Claims | 36 |
| P. | | Limitations On Judgment Recovery From Non-Settling Asbestos Insurers | 3637 |
| Q. | | Insurance Neutrality | 37 |
| R. | | Preservation of Rights of Action; Settlement of Claims and Releases | 3738 |
| | 1. | Preservation of Rights of Action by the Reorganized Debtors | 3738 |
| | 2. | Settlement of Certain Estate Claims | 3738 |
| | 3. | Releases | 3839 |
| | | a. General Releases of Debtors and Reorganized Debtors | 3839 |
| | | b. Release by the Debtors, Reorganized Debtors and Lehigh Hanson | 39 |
| | | c. General Releases by Holders of Claims or Interests | 3940 |
| | | d. Injunction Related to Releases | 40 |
| S. | | Release of Encumbrances | 4041 |
| T. | | Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes | 4041 |
| U. | | Determination of the Insolvent Insurers Proceeds Dispute | 41 |
| V. | | Compliance with QSF Regulations | 41 |
| W. | | Surety Bond Obligations | 41 |
| ARTICLE V | | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 42 |
| A. | | Executory Contracts and Unexpired Leases to Be Assumed | 42 |

## **TABLE OF CONTENTS**
### (continued)

|  |  |  | **Page** |
|---|---|---|---|
|  | 1. | Assumption Generally | 42 |
|  | 2. | Assumptions of Executory Contracts and Unexpired Leases | 42 |
|  | 3. | Approval of Assumptions and Assumption Procedures | ~~42~~43 |
| B. | | Payments Related to the Assumption of Executory Contracts and Unexpired Leases | ~~43~~44 |
| C. | | Executory Contracts and Unexpired Leases to Be Rejected and Rejection Procedures | 44 |
| D. | | Obligations to Indemnify Directors, Officers and Employees | 45 |
| E. | | Contracts and Leases Entered Into After the Petition Date | 45 |
| F. | | Insurance Policies | 45 |
|  | 1. | Assumed Insurance Policies | 45 |
|  | 2. | Reservation of Rights | 46 |
| ARTICLE VI | | PROVISIONS GOVERNING DISTRIBUTIONS | 46 |
| A. | | Distributions for Claims Allowed as of the Effective Date | 46 |
| B. | | General Unsecured Claims Escrows | 46 |
| ~~B~~C. | | Method of Distributions to Holders of Claims | ~~46~~47 |
| ~~C~~D. | | Compensation and Reimbursement for Services Related to Distributions | ~~46~~47 |
| ~~D~~E. | | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 47 |
|  | 1. | Delivery of Distributions | 47 |
|  | 2. | Undeliverable Distributions Held by Disbursing Agents | 47 |
|  |  | a. | Holding and Investment of Undeliverable Distributions | 47 |
|  |  | b. | After Distributions Become Deliverable | ~~47~~48 |
|  |  | c. | Failure to Claim Undeliverable Distributions | ~~47~~48 |
| ~~E~~F. | | Distribution Record Date | 48 |
|  | 1. | No Recognition of Transfers after the Distribution Record Date | 48 |
|  | 2. | Treatment of Certain Transfers | 48 |
| ~~F~~G. | | Means of Cash Payments | 48 |
| ~~G~~H. | | Timing and Calculation of Amounts to Be Distributed | ~~48~~49 |
|  | 1. | Timing of Distributions Under the Plan | ~~48~~49 |
|  | 2. | Allowed Claims | ~~48~~49 |

# TABLE OF CONTENTS
## (continued)

**Page**

| | | | |
|---|---|---|---|
| | 3. | Compliance with Tax Requirements | 49 |
| | | a. Withholding and Reporting | 49 |
| | | b. Backup Withholding | 49 |
| | | c. Obligations of Distribution Recipients | ~~49~~50 |
| HH. | | Setoffs | 50 |
| IJ. | | Allocation of Payments | 50 |
| ARTICLE VII | | PROCEDURES FOR RESOLVING DISPUTED CLAIMS | ~~50~~51 |
| A. | | Prosecution of Objections to Claims | ~~50~~51 |
| | 1. | Objections to Claims | ~~50~~51 |
| | 2. | Authority to Prosecute Objections | ~~50~~51 |
| | 3. | Authority to Amend Schedules | 51 |
| B. | | Treatment of Disputed Claims | 51 |
| C. | | Distributions on Account of Disputed Claims Once Allowed | 51 |
| ARTICLE VIII | | CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN | ~~51~~52 |
| A. | | Conditions to Confirmation | ~~51~~52 |
| B. | | Conditions to the Effective Date | ~~55~~56 |
| C. | | Waiver of Conditions to Confirmation or the Effective Date | ~~56~~57 |
| D. | | Effect of Nonoccurrence of Conditions to the Effective Date | ~~56~~57 |
| ARTICLE IX | | DISCHARGE, INJUNCTION AND SUBORDINATION RIGHTS | 57 |
| A. | | Discharge of Claims | 57 |
| B. | | Injunctions | ~~57~~58 |
| | 1. | General Injunctions | ~~57~~58 |
| | | a. No Actions on Account of Discharged Claims | ~~57~~58 |
| | | b. No Actions on Account of Released Claims | 58 |
| | | c. Recipients of Distribution Deemed to Consent | ~~58~~59 |
| | 2. | Asbestos Permanent Channeling Injunction | ~~58~~59 |
| | | a. Asbestos Permanent Channeling Injunction | ~~58~~59 |
| | 3. | Environmental Injunction | ~~59~~60 |
| C. | | Subordination Rights | ~~60~~61 |

# TABLE OF CONTENTS
### (continued)

|  |  |  | **Page** |
|---|---|---|---|
| ARTICLE X | RETENTION OF JURISDICTION | | ~~60~~61 |
| A. | Retention of Jurisdiction | | ~~60~~61 |
| B. | Consent to Jurisdiction | | 62 |
| C. | Jurisdiction of Litigating Asbestos Personal Injury Claims | | ~~62~~63 |
| ARTICLE XI | MISCELLANEOUS PROVISIONS | | ~~62~~63 |
| A. | DEQ Settlement | | ~~62~~63 |
| B. | Dissolution of the Creditors' Committee and the Asbestos Personal Injury Committee | | ~~62~~63 |
| C. | Limitation of Liability | | 63 |
| | 1. | Liability for Actions in Connection with the Reorganization Cases | 63 |
| | 2. | Rights of Action in Connection with the Reorganization Cases | ~~63~~64 |
| D. | Modification of the Plan and Exhibits | | 64 |
| E. | Headings | | 64 |
| F. | Severability | | ~~64~~65 |
| G. | Successors and Assigns | | ~~64~~65 |
| H. | Service of Certain Plan Exhibits | | ~~64~~65 |
| I. | Effective Date Actions Simultaneous | | ~~64~~65 |
| J. | Asbestos Personal Injury Trust Annual Report | | 65 |
| K. | Service of Documents | | 65 |
| | 1. | The Debtors and the Reorganized Debtors | ~~65~~66 |
| | 2. | Future Claimants' Representative | 66 |
| | 3. | The Asbestos Personal Injury Committee | 66 |
| | 4. | The Creditors' Committee | ~~66~~67 |
| | 5. | The Bankruptcy Administrator for the Western District of North Carolina | 67 |
| | 6. | Lehigh Hanson, Inc | 67 |

## TABLE OF EXHIBITS[1]

Exhibit I.A.6          Asbestos Insurance Policies

Exhibit I.A.16         Asbestos Personal Injury Trust Agreement

Exhibit I.A.19         Asbestos Personal Injury Trust Distribution Procedures

Exhibit I.A.47         Delaware Trustee

Exhibit I.A.60         Dual Policies

Exhibit I.A.9298       Form of Payment Note

Exhibit I.A.102108     List of Protected Affiliates

Exhibit I.A.113119     Separate Limit Policies

Exhibit I.A.114120     List of Settling Asbestos Insurance Companies

Exhibit IV.B           Description of Certain Restructuring Transactions

Exhibit IV.H           Trustee of Asbestos Personal Injury Trust

Exhibit IV.M.3         List of Asbestos-Only Policies

Exhibit IV.M.4         List of Environmental-Only Policies

Exhibit V.C            Schedule of Executory Contracts and Unexpired Leases to Be Rejected

---

[1]   To the extent not attached to and Filed with the Plan, Plan Exhibits shall be Filed and made available for review on the web site of Prime Clerk LLC ("Prime Clerk"), the Debtors' claims and noticing agent, at https://cases.primeclerk.com/kaisergypsum no later than ten (10) days before the deadline to object to confirmation of the Plan.  The Debtors also will serve such Exhibits on their then current Bankruptcy Rule 2002 service list no later than ten (10) days before the deadline to object to confirmation of the Plan. The Debtors reserve the right to modify, amend, supplement, restate or withdraw any of the Exhibits after they are Filed.  The Debtors shall File and shall make available on Prime Clerk's web site all modified, amended, supplemented or restated Exhibits as promptly as possible.

# INTRODUCTION

The Parties propose the following joint plan of reorganization for the resolution of the outstanding claims and demands against and equity interests in the Debtors pursuant to sections 524(g) and 1121(a) of title 11 of the United States Code.  The Parties are co-proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code, and the Plan is supported by the following principal stakeholders, or representatives of such stakeholders, in the chapter 11 cases:  the Debtors, the Debtors' indirect parent company, Lehigh Hanson, Inc., the Asbestos Personal Injury Committee and the Future Claimants' Representative.  Reference is made to the Debtors' disclosure statement, filed contemporaneously with the Plan, for a discussion of the history, businesses, results of operations, historical financial information, projections and properties of the Debtors, and for a summary and analysis of the Plan.  There also are other agreements and documents, which are or will be Filed with the Bankruptcy Court, that are referenced in the Plan or the Debtors' Disclosure Statement and that will be available for review.

# ARTICLE I

# DEFINED TERMS, RULES OF INTERPRETATION
# AND COMPUTATION OF TIME

## A.    Defined Terms

As used in the Plan, capitalized terms have the meanings set forth below.  Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, has the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.    **"Administrative Claim"** means a Claim for costs and expenses of administration allowed under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the respective Estates and operating the businesses of the Debtors (such as wages, salaries, commissions for services and payments for leased equipment and premises), including Claims under the DIP Credit Agreement; (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under sections 330(a), 331 or 503 of the Bankruptcy Code, including Fee Claims; and (c) all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930.

2.    **"Affiliate"** means an "affiliate," as defined in section 101(2)(B) of the Bankruptcy Code, of the Debtors.

3.      **"Allowed Claim"** means:

      a.      a Claim (other than an Asbestos Personal Injury Claim) that (i) has been listed by a particular Debtor on its Schedules as other than disputed, contingent or unliquidated and (ii) is not a Disputed Claim;

      b.      a Timely Claim (other than an Asbestos Personal Injury Claim) that is not a Disputed Claim;

      c.      a Timely Claim (other than an Asbestos Personal Injury Claim) that is liquidated and allowed:  (i) in any Stipulation of Amount and Nature of Claim executed by the Debtors or Reorganized Debtors and Claim holder; (ii) in any contract, instrument or other agreement entered into in connection with the Plan and, if prior to the Effective Date, approved by the Bankruptcy Court; (iii) in a Final Order; or (iv) pursuant to the terms of the Plan; or

      d.      a Claim (other than an Asbestos Personal Injury Claim) listed by a particular Debtor on its Schedules as other than disputed, contingent or unliquidated or a Timely Claim that the Debtors or Reorganized Debtors determine prior to the Claims Objection Bar Date (i) will not be subject to an objection or to an amendment to the Schedules and (ii) will be satisfied in accordance with the terms of the Plan on or after the Effective Date.

4.      **"Allowed . . . Claim"** means an Allowed Claim in the particular Class or category specified.

5.      **"Asbestos Coverage Litigation"** means the case captioned *Truck Insurance Exchange v. Kaiser Cement and Gypsum Corporation*, Court of Appeal of the State of California, Second Appellate District, Court of Appeal No. B278091, Superior Court No. BC249550.

6.      **"Asbestos Insurance Policies"** means those insurance policies alleged by HPCI or any other party in the Asbestos Coverage Litigation and described on Exhibit I.A.6, as well as any other insurance policy of the Debtors providing, or potentially providing, for coverage for Asbestos Personal Injury Claims.

7.      **"Asbestos Insurance Policy Claim"** means any claim against any Asbestos Insurer based on, arising under, or related to any Asbestos Insurance Policy or settlement related to any Asbestos Insurance Policy, including any claim for contribution, reimbursement, indemnity or subrogation, or bad faith refusal to settle related to any Asbestos Insurance Policy.

8.      **"Asbestos Insurer"** means any Entity that has issued an Asbestos Insurance Policy and each of its affiliates, predecessors in interest, and agents, but only in relation to such Asbestos Insurance Policies, including those insurers who issued, subscribed to, or have acquired the obligations of an issuing or subscribing insurer through assignment, conveyance, merger, acquisition or other legal theory.

9.     **"Asbestos Insurer Cooperation Obligations"** means, collectively, the Assistance and Cooperation, Inspection and Audit, and Notice of Occurrence provisions set out in the Asbestos Insurance Policies.

10.     **"Asbestos Permanent Channeling Injunction"** means an order or orders of the Bankruptcy Court or the District Court, or the Bankruptcy Court and the District Court acting jointly and, if the Confirmation Order is entered by the Bankruptcy Court, affirmed by the District Court, in accordance with, and pursuant to, section 524(g) of the Bankruptcy Code permanently and forever staying, restraining and enjoining any Entity from taking any actions against any Protected Party for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any Asbestos Personal Injury Claim, all of which shall be channeled to the Asbestos Personal Injury Trust for resolution as set forth in the Asbestos Personal Injury Trust Agreement and the related Asbestos Personal Injury Trust Distribution Procedures.

11.     **"Asbestos Personal Injury Claim"** means any and all Debtor Claims on account of or relating to death, bodily injury, sickness, disease, emotional distress, fear of cancer, medical monitoring or other personal injuries whatsoever (whether physical, emotional or otherwise) arising out of, based upon or resulting from, directly or indirectly, in whole or in part, Conduct, to the extent arising, directly or indirectly, from Conduct (including Conduct of any other Entity for whose Conduct the Debtors have or are alleged to have liability, but in all cases only to the extent of any of the Debtors' liability for such Conduct), including without limitation (a) any and all Asbestos Personal Injury Indirect Claims and (b) any and all Debtor Claims under agreements entered into by or on behalf of the Debtors prior to the Petition Date in settlement of Asbestos Personal Injury Claims.  For the purpose of this definition, Asbestos Personal Injury Claims shall not include any claim by any present or former employee of any of the Debtors for benefits under a policy of workers' compensation insurance or for benefits under any state or federal workers' compensation statute or other statute providing compensation to an employee from an employer. For avoidance of doubt, an Asbestos Personal Injury Claim excludes any liability of the Protected Parties that is not liability of the Debtors, including, but not limited to, any liability of the Protected Parties (other than the Debtors) for their own asbestos or asbestos-containing products.

12.     **"Asbestos Personal Injury Committee"** means the Official Committee of Asbestos Personal Injury Claimants appointed pursuant to an order of the Bankruptcy Court entered on October 19, 2016 in the Reorganization Cases pursuant to section 1102 of the Bankruptcy Code and any duly appointed successors, as the same may be reconstituted from time to time.  The members as of the date of the Plan are:  Cleophus Rice, c/o Armand J. Volta, Jr., The Law Offices of Peter G. Angelos; Larry Eugene Watson, c/o Alan R. Brayton, Brayton Purcell LLP; Jerry Gabrel, c/o John D. Cooney, Cooney & Conway; Bernard Kunes, II, Individually and as Special Administrator of the Estate of Bernard Kunes, Deceased, c/o Beth Gori, Gori Julian & Associates, P.C.; Margaret Tocco, Individually and as Special Administrator of the Estate of Peter Tocco, Deceased, c/o Perry J. Browder, Simmons Hanly Conroy LLC; Ronald Earl Auen and Sherrie Auen, c/o Steven Kazan, Kazan, McClain, Satterley & Greenwood; Stanley J. Anderson c/o Connie J. Anderson – POA, c/o James L. Ferraro, Kelley & Ferraro, LLP; Lauren Lougher, as Administratrix of the Estate of John Lougher, Deceased, c/o Joseph W. Belluck, Belluck & Fox, LLP; Marta Poling-Goldenne, As Successor-In-Interest to David Poling-Goldenne, Deceased c/o Peter A. Kraus, Waters & Kraus, LLP; Patricia Hoff, Individually

and as Personal Representative of David Hoff, Deceased, c/o Matthew P. Bergman, Bergman Draper Ladenburg, PLLC; Lois Annette Beach, c/o Joseph F. Rice, Motley Rice LLC.  The committee is chaired by Mr. Cooney.

13.     **"Asbestos Personal Injury Indirect Claim"** means any and all Debtor Claims asserted by a party that is not an Asbestos Insurer for contribution, reimbursement, subrogation or indemnification, or any other indirect or derivative recovery, on account of or with respect to any Asbestos Personal Injury Claim.  Notwithstanding the foregoing, any Protected Party Indemnification Claim shall not be deemed to be or treated as an Asbestos Personal Injury Indirect Claim or an Asbestos Personal Injury Claim, and the Asbestos Personal Injury Trust shall pay such claims in accordance with the terms of the Asbestos Personal Injury Trust Documents and the Plan.

14.     **"Asbestos Personal Injury Insurance Assets"** ~~mean~~means (a) all of the Debtors' rights related to or arising under their Asbestos Insurance Policies (but not the policies themselves) to the fullest extent that those rights are related to coverage for Asbestos Personal Injury Claims, and (b) all claims and causes of action that the Debtors or Reorganized Debtors have, or may have in the future, against any Asbestos Insurer that are related to the Debtors' asbestos-containing products or the Asbestos Personal Injury Claims, including, but not limited to, claims or causes of action for a bad-faith refusal to settle.  For the avoidance of doubt, Asbestos Personal Injury Insurance Assets include all rights to coverage and insurance proceeds under the Asbestos Insurance Policies that are related to coverage for Asbestos Personal Injury Claims, together with all rights to insurance coverage and insurance proceeds related to Asbestos Personal Injury Claims under any settlement agreements and/or other agreements or stipulations, including without limitation the Excess CIP Agreement, as well as the right, on behalf of the Debtors, to compromise with or grant a full release to one or more of the Asbestos Insurers of any such insurance rights, whether under any such policy or settlement agreement.

15.     **"Asbestos Personal Injury Trust"** means the trust that is to be established pursuant to section 524(g) of the Bankruptcy Code and in accordance with the Plan, the Confirmation Order and the Asbestos Personal Injury Trust Agreement, which trust will satisfy the requirements of section 524(g) of the Bankruptcy Code and section 468B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder.

16.     **"Asbestos Personal Injury Trust Agreement"** means that certain Asbestos Personal Injury Trust Agreement, executed by the Debtors and the Asbestos Personal Injury Trustee, substantially in the form of Exhibit I.A.16.

17.     **"Asbestos Personal Injury Trust Appellate Costs"** means if the Asbestos Personal Injury Trust determines to continue pursuing the Phase 1 Claims following the entry of a decision by the California Court of Appeal or, if there is a remand by that court, the Superior Court, completely resolving the Phase 1 Claims in favor of Truck, including through any further appeals or post-decision motions, all costs of pursuing the Phase 1 Appeal, including reasonable attorneys' fees and expenses incurred by the Asbestos Personal Injury Trust from that point forward.

18. **"Asbestos Personal Injury Trust Assets"** means, collectively: (a) $49.0 million in cash; (b) the Payment Note; (c) the Phase 1 Claims; and (d) the Asbestos Personal Injury Insurance Assets.

19. **"Asbestos Personal Injury Trust Distribution Procedures"** means the Asbestos Personal Injury Trust Distribution Procedures, to be implemented by the Asbestos Personal Injury Trust pursuant to the terms and conditions of the Plan and the Asbestos Personal Injury Trust Agreement governing the resolution of Asbestos Personal Injury Claims, substantially in the form of Exhibit I.A.19.

20. **"Asbestos Personal Injury Trust Documents"** means, collectively:  (a) the Asbestos Personal Injury Trust Agreement; (b) the Asbestos Personal Injury Trust Distribution Procedures; and (c) the other agreements, instruments and documents governing the establishment and administration of the Asbestos Personal Injury Trust, as the same may be amended or modified from time to time, in accordance with the terms thereof.

21. **"Asbestos Personal Injury Trust Expenses"** means, as to the Asbestos Personal Injury Trust, all costs, Taxes and expenses of or imposed on such trust, including but not limited to: (a) compensation expenses of such trust; (b) legal, accounting and other professional fees and expenses of such trust; (c) other disbursements and expenses relating to the implementation and operation of such trust; and (d) Asbestos Personal Injury Trust Appellate Costs.

22. **"Asbestos Personal Injury Trust Termination Date"** means the date on which the Asbestos Personal Injury Trust terminates as set forth in the Asbestos Personal Injury Trust Agreement.

23. **"Asbestos Personal Injury Trustee"** means the person appointed to serve as trustee of the Asbestos Personal Injury Trust to administer Asbestos Personal Injury Claims pursuant to the terms of the Asbestos Personal Injury Trust Agreement, or as subsequently may be appointed pursuant to the terms of the Asbestos Personal Injury Trust Agreement.

24. **"Bankruptcy Administrator"** means the Bankruptcy Administrator for the Western District of North Carolina.

25. **"Bankruptcy Code"** means title 11 of the United States Code, as in effect on the Petition Date or thereafter amended with retroactive applicability to the Reorganization Cases.

26. **"Bankruptcy Court"** means the United States Bankruptcy Court for the Western District of North Carolina having jurisdiction over the Reorganization Cases.

27. **"Bankruptcy Rules"** means, collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended with retroactive applicability to the Reorganization Cases.

28. **"Bar Date"** means the applicable bar date by which a proof of Claim or a request for payment of an Administrative Claim must be or must have been Filed, as established by an order of the Bankruptcy Court, including the Confirmation Order.

29.    **"Business Day"** means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)), the day after Thanksgiving and any date on which the Bankruptcy Court is closed by law or order.

30.    **"By-Laws"** means, with respect to a Reorganized Debtor, the by-laws, regulations or other comparable document of such Reorganized Debtor, to be amended and restated in accordance with Section IV.D.1.

31.    **"Certificate of Incorporation"** means, with respect to any Reorganized Debtor, the articles or certificate of incorporation or other comparable document of such Reorganized Debtor, to be amended and restated in accordance with Section IV.D.1.

32.    **"Claim"** means a "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

33.    **"Claims Objection Bar Date"** means, for all Claims (other than Asbestos Personal Injury Claims) the latest of:  (a) 120 days after the Effective Date; (b) 60 days after the Filing of a proof of Claim for such Claim; and (c) such other period of limitation as may be specifically fixed by the Plan, the Confirmation Order, the Bankruptcy Rules or an order of the Bankruptcy Court.

34.    **"Class"** means a class of Claims or Interests, as described in Article II, pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

35.    **"Conduct"** means the presence of or exposure to asbestos or asbestos containing products or things alleged to have been designed, marketed, manufactured, fabricated, constructed, sold, supplied, produced, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, distributed, or in any other way made available, or present at any premises owned, leased, occupied or operated, by either of the Debtors or any other Entity for whose products, acts, omissions, business, or operations either of the Debtors has liability or is alleged to have liability.

36.    **"Confirmation"** means the entry of the Confirmation Order on the docket of the District Court.

37.    **"Confirmation Date"** means the date on which the Bankruptcy Court and the District Court acting jointly, or the District Court enters the Confirmation Order on its docket.

38.    **"Confirmation Hearing"** means, collectively, the hearing or hearings held by the Bankruptcy Court or the District Court on Confirmation of the Plan, as such hearing or hearings may be continued from time to time.

39.    **"Confirmation Order"** means the order of the District Court, the Bankruptcy Court and the District Court acting jointly, or, if an order is entered by the Bankruptcy Court, the order of the District Court affirming the Bankruptcy Court's order, that confirms the Plan pursuant to section 1129 of the Bankruptcy Code.

**40.**     **"Creditors' Committee"** means the Official Committee of Unsecured Creditors appointed pursuant to an order of the Bankruptcy Court entered on October 14, 2016 in the Reorganization Cases pursuant to section 1102 of the Bankruptcy Code and any duly appointed successors, as the same may be reconstituted from time to time.  The members as of the date of the Plan are:  The Boeing Company and Ash Grove Cement Company.

**41.**     **"Cure Amount Claim"** means a Claim based upon a Debtor's defaults pursuant to an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by that Debtor under section 365 of the Bankruptcy Code.

**42.**     **"Debtor Appellate Costs"** means the Truck Appeal Costs together with the First Stage Costs.

**43.**     **"Debtor Claims"** means any and all claims, commitments, obligations, suits, judgments, damages (whether compensatory, exemplary, punitive or otherwise), Demands, debts, causes of action and liabilities of any kind or nature, of or against the Debtors or any Protected Party, to the full extent, but only to the extent, of the Debtors' liability, whether liquidated or unliquidated, fixed or contingent, direct or indirect, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, now existing or hereafter arising, in law, equity or otherwise, including, without limitation, under any legal or equitable theory. whatsoever, including without limitation piercing the corporate veil, alter ego, successor liability, fraudulent conveyance, fraudulent concealment, conspiracy, enterprise liability, market share, joint venture, loss of consortium, medical monitoring, negligence, failure to warn, wrongful death, survivorship, or any other legal or equitable theory.

**44.**     **"Debtors"** means, together, the above-captioned debtors and debtors in possession identified on the cover page to this Plan.

**45.**     **"Deductible"** means (a) $5,000 per paid Asbestos Personal Injury Claim for all paid claims with a first exposure date on or before December 31, 1975; (b) $50,000 per paid Asbestos Personal Injury Claim for all paid claims with a first exposure date between January 1, 1976 and March 31, 1981, inclusive; and (c) $100,000 per paid Asbestos Personal Injury Claim for all claims with a first exposure date between April 1, 1981 and March 31, 1983, inclusive.

**46.**     **"Deficiency Claim"** means a General Unsecured Claim for the difference between (a) the aggregate amount of an Allowed Claim and (b) the value received on account of the portion of such Allowed Claim that is a Secured Claim.

**47.**     **"Delaware Trustee"** means the Entity or Entities appointed to serve as the "Delaware Trustee" for the Asbestos Personal Injury Trust pursuant to Section IV.H and the terms of the Asbestos Personal Injury Trust Agreement, as identified in Exhibit I.A.47, or as subsequently may be appointed pursuant to the terms of the Asbestos Personal Injury Trust Agreement.

**48.**     **"Demand"** means a "demand," as defined in section 524(g)(5) of the Bankruptcy Code, against any Debtor.

**49.** **"DEQ"** means the Oregon Department of Environmental Quality.

**50.** **"DEQ Settlement"** means the settlement among the Debtors, Lehigh Hanson and DEQ as approved by the DEQ Settlement Order and further documented in the Consent Judgment entered in the Circuit Court of the State of Oregon for the County of Columbia; provided that the DEQ Settlement shall be subject to and governed by the terms and conditions of the Consent Judgment and the Term Sheet, and that all conditions to the effectiveness of the DEQ Settlement set forth therein shall have been satisfied or waived in writing; and, provided further, that in the event of any inconsistency between the terms of the DEQ Settlement, as so defined, and the DEQ Settlement Order, the terms and conditions of the DEQ Settlement shall govern.

**51.** **"DEQ Settlement Order"** means the Order Approving Settlement with the Oregon Department of Environmental Quality entered by the Bankruptcy Court on May 7, 2019.

**52.** **"DIP Credit Agreement"** means, collectively: (a) that Debtor-in-Possession Loan and Security Agreement; (b) all amendments thereto and extensions thereof; and (c) all security, guaranty and other documents and agreements related to the documents identified in (a) and (b), including, without limitation, any termination letters.

**53.** **"DIP Lender"** means Lehigh Hanson, Inc., a Delaware corporation, as the lender under the DIP Credit Agreement.

**54.** **"Disbursing Agent"** means any of the Reorganized Debtors, in their capacity as a disbursing agent pursuant to Section VI.~~B~~C., or any Third Party Disbursing Agent, but shall not include any disbursing agent for or with respect to the Asbestos Personal Injury Trust.

**55.** **"Disclosure Statement"** means the written disclosure statement that relates to the Plan, including the exhibits thereto, approved by the Bankruptcy Court as containing adequate information pursuant to section 1125 of the Bankruptcy Code and Rule 3017 of the Bankruptcy Rules, as such disclosure statement may be amended, modified, or supplemented from time to time.

**56.** **"Disputed Claim"** means (other than with respect to an Asbestos Personal Injury Claim):

> a. if no proof of Claim has been Filed by the applicable Bar Date or has otherwise been deemed timely Filed under applicable law, (i) a Claim that is listed on a Debtor's Schedules as disputed, contingent or unliquidated or (ii) a Claim that is not listed on a Debtor's Schedules; or

> b. if a Timely Claim, a Claim for which an objection, complaint or request for estimation has been Filed by the applicable Debtor, Reorganized Debtor or, prior to the Confirmation Date, any other party in interest, by the Claims Objection Bar Date, and such objection has not been withdrawn or denied by a Final Order.

**57.** **"Distribution"** means one or more payments or distributions under the Plan of cash, notes, interests or other property, as applicable, to the holders of Allowed Claims (other

than Asbestos Personal Injury Claims or distributions made to the Asbestos Personal Injury Trust).

**58.    "Distribution Record Date"** means the Confirmation Date.

**59.    "District Court"** means the United States District Court for the Western District of North Carolina having jurisdiction over these Reorganization Cases.

**60.    "Dual Policies"** means those insurance policies described on Exhibit I.A.60 which provide or may provide coverage for Asbestos Personal Injury Claims and Environmental Claims under a shared combined aggregate limit.

**61.    "Effective Date"** means the earliest possible date, as determined by the Debtors, the Asbestos Personal Injury Committee and the Future Claimants' Representative, that is a Business Day on or after the date on which all conditions to the effective date in Section VIII.B. have been met or waived pursuant to Section VIII.C.

**62.    "Encumbrance"** means, with respect to any asset, any mortgage, lien, pledge, charge, security interest, assignment or encumbrance of any kind or nature in respect of such asset (including any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction).

**63.    "Entity"** means an individual, corporation, partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization or government or any political subdivision thereof, or other person or entity.

**64.    "Environmental Claim"** means a Claim of any Entity against any Debtor: (a) relating to alleged violations of, or noncompliance with, or liability arising under any federal or state environmental laws or regulations; or (b) relating to Pollution (defined as actual, alleged, or threatened pollution, contamination, damage, injury, or harm to any land, soil, watercourse, surface water, ground water, body of water, the air and/or atmosphere and/or any other tangible thing, or to any person or other living thing, relating to the actual, alleged, or threatened release, discharge, disposal, application, distribution, use or escape (including emission or seepage) of smoke, vapor, soot, fumes, acids, alkalis, chemicals, liquids, gases, waste materials, oil, petroleum or petroleum derivatives, other irritants, contaminants or pollutants from any facility, structure, vehicle, premises, landfill, disposal site or other property owned or operated by the Debtors or at or to which such substances were generated, stored, transported, distributed, sold, produced, or disposed of by the Debtors or for which the Debtors may be liable by contract or by statute, or otherwise, including all sites or locations referenced in the actions pending in California state court and Oregon state court to determine insurance coverage, regardless of whether substances were known to be, or, in fact, were hazardous, contaminating or polluting substances at any particular time), including:  (i) any Claim of actual, alleged, threatened, or feared personal injury, bodily injury, sickness, or disease; (ii) any Claim of actual, alleged, threatened, or feared property damage, including damage, destruction, loss of use, diminished value or any economic loss; (iii) any Claim relating to actual, alleged, threatened, or feared damage to, destruction of, or limitation or loss of use of natural resources; (iv) any Claim

seeking to compel (through injunctive or equitable relief or otherwise), the enforcement of federal, state or local statutes, rules, regulations, ordinance or government directive or the testing, study, investigation, prevention or remediation of actual, alleged, threatened, or feared Pollution or any Claim for such costs; (ev) any Claim for nuisance, trespass, interference with quiet enjoyment of property, bad faith, sanctions, punitive or exemplary damages, statutory fines, or penalties; or (fvi) any Claim for costs or expenses incurred by any Entity for the testing study, investigation, prevention, or remediation of actual, alleged, threatened, or feared Pollution, or incurred in order to comply with any environmental statute, rule, regulation, ordinance, or government directive.  For the avoidance of doubt, Asbestos Personal Injury Claims and Asbestos Insurance Policy Claims do not fall within the definition of Environmental Claims.

65.    **"Estate"** means, as to each Debtor, the estate created for that Debtor in its Reorganization Case pursuant to section 541 of the Bankruptcy Code.

66.    **"Escrow Agent"** means the escrow agent designated to administer and make distributions from the General Unsecured Claims Escrows.

6667.    **"Executory Contract and Unexpired Lease"** and **"Executory Contract or Unexpired Lease"** meanmeans a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code and the Confirmation Order.

6768.    **"Excess CIP Agreement"** means that certain December 2013 Excess Coverage In Place Settlement Agreement.

6869.    **"Fee Claim"** means a Claim under sections 330(a), 331, 503 or 1103 of the Bankruptcy Code for compensation of a Professional or other Entity for services rendered or expenses incurred in the Reorganization Cases.

6970.    **"Fee Order"** means the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals entered by the Bankruptcy Court on November 7, 2016.

7071.    **"File," "Filed" or "Filing"** means file, filed or filing with the Bankruptcy Court, the District Court or their authorized designees, as applicable, in the Reorganization Cases.

7172.    **"Final Fee Application"** means an application for final allowance of the Professional's aggregate Fee Claim as described in Section III.A.1.d.ii.A.

7273.    **"Final Order"** means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction that has been entered on the docket in any Reorganization Case or the docket of any other court of competent jurisdiction, and has not been reversed, stayed, modified or amended, and as to which (a) the time to appeal or seek certiorari or move for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or (b) any appeal that has been taken or any petition for certiorari that has been filed timely has been withdrawn or

resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied.

7374. **"First Stage Costs"** means all costs of pursuing the Phase 1 Claims, including reasonable attorneys' fees and expenses, incurred by the plaintiff until the earlier of (a) the entry of a decision by the California Court of Appeal in the Phase 1 Appeal or, if there is a remand by that court, the California Superior Court, resolving the Phase 1 Claims or (b) a settlement of the Phase 1 Claims.

7475. **"Future Claimants' Representative"** means Lawrence Fitzpatrick (or any court appointed alternative or successor), the legal representative for persons who might subsequently assert Demands against any of the Debtors, who was appointed pursuant to order of the Bankruptcy Court dated October 19, 2016.

7576. **"General Unsecured Claim"** means a Deficiency Claim and any Claim that is not a Cure Amount Claim, Administrative Claim, Priority Tax Claim, Priority Claim, Secured Claim, Asbestos Personal Injury Claim, or Intercompany Claim.

77. **"General Unsecured Claims Escrows"** means two escrow accounts funded through (a) settlement amounts paid by Settled Environmental Insurers and (b) the Lehigh Hanson General Unsecured Claim Contribution held by the Escrow Agent to facilitate distributions to holders of Allowed General Unsecured Claims. On the Effective Date, the funds deposited into the General Unsecured Claims Escrows will total the aggregate amount of all Allowed General Unsecured Claims as of the Effective Date.

7678. **"HeidelbergCement"** means HeidelbergCement AG.

7779. **"HPCI"** means Debtor Hanson Permanente Cement, Inc., an Arizona corporation.

7880. **"Insolvent Insurers Proceeds"** means the proceeds of the Debtors' claims for insurance coverage against OIC Run-Off Limited (formerly The Orion Insurance Company plc) and The London and Overseas Insurance Company Limited (formerly The London and Overseas companyCompany plc), which proceeds are being or will be held by the Debtors in a separate bank account pending a further order of the Bankruptcy Court.

7981. **"Insolvent Insurers Proceeds Dispute"** means the dispute among the Asbestos Personal Injury Committee, the Future Claimants' Representative, certain insurers and the Creditors' Committee regarding to what extent the Debtors or other parties are entitled to the Insolvent Insurers Proceeds.

8082. **"Insurance Policies"** meanmeans the insurance policies covering or potentially covering the Asbestos Personal Injury Claims and the Environmental Claims, as described in Exhibits I.A.6, I.A.60, I.A.102119, IV.M.3 and IV.M.4.

8183. **"Insured Asbestos Claim"** means an Asbestos Personal Injury Claim that is covered by any Asbestos Insurance Policy.

**8284**.   **"Insurer Coverage Defenses"** means all defenses at law or in equity that any Asbestos Insurer may have under applicable non-bankruptcy law to provide insurance coverage to or for Asbestos Personal Injury Claims that have been channeled to and assumed by the Asbestos Personal Injury Trust pursuant to the Plan, except for (a) any defense that the transfer of the Debtors' rights as to Asbestos Personal Injury Insurance Assets pursuant to the Plan is invalid or unenforceable or otherwise breaches the terms of such coverage and (b) any defense that the drafting, proposing, confirmation or consummation of a plan of reorganization (as opposed to the terms, operation, effect or unreasonableness of any of the Plan or the Exhibits to the Plan) and/or the discharge and/or release of the Debtors from liability for Asbestos Personal Injury Claims pursuant to the Plan operates to, or otherwise results in, the elimination of or the reduction in any obligation such insurers may have under such transferred rights as to the Asbestos Personal Injury Insurance Assets.

**8385**.   **"Intercompany Claim"** means any Claim, including an Administrative Claim, by HeidelbergCement or any direct or indirect subsidiary of HeidelbergCement, including a Debtor, against a Debtor.

**8486**.   **"Interest"** means the rights of any holder of the stock of any Debtor and the rights of any Entity to purchase or demand the issuance of any of the stock of any Debtor, including: (a) redemption, conversion, exchange, voting, participation and dividend rights; (b) liquidation preferences; and (c) rights under stock options and warrants.

**87.**   **"Inter-Insurer rights"** means the rights of one Asbestos Insurer to recover from any other Asbestos Insurer based on theories of contribution, indemnity, subrogation or other right to reimbursement, whether those rights are based upon contract, statute, equity or case law.

**8588**.   **"Internal Revenue Code"** means title 26 of the United States Code, 26 U.S.C. § 1 *et seq.*

**8689**.   **"IRS"** means the Internal Revenue Service of the United States of America.

**8790**.   **"Kaiser Gypsum"** means Debtor Kaiser Gypsum Company, Inc., a North Carolina corporation.

**8891**.   **"Lehigh Hanson"** means Lehigh Hanson, Inc., a Delaware corporation.

**92.**   **"Lehigh Hanson General Unsecured Claim Contribution"** means a payment of Lehigh Hanson into the General Unsecured Claims Escrows in an amount no less than the total amount of all Allowed General Unsecured Claims as of the Effective Date, less the amount contributed to the General Unsecured Claims Escrows by the Settled Environmental Insurers, less any amount contributed to the General Unsecured Claims Escrows by the Debtors, but not to exceed the amount specified in Section IV.E of this Plan.

**8993**.   **"Non-Settling Asbestos Insurer"** means any Asbestos Insurer who is not a Settling Asbestos Insurer.

**94.**   **"Objecting Excess Insurers"** means Certain Underwriters at Lloyd's, London, Certain London Market Companies, Columbia Casualty Company, National Fire Insurance

Company of Hartford, The Continental Insurance Company, Granite State Insurance Company, Lexington Insurance Company, The Insurance Company of the State of Pennsylvania, Evanston Insurance Company, TIG Insurance Company, Allstate Insurance Company, solely as successor in interest to Northbrook Excess & Surplus Insurance Company, formerly Northbrook Insurance Company, First State Insurance Company, New England Reinsurance Company, Allianz Underwriters Insurance Company, Fireman's Fund Insurance Company, and Westchester Fire Insurance Company.

**95.**    **"Objecting Excess Insurers' Objections"** means the Plan objections and motions to dismiss, set out in docket numbers 919, 1053, 2066, 2067, 2069, 2071, 2073 and 2075 of the Bankruptcy Court docket, and any objections to any post-confirmation settlement with Truck.

~~90~~96.    **"Parties"** means, collectively, the Debtors, Lehigh Hanson, the Asbestos Personal Injury Committee and the Future Claimants' Representative.

~~91~~97.    **"Payment Default"** means the failure by the Reorganized Debtors to pay the Payment Note in full on or before the fifth anniversary of the Effective Date.

~~92~~98.    **"Payment Note"** means a note, issued to the Asbestos Personal Injury Trust by the Reorganized Debtors as co-obligors in the principal amount of $1.0 million, in substantially the form of Exhibit I.A.~~92~~98.  As reflected in Exhibit I.A.~~92~~98, the Payment Note will (a) beginning on the second anniversary of the Effective Date, bear interest at a rate of 10 percent per annum,; (b) mature on the fifth anniversary of the Effective Date,; (c) be secured by the Pledge,; and (d) provide for payment in full of the principal amount of the Payment Note on or before the Payment Note's maturity date.  As further reflected in Exhibit I.A.~~92~~98, upon the occurrence of a Payment Default, the Asbestos Personal Injury Trust may, upon written notice to the Reorganized Debtors, foreclose on the Pledge.  During the period in which the Payment Default has occurred and is continuing interest will accrue at a per annum rate of 10 percent on the amount of the unpaid principal.  A Payment Default shall not provide a basis for the Asbestos Personal Injury Trust to contend that a material breach of the Plan has occurred or that any Protected Party is no longer entitled to the protections provided to such Protected Party pursuant to the Plan, including without limitation the protections of the Asbestos Permanent Channeling Injunction, the related indemnification by the Asbestos Personal Injury Trust, and the settlement of the Estates' claims.

~~93~~99.    **"Permanente Property"** means HPCI's cement plant, rock plant and quarry (including the minerals) located in Santa Clara County, California.

~~94~~100. **"Petition Date"** means September 30, 2016.

~~95~~101. **"Phase 1 Appeal"** means HPCI's appeal of the January 5, 2015 Statement of Decision in the Asbestos Coverage Litigation that is pending in the California Court of Appeal under Case No. B278091.

~~96~~102. **"Phase 1 Claims"** means those claims of HPCI (asserted on its own and on Kaiser Gypsum's behalf) against Truck for Truck's withholding of deductible amounts in July 2007, as alleged by HPCI in its Cross-Complaint against Truck in the Asbestos Coverage Litigation, and

as tried to the court in November 2014 and reflected in a January 5, 2015 Statement of Decision, and as encompassed within the Phase 1 Appeal.

~~97~~**103**. **"Plan"** means this joint plan of reorganization for the Debtors and all Exhibits attached hereto or referenced herein, as the same may be amended, modified or supplemented.

~~98~~**104**. **"Pledge"** means 100 percent of the equity of each Reorganized Debtor.

~~99~~**105**. **""Priority Claim"** means a Claim that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code that is not an Administrative Claim or a Priority Tax Claim.

~~100~~**106**. **"Priority Tax Claim"** means a Claim that is entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.

~~101~~**107**. **"Professional"** means any professional employed in the Reorganization Cases pursuant to sections 327, 328 or 1103 of the Bankruptcy Code or any professional or other Entity seeking compensation or reimbursement of expenses in connection with the Reorganization Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

~~102~~**108**. **"Protected Affiliates"** means the parties identified on Exhibit I.A.~~102~~108.

~~103~~**109**. **"Protected Party"** means any of the following parties:

> a.     the Debtors;

> b.     the Reorganized Debtors;

> c.     the Protected Affiliates;

> d.     Lehigh Hanson;

> e.     current and former directors, officers, and employees of the Debtors, the Reorganized Debtors and the Protected Affiliates, including without limitation Lehigh Hanson, solely in their capacity as such;

> f.     as of February 15, 2018, current and former shareholders of the Debtors, the Reorganized Debtors and the Protected Affiliates, including without limitation Lehigh Hanson, solely in their capacity as such;

> g.     current and former in-house and outside attorneys, accountants, auditors, tax advisors and other professionals who have provided services to the Debtors, the Reorganized Debtors and the Protected Affiliates, including without limitation Lehigh Hanson, solely in their capacity as such;

> h.     Entities that, pursuant to the Plan or on or after the Effective Date, become a direct or indirect transferee of, or successor to, any assets of any Debtor or Reorganized Debtor, or the Asbestos Personal Injury Trust, but

only to the extent that liability is asserted to exist by reason of such Entity becoming such a transferee or successor;

i.        Entities that, pursuant to the Plan or on or after the Effective Date, make a loan to any Debtor or Reorganized Debtor, or the Asbestos Personal Injury Trust or to a successor to, or transferee of, any assets of any Debtor or Reorganized Debtor, or the Asbestos Personal Injury Trust, but only to the extent that liability is asserted to exist by reason of it becoming such a lender;

j.        Entities, other than Asbestos Insurers, that are alleged to be directly or indirectly liable for the conduct of, claims against, or Demands on any Debtor or Reorganized Debtor, or the Asbestos Personal Injury Trust, to the extent that such alleged liability arises by reason of one or more of the following:

       1.   such Entity's ownership of a financial interest in any Debtor or Reorganized Debtor, or any past or present affiliate of any them, or any predecessor in interest of any of them;

       2.   such Entity's involvement in the management of any Debtor, Reorganized Debtor or any predecessor in interest of any of them;

       3.   such Entity's service as an officer, director or employee of any Debtor or Reorganized Debtor, any past or present affiliate of any of them, any predecessor in interest of any of them, or of any entity that owns or at any time has owned a financial interest in any Debtor or Reorganized Debtor, any past or present affiliate of any of them, or any predecessor in interest of any of them;

       4.   such Entity's provision of insurance to any Debtor, Reorganized Debtor, any past or present affiliate of any of them, or any predecessor in interest of any of them, or any entity that owns or at any time has owned a financial interest in any Debtor or Reorganized Debtor, any past or present affiliate of any of them, or any predecessor in interest of any of them; and

       5.   such Entity's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of any Debtor, Reorganized Debtor, any past or present affiliate of any of them, any predecessor in interest of any of them, or any entity that owns or at any time has owned a financial interest in any Debtor or Reorganized Debtor, any past or present affiliate of any of them, or any predecessor in interest of any of them.

k.        each Settling Asbestos Insurer.

104110. **"Protected Party Indemnification Claims"** mean any and all claims, including claims for related fees and costs, of a Protected Party under the indemnification described in Section IV.K.4.

104a.  ~~**"Inter-Insurer Rights"** means the rights of one Asbestos Insurer to recover from any other Asbestos Insurer based on theories of contribution, indemnity, subrogation or other right to reimbursement, whether those rights are based upon contract, statute, equity or case law.~~

104b.  ~~**"Objecting Excess Insurers"** means Certain Underwriters at Lloyd's, London, Certain London Market Companies, Columbia Casualty Company, National Fire Insurance Company of Hartford, The Continental Insurance Company, Granite State Insurance Company, Lexington Insurance Company, The Insurance Company of the State of Pennsylvania, Evanston Insurance Company, TIG Insurance Company, Allstate Insurance Company, solely as successor in interest to Northbrook Excess & Surplus Insurance Company, formerly Northbrook Insurance Company, First State Insurance Company, New England Reinsurance Company, Allianz Underwriters Insurance Company, Fireman's Fund Insurance Company, and Westchester Fire Insurance Company.~~

104c.  ~~**"Objecting Excess Insurers' Objections"** means the plan objections and motions to dismiss, set out in docket numbers 919, 1053, 2066, 2067, 2069, 2071, 2073 and 2075 of the Bankruptcy Court Docket, and any objections to any post-confirmation settlement with Truck.~~

105111. **"Quarterly Distribution Date"** means the last Business Day of the month following the end of each calendar quarter after the Effective Date; provided, however, that if the Effective Date is within forty-five (45) days of the end of a calendar quarter, the first Quarterly Distribution Date shall be the last Business Day of the month following the end of the first calendar quarter after the calendar quarter including the Effective Date.

106112. **"Recovery Actions"** means, collectively and individually, preference actions, fraudulent conveyance actions and other claims or causes of action under sections 510, 544, 547, 548, 549, 550 and 553(b) of the Bankruptcy Code and other similar state law claims and causes of action.

107113. **"Reinstated"** or **"Reinstatement"** means the treatment of a Claim or Interest, at the applicable Reorganized Debtor's sole discretion, in accordance with one of the following:

a.      The legal, equitable and contractual rights to which such Claim or Interest entitles the holder will be unaltered; or

b.      Notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default:

i.   any such default that occurred before the applicable Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, will be cured;

ii.   the maturity of such Claim or Interest as such maturity existed before such default will be reinstated;

iii.   the holder of such Claim or Interest will be compensated for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and

iv.   the legal, equitable or contractual rights to which such Claim or Interest entitles the holder of such Claim or Interest will not otherwise be altered.

108114. **"Reorganization Case"** means:  (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor in the Bankruptcy Court; and (b) when used with reference to all Debtors, the chapter 11 cases pending for the Debtors in the Bankruptcy Court.

109115. **"Reorganized . . ."** means, when used in reference to a particular Debtor, such Debtor on and after the Effective Date.

110116. **"Restructuring Transactions"** means, collectively, those mergers, consolidations, restructurings, dispositions, liquidations, dissolutions or other transactions that the Debtors or Reorganized Debtors determine to be necessary or appropriate to effect a corporate restructuring of their respective businesses or otherwise to simplify the overall corporate structure and intercompany arrangements of the Reorganized Debtors, including without limitation the Restructuring Transactions set forth on Exhibit IV.B.

111117. **"Schedules"** means the schedules of assets and liabilities and the statements of financial affairs Filed by the Debtors, as required by section 521 of the Bankruptcy Code, as the same may have been or may be amended, restated, modified or supplemented.

112118. **"Secured Claim"** means a Claim (other than an Asbestos Personal Injury Claim) that is secured by a lien on property in which an Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to sections 506(a) and, if applicable, 1129(b) of the Bankruptcy Code.

113119. **"Separate Limit Policies"** means those insurance policies described on Exhibit I.A.113119 that provide or may provide coverage for Asbestos Personal Injury Claims and Environmental Claims under separate limits applicable to Asbestos Personal Injury Claims and Environmental Claims.

114120. **"Settling Asbestos Insurer"** means each Asbestos Insurer listed on Exhibit I.A.114120 and any Asbestos Insurer that, after the Confirmation Hearing, enters into a

settlement with the Asbestos Personal Injury Trust that (a), in the determination of the Asbestos Personal Injury Trust, the TAC and the Future Claimants' Representative, justifies treating such Asbestos Insurer as a Protected Party and (b) is approved by the Bankruptcy Court.

~~115~~121. **"Settled Environmental Insurers"** means any Entity that has subscribed or issued an insurance policy that provides coverage for Environmental Claims, which has bought back such coverage from the Debtors pursuant to a settlement agreement approved by the Bankruptcy Court, and is protected by the environmental injunction as set forth in Section IX.B.3 and a bar order under section 363 of the Bankruptcy Code.

~~116~~122. **"Stock Interests of . . ."** means, when used with reference to a particular Debtor, the Interests issued by such Debtor.

~~117~~123. **"Stipulation of Amount and Nature of Claim"** means a stipulation or other agreement between the applicable Debtor or Reorganized Debtor and a holder of a Claim (other than an Asbestos Personal Injury Claim) or Interest establishing the allowed amount or nature of such Claim or Interest that is (a) entered into in accordance with any Claim settlement procedures established in these Reorganization Cases~~,~~; (b) permitted or contemplated by the Plan or (c) approved by order of the Bankruptcy Court.

~~118~~124. **"Surety Bond Claims"** means, collectively, (a) proof of Claim number 4 filed by Zurich American Insurance Company~~,~~; (b) proof of Claim number 5 filed by Fidelity & Deposit Company of Maryland~~;~~ and (c) proof of Claim numbers 22 and 25 filed by Lexon Insurance Company and Bond Safeguard Company.

~~119~~125. **"Surety Bond Program"** means, collectively, the (~~i~~a) Debtors' surety bonds maintained in the ordinary course of business~~,~~; (~~ii~~b) surety payment and indemnity agreements, setting forth a surety's rights against the Debtors, and the Debtors' obligations to pay and indemnify such surety from any loss, cost, or expense that the surety may incur, in each case, on account of the issuance of any surety bonds on behalf of the Debtors~~,~~; (~~iii~~c) surety collateral agreements governing collateral, if any, in connection with the Debtors' surety bonds~~,~~; and/or (~~iv~~d) ordinary course premium payments to the sureties for the Debtors' surety bonds.

~~120~~126. **"Surety Bond Obligations"** means all the Debtors' obligations arising under the Surety Bond Program.

~~121~~127. **"TAC"** means the Trust Advisory Committee for the Asbestos Personal Injury Trust.

~~122~~128. **"Tax"** means:  (a) any net income, alternative or add-on minimum, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, license, property, environmental, withholding or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other Entity.

~~123~~**129.** **"Third Party Disbursing Agent"** means an Entity designated by Reorganized HPCI to act as a Disbursing Agent pursuant to Section VI.~~B~~C.

~~124~~**130.** **"Timely Claim"** means a Claim (other than an Asbestos Personal Injury Claim) for which a proof of Claim or request for payment of Administrative Claim was Filed by the applicable Bar Date or is otherwise determined to be timely Filed by a Final Order of the Bankruptcy Court.

~~125~~**131.** **"Truck"** means Truck Insurance Exchange.

~~126~~**132.** **"Truck Appeal Costs"** means if Truck continues litigation in respect of the Phase 1 Claims following the entry of a decision by the California Court of Appeal, or if there is a remand by that court, the Superior Court, resolving the Phase 1 Claims in favor of the plaintiff, in whole or part, all costs of pursuing the Phase 1 Claims, including reasonable attorneys' fees and expenses, until such litigation is finally resolved either by (a) a court decision or (b) settlement.

~~127~~**133.** **"Uninsured Asbestos Claim"** means an Asbestos Personal Injury Claim for which there is no coverage provided by any Asbestos Insurance Policy.

## B.     Rules of Interpretation and Computation of Time

### 1.     Rules of Interpretation

For purposes of the Plan, unless otherwise provided herein:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or Exhibit Filed or to be Filed means such document or Exhibit, as it may have been or may be amended, modified or supplemented pursuant to the Plan or Confirmation Order; (d) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors, assigns and affiliates; (e) all references in the Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Plan; (f) the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) the words "includes" or "including" are not limiting; (h) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (i) subject to the provisions of any contract, certificate of incorporation, by-laws, or similar constituent document, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the rights and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and the Bankruptcy Rules; and (j) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply.

2. **Computation of Time**

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

# ARTICLE II

## CLASSES OF CLAIMS AND INTERESTS

Claims and Interests, except Administrative Claims, and Priority Tax Claims, are placed in Classes as follows:

| Class | Claims or Interests |
|-------|---------------------|
| Class 1 | Priority Claims |
| Class 2 | Secured Claims |
| Class 3 | General Unsecured Claims |
| Class 4 | Asbestos Personal Injury Claims |
| Class 5 | Surety Bond Claims |
| Class 6 | Intercompany Claims |
| Class 7 | Stock Interests |

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, and Priority Tax Claims, as described in Section III.A., have not been classified and thus are excluded from the foregoing Classes. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any remainder of the Claim or Interest qualifies within the description of such other Classes.

# ARTICLE III

## TREATMENT OF CLAIMS AND INTERESTS

A. **Unclassified Claims**

1. **Payment of Administrative Claims**

a. **Administrative Claims in General**

Except as specified in this Section III.A.1., and subject to the bar date provisions herein, unless otherwise agreed by the holder of an Administrative Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Administrative Claim shall receive, in full satisfaction of its Administrative Claim, cash equal to the allowed amount of such

Administrative Claim either (i) as soon as practicable after the Effective Date or (ii) if the Administrative Claim is not allowed as of the Effective Date, thirty (30) after the date on which an order allowing such Administrative Claim becomes a Final Order or a Stipulation of Amount and Nature of Claim is executed by the applicable Reorganized Debtor and the holder of the Administrative Claim.

### b.      Statutory Fees

On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930, as determined at the Confirmation Hearing by the Bankruptcy Court or the District Court, as applicable, shall be paid in cash equal to the amount of such Administrative Claims.  All fees payable pursuant to 28 U.S.C. § 1930 shall be paid by the Reorganized Debtors in accordance therewith until the closing of the Reorganization Cases pursuant to section 350(a) of the Bankruptcy Code.

### c.      Ordinary Course Liabilities

Allowed Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business (including any Intercompany Claims that are Administrative Claims, Administrative Claims of governmental units for Taxes and Administrative Claims arising from those contracts and leases of the kind described in Section V.E.) shall be satisfied by the applicable Reorganized Debtor pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claims, without any further action by the holders of such Administrative Claims or further approval of the Bankruptcy Court.

### d.      Bar Dates for Administrative Claims

### i.      General Bar Date Provisions

Except as otherwise provided in Section III.A.1.d.ii., unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors, pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than sixty (60) days after the Effective Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date shall be forever barred from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or their respective property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests must be Filed and served on the requesting party no later than 120 days after the Effective Date.

### ii.      Bar Dates for Certain Administrative Claims

### A.      Professional Compensation

Professionals or other Entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Fee Order or other order of the Bankruptcy Court a Final Fee Application no later than (ninety) 90 days after the Effective Date.

A Professional may include any outstanding, non-Filed monthly or interim request for payment of a Fee Claim pursuant to the Fee Order in its Final Fee Application.  Objections to any Final Fee Application must be Filed and served on the Reorganized Debtors and the requesting party by the later of (1) eighty (80) days after the Effective Date or (2) thirty (30) days after the Filing of the applicable Final Fee Application.  To the extent necessary, the Confirmation Order shall amend and supersede any previously entered order of the Bankruptcy Court, including the Fee Order, regarding the payment of Fee Claims.  Any pending, Filed interim requests for a Fee Claim pursuant to the Fee Order shall be resolved in the ordinary course in accordance with the Fee Order or, if sooner, in connection with the particular Professional's Final Fee Application.

### B.    Ordinary Course Liabilities

Holders of Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business, including any Intercompany Claims that are Administrative Claims, Administrative Claims of governmental units for Taxes and Administrative Claims arising from those contracts and leases of the kind described in Section V.E., shall not be required to File or serve any request for payment of such Administrative Claims.  Such Administrative Claims shall be satisfied pursuant to Section III.A.1.c.

### 2.    Payment of Priority Tax Claims

#### a.    Priority Tax Claims in General

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of its Priority Tax Claim, payment in full of the allowed amount of the Priority Tax Claim on the later of the Effective Date or as soon as practicable after the date when such Claim becomes an Allowed Claim.

#### b.    Other Provisions Concerning Treatment of Priority Tax Claims

Notwithstanding the provisions of Section III.A.2.a., any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the holder for actual pecuniary loss shall be treated as a Class 3 Claim, and the holder (other than as the holder of a Class 3 Claim) may not assess or attempt to collect such penalty from the Reorganized Debtors or their respective property.

### B.    Classified Claims

**1.    Class 1 Claims (Priority Claims) are unimpaired.**  On the Effective Date, each holder of an Allowed Claim in Class 1 shall receive cash in an amount equal to such Allowed Claim unless the holder of such Claim agrees to less favorable treatment.

*2.*    **Class 2 Claims (Secured Claims) are unimpaired.**  On the Effective Date, unless otherwise agreed by the holder of an Allowed Claim in Class 2 and the applicable Debtor or Reorganized Debtor, each holder of a Claim in Class 2 shall receive treatment in accordance with Option A or B below, at the option of the applicable Debtor or Reorganized Debtor.  Any

Allowed Deficiency Claim of a holder of an Allowed Secured Claim shall be entitled to treatment as an Allowed Class 3 Claim.

> **Option A:**  Claims in Class 2 that are Allowed Claims and with respect to which the applicable Debtor or Reorganized Debtor elects Option A shall be paid in full in cash.

> **Option B:**  Claims in Class 2 that are Timely Claims and with respect to which the applicable Debtor or Reorganized Debtor elects Option B shall be Reinstated.

**3.      Class 3 Claims (General Unsecured Claims) are unimpaired.**  On the Effective Date, each holder of an Allowed Claim in Class 3 shall receive cash in an amount equal to such Allowed Claim including any post-petition interest as ordered by the Bankruptcy Court unless the holder of such Claim agrees to less favorable treatment.

**4.      Class 4 Claims (Asbestos Personal Injury Claims) are impaired**.  On the Effective Date, all Asbestos Personal Injury Claims shall be channeled to the Asbestos Personal Injury Trust, which shall be funded pursuant to Section IV.K.2.  All Asbestos Personal Injury Claims shall be resolved pursuant to the terms of Section IV.O.1 and Section IV.O.2., the Asbestos Personal Injury Trust Agreement, the Asbestos Personal Injury Trust Distribution Procedures and any other Asbestos Personal Injury Trust Document.  Except as provided in Section IV.O.1, pursuant to section 524(g) of the Bankruptcy Code, the Plan and the Confirmation Order shall permanently and forever stay, restrain and enjoin any Entity from taking any actions against any Protected Party for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any Asbestos Personal Injury Claim, all of which shall be channeled to the Asbestos Personal Injury Trust for resolution as set forth in the Asbestos Personal Injury Trust Agreement and the related Asbestos Personal Injury Trust Distribution Procedures, including permanently and forever staying, restraining and enjoining any Entity from any of the following, with respect to Asbestos Personal Injury Claims:

> a.      commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including a judicial, arbitral, administrative or other proceeding) in any forum against any Protected Party or any property or interests in property of any Protected Party;

> b.      enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree or other order against any Protected Party or any property or interests in property of any Protected Party;

> c.      creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Protected Party or any property or interests in property of any Protected Party;

> d.      setting off, seeking reimbursement of, contribution from or subrogation against, or otherwise recouping in any manner, directly or

indirectly, any amount against any liability owed to any Protected Party or
any property or interests in property of any Protected Party; and

e.      proceeding in any manner in any place with regard to any
matter that is subject to resolution pursuant to the Asbestos Personal Injury
Trust Documents, except in compliance therewith.

For the avoidance of doubt, no Entity shall be so stayed, enjoined, or restrained from initiating or
continuing a suit or other proceeding against any Debtor in name only for the purpose of
recovering on an Asbestos Personal Injury Claim from a Non-Settling Asbestos Insurer.

5.      **Class 5 Claims (Surety Bond Claims)  are unimpaired.**  On the Effective Date,
each Surety Bond Claim in Class 5 shall be Reinstated.

6.      **Class 6 Claims (Intercompany Claims) are unimpaired.**  On the Effective
Date, each Intercompany Claim in Class 6 shall be Reinstated.

7.      **Class 7 Interests (Stock Interests) are unimpaired.**  On the Effective Date,
Stock Interests of the Debtors shall be Reinstated, and holders of such Stock Interests shall retain
such Interests, subject to the Restructuring Transactions provisions of Section IV.B.

## ARTICLE IV

## MEANS FOR IMPLEMENTATION OF THE PLAN

**A.      Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided herein (and subject to the Restructuring Transactions
provisions of Section IV.B.), each Debtor will, as a Reorganized Debtor, continue to exist after
the Effective Date as a separate corporate or other legal Entity, with all the powers of a
corporation or other legal Entity under applicable law and without prejudice to any right to alter
or terminate such existence (whether by merger, dissolution or otherwise) under applicable state
law.  Except as otherwise provided herein (and subject to the Restructuring Transactions
provisions of Section IV.B.), as of the Effective Date, all property of the respective Estates of the
Debtors, and any property acquired by a Debtor or Reorganized Debtor under the Plan, will vest
in the applicable Reorganized Debtor, free and clear of all Claims, Encumbrances and Interests.
For the avoidance of doubt, the funds deposited into the General Unsecured Claims Escrows will
be used solely to make distributions to holders of Allowed General Unsecured Claims, and the
Debtors and Reorganized Debtors will not hold any legal or equitable interest in such funds
deposited in the General Unsecured Claims Escrows, in accordance with Section VI.B, below.
On and after the Effective Date, each Reorganized Debtor may operate its businesses and may
use, acquire and dispose of property and compromise or settle any Claims without supervision or
approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or
Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the
Confirmation Order.  Without limiting the foregoing, each Reorganized Debtor may pay the
charges that it incurs on or after the Effective Date for Professionals' fees, disbursements,

expenses or related support services (including fees and expenses relating to the preparation of Professional fee applications) without application to the Bankruptcy Court.

## B.   Restructuring Transactions

On or after the Confirmation Date, the applicable Debtor or Reorganized Debtor may take such actions as the Debtors or Reorganized Debtors determine to be necessary or appropriate to effectuate, implement and consummate the Restructuring Transactions, including without limitation the Restructuring Transactions set forth on Exhibit IV.B.; provided, however, that no Restructuring Transactions other than the Restructuring Transactions set forth on Exhibit IV.B. shall be implemented prior to the Effective Date without the written consent of the Asbestos Personal Injury Committee and the Future Claimants' Representative, which consent shall not be unreasonably withheld.  The actions to effectuate, implement and consummate the Restructuring Transactions may include:  (1) the execution and delivery of appropriate agreements or other documents that carry out the provisions of the Plan and that satisfy the applicable requirements of applicable state law; and (2) the filing of appropriate instruments pursuant to applicable state law.

## C.   Transfers and Lease Transactions

On or after the Confirmation Date, non-debtor Lehigh Cement Company LLC will transfer its interest in certain real property located in Kosse, Limestone County, Texas and Kunkletown, Monroe County, Pennsylvania (together, the "Real Properties"), together with its rights under certain leases related to the Real Properties, to Kaiser Gypsum.  The actions to effectuate, implement and consummate these transactions may include:  (1) the execution and delivery of appropriate agreements or other documents containing terms that are consistent with the provisions of the Plan and that satisfy the applicable requirements of applicable state law; and (2) the filing of appropriate instruments pursuant to applicable state law.

## D.   Corporate Governance, Directors and Officers, Employment-Related Agreements and Compensation Programs and Corporate Action

### 1.   Certificates of Incorporation and By-Laws of the Reorganized Debtors

As of the Effective Date, the Certificate of Incorporation and the By-Laws of each Reorganized Debtor will be in such form as the Debtors may determine.  The initial Certificate of Incorporation and By-Laws of each Reorganized Debtor, among other things, shall prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a) of the Bankruptcy Code.  After the Effective Date, each such Entity shall be permitted to amend and restate its Certificate of Incorporation or By-Laws pursuant to applicable state law and the terms and conditions of such constituent documents.

### 2.   Directors and Officers of the Reorganized Debtors

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, the initial directors and officers of each Reorganized Debtor shall be the directors and officers of such Debtor immediately prior to the Effective Date.  Each such director and officer shall serve from and after the Effective Date until his or her successor is duly

elected or appointed and qualified or until his or her earlier death, resignation or removal in accordance with the terms of the Certificate of Incorporation and By-Laws of the relevant Reorganized Debtor (as the same may be amended after the Effective Date) and applicable state law.

### 3.    Employee Arrangements of the Reorganized Debtors

As of the Effective Date, the Reorganized Debtors shall be authorized to:  (a) maintain, amend or revise existing employment, indemnification and other arrangements with their active and retired directors, officers and employees, subject to the terms and conditions of any such agreement; and (b) enter into new employment, indemnification and other arrangements with active and retired directors, officers and employees; all as determined by the board of directors of the applicable Reorganized Debtor.

### 4.    Corporate Action

Pursuant to section 1142 of the Bankruptcy Code, section 10-1008 of the Arizona Revised Statutes and section 55-14A-01 of the North Carolina Business Corporation Act, the following (which shall occur and be deemed effective as of the date specified in the documents effectuating the same or, if no date is so specified, the Effective Date) shall be authorized and approved in all respects and for all purposes without any requirement of further action by stockholders or directors of any of the Debtors or the Reorganized Debtors or by any other Entity:  (a) the initial Certificates of Incorporation and By-Laws of the Reorganized Debtors; (b) the initial directors and officers of the Reorganized Debtors; (c) the Distribution of cash pursuant to the Plan; (d) the creation of the Asbestos Personal Injury Trust, and the funding thereof; (e) other corporate actions that are necessary or appropriate to effectuate, implement and consummate the provisions of the Plan, including the Restructuring Transactions provisions of Section IV.B.; and (f) the adoption, execution, delivery and performance of all contracts, instruments, releases and other agreements and documents related to any of the foregoing (including the Asbestos Personal Injury Trust Agreement and the Payment Note).

### E.    Obtaining Cash for Plan Distributions

All cash payments to be made pursuant to the Plan shall be funded by the applicable Reorganized Debtor.  All cash necessary for a Reorganized Debtor to fund such cash payments pursuant to the Plan shall be obtained through a combination of one or more of the following: (1) such Reorganized Debtor's cash balances and cash generated by the operations of such Reorganized Debtor; (2) any Tax refunds actually received by such Reorganized Debtor; (3) contributions to or on behalf of such Reorganized Debtor by Lehigh Hanson; (4) proceeds of certain of the Debtors' insurance policies or (5) such other means of financing or funding as determined by the board of directors of such Reorganized Debtor.

On the Effective Date, Lehigh Hanson shall contribute to the Reorganized Debtors, as necessary to satisfy Allowed General Unsecured Claims, up to $28.15 million in cash minus the amount of the Insolvent Insurers Proceeds to which the Debtors are ~~determined to be~~ entitled.

## F.    Creation of Asbestos Personal Injury Trust

As of the Effective Date, the Asbestos Personal Injury Trust shall be created.  The Asbestos Personal Injury Trust is intended to be one or more "qualified settlement funds" within the meaning of the Treasury Regulations issued under section 468B of the Internal Revenue Code.  The purpose of the Asbestos Personal Injury Trust shall be to, among other things: (1) resolve all asserted Asbestos Personal Injury Claims in accordance with the Plan, Asbestos Personal Injury Trust Agreement, the Asbestos Personal Injury Trust Distribution Procedures and the Confirmation Order; (2) preserve, hold, manage, maximize and liquidate the assets of the Asbestos Personal Injury Trust for use in resolving Asbestos Personal Injury Claims; and (3) qualify at all times as one or more qualified settlement funds.  On the Effective Date, all right, title, and interest in and to the Asbestos Personal Injury Trust Assets, and any proceeds thereof, will be transferred to, and vested in, the Asbestos Personal Injury Trust, free and clear of all Claims, Demands, Stock Interests, Encumbrances, and other interests of any Entity, without any further action of the Bankruptcy Court or any Entity.

## G.    Authority of the Asbestos Personal Injury Trust

As of the Effective Date, without any further action of the Bankruptcy Court or any Entity, except as otherwise expressly set forth in the Plan, the Asbestos Personal Injury Trust shall be empowered to initiate, prosecute, defend, and resolve all legal actions and other proceedings related to or arising from any asset, liability, or responsibility of the Asbestos Personal Injury Trust, including but not limited to any actions arising from or related to the Asbestos Personal Injury Insurance Assets and the Phase 1 Claims.

## H.    Appointment of Asbestos Personal Injury Trustee and Delaware Trustee

On the Confirmation Date, effective as of the Effective Date, in accordance with the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures, the Entities selected jointly by the Asbestos Personal Injury Committee and the Future Claimants' Representative to serve as the Asbestos Personal Injury Trustee (as identified in Exhibit IV.H) and the Delaware Trustee shall be appointed to serve as the Asbestos Personal Injury Trustee for the Asbestos Personal Injury Trust.  All subsequent Asbestos Personal Injury Trustees and Delaware Trustees shall be appointed in accordance with the terms of the Asbestos Personal Injury Trust Agreement.

## I.    Appointment of Future Claimants' Representative and TAC Members

The Future Claimants' Representative shall serve as the legal representative for the purpose of protecting the shared interests of holders of Demands pursuant to the terms of the Asbestos Personal Injury Trust Agreement, on and after the Effective Date, and shall have the functions and rights provided in the Asbestos Personal Injury Trust Documents.  The initial members of the TAC will be identified in the Asbestos Personal Injury Trust Agreement.

## J.    Document Repository

Prior to or on the Effective Date, the Debtors shall establish a repository containing all the books and records of the Debtors that are necessary for the defense of Asbestos Personal

Injury Claims, including without limitation the historical asbestos personal injury claims database maintained by the Debtors, deposition transcripts, product identification evidence, information regarding sale and use of the products, claims settlement and payment information, and indexes and summaries relating to any such documents, and shall make that repository available to the Entities that are responsible for the processing or defense of Asbestos Personal Injury Claims, and that are entitled to review, copy or use such documents.  For the avoidance of doubt, the Asbestos Personal Injury Trust shall have access to materials in this repository only to the extent it is the Entity defending or processing (which term shall not include the mere payment of the deductible portion of an Asbestos Personal Injury Claim) an Uninsured Asbestos Claim or a particular Asbestos Personal Injury Claim, and such determination shall be made by the Reorganized Debtors on a claim-by-claim basis.  Any dispute over whether the Asbestos Personal Injury Trust shall have access to the materials in this repository shall be resolved by the Bankruptcy Court.  Notwithstanding anything to the contrary herein, holders of Asbestos Personal Injury Claims may pursue and obtain information stored in this repository through discovery to the full extent permitted by applicable law.  The Asbestos Personal Injury Trust shall be obligated to compensate the Reorganized Debtors for all out-of-pocket costs reasonably incurred after the Effective Date in connection with establishing and maintaining the repository.

Notwithstanding the foregoing or any other provisions of the Plan, the sole and exclusive remedy for the Asbestos Personal Injury Trust's failure to reimburse such out-of-pocket costs, or for its failure to pay any other amounts due to the Reorganized Debtors, shall be the right of the Reorganized Debtors to assert money damage claims against the Asbestos Personal Injury Trust, and such failure shall not relieve the Reorganized Debtors of any of their obligations hereunder, or otherwise, to the extent such obligations exist.

Pursuant to the Plan and the Confirmation Order, to the extent the Debtors or Reorganized Debtors, as applicable, provide access to the Asbestos Personal Injury Trust to any privileged books and records, such access shall not result in the destruction or waiver of any applicable privileges pertaining to such books and records.  If the preservation of privilege pertaining to such books and records is challenged or disapproved by the Bankruptcy Court or the District Court and if the Asbestos Personal Injury Trust determines that it needs access to such information, the Reorganized Debtors will, at the sole cost and expense of the Asbestos Personal Injury Trust (which cost and expense shall be reasonable), enter into arrangements to permit the Asbestos Personal Injury Trust to have access to such books and records, to the extent such access does not result in the destruction or waiver of any applicable privileges.  Further, pursuant to the Plan and the Confirmation Order, none of the Debtors, the Reorganized Debtors, Lehigh Hanson, or any Affiliates shall be liable for violating any confidentiality or privacy protections as a result of providing the Asbestos Personal Injury Trust access to the books and records, and the Asbestos Personal Injury Trust shall take appropriate steps to comply with any such applicable protections.

**K.** **Transfers of Property to and Assumption of Certain Liabilities by the Asbestos Personal Injury Trust**

**1.** **Expenses of the Asbestos Personal Injury Trust**

The Asbestos Personal Injury Trust shall pay all Asbestos Personal Injury Trust Expenses. The Reorganized Debtors shall have no obligation to pay such expenses, except for Debtor Appellate Costs.

**2.** **Funding the Asbestos Personal Injury Trust**

On the Effective Date, the Reorganized Debtors and/or Lehigh Hanson, as applicable, shall transfer to the Asbestos Personal Injury Trust the Asbestos Personal Injury Trust Assets as follows:

**a.** **Initial Payment**

One or more of the Reorganized Debtors and/or Lehigh Hanson on behalf of and as a contribution to such Reorganized Debtors will pay an aggregate of $49.0 million in cash to the Asbestos Personal Injury Trust.

**b.** **Payment Note**

The Reorganized Debtors, as co-obligors, shall issue the Payment Note to the Asbestos Personal Injury Trust.

**c.** **Phase 1 Claims**

The Reorganized Debtors shall transfer to the Asbestos Personal Injury Trust the Phase 1 Claims, free and clear of any liens, claims or encumbrances, including any rights of setoff based on any liability of the Debtors. The Debtors or the Reorganized Debtors shall pay all Debtor Appellate Costs. The Asbestos Personal Injury Trust shall pay all Asbestos Personal Injury Trust Appellate Costs. If the Asbestos Personal Injury Trust ultimately obtains any recovery with respect to Phase 1 Claims, whether as a result of settlement or judgment that exceeds $12 million, the Asbestos Personal Injury Trust shall remit to the Debtors or the Reorganized Debtors any amounts remaining, in excess of $12 million, after the Asbestos Personal Injury Trust Appellate Costs have been deducted from the full recovery amount.

**d.** **Asbestos Personal Injury Insurance Assets**

The Reorganized Debtors shall transfer to the Asbestos Personal Injury Trust the Asbestos Personal Injury Insurance Assets.

**3.** **Assumption of Certain Liability and Responsibility by the Asbestos Personal Injury Trust**

Subject to the provisions of the Plan, and in consideration for the transfer of the Asbestos Personal Injury Trust Assets to the Asbestos Personal Injury Trust pursuant to Section IV.K.2.

and in furtherance of the purposes of the Asbestos Personal Injury Trust and the Plan, the Asbestos Personal Injury Trust shall assume liability and responsibility, financial and otherwise, for all Asbestos Personal Injury Claims.  The Asbestos Personal Injury Trust shall have all defenses, cross-claims, offsets and recoupment rights, as well as rights of indemnification, contribution, subrogation and similar rights, and any other rights regarding Uninsured Asbestos Claims that any Debtor, Reorganized Debtor or Protected Party has or would have had under applicable law.

### 4.        Indemnification by the Asbestos Personal Injury Trust

The Asbestos Personal Injury Trust shall protect, defend, indemnify and hold harmless each Protected Party from and against any Asbestos Personal Injury Claim; provided, however, the sole and exclusive remedy for the Asbestos Personal Injury Trust's failure to satisfy the indemnification, defense and hold harmless obligations under this Section shall be the right of the Protected Parties to assert money damage claims against the Asbestos Personal Injury Trust.

### 5.        Authority of the Debtors

Effective on the Confirmation Date, the Debtors shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary or appropriate to enable the Reorganized Debtors to implement effectively the provisions of the Plan and the Asbestos Personal Injury Trust Agreement.

### L.    Cooperation with Respect to Insurance Matters

### 1.        Obligation to Cooperate with Respect to Insurance Matters

The Reorganized Debtors will cooperate with the Asbestos Personal Injury Trust and use reasonable efforts to take or cause to be taken all actions and to do or cause to be done all things that the Asbestos Personal Injury Trust may reasonably consider necessary to effectuate the transfer of the Asbestos Personal Injury Insurance Assets to the Asbestos Personal Injury Trust. By way of illustration and not limitation, the Reorganized Debtors will be obligated:  (a) to provide the Asbestos Personal Injury Trust with copies of insurance policies and settlement agreements included within or relating to the Asbestos Personal Injury Insurance Assets; (b) to provide the Asbestos Personal Injury Trust with other information in the Reorganized Debtors' possession, custody or control that is reasonably necessary to the Asbestos Personal Injury Trust's efforts with respect to insurance coverage for Asbestos Personal Injury Claims; (c) to execute further assignments or allow the Asbestos Personal Injury Trust to pursue claims relating to the Asbestos Personal Injury Insurance Assets in a Reorganized Debtor's name (subject to appropriate disclosure of the fact that the Asbestos Personal Injury Trust is doing so and the reasons why it is doing so), including by means of arbitration, alternative dispute resolution proceedings or litigation; and (d) to facilitate actions to enforce judgments obtained by the claimants or the Asbestos Personal Injury Trust against Asbestos Insurers, if necessary.

To the extent that any transfer or portion of a transfer of the Asbestos Personal Injury Insurance Assets to the Asbestos Personal Injury Trust is determined to be invalid by a court of competent jurisdiction, upon request of the Asbestos Personal Injury Trust and at the cost of the Asbestos Personal Injury Trust, the Reorganized Debtors shall:  (a) take all reasonable actions,

including those as may be requested by the Asbestos Personal Injury Trust, with respect to such assets, including, but not limited to, prosecution of any insurance coverage and/or breach of contract action or other action, for the benefit of, and to the extent reasonably requested by, the Asbestos Personal Injury Trust; and (b) immediately transfer any amounts recovered under or on account of any such assets to the Asbestos Personal Injury Trust.  The Asbestos Personal Injury Trust will be obligated to compensate the Reorganized Debtors for all out-of-pocket costs reasonably incurred on or after the Effective Date in connection with providing assistance to the Asbestos Personal Injury Trust pursuant to this Section, including without limitation out-of-pocket costs and expenses, consultant and expert fees, and attorneys' fees.  Any acts taken pursuant to this Section shall not be deemed to waive and shall not constitute a waiver of any applicable privilege, confidence, or work product protection as against any third party.  The Reorganized Debtors shall have a continuing obligation to satisfy the Assistance and Cooperation, Inspection and Audit, and Notice of Occurrence Provisions set out in the Asbestos Insurance Policies.  Any out-of-pocket costs incurred by the Reorganized Debtors in carrying out such obligations shall be reimbursed by the Asbestos Personal Injury Trust.  The sole and exclusive remedy for the Asbestos Personal Injury Trust's failure to reimburse such out-of-pocket costs shall be the right of the Reorganized Debtors to assert money damage claims against the Asbestos Personal Injury Trust.

### 2. Enforcement of Reorganized Debtors' Obligations to Cooperate with Respect to Insurance Matters

a.    The Reorganized Debtors shall have a continuing obligation to satisfy the Asbestos Insurer Cooperation Obligations.  Any out-of-pocket costs incurred by the Reorganized Debtors in carrying out the Asbestos Insurer Cooperation Obligations shall be reimbursed by the Asbestos Personal Injury Trust.  The Reorganized Debtors' obligations under this provision shall be ongoing until such time when all Asbestos Insurance Policies have either been settled or exhausted.

b.    If an Asbestos Personal Injury Insurance Asset does not provide coverage for an Asbestos Personal Injury Claim pursued against the Reorganized Debtors in the tort system pursuant to Section IV.O.1. because a court determines in a Final Order that the Reorganized Debtors failed to satisfy or otherwise perform any of the Asbestos Insurer Cooperation Obligations, the Asbestos Personal Injury Trust, the TAC, the Future Claimants' Representative, and the holder (the "Denied Asbestos Personal Injury Claimant") of the applicable Asbestos Personal Injury Claim (the "Denied Asbestos Personal Injury Claim"), each individually or in any combination jointly, may seek (1) specific performance directing the Reorganized Debtors to cure their breach of the Asbestos Insurer Cooperation Obligations, and/or (2) payment from the Reorganized Debtors for the judgment or settlement amount of the Denied Asbestos Personal Injury Claim. Regardless of which remedy is sought, the party may also seek payment from the Reorganized Debtors for reasonable attorneys' fees expended in pursuing such relief from the Reorganized Debtors.

c.      Within forty-five (45) calendar days of receiving notice that an Asbestos Insurer contests coverage for an Asbestos Personal Injury Claim asserted against the Reorganized Debtors because the Reorganized Debtors are alleged to have failed to satisfy or otherwise perform the Asbestos Insurer Cooperation Obligations (a "Notice"), the Asbestos Personal Injury Trust and the holder of such Asbestos Personal Injury Claim shall provide to the Reorganized Debtors any documents or information they respectively received from the Asbestos Insurer denying, rejecting or disclaiming coverage.  If such information is not provided to the Reorganized Debtors within forty-five (45) days of receipt, then the Reorganized Debtors shall have no obligations under Section IV.L.2 with respect to such Asbestos Personal Injury Claim, unless the failure to provide such information as required did not unfairly prejudice the Reorganized Debtors.

d.      Within forty-five (45) calendar days of receiving a Notice, the Reorganized Debtors shall provide to the Asbestos Personal Injury Trust and the holder of the applicable Asbestos Personal Injury Claim (1) any documents or information they received from the Asbestos Insurer denying, rejecting or disclaiming coverage and (2) any documentation or other information they have within their possession, custody, or control regarding the Reorganized Debtors' efforts to satisfy any of the Asbestos Insurer Cooperation Obligations in respect of the applicable Asbestos Personal Injury Claim.  The Asbestos Personal Injury Trust or the holder of the Asbestos Personal Injury Claim or both may assert an action against the Asbestos Insurer seeking coverage for the Asbestos Personal Injury Claim, and shall provide timely notice to the Reorganized Debtors of any action seeking such coverage.  The Reorganized Debtors agree that a finding that they failed to satisfy or otherwise perform any of the Asbestos Insurer Cooperation Obligations may be made regardless of whether they are a named party in any such action and agree to be bound by any such finding in a Final Order.  In the event that the action brought against the Asbestos Insurer pursuant to this Section IV.L.2.d results in a Final Order providing that the Asbestos Insurer does not have a coverage obligation for the Asbestos Personal Injury Claim and the basis for the finding that there is no such coverage obligation may be because the Reorganized Debtors failed to satisfy or otherwise perform any of the Asbestos Insurer Cooperation Obligations, then the Asbestos Personal Injury Trust or the holder of the Asbestos Personal Injury Claim or both may bring a subsequent direct action against the Reorganized Debtors for the sole purpose of seeking the finding described in Section IV.L.2.b.

e.      In the event any of the parties identified in Section IV.L.2.b as having rights with respect to a Denied Asbestos Personal Injury Claim seeks payment or specific performance related to a Denied Asbestos Personal Injury Claim, the Reorganized Debtors shall, within thirty (30) calendar days of receiving notice of the Denied Asbestos Personal Injury Claim, either (a) remit payment of (i) the judgment or settlement amount of the Denied Asbestos Personal Injury Claim to the Asbestos Personal Injury Trust or the

Denied Asbestos Personal Injury Claimant, as applicable, and if payment of the amount of the Denied Asbestos Personal Injury Claim is made to the Asbestos Personal Injury Trust, the Asbestos Personal Injury Trust shall in turn remit payment to the Denied Asbestos Personal Injury Claimant, and (ii) reasonable attorneys' fees expended in enforcing the rights provided in Section IV.L.2, except for any attorneys' fees expended in connection with a direct action against the Reorganized Debtors permitted by Section IV.L.2.d (collectively, the "Legal Fees") to the appropriate party, or (b) attempt to cure the breach of the Asbestos Insurer Cooperation Obligations. If the Reorganized Debtors successfully cure their breach such that the Asbestos Insurer reverses its previous denial of coverage and pays the Denied Asbestos Personal Injury Claim in full, the Reorganized Debtors shall have no obligation to pay the Denied Asbestos Personal Injury Claim; the Reorganized Debtors shall, however, remain liable for paying the Legal Fees, and shall remit payment of such Legal Fees to the appropriate party. If the Reorganized Debtors are unable to cure their breach of the Asbestos Insurer Cooperation Obligations, the Reorganized Debtors shall pay to the Asbestos Personal Injury Trust or the Denied Asbestos Personal Injury Claimant, as applicable, the judgment or settlement amount of the Denied Asbestos Personal Injury Claim and shall remit the Legal Fees to the appropriate party.

f. Lehigh Hanson shall fully guarantee the Reorganized Debtors' performance of any payment obligations they incur with respect to the Asbestos Insurance Policies, including, but not limited to, any obligations the Reorganized Debtors incur under Section IV.L.2 and shall pay directly to the Reorganized Debtors, within fourteen (14) calendar days of receiving notice of the Reorganized Debtors' failure to pay a Denied Asbestos Personal Injury Claim and related Legal Fees or otherwise, the amount of any such payment obligation so that the Reorganized Debtors may distribute the funds. Notwithstanding the foregoing, payment obligations of the Reorganized Debtors under this paragraph shall not include any obligation the Asbestos Personal Injury Trust has expressly assumed hereunder, including the Deductibles and any obligations for which the Asbestos Personal Injury Trust has agreed hereunder to reimburse the Reorganized Debtors.

g. Nothing in Section IV.L.2 is intended to preclude, limit, or otherwise impair, any other claims, causes of action, or remedies that may be available to the Asbestos Personal Injury Trust, the TAC, the Future Claimants' Representative, or any holders of Asbestos Personal Injury Claims, under otherwise applicable non-bankruptcy law or the Plan and its Exhibits, related to Asbestos Personal Injury Claims. In particular, nothing in Section IV.L.2 is intended to bar or preclude holders of Asbestos Personal Injury Claims from pursuing any action directly against Asbestos Insurers related to Asbestos Personal Injury Claims or Denied Asbestos Personal Injury Claims, including actions under Section 11580 of the California

Insurance Code and its subdivisions, or any related or similar statute in any jurisdiction.

## M.   Compromise of Insurance Policies

### 1.   Dual Policies

The Reorganized Debtors or their assignee(s) shall not compromise any part of the Dual Policies absent the prior written consent of the TAC, the Future Claimants' Representative and the Asbestos Personal Injury Trust, such consent not to be unreasonably withheld, and the Asbestos Personal Injury Trust (conditioned on the express consent of the TAC and the Future Claimants' Representative) shall not compromise any part of the Dual Policies absent the prior written consent of the Reorganized Debtors or their assignee(s), such consent not to be unreasonably withheld.  If a dispute arises as to whether a party's lack of consent is reasonable, such dispute may be presented to the Bankruptcy Court for resolution.  After the Effective Date, should the Bankruptcy Court or appellate court, if applicable, find in favor of the party withholding consent, the other party shall pay the reasonable attorneys' fees and costs of the party withholding consent.

### 2.   Separate Limit Policies

The Reorganized Debtors or their assignee(s) are entitled to settle that portion of the Separate Limit Policies that does not provide coverage for Asbestos Personal Injury Claims.  The TAC, Future Claimants' Representative and the Asbestos Personal Injury Trust are entitled to notice and review of any proposed settlement but may only object on the grounds that the proposed settlement releases or otherwise impairs coverage for Asbestos Personal Injury Claims. Also with respect to Separate Limit Policies, the Asbestos Personal Injury Trust (conditioned on the express consent of the TAC and the Future Claimants' Representative) is entitled to settle that portion of the Separate Limit Policies that does not provide coverage for Environmental Claims.  The Reorganized Debtors or their assignee(s) are entitled to notice and review of any proposed settlement but may object only on the grounds that the proposed settlement releases or otherwise impairs coverage for Environmental Claims.  If a dispute arises as to whether a proposed settlement releases or otherwise impairs coverage for Asbestos Personal Injury Claims, or Environmental Claims, as applicable, such dispute may be presented to the Bankruptcy Court for resolution.  After the Effective Date, should the Bankruptcy Court, or appellate court if applicable, find in favor of the objecting party, the other party shall pay the reasonable attorneys' fees and costs of the objecting party.

### 3.   Insurance Policies that Provide Coverage for Asbestos Personal Injury Claims but not for Environmental Claims

With respect to insurance policies that provide coverage for Asbestos Personal Injury Claims but not for Environmental Claims (a list of such policies is attached as Exhibit IV.M.3), and also any policies that may provide coverage for Asbestos Personal Injury Claims, but not for Environmental Claims that are not included on Exhibits I.A.60, I.A.113119, IV.M.3 and IV.M.4, the Asbestos Personal Injury Trust (conditioned on the express consent of the TAC and the

Future Claimants' Representative) may settle such Asbestos Personal Injury Insurance Assets and the Reorganized Debtors or their assignee(s) shall have no standing to object.

### a.   Settlement with Truck

If the Asbestos Personal Injury Trust seeks approval of a settlement with Truck, the Objecting Excess Insurers may object to approval of such settlement (notice, hearing, and the ~~Court's~~Court's approval of which are required before Truck may become a ~~"~~"Settling Asbestos Insurer~~"~~").  The Objecting Excess Insurers may object to the settlement to the same extent and on the same grounds that they could have objected (a) to the settlement if the settlement had been reached, and approval of it had been sought before Confirmation and (b) to the Plan had such a settlement been set forth in the Plan; without limiting the foregoing, any objections based on projections  with respect to events that had not occurred as of the Confirmation Hearing shall be based on information that was known or knowable as of the Confirmation Hearing.  The Objecting Excess Insurers may not argue that either the Bankruptcy Court or the District Court lacked jurisdiction to confirm the Plan; provided, however, for the avoidance of doubt, the objections set forth in the preceding sentence are preserved.  The Asbestos Personal Injury Trust may oppose the Objecting Excess Insurers~~'~~ Objections and assert any additional arguments or bases for opposition to such objections on any ground, including grounds that were or could have been advanced by the Debtors, the Asbestos Personal Injury Committee or the ~~FCR~~Future Claimants' Representative in opposition to the Objecting Excess Insurers~~'~~ Objections.  The relief available to the Objecting Excess Insurers, if one or more of them prevails on one or more such objection(s), shall be limited, to (a) denying the  motion to approve the settlement with Truck; (b) granting the Objecting Excess Insurers adequate protection of their Inter-Insurer Rights, if any, against Truck; and/or (c) modifying the Asbestos Permanent Channeling Injunction to exclude any restriction on the Objecting Excess Insurers~~'~~ pursuing their Inter-Insurer Rights, if any, against Truck, in all cases subject to the ~~Court's~~Court's determination that such relief is appropriate under principles of law and equity.  For the avoidance of doubt, and not by way of limitation, none of the Objecting Excess Insurers~~'~~ Objections will be deemed moot because of substantial consummation of the Plan, ~~confirmation~~Confirmation of the Plan, the Plan becoming final and non-appealable, or the closing of the Reorganization Cases.  For the avoidance of doubt, the Objecting Excess Insurers shall not be entitled to, and shall not seek, any other relief with respect to a settlement with Truck against the Debtors, the Reorganized Debtors, Lehigh Hanson or any of their affiliates, nor any relief with respect to the implementation, effectiveness, or consummation of the Plan (as long as the Plan is not materially altered before Confirmation).  The Objecting Excess Insurers~~'~~ agreement not to seek such relief, however, shall not operate to limit the relief that may be available to the Objecting Excess Insurers against the Asbestos Personal Injury Trust, or to the Asbestos Personal Injury Trust.

Upon the filing by the Asbestos Personal Injury Trust of a motion to approve a settlement with Truck, the Asbestos Personal Injury Trust shall move the Court to set a status conference on such motion on a date that is no less than twenty (20) days after the filing of such motion, or such other date as directed by the Court, without prejudice to the rights of any party to seek a longer or shorter period of time based upon the facts and circumstances that might then exist.  At the status conference, any party may request that the Court set a briefing schedule for any objections to the motion, set an evidentiary hearing to consider the merits of the motion and any objections thereto (unless no party requests an evidentiary hearing), establish a schedule for

discovery relating to the motion and any objections thereto, and any other party may object to such request.

Any settlement between the Asbestos Personal Injury Trust and Truck shall not contain any provision that excuses Truck from its obligation to continue to defend the underlying asbestos personal injury cases until such time as any order approving such settlement (if any such order is entered) has become a Final Order. Further, and notwithstanding anything else contained in the Plan or the Confirmation Order, unless and until the Court enters an order (which has become a Final Order) approving a Truck settlement that might provide otherwise (and without prejudice to the rights of the Objecting Excess Insurers'' rights to object to the entry of such an order as provided above), the Objecting Excess Insurers'' rights under the law, the Excess CIP Agreement, and the Asbestos Insurance Policies that relate to the defense of the underlying asbestos claims are preserved against Truck if it ceases defending any of the underlying asbestos cases.

### 4.     Insurance Policies that Provide Coverage for Environmental Claims but not for Asbestos Personal Injury Claims

With respect to insurance policies that provide coverage for Environmental Claims but not for Asbestos Personal Injury Claims (a list of such policies is attached as Exhibit IV.M.4) and any policies that may provide coverage for Environmental Claims but not for Asbestos Personal Injury Claims that are not included on Exhibits I.A.60, I.A.113119, IV.M.3 and IV.M.4, the Reorganized Debtors or their assignee(s) may settle such policies and the TAC, Future Claimants' Representative and the Asbestos Personal Injury Trust shall have no standing to object.

### 5.     Amendment of Insurance Policy Exhibits

If a dispute regarding the lists of Dual Policies and Separate Limit Policies arises after the Confirmation Hearing, it may be presented to the Bankruptcy Court. After the Confirmation Hearing, Exhibits I.A.60, I.A.113119, IV.M.3 and IV.M.4 may only be amended by written agreement of the Parties, or if after the Effective Date, the Asbestos Personal Injury Trust, the Reorganized Debtors and Lehigh Hanson. For any Insurance Policy not previously included as an Exhibit to this Plan that the Asbestos Personal Injury Trust, the Reorganized Debtors or Lehigh Hanson contend should be added to Exhibits I.A.60, I.A.113119, IV.M.3 and IV.M.4 after Confirmation, and about which there is a dispute among such parties, such dispute may be presented to the Bankruptcy Court for resolution.

### N.     Truck Obligations Regarding Deductibles

Notwithstanding any provision in any Asbestos Insurance Policy to the contrary, Truck shall have no obligation to pay, and shall not pay, any Deductible under any applicable Asbestos Insurance Policy to holders of Asbestos Personal Injury Claims or any other Entity. The Asbestos Personal Injury Trust shall satisfy such Deductible to holders of Insured Asbestos Claims in accordance with the terms, provisions and procedures of the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures. Other than with respect to Deductibles, the Asbestos Personal Injury Trust shall not assume responsibility

pursuant to the Plan for any other expenses owed to Truck, or that may become owed to Truck in the future, in connection with Asbestos Personal Injury Claims.

## O.   Liquidation of Asbestos Personal Injury Claims

### 1.   Insured Asbestos Claims

Holders of Insured Asbestos Claims may initiate, continue and/or prosecute suit against the Reorganized Debtors in the tort system to obtain the benefit of insurance coverage under the Asbestos Insurance Policies, unless and until the Asbestos Personal Injury Trust, with the consent of the TAC and the Future Claimants' Representative, has settled (other than pursuant to the Excess CIP Agreement) all rights to coverage for Asbestos Personal Injury Claims applicable to the Asbestos Personal Injury Claim of a particular holder, in which event such holder shall pursue payment of its Asbestos Personal Injury Claim from the Asbestos Personal Injury Trust in accordance with the Asbestos Personal Injury Trust Distribution Procedures.  In the event that a holder of an Insured Asbestos Claim commences such an action, the complaint may name the applicable Reorganized Debtor(s) as a defendant(s) and shall be deemed by operation of law to be an action against the applicable Reorganized Debtor(s).  Notwithstanding the foregoing, the Reorganized Debtors shall have no obligation to answer, appear or otherwise participate in the action in any respect other than as set forth in this Plan and as may be necessary to maintain coverage under the Asbestos Insurance Policies, and any judgment that may be obtained in the action cannot be enforced against the assets of the Reorganized Debtors, other than from the Asbestos Insurance Policies.  Such actions may be filed in any court where the applicable Debtor would have been subject to in personam jurisdiction as of the Petition Date or any other court of competent jurisdiction and process may be served upon a person or entity appointed by the Reorganized Debtors to serve as agent, who shall tender such actions to Truck or, if appropriate, to any other applicable Asbestos Insurers in compliance with the notice provisions of the applicable Asbestos Insurance Policies.  Nothing in this Section IV.O. is intended to affect any cause of action or right to bring a cause of action held by any holder of an Asbestos Personal Injury Claim directly against any Asbestos Insurer.  The portion of any Insured Asbestos Claim that is not covered by any Asbestos Insurance Policy shall be paid in accordance with the terms, provisions and procedures of the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures.

### 2.   Uninsured Asbestos Claims

Each Uninsured Asbestos Claim will be determined and paid in accordance with the terms, provisions and procedures of the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures.  The sole recourse of a holder of an Uninsured Asbestos Claim on account of such Claim will be to the Asbestos Personal Injury Trust and such holder will have no right whatsoever at any time to assert its Uninsured Asbestos Claim against any Protected Party.

## P.   Limitations On Judgment Recovery From Non-Settling Asbestos Insurers

To the extent that any Non-Settling Asbestos Insurer has an Asbestos Insurance Policy Claim against one or more Settling Asbestos Insurers with respect to an Asbestos Personal Injury

Claim that it could have asserted against such Settling Asbestos Insurers but for the Asbestos Permanent Channeling Injunction provided under the Plan (hereafter, "Contribution Claims"), the judgment liability (if any) of the Non-Settling Asbestos Insurer to the holder of such Asbestos Personal Injury Claim shall be reduced dollar-for-dollar by the amount (if any) of the Contribution Claims established pursuant to this Section IV.P.  The court hearing the Asbestos Personal Injury Claim shall employ such procedures as that court determines are appropriate to determine prior to entry of judgment the validity and amount of any Contribution Claims (and the corresponding reduction in the amount of the holder's recovery) as if, and to the same extent, they were asserted against the Settling Asbestos Insurers.  The holder of the Asbestos Personal Injury Claim may assert the legal or equitable rights, if any, of the Settling Asbestos Insurers in the action.  The Bankruptcy Court may modify this judgment reduction provision or grant such other relief in any order approving a settlement with any Asbestos Insurer as appropriate and necessary to adequately protect the Inter-Insurer Rights, if any, of any ~~non-settling~~Non-Settling Asbestos Insurer.

## Q.    Insurance Neutrality

Nothing in the Plan, any Exhibit to the Plan, the Confirmation Order, any finding of fact and/or conclusion of law with respect to the Confirmation of the Plan, or any order or opinion entered on appeal from the Confirmation Order shall limit the right of any Asbestos Insurer to assert any Insurer Coverage Defense; provided, however, that (a) the transfer of rights in and under the Asbestos Personal Injury Insurance Assets to the Asbestos Personal Injury Trust is valid and enforceable and transfers such rights under the Asbestos Personal Injury Insurance Assets as the Debtors may have, and that such transfer shall not affect the liability of any Asbestos Insurer, and (b) the discharge and release of the Debtors and Reorganized Debtors from all Claims and the injunctive protection provided to the Debtors, Reorganized Debtors and Protected Parties with respect to Claims as provided herein shall not affect the liability of any Asbestos Insurer, except to the extent that any such Asbestos Insurer is also a Settling Asbestos Insurer.  Notwithstanding anything in this Section IV.Q. to the contrary, nothing in this Section IV.Q. shall affect or limit, or be construed as affecting or limiting, (~~1~~a) the binding effect of the Plan and the Confirmation Order on the Debtors, the Reorganized Debtors, the Asbestos Personal Injury Trust or the beneficiaries of the Asbestos Personal Injury Trust or (~~2~~b) the protection afforded to any Settling Asbestos Insurer by the Asbestos Permanent Channeling Injunction.  Further, nothing in this Section IV.Q. is intended or shall be construed to preclude otherwise applicable principles of res judicata or collateral estoppel from being applied against any Asbestos Insurer with respect to any issue that is actually litigated by such Asbestos Insurer as part of its objections to Confirmation of the Plan.

## R.    Preservation of Rights of Action; Settlement of Claims and Releases

### 1.    Preservation of Rights of Action by the Reorganized Debtors

Except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code and to the fullest extent possible under applicable law, the Reorganized Debtors shall retain and may enforce, and shall have the right to enforce, any claims, demands, rights and causes of action that any Debtor or Estate may hold against any Entity, including any

Recovery Actions.  The Reorganized Debtors or their successors or assignees may pursue such retained claims, demands, rights or causes of action, as appropriate, in accordance with the best interests of the Reorganized Debtors or their successors or assignees holding such claims, demands, rights or causes of action.  Further, the Reorganized Debtors retain their right to File and pursue, and shall have the sole right to File and pursue, any adversary proceedings against any trade creditor or vendor related to debit balances or deposits owed to any Debtor.

## 2.    Settlement of Certain Estate Claims

a.    Pursuant to Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided under the Plan, any and all claims against the Protected Parties that are or would have been property of the Debtors' Estates or could have been brought by the Debtors' Estates, including without limitation Recovery Actions and any claims based upon a legal or equitable theory of liability in the nature of veil piercing, alter ego, successor liability, vicarious liability, fraudulent transfer, malpractice, breach of fiduciary duty, waste, fraud or conspiracy, except for Intercompany Claims, shall be deemed settled, released and extinguished.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims and the Bankruptcy Court's finding that such compromise or settlement is in the best interest of the Debtors, Reorganized Debtors and their respective Claim and Interest holders and is fair, equitable and reasonable.

b.    Pursuant to Bankruptcy Rule 9019 and in consideration for the releases and other benefits provided under the Plan, any and all claims against the holders of Asbestos Personal Injury Claims who received payments in respect of their claims from the Debtors, Lehigh Hanson, or any predecessor or affiliate of the Debtors or Lehigh Hanson prior to Petition Date, and their professionals (but only with respect to their representation of or work for such holders in connection with such payments), that are or would have been property of any of the Debtors' Estates or could have been brought by any of the Debtors' Estates or any Protected Party, including without limitation Recovery Actions, and any claims based upon a legal or equitable theory of liability, in each case arising out of, based upon or resulting from payments to holders of Asbestos Personal Injury Claims from the Debtors, Lehigh Hanson or any predecessor or affiliate of the Debtors or Lehigh Hanson prior to the Petition Date, shall be deemed settled, released and extinguished.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims and the Bankruptcy Court's finding that such compromise or settlement is in the best interest of the Debtors, the Reorganized Debtors and their respective Claim and Interest holders and is fair, equitable and reasonable.

3.      **Releases**

a.      **General Releases of Debtors and Reorganized Debtors**

Except as otherwise expressly set forth in the Plan, and except to the extent it would diminish, reduce or eliminate the duties or obligations of any Asbestos Insurer under any Asbestos Personal Injury Insurance Asset, as of the Effective Date, the Debtors and the Reorganized Debtors are released from all claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, arising out of, based upon or resulting from, directly or indirectly, in whole or in part, any act, omission, transaction or other occurrence taking place on or prior to the Effective Date.   Notwithstanding the foregoing, the releases set forth in this paragraph will not become effective with respect to holders of General Unsecured Claims until the General Unsecured Claims Escrows have been funded as set forth herein.

b.      **Release by the Debtors, Reorganized Debtors and Lehigh Hanson**

1.      Without limiting any other provision of the Plan, as of the Effective Date, the Debtors and the Reorganized Debtors, on behalf of themselves and their respective affiliates, Estates and successors and assigns, and any and all Entities who may purport to claim by, through, for or because of them, shall be deemed to forever release, waive and discharge all claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, against each of the present and former directors, officers, employees, attorneys, accountants, investment bankers, financial advisors, appraisers, representatives and agents of the Debtors, the DIP Lender and DEQ, in each case acting in such capacity, arising out of, based upon or resulting from, directly or indirectly, in whole or in part, any act, omission, transaction or other occurrence taking place on or prior to the Effective Date with respect to the Reorganization Cases, the Plan or the DEQ Settlement, except for the liability of any Entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

2.      Without limiting any other provision of the Plan, as of the Effective Date, the Debtors, the Reorganized Debtors and Lehigh Hanson, on behalf of themselves and their respective affiliates, Estates and successors and assigns, and any and all Entities who may purport to claim by, through, for or because of them, shall be deemed to forever release, waive and discharge all claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, against holders of Asbestos Personal Injury Claims who received payments in respect of their claims from the Debtors, Lehigh Hanson, or any predecessor or affiliate of the Debtors or

Lehigh Hanson prior to Petition Date, and their professionals (but only with respect to their representation of or work for such holders in connection with such payments), including without limitation Recovery Actions, in each case arising out of, based upon or resulting from payments to holders of Asbestos Personal Injury Claims from the Debtors, Lehigh Hanson or any predecessor or affiliate of the Debtors or Lehigh Hanson prior to Petition Date.

### c.   General Releases by Holders of Claims or Interests

**Without limiting any other provision of the Plan or the Bankruptcy Code, as of the Effective Date, in consideration for, among other things, the obligations of the Debtors and the Reorganized Debtors under the Plan, each holder of a Claim or Interest that votes in favor of the Plan or is deemed to accept the Plan shall be deemed to forever release, waive and discharge all claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, against any of the Parties, the Creditors' Committee or any Reorganized Debtor, or any of their respective present or former directors, officers, employees, members, subsidiaries, predecessors, successors, attorneys, accountants, investment bankers, financial advisors, appraisers, representatives and agents, or the DIP Lender, in each case acting in such capacity, arising out of, based upon or resulting from, directly or indirectly, in whole or in part, any act, omission, transaction or other occurrence taking place on or prior to the Effective Date and in any way relating to the Reorganization Cases or the Plan (which release shall be in addition to the discharge of Claims provided herein and under the Confirmation Order and the Bankruptcy Code). Notwithstanding the foregoing, no release or discharge of any of the Parties, the Creditors' Committee or any Reorganized Debtor, or any of their respective present or former directors, officers, employees, members, subsidiaries, predecessors, successors, attorneys, accountants, investment bankers, financial advisors, appraisers, representatives and agents, or the DIP Lender, in each case acting in such capacity, shall diminish, reduce or eliminate the duties or obligations of any Asbestos Insurer under any Asbestos Personal Injury Insurance Asset.**

### d.   Injunction Related to Releases

**Except as otherwise expressly provided in the Plan, including in Section IV.O.1., the Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively or otherwise, of any claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities released pursuant to the Plan.**

### S.   Release of Encumbrances

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to Article VI, all Encumbrances against the property of any Estate shall be fully released and discharged, and all

of the right, title and interest of any holder of such Encumbrances, including any rights to any collateral thereunder, shall revert to the applicable Reorganized Debtor and its successors and assigns.

## T.    Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

Each officer of each Debtor and Reorganized Debtor shall be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements and documents and take such actions as may be necessary or appropriate to effect and implement the provisions of the Plan, including the Restructuring Transactions provisions of Section IV.B.  The secretary or any assistant secretary of each Debtor or Reorganized Debtor shall be authorized to certify or attest to any of the foregoing actions.  Pursuant to section 1146(a) of the Bankruptcy Code, the following shall not be subject to any stamp Tax or similar Tax:  (1) the creation of any Encumbrances; (2) the making or assignment of any lease or sublease; (3) the execution and implementation of the Asbestos Personal Injury Trust Agreement, including the creation of the Asbestos Personal Injury Trust and any transfers to or by the Asbestos Personal Injury Trust; (4) any Restructuring Transaction; or (5) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale or assignments, applications, certificates or statements executed or filed in connection with any of the foregoing or pursuant to the Plan.

## U.    Determination of the Insolvent Insurers Proceeds Dispute

~~The Bankruptcy Court shall determine the Insolvent Insurers Proceeds Dispute unless it is resolved by agreement among the Debtors, the Asbestos Personal Injury Committee, the Future Claimants' Representative, the Insurance Company of the State of Pennsylvania, First State Insurance Company and New England Reinsurance Corporation, Associated International Insurance Company, and, if prior to the Effective Date, the Creditors' Committee.  The Confirmation Order shall establish a schedule, acceptable to the Debtors, the Asbestos Personal Injury Committee, the Future Claimants' Representative, the Insurance Company of the State of Pennsylvania, First State Insurance Company and New England Reinsurance Corporation, Associated International Insurance Company, and, if prior to the Effective Date, the Creditors' Committee for the litigation of the Insolvent Insurers Proceeds Dispute in the Bankruptcy Court.~~

The Confirmation Order shall approve the agreed resolution of the Insolvent Insurers Proceeds Dispute.

## V.    Compliance with QSF Regulations

The Debtors and the Reorganized Debtors shall take all actions required of them as "transferor," and the Asbestos Personal Injury Trustees shall take all actions required of them as "administrator," pursuant to Treasury Regulations promulgated under section 468B of the Internal Revenue Code.  Pursuant to such Treasury Regulations, the Asbestos Personal Injury Trustees as "administrator" shall be responsible for all tax reporting and withholding requirements in respect of distributions made from the Asbestos Personal Injury Trust.

**W.      Surety Bond Obligations**

Notwithstanding any other provisions of the Plan, on the Effective Date, all rights of any party related to the Surety Bond Program shall not be altered by the Plan.  The applicable Reorganized Debtor hereby reaffirms and ratifies the Surety Bond Obligations arising under the Surety Bond Program, which shall continue to be in full force and effect, and the Surety Bond Obligations are not discharged or released by the Plan in any way.  On the Effective Date, all liens and security interests, if any, granted pursuant to or in connection with the Surety Bond Program shall have the priorities established in respect thereof under applicable non-bankruptcy law, and shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination pursuant to the Plan or the Confirmation Order.  The Surety Bond Program and all Surety Bond Obligations shall be treated by the Reorganized Debtors in the ordinary course of business as if the Reorganization Cases had not been commenced.  For the avoidance of any doubt, and with a reservation of rights to all parties, any agreements related to the Surety Bond Program to which a Debtor is party will vest in the applicable Reorganized Debtor, and to the extent such agreements are considered to be executory contracts, then, notwithstanding anything contained in Article V to the contrary, the Plan will constitute a motion to assume such agreements, and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code.  Nothing in the Plan shall affect in any way any surety's rights against any non-debtor, or any non-debtor's rights against a surety, including under the Surety Bond Program or with regard to the Surety Bond Obligations.

**ARTICLE V**

**TREATMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES**

**A.      Executory Contracts and Unexpired Leases to Be Assumed**

**1.      Assumption Generally**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, including the Restructuring Transactions provisions of Section IV.B., on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the applicable Debtor or Reorganized Debtor shall assume each of its respective Executory Contracts and Unexpired Leases other than those listed on Exhibit V.C; provided, however, that the Debtors reserve the right, at any time prior to the Effective Date, to amend Exhibit V.C to:  (a) delete any Executory Contract or Unexpired Lease listed therein, thus providing for its assumption pursuant hereto; or (b) add any Executory Contract or Unexpired Lease to Exhibit V.C, thus providing for its rejection pursuant to this Section V.A.1.  The Debtors shall provide notice of any amendments to Exhibit V.C to the parties to the Executory Contracts or Unexpired Leases affected thereby and to the parties on the then-applicable service list in the Reorganization Cases.  Nothing herein shall constitute an admission by a Debtor or Reorganized Debtor that any contract or lease is an Executory Contract or Unexpired Lease or that a Debtor or Reorganized Debtor has any liability thereunder.

## 2. Assumptions of Executory Contracts and Unexpired Leases

Each Executory Contract or Unexpired Lease assumed under Section V.A.1. shall include any modifications, amendments, supplements or restatements to such contract or lease.

## 3. Approval of Assumptions and Assumption Procedures

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions described in Section V.A.1., pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.  The procedures for assumption of an Executory Contract or Unexpired Lease are as follows:

    a.    After the entry of the Confirmation Order, the Debtors shall serve upon each party to an Executory Contract or Unexpired Lease being assumed pursuant to the Plan notice of:  (i) the contract or lease being assumed or assumed and assigned; (ii) the Cure Amount Claim, if any, that the applicable Debtor believes it would be obligated to pay in connection with such assumption; and (iii) the procedures for such party to object to the assumption or assumption and assignment of the applicable contract or lease or the amount of the proposed Cure Amount Claim.

    b.    Any Entity wishing to object to (i) the proposed assumption of an Executory Contract or Unexpired Lease under the Plan or (ii) the proposed amount of the related Cure Amount Claim must File and serve on counsel to the Debtors a written objection setting forth the basis for the objection within twenty (20) days of service of the notice described in Section V.A.3.a.

    c.    If no objection to the proposed assumption or Cure Amount Claim is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease:  (i) the proposed assumption of the Executory Contract or Unexpired Lease shall be approved in accordance with the Plan and the Confirmation Order, effective as of the Effective Date, without further action of the Bankruptcy Court; and (ii) the Cure Amount Claim identified by the Debtors in the notice shall be fixed and shall be paid in accordance with the Plan on or after the Effective Date, without further action of the Bankruptcy Court, to the appropriate contract or lease party identified on the notice.

    d.    If an objection to the proposed assumption or Cure Amount Claim is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease, the Debtors or Reorganized Debtors, as applicable, and the objecting party may resolve such objection by stipulation, without further action of the Bankruptcy Court.

    e.    If an objection to the proposed assumption or Cure Amount Claim is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease and the parties are unable to resolve such objection:  (i) the Debtors or Reorganized Debtors may File a

reply to such objection no later than thirty (30) days after the Filing and
service of such objection and ask the Bankruptcy Court to schedule a hearing
on the particular objection and the related reply at an appropriate time; or
(ii) the Debtors or Reorganized Debtors, as applicable, may designate the
Executory Contract or Unexpired Lease underlying such objection for
rejection pursuant to Section V.C. and amend Exhibit V.C. accordingly.

**B.      Payments Related to the Assumption of Executory Contracts and Unexpired Leases**

To the extent that a Cure Amount Claim constitutes a monetary default, such Cure
Amount Claim associated with each Executory Contract and Unexpired Lease to be assumed
pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at
the option of the Debtor or Reorganized Debtor assuming such contract or lease or the assignee
of such Debtor or Reorganized Debtor, if any:  (1) by payment of the Cure Amount Claim in
cash on the Effective Date or (2) on such other terms as are agreed to by the parties to such
Executory Contract or Unexpired Lease.  Pursuant to section 365(b)(2)(D) of the Bankruptcy
Code, no Cure Amount Claim shall be allowed for a penalty rate or other form of default rate of
interest.  If there is a dispute regarding:  (1) the amount of any Cure Amount Claim; (2) the
ability of the applicable Reorganized Debtor or any assignee to provide "adequate assurance of
future performance" (within the meaning of section 365 of the Bankruptcy Code) under the
contract or lease to be assumed; or (3) any other matter pertaining to assumption of such contract
or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the
Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and
approving the assumption.  For assumptions of Executory Contracts or Unexpired Leases
between Debtors, the Reorganized Debtor assuming such contract may cure any monetary
default (1) by treating such amount as either a direct or indirect contribution to capital or
Distribution (as appropriate) or (2) through an intercompany account balance in lieu of payment
in cash.

**C.      Executory Contracts and Unexpired Leases to Be Rejected and Rejection
Procedures**

On the Effective Date, each Executory Contract and Unexpired Lease listed on
Exhibit V.C shall be rejected pursuant to section 365 of the Bankruptcy Code.  Each contract and
lease listed on Exhibit V.C shall be rejected only to the extent that any such contract or lease
constitutes an Executory Contract or Unexpired Lease.  Listing a contract or lease on
Exhibit V.C shall not constitute an admission by a Debtor or Reorganized Debtor that such
contract or lease is an Executory Contract or Unexpired Lease or that a Debtor or Reorganized
Debtor has any liability thereunder.  The Confirmation Order shall constitute an order of the
Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as
of the Effective Date.  The appropriate procedures for rejection of an Executory Contract or
Unexpired Lease are as follows:

1.      After the entry of the Confirmation Order, the Debtors shall serve upon each party
to an Executory Contract or Unexpired Lease being rejected pursuant to the Plan notice of such
proposed rejection.

2.      Any Entity wishing to object to the proposed rejection of an Executory Contract or Unexpired Lease under the Plan must File and serve on counsel to the Debtors a written objection setting forth the basis for the objection within twenty (20) days of service of the notice described in Section V.C.1.

3.      If no objection to the proposed rejection is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease, the proposed rejection of the applicable Executory Contract or Unexpired Lease shall be approved in accordance with the Plan and the Confirmation Order, effective as of the Effective Date, without further action of the Bankruptcy Court.

4.      If an objection to the proposed rejection is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease, the Debtors or Reorganized Debtors, as applicable, and the objecting party may resolve such objection by stipulation, without further action of the Bankruptcy Court.

5.      If an objection to the proposed rejection is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease and the parties are unable to resolve such objection, the Debtors or Reorganized Debtors, as applicable, may File a reply to such objection no later than thirty (30) days after the Filing and service of such objection and ask the Bankruptcy Court to schedule a hearing on the particular objection and the related reply at an appropriate time.

## D.      Obligations to Indemnify Directors, Officers and Employees

The obligations of each Debtor or Reorganized Debtor to indemnify any individual serving as one of its directors, officers or employees prior to or following the Petition Date by reason of such individual's prior or future service in such a capacity or as a director, officer or employee of any Debtor or other Entity, to the extent provided in the applicable Certificate of Incorporation or By-Laws, by statutory law or by written agreement, policies or procedures of or with such Debtor, shall be deemed and treated as executory contracts that are assumed by the applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date.  Accordingly, such indemnification obligations shall survive and be unaffected by entry of the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before or after the Petition Date.

## E.      Contracts and Leases Entered Into After the Petition Date

Notwithstanding any other provision of the Plan, and subject to the Restructuring Transactions provisions of Section IV.B., contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, shall be performed by the Debtor or Reorganized Debtor liable thereunder in accordance with the terms and conditions of such contracts and leases in the ordinary course of its business. Accordingly, such contracts and leases and other obligations (including any assumed Executory Contracts and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

## F.     Insurance Policies

### 1.     Assumed Insurance Policies

The Debtors do not believe that the insurance policies issued to any Debtor, including the Insurance Policies, prior to the Petition Date constitute executory contracts.  To the extent such insurance policies are considered to be executory contracts, then, notwithstanding anything contained in Article V to the contrary, the Plan will constitute a motion to assume such insurance policies, which include but are not limited to the Debtors' workers' compensation and liability, product and property insurance policies maintained by The Home Insurance Company, and authorize the Reorganized Debtors to pay all future obligations, if any, in respect thereof. Subject to the occurrence of the Effective Date, the entry of the Confirmation Order will constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtors, their respective estates and all parties in interest in the Reorganization Cases.  Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective date, no payments are required to cure any defaults of any Debtor existing as of the Confirmation Date with respect to each such insurance policy.

### 2.     Reservation of Rights

Nothing contained in the Plan will constitute a waiver of any claim, right or cause of action that a Debtor, a Reorganized Debtor or the Asbestos Personal Injury Trust, as the case may be, may hold against the insurer under any policy of insurance or insurance agreement, except to the extent the insurer is a Settling Asbestos Insurer.

## ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS

## A.     Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan, Distributions to be made on the Effective Date to holders of Claims that are Allowed Claims as of the Effective Date shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than:  (1) sixty (60) days after the Effective Date or (2) such later date when the applicable conditions of Section V.B. (regarding cure payments for Executory Contracts and Unexpired Leases being assumed), Section VI.DE.2. (regarding undeliverable Distributions) or Section VI.G.3. (regarding compliance with Tax requirements) are satisfied.  Distributions on account of Claims that become Allowed Claims after the Effective Date shall be made pursuant to Section VI.GH.2. Any Claim that is disallowed by order of the Bankruptcy Court (or the District Court) prior to the Effective Date shall be deemed expunged (to the extent not already expunged) as of the Effective Date without the necessity for further Bankruptcy Court approval and the holder of any such Claim shall not be entitled to any Distribution under the Plan.

**B.     General Unsecured Claims Escrows**

On the Effective Date, the General Unsecured Claims Escrows shall be fully funded.  The Debtors and Reorganized Debtors will not hold any legal or equitable interest in the funds deposited in the General Unsecured Claims Escrows and such funds shall not be considered property of the Reorganized Debtors and any liens, charges, Claims, Encumbrances and Interests granted under the Plan shall not extend to an interest in the funds held in the General Unsecured Claims Escrow.  The funds in the General Unsecured Claims Escrow shall be reserved solely for the benefit of the holders of Class 3 General Unsecured Claims, including any General Unsecured Claims that are Disputed Claims, pending determination of their entitlement thereto under the terms of the Plan.  To the extent there are funds remaining in any General Unsecured Claims Escrow after payment in full of all Allowed General Unsecured Claims in accordance with the Plan (the "Remaining Funds"), Lehigh Hanson shall hold an interest in those funds and may request one or more distributions from the Escrow Agent for payment of the Remaining Funds.

**~~B~~C.     Method of Distributions to Holders of Claims**

The Reorganized Debtors or Third Party Disbursing Agents as the Reorganized Debtors may employ in their sole discretion shall make all Distributions of cash and other instruments or documents required under the Plan.  Each Disbursing Agent shall serve without bond, and any Disbursing Agent may employ or contract with other Entities to assist in or make the Distributions required by the Plan.

**~~C~~D.     Compensation and Reimbursement for Services Related to Distributions**

Each Third Party Disbursing Agent providing services related to Distributions pursuant to the Plan shall receive from the Reorganized Debtors, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services.  These payments shall be made on terms agreed to with the Reorganized Debtors and shall not be deducted from Distributions to be made pursuant to the Plan to holders of Allowed Claims receiving Distributions.

**~~D~~E.     Delivery of Distributions and Undeliverable or Unclaimed Distributions**

**1.     Delivery of Distributions**

Distributions to holders of Allowed Claims (other than Asbestos Personal Injury Claims) shall be made by a Disbursing Agent (a) at the addresses set forth on the respective proofs of Claim Filed by holders of such Claims, (b) at the addresses set forth in any written certification of address change delivered to the Disbursing Agent (including pursuant to a letter of transmittal delivered to a Disbursing Agent) after the date of Filing of any related proof of Claim, or (c) at the addresses reflected in the applicable Debtor's Schedules if no proof of Claim has been Filed and the Disbursing Agent has not received a written notice of a change of address.

### 2. Undeliverable Distributions Held by Disbursing Agents

#### a. Holding and Investment of Undeliverable Distributions

If any Distribution to a holder of an Allowed Claim is returned to a Disbursing Agent as undeliverable, no further Distributions shall be made to such holder unless and until the applicable Disbursing Agent is notified by written certification of such holder's then-current address.  Undeliverable Distributions shall remain in the possession of the applicable Disbursing Agent pursuant to this Section VI.~~D~~E.2.a. until such time as a Distribution becomes deliverable. Undeliverable cash shall be held in segregated bank accounts in the name of the applicable Disbursing Agent for the benefit of the potential claimants of such funds.  Any Disbursing Agent holding undeliverable cash shall invest such cash in a manner consistent with the Reorganized Debtors' investment and deposit guidelines.

#### b. After Distributions Become Deliverable

On each Quarterly Distribution Date, the applicable Disbursing Agent shall make all Distributions that become deliverable to holders of Allowed Claims (other than Asbestos Personal Injury Claims) during the preceding calendar quarter, to the extent not distributed earlier at the discretion of the applicable Disbursing Agent.

#### c. Failure to Claim Undeliverable Distributions

Any holder of an Allowed Claim that does not assert a claim pursuant to the Plan for an undeliverable Distribution to be made by a Disbursing Agent within one year after the later of (i) the Effective Date and (ii) the last date on which a Distribution was attempted to be made to such holder shall have its claim for such undeliverable Distribution discharged and shall be forever barred from asserting any such claim against the Reorganized Debtors or their respective property.  Unclaimed Distributions shall become property of the respective Reorganized Debtor, free of any restrictions thereon, including the right of any state or other government to escheat such property, and any such Distributions held by a Third Party Disbursing Agent shall be returned to the applicable Reorganized Debtor.  Nothing contained in the Plan shall require any Debtor, Reorganized Debtor or Disbursing Agent to attempt to locate any holder of an Allowed Claim.

### ~~E~~F. Distribution Record Date

#### 1. No Recognition of Transfers after the Distribution Record Date

A Disbursing Agent shall have no obligation to recognize the transfer or sale of any interest or participation in, any Claim that occurs after the close of business on the Distribution Record Date and shall be entitled for all purposes herein to recognize and make Distributions only to those holders of Allowed Claims that are holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date.

### 2.     Treatment of Certain Transfers

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date shall be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

### F~~G~~.     Means of Cash Payments

Except as otherwise specified herein, cash payments made pursuant to the Plan to holders of Claims shall be in United States currency by checks drawn on a domestic bank selected by the Reorganized Debtors or Lehigh Hanson, as applicable, or, at the option of the Reorganized Debtors or Lehigh Hanson, as applicable, by wire transfer from a domestic bank; provided, however, that cash payments to foreign holders of Allowed Claims may be made, at the option of the Reorganized Debtors or Lehigh Hanson, as applicable, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### ~~G~~H.     Timing and Calculation of Amounts to Be Distributed

#### 1.     Timing of Distributions Under the Plan

Any Distribution to be made by any Debtor or Reorganized Debtor pursuant to the Plan shall be deemed to have been timely made if made within sixty (60) days after the time therefor specified in the Plan.  Except as otherwise provided in the Plan, no interest shall accrue or be paid with respect to any Distribution as a consequence of such Distribution not having been made on the Effective Date.  However, and for the avoidance of doubt, the funding of (a) the Asbestos Personal Injury Trust pursuant to Section IV.K.2~~.~~ and (b) the General Unsecured Claims Escrows pursuant to Section VI.B shall occur on the Effective Date.

#### 2.     Allowed Claims

On the Effective Date, each holder of an Allowed Claim (other than an Asbestos Personal Injury Claim) shall receive the full amount of the Distributions that the Plan provides for Allowed Claims in the applicable Class.  On each Quarterly Distribution Date, Distributions also shall be made pursuant to Section VII.C. to holders of Disputed Claims in any such Class that were allowed during the preceding calendar quarter, to the extent not distributed earlier at the discretion of the applicable Disbursing Agent.  Such quarterly Distributions also shall be in the full amount that the Plan provides for Allowed Claims in the applicable Class.

#### 3.     Compliance with Tax Requirements

##### a.     Withholding and Reporting

In connection with the Plan, to the extent applicable, each Disbursing Agent shall comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision of the Plan to the contrary, each Disbursing Agent

shall be authorized to take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including applying a portion of any cash Distribution to be made under the Plan to pay applicable Tax withholding, requiring Claim holders to submit appropriate certifications or establishing other mechanisms such Disbursing Agent believes are reasonable and appropriate.  To the extent that any Claim holder fails to submit appropriate certifications required by a Disbursing Agent or to comply with any other mechanism established by a Disbursing Agent to comply with Tax withholding requirements, such Claim holder's Distribution may, in such Disbursing Agent's reasonable discretion, be deemed undeliverable and subject to Section VI.DE.2.

### b.    Backup Withholding

Without limiting the generality of the foregoing, in accordance with the Internal Revenue Code's backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to Distributions made pursuant to the Plan, unless the holder (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) provides at the applicable Disbursing Agent's request a completed IRS Form W-9 (or substitute therefor) on which the holder includes a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.  Among other things, to receive any post-petition interest, if requested by a Disbursing Agent, a holder of an Allowed Claim shall be required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.  Non-U.S. Allowed Claim holders may be required by the applicable Disbursing Agent to provide a completed IRS Form W-8BEN or W-8BEN-E, as applicable (or other applicable Form W-8 or successor form), to establish an exemption from or a treaty-reduced rate of withholding on interest distributed pursuant to the Plan.  Unless a Disbursing Agent, in its discretion, determines otherwise, no Distributions on account of post-petition interest shall be made to a holder of an Allowed Claim until such time as the holder of such Claim establishes exemption from withholding or provides the applicable IRS Form.

### c.    Obligations of Distribution Recipients

Notwithstanding any other provision of the Plan, each Entity receiving a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed on it by any governmental unit on account of such Distribution, including income, withholding and other Tax obligations.

### HI.    Setoffs

Except with respect to claims of a Debtor or Reorganized Debtor released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Reorganized Debtors or, as instructed by the applicable Reorganized Debtor, a Third Party Disbursing Agent may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Claim (before any Distribution is made on account of such Claim) the claims, rights and causes of action of any

nature that the applicable Debtor or Reorganized Debtor may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the applicable Debtor or Reorganized Debtor of any claim, right or cause of action that the Debtor or Reorganized Debtor may possess against such a Claim holder.

**I.J.**    **Allocation of Payments**

Amounts paid to holders of Claims in satisfaction thereof shall be allocated first to the principal amounts of such Claims, with any excess being allocated to accrued but unpaid interest on such Claims.

## ARTICLE VII

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

**A.**    **Prosecution of Objections to Claims**

**1.**    **Objections to Claims**

Objections to Claims (other than Asbestos Personal Injury Claims) must be Filed and served on the holders of such Claims by the Claims Objection Bar Date, and, if Filed prior to the Effective Date, such objections will be served on the parties on the then-applicable service list in the Reorganization Cases.  If an objection has not been Filed to a proof of Claim or an amendment has not been made to the Schedules with respect to a scheduled Claim by the Claims Objection Bar Date, the Claim to which the proof of Claim or Schedules relates will be treated as an Allowed Claim if such Claim has not been earlier allowed.

**2.**    **Authority to Prosecute Objections**

After the Effective Date, the Reorganized Debtors shall have the authority to File (if applicable), settle, compromise, withdraw or litigate to judgment objections to all Claims (other than Asbestos Personal Injury Claims), including pursuant to any alternative dispute resolution or similar procedures approved by the Bankruptcy Court.  After the Effective Date, the Reorganized Debtors may settle, compromise or otherwise resolve any Disputed Claim or any objection or controversy relating to any Claim without approval of the Bankruptcy Court.

**3.**    **Authority to Amend Schedules**

The Debtors or the Reorganized Debtors shall have the authority to amend the Schedules with respect to any Claim (other than Asbestos Personal Injury Claims) and to make Distributions based on such amended Schedules without approval of the Bankruptcy Court.  If any such amendment to the Schedules reduces the amount of or changes the nature or priority of such Claim, the Debtor or Reorganized Debtor shall provide the holder of such Claim with notice of such amendment and such holder shall have twenty (20) days to File an objection to such amendment with the Bankruptcy Court.  If no such objection is Filed, the Debtor or

Reorganized Debtor may proceed with Distributions based on such amended Schedules without approval of the Bankruptcy Court.

**B.      Treatment of Disputed Claims**

Notwithstanding any other provision of the Plan, no payments or Distributions shall be made on account of a Disputed Claim until such Claim becomes an Allowed Claim.

**C.      Distributions on Account of Disputed Claims Once Allowed**

On each Quarterly Distribution Date, the applicable Disbursing Agent shall make all Distributions on account of any Disputed Claim that has become an Allowed Claim during the preceding calendar quarter, to the extent not distributed earlier at the discretion of the applicable Disbursing Agent.  Such Distributions shall be made pursuant to the provisions of the Plan governing the applicable Class.

**ARTICLE VIII**

**CONDITIONS PRECEDENT TO CONFIRMATION
AND CONSUMMATION OF THE PLAN**

**A.      Conditions to Confirmation**

The following shall be conditions to Confirmation unless such conditions shall have been duly waived pursuant to Section VIII.C.:

1.      The Confirmation Order shall have been entered by the Bankruptcy Court and the District Court acting jointly, or by the Bankruptcy Court or the District Court acting separately (and, if the Confirmation Order is entered separately by the Bankruptcy Court, shall have been fully affirmed by the District Court), and shall be reasonably acceptable in form and substance to the Parties.

2.      The Plan shall be acceptable in all respects to the Parties, and all Exhibits to the Plan shall be (a) acceptable in all respects to the Parties and (b) consistent with section 524(g) of the Bankruptcy Code and the terms of the Plan.

3.      The Bankruptcy Court and the District Court acting jointly, or the Bankruptcy Court or the District Court acting separately shall have made the following findings, each of which shall be contained in the Confirmation Order and each of which, if the Confirmation Order is entered separately by the Bankruptcy Court, shall be fully affirmed by the District Court:

> a.      The Asbestos Permanent Channeling Injunction is to be implemented in connection with the Plan and the Asbestos Personal Injury Trust.

> b.      The Asbestos Personal Injury Trust, as of the Effective Date, shall assume all liability and responsibility, financial and otherwise, for all

Asbestos Personal Injury Claims, and, upon such assumption, no Protected Party shall have any liability or responsibility, financial or otherwise, therefor.

        c.      As of the Petition Date, each Debtor had been named as a defendant in a personal injury or wrongful death action seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products.

        d.      The Asbestos Personal Injury Trust will be funded in whole or in part by securities of the Reorganized Debtors and by the obligation of the Reorganized Debtors to make future payments, which payments may be funded by contributions from Lehigh Hanson to the Reorganized Debtors.

        e.      The Asbestos Personal Injury Trust, by the exercise of rights granted under the Plan, would be entitled to own, if specified contingencies occur, a majority of the voting shares of each of the Reorganized Debtors.

        f.      The Asbestos Personal Injury Trust shall use its assets or income to pay Asbestos Personal Injury Claims, including Demands.

        g.      Each of the Debtors is likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Claims that are addressed by the Asbestos Permanent Channeling Injunction.

        h.      The actual amounts, numbers and timing of such future Demands cannot be determined.

        i.      Pursuit of such Demands outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with Claims and future Demands.

        j.      The terms of the Asbestos Permanent Channeling Injunction, including any provisions barring actions against third parties pursuant to section 524(g)(4)(A) of the Bankruptcy Code, are set out in the Plan.

        k.      The Plan establishes, in Class 4 (Asbestos Personal Injury Claims), a separate class of the claimants whose Claims are to be addressed by the Asbestos Personal Injury Trust.

        l.      At least two-thirds (2/3) in amount and 75% in number of those voting Claims in Class 4 (Asbestos Personal Injury Claims) have voted in favor of the Plan.

        m.      Pursuant to court orders or otherwise, the Asbestos Personal Injury Trust shall operate through mechanisms, such as structured, periodic or supplemental payments, pro rata distributions, matrices or periodic review of estimates of the numbers and values of Asbestos Personal Injury Claims, that

provide reasonable assurance that the Asbestos Personal Injury Trust shall value, and be in a financial position to pay, Asbestos Personal Injury Claims, including Demands, in substantially the same manner.

n.      Each Protected Party is identifiable from the terms of the Asbestos Permanent Channeling Injunction by name or as part of an identifiable group, and each Protected Party is or may be alleged to be directly or indirectly liable for the conduct of, Claims against or Demands on a Debtor to the extent that such alleged liability arises by reason of one or more of the following:

(i)  such Entity's ownership of a financial interest in any Debtor, Reorganized Debtor, any past or present Affiliate of any Debtor or Reorganized Debtor, or any predecessor in interest of any Debtor or Reorganized Debtor;

(ii)  such Entity's involvement in the management of any Debtor, Reorganized Debtor or predecessor in interest of any Debtor or Reorganized Debtor;

(iii)  such Entity's service as an officer, director or employee of any Debtor, Reorganized Debtor, any past or present Affiliate of any Debtor or Reorganized Debtor, or any predecessor in interest of any Debtor or Reorganized Debtor or Entity that owns or at any time has owned a financial interest in any Debtor, Reorganized Debtor, any past or present Affiliate of any Debtor or Reorganized Debtor, or any predecessor in interest of any Debtor or Reorganized Debtor; or

(iv)  such Entity's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of any Debtor, Reorganized Debtor, any past or present Affiliate of any Debtor or Reorganized Debtor, any predecessor in interest of any Debtor or Reorganized Debtor or of an Entity that owns or at any time has owned a financial interest in any Debtor, Reorganized Debtor, any past or present Affiliate of any Debtor or Reorganized Debtor, or any predecessor in interest of any Debtor or Reorganized Debtor, including (A) involvement in providing financing (debt or equity) or advice to an Entity involved in such a transaction or (B) acquiring or selling a financial interest in any Entity as part of such transaction.

o.      The Future Claimants' Representative was appointed as part of the proceedings leading to issuance of the Asbestos Permanent Channeling Injunction for the purpose of protecting the rights of all persons, whether known or unknown, that might subsequently assert, directly or indirectly, against any Debtor an Asbestos Personal Injury Claim that is a Demand

addressed in the Asbestos Permanent Channeling Injunction and channeled to the Asbestos Personal Injury Trust.

p.     Identifying each Protected Party (by name or as part of an identifiable group, as applicable) in the Asbestos Permanent Channeling Injunction is fair and equitable with respect to individuals that might subsequently assert Demands against each such Protected Party, in light of the benefits provided, or to be provided, to the Asbestos Personal Injury Trust by or on behalf of any such Protected Party.

q.     The Plan and the Asbestos Personal Injury Trust Documents comply with section 524(g) of the Bankruptcy Code in all respects.

r.     The Plan and its Exhibits are a fair, equitable and reasonable resolution of the liability of the Debtors for the Asbestos Personal Injury Claims.

s.     The Future Claimants' Representative has adequately and completely fulfilled his duties, responsibilities and obligations as the representative for the individuals referred to in the finding set forth in Section VIII.A.3.o. above in accordance with section 524(g) of the Bankruptcy Code.

t.     Adequate and sufficient notice of the Plan and the Confirmation Hearing, as well as all deadlines for objecting to the Plan, has been given to (i) all known creditors and holders of Interests, (ii) parties that requested notice in accordance with Bankruptcy Rule 2002 (including the Asbestos Personal Injury Committee and the Future Claimants' Representative), (iii) all parties to Executory Contracts and Unexpired Leases, (iv) all taxing authorities listed on the Debtors' Schedules or in the Debtors' Claims database, in each case, (v) the Department of the Treasury by service upon the District Director of the IRS, (vi) state attorney generals and state departments of revenue for states in which any of the Debtors have conducted business, and (vii) the Securities and Exchange Commission, (A) in accordance with the solicitation procedures governing such service and (B) in substantial compliance with Bankruptcy Rules 2002(b), 3017 and 3020(b). Such transmittal and service were adequate and sufficient to bind, among other parties, any holder of an Asbestos Personal Injury Claim, and no other or further notice is or shall be required.

u.     The Debtors' conduct in connection with and throughout these Reorganization Cases, including, but not limited to, their negotiations with the ad hoc committee of asbestos personal injury claimants and the pre-petition future claimants' representative, and the commencement of these Reorganization Cases, as well as the drafting, negotiation, proposing, confirmation, and consummation of the Plan, and their opposition to any other plan of reorganization, does not and has not violated any Asbestos Insurer Cooperation Obligations contained in any Asbestos Insurance Policies, nor

was such conduct a breach of any express or implied covenant of good faith and fair dealing. The Objecting Excess Insurers[21] consent to this finding in the particular facts and circumstances of these Reorganization Cases is expressly without prejudice to the rights of any party to contend that such a finding is or is not appropriate in any subsequent bankruptcy case not involving these Debtors.

4.     The Bankruptcy Court and the District Court, as required, shall have entered the Asbestos Permanent Channeling Injunction, which may be included in the Confirmation Order, and the Asbestos Permanent Channeling Injunction and the Confirmation Order are reasonably acceptable to the Parties.

5.     The settlement with the United States, on behalf of the Environmental Protection Agency and the United States Department of Interior, acting through the U.S. Fish and Wildlife Service, and the United States Department of Commerce, acting through the National Oceanic and Atmospheric Administration, the DEQ Settlement and the agreements with certain insurers related to such Claims have been approved by the Bankruptcy Court.

**B.     Conditions to the Effective Date**

The Effective Date shall not occur and the Plan shall not be consummated unless and until each of the following conditions has been satisfied or duly waived pursuant to Section VIII.C.

1.     The District Court or the Bankruptcy Court and the District Court acting jointly shall have entered an order (contemplated to be part of the Confirmation Order) in form and substance reasonably acceptable to the Parties approving and authorizing the Debtors and the Reorganized Debtors to take all actions necessary or appropriate to effectuate, implement and consummate the Plan and the Restructuring Transactions, including the execution, delivery and performance of contracts, instruments, releases and other agreements or documents created in connection with the Plan and the Restructuring Transactions.

2.     The Confirmation Order shall have been entered by the Bankruptcy Court and the District Court acting jointly, or by the Bankruptcy Court or the District Court acting separately (and, if the Confirmation Order is separately entered by the Bankruptcy Court, has been fully affirmed by the District Court) and shall have become a Final Order.

3.     No request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending.

4.     The Confirmation Order and the Asbestos Permanent Channeling Injunction shall be in full force and effect.

5.     No fact or circumstance shall prevent the Asbestos Personal Injury Trust from receiving the Asbestos Personal Injury Trust Assets upon occurrence of the Effective Date.

6.      The Asbestos Personal Injury Trustees shall have been selected and shall have executed and delivered the Asbestos Personal Injury Trust Agreement.

7.      The Asbestos Personal Injury Trust shall have been funded in accordance with Section IV.K.2.

8.      Each of the documents and agreements contemplated by the provisions and Exhibits of the Plan to be executed and delivered as of the Effective Date shall have been fully executed and delivered in form and substance acceptable to the Debtors and to the Asbestos Personal Injury Committee and Future Claimants' Representative and shall be fully enforceable in accordance with their terms.

9.      A settlement agreement in a form acceptable to the Debtors regarding the Lower Duwamish Waterway site and a consent judgment in a form acceptable to the Debtors regarding the St. Helens site have each been approved by a court with jurisdiction to approve such settlement agreement or enter such consent judgment.

10.     All terms and conditions to the effectiveness of the DEQ Settlement, other than the occurrence of the Effective Date, shall have been satisfied or waived in writing.

The Effective Date shall occur as of 12:01 a.m., prevailing Eastern Time on the date that the Debtors or Reorganized Debtors file a notice with the Bankruptcy Court stating that the Effective Date has occurred because each of the conditions to the Effective Date has been satisfied or waived in accordance with the Plan.

## C.      Waiver of Conditions to Confirmation or the Effective Date

The conditions to Confirmation set forth in Section VIII.A. and the conditions to the Effective Date set forth in Section VIII.B. may be waived in whole or part in writing by the Debtors, subject to the consent of Lehigh Hanson, the Asbestos Personal Injury Committee and the Future Claimants' Representative, at any time without an order of the Bankruptcy Court or the District Court; provided, however, waiver of the condition to the Effective Date set forth in Section VIII.B.10. also requires the DEQ's consent.  Confirmation and the Effective Date will occur irrespective of whether any claims allowance process or related litigation has been completed.

## D.      Effect of Nonoccurrence of Conditions to the Effective Date

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Section VIII.C., then upon motion by the Debtors, Lehigh Hanson, the Asbestos Personal Injury Committee and/or the Future Claimants' Representative made before the time that each such condition has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order shall be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to this Section VIII.D., (1) the Plan shall be null and void in all respects, including with respect to the discharge of Claims; and (2) nothing contained

in the Plan shall (a) constitute a waiver or release of any Claims by or against, or any Interest in, the Debtors or (b) prejudice in any manner the rights, including any claims or defenses, of the Parties or any other party in interest.

## ARTICLE IX

## DISCHARGE, INJUNCTION
## AND SUBORDINATION RIGHTS

### A.    Discharge of Claims

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan shall be in exchange for and in complete satisfaction and discharge of all Claims, and including any interest accrued on Claims from the Petition Date.  Except as provided in the Plan or in the Confirmation Order, Confirmation shall, as of the Effective Date, discharge the Debtors from all Claims or other liabilities that arose on or before the Effective Date and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (c) the holder of a Claim based on such debt has accepted the Plan.

In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination, as of the Effective Date, of a discharge of all Claims and other debts and liabilities against the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against a Debtor at any time, to the extent that such judgment relates to a discharged Claim, debt or liability.  Nothing contained in the foregoing discharge shall, to the full extent provided under section 524(e) of the Bankruptcy Code, affect the liability of any other Entity on, or the property of any other Entity for, any debt of the Debtors that is discharged under this Plan.

Notwithstanding any provision of the Plan to the contrary, Confirmation shall not discharge (1) the Debtors from any debt of a kind specified in 11 U.S.C. § 1141(d)(6) or (2) the Debtors' obligations under their settlement agreements with the Settled Environmental Insurers.

### B.    Injunctions

#### 1.    General Injunctions

##### a.    No Actions on Account of Discharged Claims

Except as provided in the Plan, including in Section IV.O.1., or the Confirmation Order, as of the Effective Date, all Entities that have held, currently hold or may hold a Claim or other debt or liability that is discharged pursuant to the terms of the Plan shall be permanently enjoined from taking any of the following actions on account of any such discharged Claim, debt or liability:  (i) commencing or continuing in any manner any action or other proceeding against any Debtor or Reorganized Debtor, or any of its property, other than to enforce any right to a Distribution pursuant to the Plan; (ii) enforcing, attaching, collecting or recovering in any

manner any judgment, award, decree or order against any Debtor or Reorganized Debtor, or any of its property, other than as permitted pursuant to (i) above; (iii) creating, perfecting or enforcing any lien or encumbrance against any Debtor or Reorganized Debtor, or any of its property; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any Debtor or Reorganized Debtor; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

### b.    No Actions on Account of Released Claims

Except as provided in the Plan, including in Section IV.O.1., or the Confirmation Order, as of the Effective Date, all Entities that have held, currently hold or may hold any claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action or liabilities that are released pursuant to the Plan shall be permanently enjoined from taking any of the following actions against any released Entity, or any of its property, on account of such released claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action or liabilities:  (i) commencing or continuing in any manner any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any Encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any released Entity; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

### c.    Recipients of Distribution Deemed to Consent

By accepting Distributions pursuant to the Plan, each holder of an Allowed Claim receiving Distributions pursuant to the Plan shall be deemed to have specifically consented to the injunctions set forth in Section IX.B.

### 2.    Asbestos Permanent Channeling Injunction

### a.    Asbestos Permanent Channeling Injunction

**Pursuant to section 524(g) of the Bankruptcy Code, and except as otherwise provided in the Plan, including Section IV.O.1., the Plan and the Confirmation Order shall permanently and forever stay, restrain and enjoin any Entity from taking any actions against any Protected Party for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any Asbestos Personal Injury Claim, all of which shall be channeled to the Asbestos Personal Injury Trust for resolution as set forth in the Asbestos Personal Injury Trust Agreement and the related Asbestos Personal Injury Trust Distribution Procedures, including permanently and forever staying, restraining and enjoining any Entity from any of the following:**

**1.    commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including a judicial, arbitral, administrative or other proceeding) in any forum against any Protected Party or any property or interests in property of any Protected Party;**

2.       enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree or other order against any Protected Party or any property or interests in property of any Protected Party;

3.       creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Protected Party or any property or interests in property of any Protected Party;

4.       setting off, seeking reimbursement of, contribution from or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; and

5.       proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the Asbestos Personal Injury Trust Documents, except in compliance therewith.

For the avoidance of doubt, the Asbestos Permanent Channeling Injunction shall not affect any claims or causes of action under Sections IV.L.1. and IV.L.2. hereof.

**3.       Environmental Injunction**

In consideration of the undertakings of the Settled Environmental Insurers, and other consideration, and pursuant to their respective settlements with the Debtors and to preserve and promote further the agreements between and among the Debtors and any Settled Environmental Insurers, and pursuant to section 105 of the Bankruptcy Code:

a.       any and all Environmental Claims shall be treated, administered, determined and resolved under the procedures and protocols under the Plan as the sole and exclusive remedy with respect to Environmental Claims; and

b.       all Entities are hereby permanently stayed, enjoined, barred and restrained from doing any of the following against the Settled Environmental Insurers:

(i)       commencing or continuing in any manner any action or other proceeding of any kind with respect to any Environmental Claim against any of the Settled Environmental Insurers or against the property of any of Settled Environmental Insurers;

(ii)      commencing or continuing in any manner any contribution, indemnity or other equitable action or other similar proceeding relating to the environmental settlements made in this bankruptcy case against any of the Settled Environmental Insurers or against the property of any of Settled Environmental Insurers;

(iii)    **enforcing, attaching, collecting or recovering, by any manner or means, from any of the Settled Environmental Insurers, or the property of any of the Settled Environmental Insurers, any judgment, award, decree, payment or order relating to any Environmental Claim against any of the Settled Environmental Insurers; and**

(iv)    **creating, perfecting or enforcing any lien of any kind relating to any Environmental Claim against any of the Settled Environmental Insurers, or the property of the Settled Environmental Insurers.**

**The injunction set forth set forth in this Section IX.B.3 (the "Environmental Injunction") is an integral part of the Plan and is essential to the Plan's consummation and implementation.  The Environmental Injunction shall inure to the benefit of the Settled Environmental Insurers, but shall not apply to any Debtor or Reorganized Debtor.**

**For the avoidance of doubt, the Environmental Injunction shall not apply to Asbestos Personal Injury Claims, or to Asbestos Insurance Policy Claims arising from the payment of, or obligations arising from, Asbestos Personal Injury Claims.**

## C.    Subordination Rights

The classification and manner of satisfying Claims and Interests under the Plan does not take into consideration subordination rights, and nothing in the Plan or Confirmation Order shall affect any subordination rights that a holder of a Claim may have with respect to any Distribution to be made pursuant to the Plan, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code or otherwise.

## ARTICLE X

## RETENTION OF JURISDICTION

## A.    Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Reorganization Cases after the Effective Date as is legally permissible, including jurisdiction to:

1.    Hear and determine any proceeding that involves the validity, applicability, construction, enforceability or modification of the Asbestos Permanent Channeling Injunction or the application of section 524(g) of the Bankruptcy Code to the Asbestos Permanent Channeling Injunction;

2.    Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim (other than Asbestos Personal Injury Claims) or Interest, including the resolution of any request for payment of any Administrative Claim or the resolution of any objections to the allowance, priority or classification of Claims (other than Asbestos Personal Injury Claims) or Interests;

3.      Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

4.      Resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including any Cure Amount Claims;

5.      Ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

6.      Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any application, involving the Debtors that may be pending on the Effective Date or brought thereafter, including issues related to the Insolvent Insurers Proceeds Dispute;

7.      Enter such orders as may be necessary or appropriate to effectuate, implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements and documents entered into or delivered in connection with the Plan or the Confirmation Order;

8.      Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

9.      Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code;

10.     Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the effectuation, implementation, consummation or enforcement of the Plan or the Confirmation Order;

11.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or Distributions pursuant to the Plan are enjoined or stayed;

12.     Determine any other matters that may arise in connection with or relate to the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan or the Confirmation Order;

13.     Determine matters concerning state, local and federal Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for Taxes;

14.    Adjudicate any claims or causes of action under Section IV.L.2;

15.    Enforce remedies upon any default under the Plan;

16.    Hear and determine any other matters not inconsistent with the Bankruptcy Code; and

17.    Enter a final decree closing the Reorganization Cases.

**B.    Consent to Jurisdiction**

Upon default under the Plan, the Parties consent to the jurisdiction of the Bankruptcy Court, and agree that it shall be the preferred forum for all proceedings relating to any such default.

**C.    Jurisdiction of Litigating Asbestos Personal Injury Claims**

Notwithstanding anything to the contrary in this Article X, the resolution of Asbestos Personal Injury Claims and the forum in which such claims will be litigated shall be governed by and in accordance with the Asbestos Personal Injury Trust Distribution Procedures.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

**A.    DEQ Settlement**

The DEQ Settlement, as defined herein and subject to the terms and conditions thereof, is incorporated in full in the Plan and shall remain in full force and effect following entry of the Confirmation Order, including the mutual general release among DEQ, Lehigh Hanson, certain affiliates of Lehigh Hanson and the Debtors.  For the avoidance of doubt, in the event of any inconsistency between the DEQ Settlement, as defined herein, and any other provision of the Plan, the terms and conditions of the DEQ Settlement shall govern.

**B.    Dissolution of the Creditors' Committee and the Asbestos Personal Injury Committee**

On the Effective Date, the Creditors' Committee and the Asbestos Personal Injury Committee shall dissolve and the respective members of such committees shall be released and discharged from all duties and obligations arising from or related to the Reorganization Cases. The members of and the Professionals retained by the Creditors' Committee or the Asbestos Personal Injury Committee or by the Future Claimants' Representative shall not be entitled to assert any Fee Claim for any services rendered or expenses incurred after the Effective Date, except for services rendered and expenses incurred in connection with (i) any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or Filed and served after the Effective Date pursuant to Section III.A.1.d.ii.A and (ii) participation in an appeal from the Confirmation Order, but only to the extent the appeal raises issues specific

to the treatment of creditors represented by the respective committee or Future Claimants' Representative.

Effective as of the Effective Date, the TAC shall succeed to, and exclusively hold, the attorney-client privilege and any other privilege held by the Asbestos Personal Injury Committee and shall enjoy the work product protections that were applicable or available to the Asbestos Personal Injury Committee before its dissolution. Further, the TAC shall be a party in interest on and after the Effective Date within the meaning of section 1109(b) of the Bankruptcy Code.

## C.   Limitation of Liability

### 1.   Liability for Actions in Connection with the Reorganization Cases

The Debtors, the Reorganized Debtors, the Future Claimants' Representative, the Asbestos Personal Injury Committee, the Creditors' Committee, the DIP Lender, Lehigh Hanson, DEQ, and their respective directors, officers, employees, affiliates, subsidiaries, predecessors, successors, members, attorneys, accountants, investment bankers, financial advisors, appraisers, representatives and agents, acting in such capacity, shall neither have nor incur any liability to any Entity for any act taken or omitted to be taken in connection with, related to or arising out of the Reorganization Cases or the consideration, formulation, preparation, dissemination, Confirmation, effectuation, implementation or consummation of the Plan or Exhibits or any transaction proposed in connection with the Reorganization Cases or any contract, instrument, release or other agreement or document entered into or delivered, or any other act taken or omitted to be taken, in connection therewith; provided, however, that the foregoing provisions of this Section XI.C.1. shall have no effect on:  (a) the liability of any Entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan; or (b) the liability of any Entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

### 2.   Rights of Action in Connection with the Reorganization Cases

Notwithstanding any other provision of this Plan, no holder of a Claim or Interest, no other party in interest and none of their respective directors, officers, employees, affiliates, subsidiaries, predecessors, successors, members, attorneys, accountants, investment bankers, financial advisors, appraisers, representatives or agents shall have any right of action against any of the Debtors, the Reorganized Debtors, the Creditors' Committee, the Future Claimants' Representative, the Asbestos Personal Injury Committee, the DIP Lender, Lehigh Hanson, and DEQ or any of their respective directors, officers, employees, affiliates, subsidiaries, predecessors, successors, members, attorneys, accountants, investment bankers, financial advisors, appraisers, representatives and agents, acting in such capacity, for any act or omission in connection with, relating to or arising out of the Reorganization Cases or the consideration, formulation, preparation, dissemination, Confirmation, effectuation, implementation or consummation of the Plan or any transaction or document created or entered into, or any other act taken or omitted to be taken, in connection therewith, except for:  (a) the liability of any Entity that would otherwise result from the failure to perform or pay any obligation or liability

under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan; or (b) the liability of any Entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

**D.     Modification of the Plan and Exhibits**

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code, the Parties reserve the right to alter, amend or modify the Plan and the Exhibits to the Plan at any time before its substantial consummation.

**E.     Headings**

The headings used in the Plan are inserted for convenience only and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

**F.     Severability**

After the Effective Date, any provision of the Plan, any Exhibit hereto, any instrument, agreement or other document executed in connection with the Plan, or the Confirmation Order, that is determined to be prohibited, unenforceable, or invalid by a court of competent jurisdiction or any other governmental Entity with appropriate jurisdiction may be deemed ineffective as to any jurisdiction in which such provision is prohibited, unenforceable, or invalidated to the extent of such prohibition, unenforceability, or invalidation, without invalidating the effectiveness of the remaining provisions of the Plan, the Plan Exhibits, any instruments, agreements, or other documents executed in connection with the Plan, or the Confirmation Order or affecting the validity or enforceability of such provision and such remaining provisions in any other jurisdiction.

**G.     Successors and Assigns**

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

**H.     Service of Certain Plan Exhibits**

Certain Exhibits are not being Filed or served with copies of the Plan.  The Debtors shall File such Exhibits no later than ten (10) days before the deadline to object to Confirmation. Once Filed, the Debtors shall make available for review the relevant Exhibits on their web site at https://cases.primeclerk.com/kaisergypsum.

**I.     Effective Date Actions Simultaneous**

Unless the Plan or the Confirmation Order provides otherwise, actions required to be taken on the Effective Date shall take place and be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

Actions required to be taken after the Effective Date or as soon as thereafter as is reasonably practicable shall be deemed to have been taken on the Effective Date.

**J.      Asbestos Personal Injury Trust Annual Report**

Notwithstanding the closing of the Reorganization Cases under section 350 of the Bankruptcy Code, the Clerk of the Bankruptcy Court shall accept for filing the Asbestos Personal Injury ~~Trust's~~Trust's annual report without the requirement that any party in interest file a request to reopen the case.

**K.      Service of Documents**

Any pleading, notice or other document required by the Plan or Confirmation Order to be served on or delivered to the Debtors, the Reorganized Debtors, the Creditors' Committee, the Future Claimants' Representative, the Asbestos Personal Injury Committee or the Bankruptcy Administrator must be sent by overnight delivery service, courier service or messenger to:

**1.      The Debtors and the Reorganized Debtors**

C. Richard Rayburn, Jr.
John R. Miller, Jr.
RAYBURN COOPER & DURHAM, P.A.
1200 Carillon
227 West Trade Street
Charlotte, North Carolina 28202

-and-

Gregory M. Gordon
Amanda Rush
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201

-and-

Paul M. Green
JONES DAY
717 Texas, Suite 3300
Houston, Texas  77002

2.      **Future Claimants' Representative**

Edwin Harron
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801

- and-

Felton Parrish
HULL & CHANDLER
1001 Morehead Square Drive, Suite 450
Charlotte, North Carolina 28203

3.      **The Asbestos Personal Injury Committee**

Kevin Maclay
Todd E. Phillips
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle N.W., Suite 1100
Washington, D.C. 20005

- and-

Sally Higgins
HIGGINS & OWENS
524 East Boulevard
Charlotte, North Carolina 28203

4.      **The Creditors' Committee**

Ira L. Herman
BLANK ROME LLP
405 Lexington1271 Avenue of the Americas
New York, New York 1017410020

-and-

Jeffrey Rhodes
BLANK ROME LLP
1825 Eye Street NW
Washington, DC 20006

-and-

Andrew T. Houston
MOON WRIGHT & HOUSTON, PLLC,
121 W. Trade Street, Suite 1950
Charlotte, North Carolina 28202

**5.** **The Bankruptcy Administrator for the Western District of North Carolina**

Alexandria Kenny
402 West Trade Street, Suite #200
Charlotte, North Carolina 28202

**6.** **Lehigh Hanson, Inc.**

Ben Hawfield, Jr.
Hillary B. Crabtree
MOORE &VAN ALLEN
100 North Tryon Street, Suite 4700
Charlotte, North Carolina 28202

Dated:  ~~October 14~~July 20, ~~2019~~2020          Respectfully submitted,

                                                    HANSON PERMANENTE CEMENT
                                                    COMPANY


                                                    /s/ Charles E. McChesney II_____
                                                    Charles E. McChesney II
                                                    Vice President, Secretary and Director
ASBESTOS PERSONAL INJURY                            KAISER GYPSUM COMPANY, INC.
COMMITTEE

/s/ Alan R. Brayton_____
Alan R. Brayton                                     /s/ Charles E. McChesney II_____
                                                    Charles E. McChesney II
                                                    Vice President, Secretary and Director
FUTURE CLAIMANTS'
REPRESENTATIVE
                                                    LEHIGH HANSON, INC.
/s/ Lawrence Fitzpatrick_____
Lawrence Fitzpatrick

                                                    /s/ Carol L. Lowry_____
                                                    Carol L. Lowry
                                                    Vice President and General Counsel

| Summary report: Litera® Change-Pro for Word 10.4.0.0 Document comparison done on 9/25/2020 10:23:21 AM | |
|---|---|
| **Style name:** JD Color | |
| **Intelligent Table Comparison:** Inactive | |
| **Original DMS:** iw://NAI/NAI/1505596661/9 | |
| **Modified DMS:** iw://NAI/NAI/1505596661/15 | |
| **Changes:** | |
| Add | 256 |
| Delete | 232 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 4 |
| Table Delete | 4 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 496 |

**<u>EXHIBIT C</u>**

**CONFIRMATION NOTICE**

NAI-1514152687v6

JA00478

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| KAISER GYPSUM COMPANY, INC., *et al.,*[1] | : | Case No. 16-31602 (JCW) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

**NOTICE OF (I) ENTRY OF ORDER CONFIRMING THE JOINT**
**PLAN OF REORGANIZATION OF KAISER GYPSUM COMPANY, INC.**
**AND HANSON PERMANENTE CEMENT, INC.; (II) EFFECTIVE**
**DATE AND (III) BAR DATE FOR CERTAIN ADMINISTRATIVE**
<u>**CLAIMS, PROFESSIONAL FEE CLAIMS AND REJECTION DAMAGES CLAIMS**</u>

PLEASE TAKE NOTICE OF THE FOLLOWING:

      **1.**      **Confirmation of the Plan.**  On [ _____ ], 2020, the United States Bankruptcy Court for the Western District of North Carolina entered an order (the "<u>Confirmation Order</u>") confirming the Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc., dated July 20, 2020 (as modified by the Confirmation Order, the "<u>Plan</u>") filed by the above-captioned debtors (together, the "<u>Debtors</u>").  The Confirmation Order was subsequently affirmed by the United States District Court for the Western District of North Carolina.  Unless otherwise defined in this Notice, capitalized terms and phrases used herein have the meanings given to them in the Plan and the Confirmation Order.

      **2.**      **Effective Date.**  Pursuant to the Confirmation Order, the Debtors hereby certify and give notice that the Plan became effective in accordance with its terms, and the Effective Date occurred, on [ _____ ], 2020.

      **3.**      **Settlement of Claims.**

      (a)      Pursuant to Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided under the Plan, any and all claims against the Protected Parties that are or would have been property of the Debtors' Estates or could have been brought by the Debtors' Estates, including without limitation Recovery Actions and any claims based upon a legal or equitable theory of liability in the nature of veil piercing, alter ego, successor liability, vicarious liability, fraudulent transfer, malpractice, breach of fiduciary duty, waste, fraud or conspiracy, except for Intercompany Claims, are deemed settled, released and extinguished.  The entry of the Confirmation Order constitutes the Bankruptcy Court's approval,

---

[1]     The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  Kaiser Gypsum Company, Inc. (0188) and Hanson Permanente Cement, Inc. (7313).  The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

as of the Effective Date, of the compromise or settlement of all such claims and the Bankruptcy Court's finding that such compromise or settlement is in the best interest of the Debtors, Reorganized Debtors and their respective Claim and Interest holders and is fair, equitable and reasonable.

(b)     Pursuant to Bankruptcy Rule 9019 and in consideration for the releases and other benefits provided under the Plan, any and all claims against the holders of Asbestos Personal Injury Claims who received payments in respect of their claims from the Debtors, Lehigh Hanson, or any predecessor or affiliate of the Debtors or Lehigh Hanson prior to Petition Date, and their professionals (but only with respect to their representation or work for such holders in connection with such payments), that are or would have been property of any of the Debtors' Estates or could have been brought by any of the Debtors' Estates or any Protected Party, including without limitation Recovery Actions, and any claims based upon a legal or equitable theory of liability, in each case arising out of, based upon or resulting from payments to holders of Asbestos Personal Injury Claims from the Debtors, Lehigh Hanson or any predecessor or affiliate of the Debtors or Lehigh Hanson prior to the Petition Date, are deemed settled, released and extinguished.  The entry of the Confirmation Order constitutes the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims and the Bankruptcy Court's finding that such compromise or settlement is in the best interest of the Debtors, the Reorganized Debtors and their respective Claim and Interest holders and is fair, equitable and reasonable.

## 4.     Releases.

(a)     <u>General Releases of Debtors and Reorganized Debtors</u>.  Except as otherwise expressly set forth in the Plan, and except to the extent it would diminish, reduce or eliminate the duties or obligations of any Asbestos Insurer under any Asbestos Personal Injury Insurance Asset, as of the Effective Date, the Debtors and the Reorganized Debtors are released from all claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, know or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, arising out of, based upon or resulting from, directly or indirectly, in whole or in part, any act, omission, transaction or other occurrence taking place on or prior to the Effective Date.  Notwithstanding the foregoing, the releases set forth in this paragraph will not become effective with respect to holders of General Unsecured Claims until the General Unsecured Claims Escrows have been funded as set forth in Section IV.R.3.a. of the Plan.

(b)     <u>Release by the Debtors, Reorganized Debtors and Lehigh Hanson</u>.

(i)     Without limiting any other provision of the Plan, as of the Effective Date, the Debtors and the Reorganized Debtors, on behalf of themselves and their respective affiliates, Estates and successors and assigns, and any and all Entities who may purport to claim by, through, for or because of them, are deemed to forever release, waive and discharge all claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, then existing

or thereafter arising, in law, equity or otherwise, against each of the present and former directors, officers, employees, attorneys, accountants, investment bankers, financial advisors, appraisers, representatives and agents of the Debtors, the DIP Lender and DEQ, in each case acting in such capacity, arising out of, based upon or resulting from, directly or indirectly, in whole or in part, any act, omission, transaction or other occurrence taking place on or prior to the Effective Date with respect to the Reorganization Cases, the Plan or the DEQ Settlement, except for the liability of any Entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

(ii)    Without limiting any other provision of the Plan, as of the Effective Date, the Debtors, the Reorganized Debtors and Lehigh Hanson, on behalf of themselves and their respective affiliates, Estates and successors and assigns, and any and all Entities who may purport to claim by, through, for or because of them, are deemed to forever release, waive and discharge all claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, against holders of Asbestos Personal Injury Claims who received payments in respect of their claims from the Debtors, Lehigh Hanson, or any predecessor or affiliate of the Debtors or Lehigh Hanson prior to Petition Date, and their professionals (but only with respect to their representation of or work for such holders in connection with such payments), including without limitation Recovery Actions, in each case arising out of, based upon or resulting from payments to holders of Asbestos Personal Injury Claims from the Debtors, Lehigh Hanson or any predecessor or affiliate of the Debtors or Lehigh Hanson prior to Petition Date.

(c)    General Releases by Holders of Claims or Interests.  Without limiting any other provision of the Plan or the Bankruptcy Code, as of the Effective Date, in consideration for, among other things, the obligations of the Debtors and the Reorganized Debtors under the Plan, each holder of a Claim or Interest that voted in favor of the Plan or was deemed to have accepted the Plan is deemed to forever release, waive and discharge all claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, against any of the Parties, the Creditors' Committee or any Reorganized Debtor, or any of their respective present or former directors, officers, employees, members, subsidiaries, predecessors, successors, attorneys, accountants, investment bankers, financial advisors, appraisers, representatives and agents, or the DIP Lender, in each case acting in such capacity, arising out of, based upon or resulting from, directly or indirectly, in whole or in part, any act, omission, transaction or other occurrence taking place on or prior to the Effective Date and in any way relating to the Reorganization Cases or the Plan (which release is in addition to the discharge of Claims provided herein and under the Confirmation Order and the Bankruptcy Code).  Notwithstanding the foregoing, no release or discharge of any of the Parties, the Creditors' Committee or any Reorganized Debtor, or any of their respective present or former directors, officers, employees, members, subsidiaries, predecessors, successors, attorneys, accountants, investment bankers, financial advisors, appraisers, representatives and agents, or the

DIP Lender, in each case acting in such capacity, diminishes, reduces or eliminates the duties or obligations of any Asbestos Insurer under any Asbestos Personal Injury Insurance Asset.

        (d)   <u>Injunction Related to Releases</u>.  Except as otherwise expressly provided in the Plan, including in Section IV.O.1., the Confirmation Order permanently enjoins the commencement or prosecution by any Entity, whether directly, derivatively or otherwise, of any claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities released pursuant to the Plan.

### 5.    **Discharge of Claims.**

        (a)   Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan are in exchange for and in complete satisfaction and discharge of all Claims, and including any interest accrued on Claims from the Petition Date.  Except as provided in the Plan or in the Confirmation Order, Confirmation, as of the Effective Date, discharges the Debtors from all Claims or other liabilities that arose on or before the Effective Date and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (iii) the holder of a Claim based on such debt has accepted the Plan.

        (b)   In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order is a judicial determination, as of the Effective Date, of a discharge of all Claims and other debts and liabilities against the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge voids any judgment obtained against a Debtor at any time, to the extent that such judgment relates to a discharged Claim, debt or liability.  Nothing contained in the foregoing discharge, to the full extent provided under section 524(e) of the Bankruptcy Code, affects the liability of any other Entity on, or the property of any other Entity for, any debt of the Debtors that is discharged under the Plan.

        (c)   Notwithstanding any provision of the Plan or the Confirmation Order to the contrary, Confirmation does not discharge (i) the Debtors from any debt of a kind specified in 11 U.S.C. § 1141(d)(6) or (ii) the Debtors' obligations under the settlement agreements with the Settled Environmental Insurers.

### 6.    **Asbestos Permanent Channeling Injunctions.**

        (a)   Pursuant to section 524(g) of the Bankruptcy Code, and except as otherwise provided in the Plan, including Section IV.O.1., the Plan and the Confirmation Order permanently and forever stays, restrains and enjoins any Entity from taking any actions against any Protected Party for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any Asbestos Personal Injury Claim, all of which are channeled to the Asbestos Personal Injury Trust for resolution as set forth in the Asbestos Personal Injury Trust Agreement and the related Asbestos Personal Injury Trust Distribution Procedures, including permanently and forever staying, restraining and enjoining any Entity from any of the following:

(i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including a judicial, arbitral, administrative or other proceeding) in any forum against any Protected Party or any property or interests in property of any Protected Party;

(ii) enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree or other order against any Protected Party or any property or interests in property of any Protected Party;

(iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Protected Party or any property or interests in property of any Protected Party;

(iv) setting off, seeking reimbursement of, contribution from or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; and

(v) proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the Asbestos Personal Injury Trust Documents, except in compliance therewith.

(b) For the avoidance of doubt, the Asbestos Permanent Channeling Injunction shall not affect any claims or causes of action under Sections IV.L.1. and IV.L.2. of the Plan.

## 7. Environmental Injunctions.

(a) In consideration of the undertaking of the Settled Environmental Insurers, and other consideration, and pursuant to their respective settlements with the Debtors and to preserve and promote further the agreements between and among the Debtors and any Settled Environmental Insurers, and pursuant to section 105 of the Bankruptcy Code:

(i) any and all Environmental Claims shall be treated, administered, determined and resolved under the procedures and protocols under the Plan as the sole and exclusive remedy with respect to Environmental Claims; and

(ii) all Entities are hereby permanently stayed, enjoined, barred and restrained from doing any of the following against the Settled Environmental Insurers:

(A) commencing or continuing in any manner any action or other proceeding of any kind with respect to any Environmental Claim against any of the Settled Environmental Insurers or against the property of any of Settled Environmental Insurers;

(B) commencing or continuing in any manner any contribution, indemnity or other equitable action or other similar proceeding

relating to the environmental settlements made in this bankruptcy case against any of the Settled Environmental Insurers or against the property of any of Settled Environmental Insurers;

        (C)    enforcing, attaching, collecting or recovering, by any manner or means, from any of the Settled Environmental Insurers, or the property of any of the Settled Environmental Insurers, any judgment, award, decree, payment or order relating to any Environmental Claim against any of the Settled Environmental Insurers; and

        (D)    creating, perfecting or enforcing any lien of any kind relating to any Environmental Claim against any of the Settled Environmental Insurers, or the property of the Settled Environmental Insurers.

        (b)    The injunction set forth set forth in Section IX.B.3 of the Plan is an integral part of the Plan and is essential to the Plan's consummation and implementation.  The Environmental Injunction shall inure to the benefit of the Settled Environmental Insurers, but shall not apply to any Debtor or Reorganized Debtor.

        (c)    For the avoidance of doubt, the Environmental Injunction shall not apply to Asbestos Personal Injury Claims, or to Asbestos Insurance Policy Claims arising from the payment of, or obligations arising from, Asbestos Personal Injury Claims.

      **8.**    **General Injunctions.**

        (a)    <u>No Actions on Account of Discharged Claims.</u>  In addition to the Asbestos Permanent Channeling Injunctions and the Environmental Injunctions set forth above, except as provided in the Plan, including in Section IV.O.1., or the Confirmation Order, as of the Effective Date, all Entities that have held, currently hold or may hold a Claim or other debt or liability that is discharged pursuant to the terms of the Plan is permanently enjoined from taking any of the following actions on account of any such discharged Claim, debt or liability: (i) commencing or continuing in any manner any action or other proceeding against any Debtor or Reorganized Debtor, or any of its property, other than to enforce any right to a Distribution pursuant to the Plan; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against any Debtor or Reorganized Debtor, or any of its property, other than as permitted pursuant to (i) above; (iii) creating, perfecting or enforcing any lien or encumbrance against any Debtor or Reorganized Debtor, or any of its property; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any Debtor or Reorganized Debtor; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

        (b)    <u>No Actions on Account of Released Claims.</u>  In addition to the Asbestos Permanent Channeling Injunctions and the Environmental Injunctions set forth above, except as provided in the Plan, including in Section IV.O.1., or the Confirmation Order, as of the Effective Date, all Entities that have held, currently hold or may hold any claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action or liabilities that are

released pursuant to the Plan are permanently enjoined from taking any of the following actions against any released Entity, or any of its property, on account of such released claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action or liabilities:  (i) commencing or continuing in any manner any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any Encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any released Entity; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

(c)    Recipients of Distributions Deemed to Consent.  By accepting Distributions pursuant to the Plan, each holder of an Allowed Claim receiving Distributions pursuant to the Plan is deemed to have specifically consented to the injunctions set forth in Section IX.B of the Plan.

**9.    Bar Dates.**

(a)    Bar Dates for Administrative Claims.  Except as otherwise provided in Section III.A.1.d.ii. of the Plan and section 9(b) below, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors, at the addresses set forth in Section XI.K of the Plan, no later than sixty (60) days after the Effective Date (i.e., [_____], 2020).  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date shall be forever barred from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or their respective property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests must be Filed and served on the requesting party no later than 120 days after the Effective Date (i.e., [_____], 2020).

(b)    Bar Dates for Professional Compensation.  With certain limited exceptions, Professionals or other Entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Fee Order or other order of the Bankruptcy Court a Final Fee Application no later than ninety (90) days after the Effective Date (i.e., [_____], 2020).  A Professional may include any outstanding, non-Filed monthly or interim request for payment of a Fee Claim pursuant to the Fee Order in its Final Fee Application. Objections to any Final Fee Application must be Filed and served on the Reorganized Debtors and the requesting party by the later of (i) eighty (80) days after the Effective Date or (ii) thirty (30) days after the Filing of the applicable Final Fee Application.  To the extent necessary, the Confirmation Order shall amend and supersede any previously entered order of the Bankruptcy Court, including the Fee Order, regarding the payment of Fee Claims.  Any pending, Filed interim requests for a Fee Claim pursuant to the Fee Order shall be resolved in the ordinary course in accordance with the Fee Order or, if sooner, in connection with the particular Professional's Final Fee Application.

(c)    Ordinary Course Liabilities.  Holders of Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business, including any

Intercompany Claims that are Administrative Claims, Administrative Claims of governmental units for Taxes and Administrative Claims arising from those contracts and leases of the kind described in Section V.E. of the Plan, are not required to File or serve any request for payment of such Administrative Claims.  Such Administrative Claims shall be satisfied pursuant to Section III.A.1.c. of the Plan.

(d)      Rejection Damage Claims.  Notwithstanding anything in the Bankruptcy Court's Order Establishing Bar Dates for Filing Proofs of Claim Other Than Asbestos Personal Injury Claims and Approving Related Relief [D.I. 553] to the contrary, if the rejection of an Executory Contract or Unexpired Lease pursuant to Section V.C of the Plan gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors, their respective successors or their properties unless a proof of Claim is Filed and served on the Reorganized Debtors at the addresses set forth in Section XI.K of the Plan, on the latter to occur of (i) sixty (60) days after the Effective Date or (ii) thirty (30) days after the effective date of rejection of such Executory Contract or Unexpired Lease.

**10.      Bankruptcy Court Address**.  For purposes of Filing requests for payment of Administrative Claims, applications for allowance of Fee Claims or other documents, the address of the Bankruptcy Court is 401 West Trade Street, Room 111, Charlotte, North Carolina 28202.

**11.      Claims Agent Address.**  For purposes of Filing proofs of Claim arising from the rejection of Executory Contracts or Unexpired Leases, Prime Clerk LLC's address is 55 East 52nd Street, 31st Floor, New York, New York 10055.

**12.      Copies of Confirmation Order**.  Copies of the Confirmation Order may be obtained free of charge at www.primeclerk.com/kaisergypsum or by sending a request, in writing, to Prime Clerk, LLC, 55 East 52nd Street, 31st Floor, New York, New York 10055 (Attn:  Kaiser Gypsum Company, Inc.).

Dated: _____, 2020            BY ORDER OF THE COURT

C. Richard Rayburn, Jr. (NC 6357)
John R. Miller, Jr. (NC 28689)
RAYBURN COOPER & DURHAM, P.A.
1200 Carillon
227 West Trade Street
Charlotte, North Carolina  28202
Telephone:  (704) 334-0891
Facsimile:  (704) 377-1897
E-mail:   rrayburn@rcdlaw.net
          jmiller@rcdlaw.net

-and-

Gregory M. Gordon (TX 08435300)
Amanda Rush (TX 24079422)
JONES DAY
2727 N. Harwood Street
Dallas, Texas  75201
Telephone:  (214) 220-3939
Facsimile:  (214) 969-5100
E-mail:  gmgordon@jonesday.com
          asrush@jonesday.com

-and-

Paul M. Green (TX 24059854)
JONES DAY
717 Texas, Suite 3300
Houston, Texas 77002
Telephone: (832) 239-3939
Facsimile: (832) 239-3600
E-mail: pmgreen@jonesday.com

ATTORNEYS FOR THE REORGANIZED DEBTORS

# EXHIBIT D

**CONFIRMATION NOTICE — PUBLICATION VERSION**

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| KAISER GYPSUM COMPANY, INC., *et al.*,[1] | : | Case No. 16-31602 (JCW) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

**NOTICE OF (I) ENTRY OF ORDER CONFIRMING THE JOINT
PLAN OF REORGANIZATION OF KAISER GYPSUM COMPANY, INC.
AND HANSON PERMANENTE CEMENT, INC.; (II) EFFECTIVE
DATE AND (III) BAR DATE FOR CERTAIN ADMINISTRATIVE
CLAIMS, PROFESSIONAL FEE CLAIMS AND REJECTION DAMAGES CLAIMS**

PLEASE TAKE NOTICE OF THE FOLLOWING:

1.      **Confirmation of the Plan.**  On [_____], 2020, the United States
Bankruptcy Court for the Western District of North Carolina entered an order (the "Confirmation
Order") confirming the Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and
Hanson Permanente Cement, Inc., dated July 20, 2020 (as modified by the Confirmation Order,
the "Plan") filed by the above-captioned debtors (together, the "Debtors").  The Confirmation
Order was subsequently affirmed by the United States District Court for the Western District of
North Carolina.  Unless otherwise defined in this Notice, capitalized terms and phrases used
herein have the meanings given to them in the Plan and the Confirmation Order.

2.      **Effective Date.**  Pursuant to the Confirmation Order, the Debtors hereby
certify and give notice that the Plan became effective in accordance with its terms, and the
Effective Date occurred, on [_____], 2020.

3.      **Releases.**  The confirmed Plan provides for various debtor and non-debtor
releases that became effective as of the Effective Date.  Except as otherwise expressly set forth
in the Plan, the Debtors and the Reorganized Debtors are released from all claims, commitments,
obligations, suits, judgments, damages, demands, debts, causes of action and liabilities, whether
liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured,
known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or
otherwise, arising out of, based upon or resulting from, directly or indirectly, in whole or in part,
any act, omission, transaction or other occurrence taking place on or prior to the Effective Date.
In addition, the Plan contains broad releases in favor of identified, non-debtor third parties
granted by (a) the holders of Claims or Interests that voted in favor of the Plan or were deemed

---

[1]      The Debtors are the following entities (the last four digits of their respective taxpayer identification
numbers follow in parentheses):  Kaiser Gypsum Company, Inc. (0188) and Hanson Permanente Cement,
Inc. (7313).  The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

to accept the Plan and (b) the Debtors and the Reorganized Debtors, on behalf of themselves and their affiliates, Estates and their respective successors, assigns and any and all Entities who may purport to claim by, through, for or because of them.

**4.      Discharge of Claims.**

a.      Pursuant to the Confirmation Order, with certain limited exceptions, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan are in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date. With certain limited exceptions, Confirmation of the Plan will, as of the Effective Date, discharge the Debtors from all Claims, other liabilities or debts that arose on or before the Effective Date.

b.      In accordance with the foregoing, with certain limited exceptions, the Confirmation Order, as of the Effective Date, discharges all Claims, debts and other liabilities against the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against a Debtor at any time, to the extent that such judgment relates to a discharged Claim, debt or liability.

**5.      Injunctions Issued Pursuant to the Confirmation Order.**

a.      <u>Asbestos Permanent Channeling Injunctions</u>.  Pursuant to the Confirmation Order, an injunction was issued, applicable to all persons and entities, that permanently channels to a trust established pursuant to section 524(g) of the Bankruptcy Code for resolution of all claims, remedies, liabilities or demands against the Debtors or certain other protected parties for death or personal injuries caused directly or indirectly by the presence of, or exposure to, asbestos, including any claims or demands for reimbursement, indemnification, subrogation or contribution.

b.      <u>Environmental Injunction</u>.  Pursuant to the Confirmation Order, an injunction was issued (i) requiring that all Environmental Claims be treated, administered, determined and resolved under the procedures and protocols set forth in the Plan and (ii) enjoining all persons or entities from taking broad categories of actions against the Settled Environmental Insurers or their respective property.

c.      <u>Other Injunctions</u>.  Pursuant to the Confirmation Order, in addition to the injunctions described above, an injunction was issued enjoining all persons and entities from taking broad categories of actions in the pursuit of (i) any Claim against or Interest in the Debtors, the Reorganizing  Debtors, or any of their respective property to the extent that such Claim or Interest was discharged, released, waived, settled or deemed satisfied in accordance with the Plan (other than to enforce any right to a Distribution under the Plan) and (ii) any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities against third parties that were released pursuant to the Plan.

**6.**      For the specific terms and conditions of these injunctions and releases and the precise scope of the claims and demands to be channeled, please refer to the specific terms of the Plan, which can be obtained free of charge at www.primeclerk.com/kaisergypsum or by

sending a request, in writing, to Prime Clerk, LLC, 55 East 52nd Street, 31st Floor, New York, New York 10055 (Attn:  Kaiser Gypsum Company, Inc.).

### 7.     Bar Dates.

a.     <u>Bar Dates for Administrative Claims</u>.  Except as otherwise provided in Section III.A.1.d.ii. of the Plan and section 7.b below, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors at the addresses set forth in Section XI.K of the Plan, no later than sixty (60) days after the Effective Date (<u>i.e.</u>, [         ], 2020).  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date shall be forever barred from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or their respective property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests must be Filed and served on the requesting party no later than 120 days after the Effective Date (<u>i.e.</u>, [         ], 2020).

b.     <u>Bar Dates for Professional Compensation</u>.  With certain limited exceptions, Professionals or other Entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and certain other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Fee Order or other order of the Bankruptcy Court a Final Fee Application no later than (ninety) 90 days after the Effective Date (<u>i.e.</u>, [         ], 2020).  A Professional may include any outstanding, non-Filed monthly or interim request for payment of a Fee Claim pursuant to the Fee Order in its Final Fee Application.  Objections to any Final Fee Application must be Filed and served on the Reorganized Debtors and the requesting party by the later of (i) eighty (80) days after the Effective Date or (ii) thirty (30) days after the Filing of the applicable Final Fee Application.  To the extent necessary, the Confirmation Order shall amend and supersede any previously entered order of the Bankruptcy Court, including the Fee Order, regarding the payment of Fee Claims.  Any pending, Filed interim requests for a Fee Claim pursuant to the Fee Order shall be resolved in the ordinary course in accordance with the Fee Order or, if sooner, in connection with the particular Professional's Final Fee Application.

c.     <u>Ordinary Course Liabilities</u>.  Holders of Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business, including any Intercompany Claims that are Administrative Claims, Administrative Claims of governmental units for Taxes and Administrative Claims arising from those contracts and leases of the kind described in Section V.E. of the Plan, are not required to File or serve any request for payment of such Administrative Claims.  Such Administrative Claims shall be satisfied pursuant to Section III.A.1.c. of the Plan.

d.     <u>Rejection Damage Claims</u>.  Notwithstanding anything in the Bankruptcy Court's Order Establishing Bar Dates for Filing Proofs of Claim Other Than Asbestos Personal Injury Claims and Approving Related Relief [D.I. 553] to the contrary, if the rejection of an Executory Contract or Unexpired Lease pursuant to Section V.C of the Plan gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors, their

respective successors or their properties unless a proof of Claim is Filed and served on the Reorganized Debtors at the addresses set forth in Section XI.K of the Plan, on the latter to occur of (i) sixty (60) days after the Effective Date or (ii) thirty (30) days after the effective date of rejection of such Executory Contract or Unexpired Lease.

8.    **Copies of Confirmation Order**.  Copies of the Confirmation Order may be obtained free of charge at www.primeclerk.com/kaisergypsum or by sending a request, in writing, to Prime Clerk, LLC, 55 East 52nd Street, 31st Floor, New York, New York 10055 (Attn:  Kaiser Gypsum Company, Inc.).

Dated:_____, 2020                    BY ORDER OF THE COURT

C. Richard Rayburn, Jr. (NC 6357)
John R. Miller, Jr. (NC 28689)
RAYBURN COOPER & DURHAM, P.A.
1200 Carillon
227 West Trade Street
Charlotte, North Carolina  28202
Telephone:  (704) 334-0891
Facsimile:  (704) 377-1897
E-mail:   rrayburn@rcdlaw.net
          jmiller@rcdlaw.net

-and-

Gregory M. Gordon (TX 08435300)
Amanda Rush (TX 24079422)
JONES DAY
2727 N. Harwood Street
Dallas, Texas  75201
Telephone:  (214) 220-3939
Facsimile:  (214) 969-5100
E-mail:  gmgordon@jonesday.com
          asrush@jonesday.com

Paul M. Green (TX 24059854)
JONES DAY
717 Texas, Suite 3300
Houston, Texas 77002
Telephone: (832) 239-3939
Facsimile: (832) 239-3600
E-mail: pmgreen@jonesday.com

ATTORNEYS FOR THE REORGANIZED DEBTORS

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**Charlotte Division**
**No. 3:20-cv-00537-GCM**

| | |
|---|---|
| In re:<br><br>KAISER GYPSUM COMPANY, INC. et al.,[1]<br><br>Debtor. | **OBJECTION OF TRUCK INSURANCE EXCHANGE TO THE BANKRUPTCY COURT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING CONFIRMATION OF THE JOINT PLAN OF REORGANIZATION OF KAISER GYPSUM COMPANY, INC. AND HANSON PERMANENTE CEMENT, INC., AS MODIFIED** |

**Truck's Objections to Proposed Findings of Fact and Conclusions of Law**

Truck Insurance Exchange ("***Truck***") objects to the Bankruptcy Court's Proposed Findings of Fact and Conclusions of Law (the "***Proposed Findings and Conclusions***") Regarding Confirmation of the Third Amended Joint Plan of Reorganization (the "***Plan***") of Kaiser Gypsum Company, Inc. ("***Kaiser Gypsum***") and Hanson Permanente, Inc. ("***Hanson Permanente***", collectively with Kaiser Gypsum, "***Kaiser***" or "***Debtors***"), Dkt. 1-1, and to the proposed form of the confirmation order attached as Annex A (the "***Proposed Confirmation Order***").

The Bankruptcy Court has recommended approval of a Plan that would allow, if not actively enable, the continuation of a widespread scheme of fraud among asbestos claimants and their counsel uncovered in this district in 2014. Truck's specific objections to the Proposed Findings and Conclusions are as follows and as explained in the accompanying brief. For all of the reasons stated, this Court should decline to (1) adopt the Proposed Findings and Conclusions, (2) issue the requested section 524(g) injunction, and (3) confirm the Plan as proposed; and should condition Plan confirmation on extension of the fraud prevention measures to insured claims so

---

[1]  The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  Kaiser Gypsum Company, Inc. (0188); and Hanson Permanente Cement, Inc. (7313).  The Debtors' address is 300 E. John Carpenter Freeway, Irving, TX 75062.

that Truck can obtain the disclosures and authorizations necessary to obtain full information as to the claimants' asbestos exposures.

### I.G. & II.F  Disputed Findings of Fact and Conclusions of Law—Good Faith and Bankruptcy Code Compliance

1. I.G.3.  The Plan does not comply with the applicable provisions of the Bankruptcy Code including section 1129(a)(3).  The Plan has not been proposed in good faith because it is the product of a collusive deal between the debtors and the asbestos plaintiffs' bar pursuant to which the plaintiffs' bar is provided a mechanism to continue its scheme to fraudulently inflate asbestos claims against the Debtors, but Debtors are shielded from the effects of the fraud, with the burden of the fraud falling entirely upon Debtors' insurers.  The Plan is also not a good faith proposal because it fails to achieve a result consistent with the objectives and purposes of the Bankruptcy Code.

### I.H. & II.G. Disputed Findings of Fact and Conclusions of Law—Section 524(g)

2. I.H.1.a. The Plan fails to satisfy the requirements of section 524(g)(2)(B)(i)(I) that the Trust assume the Debtors' asbestos liabilities notwithstanding pretextual language purporting to assume.  The Plan nominally provides that the Trust "shall assume liability . . . for all Asbestos Personal Injury Claims," but said assumption is expressly made "[s]ubject to" other "provisions of the Plan." Plan Art. IV.K.3 The Plan elsewhere provides that claimants "who wish to recover on" asbestos claims "must sue the Reorganized Debtor(s) in the relevant tort system." Plan TDP Art. 5.3(a).   The Plan further provides that the complaint may name the Reorganized Debtors as defendants and that any settlement or judgment obtained may be enforced only against Debtors' insurance policies.  Plan Art. IV.O.1  The Plan further provides that if insurance coverage is lost due to a finding that the Reorganized Debtors have breached their policy duties to assist and cooperate, holders of asbestos claims for which coverage has been denied may seek payment from the Reorganized Debtors.  *Id.* Art. IV.L.b.2

3. I.H.1.b.  The Plan purports to comply with the requirement of section 524(g)(2)(B)(i)(II) that it be funded by the securities of one or more debtors and the obligation to make future payments by including a contribution of a nominal $1 million note, payable by Reorganized Debtors within five years (the "Note").  No future payments are specified.  Plan Art. IV.K.2.b.  Such nominal funding is pretextual and therefore not in compliance with the statutory requirement.

4. I.H.1.c. The Plan fails to satisfy the requirement of section 524(g)(2)(B)(i)(III) that the Trust own or would own if "specified contingencies occur," a majority of the voting shares of each Debtor.  The "specified contingency" pursuant to which the Trust could obtain ownership of the Reorganized Debtors is a payment default on the Note.  Plan Art. I.A.92, 98.  However, Debtors' financial disclosures project millions of dollars in future annual cash flows to Debtor HPCI, and the value HPCI's physical assets at more than $179 million, rendering it inconceivable that

Reorganized Debtors would default on a $1 million note and risk the loss of control over HPCI. Thus, the "specified contingency" is a sham and is pretextual.

5. I.H.2.c The Plan fails to satisfy the requirements of section 524(g)(2)(B)(ii)(III) because there is no basis for a finding that the Plan is likely to prevent inequitable treatment for future claimants (compared to present claimants). Insurance coverage shields the Debtors from any serious threat that asbestos liability will exhaust their financial resources. The Plan finding that the risk of such exhaustion poses a threat to future claimants is baseless and contradicted by the record.

## I.K. & II.B. Disputed Findings of Fact and Conclusions of Law—Insurance Neutrality and Truck's Standing

1. The Proposed Findings and Conclusions grant Truck "limited standing" to contest whether the Plan is insurance neutral and whether the Insurance Finding should issue, but based on an erroneous finding that the Plan is insurance neutral, holds that Truck lacks standing to otherwise challenge the Plan. The Plan is not insurance neutral because the term Insurer Coverage Defenses that are purportedly preserved under the Plan's insurance neutrality provision, Plan Art. IV.Q, is defined to exclude "any defense that the drafting, proposing, confirmation or consummation of a plan of reorganization . . . operates to, or otherwise results in, the elimination of or the reduction in any obligation such insurers may have under such transferred rights as to the Asbestos Personal Injury Insurance Assets." Plan Art. 1.A.82.

2. The Plan is also not insurance neutral because it purports to litigate and resolve in Debtors' favor disputed insurance coverage issues through the Insurance Finding.

3. Even if the Plan were insurance neutral, Truck would have standing under section 1109(b) of the Bankruptcy Code (a) as a creditor, (b) because its legal rights will be diminished by the Plan and (c) because it will suffer financial harm if the Plan is confirmed due to the resumption of the scheme to inflate the insured asbestos liabilities by suppressing asbestos exposure evidence. Truck is also injured by the Plan and therefore has constitutional standing.

## II.C. Disputed Conclusion of Law—The Plan Insurance Finding

1. The Plan erroneously includes an Insurance Finding that the Debtors' have not violated their duties under the policies in the negotiation and acceptance of the Plan. Truck has introduced evidence of the Debtors' misconduct which, in combination with the terms of the Plan, establishes that the Debtors have violated their policy obligations. That evidence is sufficient to support a declaration in Truck's favor on the Debtors' policy duty violations. The Debtors, by contrast, have introduced no evidence in support of their proposed Insurance Finding. Therefore, while the Court can (and should) conclude based on Truck's evidence that the Debtors have violated their policy duties, the Court cannot conclude, as the proposed Insurance Finding does, that the Debtors have complied with their duties. The Proposed Insurance Finding requires the Court to improperly disregard Truck's record

3

JA00495

evidence and deprives Truck of its constitutional right to a jury trial on any disputed question of fact on this important issue.

2. The Proposed Findings and Conclusions endorses the Insurance Finding based on a series of improper legal and factual conclusions. These include misinterpretations of the policy language, of the record evidence, and relevant case law.

3. The Insurance Finding impermissibly expands the Debtors' contractual rights under the Policies. The Insurance Finding has the effect of requiring the Debtors' contractual counterparty to continue to perform under the policies while relieving the Debtors of their obligations under the policies.

Finally, Truck also objects, for the reasons stated in the brief, to the Debtors' request to waive the 14-day stay under Bankruptcy Rule 3020(e).

Respectfully submitted,

Dated: November 4, 2020

/s/ Michael L. Martinez

Michael A. Rosenthal (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Phone: (212) 351-4000; Fax: (212) 351-4035
Email: MRosenthal@gibsondunn.com

GRIER WRIGHT MARTINEZ, PA
Michael L. Martinez (N.C. St. Bar No. 39885)
101 North Tryon Street, Suite 1240
Charlotte, NC 28246
Phone: (704) 332-0209; Fax: (704) 332-0215
Email: mmartinez@grierlaw.com

Robert B. Krakow (admitted *pro hac vice*)
Allyson N. Ho (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
Email: RKrakow@gibsondunn.com
Email: AHo@gibsondunn.com

– and –

PIA ANDERSON MOSS HOYT, LLC
Scott R. Hoyt (admitted *pro hac vice*)
136 E. South Temple, 19th Floor
Salt Lake City, UT 84111
Phone: (817) 454-5678; Fax: (801) 350-9010
Email: SHoyt@pamhlaw.com

Matthew G. Bouslog (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612-4412
Email: MBouslog@gibsondunn.com

David W. Casazza (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave, N.W.
Washington, D.C. 20036
Email: DCasazza@gibsondunn.com

– and –

*Counsel for Truck Insurance Exchange*

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division
No. 3:20-cv-00537-GCM**

|  |  |
|---|---|
| In re:<br><br>KAISER GYPSUM COMPANY, INC. et al.,[1]<br><br>Debtor. | **BRIEF IN SUPPORT OF OBJECTION OF TRUCK INSURANCE EXCHANGE TO THE BANKRUPTCY COURT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING CONFIRMATION OF THE JOINT PLAN OF REORGANIZATION OF KAISER GYPSUM COMPANY, INC. AND HANSON PERMANENTE CEMENT, INC., AS MODIFIED** |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................... iv

PRELIMINARY STATEMENT ............................................... 1

BACKGROUND AND STATEMENT OF FACTS ................................. 4

    I.     Introduction.......................................................... 4

    II.    The Scheme To Suppress Exposure Evidence And Inflate Asbestos Claim Values Is Uncovered in *Garlock*.......................................... 6

    III.   The Evidence Suppression Scheme Was Made Possible By The Asbestos Plaintiffs' Bar's Control Over Asbestos Trust Distribution Procedures And Is Specifically Designed To Avoid Detection In The Tort System ..................... 12

    IV.   Fraud Prevention Measures Are Now Routinely Required In Asbestos Trust Distribution Procedures To Prevent Evidence Suppression ........................ 14

    V.    Kaiser Has Been Victimized By The Same Evidence Suppression Scheme Uncovered In *Garlock*............................................. 17

    VI.   Truck Agrees to Fund a Prepackaged Bankruptcy Process ................. 18

---

[1] The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Kaiser Gypsum Company, Inc. (0188); and Hanson Permanente Cement, Inc. (7313). The Debtors' address is 300 E. John Carpenter Freeway, Irving, TX 75062.

Case 3:20-cv-00537-GCM   Document 26   Filed 11/04/20   Page 1 of 78   TA00497

VII.    Kaiser Abandons The Prepackaged Process, Files For Bankruptcy And Threatens To Exclude Truck From The Plan Negotiations Unless Truck Unconditionally Agrees To Pay For The Bankruptcy ......................................... 19

VIII.    Kaiser Negotiates A Collusive Deal With The ACC And FCR ........................ 21

IX.    Truck's Repeated Attempts to Gain Access To Exposure Evidence Necessary To Defend Kaiser Asbestos Claims Are Rebuffed At Every Turn ............................................................................................................... 23

ARGUMENT ............................................................................................................... 28

I.    The Plan Does Not Satisfy The Good Faith Requirement of 11 U.S.C. § 1129(a)(3) ................................................................................................ 29

    A.    The Plan embodies a collusive agreement to facilitate fraud ................. 30

    B.    The Plan contravenes section 524(g)'s objective and purpose of fairly resolving asbestos claims outside the tort system ......................... 39

II.    The Plan Does Not Comply With The Requirements of Section 524(g)............. 41

    A.    Under the Plan, the Trust fails to assume Kaiser's asbestos liabilities in violation of section 524(g)(2)(B)(i)(I) ................................ 42

    B.    The Plan fails to require future payments to the Trust by Kaiser in violation of section 524(g)(2)(B)(i)(II) .................................................... 43

    C.    The contingency under which the Trust would own a majority of the voting shares is a sham that violates section 524(g)(2)(B)(i)(III)...... 45

    D.    There is no basis for a finding that the Plan is likely to prevent inequitable results for future claimants that would otherwise occur in the tort system, as required by section 524(g)(2)(B)(ii)(III)................ 47

III.    The Plan's Insurance Finding Is Incorrect And Improperly Expands The Debtors' Rights Under The Policy ........................................................................ 50

    A.    Truck's evidence shows that Kaiser violated its policy obligations ........ 52

    B.    The Bankruptcy Court's adoption of the Insurance Finding rests on legal errors ............................................................................................. 56

    C.    The Plan impermissibly seeks to expand the Debtors' rights under the Truck Policies at Truck's expense ..................................................... 59

IV.    Truck Has Standing To Challenge The Plan Both As A Party In Interest And Because It Is Injured By The Plan ............................................................... 60

Case 3:20-cv-00537-GCM   Document 26   Filed 11/04/20   Page 2 of 78   JA00498

      A.     Truck has statutory standing as a party in interest under section 1109(b) ........................................................................................ 61

      B.     Truck is injured by the plan and has Constitutional standing ................. 67

V.     If the Court Confirms The Plan, The Court Should Not Waive The 14-Day Stay Under Bankruptcy Rule 3020(e) ................................................... 68

CONCLUSION ............................................................................................... 69

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re ACandS, Inc.*,
311 B.R. 36 (Bankr. D. Del. 2004) ...................................................................39, 45

*In re Adelphia Commc'ns Corp.*,
368 B.R. 140 (Bankr. S.D.N.Y. 2007) ...................................................................68

*Admiral Ins. Co. v Grace Indus. Inc.*,
409 B.R. 275 (E.D.N.Y. 2009) ...............................................................................57

*In re Am. Capital Equip.*,
688 F.3d 145 (3d Cir. 2012) ...............................................................29, 31, 39, 40

*Am. United Mut. Life Ins. Co. v. City of Avon Park, Fla.*,
311 U.S. 138 (1940) ................................................................................................29

*In re Amatex Corp.*,
755 F.2d 1034 (3rd Cir. 1985) ...............................................................................62

*Amchem Prods., Inc. v Windsor*,
521 U.S. 591 (1997) ..................................................................................................4

*In re ANC Rental Corp.*,
280 B.R. 808 (D. Del. 2002) ..................................................................................64

*Andrade v. Jennings*,
54 Cal. App. 4th 307 (Cal. Ct. App. 1997) ............................................................58

*Ass'n of Battery Recyclers, Inc. v. EPA*,
716 F.3d 667 (D.C. Cir. 2013) ...............................................................................64

*Bachman v. Indep. Indem. Co.*,
297 P. 110 (Cal. Dist. Ct. App. 1931) ....................................................................53

*In re Bateman*,
331 F.3d 821 (11th Cir. 2003) ...............................................................................45

*Baumler v. State Farm Mut. Auto. Ins. Co.*,
493 F.2d 130 (9th Cir. 1974) .................................................................................52

*Belz v. Clarendon Am. Ins. Co.*,
69 Cal. Rptr. 3d 864 (Cal. Ct. App. 2007) ............................................................53

iv

*In re Bestwall LLC*,
    606 B.R. 243 (Bankr. W.D.N.C. 2019) ...................................................................40

*Beverage v. AC&S*,
    No. 24X08000439 (Md. Cir. Ct. Balt. City, Aug. 26, 2013) ...................................11

*Boone v. Everett*,
    671 F. App'x 864 (4th Cir. 2016) ...........................................................................51

*In re Bumper Sales, Inc.*,
    907 F.2d 1430 (4th Cir. 1990) ...............................................................................61

*In re Caldor Corp.*,
    303 F.3d 161 (2d Cir. 2002).....................................................................................63

*Campbell v Allstate Ins. Co.*,
    60 Cal. 2d 303 (1963) ..............................................................................................52

*In re Combustion Engineering, Inc.*,
    391 F.3d 190 (3d Cir. 2004) *as amended* (Feb. 23, 2005)...................30, 39, 44, 60, 63, 64, 65

*Comunale v. Traders Gen. Ins. Co.*,
    328 P.2d 198 (Cal. 1958) .........................................................................................53

*In re Congoleum Corp.*,
    362 B.R. 167 (Bankr. D.N.J. 2007) ...........................................................45, 46, 47

*In re Congoleum Corp.*,
    426 F.3d 675 (3d Cir. 2005).............................................................................62, 67

*Congoleum Corp. v. Ace American Insurance*,
    No. MID-L-8908-01 (N.J. Super. Ct. May 18, 2007)..............................................39

*In re Crippin*,
    877 F.2d 594 (7th Cir. 1989) ..................................................................................59

*Edwards v. John Crane-Houdaille, Inc.*,
    No. 24X08000351 (Md. Cir. Ct. Balt. City July 31, 2008) .....................................11

*In re EES Lambert Assocs.*,
    62 B.R. 328 (N.D. Ill. Bankr. 1986) ........................................................................52

*In re Fed.-Mogul Glob. Inc.*,
    411 B.R. 148 (Bankr. D. Del. 2008) ........................................................................48

*In re Federal-Mogul Global Inc.*,
    684 F.3d 355 (3d. Cir. 2012)...............................................................................5, 40

*In re Flintkote Co.,*
    486 B.R. 99 (Bankr. D. Del. 2012) ........................................................64

*In re G-I Holdings, Inc.,*
    292 B.R. 804 (Bankr. D.N.J. 2003) ......................................................62

*In re Garlock Sealing Techs., LLC,*
    504 B.R. 71 (Bankr. W.D.N.C. 2014)....................................1, 4, 6, 7, 9, 10, 17, 23, 27, 32, 36

*Garlock Sealing Techs., LLC v. Shein,*
    No. 3:14–cv–137, 2015 WL 5155362 (W.D.N.C. Sep. 2, 2015)...................1, 12, 32

*In re Glob. Indus. Techs., Inc.,*
    645 F.3d 201 (3d Cir. 2011)...........................................................61, 62, 67

*Granfinanciera, S.A. v. Nordberg,*
    492 U.S. 33 (1989).........................................................................51

*In re Heating Oil Partners,*
    3:08-CV-1976, 2009 WL 5110838 (D. Conn. Dec. 17, 2009) ..................62

*In re Heritage Org., L.L.C.,*
    375 B.R. 230 (Bankr. N.D. Tex. 2007).................................................68

*Kananian v. Lorillard Tobacco Co.,*
    No. 442750 (Ohio Ct. of Common Pleas).............................................10

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014).......................................................................64

*In re Maremont,*
    No. 19-10118-KJC (Bankr. D. Del. 2019) ...........................................16

*Moody v. Amoco Oil Co.,*
    734 F.2d 1200 (7th Cir. 1984) .........................................................60

*Ortiz v Fibreboard Corp.,*
    527 U.S. 815 (1999)........................................................................4

*In re Penn-Dixie Indus., Inc.,*
    9 B.R. 936 (S.D.N.Y. 1981).............................................................63

*In re Pittsburgh Corning Corp.,*
    453 B.R. 570 (Bankr. W.D. Pa. 2011) ................................................60

*In re Plant Insulation Co.,*
    734 F.3d (9th Cir. 2013) .............................................................46, 47

Case 3:20-cv-00537-GCM   Document 26   Filed 11/04/20   Page 6 of 78   JA00502

*In re Plant Insulation Co.*,
469 B.R. 843 (Bankr. N.D. Cal. 2012) ...............................................5, 41

*In re Public Serv. Co. of N.H.*,
88 B.R. 546 (Bankr. D.N.H. 1988) ..........................................................61

*Rajwinder Kaur v. Fire Ins. Exch.*,
No. F055359, 2009 WL 5107838 (Cal. Ct. App. 2009) .........................53

*In re River Bend-Oxford Assocs.*,
114 B.R. 111 (Bankr. D. Md. 1990) .......................................................63

*Safeco Ins. Co. of Am. v Parks*,
170 Cal. App. 4th, 992, 1013 (2009) ......................................................58

*Span, Inc. v. Assoc. Int'l Ins. Co.*,
277 Cal. Rptr. 828 (Cal. Ct. App. 1991) ...........................................53, 59

*In re Specialty Retail Concepts, Inc.*,
108 B.R. 104 (Bankr. W.D.N.C. 1989)...................................................28

*In re SPM Mfg. Corp.*,
984 F.2d 1305 (1st Cir. 1993).................................................................59

*In re Standard Insulations, Inc.*,
138 B.R. 947 (Bankr. W.D. Mo. 1992).....................................................62

*Stoeckler v. Am. Oil Co.*,
No. 23,451 (Tex. Dist. Ct. Angelina Cty, Jan. 28, 2004).........................11

*In re Thorpe Insulation Co.*,
677 F.3d 869 (9th Cir. 2012) .......................................................61, 65, 66

*Town of Chester v. Laroe Estates, Inc.*,
137 S. Ct. 1645 (2017)............................................................................67

*In re Varona*,
388 B.R. 705 (Bankr. E.D. Va. 2008) .....................................................37

*In re W.R. Grace*,
475 B.R. 34 (D. Del. 2012)......................................................................32

*Warfield v. AC&S*,
No. 24X06000460, Con. Case No. 24X09000163
(Md. Cir. Ct. Baltimore Cty. Jan. 11, 2011) ...........................................11

*Wood v Allstate Ins. Co.*,
21 F. 3d 741 (7th Cir. 1994) ....................................................................53

Case 3:20-cv-00537-GCM   Document 26   Filed 11/04/20   Page 7 of 78   JA00503

**Statutes**

11 U.S.C. § 102(3) ................................................................................................61

11 U.S.C. § 524(g) ...............................................................................................1, 4

11 U.S.C. § 524(g)(2)(B)(i)(I) ...............................................................................42

11 U.S.C. § 524(g)(2)(B)(i)(II) ........................................................................44, 47

11 U.S.C. § 524(g)(2)(B)(i)(III) ...............................................................45, 46, 47, 49

11 U.S.C. § 524(g)(2)(B)(ii)(III) ...............................................................47, 48, 49, 50

11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb) ........................................................................5

11 U.S.C. § 1109(b) ...............................................................61, 62, 63, 64, 65, 66

11 U.S.C. § 1129(a)(1) ...........................................................................................46

11 U.S.C. §1129(a)(3) ...............................................................................3, 29, 39, 41

**Rules**

Fed. R. Bankr. P. 3020(e) ...............................................................................68, 69

Fed. R. Bankr. P. 9033(d) .......................................................................................28

**Other Authorities**

14 Couch on Insurance § 199:4 ...............................................................................53

Black's Law Dictionary (9th ed. 2009) .....................................................................31

H.R. Rep. 103-835, 1994 U.S.C.C.A.N. 3340 (1994) .......................................4, 40, 48

Rick Virnig, *The Insured's Duty to Cooperate* 6 J. Tex. Ins. L. 11 (2005)...................53

Case 3:20-cv-00537-GCM   Document 26   Filed 11/04/20   Page 8 of 78   JA00504

## PRELIMINARY STATEMENT

In 2014, the Bankruptcy Court in this District issued a landmark decision finding widespread suppression and manipulation of evidence by plaintiffs' counsel in asbestos cases litigated in the tort system—a scheme to fraudulently increase claim values by denying defendants access to the evidence they need to defend themselves. *In re Garlock Sealing Techs., LLC*, 504 B.R. 71 (Bankr. W.D.N.C. 2014) (Hodges, J.). As this Court has also recognized, the asbestos plaintiffs' bar has engaged in a wide-ranging, systematic, and well-concealed scheme against a variety of defendants designed to suppress evidence and fraudulently inflate settlement values of mesothelioma claims. *Garlock Sealing Techs., LLC v. Shein*, No. 3:14–cv–137, 2015 WL 5155362 at *3 (W.D.N.C. Sep. 2, 2015) (Mullen, J.) (citing Judge Hodges's decision).

The spotlight shined on this fraudulent scheme in *Garlock* has led to profound changes in how asbestos claims are resolved in bankruptcy proceedings. Beginning with *Garlock*, it has become the standard practice in asbestos bankruptcies nationwide to mandate straightforward fraud prevention measures that are specifically designed to thwart the scheme exposed in *Garlock* while ensuring that claimants are adequately and appropriately compensated. This makes perfect sense: no federal court should ever lend its imprimatur to fraud in the judicial system. Any court that is presented with an opportunity to interrupt such a fraudulent scheme is duty-bound to act on it.

But in the case now before this Court, the Bankruptcy Court has recommended approval of a plan that contains a glide path to a resumption of the scheme to defraud that Judge Hodges uncovered in *Garlock*. Remarkably, these two jointly administered cases—filed in the very Bankruptcy Court where the scheme was uncovered in *Garlock*—appear to be the ***only*** exception anywhere in the country to the now-standard practice of requiring fraud prevention procedures in plans confirmed under the asbestos bankruptcy statute, 11 U.S.C. § 524(g). Notwithstanding the

1

fact that the Debtors themselves believe they have been victimized by this scheme, they agreed to a deal with the asbestos plaintiffs' lawyers on a plan of reorganization that (a) was plainly designed to allow the scheme to continue as to the Debtors' insurers and (b) gave the plaintiffs' lawyers veto rights over including the fraud prevention measures necessary to disrupt the scheme. For all of the reasons explained in greater detail below, this Court should decline the Plan Proponents' request that the Court lend its imprimatur to a plan whose purpose is, and effect would be, to facilitate fraud in the tort system.

The debtors in this case, Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc. (together, "*Kaiser*" or the "*Debtors*") freely and brazenly admit to being unconcerned about whether their insured liabilities are fraudulently inflated. According to the Debtors, all that matters is whether their bottom line is protected. But in fact the Debtors have duties that go beyond their perceived self-interest, including statutory duties to present a plan in good faith, and that complies with express requirements for the issuance of the protective injunction they seek. And, as part of its assessment of whether a plan is proposed in good faith, the Bankruptcy Court itself has an independent duty to ensure that the plan is consistent with the objectives and purposes of the Bankruptcy Code and that the bankruptcy process is not being used as the instrument to perpetuate a fraudulent resolution of claims against a debtor, whether those claims are insured or not.

The Bankruptcy Court's recommendation to confirm the proposed plan (the "*Plan*")— despite the lack of fraud prevention measures for insured claims—is premised on its mistaken acceptance of the plaintiffs' bar's argument, raised through its representative, the Official Committee of Asbestos Personal Injury Claimants (the "*Asbestos Claimants' Committee*" or "*ACC*") that because the Plan mandates that the bankruptcy claims of asbestos personal injury claimants must be resolved in the tort system, the Bankruptcy Court has no business imposing

disclosure requirements, such as the fraud prevention measures, on the bankruptcy claimants. Moreover, the ACC argued, and the Bankruptcy Court erroneously agreed, that the tort system was fully equipped to deal with any attempted fraud even though the findings of Judge Hodges in *Garlock* and the unrebutted testimony here by Truck's expert, Professor Lester Brickman, show that the evidence suppression scheme *both was specifically designed to be and in practice has been impervious to discovery in the tort system.* Indeed, when asked what would be wrong with including the disclosures and authorizations required by fraud prevention measures, Lawrence Fitzpatrick, the Future Claims Representative (the "***FCR***," together with the ACC and the Debtors, the "***Plan Proponents***"), testified that such requirements would impose an unfair burden on bankruptcy claimants *because it would require them to disclose evidence that Truck could not obtain in the tort system.* Yet the Bankruptcy Court accepted this argument even though the Plan mandates the *very same disclosures* for claimants with *uninsured* claims.

While it is perhaps understandable that four full years after the filing of these cases, the Bankruptcy Court would welcome a plan agreed to by Kaiser and the claimants, the recommended Findings and Conclusions are fatally flawed. A plan that turns a blind eye to the fraudulent resolution of Kaiser's asbestos liabilities cannot possibly satisfy the Bankruptcy Code requirement of good faith under 11 U.S.C. §1129(a)(3). Nor can section 524(g) injunctive relief be granted when the plan so obviously violates the express requirements of section 524(g). In addition, the Bankruptcy Court's proposed declaratory finding that Kaiser has not violated its duties under the Truck insurance policies is wholly improper both procedurally and substantively.

Lastly, the Bankruptcy Court erroneously found that Truck lacked standing to raise its objections. Truck is a party in interest: it is the party that—as it continues to defend claims filed against the Debtors—would be victimized by the resumption of the fraudulent scheme, and it is

the only party with an incentive to raise these important concerns about statutory compliance and fraudulent claims.

Accordingly, this Court should deny the motion to approve the Plan, including the requested section 524(g) injunctive relief, and should condition confirmation on the inclusion of fraud prevention requirements for of *all* of the Debtors' asbestos claimants who seek to collect upon their claims, regardless of whether their claims are insured or uninsured.

## BACKGROUND AND STATEMENT OF FACTS

### I.    Introduction

Beginning in the late 1970s, the tort system was overwhelmed by a massive volume of asbestos litigation.  By 1990, Chief Justice Rehnquist had appointed the Ad Hoc Committee on Asbestos Litigation to address what the Court later referred to as the "asbestos-litigation crisis." *Amchem Prods., Inc. v Windsor*, 521 U.S. 591, 597 (1997).  Various efforts to resolve this crisis— whether through legislation or comprehensive class action settlements—were unavailing.  *Id.*; *Ortiz v Fibreboard Corp*., 527 U.S. 815 (1999).

In the early years of asbestos litigation, Johns Manville Corporation, which had the largest share of the asbestos product market as a manufacturer of asbestos insulation, was the "primary defendant in virtually every asbestos tort complaint and generally drove the defense of the litigation."  *In re Garlock Sealing Techs. LLC*, 504 B.R. at 83.  Ultimately, Johns Manville filed for bankruptcy and exited the tort system by establishing a trust to pay its asbestos liabilities.  *Id.* In the 1990s, several other large asbestos insulation manufacturers filed for bankruptcy relief and the early 2000s saw what has been referred to as a "bankruptcy wave," which took virtually all of the remaining thermal insulation manufacturers out of the tort system.  *Id.* (quotation marks omitted).

The bankruptcy wave followed the 1994 enactment of 11 U.S.C. § 524(g), which

essentially codified the *Manville* structure. *See* H.R. Rep. 103-835 at 41 (1994) (the purpose of section 524(g) is "to strengthen the Manville and UNR trust/injunction mechanisms and to offer similar certitude to other asbestos trust/injunction mechanisms"). By most accounts, section 524(g) has been a great success. As the Third Circuit has explained:

> [A] just and efficient resolution of asbestos claims has often eluded the traditional tort system. . . . The trusts appear to have fulfilled Congress's expectation that they would serve the interests of both current and future asbestos claimants and corporations saddled with asbestos liability. In particular, observers have noted the trusts' effectiveness in remedying some of the intractable pathologies of asbestos litigation, especially given the continued lack of a viable alternative providing a just and comprehensive resolution.

*In re Federal-Mogul Global Inc.*, 684 F.3d 355, 358–62 (3d. Cir. 2012); *see also In re Plant Insulation Co.*, 469 B.R. 843, 879 (Bankr. N.D. Cal.), *aff'd*, 485 B.R. 203 (N.D. Cal. 2012), *rev'd on other grounds*, 734 F.3d 900 (9th Cir. 2013), *aff'd*, 544 F. App'x 669 (9th Cir. 2013) (noting that one of the "statutory objectives" of a section 524(g) trust is efficient resolution of asbestos claims "without the expense of trial").

Notwithstanding the general success of section 524(g) in addressing the litigation crisis, it is now also clear that the leverage it gave to the asbestos plaintiffs' bar to tailor the Trust Distribution Procedures (the "***TDPs***") of the asbestos trusts made possible the scheme to fraudulently inflate the value of tort system claims.[2] The *Garlock* estimation proceeding exposed that scheme once and for all. Since Judge Hodges's ruling in *Garlock*, it has become standard practice in asbestos bankruptcies to include fraud prevention measures that require disclosures and authorizations to ensure that exposure evidence is not suppressed and claims are not fraudulently inflated. The Plan proposed in these cases contains such measures for uninsured claims, but the

---

[2]  A requirement for a section 524(g) injunction is that the plan of reorganization must be supported by at least 75 percent of the asbestos claimants that vote on the plan. 11 U.S.C. §  524(g)(2)(B)(ii)(IV)(bb).

Plan Proponents have refused to extend the protections to the Debtors' insured liabilities.

## II. The Scheme To Suppress Exposure Evidence And Inflate Asbestos Claim Values Is Uncovered in *Garlock*

The findings in the *Garlock* estimation proceeding revealed an elaborate scheme by asbestos plaintiffs' lawyers to fraudulently inflate the value of their clients' tort system claims. Although the ruling concerned the proper estimation of Garlock's asbestos liabilities, the alarming findings by Judge Hodges have broad applicability and have had a profound impact on asbestos bankruptcies over the past several years.

The specific issue presented in *Garlock* was whether the debtor's history of resolving asbestos claims in the tort system was an accurate measure of its liabilities for pending and future asbestos claims. The representatives of the current and future asbestos claimants presented expert testimony valuing Garlock's liabilities in the range of $1.0-$1.3 billion, based upon Garlock's tort system history. Garlock argued that the tort system values were inflated by widespread fraud and thus did not reflect the actual value of the unresolved claims. The Court found that the practice of withholding asbestos exposure evidence in the tort system cases "was widespread and significant enough to infect fatally the settlement process and historic data." *Garlock*, 504 B.R. at 94. Judge Hodges instead agreed with the testimony of Garlock's expert economist, Dr. Charles Bates, that the correct value of the pending asbestos liabilities was $25 million and the value of future liabilities was $100 million. Dr. Bates used a "legal liability" approach to determine Garlock's liability if full disclosures were made of the claimants' exposures and Garlock was assessed its proportionate share of the liability. *Id.* at 94–97.

As Judge Hodges observed, "[o]ne of Garlock's primary defenses was to deflect responsibility to other co-defendants." *Id.* at 83. Accordingly, evidence of a plaintiff's exposure to the asbestos products of other companies was "essential to [Garlock's] defense and its

negotiating position." *Id.* Of particular importance was Garlock's ability to show that an asbestos plaintiff had been exposed to products containing highly toxic types of asbestos, such as insulation. The scientific evidence presented showed that chrysotile asbestos, the type found in Garlock's products, was far less toxic than amphibole asbestos, which is found in asbestos insulation products. *Id.* at 75.

When the bankruptcy wave removed most of the primary targets of asbestos plaintiffs from the tort system, asbestos plaintiffs' lawyers turned their attention to companies such as Garlock, which had been "a relatively small player in the asbestos tort system." *Id.* at 82. As Dr. Bates testified at the Kaiser confirmation hearing, plaintiffs stopped affirmatively asserting their exposures to many of the high-risk asbestos products and activities associated with defendants that had filed for bankruptcy and instead focused on previously peripheral defendants that sold products containing low doses of asbestos such as gaskets (Garlock), automotive friction products (Motors Liquidation), and residential construction products (Kaiser, Bondex, and Bestwall). As a result, the litigation pressure on formerly peripheral defendants increased. Bates Declaration, Ex. 67 ¶¶ 9-10.[3]

Judge Hodges further found that "most significant to Garlock . . . was the fact that often the evidence of exposure" to asbestos products from other potential defendants, including most notably "insulation companies' products also 'disappeared.'" *Garlock*, 504 B.R. at 84. This disappearance "was the result of the effort by some plaintiffs and their lawyers to withhold evidence of exposure to other asbestos products and to delay filing claims against bankrupt defendants' asbestos trusts until after recovering from Garlock (and other viable defendants)." *Id.*

---

[3]   Unless otherwise noted, all references to Exhibits ("Ex.") are to the exhibits admitted into evidence by the Bankruptcy Court at the Kaiser confirmation hearing, a complete and accurate set of which will be made available to the Court in a subsequent filing.

As laid bare by the *Garlock* proceeding, a key feature of the scheme was plaintiffs' tactical decision to delay filing trust claims until *after* tort system cases had been concluded. Plaintiffs' lawyers admitted they did so in their *Garlock* testimony. As one lawyer testified, "if in my judgment it would benefit the litigation case to delay the filing of a [trust] claim, and it was lawful to delay filing the claim, we would do that." Bates Decl., Ex. 67 at 18. The dispute here over the Kaiser Plan concerns the very same evidence suppression scheme that lies at the heart of the *Garlock* estimation ruling.

As detailed in the unrebutted expert testimony in the instant case by Professor Lester Brickman, who also provided expert testimony in *Garlock* and has extensively studied, written and testified about the history of asbestos litigation, the origins of the evidence suppression scheme tie to the explosion of the number of asbestos bankruptcy trusts following the bankruptcy wave. Between 2004 and 2016, the number of active asbestos bankruptcy trusts increased from 14 to 58. Brickman Declaration, Ex. 66 ¶ 12.[4] The creation of these trusts resulted in a dual compensation system for the satisfaction of asbestos liabilities whereby asbestos claimants could sue solvent defendants in the tort system and also assert claims against the trusts created in the bankruptcy cases.[5]

The many billions of dollars available from the trusts to pay asbestos liabilities created a quandary for certain asbestos plaintiffs' lawyers. Trust recoveries were far too lucrative to pass up. But the disclosure of trust submissions—which typically require demonstration of

---

[4]    During that period, the trusts paid out $24 billion to claimants, and as of 2016, still had assets available for distribution of $27 billion. *Id.*

[5]    Mesothelioma claimants typically qualify for payments from multiple trusts as well as tort system defendants. Dr. Bates sampled pending and resolved Garlock claims and determined that the typical Garlock plaintiff had tort system claims against 14 defendants plus claims against 22 trusts. *Id.* 13.

"meaningful and credible exposure" to the asbestos products of the company funding the trust—would substantially reduce the value of tort system claims against the remaining solvent defendants. This was particularly true for defendants like Kaiser and Garlock, whose products were far less toxic than those of the companies that had already established trusts. Brickman Decl., Ex. 67 ¶¶ 14, 16.

The solution for many plaintiffs' lawyers was to (1) have their clients falsely deny, under oath, their exposures to the asbestos products of reorganized companies; (2) use their control over the content of TDPs to enact measures to deny tort system defendants access to evidence of other undisclosed exposures in trust filings; and (3) delay the filing of claims with the bankruptcy trusts until all tort actions had been concluded, so that even if discovery could be obtained from the trusts, no filings by the plaintiff would exist. *Id.*

Judge Hodges permitted Garlock to have full discovery of 15 settled cases, including taking the depositions of the plaintiffs' lawyers in those cases, in order to assess the prevalence of fraudulent claims. Judge Hodges noted that one of the leading plaintiffs' law firms "published a 23-page set of directions for instructing their clients on how to testify in discovery." *Garlock*, 504 B.R. at 84. He further found that it was "a regular practice by many plaintiffs' firms to delay filing Trust claims for their clients so that remaining tort system defendants would not have that information" and that one plaintiffs' lawyer even testified to this practice "as seemingly some perverted ethical duty." *Id.* The court observed that with respect to the 15 settled cases for which full discovery was permitted, "Garlock demonstrated that exposure evidence was withheld in *each and every one* of them." *Id.* (emphasis in original). In the 15 settled cases, on average two exposures against asbestos trusts were disclosed, but, after Garlock settled in the tort system, the plaintiffs filed an average of 19 claims against asbestos trusts. *Id.* While recognizing that the 15

JA00513

cases were not a random or representative sample, the court found that the fact that evidence was withheld in every one of them was "surprising and persuasive." *Id.* at 85.

Garlock identified 205 additional cases where the plaintiffs' tort system discovery responses conflicted with the records of the trusts or balloting in the bankruptcy cases that created those trusts, and Garlock presented evidence based on more limited discovery that nearly half of its high-dollar settlements were in cases where there was misrepresentation of exposure evidence. *Id.* at 85–86. According to the court, "[i]t appears certain that more extensive discovery would show more extensive abuse. But that is not necessary because the startling pattern of misrepresentation that has been shown is sufficiently persuasive." *Id.* at 86. Judge Garlock added that the evidence presented by Garlock "demonstrated that the last ten years of its participation in the tort system was infected by the manipulation of exposure evidence by plaintiffs and their lawyers." *Id.* at 82.

As far back as 2007, suppression of exposure evidence had been found in individual cases. The first to gain notoriety was *Kananian v. Lorillard Tobacco Co.*, No. 442750 (Ohio Ct. of Common Pleas), in which the plaintiff and his lawyers had filed a half dozen trust claims with assertions of asbestos exposure, then sued Lorillard Tobacco asserting exposure to tobacco as the cause of his asbestos disease. Counsel falsely denied filing the trust claims, then falsely stated that the claim forms were unsigned, then falsely stated he was unaware of actions taken by an associated law firm with respect to the claim filings, and he filed a false privilege log to conceal the initial deception. The court described the conduct as "lies upon lies" and revoked counsel's *pro hac vice* approval to appear in that court. Brickman Decl., Ex. 66 ¶ 24. The law firm that engaged in this misconduct, Brayton Purcell, is a leading asbestos plaintiffs' firm, represents a number of asbestos claimants against Kaiser, and sits on the ACC in these cases. Order Appointing

Official Committee of Asbestos Personal Injury Claimants, Ex. 55 at 2; Bates Decl., Ex. 67 at 29-30.

Professor Brickman detailed a series of other pre-*Garlock* cases involving tort system plaintiffs who failed to disclose trust claims. *See e.g.*, *Warfield v. AC&S*, No. 24X06000460, Consolidated Case No. 24X09000163 (Md. Cir. Ct. Baltimore Cty. Jan. 11, 2011); *Edwards v. John Crane-Houdaille, Inc.*, No. 24X08000351 (Md. Cir. Ct. Balt. City July 31, 2008); *Beverage v. AC&S,* No. 24X08000439 (Md. Cir. Ct. Balt. City, Aug. 26, 2013); *Stoeckler v. Am. Oil Co.*,No. 23,451 (Tex. Dist. Ct. Angelina Cty, Jan. 28, 2004). The judge in *Dunford v. Honeywell Corp.* described the deception as "the most egregious case of discovery abuse that I have seen [in 22 years on the bench]." Tr. of Motions Hearing at 105, No. CL-25113 (Va. Cir. Ct. Loudoun Cty. Dec. 10, 2003). The judge in *Montgomery v. American Steel & Wire Corp.*, who served as the Delaware Superior Court judge responsible for all Delaware state court asbestos litigation, called the failure to report 20 trust claim filings an example of "dishonesty and disreputableness," stating "[t]he core of this case has been fraudulent," adding "it happens a lot [in asbestos litigation]." Pretrial Hearing Tr. at 7, 23, 25, No. 09C-11-217 ASB (Del. Super. Ct. Nov. 7, 2011). Brickman Decl., Ex. 66-1[6] ¶¶ 23-29.

But it was *Garlock,* due to the breadth of the discovery of closed cases, the scientific and social science evidence presented, and the testimony of plaintiffs' lawyers themselves, that revealed the systemic nature of the scheme. After the bankruptcy proceeding, Garlock brought RICO civil lawsuits against the plaintiffs' firms that had perpetrated the fraud. This Court, denying a motion to dismiss in one of the cases, held:

[T]he Court will simply note that Garlock successfully alleges that Defendants

---

[6]  Exhibit numbers separated by a hyphen (e.g. "Ex. 66-1") denote an attachment or sub-exhibit within an exhibit.

engaged in a wide-ranging, systematic, and well-concealed fraud designed to suppress evidence and inflate settlement values for mesothelioma claims. Indeed, the bankruptcy court found as much when it reviewed a number of these cases. . . . The Court also notes that Defendants' conduct as alleged in the Complaint goes well past the kind of routine litigation activities that . . . courts have found inadequate to state a claim under RICO. Defendants are accused of committing rampant fraud over the course of several years in various state court proceedings.

*Garlock Sealing Techs., LLC v. Shein*, 2015 WL 5155362 at *2.

## III.    The Evidence Suppression Scheme Was Made Possible By The Asbestos Plaintiffs' Bar's Control Over Asbestos Trust Distribution Procedures And Is Specifically Designed To Avoid Detection In The Tort System

The unrebutted testimony of Professor Brickman at the Kaiser confirmation hearing explains that the evidence suppression scheme described in *Garlock* has been facilitated by the control exercised by the asbestos plaintiffs' bar over asbestos trusts.

> The same baker's dozen or so law firms that represent the large majority of asbestos claimants in the tort system also represent the majority of claimants in asbestos-related bankruptcy proceedings. In most cases, these leading asbestos law firms largely control the asbestos bankruptcy process and the operation of the trusts created under § 524(g). In addition to their populating the asbestos claimants committees . . . these plaintiffs' counsel effectively select the trustees to operate the § 524(g) bankruptcy trusts that will be created to actually pay the claims, the administrator of the trust, and also the future claims representative . . . who is to represent the interests of future claimants. Finally, these plaintiffs' counsel also constitute the membership of trust advisory committees ("TACs"), which represent the interests of current asbestos claimants. While trustees have the authority to amend TDPs, that can only be done with the consent of the TAC and FCR. Essentially, it is the TAC that exercises effective control over the TDPs after they have been initially drafted by the ACC and adopted as part of the plan of reorganization.

Brickman Decl., Ex. 66 ¶ 15.

Professor Brickman testified that although an asbestos claimant submitting a trust claim must demonstrate meaningful and credible exposure to the products of the company funding the trust, starting around 2006, asbestos plaintiffs' lawyers began to include in the TDPs confidentiality provisions designed to prevent tort system defendants from gaining access to trust claims information. These provisions state that all information provided to the trust by the claimant

is made in the course of settlement negotiations and is intended to be kept confidential and protected by all applicable privileges. *Id.* ¶¶ 16–17.

The trusts are obligated to defend that confidentiality when presented with discovery requests for the information and may only disclose claims information with the permission of the claimant or in response to a valid subpoena issued by the bankruptcy court, a Delaware state court, or the United States District Court for the District of Delaware (the state of incorporation for most asbestos trusts). Moreover, if served with a subpoena by one of those specified courts, the trusts are obligated to take steps to preserve the privileges and provide the impacted claimant with notice of the subpoena so that the claimant can also weigh in on the request for the information. *Id.* ¶ 18.

The TDPs also typically include a provision stating that the evidence submitted in support of a trust claim is for the "sole benefit" of that trust, and claimants are not required to list exposures other than those for which the trust is responsible. This sole benefit provision serves to minimize the breadth of exposure evidence possessed by any one trust. Thus, a tort system defendant would need to successfully subpoena *all* asbestos trusts in order to obtain complete evidence of a claimant's exposures. *Id.* ¶¶ 19.

On top of all that, most TDPs have extended statutes of limitations and provisions allowing a claimant to (a) file its trust claim, (b) immediately withdraw the claim, and then (c) refile the claim after concluding all tort system cases. The trust uses the initial filing to satisfy the limitations period and deems the claim timely. According to Professor Brickman, "[t]hese deferral provisions further facilitate plaintiffs' and their counsel's denials in the course of pretrial discovery that they had filed trust claims, despite their having done so." *Id.* ¶ 20. Professor Brickman further testified, "[i]t can hardly be a coincidence that the 'sole benefit' and 'deferral' provisions were mostly added to TDPs during the years 2006–10, soon after the new trusts began to emerge, and that during this

JA00517

time period, the current version of the 'confidentiality' provisions became standard." *Id.* ¶ 21.

It is important to note that this fraudulent scheme has succeeded not because courts condone fraud or are otherwise acting improperly. The scheme is specifically designed to avoid detection in the tort system. According to Professor Brickman's unrebutted testimony, a "tort system defendant seeking to learn whether the plaintiff had filed claims with any of the 60+ asbestos trusts would need to go to each of the bankruptcy courts from which those trusts were created, or courts in Delaware, and convince those courts, over the objections of the trusts and the plaintiff, that the trust secrecy provisions previously authorized by those same courts should not be applied to deny the [defendant] access to information the trust may have with respect to that plaintiff." *Id.* ¶ 40. And even if a defendant could somehow successfully subpoena all asbestos trusts, the defendant would still be stymied in those cases where the filing of trust claims was deliberately delayed. As testified to by Professor Brickman, "in any given lawsuit, even successful efforts to subpoena trust records will not reveal any trust claims that have not yet been filed. A plaintiff and his lawyer, during the duration of the trials in the tort system, can rest assured that evidence contradicting denial of exposures will be far beyond the reach of the defendants." *Id.* ¶ 41.

## IV. Fraud Prevention Measures Are Now Routinely Required In Asbestos Trust Distribution Procedures To Prevent Evidence Suppression

Fortunately, there is a way to combat the scheme, at least where the asbestos defendant has filed a bankruptcy case. That solution arose in the *Garlock* bankruptcy, and it is straightforward—the Bankruptcy Court must build into the claims resolution procedures disclosure requirements that ensure that the surfacing of information about all trust claims held by the claimants, whether or not yet asserted. These fraud prevention measures are now routinely required for the resolution of asbestos claims in bankruptcy cases, having been included in a series of post-Garlock cases.

As is true for virtually all section 524(g) trusts, the Garlock claims resolution procedures offer claimants the option between submitting claims for expedited review or extraordinary review. Garlock Claims Resolution Procedures § 6.1. **Expedited review claims**, as the name implies, are reviewed more rapidly than extraordinary review claims, require less information and documentation, and—to the extent the claimant qualifies for a settlement offer based upon the information submitted—the trust calculates that offer using a predetermined matrix incorporating various relevant factors. As acknowledged by the FCR (speaking with respect to the Kaiser Trust's similar claims procedures for uninsured claims), the settlement offer valuations for expedited claims typically assume that the claimant had a number of other asbestos exposures, thus eliminating the need for substantial disclosure of other exposures. D.E. 2420,[7] July 20, 2020 Tr. 176:6-18.

But asbestos claimants who opt for **extraordinary review** seek larger recoveries based upon the assertion that the trust at issue should bear most or all of the liability for claimant's injuries. Extraordinary review claimants are required to provide substantial additional information about their exposure histories, including identifying all other asbestos claims that have been asserted by the claimant. Garlock Claims Resolution Procedures § 6.8(a). To address the problem of claimants suppressing or manipulating evidence to inflate their claim values, the parties agreed to include in the *Garlock* claims resolution procedures a package of fraud prevention measures specifically designed to combat the scheme exposed in the estimation proceeding. Those measures include:

> 1. Claimant must provide **specific information concerning all other claims** that relate in any way to the alleged injuries for which the claimant seeks compensation and a certification that no other entity other than those disclosed is known to the

---

[7]   Citations to "D.E." herein refer to docket entries in the Kaiser bankruptcy cases, Case No. 16-31602 (Bankr. W.D.N.C.).

claimant to be potentially responsible for claimant's injuries.

2. Claimant must execute **a release of information** form authorizing the trust to obtain all submissions made by the claimant to any other asbestos trust.

3. Claimant's attorney (or the claimant if unrepresented) must **certify under penalty of perjury** that a full investigation has been conducted as to the alleged injuries that form the basis of the claim and that no good faith basis exists to bring a claim against any entity not identified by the claimant.

*See id.* § 6.8(a)-(d). The Garlock fraud prevention measures also give the trust the right to audit submissions after the fact, and if the audit reveals that the claimant asserted fraudulent information, the trustee can exercise a variety of remedies including seeking prosecution of the claimant or the claimant's attorney, sanctions from the Bankruptcy Court and sanctions from the appropriate State Bar. *Id.* §§ 11.1-11.3. These procedures effectively undercut all three of the primary components of the evidence suppression scheme found by Judge Hodges—(1) dishonest exposure testimony, (2) trust secrecy provisions that stymie discovery, and (3) tactical delayed filing of trust claims.

The fraud prevention measures added to the Garlock claims procedures have become standard in recent asbestos bankruptcies. *In re Maremont*, No. 19-10118-KJC (Bankr. D. Del. 2019), an essentially fully consensual plan was presented to the bankruptcy court and objected to only by the U.S. Bankruptcy Trustee, who noted that there were no procedures to protect against the fraudulent scheme revealed in *Garlock*.[8] The bankruptcy court refused to confirm the plan, stating "I don't know any reason why, under the circumstances if, in fact [fraud has] happened [] at least in some cases . . . that we shouldn't try to guard against it here." *Id.* March 18, 2019 Tr. at 6-7. The parties then added the Garlock fraud prevention measures and the plan was confirmed. Recently, in the *In re Sepco Corp.* asbestos bankruptcy in Ohio, following a *Garlock*-based

---

[8] Because a section 524(g) asbestos plan of reorganization must be a consensual plan supported by the debtor, the asbestos claimants and the FCR, it is usually left to others—a U.S. Bankruptcy Trustee, an impacted insurer, or a court on its own motion—to raise the fraud concerns.

objection by the U.S. Bankruptcy Trustee to an otherwise fully consensual plan, the plan proponents did not even wait for a court ruling—they simply added the Garlock fraud prevention measures to resolve the Trustee's objection.[9] D.E. 2420, July 20, 2020 Tr. 172:12-173:23.

## V. Kaiser Has Been Victimized By The Same Evidence Suppression Scheme Uncovered In *Garlock*

Data reviewed by Dr. Bates and Professor Brickman confirms that Kaiser has been victimized by the very same evidence suppression scheme described in *Garlock*. Moreover, Kaiser itself acknowledges its belief that it has been victimized. To begin with, the testimony by the plaintiffs' lawyers in *Garlock* was not limited to their practices against any one specific defendant. According to one plaintiffs' lawyer, "we file trust claims after the completion of the tort litigation" and "[m]y duty to these clients is to maximize their recovery, okay, and the best way for me to maximize their recovery is to proceed against solvent viable non-bankrupt defendants first, and then, if appropriate, to proceed against bankrupt companies." Bates Decl., Ex. 67 ¶ 18. Nor were Judge Hodges's findings limited to Garlock: "[i]t was a regular practice by many plaintiffs' firms to delay filing Trust claims for their clients so that the remaining tort system defendants would not have that information." *Garlock,* 504 B.R. at 84; Bates Decl., Ex. 67 ¶ 18.

Dr. Bates, whose testimony here was unrebutted, testified at length as to the substantial overlap between claims specifically and tort system history generally of Garlock and Kaiser. He noted that both companies (a) manufactured products containing low doses of chrysotile asbestos; (b) were peripheral defendants prior to the bankruptcy wave of the early 2000s; and (c) experienced rapid rises in the number of claims faced, costs of defense and payments to mesothelioma claimants

---

[9]   The FCR in *Sepco* was Lawrence Fitzpatrick, who is also the FCR here. He is represented by the same lawyers here who represented him in *Sepco*, and the asbestos plaintiffs' bar, through the ACC, is likewise represented by the same counsel here as in *Sepco*.

JA00521

after the bankruptcy wave. *Id.* ¶¶ 19-21.[10] Dr. Bates determined that 80% of the Kaiser mesothelioma claims filed prior to Garlock's petition date appeared in the Garlock analytical database, a remarkable overlap in claimants given that the products manufactured by each (gaskets by Garlock, used in high-temperature industrial settings, and joint compound by Kaiser, used on construction projects) were so dissimilar. *Id.* ¶ 22. Dr. Bates further determined that 63% of the trust claims filed by the 205 claimants who asserted claims against both Kaiser and Garlock (and for whom tort system discovery and trust filings or other bankruptcy information was available) were not disclosed in tort system discovery. *Id.* ¶¶ 24-26. Finally, and perhaps most significantly, Dr. Bates determined that 53% of the Kaiser bankruptcy claimants with unresolved mesothelioma claims are represented by law firms identified in *Garlock* as having handled cases where exposure evidence was withheld. That 53% does not include claimants being represented by Brayton Purcell, the law firm barred from participation in *Kananian*. *Id.* ¶ 30.[11] Moreover, Kaiser does not deny that it has been victimized by the fraudulent scheme, *see infra* § VIII.

## VI.    Truck Agrees to Fund a Prepackaged Bankruptcy Process

In late January 2014, shortly after the *Garlock* estimation ruling, Kaiser Gypsum's insurance counsel, Phil Cook, reached out to Scott Hoyt, Truck's insurance counsel, to inquire as to Truck's willingness to discuss a possible prepackaged bankruptcy for Kaiser Gypsum. Hoyt Declaration, Ex. 65 ¶¶ 3-4. Truck provides the primary insurance coverage for Kaiser Gypsum's

---

[10]   From 1993–99, Kaiser was named as a defendant in an average of 48 mesothelioma cases per year, but after the bankruptcy wave, mesothelioma filings against Kaiser soared to an average of 434 per year from 2000–09, and 604 per year from 2010–16. Brickman Decl., Ex. 66 ¶ 10.

[11]   Professor Brickman further testified that the members of the ACC in these cases includes (a) law firms that handled several of the 15 cases in *Garlock* for which full discovery was permitted and substantial evidence suppression established, (b) Brayton Purcell, the firm excoriated by the court in the *Kananian* case and (c) many of the firms with the largest recoveries from Kaiser Gypsum. Brickman Decl., Ex. 66 ¶ 58.

JA00522

asbestos liabilities for all asbestos exposures occurring between 1964–83.  Truck is responsible for defending all of the insured asbestos claims asserted against Kaiser Gypsum and for the first $500,000 of liability, with no aggregate limits.[12]

At a subsequent meeting in June 2014, Kaiser informed Truck that it was contemplating negotiations with asbestos plaintiffs' counsel on a prepackaged bankruptcy plan to create a section 524(g) trust plan to resolve Kaiser's asbestos liabilities and to obtain an injunction against future claims that would protect Kaiser, Truck, and other insurers.  Hoyt Decl., Ex. 65 ¶ 6.  Kaiser's representatives further stated that they expected the section 524(g) trust would be funded by Truck and other insurers, and that while they anticipated that the plaintiffs' lawyers would argue for a trust funding based on tort system history, Kaiser believed that Judge Hodges's approach in *Garlock* was the correct way to value its asbestos liabilities. *Id.* ¶ 7.

Following the June 2014 meeting, Truck and Kaiser entered into a Common Interest and Confidentiality Agreement, confirming their common interest in negotiating a resolution of Kaiser's asbestos liabilities.  *Id.* ¶ 9.  And later, they agreed to a Cost Sharing Agreement, pursuant to which Truck agreed to pay the great majority of fees and expenses incurred in attempting to negotiate the prepackaged plan, subject to a $5 million cap on such bankruptcy costs.[13]  *Id.* ¶ 10.  Truck understood that there was no guarantee the process would be successful, but rather that it was paying for a process to attempt to negotiate a prepackaged plan.  *Id.*

**VII.   Kaiser Abandons The Prepackaged Process, Files For Bankruptcy And Threatens To Exclude Truck From The Plan Negotiations Unless Truck Unconditionally Agrees To**

---

[12]   Most of the claims against Kaiser arise from exposures during the policy years and are subject to Truck's policies, which generally provide for a $5,000 deductible.  D.E. 2072-12 at 22; July 20, 2020 Tr. 142:11-15.

[13]   Truck was obligated to pay 90% of the first $1 million of such bankruptcy costs, and up to $4.1 million should the cap be reached.  Hoyt Decl., Ex. 65 ¶ 9.

JA00523

**Pay For The Bankruptcy**

An *ad hoc* Asbestos Creditors Committee of plaintiffs' asbestos lawyers was created, and Kaiser provided substantial information to that committee—but no negotiations took place before the bankruptcy cases were filed on September 30, 2016 (the "**Petition Date**"). *Id.* ¶ 11. Two weeks prior to the Petition Date, Kaiser asked Truck to bear 95% of the bankruptcy costs, with no cap. Neale Affidavit, Ex. 37 ¶ 13. Kaiser provided Truck an estimate of $24.5 million in bankruptcy costs over the first two years of the bankruptcy case. *Id.* ¶ 15. Truck did not agree to the 95% request, but ultimately did agree to an extension of the existing Cost Sharing Agreement, which provided for automatic termination upon a bankruptcy filing. *Id.* ¶ 16-17.[14]

Between late October 2016 and January 2017, counsel for Kaiser and Truck continued discussions about a cost sharing arrangement for the bankruptcy. Truck was willing to help fund the bankruptcy provided the outcome was agreement on a confirmable 524(g) plan that included injunctive protections for Truck. *Id.* ¶ 20. Kaiser rejected this condition, and instead proposed to condition Truck's cost sharing obligation on "afford[ing] Truck a full opportunity to negotiate with the claimant representatives." *Id.* ¶ 22. Moreover, counsel made clear that absent a cost sharing agreement acceptable to Kaiser, Truck would be excluded from the plan negotiations:

> If Truck is nonetheless unwilling to continue cost sharing on these or other terms, then Kaiser would have no choice but to commence negotiations with the claimant representatives on a plan of reorganization that would include (a) a contribution by Kaiser to the asbestos trust, which contribution would resolve Kaiser's limited liability with respect to current and future claims and (b) an assignment to the trust of Kaiser's rights under the Truck policies.

---

[14]  The parties also agreed that deductible amounts owed by Kaiser to Truck could be offset against payments due from Truck under the Cost Sharing Agreement. *Id.* ¶ 17. Through payments and offsets, Truck funded the maximum amount that could be owed under the Cost Sharing Agreement—$4.1 million—covering the prepetition and first month professional fees and expenses incurred by the Debtors. *Id.* ¶ 19.

Case 3:20-cv-00537-GCM   Document 26   Filed 11/04/20   Page 28 of 78   JA00524

*Id.* ¶ 23.

This statement stands in stark contrast to Kaiser's public pledge to pursue "a consensual agreement with representatives for current and future claimants and the primary and excess insurers." McChesney Declaration, Ex. 36 ¶ 47. Now, however, Kaiser made clear that Truck would be excluded from the plan negotiations unless it was willing to make an unconditional promise to bear the costs of the bankruptcy professionals in the cases.

An unconditional agreement to fund its insureds' bankruptcy, estimated to cost on average approximately $1 million per month, and not tethered to an agreement between the Debtors, the claimants and Truck on a section 524(g) plan that included Truck, was not acceptable to Truck. And despite Truck's repeated expressions of interest in participating in the negotiations on a consensual agreement that Kaiser had promised the Bankruptcy Court it was committed to conducting, Neale Aff., Ex. 37 ¶¶ 24, 26, 29, Kaiser followed through on its threat and negotiated a deal with the ACC (representing the asbestos plaintiffs' bar) and the FCR (selected by the asbestos plaintiffs' bar), without Truck's involvement.

## VIII. Kaiser Negotiates A Collusive Deal With The ACC And FCR

On March 6, 2018, the Debtors filed the Plan Term Sheet, outlining the deal Kaiser had struck with the ACC and FCR.[15] Notice of Filing of Plan Term Sheet, Ex. 34. The deal mandates that Kaiser's 14,000 pending insured asbestos liabilities and all insured asbestos claims to be filed in the future must be resolved in the tort system through litigation nominally against the Reorganized Debtors, with Truck being responsible for the actual defense of the lawsuits.

---

[15] Although theoretically, the interests of current and future asbestos claimants could diverge, Lawrence Fitzpatrick was asked to serve as FCR by a leading asbestos plaintiffs' lawyer and the positions of the ACC and FCR throughout these cases have been fully aligned. *See* D.E. 2420, July 20, 2020 Tr. at 161:17-25.

Although uninsured claims are to be resolved by the Kaiser Gypsum Trust (the "***Trust***"), the Debtors are unaware that any of the pending asbestos claims are uninsured. D.E. 2420, July 20, 2020 Tr. 87:23-89:21. Kaiser's parent company, Lehigh Hanson, agreed to provide $49 million to the Trust, and Kaiser agreed to provide a $1 million note to the Trust. In exchange, the deal called for the Debtors and Lehigh Hanson to receive section 524(g) injunctions.

In a key additional component of the Term Sheet deal, Kaiser agreed to move immediately to lift the automatic stay to allow the 14,000 asbestos claimants to resume their cases in the tort system, provided the claimants agreed to look solely to Kaiser's insurers for their recoveries. In response to the motion to lift stay, Truck raised the concern that resolving the asbestos claims in the tort system would facilitate the fraudulent evidence suppression scheme exposed in *Garlock* and would result in inflated claims. D.E. 916 at 18-20. At the initial hearing on the motion, Kaiser's counsel made the following telling admission:

> [D]o the debtors think they . . . were fairly treated in the tort system? No. . . . [A]re the debtors suspicious that maybe they were the subject of misconduct in the tort system? Yes. But . . . we've negotiated an agreement. . . . [A] lot can be said about fraud, a lot, lot of references can be made to *Garlock* . . . , but the point is there's nothing inconsistent in that regard. We didn't think we were treated fairly, either. It is what it is. We've settled and this agreement takes the debtors out of the tort system. And that's the only . . . point that matters from an estate perspective.

D.E. 950, May 10, 2018 Tr. 41:19-42:8.[16] At the confirmation hearing, Kaiser's corporate designee testified that "[t]he debtors agree with all portions of that colloquy other than the statement comparing it to *Garlock*" (which he had not read and thus could not comment on). D.E. 2420, July 20, 2020 Tr. 141:7-21.

---

[16] At the conclusion of the May 10, 2018 hearing, the Bankruptcy Court declined to lift the stay, finding that Truck had a "reasonable prospect" of defeating the motion, but at a subsequent hearing, the Court decided to lift the stay. *Id.* at 144:2; Order Lifting the Automatic Stay, D.E. 1108 (August 9, 2018).

JA00526

Consistent with the Plan Term Sheet, the Plan that is the subject of this confirmation proceeding (a) mandates that all insured asbestos claims must be resolved in the tort system, Plan TDP, D.E. 2481-1 § 5.3(a).; (b) provides that the Trust is only to resolve any uninsured claims, and pay deductibles—typically $5,000, *e.g.*, D.E. 2072-12 at 22—after the insured claims are resolved by Truck in the tort system, Plan, D.E. 2481 Art. IV.N; and (c) provides injunctive relief under section 524(g) to the Debtors and Lehigh Hanson, *id.* Art. I.A.103, IX.B.2.

## IX. Truck's Repeated Attempts to Gain Access To Exposure Evidence Necessary To Defend Kaiser Asbestos Claims Are Rebuffed At Every Turn

As testified to by Kaiser's corporate representative at the confirmation hearing, "I think in defending a claim you would want to present as much exposure evidence to the jury as you could." D.E. 2420, July 20, 2020 Tr. 87:6-7. And because, as found by Judge Hodges, complete asbestos exposure evidence is "essential" to the defense of asbestos cases, *Garlock*, 504 B.R. at 83, ever since the Plan Term Sheet was filed and made public in March 2018, Truck has attempted, in a variety of ways, to incorporate fraud prevention measures to ensure that exposure evidence is not suppressed and Kaiser's asbestos liabilities are resolved at their fair value and are not fraudulently inflated.

Truck's initial focus was to file a plan on behalf of Kaiser. Kaiser had allowed its exclusive period to file a plan to lapse, so Truck filed its own plan. Chapter 11 Plan of Reorganization Proposed By Truck Insurance Exchange (the "***Truck Plan***"), D.E. 887. The Truck Plan incorporated the Garlock claims resolution procedures, including the establishment of a payment matrix, the option to elect expedited or extraordinary review, non-binding arbitration, and a right for claimants to resolve their claims in the tort system if not otherwise resolved through claims review or arbitration. *See* Initial Plan Supplement Documents, D.E. 890 at 46. Like the Garlock claimants, the Kaiser claimants who opted not to pursue expedited review claims were required to

comply with the requirements of the fraud prevention measures.[17]  The ACC and FCR vociferously objected to the Truck Plan, making clear they would never support it, and the Bankruptcy Court ultimately refused to approve the Plan's disclosure statement.

Truck also sought to encourage Kaiser to add fraud prevention measures to its Plan.  In an April 3, 2019 letter (the "***Reservation of Rights Letter***"), Ex. 62, Truck reminded Kaiser of its obligation under the Truck Policies to "assist in . . . securing and giving evidence."  *Id.* at 1.  Truck noted that Kaiser had refused to support the Truck Plan, which included the fraud prevention measures, and had proposed its own plan containing no such protections against fraud.  *Id.* at 2.  Truck reserved its right to deny coverage if the Kaiser Plan was not modified to comply with Kaiser's duty to cooperate and assist.  *Id.*  Rather than heed this warning, Kaiser instead requested a plan finding (the "***Insurance Finding***") from the Bankruptcy Court as a condition to confirmation, seeking to preclude Truck from later asserting a coverage defense based upon Kaiser's refusal to help Truck obtain the exposure evidence.  The Insurance Finding provides in pertinent part:

> The Debtors' conduct in connection with and throughout these Reorganization Cases, including, but not limited to, their negotiations with the ad hoc committee of asbestos personal injury claimants and the pre-petition future claimants' representative, and the commencement of these Reorganization Cases, as well as the drafting, negotiation, proposing, confirmation and consummation of the Plan, and their opposition to any other plan of reorganization, does not and has not violated any Asbestos Insurer Cooperation Obligations contained in any Asbestos Insurance Policies, nor was such a breach of any express or implied covenant of good faith and fair dealing.

---

[17]  The Truck Plan initially called for a fixed contribution from Truck that Truck believed was more than sufficient to resolve all of Debtors' asbestos liabilities in full at their fair values.  Truck later amended the Plan to remove the fixed contribution and instead to provide for satisfaction in full all asbestos liabilities at whatever values were established.  *Compare* Truck Plan, D.E. 887 at 56 (defining the "Truck Contribution") *with* Fifth Amended Chapter 11 Plan of Reorganization Proposed By Truck Insurance Exchange, D.E. 1665 at 18-19 (defining the "Truck Structured Settlement Contribution").

JA00528

Plan, D.E. 2481 Art. VIII.A.3.u. Truck challenged the Insurance Finding on numerous procedural and substantive grounds including (a) the coverage dispute was a non-core matter that was not properly before the Bankruptcy Court; (b) there were no facts to support the Finding—indeed, the Plan Proponents refused to testify at all about their Plan negotiations, cloaking all discussions with assertions of privilege; and (c) the Insurance Finding was based upon erroneous interpretations of California insurance law.[18]

In addition, Truck objected to Kaiser's Plan on the grounds that, among other things, the Plan was not proposed in good faith because it proposed to resolve all or virtually all of Kaiser's asbestos liabilities in the tort system without the fraud prevention measures necessary to prevent the liabilities from being fraudulently inflated. This objection was initially considered in connection with Kaiser's motion for approval of their disclosure statement.[19] At that time, the Bankruptcy Court indicated a genuine concern as to the confirmability of the Plan without inclusion of fraud prevention measures:

> There's an argument also made about anti-fraud provisions and the necessity for those. And this one . . . is of concern to me, given where we are sitting and what's transpired in Garlock, which I had the second half of that case where, where a variety of the trust procedures and mechanisms and standards and disclosure requirements ended up being agreed to by the parties. The argument is that there's a lack of oversight over the operations of the trust and notes that both Maremont refused to confirm a plan that failed to contain these anti-fraud provisions and that Garlock, well, it was cited as having refused, but I think what happened was it was agreed to. Similarly, they, DOJ and Truck, like the Garlock claims mechanisms and the mandatory disclosures by claimants of exposures, releases, authorizing other trusts to disclose information about the claimant, and requiring those who submit claims to provide information about other claims they filed. The trust distribution

---

[18] In an effort to address the procedural infirmities of the request for the Insurance Finding, Truck filed an adversary proceeding more fully addressing the coverage dispute and moved to withdraw the reference of said proceeding to this Court. On its own motion, this Court on October 1, 2019 stayed the adversary proceeding until the Bankruptcy Court ruled on the plan of reorganization.

[19] Truck Objection to Plan Proponents' Disclosure Statement Motion, D.E. 1302. The Bankruptcy Court had invited the parties to present at the disclosure statement hearing objections addressed to whether the proposed Plan was patently unconfirmable.

procedures that are proposed here have no such obligation about informing about other exposures. There's also an argument about audit procedures and requiring the debtors to adopt an audit procedure and implement audits. This appears to be discretionary. Debtor doesn't think these are necessary because most of the claims are going to be paid out of insurance and only a small part will be funded out of the trust. That sounds suspiciously, to me, like a little fraud's okay. So I don't think, as I said, a federal court should approve a mechanism and a process that could lead to fraud, particularly in an area where the trusts have been subject to false claims and some have been rendered insolvent because of present claims taking the money before future claims are paid . . . . This is one that I'm concerned about of whether the plan, ultimately, is confirmable based on this. Again, we are the Garlock court and without mandating what was consented to in that, I want to tell you that I'm concerned about this issue and whether the plan could be confirmed without something more like what Garlock and Maremont implemented. But I'm going to hold that until we get to confirmation.

D.E. 1785, Sept. 4, 2019 Tr. at 64:15-66:13.

At the very next hearing, Kaiser's counsel advised that they had been working with the ACC and the FCR, and had "certainly heard your Honor's concerns with respect to these" concerns, and that they had amended the Trust procedures to add the Garlock and Maremont fraud prevention procedures. D.E. 1826, Sept. 26, 2019 Tr. 32:4-33:9. However, as they advised the Court, the fraud prevention measures would apply *only to uninsured extraordinary claims*. *Id.* Even though Kaiser did not know whether any of the 14,000 pending claims were uninsured, or if any future claims would be uninsured, it requested anti-fraud procedures to ensure its Trust was protected from fraudulent claims. But Kaiser proposed nothing to prevent the fraudulent inflation of its insured asbestos liabilities.

Kaiser's corporate designee, Charles McChesney, was open about Kaiser's priorities. When asked if Kaiser cared if its liabilities were resolved at fraudulently inflated values, Mr. McChesney made clear that Kaiser was concerned about things that might impact Kaiser's bottom line—deductibles and punitive damages, and that the liabilities be resolved in such a way that fall within the scope of the insurance policy. D.E. 2420, July 20, 2020 Tr. 135:12-137:16. Even though the claims defended and paid by Truck are *Kaiser's liabilities,* Kaiser seems not to care

JA00530

whether those liabilities are fraudulently inflated, so long as the payment burden falls on Truck. Tellingly, when asked whether Kaiser was opposed to adding fraud prevention measures for insured claims, Mr. McChesney made clear it was up to the representatives of the plaintiffs' bar to make that call:

> The term sheet deal gives the ACC and the FCR the rights to decide what's in the trust distribution procedures . . . . [T]hat is the benefit of the bargain we negotiated. It's my understanding that the ACC and the FCR oppose the . . . modifications to the trust distribution procedures that you just articulated and we are committed to the term sheet deal.

*Id.* at 150:16-24.

Lawrence Fitzpatrick, the FCR, also testified. Mr. Fitzpatrick agreed that in evaluating or defending an asbestos bodily injury claim the defendant would want complete and accurate information about all of the claimants' asbestos exposures. *Id.* at 158:11-14. He acknowledged that the fraud prevention measures added to the Kaiser Trust's TDPs for extraordinary uninsured claims were "quite similar" to the *Maremont* and *Sepco* fraud prevention measures, *id.* at 171:24-172:22, and served as a "backstop" against a claimant failing to disclose claims that have been asserted against other trusts. *Id.* at 171:15-18. He further acknowledged that the procedures went beyond what could be obtained in tort system discovery, *id.* at 184:4-15; that the practice detailed in *Garlock* of delaying the filing of trust claims until after the tort system litigation concluded is something that sometimes happens, *id.* at 163:13-17; and that the 15 full discovery cases in *Garlock* seemed to be "problematic," *id.* at 162:17-23. The FCR also acknowledged that "we all have [a] duty" to mitigate fraud in the claims process and that "everybody involved in the bankruptcy," not just Truck, should strive to reduce the level of fraud. *Id.* at 187:17-21.

Yet, when asked what the problem would be with requiring the holders of insured asbestos claims against Kaiser to provide the very same disclosures and authorizations required of holders of extraordinary uninsured claims, Mr. Fitzpatrick objected that it would impose a "burden" on the

insured claimants to "do things in discovery that aren't required by state law in that particular state." *Id.* at 187:22-189:11.

After the hearing, the Bankruptcy Court adopted wholesale (with minor edits) the Proposed Findings of Fact and Conclusions of Law drafted by the Plan Proponents.[20] But, mindful that only this Court may determine whether the requested section 524(g) injunction can issue, the Bankruptcy Court exercised its discretion under Rule 9033 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") to submit the Plan and all of the Proposed Findings and Conclusions to this Court for its consideration. *See* Order Recommending Entry of Proposed Findings of Fact and Conclusions of Law and Order Confirming Joint Plan of Reorganization, Dkt. No. 1 (the "***Proposed Findings and Conclusions***").

## ARGUMENT

Bankruptcy Rule 9033 requires that when a bankruptcy court "has issued proposed findings of fact and conclusions of law" but has not itself rendered a final ruling, "[t]he district judge shall make a de novo review upon the record . . . of any portion of the bankruptcy judge's findings of facts or conclusions of law to which specific written objection has been made." Fed. R. Bankr. P. 9033(d); *see In re Specialty Retail Concepts, Inc.*, 108 B.R. 104, 106 (Bankr. W.D.N.C. 1989) (court conducts "a de novo review"). The district court "may accept, reject, or modify the proposed findings of fact or conclusions of law" or "receive further evidence." *Id*.

Both the Plan and the Proposed Findings and Conclusions accepting the Plan fall short of the requirements of the Bankruptcy Code in several independent ways that make confirmation of the Plan impossible. First, the Plan was not proposed in good faith and therefore cannot be

---

[20] *Compare* D.E. 2442 (Proposed Findings of Fact and Conclusions of Law as submitted by Plan Proponents) *with* Dist. Ct. Dkt. No. 1 (Proposed Findings and Conclusions as entered by the Bankruptcy Court).

JA00532

confirmed under section 1129(a)(3). Second, the Plan fails to comply with several of the specific requirements—both substantive and procedural—that section 524(g) imposes on bankruptcy asbestos trusts. Third, the Plan includes an unlawful Insurance Finding purporting to limit Truck's ability to defend itself in future actions arising from its insurance contracts with Kaiser. The Insurance Finding is both impermissible under the Bankruptcy Code and incorrect. And, because Truck is a party in interest under section 1109(b) of the Code, it has standing to challenge *any issue* relating to confirmation of the plan.

## I. The Plan Does Not Satisfy The Good Faith Requirement of 11 U.S.C. § 1129(a)(3)

It is a fundamental requirement of the Bankruptcy Code that no reorganization plan may be confirmed unless the Court concludes the plan is "proposed in good faith." 11 U.S.C. § 1129(a)(3). The good faith requirement imposes a "responsibility" on the Court to "scrutin[ize][] the circumstances surrounding" plan negotiations, including any "ulterior motives" of plan proponents: "Only after such investigation can the court exercise the informed, independent judgment which is an essential prerequisite for confirmation of a plan." *Am. United Mut. Life Ins. Co. v. City of Avon Park, Fla.*, 311 U.S. 138, 145-46 (1940) (cleaned up). Contrary to the Proposed Findings and Conclusions, the Plan cannot be presumed to be in good faith simply because it is the result of a negotiated agreement between Kaiser and legal representatives of their principal creditors, the asbestos claimants.[21] A court should deny confirmation of a plan if it is intended to facilitate improper conduct, including litigation abuse in other proceedings, *see In re Am. Capital Equip.*, 688 F.3d 145, 158 (3d Cir. 2012), or, likewise, if the plan seeks relief unrelated to any

---

[21] *See* Proposed Findings and Conclusions at p. 24-25 (reasoning that the Joint Plan satisfied section 1129(a)(3) because the Debtors "engaged in arms-length negotiations with many parties in interest over the course of these cases" and because Truck lacks standing to object to the results of those negotiations).

JA00533

"result consistent with the objectives and purposes of the Bankruptcy Code," *In re Combustion Engineering, Inc.*, 391 F.3d 190, 247 (3d Cir. 2004) *as amended* (Feb. 23, 2005).

The Plan fails on both counts. ***First***, it represents the fruit of a corrupt bargain. With full knowledge of the scheme by asbestos plaintiffs' lawyers to fraudulently inflate the value of asbestos claims through the suppression of exposure evidence, and a belief that the asbestos claims brought against them had been tainted by this scheme, the Debtors and their parent Lehigh Hanson negotiated a deal with the asbestos plaintiffs' bar that permanently resolves their liability for uninsured claims, and fully insulates both themselves and the Trust established to resolve uninsured claims from any future attempts to defraud. In return, the Debtors have agreed to turn a blind eye to the resumption in the tort system of the fraudulent scheme to inflate their insured asbestos liabilities, which represent all or nearly all of the 14,000 asbestos personal injury claims pending against the Debtors, not to mention the thousands more likely to be brought in the future. And, ***second***, it would achieve these ends through the mechanism of a section 524(g) channeling injunction, notwithstanding the fact that the Plan structure is antithetical to the section 524(g) objective of efficiently resolving asbestos claims outside the tort system and fails to satisfy several explicit requirements for the issuance of such an injunction.

### A.  The Plan embodies a collusive agreement to facilitate fraud

The Plan is not proposed in good faith because it is the product of a collusive agreement among the Plan Proponents to facilitate fraud. The Debtors were aware of Judge Hodges' ruling in *Garlock*, believed that they too had been victimized by wrongdoing in the tort system by the asbestos plaintiffs' bar and agreed that their own tort system history was not reflective of their true liability to asbestos plaintiffs. *See* Neale Aff., Ex. 37 ¶¶ 5, 6; May 10, 2018 Tr. at 41:19-42:8. Yet, the Debtors negotiated the Plan agreement with the ACC, the committee that represents the asbestos plaintiffs' bar and includes several law firms identified in *Garlock* as participants in the

fraudulent scheme. Brickman Decl., Ex. 66 ¶ 58. In exchange for injunctive protections for themselves and their corporate parent, the Debtors agreed to give the very people responsible for the fraudulent scheme full control over how the asbestos claims would be resolved. D.E. 2420, July 20, 2020 Tr. at 150:16-24. Moreover, the Plan includes fraud prevention measures necessary to prevent the scheme from infecting the Debtors' asbestos liabilities, *but only for any uninsured claims*. No such protections are included for insured claims because of the opposition of the plaintiffs' bar to their inclusion. *Id.*

As was openly stated by Kaiser's counsel when Truck first asserted that the Plan would further fraud: "It is what it is. We've settled and this agreement takes the debtors out of the tort system. And that's the only . . . point that matters from an estate perspective." D.E. 950, May 10, 2018 Tr. 42:5-8. But it is well-established that a plan designed to facilitate litigation abuse in other proceedings cannot meet the good-faith standard under section 1129(a)(3). *See In re Am. Capital Equip., LLC*, 688 F.3d at 158 (holding that collusion in plan formation—defined as "[a]n agreement to defraud another or to do or obtain something forbidden by law"—violates section 1129(a)(3)) (quoting Black's Law Dictionary (9th ed. 2009)). In *American Capital*, which preceded *Garlock*, the Third Circuit concluded that the insurers' allegations fell short of collusion. *Id.* Here, in light of the clear evidence showing Kaiser (1) was aware of the findings in *Garlock* of a widespread evidence-suppression scheme in asbestos cases, and (2) believed asbestos claims against them had been impacted by it at the time they negotiated the Plan with the representatives of the perpetrators of the scheme, Truck's allegations of collusion stand on firm ground. Moreover, the Debtors' admission that the sole reason the Plan does not include measures to prevent fraud as to their insured liabilities is that their deal gave the asbestos plaintiffs' bar the right to veto such measures is powerful evidence that the Plan is not proposed "with honesty and

31

JA00535

good intentions" and therefore should not be confirmed. *In re W.R. Grace*, 475 B.R. 34, 88 (D. Del. 2012).

### 1. The scheme to manipulate exposure evidence and obtain fraudulently inflated recoveries in asbestos cases is well-established and extends to claims against Kaiser

*Garlock*—which preceded the Kaiser's chapter 11 filings by over two years—established, through extraordinary discovery of closed asbestos cases, a "widespread and significant" pattern of fraud. *Garlock*, 504 B.R. at 94; *supra* § II. This scheme involves the manipulation and suppression of exposure evidence to enable inflated recoveries from defendants in the tort system on top of claimants' recoveries from the scores of asbestos trusts established in chapter 11 proceedings since the early 1990s. *Id.* This Court has already recognized the seriousness and credibility of the findings in *Garlock*, declining to dismiss RICO claims against law firms implicated in the *Garlock* evidence suppression scheme. This Court noted that the *Garlock* Bankruptcy Court had "already found" evidence of a "wide-ranging, systematic, and well-concealed fraud designed to suppress evidence and inflate settlement values for mesothelioma claims." *Garlock Sealing Techs., LLC v. Shein*, 2015 WL 5155362, at *3.

In this case, Dr. Bates has offered extensive unrebutted testimony establishing that the same discovery abuses have occurred against Kaiser. Bates Decl., Ex. 67 ¶¶ 24-26. Further, Dr. Bates testified that firms found to have engaged in evidence suppression in *Garlock* represent a majority of the holders of unresolved mesothelioma claims against Kaiser. Two such firms occupy seats on the ACC in this case, as does the firm responsible for the misconduct detailed in *Kananian*. *Compare id.* ¶ 29 *with* Ex. 55 at 2, 3.[22] For their part, the Debtors have all but conceded that the

---

[22]   [NTD: do we want to name the other two ACC law firms identified as evidence-suppressors by Dr. Bates? We do not do so elsewhere. The firms are The Law Offices of Peter G. Angelos, P.C.; and Belluck & Fox.]

claims against them have been tainted by the fraudulent scheme. "[D]o the debtors think they . . . were fairly treated in the tort system? No. . . . [A]re the debtors suspicious that maybe they were the subject of misconduct in the tort system? Yes." D.E. 950, May 10, 2018 Tr. 41:19-42:8.

### 2. Including fraud prevention measures *only* for uninsured claims shows the Plan's lack of good faith

The *Garlock* bankruptcy was notable not only for its unmasking of the evidence suppression scheme but also for creating the blueprint to stop it. As part of the settlement that followed this Court's denial of the motions to dismiss the RICO lawsuits filed against the asbestos plaintiffs' lawyers, the *Garlock* claims resolution procedures mandated that any asbestos claimant unwilling to accept a settlement offer valued based upon the presumption that the claimant had multiple asbestos exposures would be required to (a) fully disclose all known asbestos exposures and claims made and (b) provide authorizations that would allow for discovery of any and all trust claims filed by said claimant. Garlock Claims Resolution Procedures §§ 6.8(a)-(d). Armed with complete disclosure information, the Garlock trust is protected from fraudulently inflated claims, whether the claims are made through settlement negotiations, arbitration, or tort system litigation.

Garlock's fraud prevention measures are now the gold standard, and have been adopted in *Maremont*, after Judge Carey insisted upon them, and *Sepco,* where both the ACC and the FCR were represented by the same counsel as in this action, and the FCR was Mr. Fitzpatrick, the FCR here. D.E. 2420, July 20, 2020 Tr. 171:24-173:23. When the Bankruptcy Court expressed some concern in these cases about potential fraudulent claims and the absence of fraud prevention measures, the Plan Proponents swiftly added them to the Plan, but only for uninsured claims. *Id.* 174:19-175:13. They refused to add fraud prevention for insured claims, even when Truck offered to withdraw all of its Plan objections if such measures were extended to the insured claims. *Id.* 45:19-46:8.

Kaiser joined in the refusal to add the fraud prevention measures not because it finds them objectionable but rather simply to "honor" its deal with the plaintiffs' bar. As the Debtors' corporate representative, Mr. McChesney testified: "The term sheet deal gives the ACC and the FCR the right to decide what's in the trust distribution procedures . . . . It's my understanding that the ACC and the FCR oppose the . . . modifications to the trust distribution procedures that you just articulated and we are committed to the term sheet deal." *Id.* at 150:16-24. Stated otherwise, the deal struck by the Debtors that resulted in the Plan gave the very people responsible for the evidence suppression scheme—the asbestos plaintiffs' bar—the right to veto the inclusion of the measures necessary to prevent the fraud going forward. That alone precludes any finding that the Plan has been proposed in good faith.

### 3. The Bankruptcy Court's Proposed Findings and Conclusions Regarding Compliance With Section 1129(a)(3) Are Legally and Factually Erroneous

The Proposed Findings and Conclusions fail entirely to confront Truck's arguments regarding compliance with section 1129(a)(3)—the section requiring that a plan be proposed in good faith. Instead, the Proposed Findings and Conclusions agree with the Plan Proponents' caricature of Truck's position and erroneously accept each and every excuse offered by the ACC and FCR for not including fraud prevention measures.

The Bankruptcy Court rejected a purported argument by Truck that "[t]he argument that resolving asbestos claims in the tort system is unfair or constitutes bad faith . . . ." Proposed Findings and Conclusions at 25. The Court noted a number of section 524(g) bankruptcy reorganizations where asbestos claimants were authorized to resolve their claims in the tort system. *Id.* at n.13. But it is *not* Truck's contention that resolving asbestos claims in the tort system is in and of itself improper. Truck's actual 1129(a)(3) arguments are that (a) as discussed in the following section, mandating that *all* claims be resolved in the tort system is at odds with the

34

purpose of section 524(g); and (b) resolving the claims in the tort system *without including fraud prevention measures* is a greenlighting of the resumption of the evidence suppression scheme, and thus not in good faith. A plan that implements a deal with the perpetrators of a fraudulent scheme and is designed to allow that scheme to continue to the detriment of Debtors' primary insurer is, by definition, not proposed in good faith.

In rejecting the straw man argument that the Plan Proponents posed as Truck's argument, the Bankruptcy Court said that it "does not read Garlock as an indictment of the tort system or a ruling that a party cannot get a fair trial in state and federal courts," that it was "not inclined to indict its colleagues on the state benches," that it did not "believe that a bankruptcy court in North Carolina is necessary to protect state courts from fraud," and that because the findings in *Garlock* "have been widely debated," and "some state legislatures have taken steps to address these issues . . . [s]tate courts and litigants will obviously be alert to what has been proposed in this case and can take their own actions." *Id.* The Bankruptcy Court also opined that Truck's arguments "hinged on speculation as to future events, such as what would happen in state courts, and are unsupported." *Id.* These findings, which adopt entirely the arguments made by the plaintiffs' bar through the ACC and FCR, are widely off the mark.

To begin with, Truck's objections are not rooted in an "indictment" of the tort system or the courts therein. To the contrary, the unrebutted testimony shows that the evidence suppression scheme works not because of malfeasance by the courts, but because the exposure evidence suppressed by dishonest asbestos plaintiffs and lawyers cannot be obtained through normal discovery channels. Judge Hodges detailed the widespread practice of false denials of exposure to asbestos products of companies that had filed for bankruptcy and the practice of delaying the filing of trust claims until after the completion of the tort system litigation, rendering impossible

any efforts by defendants to uncover and disprove false denials of exposure. *Garlock*, 504 B.R. at 82-84. Professor Brickman addressed these issues in detail as well as how the standardized terms of trust distribution procedures make it virtually impossible to obtain discovery from trusts with regard to claims that have been made against them. Brickman Decl., Ex. 66 at 41

Beyond being undisputed, Professor Brickman's testimony was confirmed by Mr. Fitzpatrick's testimony that his objection to the disclosures and authorizations required by the fraud prevention measures is that "you're forcing claimants to do things beyond what would be called for" under state court rules. D.E. 2420, July 20, 2020 Tr. 188:17-19. This indeed is the very reason why fraud prevention measures are necessary—these mandated disclosures are the only way to ensure that full exposure evidence is available and the asbestos bankruptcy claims are not fraudulently inflated.

Moreover, the Bankruptcy Court's suggestion that the state courts are the proper courts to address any fraud concerns, and that "[i]t is not within the province of this Court to mandate to state courts and other federal courts what kind of discovery is required in asbestos cases," Proposed Findings and Conclusions at 26, misses the fact that the insured claims at issue are *bankruptcy claims*. The fact that the Debtors agreed to a deal allowing all insured claims against them to be resolved in the tort system does not alter the fact that these are claims against them in this bankruptcy proceeding. The issue here is not, as the Bankruptcy Court put it, the need "to protect state courts from fraud." *Id*. The issue is ensuring that the 14,000 pending bankruptcy claims, and thousands more likely to be asserted, are not resolved in a fraudulent manner. Nothing should be more fundamental to a bankruptcy reorganization, yet the Bankruptcy Court accepted the Plan Proponents' argument that the fraud was none of its business. *Cf. In re Varona*, 388 B.R. 705, 717 (Bankr. E.D. Va. 2008) ("The filing of a false or fraudulent claim in a bankruptcy case would

unquestionably constitute an abuse of the claims process as well as an attempted fraud upon the court.").

Similarly, the Bankruptcy Court rejected what it described as the "burdensome and unprecedented attempt to impair the rights of asbestos claimants to pursue their rights in the tort system." Proposed Findings and Conclusions at 27. This was an adoption of the FCR's testimony that fraud prevention measures would unfairly burden the claimants in the tort system by "forcing claimants to do things beyond what is called for" under state court rules of discovery. *See* D.E. 2420, July 20, 2020 Tr. 188:17-19. Yet the FCR also admitted that "if you want to file an *extraordinary* claim [against the Trust] you have to provide this information, yes." *Id.* at 189:10-11 (emphasis added). Moreover, there is nothing unfair or burdensome about mandating that asbestos claimants make full and truthful disclosures of their asbestos exposures and the trust claims that they have already filed or will file in the future so that their bankruptcy claims can be fairly resolved.

The Bankruptcy Court likewise missed the mark with the proposed finding that Truck's arguments "hinged on speculation as to future events" and were "unsupported." *Id.* The existence of the evidence suppression scheme has been firmly established. The evidence likewise establishes that the Debtors have been victimized by this scheme and the Debtors have acknowledged this. Moreover, law firms found to have engaged in the evidence suppression (a) sit on the ACC in these cases and (b) represent more than half of the claimants with pending mesothelioma claims against Kaiser. Fraud prevention measures to stop the scheme have been adopted in multiple other recent asbestos reorganizations—*Garlock*, *Maremont* and *Sepco*. Indeed, the likelihood of ongoing fraud was significant enough for the Bankruptcy Court *in these cases* to raise its own concerns about the lack of fraud prevention measures and for the Plan Proponents to protect the Kaiser Trust by adding

such requirements for uninsured claims. And of course even though Truck offered to withdraw all objections to the Plan if fraud prevention measures were added for insured claims, the parties are now before this Court because the plaintiffs' bar refused and continues to refuse to add the exact same protections against fraud for insured claims that have been agreed to for uninsured claims. There is nothing at all speculative or unsupported that the Plan will facilitate a resumption of the evidence suppression scheme if confirmed without fraud prevention measures.

Finally, the Bankruptcy Court is plainly mistaken in its proposed finding that Truck was not excluded from the Plan negotiations that led to the collusive deal. Proposed Findings and Conclusions at 27. The Court found that Truck attempted to negotiate only after the Plan Proponents had agreed to the Term Sheet. In fact, long prior to the Term Sheet, Truck repeatedly informed the Debtors, the ACC and the FCR of its desire to negotiate. Neale Aff., Ex. 37 ¶¶ 24, 25 (emails dated November 17, 2016 and December 9, 2016 from Truck's counsel to Debtors' counsel: "We will be in a better position to discuss [cost sharing] issues once we have opened the door to discussions with the asbestos claimants"; and Truck is "ready and willing to engage and participate in [plan] negotiations with all relevant constituencies"); Hoyt Decl., Ex. 65 ¶ 16 (stating that Hoyt had "conversations with Kevin Maclay, counsel for the ACC, where [Hoyt] reaffirmed Truck's interest in talking"). However, the Debtors told Truck that unless Truck agreed to bear the costs of the bankruptcy on terms acceptable to the Debtors, Truck would be excluded. Neale Aff., Ex. 37 ¶ 23. Because Truck was only willing to pay for a bankruptcy that resulted in a deal that included Truck, *id.* ¶ 24, Truck was in fact excluded. The testimony is uncontroverted that the collusive agreement that gives rise to the Plan was negotiated between the Debtors, Lehigh Hanson, the ACC and the FCR. D.E. 2420, July 20, 2020 Tr. 132:1-13. Truck was, as had been threatened, excluded from the negotiations. Hoyt Decl., Ex. 65 ¶ 40.

The Bankruptcy Code does not permit the proponents of a chapter 11 plan to take such a cavalier attitude toward a known, ongoing fraud; nor is this Court obliged to give its blessing to a bargain in which Kaiser has been paid for its silence. *See In re Am. Capital Equip.*, 688 F.3d at 158 (holding that a plan is collusive if there is "evidence of an agreement to defraud insurers"); *In re ACandS, Inc.*, 311 B.R. 36, 43 (Bankr. D. Del. 2004) (524(g) plan "largely drafted by and for the benefit of" the asbestos bar was not in good faith).[23]  A plan of reorganization that turns a blind eye to ongoing fraud cannot meet the good faith requirement of 11 U.S.C. § 1129(a)(3).

### B.     The Plan contravenes section 524(g)'s objective and purpose of fairly resolving asbestos claims outside the tort system

The Plan also fails to satisfy section 1129(a)(3)'s good-faith standard because, in mandating that no insured claims shall be resolved through the Trust, it fails to "achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Combustion Engineering, Inc.*, 391 F.3d at 247.  The Bankruptcy Court concluded that the Plan "serves valid bankruptcy purposes." *See* Proposed Finding and Conclusions at 24 (explaining that the Plan "maximizes the value of assets available to pay claims" because under the plan "creditor recoveries are greater than could be realized if the Debtors were to liquidate").  But a company "may pursue a valid bankruptcy goal, yet in the end, propose a plan that is otherwise inconsistent with the Bankruptcy Code." *In re Am. Capital Equip.*, 688 F.3d at 157.  Here, the Plan makes no attempt to effectuate the core purpose of section 524(g): the fair and efficient resolution of asbestos injury claims.

The Bankruptcy Court further found "no requirement that *all* of a debtor's asbestos

---

[23]     Similarly, in *Congoleum Corp. v. Ace American Insurance*, a state court sustained several insurers' coverage challenge on good-faith grounds to a collusive global settlement of asbestos litigation that was the cornerstone of a consensual section 524(g) plan.  The court based its finding in part on the fact that the settlement agreement contained "no meaningful provisions to ferret out fraudulent claims."  No. MID-L-8908-01 (N.J. Super. Ct. May 18, 2007), D.E. 2072-17 at 12, 13.

39

liabilities must be resolved by a section 524(g) trust, as opposed to being resolved in the tort system." Proposed Findings and Conclusions at 25 (emphasis added). It has never been Truck's position that it is improper under section 524(g) for any asbestos claims to be resolved in the tort system. As Truck stated prior to the confirmation hearing when this issue was raised, "[t]he legal defect here is not that the claims *can* be resolved in the tort system…[but that they] *cannot* be resolved *outside* the tort system…[or] even present[ed]…to the Trust for resolution …[which] is unprecedented and contrary to the very purpose of section 524(g)." Truck Consolidated Response To The Briefs in Support Of Confirmation, D.E. 2359 at 6.

Congress enacted section 524(g) in response to the asbestos-litigation crisis that had overwhelmed the tort system, and it did so with the express goal of creating a statutory mechanism by which "[p]resent, as well as future, asbestos personal injury claimants" would be given the opportunity to resolve their claims outside the tort system by bringing their "actions against [a] trust." H.R. Rep. 103-835, 1994 U.S.C.C.A.N. 3340, 3349 (1994); *see In re Bestwall LLC*, 606 B.R. 243, 257 (Bankr. W.D.N.C. 2019) (Beyer, J.) (the "purpose of section 524(g)" is to serve "as a solution to the inefficient resolution of asbestos claims in the traditional tort system" (citing *In re Federal-Mogul Global Inc.*, 684 F.3d 355, 357-62 (3d Cir. 2012))). Thus, Congress authorized an extraordinary form of injunctive relief: the "channeling injunction," which protects reorganized debtors (and even, in certain cases, their non-bankrupt affiliates) from future as well as present asbestos claims. In return, the debtors must establish a trust for the satisfaction of asbestos claims, funded in part by the ongoing operations of the reorganized debtors; and the trust must endeavor to fairly and efficiently resolve asbestos claims outside the tort system through trust distribution procedures, thus preserving trust assets for future claimants. *See In re Plant Insulation Co.*, 469 B.R. 843, 879 (Bankr. N.D. Cal. 2012) (subsequent history omitted) (one of section 524(g)'s

JA00544

"statutory objectives" is efficient resolution of asbestos claims "without the expense of trial").

The Plan turns the statute on its head. It purports to take advantage of the section 524(g) channeling injunction for the benefit of Kaiser and their parent company, but does not create a trust capable of resolving asbestos claims outside the tort system. Instead, the Plan mandates that *all* insured claims—which constitute the vast majority if not all of the asbestos claims currently pending against the Debtors—must bypass the trust resolution procedures and be resolved in the courts. None of the scores of section 524(g) plans that have been confirmed in the years since enactment of section 524(g) have operated in this way, no doubt because that is the antithesis of what section 524(g) was designed to do.[24]

For all of the above-stated reasons, the Plan has not been presented in good faith. Accordingly, it is not confirmable, at least as presently constituted, under section 1129(a)(3).

## II.    The Plan Does Not Comply With The Requirements of Section 524(g)

For the claimants and their lawyers, the Plan greenlights their return to the tort system, without any fraud prevention requirements, as if these cases had never been filed. For the Debtors and Lehigh Hanson, the Plan offers the enormous benefit of a section 524(g) injunction. The fundamental problem with this deal, aside from its abject bad faith as detailed above, is that it is a section 524(g) plan in name only. It violates several express requirements of the statute and is wholly at odds with its purpose. This is not a drafting error. Rather, it is the natural effect of a deal where one side—the plaintiffs' bar—wanted nothing to do with a bankruptcy resolution and the other side—the Debtors and Lehigh Hanson—wanted relief only offered under the Bankruptcy

---

[24]    To be sure, every section 524(g) plan preserves the right of claimants and demand-holders to pursue their claims through litigation in the tort system if they are unsatisfied with the trust resolution procedures; any plan that did not would likely run afoul of the First and Seventh Amendments. The Truck Plan included a tort system option.

Code. They reconciled these seemingly irreconcilable differences by agreeing to merely pretextual and nominal compliance with the statute. But a section 524(g) plan that violates both the letter and spirit of the statute cannot be confirmed. The Plan fails to satisfy four separate requirements of section 524(g), each of which must be met as a condition to issuance of a 524(g) injunction.

### A. Under the Plan, the Trust fails to assume Kaiser's asbestos liabilities in violation of section 524(g)(2)(B)(i)(I)

11 U.S.C. § 524(g)(2)(B)(i)(I) mandates that "the [channeling] injunction is to be implemented in connection with a trust that *. . . is to assume the liabilities of a debtor* which at the time of entry of the order for relief has been named as a defendant in [asbestos lawsuits]." (Emphasis added.) The Court found that the Plan satisfied the requirements of section 524(g)(2)(B)(i)(I) by its "express terms" which state that the Trust "shall assume liability and responsibility, financial and otherwise, for all Asbestos Personal Injury Claims." (Plan, D.E. 2481 Art. IV.K.3.; Proposed Findings and Conclusions at 32). However, this purported assumption of liability is expressly made "[s]ubject to" other "provisions of the Plan." Plan, D.E. 2481 Art. IV.K.3. Elsewhere, the Plan provides that claimants "who wish to recover on" asbestos claims "must sue the Reorganized Debtor(s) in the relevant tort system." Plan TDP, D.E. 2481-1 § 5.3(a). And a separate provision makes it clear that the complaint in the action "may name the applicable Reorganized Debtor(s) as a defendant(s) and shall be deemed by operation of law to be an action against" them and that any settlement or obtained in the action may be enforced only against "the Asbestos Insurance Policies." Plan, D.E. 2481 Art. IV.O.1. The Trust's purported assumption of asbestos liabilities is illusory: in reality, it plays no role in resolving asbestos claims and bears responsibility only for payment of a $5,000 deductible after a claim has been resolved.

The Bankruptcy Court held that the Plan satisfies the requirements of section 524(g)(2)(B)(i) because the "Trust will be responsible for resolving Uninsured Asbestos Claims

and the portion of Insured Asbestos Claims that is not covered by an Asbestos Insurance Policy." Proposed Findings and Conclusions at 32-33. An uninsured claim would be any claim arising outside of the coverage periods under the Truck policies. D.E. 2420, July 20, 2020 Tr. 165:25-166:3. However, in Kaiser's entire history of asbestos litigation dating back to 1978, of the roughly 38,000 asbestos claims asserted, the number of uninsured claims resulting in a payment is in the single digits, and the Debtors' corporate representative was not aware that any of the nearly 14,000 asbestos claims pending against the Debtors was uninsured. *Id.* 19:13-15; 87:23-89:21. Thus, for all intents and purposes, none of the pending asbestos claims are to be resolved by the Trust—all are mandated to be pursued in the tort system.[25]

Moreover, the statutory requirement is that the trust "is to assume the [asbestos] liabilities of a debtor . . . ." Assuming responsibility for, at most, a tiny sliver of those liabilities does not satisfy this requirement. Therefore, the language relied upon by the Bankruptcy Court—that the "Trust shall assume liability and responsibility, financial and otherwise, for all Asbestos Personal Injury claims," Plan, D.E. 2481 § IV.K.3—is not merely pretextual, but untrue, and the Plan fails to comply with section § 524(g)(2)(B)(i)(I).

## B. The Plan fails to require future payments to the Trust by Kaiser in violation of section 524(g)(2)(B)(i)(II)

The Plan also fails to comply with the requirement that an asbestos trust established under section 542(g) "be funded in whole or in part by the securities of 1 or more debtors involved in

---

[25] Under the Plan, if insurance coverage for the asbestos liabilities is lost—for example, if a court determines that Kaiser has breached its duty of assistance and cooperation under the policies—then the holder of that claim may seek "payment from the Reorganized Debtors for the judgment or settlement amount of" the denied claim. Plan, D.E. 2481 Art. IV.L.2.b. Further, the obligations of the Reorganized Debtors under this scenario are guaranteed by Lehigh Hanson. Plan, D.E. 2481 Art. IV.L.2.f. Thus, if insurance coverage is lost, the Trust will have no responsibility whatsoever for the resolution of asbestos liabilities. D.E. 2420, July 20, 2020 Tr. 185:3-14. This simply confirms that the Trust's assumption of asbestos liabilities is illusory and pretextual.

such plan and by the obligation of such debtor or debtors to make future payments, including dividends." 11 U.S.C. § 524(g)(2)(B)(i)(II). Congress mandated future payments from reorganized debtors in order "to provide an 'evergreen' funding source for future asbestos claimants." *In re Combustion Engineering, Inc.*, 391 F.3d at 248. But the only "future payment" contemplated by the Plan is repayment of a $1 million dollar note (the "***Payment Note***") that the Reorganized Debtors would issue to the Trust and repay in five years—hardly an "'evergreen' source of funding." Plan, D.E. 2481 Art. I.A.98, IV.K.2.b.[26]

The Bankruptcy Court recognized that the design of the Trust clashes with section 524(g)(2)(B)(i)(II), conceding that the Plan's $1 million note may be "pretextual, given its short term and small amount." Proposed Findings and Conclusions at 33 n.15. But the Bankruptcy Court maintained that this was no obstacle to plan confirmation, because (1) Truck has "no standing to make this argument," and (2) the Payment Note was "a small part of the total funding" for the Trust. *Id.* at 34 n.15. Neither observation excuses the Plan's noncompliance with section 524(g)(2)(B)(i)(II). Even if the Bankruptcy Court were correct that Truck lacks standing to make this objection—and it is not, *see infra* § IV—this Court would nonetheless have an "independent duty . . . to ensure that the proposed plan comports with the requirements of the bankruptcy code." *In re Bateman*, 331 F.3d 821, 828 (11th Cir. 2003). *See also In re ACandS, Inc.*, 311 B.R at 42 ("Section 524(g)(2)(a) makes clear that as a condition to obtaining the relief provided by the statute, the court must find that all of its requirements have been met, even if no one objects.").

---

[26] The Trust's funding comes from only four sources: (1) an initial payment of $49 million to be made by Lehigh; (2) a sham $1 million note payable by the Debtors within five years; (3) the Debtors' claims against Truck for withholding of certain deductibles; and (4) all rights belonging to the Debtors under the Asbestos Insurance Policies (but not the policies themselves). Plan, D.E. 2481 Art. IV.K.2. Nothing in the Joint Plan obligates the Debtors to make the "future payments" that section 524(g)(2)(B)(i)(II) requires.

And the fact that the Payment Note represents "a small part of the total funding for the Trust" is precisely what makes it pretextual. Ultimately, the Plan Proponents have no interest in providing for recurring payments to the Trust because the Trust itself will not play a meaningful role in resolving or paying asbestos claims.

### C. The contingency under which the Trust would own a majority of the voting shares is a sham that violates section 524(g)(2)(B)(i)(III)

The design of the Trust likewise fails to comply with section 524(g)(2)(B)(i)(III), which requires that the Trust "own, or by exercise of rights granted under such plan would be entitled to own if specified contingencies occur, a majority of the voting shares of" each Debtor. This provision of section 524(g)—much like the "future payments" requirement that immediately precedes it—is designed to ensure that the continuing operations of reorganized debtors provide a meaningful source of funding for future asbestos claimants' recoveries. Over time, reorganized debtors may be mismanaged or have interests that conflict with those of future asbestos claimants—a reorganized company might, for example, be incentivized to transfer productive assets to affiliates with no ongoing obligations to the asbestos trust.

To protect claimants against these risks, section 524(g)(2)(B)(i)(III) mandates that a trust either own a controlling stake in the reorganized debtor or have an opportunity to acquire it. Thus, fiduciaries of the trust would be in a position to ensure that the reorganized debtor remains focused on maximizing its value as a going concern and, by extension, a source of funding for the trust. *See In re Congoleum Corp.*, 362 B.R. 167, 176 (Bankr. D.N.J. 2007). For the control requirement to serve this purpose—or, indeed, any purpose—the trust's opportunity to gain control of the debtor cannot depend on a contingency that is impossibly remote, or would only occur when the reorganized debtor is beyond saving:

> [C]ontrol must come at a point when control is meaningful. In other words, control of the Debtor must shift in time for the trust to change the course of operations and

ensure the future viability and profitability of the company to protect the interests of the trust beneficiaries. Accordingly, the "specified contingencies" need to precede the financial "point of no return" for the Debtor. Granting the trust control of a company that is no longer viable would not further the goal of protecting the interests of future claimants.

*Id.* In short, a plan of reorganization cannot satisfy section 524(g)(2)(B)(i)(III) by inserting "sham" contingencies that "allow control facially, but not in practice." *In re Plant Insulation Co.*, 734 F.3d at 916 (9th Cir. 2013).

The Plan's purported compliance with section 524(g)(2)(B)(i)(III) is an obvious sham—but a sham acceptable to the claimants because they are not looking to the Trust to pay the insured claims. The Plan provides that the Trust can obtain ownership of "100 percent of the equity of each Reorganized Debtor" if—but only if—the Reorganized Debtors default on their obligation to repay the $1 million Payment Note sometime within the first five years after the Effective Date. To understand why this contingency is a sham, one need only look to the Plan Proponents' own disclosures, which project millions of dollars in positive annual cash flow for a reorganized Hanson Permanente, and value its physical assets (including property, quarries and facilities) at more than $179 million. Bittner Declaration, Ex. 22 at 17, 25. The only scenario in which the reorganized debtors would default on the $1 million Payment Note—in effect, turning over ownership of the companies to the trust—is one in which the value of the companies has dipped below $ 1 million.[27] Otherwise, it would defy economic logic for the owners of the reorganized debtors to default on a relatively small liability if doing so would mean losing ownership of a far more valuable asset. In *In re Plant Insulation*, the Ninth Circuit found that a similar note-default provision was a sham,

---

[27]   It is also exceptionally unlikely. In fact, if it were plausible that the equity value of the reorganized debtors might collapse to less than $1 million within 5 years of plan confirmation, then the Plan would fail to satisfy the Bankruptcy Code's feasibility requirement under 11 U.S.C. § 1129(a)(1).

because "if a reorganized debtor were to 'default on such insignificant payments, it is essentially insolvent, making the value of the shares negligible.'" 734 F.3d 900, 916. Likewise, the "specified contingency" in the Payment Note is one that would only "[g]rant[] the trust control of a company that is no longer viable." *In re Congoleum Corp.*, 362 B.R. at 176.

This kind of contingency—one that is all but certain not to occur and, if it did, would occur only in circumstances where the purpose of the statute could not be satisfied—is not "the type of contingency Congress envisioned when it drafted § 524(g)(2)(B)(i)(III)." *In re Congoleum Corp.*, 362 B.R. at 179. As with the "future payments" requirement under section 524(g)(2)(B)(i)(II), the Bankruptcy Court expressed doubts about the Plan's compliance with section 524(g)(2)(B)(i)(III) but again declined to reach the issue based on the erroneous conclusion that Truck lacked standing to raise it. Proposed Findings and Conclusions at 35 n.16 (referring back to discussion of "pretextual" compliance with section 524(g) at 33 n.15). This Court should instead recognize that the Plan violates section 524(g)(2)(B)(i)(III), as there is "no plausible scenario in which" the Trust would obtain control of the Reorganized Debtors "when they were still valuable." *In re Congoleum Corp.*, 362 B.R. at 179.

### D. There is no basis for a finding that the Plan is likely to prevent inequitable results for future claimants that would otherwise occur in the tort system, as required by section 524(g)(2)(B)(ii)(III)

The Plan is premised on the notion that both current and future asbestos claimants can achieve a full and fair recovery for their injuries by pursuing Kaiser's insurers in the tort system. But if that is correct, then there is no basis for a finding that the "pursuit of [future asbestos] demands outside the procedures prescribed by [the] plan"—i.e., in the tort system—"is likely to threaten the plan's purpose to deal equitably with claims and future demands." 11 U.S.C. § 524(g)(2)(B)(ii)(III). The Plan Proponents cannot have it both ways. If Kaiser's insurance policies provide an inexhaustible source of recoveries for future claimants in the tort system, as

47

the Plan Proponents have repeatedly argued, then the Debtors are not entitled to the extraordinary relief that 524(g) provides.

Section 524(g) authorizes an "an extraordinary remedy" that is reserved "for debtors overwhelmed by asbestos-related liability." *In re Fed.-Mogul Glob. Inc.*, 411 B.R. 148, 166 (Bankr. D. Del. 2008). Under section 524(g)(2)(B)(ii)(III), a bankruptcy court may not issue an injunction that channels asbestos claims and demands to a section 524(g) trust unless "the trust is needed in order to deal equitably with present and future claims." *See* H.R. Rep. 103-835, at 41, reprinted in 1994 U.S.C.C.A.N. at 3350. In other words, a debtor cannot qualify for section 524(g) relief unless it can show that the financial burden of satisfying present asbestos claims will be so great that it will exhaust or so substantially deplete the debtor's financial resources that little or nothing will remain to satisfy future asbestos demands. *See* 4 Collier on Bankruptcy ¶ 524.07(2) (Richard Levin & Henry Summers eds., 16th Ed.) ("[I]f the court finds that the viability of the debtor or a successor would not be seriously threatened by the assertion of such claims or demands," the 524(g)(2)(B)(ii)(III) "finding should not be made."). Where there is no risk of this type of exhaustion, a trust is "not necessary for the Debtors' successful reorganization," and section 524(g) relief is unavailable. *In re Fed.-Mogul Glob. Inc.*, 411 B.R. at 167.

In this case, insurance coverage shields Kaiser from any serious threat that asbestos liabilities will exhaust Kaiser's financial resources. Indeed, the Plan Proponents have repeatedly argued that the usual protections for future claimants under section 524(g) are unnecessary because Kaiser's insurance policies will be an evergreen source for future recoveries. *See, e.g.*, Joint Omnibus Reply, D.E. 2274 at 40 (arguing that strict compliance with section 524(g)(2)(B)(i)(III) is unnecessary because the "vast majority of the 'funding package' [for asbestos claims] under the Plan comes from the proceeds of the Debtors' insurance, not from the Debtors' business

operations"); D.E. 1710 at 20 (arguing that the Plan "allows both present and future claimants the same opportunity they had prepetition to litigate their claims in the tort system against an unlimited insurance asset that will never exhaust"). Likewise, in arguing in favor of lifting the automatic stay, the Plan Proponents stated that "[t]here is not, and could not be, any serious dispute that the Debtors are protected by adequate insurance to cover their asbestos liabilities" and that "the insurance is sufficient to satisfy the relevant claims." D.E. 881 at 11, 13.

Nevertheless, the Bankruptcy Court recommended finding that the Plan complies with section 524(g)(2)(B)(ii)(III), citing the conclusory testimony of Mr. McChesney and Mr. Fitzpatrick and finding that "[w]ithout the Plan, there is a *risk* that present claimants will be treated more favorably than future claimants because the potential for uninsured judgments, including punitive damages, could leave the Debtors without sufficient assets to make equivalent payments to future claimants." Proposed Findings and Conclusions at 38 (citing McChesney Decl., Ex. 19 ¶ 44; Fitzpatrick Decl., Ex. 18 ¶ 37). That "risk" would appear to be *de minimis* given the insurance coverage for all pending asbestos claims and just one substantially-reduced punitive damage award in 40+ years of asbestos litigation.[28] But the statute does not reference a mere "risk." Pursuant to the plain language of the statute, a finding must be made that "pursuit of such demands outside the procedure prescribed by the plan is *likely* to threaten the plan's purpose to deal equitably with claims and future demands." (emphasis added). No such proposed finding was made by the Bankruptcy Court, and the record is bereft of support for one. Indeed, given the structure of the plan and the lack of any known uninsured claims, the claims would be resolved exactly the same

---

[28] In Kaiser's entire history, punitive damages were awarded in only three asbestos cases. The trial court dismissed the award in one of the cases, reduced the award by 80 percent in a second case, and the third case was settled for less than the amount of compensatory damages awarded by the jury. McChesney Declaration, D.E. 1361 ¶ 17.

way with or without the Plan, with insurance paying the costs of defense and making indemnity payments. Thus there is not, and cannot be, a basis for finding that it is "likely" that current and future demands will not be treated equitably. Because the Plan Proponents have failed to show that litigation in the tort system is likely to threaten Kaiser's viability—and have, in fact, proposed a Plan that would have the insurers resolve *all* known asbestos claims in the tort system—there is no basis for the Bankruptcy Court's recommended finding under section 524(g)(2)(B)(ii)(III). And because the Plan fails to satisfy four separate requirements of section 524(g), the requested injunction cannot issue.

### III. The Plan's Insurance Finding Is Incorrect And Improperly Expands The Debtors' Rights Under The Policy

In addition to the Plan defects outlined above, the Bankruptcy Court erroneously recommended that the Debtors were entitled to the Insurance Finding, which provides that Kaiser's conduct "in connection with and throughout these Reorganization Cases, including but not limited to, their negotiations with [the Committees]" in drafting the Plan, and in opposing the Truck Plan, "has not violated any Asbestos Insurer Cooperation Obligations contained in any Asbestos Insurance Policies, nor was such conduct a breach of any express or implied covenant of good faith and fair dealing." Plan, D.E. 2481 Art. VIII.A.3.u. The Insurance Finding is, in effect, a "get out of jail free" card designed to protect the Debtors from the insurance coverage implications of their collusive deal with the asbestos claimants.

The Insurance Finding in the Proposed Plan is fatally flawed. As an initial matter, the Insurance Finding is simply incorrect—Truck has introduced evidence showing that the Plan and Kaiser's conduct in securing the Plan violate Kaiser's obligations to cooperate and perform in good faith under the Truck policies. Truck's uncontested evidence, when considered alongside the terms of the Plan itself, establish that Kaiser violated its policy duties.

Kaiser, by contrast, has refused to introduce *any* evidence of its conduct during the negotiation of the Plan and has affirmatively hidden much of its conduct behind the cloak of privilege. Kaiser's failure to introduce any evidence makes it impossible for the Court to rule, as the Bankruptcy Court recommends, that Kaiser has not violated its duties.

If the Court concludes that Truck has not demonstrated Kaiser's noncompliance because there is a dispute of fact as to Kaiser's conduct, the Constitution requires the Court to abstain from making any ruling at all and to preserve Truck's right to a jury trial. *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41–42 (1989) (constitutional right to jury on dispute of legal and not equitable issue). The Plan Proponents dismiss Truck's Seventh Amendment right by comparing the Insurance Finding to a dispositive motion, *see* D.E. 2274 at 21, but a ruling by the Court—for example at summary judgment—would only be appropriate in the absence of disputed facts. *Boone v. Everett*, 671 F. App'x 864, 865 (4th Cir. 2016) ("A court can only award summary judgment when no genuine dispute of material fact remains and the record shows that the moving party is entitled to judgment as a matter of law."). The Insurance Finding recommended by the Bankruptcy Court would only be appropriate if both (a) Kaiser had put evidence in the record about its conduct during the negotiation of the Plan *and* (b) Truck had not introduced any evidence contradicting Kaiser's representation. Neither is true. Kaiser has hidden evidence of its conduct, and Truck has entered evidence establishing the corrupt bargain Kaiser struck. On this record, there is no conceivable path to issue a declaratory summary-judgment style ruling in Kaiser's favor.

Finally, independent of whether the Insurance Finding correctly concludes that Kaiser complied with its California law duties under the policies, the Insurance Finding has the effect of *expanding* the Debtors' contract rights at the expense of a third party. Because "a debtor cannot

retain those aspects of [a] contract to his benefit while rejecting the burdensome aspects thereof," this provides a second and alternative reason that the Insurance Finding cannot be included in the Plan. *In re EES Lambert Assocs.*, 62 B.R. 328, 336 (N.D. Ill. Bankr. 1986).

Although this aspect of the dispute has a complex procedural history,[29] the issues that this Court must now address are limited and straightforward. Indeed, if the Court declines to confirm the Plan based on Truck's other arguments, there is no need even to reach the Insurance Finding, which is merely a condition of confirmation. But if the Court must address its propriety, the Insurance Finding is unsupportable.

### A. Truck's evidence shows that Kaiser violated its policy obligations

Under California law, a party insured under a liability policy has a duty to cooperate with and assist its insurer. *See Campbell v Allstate Ins. Co.,* 60 Cal. 2d 303 (1963). The Truck policies codify this duty by requiring Kaiser, as a condition to Truck's coverage obligations, to "cooperate with [Truck]" and, upon Truck's request, to "assist in effecting settlements" and in "securing and giving evidence." Ex. 30 at TRUCK0000586 (emphasis added). An insured breaches the duty to cooperate when "the insured in bad faith refused or neglected to cooperate with the insurer" and "the noncooperation caused substantial prejudice to the insurer's preparation of a defense to a claim lodged against the insured." *Baumler v. State Farm Mut. Auto. Ins. Co.*, 493 F.2d 130, 134 (9th Cir. 1974). This duty extends beyond a mere duty to produce evidence; an insured party "cannot arbitrarily or unreasonably decline to assist in making any fair and legitimate defense."

---

[29] After Kaiser proposed the Insurance Finding, which Truck viewed as both procedurally and substantively improper, Truck filed an adversary proceeding to fully address the coverage dispute and to protect its right to a jury trial, and moved to withdraw the reference to this Court. The adversary proceeding was stayed before Kaiser filed any response to the motion to withdraw the reference. Whether any of these issues need to be resolved will depend on the Court's confirmation ruling.

JA00556

*Bachman v. Indep. Indem. Co.*, 297 P. 110, 115 (Cal. Dist. Ct. App. 1931). More generally, the insured's duty to cooperate and assist serves to "prevent collusion" between the insured and its litigation adversaries so that the insurer can "protect itself from fraudulent and false claims." 14 Couch on Ins. §199:4 (3d ed. June 2020); *accord* Rick Virnig, *The Insured's Duty to Cooperate* 6 J. Tex. Ins. L. 11, 11 (Fall 2005). An insured is prohibited from "sabotaging the insurance company's interests" and is obligated to "put forth an honest effort to defeat or minimize the claims . . . ." *Id.; accord Wood v Allstate Ins. Co.*, 21 F. 3d 741, 745 (7th Cir. 1994) (cooperation clause addresses concern "that the plaintiff and the insured might collude, to the detriment of the company").

The cooperation and assistance requirement also demands that Kaiser take all reasonable steps to "enable the insurer to obtain the information it needs in order to decide whether to pay the claim." *Rajwinder Kaur v. Fire Ins. Exch.*, No. F055359, 2009 WL 5107838, at *3 (Cal. Ct. App. 2009). In other words, the insured must assist Truck in obtaining "all knowledge" and "all information as to other sources and means of knowledge, in regard to facts" material to a claim and necessary for the insurer "to protect [itself] against false claims." *Belz v. Clarendon Am. Ins. Co.*, 69 Cal. Rptr. 3d 864, 870 (Cal. Ct. App. 2007) (alteration in original).

California law also imposes "an implied covenant of good faith and fair dealing" on every insurance agreement demanding "that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Comunale v. Traders Gen. Ins. Co.*, 328 P.2d 198, 200 (Cal. 1958). Kaiser's collusion also violates that duty of the insured to act in good faith. *See Span, Inc. v. Assoc. Int'l Ins. Co.*, 277 Cal. Rptr. 828, 839–40 (Cal. Ct. App. 1991).

Truck's record evidence, considered in combination with the terms of the Plan, show that Kaiser has violated these duties. The history of the request for the Insurance Finding is telling.

From the very outset, the Plan Proponents seemed to understand the tension between the deal they struck and the Debtors' policy obligations. To reach its agreement with the ACC and FCR, the Debtors agreed that if they lost coverage because of a determination they violated the duty to cooperate, the Reorganized Debtors would become liable for payment of the asbestos claims. Lehigh Hanson agreed to guarantee those obligations. *Supra* p. 43 n. 23; D.E. 2420, July 20, 2020 Tr. 185:3-14.

Moreover, the Plan has always included what purports to be an "Insurance Neutrality" provision, but in reality is the very opposite. At first glance, the language seems to preserve insurers' rights, providing that "*[n]othing in the Plan* . . . the Confirmation Order, any finding of fact or conclusion of law with respect to the Confirmation of the Plan or any order or opinion entered on appeal from the Confirmation Order *shall limit the right of any Asbestos Insurer to assert any Insurer Coverage Defense*." Plan, D.E. 2481 Art. IV.Q (emphases added). But this is a slight of hand, because the defined term "Insurer Coverage Defense" expressly excludes any defense based upon the "drafting, proposing, confirmation or consummation of the Plan." *Id.* Art. I.A.84. And, immediately after purporting to reserve all rights, the "Insurance Neutrality" provision clarifies that it does not block Kaiser from asserting "otherwise applicable principles of res judicata or collateral estoppel from being applied against any Asbestos Insurer." *Id.* Art. IV. Thus, the Plan's purported insurance neutrality language was actually intended to blunt any later assertion that Kaiser violated its duty to cooperate in connection with the Plan.

Concerned by Kaiser's collusive agreement with the asbestos claimants and their lawyers, Truck sent Kaiser the Reservation of Rights Letter, a warning that the Plan's failure to include fraud prevention measures was at odds with Kaiser's duty to cooperate and reserving Truck's right to challenge coverage if the Plan were not amended to include such protections. Ex. 62. Unable

JA00558

to comply due to its deal ceding control of the claims resolution procedures to the ACC and FCR, Kaiser elected instead to amend the Plan to add the Insurance Finding.

The bankruptcy claims resolution process affords Kaiser a unique opportunity in a single court to set the procedures necessary to ensure the fair and equitable resolution of its liabilities. Other asbestos bankruptcies have proven this. But when Kaiser had the opportunity to assist Truck in obtaining the exposure evidence necessary to fairly value and resolve its liabilities, Kaiser chose instead to look out only for its own perceived interests and traded away control over the claims resolution process to the very people responsible for the fraudulent scheme—specifically the ACC, which represents the interests of the asbestos plaintiffs' bar and includes law firms identified in *Garlock* as having participated in the scheme to suppress evidence, and the FCR, asked to serve by a member of the ACC.

Having clearly abandoned its obligation to assist Truck in defending claims, Kaiser amended the Plan to request a finding that day is night—that nothing it has done prior to or during the course of these cases, including its negotiations of the Plan with the ACC and FCR, violates its duty to cooperate and assist. Kaiser offered no evidence to support the finding, and actually refused to testify as to the substance of the Plan negotiations, asserting common interest privilege. D.E. 2420, July 20, 2020 Tr. 133:18-134:17.

Despite Kaiser's tactical assertion of privilege, Truck has introduced sufficient evidence to establish the corrupt bargain Kaiser struck to escape bankruptcy by agreeing not to fulfill its obligation to assist Truck. *Supra* §§ VII-IX. Most importantly, Truck has introduced evidence that Kaiser (a) knew it was being defrauded in the tort system, (b) negotiated the terms of the Plan without Truck's involvement, (c) gave the ACC and FCR control over the terms of the claims resolution process, (d) declined to seek anti-fraud disclosure and audit terms for insured claims,

(e) agreed to exempt insured claims from the Trust's claims resolution process leaving Truck to defend these claims in the tort system, and (f) demanded *for uninsured claims* each of the protections that it bargained away for insured claims. Kaiser has not introduced any evidence in response. If the Court concludes this evidence is sufficient to demonstrate Kaiser's violation of the policies, it should issue a declaration in Truck's favor. Because Kaiser has introduced no evidence of its own conduct, if the Court concludes Truck falls short of judgment as a matter of law or there is a contested issue of fact, it must reserve the question for a future resolution by a jury.

### B. The Bankruptcy Court's adoption of the Insurance Finding rests on legal errors

The Bankruptcy Court's adoption of the Insurance Finding rests on a number of legal and factual errors. Realizing that it could not overcome the evidence of its failure to cooperate, Kaiser instead argued, and the Bankruptcy Court agreed, that its cooperation obligations simply did not extend to this proceeding. Proposed Findings and Conclusions at 63. A fundamental underpinning of the Debtors' argument and the Bankruptcy Court's ruling was an implausible reading of the policy language:

> **8. ASSISTANCE AND COOPERATION OF THE INSURED**
> The insured shall cooperate with [Truck], and upon [Truck]'s request, shall attend hearings and trials and *shall assist* in effecting settlements, *securing and giving evidence*, obtaining the attendance of witnesses and in the conduct of suits.

Ex. 30 at TRUCK0000586 (emphases added). Unable to deny the obvious—that they have failed and refused to help Truck obtain exposure evidence necessary to defend the claims—the Debtors tried to justify this refusal by arguing that the duty to assist in securing evidence is modified by the wording "in the conduct of suits" and therefore should be read to only apply to assisting Truck in defending "individual suits." According to this argument, the Debtors had no overall duty under the policy to assist in securing exposure evidence to overcome the fraudulent scheme. Proposed

Findings and Conclusions at 63–64.

There are two clear problems with this interpretation of the policy. First, the phrase "in the conduct of suits" is preceded by the word "and," and not by a comma. Assisting in the conduct of suits is an *additional duty* of the insureds, not a limitation of their other enumerated duties. Second, even if the phrase "in the conduct of suits" somehow did modify and limit the duty to assist in securing evidence, the use of the plural "suits" runs counter to the argument that the duty only applies to assistance in individual cases. While, not surprisingly, Debtors found and the Bankruptcy Court cited to individual cases where a violation of the duty to cooperate was found, none stand for the proposition that the duty *only* applies on a case-by-case basis.

The Bankruptcy Court also attempted to excuse Debtors' obvious refusal to cooperate by suggesting that Truck was advocating that "the Assistance and Cooperation Clause can be used to control the Debtors' conduct in their own bankruptcy." Proposed Findings and Conclusions at 66. This conclusion rested on *Admiral Ins. Co. v Grace Indus. Inc.*, 409 B.R. 275 (E.D.N.Y. 2009), but that case is inapposite. The insurer in that case argued that the debtor-insured breached the duty to cooperate by stipulating that the automatic stay could be lifted to allow litigation of insured claims to resume. These purely procedural stipulations "[did] not impinge on Admiral's ability to defend the actions," and, while the cooperation clause extended to "the ultimate disposition of actual claims," it did not require the insured "to take on a partner to make litigation decisions solely regarding [debtor's] own bankruptcy reorganization." *Id.* at 283.[30] Here, conversely, the failure to cooperate is not merely procedural—it is substantive and goes directly to "the ultimate

---

[30] The Debtors here similarly agreed to lift the automatic stay to allow asbestos litigation to resume. While Truck objected to the lifting of the stay on other grounds—namely the likelihood that the fraud would resume—Truck never contended that the Debtors' agreement to lift the stay violated the duty to cooperate.

disposition of actual claims."  Insisting that Kaiser abides by its contractual obligations is not an effort to control Kaiser's actions in bankruptcy—it merely emphasizes that Kaiser's failure to perform its obligations may impact its coverage.  By contrast, Kaiser and the Bankruptcy Court's position uses the bankruptcy as a tool to void Kaiser's contractual obligations—and there is no support in the Bankruptcy Code for that erasure.

Next, the Bankruptcy Court rejected Truck's contention that the Insurance Finding is improper because of the obvious collusion between the Debtors and the claimants, in violation of the duty to cooperate.  Once again, the Proposed Findings and Conclusions fail to address Truck's contentions.  Indeed, the case law cited in the Proposed Findings and Conclusions actually seems to support the collusion contention, noting that "collusion occurs when the insured and the third party claimant work together to . . . *inflate the third party's recovery*," *id.* at 65 (quoting *Safeco Ins. Co. of Am. v Parks,* 170 Cal. App. 4th, 992, 1013 (2009)) (emphasis added), and that collusive assistance "not only constitutes a breach of the cooperation clause but also is a breach of the covenant of good faith and fair dealing," *id.* (quoting *Andrade v. Jennings,* 54 Cal. App. 4th 307, 327 (Cal. Ct. App. 1997)).  But the Bankruptcy Court then incorrectly reasoned that Truck was not prejudiced by the collusion because "Truck [is] in the same position it was in before the Debtors' bankruptcy."  Proposed Findings and Conclusions at 65.

This reasoning is nonsensical—the bankruptcy presented a unique opportunity to fairly and properly resolve all of the Debtors' asbestos liabilities, with all of the claims and claimants subject to the jurisdiction and equitable powers of the Bankruptcy Court.  Truck is plainly prejudiced by the decision of the Debtors, Truck's insureds, to trade away that opportunity for a deal that protects them and their parent from future fraud but leaves Truck fully exposed to the fraudulent resolution of the Debtors' liabilities.  The fact that Kaiser and Truck were victimized by the scheme before

the bankruptcy was filed is all the more reason for Kaiser not to have colluded with the perpetrators of the scheme, and not an excuse to collude.

The Bankruptcy Court also erroneously found, as a matter of law, that the Debtors were in compliance with their implied contractual duty of good faith and fair dealing. Proposed Findings and Conclusions at 66-68. In justifying the Insurance Finding, the Bankruptcy Court recognized that California law imposes an implied duty of good faith and fair dealing on insurance contracts but found that the Debtors had not breached the implied covenant. Proposed Findings and Conclusions at 66–68; *see Span, Inc. v. Assoc. Int'l Ins. Co.*, 277 Cal. Rptr. 3d 828, 839–40 (1991). But the Bankruptcy Court never explained the basis for the ruling. It did note that bankruptcy "is not intended to relieve insurers of their contractual liabilities or to improve their position under their insurance contracts in the tort system." *Id.* at 67. But Truck is not seeking any such relief. To the contrary, Truck is simply insisting upon its insureds' compliance with their policy obligations. It is the Debtors who are seeking a finding that they need not fully comply with those obligations during the bankruptcy.

### C.    The Plan impermissibly seeks to expand the Debtors' rights under the Truck Policies at Truck's expense

A court in a chapter 11 case is not authorized to "create substantive rights that are otherwise unavailable under the [Bankruptcy] Code, or to expand the contractual obligations" of other parties. *In re SPM Mfg. Corp.*, 984 F.2d 1305, 1311 (1st Cir. 1993). A plan that purports to expand the debtors' rights or reduce those of another party in interest, except as expressly allowed by the Bankruptcy Code, is not made "in good faith" and employs means "forbidden by law." 11 U.S.C. § 1129(a)(3). In short, "bankruptcy courts do not have the power to rewrite contracts to allow debtors to continue to perform on more favorable terms." *In re Crippin*, 877 F.2d 594, 598 (7th Cir. 1989); *see also Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984) ("filing of [a]

JA00563

chapter 11 petition cannot expand debtors' rights" under a contract). Under this general rule, a plan cannot be confirmed if it expands the rights of a debtor to the detriment of the debtor's insurer. A plan under section 524(g) that purportedly reserves an insurer's defenses (and is ostensibly insurance neutral) cannot be confirmed if that reservation "contains many qualifications and provisos." *In re Pittsburgh Corning Corp.*, 453 B.R. 570, 589 (Bankr. W.D. Pa. 2011). A plan whose neutrality provision is neutered with "a multitude of qualifications that create ambiguity" as to the relative rights of the insurer and the insured expands the rights of the insured and cannot be confirmed. *Id.* at 589, 605.

In other words, the Plan must include express language, comparable to the language approved in *In re Combustion Engineering*, 391 F.3d at 209, that "notwithstanding anything to the contrary in this Order, the Plan or any of the Plan Documents, nothing in this Order, the Plan or any of the Plan documents . . . shall in any way . . . impair[] the insurers' legal, equitable or contractual rights, if any, in any respect" and must include such language *without qualification*. (Cleaned up.) The Plan states that all insurers' defense rights are reserved but then immediately and expressly qualifies the reservation by limiting Truck's coverage defenses. Plan, D.E. 2481 Art. IV.Q (preserving the right to assert "Insurer Coverage Defenses"); *id*. Art. I.A.82 (defining "Insurer Coverage Defense" to *exclude* "any defense that the drafting, proposing, confirmation or consummation of" the Plan resulted in "the elimination of or the reduction in" any insurer's coverage obligations). The Plan expands Kaiser's rights under the policy by effectively eliminating Kaiser's obligations of assistance and cooperation, good faith, and fair dealing. This is not authorized by the Bankruptcy Code and renders the Plan unconfirmable.

## IV. Truck Has Standing To Challenge The Plan Both As A Party In Interest And Because It Is Injured By The Plan

The Proposed Findings and Conclusions incorrectly conclude (at 51–53, 58–59) that Truck

lacks standing to object to confirmation. The standing finding is premised on the fiction that "[t]he Plan is insurance neutral." Findings and Conclusions at 51. In actuality, (1) the Plan's insurance neutrality language fails to satisfy the legal requirements for such a finding; and (2) Kaiser's request for the Insurance Finding, which seeks to litigate a coverage dispute between Debtors and Truck, vitiates any possible argument that the Plan is insurance neutral, regardless of whether the Plan, independent of the finding, included a proper insurance neutrality provision. Indeed, the Bankruptcy Court found that Truck had standing, but as a matter of law incorrectly determined that Truck's standing was limited and did not extend to the right to object to the confirmability of the Plan. *Id.* at 52, 58-59. In fact, Truck has standing to raise its Plan objections, both as a party in interest under the Bankruptcy Code and as an injured party under Article III of the United States Constitution.

### A.     Truck has statutory standing as a party in interest under section 1109(b)

Section 1109(b) of the Bankruptcy Code provides that "[a] party in interest, including . . . a creditor . . . may raise and may appear and be heard on any issue in a case under this chapter." Although section 1109(b) lists several potential parties in interest, that enumerated list, introduced by "including," "is not exclusive." *In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 210 (3d Cir. 2011); *accord In re Thorpe Insulation Co.*, 677 F.3d 869, 884 (9th Cir. 2012) (same); 11 U.S.C. § 102(3) ("'includes' and 'including' are not limiting"). The "party in interest" provision "'is to be construed broadly, in order to allow parties affected by a chapter 11 case to appear and be heard.'" *In re Bumper Sales, Inc.*, 907 F.2d 1430, 1433 (4th Cir. 1990) (quoting *In re Public Serv. Co. of N.H.*, 88 B.R. 546, 550 (Bankr. D.N.H. 1988)).

Under this flexible, elastic standard, any party with "a practical stake in the outcome of the proceedings" qualifies as a party in interest—especially where, as here, none of the other "parties currently involved in the reorganization proceedings have interests similar to those of" the party

JA00565

seeking to appear and be heard. *See In re Amatex Corp.*, 755 F.2d 1034, 1041, 1042–43 (3rd Cir. 1985). Courts applying this "practical stake" test routinely find that insurers are parties in interest. *See, e.g.*, *In re Glob. Indus. Techs., Inc.*, 645 F.3d at 204; *In re Congoleum Corp.*, 426 F.3d 675, 685, 687 (3d Cir. 2005); *In re Heating Oil Partners*, 3:08-CV-1976, 2009 WL 5110838, at *5 (D. Conn. Dec. 17, 2009), *aff'd*, 422 F. App'x 15 (2d Cir. 2011); *In re Standard Insulations, Inc.*, 138 B.R. 947, 950 (Bankr. W.D. Mo. 1992).

Truck is a party in interest for at least three separate reasons. First, it is a creditor. Second, the Plan specifically seeks to impair Truck's rights under its insurance policies. And third, the Plan if confirmed would greenlight a scheme to fraudulently inflate Debtors' insured asbestos liabilities, the financial consequences of which would fall on Truck. The Bankruptcy Court erroneously found that Truck had only limited standing, a ruling that is not supportable as a matter of law and directly contrary to party-in-interest standing.

### 1. Truck is a party in interest because it is a creditor

Truck holds allowed claims against both Kaiser and Hanson stemming from unpaid deductibles. D.E. 2438. In allowing these claims, the Bankruptcy Court validated Truck's status as a creditor. As a creditor, Truck is a party in interest under section 1109(b)'s express terms. Indeed, "[b]y the terms of the statute even a *de minimis* creditor may be entitled to the rights afforded by" section 1109(b). *In re G-I Holdings, Inc.*, 292 B.R. 804, 813 (Bankr. D.N.J. 2003). The Proposed Findings and Conclusions dismiss Truck's creditor status because Truck will be paid in full under the Plan (D.E. 2486 at 58 n.25) but cite no legal authority in support of this purported distinction—unsurprisingly, as it reads into section 1109 a limitation found nowhere in its text. The statute grants party-in-interest status to "a creditor"—not only an *impaired* creditor.

As a party-in-interest creditor, Truck is expressly authorized to "raise and appear and be heard on *any issue*." *See* 11 U.S.C. § 1109(b) (emphasis added). This language means exactly what

JA00566

it says: Truck has "the right to be heard on all matters arising in a reorganization proceeding." *In re River Bend-Oxford Assocs.*, 114 B.R. 111, 113 (Bankr. D. Md. 1990). A party in interest does not have to demonstrate a nexus between its interests in the case and the issues on which it seeks to be heard; "the phrase 'any issue in a case' plainly grants a right to raise, appear and be heard on *any issue.*" *In re Caldor Corp.*, 303 F.3d 161, 169 (2d Cir. 2002) (emphasis added); *accord In re Penn-Dixie Indus., Inc.*, 9 B.R. 936, 939 (S.D.N.Y. 1981) ("Congress intended section 1109(b) to carry forward an absolute right to be heard on any issue arising in a chapter 11 reorganization").

## 2. Truck is a party in interest because it is an insurer whose legal rights would be diminished by the Plan

In addition to being a creditor, Truck is a party in interest under section 1109(b) because its legal rights would be adversely affected by the Plan's Insurance Finding. The only purpose of the Insurance Finding is to foreclose Truck from asserting claims or defenses against Kaiser in future disputes over Truck's coverage obligations under the Truck Policies. Furthermore, the portion of the Plan purporting to establish that the Plan is insurance neutral in fact establishes the opposite, as it limits Truck's permitted coverage defenses, *see supra* § III, and provides that "any issue that is actually litigated by" Truck in this proceeding—including the Insurance Finding— will have preclusive effect under "applicable principles of res judicata or collateral estoppel" in any future coverage litigation between Truck and the Debtors. Plan, D.E. 2481 Art. IV.Q.

The Bankruptcy Court erred, initially, by accepting the Plan Proponents' contention that the Plan was insurance neutral and, therefore, Truck did not have standing. Both contentions are wrong. Insurance neutrality itself, a judge-made "prudential standing" doctrine laid out in *In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004) *as amended* (Feb. 23, 2005), rests on an unsound legal foundation. Moreover, even if the doctrine could somehow trump party-in-interest standing under section 1109(b), the Plan is not insurance neutral.

*Combustion Engineering* did not address "party in interest" standing under section 1109(b)—rather, it addressed whether an insurer satisfied the "more restrictive" "persons aggrieved" requirement that some courts demand as a matter of "prudential standing" before allowing a party to *appeal* an adverse final decision in a bankruptcy case. *Id.* at 215. The "persons aggrieved" standard is irrelevant to the party-in-interest determination under section 1109(b). *See In re ANC Rental Corp.*, 280 B.R. 808, 815–16 (D. Del. 2002) (contrasting two standards). Second, since *Combustion Engineering* was decided, the Supreme Court has cast substantial doubt on the permissibility of "prudential standing" doctrines generally and has instructed courts to consider instead "whether this particular class of persons has a right to sue under this substantive statute." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014) (quoting *Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 675–76 (D.C. Cir. 2013) (Silberman, J, concurring)). Contrary to *Combustion Engineering*, absent some statutory restriction, a court "cannot limit a cause of action that Congress has created merely because 'prudence' dictates." *Id.* at 128.

Even accepting, incorrectly, that *Combustion Engineering*'s test applied, this Plan does not comport with that test. A plan is not insurance neutral unless "all contractual rights and coverage defenses [are] fully preserved." *In re Flintkote Co.,* 486 B.R. 99, 117 (Bankr. D. Del. 2012) *aff'd*, 526 B.R. 515 (D. Del. 2014). *Combustion Engineering*'s plan decreed that:

> [N]otwithstanding anything to the contrary in this Order, the Plan or any of the Plan Documents, nothing in this Order, the Plan or any of the Plan documents (including any other provision that purports to be preemptory or supervening), shall in anyway [sic] operate to, or have the effect of, impairing the insurers' legal, equitable or contractual rights, if any, in any respect. The rights of insurers shall be determined under the Subject Insurance Policies or Subject Insurance Settlement Agreements as applicable.

391 F.3d at 209. "[T]his language broadly preserves insurers' pre-petition rights under the subject

64

insurance policies" and, as a result, the Court held that the plan did not "diminish the rights of insurers or increase their burdens under the subject insurance policies." *Id.* at 217. The *Combustion Engineering* court made clear that neither the plan documents nor confirmation order would in any way impair the insurers' legal, equitable, or contractual rights under the policies and that their rights should be determined under the policies.

That is not true of this Plan. The proposed insurance neutrality language states that nothing in the plan documents, confirmation order, or findings and conclusions "shall limit the right of any Asbestos Insurer to assert any Insurer Coverage Defense." But "Insurer Coverage Defense" is a defined term under the Joint Plan that excludes defenses relating to the "drafting, proposing, confirmation or consummation of a plan of reorganization." In other words, the plan *does* impair an insurer's contractual right to argue that Kaiser's conduct in bankruptcy violates its policy. This Plan cannot meet the standard for insurance neutrality set forth in *Combustion Engineering.*

Of course, the Debtors' request for the Insurance Finding lays to rest any plausible suggestion that this Plan is insurance neutral. To the contrary, the Insurance Finding is an explicit declaration restricting Truck's policy defenses. In *In re Thorpe Insulation Co.*, 677 F.3d 869 (9th Cir. 2012), the Ninth Circuit held that the mere "possibility that the plan will have a preclusive effect" in litigation was enough to make the insurers parties in interest under section 1109(b) and render the plan *not* insurance neutral.[31] *Id.* at 885.

---

[31] *Thorpe* provides an instructive comparison to this case. That plan, like this one, "contain[ed] a section stating that it is 'insurance neutral,' preserving all 'Asbestos Insurance Defenses' . . . [but] in apparent contradiction of the neutrality characterization, the plan includes . . . exceptions to the otherwise preserved defenses." *Id.* at 878. To this extent, the Thorpe insurers were precisely in Truck's position. Among other reasons, the Ninth Circuit explicitly found that the plan's preclusive effect, the plan's economic impact on the insurers, and the plan's (quite limited) authorization empowering the Trust to allow claims against the insurers adversely impacted the insurers and gave them standing. If anything, the standing argument for the Thorpe insurers was less powerful than Truck's argument here because the Thorpe plan required future

JA00569

The same is true here. In addition to the pecuniary injury it would suffer if the Plan were confirmed, *see infra* § IV.A.3, confirmation of the plan would cause Truck to suffer a legal injury. Because the Insurance Finding seeks to adjudicate Truck's coverage rights under the Truck Policies and to extinguish Truck's right to argue in future coverage litigation that the Debtors have forfeited coverage under the Truck Policies, the Insurance Finding itself is a basis for recognizing Truck's party-in-interest under section 1109(b).

3.      **Truck is a party in interest as to all confirmation issues because it will bear the financial burden of the fraudulent scheme to inflate the Debtors' insured asbestos liabilities greenlighted by the Plan**

Recognizing that Truck plainly has standing to be heard with respect to insurance coverage issues, the Plan Proponents argued, and the Bankruptcy Court agreed, that Truck nevertheless lacked standing to assert that the Plan does not comply with sections 1129(a)(3) or 524(g) of the Bankruptcy Code. According to the Proposed Findings and Conclusions, Truck has limited standing to object to the Finding of insurance neutrality and to Kaiser's entitlement to the Insurance Finding, but cannot otherwise challenge confirmation. D.E. 2486 at 58. This dual track approach is incompatible with section 1109(b)'s statement that a "party in interest" may challenge "any issue under this chapter."

Even accepting the mistaken dual-track premise, Truck is nevertheless a party in interest with respect to its specific confirmation objections because those objections argue that the Plan has been designed to enable the pursuit of fraudulent claims against the Reorganized Debtors that are *insured by Truck*. "[W]hen a federal court gives its approval to a plan that allows a party to put its hands into other people's pockets, the ones with the pockets are entitled to be fully heard

claimants to proceed against the Trust and prohibited tort litigation, even against nonsettling insurers, unless the trust allowed the action and the tort plaintiff agreed to the same judgment reduction he would have received in a claim against the trust. *Id.*

and to have their legitimate objections addressed." *In re Glob. Indus. Techs.*, 645 F.3d at 204. Indeed, it is particularly appropriate to grant standing to insurers "since it was 'highly unlikely that any of the parties other than the insurers' would raise the issue." *Id.* at 214 (quoting *In re Congoleum Corp.,* 426 F.3d at 685).

More fundamentally, assuming this Court agrees that the Plan has not been proposed in good faith or that it fails to comply with section 524(g), or both, it would be a perversion of justice to nevertheless confirm that Plan based on a finding that the only party with a financial incentive to challenge the Plan lacks standing to object. Moreover, the Court has an independent obligation to ensure that the requirements of section 524(g) are complied with prior to issuing a 524(g) injunction, and the Court should likewise decline to lend its imprimatur to a bad faith plan, regardless of whether anyone objects.

### B. Truck is injured by the plan and has Constitutional standing

Truck has Article III standing to object to confirmation of the Plan because it is injured by the Plan's blind eye to ongoing fraud. Article III requires that each party seeking a remedy in federal court must demonstrate an injury in fact that is traceable to the conduct challenged in the dispute and that is likely to be redressed by a favorable decision. *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). In a chapter 11 proceeding, Article III standing is satisfied where "the participant holds a financial stake in the outcome of the proceeding such that the participant has an appropriate incentive to participate in an adversarial form to protect his or her interests." Collier on Bankr. ¶ 1109.04. "Article III standing and standing under the Bankruptcy Code are effectively coextensive." *In re Glob. Indus. Techs., Inc.*, 645 F.3d at 211.

Here, Truck has suffered several injuries, all of which are traceable to the proposed Plan— Truck faces financial harm because the Debtors have agreed to permit the fraudulent inflation of their own asbestos liabilities, provided such liabilities are covered by Truck's insurance. These

injuries are the direct result of the Plan and the Proposed Findings and Conclusions. If this Court declines to confirm the Plan, or if it modifies the Plan to include the vital anti-fraud measures, Truck's injuries will be redressed. That is all that Article III requires.

## V. If the Court Confirms The Plan, The Court Should Not Waive The 14-Day Stay Under Bankruptcy Rule 3020(e)

Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 3020(e). The Debtors disingenuously argued below that such a waiver "will not prejudice any party in interest," D.E. 2275 at 99, and without any explanation, the Proposed Confirmation Order provides for a waiver of the 14-day stay of the Proposed Confirmation Order.

The purpose of Bankruptcy Rule 3020(e) is "to provide sufficient time for a party to seek a stay pending appeal before the plan is implemented and appeal becomes moot." *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 282 (Bankr. S.D.N.Y. 2007); *see also In re Heritage Org., L.L.C.*, 375 B.R. 230, 315 n.103 (Bankr. N.D. Tex. 2007) (citing Fed. R. Bankr. P. 3020(e) (Advisory Committee Notes)). In the face of an objecting party and a likely appeal, a court should "not take an affirmative step that would foreclose all opportunities for judicial review" by waiving the stay under Bankruptcy Rule 3020(e) thereby "tak[ing] away the normal period for asking for a further stay." *In re Adelphia Commc'ns Corp.*, 368 B.R. at 282.

In this case, should the Court confirm the Plan, Truck will seek review from the Fourth Circuit and will petition first this Court and then, if unsuccessful, the Fourth Circuit for a stay pending appeal. The 14-day stay should not be waived because, among other reasons, the potential injury to Truck from waiver of the 14-day stay far exceeds any possible injury to the Plan Proponents from failure to waive the stay. The Debtors have been in bankruptcy for more than four years and their ongoing business operations will not be disrupted by a 14-day stay. Moreover,

asbestos claimants already have relief from the automatic stay to pursue claims in the tort system. If the Court confirms the Plan, the Court should not waive the 14-day under Bankruptcy Rule 3020(e) and should allow Truck a full opportunity to seek a further stay pending appeal.

## CONCLUSION

The Court should decline to (1) adopt the Proposed Findings and Conclusions, (2) issue the requested section 524(g) injunction, and (3) confirm the Plan; and should condition Plan confirmation on extension of the fraud prevention measures to insured claims so that Truck can obtain the disclosures and authorizations necessary to obtain full information as to the claimants' asbestos exposures.

JA00573

Respectfully submitted,

Dated: November 4, 2020

Michael A. Rosenthal
(admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Phone:  (212) 351-4000; Fax:  (212) 351-4035
Email:  MRosenthal@gibsondunn.com

Robert B. Krakow (admitted *pro hac vice*)
Allyson N. Ho (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
Email:  RKrakow@gibsondunn.com
Email: AHo@gibsondunn.com

Matthew G. Bouslog (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612-4412
Email:  MBouslog@gibsondunn.com

David W. Casazza (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave, N.W.
Washington, D.C. 20036
Email: DCasazza@gibsondunn.com

*/s/ Michael L. Martinez*

GRIER WRIGHT MARTINEZ, PA
Michael L. Martinez
(N.C. State Bar No. 39885)
101 North Tryon Street, Suite 1240
Charlotte, NC 28246
Phone:  (704) 332-0209; Fax:  (704) 332-0215
Email:  mmartinez@grierlaw.com

– and –

PIA ANDERSON MOSS HOYT, LLC
Scott R. Hoyt (admitted *pro hac vice*)
136 E. South Temple, 19th Floor
Salt Lake City, UT 84111
Phone: (817) 454-5678; Fax: (801) 350-9010
Email: SHoyt@pamhlaw.com

*Counsel for Truck Insurance Exchange*

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : | Case No. 16-31602 (JCW) |
|  | : | (Jointly Administered) |
| KAISER GYPSUM COMPANY, INC., *et al.*[1] | : |  |
|  | : |  |
| Debtors. | : | Case No. 3:20-cv-00537-GCM |
|  | : |  |

## FUTURE CLAIMANTS' REPRESENTATIVE'S BRIEF IN RESPONSE TO OBJECTION OF TRUCK INSURANCE EXCHANGE TO THE BANKRUPTCY COURT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING CONFIRMATION OF THE JOINT PLAN OF REORGANIZATION OF KAISER GYPSUM COMPANY, INC. AND HANSON PERMANENTE CEMENT, INC., AS MODIFIED

Dated: December 4, 2020

HULL & CHANDLER, P.A.
Felton E. Parrish (NC Bar No. 25448)
1001 Morehead Square Drive
Suite 450
Charlotte, NC 28203
Telephone: 704-375-8488
Facsimile: 704-375-8487
Email: fparrish@lawyercarolina.com

YOUNG CONAWAY STARGATT & TAYLOR, LLP
James L. Patton, Jr. (DE Bar No. 2202)
Edwin J. Harron (DE Bar No. 3396)
Sharon M. Zieg (NC Bar No. 29536)
Travis G. Buchanan (DE Bar No. 5595)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: jpatton@ycst.com
          eharron@ycst.com
          szieg@ycst.com
          tbuchanan@ycst.com

*Counsel for the Future Claimants' Representative*

---

[1] The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  Kaiser Gypsum Company, Inc. (0188) and Hanson Permanente Cement, Inc. (7313).  The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

27384567.10

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND .................................................................................................................. 8

    I.     The Future Claimants' Representative supports the Plan. ...................................... 8

    II.    The record in these chapter 11 cases does not contain any evidence of fraud. ................................................................................................................... 10

ARGUMENT ..................................................................................................................... 13

    I.     Truck has no standing to raise its confirmation objections. ................................. 13

         A.    The Plan is insurance neutral. .................................................................. 13

         B.    Truck cannot circumvent the Plan's insurance neutrality in order to obtain standing. ..................................................................................... 15

             i.    Section 1109(b) of the Bankruptcy Code does not confer standing on Truck. ............................................................ 15

             ii.    Article III of the Constitution does not confer standing on Truck. ..................................................................................... 17

    II.    The Plan satisfies the requirements for confirmation under § 1129 of the Bankruptcy Code. .......................................................................................... 19

    III.   The Plan complies with the requirements of § 524(g) of the Bankruptcy Code. ................................................................................................................... 22

         A.    The Asbestos Personal Injury Trust assumes the Debtors' liabilities, satisfying § 524(g)(2)(B)(i)(I). ................................................ 23

         B.    The Asbestos Personal Injury Trust will be funded by, in part, by a security of the Debtors and the Debtors' obligation to make future payments, satisfying § 524(g)(2)(B)(i)(II). ................................................ 24

         C.    The Asbestos Personal Injury Trust will be entitled to own 100% of the Reorganized Debtors if they fail to pay the Payment Note in full, satisfying § 524(g)(2)(B)(i)(III). ...................................................... 25

         D.    Relief under § 524(g) is necessary to deal equitably with present claims and future demands, satisfying § 524(g)(2)B)(ii)(III). ................. 27

    IV.   The Insurance Finding is entirely proper. ........................................................... 29

CONCLUSION .................................................................................................................. 30

Case 3:20-cv-00537-GCM    Document 32    Filed 12/04/20    Page 2 of 38    JA00576

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re A.P.I., Inc.*,
331 B.R. 828 (Bankr. D. Minn. 2005) ....................................................................................16

*In re Am. Capital Equip., LLC*,
688 F.3d 145 (3d Cir. 2012)..................................................................................................19

*In re Amatex Corp.*,
755 F.2d 1034 (3d Cir. 1985)................................................................................................16

*In re Andrews*,
80 F.3d 906 (4th Cir. 1996) ....................................................................................................4

*In re Art Midwest, Inc.*,
No. 04-91225-RFN-11, 2006 WL 306894 (Bankr. N.D. Tex. Jan. 5, 2006) ...........................16

*AV Media Pte. Ltd. v. Promounts*,
No. 207CV00059FMCCTX, 2008 WL 11337209 (C.D. Cal. July 1, 2008) ..........................4

*In re Burns & Roe Enters., Inc.*,
Case No. 00-41610, 2009 WL 438694 (D.N.J. Feb. 23, 2009) ...................................... *passim*

*CalPERS v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004).....................................................................................................5

*Casey v. Kaiser Gypsum Co.*,
Case No. A133062 (Cal. Ct. App. 2011) ...............................................................................28

*In re Combustion Eng'g, Inc.*,
391 F.3d 190 (3d Cir. 2004)........................................................................................... *passim*

*Comm. of Dalkon Shield Claimants v. A.H. Robins Co.*,
828 F.2d 239 (4th Cir. 1987) ...................................................................................................4

*In re Congoleum Corp.*,
362 B.R. 167 (Bankr. D.N.J. 2007) ...................................................................................26, 27

*In re Couture Hotel Corp.*,
536 B.R. 712 (Bankr. N.D. Tex. 2015)...............................................................................5, 22

*In re Fairbanks Co.*,
601 B.R. 831 (Bankr. N.D. Ga. 2019) ..................................................................................28

Case 3:20-cv-00537-GCM   Document 32   Filed 12/04/20   Page 3 of 39   JA00577

*In re Federal-Mogul Global Inc.*,
    684 F.3d 355 (3d Cir. 2012)................................................................4, 9, 20

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servo (TOC), Inc.*,
    528 U.S. 167 (2000)....................................................................................16

*In re Fuller-Austin Insulation*,
    No. 98-2038-JJF, 1998 WL 812388 (D. Del. Nov. 10, 1998) ................13

*Izell v. Union Carbide Corp.*,
    180 Cal. Rptr. 3d 382 (Cal. Ct. App. 2014) ..........................................28

*J T Thorpe Co.*,
    No. 02-41487-H5-11, 2003 WL 23354129 (Bankr. S.D. Tex. Jan. 30, 2003) ........13

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987),
    *aff'd sub nom. Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
    843 F.2d 636 (2d Cir. 1988)......................................................................15

*In re Leslie Controls, Inc.*,
    No. 10-12199 (CSS) (Bankr. D. Del. Oct. 26, 2010) ........................13, 14

*In re Leslie Controls, Inc.*,
    No. 11-0013 JBS, 2011 WL 1226402 (D. Del. Mar. 25, 2011)..............26

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)....................................................................................17

*In re Michener*,
    342 B.R. 428 (Bankr. D. Del. 2006) ........................................................19

*Mt. McKinley Ins. Co. v. Pittsburgh Corning Corp.*,
    518 B.R. 307 (W.D. Pa. 2014)......................................................13, 14, 17

*In re Newcare Health Corp.*,
    244 B.R. 167 (B.A.P. 1st Cir. 2000) ........................................................15

*OneBeacon Am. Ins. Co. v. A.P.I., Inc.*,
    No. CIV. 06-167 (JNE), 2006 WL 1473004 (D. Minn. May 25, 2006) ................15

*Pettibone Corp. v. Hawxhurst*,
    163 B.R. 989 (N.D. Ill. 1994), *aff'd*, 40 F.3d 175 (7th Cir. 1994)..........14

*In re Phillips*,
    573 B.R. 626 (Bankr. E.D.N.C. 2017) ....................................................15

27384567.10

iii

*In re Pittsburgh Corning Corp.*,
    417 B.R. 289 (Bankr. W.D. Pa. 2006) ........................................................3, 13, 17

*In re Plant Insulation Co.*,
    485 B.R. 203 (N.D. Cal. 2012), *rev'd on other grounds*, 734 F.3d 900 (9th
    Cir. 2013) ........................................................................................................20, 21

*In re Plant Insulation Co.*,
    734 F.3d 900 (9th Cir. 2013) ..................................................................................26

*In re Plant Insulation Co.*,
    Case No. 09-31347 (Bankr. N.D. Cal. Mar. 3, 2014) ..................................20, 24, 27

*In re Plant Insulation Co.*,
    Case No. 09-31347 TEC, 2012 Bankr. LEXIS 1716 (Bankr. N.D. Cal. Mar.
    15, 2012), *rev'd on other grounds*, 734 F.3d 900 (9th Cir. 2013) ....................15, 20

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414 (1968)............................................................................................5, 22

*In re Real Wilson Enters., Inc.*,
    No. 11-15697-B-11, 2013 WL 5352697 (Bankr. E.D. Cal. Sept. 23, 2013) ...........15

*Revitt v. Ashland, Inc.*,
    Case No. 03-5935-C (Dallas Cty. Ct. 2005 ...........................................................28

*Rosen v. Tenn Comm'r of Fin. & Admin.*,
    288 F.3d 918 (6th Cir. 2002) .................................................................................16

*In re S B Bldg. Assocs. Ltd. P'ship*,
    No. 13-12682 VFP, 2020 WL 6552089 (Bankr. D.N.J. Nov. 6, 2020) .................5, 22

*In re Sylmar Plaza, L.P.*,
    314 F.3d 1070 (9th Cir. 2002) ...............................................................................16

*In re Tascosa Petrol Corp.*,
    196 B.R. 856 (D. Kan. 1996) .................................................................................15

*In re Thorpe Insulation Co.*,
    Case No. 2:07-bk-19271-BB (Bankr. C.D. Cal. May 8, 2013).....................20, 24, 27

*In re Torrez*,
    132 B.R. 924 (Bankr. E.D. Cal. 1991) ...................................................................16

*In re Tower Park Properties, LLC*,
    803 F.3d 450 (9th Cir. 2015) .................................................................................16

*Untermann v. Kaiser Gypsum Co.*,
    Case No. A137886 (Cal. Ct. App. 2013) ...............................................................28

*Vara v. Duro Dyne Nat'l Corp. (In re Duro Dyne Nat'l)*,
    C.A. No. 18-15563, 2019 WL 4745879 (D.N.J. Sept. 30, 2019) ...........................28

*In re W. Asbestos Co.*,
    313 B.R. 832 (Bankr. N.D. Cal. 2003) .............................................................25, 26

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012) ..................................................................................19

*In re W.R. Grace & Co.*,
    729 F.3d 311 (3d Cir. 2013) .................................................................................19

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) ............................................................................................17

**STATUTES**

11 U.S.C. § 101(49) .......................................................................................................24

11 U.S.C. § 524(e) .....................................................................................................3, 14

11 U.S.C. § 524(g) ................................................................................................ *passim*

11 U.S.C. § 524(g)(1)(A) ...............................................................................................9

11 U.S.C. § 524(g)(2)(B)(ii)(III) .................................................................................27

11 U.S.C. § 524(g)(2)(B)(ii)(V) .....................................................................................9

11 U.S.C. § 524(g)(4)(B)(i) .......................................................................................9, 28

11 U.S.C. § 524(g)(4)(B)(ii) ...........................................................................................9

11 U.S.C. § 524(g)(5) .......................................................................................................1

11 U.S.C. § 1109(b) ...........................................................................................15, 16, 18

11 U.S.C. § 1129 .........................................................................................................1, 19

11 U.S.C. § 1129(a)(3) ..............................................................................................19, 20

Ariz. Rev. Stat. Ann. § 12-782 .................................................................................7, 18

N.C. Gen. Stat. Ann. 1A-1 .............................................................................................7

Case 3:20-cv-00537-GCM   Document 32   Filed 12/04/20   Page 6 of 38   JA00580

R**ULES**

Fed. R. Civ. P. 9(b) ...................................................................................................5

Rule 26(b)(2a) ...........................................................................................................7

O**THER** A**UTHORITIES**

A.B. 1056, 2017 Leg., Reg. Session (Cal. 2017) ..............................................7, 18

C. Bianchi et al., *Latency Periods in Asbestos-Related Mesothelioma of the Pleura* ...............................................................................................................8

H.B. 1026, 203rd Gen. Assemb., Reg. Sess. (Pa. 2019) .................................7, 18

H.B. 1428, 199th Gen. Assemb., Reg. Sess. (Pa. 2015) .................................7, 18

H.B. 238, 201st Gen. Assemb., Reg. Sess. (Pa. 2017) ...................................7, 18

Muriel L. Newhouse & Hilda Thompson, *Mesothelioma of Pleura and Peritoneum Following Exposure to Asbestos in the London Area* .......................8

Order Confirming the First Am. Plan of Reorganization of Leslie Controls, Inc. Under Chapter 11 ............................................................................................13

S.B. 2511, 240th Leg., Reg. Sess. (N.Y. 2017) ..............................................7, 18

S.B. 3643, 100th Gen. Assemb., 2nd Reg. Sess. (Ill. 2018) ..........................7, 18

S.B. 415, 155th Gen. Assemb., Reg. Session (Ga. 2019) ...............................7, 18

S.B. 452, 122nd Gen. Assemb., 1st Reg. Sess. (S.C. 2017) ...........................7, 18

S.B. 69, 100th Gen. Assemb., Reg. Sess. (Mo. 2019) ....................................7, 18

Case 3:20-cv-00537-GCM   Document 32   Filed 12/04/20   Page 7 of 38   JA00581

Lawrence Fitzpatrick (the "Future Claimants' Representative" or the "FCR") is the Bankruptcy Court-appointed legal representative for the individuals (the "Future Claimants") who will assert asbestos-related personal injury demands, as defined in § 524(g)(5) of the Bankruptcy Code, against the above-captioned chapter 11 debtors (the "Debtors") after confirmation of a plan of reorganization in the Debtors' chapter 11 bankruptcy cases. The Future Claimants' Representative hereby submits this brief (the "Response Brief") in response to the objection [Docket No. 25] and accompanying brief [Docket No. 26] (the "Truck Brief") filed by Truck Insurance Exchange ("Truck") in connection with the *Third Amended Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc.* [Bankr. Docket No. 2481] (the "Plan")[2] and the Bankruptcy Court's *Order Recommending Entry of Proposed Findings of Fact and Conclusions of Law and Order Confirming Joint Plan of Reorganization* [Docket No. 1] (the "Recommendation Order").

## PRELIMINARY STATEMENT

1.      The Future Claimants' Representative is a co-proponent of the Plan, along with the Debtors, their affiliates, and the Official Committee of Asbestos Personal Injury Claimants. The Plan meets all of the requirements of §§ 524(g) and 1129 of the Bankruptcy Code and is fair and equitable to Future Claimants. There is no evidence to the contrary.

2.      The Plan channels the Debtors' asbestos-related liability to a trust and allows the Debtors to make the "fresh start" that the Bankruptcy Code contemplates for chapter 11 debtors. The Plan, moreover, was unanimously approved by the current asbestos claimants. Asbestos claimants were the only parties entitled to vote on the Plan because they were the only parties whose pre-bankruptcy rights and obligations are impaired under the Plan.

---

[2] Capitalized terms and phrases used herein have the meanings given to them in the Plan.

27384567.10

JA00582

3.      The trust will pay qualifying uninsured asbestos claims, as well as any insurance deductibles or other uninsured portions of an insured claim.  Under the Plan, the Debtors are funding the trust with $49 million in cash, a $1 million note, and the Debtors' insurance rights.  As part of the trust's settlement process, claimants provide the trust with the evidence necessary for the trust to determine that they qualify for a settlement.  The trust is not funded or designed to litigate claims.  If claimants provide the requisite information, the trust will pay them.

4.      The vast majority of the Debtors' asbestos claimants hold insured claims.  Under the Plan, these insured asbestos claims are passed through the trust to the tort system, where the holders of such claims can sue the Debtors in name only in order to pursue a recovery from available insurance coverage (with the trust paying deductibles and any uninsured portions of the claims).

5.      Truck is one of the Debtors' insurers and the primary party responsible for defending and paying insured asbestos claims.  By its own admission, Truck is contractually obligated to defend and pay asbestos claims resulting from asbestos exposures occurring between 1964 and 1983, up to $500,000 per claim, with no aggregate limits.[3]  For more than 18 years, Truck accepted policy premiums from the Debtors under an insurance contract in which Truck agreed to defend against *any* claim or suit.[4]  Truck further agreed, specifically, that a bankruptcy filing by the Debtors "shall *not* relieve [Truck] of any of its obligations" under the insurance contract.[5]

---

[3] *See* Truck Brief at 19 & n.12.

[4] Confirmation Ex. 30 at TRUCK0000575 (Truck Ins. Exch. Comprehensive Liability Policy No. 3504000, incepting Jan. 1, 1976).

[5] Confirmation Ex. 30 at TRUCK0000587 (Truck Ins. Exch. Comprehensive Liability Policy No. 3504000, incepting Jan. 1, 1976) (emphasis added).

27384567.10

2

Case 3:20-cv-00537-GCM   Document 32   Filed 12/04/20   Page 9 of 38

JA00583

6.       Truck is the only party that opposes confirmation of the Plan. Truck asks the Court to deny confirmation unless the Plan is revised to require the trust to operate for Truck's benefit. Truck wants the trust to obtain evidence from claimants whose claims are being resolved, not by the trust, but by Truck, before those claimants are permitted to pursue their claims in the tort system. The trust is not an instrument for Truck's litigation strategy, however, and collecting this evidence would not benefit the trust or the claimants in any way.

7.       Under the Plan, however, Truck's ability to defend asbestos claims, and its obligation to pay those claims, are unchanged from what they were before the bankruptcy. Truck does not even contend that the Plan alters its prior obligations as an insurer in any way. Instead, relying solely upon unsubstantiated allegations of fraud, Truck argues that the Plan cannot be confirmed unless it is amended to significantly alter the state-law rights of asbestos claimants by imposing new requirements on them as a prerequisite to asserting their claims in the tort system.

8.       As a threshold issue, Truck lacks standing to raise its objections to the Plan. The Plan is "insurance neutral," because nothing about the Plan impairs the rights and defenses that Truck had available to it before the bankruptcy.[6]

9.       Truck's opposition to the Plan also fails on the merits, however. The Bankruptcy Code is designed to protect the rights of creditors, not insurers.[7] As the Fourth Circuit has

---

[6] *Cf. In re Pittsburgh Corning Corp.*, 417 B.R. 289, 317 (Bankr. W.D. Pa. 2006) ("Because the Second Amended Plan of Reorganization does not diminish the rights of the Objecting Insurers or increase their burdens under the subject insurance policies, the court finds that it is 'insurance neutral.' As a result, the insurers have no standing to object to confirmation."); *see also In re Combustion Eng'g, Inc.*, 391 F.3d 190, 202 (3d Cir. 2004) (describing a plan's "neutrality" provision as "protect[ing] the debtor's and insurers' prepetition rights under certain insurance policies").

[7] *See* 11 U.S.C. § 524(e) (providing that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt").

Case 3:20-cv-00537-GCM   Document 32   Filed 12/04/20   Page 10 of 38   3A00584

explained, protecting creditors is one of the "ultimate aim[s]" of the Bankruptcy Code.[8]  Truck

does not object to confirmation based on its status as a minor unsecured creditor.[9]  Rather, Truck

is attempting to use the plan confirmation process to rewrite the terms of its insurance policies

with the Debtors in order to enhance its profits.  This is in stark contrast to the Debtors' asbestos

claimants, who are involuntary creditors[10] and whose prepetition rights are not enhanced under

the Plan.

10.     To disrupt the bankruptcy in furtherance of its business objectives, Truck has

contrived objections based on collusion and fraud.  But a debtor negotiating with its creditors is

not collusion.[11]  Truck also had numerous opportunities to negotiate,[12] even participating in a

specific mediation with the Debtors, the ACC, and the FCR.[13]  According to Truck, the Debtors'

and the claimants' representatives' resolution of their disputes is equivalent to collusion—but in

---

[8] *Comm. of Dalkon Shield Claimants v. A.H. Robins Co.*, 828 F.2d 239, 242 (4th Cir. 1987); *see also In re Andrews*, 80 F.3d 906, 909 (4th Cir. 1996) (explaining that the Bankruptcy Code's "two overarching purposes" are "providing protection for the creditors" and "permitting the debtor to . . . make a 'fresh start'").

[9] Under the Plan, all General Unsecured Claims—including Truck's claim—are paid in full.  *See* Plan § III.B.3.

[10] *Cf. AV Media Pte. Ltd. v. Promounts*, No. 207CV00059FMCCTX, 2008 WL 11337209, at *2 (C.D. Cal. July 1, 2008) ("[V]oluntary creditors are compensated at the time of contract formation for the risk that the corporation will later default.  Tort creditors, because their interaction with the corporation is involuntary, received no such compensation.").

[11] *In re Federal-Mogul Global Inc.*, 684 F.3d 355, 357-59 (3d Cir. 2012) ("Insurers also allege the trust mechanism might distort ordinary incentives between insurer and insured, encouraging the debtor to collude with claimants and impose costs on the insurer.  But as [the debtor] points out, this shift in incentives is not unique to the asbestos context and occurs in bankruptcy where there is a discharge of the liability of the debtor but not that of the insurer.  Nor do the Insurers provide any evidence of such collusion in this case.  Such bare speculation does not establish an increase in [the Insurers'] risk." (internal citations omitted)).

[12] In fact, the Debtors, the ACC, and the FCR negotiated consensual resolutions with more than a dozen other insurers who had initially objected to the Plan.  *See Notice of Filing of Redline Version of Third Amended Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc. Reflecting Settlement Reached with Certain Excess Insurers* [Bankr. Docket No. 2304].

[13] *See, e.g.*, Hr'g Tr. at 154:9-18 (July 20, 2020) (McChesney testimony) ("Q And are you aware that negotiations did occur between the debtors, Truck, ACC, and FCR following the filing of the bankruptcy petition?  A Yes.  There was a mediation and, in fact, I think there have already been multiple sessions in which Truck participated in an attempt to determine whether there was a resolution that could involve Truck.  I'm obviously not privy to the direct communication that occurred between Truck and the ACC and FCR, but I, I know that they participated.  I participated in the mediation sessions.") [Bankr. Docket No. 2420].

A00585

fact a fundamental purpose of bankruptcy is the consensual resolution of debtor-creditor disputes.[14]

11.    Truck's accusations of fraud also miss the mark.  These are serious allegations.  It is black-letter law that allegations of fraud require specificity.[15]  These allegations require compelling evidence to support them, and Truck has offered none.

12.    Scott R. Hoyt, whom Truck offered as its 30(b)(6) corporate representative, testified that he could not identify any specific instances in which Truck determined that an asbestos suit against the Debtors was false or fraudulent.  According to Mr. Hoyt, "I can't identify a particular claim where Truck was able to actually say, look, we found trust submissions by this claimant that show they lied about their exposure history or whatever, I can't recall a claim like that."[16]  The Debtors' representative, Charles E. McChesney II, similarly testified that he was "not aware specifically of any fraudulent claims involving Kaiser Gypsum or Hanson Permanente Cement."[17]

13.    Moreover, Dr. Charles E. Bates, the expert witness that Truck enlisted to provide an analysis of allegedly fraudulent claims against the Debtors, did not actually look at any claims against the Debtors.  Instead, Dr. Bates recycled his 2013 analysis from the *Garlock* case in

---

[14] *See, e.g.*, *In re S B Bldg. Assocs. Ltd. P'ship*, No. 13-12682 VFP, 2020 WL 6552089, at *26 (Bankr. D.N.J. Nov. 6, 2020) ("The Bankruptcy Code allows for -- and indeed encourages -- such settlements as part of the plan confirmation process."); *In re Couture Hotel Corp.*, 536 B.R. 712, 735 (Bankr. N.D. Tex. 2015) (consensual resolution of debtor-creditor disputes "clearly promotes the objectives and purposes of the Bankruptcy Code"); *cf. Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) ("Compromises are a normal part of the process of reorganization.  In administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts.") (citation and internal quotation marks omitted)).

[15] *See, e.g.*, *CalPERS v. Chubb Corp.*, 394 F.3d 126, 163 (3d Cir. 2004) (explaining that a party alleging fraud must "plead with particularity the 'who, what, when and how'" of each allegedly fraudulent act); *cf.* Fed. R. Civ. P. 9(b).

[16] Hoyt Dep. Tr. at 47:25-48:11; see also Hoyt Dep. Tr. at 267:23-268:6 ("I can't point to a case and say, this case is permeated by the fraud . . . .").

[17] Hr'g Tr. at 146:12-14 (July 20, 2020) (McChesney testimony) [Bankr. Docket No. 2420].

which the Bankruptcy Court concluded that certain plaintiffs had asbestos exposures that were not disclosed to the debtor in that case. Dr. Bates compared the claims database that Garlock maintained as of its bankruptcy filing on June 5, 2010, with the claims database maintained by the Debtors here. According to Dr. Bates, some of the individuals who filed claims against the Debtors as of June 5, 2010, had also filed claims against Garlock. But Dr. Bates did not actually look at any of the claims filed against the Debtors. And he had no idea how the Debtors had disposed of those claims—that is, Dr. Bates never ascertained whether or not the Debtors had actually paid any of the individuals who had also asserted claims against the Debtors and Garlock prior to June 5, 2010. In fact, Dr. Bates testified that he "suspect[ed]" and "wouldn't be surpris[ed]" to learn that the overlapping plaintiffs would have had their claims against the Debtors dismissed.[18] But again, Dr. Bates did not bother to check.

14.     In its opposition to the Plan, Truck relies heavily on the *Garlock* case—the word "Garlock" appears 117 times in the Truck Brief—but in practice, the purported misconduct described in *Garlock* had no effect on Truck's handling of claims. Mr. Hoyt testified that the *Garlock* decision had no practical effect on the way that Truck defended asbestos claims against the Debtors.[19] In the tort system, Truck never deemed it necessary to seek information about plaintiffs' other exposures—either before or after the *Garlock* decision.

---

[18] Bates Dep. Tr. at 84:1-85:1.

[19] Hoyt Dep. Tr. at 205:6-18 ("Since Truck became aware of the Garlock estimation decision in and around February 2014, are you aware of any counsel defending Kaiser in asbestos personal injury cases undertaking additional discovery to obtain information about exposures that you contend that Garlock decision demonstrated was being withheld? A.   You are talking about discovery, for example, to asbestos trusts? Q.   That would be one example, yes, sir. A.   I am not aware."); *id.* at 205:21-206:2 ("Since Truck became aware of the Garlock estimation decision in and around February of 2014, are you aware of any counsel that Truck has defending Kaiser subpoenaing any asbestos trusts? A.   No."); *id.* at 207:8-17 ("Q.   Is there any discovery, additional discovery beyond that that defense counsel didn't seek, prior to 2014, that defense counsel hired by Truck then did seek after the Garlock estimation decision came out? A.   I'm not aware of any. Q.   Did the Garlock estimation decision effect how Truck defended Kaiser in any asbestos personal injury cases in any way? A.   No.").

27384567.10

A00587

15.     The Future Claimants' Representative submits that the arguments and defenses available to Truck in the tort system should be left to the courts in the tort system.  It is simply not appropriate for the Plan to impose obligations on claimants—beyond what the tort system would require—for the express purpose of augmenting Truck's defenses beyond what state law would provide.

16.     The contours of state-court litigation is the province of state legislatures.  Some state legislatures enacted "asbestos trust transparency" bills that would require claimants in those states to provide the information that Truck seeks from all claimants across the board.[20]  Other states, such as California, Missouri, Georgia, New York, Pennsylvania, Illinois, and South Carolina, have considered similar legislation and declined to enact it.[21]

17.     The Court should not legislate one approach over another but should allow the individual states to make those determinations for themselves.  As the Bankruptcy Court aptly explained, "[t]he remedy Truck seeks—a requirement that before an asbestos claimant can sue in state court they must provide pre-suit discovery that is not mandated in other forums and not for the benefit of the Asbestos Personal Injury Trust—is essentially legislative in nature, and is

---

[20] *See, e.g.*, N.C. Gen. Stat. Ann. 1A-1, Rule 26(b)(2a); *see also* Ariz. Rev. Stat. Ann. § 12-782 (requiring asbestos plaintiffs to identify each claim filed against an asbestos trust and any claim that "that the plaintiff reasonably anticipates filing against an asbestos trust, including the name, address, and contact information for the asbestos trust and the amount that the plaintiff anticipates claiming against the asbestos trust"); Wisc. Stat. § 802.025.

[21] S.B. 415, 155th Gen. Assemb., Reg. Session (Ga. 2019) (died in chamber); S.B. 69, 100th Gen. Assemb., Reg. Sess. (Mo. 2019) (died in chamber); S.B. 3643, 100th Gen. Assemb., 2nd Reg. Sess. (Ill. 2018) (died in committee); A.B. 1056, 2017 Leg., Reg. Session (Cal. 2017) (died in committee); S.B. 2511, 240th Leg., Reg. Sess. (N.Y. 2017) (died in committee); S.B. 452, 122nd Gen. Assemb., 1st Reg. Sess. (S.C. 2017) (died in committee).  Indeed, in Pennsylvania, such legislation has been rejected three times.  H.B. 1026, 203rd Gen. Assemb., Reg. Sess. (Pa. 2019) (died in committee); H.B. 238, 201st Gen. Assemb., Reg. Sess. (Pa. 2017) (same); H.B. 1428, 199th Gen. Assemb., Reg. Sess. (Pa. 2015) (same).

inappropriate."[22]  The Court should not "mandate to state courts and other federal courts what kind of discovery is required in asbestos cases."[23]

18.     Accordingly, for all of these reasons and as set forth in more detail below, the Court should overrule Truck's objection and confirm the Plan.

## BACKGROUND

**I.     The Future Claimants' Representative supports the Plan.**

19.     On October 19, 2016, the Bankruptcy Court appointed Mr. Fitzpatrick to serve as FCR to ensure that the rights and interests of Future Claimants are fully protected in the bankruptcy proceedings.

20.     Given their number and value, the disposition of future claims is the single most important aspect of the Debtors' bankruptcy.  At least tens of thousands of persons injured by asbestos-containing products manufactured and sold by the Debtors will assert claims for compensation in the future.  Asbestos-related diseases have long latency periods, sometimes up to fifty years or longer between first exposure and manifestation of disease.[24]  Future Claimants do not now know who they are and are by definition incapable of acting to protect their rights and interests in the chapter 11 cases.

21.     Mr. Fitzpatrick has extensive experience resolving asbestos personal-injury claims.  Much of his experience is from working on behalf of defendants—first on behalf of Owens-Illinois, then on behalf of the members of the Asbestos Claims Facility, and finally for

---

[22] Recommendation Order, Ex. A, at 26-27.

[23] *Id.* at 26.

[24] *See* Muriel L. Newhouse & Hilda Thompson, *Mesothelioma of Pleura and Peritoneum Following Exposure to Asbestos in the London Area*, 22 Brit. J. of Indust. Med. 261, 265 (1965) (noting latency period can be as long as 55 years); C. Bianchi et al., *Latency Periods in Asbestos-Related Mesothelioma of the Pleura*, 6 Eur. J. of Cancer Prevention 162, 162 (1997) (noting the latency period in one case was 72 years).

27384567.10

8

ten years on behalf of the 20 members of the Center for Claims Resolution. Mr. Fitzpatrick also

has extensive experience in resolving asbestos personal-injury claims under the Bankruptcy

Code. He currently serves as the future claimants' representative in two other active asbestos

bankruptcy cases, in addition to this case. Mr. Fitzpatrick has also served as the future

claimants' representative in seven more cases that have concluded and for which he now serves

as the future claimants' representative for the settlement trusts resulting from those cases.

22. Section 524(g) is a unique provision of the Bankruptcy Code that allows a debtor

to achieve a final resolution of present and future asbestos-related claims through the

confirmation of a chapter 11 of plan of reorganization that establishes an appropriate mechanism

to equitably pay the claims of current and future victims of asbestos-related diseases.[25]

Confirming a § 524(g) plan of reorganization results in a permanent injunction that channels

asbestos claims away from the debtor for resolution and payment.[26] To satisfy due process,[27]

§ 524(g) conditions the issuance of this channeling injunction on multiple requirements,

including the appointment a legal representative for future claimants and a determination that the

terms of the injunction would be "fair and equitable" to future claimants.[28]

---

[25] See 11 U.S.C. § 524(g)(2)(B)(ii)(V) (providing that there must be "a reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner").

[26] 11 U.S.C. § 524(g)(1)(A).

[27] Federal-Mogul, 684 F.3d at 359 ("To . . . protect the due process rights of future claimants, section 524(g) imposed many statutory prerequisites that must be satisfied before a channeling injunction may issue." (internal quotation marks omitted)); Combustion Eng'g, Inc., 391 F.3d at 234 ("Many of the[] requirements [of § 524(g)] are specifically tailored to protect the due process rights of future claimants.").

[28] See 11 U.S.C. § 524(g)(4)(B)(i) (an injunction affecting future claimants may be issued only if "the court appoints a legal representative for the purpose of protecting the rights of persons that might subsequently assert demands"); 11 U.S.C. § 524(g)(4)(B)(ii) (a plan cannot be confirmed unless it is deemed to be "fair and equitable with respect to the persons that might subsequently assert [future] demands").

3A-00590

**II.    The record in these chapter 11 cases does not contain any evidence of fraud.**

23.    As noted above, the only opposition to confirmation of the Plan is from Truck—who has already had its own proposed plan rejected by the Bankruptcy Court as a "sham" that was "aimed at serving Truck's interest as an insurer and trying to reduce the magnitude of its obligations."[29]  According to the Bankruptcy Court, "[t]hat comes through loud and clear."[30]

24.    For all its protestations that the proponents of the Plan are colluding to perpetuate fraud, Truck has not offered evidence of a single fraudulent claim—despite having every incentive to do so.  Truck's own witness repeatedly conceded at his deposition that he *could not identify a single fraudulent claim* against the Debtors:

- Hoyt Dep. Tr. at 47:25-48:11 ("Q.  Do you have any specific instances of an [asbestos bodily injury] claim alleged against Kaiser in which Truck determined that the suit was false or fraudulent?  A.  I would think there were suspicions.  I can't identify a particular claim where Truck was able to actually say, look, we found trust submissions by this claimant that show they lied about their exposure history or whatever, I can't recall a claim like that.").

- Hoyt Dep. Tr. at 67:12-23 ("Q.  The topic reads, Any motion, pleading or transcript from any asbestos personal injury claim in the tort system against Kaiser, in which Kaiser or its representatives or insurers, including Truck, made any allegation or claim that the plaintiff or plaintiff's counsel was manipulating or concealing exposure evidence.  As a designee to testify on Truck's behalf as to that topic, are you aware of any information?  A.  No.").

- Hoyt Dep. Tr. at 267:23-268:6 ("Q.  You don't have any -- we talked about this this morning, but this is presented in a different context.  You have no evidence of that happening in any specific one of the tens of thousands of case that have been filed against Kaiser, correct?  A.  I can't point to a case and say, this case is permeated by the fraud . . . .").

---

[29] Hr'g Tr. at 93:5-21 (Sept. 4, 2019) [Bankr. Docket No. 1785].

[30] *Id.* at 93:20-21.

27384567.10

3A00591

25.    Mr. McChesney also testified on behalf of the Debtors that he "was not aware specifically of any fraudulent claims involving Kaiser Gypsum or Hanson Permanente Cement."[31]

26.    Accordingly, the facts that Truck alludes to in its brief—that the so-called evidence-suppression scheme infected Kaiser's settlements—are not facts at all.  Truck has not offered evidence of a single instance in which it paid, or even received, a fraudulent claim asserted against the Debtors.

27.    Instead of offering any evidence of fraud, Truck attempts to derail confirmation by resort to the Bankruptcy Court's conclusion in *Garlock* that certain plaintiffs had acted improperly with respect to their claims against the debtor in that case.  According to Truck, some of the individuals who asserted claims against Garlock also had claims against the Debtors. Truck thus attempts to prove fraud through analogy, rather than through actual evidence.

28.    Truck's own expert witness testified, however, that, for many of the claims that allegedly overlap between Garlock and Kaiser, he had no idea how the claims were actually resolved against Kaiser or whether Kaiser or Truck paid any of those claims:

- Bates Dep. Tr. at 87:18-22 ("Q  Of those 205 cases [that had claim files and ballots reviewed in Garlock and that overlapped with Kaiser], do you know how many were resolved with a non-zero payment by Kaiser?  A  I do not.").

29.    Truck's expert witness further testified that, although he had no idea whether Kaiser or Truck paid any claims asserted against them by plaintiffs from Garlock, he "suspect[ed]" and "wouldn't be surpris[ed]" to learn that any such claims against Kaiser were dismissed:

- Bates Dep. Tr. at 84:1-85:1 ("Of those three claims that were among the 15 that Judge Hodges discussed in the [Garlock] estimation order, do you know how they were

---

[31] Hr'g Tr. at 154:9-18 (July 20, 2020) (McChesney testimony) [Bankr. Docket No. 2420].

resolved against Kaiser? A No. But remember that the 15 cases on [Garlock's list of suspicious claims] are cases that were targeted against Garlock, so as such, they aren't cases that are likely to also have been targeted against Kaiser. So I suspect they could be either lower dollar settlements or dismissals and it wouldn't be surprising to me, but I don't know.").

30. And as much as Truck refers to the *Garlock* ruling, it is noteworthy that nothing about *Garlock*, or the supposed revelations in that case, had any impact on Truck's settlement or defense of claims. Truck did not make any effort to obtain plaintiffs' exposure profiles before *Garlock* or after.

- Hoyt Dep. Tr. at 71:25-72:5 ("Q. Did it ever subpoena discovery from any asbestos trusts in connection with a claim it was defending for Kaiser? A. Not to my knowledge.").

- Hoyt Dep. Tr. at 72:18-74:3 ("Q. Take a look at topic No. 14 in the 30(b)(6) deposition notice, Exhibit 38. Do you see that? It reads, Any asbestos personal injury claim in the tort system against Kaiser in which Kaiser or its representatives or insurers, including Truck, issued a subpoena to an asbestos trust, including which trusts were subpoenaed, the responses to those subpoenas and the uses of those responses in the proceeding. Are you aware of any information responsive to that topic? A. No. . . . Q. And you haven't done anything or you are not aware of any information responsive to No. 14? A. No. And what I'm telling you, I believe we asked the appropriate person and I think the answer was no.").

- Hoyt Dep. Tr. at 93:12-22 ("Q. Doesn't the claimant, when he or she is deposed, or the descendants of a deceased claimant, provide evidence to the party defending the case as to where they worked, when they worked? You subpoena evidence from Social Security to find out who they got paid by, where they were paid. Is that information that Truck ever asked Kaiser to provide for it in the course of defending a case? A. I don't believe so.").

- Hoyt Dep. Tr. at 205:6-18 ("Since Truck became aware of the Garlock estimation decision in and around February 2014, are you aware of any counsel defending Kaiser in asbestos personal injury cases undertaking additional discovery to obtain information about exposures that you contend that Garlock decision demonstrated was being withheld? A. You are talking about discovery, for example, to asbestos trusts? Q. That would be one example, yes, sir. A. I am not aware.").

- Hoyt Dep. Tr. at 205:21-206:2 ("Since Truck became aware of the Garlock estimation decision in and around February of 2014, are you aware of any counsel that Truck has defending Kaiser subpoenaing any asbestos trusts? A. No.").

- Hoyt Dep. Tr. at 207:8-17 ("Q. Is there any discovery, additional discovery beyond that that defense counsel didn't seek, prior to 2014, that defense counsel hired by Truck then did seek after the Garlock estimation decision came out? A. I'm not aware of any. Q. Did the Garlock estimation decision effect how Truck defended Kaiser in any asbestos personal injury cases in any way? A. No.").

31. Nearly a year before confirmation, the Bankruptcy Court explained to Truck that "I don't think there's anything inherently fraudulent or bad faith about returning the insured portions of these claims to the state court. We'll talk about why this debtor is doing it at confirmation and I don't think I can assume that fraud would be the result."[32]

32. Despite this admonition, Truck is still asking the Court to make that assumption. Truck has certainly not put any evidence in the record that Kaiser Gypsum is, was, or will be subject to fraudulent claims. And it has had ample opportunity to do so.

## ARGUMENT

**I.  Truck has no standing to raise its confirmation objections.**

33. As a threshold matter, Truck lacks standing to object to confirmation if the Plan is "insurance neutral." Truck may argue that the Plan is not insurance neutral, but once the Court finds that it is, Truck lacks standing to raise other objections.[33] This is sufficient to end the Court's inquiry.

**A.  The Plan is insurance neutral.**

34. As the Bankruptcy Court recognized, and numerous courts have held, insurers lack standing to challenge the confirmation of "insurance neutral" plans that leave their pre-

---

[32] Hr'g Tr. at 52:7-11 (Sept. 4, 2019) [Bankr. Docket No. 1785]. The cases that Truck cites on pages 10 and 11 of its brief belie Truck's contention that state courts are incapable of detecting misconduct by plaintiffs in the tort system.

[33] *See, e.g., Pittsburgh Corning*, 417 B.R. at 317; *see also Combustion Eng'g*, 391 F.3d at 218 (holding that insurers lacked standing insofar as the plan did not affect their rights); *In re Burns & Roe Enters., Inc.*, Case No. 00-41610, 2009 WL 438694, at *23 (D.N.J. Feb. 23, 2009) (insurer was not prejudiced and lacked standing to object to confirmation because plan "placed [it] back into the identical position existing prior to the commencement of the Debtors' Chapter 11 cases").

27384567.10

3A00594

bankruptcy rights and obligations unaffected.[34]  After all, the Bankruptcy Code's "fresh-start"

policy for debtors "does not allow an insurer to escape its obligations merely because of the

financial misfortunes of the insured."[35]

35.     Here, the Plan contains a specific "Insurance Neutrality" provision, preserving

Truck's defenses and specifying that the transfer of insurance rights not alter the liability of the

insurers.[36]  Specifically, the "Insurance Neutrality" provision of the Plan expressly preserves all

"Insurer Coverage Defenses," which include "all defenses at law or in equity that any Asbestos

Insurer may have under applicable non-bankruptcy law to provide insurance coverage to or for

Asbestos Personal Injury Claims"[37] and states that the transfer of insurance rights to the Trust

"shall not affect the liability of any Asbestos Insurer."[38]  The Plan simply returns insurers to their

prepetition positions.[39]  And to the extent that the Debtor do breach the cooperation clause,

Truck has all of the same remedies it had before the bankruptcy.

---

[34] *Mt. McKinley Ins. Co. v. Pittsburg Corning Corp.*, 518 B.R. 307, 329 (W.D. Pa. 2014) (concluding that the insurer's "arguments that it has standing are without merit" because "[t]he plan did not dramatically increase the 'quantum of liability,' harm . . . [the insurer's] contractual rights, or increase its administrative burdens"); *In re Fuller-Austin Insulation*, No. 98-2038-JJF, 1998 WL 812388, at *1 (D. Del. Nov. 10, 1998) (holding that insurers lacked standing to object to the plan because the plan preserved insurers' rights in coverage litigation); *J T Thorpe Co.*, No. 02-41487-H5-11, 2003 WL 23354129, at *1 (Bankr. S.D. Tex. Jan. 30, 2003) (noting that the district court had affirmed the bankruptcy court's prior ruling sustaining the debtors' objection to insurers' standing to object to the plan); Hr'g Tr., *In re Leslie Controls, Inc.*, No. 10-12199 (CSS) (Bankr. D. Del. Oct. 26, 2010) (Docket No. 381); Findings of Fact, Conclusions of Law and O240

Order Confirming the First Am. Plan of Reorganization of Leslie Controls, Inc. Under Chapter 11, *In re Leslie Controls, Inc.*, No. 10-12199 (CSS) (Bankr. D. Del. Oct. 28, 2010) (Docket No. 382) (granting the debtor's motion to strike the insurers' objections because the plan was insurance neutral and deprived the insurers of standing).

[35] *Pettibone Corp. v. Hawxhurst*, 163 B.R. 989, 994 (N.D. Ill. 1994), *aff'd*, 40 F.3d 175 (7th Cir. 1994); *see also* 11 U.S.C. § 524(e).

[36] Plan art. IV.Q; *see also Combustion Eng'g*, 391 F.3d at 202 (describing "neutrality" provision as "protect[ing] the debtor's and insurers prepetition rights under certain insurance policies"); *Mt. McKinley Ins. Co.*, 518 B.R. at 329.

[37] Plan art. I.A.82.

[38] *Id.* art. IV.Q.

[39] Truck attempts to argue that the Plan is not insurance neutral because the Insurance Finding would prevent Truck from arguing that confirmation of the Plan breached the Debtors' cooperation obligations.  This is wrong for two reasons.  First, the Debtors have not breached any cooperation obligation, as explained in more detail in the ACC's brief filed concurrently herewith.  Second, to the extent that the Insurance Finding would deny a coverage defense based on confirmation of the Plan, the Insurance Finding merely preserves the prepetition status quo, which is the

27384567.10

14

36.     Furthermore, the Plan expressly provides that post-confirmation, the Reorganized Debtors will continue to fulfill their cooperation obligations arising under the Asbestos Insurance Policies, including an enforcement mechanism.[40]  Courts have found that the inclusion of similar cooperation provisions in a plan is sufficient.[41]  Accordingly, the Plan is insurance neutral, and Truck had no standing to raise its objections to confirmation.

**B.     Truck cannot circumvent the Plan's insurance neutrality in order to obtain standing.**

37.     Truck's attempts to use § 1109(b) of the Bankruptcy Code and Article III of the Constitution to circumvent the Plan's insurance neutrality are unavailing.  Neither confers standing on Truck that it otherwise lacks.

**i.     Section 1109(b) of the Bankruptcy Code does not confer standing on Truck.**

38.     It is a "well-established rule that a party in interest only has standing to object to provisions of a plan that directly affect its interest;"[42] accordingly, "[i]n bankruptcy, a party may

---

very definition of an "insurance neutral" plan.  *See Combustion Eng'g*, 391 F.3d at 202; *Burns & Roe*, 2009 WL 438694, at *23 (insurer was not prejudiced and lacked standing to object to confirmation because plan "placed [it] back into the identical position existing prior to the commencement of the Debtors' Chapter 11 cases").

[40] Plan art. IV.L.1 ("The Reorganized Debtors shall have a continuing obligation to satisfy the Assistance and Cooperation, Inspection and Audit, and Notice of Occurrence Provisions set out in the Asbestos Insurance Policies."), IV.L.2.

[41] *See, e.g.*, *OneBeacon Am. Ins. Co. v. A.P.I., Inc.*, No. CIV. 06-167 (JNE), 2006 WL 1473004, at *4 (D. Minn. May 25, 2006) (concluding that the plan did not "alter [the insurer's] . . . rights or duties" where it required the debtor "to cooperate with . . . [the insurer]" and expressly provided that "each Asbestos Insurance Company shall be entitled to . . . the cooperation of the debtor in defense of the claim in all other forums" and that "[n]otwithstanding the revesting of the Debtor's Asbestos Insurance Rights in the Asbestos Insurance Policies to the Trust, the Debtor shall not be relieved of its continuing duties, if any, under any Asbestos Insurance Policies, and shall continue to perform such duties as required by applicable law" (internal quotation marks omitted)); *In re Plant Insulation Co.*, Case No. 09-31347 TEC, 2012 Bankr. LEXIS 1716, at *13 (Bankr. N.D. Cal. Mar. 15, 2012) ("The Plan does not require or foster any breach of a cooperation clause.  The Non-Settling Insurers failed to prove that the Reorganized Debtor is likely to breach any policy obligation or that the Plan impairs the ability of any insurer to defend claims against Plant in the tort system.  To the extent that a future breach of an obligation to cooperate is alleged to have occurred, the Non-Settling Insurers will have the same state law rights and remedies that they enjoyed pre-petition. The Plan specifically obligates the Reorganized Debtor (directly or by contract) to perform any cooperation obligations imposed by the policies."), *rev'd on other grounds*, 734 F.3d 900 (9th Cir. 2013).

[42] *In re Real Wilson Enters., Inc.*, No. 11-15697-B-11, 2013 WL 5352697, at *7 (Bankr. E.D. Cal. Sept. 23, 2013) (citations omitted); *see also In re Tascosa Petrol Corp.*, 196 B.R. 856, 863 (D. Kan. 1996) (class 5 creditor did not

27384567.10

have standing for some matters and not for others."[43]  Courts determine whether a party has a "sufficient stake in the proceeding" under section 1109(b) on a "case by case basis."[44]  Here, none of Truck's asserted bases for bankruptcy standing are sufficient.  As explained above, Truck does not have standing as an insurer; nor does it have standing as a creditor (who is being paid in full) or a payor (who contracted to pay asbestos claims and accepted policy premiums for 18 years).

39.     Truck is incorrect that, as a creditor, it has the unbridled right to raise issues in a bankruptcy proceeding, even if no "nexus [exists] between its interests in the case and the issues on which it seeks to be heard."[45]  If this were true (it is not), creditors could filibuster any matter in the bankruptcy, even matters inconsequential to their own interests, thereby "thwart[ing] the traditional purpose of bankruptcy laws[,] which is to provide reasonably expeditious rehabilitation of financially distressed debtors with a consequent distribution to creditors who have acted diligently."[46]

---

have standing to assert rights of class 4 creditors in objecting to plan); *In re Johns-Manville Corp.*, 68 B.R. 618, 623 (Bankr. S.D.N.Y. 1986) ("[N]o party may successfully prevent the confirmation of a plan by raising the rights of third parties who do not object to confirmation."), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 644 (2d Cir. 1988).

[43] *In re Newcare Health Corp.*, 244 B.R. 167, 172 (B.A.P. 1st Cir. 2000) (citing *In re Tascosa Petroleum Corp.*, 196 B.R. 856 (D. Kan. 1996)); *In re Phillips*, 573 B.R. 626, 642 (Bankr. E.D.N.C. 2017) ("'[T]he right to appear and be heard is not the same as standing and § 1109(b) does not necessarily mean that every party in interest can seek relief on every issue.'" (quoting *In re Rimsat, Ltd.*, 193 B.R. 499, 503 (Bankr. N.D. Ind. 1996))).

[44] *In re Art Midwest, Inc.*, No. 04-91225-RFN-11, 2006 WL 306894, at *2 (Bankr. N.D. Tex. Jan. 5, 2006) (citation omitted); *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985) (citation omitted); *In re Torrez*, 132 B.R. 924, 933 (Bankr. E.D. Cal. 1991) (citations omitted); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servo (TOC), Inc.*, 528 U.S. 167, 185 (2000) (standing is determined on an ad hoc basis, and party "must demonstrate standing separately for each form of relief sought; *accord Rosen v. Tenn Comm'r of Fin. & Admin.*, 288 F.3d 918, 928 (6th Cir. 2002) ("It is black-letter law that standing is a claim-by-claim issue.").

[45] Truck Brief at 63 (citations omitted).

[46] *In re Tower Park Properties, LLC*, 803 F.3d 450, 459 (9th Cir. 2015) (citing *In re Refco Inc.*, 505 F.3d 109 (2d Cir. 2007) (internal quotation marks omitted)).

27384567.10

16

A00597

40.     Here, the Plan provides that holders of general unsecured claims, including Truck, will be paid *in full*.[47]  Therefore, Truck, like the Debtors' other unsecured creditors (who have not objected), has nothing to complain about in its capacity as an unsecured creditor.  And Truck's status as a minor creditor of the Debtors does not confer standing.[48]

41.     Truck fares no better with its argument that it has a right to raise objections to all confirmation issues simply because it is the party with the obligation to pay insured claims.  If this argument were correct, any insurer would have standing on any matter in a chapter 11 case.  The critical question for standing purposes is whether confirmation of the Plan would increase the financial burden on Truck beyond the financial burden that Truck would otherwise bear in the tort system.[49]  It does not, and thus, Truck lacks standing.

### ii.     Article III of the Constitution does not confer standing on Truck.

42.     Truck does not have constitutional standing to object to the Plan because it is not injured by the Plan.  Truck does not suffer harm simply because the Plan fails to improve Truck's position in the tort system.  To have standing under Article III of the Constitution, a party must demonstrate that it has experienced an "injury in fact," which is "concrete," "distinct and palpable," and "actual or imminent."[50]  Second, the party must draw a "causal connection between the injury and the conduct complained of—the injury has to be 'fairly trace[able] to the

---

[47] Recommendation Order at 16 (citing Bittner Decl. ¶ 24; McChesney Decl. ¶ 35); *see also* Truck Brief at 62.

[48] *See, e.g.*, *In re Sylmar Plaza, L.P.*, 314 F.3d 1070, 1075 (9th Cir. 2002) (holding that an unimpaired creditor did not have standing to raise an unfair-discrimination objection); *cf. In re A.P.I., Inc.*, 331 B.R. 828, 857 (Bankr. D. Minn. 2005) ("An entity may be [a] real party in interest and have standing in one respect while he [sic] may lack standing in another respect . . . .  The insurers' standing to object must be determined on a particularized basis as to each theory they have raised in opposition to confirmation." (citations and internal quotation marks omitted)).

[49] *Mt. McKinley Ins. Co.*, 518 B.R. at 329; *Pittsburgh Corning*, 417 B.R. at 317.

[50] *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (citation and internal quotation marks omitted).

challenged action of the defendant, and not . . . th[e] result [of] some third party not before the court."[51]

43.     Here, as noted above, Truck has not offered evidence of a single fraudulent claim—and its witnesses have repeatedly conceded that they cannot *could not identify a single fraudulent claim* against the Debtors.[52]  But Article III of the Constitution requires a more "concrete" injury in fact than Truck's asserted "suspicions."[53]

44.     Moreover, the injury that Truck complains of—alleged misconduct in the tort system—is not "fairly traceable" to the confirmation of the Plan.  The contours of state-court litigation is the province of state legislatures.  Some state legislatures have adopted "asbestos trust transparency" bills that require plaintiffs to identify pending and potential trust filings.[54]  Other states have declined to do so.[55]  But the individual states are entitled to make those decisions for themselves.  And Truck does not suffer any cognizable "injury in fact" simply because the Plan does not improve Truck's litigation position in the tort system.

45.     Accordingly, neither § 1109(b) of the Bankruptcy Code nor Article III of the Constitution confers standing on Truck.  Because the Plan is not challenged by anyone with

---

[51] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (quoting *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41-42 (19766)).

[52] Hoyt Dep. Tr. at 47:25-48:11.

[53] Hoyt Dep. Tr. at 47:25-48:11; *see also* Hr'g Tr. 30:7-9 (Aug. 13, 2020) (finding that "[t]The evidence that Truck presents for the potential of . . . fraud in this case is not particularly strong and it's not direct.  There's a lot of conjecture and assumption . . . .") [Bankr. Docket No. 2439].

[54] *See, e.g.*, Ariz. Rev. Sta. Ann. § 12-782; Wisc. Stat. § 802.025.

[55] S.B. 415, 155th Gen. Assemb., Reg. Session (Ga. 2019) (died in chamber); S.B. 69, 100th Gen. Assemb., Reg. Sess. (Mo. 2019) (died in chamber); S.B. 3643, 100th Gen. Assemb., 2nd Reg. Sess. (Ill. 2018) (died in committee); A.B. 1056, 2017 Leg., Reg. Session (Cal. 2017) (died in committee); S.B. 2511, 240th Leg., Reg. Sess. (N.Y. 2017) (died in committee); S.B. 452, 122nd Gen. Assemb., 1st Reg. Sess. (S.C. 2017) (died in committee).  Indeed, in Pennsylvania, such legislation has been rejected three times.  H.B. 1026, 203rd Gen. Assemb., Reg. Sess. (Pa. 2019) (died in committee); H.B. 238, 201st Gen. Assemb., Reg. Sess. (Pa. 2017) (same); H.B. 1428, 199th Gen. Assemb., Reg. Sess. (Pa. 2015) (same).

standing to do so, the Court should adopt the Bankruptcy Court's Proposed Findings and issue the Confirmation Order.

## II.    The Plan satisfies the requirements for confirmation under § 1129 of the Bankruptcy Code.

46.    The Bankruptcy Court correctly concluded that the Plan was proposed in good faith as required under 11 U.S.C. § 1129(a)(3).[56]  A plan has been proposed in good faith if it "will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."[57]  Here, the Plan serves valid bankruptcy objectives—it provides the Debtors with a fresh start free of all of their asbestos-related liabilities.[58]

47.    The Plan also satisfies § 524(g).  The primary purpose of § 524(g) is twofold: "ensuring the equitable resolution of present and future asbestos claims, and 'enabling corporations saddled with asbestos liability to obtain the "fresh start" promised by bankruptcy.'"[59]  The Plan achieves both objectives.  It provides holders of insured asbestos claims the same opportunity that they had prepetition to litigate their claims in the tort system against an unlimited insurance asset that will never exhaust.  It provides holders of uninsured asbestos claims a § 524(g) settlement trust that will expeditiously and efficiently pay qualifying claims.  And it provides the Reorganized Debtors with the certainty and finality of injunctive protection necessary to emerge from bankruptcy as a going concern.

---

[56] *Cf. In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012) ("In assessing the totality of the circumstances, a court has 'considerable discretion in finding good faith.'  Moreover, the bankruptcy courts are in the best position to ascertain the good faith of the parties' proposals.  Thus, district and circuit courts should carefully consider any recommendations from the bankruptcy court on appeal." (citations and internal quotation marks omitted)).

[57] *In re Am. Capital Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012) (citation and internal quotation marks omitted).

[58] *In re Michener*, 342 B.R. 428, 434 (Bankr. D. Del. 2006); *Am. Capital Equip., LLC*, 688 F.3d at 156 (explaining that the "two 'recognized' policies, or objectives, [of Chapter 11] are 'preserving going concerns and maximizing property available to satisfy creditors'" (citation omitted)).

[59] *In re W.R. Grace & Co.*, 729 F.3d 311, 320 (3d Cir. 2013).

JA00600

48.     Here, Truck has not, and cannot, point to any provision in the Plan that renders it unconfirmable.  Truck spends a dozen pages rehashing its accusations of fraud, but its brief is devoid of any actual analysis of the case law or the statutory requirements of § 1129(a)(3).  The reasons for this are plain.  First, numerous courts have recognized that there is nothing improper about debtors and creditors negotiating the terms of a consensual plan.[60]  As noted above, the entire purpose of bankruptcy is the resolution of debtor-creditor disputes.  And the fact that Truck squandered numerous opportunities to negotiate its own resolution with the Debtors, the ACC, and the FCR is simply not evidence of collusion.[61]

49.     Second, numerous courts have recognized that there is nothing improper about liquidating asbestos claims in the tort system.  Indeed, courts have consistently approved "pass-through" plan structures that allow asbestos victims to continue to prosecute their claims in the tort system after confirmation in order to recover the value of insurance proceeds.  In *Burns & Roe*, for instance, the District Court for the District of New Jersey explained that, under the plan in that case, the trust could "authorize individual claimants, whose claims are potentially covered by policies issued by . . . [a non-settling insurer], to commence litigation in tort system."[62]  Similarly, in *Plant Insulation*, the District Court for the Northern District of California, explained that under the plan in that case, "asbestos injury claimants retain their right to pursue Plant and

---

[60]  *Federal-Mogul*, 684 F.3d at 357-59.

[61]  *See, e.g.*, Hr'g Tr. at 154:9-18 (July 20, 2020) (McChesney testimony) [Bankr. Docket No. 2420].

[62]  *Burns & Roe*, 2009 WL 438694, at *4; *see also* Order Confirming Sixth Am. Joint Plan of Reorganization of Thorpe Insulation Co. and Pacific Insulation Co. (Following Remand) § 5.1.6, *In re Thorpe Insulation Co.*, Case No. 2:07-bk-19271-BB (Bankr. C.D. Cal. May 8, 2013) (Docket No. 3429) (providing that asbestos claimants may commence actions to "obtain the benefit of Asbestos Insurance Coverage" in the tort system after confirmation); Order Confirming Am. and Restated Second Am. Plan of Reorganization of Plant Insulation Co. as Modified § 5.2.6, *In re Plant Insulation Co.*, Case No. 09-31347 (Bankr. N.D. Cal. Mar. 3, 2014) (Docket No. 2722) (providing that post-confirmation, asbestos claimants may "commence suit against the Reorganized Debtor and pursue their Claims in the tort system to obtain the benefit of Asbestos Insurance Coverage").

Non-Settling Insurers by filing a tort action, subject to several conditions."[63]  Faced with insurers' objections similar to Truck's here, the *Plant* court stated explicitly that § 524(g) "does not suggest, as . . . [insurers] seem to think, that asbestos claims may not be returned to the tort system, where appropriate, as part of the reorganization Plan."[64]

50.     Moreover, the Plan is not collusive simply because it is consensual.  The *American Capital Equipment* case that Truck relies on in support of its accusations of collusion provides an instructive contrast to this case.  In *American Capital Equipment*, the debtor and the asbestos claimants agreed to a plan structure in which claimants could opt into an ADR process to resolve their claims as long as the claimants paid the debtor a 20% kick-back on any recoveries from the debtor's insurance.  The Third Circuit concluded that the arrangement was not actually "collusive" without "evidence of an agreement to defraud investors" but nonetheless concluded that the arrangement would not fairly achieve the Bankruptcy Code's objectives because it would create an inherent conflict of interest.  The debtor in that case was financially incentivized *not* to cooperate in its own defense so that it could obtain its 20% cut of claimants' insurance recoveries.

51.     Here, by contrast, there is no kickback for the Debtors under the Plan, which contemplates that the Debtors will have to pay any claims, plus certain attorneys' fees, where the Debtors fail to cooperate with Truck's defense of asbestos claims.  Under the Plan, moreover, the Debtors' corporate parent has expressly guaranteed this payment obligation.  This case is thus a far cry from the situation in *American Capital Equipment*.  The Third Circuit explicitly distinguished the plan at issue in that case from a § 524(g) plan.  According to the Third Circuit,

---

[63] *In re Plant Insulation Co.*, 485 B.R. 203, 213 (N.D. Cal. 2012), *rev'd on other grounds*, 734 F.3d 900 (9th Cir. 2013), *and aff'd*, 544 F. App'x 669 (9th Cir. 2013).

[64] *Id.* at 231.

JA00602

"the structure and objectives of a § 524(g) trust are inconsistent with the trust created" under the plan in *American Capital Equipment*: "There is no channeling injunction to protect the debtor or insurers from future claimants, and the debtor makes no contribution whatsoever to the trust, but rather plans to pull money *from* it."

52.     Accordingly, there is nothing in *American Capital Equipment* that remotely suggests that a § 524(g) plan is collusive or otherwise lacks good faith simply because it is accepted by debtors and creditors alike.  As the Bankruptcy Court correctly explained, bankruptcy courts routinely grant creditors relief from the automatic stay, with the consent of the debtor, to allow them to recover from insurance in state court.[65]  The consensual resolution of disputes between a debtor and its creditors is in fact "a normal part of the process of reorganization."[66]

## III.     The Plan complies with the requirements of § 524(g) of the Bankruptcy Code.

53.     The Plan follows the letter and the spirit of § 524(g) by satisfying all statutory requirements and ensures that asbestos claimants are fairly compensated for their injuries.  Although Truck attacks the Plan and Trust on several § 524(g) grounds, it cannot point to any concrete failure.  Even Truck concedes that the express terms of the Plan and the Trust satisfy § 524(g).  Truck's only recourse, therefore, is to set up straw men arguments and lob accusations that the Plan and Trust's terms are "illusory" or "shams."  Such conclusory contentions cannot withstand scrutiny for the reasons detailed below.

---

[65] Hr'g Tr. at 29:11-19 (Aug. 13, 2020) [Bankr. Docket No. 2439].

[66] *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. at 424; *see also S B Bldg. Assocs. Ltd. P'ship*, VFP, 2020 WL 6552089, at *26; *Couture Hotel Corp.*, 536 B.R. at 735.

27384567.10

22

JA00603

## A. The Asbestos Personal Injury Trust assumes the Debtors' liabilities, satisfying § 524(g)(2)(B)(i)(I).

54. Section 524(g)(2)(B)(i)(I) provides for a trust to assume liabilities of a debtor that has been named as a defendant in actions seeking damages for asbestos exposure. The Plan states that "the Asbestos Personal Injury Trust shall assume liability and responsibility, financial and otherwise, for all Asbestos Personal Injury Claims."[67] There should accordingly be no question that the Trust satisfies § 524(g)(2)(B)(i)(I)'s straightforward requirement. Indeed, the Bankruptcy Court found that the Plan satisfied the requirement by its express terms.

55. Truck, however, suggests that the Trust's assumption of liabilities is "illusory" because it does not play a large enough role in the resolution of asbestos claims. This red herring ignores the statute's plain language, which does not require the trust to liquidate every claim for itself. It also ignores the fact that all of the Debtors' rights under their Asbestos Insurance Policies are assets of the Trust.[68] Said differently, the Plan permits claimants to seek recovery from the Trust's Asbestos Personal Injury Insurance Assets precisely because the Trust has assumed liability for the claims against the Debtors, as § 524(g)(2)(B)(i)(I) requires.

56. Moreover, as Truck itself admits, the Trust will assume and be responsible for paying Deductibles and any Uninsured Asbestos Claims. Even if these might be a "tiny sliver" of the Debtors' asbestos liabilities, they are nevertheless the only liabilities that the Debtors were responsible for paying before the bankruptcy. The Trust will accordingly stand in the Debtors' shoes for purposes of satisfying asbestos claims and will assume the Debtors' liabilities and

---

[67] Plan § IV.K.3.

[68] Plan § IV.K.2.d ("The Reorganized Debtors shall transfer to the Asbestos Personal Injury Trust the Asbestos Personal Injury Insurance Assets."); Plan § I.A.14 (defining "Asbestos Personal Injury Insurance Assets" to include "all of the Debtors' right related to or arising under their Asbestos Insurance Policies (but not the policies themselves) to the fullest extent that those rights are related to coverage for Asbestos Personal Injury Claims").

responsibilities while utilizing the Asbestos Personal Injury Insurance Assets to ensure that claimants are fairly and fully compensated.

57.     Such a result comports with § 524(g)'s primary goal, and it is consistent with both § 524(g) case law and bankruptcy principles in general.  As the Bankruptcy Court noted, "I can't find any cases that hold that 524(g) prohibits plans that allow asbestos claimants to go back to the tort system to pursue insurance."[69]  To the contrary, "bankruptcy courts typically allow creditors . . . to proceed against insurance in the state court while allowing them to recover against the debtor on anything else in the bankruptcy case.  That's a well-established practice."[70]  The logic underlying this practice is simple: "It's not really injurious to insurers 'cause that's what they contracted for and if we did otherwise would be to grant bankruptcy relief to a nondebtor."[71]

## B.     The Asbestos Personal Injury Trust will be funded by, in part, by a security of the Debtors and the Debtors' obligation to make future payments, satisfying § 524(g)(2)(B)(i)(II).

58.     Section 524(g)(2)(B)(i)(II) requires that the trust "be funded in whole or in part by the securities of 1 or more debtors involved in . . . [the] plan and by the obligation of . . . [the] debtor or debtors to make future payments, including dividends."  As the Bankruptcy Court recognized, the Plan satisfies this requirement by providing that the Asbestos Personal Injury

---

[69] Hr'g Tr. 49:16-19 (Sept. 4, 2019) [Bankr. Docket No. 1785]; *see also, e.g.*, Order Confirming Am. and Restated Second Am. Plan of Reorganization of Plant Insulation Co. as Modified § 5.2.6, *In re Plant Insulation Co.*, Case No. 09-31347 (Bankr. N.D. Cal. Mar. 3, 2014) (Docket No. 2722) (providing that post-confirmation, asbestos claimants may "commence suit against the Reorganized Debtor and pursue their Claims in the tort system to obtain the benefit of Asbestos Insurance Coverage"); *In re Thorpe Insulation Co.*, Case No. 2:07-bk-19271-BB (Bankr. C.D. Cal. May 8, 2013) (Docket No. 3429) (providing that asbestos claimants may commence actions to "obtain the benefit of Asbestos Insurance Coverage" in the tort system post confirmation); *Burns & Roe*, 2009 WL 438694, at *4 (explaining that plan allowed the trust to "authorize individual claimants, whose claims are potentially covered by policies issued by . . . [a non-settling insurer], to commence litigation in the tort system").

[70] Hr'g Tr. 49:21-25 (Sept. 4, 2019) [Bankr. Docket No. 1785].

[71] *Id.* at 49:25-50:3.

Case 3:20-cv-00537-GCM   Document 32   Filed 12/04/20   Page 31 of 38   A00605

Trust will be funded in part by the Payment Note.[72]  Pursuant to section 101(49) of the

Bankruptcy Code, a "security" includes, among other things, a note.

59.     The Payment Note expressly satisfies § 524(g)(2)(B)(i)(II), but Truck again

contends that the Plan's straightforward satisfaction of a straightforward requirement is illusory.

Truck ignores (or hopes that the Court will ignore) the Trust's overall funding package.  It claims

that the Reorganized Debtors should provide an "evergreen" source of funding, but the Trust

possesses an evergreen funding source—the Asbestos Personal Injury Insurance Assets.  Courts

have held that in situations such as this, where the Trust is to be funded primarily by insurance

assets, the obligation to make future payments does not have to be substantial.[73]

60.     Even the Third Circuit case upon which Truck relies recognizes that there are

additional factors to consider aside from the face value of future payment obligations.  "One is

the significant financial contributions to the [trust] by non-debtors . . . .  From the claimants'

perspective, it may make little economic difference whether the source of future funds comes

from the debtor or a third-party, so long as a sufficient and reliable pool of assets remains

available to pay their claims."[74]  This is precisely why the Bankruptcy Court was correct in its

conclusion that the Payment Note satisfies § 524(g)(2)(B)(i)(II).

**C.     The Asbestos Personal Injury Trust will be entitled to own 100% of the Reorganized Debtors if they fail to pay the Payment Note in full, satisfying § 524(g)(2)(B)(i)(III).**

61.     Section 524(g)(2)(B)(i)(III) requires that a trust "own, or by the exercise of rights

granted under such plan would be entitled to own if specified contingencies occur, a majority of

the voting shares" of each debtor.  As Truck recognizes, the purpose of this provision is to ensure

---

[72] Plan § IV.K.2.b.

[73] *See, e.g.*, *In re W. Asbestos Co.*, 313 B.R. 832, 852 (Bankr. N.D. Cal. 2003).

[74]  *Combustion Eng'g*, 391 F.3d at 248 n.70.

Case 3:20-cv-00537-GCM   Document 32   Filed 12/04/20   Page 32 of 38   A00606

that an asbestos trust is sufficiently funded to compensate its beneficiaries.  With this

fundamental goal in mind, courts have afforded debtors flexibility in satisfying

§ 524(g)(2)(B)(i)(III)'s requirement when a trust is to receive substantial contributions from third

parties such as insurers.[75]  The logic underlying these decisions stems naturally from

§ 524(g)(2)(B)(i)(III)'s purpose in ensuring payment for future claimants—"guaranteeing the

future success of the Trust by tying it to the success of reorganized [debtors] is unnecessary

[where] the current proposal will better secure the future claimants' interests."[76]  As recognized

by the *Congoleum* case that Truck cites, all that is required for § 524(g)(2)(B)(i)(III) is that the

"contingency" not be "completely untethered to the realities of the case."[77]  In fact, the

*Congoleum* court expressly distinguished the situation in the case before it itself from situations,

such as this one, where the trust funding is "substantial" and non-asbestos creditors are paid in

full.[78]

> 62.     Here, the Plan satisfies § 524(g)(2)(B)(i)(III)'s requirement by its express terms.
> It provides that the Trust will receive a Payment Note secured by a Pledge of 100% of the
> Reorganized Debtors' equity.  If the Reorganized Debtors fail to pay the Payment Note in full on
> or before the Effective Date's fifth anniversary, the Trust can foreclose on the Pledge and
> become the Reorganized Debtors' 100% owner.

---

[75] *See, e.g.*, *In re W. Asbestos Co.*, 313 B.R. at 852 ("Where the Trust is to be funded at the onset by a substantial contribution from one of the Debtors' insurers and where, by comparison, the Debtors' liquidation value is nominal, the contingency need not require the Debtor to make substantial future contributions in order to retain control over its operations.").

[76] *In re Leslie Controls, Inc.*, No. 11-0013 JBS, 2011 WL 1226402, at *5 (D. Del. Mar. 25, 2011); *see also In re Plant Insulation Co.*, 734 F.3d 900, 916 (9th Cir. 2013) ("To the extent Congress has provided an exception to the general rule that the trust should control the reorganized debtor, the overarching goal—that asbestos claimants get paid to the fullest possible extent—informs that exception."); *In re W. Asbestos Co.*, 313 B.R. at 852.

[77] *In re Congoleum Corp.*, 362 B.R. 167, 177 (Bankr. D.N.J. 2007).

[78] *Id.* at 177-78.

27384567.10

JA00607

63.     The Payment Note is plainly "tethered to the realities" of this case.  Although

Truck characterizes the Payment Note as a "sham," Truck ignores the Trust's overall funding

package, which mirrors those from cases in which courts have upheld similar contingencies.  The

Payment Note is "only a small part of the overall funding package,"[79] and the Plan proposes

substantial trust funding in the form of cash and valuable rights to insurance coverage as well as

paying Allowed General Unsecured Claims in full.  This substantial funding, coupled with the

unanimous acceptance of the Plan by asbestos personal injury claimants, follows

§ 524(g)(2)(B)(i)(III)'s express requirements and demonstrates that the Trust achieves the

statute's primary goal of paying claimants to the fullest possible extent.

### D.      Relief under § 524(g) is necessary to deal equitably with present claims and future demands, satisfying § 524(g)(2)B)(ii)(III).

64.     Section 524(g)(2)(B)(ii)(III) of the Bankruptcy Code requires a finding that

"pursuit of such demands outside the procedures prescribed by such plan is likely to threaten the

plan's purpose to deal equitably with claims and future demands."  Ignoring the voluminous

precedent in which courts have confirmed § 524(g) plans that send claimants to the tort system,[80]

Truck suggests that the fact that most claimants will be permitted to proceed in the tort system

somehow means that the Plan is unnecessary.

65.     Absent this plan, however, future claimants would bear the likely risk that the

Debtors' assets would be depleted through uninsured judgments, punitive damage awards, and/or

---

[79] *Id.* at 178.

[80] *See, e.g.*, Order Confirming Am. and Restated Second Am. Plan of Reorganization of Plant Insulation Co. as Modified § 5.2.6, *In re Plant Insulation Co.*, Case No. 09-31347 (Bankr. N.D. Cal. Mar. 3, 2014) (Docket No. 2722) (providing that post-confirmation, asbestos claimants may "commence suit against the Reorganized Debtor and pursue their Claims in the tort system to obtain the benefit of Asbestos Insurance Coverage"); *see also In re Thorpe Insulation Co.*, Case No. 2:07-bk-19271-BB (Bankr. C.D. Cal. May 8, 2013) (Docket No. 3429) (providing that asbestos claimants may commence actions to "obtain the benefit of Asbestos Insurance Coverage" in the tort system post confirmation); *Burns & Roe*, 2009 WL 438694, at *4.

a liquidation. Ironically, Truck argues that there is a low risk of uninsured judgments in the same brief in which it attempts to argue that it has no obligation to provide insurance. Truck also ignores that claims might arise during periods when the Debtors did not have insurance coverage responsive to asbestos claimants. Under the Plan, the Debtors are funding $50 million to fill in amounts not covered by insurance. As for punitive damages, Truck contends that historically the Debtors suffered only three punitive-damage verdicts, but critically, those verdicts were among the *most recent verdicts* against the Debtors.[81]

66.     And if the Debtors were forced to liquidate, future claimants would undoubtedly be prejudiced. A liquidation trustee would be tasked with liquidating the Debtors' estates, resulting in (a) higher administrative costs that would reduce recoveries for future claimants and (b) the proverbial "race to the courthouse," which future claimants could never win. Moreover, there would be no assurance that the responsive insurance policies' deductibles would be paid and/or that the Debtors would satisfy their cooperation obligations. In sum, under any scenario outside of the Plan, future claimants would fare worse than current claimants.

67.     It also cannot be overlooked that the analysis of equitable treatment for future claimants falls squarely within the ambit, expertise, and role of the FCR. Section 524(g) requires the appointment of an FCR "as part of the proceedings leading to the issuance of [an] injunction,"[82] and courts have recently highlighted the pivotal role the FCR plays in protecting

---

[81] In the decade preceding the petition date, the Debtors faced exposure to punitive damages ranging from one hundred thousand to tens of millions of dollars. *See Casey v. Kaiser Gypsum Co.*, Case No. A133062 (Cal. Ct. App. 2011) (awarding claimant $20 million for punitive damages in 2011); *Untermann v. Kaiser Gypsum Co.*, Case No. A137886 (Cal. Ct. App. 2013) (awarding claimant $6 million for punitive damages in 2013); *Revitt v. Ashland, Inc.*, Case No. 03-5935-C (Dallas Cty. Ct. 2005) (awarding claimant $100,000 for punitive damages in 2005). Notably, in a fourth personal injury case, *Izell v. Union Carbide Corp.*, the Debtors were named as defendants for asbestos-related injuries. 180 Cal. Rptr. 3d 382, 387 (Cal. Ct. App. 2014). The Debtors settled before the jury decided the amount of punitive damages, ultimately returning a verdict of $18 million in punitive damages. *Id.* at 387-88.

[82] 11 U.S.C. § 524(g)(4)(B)(i).

Case 3:20-cv-00537-GCM    Document 32    Filed 12/04/20    Page 35 of 38    PA00609

future claimants' interests.[83]  Here, consistent with his duties, the FCR has analyzed how to resolve the Debtors' historical asbestos liabilities in a way that is consistent with § 524(g) and equitable to future claimants.  He has concluded that the Plan achieves that goal.

## IV.    The Insurance Finding is entirely proper.

68.    Finally, in the interest of brevity, the Future Claimants' Representative hereby incorporates by reference Section VII of the ACC's brief, filed concurrently herewith, which explains why it is appropriate for the Court to find that the Plan does not breach the cooperation clause in the Debtors' insurance policies.  The Debtors' insurance is critical to the Future Claimants and to the Plan.  And, for all of the reasons ably articulated by the ACC, a finding by the Court that Plan confirmation does not invalidate that insurance coverage is entirely proper.

---

[83] *See, e.g.*, *In re Fairbanks Co.*, 601 B.R. 831, 840 (Bankr. N.D. Ga. 2019) ("[A]n FCR must advocate on behalf of unknown future claimants in the negotiation of the terms of the plan, trust, and channeling injunction and in the confirmation process to protect future claimants' rights and give them the best possible opportunity to recover."); *Vara v. Duro Dyne Nat'l Corp. (In re Duro Dyne Nat'l)*, C.A. No. 18-15563, 2019 WL 4745879, at *9 (D.N.J. Sept. 30, 2019) ("The role of the future claimants' representative is to consider the best interests of the future claimants . . . .").

27384567.10

JA00610

## <u>CONCLUSION</u>

For the foregoing reasons, the FCR respectfully requests that the Court overrule Truck's

objection, adopt the Proposed Findings, and issue the Confirmation Order.


Dated:   December 4, 2020

/s/ Felton Parrish
_____
Felton E. Parrish (NC Bar No. 25448)
HULL & CHANDLER, P.A.
1001 Morehead Square Drive, Suite 450
Charlotte, NC 28203
Telephone: 704-375-8488
Facsimile: 704-375-8487
Email: fparrish@lawyercarolina.com

-and-

James L. Patton, Jr. (Delaware Bar No. 2202)
Edwin J. Harron (Delaware Bar No. 3396)
Sharon M. Zieg (NC Bar No. 29536)
Travis G. Buchanan (Delaware Bar No. 5595)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: jpatton@ycst.com
      eharron@ycst.com
      szieg@ycst.com
      tbuchanan@ycst.com

*Counsel to the Future Claimants' Representative*

A00611

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that copies of the foregoing were served by electronic notification on those parties registered with the United States District Court, Western District of North Carolina, electronic case filing system to receive notices for this case.

This the 4th day of December, 2020.

/s/ *Felton E. Parrish*
Felton E. Parrish (N.C. Bar No. 25448)
HULL & CHANDLER, P.A.
1001 Morehead Square Drive, Suite 450
Charlotte, NC 28203
Telephone: 704-375-8488
Facsimile: 704-512-0525
Email: fparrish@lawyercarolina.com

*Counsel to the Future Claimants' Representative*

JA00612

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division
No. 3:20-cv-00537-GCM**

In re:

KAISER GYPSUM COMPANY, INC. *et al.*,

Debtors.[1]

**RESPONSE OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL
INJURY CLAIMANTS TO THE OBJECTION OF TRUCK INSURANCE
EXCHANGE TO THE BANKRUPTCY COURT'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW REGARDING CONFIRMATION OF THE JOINT
PLAN OF REORGANIZATION OF KAISER GYPSUM COMPANY, INC. AND
HANSON PERMANENTE CEMENT, INC., AS MODIFIED**

---

[1]  The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  Kaiser Gypsum Company, Inc. (0188) ("**Kaiser Gypsum**") and Hanson Permanente Cement, Inc. (7313) ("**Hanson Permanente**") (collectively, the "**Debtors**").  The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

DOC# 3427780

JA00613

# TABLE OF CONTENTS

Preliminary Statement ............................................................................................................... 1

Factual and Procedural Background .......................................................................................... 2

   I.    The Debtors Face Large Asbestos Liabilities From Their Manufacture and Sale of Building Products ......................................................................................................... 2

   II.   Truck Has an Unlimited Obligation to Defend and Indemnify Kaiser Gypsum for Those Asbestos Liabilities, Subject Only to Deductibles and Per Case Limits ............. 3

   III.  The Plan Recommended by the Bankruptcy Court Preserves Insurance by Sending Cases Back to State and Federal Courts Around the Country Where They Have Been Litigated for Decades ...................................................................... 3

   IV.  The Bankruptcy Court Has Rejected Truck's Repeated Attempts to Avoid Its Insurance Obligations ............................................................................................... 4

Argument ................................................................................................................................. 6

   I.    As an Insurer, Truck Lacks Standing to Object to Confirmation of the Plan ................. 6

       A.  Truck Lacks Standing Because the Plan Leaves Truck in the Same Position Truck Was in Prepetition ...................................................................................... 7

           1.   Insurers like Truck generally have no standing at confirmation ............................ 7

           2.   The Plan is insurance neutral ............................................................................ 9

       B.  Any Standing Truck Does Have is Limited to Issues That Affect Its Direct Interests ............................................................................................................ 10

       C.  Truck's Arguments to the Contrary Are Not Availing ............................................ 11

   II.   The Plan Satisfies Section 1129(a)(3)'s Good Faith Requirement ................................ 13

       A.  The Plan Easily Meets the Good Faith Requirement of 11 U.S.C. § 1129(a)(3) ......... 14

       B.  Truck's Claim That It Is the Victim of a Wide-Ranging Conspiracy to Subject It to Unfair Treatment in Courts Around the Country is Utterly Unsupported by Credible Evidence .............................................................................................. 16

           1.   Truck presented no evidence of even a single, identifiable false or fraudulent claim ever brought against the Debtors ................................................................ 16

           2.   Truck's rehashing of Garlock does not establish bad faith .................................... 20

           3.   In its demand for special treatment, Truck conflates the treatment of insured and uninsured claims under the Plan .............................................................. 22

       C.  Truck's Arguments Ultimately Amount to a Request to Rearrange the United States Civil Justice System to Suit Truck, a Request That the Bankruptcy Court Properly Declined ............................................................................................. 24

   III.  The Finding That the Plan Does Not Breach the Cooperation Clause Is Appropriate ............................................................................................................. 27

i

A.  As a Matter of Law, the Debtors' Negotiation and Pursuit of the Plan Does Not Violate Their Policy Obligations ................................................................28

    1.  The Plan Finding is purely a question of law ........................................ 33

    2.  Truck is not the debtor and is not entitled to benefit from the Debtors' bankruptcy................................................................................................ 34

IV.  The Plan Fulfills the Requirements of Section 524(g).................................... 35

A.  The Plan Satisfies § 524(g)(2)(B)(i)(I) ................................................................36

B.  The Plan Satisfies § 524(g)(2)(B)(i)(II) ...............................................................37

C.  The Plan Satisfies § 524(g)(2)(B)(i)(III)..............................................................38

    1.  The Trust would be entitled to own the Reorganized Debtors in the event of a default under the payment note.......................................................... 38

    2.  The Plan is necessary to deal equitably with present claims and future demands .................................................................................................. 39

Conclusion ................................................................................................................ 40

JA00615

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re A.P.I., Inc.*,
331 B.R. 828 (Bankr. D. Minn. 2005), *aff'd sub nom. OneBeacon Am. Ins. Co. v. A.P.I., Inc.*, No. CIV. 06-167 (JNE), 2006 WL 1473004 (D. Minn. May 25, 2006) .................................................................................................................11

*Admiral Ins. Co. v. Grace Indus., Inc.*,
409 B.R. 275 (E.D.N.Y. 2009) ...............................................................30, 31

*Allstate Ins. Co. v. King*,
60 Cal. Rptr. 892 (Ct. App. 1967)......................................................................30

*In re Am. Capital Equip., LLC*,
688 F.3d 145 (3d Cir. 2012)..............................................................................14

*Am. United Mut. Life Ins. Co. v. City of Avon Park, Fla.*,
311 U.S. 138 (1940)...........................................................................................14

*In re Armstrong World Indus., Inc.*,
348 B.R. 111 (D. Del. 2006)..............................................................................25

*In re B. Cohen & Sons Caterers, Inc.*,
124 B.R. 642 (E.D. Pa. 1991) ...........................................................................11

*Bachman v. Indep. Indem. Co.*,
297 P. 110 (Cal. Ct. App. 1931) ........................................................................32

*Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*,
321 B.R. 147 (D.N.J. 2005) ..............................................................................10

*Baumler v. State Farm Mut. Auto. Ins. Co.*,
493 F.2d 130 (9th Cir. 1974) ............................................................................32

*Belz v. Clarendon America Ins. Co.*,
69 Cal. Rptr. 3d 864 (Ct. App. 2007)..........................................................28, 32

*In re Burns & Roe Enters., Inc.*,
No. 08-4191, 2009 WL 438694 (D.N.J. Feb. 23, 2009) ....................................15

*Campbell v. Allstate Ins. Co.*,
384 P.2d 155 (Cal. 1963) .............................................................................30, 32

*In re Catholic Bishop of N. Alaska*,
No. F08-00110-DMD, 2009 WL 8412175 (Bankr. D. Alaska Sept. 11, 2009)......................10

iii

*In re Celotex Corp.*,
204 B.R. 586 (Bankr. M.D. Fla. 1996) ................................................................39

*In re Combustion Eng'g, Inc.*,
391 F.3d 190 (3d Cir. 2004), *as amended* (Feb. 23, 2005) ...........................7, 8, 9, 11

*Comunale v. Traders Gen. Ins. Co.*,
328 P.2d 198 (Cal. 1958) ....................................................................................32

*In re Congoleum Corp.*,
362 B.R. 167 (Bankr. D.N.J. 2007) ....................................................................38

*In re Federal-Mogul Glob. Inc.*,
385 B.R. 560 (Bankr. D. Del. 2008), *aff'd sub nom. In re Federal-Mogul
Glob.*, 402 B.R. 625 (D. Del. 2009), *aff'd sub nom. In re Federal-Mogul Glob.
Inc.*, 684 F.3d 355 (3d Cir. 2012) ............................................................28, 33, 35

*In re Fuller-Austin Insulation*,
No. 98-2038-JJF, 1998 WL 812388 (D. Del. Nov. 10, 1998) ..................................8

*In re Garlock Sealing Techs., LLC*,
504 B.R. 71 (Bankr. W.D.N.C. 2014)............................................................ *passim*

*In re Garlock Sealing Techs., LLC*,
No. 3:17-cv-00275-GCM, 2017 WL 2539412 (W.D.N.C. June 12, 2017) ............37

*In re Glob. Indus. Techs., Inc.*,
645 F.3d 201 (3d Cir. 2011)....................................................................6, 10, 13

*In re Grace Indus., Inc.*,
341 B.R. 399 (Bankr. E.D.N.Y. 2006), *aff'd as modified sub nom. Admiral
Ins. Co. v. Grace Indus., Inc.*, 409 B.R. 275 (E.D.N.Y. 2009) ..............................34

*In re Honosky*,
6 B.R. 667 (Bankr. S.D. W.Va. 1980) ................................................................35

*J T Thorpe Co.*,
No. 02-41487-H5-11, 2003 WL 23354129 (Bankr. S.D. Tex. Jan. 30, 2003) ........8

*In re Jet Fla. Sys., Inc.*,
883 F.2d 970 (11th Cir. 1989) ..........................................................................35

*Johnson v. Fankell*,
520 U.S. 911 (1997)...........................................................................................27

*Jones v. Golden Eagle Ins. Co.*,
133 Cal. Rptr. 3d 874 (Ct. App. 2011)...............................................................34

iv

*Lewis v. Casey*,
    518 U.S. 343 (1996)........................................................................................10

*In re Lind*,
    10 B.R. 611 (Bankr. D.S.D. 1981).................................................................27

*In re McNeill*,
    193 B.R. 654 (Bankr. E.D.N.Y. 1996)............................................................27

*In re Michener*,
    342 B.R. 428 (Bankr. D. Del. 2006) ..............................................................14

*In re Mid-Valley, Inc.*,
    305 B.R. 425 (Bankr. W.D. Pa. 2004) ...........................................................36

*Mt. McKinley Ins. Co. v. Pittsburgh Corning Corp.*,
    518 B.R. 307 (W.D. Pa. 2014).....................................................................8, 9

*OneBeacon Am. Ins. Co. v. A.P.I., Inc.*,
    No. CIV. 06-167 (JNE), 2006 WL 1473004 (D. Minn. May 25, 2006) ...................9

*In re Pittsburgh Corning Corp.*,
    417 B.R. 289 (Bankr. W.D. Pa. 2006) ..........................................................7, 8

*In re Plant Insulation Co.*,
    No. 09-31347 TEC, 2012 Bankr. LEXIS 1716 (Bankr. N.D. Cal. Mar. 15,
    2012), *rev'd on other grounds*, 734 F.3d 900 (9th Cir. 2013) ................................10

*In re Quigley Co.*,
    391 B.R. 695 (Bankr. S.D.N.Y. 2008).......................................................10, 36

*Rajwinder Kaur v. Fire Ins. Exch.*,
    No. F055359, 2009 WL 5107838 (Cal. Ct. App. Dec. 29, 2009)........................32

*Safeco Ins. Co. of Am. v. Parks*,
    88 Cal. Rptr. 3d 730 (Ct. App. 2009)............................................................32

*Sesco v. Dana World Trade Corp.*,
    No. 1:01CV43-T, 2002 WL 215015 (W.D.N.C. Feb. 5, 2002) ...........................27

*Span, Inc. v. Assoc. Int'l Ins. Co.*,
    277 Cal. Rptr. 828 (Ct. App. 1991) ..............................................................32

*In re Sudbury, Inc.*,
    153 B.R. 776 (Bankr. N.D. Ohio 1993)..........................................................29

*In re Thorpe Insulation Co.*,
    677 F.3d 869 (9th Cir. 2012) .............................................................10, 33, 35

*Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*,
    549 U.S. 443 (2007)................................................................25, 26

*Tucker v. Am. Int'l Grp., Inc.*,
    745 F. Supp. 2d 53 (D. Conn. 2010) ........................................35

*In re W.R. Grace & Co.*,
    729 F.3d 311 (3d Cir. 2013)........................................................14

*Warth v. Seldin*,
    422 U.S. 490 (1975)........................................................................6

*Wood v. Allstate Ins. Co.*,
    21 F.3d 741 (7th Cir. 1994) ........................................................32

**Statutes**

11 U.S.C. § 101(49)(A)(i)..............................................................37

11 U.S.C. § 109(d) ..........................................................................35

11 U.S.C. § 362 ................................................................................4

11 U.S.C. § 524(g) .................................................................*passim*

11 U.S.C. § 524(g)(2)(B)(i)(I)........................................................36

11 U.S.C. § 524(g)(2)(B)(i)(II) ...............................................11, 37

11 U.S.C. § 524(g)(2)(B)(i)(III).....................................................38

11 U.S.C. § 524(g)(2)(B)(ii)(III)....................................................39

11 U.S.C. § 524(g)(2)(b)(ii)(IV)(bb) ...............................................4

11 U.S.C. § 704(a) ..........................................................................40

11 U.S.C. § 1129(a)(3)..............................................................14, 24

Cal. Ins. Code § 11580(b)(1) ........................................................34

JA00619

The Official Committee of Asbestos Personal Injury Claimants (the "**ACC**"), by and through its undersigned counsel, hereby files this Response to the Brief in Support of Objection of Truck Insurance Exchange to the Bankruptcy Court's Proposed Findings of Fact and Conclusions of Law Regarding Confirmation of the Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc., as Modified (ECF No. 26) (the "**Objection**") filed by Truck Insurance Exchange ("**Truck**").

## PRELIMINARY STATEMENT

The Bankruptcy Court, after extensive briefing and an evidentiary hearing, has recommended that this Court adopt its Proposed Findings and Conclusions and issue the Confirmation Order approving the Third Amended Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson Permanente Cement (the "**Plan**").[2] The Plan, proposed by the Debtors, their affiliates, the ACC, and the Future Claimants' Representative (the "**FCR**," and together with the Debtors, their affiliates, and the ACC, the "**Plan Proponents**"), was unanimously approved by the votes of the only impaired class, the asbestos claimants. Indeed, it is supported by all relevant stakeholders, and complies fully with the Bankruptcy Code.

Truck, one of the insurance companies that sold policies that cover asbestos personal injury claims against the Debtors, is the only objector.[3] Truck's obligations to defend and indemnify the Debtors are effectively unlimited, and Truck has repeatedly attempted to use this bankruptcy to alter the deal it made and avoid paying claims. Indeed, the Bankruptcy Court observed that:

> We are here, in my opinion, because decades ago Truck improvidently wrote an unlimited insurance policy, probably having no idea of what kind of asbestos liabilities it was going to have to pay, and without caps on the coverage and since

---

[2] Capitalized terms used herein and not otherwise defined have the meanings ascribed to them in the Plan.

[3] The other insurers that provide coverage of the Debtors' asbestos claims resolved their objections to the Plan prior to the Confirmation Hearing.

then, having paid out huge sums of money based on that decision, Truck would like to improve that deal and use this case to limit its financial exposure.

Hr'g Tr. 33:10-17, Aug. 13, 2020 ("**Confirmation Ruling**"). Upon hearing all of the evidence presented by the Plan Proponents and Truck at confirmation hearings for the Plan (the "**Confirmation Hearing**"), the Bankruptcy Court overruled Truck's objections in their entirety. The Bankruptcy Court held that the Plan should be confirmed and issued Proposed Findings and Conclusions.[4] The Bankruptcy Court summed up its ruling as follows:

> But in the rarest of contexts, which is an asbestos case with unlimited insurance, in this circumstance I believe Truck gains no advantages under this plan, but it also loses nothing. It returns to state court to defend these claims with all its rights and defenses intact, all the ones it had before bankruptcy, and it need not have its rights, contract rights, augmented.

*Id.* at 34:8-17. This Court should similarly overrule Truck's objections, adopt the Proposed Findings and Conclusions and enter the Proposed Confirmation Order.

## FACTUAL AND PROCEDURAL BACKGROUND

## I. THE DEBTORS FACE LARGE ASBESTOS LIABILITIES FROM THEIR MANUFACTURE AND SALE OF BUILDING PRODUCTS

Kaiser Gypsum, a wallboard manufacturer, sold joint compounds, paints and similar products that contained asbestos. Kaiser Gypsum also manufactured fiberboard products that contained asbestos. Confirmation Ex. 19, McChesney Decl. in Support of Joint Plan ¶ 12 (the "**McChesney Declaration**"). Hanson Permanente's primary business was the manufacture and sale of cement products. *Id.* ¶ 13. Hanson Permanente made masonry and plastic cements that contained asbestos. *Id.* As a result, since 1978, one or both of the Debtors have been named in

---

[4] Proposed Findings of Fact and Conclusions of Law Regarding Confirmation of the Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc., as Modified (the "**Proposed Findings and Conclusions**"), ECF No. 1-01. The Bankruptcy Court also issued a Proposed Order Confirming the Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc., as Modified (the "**Proposed Confirmation Order**"), ECF No. 1-02.

2

JA00621

more than 38,000 asbestos-related lawsuits. *Id.* ¶ 14. Before filing for bankruptcy in 2016, the Debtors were named as defendants in approximately 14,000 asbestos-related bodily injury lawsuits pending in courts across the country. *Id.*

## II. TRUCK HAS AN UNLIMITED OBLIGATION TO DEFEND AND INDEMNIFY KAISER GYPSUM FOR THOSE ASBESTOS LIABILITIES, SUBJECT ONLY TO DEDUCTIBLES AND PER CASE LIMITS

Truck sold primary commercial general liability policies to the Debtors in the 1960s, 70s and 80s, and is a significant insurer of the Debtors' asbestos liabilities. McChesney Decl. ¶ 15; Objection at 18-19. Prior to the Debtors' bankruptcy, Truck attempted to avoid its policy obligations through nearly two decades of coverage litigation in California state courts. McChesney Decl. ¶ 15. Truck lost those cases, and the scope of Truck's contractual obligation to defend and indemnify the Debtors against asbestos claims was judicially determined. *Id.* The scope of that obligation is substantial. Truck's policies do not include any aggregate limits and will never exhaust. Truck itself acknowledges this reality. Hr'g Tr. 18:11-25, May 2, 2017 ("[T]he Truck primary policies and the excess above them for all of the years selected by the debtors to respond to these claims have no aggregate limits. They will never exhaust."); *see also* Confirmation Ruling at 33:10-17.

## III. THE PLAN RECOMMENDED BY THE BANKRUPTCY COURT PRESERVES INSURANCE BY SENDING CASES BACK TO STATE AND FEDERAL COURTS AROUND THE COUNTRY WHERE THEY HAVE BEEN LITIGATED FOR DECADES

To preserve this effectively unlimited insurance for asbestos personal injury claimants, the Debtors and the representatives of asbestos creditors, the ACC and FCR, negotiated first a term sheet and then the corresponding Plan that is the subject of this proceeding. The Plan provides that, with respect to the Debtors' insured asbestos liabilities, asbestos claimants may continue to file lawsuits in state and federal courts naming the Reorganized Debtors as they have done for

3

decades.[5] To satisfy any claims that might fall entirely outside of the available insurance coverage, as well as any uninsured portions of claims filed in court, such as deductibles, the Plan also creates an Asbestos Personal Injury Trust established pursuant to 11 U.S.C. § 524(g) (the "**Trust**"). This Trust is funded with a $49 million cash payment by the Debtors and Lehigh Hanson, plus a $1 million note. In the Proposed Finding and Conclusions, the Bankruptcy Court determined the Plan and Trust met all the requirements of § 524(g). For example, it has been approved by a supermajority of asbestos personal injury claimants as required by § 524(g)(2)(b)(ii)(IV)(bb).

## IV. THE BANKRUPTCY COURT HAS REJECTED TRUCK'S REPEATED ATTEMPTS TO AVOID ITS INSURANCE OBLIGATIONS

Meanwhile, its attempt to litigate away its policy obligations in state court having failed, Truck began to explore ways to improve its position through its insureds' bankruptcy. *See* Confirmation Ex. 65, Decl. of Scott R. Hoyt ¶¶ 15-17 (detailing the benefits of liquidating Truck's insurance policies to fund a § 524(g) trust and describing such a bankruptcy resolution as Truck's goal since January 2014).

Truck first proposed its own bankruptcy plan without the support of the Debtors or the asbestos creditors. The Truck Plan proposed routing all asbestos claims to a trust with an aggregate cap on liabilities, meaning the amount that Truck would pay could be limited to an amount of its choosing. Chapter 11 Plan of Reorganization Proposed by Truck Insurance Exchange at 56, 3:16-bk-31602, ECF No. 887 (the "**Truck Plan**"); *see also* Objection at 24 n.17. Given Truck's admission that its policies were uncapped and "will never exhaust," Hr'g Tr. 18:11-25, May 2, 2017, the Bankruptcy Court deemed Truck's proposal "obviously a nonstarter." Confirmation

---

[5]    Pursuant to an earlier and separate motion, the Bankruptcy Court had also lifted the automatic stay so that asbestos claimants could pursue insurance by proceeding with lawsuits as they did before the bankruptcy. Order Lifting the Automatic Stay Pursuant to 11 U.S.C. § 362 as to Certain Asbestos Personal Injury Claims, 3:16-bk-31602, ECF No. 881.

4

Ruling at 33:18-20. Truck eventually amended its Plan to propose a nominally uncapped trust, but one that included claims procedures designed to suppress payment of claims. Fifth Am. Chapter 11 Plan Proposed by Truck Insurance Exchange at 18-19, 3:16-bk-31602, ECF No. 1665. This iteration of Truck's Plan was rejected by the Bankruptcy Court as unconfirmable as a matter of law and "aimed at serving Truck's interest as an insurer and trying to reduce the magnitude of its obligations." Hr'g Tr. 93:16-20, Sept. 4, 2019.

Once it became clear that Truck would not be able to impose its own preferred plan on the Debtors or the creditors, Truck attempted to force the Plan Proponents to negotiate more favorable terms for Truck, first by claiming that confirmation of the Plan as written would violate the terms of the insurance policy and jeopardize the Debtors' insurance coverage. This culminated in Truck sending a demand letter to the Debtors asserting that they would breach their policies by pursuing the Plan. *See* Confirmation Ex. 62, Truck's Reservation of Rights Letter, Apr. 3, 2019. The Bankruptcy Court characterized Truck's actions as "a variety of threats being made to block confirmation or avoid coverage until it got what it wants in the confirmation process." Confirmation Ruling at 25:14-15.

Finally, in another effort to force the Plan Proponents to agree to Truck's terms, Truck filed its various confirmation objections. Truck claimed again that its policy required the Debtors to promote a bankruptcy plan that took care of Truck and that failing to do so violated their policy. Astonishingly, Truck also claimed that a plan that sent cases back to the state and federal courts where they had been tried for decades was a "scheme" that amounts to "bad faith," and that the United States civil justice system, including state and federal judges across the country, were simply incapable of protecting Truck's interests. Truck's Obj. to Plan Confirmation at 3, ECF No. 2070 (the "**Truck Brief**"). The Bankruptcy Court rejected both arguments. It found Truck's

JA00624

policy did not require the Debtors to "take on a partner in its bankruptcy case." Confirmation Ruling at 18:19-20. It further observed that "routinely bankruptcy courts in all cases, not just asbestos cases, grant relief from [the] stay to allow claimants and creditors to pursue insurance in [] state court. There's nothing bad faith about that." *Id.* at 29:12-15. The Bankruptcy Court declined to make special rules for Truck, which had wanted claimants who file in state and federal courts to have to jump through additional hoops, in the form of unprecedented discovery, before being allowed to pursue their claims:

> And now, it would ask that I require all claimants, every last one of them to provide it with what would be burdensome and unprecedented pre-trial discovery as a condition of exercising what, I think, deep down we all believe to be the right of these claimants, which is to get a trial in, in the tort system and do that as a condition of just even trying to seek recovery of insurance.

> I don't think that that failure to accede to that is either collusive or bad faith or fraud or anything else. It's, effectively, changing Truck's insurance policies to its advantage.

*Id.* at 33:23-34:8.

In the present Objection, determined as ever to avoid its obligations as an insurer, Truck presses these objections yet again. This Court should decline to entertain Truck's objections for the same reasons the Bankruptcy Court did.

## ARGUMENT

## I. AS AN INSURER, TRUCK LACKS STANDING TO OBJECT TO CONFIRMATION OF THE PLAN

Standing is a "threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 95 (1975); *see also In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 210 (3d Cir. 2011) ("To object to the confirmation of a reorganization plan in bankruptcy court, a party must, in the first instance, meet the requirements for standing that litigants in all federal cases face under Article III of the Constitution.").

### A. Truck Lacks Standing Because the Plan Leaves Truck in the Same Position Truck Was in Prepetition

Truck has no standing to object to confirmation of the Plan because the Plan leaves Truck as an insurer exactly where it was prepetition, defending and resolving asbestos personal injury claims against the Debtors in courts around the country. Where a bankruptcy plan does not diminish an insurer's rights or increase its burdens, the plan is "insurance neutral" and the insurer has no standing to object to it. *See, e.g.*, *In re Pittsburgh Corning Corp.*, 417 B.R. 289, 317 (Bankr. W.D. Pa. 2006) (striking insurer's objections for lack of standing because the plan was insurance neutral where plan did "not diminish the rights of the Objecting insurers or increase their burdens under the subject insurance policies").

The Bankruptcy Court correctly concluded that Truck's standing was limited to arguments regarding whether or not the Plan is insurance neutral. Confirmation Ruling at 17:1-19 ("Effectively, Truck gets to contest insurance neutrality as a standing matter . . . but because I conclude the plan is insurance neutral and returns Truck to the tort system exactly as it was in prepetition I don't think Truck has standing to advance the other confirmation objections . . . ."). Because the Plan is insurance neutral, the Bankruptcy Court concluded that Truck did not have standing to advance its objections.[6] Proposed Findings and Conclusions at 52. For the reasons below, the Court should adopt the Proposed Findings and Conclusions regarding standing.

#### 1. Insurers like Truck generally have no standing at confirmation

Insurers like Truck generally do not have standing to contest confirmation issues when the plan is insurance neutral. *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 218 (3d Cir. 2004), *as*

---

[6] As the Bankruptcy Court reached this conclusion after the Confirmation Hearing had concluded, Truck was not deprived of an opportunity to present evidence and arguments in support of its objections. In fact, the Bankruptcy Court also addressed Truck's objections on their merits, concluding that they too should be overruled. Proposed Findings and Conclusions at 52-53.

7

*amended* (Feb. 23, 2005) (holding that insurers lacked standing insofar as the plan did not affect their rights); *Mt. McKinley Ins. Co. v. Pittsburgh Corning Corp.*, 518 B.R. 307, 329 (W.D. Pa. 2014) (concluding that the insurer's "arguments that it has standing are without merit" because "[t]he plan did not dramatically increase the 'quantum of liability,' harm . . . [the insurer's] contractual rights, or increase its administrative burdens"); *In re Fuller-Austin Insulation*, No. 98-2038-JJF, 1998 WL 812388, at *1 (D. Del. Nov. 10, 1998) (holding that insurers lacked standing to object to the plan because the plan preserved insurers' rights in coverage litigation); *J T Thorpe Co.*, No. 02-41487-H5-11, 2003 WL 23354129, at *1 (Bankr. S.D. Tex. Jan. 30, 2003) (noting that the district court had affirmed the bankruptcy court's prior ruling sustaining the debtors' objection to insurers' standing to object to the plan).

If the Court determines that the Plan is insurance neutral, the Court can and should dismiss Truck's objections for lack of standing. *See* Transcript of Hearing, *In re Leslie Controls, Inc.*, No. 10-12199 (CSS) (Bankr. D. Del. Oct. 26, 2010); Findings of Fact, Conclusions of Law and Order Confirming the First Amended Plan of Reorganization of Leslie Controls, Inc. Under Chapter 11, *In re Leslie Controls, Inc.*, No. 10-12199 (CSS) (Bankr. D. Del. Oct. 28, 2010) (granting the debtor's motion to strike the insurers' objections because the plan was insurance neutral and deprived the insurers of standing); *Pittsburgh Corning*, 417 B.R. at 317 ("Because the Second Amended Plan of Reorganization does not diminish the rights of the Objecting Insurers or increase their burdens under the subject insurance policies, the court finds that it is 'insurance neutral.' As a result, the insurers have no standing to object to confirmation."); *Combustion Eng'g*, 391 F.3d at 219-20 (affirming insurers lack standing to challenge neutrality provisions in a plan of reorganization).

2.	*The Plan is insurance neutral*

Here, the Plan is insurance neutral.  First, the Plan contains an "Insurance Neutrality" provision, preserving Truck's defenses and specifying that the transfer of insurance rights shall not alter the liability of the insurers.  Plan art. IV.Q; *see also Combustion Eng'g*, 391 F.3d at 202 (describing "neutrality" provision as "protect[ing] the debtor's and insurers' prepetition rights under certain insurance policies"); *Mt. McKinley Ins. Co.*, 518 B.R. at 329 (explaining that plan was insurance neutral where it "did not dramatically increase the 'quantum of liability,' harm . . . [the insurer's] contractual rights, or increase its administrative burdens").  Specifically, the "Insurance Neutrality" provision of the Plan, Plan art. IV.Q, expressly preserves all "Insurer Coverage Defenses," which include "all defenses at law or in equity that any Asbestos Insurer may have under applicable non-bankruptcy law to provide insurance coverage to or for Asbestos Personal Injury Claims," Plan art. I.A.82, and states that the transfer of insurance rights to the Trust "shall not affect the liability of any Asbestos Insurer."  *Id*. art. IV.Q.  The Plan simply returns Truck to its prepetition position.

Furthermore, the Plan expressly provides that post-confirmation, the Reorganized Debtors will continue to fulfill their obligations under the Truck policies, including an enforcement mechanism. *Id*. art. IV.L.1 ("The Reorganized Debtors shall have a continuing obligation to satisfy the Assistance and Cooperation, Inspection and Audit, and Notice of Occurrence Provisions set out in the Asbestos Insurance Policies."), IV.L.2.  Courts have found that the inclusion of similar cooperation provisions in a plan is sufficient.[7]

---

[7]	*See, e.g.*, *OneBeacon Am. Ins. Co. v. A.P.I., Inc.*, No. CIV. 06-167 (JNE), 2006 WL 1473004, at *4 (D. Minn. May 25, 2006) (concluding that the plan did not "alter [the insurer's] . . . rights or duties" where it required the debtor "to cooperate with . . . [the insurer]" and expressly provided that "each Asbestos Insurance Company shall be entitled to . . . the cooperation of the debtor in defense of the claim in all other forums" and that "[n]otwithstanding the revesting of the Debtor's Asbestos Insurance Rights in the Asbestos Insurance Policies to the Trust, the Debtor shall not be

Truck offers only one specific example of how the Plan allegedly impairs its coverage defenses, and that example fails. Truck alleges that the Debtors have breached their cooperation obligations under the so-called "cooperation clauses" in the policies by advancing the Plan itself. *See, e.g.*, Objection at 55. Confirming the Plan is not, however, a breach of any cooperation clause, as discussed further below. *See infra* section III.[8]

## B. Any Standing Truck Does Have is Limited to Issues That Affect Its Direct Interests

Even if the Bankruptcy Court were wrong and Truck did have standing, that standing would be narrowly construed. Standing is not dispensed in gross, and must be analyzed issue by issue. *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) (standing is not dispensed in gross and must be assessed by the court on an issue-by-issue basis); *In re Quigley Co.*, 391 B.R. 695, 703-05 (Bankr.

---

relieved of its continuing duties, if any, under any Asbestos Insurance Policies, and shall continue to perform such duties as required by applicable law" (internal quotation marks omitted)); *In re Plant Insulation Co.*, No. 09-31347 TEC, 2012 Bankr. LEXIS 1716, at *13 (Bankr. N.D. Cal. Mar. 15, 2012) ("The Plan does not require or foster any breach of a cooperation clause. The Non-Settling Insurers failed to prove that the Reorganized Debtor is likely to breach any policy obligation or that the Plan impairs the ability of any insurer to defend claims against Plant in the tort system. To the extent that a future breach of an obligation to cooperate is alleged to have occurred, the Non-Settling Insurers will have the same state law rights and remedies that they enjoyed prepetition. The Plan specifically obligates the Reorganized Debtor (directly or by contract) to perform any cooperation obligations imposed by the policies."), *rev'd on other grounds*, 734 F.3d 900 (9th Cir. 2013).

[8] While the Plan is insurance neutral, "[t]here is no legal requirement that a plan of reorganization be 'insurance neutral' to be confirmed." *Plant Insulation Co.*, 2012 Bankr. LEXIS 1716, at *13. Courts have, accordingly, recognized that non-insurance neutral plans are confirmable. *See, e.g., In re Thorpe Insulation Co.*, 677 F.3d 869, 891 (9th Cir. 2012) (finding that plan was not insurance neutral and that, for that reason, insurers had standing to object but not finding that plan was unconfirmable); *Glob. Indus. Techs., Inc.*, 645 F.3d at 216 (same); *In re Catholic Bishop of N. Alaska*, No. F08-00110-DMD, 2009 WL 8412175, at *5 (Bankr. D. Alaska Sept. 11, 2009) (declining "to mandate the insertion of a neutrality provision" in a plan and explaining that insurers could raise their plan objections at confirmation); *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147, 158-59 (D.N.J. 2005) (affirming bankruptcy court's finding that plan was not insurance neutral and that insurers had standing to be heard at confirmation and on other matters). Thus, even were the Court to ultimately conclude that the Plan alters insurers' rights, this finding would not bar confirmation.

JA00629

S.D.N.Y. 2008) ("[A]lthough '[a] party in interest may object to confirmation of a plan' . . . it cannot challenge portions of the plan that do not affect its direct interests." (second alteration in original) (citation omitted)); *In re B. Cohen & Sons Caterers, Inc.*, 124 B.R. 642, 647 (E.D. Pa. 1991) ("[C]reditors lack standing to challenge those portions of a reorganization plan that do not affect their direct interest."). Thus, Truck does not have standing generally to complain about issues that do not affect its direct interests.[9] For example, courts have expressly recognized that insurers lack standing to raise objections relating to compliance with § 524(g), such as Truck has raised here.[10]

## C.    Truck's Arguments to the Contrary Are Not Availing

Truck advances several arguments as to why it has standing. Truck claims that it is a party in interest because: (i) it is a creditor; (ii) its legal rights are limited by the Plan Finding; and (iii) it is an insurer responsible for paying and defending the Defendants' asbestos liabilities. *See* Objection at 62-67. Truck also claims to have standing because it is generally injured by the Plan. *Id*. at 67-68. All of these arguments fail.

Truck's status as a creditor of the estate does not grant Truck standing to challenge the Plan on the grounds Truck has advanced. Specifically, Truck's status as a creditor does not expand Truck's standing to challenge aspects of the Plan that do not affect it or to bring challenges on behalf of third parties who support the Plan. In reality, as the Bankruptcy Court recognized, Truck

---

[9]    Truck filed a proof of claim in this case. However, Truck's claim, if allowed, falls within Class 3, General Unsecured Claims, which are to be paid in full, and Truck is thus an unimpaired, non-voting creditor.

[10]    *Combustion Eng'g*, 391 F.3d at 248 ("While . . . [insurers] argue that § 524(g)(2)(B)(i)(II) is not satisfied, they do not have standing to raise this matter."); *In re A.P.I., Inc.*, 331 B.R. 828, 867 (Bankr. D. Minn. 2005) ("[T]he insurers cannot be heard in objection to the plan on its conformity with either § 524(g)(2)(B)(i)(II) or (i)(III).."), *aff'd sub nom. OneBeacon Am. Ins. Co. v. A.P.I., Inc.*, No. CIV. 06-167 (JNE), 2006 WL 1473004 (D. Minn. May 25, 2006).

is not objecting in its role as a creditor, but rather as an insurer of the Debtors.  Confirmation Ruling at 17:20-18:5; *see also* Proposed Findings and Conclusions at 58 n.25.

Truck also argues the finding in the Plan at art. VIII.A.3.u (the "**Plan Finding**"), which finds that the Debtors' pursuit of the Plan did not breach the cooperation clause, alters Truck's contractual rights such that Truck obtains standing.  Objection at 61, 65-66.  However, Truck's argument is based on the "false premise" that "its contract gives it the right to collaterally attack elsewhere a confirmation ruling and make determinations of the propriety of the conduct of the parties in the course of [the bankruptcy]."  Confirmation Ruling at 19:22-20:2.  Truck's insurance contract does not grant it a right to collaterally attack the Plan, and does not grant Truck the right to direct the conduct of the Debtors in their own bankruptcy.  *See infra* section III.  Confirming the Plan does not constitute a breach of the insurance contract and, accordingly, the Plan Finding does not alter Truck's contractual rights.  *Id.*  Truck cannot bootstrap standing for itself by claiming rights under its insurance contract that it never had.[11]

Truck's next argument, that it has party-in-interest standing because it will bear a financial burden under the Plan, is similarly not availing.[12]  The Plan does not create Truck's financial obligations.  Truck's "financial burden" is the obligation Truck voluntarily took up when it signed contracts to provide insurance to the Debtors decades ago.  Nor does the Plan increase Truck's

---

[11]  Further, as the Bankruptcy Court recognized, to the extent Truck's insurance contracts intended to legislate confirmation issues, including debtor-in-possession responsibilities and the conduct of the parties in this bankruptcy, such contractual provisions would be preempted.  Confirmation Ruling at 19:9-20:5.

[12]  Truck makes essentially the same argument in both sections IV.A.3. and IV.B. of its Objection.  In both sections, Truck argues it has standing because Truck will be financially harmed by the Plan, though Truck claims this fact separately confers Article III standing.  Objection at 67-68.  However, for the same reasons Truck's argument does not establish party in interest standing, they do not establish separate Article III standing.  As Truck acknowledges, Article III standing and party in interest standing are "effectively coextensive."  Objection at 67 (quoting *In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 211 (3d Cir. 2011)).

12

contractual obligations.  Additionally, the single case that Truck cites does not support its position.

*See generally Glob. Indus. Techs., Inc.*, 645 F.3d 201 (3d Cir.).  In that case, the court recognized

that while insurers generally do not have standing to object to a plan which "does not materially

alter the quantum of liability that the insurers would be called to absorb," the plan at issue in that

case significantly increased the insurers' prepetition potential liability by a factor of more than

twenty-seven times and was therefore not insurance neutral.  *Id.* at 212.  Here, the Plan is insurance

neutral because it returns Truck to the same position it was in prepetition and does not materially

alter its potential liability.  *See* Plan at section IV.Q.  Truck does not have standing to object to an

insurance neutral plan simply because the Plan requires Truck to honor its obligations.

As the Bankruptcy Court concluded, because the Plan returns Truck to the tort system

exactly as it was prepetition, Truck does not have standing to address its confirmation objections.

Confirmation Ruling at 17:10-19.  However, even if Truck did have standing, its objections fail

on the merits as well, as shown below.

## II.    THE PLAN SATISFIES SECTION 1129(a)(3)'S GOOD FAITH REQUIREMENT

Truck challenges the Bankruptcy Court's finding that the Plan meets § 1129(a)(3)'s good

faith requirement, claiming that the Plan "represents the fruit of a corrupt bargain" between the

Debtors and the plaintiffs' bar whereby "the Debtors have agreed to turn a blind eye to the

resumption in the tort system of the fraudulent scheme to inflate their insured asbestos liabilities."

Objection at 30.  Truck's Objection presents the same arguments Truck has repeatedly made

throughout this case: that there is a widespread fraudulent scheme at work in the United States

civil justice system that Truck is powerless to combat.  However, as the Bankruptcy Court

recognized, Truck failed to present any credible evidence to support its claims regarding fraud and

collusion.  Confirmation Ruling at 29:20-30:13.  Truck's Objection should be overruled and the

JA00632

Proposed Findings and Conclusions adopted because the Plan was proposed in good faith, and Truck has no evidence to support its accusations regarding fraud and collusion.

## A. The Plan Easily Meets the Good Faith Requirement of 11 U.S.C. § 1129(a)(3)

As a preliminary matter, the Plan Proponents clearly established that the Plan was proposed in good faith. A plan has been proposed in good faith if it "will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."[13] Here, the Plan serves valid bankruptcy objectives—it provides the Debtors with a fresh start and maximizes creditor recoveries. *In re Michener*, 342 B.R. 428, 434 (Bankr. D. Del. 2006); *Am. Cap. Equip., LLC*, 688 F.3d at 156 (explaining that the "two 'recognized' policies, or objectives, [of Chapter 11] are 'preserving going concerns and maximizing property available to satisfy creditors'" (citation omitted)).

The Plan is also consistent with § 524(g). The primary purpose of § 524(g) is twofold: "ensuring the equitable resolution of present and future asbestos claims, and 'enabling corporations saddled with asbestos liability to obtain the "fresh start" promised by bankruptcy.'" *In re W.R. Grace & Co.*, 729 F.3d 311, 320 (3d Cir. 2013) (internal citation omitted). The Plan achieves both

---

[13]    *In re Am. Capital Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012) (internal quotation marks and citation omitted). Truck cites to and selectively quotes from *Am. United Mut. Life Ins. Co. v. City of Avon Park, Fla.*, 311 U.S. 138 (1940), claiming the Court must "scrutinize" Plan negotiations before the Court can find that a plan meets § 1129(a)(3)'s good faith standard. Objection at 29. *City of Avon* says nothing of the sort. *City of Avon* dealt with, in the chapter 9 context, whether the plan at issue was accepted in good faith given that the debtor's fiscal agent solicited creditor votes for the plan but failed to disclose to those creditors that the fiscal agent was also a voting creditor. *Id.* at 143-44. The *City of Avon* Court did not discuss plan negotiation. In fact, the language Truck quotes deals with the validity of plan acceptances, which is not challenged by any party in this bankruptcy. *See id.* at 145-46 ("The court is not merely a ministerial register of the vote of the several classes of security holders. The responsibility of the court entails scrutiny of the circumstances surrounding the acceptances, the special or ulterior motives which may have induced them, the time of acquiring the claims so voting, the amount paid therefor, and the like." (internal quotation omitted)).

objectives: it allows both present and future claimants the same opportunity that they had prepetition to litigate their claims in the tort system against an unlimited insurance asset that will never exhaust, and provides the Reorganized Debtors with the certainty and finality of injunctive protection necessary to emerge from bankruptcy as going concerns.

Truck argues that leaving asbestos cases in the courts where they have been and continue to be litigated contravenes § 524(g)'s objective, and that instead claims must be resolved through a trust. Objection at 39-41. The Bankruptcy Court disagreed, finding "no requirement that all of a debtor's asbestos liabilities must be resolved by a section 524(g) trust, as opposed to being resolved in the tort system." Proposed Findings and Conclusions at 25. Here, of course, some claims go to the Trust and some to courts. And courts have confirmed many such "pass-through" plan structures that expressly allow asbestos victims to continue to prosecute their claims in the tort system after confirmation to recover the value of insurance proceeds.[14] Preserving that insurance asset—one of the Debtors' largest—by allowing asbestos claimants to go to court where they can access that asset, is therefore entirely consistent with the purpose of § 524(g).

---

[14] *In re Burns & Roe Enters., Inc.*, No. 08-4191, 2009 WL 438694, at *4 (D.N.J. Feb. 23, 2009) (explaining that under the plan, the Trust could "authorize individual claimants, whose claims are potentially covered by policies issued by . . . [a non-settling insurer], to commence litigation in the tort system"); Order Confirming Sixth Amended Joint Plan of Reorganization of Thorpe Insulation Co. and Pacific Insulation Co. (Following Remand) § 5.1.6, *In re Thorpe Insulation Co.*, No. 2:07-bk-19271-BB (Bankr. C.D. Cal. May 8, 2013), ECF No. 3429 (providing that asbestos claimants may commence actions to "obtain the benefit of Asbestos Insurance Coverage" in the tort system post-confirmation); Order Confirming Amended and Restated Second Am. Plan of Reorganization of Plant Insulation Co. as Modified § 5.2.6, *In re Plant Insulation Co.*, No. 09-31347 (Bankr. N.D. Cal. Mar. 3, 2014), ECF No. 2722 (providing that post-confirmation, asbestos claimants may "commence suit against the Reorganized Debtor and pursue their Claims in the tort system to obtain the benefit of Asbestos Insurance Coverage").

### B. Truck's Claim That It Is the Victim of a Wide-Ranging Conspiracy to Subject It to Unfair Treatment in Courts Around the Country is Utterly Unsupported by Credible Evidence

Truck devotes much of its Objection characterizing the agreement between the Debtors, the ACC and the FCR to put forward the Plan as "collusion." *See, e.g.*, Objection at 21 ("Kaiser Negotiates a Collusive Deal with the ACC and FCR"). Truck also hints darkly at decades-long "evidence suppression schemes" and the machinations of "dishonest asbestos plaintiffs and lawyers." *Id.* at 12, 35. Truck argues, rather astonishingly, that asbestos defendants and their insurers cannot get a fair trial in any court in the United States. *Id.* at 35. But it offers scant evidence of any of this, relying on an overheated reading of the interlocutory and subsequently mooted *Garlock* decision and experts reprising their stale testimony from that case.

The Bankruptcy Court did not find this "evidence," or more accurately the lack thereof, compelling:

> The evidence that Truck presents for the potential of, of fraud in this case is not particularly strong and it's not direct. There's a lot of conjecture and assumption and just assuming that everybody is in cahoots ranging from the debtor, the ACC, the FCR, all the plaintiffs' firms, and it speculates as to future events of what would happen in state court.

Confirmation Hearing at 30:7-12. As detailed below, the Bankruptcy Court's assessment of Truck's fraud claims are correct.

#### 1. *Truck presented no evidence of even a single, identifiable false or fraudulent claim ever brought against the Debtors*

Truck's Objection spends many pages explaining why it will inevitably be the victim of a fraudulent scheme to suppress evidence if it has to defend claims against the Debtors in courts around the country. But Truck presented *no* evidence of even one identifiable false or fraudulent claim ever brought against the Debtors. When asked, Truck's 30(b)(6) witness and corporate

16

designee, Mr. Hoyt, providing testimony binding on Truck, could not identify a single false or fraudulent claim brought against Kaiser:

> Q. Do you have any specific instances of an [asbestos] claim alleged against Kaiser in which Truck determined that the suit was false or fraudulent?
>
> A. I would think there were suspicions. I can't identify a particular claim where Truck was able to actually say, look, we found trust submissions by this claimant that show they lied about their exposure history or whatever, I can't recall a claim like that. I know that it was suspected that that was happening and Kaiser suspected it, as well as Truck.
>
> . . .
>
> Q. I want to find out whether there was any actual claim ever identified where a claims handler concluded it was a false or fraudulent claim?
>
> A. I don't recall any specific claim.

Hoyt Dep. 47:25-48:13; 70:25-71:5, Feb. 26, 2020.

For its part, the Debtors' corporate representative testified at the Confirmation Hearing that he was "not aware specifically of any fraudulent claims involving [the Debtors]." Hr'g Tr. at 146:12-14, Jul. 20, 2020. Truck nevertheless claims its allegations stand on "firm ground" because the Debtors were aware of the *Garlock* opinion, and because prior statements by Debtors' counsel and corporate representative indicate that the Debtors thought that some of the claims against them might not have been settled for fair amounts. Objection at 31. This is not evidence, but mere conjecture.

Instead of offering evidence, Truck presented two experts who had appeared in *Garlock* years ago, Lester Brickman and Charles Bates, to reprise their testimony from that case. In its Objection, Truck places substantial weight on the testimony of Mr. Brickman and Dr. Bates, even claiming that "[d]ata reviewed by Dr. Bates and Professor Brickman confirms that Kaiser has been victimized by the very same evidence suppression scheme described in Garlock." Objection at 17. In reality, neither Mr. Brickman's nor Dr. Bates's testimony did anything of the kind.

17

JA00636

Mr. Brickman, a retired law professor, offered what amounted to a summary of law review articles published during his career attacking the plaintiffs' bar and cataloging alleged practices of the plaintiffs' bar that Mr. Brickman found objectionable dating back to the 1990s. *See generally* Confirmation Ex. 66, Decl. of Lester Brickman ("**Brickman Decl.**"). For example, he described "the use of unreliable medical evidence" (*id.* ¶ 5), "ginning up phony asbestosis claims" (*id.* ¶ 10), and "implanting false memories" (*id.* ¶ 14).

While Mr. Brickman's testimony makes clear his opinion of plaintiff lawyers generally, Mr. Brickman performed no analysis at all about any impact of the alleged "evidence suppression scheme" on the Debtors in this case:

> Q.  You have not studied the value of claims against Kaiser Gypsum.  Is that correct?
>
> A.  Correct.
>
> Q.  You have not looked at databases of the values of claims against the debtors in this case.  Is that correct?
>
> A.  Correct.
>
>  . . .
>
> Q.  So you have not studied asbestos personal injury claims against Kaiser Gypsum specifically?
>
> A.      Correct.

Brickman Dep. 82:5-82:11; 83:5-83:8.  With respect to the Debtors, then, Mr. Brickman's opinions are simply speculation.

Truck cites to Mr. Brickman's testimony as support for its more generic claims that the alleged evidence suppression scheme was "both specifically designed to be and in practice has been impervious to discovery in the tort system," Objection at 3, and that asbestos defendants cannot access the evidence they need in court.  Objection at 14.  But Mr. Brickman offers little of substance in that regard, either.  When pressed, Mr. Brickman could not name a single instance in

the past five years where *any* asbestos defendant even *alleged* to a court that the plaintiff was concealing exposure evidence. Brickman Dep. 95:22-96:3.

Truck next cites Dr. Bates in support of its claim that the Debtors have been "victimized by the very same evidence suppression scheme described in *Garlock*." Objection at 17. Truck claims that Dr. Bates "testified at length as to the substantial overlap between claims specifically and tort system history generally of Garlock and Kaiser." *Id.* However, Dr. Bates's work on this matter was extremely limited. For his analysis, Dr. Bates was not provided substantive Kaiser-specific data, such as the actual evidence Kaiser Gypsum had. Instead, Dr. Bates reviewed the information he had previously collected for *Garlock* more than ten years ago and attempted to find some connection to claims against Kaiser Gypsum. Bates Dep. 53:15-54:11. Dr. Bates located 205 Garlock claims that also named Kaiser Gypsum as a defendant where some case documents had been collected for *Garlock*. However, these claims were all filed more than a decade ago. Bates Dep. 77:4-15.

In addition to being old, the data was incomplete with respect to Kaiser Gypsum claims. Specifically, Dr. Bates could not say what information Kaiser Gypsum (or the defense counsel Truck hired) had when it resolved these cases because his analysis did not take into account additional discovery or disclosures after the data had been collected for use in *Garlock*:

> Q. Did any of the cases, the 205 cases which are going into this analysis, continue against Kaiser Gypsum past the date that you had discovery information available?
>
> A. It's possible. I didn't look at that.
>
> Q. Would that be relevant to the analysis?
>
> A. Potentially.
>
> Q. How?
>
> A. I mean, I think what you're suggesting is that perhaps there was additional discovery that was added to the claims after the time period for Garlock petition date that was added by further discovery in the prosecution of the claim against Kaiser that would have modified this.

19

Q. This analysis would not take that into account?

A. It would not take that into account. It would be discovery that was available at the time that Garlock, the information that we had from the analysis of the Garlock files. **We didn't have access to the Kaiser files**, so we could not have done that.

Bates Dep. 78:8-79:4 (emphasis added). In other words, Truck did not give adequate data to its expert. As a result, Dr. Bates's analysis cannot determine whether a single one of the 205, decade-old cases against Kaiser Gypsum he found in the *Garlock* files suffered from any lack of exposure information as it relates to the Debtors here.

Truck also claims that Dr. Bates's testimony establishes that "the same discovery abuses" alleged in *Garlock* "have occurred against Kaiser." Objection at 32. However, Dr. Bates testified that he did not have any knowledge regarding whether or not the lawyers defending Kaiser ever requested discovery regarding the plaintiff's exposure to non-Kaiser asbestos products because he did not have access to defense counsel's claim files:

Q. So sitting here today, you don't know with respect to any Kaiser claim that's subject to your Garlock matching exercises, the extent to which the lawyers defending those claims requested information about the plaintiffs' exposure to other products?

A. No, I didn't look at the claims. I don't have the underlying claim files here. I don't have access to those files.

Bates Dep. 111:4-12; *see also id.* at 109:17-110:10 (did not interview lawyers defending claims against Kaiser). In short, Truck asked Dr. Bates to stretch a decade-old expert report he did for another case to fit this one. Unsurprisingly, that effort resulted in conjecture rather than evidence.

2.     *Truck's rehashing of Garlock does not establish bad faith*

Truck leans heavily on the interlocutory estimation opinion, *In re Garlock Sealing Techs., LLC*, 504 B.R. 71 (Bankr. W.D.N.C. 2014), to support its allegation that, if it is forced to litigate claims in courts around the country, it will be subjected to a massive "evidence suppression scheme." This is, however, an overbroad reading of that opinion.

20

JA00639

*Garlock* was a narrow decision regarding the methodology for estimating the aggregate asbestos liability of one particular asbestos defendant. *Garlock*'s findings were based on a review of a small number of cases—15—that were hand-selected by Garlock's own experts. And the opinion itself recognizes that those were cherry-picked, as "they are not purported to be a random or representative sample." *Id.* at 85. The decision was ultimately superseded by a settlement among the parties—including Garlock itself—four times higher than the estimate in the *Garlock* decision. Accordingly, the opinion was never subjected to further scrutiny by a higher court.

Judge Whitley, who inherited the *Garlock* case and eventually oversaw its plan confirmation, reads the case narrowly. "It's interesting to me, as I watched him when he did this, Judge Hodges' ruling was written narrowly, but has been read broadly and it is, admittedly, based on a fairly [] limited number of instances of suppression of evidence by plaintiffs' firms, only 15." Hr'g Tr. 51:13-17, Sept. 4, 2019. Judge Whitley explained further at the Confirmation Hearing:

> I've told you previously that it says what it says. Judge Hodges was dealing with whether or not the estimation ruling should be made based on, on prior settlements and because of finding some of those suppression of evidence matters didn't think that was the best methodology.

Confirmation Ruling at 29:23-30:2. He did not find *Garlock* supported Truck's theory that it would be subjected to an "evidence suppression scheme" if it had to defend claims in court.

> I don't read *Garlock* as a[n] indictment of the tort system or a ruling that you can't get a fair trial in state and federal court elsewhere. Obviously, that's one of the legal options and obviously, I'm not inclined to indict my colleagues on the state benches and have the arrogance to believe that a bankruptcy court in North Carolina is necessary to protect all of them from fraud.

*Id.* at 30:15-21.

Nor can Truck assume that nothing has changed since *Garlock*. As the Bankruptcy Court correctly noted,

> That case got a lot of attention. It got notice in Congress. It got notice in state legislatures. A few changed their [] laws because of it. It [] was all out there in the trades.

*Id.* at 30:2-5. At this point, legislatures, courts, and parties litigating asbestos claims are well aware of *Garlock*, and have made whatever adjustments, if any, to court procedures they deem appropriate.

Curiously, for a case that it now says laid bare a nationwide cabal bent on evidence suppression, *Garlock* was apparently of little interest to Truck in actual practice. Truck's 30(b)(6) corporate designee admitted Truck did not change anything at all about how it defended Kaiser Gypsum after *Garlock*. Hoyt Dep. 207:14-17, Feb. 26, 2020 ("Q. Did the Garlock estimation decision effect how Truck defended Kaiser in any asbestos personal injury cases in any way? A. No."). Similarly, Truck's expert witnesses both rely on *Garlock* in their testimony, but neither of them examined whether *Garlock* changed Truck's experience defending cases in the tort system. Mr. Brickman did not study whether *Garlock* affected how cases are brought and tried in courts at all. Brickman Dep. 86:1-86:4. Dr. Bates also did not know whether *Garlock* had any effect on how Truck defended Kaiser. Bates Dep. 116:18-23. Truck's aggressive overreading of *Garlock* is not borne out even by its own behavior in court proceedings, much less by the record in this case.

3. *In its demand for special treatment, Truck conflates the treatment of insured and uninsured claims under the Plan*

Throughout its objection, Truck complains that what it calls "fraud prevention measures" found in the asbestos trust here are unavailable to Truck, and demands that it get the same treatment when it litigates cases in court. *E.g.*, Objection at 16, 33. In making this complaint, however, Truck is deliberately confusing several distinct concepts. First, Truck is ignoring the difference between the treatment of uninsured claims and insured claims under the Plan. Insured claims are

22

passed through to courts around the country for litigation by Truck in the same manner as they have been for decades. There, Truck has access to the wide range of discovery and procedural mechanisms that those states and court systems view as appropriate, just as it did prepetition. Uninsured claims, on the other hand, are channeled to the Trust. Like other asbestos trusts, the Trust does not litigate claims in court or otherwise, but rather pays claims that satisfy the criteria set out in the Trust Distribution Procedures ("**TDP**"),[15] which govern such payments. Truck further confuses matters when it selects some of the asbestos trust procedures it likes and blends them together into something it calls "fraud prevention measures." Truck then demands that this hodgepodge of procedures for claims to asbestos trusts be imposed on litigants in courts around the country.

Truck points to audit procedures, for example. *Id.* at 16. The TDP here includes provisions, such as audit procedures, designed to make sure that the Trust pays valid claims[16] but those provisions are simply inapplicable in the context of court proceedings, where trials are the ultimate arbiter of validity. Truck also references trust procedures for what are known as "extraordinary claims." Objection at 15-17. Asbestos trusts, which are formed in bankruptcy to pay out to claimants an amount to cover the share of damages attributable to a single asbestos defendant, are generally calibrated to pay an amount appropriate for a claimant whose injury is attributable to more than one defendant. However, these trusts may also provide for higher payments to an "extraordinary claimant" who had very little or no exposure to asbestos produced by anyone other than the defendant that formed the trust. In that unusual circumstance, the asbestos

---

[15]   The TDP is attached to the Plan as Exhibit I.A.19.

[16]   Truck's Objection acknowledges that the Debtors' TDP include these provisions, which Truck describes as the "gold standard." Objection at 33.

trust (which does not have access to the discovery tools provided a litigant in court) may ask for information about other claims the claimant has to insure that such a claim qualifies.[17]

Truck's demand is that every claimant that brings a lawsuit against the Debtors in court to access Truck's insurance be subjected to these trust procedures and more. Specifically, Truck wants, before an asbestos claimant could litigate a claim in court, the claimant to be required to submit to an extensive round of pre-lawsuit discovery of Truck's devising. *Id.* at 33. But as the Bankruptcy Court explained, Truck's demand for pre-suit disclosures before *any* claimant can proceed with their claims in court is improper.

> And now it would ask that I require all claimants, every last one of them to provide it with what would be burdensome and unprecedented pre-trial discovery as a condition of exercising what I think, deep down we all believe to be the right of these claimants, which is to get a trial in the tort system and do that as a condition of just even trying to seek recovery of insurance.

Confirmation Ruling at 33:23-34:4. Such pre-suit disclosures would unfairly and unnecessarily expand the discovery burden on the thousands of claimants seeking to recover from the Debtors' insurance assets. The Bankruptcy Court found this request improper, and this Court should as well.

### C. Truck's Arguments Ultimately Amount to a Request to Rearrange the United States Civil Justice System to Suit Truck, a Request That the Bankruptcy Court Properly Declined

Finally, it is important to recognize the full implications of Truck's arguments. Truck's good faith argument requires finding as a factual predicate that the United States civil justice system is so infected with "suppression and manipulation of exposure evidence" that Truck cannot fairly defend claims anywhere. Truck Consolidated Resp. at 2, 3:16-bk-31602, ECF No. 2359.[18]

---

[17]  See, for example, the extraordinary claims procedures in the Debtors' TDP at section 5.5(b).

[18]  Truck's brief to the Bankruptcy Court read as follows: "The primary objection is the very first argument made in Truck's pleading—that '[t]he Joint Plan embodies a collusive agreement that is designed to perpetuate fraud' and thus fails to satisfy the good faith requirement of 11 U.S.C.

JA00643

Truck's solution to this alleged failure of the legal system is to impose on state and federal courts a new discovery and disclosure regime of its own devising. Truck's claim is not only unsupported by the evidence, as previously explained, but it is also oblivious to the concept of federalism and to the limits of a bankruptcy court's ability to re-engineer the legal system nationwide.

Bankruptcy cannot supplant state law and impose new rules to resolve claims. The Supreme Court has recognized that the "'basic federal rule' in bankruptcy is that state law governs the substance of claims." *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450 (2007) (quoting *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 20 (2000)). Accordingly, "there is no reason why . . . [property] interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Id.* at 451 (quoting *Butner v. United States*, 440 U.S. 48, 55 (1979)); *see also In re Armstrong World Indus., Inc.*, 348 B.R. 111, 123 (D. Del. 2006) ("Because asbestos claims arise under state law, the claims must be valued in accordance with substantive state tort law.").

In *Travelers*, for example, the Supreme Court struck down a "rule of th[e] . . . [Ninth Circuit's] own creation—the so-called Fobian rule—which dictates that 'attorney fees are not recoverable in bankruptcy for litigating issues "peculiar to federal bankruptcy law."'" 549 U.S. at 451 (citation omitted). The Court observed that "[c]onsistent with our prior statements regarding creditors' entitlements in bankruptcy . . . we generally presume that claims enforceable under

---

§ 1129(a)(3). Objection at 5.3 **The sub-parts of this objection are (1) suppression and manipulation of exposure evidence are rampant in the tort system;** (2) the Debtors are well aware of this scheme to suppress and manipulate evidence; (3) including fraud prevention measures in the Joint Plan is the only way to disrupt this scheme because the scheme is carefully designed to be impervious to the rules of civil procedure; and (4) the Plan Proponents' refusal to include fraud prevention measures confirms that the Joint Plan is proposed in bad faith and for an improper purpose." (emphasis added). Truck Consolidated Resp. at 2, 3:16-bk-31602, ECF No. 2359.

25

applicable state law will be allowed in bankruptcy unless they are expressly disallowed." *Id*. at 452 (internal citation omitted). Finding no express provision of the Bankruptcy Code "clearly and expressly" disallowing such attorney fee claims, the Court struck down the Fobian rule created by the Ninth Circuit. *Id. at 453*. Here, there is no impediment "clearly and expressly" stated in the Bankruptcy Code to leaving state law tort cases in the courts that adjudicated such cases prepetition and are doing so now.

Truck's argument is, in reality, a demand that the Bankruptcy Court replace state law and effectively impose new rules to resolve lawsuits in state courts. That demand is wholly inappropriate. It is not up to Truck—an insurer—to determine what discovery is available to it in state and federal court systems. That determination lies with the courts and their respective legislatures. Truck knows this perfectly well. Truck has explained in this case that "[s]eventeen states have enacted asbestos trust transparency statutes that require asbestos plaintiff[s] to disclose all filed and potential asbestos trust claims; 14 of the statutes were enacted after *Garlock*." Truck Brief at 8. And, that "[t]hese statutes reflect a *legislative* judgment." *Id*. (emphasis added). Of course, other states have *rejected* such statutes in an exercise of their legislative judgment.[19]

The Bankruptcy Court properly declined to wade in to such issues of "politics," and overrule the political processes of the individual states which have, pursuant to principles of

_____

[19]  For example, "asbestos trust transparency" bills have been rejected by the state legislatures of at least California, Missouri, Georgia, New York, Illinois, and South Carolina. A.B. 1056, 2017 Leg., Reg. Session (Cal. 2017) (died in committee); S.B. 69, 100th Gen. Assemb., Reg. Sess. (Mo. 2019) (died in chamber); S.B. 415, 155th Gen. Assemb., Reg. Session (Ga. 2019) (died in chamber); S.B. 2511, 240th Leg., Reg. Sess. (N.Y. 2017) (died in committee); S.B. 3643, 100th Gen. Assemb., 2nd Reg. Sess. (Ill. 2018) (died in committee); S.B. 452, 122nd Gen. Assemb., 1st Reg. Sess. (S.C. 2017) (died in committee). Pennsylvania has rejected such legislation three times. H.B. 1026, 203rd Gen. Assemb., Reg. Sess. (Pa. 2019) (died in committee); H.B. 238, 201st Gen. Assemb., Reg. Sess. (Pa. 2017) (died in committee); H.B. 1428, 199th Gen. Assemb., Reg. Sess. (Pa. 2015) (died in committee).

federalism, retained the authority to draft and enforce their own tort laws. Not only does Truck not cite any authority to the contrary, but courts have also recognized this principle time and time again. *See, e.g.*, *In re McNeill*, 193 B.R. 654, 661 (Bankr. E.D.N.Y. 1996) (discussing certain property exemptions and stating "[t]his Court cannot and should not substitute its judgment for that of the [New York State] Legislature"); *In re Lind*, 10 B.R. 611, 615 (Bankr. D.S.D. 1981) (finding in the context of state exemption statutes that "[e]ven though Debtors' arguments have merit, this Bankruptcy Court will not violate the separation of powers provided by our Constitution and invade a [state] legislative prerogative"); *Sesco v. Dana World Trade Corp.*, No. 1:01CV43-T, 2002 WL 215015, at *6 (W.D.N.C. Feb. 5, 2002) ("Federal courts are not the advocates for expansion of state law."); *Johnson v. Fankell*, 520 U.S. 911, 922 & n.13 (1997) (stating "respect [for federalism] is at its apex when we confront a claim that federal law requires a State to undertake something as fundamental as restructuring the operation of its courts" and "[the Supreme Court has] made it quite clear that it is a matter for each State to decide how to structure its judicial system"). This Court should likewise decline to reimagine state law and procedure across the country for the benefit of an insurance company seeking to reduce its agreed contractual obligation.

## III. THE FINDING THAT THE PLAN DOES NOT BREACH THE COOPERATION CLAUSE IS APPROPRIATE

As the Bankruptcy Court recognized, the Debtors' insurance is the predominant estate asset and the driver of the Plan. Confirmation Ruling at 23:25-24:2. Throughout this case, Truck has made several attempts to use the Debtors' bankruptcy to limit or eliminate its coverage obligations. In Truck's most recent attempt, Truck argues that the Debtors' negotiation and pursuit of confirmation of the Plan would result in a breach of the Debtors' duty to cooperate should the Plan be confirmed. Objection at 50; *see also* Hoyt Dep. 28:6-29:7, Feb. 26, 2020 ("And I should clarify, the position really is *that if this plan is confirmed, Kaiser will have breached the assistance and*

27

*cooperation clause* because the plan does not include any safeguards or disclosure requirements with regard to fraud, so the point is, Kaiser could still add those into its plan and perhaps not be in violation of breach of the assistance and cooperation clause, but *it seems determined to go forward with the plan* without those safeguards and protections *and should it do so, our position is that will be an actual breach*." (emphasis added)).

Truck first raised this argument when it sent the Debtors a letter alleging that they would breach their cooperation obligations by pursuing the Plan. *See* Confirmation Hearing Ex. No. 62, Truck's Reservation of Rights Letter, dated Apr. 3, 2019.[20] As a result, the Plan Proponents added to the Plan a finding that the Debtors' pursuit of the Plan did not breach the cooperation clause. *See* Plan art. VIII.A.3.u.[21]

### A. As a Matter of Law, the Debtors' Negotiation and Pursuit of the Plan Does Not Violate Their Policy Obligations

Truck's argument that the Plan breaches the cooperation clause in their policies stretches the policy language beyond all recognition. The cooperation clause in an insurance policy requires that an insured provide assistance, such as access to documents or information, that relate to the defense of a *particular* insured claim. "A standard cooperation clause provides that the insured will cooperate with the insurer in the investigation, settlement, or defense of a claim or suit." *Belz v. Clarendon America Ins. Co.*, 69 Cal. Rptr. 3d 864, 869 (Ct. App. 2007). If an insured fails to cooperate with its insurer in defending a particular claim, the insurer can raise a breach of cooperation clause coverage defense with respect to that particular claim. *See In re Federal-Mogul*

---

[20] The version of the Plan that included the Plan Finding was filed with the Bankruptcy Court on May 30, 2019. *See* Third Am. Joint Plan of Kaiser Gypsum Co., Inc. and Hanson Permanente Cement, Inc., 3:16-bk-31602, ECF No. 1668.

[21] This is the Plan Finding discussed briefly at section IC above. Truck calls this the "Insurance Finding" in its Objection.

28

*Glob. Inc.*, 385 B.R. 560, 575-76 (Bankr. D. Del. 2008) ("Failure of cooperation with respect to a claim establishes only that an insurer may have a defense to payment of *that claim* and would not affect an insurer's obligation regarding other claims." (emphasis added)), *aff'd sub nom. In re Federal-Mogul Glob.*, 402 B.R. 625 (D. Del. 2009), *aff'd sub nom. In re Federal-Mogul Glob. Inc.*, 684 F.3d 355 (3d Cir. 2012); *In re Sudbury, Inc.*, 153 B.R. 776, 780 (Bankr. N.D. Ohio 1993) ("If the Debtor fails to cooperate as to any claim, the Insurers will have a defense to *that claim* . . . ." (emphasis added)). Thus, the cooperation clause would be implicated only if the Debtors failed to assist Truck in defending any particular asbestos claim.

Taken as a whole, the cooperation provision clearly applies only to the defense and resolution of individual claims—speaking as it does of "attending trials and hearings" and "emergency medical and surgical relief"—rather than imposing on an insured some comprehensive obligation to help the insurer avoid coverage. The provision states in full as follows:

> 8. ASSISTANCE AND COOPERATION OF THE INSURED:
>
> The Insured shall cooperate with the Company and, upon the Company's request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits. The Insured, shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense, except under Coverages A and B for emergency medical and surgical relief to others at the time of the occurrence; unless, however, the loss or claim is subject to adjustment under the $5,000 Deductible Endorsement #5.

Confirmation Ex. 30 at TRUCK0000586.

Truck's argument that this clause is not limited to individual claims or suits focuses on the last clause, as Truck maintains that the phrase "and in the conduct of suits" does not modify or limit the preceding clauses including "securing and giving evidence." Objection at 56-57. But that final phrase was never a lynchpin of the argument that the entire provision applies to specific

and individual claims. That argument is based upon every activity mentioned in the entire clause: (i) attend hearings and trials; (ii) assist in effecting settlements; (iii) securing and giving evidence; (iv) obtaining the attendance of witnesses; and (v) in the conduct of suits. All of these apply to aid an insurer in the defense of a particular lawsuit against a policyholder, not to impose a duty on a policyholder to engineer an alternative to the court system through its own bankruptcy.

Moreover, Truck's argument glosses over the essential meaning of "securing and giving evidence." Truck presumes it means obtaining evidence from claimants, but it does not. One does not "secure and give evidence" that is in the possession of others. The obligation to "secure and give evidence" refers to the obligation of the policyholder to secure its own evidence and share it with the insurance company. For example, in one case cited by Truck, the policyholder was unresponsive and hard to locate (by both the underlying claimant and the insurance company) and his failure to communicate with the insurance company led to a default judgment. *Campbell v. Allstate Ins. Co.*, 384 P.2d 155, 156 (Cal. 1963). *See also*, *Allstate Ins. Co. v. King*, 60 Cal. Rptr. 892 (Ct. App. 1967) (failure of policyholder/defendant to appear at trial constitutes failure to secure and give evidence as required in policy's cooperation clause).

The cooperation clause does not require that an insured filing for bankruptcy take steps to relieve its insurer of that insurer's coverage obligations or help its insurer exploit the bankruptcy as a means of improving the insurer's own position. In *Admiral Ins. Co. v. Grace Indus., Inc.*, 409 B.R. 275 (E.D.N.Y. 2009), the district court addressed this question directly when an insurance company argued that its coverage was voided when a debtor lifted the stay as to certain insured claims and to the proceeds of the policy. The court first observed that:

> [T]he cooperation clause only required Grace to assist in the ultimate disposition of the actual claims, not to take on a partner to make litigation decisions solely regarding Grace's own bankruptcy reorganization.

*Id.* at 283.   The court further found the stipulations lifting the stay and limiting damages to insurance proceeds "do not impinge on [the insurer's] ability to defend the actions."   *Id.*   Here, the Plan requires the Debtors to continue to fulfill their cooperation obligations arising under the Asbestos Insurance Policies in the defense of claims.   Plan art. IV.L.1.   Truck attempts to distinguish *Admiral*, on the grounds that it involved lifting a stay.   Objection at 57-58.   Truck characterizes that as "merely procedural," while the lack of additional discovery requirements for Truck's benefit in this case is supposedly "substantive and goes to 'the ultimate disposition of actual claims.'"   *Id.*   But Truck does not explain how this distinction applies.   The Debtors have not resolved or compromised any individual claims.   Rather, the Debtors simply negotiated the Plan with a constituency whose support was necessary to pass any plan.   That Plan does not require asbestos claimants to provide additional discovery outside of what state and federal courts allow. The Debtors' agreement to a Plan that does not purport to expand discovery requirements in the tort system is no less "procedural" than a debtor's agreement to allow the automatic stay to be lifted.   Further, nothing in the Plan prevents Truck from obtaining such discovery in the tort system.   As Truck testified:

> Q.      What keeps the defense counsel on any individual case from sending out whatever discovery requests that defense counsel wants to send out?
> A.      Nothing.

Hoyt Dep. 195:2-195:6, Feb. 26, 2020.

Truck criticizes the Proposed Findings and Conclusions on the ground that "[w]hile, not surprisingly, Debtors found and the Bankruptcy Court cited to individual cases where a violation of the duty to cooperate was found, none stand for the proposition that the duty only applies on a case-by-case basis."   Objection at 57.   Yet Truck itself has failed to cite *any* case where the cooperation clause was applied outside the context of an individual case.   Rather, each of the cases

31

JA00650

Truck cites is one in which a policyholder sought coverage for a particular, individual lawsuit or claim that an insurer refused to cover.[22]

Truck similarly misfires when it takes aim at the Proposed Findings and Conclusions regarding this issue, as it incorrectly argues that reliance on cases such as *Safeco Ins. Co. of Am. v. Parks*, 88 Cal. Rptr. 3d 730 (Ct. App. 2009) support Truck's collusion contentions in this case. In fact, *Safeco* is yet another case involving a specific underlying claim (related to a car crash) where an insurer sought to defend against its obligations (and a claim for bad faith) by asserting collusion between its policyholder and the claimant. *Safeco*, 88 Cal. Rptr. 3d at 747-48. In that case, the insurer Safeco failed to defend, then claimed collusion after that failure led one defendant to assign her bad faith claim to the underlying claimant, and other defendants to settle. *Id.* The court ruled that this did not rise to the level of "the insured and the third party claimant work[ing] together to manufacture a cause of action for bad faith against the insurer or to inflate the third party's recovery to artificially increase damages . . . ." *Id.* at 748. There was no evidence that the insured and claimant conspired to manufacture or falsify evidence or to generate an inflated settlement. *Id.* at 747-48. Similarly, in this case, there is no evidence of any collusive or fraudulent activity.

---

[22] *See Campbell*, 384 P.2d 155 (individual car crash coverage case); *Wood v. Allstate Ins. Co.*, 21 F.3d 741, 745 (7th Cir. 1994) (individual construction defects coverage case); *Bachman v. Indep. Indem. Co.*, 297 P. 110 (Cal. Ct. App. 1931) (individual car crash coverage case); *Rajwinder Kaur v. Fire Ins. Exch.*, No. F055359, 2009 WL 5107838, at *3 (Cal. Ct. App. Dec. 29, 2009) (individual home fire coverage case); *Belz*, 69 Cal. Rptr. 3d at 870 (individual construction defects coverage case); *Baumler v. State Farm Mut. Auto. Ins. Co.*, 493 F.2d 130, 134 (9th Cir. 1974) (individual car crash coverage case); *Comunale v. Traders Gen. Ins. Co.*, 328 P.2d 198, 200 (Cal. 1958) (individual car crash coverage case); *Span, Inc. v. Assoc. Int'l Ins. Co.*, 277 Cal. Rptr. 828, 839-40 (Ct. App. 1991) (individual slip and fall case).

JA00651

Truck argues that the Plan Finding cannot be entered because the Debtors have failed to introduce any evidence to support the finding that the Debtors' negotiation and pursuit of the Plan did not violate the Truck policies.  Objection at 55.  Truck also argues that it may be entitled to a jury trial in the event that the Court finds a material dispute of fact regarding the Debtors' conduct.  *Id.* at 51.  Truck's arguments fail to recognize that the Plan Finding does not implicate questions of fact, but can be resolved as a matter of law.

The Bankruptcy Court explicitly recognized that the Plan Finding did not implicate any questions of fact.  Confirmation Ruling at 25:23-26:2 ("There are no disputed facts at issue.  It all turns on the policy, the statute, and the plan.  Those are uncontested.  I don't see a jury trial right there.").  Accordingly, the Plan Finding can and should be entered by the Court as a matter of law.  As the Bankruptcy Court also recognized, the insurance policies were not intended to be used "to legislate confirmation issues, debtor-in-possession responsibilities, [or] the conduct of the parties in the bankruptcy case."  Confirmation Ruling at 19:9-14.

Moreover, even assuming for the purpose of argument that the cooperation clause was applicable to the negotiation and consummation of a plan of reorganization, the Bankruptcy Code would as a matter of law preempt Truck's state law contractual right to enforce the clause.  In this regard, two appellate courts have held that the Bankruptcy Code preempts insurance policies' contractual provisions where those provisions would conflict with the operation of § 524(g).  *See Thorpe Insulation Co.*, 677 F.3d at 891 (holding that anti-assignment provisions in insurance contracts are preempted by the Bankruptcy Code because they "stand as an obstacle to completion of a successful § 524(g) plan"); *Federal-Mogul*, 684 F.3d at 382 (holding that anti-assignment provisions "are preempted by § 1123(a)(5)(B) to the extent they prohibit transfer to a § 524(g) trust").

2.   *Truck is not the debtor and is not entitled to benefit from the Debtors'*
     *bankruptcy*

Truck's Objection complains that the Debtors, rather than using their bankruptcy to benefit

Truck, "chose instead to look out for [their] own perceived interests."  Objection at 55; *see also*

*id*. at 58 ("[T]he bankruptcy presented a unique opportunity to fairly and properly resolve all of

the Debtors' asbestos liabilities . . . Truck is plainly prejudiced by the decision of the Debtors,

Truck's insureds, to trade away that opportunity . . . .").  Truck loses sight of the fact that it is not

the debtor in this bankruptcy—Kaiser Gypsum and Hanson Permanente are.  Truck's argument

that it can invoke the cooperation clause to condition its coverage obligations on the Debtors filing

a bankruptcy plan that Truck likes must be rejected.  Beyond being an unsupported and

unsupportable reading of the cooperation clause itself, the argument is also inconsistent with

California law, which governs Truck's insurance policies.

California law provides that the bankruptcy or insolvency of the insured does not terminate

an insurer's obligations under its policies.  Cal. Ins. Code § 11580(b)(1) (requiring that all

insurance contracts include the following clause: "the insolvency or bankruptcy of the insured will

not release the insurer from the payment of damages for injury sustained or loss occasioned during

the life of such policy").  This statute ensures that an insurer must continue to fulfill its contractual

obligations regardless of whether the insured is insolvent or even no longer in existence.  *See Jones*

*v. Golden Eagle Ins. Co.*, 133 Cal. Rptr. 3d 874, 880 (Ct. App. 2011) (explaining that the debtor's

"bankruptcy did not release [the insurers] . . . from their obligations under the insurance policies

issued to [the debtor].  Insurance Code section 11580, subdivision (b)(1) expressly preserves the

obligation of insurers to honor insurance policies issued to entities that become bankrupt."); *In re*

*Grace Indus., Inc.*, 341 B.R. 399, 402-04 (Bankr. E.D.N.Y. 2006) (excusing the payment of self-

insured retention so as not to "permit an insurer to avoid its obligations under the insurance policy

34

by reason of the insured's bankruptcy"), *aff'd as modified sub nom. Admiral Ins. Co. v. Grace Indus., Inc.*, 409 B.R. 275 (E.D.N.Y. 2009).

While Truck would clearly like to have controlled the bankruptcy of its insureds for its own benefit, the cooperation clause in its policies does not give it such control, and the law is clear that bankruptcies are for the benefit of debtors, not insurance companies. *Tucker v. Am. Int'l Grp., Inc.*, 745 F. Supp. 2d 53, 65 (D. Conn. 2010) (reasoning an insurer should not be entitled to gain a benefit in bankruptcy that was not intended by the policy); *In re Jet Fla. Sys., Inc.*, 883 F.2d 970, 974-76 (11th Cir. 1989) (collecting cases holding that insurance companies shall not be unjustly enriched by escaping liability on account of the insolvency of the insured); *In re Honosky*, 6 B.R. 667, 669 (Bankr. S.D. W.Va. 1980) ("[T]he Bankruptcy Code was [not] intended to bestow such a benefit upon insurance companies."); *see also Thorpe Insulation Co.*, 677 F.3d at 890-91 (refusing to give debtor's insurer "veto" power over a § 524(g) plan of reorganization). Indeed, insurance companies are not even eligible to file for bankruptcy. *See, e.g.*, 11 U.S.C. § 109(d) (prohibiting a domestic insurance company from filing for chapter 11 bankruptcy).

Consequently, the Debtors did not breach the cooperation clause in the Truck policies by proposing one plan of reorganization where Truck would prefer a different one. The cooperation clause simply does not apply in the context of the negotiation, proposal, or approval of a plan of reorganization in bankruptcy, and Truck has never cited a single case to the contrary.

## IV. THE PLAN FULFILLS THE REQUIREMENTS OF SECTION 524(G)

Truck objects to several of the Proposed Findings and Conclusions regarding the Plan's compliance with § 524(g). However, the statutory prerequisites of § 524(g), including those on which Truck bases its objections, exist solely for the benefit of asbestos claimants and asbestos defendants. *Federal-Mogul*, 684 F.3d at 359 (noting requirements of § 524(g) are meant to ensure that future claims "w[ill] be compensated comparably to present claims," to "protect the due

35

process rights of future claimants," and to "enabl[e] corporations saddled with asbestos liability to obtain the 'fresh start' promised by bankruptcy" (internal quotation marks omitted) (quoting *Combustion Eng'g*, 391 F.3d at 234 n.45)). As in insurer, Truck does not have standing to assert the interests of other parties, particularly where its interests are "directly in conflict with [those] interests." *Quigley Co.*, 391 B.R. at 705; *see also In re Mid-Valley, Inc.*, 305 B.R. 425, 434 (Bankr. W.D. Pa. 2004) (finding insurer "interests are entirely adverse to those of the asbestos claimants," and they "cannot . . . act on . . . [asbestos claimants'] behalf, any more than any other adverse entity could"). Accordingly, as previously explained, Truck does not have standing to raise objections regarding compliance with § 524(g). *See supra* section I(B).

Regardless, the Plan does comply with § 524(g) and Truck's arguments fail on their merits, as set forth below.

## A. The Plan Satisfies § 524(g)(2)(B)(i)(I)

Section 524(g)(2)(B)(i)(I) requires only that a trust assume the liabilities of a debtor that has been named as a defendant in actions seeking damages for asbestos exposure. *See* 11 U.S.C. § 524(g)(2)(B)(i)(I). That is precisely what the Plan provides. The Plan states that "the Asbestos Personal Injury Trust shall assume liability and responsibility, financial and otherwise, for all Asbestos Personal Injury Claims." Plan art. IV.K.3.

Truck claims that this assumption of liability is illusory because the Plan contemplates that claimants will be able to bring their claims in the tort system and recover from the available insurance coverage. Accordingly, Truck argues, the Trust fails to assume Kaiser's asbestos liabilities because the Trust will only be responsible for uninsured claims and deductible amounts. Objection at 42.

The Trust's assumption of the Debtors' asbestos liabilities is not illusory. Rather, the Plan preserves the value of the Debtors' largest asset: its insurance coverage. Pursuant to the Plan, the

36

Debtors' insurance coverage will become an asset of the Trust. Plan arts. I.A.14; IV.K.2.d. While Truck criticizes the Plan because the Trust will have "no role in the resolution" of insured claims, the Debtors also had no role in resolving insured claims prepetition. *See* McChesney Decl. ¶ 17. Essentially, the Trust will stand in the shoes of the Debtors for purposes of satisfying asbestos claims.

**B.** **The Plan Satisfies § 524(g)(2)(B)(i)(II)**

The Plan satisfies § 524(g)'s requirement that the reorganized debtor remain a going concern after confirmation. The provision at issue—§ 524(g)(2)(B)(i)(II)—requires that the trust "be funded in whole or in part by the securities of 1 or more debtors involved in . . . [the] plan and by the obligation of . . . [the] debtor or debtors to make future payments, including dividends." The Plan satisfies this statutory requirement by providing that the Trust will be funded by securities of the Reorganized Debtors. Plan arts. I.A.91, 92; IV.K.2.b. 11 U.S.C. § 101(49)(A)(i) specifically provides that the term "security" includes a note.

Further, the Plan provides that, under that Payment Note, the Debtors will have the obligation to make future payments to the Trust. *See* Plan arts. I.A.92; IV.K.2.b. The Payment Note, which is a plan exhibit, will embody this funding obligation and provide that the Reorganized Debtors will make a payment of $1.0 million on the first anniversary of the Effective Date—an obligation secured by the Pledge of 100% of the equity of each Reorganized Debtor. This Court has previously confirmed a § 524(g) plan with a similar funding provision. *In re Garlock Sealing Techs., LLC*, No. 3:17-cv-00275-GCM, 2017 WL 2539412, at *20 (W.D.N.C. June 12, 2017) (confirming plan where the trust was to be funded in part by deferred contribution in the amount of $60 million which was to be paid by a reorganized debtor no later than the first anniversary of the plan's effective date (citing Plan §§ 7.3.2 and 7.8(1); Plan Ex. H, I, and J)). Accordingly, the Plan satisfies the plain language of § 524(g)(2)(B)(i)(II).

 JA00656

### C. The Plan Satisfies § 524(g)(2)(B)(i)(III)

        *1.*     *The Trust would be entitled to own the Reorganized Debtors in the event of a default under the payment note*

The Plan also satisfies § 524(g)'s requirement that the Trust own or have the ability to own, upon specified contingencies, a majority of the voting shares of (a) the debtor, (b) the parent of the debtor, or (c) a subsidiary of the debtor. 11 U.S.C. § 524(g)(2)(B)(i)(III). The Plan satisfies § 524(g)(2)(B)(i)(III), by providing that, upon the Effective Date, the Trust will receive a Payment Note in the principal amount of $1.0 million secured by 100% of the equity in the Reorganized Debtors. Plan arts. IV.K.2.b; I.A.92, 98. If an event of default occurs, the Trust may exercise its right to foreclose on the Payment Note and ownership of the Reorganized Debtors' equity will pass to the Trust. *Id.* at art. I.A.91, 92.

Truck does not challenge that the Plan complies with the letter of this section of 524(g). Rather, Truck claims that the Plan's "purported compliance" with § 524(g)(2)(B)(i)(III) is an "obvious sham" because it would be inconceivable for the Reorganized Debtors to fail to satisfy the Payment Note unless the Reorganized Debtors were insolvent, in which case the Trust would derive no benefit from owning the Debtors' stock. Objection at 46. The main problem with this argument is that it overlooks that the vast majority of the "funding package" under the Plan comes from the proceeds of the Debtors' insurance, not from the Reorganized Debtors' ongoing business operations. Indeed, Truck's own cited case recognizes that a trust's right to own the reorganized debtor is less meaningful when, as here, the note secured by equity is a "small part of the overall funding package." *In re Congoleum Corp.*, 362 B.R. 167, 177-78 (Bankr. D.N.J. 2007). Here, the bulk of the funding package is the Debtors' insurance policies.

JA00657

2. *The Plan is necessary to deal equitably with present claims and future demands*

Truck argues the Plan does not satisfy § 524(g)(2)(B)(ii)(III) because "there is no basis for a finding that the 'pursuit of [future asbestos] demands outside the procedures prescribed by [the] plan'—i.e., the tort system—'is likely to threaten the plan's purpose to deal equitably with claims and future demands.'" Objection at 47. Truck's argument ignores the risk of uninsured judgments and claims, which include punitive damage awards.

The threat of punitive judgments is acute. As demonstrated at the Confirmation Hearing, in three of the last seven verdicts the Debtors took before filing for bankruptcy, juries awarded punitive damages against the Debtors in amounts ranging from $100,000 to $20,000,000. McChesney Decl. ¶ 17. Accordingly, it is likely that without chapter 11 relief the Debtors would continue to be subject to punitive damages awards in the future. Thus, there is a corresponding risk to the claimant constituency that the Debtors assets would be consumed by uninsured punitive damages awards, which would impact both current and future claimants' ability to collect on uninsured liabilities.

Importantly, the Trust will not be paying punitive damages, *see* TDP §§ 5.5(a), 7.2, which is one mechanism to ensure that the Trust provides similar treatment to similar claims and will maintain the funding necessary to pay compensable claims. *See In re Celotex Corp.*, 204 B.R. 586, 613 (Bankr. M.D. Fla. 1996) ("The Trust cannot compensate holders of Asbestos Claims for punitive damages and still treat all similar Claims equitably. Consequently, payment of punitive damages would prevent the fair and equitable treatment of the holders of Asbestos Claims, would frustrate the fair distribution of the Trust Assets . . . .").

Additionally, the Debtors' reorganization pursuant to § 524(g) is necessary to serve the interests of claimants, particularly future claimants who would fare far worse under the alternative

39

scenario of liquidation. In a liquidation, there is no readily apparent mechanism for addressing future claims against the Debtors. Instead, a liquidation trustee would be tasked with expeditiously liquidating and closing the Debtors' estate. *See* 11 U.S.C. § 704(a). Liquidation would likely involve the setting of a bar date that might unfairly deny recourse to future claimants for their latent injuries. The increased administrative costs pursuant to a liquidation would further reduce recoveries from claimants, as well as jeopardize the Debtors' most valuable asset: its insurance policies. Without assurance that the Debtors would satisfy their ongoing obligations under the policies, any liquidation could also endanger future claimants' ability to recover under the Debtors' insurance policies.

## CONCLUSION

In the end, Truck's problem with the Plan is that Truck's position will not be improved. Truck's arguments should be rejected, because bankruptcy is not intended to relieve a debtor's insurer of its contract obligations. Nor, for the reasons detailed herein, should the Court attempt to impose Truck's "fraud prevention measures" on state and federal courts around the country. Accordingly, the ACC respectfully requests that this Court confirm the Plan.

JA00659

Dated: December 4, 2020                    Respectfully submitted,

CAPLIN & DRYSDALE, CHARTERED


*/s/ Kevin C. Maclay*
Kevin C. Maclay, Esq. (admitted *pro hac vice*)
James P. Wehner, Esq. (admitted *pro hac vice*)
Todd E. Phillips, Esq. (admitted *pro hac vice*)
One Thomas Circle, NW, Suite 1100
Washington, DC 20005
Telephone:  (202) 862-5000
kmaclay@capdale.com
jwehner@capdale.com
tphillips@capdale.com

-and-

HIGGINS & OWENS, PLLC
Sara (Sally) W. Higgins (NC Bar No. 22111)
Raymond E. Owens, Jr.
524 East Blvd.
Charlotte, NC 28203
Telephone:  (704) 366-4607
shiggins@higginsowens.com
rowens@higginsowens.com

*Counsel for the Official Committee*
*of Asbestos Personal Injury Claimants*

-and-

ANDERSON KILL PC
Robert M. Horkovich (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020-1182
Telephone:  (212) 278-1000
Facsimile:  (212) 278-1733
rhorkovich@andersonkill.com

*Special Insurance Counsel for the Official*
*Committee of Asbestos Personal Injury Claimants*

41

JA00660

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that copies of the foregoing were served by electronic notification on those parties registered with the United States District Court, Western District of North Carolina, electronic case filing system to receive notices for this case.

This the 4th day of December, 2020.

/s/ Todd E. Phillips
Todd E. Phillips, Esq. (admitted *pro hac vice*)
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle, NW, Suite 1100
Washington, DC 20005
Telephone: (202) 862-5000
tphillips@capdale.com

*Counsel for the Official Committee*
*of Asbestos Personal Injury Claimants*

42

JA00661

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division
### No. 3:20-cv-00537-GCM

In re:

KAISER GYPSUM COMPANY, INC. et al.,[1]

                        Debtor.

---

**REPLY BRIEF IN SUPPORT OF OBJECTION OF TRUCK INSURANCE EXCHANGE TO THE BANKRUPTCY COURT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING CONFIRMATION OF THE JOINT PLAN OF REORGANIZATION OF KAISER GYPSUM COMPANY, INC. AND <u>HANSON PERMANENTE CEMENT, INC., AS MODIFIED</u>**

---

[1]    The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  Kaiser Gypsum Company, Inc. (0188); and Hanson Permanente Cement, Inc. (7313). The Debtors' address is 300 E. John Carpenter Freeway, Irving, TX 75062.

# CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ........................................................................................................ 2

    I.    The Plan Does Not Meet Section 1129(a)(3)'s Good Faith Requirement .................... 2

    II.   The Plan Does Not Satisfy The Requirements Of Section 524(g)............................. 12

    III.  The Insurance Finding Is Improper And Unnecessary ................................. 16

    IV.  Truck Has Standing To Contest Confirmation Of The Plan........................ 21

CONCLUSION ..................................................................................................... 25

Case 3:20-cv-00537-GCM   Document 34   Filed 12/31/20   Page 2 of 33   JA00663

# TABLE OF AUTHORITIES

**Cases**

*Admiral Ins. Co. v Grace Indus., Inc.*,
  409 B.R. 275 (E.D.N.Y.) ....................................................................................17

*In re Am. Cap. Equip., LLC*,
  688 F.3d 145 (3d Cir. 2012)..................................................................................8

*In re Ambanc La Mesa Ltd. Partnership*,
  115 F. 3d 650 (9th Cir. 1997) .............................................................................24

*Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*,
  321 B.R. 147 (D.N.J. 2005) ................................................................................24

*In re Bestwall LLC*,
  606 B.R. 243 (Bankr. W.D.N.C. 2019)...............................................................12

*In re Bestwall LLC*,
  Case No. 17-BK-31795 (Bankr. W.D.N.C.), Dkt. Nos. 1236, 1237, 1321,
  1327, 1328.............................................................................................................9

*Bowman v Wilson*,
  672 F.2d 1145 (3d Cir. 1982)..............................................................................23

*In re Combustion Eng'g*,
  391 F.3d 190 (3d Cir. 2004)................................................................................21

*In re Congoleum Corp.*
  362 B.R. 167 (Bankr. D. N.J. 2007) ......................................................14, 22, 24

*Davis v. Fed. Election Comm'n*,
  554 U.S. 724 (2008).............................................................................................23

*In re Fed. Mogul Glob. Inc.*,
  684 F.3d 355 (3d Cir. 2012)..............................................................12, 18, 19

*In re Garlock Sealing Techs., LLC*,
  504 B.R. 71 (Bankr. W.D.N.C. 2014)...............................................................9, 10

*In re Genesis Health Ventures, Inc.*,
  266 B.R. 591 (Bankr. D. Del. 2001) ...................................................................24

*In re Global Indus. Techs., Inc.*,
  645 F.3d 201 (3d Cir. 2011)...........................................................................23, 25

*Mt. McKinley Ins. Co. v. Pittsburgh Corning Corp.*,
  518 B.R. 307 (W.D. Pa. 2014).......................................................................21, 22

*In re Pittsburgh Corning Corp.*
    453 B.R. 570 (Bankr. W.D. Pa. 2011) ...................................................................24

*In re Plant Insulation Co.*,
    734 F.3d 900 (9th Cir. 2013) ...............................................................14, 15

*In re Quigley Co.*,
    391 B.R. 695 (Bankr. S.D.N.Y. 2008) ..................................................23

*In re Szostek*,
    886 F. 2d 1405 (3d Cir. 1989) ..............................................................24

*In re Thorpe*,
    677 F.3d 869 (9th Cir. 2012) .............................................18, 19, 22, 24

*Town of Chester, New York v. Laroe Estates, Inc.*,
    137 S. Ct. 1645 (2017) .........................................................................23

*United States v. Students Challenging Regulatory Agency Procedures*,
    412 U.S. 669 (1973) ..............................................................................23

*In re WCI Cable, Inc.*,
    282 B.R. 457 (Bankr. D. Or. 2002) ......................................................24

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) .........................................................2

**Statutes**

11 U.S.C. § 524(g) ........................................2, 12, 13, 14, 15, 16, 19, 23, 24

11 U.S.C. § 524(g)(2)(B)(i)(I) .........................................................................13

11 U.S.C. § 524(g)(2)(B)(i)(III) .....................................................................14

11 U.S.C. § 524(g)(2)(B)(ii)(III) ....................................................................15

11 U.S.C. § 541(c)(A) .....................................................................................19

11 U.S.C. § 1109(b) ........................................................................................23

11 U.S.C. § 1123(a)(5) ....................................................................................19

11 U.S.C. § 1128(b) ........................................................................................23

11 U.S.C. §1129(a)(3) .....................................................................1, 2, 7, 8, 12

**Rules**

Bankruptcy Rule 2004 ................................................................................................9

Case 3:20-cv-00537-GCM   Document 34   Filed 12/31/20   Page 5 of 32   JA00666

## PRELIMINARY STATEMENT

Truck's opening brief (a) detailed the evidence suppression scheme that has plagued asbestos litigation for many years, (b) showed how it works to fraudulently inflate the litigation value of asbestos claims generally, (c) presented the evidence that asbestos claims against the Debtors (which are defended and paid primarily by Truck) have been infected by the scheme, which the Debtors themselves acknowledge, (d) demonstrated the necessity for fraud prevention measures to ensure that the asbestos bankruptcy claims against the Debtors are not infected by the fraud, and (e) charged the Debtors with agreeing to a deal, embodied in the terms of the Plan, with representatives of the asbestos plaintiffs' bar—the perpetrators of the evidence suppression scheme—that will permit the scheme to continue, protecting the Debtors, but not Truck, their primary insurer, from the financial consequences of the fraud, all in violation of 11 U.S.C. §1129(a)(3).

Tellingly, nowhere in their Response do the Debtors deny **any** of these facts. Rather, they focus on trying to convince the Court that Truck has no standing to object to the Plan and therefore the Court should ignore the issues Truck raises. The standing argument fails for many reasons, not the least of which is that it is premised on the contention that a Plan that (a) seeks to adjudicate in the Debtors' favor and against Truck a dispute as to the Debtors' duties under the Truck insurance policies and (b) is designed to impose upon Truck the financial burden of a fraudulent scheme, is somehow "insurance neutral." The Debtors mostly leave it to the representatives of the plaintiffs' bar, the ACC and the FCR, to respond to the substance of Truck's contentions, and they too seek to deflect, both by repeating the Debtors' standing argument and by disingenuously contending that the courts in the tort system can prevent fraud—even though undisputed evidence shows that the fraudulent scheme was specifically designed to be undetectable in the tort system.

Nowhere in the Responses do any of the Plan Proponents offer any cogent explanation for the omission of fraud prevention measures for any claims against the Debtors. None of them deny

1

that the application of fraud prevention measures to the insured asbestos bankruptcy claims would in fact prevent their fraudulent resolution. Indeed, the Debtors tout the Plan's inclusion of fraud prevention measures for the relatively small subset of uninsured asbestos claims, describing them as "appropriate and well-recognized claim handling procedures." The excuses offered by the Plan Proponents for not incorporating them for the wider category of insured claims—that such measures would place an unfair burden on the claimants and interfere with the trial courts' management of the cases that are resolved there—make no sense given the adoption of such measures in multiple other asbestos bankruptcies, and in these cases as well for uninsured claims, including ones that may ultimately be resolved in the tort system.

The Responses likewise make clear that the Plan does not satisfy the requirements of 11 U.S.C. § 524(g). Rote recitation of statutory compliance is plainly insufficient: the Debtors have not shown and cannot establish that the Plan in substance satisfies those requirements. Lastly, should the Court otherwise find that the Plan can be confirmed, the Responses demonstrate that no legal or factual basis exists for making the requested Insurance Finding.

## ARGUMENT

### I. The Plan Does Not Meet Section 1129(a)(3)'s Good Faith Requirement

The Debtors acknowledge that good faith under 11 U.SC. § 1129 (a)(3) "requires that the plan be proposed with honesty [and] good intentions . . . ." Debtors' Response at 18, n.21 (quoting *In re Zenith Elecs. Corp*., 241 B.R. 92, 107 (Bankr. D. Del. 1999)). Yet, they are asking this Court to confirm a plan that they plainly recognize will enable the fraudulent resolution of some material portion of the 14,000 pending asbestos bankruptcy claims asserted against them. An agreement to look the other way on fraud cannot possibly satisfy the requirement of honesty and good intentions, and therefore the Plan is not confirmable under Section 1129 (a)(3).

As noted above, the Debtors do not deny the existence of the evidence suppression scheme,

the fact that the asbestos claims asserted against them have been infected by the scheme, or that the Plan will facilitate a resumption of the fraud. Rather, the Debtors summarily dismiss Truck's contentions that the Plan has not been proposed in good faith because they took "a cavalier attitude towards a known, ongoing fraud" and were "paid for [their] silence," by stating that "Truck provided no evidence to support these allegations." Debtors' Response at 20. In fact, the record is replete with supporting evidence.

As detailed by Truck in its opening brief (the "***Objection***") at pages 22 and 31, when Truck first raised its concern that the then recently-announced Plan Term Sheet would facilitate a resumption of the fraudulent scheme to inflate claim values by suppressing evidence, Debtors' counsel acknowledged the scheme but then made clear that "[i]t is what it is. We've settled and this agreement takes the debtors out of the tort system. And that's the only . . . point that matters from an estate perspective." D.E. 950, May 10, 2018 Tr. 42:5-8. At the Confirmation hearing, the Debtors' corporate representative, Charles McChesney, confirmed that the Debtors agreed with their counsel's statement. D.E. 2420, July 20, 2020 Tr. 141:7-21. Lest there be any doubt as to the Debtors' lack of concern about the fraudulent resolution of the asbestos claims, Mr. McChesney, after acknowledging that the asbestos claims were claims against the Debtors, and not Truck, was asked five times if the Debtors care whether the asbestos claims are resolved at their fair values or fraudulently inflated values. *Id.* 134:18-137:12. Each time, he refused to answer this question, but he made clear that what the Debtors did care about: their own exposure for deductibles and punitive damages, and that the asbestos liabilities "be resolved in a way that they . . . fall within the scope of the insurance policy. That's what's important to the [D]ebtors." *Id.* 135:20-136:4; 137:13-16. This testimony, combined with the statements of Debtor's counsel amply demonstrates a "cavalier attitude toward a known, ongoing fraud" and thus lack of good faith.

Mr. McChesney's further testimony that the Plan does not include fraud prevention measures for insured claims because "[t]he term sheet deal gives the ACC and the FCR the right to decide what's in the trust distribution procedures" and that they oppose the inclusion of fraud prevention measures, *id.* 150:16-24, is ample support for Truck's contention that the Debtors have been "paid for [their] silence."

In fact, the Debtors' Response only serves to confirm the Plan's inherent bad faith. In distinguishing *Garlock* and justifying the absence of fraud prevention measures for insured claims (which are just as much bankruptcy claims as uninsured claims), the Debtors argue that these cases "present very different circumstances than those presented in *Garlock*," namely that here, "the Debtors have access to valuable insurance assets," and that "[t]he structure of the Plan is driven by this critical difference." Debtors' Response at 21. That distinction certainly *explains why* the Debtors do not care whether insured claims will be fraudulently resolved, but it hardly *justifies* their agreement to a Plan that is designed to further fraud.

The Debtors clearly understand the importance of including fraud prevention measures to guard against the evidence suppression scheme. They tout the fact that "[w]ith respect to uninsured Asbestos Personal Injury claims, the Plan contains appropriate and well-recognized claim handling procedures that include 'fraud-prevention' procedures nearly identical to those included in *Gar-lock*." *Id.* But they then assert that there is no need for such measures for claims that will be resolved in the tort system since that is how they were resolved prior to bankruptcy, and that the Bankruptcy Court "correctly found" that it was not within its province to mandate what discovery was required in asbestos cases. *Id.* at 22. The ACC similarly argues that Truck is demanding that the Bankruptcy Court replace state law and impose new rules to resolve lawsuits. ACC Response at 26.

4

JA00670

This argument completely misses the mark. The issue is not about mandating new procedures upon trial courts or replacing state law. Rather, the issue is whether the Bankruptcy Court, and now this Court, should lend its imprimatur to an agreement that will facilitate the fraudulent resolution of some of the 14,000 pending asbestos personal injury claims *asserted in these cases* and thousands more likely to be asserted going forward. As explained in Truck's opening brief, Professor Lester Brickman's unrebutted testimony showed in great detail how the evidence suppression scheme works and why the suppressed evidence cannot be discovered during the litigation of the cases in the tort system. *See* Truck Objection at 12-14. Therefore, asking a Bankruptcy Court to confirm a plan that simply sends the claims back to the tort system for resolution is tantamount to asking that Court to sanction the fraudulent resolution of the Debtors' asbestos liabilities.

To address this concern, debtors and claimants have agreed in multiple other recent asbestos bankruptcies to implement fraud prevention measures. In *Garlock* and *Sepco,* they did so without prompting from the courts. In *Maremont,* they agreed only after Judge Kevin Carey made clear that he would not confirm the plan presented unless such measures were added to the plan. Then, in this bankruptcy, after the Bankruptcy Court stated that it did not think "a federal court should approve a mechanism and a process that could lead to fraud" and that it was "concerned about . . . whether the plan could be confirmed without something more like what Garlock and Maremont implemented," the Plan Proponents added fraud prevention measures, *but only for uninsured claims*. Truck Objection at 26.

The issue here is the fair resolution of bankruptcy claims, something that bankruptcy courts adjudicate every day in bankruptcy cases and that, since *Garlock*, has led to the adoption of comprehensive fraud prevention measures in the context of asbestos claims. To be clear, Truck is not

asking this Court to impose fraud prevention measures. Rather, it is asking this Court not to confirm a Plan that will facilitate fraud. This fundamental defect in the Plan can be readily cured, and the Plan then confirmed, if the Plan Proponents agree to add fraud prevention measures for insured claims, just as they agreed for uninsured claims, and just as the plaintiffs' bar has agreed in multiple other recent asbestos bankruptcies.

The Responses contain a number of other arguments that are irrelevant, misleading, or in some cases, false, all designed to distract this Court from the impropriety of the Plan and the negotiations that led to it. For example, Debtors assert that "Truck's alleged concerns about fraud ring particularly hollow in the context of policy provisions that obligate it to defend even allegedly fraudulent claims." Debtors' Response at 22. Truck is defending all insured claims, even if fraudulent. But the fact that Truck agreed to defend fraudulent claims does not mean it agreed to be defrauded, let alone defrauded pursuant to a collusive deal between its insured and those responsible for the fraud, a deal wholly contrary to the Debtors' duty to assist.

The Debtors falsely deny that Truck was excluded from the plan negotiations, stating that "Truck [] indicated near the outset of the cases that it was not interested in pursuing a consensual, global resolution of the Debtors' asbestos liabilities." Debtors' Response at 19, citing Proposed Findings at 27. All evidence, in fact, is to the contrary. *See* Testimonial Affidavit of David Neale, Ex. 37 ¶¶ 24, 26, 29; Hoyt Declaration, Ex. 65 ¶¶ 15, 16. Indeed, the sole source the Debtors cite for this contention—page 27 of the Proposed Findings, providing that "all parties were free to negotiate, but Truck did not"—in turn cites Mr. McChesney's confirmation hearing testimony at 154:2-8. But that testimony demonstrates both Truck's willingness to negotiate and its exclusion from the process. When asked by Debtors' counsel whether Truck ever reached out prior to the signing of the Plan Term Sheet, Mr. McChesney responded, "*[o]ther than this Exhibit 50 that Mr.*

*Krakow asked me about,* I'm not aware of Truck ever asking to participate in any of those discussions." D.E. 2420, July 20, 2020 Tr. 154:5-8. Exhibit 50, one of the many emails referenced in Mr. Neale's affidavit concerning Truck's attempts to engage in plan negotiations, is an email from Mr. Neale to Debtors' counsel providing in relevant part: "Although you claim that Kaiser has 'no alternative' but to proceed with plan negotiations without Truck's involvement, the fact is that Truck remains ready and willing to engage and participate in such negotiations with all relevant constituencies."[2]

In sum, there is no evidence that Truck ever indicated that it did not want to engage in plan negotiations, and ample evidence that Debtors threatened to and then did exclude Truck from such negotiations. Moreover, although there were certainly negotiations with insurers, including Truck, to resolve environmental claims, the Plan Term Sheet, which provides the template for the Plan, was negotiated solely by the signatories to that agreement—the Debtors, Lehigh Hanson, the ACC and the FCR. Ex. 34; D.E. 2420, July 20, 2020 Tr. 132:1-133:17.[3]

At bottom, the Debtors emphasize form over substance, arguing that the Plan "serves valid Bankruptcy objectives" by effecting settlements that "maximiz[e] the value of assets available to satisfy claims," and that their agreement with the asbestos bar was "negotiated at arm's length" and therefore satisfies section 1129(a)(3) of the Bankruptcy Code. Debtors' Response at 19-20. While certain parts of the Plan contain elements consistent with the Bankruptcy Code, such as the resolution of the Debtors' environmental liabilities, a plan may "fulfill one specific

---

[2] On multiple occasions, Debtors' counsel threatened to exclude Truck from the negotiations unless Truck capitulated to Debtors' proposed cost sharing terms. Neale Affidavit, Ex. 37 ¶¶ 23, 25.

[3] The negotiations leading to the Plan agreement concluded on October 20, 2017. D.E. 2420, July 20, 2020 Tr. 132:1-133:17. The Term Sheet itself is dated February 15, 2018 and was filed on March 6, 2018. Ex. 34. There were subsequent mediation sessions later in 2018 that included Truck—which was the party that suggested mediation. Without getting into the substance of the mediation discussions, the Plan before the Court continues to reflect what was negotiated and agreed to by the Proponents prior to the filing of the Term Sheet.

purpose of the Code and yet be inconsistent with other overarching principles, or with the requirement that objectives and purposes of the Code must be fairly achieved." *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 160 n.8 (3d Cir. 2012).

The ACC (the committee comprised of members of the asbestos plaintiffs' bar) and the FCR (hand-selected by the plaintiffs' bar) make additional arguments in their Responses on the section 1129(a)(3) issues that the Debtors correctly elected not to assert. These arguments are mostly variations on a theme—that there is no real fraud problem in asbestos litigation and thus the Court need not be concerned about resolving the bankruptcy claims in the tort system.

The ACC asserts that "*Garlock* was a narrow decision . . . [and its] findings were based on . . . a small number of cases—15—that were hand-selected by Garlock's own experts." ACC Response at 21. The ACC's counsel had made similar assertions prior to the confirmation hearing. At the confirmation hearing, Dr. Bates, who had reviewed the available data and presented the testimony in *Garlock* regarding the evidence suppression, eviscerated that contention in *unrebutted* testimony. As noted by Dr. Bates, counsel's contention "is directly contradicted by the *Garlock* court's finding of a 'widespread' and 'startling pattern of misrepresentation.'" Bates Declaration, Ex. 67 ¶ 12. Dr. Bates noted that in addition to the 15 cases for which full discovery had been obtained, Judge Hodges cited "205 other cases that confirmed the pervasive pattern of exposure omissions in cases litigated against Garlock." *Id.* ¶ 13. Dr. Bates further pointed out that there were only a few hundred cases from which sufficient information existed to determine whether exposure evidence had been suppressed, and thus the more than 200 cases cited in the *Garlock* opinion were "a large portion of the relevant cases." *Id.* ¶ 17. Moreover, based upon the evidence presented in *Garlock,* Judge Hodges concluded "[i]t appears certain that more extensive discovery would show more extensive abuse. But that is not necessary because the

startling pattern of misrepresentation that has been shown is sufficiently persuasive." *In re Garlock Sealing Techs., LLC*, 504 B.R. 71, 86 (Bankr. W.D.N.C. 2014); Bates Decl., Ex. 67 ¶ 12. In sum, the *Garlock* findings were based on hundreds of cases, not merely the 15 for which full discovery had been allowed, and Judge Hodges found "widespread" misrepresentation, not "narrow" misconduct.

The ACC notes that Truck's corporate representative could not identify any specific claim where Kaiser was victimized, ACC Response at 16-17, and that Truck's experts did not have access to the Kaiser claim files, *id.* at 20, all to suggest that there is a lack of evidence that the claims against Kaiser have been impacted by the scheme uncovered in *Garlock*. Similarly, the FCR emphasizes Mr. Hoyt's testimony that after the *Garlock* estimation proceeding, Truck did not seek discovery from the asbestos trusts. FCR Response at 12. But Professor Brickman explained at length why such discovery efforts would be futile, Brickman Decl., Ex. 66 ¶¶ 40, 41, a point Mr. Hoyt repeatedly made during his deposition and in his confirmation hearing testimony. Hoyt Depo. 71:13-72:10; 211:1—212:22; Hoyt Decl. ¶ 20. The scheme was exposed in *Garlock* only because Judge Hodges authorized expansive discovery of closed cases, including access to the records of trusts and other settlement facilities and even the depositions of asbestos plaintiffs' lawyers. It was that evidence, not mere tort system discovery in individual cases, that revealed the fraudulent scheme and its extent. *Garlock*, 504 B.R. at 83-86.

Unlike in *Garlock,* the Debtors here have not sought to estimate their liabilities, and requests by Truck for discovery comparable to what Judge Hodges approved most certainly would have been opposed by all of the Plan Proponents, including the Debtors.[4] However, for the

---

[4] Indeed, in the *Bestwall* asbestos bankruptcy currently pending in this District, the Bankruptcy Court has authorized an estimation of debtor's asbestos liabilities, and in connection therewith, the debtor is seeking approval to obtain discovery from the asbestos claimants and from the trusts pursuant to Bankruptcy Rule 2004, which is

*(Cont'd on next page)*

reasons detailed by Dr. Bates in his testimony, such discovery was simply not needed to determine the more narrow issue of whether the claims against Kaiser have been impacted by the scheme. Nor should *Garlock*-type discovery and an evidentiary proceeding be a necessary precondition to the application of fraud prevention measures, which are now standard in asbestos bankruptcy claims resolution procedures, to the insured claims against Kaiser.

To begin with, the fraud uncovered in *Garlock* was not a scheme specific to Garlock asbestos claims. Testimony given by the asbestos plaintiffs' lawyers in *Garlock* made clear that delaying or concealing trust disclosures in the tort system was part of their usual *modus operandi.* Bates Decl., Ex. 67 ¶ 18. Judge Hodges described this as "a regular practice by many plaintiffs' firms . . . so that the tort system defendants would not have that information." *Garlock*, 504 B.R. at 84. Indeed, Professor Brickman identified a slew of non-*Garlock* cases where exposure evidence was suppressed. Brickman Decl. Ex. 66 ¶¶ 23-29.

Dr. Bates noted the strikingly similar tort system experiences of Kaiser and Garlock, with both seeing huge spikes in the number of cases brought against them and the payments to claimants as the more prominent defendants sought bankruptcy protection. Bates Decl., Ex. 67 ¶¶ 20, 21. He testified that 80% of the mesothelioma cases filed against Kaiser before Garlock's bankruptcy filing were found in the Garlock database. *Id.* ¶ 22. He found 205 Kaiser claims that overlap Garlock claims for which discovery was available in Garlock, and that 63% of the exposures in those 205 cases were omitted from the tort discovery. *Id.* ¶ 25. In addition, as noted, the Debtors themselves believe they have been victimized, only opposing fraud prevention measures for insured claims because the plaintiffs' bar is unwilling to agree to them. D.E. 2420, July 20,

---

being vigorously opposed by the ACC, the FCR and the Trusts. *In re Bestwall LLC,* Case No. 17-BK-31795 (Bankr. W.D.N.C.), Dkt. Nos. 1236, 1237, 1321, 1327, 1328.

2020 Tr. 150:16–151:4. And Dr. Bates testified that more than half of the pending mesothelioma claims asserted against Kaiser are being handled by law firms identified in *Garlock* as having suppressed evidence, including firms that sit on the ACC. Bates Decl., Ex. 67 ¶ 30; Brickman Declaration, Ex. 66 ¶ 58.

Moreover, the findings in *Garlock* were cited by Judge Carey when he was unwilling to confirm the original *Maremont* plan. Ex. 66 ¶ 52. They were likewise cited here by the Bankruptcy Court, leading to a revision of the Plan to include fraud prevention measures, albeit only for uninsured claims. It is pure sophistry to imply that the scheme to defraud does not extend to claims against Kaiser. The bottom line is that the fraud uncovered in the *resolved* Garlock cases led to the development and application of fraud prevention measures for the remaining claims against Garlock, for the claims against Maremont and Sepco, and for the uninsured claims against Kaiser. There is no legitimate reason not to ensure that the insured claims against Kaiser be likewise protected.

Lastly, the ACC complains that the fraud prevention measures "would unfairly and unnecessarily expand the discovery burden on the thousands of claimants seeking to recover from the Debtors' insurance assets." ACC Response at 24. Asking a claimant to accurately and completely list all of the entities against whom the claimant has asserted or intends to assert a claim, and to sign a piece of paper authorizing Truck to request claims information from the trusts, is hardly burdensome. It is also precisely the same burden imposed by the fraud prevention measures agreed to by the ACC and the FCR on holders of uninsured claims who seek substantial recoveries from the Trust. The real objection of the plaintiffs' bar is what was testified to by Mr. Fitzpatrick, the FCR, at the confirmation hearing: Truck would be receiving information it

*could not obtain in tort system discovery*. D.E. 2420, July 20, 2020 Tr. 187:22-189:11. In other words, the information necessary to combat the fraud.

Finally, the Plan Proponents fare no better in their response to Truck's alternative section 1129(a)(3) argument: that the Plan fails to achieve a result consistent with the objectives and purposes of the Bankruptcy Code because it fails to address a core purpose of section 524(g). The Debtors do not challenge or even address the holding in *Bestwall* that "the purpose of section 524(g) [is to serve] as a solution to the inefficient resolution of asbestos claims in the traditional tort system." *In re Bestwall LLC*, 606 B.R. 243, 257 (Bankr. W.D.N.C. 2019) (citing *In re Fed. Mogul Glob. Inc.*, 684 F.3d 355, 357-62 (3d Cir. 2012)). Although the Debtors identify cases where courts have authorized the resolution of claims against 524(g) trusts in the tort system, Truck made clear in the Objection that the issue was not whether the trust to be created here permitted *any* claims to be resolved in the tort system. Rather, the defect is the trust will not resolve *any* of the insured claims and *mandates that all such claims be resolved in the tort system*. As noted in the Objection, no section 524(g) trust has ever so provided—a fact not challenged by the Plan Proponents. Truck Objection at 39-41. A trust that resolves many of the claims outside the tort system could serve the purposes of section 524(g), even if some claims are still resolved in the tort system. But a plan that mandates that all claims must be resolved in the tort system and not by the trust is plainly at odds with what section 524(g) was designed to accomplish.

## II. The Plan Does Not Satisfy The Requirements Of Section 524(g)

Truck showed in its opening brief that the Plan fails to satisfy four distinct requirements of section 524(g). The Plan Proponents' Responses fail to explain or justify any of these deficiencies. As shown in Truck's Objection at pages 42-43, the Plan fails to satisfy the requirement of section 524(g)(2)(B)(i)(I) that the trust must "assume the [asbestos] liabilities of [the debtors]." Truck further noted that in the event insurance coverage is lost, the Reorganized Debtors,

not the Trust, would be responsible for payment of the entirety of the asbestos claims.  *See* Plan §

IV.L.2.b.  In their Response, the Debtors insist that the Trust is "fully assuming the Debtors' lia-

bility for asbestos claims" because "the Trust will be responsible for the payment of all unin-

sured claims and the uninsured portions of Asbestos Personal Injury Claims, including deducti-

bles."  Debtors' Response at 24-25.  And they explain that should coverage be lost, "[t]he Debt-

ors' liability for asbestos claims is still being assumed by the Trust" and the "insured portion of

that claim will be covered by the Reorganized Debtors."  *Id.* at 25.  In other words, the Debtors

are defining their liability as only the amounts they are required to pay after Truck pays the por-

tion covered by insurance, and thus the Trust is assuming their liabilities.  But that is nonsense.

The Debtors' asbestos liabilities are for the *entirety* of the asbestos claims.  That they may have

insurance to cover most of their liability does not change the fact that the entirety of the claims

are liabilities of the Debtors.  And without question, a section 524(g) plan that prohibits claim-

ants from presenting their asbestos claims to the section 524(g) trust fails to comply with the stat-

utory requirement that the trust "assume the [asbestos] liabilities of [the debtors]."[5]  Perhaps that

is why no known 524(g) plan has ever precluded the submission of claims to the trust or prohib-

ited the trust from resolving claims.

  In addition, and as noted in Truck's opening brief at pages 44-47, the proposed $1 million

note from the Debtors secured by 100% of the equity of the Reorganized Debtors is a pretextual

sham designed to attempt to comply with the requirements of sections 524(g)(2)(B)(i)(II) and

(III), as there is no conceivable circumstance in which the Reorganized Debtors would default on

a $1 million note and thereby yield control of a company they value at $179 million and that is

---

[5]  Debtors are further mistaken in their contention that if coverage is lost, the Trust will still assume what they de-
scribe as Debtors' liability for the claims, i.e. the deductibles.  There is no deductible if there is no insurance,
and the Plan provides that if coverage is lost, claimants may seek payment from the Reorganized Debtors for
the "judgment or settlement amount" of the claim.  Plan, D.E. 2481 Art. IV.L.2.b.

projected to generate millions of dollars in positive annual cash flow.  In their Response, the

Debtors do not even attempt to suggest that there is any circumstance in which the Reorganized

Debtors would default on the note and the Trust would ever gain control of the voting shares.

Rather, the Debtors, the ACC and FCR all urge the Court to overlook this feigned compliance

because they all agree that the overall funding is substantial and adequate to satisfy the asbestos

liabilities, and thus it is unimportant that the note is *de minimis* or that the specified contingency

will never occur.  But the statutory provisions at issue are "requirements" for the issuance of the

section 524(g) injunction sought by the Debtors, and no court has ever held that these "require-

ments" can be waived if funding is otherwise substantial and the claimants consent.[6]

The Debtors plainly misread the Ninth Circuit's holding in *Plant Insulation.*  In that case,

the debtor contended, and the bankruptcy court agreed, that any contingency for control could

satisfy section 524(g)(2)(B)(i)(III), and that the nature of the circumstances of the contingency or

their impossibility was irrelevant.  Citing to *In re Congoleum Corp.* 362 B.R. 167, 176 (Bankr.

D. N.J. 2007), the Ninth Circuit rejected this argument because it would "render the entire sub-

section a nullity."  *In re Plant Insulation Co.*, 734 F.3d 900, 916 (9th Cir. 2013).  "It strains cre-

dulity to believe that . . . Congress would have drafted such a toothless provision"  and the speci-

fied contingencies "cannot be 'shams' that allow control facially, but not in practice."  *Id.*

The final requirement for a section 524(g) injunction—evidentiary proof that the "pursuit

of [asbestos] demands outside the procedures prescribed by [the Plan] is ***likely*** to threaten the

plan's purpose to deal equitably with claims and future demands"—concerns what a debtor must

show to be eligible for the injunction.  *See* 11 U.S.C. §  524(g)(2)(B)(ii)(III) (emphasis added).

---

[6]  We only have the word of the Plan Proponents that they expect the funding to be sufficient as they presented no projections of deductibles or uninsured claims.

Truck's opening brief showed through case law, legislative history and treatise authority that absent a finding that the viability of the debtor would be seriously threatened by the assertion of asbestos claims and demands, the debtor is not eligible for the injunction. Truck Objection at 48. Truck further showed that the Plan Proponents had failed even to attempt to establish such a likelihood, instead offering only evidence of some unspecified degree of **risk**, a risk that under the facts presented appears to be *de minimis*. *Id.* at 49.

What say the Plan Proponents in response? Nothing aside from repeating that there is *a risk* of some unquantified degree that absent the Plan, punitive damage recoveries could result in inequitable treatment of claims. They do not challenge the authorities cited by Truck, and they do not assert that they did in fact prove a *likelihood* of disparate treatment. Even if risk, and not likelihood, were the standard, it is obvious why the Plan Proponents are vague in describing that risk. Insured claims are defended and paid by Truck with or without the Plan, and the Debtors do not even know whether any of the pending claims are uninsured. The physical assets of Debtor HPCI are valued at $179 million and HPCI is projected to generate millions of dollars per year in positive cash flow from operations. Yet, despite the fact that punitive damage awards have been exceedingly rare in Kaiser's 40 year history of asbestos litigation—just three, only one of which stood post-trial and even then at a sharply reduced amount, *see* Truck Objection at 49, n.28—the purported need for the section 524(g) injunction is entirely predicated on the argument that there is some unspecified risk that future punitive damage awards could threaten the Debtors' ability equitably to resolve their obligations to pay the $5,000 deductibles and any uninsured claims. *See* FCR Response ¶¶ 64-67; ACC Response at 39. The Debtors clearly cannot show a likelihood of disparate treatment of asbestos claims absent the Plan, and thus they are not eligible to receive the benefit of a section 524(g) injunction.

JA00681

### III. The Insurance Finding Is Improper And Unnecessary

The Debtors' Response, and the Response filed by the ACC, only serve to confirm that the Insurance Finding is both improper and unnecessary. The various and sundry accusations made by the Debtors—that Truck is seeking to control the bankruptcy, to force the Debtors to place Truck's financial interests above their own, to shift the defense burden from Truck to the Debtors—are not only incorrect, but seem designed to obscure Debtors' inability to challenge the core legal authorities and facts set forth in the Truck Objection.

At pages 52-53 of its Objection, Truck laid out the controlling California law concerning an insured's contractual duty to cooperate, the implied duty of good faith and fair dealing, and the overarching prohibition of collusion between an insured and its litigation adversaries. At pages 55-56 of the Objection, Truck summarized the evidence (specifically set forth earlier in the Objection) of Kaiser's failure to meet its policy obligations. Truck also noted that, despite requesting a factual finding that its conduct in the Plan negotiations had not violated the duty to cooperate, Kaiser offered no evidence in support of the Insurance Finding and indeed refused to testify as to the substance of the Plan negotiations. Truck Objection at 55. In their Responses, the Debtors and the ACC dispute *none* of this—not the case law and treatise authorities cited by Truck, and not the evidence presented by Truck nor their own failure to present evidence.

Because they cannot dispute the evidence, the Debtors instead manufacture an argument that their conduct during the course of these cases is "completely irrelevant." Debtors' Response at 36. Debtors base this argument on a contention that Truck "abandoned its claim that the Debtors' conduct breached the Truck Policies," citing to the testimony of Scott Hoyt that the breach would occur if the Plan were confirmed without fraud prevention measures. *Id.* at 35-36. In fact, Mr. Hoyt testified that there was still time for Debtors to possibly cure their breach by adding

Garlock-type fraud prevention measures to the Plan.[7] Moreover, because the proposed Insurance Finding specifically blesses Debtors' conduct, that conduct is by definition relevant. The ACC's contention (ACC Response at 33) that the Insurance Finding is "purely a question of law" is belied by the Finding itself, which plainly purports to resolve facts in the Debtors' favor.

Unable to deny the basic facts—that Debtors negotiated a collusive agreement with those who concocted the evidence suppression scheme, the plaintiffs' bar, and gave them the right to veto the inclusion of measures that would provide Truck with the exposure evidence it needs to properly defend the claims—the Debtors and the ACC instead resort to impugning Truck's motives and presenting arguments that effectively would relieve the Debtors of their cooperation duties simply because they are debtors in bankruptcy. For example, the Debtors argue that they have not breached their assistance and cooperation duties because the clause "cannot require the Debtors to 'take on [Truck] as a partner' during the course of their reorganization cases." Debtors' Response at 31 (citing *Admiral Ins. Co. v Grace Indus., Inc.,* 409 B.R. 275, 283 (E.D.N.Y.)). The ACC likewise relies on *Admiral Insurance,* accusing Truck of seeking to "exploit" the bankruptcy. ACC Response at 30-31. As Truck explained in its opening brief, that case is inapposite because it involved purely procedural stipulations which the court found did not impinge on the insurer's ability to defend the actions, whereas the Debtors' assistance in securing exposure evidence goes directly to Truck's defense of the cases. Truck Objection at 57-58.

According to the ACC, there is no distinction between these cases and *Admiral Insurance.* In a matter of fact way, the ACC states that (1) "the Debtors simply negotiated the Plan with a

---

7  Hoyt Depo. 28:6-29:7 ("[I]f this plan is confirmed, Kaiser will have breached the assistance and cooperation clause because the plan does not include safeguards or disclosure requirements, so the point is, Kaiser could still add those into its plan and perhaps not be in . . . breach of the assistance and cooperation clause"); 177:10-178:8 ("Q. And I think you testified earlier that that still could be cured? A. Yes. Q. How so? A. By implementing those safeguards and those disclosure requirements like the court in Garlock mandated.").

constituency (i.e. the asbestos plaintiffs' bar) whose support was necessary to pass any plan," (2) the resulting "Plan does not require asbestos claimants to provide additional discovery outside of what state and federal courts allow," and (3) "nothing in the Plan prevents Truck from obtaining such discovery in the tort system." ACC Response at 31. The ACC contends this is all merely "procedural," just as in *Admiral Insurance.* The ACC of course knows that full exposure evidence is not available through tort system discovery—its constituents designed the scheme that places trust filings in a secure lockbox. Indeed, the ACC's Response on this point is an admission by the plaintiffs' bar that they used their leverage—the necessity of their support for the Plan—to obtain the Debtors' approval of deal terms that would deny Truck access to full exposure evidence. Clearly, this is not a "procedural" matter. Nothing could be more substantive or relate more directly to Truck's ability to defend the claims than access to complete exposure information. Nor is insisting that the Debtors abide by their contractual duties an effort to "exploit" the bankruptcy. If the Debtors want the insurance contracts to remain in effect—which they clearly do—then they must honor their own obligations under those contracts.

For similar reasons, the Court should reject the Plan Proponents' contention that enforcement of the Assistance and Cooperation Clause is preempted by the Bankruptcy Code. ACC Response at 33; Debtors' Response at 37. The cases relied upon—*In re Thorpe*, 677 F.3d 869 (9th Cir. 2012) and *In re Federal-Mogul Global Inc.,* 684 F.3d 355 (3d Cir. 2012)—are wholly inapposite. Both held that anti-assignment provisions in insurance contracts, which would frustrate the entire statutory scheme of section 524(g) by preventing assignment of a debtor's insurance coverage to a section 524(g) trust, were preempted based upon express provisions of the Bankruptcy Code. *See Federal Mogul,* 684 F.3d at 366, 382 (citing 11 U.S.C. § 1123(a)(5), which authorizes the court to "transfer all or any part of the property of the estate"); *In re Thorpe*, 677

JA00684

F.3d at 889 (citing 11 U.S.C. § 541(c)(A), providing that "an interest of the debtor in property becomes property of the estate . . . notwithstanding any provision in an agreement . . . that restricts or conditions transfer of such interest by the debtor "). Conversely here, the Plan Proponents identify no statutory provision that evinces Congressional intent to preempt assistance and cooperation clauses. Nor would Debtors' compliance with their policy duties, which actually preserves insurance coverage and the ability to fund a section 524(g) plan, preclude a section 524(g) plan or otherwise frustrate the purpose of the Bankruptcy Code.

Debtors also contend that "[t]he plain language of the Assistance and Cooperation Clause can only be read to require the Debtors to provide evidence and witnesses within their control," Debtors' Response at 32, but nothing in that Clause so limits the assistance obligation. Similarly, the ACC argues without any logic or case support that "[t]he obligation to 'secure and give evidence' refers to the obligation of the policyholder to secure *its own* evidence and share it with the insurance company." (ACC Response at 30, emphasis added).

The Debtors also restate their argument that compliance with the Assistance and Cooperation Clause can only be determined on a case by case basis and only after a defended case has been resolved. (Debtors' Response at 33, citing coverage cases requiring the insurer to show prejudice from the lack of cooperation.) But the Debtors are conflating what they must prove to support a finding that they are in compliance with their policy duties with the prejudice Truck might be required to prove if it were challenging its coverage obligations based upon the insured's breach of its duties. Stated otherwise, determining whether the Debtors have complied with their policy duties and determining whether Truck could prevail on a coverage challenge based upon non-compliance with those duties are two different questions. If and when Truck challenges coverage

the issue of prejudice will require adjudication, but it is both premature and not relevant to the declaratory ruling requested by the Debtors.

The Debtors are likewise off base in arguing that the Insurance Finding is "necessary" to confirmation of the Plan. Debtors' Response at 35. To begin with, it is not now, nor has it ever been Truck's contention that the Plan cannot be confirmed because of a policy breach. Truck merely reserved its right to deny coverage post-confirmation if the Debtors fail to take steps to comply with their policy duties to cooperate and assist. If the Debtors truly believe they are in compliance, they can present those arguments when and if Truck later denies coverage. It is the Debtors, not Truck, that have elected to raise the policy dispute now, apparently because their deal with the plaintiffs' bar does not permit them to unilaterally add fraud prevention measures to the Plan, which would resolve the dispute.

The Debtors also argue that the right to receive Truck policy proceeds "is the most substantial portion of the Asbestos Personal Injury Trust Assets," thus making inclusion of the Insurance Finding "critical" and that "[p]ermitting Truck to later attack, in a different forum, the Debtors' conduct during the Reorganization Cases would afford Truck a backdoor to unwind the Plan . . . ." Debtors' Response at 36. This is all nonsense. As noted in Truck's opening brief, from the very outset, and long prior to Truck's reservation of rights letter, the Plan has provided that if coverage is lost due to a breach of the duty to cooperate, the Reorganized Debtors are liable for payment of the asbestos claims, and Lehigh Hanson guarantees those obligations. Truck Objection at 54. The FCR testified that in the event the insurance coverage was lost, Lehigh Hanson would be able to satisfy the Debtors' obligations to pay the claims, and therefore the Plan was feasible with or without the insurance coverage. D.E. 2420, July 20, 2020 Tr. 185:6-186:7. Thus, the Plan

JA00686

would not be at risk of being "unwound" in the event of a later coverage challenge—the Plan is designed to address that very contingency.[8]

## IV. Truck Has Standing To Contest Confirmation Of The Plan

Finally, in a transparent attempt to avoid judicial scrutiny of the many defects in the Plan, the Plan Proponents continue to insist that Truck lacks standing because the Plan is purportedly insurance neutral. The Plan is not insurance neutral and Truck is plainly a party in interest with standing for multiple reasons.

Setting aside whether the doctrine of insurance neutrality is an appropriate consideration for standing to object at confirmation, rather than appellate standing, *see In re Combustion Eng'g*, 391 F.3d 190, 215–220 (3d Cir. 2004), there can be no doubt that Truck has standing because the Plan *is not* insurance neutral. In *Combustion Engineering* and the other insurance neutrality cases cited by the Plan Proponents, the insurance neutrality provisions provided in words or substance that "[n]othing in the Plan or Confirmation Order shall preclude" the insurers from asserting "any and all claims, defenses, rights or causes of action" under the insurance policies. *In re Combustion Eng'g*, 391 F.3d at 212; *see also Mt. McKinley Ins. Co. v. Pittsburgh Corning Corp.*, 518 B.R. 307, 319 (W.D. Pa. 2014) (substantially similar provision "based upon" *Combustion Eng'g* clause). The *Mt. McKinley* court found the plan insurance neutral only *after* noting that "[w]hether PPG or Corning has a contractual duty to cooperate with Mt. McKinley under the . . . policies is a matter to be resolved in coverage litigation" and "[n]othing in the plan or the bankruptcy court's

---

[8] For the same reason, the Debtors' contention that the coverage dispute is a core matter that had to be resolved at confirmation in order to make the finding that the Plan has adequate means of implementation is incorrect. Debtors' Response at 38. The Insurance Finding is not a core issue and cannot be resolved against Truck without violating Truck's jury rights. Kaiser's suggestion that the coverage dispute is a core matter because it "would have no practical existence but for the bankruptcy" is likewise unsupported as Truck's entitlement to Kaiser's cooperation and assistance existed decades before this bankruptcy.

confirmation opinion and order made any determination with respect to this issue." 518 B.R. at 323.

Here, conversely, the Plan's purported neutrality provision expressly exempts from preserved coverage rights coverage defenses based upon the insureds' conduct in the bankruptcy. D.E. 2481 Art.IV.Q (reserving Truck's rights only to assert "Insurer Coverage Defense"); Art. I.A.84 (defining "Insurer Coverage Defense" to *exclude* coverage defenses based on conduct in bankruptcy proceeding). The court in *In re Congoleum Corp.,* 362 B.R. 167 (Bankr. D.N.J. 2007), sitting within the same Circuit that issued the *Combustion Engineering* ruling, distinguished the insurance neutrality provision at issue there from *Combustion Engineering* because the provision employed the same sleight of hand as the Plan here: it only preserved those coverage defenses that fell within a defined term, "Asbestos Insurer Coverage Defenses." Because all coverage defenses were not preserved, the plan was not insurance neutral. *Id.* at 174. *See also In re Thorpe*, 677 F.3d at 878, 885 (plan, which excluded from insurance neutrality provision certain coverage defenses, was not insurance neutral because it "affect[ed] the nature of [insurers'] contracts with [the debtors]").

Moreover, beyond the wording of the insurance neutrality provision, the Plan as proposed would actually resolve in the Debtors' favor a live dispute with Truck regarding the Debtors' duty to cooperate and assist. For purposes of standing, it is no answer to argue that the Plan Proponents are right and Truck is wrong with respect to the dispute over the Debtors' policy obligations. "If the insurer's rights are affected *in any way*, the insurer will have standing to object to the alteration of its rights." Collier on Bankr. ¶ 1109.04.

Clearly recognizing that Truck is a party in interest—indeed, the Bankruptcy Court so held—the Plan Proponents' real contention is that Truck's standing should be limited to certain

issues.  In particular, the Plan Proponents seek to prevent the Court from considering the section 524(g) compliance issues raised by Truck.  Debtors' Response at 15-17; ACC Response at 11.

None of the Plan Proponents meaningfully address section 1109(b)'s directive that a "party in interest . . . may raise and may appear and be heard *on any issue.*"  11 U.S.C. § 1109(b) (emphasis added).  While the Plan Proponents refer to out-of-circuit decisions asserting that a party in interest "cannot challenge portions of the plan that do not affect its direct interests," *In re Quigley Co.*, 391 B.R. 695, 703-05 (Bankr. S.D.N.Y. 2008), those cases cannot be squared with the text of section 1109(b) instructing that parties in interest may be heard "on any issue," nor with 11 U.S.C. § 1128(b), which provides that a "party in interest may object to confirmation of a plan."[9]

Moreover, although the Plan Proponents note that standing is not "dispensed in gross," they neglect to complete the rule, which states that a party is required only to "demonstrate standing *for each claim* he seeks to press and *for each form of relief* that is sought."  *Town of Chester, New York v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)).  Truck asserts one claim here, that the Plan violates the requirements of chapter 11, and seeks only a single form of relief, the Court's rejection of confirmation.  That Truck asserts multiple independent *theories* in support of that single form of relief is irrelevant—

---

[9]  Contrary to the Plan Proponents' characterizations, standing to object under section 1109(b) is "*at least* [as] broad" as "Article III" standing.  *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 211 n.25 (3d Cir. 2011) (emphasis added).  "The contours of the injury-in-fact requirement, while not precisely defined, are very generous," *Bowman v Wilson*, 672 F.2d 1145, 1151 (3d Cir. 1982).  "The standard is met as long as a party alleges a 'specific, identifiable trifle'" of injury."  *In re Global Indus.* 645 F. 3d at 210 (quoting *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 686-90, 690 n.14 (1973)).  Moreover, the Plan's violations of 524(g) do "affect [Truck's] direct interests," *In re Quigley*, 391 B.R. at 703.  The 524(g) injunction is the *quid pro quo* for Debtors' willingness to ignore the fraudulent resolution of insured claims, and the sham 524(g) trust proposed is what facilitates the resolution of those claims in venues that are powerless to prevent the evidence suppression scheme.

JA00689

it is enough for Article III purposes that one form of relief is sought and that Truck satisfies the requirements of standing as to that relief.[10]

Even if Truck did not have standing to raise the section 524(g) or 1129(a) issues, the Court would still need to address them. In finding that it must address the insurers' issues, including compliance with section 524(g), whether or not the insurers had standing, the court in *In re Congoleum* held:

> Since Congress imposes on the court the obligation to ensure that all of the confirmation requirements in § 1129 are satisfied, it is beyond cavil that this Court has standing to address the issues raised in these motions. *In re WCI Cable, Inc.,* 282 B.R. 457, 466 (Bankr. D. Or. 2002) (citing *In re Ambanc La Mesa Ltd. Partnership,* 115 F. 3d 650, 653 (9th Cir. 1997)) ("The court has an affirmative duty to make sure that all of the requirements for confirmation under § 1129 have been met."). Since the Court has an independent duty to address the issues raised by the Insurers, it is of no consequence whether there are any valid objections to confirmation, no less objections by parties with standing. *In re Genesis Health Ventures, Inc.,* 266 B.R. 591 (Bankr. D. Del. 2001).

362 B.R. at 175. *See also In re Szostek,* 886 F. 2d 1405, 1414 (3d Cir. 1989) (bankruptcy court has independent duty to "examine a plan for compliance with the [Bankruptcy Code] even though no objections by creditors [are] made").

Lastly, although each of the Plan Proponents asserts that the Plan leaves Truck in the same position it was in prior to the bankruptcy—Debtors' Response at 2; FCR Response at 3; ACC Response at 15—the unspoken part of that assertion is that the Court need not be concerned about

---

[10]   As found in one of the section 524(g) cases cited by the ACC, "[t]hat the Insurers' stake in plan confirmation includes a stake in the fundamental fairness of the Plan cannot be seriously challenged." *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147, 160 (D.N.J. 2005) (concluding insurer had standing to oppose confirmation based on procedural challenge to Plan Proponents compliance with technical disclosure requirements of Bankruptcy Rule 2019). *See also, In re Pittsburgh Corning Corp.* 453 B.R. 570, 589 (Bankr. W.D. Pa. 2011) (because plan is not insurance neutral and creates doubt as to whether insurer's rights are impaired, insurer had the necessary standing to prosecute its objections to the confirmation of the plan, including non-compliance with section 524(g)); *In re Thorpe,* 677 F.3d at 888 ("[b]ecause Appellants are parties in interest, they should have had standing to object to confirmation of the plan . . . . For this reason the nonsettling insurers had a right to be heard, to present evidence, and to participate in the proceedings culminating in approval of the §524(g) plan").

how the bankruptcy claims get resolved, *even if fraudulently*, so long as the process for resolving them remains unchanged from what it was prepetition. In a normal bankruptcy, no debtor would support and promote a plan that would lead to fraudulently-inflated resolution of the claims asserted against the debtor, nor would a court accept an argument that fraudulent resolution of the claims was of no concern to the court, so long as the means for resolving the claims was unchanged from how similar claims were resolved prepetition. But in these cases, because of the corrupt bargain struck, the only party with an interest in fraud prevention is Truck—the intended financial victim. In *In re Global Indus. Technologies*, the Third Circuit reversed lower court rulings in support of plan confirmation that dispensed with insurers' confirmation objections based on a lack of standing, noting in part that "the integrity of the bankruptcy proceeding is called into question by nonfrivolous allegations of collusion" between the debtor and the asbestos claimants' counsel, a "profoundly serious charge . . . that apparently no one has an incentive to pursue, other than the insurers. . . . Recognizing [the insurers'] bankruptcy standing is particularly appropriate because the challenges they want to bring implicate the integrity of the bankruptcy process." 645 F.3d at 214-15. Similarly, here, justice would hardly be served if the only parties permitted to address plan confirmation were the parties to the collusive agreement that gives rise to that plan.

## CONCLUSION

For all the reasons set forth above and in the Truck Objection, the Court should deny confirmation of the proposed Plan. Alternatively, as in *Maremont,* confirmation should be conditioned on extension of fraud prevention measures to all insured asbestos personal injury claims for which claimants seek resolution in the tort system so as to provide Truck with full and complete asbestos exposure evidence necessary to fairly resolve the asbestos personal injury claims asserted in these bankruptcy cases against the Debtors.

JA00691

Respectfully submitted,

Dated: December 31, 2020

/s/ Michael L. Martinez

Michael A. Rosenthal
(admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Phone:  (212) 351-4000; Fax:  (212) 351-4035
Email:  MRosenthal@gibsondunn.com

Robert B. Krakow (admitted *pro hac vice*)
Allyson N. Ho (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
Email:  RKrakow@gibsondunn.com
Email: AHo@gibsondunn.com

Matthew G. Bouslog (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612-4412
Email:  MBouslog@gibsondunn.com

David W. Casazza (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave, N.W.
Washington, D.C. 20036
Email: DCasazza@gibsondunn.com

GRIER WRIGHT MARTINEZ, PA
Michael L. Martinez
(N.C. State Bar No. 39885)
101 North Tryon Street, Suite 1240
Charlotte, NC 28246
Phone:  (704) 332-0209; Fax:  (704) 332-0215
Email:  mmartinez@grierlaw.com

– and –

PIA ANDERSON MOSS HOYT, LLC
Scott R. Hoyt (admitted *pro hac vice*)
136 E. South Temple, 19th Floor
Salt Lake City, UT 84111
Phone: (817) 454-5678; Fax: (801) 350-9010
Email: SHoyt@pamhlaw.com

*Counsel for Truck Insurance Exchange*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that copies of the foregoing *Reply Brief in Support of Objection of Truck Insurance Exchange to the Bankruptcy Court's Proposed Findings of Fact and Conclusions of Law Regarding Confirmation of the Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc., as Modified* were served by electronic notification on those parties registered with the United States District Court, Western District of North Carolina, electronic case filing system to receive notices for this case.

This is the 31st day of December, 2020.

*/s/  Michael L. Martinez*
Michael L. Martinez
Grier Wright Martinez, PA
521 East Morehead Street, Suite 440
Charlotte, North Carolina 28202

JA00693