No. 21-1858

# In the United States Court of Appeals for the Fourth Circuit

---

IN RE: KAISER GYPSUM COMPANY, INC., ET AL.,

*Debtors.*

TRUCK INSURANCE `EXCHANGE,

*Appellant,*

v.

IN RE: KAISER GYPSUM COMPANY, INC.
HANSON PERMANENTE CEMENT, INC.,

*Appellees*,

and

LEHIGH HANSON, INC.

*Appellee,*

and

OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS;
FUTURE CLAIMANTS' REPRESENTATIVE

*Appellees.*

---

On Appeal from the United States District Court for the Western
District of North Carolina, No. 20-cv-537 (Hon. Graham C. Mullen)

---

**JOINT APPENDIX – VOLUME VIII**

---

Michael A. Rosenthal
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
mrosenthal@gibsondunn.com

Allyson N. Ho
*Counsel of Record*
Robert B. Krakow
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
Telephone: (214) 698-3100
Facsimile: (214) 571-2934
aho@gibsondunn.com
rkrakow@gibsondunn.com

COUNSEL FOR APPELLANT TRUCK INSURANCE EXCHANGE

Gregory M. Gordon
JONES DAY
2727 North Harwood Street,
Suite 500
Dallas, Texas 75201
Telephone: (214) 220-3939
gmgordon@jonesday.com

C. Kevin Marshall
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
ckmarshall@jonesday.com

Paul M. Green
JONES DAY
717 Texas, Suite 3300
Houston, Texas 77002
pmgreen@jonesday.com

Ross R. Fulton
John R. Miller, Jr.
RAYBURN COOPER &
    DURHAM, P.A.
227 West Trade Street, Suite 1200
Charlotte, North Carolina 28202
Telephone: (704) 334-0891
rfulton@rcdlaw.net
jmiller@rcdlaw.net

COUNSEL FOR DEBTORS-APPELLEES KAISER GYPSUM COMPANY, INC. AND
HANSON PERMANENTE CEMENT, INC.

[ADDITIONAL COUNSEL LISTED ON FOLLOWING PAGES]

Mark A. Nebrig
Moore & Van Allen PLLC
100 N. Tryon St., Suite 4700
Charlotte, North Carolina 28202
Telephone: (704) 331-3602
marknebrig@mvalaw.com

Counsel for Defendant-Appellee Lehigh Hanson, Inc.

Sara Wyche Higgins
Higgins & Owens, PLLC
Suite 530
5925 Carnegie Boulevard
Charlotte, North Carolina 28209
Telephone: (704) 366-4607
shiggins@higginsowens.com

Kevin C. Maclay
Todd E. Phillips
James P. Wehner
Caplin & Drysdale
Suite 1100
1 Thomas Circle, NW
Washington, D.C. 20005
Telephone: (202) 862-7841
kmaclay@capdale.com
tphillips@capdale.com
jwehner@capdale.com

Felton Edward Parrish
Alexander Ricks, PLLC
Suite 100
1420 East 7th Street
Charlotte, North Carolina 28204
Telephone: (980) 334-2001
felton.parrish@alexanderricks.com

Counsel to Appellee the Official Committee of
Asbestos Personal Injury Claimants

Edwin J. Harron
Sharon M. Zieg
Young, Conaway, Stargatt
    & Taylor
Rodney Square North
P. O. Box 391
Wilmington, Delaware 19899
Telephone: (302) 571-6600
eharron@ycst.com
szieg@ycst.com

Counsel to Appellee the Future Claimants' Representative

# TABLE OF CONTENTS

**JA Page**

## VOLUME I (DISTRICT COURT FILINGS)

Docket Report, U.S. District Court for the Western District of
North Carolina, *In re Kaiser Gypsum Company, Inc.*,
No. 20-cv-537-GCM ....................................................................JA00001

Order Recommending Entry of Proposed Findings of Fact and
Conclusions of Law and Order Confirming Joint Plan of Reorganization
by United States Bankruptcy Judge J. Craig Whitley.
(filed Sept. 28, 2020) (Dkt. 1) .......................................................JA00010
      Ex. A: Proposed Findings .....................................................JA00014
      Ex. B: Proposed Confirmation Order ...................................JA00089

Truck's Objections to Proposed Findings of Fact and Conclusions of
Law (filed Nov. 4, 2020) (Dkt. 25).................................................JA00493

Brief in Support of Objection of Truck to Proposed Findings of Fact and
Conclusions of Law (filed Nov. 4, 2020) (Dkt. 26) ........................JA00497

Future Claimants' Representative's Brief in Response to Objection of
Truck to Proposed Findings of Fact and Conclusions of Law
(filed Dec. 4, 2020) (Dkt. 32) ........................................................JA00575

Official Committee of Asbestos Personal Injury Claimants' Brief in
Response to Objection of Truck to Proposed Findings of Fact and
Conclusions of Law (filed Dec. 4, 2020) (Dkt. 33).........................JA00613

Reply Brief in Support of Objection of Truck to Proposed Findings of
Fact and Conclusions of Law (filed Dec. 31, 2020) (Dkt. 34)........JA00662

**VOLUME II (DISTRICT COURT FILINGS, CONT'D)**

Notice of Filing of Joint Record Index and Excerpts from Joint Record Documents (filed Jan. 11, 2021) (Dkts. 36–46)[1] ..........................JA00694

    Truck Insurance Exchange's Responses and Objections to Debtors' First Set of Interrogatories (A000639 - A000651)......JA00709

    Truck Insurance Exchange's Responses and Objections to the Official Committee of Asbestos Personal Injury Claimants' and the Future Claimants' Representative's First Set of Interrogatories and Requests for Production of Documents (A000664 - A000677)...................................................JA00722

    Truck Insurance Exchange's Responses and Objections to the Official Committee of Asbestos Personal Injury Claimants' and the Future Claimants' Representative's Second Set of Interrogatories and Requests for Production of Documents (A000678 - A000690)...................................................JA00736

    Truck Insurance Exchange's Responses to the Official Committee of Asbestos Personal Injury Claimants' First Set of Interrogatories and Requests for Production of Documents (A000691 - A000712)...................................................JA00749

    Truck Insurance Exchange's Responses to the Official Committee of Asbestos Personal Injury Claimants' Second Set of Interrogatories and Requests for Production of Documents (A000713 - A000719)...................................................JA00771

---

[1] These documents were included in the joint appendix of record materials and additional evidence submitted to the district court in connection with the district court's consideration of the Plan. The numbers in parentheses identify the bates ranges assigned to these documents in the district court appendix. The documents listed here were not filed on the bankruptcy court docket. Documents that were filed as part of the record in the district court but were also previously filed in the bankruptcy court docket are located in volume IV – XII of this Joint Appendix according to their position on the bankruptcy court docket.

Official Committee of Asbestos Personal Injury Claimants' and the
    Future Claimants' Representative's Notice of Deposition of
    Truck Insurance Exchange (A000720 - A000730)......JA00778
1974 Truck Insurance Policy to Kaiser (A001124 - A001197)
    ...................................................................................JA00789
Reservation of Rights Letter to Kaiser Concerning Cooperation
    and Assistance Dated April 3, 2019 (A001748 - A001750)
    ...................................................................................JA00863
Truck Insurance Exchange's Complaint for Declaratory Relief
    (A007504 - A007534)...................................................JA00866
Deposition of Scott Hoyt (A007576 - A007626) ...................JA00897
Deposition of Lester Brickman (A007628 - A007651).........JA00948
Deposition of Charles Bates (A007653 - A007677)..............JA00972
Sepco Asbestos Personal Injury Trust Distribution Procedures,
    attached as Exhibit A to Order Confirming the Second
    Amended Plan of Reorganization, as Modified, for Sepco
    Corporation Under Chapter 11 of the Bankruptcy Code, and
    Report and Recommendation to the District Court, *In re
    Sepco Corp.*, No. 16-50058 (Bankr. N.D. Ohio Mar. 24, 2020),
    Dkt. No. 732 (A007678 - A007733) .............................JA00997
Garlock Settlement Facility Amended and Restated Claims
    Resolution Procedures, *In re Garlock Sealing Techs. LLC,*
    Case No. 17-cv-00275-GCM (W.D.N.C.), Dkt. No. 13-1
    (A007734 - A007815)...................................................JA01053
Filings in *In re Bestwall LLC*, Case No. 17-BK-31795 (Bankr.
    W.D.N.C.), Dkt. Nos. 1236, 1237, 1321, 1327, 1328
    (A007816 - A007962)...................................................JA01135
Transcript of Confirmation Hearing, *In re Leslie Controls, Inc.*,
    No. 10-12199 (CSS) (Bankr. D. Del. Oct. 26, 2010),
    Dkt. No. 381 (A007963 - A008043).............................JA01282

**VOLUME III (DISTRICT COURT FILINGS, CONT'D)**

Findings of Fact, Conclusions of Law and Order Confirming the First Amended Plan of Reorganization of Leslie Controls, Inc. Under Chapter 11, *In re Leslie Controls, Inc.*, No. 10-12199 (CSS) (Bankr. D. Del. Oct. 28, 2010), Dkt. No. 382 (A008044 - A008100) .............................JA01363

Order Confirming Sixth Am. Joint Plan of Reorganization of Thorpe Insulation Co. and Pacific Insulation Co., *In re Thorpe Insulation Co.*, No. 2:07-bk-19271-BB (Bankr. C.D. Cal. May 8, 2013) (A008101 - A008129) ....................................................................................JA01420

Order Confirming Am. and Restated Second Am. Plan of Reorganization of Plant Insulation Co. as Modified § 5.2.6, *In re Plant Insulation Co.*, No. 09-31347 (Bankr. N.D. Cal. Mar. 3, 2014), Dkt. No. 2722 (A008130 - A008150)...................................................JA01439

Transcript of District Court Plan Confirmation Proceedings (dated June 25, 2021) (Dkt. 50).....................................JA01470

District Court's Findings of Fact and Conclusions of Law Regarding Confirmation of the Joint Plan of Reorganization (signed July 27, 2021) (Dkt. 51)........................................................................JA01558

District Court's Order Confirming the Joint Plan of Reorganization (signed July 27, 2021) (Dkt. 52)....................................JA01632
    Ex. A: Plan.........................................................................JA01667
    Ex. B: Modifications ..........................................................JA01743
    Ex. C: Confirmation Notice ...............................................JA01824
    Ex. D: Confirmation Notice—Publication Version ..............JA01833

Joint Opposition of the Official Committee of Asbestos Personal Injury Claimants and the Future Claimants' Representative to the Emergency Motion of Truck for Stay Pending Appeal (filed Aug. 5, 2021) (Dkt. 55)............................................................................JA01838

Debtors' Objection to Truck Insurance Exchange's Motion for Stay Pending Appeal of the Findings of Fact and Conclusions of Law and Order Confirming Joint Plan of Reorganization (filed Aug. 5, 2021) (Dkt. 56)......................................................................................JA01851

Truck's Notice of Appeal (filed Aug. 6, 2021) (Dkt. 58)................JA01875

## VOLUME IV (BANKRUPTCY COURT FILINGS)

Docket Report, U.S. Bankruptcy Court for the Western District of North Carolina, *In re Kaiser Gypsum Company, Inc.*, No. 16-31602..................................................................................JA01877

Declaration of Charles E. McChesney II in Support of First Day Pleadings (filed Sep. 30, 2016) (Dkt. 13)......................................JA02218

Lawrence Fitzpatrick CV (filed Oct. 11, 2016) (Dkt. 68, Ex. A)...JA02241

Order Appointing Official Committee of Asbestos Personal Injury Claimants (filed Oct. 19, 2016) (Dkt. 100)...................................JA02245

Agreed Order Amending the Interim DIP Financing Order (filed Apr. 10, 2017) (Dkt. 444) ....................................................JA02249

Transcript for Hearing on Truck Motion for Relief from Stay in Connection with California Insurance Coverage Action (dated May 2, 2017) (Dkt. 499).............................................................................JA02253

Notice of Filing of Plan Term Sheet (filed Mar. 6, 2018) (Dkt. 854) ..................................................................................................JA02306

Chapter 11 Plan of Reorganization Proposed by Truck (filed Apr. 13, 2018) (Dkt. 887) ....................................................JA02323

Transcript for Hearing on Motion for Relief from Stay in Connection with Asbestos Personal Injury Claims (dated May 10, 2018) (Dkt. 950) ......................................................................................JA02379

Order Granting Motion of the Debtors, the Official Committee of Asbestos Personal Injury Claimants and the Future Claims Representative to Lift the Stay (filed Aug. 9, 2018) (Dkt. 1108)....................................................................................JA02527

**JA Page**

**VOLUME V (BANKRUPTCY COURT FILINGS, CONT'D)**

First Amended Disclosure Statement for First Amended Chapter 11 Plan of Reorganization Proposed by Truck Insurance Exchange (filed Sept. 25, 2018) (Dkt. 1204)............................................................JA02543

Objection of Truck to Motion for Approval of Debtors' Disclosure Statement (filed Nov. 06, 2018) (Dkt. 1302).................................JA02893

Declaration of Charles McChesney II In Support of Debtor's Objection to First State Companies' Renewed Motion to Dismiss (filed Dec. 03, 2018) (Dkt. 1361).....................................................JA02925

Order Approving Settlement with Armstrong World Industries, Inc. (filed Mar. 15, 2019) (Dkt. 1556)....................................................JA02936

Amended Order Granting Debtors' Motion for Reconsideration of the Court's Oral Ruling on the Debtors' Motion for an Order Approving Settlement with Owens Corning Fibreglas Corporation (filed Mar. 15, 2019) (Dkt. 1558)....................................................JA02938

Order Approving Settlement with the Boeing Company (filed Apr. 18, 2019) (Dkt. 1601).........................................................................JA02941

Order Approving Settlement with the City of Seattle (filed Apr. 18, 2019) (Dkt. 1602).........................................................................JA02943

Order Approving Settlement with the Port of Seattle(filed Apr. 18, 2019) (Dkt. 1603)...........................................................................JA02945

Order Approving Settlement with King County, Washington (filed Apr. 18, 2019) (Dkt. 1604).....................................................JA02947

Order Approving Settlement with the Oregon Department of Environmental Quality (filed May 7, 2019) (Dkt. 1625) ..............JA02949

Fifth Amended Chapter 11 Plan of Reorganization Proposed by Truck (filed May 30, 2019) (Dkt. 1665) ...................................................JA02951

Fifth Amended Truck Disclosure Statement (filed May 30, 2019) (Dkt. 1666)....................................................................................JA03015

**JA Page**

## VOLUME VI (BANKRUPTCY COURT FILINGS, CONT'D)

Third Amended Joint Plan of Reorganization (filed May 30, 2019) (Dkt. 1668)....................................................................................JA03210

Second Supplemental Objection of Truck Insurance Exchange to Motion for Approval of Debtors' Disclosure Statement (filed Jun. 6, 2019) (Dkt. 1682)....................................................................................JA03429

Transcript for Hearing on Approval of Disclosure Statements filed by Truck and the Debtors (dated Sept. 4, 2019) (Dkt. 1785) ............JA03587

Order Approving Settlement with the United States (filed Sept. 12, 2019) (Dkt. 1789) ...................................................JA03690

Kaiser Gypsum Asbestos Personal Injury Trust Distribution Procedures (filed Sep. 25, 2019) (Dkt. 1818)......................................................JA03692

Kaiser Gypsum Asbestos Personal Injury Trust Agreement (filed Oct. 21, 2019) (Dkt. 1868)......................................................JA03738

**VOLUME VII (BANKRUPTCY COURT FILINGS, CONT'D)**

Disclosure Statement for the Third Amended Joint Plan of
Reorganization of Kaiser Gypsum Company, Inc. and Hanson
Permanente Cement, Inc. (filed Oct. 21, 2019) (Dkt. 1869) .........JA03791

Order (I) Approving the Debtors' Disclosure Statement, (II)
Establishing Procedures for Solicitation and Tabulation of Votes to
Accept or Reject Proposed Joint Plan of Reorganization and (III)
Scheduling a Hearing on Confirmation of Proposed Joint Plan of
Reorganization and Approving Related Notice Procedures
(filed Oct. 23, 2019) (Dkt. 1875) .....................................................JA03923

Declaration of Anna Jadonath Regarding Publication of Notice of (I)
Deadline for Casting Votes to Accept or Reject Proposed Joint Plan of
Reorganization, (II) Hearing to Consider Confirmation of Proposed
Joint Plan of Reorganization and (III) Related Matters
(filed Nov. 14, 2019) (Dkt. 1903) ....................................................JA03987

Order Approving Settlement with Ash Grove Cement Company
(filed Nov. 20, 2019) (Dkt. 1908) ....................................................JA04117

Objection of Truck to Confirmation of the Third Amended Joint Plan of
Reorganization (filed Feb. 24, 2020) (Dkt. 2070) ..........................JA04119

**VOLUME VIII (BANKRUPTCY COURT FILINGS, CONT'D)**

Notice of Filing of Exhibits to Objection by Truck to Confirmation of the
Third Amended Joint Plan of Reorganization) (filed February 24, 2020)
(Dkt. 2072) ...................................................................................JA04159
    Ex. L: Sample Truck Policy.................................................JA04486
    Ex. Q: Slip Op. in *Congoleum Corp. v. Ace American Insurance*,
    No. MID-L-8908-01 (N.J. Super. Ct. May 18, 2007)............JA04814

Declaration of Kevin O'Neal Holdeman, CPA, in Support of
Confirmation of the Third Amended Joint Plan of Reorganization
(filed Mar. 13, 2020) (Dkt. 2145)....................................................JA04839


**JA Page**

**VOLUME IX (BANKRUPTCY COURT FILINGS, CONT'D)**

Joint Omnibus Reply of the Official Committee of Asbestos Personal
Injury Claimants and the Future Claimants' Representative in
Response to Objections to the Third Amended Joint Plan of
Reorganization (filed Jun. 15, 2020) (Dkt. 2274)..........................JA04845

Debtors' Memorandum of Law in Support of Third Amended Joint Plan
(filed June 15, 2020) (Dkt. 2275)....................................................JA04891

Notice of Filing of Redline Version of Third Amended Joint Plan of
Reorganization Debtors Reflecting Settlement Reached with Certain
Excess Insurance Carriers (filed June 23, 2020) (Dkt. 2304) ......JA05068

Truck's Response to Reply of Debtors to Omnibus Objections to Truck
Insurance Exchange Claim Nos. 42 and 43 (filed July 1, 2020)
(Dkt. 2328)......................................................................................JA05149

Declaration of Lawrence Fitzpatrick in Support of Confirmation of
Third Amended Joint Plan of Reorganization of Kaiser Gypsum
Company, Inc. and Hanson Permanente Cement, Inc.
(filed July 1, 2020) (Dkt. 2336) .....................................................JA05158

Testimonial Declaration of Truck Insurance Exchange Witness Charles
E. Bates (filed July 1, 2020) (Dkt. 2337)......................................JA05183

Testimonial Declaration of Truck Insurance Exchange Witness Lester
Brickman (filed July 1, 2020) (Dkt. 2338) ....................................JA05257

Testimonial Declaration of Truck Insurance Exchange Witness Scott R.
Hoyt (filed July 1, 2020) (Dkt. 2339).............................................JA05390

13

Affidavit of David L. Neale (filed July 1, 2020) (Dkt. 2340).........JA05405

Bittner Declaration in Support of Third Amended Joint Plan of
Reorganization on Behalf of Kaiser Gypsum Company, Inc.
(filed July 1, 2020) (Dkt. 2341-1) .................................................JA05414

Plan Projections, Exhibit A to Bittner Declaration (filed July 1, 2020)
(Dkt. 2341-1)..................................................................................JA05426

Liquidation Analysis, Exhibit B to Bittner Declaration
(filed July 1, 2020) (Dkt. 2341-1) .................................................JA05433

McChesney Declaration in Support of Third Amended Joint Plan of
Reorganization on Behalf of Kaiser Gypsum Company, Inc.
(filed July 1, 2020) (Dkt. 2341-2) .................................................JA05444

**JA Page**

## VOLUME X (BANKRUPTCY COURT FILINGS, CONT'D)

Debtors' Motion for an Order Approving Non-Material Modifications to
the Joint Plan of Reorganization (filed July 1, 2020) (Dkt. 2342)
.......................................................................................................JA05463

Declaration of James Daloia of Prime Clerk LLC Regarding the
Solicitation of Votes and Tabulation of Ballots Cast on the Third
Amended Joint Plan of Reorganization of Kaiser Gypsum Company, Inc.
and Hanson Permanente Cement, Inc. (filed July 1, 2020) (Dkt. 2343)
.......................................................................................................JA05554

Declaration of Cameron R. Azari, Esq. on Implementation of Notice
Regarding the Joint Plan of Reorganization of Kaiser Gypsum
Company, Inc. and Hanson Permanente Cement, Inc.
(filed July 2, 2020) (Dkt. 2345) ....................................................JA05562

Consolidated Response of Truck Insurance Exchange to the Briefs in
Support of Confirmation Filed by the Plan Proponents
(filed July 7, 2020) (Dkt. 2359) ....................................................JA05686

Notice of Joint Deposition Designations (filed July 14, 2020)
(Dkt. 2370) ....................................................................................JA05706

Joint Reply of the Official Committee of Asbestos Personal Injury
Claimants and the Future Claimants' Representative in Response to
Truck's Consolidated Response to Plan Proponents' Confirmation Briefs
(filed July 16, 2020) (Dkt. 2376)....................................................JA05720

Debtors' Reply to Consolidated Response of Truck Insurance Exchange
(filed July 16, 2020) (Dkt. 2377)....................................................JA05730

Transcript for Hearing on Confirmation of the Debtors' Joint Plan of
Reorganization (dated July 20, 2020) (Dkt. 2420).........................JA05758
      Cross Examination of Charles E. McChensey, II ................JA05833
      Redirect Examination of Charles E. McChensey, II ...........JA05909
      Cross Examination of Lawrence Fitzpatrick.......................JA05914

**JA Page**

**VOLUME XI (BANKRUPTCY COURT FILINGS, CONT'D)**

Transcript for Hearing on Confirmation of the Debtors' Joint Plan of
Reorganization (dated July 22, 2020) (Dkt. 2426).........................JA05970

Order Allowing, In Part, the Claims of Truck Insurance Exchange
(Claims Nos. 42 and 43) (filed Aug. 17, 2020) (Dkt. 2438)...........JA06168

Transcript for Hearing in Connection with Oral Ruling on Confirmation
of the Debtors' Joint Plan of Reorganization (dated Aug. 13, 2020)
(Dkt. 2439) ....................................................................................JA06178

Notice of Filing of (I) Proposed Findings of Fact and Conclusions of Law
Regarding Confirmation of the Joint Plan of Reorganization and (II)
Proposed Order Confirming the Joint Plan of Reorganization, as
Modified, filed on behalf of Kaiser Gypsum Company, Inc.
(filed Aug. 25, 2020) (Dkt. 2442)....................................................JA06214

Third Amended Joint Plan of Reorganization (filed Sept. 24, 2020) (Dkt. 2481) ...................................................................JA06330
    Exhibit I.A.16 – Asbestos Personal Injury Trust Agreement .........................................................................JA06417
    Exhibit I.A.19 – Asbestos Personal Injury Trust Distribution Procedures .........................................................................JA06471

**JA Page**

**VOLUME XII (BANKRUPTCY COURT FILINGS, CONT'D)**

Order Recommending Entry of Proposed Findings of Fact and Conclusions of Law and Order Confirming Joint Plan of Reorganization (filed Sept. 28, 2020) (Dkt. 2486) ...................................................JA06605

Order Approving Debtors' (I) Settlement with Allianz Underwriters Insurance Company and Fireman's Fund Insurance Company and (II) Sale of Transferred Interests in Connection with Insurance Policies Related Thereto (filed Oct. 14, 2020) (Dkt. 2516).........................JA07088

Order Approving Debtors' (I) Settlement with Certain Underwriters at Lloyd's, London, Certain London Market Insurance Companies, Continental Insurance Company, Columbia Casualty Company and National Fire Insurance Company of Hartford and (II) Sale of Transferred Interests in Connection with Insurance Policies Related Thereto (filed Oct. 14, 2020) (Dkt. 2517) ......................................JA07095

Order Approving Debtors' (I) Settlement with Munich Reinsurance America, Inc. and Executive Risk Indemnity, Inc. and (II) Sale of Transferred Interests in Connection with Insurance Policies Related Thereto (filed Oct. 14, 2020) (Dkt. 2518) ......................................JA07102

Order Approving Debtors' (I) Settlement with Insurance Company of The State of Pennsylvania and National Union Fire Insurance Company and (II) Sale of Transferred Interests on Connection with Insurance Policies Related Thereto (filed Oct. 14, 2020) (Dkt. 2519) ..................................................................................JA07109

Order Approving Debtors' (I) Settlement With Transport Insurance Company and (II) Sale of Transferred Interests in Connection With

Insurance Policies Related Thereto (filed Oct. 14, 2020)
(Dkt. 2520) ...................................................................JA07116

Order Approving (I) Settlement with Insurance Westchester Fire
Insurance Company and Westchester Surplus Lines Insurance
Company and (II) Sale of Transferred Interests in Connection with
Insurance Policies Related Thereto (filed Oct. 14, 2020)
(Dkt. 2521)...................................................................JA07123

Order Approving Debtors' (I) Settlement with Westport Insurance
Corporation and (II) Sale of Transferred Interests in Connection with
Insurance Policy Related Thereto (filed Oct. 14, 2020)
(Dkt. 2522)...................................................................JA07130

Order Approving Debtors' (I) Settlement with Truck and (II) Sale of
Transferred Interests in Connection with Insurance Policies Related
Thereto (filed Oct. 14, 2020) (Dkt. 2523) ....................................JA07136

Order Approving Debtors' (I) Settlement with Hartford Insurance
Company, First State Insurance Company, New England Insurance
Company and Twin City Fire Insurance Company and (II) Sale Of
Transferred Interests in Connection with Insurance Policies Related
Thereto (filed Oct. 14, 2020) (Dkt. 2524) ....................................JA07143

Order Approving Debtors' (I) Settlement with Allstate Insurance
Company and (II) Sale of Transferred Interests in Connection with
Insurance Policies Related Thereto (filed Oct. 14, 2020) (Dkt. 2525)
...................................................................JA07150

Order Approving Debtors' Settlement with Associated International
Insurance Company and TIG Insurance Company (filed Oct. 14, 2020)
(Dkt. 2526)...................................................................JA07157

Transcript for Hearing (Status Conference dated Sept. 26, 2020)
(Dkt. 1826)...................................................................JA07160

## VOLUME XIII (FILINGS FROM DISTRICT COURT PROCEEDING TO WITHDRAW THE REFERENCE)

Docket Report, U.S. District Court for the Western District of North Carolina, *Truck Insurance Exchange v. Kaiser Gypsum Company, Inc. et al*, No. 19-cv-00467-GCM ....................................................JA07218

Truck's Motion to Withdraw the Reference of Adversary Proceeding to the Bankruptcy Court (filed Sept. 19, 2019) (Dkt. 1)...................JA07222

Memorandum of Law in Support Truck Insurance Exchange's Motion to Withdraw the Reference of Adversary Proceeding to the Bankruptcy Court (filed Sept. 19, 2019) (Dkt. 1-1)..........................................JA07226

Order Staying Motion to Withdraw the Reference of Adversary Proceeding to the Bankruptcy Court (filed Oct. 1, 2019) (Dkt. 3) .......................................................................................JA07257

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division**

| | |
|---|---|
| In re | Case No. 16-31602 |
| **KAISER GYPSUM COMPANY, INC., et al.,**[1] | **Chapter 11** |
| **Debtors.** | (Jointly Administered) |

**NOTICE OF FILING OF EXHIBITS TO OBJECTION BY
TRUCK INSURANCE EXCHANGE TO CONFIRMATION OF THE
THIRD AMENDED JOINT PLAN OF REORGANIZATION**

TAKE NOTICE that Truck Insurance Exchange, an interested party in the above-referenced bankruptcy cases (collectively, this "Case"), through counsel, hereby files the attached Exhibits A – Q in support of its *Objection by Truck Insurance Exchange to Confirmation of the Third Amended Joint Plan of Organization* (D.E. 2070).

This, the 24th day of February, 2020.

<div align="right">

 */s/ Michael L. Martinez*
GRIER WRIGHT MARTINEZ, PA
Michael L. Martinez (N.C. Bar No. 39885)
521 North Tryon Street, Suite 440
Charlotte, NC 28202
Phone:  704/332.0209; Fax:  704/332.0215
Email:  mmartinez@grierlaw.com

—and—

GIBSON, DUNN & CRUTCHER, LLP
Michael A. Rosenthal (admitted *pro hac vice*)
Robert B. Krakow (admitted *pro hac vice*)
Alan Moskowitz (admitted *pro hac vice*)
Matthew G. Bouslog (admitted *pro hac vice*)
Dylan S. Cassidy (admitted *pro hac vice*)
200 Park Avenue
New York, NY 10166-0193

</div>

---

[1]     The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  Kaiser Gypsum Company, Inc. (0188); and Hanson Permanente Cement, Inc. (7313).  The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

JA04159

Phone:  (212) 351-4000; Fax:  (212) 351-4035
Email:  MRosenthal@gibsondunn.com
Email:  RKrakow@gibsondunn.com
Email:  AMoskowitz@gibsondunn.com
Email:  MBouslog@gibsondunn.com
Email:  DCassidy@gibsondunn.com

*Counsel for Truck Insurance Exchange*

JA04160

# EXHIBIT A

JA04161

1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2
                                        .    Chapter 11
3    IN RE:                             .
                                        .    Case No. 19-10118 (KJC)
4    MAREMONT CORPORATION, *et al.*,    .
                                        .    Courtroom No. 5
5                                       .    824 North Market Street
                                        .    Wilmington, Delaware 19801
6                                       .
                                        .
7                        Debtors.       .    March 18, 2019
     . . . . . . . . . . . . . . . . .       1:00 P.M.
8
                     TRANSCRIPT OF OMNIBUS HEARING
9             BEFORE THE HONORABLE KEVIN J. CAREY
                  UNITED STATES BANKRUPTCY JUDGE
10
     APPEARANCES:
11
12   For the Debtors:          James Conlan, Esquire
                               Andrew O'Neill, Esquire
13                             Allison Ross Stromberg, Esquire
                               Blair Warner, Esquire
14                             SIDLEY AUSTIN LLP
                               One South Dearborn Street
15                             Chicago, Illinois 60603

16

17

18   Audio Operator:          Electronically Recorded
                               by Dana L. Moore, ECRO
19
     Transcription Company:    Reliable
20                             1007 N. Orange Street
                               Wilmington, Delaware 19801
21                             (302)654-8080
                               Email:  gmatthews@reliable-co.com
22
     Proceedings recorded by electronic sound recording,
23   transcript produced by transcription service.

24

25

                                                            JA04162

```
 1   APPEARANCES (Continued):

 2   For the Debtors:            Norman Pernick, Esquire
                                 J. Kate Stickles, Esquire
 3                               COLE SCHOTZ P.C.
                                 500 Delaware Avenue, Suite 1410
 4                               Wilmington, Delaware 19801

 5
     For the U.S. Trustee:       Richard Schepacarter, Esquire
 6                               UNITED STATES DEPARTMENT OF JUSTICE
                                 OFFICE OF THE UNITED STATES TRUSTEE
 7                               844 King Street, Suite 2207
                                 Lockbox 35
 8                               Wilmington, Delaware 19801

 9   For James Patton:           Robert Brady, Esquire
                                 Edwin Harron, Esquire
10                               YOUNG CONAWAY STARGATT & TAYLOR LLP
                                 Rodney Square
11                               1000 North King Street
                                 Wilmington, Delaware 19801
12
     For the Asbestos            Natalie Ramsey, Esquire
13   Committee:                  Robinson & Cole
                                 1000 N. West Street, Suite 1200
14                               Wilmington, Delaware 19801

15

16

17

18

19

20

21

22

23

24

25
```

JA04163

1                                   INDEX

2                                                                    Page

3  **Confirmation.**  Modified Joint Prepackaged Plan of
   Reorganization of Maremont Corporation and Its Debtor
4  Affiliates Pursuant to Chapter 11 of the Bankruptcy Code
   (Filed March 12, 2019) (Docket No. 136)
5
   **No Ruling Given; Hearing will Resume on 3/26/19**
6

7

8  EXHIBITS:                                          ID    Rec'd

9  Declaration of Carl D. Anderson, II                       12
      In Support of First Day
10
   Declaration of Carl D. Anderson, II                       13
11    In Support of Confirmation

12 Declaration of Jung W. Song                                13

13 Declaration of James L. Patton, Jr.                        15

14 Transcript of March 8th, 2019                              15

15

16

17

18

19

20

21

22

23

24

25

JA04164

 1           (Proceedings commenced at 1:04 p.m.)

 2           (Call to order of the court)

 3                THE COURT:  Good afternoon, everyone.

 4                ALL:  Good afternoon, Your Honor.

 5                MR. O'NEILL:  Good afternoon, Your Honor; Andrew

 6    O'Neill, Sidley Austin, on behalf of the debtors.  I am

 7    joined by my colleagues; John Skakun, Allison Stromberg,

 8    Blair Warner, as well as by Norm Pernick and Kate Stickles

 9    from Cole Schotz.  We have Mr. Carl Anderson in the courtroom

10    today, Your Honor.  He's chairman of the board and sole

11    officer of Maremont.  Also in the courtroom is J.W. Song from

12    Donlin Recano, the debtors' solicitation and noticing agent.

13                I guess others will make appearances as they come

14    to the microphone.

15                Your Honor, we have one item on the agenda today;

16    confirmation of the plan.  Well, in addition to the approval

17    of the solicitation and our disclosure statement.  We're

18    happy to report that outside of the remaining elements of the

19    U.S. Trustees objection, which you will hear about shortly,

20    we have consensus on this plan and support from the current

21    claimants, the future claimants, and every other party of

22    interest that is engaged with us in this process.

23                THE COURT:  Give me a preview, if you would, of

24    who intends to make what presentation?  Then I would like to

25    know what remains of the U.S. Trustee's objection.

JA04165

1         MR. O'NEILL:  Very good, Your Honor.  So, the way

2 we thought this would work is my colleague, Ms. Stromberg,

3 was going to fill Your Honor in on what has been settled both

4 from informal comments from parties and also with the U.S.

5 Trustee who we have been working with on some of the plan

6 objections.  I can tell you that the remaining objections

7 from the U.S. Trustee relate to the trust distribution

8 procedures.  Those are the sole remaining objections; the

9 good faith objection and the 524(g) objection about

10 substantial similarity of treatment of future claimants.

11         THE COURT:  Have any of the components of the U.S.

12 Trustee objection been worked out or do they still stand as

13 they did in the filed objection?

14         MR. O'NEILL:  They stand as they did in the

15 objection.

16         THE COURT:  Okay.

17         MR. O'NEILL:  We got to the effective date

18 argument and the exculpation argument, and are in agreement

19 on those objections, but the TDP objection, if you will,

20 remains in toto.

21         So, what we plan to do, Your Honor, as I said, Ms.

22 Stromberg will catch the court up on changes to the plan and

23 the order, and describe those settlements including the

24 recent Fireman's Settlement that occurred on Friday.  Then we

25 will make the record for the day.  We anticipate moving the

 1  declarations into evidence and not having direct or cross,

 2  but, of course, folks are available in court if Your Honor

 3  would like to ask questions.  Then we will go straight to

 4  argument and make our case in chief.  I believe the committee

 5  and the future's rep will say a few things as well and then

 6  Mr. Schepacarter from the U.S. Trustees Office will have his

 7  turn to argue as well.

 8         THE COURT:  All right.  Mr. Schepacarter, does the

 9  U.S. Trustee intend to present any witnesses or other

10  evidence in support of its objection?

11         MR. SCHEPACARTER:  Thank you, Your Honor; for the

12  record Richard Schepacarter for the United States Trustee.

13         No, Your Honor.  As Mr. O'Neill has outlined and

14  laid out for the court that is, sort of, the process upon

15  which we will proceed today.  Thank you.

16         THE COURT:  All right.  Thank you.

17         I did want to take, before you begin, an

18  opportunity to make a few comments and that is while I don't

19  disagree of the fact that there's an opinion by the

20  bankruptcy court in the Garlock case, which on a selected

21  basis has reached some conclusions, I think I do agree that

22  if there's to be some drastic change in the process that

23  maybe that's for another forum or another time; however, I

24  think the U.S. Trustee makes some very good points about

25  putting in provisions that will guard against the possibility

1  that such fraud should occur.  By that I mean it's the

2  multiple claims made by plaintiffs' attorneys on behalf of

3  various claimants in a variety of different trust situations.

4         I don't know any reason why, under the

5  circumstances, if, in fact, it's happened and at least it's

6  happened in some cases, looks to me from the <u>Garlock</u> opinion,

7  that we shouldn't try to guard against it here.  I think at

8  the end of the day, if the evidence is consistent with what

9  the papers have shown, I'm going to ask that you make some

10 adjustments.  The argument that it's a prepack and I

11 shouldn't touch it, and the world will collapse if I don't,

12 will not persuade me.

13        So, with that in mind I had thought about maybe

14 bringing counsel into Chamber's initially, but the parties

15 are so far apart I'm just wondering whether it's just better

16 to make your record and then we'll go from there.  In having

17 said that I'm open to suggestions by any or all of the

18 parties.

19        MR. O'NEILL:  Okay.  Thanks, Your Honor.

20        I think what we'll do, though, is proceed on the

21 basis that we described and then perhaps have conversations

22 based on Your Honor's comments.

23        THE COURT:  It's your party.  Let's get started.

24        MR. O'NEILL:  Sounds good.

25        Okay.  Well, with that I will cede the podium to

1  Ms. Stromberg to run Your Honor through the plan and order

2  changes.

3         THE COURT:  All right.

4         MS. STROMBERG:  Good afternoon, Your Honor;

5  Allison Stromberg from Sidley Austin on behalf of the

6  debtors.

7         We filed plan modifications on March 12th with a

8  memorandum of law in support of confirmation and the proposed

9  findings of fact, conclusions of law and order confirming the

10 plan.  We also filed further revisions to the plan and

11 proposed order yesterday.

12        We have a cumulative redline of the plan as well

13 as a redline of the proposed order that I can provide for

14 you.  May I approach?

15        THE COURT:  Yes.  Do you have an extra set for my

16 law clerk by any chance?

17        MS. STROMBERG:  So, I wasn't going to do a page

18 turn, but rather spend a few moments to walk the court

19 through the main revisions that we made to the plan and the

20 language included in the proposed order that we incorporated

21 to address informal comments that we received from parties as

22 well as the certain issues that were resolved with the United

23 States Trustee.

24        To start, Your Honor may remember that at the

25 first day hearing you had raised two concerns regarding the

1  plan;

2           The first was the provision regarding the

3  retention of exclusive jurisdiction.  We revised the plan to

4  remove the exclusive phrase and that's changes reflected in

5  Article 11(a) of the plan and Paragraph 105 of the proposed

6  order.

7           The second issue Your Honor raised concerned the

8  plan's third-party releases and the extent to which such

9  releases were fully consensual.  We revised the plan to

10 provide for an opt-out mechanism that will allow parties to

11 opt-out of the third-party releases through a notice that

12 will be sent with a notice of the confirmation and effective

13 date.  That opt-out election form is Exhibit 1 to the notice

14 of the effective date, which in turn is Exhibit B to the

15 proposed order.

16          We have also received comments in the plan from

17 certain governmental entities other than the United States

18 Trustee; the Department of Justice, the Environmental

19 Protection Agency in the State of Ohio, and it's State

20 Environmental Agency.  We were able to satisfy these parties

21 with a reservation of rights in favor of the Governmental

22 units that's included in Paragraphs 192 and 193 of the

23 proposed order.  This paragraph is similar to revisions of

24 rights included in other prepackaged plans.  In essence,

25 allows claims and rights of the Governmental units to ride

1  through the plan unaffected with the exception here of any

2  asbestos personal injury claims which are channeled to

3  Asbestos Personal Injury Trust.

4          We received comments from two insurers; Zurich and

5  Fireman's Fund Insurance Company.

6          With respect to Zurich we had discussions with

7  counsel to Zurich regarding the treatment of its settlement

8  agreement under the plan, and Zurich has agreed to the

9  treatment as set forth in Section 4(d)(3) of the plan.  We

10  agreed on language in Paragraph 195 of the proposed order

11  confirming the treatment of Zurich as a settling insurer and

12  the mutual release of potential claims between the debtors

13  and Zurich.

14          With respect to Fireman's Fund we engaged in

15  negotiations with Fireman's Fund regarding the treatment of

16  the existing insurance agreement under the plan and,

17  ultimately, entered into a new agreement settling all issues

18  with respect to the remaining insurance. We filed the

19  settlement agreement along with the corresponding plan

20  changes and proposed confirmation order reflecting Fireman's

21  agreement over the weekend.  The settlement agreement is now

22  Exhibit N to the plan.

23          The settlement provides that Fireman's will pay $8

24  million dollars to the benefit of the trust right after the

25  effective date and the prior agreement with Fireman's, which

1   is a coverage place insurance agreement, will be rejected.

2   Fireman's will be treated as a settling insurer and the

3   parties will grant mutual releases with respect to the

4   policies in the prior agreement.  This agreement is described

5   in Paragraph 194 of the proposed confirmation order and

6   Section 4(d)(1) of the plan.  I also understand that Mr.

7   Harron will speak to the settlement from the perspective of

8   the trust.

9        We did not receive comments or objections from

10  Everest or Mount McKinley, who were the other settling

11  insurers.  Their treatment is provided for in Section 4(d)(2)

12  of the plan and confirmed by Paragraph 196 of the proposed

13  confirmation order.

14       Finally, we were able to resolve two of the

15  objections raised by the United States Trustee with respect

16  to the effective date.  The plan now provides that the

17  effective date will occur within ten business days of the

18  conditions precedent to effectiveness being satisfied.  And

19  with respect to the exculpation provisions we made several

20  revisions to the exculpation in Section 1125(e) protections

21  including revisions to clarify the estate fiduciary is

22  entitled to exculpation and the plan participant is entitled

23  to the protection of Section 1125(e).  And we understand that

24  with these modifications the U.S. Trustee's objection to

25  exculpation provision has been resolved.

1        Unless you have any questions about the recent

2   revisions I can turn the podium back to Mr. O'Neill.

3            THE COURT:  I do not.  Thank you.

4            MS. STROMBERG:  Thank you, Your Honor.

5            MR. O'NEILL:  Okay.  With that, Your Honor, I'd

6   like to start by moving a few declarations into evidence.

7   Then Mr. Harron will do the same for Mr. Patton's

8   declaration.

9        First, we'd like to move in the declaration of Mr.

10  Carl Anderson in support of the first days.  This was entered

11  in on the first day hearing as well, but we rely upon it in

12  our brief as additional evidence on the process.  So, we'd

13  like to re-enter it if you will.

14           THE COURT:  Is there any objection?

15       (No verbal response)

16           THE COURT:  It's admitted without objection.

17       (Declaration of Carl Anderson, admitted into evidence)

18           MR. O'NEILL:  Great.  And I have copies of all of

19  these if Your Honor wants me to bring them up to be marked,

20  but, otherwise, we will just rely on the record.

21           THE COURT:  I think that would be fine.

22           MR. O'NEILL:  Okay.  We also move the declaration

23  of Mr. Anderson in support of confirmation, that is docket

24  139, into evidence.

25           THE COURT:  Is there any objection to the

 1 | admission of the second Anderson declaration?

 2 |      (No verbal response)

 3 |           THE COURT:  I hear none.  It's admitted without

 4 | objection.

 5 |      (Declaration of Carl Anderson, admitted into evidence)

 6 |           MR. O'NEILL:  Great.  Thank you.

 7 |           Also, we'd like to move the declaration of J.W.

 8 | Song into evidence.  That is docket number 12.  That is the

 9 | voting declaration.

10 |           THE COURT:  Any objection?

11 |      (No verbal response)

12 |           THE COURT:  I hear none.  The Song declaration is

13 | admitted without objection.

14 |      (Declaration of Jung W. Song, admitted into evidence)

15 |           MR. O'NEILL:  Thank you, Your Honor.

16 |           We'd also ask that the court take judicial notice

17 | of the various affidavits of service and notices that have

18 | been filed on the docket.  They're all listed in the agenda.

19 | I can list them out by docket number if Your Honor would

20 | like.

21 |           THE COURT:  If they're limited to what's in teh

22 | agenda that's not necessary.

23 |           I will ask if there's any objection to proceeding

24 | in that manner.

25 |      (No verbal response)

1              THE COURT:  I hear none.  So ordered.

2              MR. O'NEILL:  Thank you, Your Honor.

3              Finally, as I noted, we have Mr. Patton in court,

4   the future's representative.  Unless Your Honor has any more

5   questions for me I will let Mr. Harron approach to enter his

6   declaration.

7              THE COURT:  All right.

8              MR. HARRON:  Good afternoon, Judge Carey.  May I

9   please the court; for the record Ed Harron from Young Conaway

10  Stargatt & Taylor.  I am here on behalf of James Patton, the

11  future claimants' representative.

12             I'd like to make a few introductions if I may.

13  Also at counsel table is Ms. Zieg from Young Conaway.

14             MS. ZIEG:  Good afternoon, Your Honor.

15             MR. HARRON:  Mr. Kochenash who is a newer lawyer

16  at Young Conaway.  Ms. Brockman who is with Ankura, the

17  consultant who assisted us with things like the payment

18  percentage.  And to the extent the court has questions we

19  wanted to make sure she was available.

20             By way of housekeeping, Your Honor, I'd note that

21  Mr. Patton submitted a declaration in support of

22  confirmation.  It can be found at docket number 140.  As part

23  of that declaration we incorporated, by reference, the

24  transcript from last week's hearing where Mr. Patton

25  addressed many of his qualifications in his due diligence.

 1          If I may, I'd like to move that declaration -- and

 2   Mr. Patton, of course, is here for cross examination.  I'd

 3   like to move that into evidence along with the March 8th

 4   transcript.

 5          THE COURT:  Is there any objection?

 6      (No verbal response)

 7          THE COURT:  All right. The declaration is at 140

 8   and the transcript is at docket 126.  They are admitted

 9   without objection.

10      (Declaration of James Patton, admitted into evidence)

11      (Transcript of March 8th, admitted into evidence)

12          MR. HARRON:  Your Honor, if I could, I'd like to

13   make a, kind of before I do so, brief proffer of Mr. Patton

14   solely in respect of the Fireman's Fund settlement which we

15   recently negotiated.  It was not addressed in his

16   declaration.

17          THE COURT:  Proceed.

18          MR. HARRON:  Your Honor, if Mr. Patton were called

19   to testify he would testify as follows.  Maremont and

20   Fireman's Fund were parties to two insurance policies

21   historically.  Those policies provided coverage for asbestos

22   personal injury claims.  Prior to the bankruptcy case the

23   Fireman's Fund and Maremont had entered into a coverage and

24   place agreement which provided a mechanism to exhaust the

25   remaining indemnity limits and allocated defense costs

1 largely outside of the limits and charged a portion of the

2 defense to the indemnity limits.  The parties had conducted

3 themselves in good faith under that coverage and place

4 agreement for some time up to the petition date.

5          When we filed, Your Honor, the debtor along with

6 the future claimants' rep, with the participation of the

7 committee, reached out to Fireman's Fund and sought to reach

8 a resolution of the coverage and place agreement, and

9 Fireman's Fund's larger obligations under their insurance

10 policies.  We entered into good faith negotiations which

11 resulted in the settlement that's before Your Honor, which

12 has been incorporated into the plan.

13          Your Honor, the negotiations largely focused on to

14 what extent Fireman's Fund should contribute to the trust for

15 defense costs.  The remaining indemnity limits were

16 approximately $7 million dollars.  There was a good faith

17 dispute about the extent to which trust administrative costs

18 would qualify as defense costs under either the policy

19 language or the language of the coverage and place agreement.

20 Also, the coverage and place agreement was silent on the

21 extent to which Fireman's Fund would be entitled to 524(g)

22 should the debtors enter into a Chapter 11 proceeding.

23          To resolve both of those issues we agreed on a

24 settlement which provides for a total of $8 million dollars

25 of funding which will be paid on the effective date of a

 1  plan, and for which Fireman's Fund and its affiliated parties

 2  will receive a full release from Maremont and also be

 3  entitled to the protections of a protected party under the

 4  plan, which will allow them to be included in the channeling

 5  injunction that we're seeking from this court.

 6          Your Honor, I believe that would conclude Mr.

 7  Patton's testimony.  It's safe to say that Mr. Patton is of

 8  the view that the settlement is fair and reasonable, and

 9  furthers the best interest of future claimants.

10          Ms. Davis is in the courtroom on behalf of

11  Fireman's Fund should Your Honor have any questions.

12          THE COURT:  All right.  Let me ask, does anyone

13  wish to cross-examine Mr. Patton?

14      (No verbal response)

15          THE COURT:  I hear no response.

16          MR. HARRON:  Thank you, Your Honor.

17          Your Honor, I'd like to address the court's

18  concerns to the extent possible, but we're operating in a bit

19  of a vacuum because it's not clear to us on this side of the

20  bench exactly which of the Trustee's objections have

21  resignated with Your Honor.  If Your Honor would like to hear

22  from Mr. Patton potentially on the issue of what safeguards

23  the trust has in place to address inconsistent claiming

24  across trusts or other issues we're happy to put Mr. Patton

25  on the stand to attempt to address those issues.

 1          THE COURT:  Well, let's do this; I'm assuming that

 2   there is no further evidence to be introduced by any party at

 3   this point.

 4       (No verbal response)

 5          THE COURT:  Okay.  So, let me follow along the

 6   U.S. Trustee's objection and tell you what my thoughts were.

 7   And, of course, they do focus around the trust distribution

 8   procedures, and specifically with respect to the issue of

 9   transparency.  I have a couple things.

10          One, while I understand why the claims submissions

11   should be, at least initially, confidential, why shouldn't

12   the, as a condition of brining a claim, claimants should do

13   two things: (1) disclose what other claims they've made

14   against other trusts or made a claim and withdrawn it; and

15   (2) offer a release in favor of the trust to share their

16   claim information with other trusts.  What is so bad about

17   that?

18          MR. HARRON:  Well, Your Honor, I have a view on

19   those issues, but it may be more productive if I take a

20   moment and consult with my client and the committee --

21          THE COURT:  Certainly.

22          MR. HARRON:  -- that way I can address them more

23   efficiently.

24          THE COURT:  Okay.

25          MR. HARRON:  Would it make sense to have a fifteen

JA04179

1  minute recess?

2          THE COURT:  Well, let's go through the rest of my

3  comments.

4          MR. HARRON:  Okay.

5          THE COURT:  Why is it important that issues about

6  who should see what would be resolved only in the Bankruptcy

7  Court, a Delaware State Court or the United States District

8  Court for the District of Delaware?  Is that largely a cost-

9  savings device or are there other reasons for it?

10          MR. HARRON:  I can answer that one, Your Honor.

11  It is a cost-savings device.  It's contemplated that this

12  will be a Delaware trust.  There are many Delaware 524(g)

13  trusts and we believe it's most efficient for the trusts to

14  have these disputes heard in Delaware to the extent possible.

15  Also, the District Court in Delaware now has some experience

16  addressing these subpoenas because we've done it before.

17          So, that provision is entirely one of efficiency.

18          THE COURT:  Okay.  I don't necessarily have so

19  much of an issue with the Section 5.7(b)(3) provision which

20  talks about failure to identify debtors' product lines in the

21  claimants' underlying tort action or to other bankruptcy

22  trusts.  It says,

23              "Does not preclude the claimant from recovering

24              from the asbestos trust provided that claimant,

25              otherwise, satisfies the medical and exposure

1          requirements."

2          Now, consistent with what I said I'd like to see

3  that disclosure, but if the trustee decides that a failure to

4  disclose isn't relevant and it's the medical and exposure

5  requirements are otherwise satisfied it seems to me that

6  ought to be enough.

7          So, what is the purpose of Section 5.7(a)(2) which

8  says,

9          "Claimants who, otherwise, meet the requirements

10         of the TDP for payment of an asbestos claim shall

11         be paid irrespective of the results in any

12         litigation at any time between the claimant and

13         any other defendant in the tort system."

14         There is a proviso that says,

15         "However, any relevant evidence submitted in the

16         proceeding in the tort system other than any

17         findings of fact, verdict or judgment involving

18         another defendant may be introduced by either the

19         claimant or the asbestos trust."

20         Again, is that, in effect, a cost-saving device so

21  that the trustee is relieved from having to sort through what

22  another court said, and what it meant and what effect it

23  should have or is there some other reason for it?

24         MR. HARRON:  There are at least two reasons, Your

25  Honor.  One is exactly that.  This trust will have relatively

1 | modest pay-outs.

2 |       THE COURT:  And it's a small trust.

3 |       MR. HARRON:  In negotiating the payment percentage

4 | we assumed 15 million of funding for the life of the trust.

5 | We have to be efficient to make that work.  So, it's to

6 | alleviate the burden on the trust from evaluating that

7 | information and in recognition of the fact that the payment

8 | to be received by the claimant is only for Maremont's share

9 | based on what it was paying, you know, in the tort system to

10 | settle its several share of liability and, of course, subject

11 | to the payment percentage.  So, it furthers the policy views

12 | of a settlement trust with limited administrative funding.

13 |       As you may note from the discussion we just had

14 | about the Fireman's Fund policy the trust is largely trusted

15 | with indemnity dollars.  So, every dollar, more or less, that

16 | is spent fighting and litigating claims is coming out of

17 | money that's designed to pay claims.  So, there is a

18 | balancing inherent in the process and the TDP provisions

19 | actually say that the trust is to be mindful of how much

20 | money is spent litigating claims versus paying sick people.

21 | Here we designed the trust to pay the sickest of the

22 | claimants 90 percent of the dollars.

23 |       So, that is one of the reasons, Your Honor, its

24 | efficiency.  The other is just a recognition of the nature of

25 | asbestos litigation.  We touched on this a little bit last

 1  week or maybe we didn't.  The cases run together a bit, Your

 2  Honor.  These claimants --

 3          THE COURT:  Yeah, I know that feeling.

 4       (Laughter)

 5          MR. HARRON:  These exposures largely occurred

 6  thirty and forty years ago.  The claimants are elderly.  In

 7  this case you are going to ask a claimant to identify whose

 8  brake pad it used when he or she changed their brakes forty

 9  years ago or more relevant is whose brakes were you cleaning

10  off the rotor.  It's just -- the proof problem is acute for

11  an asbestos trust; particularly with a product like this.

12  It's very difficult for a claimant to identify the product.

13          Memories and evidence evolves over time.  So, if

14  someone worked at a site where they were installing Owens

15  Corning insulation for twenty years and they filed a claim

16  with Owens Corning, and they said, well, I got sick from

17  Owens Corning it may not be till a few years later that they

18  see a package that has the trade address for Maremont Brakes

19  that they realize, hey, I also changed Maremont brakes.  Who

20  is to say whether or not that memory is accurate and how much

21  of the trust funds should we spend investigating it.

22          That is what happens in the litigation, the file

23  evolves over time, things jog peoples' memories and/or

24  depositions.  They learn of other products to which they were

25  exposed that they may not have known when they were in the

 1  prior litigation or sometimes they will be involved in

 2  litigation and they will know they worked around pipes, but

 3  there is no way for the claimant to know whose insulation was

 4  surrounding those pipes.  So --

 5          THE COURT:  I also have a feeling that the

 6  claimants have a lot of help from lawyers in that respect.

 7          MR. HARRON:  Well, I think it's fair to suspect,

 8  Your Honor, that the plaintiffs' lawyers don't build their

 9  cases in a way to aid the defendants.  The defendants need to

10  ask the right questions when they take the depositions and

11  serve their discovery.

12          THE COURT:  All right.  So, let me just say this;

13  I don't have a problem with the provision that permits a

14  claimant to with draw and then claim again.  That doesn't

15  trouble me, but, again, I do think that when claimants' file

16  they ought to be able to say where else they filed or where

17  they filed and withdrawn claims.

18          With respect to the audit provision I'm a little

19  bit -- well, I will put it this way, the submissions

20  conflict.  The TDP provides that the trust may conduct

21  audits, but the debtor, I think, argued -- the committee

22  argued that it says it must conduct audits; it may, but

23  doesn't have to use a third-party auditor.  So, are the

24  audits mandatory or aren't they?

25          MR. HARRON:  The audits are mandatory.

1           THE COURT:  Okay.  But on a selected basis, right?

2           MR. HARRON:  Random.  This trust provides and we

3 expect it will implement two types of audits; random and

4 targeted.  It's set forth in the TDP.  Random, I think, was

5 the subject of Your Honor's question and the TDP requires for

6 mandatory random audits of both the exposure and the medical

7 evidence.

8           THE COURT:  Okay.  And that troubled me -- that

9 doesn't trouble me either.  So, those were the things that

10 struck me as I looked through the U.S. Trustee's objection

11 and the committee's response to it, as well as Mr. Patton's

12 declaration.

13          So, if you'd like a fifteen minute break now you

14 may have it.

15           MR. HARRON:  We would, Your Honor. Thank you.

16           THE COURT:  All right.  Stand in recess.

17       (Recess taken at 1:32 p.m.)

18       (Proceedings resumed at 1:49 p.m.)

19       (Call to Order of the Court)

20           MR. HARRON:  Thank you for that break, Your Honor.

21 We gave the parties some time to consider your questions.

22          Before getting to the headline I'd like to provide

23 a little more context.  First, Your Honor, my client wanted

24 to emphasize to the court how seriously we take the issues of

25 fraud, the allegations of fraud, the risk of fraud, but,

1  again --

2          THE COURT:  Well, if I didn't think you did I

3  wouldn't have approved Mr. Patton's application in the first

4  place.

5          MR. HARRON:  Understood, Your Honor.  And it's our

6  view that this trust and other trusts are effective at

7  policing fraud through the audit procedures.  All the trusts

8  with which we're involved do implement audits.  It is that

9  cost benefit analysis that comes into play when you consider

10 how much information need be provided to the trust and what

11 the trust is going to do wiht it.

12         Mr. O'Neill would confirm that in just the five

13 years leading up to this case the company paid about $43

14 million dollars to address its asbestos liabilities.

15         THE COURT:  That was in the papers, I think.

16         MR. HARRON:  So, we have structured a trust to go

17 out over the next thirty years using $58 million dollars.  Of

18 that $43 million dollars about 32 million was spent on

19 defense.  So, 75 percent of every dollar the company spent

20 went to litigate and fight claims and 25 percent went to

21 claimants.

22         So, the trust flips the equation.  It's an

23 administrative settlement and I will represent to the court

24 that the trust admin budget for the entire thirty years is

25 $15 million dollars of a corpus just under 60.  So, here

 1 │ we're spending 25 percent to administer the trust and 75

 2 │ percent goes to paying sick people.  Again, this trust is

 3 │ structured so 90 percent of the dollars goes to mesothelioma

 4 │ victims.  It's undisputed that asbestos is the only known

 5 │ cause of mesothelioma.

 6 │         Your Honor, if the trust were required to obtain

 7 │ the full exposure history from every claimant it wouldn't be

 8 │ able to afford to process that information and the trustee

 9 │ would be in a position where they feel duty bound to do

10 │ something with it.

11 │         THE COURT:  Well, let me explore that for a

12 │ moment.  A claimant files a claim, but of what does the claim

13 │ consist?

14 │         MR. HARRON:  I didn't hear Your Honor.

15 │         THE COURT:  Of what does a claim consist?

16 │         MR. HARRON:  There is a claim form that can be

17 │ found on the internet.  It requires you to generally identify

18 │ your work history and it requires you to provide evidence of

19 │ your exposure to Maremont's products.  Generally,

20 │ particularly in the case of a product that's used at home

21 │ they would satisfy that exposure through an affidavit.

22 │ They'd say that I changed my brakes over the last thirty

23 │ years and I recall going to Sears to pick up Grizzly brakes

24 │ and I remember seeing the packaging.

25 │         This trust also pays for occupational claims.  In

 1  that case the affidavit would say I worked at a garage for

 2  twenty years changing brakes and Grizzly was among the brakes

 3  that I used.  They also provide medical evidence usually in

 4  the form of a diagnosis and maybe a scan that shows a growth

 5  of mesothelioma in linings of -- I think it appears in the

 6  linings of the heart or the stomach.

 7           THE COURT:  Okay.  So, if a claimant has filed a

 8  claim in other asbestos trusts what is the problem with

 9  requiring that they give copies of that to this trust as

10  well?  It doesn't require anything more for the trust to do,

11  neither does the requirement that a release be provided.

12           MR. HARRON:  What does Your Honor contemplate the

13  trust would do with that information?

14           THE COURT:  Nothing unless someone asked for it.

15  You see the framework that I think is appropriate under these

16  circumstances is get that information, and if someone in the

17  future shows a right to it, with whatever other protections

18  you've built in, then they have a right to it, but at least

19  it's available.  That is the point.

20           MR. HARRON:  Your Honor, in the --

21           THE COURT:  Let me ask it another way.

22           MR. HARRON:  Yeah.

23           THE COURT:  Would you like a plan confirmed today?

24  Then you got to get to the headline that I want to hear?

25           MR. HARRON:  Okay.  Well, the headline is that in

1 │ connection with audit we would require, as we normally do,

2 │ that claimants who are audited provide their full exposure

3 │ history including their tort system allegations and any

4 │ filings they made with other trusts.

5 │       THE COURT:  I'll give you another fifteen minutes

6 │ if you need it, but, otherwise, we're done today.

7 │       MR. HARRON:  Your Honor, if I may --

8 │       THE COURT:  Do you understand what a ruling is,

9 │ Mr. Harron?  This is only the second time before me, so maybe

10 │ you didn't understand that.  It's coming and given the U.S.

11 │ Trustee's objections I think I'm being relatively gentle.

12 │       MR. HARRON:  I will take the court's lead and

13 │ accept the offer of another break.  Thank you.

14 │       THE COURT:  Very well.  Stand in recess.

15 │       (Recess at 1:55 p.m.)

16 │     (Proceedings resume at 2:10 p.m.)

17 │       THE COURT OFFICER:  All rise.

18 │       MS. RAMSEY:  Good afternoon, Your Honor.  For the

19 │ record, Natalie Ramsey, Robinson & Cole for the official

20 │ committee of asbestos claimants.

21 │       Your Honor, we would like to take ten minutes,

22 │ maybe of Your Honor's time, and explain why we think that a

23 │ provision that would have the trust collect all other trust

24 │ information is problematic for this trust, in particular.

25 │       THE COURT:  What we're going to do since you

1 || haven't convinced me that I'm wrong, I'll hear argument from

2 || everyone, then I'm going to rule.  Let me start with the

3 || debtor.  It's the debtors' plan, then I'll hear from everyone

4 || else.

5 ||          MS. RAMSEY:  Well, Your Honor -- okay.  Will do.

6 ||          MR. O'NEILL:  Your Honor, I walked us through much

7 || of the background.  I think Your Honor has it all.  But I do

8 || want to just make a few points, from the debtors' point of

9 || view on the objection which, among other things, falls into

10 || question the good faith of the plan has been proposed.

11 ||          Your Honor, good faith is a factual inquiry.  We

12 || think that the record is clear here, that there is a process.

13 || It was a good faith negotiation.  The parties all came to

14 || agreement on a consensual plan.

15 ||          Again, this is a settlement. It's not perfect from

16 || everybody's perspective, but it's a consensual plan that the

17 || voting creditors voted in favor of.

18 ||          The U.S. Trustee's objection identifies five or

19 || six issues in the TDP that disagrees with and shoehorns those

20 || disagreements into a good faith objection.  We don't think

21 || that that's appropriate.

22 ||          Again, there's been no showing as Your Honor

23 || identified last week that there's been any bad faith, that

24 || there's been any untoward behavior, that there's been

25 || inequitable conduct.

1          The cases cited by the U.S. Trustee are in

2  opposite.  There's no precedential case here that a court has

3  found that a similar plan has been proposed in bad faith.

4  With that, I'll just jump into the various provisions.

5          Many of the kind of arguments that I had have been

6  addressed already but, again, confidentiality.  As we were

7  reviewing the TDP's, from the debtors' perspective, we

8  understood the trust interest in protecting the identifiable

9  information of the individual claimants.

10         Mr. Patton's persuasive that these claimants just

11 don't want their information available to other parties for

12 various reasons.  We think that this confi provision --

13         THE COURT:  Let me talk about that for a minute

14 because there's a discussion in the submissions that the

15 trustee says, look.  If you filed a tort claim that would be

16 public information.  The response to that is well, we're

17 really setting up a private trust and that's different.

18         We're in court.  It's different than having just a

19 setup of a private trust.   You're acting under the aids of

20 the federal bankruptcy court.  So, I guess, at best, you'd

21 say it's a hybrid.  You may proceed.

22         MR. O'NEILL:  Understood, Your Honor.  I think

23 that the argument is that this is actually a settlement, not

24 just filing a claim in the tort system. And in the tort

25 system, a settlement would be subject to confidentiality

JA04191

1 provisions.  And that's what is trying to be replicated here

2 with the trust.

3          THE COURT:  Well, but first the claim would be

4 filed publicly, even if the settlement might be kept

5 confidential.

6          MR. O'NEILL:  And I don't want to quibble too much

7 with Your Honor, but in certain instances there are

8 settlements and other warehouse deals where the claims

9 actually never become public.  The company settled them

10 without the parties having to actually file a complaint and

11 become public.

12          THE COURT:  Right, so then you don't ask for court

13 blessing, right.  But once you're in the judicial process,

14 you're in the judicial process.

15          MR. O'NEILL:  Your Honor, just to address a couple

16 of the points that the U.S. Trustee made with respect to the

17 confidentiality.  And to note just because Your Honor seized

18 on it a bit in your opening statement.

19          Garlock TDP, exact same confidentiality provision

20 and, you know, that was a case where there was actual

21 evidence of some fraud among some of the claimants in that

22 case.  This provision is slightly different than some that

23 are out there but that's because it's more comprehensive.  It

24 adds a provision about sharing information with insurers,

25 where necessary.

1          There's also a cost savings provision when there's

2     a bulk discovery request so that the TAC and the FCR can

3     potentially address without having the notice provisions.

4     This just iterates some of what Mr. Harron said.  But, again,

5     as we understand it, these are all cost-saving provisions.

6          Again, from the debtors' perspective when we were

7     being a party to these conversations and negotiations about

8     the TP, our goal, of course, was to protect the interest of

9     our creditors.  And, frankly, you know, get away from the

10    historical precedent that Mr. Harron described as paying 75,

11    85 percent of the dollars to the defense lawyers rather the

12    actual claimants.

13         Procedures that allow that to happen are very

14    attractive to the debtors.  And we felt it was completely

15    good faith to allow those provisions or, you know, to agree

16    to negotiate and accept those provisions given that result.

17         Again, I'm not sure what more I can add about

18    exposure to other products.  The bottom line is the trust is

19    not a proxy for the tort system.  It doesn't defend these

20    claims. That's not its purpose.  Obtaining this information

21    is burdensome.

22         I think what you'll hear from Ms. Ramsey and Mr.

23    Harron, to the extent they argue more, is that there are

24    exponential costs associated with gathering this information,

25    not just acting on it, gathering it.  And then what are the

1   outgrowth, what are the results of gathering that

2   information?  Becoming a target of discovery and subpoenas

3   and having to deal with those.

4         I won't get into the withdrawal and defraud

5   provisions, Your Honor.  Again, this was something on the

6   debtors' side.  We asked the questions.  We wanted to

7   understand it, and the answers, frankly, made sense to us.

8         Cost savings, not having a purpose of the trust be

9   the ding claimants, frankly.  So, you know, and again a lot

10  of the arguments here -- how do I say this.  They're based on

11  this concept of the boogieman, dishonest lawyer, dishonest

12  plaintiff.

13        Frankly, this is an example of an objection that

14  we just didn't understand from that perspective. Again, if

15  somebody is being deposed, if an attorney is asked a

16  question, you can just ask if they ever filed a claim with a

17  trust.  Full stop.  If they then withdrawn it or told it,

18  they still have to answer that question.  If they lie, then

19  they lie.  That's not, again, something from our perspective

20  with this trust that we can control.  So, again, we thought

21  these provisions made sense.

22        The mandatory audit provision, Your Honor I think

23  understood at the end after Mr. Harron's presentation. But to

24  the extent that our paper was unclear, we apologize.  The

25  language is shall.  It's a mandatory provision.  Unlike

1  Garlock, they can actually hire third parties to really clamp

2  down and do these audits.

3          Our understanding, again, these are very

4  expensive.  Yes, you want to weed out corruption.  You want

5  to weed out fraud.  You want the dollars to go to claimants

6  that are legitimate claimants with legitimate claims.  But

7  the cost of doing that, then you potentially deprive some

8  future of getting a recovery at all.

9          And we've talked, Your Honor, a little bit, but I

10  think it bears repeating in the context of the audit

11  provision and what I just said. It's a very small trust.

12  Fifteen million dollars to administer over thirty years.  If

13  that's $30 million dollars because of ramping up various

14  procedures, collecting additional information, storing it,

15  analyzing it, then the recovery percentage goes down

16  dramatically.  That's just the reality here.

17          You know, again, release information.  As we

18  understand it, these are several payments.  This simply isn't

19  applicable to what the trust is doing.  They aren't

20  interested in what the claimant has done with respect to

21  other trusts.  And that's with the exception of the

22  extraordinary claims or claimants that go to arbitration.

23          Finally, we didn't discuss attorney's fees.  I

24  don't think that that's an issue for the court.  You know,

25  obviously, we view this as an intrusion on claimant's ability

1   --

2           THE COURT:  I don't have an issue with that.

3           MR. O'NEILL:  Very good.

4           So, with that, Your Honor, I'll move onto the

5   substantially similar objection which we view as slightly

6   different from the good faith objection.

7           Obviously, we think the plan was proposed in good

8   faith.  All we've done is propose a plan with provisions that

9   have been approved in many many other cases, including after

10  Garlock.  So, we blanch at the idea that this plan wasn't

11  proposed in good faith.

12          With respect to substantially similar treatment, I

13  think FCR counsel and ACC counsel will be in a better

14  position to talk about all the anti-fraud provisions in these

15  documents.  But, suffice to say, that all of the terms and

16  mechanisms in the TDP apply equally to current and future

17  claimants.  We believe it satisfies 524(g) to big (B)(ii)(v)

18  which requires that.

19          Just so sum up, Your Honor, you know, 524(g)

20  specialty provision created by Congress doesn't require any

21  of the requirements that the trustee is trying -- the U.S.

22  Trustee is trying to impose upon this trust. Again, I just

23  said it, but I'll repeat it.  We haven't seen provisions like

24  the U.S. Trustee is suggesting in TDP's before.

25          From our perspective that created a viable and an

JA04196

1   accepted TDP that would work in conjunction with our plan,

2   specially given the small corpus, the small size of the

3   trust.

4          We haven't heard any evidence today, Your Honor,

5   that, frankly, any of the proposed provisions from the U.S.

6   Trustee would create more fraud, create any fraud, change the

7   amount of fraud from a rounding error to something greater.

8   We haven't heard what disclosure or releases, how that would

9   practically impact the trust.

10         But we do know from the past and from these

11  provisions, operating in various trusts, that they do help

12  the trust save money.  And that's a goal that is significant

13  in this case, given the size of the trust.

14         Your Honor, I won't go through our affirmative

15  plan argument, unless Your Honor would like to discuss any of

16  that.

17         THE COURT:  I've read the submissions.

18         MR. O'NEILL:  Very good.  And I was going to say

19  based on the length of our brief, we addressed everything and

20  more so.  So, I'm glad to hear that.

21         So, in closing, Your Honor, I just say this plan,

22  we believe, is confirmable in every respect and we understand

23  and hear Your Honor's concern with some of the TDP

24  provisions, but we ask that Your Honor confirm it, not hold

25  it hostage or otherwise require things that, you know, our

1  colleagues across the aisle are unwilling to do for the

2  debtors' sake and for the creditor's sake.

3          Unless Your Honor has any questions, I'll cede the

4  podium to the next.

5          THE COURT:  No.  I'll hear next from the trustee.

6          MR. O'NEILL:  Okay.

7          MR. SCHEPACARTER:  Thank you, Your Honor. Richard

8  Schepacarter for the United States Trustee.

9          Let me just address some of the specific issues

10  that have been raised, some of the specific objections.

11          With respect to the Section 6.5 of the Trust

12  Distribution Procedures, it basically makes that all

13  submissions to the trust, by the claimant, are going to be

14  treated as confidential as part of settlement discussions,

15  subject to all applicable privileges, and that the trust is

16  going to protect those submissions.

17          THE COURT:  I don't have a problem with that part.

18          MR. SCHEPACARTER:  Okay.  Let me skip to another

19  section.

20          THE COURT:  And yes, they make it hard to get at

21  the information.  I agree.

22          MR. SCHEPACARTER:  Understood.  That same section

23  also, the TDP also appears, designed to impede future

24  discovery of trust claims even in cases in which the trust is

25  not a party.

JA04198

1        I think what they basically want to do is -- with

2   respect to the releases -- well, let's get into the releases

3   because I know Your Honor is interested in that.

4        Having the claimants authorized to release

5   information to the trust can only assist the trust in its

6   efforts of claims administration with really no burden put

7   upon the claimants.  They would have to submit this

8   information in any regard.

9        In fact, the provision such as that can only

10  protect the trust especially the unknown future claimants and

11  can allow the trust to verify information provided in

12  connection with claims and assist with audits and to act as

13  another protection and deterrent with respect to fraud.

14       With respect to the audits, I think our objection

15  with respect to the audits hammers upon the fact that the

16  audits are not -- although, they're mandatory, they're sort

17  of an internal mandatory audit and there's no mandatory

18  requirement that the audits be made by independent third

19  parties, which are more reliable, of course, because they're

20  audits of the people who are actually doing the internal

21  auditing as a third party who could verify the information,

22  that is --

23       THE COURT:  Okay.  So, let me just give you my

24  view on that.  I am sensitive to the point that I don't think

25  is in dispute here is that there's a small trust involved.

1   And that it's legitimate aim of all the stakeholders to make

2   administering the trust as cost effective as possible.  And I

3   do, as I said earlier, have confidence that the FCR and those

4   involved with administering the trust will act appropriately.

5   And should there be something they think is worthy of audit,

6   that they can undertake that on their own.  And, if

7   necessary, at their option bring in a third party.  But under

8   the circumstances, I'm not inclined to require that a third

9   party be brought in.

10          MR. SCHEPACARTER:  Okay.  I understand, Your

11   Honor.

12          With respect to the sort of the information that I

13   think that Your Honor has been discussing, basically the

14   other information of other claims made with respect to other

15   trusts, not having that information sort of belies the

16   ability of the trust to verify that information from other

17   trusts.

18          For example, if someone who may be changing their

19   breaks may have worked at shipyard or something along those

20   lines where we know that they've been exposed to ample

21   asbestos and that they've made submissions to other trusts.

22   I think that that information is important.  And that's one

23   of the reasons why we made or objection is to get away from

24   the Garlock problem which is that the information is not

25   readily available to all the other parties.

1       THE COURT:  Well, listen, I understand, at least,

2   one of the concerns, and that is that well if they have the

3   information, which I think they should, if they have the

4   information, number one, does that create an obligation, a

5   duty, to do something about it?

6       I don't think that the trust should be required,

7   okay, to follow up on the information if in the trustee's

8   discretion there's no need to.  And, secondly, again I'll

9   repeat, I think the information ought to be available.  But

10  under the circumstances that are proposed in the provisions,

11  and it will be left to a later day whether anyone's able to

12  make a case for a legitimate need to get it.  And I

13  understand there may be some costs involved with that too.

14      MR. SCHEPACARTER:  But I think it's important to

15  note that these trusts are in the framework of information

16  which is not readily available but, at the same time, it's in

17  the framework that was the issue that was developed,

18  acknowledged, recognized in the Garlock case which is that

19  there are some gamesmanship that's done with respect to the

20  claims.

21      And to have the transparency with respect to the

22  trust so that the information is transparent and that, for

23  example, I know that there's an issue with respect to

24  withdraw of claims and deferral of claims.  Garlock says

25  basically if you withdrew a claim, like a baseball game once

1  you're out, you're out.  You can defer the claim, but I think

2  that that's --

3          THE COURT:  Well, we're not into a baseball park,

4  Mr. Schepacarter.

5          MR. SCHEPACARTER:  Couple of weeks.

6          But I think it's incumbent upon he trust to be

7  able to be transparent enough to get away from the issue of

8  that those claimants that are going to be paid now will not -

9  - so that the trust ensures that -- and you'll hear other

10  provisions -- but I think it's important that with respect to

11  the objections that our office has set forth in the written

12  submissions, that information be made not hidden, so to

13  speak, in the settlement that it is able to be able to be

14  assessed by the trust, as well as -- so that those claimants

15  that come in will be giving the right information so that

16  when the future claimants that come along, who we don't even

17  know who they are, will be protected.

18          I mean this is -- there's no question that this is

19  a limited small trust and everybody has acknowledged that.

20  So, it's even more incumbent upon the parties to protect

21  those claimants if this is a thirty year trust that are

22  twenty years down the road that when those claimants come in

23  that there are sufficient funds, that the funds haven't been

24  depleted by the other parties because of the inability of the

25  trust for cost-cutting measures they have decided to sort of

1  take some of these claims without really being able to know

2  exactly what the other information is.

3        THE COURT:  Well, but you understand the argument

4  is, look if we took the time to do that, it just would defeat

5  the whole purpose of the trust to get as much as we can to

6  the claimants.

7        MR. SCHEPACARTER:  And I think that that's, to a

8  large extent, everybody's goal is to make sure that all the

9  claimants get the money.  But there's all the claimants --

10  everybody's in the game for the thirty years.  It's not just

11  the people in the beginning of the game that get everything.

12  And then when the people at the end of the line come in, you

13  know, there's nothing left.

14        And I think that, to address another issue before

15  I forget.  With respect to the confidentiality, I think that

16  there could be safeguards, and we mention in our papers.  But

17  there could be safeguards not unlike with Judge Stark alluded

18  to or ordered in his Garlock sealing product opinion a few

19  yeas ago that basically said, you know, we can protect the

20  personal information of claimants so that.

21        I know there's been, at least, argument or, at

22  least, allusions that have been to the point that we don't

23  want these persons, these claimant's information out there.

24  Their personal information, yes.  When they file a tort

25  claim, that complaint is filed and all that information is

1  public.  There may be some personal information and there's

2  safeguards that can be enacted to protect all that.

3          THE COURT:  So, there's no misunderstanding.  I'm

4  not suggesting the information that I think should be

5  collected be publicly available.

6          MR. SCHEPACARTER:  Understood.  Understood.

7          So, did Your Honor want to hear anything more or?

8          THE COURT:  Only if you think I should.

9          MR. SCHEPACARTER:  Well, I don't know.  I have a

10 lot to say.

11         THE COURT:  I read your submission.  I think you

12 might have gathered that by now.

13         MR. SCHEPACARTER:  Yeah.  I mean I can't sort of -

14 - I know the party's kind of want to make, you know, the

15 Garlock opinion sort of an outlier to a certain extent, but

16 it's sort of one off of some sort.  But I think it's

17 important to notice that in the Garlock case, there were 15

18 cases and the make a point that only 15 cases.  But out of

19 the 15 that were assessed, it was a 100 percent that they

20 found fraud.

21         THE COURT:  Look, the way I -- here's how I weigh

22 that information or evidence, if you want to call it evidence

23 and that is, it demonstrates that something can happen.

24         MR. SCHEPACARTER:  Well, I would say that I mean

25 my argument would be and my point would be that it has

1  happened and it happens a lot; at least, <u>Garlock</u> said in the

2  15 cases that they found, it happened in all of those cases.

3      And there was other evidence and testimony in that

4  case that basically there were other incidences that were

5  testified to or, at least, alluded to by counsel that talked

6  about some of the defense counsel that talked about other

7  instances of like 161 cases where they paid, you know, a

8  quarter of a million dollars on some of this limited

9  discovery exposure.

10     So, I think that that's, again, I think it's -- I

11  know everybody says they kind of harp on the fact that we say

12  it's a game changer, but it is.  It changed the landscape of

13  the asbestos litigation trust and as a host of bankruptcy

14  cases.

15     Let me see if there's anything else.

16     I think Your Honor has basically talked about the

17  confidentiality provisions and the withdrawal and deferral of

18  claims I think Your Honor has already indicated that.  So if

19  Your Honor has anymore questions after you hear from the

20  trust and, I guess, the future claims representative counsel,

21  I'm happy to answer those questions.

22          THE COURT:  All right, thank you.

23          MR. SCHEPACARTER:  Thank you, Your Honor.

24          THE COURT:  I'll hear from the committee.

25          MS. RAMSEY:  Thank you, Your Honor.  Again,

1   Natalie Ramsey for the official committee of asbestos

2   claimants.

3           Your Honor, I'm trying to address specifically

4   what the court has asked and suggested and not engage in a

5   broader argument because I think that the court knows exactly

6   where our position is.

7           For the record, I think the court is in line with

8   the committee in terms of the Garlock decision.  I think that

9   our position is that it illustrates the possibility that

10  there could be claims paid that should not be paid.  And we

11  acknowledge that that is a potential.

12          We have all kinds of safeguards in this trust that

13  are designed to avoid that.  The audit is one.  Section

14  5.7(b)(1) which provides for submission and review by the

15  trust, provides specifically that, and I quote:

16          "The asbestos trust can also require submission of

17           other or additional evidence of exposure when it

18           deems necessary."

19          This is a trust that is small, as the court has

20  said.  This is a trust that is 90 percent allocated to

21  occupationally exposed claims and occupational exposure is

22  defined as professional oil mechanics who were allegedly

23  exposed to the debtor product lines while working as

24  professional mechanics in the automotive industry.  It

25  requires a specified length of time for that exposure.

1          This is a trust that is set up to pay a several

2     liability.  So, this trust is based on what the debtor was

3     paying in the tort system.  It is based on the values that

4     were assigned or based on the values that were being paid in

5     the tort system.  This is primarily a mesothelioma trust.

6          The only significant value claims are the

7     mesothelioma claims for occupationally exposed.  It's

8     $111,000 for mesothelioma claims that result from Shade Tree

9     exposure, casual exposure.  It's a $12,100 dollar claim.

10          There's a payment percentage that is established

11     that was hotly negotiated in this case.  And several times

12     threatened the ultimate resolution here.  And that is based

13     on a negotiation between the current claims and the future

14     claims based upon the anticipated number of claims that are

15     going to be paid in the trust.  That payment percentage is

16     set at 29.1 percent.

17          That payment percentage was ultimately reached by

18     an agreement that the parties would do everything they could

19     to cap administrative costs of this trust at $15 million

20     dollars. This would be an extraordinary savings for this

21     trust over other trusts.

22          Typically, a trust this size would end up with

23     administrative expenses of $20 million or more.  So, this

24     trust has to operate extremely, efficiently in order to hold

25     that payment percentage.  So, you're looking at a

1 mesothelioma claim who is occupationally exposed receiving

2 something like $31,000 dollars out of this trust as a claim,

3 unless they're able to prove some sort of extraordinary

4 status.  There's a maximum annual payment that is set by the

5 trust, reserve the funds to ensure that there's not a

6 significant run on the trust.

7        What the court has proposed is one way, and we

8 understand what the court is, as I understand it, concerned

9 with is what the trust knows about the claim.  Is there

10 something out there that would affect whether or not the

11 trust paid a claim if it only knew that information.  And,

12 therefore, more information is better.

13        We have two concerns with that.  Number one, it

14 puts the trust and the trustees in a very difficult position

15 if they have that kind of information and somebody doesn't

16 look at it.  Because if somebody comes back later and says

17 you paid this claim and you had the information right there

18 that demonstrated that you shouldn't have paid it, the

19 trustees are in an untenable position.  So, that information,

20 we believe, would have to be reviewed by the trust in the

21 exercise of its fiduciary duty and that's a cost.

22        The other thing that we're concerned about is that

23 by becoming and repository for that information, the trust is

24 going to be responding to multiple claims for that

25 information.  But other defendants in the tort system who are

JA04208

1  going to be seeking that information for their own purposes

2  and that is going to be another cost.

3         Responding to all of those subpoenas, responding

4  to all of those requests, the legal fees are going to quickly

5  rise.  Those two things threaten the $15 million dollar

6  administered budget that we have tried to set for this trust.

7  And if that were to happen, that requires re-negotiation of

8  the payment percentage, and it drives it down because the

9  costs go up.  And that results in a re-negotiation of the

10  trust and probably a re-solicitation. And that threatens this

11  case.

12         We understand the court's concern.  It is not the

13  intention of this trust to pay any fraudulent claims. And we

14  have done what we can to try to ensure that the particular

15  proof requirements in this, which are pretty specific because

16  there's one line of products really we're paying -- Grizzly

17  Brakes.

18         Now with respect to Shade Tree claims and Sears,

19  you know what Sears sold, there are a lot of individuals who

20  probably worked with those.  Could you have somebody who said

21  I worked as a Shade Tree mechanic and I swear that I was

22  exposed to Grizzly, yes.  Would it matter to us?  Would it

23  matter to this trust or the trust to know that someone also

24  had amphibole exposure?  The answer is no.

25         In the tort system with respect to mesothelioma

1  claims, generally it is accepted that any exposure could have

2  caused the disease.  And so, if this defendant would have had

3  to pay its several share in the tort system, along with the

4  amphibole exposure, probably paying a much greater portion of

5  that claimant's injury, those two defendants would be liable,

6  both of them, to the claimant. And that's what this trust

7  tries to realize.

8         So, while we appreciate the court's concern, we

9  believe that this trust is set up as best as it can given the

10  nature of the product, given the size of the trust to try to

11  maximize payments to the claimants.  And we are concerned

12  that if the trust becomes more like a defendant in the tort

13  system that what you're going to see is the same dynamic, the

14  same proportion of the money that's available going to

15  defense and to claimants.

16         And the analysis that we would argue is if there

17  has to be -- if there are few claims that get paid that

18  shouldn't have been paid, we think that that's going to be a

19  limited number if it happens.  And the costs associated with

20  that is much less than the cost that would be associated with

21  trying to second guess --

22         THE COURT:  And I understand that as a business

23  proposition and, frankly, have no trouble with it.  But

24  you're in a federal bankruptcy court okay.  And there's an

25  overlay here that the terms, as I see them, don't fit with.

1   And I take as true all of the economic considerations that

2   you've just described.  I don't know what to say more than

3   that.

4          MS. RAMSEY:  Thank you, Your Honor.

5          THE COURT:  Mr. Harron, I'll give you the last

6   word, if you like it, but make it short.

7          MR. HARRON:  Thank you again, Your Honor.  I

8   appreciate the court's time.

9          I will endeavor to be brief.  I understand the

10  court's concerns.

11         The system that the court may be envisioning where

12  the trust requires a full exposure history.  As Ms. Ramsey

13  said, it would be expensive, not for the claimants to submit

14  the data but, inevitably, this would cause this trust to have

15  more information from its claimants than any other trust and

16  we'd become the focal point for discovery from every

17  defendant remaining in the tort system.

18         That litigation would be expensive.  We would have

19  to account for in the budget.  It would drive the payment

20  percentage down.  And we'd have to resolicit.  And then we'd

21  be faced with a situation of whether we could even get the

22  affirmative vote of 75 percent of the claimants.

23         At the current payment percentage of 29.1 percent,

24  the most mesothelioma claimant could receive in this trust is

25  about $30,000 dollars.

 1          THE COURT:  Okay.  I just heard all this from Ms.

 2   Ramsey.  Saying again doesn't make it any better.

 3          MR. HARRON:  The point that I'd like to drive

 4   home, Your Honor, is that this -- if this plan fails, it will

 5   actually be the future claimants who suffer.  The argument

 6   from the trustee is that fraud is harming future claimants.

 7   Causing this prepack to fail will occasion much more harm on

 8   future claimants.

 9          This company was paying $9 million dollars a year.

10   So just apply that to the $58 million in funding we have and

11   it's, you know, six or seven more years in the tort system.

12   Most of that money goes to defense costs.  But, keep in mind,

13   $28 million is for Meritor, the parent, for return of a

14   dividend.  It's unclear whether that money would be available

15   to claimants in any event, outside of this case.

16          So in seven years at the current burn rate, even

17   if Meritor contributes the full $28 million they're prepared

18   to contribute here, the pot is empty.  Future claimants

19   recover nothing.

20          Your Honor, the information that you've described

21   is available to the trust in audit.  It serves two purposes.

22   It allows the trust to evaluate the credibility of the claim,

23   but it also serves as a deterrent because claimants know if

24   there's selective fraud, they'll have to provide that

25   information.

1    I think the court itself has conceded that

2  gathering all the information from each claimant serves no

3  purpose for the trust itself.  You said the trustee doesn't

4  even have to look at it.  And, Your Honor, we'd submit that

5  the 524(g) trust is not intended by Congress and not intended

6  by the claimants to serve the interest of parties outside of

7  the trust; certainly, not intended to serve the interest of

8  claimants, Your Honor.

9    THE COURT:  But the barrier that in the procedures

10  you've guilt to access to this information I'm prepared to

11  approve and it's a pretty high wall that you've built.

12    MR. HARRON:  Your Honor, it will be litigated

13  repeatedly.  And we will face subpoenas.  We have experience

14  with that in other trusts, in other bankruptcy cases, and you

15  know, Your Honor, those things become expensive.

16    A couple other things that Your Honor has said

17  that because it's a trust, it's subject to some amount of

18  judicial oversight.

19    I would note --

20    THE COURT:  No, it's not because it's a trust.

21  It's because it's a trust here that's subject to some

22  judicial oversight.

23    You know in the U.S. a bankruptcy proceeding by

24  its nature is judicial.  You can argue whether it shouldn't

25  be, maybe just administrative, but it's judicial.

1         MR. HARRON:  I understand, Your Honor, but when a

2 company is reorganized generally, other than a retention of

3 jurisdiction, the court plays no oversight role.

4         THE COURT:  Happily not.

5         MR. HARRON:  Why should it be that claimants who

6 are prepared to accept less, the current claimants who voted

7 on this are going to get less than the ones in the front of

8 the line in the tort system.  But they're going to have to

9 give up more rights, while the process you envision provides

10 additional rights to defendants in the tort system who

11 haven't contributed a dime to the trust.

12         And Maremont and Fireman's Fund get to go about

13 their business, but claimants have to give more, provide more

14 information to receive less money.  It's a different standard

15 you'd be opposing on this trust than you're imposing on the

16 reorganized company.

17         THE COURT:  Yes, but this is -- the asbestos trust

18 are unique animals under the Bankruptcy Code.

19         MR. HARRON:  Well, there is a specific provision

20 in the Bankruptcy Code, but that provision doesn't address --

21         THE COURT:  It was created for this unique

22 purpose.

23         MR. HARRON:  Correct, Your Honor, and numerous

24 courts have approved these provisions under 524(g) --

25         THE COURT:  I understand.

 1          MR. HARRON:  -- including the Third Circuit in

 2  Federal Mogul and W.R. Grace.

 3          THE COURT:  I understand.

 4          MR. HARRON:  The whole trustee argument is based

 5  on multiple false premises.  Their argument starts with the

 6  fact that fraud causes the payment percentage to go down.

 7  They provide no evidence to support that fact.

 8          524(g) exists by its terms to account for the fact

 9  that the amount of future liability is unknowable.  524(g)

10  requires periodic review of the payment percentage in

11  recognition of the fact that the payment percentage may go

12  down if more claims come in.

13          THE COURT:  Okay.  So, we're treading old ground,

14  at this point.  Look, I commend you for your passion, but I

15  think I've heard all the arguments that are to be made.

16          MR. HARRON:  Your Honor, just one more point and I

17  know I'm risking the court's patience.

18          The Garlock TDP has the same confidentiality

19  provision that we have here, even after hearing about the

20  Garlock litigation which was regarded tort claims not trust

21  claims.

22          Like this TDP for expedited review, Garlock only

23  requires exposure to Garlock products, but this TDP is the

24  same in the Garlock's TDP that if you file an extraordinary

25  claim; in other words, you've primarily been made sick

1 because of Maremont products and that case your entire

2 exposure history is subject to the trust review.

3           So, to that extent, when claimants are seeking to

4 recover for a greater percentage of their injury, the trust

5 gets more information.  But, again, Your Honor, we've tried

6 to balance the fraud and the need for a full exposure record

7 against the cost of administration and the fact that

8 requiring the trust to gather all of this data will make it a

9 target of unlimited discovery.

10           Thank you, Your Honor.

11           THE COURT:  All right.  So, I think sometimes --

12 well, I'll hold that comment.  I'll just say this.

13           I'm not prepared to confirm this plan in its

14 present form, and I think I've made that clear already.  So,

15 what I'm prepared to do, however, is to bring you back

16 tomorrow, I'll say one o'clock also, to give you the

17 opportunity to try to work with the U.S. Trustee to address

18 the concern that I've been made.

19           So, that I'm clear, I'm prepared to overrule all

20 of the other objections that have been raised by the U.S.

21 Trustee for basically for the reasons the parties on the

22 other side have argued.  But you need to address my concern

23 or this plan is not going to get approved.

24           I understand your concerns and I am not unmindful

25 of them, but there we are.  Are there any questions?

1                    THE COURT:  Are there any questions?

2                    MR. O'NEILL:  I think we understand, Your Honor.

3    Could we have five minutes, maybe, to talk about schedules?

4    I gather Your Honor has given us tomorrow at one p.m. for our

5    benefit, but there may be some limitations there and just

6    talk through that for a moment.

7                    THE COURT:  Certainly.

8                    MR. O'NEILL:  Okay.  Thank you.

9                    THE COURT:  All right.  We'll take a brief break.

10         (Recess taken at 2:53 p.m.)

11         (Proceedings resumed at 3:07 p.m.)

12         (Call to Order of the Court)

13                   THE COURT:  All right.  For the record we met

14   briefly in Chambers to discuss whether there might be some

15   basis to satisfy my concerns and the parties, I think, are

16   going to get in discussion on that.  They've asked to come

17   back next Tuesday.

18                   So, I have a noon time commitment in Philadelphia,

19   but I'll come back for that if necessary.  How about three

20   o'clock next Tuesday, does that suit?

21                   ALL:  Yes, Your Honor.

22                   THE COURT:  All right.  So, we'll leave the record

23   open till next Tuesday at three.  And, hopefully, at that

24   point the parties will be able to have come to some way of

25   addressing my concerns.

JA04217

1           Is there anything else we need to talk about

2    before we adjourn?

3           MR. O'NEILL:  No, Your Honor.

4           THE COURT:  Thank you all very much.  That

5    concludes this hearing.  Court will stand adjourned.

6           ALL:  Thank you, Your Honor.

7           THE COURT:  And, Mr. Schepacarter, don't get

8    greedy, okay.

9        (Laughter)

10        (Proceedings concluded at 3:09 p.m.)

11

12

13                        CERTIFICATE

14

15   We certify that the foregoing is a correct transcript from

16   the electronic sound recording of the proceedings in the

17   above-entitled matter.

18

19
     /s/Mary Zajaczkowski_____              March 19, 2019
20   Mary Zajaczkowski, CET**D-531

21

22

23

24

25

# EXHIBIT B

JA04219

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division**

| | |
|---|---|
| In re | Bankruptcy Case No. 16-31602 |
| KAISER GYPSUM COMPANY, INC., et al., | Chapter 11 |
| Debtors. | (Jointly Administered) |

**EXPERT REPORT OF LESTER BRICKMAN, ESQ.
BENJAMIN N. CARDOZO SCHOOL OF LAW**

**February 20, 2020**

JA04220

# TABLE OF CONTENTS

A.     Credentials and Summary of Conclusions .......................................................................... 1

B.     The Asbestos Litigation Phenomenon ............................... 5

C.     The Entrepreneurial Model of Asbestos Litigation ........................................... 6

D.     The Bankruptcy Wave ....................................... 11

E.     The Dual Compensation System/Explosion of Trust Payments ...................................... 13

F.     Plaintiffs' Counsel's Control of Trusts/Advent of Trust Secrecy Provisions.................. 15

G.     Pre-*Garlock* Judicial Findings and Statements Regarding Evidence Suppression
and Other Malfeasance in Asbestos Litigation ................................................. 21

H.     In *Garlock,* Judge Hodges Confirmed that the Scheme to Withhold and Suppress
Exposure Evidence Was Indeed Common and Widespread.............................................. 28

I.     Judge Hodges Found that it Was a Regular Practice of Plaintiffs' Firms to Delay
Filing Trust Claims Until After Tort System Recoveries were Obtained........................ 33

J.     The *Garlock* Trust Procedures Include Fraud Prevention Requirements ........................ 34

K.     In *Maremont,* the Delaware Bankruptcy Court Insists Upon Fraud Prevention
Measures ................................................................................................ 36

L.     The Kaiser Trust Includes Fraud Prevention Measures But Only for Uninsured
Claims .................................................................................................. 37

M.     The Asbestos Evidence Fraud Cannot Be Fully Combatted in the Tort System ............. 38

JA04221

### A.    Credentials and Summary of Conclusions

1.    I am an *emeritus* professor of law at the Benjamin N. Cardozo School of Law.  I

have been qualified by a number of courts as an expert on the history of asbestos litigation;

fraudulent and deceptive practices of lawyers for plaintiffs in asbestos litigation; asbestos claim

settlement practices; asbestos bankruptcy trusts; and the effect of trust distribution procedures on

the litigation and valuation of asbestos claims.  I have written 11 articles on asbestos litigation

which have been published in law reviews and widely cited and downloaded; testified before

Congress on four occasions on the abuses prevalent in asbestos litigation and asbestos

bankruptcy practices; and was one of two law professors "who have published and are well-

known experts in the areas of asbestos litigation and bankruptcy trusts" consulted by the U.S.

Government Accountability Office in preparing a report on asbestos trusts.[1]  In addition, I have

researched, written about extensively, and taught courses and seminars on legal ethics and the

legal profession for over 50 years, including a seminar on the ethics of legal fees and the impact

on the tort system of contingency fee financing.

2.    I have been retained by counsel for Truck Insurance Exchange ("Truck") to

prepare an expert report and provide expert testimony in connection with the Kaiser Gypsum

bankruptcy.  I have been asked to render an opinion, based upon my scholarly research and the

materials I have examined in connection with this matter, as to (1) what would be the likely

effect of adoption of the plan of reorganization ("Joint Plan") as negotiated between the Debtors

Kaiser Gypsum Company, Inc. ("Kaiser") and Hanson Permanente Cement, Inc. ("HPCI"), the

Asbestos Creditors Committee ("ACC") and the Future Claims Representative ("FCR") on the

---

[1]   U.S. Gov't Accountability Office, Report to the Chairman, H. Comm. on the Judiciary, *Asbestos Injury
Compensation:  The Role and Administration of Asbestos Trusts* at 5, GAO-11-819 (Sept. 2011) ("GAO
Report").

JA04222

incidence of fraudulent tort claims brought against Kaiser or HPCI and insured by Truck; and

(2) whether there are provisions which, if added to the Joint Plan, would significantly reduce the

incidence of fraudulent claims.  It is my opinion that adoption of the Joint Plan as currently

proposed is likely to facilitate fraudulent claims and result in Truck bearing the burden of paying

fraudulently inflated asbestos claims due to the concealment of material evidence of claimants'

exposure to asbestos manufactured, distributed or sold by multiple entities other than Kaiser and

HPCI.  It is my further opinion that adding to the Joint Plan the fraud prevention measures

included in both the *Maremont* and *Garlock* trust procedures, as well as in the proposed Kaiser

trust procedures (but only for extraordinary *uninsured* claims, thus excluding Truck from this

protection), would substantially reduce the likelihood of Truck and the Debtors' other insurers

being the victim of the widespread exposure evidence suppression that is endemic in asbestos

litigation which I further discuss below.

3.      For my time in preparing this report, I am being paid a fee of $975 an hour.  I

attach as Brickman Exhibit A a list of materials that I have relied upon in the preparation of this

report.

4.      As I elaborate in Parts E and F of this report, it is my conclusion, based upon the

materials I have reviewed in this matter, evidence that I and others presented in the *Garlock*

estimation proceeding and Judge Hodges's findings therein, and my scholarly research, that

plaintiffs and their counsel have systematically and fraudulently suppressed the production of

evidence of plaintiffs' exposures to asbestos-containing products other than those manufactured

by the entities against whom they are litigating in the tort system.  The intended effect of this

suppression of vital evidence is to significantly inflate asbestos defendants' claim resolution

costs by driving up settlement and defense costs and increasing defendants' litigation risk.  In

2

many cases, the suppression is of exposure to products containing highly toxic forms of asbestos, as opposed to the far less toxic asbestos products distributed by Kaiser and HPCI, thus putting Kaiser and HPCI at substantial risk in cases where they likely would be found to have little to no liability.  It is my further conclusion that because the Joint Plan proposes to resolve all insured asbestos bodily injury claims against the Debtors in the tort system, many of those claims are likely to be infected by the same improper evidence suppression scheme that has inflated the value of such claims for at least the better part of the past 20 years.  Adoption of the Joint Plan, as currently proposed, would facilitate the fraudulent practices that I have identified in my published scholarship and in my testimony in the *Garlock* bankruptcy proceeding.  Unless fraud prevention measures similar to those agreed to in the *Garlock and Maremont* bankruptcies (and which have been included in the Joint Plan but only applicable to uninsured claims presented to the Kaiser Gypsum Asbestos Personal Injury Trust), are required for claimants who resolve their insured claims in the tort system, Truck and other insurers of those claims will continue to be victimized by the fraud.  Indeed, given the content of the Joint Plan and how the Joint Plan proposes to strip Truck of all protection being provided to the Debtors, it is likely that the incidence of fraudulent claims filed against Truck in the tort system will increase.

5.      For the past 30 years, I have studied asbestos litigation and the unscrupulous practices of asbestos plaintiffs' lawyers motivated by the potential for billions of dollars in fees. For roughly the first 15 years of that period, the wrongdoing was centered on the use of unreliable medical evidence in support of hundreds of thousands of nonmalignant claims that were, in the words of U.S. District Court Judge Janis Jack, "manufactured for money."  In the last 15 years or so, and since the "Bankruptcy Wave" that overtook the principal asbestos defendants in the early 2000s, the focus of the litigation has shifted to malignant mesothelioma

3

litigation and the suppression of evidence in the tort system of exposure to asbestos products of

companies that were bankrupted by asbestos litigation and therefore exited the tort system.

6.       My descriptions of the asbestos litigation phenomenon have been extensively

cited and have come to be widely accepted in the legal and academic communities.  In 1991, I

was asked by the Administrative Conference of the United States, an agency in the executive

branch of the federal government, to draft a proposed administrative alternative to asbestos

litigation and to organize a colloquy to consider that proposal.  In addition, I have testified on

four occasions before congressional committees on fraudulent practices in asbestos litigation and

bankruptcy issues.  My qualifications to testify as an expert on the history of asbestos litigation

have been challenged in three *Daubert*[2] proceedings.  Each time, the courts rejected the

challenge.[3]  In rejecting a challenge in the Armstrong World Industries bankruptcy in 2006, U.S.

District Court Judge Eduardo Robreno (who subsequently presided over the asbestos

multidistrict litigation *In re Asbestos Prod Liab. Litig.* (No. VI), MDL No. 875 (E.D. Pa.), where

his rulings resulted in the dismissal of tens of thousands of asbestos claims because of invalid

medical evidence) stated:

> Dr. Brickman has been shown to be qualified as an expert in the history of asbestos
> litigation, he has been studying the subject for 15 years, he has published at least
> seven articles on the subject and has testified three times before congressional
> committees on asbestos litigation and asbestos bankruptcy and has been qualified
> by at least two federal judges as an expert on the history of asbestos litigation and
> he has supplied a full and complete written expert testimony in a third asbestos
> bankruptcy proceeding.  Therefore, I think that under Rule 702, he is qualified by
> virtue of skill, education, experience to aid the Court in -- in this case.  Secondly,
> the opinions rendered in the report appear to be reliable.  Dr. Brickman relies on
> sources and data which are recently relied [on] by experts in his field and others

---

[2]   *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993).

[3]   In a fourth case, a *Daubert* challenge was raised as to my qualifications to testify about how the practices of a
law firm and a doctor it hired to read over 20,000 x-rays were consistent with the entrepreneurial model I
presented and constituted a scheme to generate false medical evidence.  The challenge was dismissed as moot.
*CSX Transp., Inc. v. Gilkison*, No. 5:05CV202, 2013 WL 85253 (N.D. W. Va. Jan. 7, 2013).

JA04225

have relied upon. . . his opinion.  So . . . I find his opinion to be reliable. . . .[p]lacing
the issues in this case. . . in the historical context of asbestos litigation and claim
settlement, will provide the Court with a greater understanding of the debtor's
future liability.  A good deal of the testimony in this case has involved a change in
the lay of the land in the last few years and how that will affect the debtor's future
liability.  And . . . I believe that the testimony of Professor Brickman will be helpful
to the court and . . . that his testimony fits well with the facts of the case. . . .[4]

Attached hereto as Brickman Exhibit B is a more complete statement of my qualifications with

regard to asbestos litigation and bankruptcies.  Attached hereto as Brickman Exhibit C is a copy

of my curriculum vitae.  I have not presented any testimony in the past 4 years.

### B.   The Asbestos Litigation Phenomenon

7.     Mesothelioma is a rare, aggressive, and mostly fatal cancer of the mesothelium,

the protective covering surrounding many of the internal organs of the body.  The most common

locus of mesothelioma is the mesothelial cells lining the pleura (the lining around the lung), a

condition called malignant pleural mesothelioma.  The main cause of malignant pleural

mesothelioma is exposure to manufactured asbestos-containing materials.  Approximately 80%

of those who develop pleural mesothelioma have a history of such asbestos exposure; the other

20% are considered idiopathic, that is, having no known cause.  The latency period of the

disease, the length of time from first exposure to manifestation, is mostly in the 20- to 40-year

range but can be as much as 50 years.

8.     Exposures to asbestos-containing materials, mostly in the 1940s and 1950s, and to

a lesser extent in the 1960s and 1970s, have exacted and continue to exact an enormous toll on

occupationally exposed industrial and construction workers.  By 2047, when this scourge is

expected to have mostly run its course, several hundred thousand deaths will have resulted from

asbestos exposures.  The litigation spawned by these exposures has no counterpart in our history.

---

[4]  Transcript of Hearing at 22:20-23:21, *In re Armstrong World Indus., Inc.*, No. 00-04471 (Bankr. D. Del. May
23, 2006).

JA04226

Over 10,000 corporations have been named as defendants, leading to over 100 bankruptcies (and

counting).

### C.     The Entrepreneurial Model of Asbestos Litigation

9.     In the following sections, I will discuss the Bankruptcy Wave of the early 2000s

and its after-effects, which were fully exposed in the *Garlock* estimation proceedings.  The

suppression of exposure evidence in mesothelioma claims being litigated in the tort system is

simply the latest manifestation of fraudulent practices by asbestos plaintiffs' lawyers that have

plagued asbestos litigation for more than three decades.  My study of asbestos litigation has led

me to identify an "entrepreneurial model" for asbestos litigation.  This model originated with the

development of nonmalignant asbestos claims that began to emerge in the mid-to-late 1980s.

Spurred on by enormous financial incentives—the billions of dollars in fees to be generated—

lawyers transformed the basis for asbestos litigation from a traditional model of an injured

worker seeking out a lawyer to sue for compensation to an illegitimate entrepreneurial model

where screening enterprises working for lawyers systematically recruited hundreds of thousands

of workers who may have had occupational exposure to asbestos even though they had not

manifested any asbestos-related disease.  Evidence that I have set out in my published writings

and in testimony before Congress shows that a high percentage of the hundreds of thousands of

diagnoses were simply false.

10.     One of the elements of the entrepreneurial model that is of great relevance to

mesothelioma litigation, as well as other malignancy-based asbestos litigation, is plaintiffs'

counsel's control over the production of evidence—control that can be used to manipulate

evidence in order to inflate the value of tort claims.  One manifestation of this control was the

sea change that took place in the early 2000s.  Litigation doctors changed their findings for the

great majority of those screened from asbestosis to silicosis, leading to an eruption of silicosis

6

JA04227

claims of epidemic proportions from 2002 to 2004.  In that period, approximately 20,000

silicosis claims were filed, mostly in state courts in Mississippi and Texas—an anomalous

phenomenon in view of the fact that as a result of government regulation and industry practice

there had been a 70% decline in the death rate from silicosis over the previous thirty years.  The

reason for this phantom epidemic was that the United States Senate looked poised to enact

legislation to provide an industry-funded administrative alternative to asbestos litigation, which

would, inter alia, limit attorneys' fees and also limit the recovery for nonmalignant, unimpaired

asbestosis claims to medical monitoring expenses.  Worried about the future of claim generation

and concerned that the endgame had begun for asbestos litigation, some plaintiffs' lawyers went

through their asbestos files and began directing the screening enterprises to reread the X-rays

previously determined to be "consistent with asbestosis" as instead indicating silicosis.  These

screening companies and the litigation doctors then shifted gears from ginning up phony

asbestosis claims to ginning up phony silicosis claims.  The massive fraud blew up when United

States District Judge Janis Jack, who had extensive medical training, presided over a multidistrict

litigation involving approximately 10,000 silicosis claims.  Judge Jack saw the doctors'

diagnoses as raising "great red flags of fraud," and allowed defendants to cross examine the

doctors who rendered the diagnoses, which these doctors then abandoned.[5]  Judge Jack found

that the medical reports supporting the claims were "manufactured for money."[6]

     11.     Another example of plaintiffs' counsel's control over the production of evidence

in asbestos litigation, which is also highly relevant to mesothelioma litigation, is the

---

[5]  *Silicosis Ruling Could Revamp Legal Landscape*, NPR.org (Mar. 6, 2006), https://www.npr.org/templates/story/story.php?storyId=5244935.

[6]  Order No. 29: Addressing Subject-Matter Jurisdiction, Expert Testimony, and Sanctions, *In re Silica Prods. Liab. Litig.*, 2:03-md-01553, Dkt. No. 1902, at 150 (S.D. Tex. June 30, 2005).

JA04228

phenomenon of widespread changes in witness testimony concerning the products to which

plaintiffs were exposed whenever a top-tier asbestos defendant is driven into bankruptcy.  There

is evidence that this phenomenon is attributable to plaintiffs' counsel's use of witness

preparation techniques to produce testimony that denies or minimizes plaintiffs' exposures to

asbestos-containing products that were manufactured by top-tier companies that had filed for

bankruptcy and instead identifies only or mostly the products manufactured by the defendants

being sued in the tort system.

12.     This practice first became evident in the aftermath of the bankruptcy of the Johns-

Manville Corporation ("Manville") in 1982.  Prior to 1982, the focus of asbestos litigation was

on Manville, then the largest producer of asbestos-containing products.  Plaintiffs and their

witnesses regularly testified that the company produced the dominant share of the asbestos-

containing construction materials encountered by claimants, and as a consequence, the company

paid out the most funds to claimants.  The 1982 bankruptcy of the company imposed an

immediate stay on all asbestos litigation and payments to tort claimants, thus halting the main

flow of revenue derived from asbestos litigation.  Payments would not resume until 1988 when a

"run on the bank" led by plaintiffs' lawyers quickly depleted the assets of the trust that was

created to pay Manville's asbestos claims, resulting in a further delay in payments and a series of

substantial reductions in the amounts paid out for each disease category.  Accordingly, the more

witnesses would continue to identify the company's products as dominating the list of

asbestos-containing products to which claimants claimed exposure, the less funds would then be

available to pay to claimants and their counsel.  However, immediately after the Manville

bankruptcy filing, witness testimony underwent a sea change.[7]  Whereas testimony in the

Philadelphia Navy Yard cases, for example, put Manville's share of asbestos-containing

workplace products as high as 80%, witnesses after bankruptcy testified that Manville products

accounted for an increasingly declining percentage of asbestos-containing products used at work

sites.  Thus, in the Brooklyn Navy Yard cases, after hearing witness testimony, the jury

apportioned only 9-11% of the overall liability to Manville.[8]  A witness who was deposed just

months after the Manville bankruptcy testified that only 25% of the asbestos-containing products

used at a shipyard were manufactured by Manville.  Earlier in that deposition, the witness had at

first estimated that "basically, most of the [asbestos-containing] materials [were made by] Johns-

Manville."  Letting the cat out of the bag, he then added, "I wasn't supposed to mention that, was

I?"[9]

13.     The phenomenon of witness testimony switching from identifying exposures to

companies that had subsequently entered bankruptcy to identifying products of solvent

companies that had formerly been peripheral defendants, or simply not defendants at all, has

become a salient feature in mesothelioma litigation.

14.     A method by which plaintiffs' counsel have been able to bring about sea changes

in witness testimony was revealed in an extensive series of reports in 1998 by newspaper

reporters who investigated the litigation screening practices of Baron & Budd, one of the leading

asbestos plaintiffs' law firms in the country.  This investigation uncovered the extensiveness of

the practice of witness preparation that focused on implanting false memories in asbestos

---

[7]  *See* Andrew T. Berry, *Asbestos Personal Injury Compensation and the Tort System: Beyond "Fix It 'Cause It's Broke,"* 13 Cardozo L. Rev. 1949, 1951 n.9 (1992) (hereinafter, "Berry, *Beyond Fix It*").

[8]  *In re E. & S. Districts Asbestos Litig.*, 772 F. Supp. 1380, 1398 (E.D.N.Y. 1991), *aff'd in part, rev'd in part sub nom. In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831 (2d Cir. 1992).

[9]  Berry, *Beyond Fix It*, at 1951 n.9.

claimants.[10]  In 1997, a novice lawyer at Baron & Budd inadvertently produced a twenty-page

internal memo titled "Preparing for Your Deposition," which I have referred to as the "Script

Memo."[11]  Claimants were instructed to memorize the information that a paralegal had filled out

for them on their Script Memos but to never mention it.  The Script Memo included instructions

for the client on how to prepare for their deposition including specific answers, however false,

that were to be given regarding product exposure.  The newspaper reported that former

employees of Baron & Budd told them that in filling out the form "[w]orkers were routinely

encouraged to remember seeing asbestos products on their jobs that they didn't truly recall," and

where necessary, employees would "implant false memories."[12]  One former paralegal explained

that by the time she finished preparing a client, she had a product "ID for every manufacturer

that we needed to get ID for."[13]  Baron & Budd paralegals were also instructed to steer clients

away from identifying the products of bankrupt companies, such as Manville, and to ''warn . . .

[the client] not to say you were around [a certain product]—even if you were—after you knew it

was dangerous" and "deny that they ever saw warning labels on product packages."[14]  Finally,

clients were assured that defense lawyers who questioned them in a deposition would have no

way of knowing what products were actually used at relevant job sites, signaling that *anything*

---

[10]  *See* Senate Rep. No. 108-118, at 89–95 (2003) (discussing investigative reporting series from the *Dallas Observer*).

[11]  Lester Brickman, *On the Theory Class's Theories of Asbestos Litigation: The Disconnect Between Scholarship and Reality*, 31 Pepp. L. Rev. 33, 142 (2003) (herineafter, "Brickman, *Asbestos Litigation*"); Senate Rep. No. 108-118, at 109 (2003) (copy of Baron & Budd memo as exhibit to Judiciary Committee Report).

[12]  Brickman, *Asbestos Litigation*, at 139–40; Senate Rep. No. 108-118, at 89 (2003) (quoting investigative reporting series from the *Dallas Observer*).

[13]  Brickman, *Asbestos Litigation*, at 139; Senate Rep. No. 108-118, at 89 (2003) (quoting investigative reporting series from the *Dallas Observer*).

[14]  Brickman, *Asbestos Litigation*, at 144, 152; Senate Rep. No. 108-118, at 92 (2003) (quoting investigative reporting series from the *Dallas Observer*).

JA04231

the client testified to could not be challenged.[15]  Fred Baron, then the lead partner of Baron &

Budd, justified the use of the Script Memo, arguing that there was nothing unethical or illegal

about its contents.  Indeed, he asserted that the way the firm prepared its asbestos clients to

testify was how *"'any lawyer in the country that is worth a damn' works."*[16]  As I detail in the

following sections, the practice of manipulating, and at times falsifying, exposure evidence

became a common practice once the Bankruptcy Wave took the primary asbestos defendants out

of the tort system.

### D.    The Bankruptcy Wave

15.    From 2000 to 2001, a "Bankruptcy Wave" took ten top-tier defendants—

producers of thermal insulation and refractory products that had accounted for a substantial share

of the compensation then being paid to defendants—out of the tort system.[17]  Some analysts

believe that top-tier companies were paying upwards of 80% of what plaintiffs were receiving as

compensation in the tort system during the late 1990s.[18]  Although these bankruptcies would

eventually lead to the formation of trusts that would pay the asbestos claims against the bankrupt

entities, payments from the resulting trusts would not amount to substantial sums until 2006.

Ultimately, approximately 100 asbestos defendants would file for bankruptcy relief and

---

[15]  Brickman, *Asbestos Litigation*, at 144.

[16]  *Toxic Justice*, Dallas Observer (Aug. 23, 1998) (emphasis added), https://www.dallasobserver.com/news/toxic-justice-6406744.

[17]  The Babcock & Wilcox Company, Pittsburgh Corning, Owens Corning, Owens-Corning Fiberglas Corporation, Armstrong World Industries, G-1 Holdings, W.R. Grace, U.S. Gypsum Corporation, Federal Mogul, and Federal Mogul (Turner & Newall).  There were ten additional bankruptcies filed from 2000 to 2001. Some date the Bankruptcy Wave to have extended from 2000 through 2002.  Fifteen bankruptcies were filed in 2002. Lloyd Dixon *et al.*, *Asbestos Bankruptcy Trusts: An Overview of Trust Structure and Activity with Detailed Reports on the Largest Trusts*, RAND Inst. for Civil Justice, 49–51 (2010).

[18]  *Furthering Asbestos Claim Transparency (FACT) Act of 2012: Hearing on H.R. 4369 Before the Subcomm. on Courts, Commercial & Admin. Law of the H. Comm. on the Judiciary*, 112th Cong. 67, 76 (2012) (statement of Marc Scarcella).

JA04232

disappear from the tort system and, by 2011, approximately 60 bankruptcy trusts had been

created with tens of billions of dollars of assets to satisfy asbestos claims.[19]

16.    Continuing to name the top-tier companies that had gone bankrupt as defendants

would have resulted not only in substantial delays in receiving payment but also much reduced

recoveries from solvent defendants.  Not surprisingly to those who have studied asbestos

litigation, in the immediate aftermath of the Bankruptcy Wave plaintiffs stopped identifying

exposures to the asbestos-containing thermal insulation and refractory products of these top-tier

companies.  Instead, they stepped up litigation efforts against formerly peripheral companies that

prior to the Bankruptcy Wave were infrequently sued and, when they were sued, typically paid at

most nominal amounts to settle the claims.  These peripheral defendants were involved in the

manufacture and distribution of such asbestos-containing products as gaskets, pumps, automotive

friction products, and residential construction products, rather than the thermal insulation and

refractory products that were the dominant sources of exposures alleged prior to the Bankruptcy

Wave.  Garlock (gaskets), as well as companies like Kaiser Gypsum and Bestwall (residential

construction and home repair projects) were formerly peripheral asbestos defendants that had

sold products containing the far less toxic chrysotile asbestos fibers and against whom tort

system filings exploded following the Bankruptcy Wave.[20]  According to data provided by Bates

White, Kaiser was named as a defendant in mesothelioma lawsuits an average of 48 times per

---

[19]    GAO Report at 2–3.

[20]    The asbestos products sold by Kaiser and HPCI generally contained small or minimal amounts of chrysotile
asbestos fibers, as opposed to the amphibole asbestos products found in insulation.  *See* Declaration of Charles
E. McChesney II in Support of First Day Pleadings, Dkt. No. 13, ¶¶ 22–26.  Garlock's asbestos products
likewise almost exclusively involved chrysotile fibers.  *See In re Garlock Sealing Techs., LLC*, 504 B.R. 71,
75–78 (Bankr. W.D.N.C. 2014) ("*Garlock*").  Noting that various studies had found that amphibole was far
more toxic than chrysotile (one study labeling the relative toxicity ratio of amphibole to chrysotile as 900-
2000:1) and that experts from Duke and Stanford had testified that there was no scientifically reliable
connection between chrysotile exposure and mesothelioma, Judge Hodges found that "it is clear under any
scenario that chrysotile is far less toxic than other forms of asbestos."  *Id.* at 75–76.

JA04233

year from 1993-1999.  From 2000-2009, this average number soared to 434 mesothelioma

lawsuits per year, and further increased to 604 mesothelioma lawsuits per year from 2010-2016.

Testimony identifying the products that were alleged to have caused plaintiffs' mesothelioma

abruptly shifted from the manufacturers of insulation and other products containing amphibole

asbestos, which had succumbed to the Bankruptcy Wave, and was replaced by testimony

identifying formerly peripheral distributors of products containing chrysotile asbestos such as

Kaiser Gypsum, Bestwall, Garlock and others as the principal suppliers of the asbestos products

to which plaintiffs had been exposed and to which they attributed their mesothelioma.  This

abrupt shift in plaintiffs' exposure testimony is explained below.

### E.      The Dual Compensation System/Explosion of Trust Payments

17.      The explosion of asbestos bankruptcy trusts has created a dual compensation

system for the satisfaction of asbestos liabilities:  Asbestos claimants can seek recovery from

solvent defendants in the tort system and from bankrupt entities through their trusts.  The amount

of money disbursed by the trusts has soared since 2004.  Between 2004 and 2016, the number of

active asbestos trusts increased from 14 to 58.  In that period, the trusts paid out $24 billion to

claimants.  As of 2016, trusts' assets totaled $27 billion.  An additional five asbestos debtors

(including Bestwall and Kaiser Gypsum) are currently going through the asbestos bankruptcy

process.[21]

18.      Asbestos claimants also seek compensation from defendants in the tort system,

whose ranks have been considerably thinned by the more than 100 bankruptcies of companies

that manufactured or distributed products containing asbestos.  Notwithstanding the

disappearance from the tort system of so many defendants, including the top-tier insulation

---

[21]   Peter Kelso, "*The State of the Bankruptcy Trusts*," Nat'l Asbestos Litigation Conference (Oct. 1-3, 2018).

JA04234

manufacturers, and notwithstanding the payments by the trusts of tens of billions of dollars to mesothelioma victims since 2004, mesothelioma claim values in the tort system have actually risen in recent years.  It is the formerly peripheral defendants such as Garlock, Kaiser and Bestwall that have borne the brunt of the post-2004 tort system liabilities.

19.     Mesothelioma victims typically qualify for payment from multiple trusts, depending upon the sources of their exposures to asbestos-containing products.  If the products responsible for the exposures were distributed on a national basis for industrial or commercial use, then a substantial percentage of those mesothelioma claimants may be eligible for compensation from as many as 25 trusts invested with assets provided by the reorganized companies that produced and distributed these products.  I estimate that mesothelioma victims (and nonmalignant claimants) with exposures to industrial and commercial asbestos-containing products distributed nationally will typically qualify for payment from 15 to 20 trusts.[22]

20.     When trust payments began to amount to substantial sums by 2004, it presented a quandary for certain asbestos plaintiffs' lawyers.  Trust recoveries from 15 to 20 trusts for most claimants were too lucrative to pass up.  However, submitting claims to these trusts and replying to discovery with disclosure of all trust claims filed or to be filed would substantially reduce the value of tort system claims against the remaining solvent asbestos defendants, particularly those defendants like Kaiser, Bestwall and Garlock that sold asbestos products that were far less toxic. The solution for many plaintiffs' counsel was to (1) have their clients falsely deny, under oath, their exposures to the asbestos products of reorganized companies and then argue to the juries

---

[22]   In the Garlock estimation proceeding, Judge Hodges relied on the testimony of an expert witness for the debtor, Dr. Charles E. Bates of Bates White, who sampled 1,300 pending and resolved Garlock claims and "determined that the typical claimant alleges exposure to products of 36 parties:  13 tort defendants (plus Garlock) and 22 Trusts.  This number was derived from the actual claims against Garlock." *Garlock*, 504 B.R. at 95–96.

JA04235

that the defendants had failed to show that plaintiffs had been exposed to the highly toxic

products of the companies that had succumbed to the Bankruptcy Wave; (2) use their control

over the content of Trust Distribution Procedures ("TDPs") to enact measures to deny tort system

defendants access to trust filings; and (3) delay filing claims with the bankruptcy trusts until all

tort actions had been concluded.  Indeed, beginning around 2006, asbestos plaintiffs' lawyers,

through their control of the asbestos trusts, began to implement and standardize trust

confidentiality provisions designed to prevent tort system defendants from gaining access to trust

filing information.  Not coincidentally, a few judges soon became aware of manifestations of the

scheme that Judge Hodges would later fully expose.

### F.    Plaintiffs' Counsel's Control of Trusts/Advent of Trust Secrecy Provisions

21.    The same baker's dozen or so law firms that represent the large majority of

asbestos claimants in the tort system also represent the majority of claimants in asbestos-related

bankruptcy proceedings.  In most cases, these leading asbestos law firms largely control the

asbestos bankruptcy process and the operation of the trusts created under § 524(g).  In addition to

their populating the asbestos claimants committees ("ACCs"), these plaintiffs' counsel

effectively select the trustees to operate the § 524(g) bankruptcy trusts that will be created to

actually pay the claims, the administrator of the trust, and also the future claims representative

("FCR") who is to represent the interests of future claimants.  Finally, these plaintiffs' counsel

also constitute the membership of trust advisory committees ("TACs"), which represent the

interests of current asbestos claimants.  While trustees have the authority to amend TDPs, it can

only be done with the consent of the TAC and FCR.  Essentially, it is the TACs that exercise

effective control over the TDPs after they have been initially drafted by the ACCs and adopted as

part of the plan of reorganization.

JA04236

22.     The plaintiffs' counsel who have effective control over the creation and administration of asbestos bankruptcy trusts have used that power to include, amend, or add provisions to TDPs designed to limit, if not preclude, tort system defendants' ability to use discovery to access evidence that a tort plaintiff has filed one or more trust claims.  In filing a trust claim, a "claimant must demonstrate meaningful and credible exposure" to the products of the company funding the trust.  The great majority of asbestos trust TDPs include provisions designed to allow claimants who are also suing defendants in the tort system to prevent tort defendants from accessing exposure evidence and other vital information submitted by the claimants as part of their trust claims.

23.     One such provision is a "confidentiality" provision, which generally states that all information submitted to trusts by an asbestos claimant is to be treated as made in the course of settlement negotiations and is intended to be confidential and protected by all applicable privileges.  Additionally, trusts must take all available steps to defend that confidentiality, especially as against the efforts of tort defendants seeking to discover whether a plaintiff had filed a claim with that trust alleging "under penalty of perjury" that the claimant had "meaningful and credible exposure" to the products of the very bankrupted companies that provided the assets to fund the trusts.  Stated plainly:  The object of the confidentiality clause is to provide armor-cladding for tort plaintiffs' false denials of exposure to the products of companies that have sought bankruptcy relief, created trusts to resolve their asbestos liabilities, and disappeared from the tort system.  The confidentiality clause is a critical element of the scheme to prevent defendants from discovering the fact that plaintiffs have or will file trust claims where they represent that they had "meaningful and credible" exposure to the products of the bankrupt entities.

JA04237

24.     Indeed, the trust procedures proposed by the Joint Plan proponents in the Kaiser

Gypsum bankruptcy include a confidentiality provision typical of what has been adopted by

other asbestos trusts.  Section 6.5 of the proposed trust procedures provides as follows:

> All submissions to the Asbestos Trust by a holder of an Asbestos Claim, including
> a claim form and materials related thereto, shall be treated as made in the course of
> settlement discussions between the holder and the Asbestos Trust, and intended by
> the parties to be confidential and to be protected by all applicable state and federal
> privileges and protections, including but not limited to those directly applicable to
> settlement discussions.[23]

The Kaiser confidentiality provision further provides that the Trust "will preserve the

confidentiality of the submissions" and shall disclose their contents only "with the permission"

of the claimant or in response to a valid subpoena issued by the Bankruptcy Court, a Delaware

state court, or the United States District Court for the District of Delaware.  Moreover, if served

with a subpoena from one of the specified courts, the Trust is obligated "to take all necessary and

appropriate steps to preserve such privileges" before said court and to provide the impacted

claimants with notice of the subpoena.  Thus, not only does this provision require a subpoena for

production of claims information, it requires that the subpoena issue from courts other than the

trial court where the asbestos claim is being litigated.  This is intended to delay defendants'

access to possibly vital information by having to run an additional gauntlet of bankruptcy judges

or the Delaware courts, thus imposing increased costs on defendants and also running out the

clock on the trial courts' timetable for conducting discovery.

25.     In addition to "confidentiality" provisions, plaintiffs' counsel have also inserted

into TDPs a provision that provides that evidence submitted to the trust is for the "sole benefit"

of the trust, and claimants are not required to list any other exposures in filing a claim except

---

[23]  Section 6.5, *Third Amended Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson
Permanente Cement, Inc.*, Dkt. No. 1868, at 173 (TRUCK0000159, at -0000331).

17

those for which the trust is responsible.  In addition, if an asbestos plaintiff in a tort action fails to

identify exposure to products of a reorganized company or fails to do so when filing claims with

other trusts, then the plaintiff would not be precluded from recovering as an asbestos claimant

from that trust.  Section 5.7(b)(3) of the Armstrong World Industries, Inc., TDP is a standard

"sole benefit" provision in many trust TDPs:

> Evidence submitted to establish proof of exposure to AWI Products/Operations is
> for the sole benefit of the PI Trust, not third parties or defendants in the tort system.
> The PI Trust has no need for, and therefore claimants are not required to furnish the
> PI Trust with, evidence of exposure to specific asbestos products other than those
> for which AWI is responsible, except to the extent such evidence is required
> elsewhere in the TDP.  Similarly, failure to identify AWI Products/Operations in
> the claimant's underlying tort action, or to other bankruptcy trusts, does not
> preclude the claimant from recovering from the PI Trust, provided the claimant
> otherwise satisfies the medical and exposure requirements of the TDP.[24]

26.    These "sole benefit" provisions appear intended to enable plaintiffs and their

counsel to limit the exposure evidence they must provide in support of each trust claim, thus

minimizing the breadth of exposure evidence possessed by any one asbestos trust.  Accordingly,

a tort system defendant seeking to obtain evidence of *all* trust claims submitted by the plaintiff

would need to successfully subpoena *all* asbestos trusts.  This provision also seeks to vitiate any

consequences with regard to perjurious testimony in interrogatories, depositions, and at trial.[25]

---

[24]   Section 5.7(b)(3), Second Amended and Restated Armstrong World Industries Inc. Asbestos Personal Injury
Settlement Trust Distribution Procedures (July 31, 2015), http://www.armstrongworldasbestostrust.com/wp-
content/uploads/2015/11/AWI-Second-Amended-and-Restated-Trust-Distribution-Procedures-TDP-as-of-July-
31-2015.pdf.

[25]   The sole benefit provision in the Joint Plan deviates from the standard provision.  Section 6.5 provides that there
may be times when the Kaiser Trust will need to provide access to certain claim information to preserve,
litigate, resolve or settle coverage, or to comply with an applicable obligation under any insurance policy or
settlement agreement.  In such an instance:

> the Asbestos Trust shall take any and all steps reasonably feasible in its judgment to preserve the
> further confidentiality of such information, documents and materials, and prior to the disclosure of
> such information, documents or materials to a third party, the Asbestos Trust shall receive from such
> third party a written agreement of confidentiality that (a) ensures that the information, documents
> and materials provided by the Asbestos Trust shall be used solely by the receiving party for the
> purpose stated in the agreement and (b) prohibits any other use or further dissemination of the

JA04239

27.    A third TDP provision that appears intended to suppress evidence of plaintiffs'

exposures to the products of reorganized companies so as to inflate the value of tort claims

involves the timing of trust claim filings.  Most TDPs have a three-year statute of limitations

requiring that trust claims be filed within three years of diagnosis of an asbestos-related disease

or, if later, within three years after the "initial claims filing date" or the date of the asbestos-

related death.  This allows plaintiffs to file and resolve many tort actions before filing trust

claims.  In the event that plaintiffs are unable to resolve their tort claims within the allowed time

period, most TDPs allow a claimant to file a trust claim to meet the applicable statute of

limitations first and then to withdraw the claim "at any time . . . and file another claim

subsequently without affecting the status of the claim for statute of limitations purposes."  These

provisions typically further provide:

> A claimant can . . . request that the processing of his or her PI Trust Claim by the
> PI Trust be deferred for a period not to exceed three (3) years without affecting the
> status of the claim for statute of limitations purposes, in which case the claimant
> shall also retain his or her original place in the FIFO Processing Queue.[26]

28.    Thus, plaintiffs suing in the tort system can have filed trust claims, then

withdrawn or deferred them, completed the tort suits during which they testified that they had not

filed any trust claims, and then immediately refile or revive the trust claims asserting product

exposures that controvert their testimony in the tort action.  These deferral provisions further

---

information, documents and materials by the third party except as set forth in the written agreement
of confidentiality.

Section 6.5, *Third Amended Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson
Permanente Cement, Inc.*, Dkt. No. 1868, at 173–74 (TRUCK0000159, at -0000331–332).

[26]  Section 6.3, *Second Amended and Restated Armstrong World Industries Inc. Asbestos Personal Injury
Settlement Trust Distribution Procedures* (July 31, 2015).  Section 6.3 of the proposed Joint Plan, titled
"Withdrawal or Deferral of Claims," is substantially similar to the standard TDP provision but, by its terms,
addresses only uninsured asbestos claims.  *See* Section 6.3, *Third Amended Joint Plan of Reorganization of
Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc.*, Dkt. No. 1868, at 172 (TRUCK0000159,
at -0000330).

JA04240

facilitate plaintiffs' and their counsel's denials in the course of pretrial discovery that they had

filed trust claims, despite their having done so.  Upon refiling or reviving the trust claims,

plaintiffs and their counsel will almost certainly assert product exposures that are inconsistent

with the claims of causation advanced in the tort litigation.  The practice of using TDP deferral

provisions for this purpose is laid bare in *Barnes & Crisafi v. Georgia-Pacific.*[27]  There,

plaintiffs' counsel justified plaintiffs' denial of filing any trust claims—when they had in fact

filed at least four trust claims—on the grounds that the claims were deferral claims and therefore

were not filed trust claims.[28]  An irate judge emphatically rejected that excuse stating that her

order required all trust claims to be disclosed, including "deferral claims;' and that "[t]he defense

is entitled to know that."[29]  She then reopened discovery to permit the defendant to further

investigate the plaintiffs' trust filings.[30]

29.     The timing of the TDP changes is noteworthy.  As I noted above in Section E,

starting around 2004, the number of asbestos trusts, and the trust assets available to pay asbestos

claims, exploded, as did tort system filings against solvent, peripheral defendants such as Kaiser.

Plaintiffs' lawyers came to understand that the value of their tort system claims against the

peripheral defendants would be severely reduced if the trust filings were discovered.  It can

hardly be a coincidence that the "sole benefit" and "deferral" provisions were mostly added to

TDPs during the years 2006 to 2010, soon after new trusts began to emerge, and that during this

time period, the current version of the "confidentiality" provisions became standard.  And as I

---

[27]  Lester Brickman, *Fraud and Abuse in Mesothelioma Litigation*, 88 Tul. L. Rev. 1071, 1106 (2014) (hereinafter, "Brickman, *Fraud and Abuse*") (citing Transcript of Pre-Trial Conference at 128–39, *Barnes & Crisafi v. Georgia-Pacific*, Nos. MID-L-5018-08(AS), MID-L-316-09(AS) (N.J. Super. Ct. Middlesex Cty. June 12, 2012)).

[28]  *Id.*

[29]  *Id.*

[30]  *Id.*

JA04241

explain below, this was also the time when concerns about "double-dipping"—asserting trust claims with work histories and exposure claims that are inconsistent with plaintiffs' testimony in tort actions—were gaining national attention because of *Kananian v. Lorillard Tobacco Co.*[31]

30.     It is my opinion that the TDP changes discussed above were designed by plaintiffs' counsel, who exercise effective control over the trusts, to prevent tort system defendants from accessing the evidence in proofs of claim filed with trusts, which access is essential to exposing false denials of exposure.  If defendants were able to readily access evidence of plaintiffs' exposure to products of companies bankrupted in the Bankruptcy Wave and others, that could substantially reduce, and in some cases eliminate, formerly peripheral defendants' liability in tort litigation.

### G.     Pre-*Garlock* Judicial Findings and Statements Regarding Evidence Suppression and Other Malfeasance in Asbestos Litigation

31.     The 2014 findings of Judge Hodges in the *Garlock* estimation proceeding have been widely recognized for revealing the startling degree of exposure evidence suppression in asbestos litigation and the unfair outcomes that result from that practice.  Judge Hodges found that this suppression had "infected" the reliability of the settlement values and therefore rejected the plaintiffs' bar representatives attempt to use these values as the basis for projecting future claim liability.  I testified as an expert in that proceeding and will detail herein some of Judge Hodges's key findings, including those that unequivocally refute the false suggestion made to this Court that wrongdoing was only found as to 15 claims against Garlock.  However, while the *Garlock* ruling has been the subject of much attention and comment, it was hardly the first time a court had found that asbestos plaintiffs' lawyers were wrongfully suppressing exposure evidence.

---

[31]  *See infra* ¶ 32.

JA04242

32.     The first case to receive widespread attention for fraudulent testimony regarding asbestos exposure was the 2007 case of *Kananian v. Lorillard Tobacco Co.*[32]  According to the presiding judge, the facts in *Kananian* reveal fraudulent conduct by plaintiffs' counsel on a massive scale.  Harry Kananian died of mesothelioma in 2000 and was represented by two law firms.  As described in a *Wall Street Journal* article:

> [One] law firm filed a claim to one trust, saying Kananian had worked in a World War II shipyard and was exposed to insulation containing asbestos.  It also filed a claim to another trust saying he had been a shipyard welder.  A third claim, to another trust, said he'd unloaded asbestos off ships in Japan.  And a fourth claim said that he'd worked with "tools of asbestos" before the war. . . . [T]wo more claims [were submitted] to two further trusts, with still different stories [about how he was exposed to asbestos]. [The firm then] sued Lorillard Tobacco, this time claiming its client had become sick from smoking Kent cigarettes, whose filters contained asbestos for several years in the 1950s.[33]

33.     As Presiding Judge Harry Hanna explained, the California law firm of Brayton Purcell ("BP") filed a claim with the Manville Trust which stated that Kananian was a shipyard laborer working in direct contact with Johns Manville products.[34]  However, there was no evidence that he had ever worked with those products.  When the court ordered the BP counsel to produce the Manville Trust filing, which he essentially refused to do, the firm was forced to produce internal e-mails including one acknowledging that the filings were rife with outright fabrications.  Nonetheless, prior thereto, BP counsel lied to the court, stating that the claim form was "entirely accurate."  To delete the inaccurate filing, the BP counsel then submitted an amended claim form to the Manville Trust but repeatedly denied doing so to the court.[35]  The BP

---

[32]  No. CV 442750 (Ct. Comm. Pl. Cuyahoga Cty.).

[33]  Kimberly A. Strassel, Op-Ed., *Trusts Busted*, Wall St. J. (Dec. 5, 2006), https://www.wsj.com/articles/ SB116527814374340591.

[34]  Order & Opinion at 1–3, 15, *Kananian*¸ No. CV 442750 (Ct. Comm. Pl. Cuyahoga Cty., Ohio, Jan. 18, 2007).

[35]  *Id.* at 5–7.

JA04243

counsel "continued the deceit in its amended answers to Lorillard's Interrogatories."[36]  The BP counsel also denied that claim forms had been filed with other trusts even as BP and an associated firm had received monies on behalf of Kananian from multiple trusts.  The BP counsel also lied when he stated that original claim forms had not been submitted to the bankruptcy trusts, claiming that the forms were unsigned.  In fact, they were signed.  The BP counsel also denied having any control over the law firm with which it was associated in representing Kananian and maintained ignorance about what that firm did with the amended claim form.[37]  However, "[c]ommunications between Brayton Purcell and [the associated firm] prove otherwise."[38]  The BP counsel also filed a false privilege log to conceal his initial deception.[39]  It was, said Judge Hanna, "lies upon lies."[40]  Judge Hanna then revoked counsel's *pro hac vice* approval to appear in his court.[41]

34.      Judge Hanna's ruling received national attention for exposing "one of the darker corners of tort abuse" in asbestos litigation:[42] inconsistencies between allegations made in open court in tort cases and those submitted to trusts set up by bankrupt companies to pay asbestos-related claims.  An editorial in the *Wall Street Journal* found this to be evidence of "rampant fraud inherent in asbestos trusts."[43]  The *Cleveland Plain Dealer* reported that Judge Hanna's decision ordering the plaintiff to produce proof of claim forms "effectively opened a Pandora's

---

[36]  *Id.* at 8.

[37]  *See id.* at 6, 11–12.

[38]  *Id.* at 12.

[39]  *Id.*

[40]  James F. McCarty, *Judge Becomes National Legal Star, Bars Firm from Court Over Deceit*, Cleveland Plain Dealer, at B1 (Jan. 25, 2007).

[41]  Order & Opinion at 19, *Kananian¸* No. CV 442750 (Ct. Comm. Pl. Cuyahoga Cty., Ohio, Jan. 18, 2007).

[42]  Editorial, *Cuyahoga Comeuppance*, Wall St. J. (Jan 22, 2007), https://www.wsj.com/articles/SB116942159908683141.

[43]  *Id.*

JA04244

box of deceit . . . reveal[ing] that [counsel] presented conflicting versions of how Kananian

acquired his cancer."[44]  As Judge Hanna would later say, "[i]n my 45 years of practicing law I

never expected to see lawyers lie like this."[45]

35.     Striking a theme that would be reprised following *Garlock*, a senior partner at

Caplin & Drysdale would later argue that *Kananian* was a one-off, an "isolated incident."[46]

However, it has become clear that *Kananian* is by no means an outlier.  Rather, it has been a

harbinger of widespread revelations of fraudulent practices, including plaintiffs' outright lies

about their exposures, facilitated by plaintiffs' counsel's suppression of defendants' ability to

obtain evidence of plaintiffs' product exposures.

36.     In *Warfield v. AC&S, Inc.*,[47] the plaintiff failed to disclose nine trust claims, eight

of which had been filed before he testified in the litigation.[48]  In another case, the plaintiff denied

having filed trust claims despite having received payment of approximately $185,000 from five

trusts and "deferring" fourteen other claims worth at least $313,000—a total of nineteen

undisclosed filed claims.[49]  In *Edwards v. John Crane-Houdaille, Inc.*,[50] the plaintiff amended

---

[44]   James F. McCarty, *Judge Becomes National Legal Star, Bars Firm from Court Over Deceit*, Cleveland Plain
Dealer, at B1 (Jan. 25, 2007).

[45]   *Id.*

[46]   *See Furthering Asbestos Claim Transparency (FACT) Act of 2013:  Hearing  on H.R. 982 Before the
Subcomm. on Regulatory Reform, Commercial & Antitrust Law of the H. Comm. on the Judiciary*, 113th
Cong. 66 (2013) (prepared statement of Elihu Inselbuch, Member, Caplin & Drysdale) ("The *Kananian* case . . .
was an isolated incident, remedied by a state court, involving inconsistent trust claims with respect to a single
claimant, one of the millions who have filed claims with asbestos trusts.").

[47]   No. 24X06000460, Consolidated Case No. 24X09000163 (Md. Cir. Ct. Baltimore Cty. Jan. 11, 2011).

[48]   *How Fraud and Abuse in the Asbestos Compensation System Affect Victims, Jobs, the Economy, and the Legal
System: Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 112th Cong. 103–
04 (2011) (statement of James L. Stengel, Orrick, Herrington & Sutcliffe LLP) (hereinafter, "*Stengel
Statement*").

[49]   Brickman, *Fraud and Abuse*, at 1116 (citing Memorandum in Support of Defendant CertainTeed Corp.'s
Motion To Delay Trial Until After Plaintiff Completes Her Bankruptcy Trust Claims at 1, *Bacon v. Ametek,
Inc.*, No. CJ-08-238 (Okla. Dist. Ct. McIntosh Cty. Jan. 22, 2008)).

[50]   No. 24X08000351 (Md. Cir. Ct. Balt. City July 31, 2008).

JA04245

his discovery responses to reflect that he had only been exposed to asbestos-containing material made by the remaining solvent defendants.  When finally compelled to produce trust claims materials two weeks before trial, it was revealed that the plaintiff had filed with sixteen trusts, many of which had been filed before his initial discovery responses.[51]  Similarly, in *Dunford v. Honeywell Corp.*,[52] the plaintiff asserted throughout the litigation that his illness resulted solely from working in a gas station for two years and being exposed to such asbestos-containing friction products as brake-lining dust.[53]  Dunford had, in fact, filed numerous trust claims certifying exposure to products made by many of the traditional defendants and had already collected money from one building-products trust based on his claim that he was a construction worker.[54]  Judge Thomas D. Horne characterized Dunford's deception as the "most egregious case of a discovery abuse that I have ever seen [in 22 years on the bench] if not the worst."[55]

37.    In *Beverage v. AC and S, Inc.*, a particularly egregious illustration of this practice, the plaintiff was asked to describe "all of the ways that you believe that you may have been exposed to asbestos in your lifetime."[56]  The plaintiff's answer was unclear, and his counsel then stated, "[w]e are not alleging asbestos exposure anywhere else than that which he has discussed already."[57]  Seven days after the jury returned a verdict in favor of the defendant CertainTeed,

---

[51]    *Stengel Statement*, at 104.

[52]    No. CL-25113 (Va. Cir. Ct. Loudoun Cty. Dec. 10, 2003).

[53]    *Furthering Asbestos Claims Transparency (FACT) Act of 2012: Hearing on RR. 4369 Before the Subcomm. on Courts, Commercial & Admin. Law of the H. Comm. on the Judiciary*, 112th Cong. 21–22 (2012) (testimony of Leigh Ann Schell).

[54]    Daniel Fisher, *Double-Dippers*, Forbes (Aug. 19, 2006), https://www.forbes.com/free_forbes/2006/0904/136.html.

[55]    Brickman, *Fraud and Abuse*, at 1117 (quoting Transcript of Motions Hearing at 105, *Dunford*, No. CL-25113 (Va. Cir. Ct. Loudoun Cty. Dec. 10, 2003)).

[56]    *Id.* (quoting Defendant CertainTeed Corp.'s Motion for Sanctions & Request for Hearing at 6, *Beverage v. AC and S, Inc. (In re Balt. City Asbestos Litig.)*, No. 24X08000439 (Md. Cir. Ct. Balt. City, Aug. 26, 2013)).

[57]    *Id.*

JA04246

the plaintiff's counsel filed ten trust claims and thirteen more in the months that followed.[58]  In

*Stoeckler v. Am. Oil Co.*, defendants discovered that the plaintiff had failed to disclose several

trust claims only when trial counsel disclosed for the first time three days *after* commencement

of trial that Stoeckler had filed trust claims against the Manville, Celotex, Eagle-Picher, and HK

Porter Trusts.  Despite deposing Stoeckler twice, defendants—being unaware of the trust

filings—never had the opportunity to question Stoeckler about the exposures asserted in the

filings.[59]

38.    Judge Peggy Ableman, formerly the Delaware Superior Court judge responsible

for all asbestos litigation in the State of Delaware, discussed abusive, if not fraudulent, practices

in a pretrial hearing in *Montgomery v. American Steel & Wire Corp.*[60] and in subsequent

congressional testimony.[61]  The Delaware court had adopted Standing Order No. 1, which set

forth mandatory disclosure obligations related to bankruptcy trust claims and specifically

included "claims made to trusts for bankrupt asbestos litigation defendants."[62]  Nonetheless, the

plaintiffs in *Montgomery failed* to identify twenty bankruptcy trusts to which they had submitted

claims.[63]  In response to an interrogatory asking plaintiffs to identify all entities who were not

defendants whose products plaintiff June Montgomery had been exposed, plaintiffs identified

---

[58]   *Id.*

[59]   *Id.* at 1119 (citing Transcript of Trial on the Merits at 19, 63, *Stoeckler v. Am. Oil Co.*, No. 23,451 (Tex. Dist. Ct. Angelina Cty. Jan. 28, 2004)).   The Eagle-Picher Trust filing occurred almost two years earlier.  *Id.* at 1119 n.213.

[60]   *Furthering Asbestos Claims Transparency (FACT) Act of 2012: Hearing on RR. 4369 Before the Subcomm. on Courts, Commercial & Admin. Law of the H. Comm. on the Judiciary*, 112th Cong. 140–73 (2012) (Pretrial Hearing Transcript, *In re Asbestos Litig. Ltd. to Montgomery*, No. 09C-11-217 ASB (Del. Super. Ct. Nov. 7, 2011)).

[61]   *Furthering Asbestos Claim Transparency (FACT) Act of 2013:  Hearing on H.R. 982 Before the Subcomm. on Regulatory Reform, Commercial & Antitrust Law of the H. Comm. on the Judiciary,* 113th Cong. 43–53 (2013) (statement of Judge Peggy L. Ableman (retired), Del. Super. Ct.) (hereinafter, "*Ableman Statement*").

[62]   Standing Order No. 1 ¶ 7(k), *In re Asbestos Litig.*, No. 77C-ASB-2 (Del. Super. Ct. Oct. 10, 2013).

[63]   *Ableman Statement*, at 50.

JA04247

none of the trusts to which claims had been submitted.[64]  Indeed, counsel for plaintiffs stated that

no bankruptcy submissions had been made and no monies received.[65]  Two days before a two-

week trial was to commence, plaintiffs' counsel reported that his client had received two

bankruptcy settlements of which he was previously unaware.[66]  The following day, the defendant

learned that, in fact, twenty bankruptcy trust claims had been submitted.[67]  These included claims

submitted to the trusts formed by Owens Corning, U.S. Gypsum, Armstrong World Industries,

Babcock & Wilcox, Plibrico, and ASARCO, even though plaintiffs had, in fact, specifically

denied submitting such claims.[68]  Compounding the deceit, although Mrs. Montgomery's

claimed exposure was solely from the take-home fibers on her husband's clothing, trust claims

materials established that she had worked with asbestos products herself.[69]  Moreover, even

though her husband was a career electrician exposed to a wide variety of asbestos products, "the

impression garnered from the Complaint, the answers to written discovery, and Mr.

Montgomery's sworn [deposition] testimony . . . was that the bulk of his work around asbestos

occurred only during a short period at the Everglades Power Plant."[70]

39.    According to Judge Ableman, the fraudulent scheme was only exposed because

one of the named defendants knew of other instances of plaintiffs' counsel submitting

"conflicting work histories to multiple trusts [and] filed a motion in advance of trial requesting

that the Court order disclosure of all pretrial settlements, including monies received from

---

[64]  *Id.* at 49.

[65]  *Id.*

[66]  *Id.* at 50.

[67]  *Id.*

[68]  *Id.* at 49–50.

[69]  *Id*. at 44.

[70]  *Id*. at 48–49.

JA04248

bankruptcy trusts."[71]  The court called the failure to report those twenty trust claim filings

examples of "dishonesty and disreputableness,"[72] stating, "[t]he core of this case has been

fraudulent."[73]  "This is trying to defraud," the jurist stated.[74]  "[I]t happens a lot [in asbestos

litigation]."[75]

40.     In a 2013 congressional hearing, Judge Ableman strongly denounced the practice

of plaintiffs denying exposures to the products of reorganized companies when, in fact, plaintiffs

and their counsel had asserted just such substantial exposures in claims submitted to trusts:

> In the final analysis, there can be no real justice or fairness if the law imposes any
> obstacles to ascertaining and determining the complete truth.  From my perspective
> as a judge, it is not simply the sheer waste of resources that occurs when one
> conducts discovery or trials without knowledge of all of the facts.  What is most
> significant is the fact that the very foundation and integrity of the judicial process
> is compromised by the withholding of information that is critical to the ultimate
> goal of all litigation, a search for, and discovery of, the truth.[76]

### H.     In *Garlock,* Judge Hodges Confirmed that the Scheme to Withhold and Suppress Exposure Evidence Was Indeed Common and Widespread

41.     I testified in the *Garlock* estimation proceeding before Judge Hodges, and I have

carefully reviewed and written about his findings.  I am also aware that counsel for the ACC in

this proceeding has argued with respect to Judge Hodges's ruling that "the fact that a cherry-

picked selection of 15 cases out of 600,000 or more [asbestos claims filed against Garlock] has

---

[71]  *Id.* at 49.

[72]  *Furthering Asbestos Claims Transparency (FACT) Act of 2012: Hearing on RR. 4369 Before the Subcomm. on Courts, Commercial & Admin. Law of the H. Comm. on the Judiciary*, 112th Cong. 160 (2012) (Pretrial Hearing Transcript at 23, *In re Asbestos Litig.  Ltd. to Montgomery*, No. 09C-11-217 ASB (Del. Super. Ct. Nov. 7, 2011)).

[73]  *Id.* at 162 (Pretrial Hearing Transcript at 25, *In re Asbestos Litig.  Ltd. to Montgomery*, No. 09C-11-217 ASB (Del. Super. Ct. Nov. 7, 2011)).

[74]  *Id.* at 144 ((Pretrial Hearing Transcript at 7, *In re Asbestos Litig.  Ltd. to Montgomery*, No. 09C-11-217 ASB (Del. Super. Ct. Nov. 7, 2011)).

[75]  *Id.*

[76]  *Ableman Statement*, at 44.

JA04249

been viewed as problematic . . . demonstrates there really isn't a widespread fraud

problem . . ."[77]  This statement is more than a distortion of Judge Hodges's findings.  It is a

perversion of what he found.

     42.     While Judge Hodges was hardly the first judge to find that asbestos exposure

evidence was being wrongfully suppressed, his ruling was of great significance due to the

opportunity he afforded the parties to take discovery, the time he allowed for the presentation of

factual and expert testimony, and the comprehensiveness of his written and published opinion.

The discovery permitted included "not only the normal discovery tools pursuant to the Federal

Rules, but also multiple questionnaires directed at the claimants (and their law firms) . . . [that]

sought important information on work histories and exposure to Garlock's and other

manufacturers' products."[78]

     43.     The fundamental issue before the Court in *Garlock* was the proper method of

estimating the debtor's asbestos liabilities.  Relying largely on the data collected from the

questionnaires, the debtor's expert economist, Dr. Charles Bates, employed an econometric

analysis of pending and projected claims.  The experts for the ACC and the FCR "offered a

'settlement approach' based upon an extrapolation from Garlock's history of resolving

mesothelioma claims in the tort system.  The end product of the two approaches differ by about a

billion dollars:  Garlock's estimate is $125 million and the ACC/FCR estimates are $1–1.3

billion."[79]

---

[77]   June 13, 2019 Tr. (Dkt. No. 1742) at 239–40.  The ACC is represented here by the same law firm that described
the fraudulent withholding of exposure evidence in *Kananian* as an "isolated incident."

[78]   *Garlock*, 504 B.R. at 74.

[79]   *Id.*

JA04250

44.     No serious reading of the *Garlock* opinion can possibly support the ACC's

suggestion that Judge Hodges merely found problems with 15 out of 600,000 or more claims.  In

rejecting the claimants' approach of extrapolating Garlock's future liabilities based upon its tort

system experience, Judge Hodges found as follows:

> Garlock's evidence at the present hearing demonstrated that the last ten years of its
> participation in the tort system *was infected by the manipulation of exposure
> evidence by plaintiffs and their lawyers.*  That tactic, though not uniform, *had a
> profound impact on a number of Garlock's trials and many of its settlements* such
> that the amounts recovered were inflated.[80]

45.     To be clear, Judge Hodges did emphasize the suppression of evidence in 15

settled cases.  Judge Hodges found as follows:

> In 15 settled cases, the court permitted Garlock to have full discovery.  Garlock
> demonstrated that exposure evidence was withheld in *each and every one of them*.
> These were cases that Garlock settled for large sums.  The discovery in this
> proceeding showed what had been withheld in the tort cases—on average plaintiffs
> disclosed only about 2 exposures to bankrupt[] companies' products, but after
> settling with Garlock made claims against about 19 such companies.[81]

Judge Hodges then puts to bed any assertion that the malfeasance identified in the 15 cases was

somehow limited to those cases:

> The court permitted Garlock to have full discovery in only 15 closed cases.  In each
> and every one of those cases it disclosed that exposure evidence was withheld.  For
> fifteen plaintiffs represented by five major firms, the pattern of non-disclosure is
> the same:

| Case | Disclosed | Not Disclosed |
|------|-----------|---------------|
| 1 | 2 | 22 |
| 2 | 7 | 25 |
| 3 | 3 | 23 |
| 4 | 6 | 19 |

---

[80]  *Id.* at 82 (emphasis added).

[81]  *Id.* at 84 (emphasis in original).

JA04251

| 5  | 2 | 22 |
| 6  | 1 | 14 |
| 7  | 0 | 11 |
| 8  | 5 | 11 |
| 9  | 0 | 25 |
| 10 | 0 | 20 |
| 11 | 1 | 23 |
| 12 | 3 | 26 |
| 13 | 1 | 25 |
| 14 | 1 | 14 |
| 15 | 0 | 4  |

These fifteen cases are just a minute portion of the thousands that were resolved by Garlock in the tort system.  And they are not purported to be a random or representative sample.  But, the fact that *each and every one of them* contains such demonstrable misrepresentation is surprising and persuasive.  More important is the fact that the pattern exposed in those cases appears to have been sufficiently widespread to have a significant impact on Garlock's settlements and results.  Garlock identified 205 additional cases where the plaintiff's discovery responses conflicted with one of the Trust claim processing facilities or balloting in bankruptcy cases.  Garlock's corporate parent's general counsel identified 161 cases during the relevant period where Garlock paid recoveries of $250,000 or more.  The limited discovery allowed by the court demonstrated that almost *half* of those cases involved misrepresentation of exposure evidence.[82]

In other words, Judge Hodges found that there was evidence of suppression in hundreds of cases, not just the 15 where he had authorized full discovery.  And lest there be any doubt as to the breadth of his findings, he added the following:

---

[82]  *Id.* at 85–86 (emphasis in original).

JA04252

> **It appears certain that more extensive discovery would show more extensive
> abuse.   But that is not necessary because the startling pattern of
> misrepresentation that has been shown is sufficiently persuasive.**[83]

46.      Having made these findings, Judge Hodges rejected the proposed liability

estimate offered by the experts for the ACC and the FCR.  As stated by Judge Hodges:

> [T]he settlement history data does not accurately reflect fair settlements because
> exposure evidence was withheld.  While that practice was not uniform, *it was
> **widespread and significant enough to infect fatally** the settlement process and
> historic data.  It has rendered that data useless for fairly estimating Garlock's
> liability to present and future claimants.*[84]

Thus, the argument advanced by the ACC here—that *Garlock* merely involved 15 "cherry-

picked" cases and actually demonstrated that there was no "widespread fraud problem"—is

wholly inconsistent with what Judge Hodges found.  Beyond the fact that Judge Hodges found

that the wrongful practices were "widespread and significant," had he believed that the problems

were limited to a tiny fraction of the claims brought against Garlock, he would have had no basis

to reject the use of Garlock's settlement history in estimating its future liabilities.[85]

---

[83]  *Id.* at 86 (emphasis added).

[84]  *Id.* at 94 (emphasis added).

[85]  I am aware that nowhere in Judge Hodges's opinion does he actually use the word "fraud."  There can,
however, be no doubt that (a) he was describing wrongful conduct and (b) that conduct, as a matter of law,
constitutes fraud, defined in *Black's Law Dictionary* as a "knowing misrepresentation of the truth or
concealment of a material fact to induce another to act to his detriment."  Moreover, in rejecting a motion to
dismiss Garlock's suit under the Racketeer Influenced and Corrupt Organizations Act (RICO) against four of
the law firms that had brought mesothelioma claims against Garlock that were tainted by evidence suppression,
U.S. District Judge Graham C. Mullen noted that "Garlock successfully alleges that Defendants engaged in a
wide-ranging, systematic, and well-concealed ***fraud*** designed to suppress evidence and inflate settlement values
for mesothelioma claims.  Indeed, ***the bankruptcy court found as much*** when it reviewed a number of these
cases."  *Garlock Sealing Techs., LLC v Shein*, No. 3:14-cv-137, 2015 WL 5155362, at *2 (W.D.N.C. Sept. 2,
2015) (emphasis added).  Judge Mullen thus concluded that Garlock's allegations in the RICO suits that
plaintiffs' counsel had engaged in a "well-concealed fraud designed to suppress evidence" were consistent with
Judge Hodges's findings in the Garlock estimation proceeding.

JA04253

I.      **Judge Hodges Found that it Was a Regular Practice of Plaintiffs' Firms to Delay Filing Trust Claims Until After Tort System Recoveries were Obtained**

47.     One of the specific findings of Judge Hodges in *Garlock* that is of particular relevance here concerns the practice of plaintiffs' firms to delay filing trust claims so that they simply would not exist at the time the claimants' tort system claims were being litigated.  Judge Hodges noted that the disappearance of evidence of exposure to the asbestos products of bankrupt companies "was a result of the effort by some plaintiffs and their lawyers to withhold evidence of exposure to other asbestos products and to delay filing claims against bankrupt defendants' asbestos trusts until after obtaining recoveries from Garlock (and other viable defendants."[86]  Judge Hodges found that "[i]t was a regular practice by many plaintiffs' firms to delay filing Trust claims for their clients so that remaining tort system defendants would not have that information."[87]  Judge Hodges specifically noted that one plaintiffs' lawyer even defended this practice "as seemingly some perverted ethical duty:"

> My duty to these clients is to maximize their recovery, okay, and the best way for me to maximize their recovery is to proceed against solvent viable non-bankrupt defendants first, and then, if appropriate, to proceed against bankrupt companies.[88]

As I will discuss further below, this practice is a prime reason why it is no answer to say that Truck can uncover the fraud in the tort system.  If the *modus operandi* is to delay the filing of the trust claims until after the tort system cases are resolved, even discovery efforts targeted at the trusts that somehow successfully break through the confidentiality barriers of the TDPs will not reveal trust filings that have yet to be made.

---

[86] *Garlock*, 504 B.R. at 84.

[87] *Id.*

[88] *Id.*

JA04254

### J.   The *Garlock* Trust Procedures Include Fraud Prevention Requirements

48.   Judge Hodges, having rejected the use of Garlock's settlement history as a basis for estimating its future asbestos liabilities, instead adopted Dr. Bates's econometric opinion that current and future liabilities would total approximately $125 million.  Thereafter, a settlement was reached on a funded 524(g) trust at a level far closer to Dr. Bates's estimate than the $1 billion+ amount suggested by the ACC and FCR.

49.   Once an agreement was reached on the funding of the Garlock trust, attention shifted to the Garlock TDP.  The ACC sought to adopt the standard form TDP, the terms of which had aided and abetted the fraudulent scheme to suppress exposure evidence in the tort system.  However, the Garlock FCR, Joe Grier, seeking to protect the interests of future claimants, insisted upon Claims Resolution Procedures ("CRPs") previously proposed by Garlock.  Those procedures included fraud prevention requirements specifically designed to prevent a recurrence of the evidence suppression that had plagued the claims in the tort system.

50.   Like many trusts, the Garlock CRPs proposed to give claimants two options for the resolution of their claims.  The first was to seek "expedited review," which would lead to settlement offers at compensation levels that have baked into them the presumption that the claimant has been exposed to asbestos products of many companies.  The other option was to seek "extraordinary review," which can result in settlement offers five times greater than expedited review, if the claimant can demonstrate a history of extraordinary exposure to Garlock's products with little or no exposure to any other companies' products.

51.   One set of provisions in the CRPs, perhaps more than any other, appears to take direct aim at the fraudulent practices revealed in the Garlock bankruptcy proceeding and is a direct counter to the standard TDP provisions seeking to facilitate suppression of evidence of tort claimants' exposures to the products of reorganized companies.  These provisions require that a

34

Garlock trust claimant seeking Extraordinary Claim Review must identify all other asbestos-related claims that the claimant has asserted, and provide copies of any documents submitted to or served upon any entity containing information regarding the claimant's contact with or exposure to asbestos or asbestos-containing products, including claims forms submitted to other trusts, ballots submitted in any bankruptcy case and discovery responses served in tort litigation.[89]

52.    The claimant must also certify that, to the best of his knowledge at that time, with the exception of the other claims that been expressly disclosed and identified by the claimant, no other entity is known to the claimant to be potentially responsible for the alleged injuries that are the basis for the claims.[90]  In addition, claimants seeking Extraordinary Claim Review are required to identify a complete set of information about all other claims made by the claimant that "relate in any way to the alleged injuries for which the Claimant seeks compensation" including lawsuits and other trust claims.[91]  The Garlock trust claimant must also provide copies of all documents that were submitted to trusts or used in litigation in support of such claims.[92]

53.    Additionally, and critically, the Garlock trust claimant seeking Extraordinary Claim Review must also execute a release of information in favor of the Garlock Settlement Facility authorizing all asbestos bankruptcy trusts against which the claimant has also filed a claim to release all information submitted to that trust and the status of any such claim and the amount and date of any payment.[93]  This requirement ensures that the trust can receive

---

[89] *See* Settlement Facility Claims Resolution Procedures, *Garlock*, No. 3:17-cv-000275, Dkt. No. 13-1, at Ex. B. p.27 (W.D.N.C.) (TRUCK0001135, at -0001305).

[90] *Id* at 28.

[91] *Id.* at 27.

[92] *Id.* at 28.

[93] *Id.*

JA04256

information on all other trust filings, regardless of when made and regardless of whether the claimant himself makes a full disclosure.

54.    Finally, the CRPs provides that trustees "shall develop methods for auditing the claims process" in consultation with plaintiffs' counsel on the CAC (formerly the ACC) and the FCR.[94]  This audit right allows the trust to review the accuracy of the disclosures even after payment has been made and makes it possible to take appropriate steps if it is subsequently determined that full and accurate information was not provided.

**K.    In *Maremont,* the Delaware Bankruptcy Court Insists Upon Fraud Prevention Measures**

55.    In *In re Maremont Corporation*,[95] Judge Kevin Carey of the United States Bankruptcy Court for the District of Delaware was presented with a plan of reorganization fully consented to by all parties in interest.  The only objection to the plan was filed by the United States Trustee, who, citing my scholarship regarding fraud and abuse in mesothelioma litigation, raised concerns in light of the *Garlock* findings of exposure evidence suppression that the plan lacked adequate fraud prevention measures.[96]  Judge Carey remarked, "I don't know any reason why, under the circumstances, if, in fact, it's happened in some cases, looks to me from the Garlock opinion, that we shouldn't try to guard against it here."[97]  Judge Carey specifically asked why the bankruptcy claimants, as a condition of bringing a claim, should not be required to (1) disclose what other claims they have made against other trusts and (2) offer a release in favor

---

[94]    *See id.* at 39.

[95]    Case No. 19-10118-KJC (Bankr. D. Del.).

[96]    *See* Objection of the Acting United States Trustee to the Disclosure Statement and Joint Prepackaged Plan of Reorganization of Maremont Corp., *Maremont*, No. 19-10118-KJC, Dkt. No. 112 at 1 (Bankr. D. Del.) (citing Lester Brickman, *Fraud and Abuse in Mesothelioma Litigation*, 88 Tul. L. Rev. 1071, 1104 (2014)).

[97]    March 18, 2019 Tr. at 7, *Maremont*, No. 19-10118-KJC, Dkt. No. 166 (Bankr. D. Del.).

JA04257

of the trust to share their information with other trusts.[98]  Tellingly, the lawyer for the ACC

acknowledged the validity of Judge Carey's concern:

> For the record, I think the court is in line with the committee in terms of the <u>Garlock</u>
> decision.  I think that our position is that it illustrates the possibility that there could
> be claims paid that should not be paid.  And we acknowledge that that is a
> potential.[99]

However, the ACC argued that the provisions of the plan authorizing the trust to require

additional information when it deems necessary were sufficient, and expressed the concerns that

if the trust actually obtained full disclosure information, the trustees could be second guessed as

to why they paid the claims and the trust would have to bear the cost of responding to discovery

requests from defendants in the tort system for the exposure information.[100]  Judge Carey was

unmoved and reiterated that he would not confirm the plan unless his concerns were

addressed.[101]  Two months later, in May 2019, the parties filed an amended TDP that included

fraud prevention measures substantially the same as those found in the *Garlock* CRP.[102]

### L.   The Kaiser Trust Includes Fraud Prevention Measures But Only for Uninsured Claims

56.    At the September 4, 2019 hearing where the Court ruled on the disclosure

statement motions, the Court questioned whether a "federal court should approve a mechanism

and a process that could lead to fraud" and whether the Joint Plan "could be confirmed without

something more like what <u>Garlock</u> and <u>Maremont</u> implemented," but said that it would hold that

---

[98]   *Id.* at 18.

[99]   *Id.* at 45.

[100]   *Id.* at 45, 47–48.

[101]   *Id.* at 55.

[102]   Maremont Asbestos Personal Injury Trust Distribution Procedures, *Maremont*, No. 19-10118-KJC, Dkt. No. 222-2 (Bankr. D. Del.).

JA04258

issue until confirmation.[103]  In apparent response to that concern, the Debtors, the ACC and the

FCR did in fact amend the Kaiser TDP to include the types of fraud prevention measures adopted

in *Garlock* and *Maremont*, but **excluded** Truck and the other insurers from that protection by

limiting the amendment to extraordinary *uninsured* claims.  Thus, no fraud prevention measures

apply to the insured claims to be resolved under the Joint Plan in the tort system.  Indeed, this not

only exposes Truck and other insurers to continued fraud, but also leaves the Trust exposed to

fraud with respect to its obligation to pay up to $5,000 in deductibles on every insured claim.

### M.   The Asbestos Evidence Fraud Cannot Be Fully Combatted in the Tort System

57.     The proponents of the Joint Plan will undoubtedly argue that any concerns Truck

may have with respect to fraud in the tort system can be addressed in the tort system, and that

since the insured claims are to be resolved in the tort system, there is no need for the bankruptcy

court to address fraud prevention as to such claims.  Indeed certain courts, over the strenuous

opposition of plaintiffs' lawyers, have held that claim forms submitted to asbestos bankruptcy

trusts and factual information such as medical records submitted in support of trust claims are

not confidential records and are discoverable in civil litigation.[104]  In addition, several courts

have promulgated standing case management orders ("CMOs") requiring asbestos plaintiffs to

disclose information about trust claims filed or intended to be filed by the plaintiff.[105]  And as

discussed further below, a number of states, in the wake of the *Garlock* findings, have enacted

---

[103]   Sept. 4, 2019 Tr. (Dkt. No. 1785) at 65–66.

[104]   For a listing of decisions and orders requiring tort plaintiffs and/or trusts to produce documentation relating to trust claims filed by plaintiffs, see Victor E. Schwartz, *A Letter to the Nations Trial Judges: Asbestos Litigation, Major Progress Made over the Past Decade and Hurdles You Can Vault in the Next*, 36 Am. J. Trial Advoc. 1, 18 n.86 (2012).

[105]   *Id.* at 18–19 n.87.

JA04259

"trust transparency" statutes designed to mandate full disclosure by tort system asbestos claimants of all claims they have filed with trusts or may file in the future.

58.     Whatever surface appeal this argument might have is belied by practical realities. To begin with, and as I detailed in Section F of this report, the TDPs of most if not all of the asbestos trusts other than Garlock and Maremont are specifically designed to facilitate fraud by preventing tort system defendants from gaining access to trust filing information.  In the absence of a transparency statute, a CMO or other standing order mandating disclosures, a tort system defendant seeking to learn whether the plaintiff had filed claims with any of the 60+ asbestos trusts would need to go to each of the bankruptcy courts from which those trusts were created, or courts in Delaware, and convince those courts, over the objections of the trusts and the plaintiff, that the trust secrecy provisions previously authorized by those same courts should not be applied to deny the plaintiff access to information the trust may have with respect to that plaintiff.  Furthermore, there is evidence that plaintiffs and their counsel, in some cases, simply ignore the requirement in CMOs and standing orders of courts that plaintiffs provide defendants with a statement of any and all claims that may exist against asbestos trusts.[106]

59.     Moreover, even assuming Truck took on the cost and time burden required to seek this information in each case from each trust, and even if Truck was successful in obtaining the information sought in each and every case from each and every trust, it would still be exposed to fraud.  As detailed in Judge Hodges's *Garlock* ruling, a key component of the fraudulent scheme has been delaying the filing of trust claims until *after* the tort system claims are resolved.  Thus,

---

[106]  *See* Mark Davidson *et al.*, *Asbestos Bankruptcy Trusts and Their Impact on the Tort System,* 7 J.L. Econ. & Pol'y 281, 297–98 (2010) (remarks by Judge Mark Davidson); *see also* Mary M. Gay and Sarah Beth Jones, *A Matter of Trust? How Access to Asbestos Trust Claims Information Affects Cases in New York Courts,* www.NYCJL.org (Oct. 2019) (stating that information included with trust claims sought by asbestos defendants in New York "remains difficult to obtain and is often times intentionally withheld").

in any given lawsuit, even successful efforts to subpoena trust records will, of course, not reveal

any trust claims that have not yet been filed. A plaintiff and his lawyer, during the duration of

trials in the tort system, can rest assured that evidence contradicting the denials will be far

beyond the reach of defendants. Once the tort claims have concluded, however, counsel can file

multiple trust claims for a plaintiff, claiming "under penalty of perjury" a "meaningful and

credible exposure" to the products of the very trusts to which the plaintiff had denied exposure.

Thus, there is no effective way in the tort system for a defendant in a given lawsuit to confront

this aspect of the fraudulent scheme.

60.     As noted above, 17 states have enacted trust transparency statutes.[107]  Although

the statutes vary somewhat from state to state, they all mandate that asbestos plaintiffs must

disclose all filed and potential asbestos trust claims. The very fact that these statutes have been

enacted is a recognition that the tort system cannot address the problem of withheld exposure

evidence. Indeed, as observed by Mark Behrens in his 2018 *Fordham Law Review* article

"Asbestos Trust Transparency,"[108] an "argument frequently heard in debates about trust

transparency is that reform is unnecessary because information about a plaintiff's exposures

should be available through ordinary discovery."[109]  But as Mr. Behrens observes, while this

should theoretically be true, plaintiffs who are asked about exposures that occurred many

decades prior do not recall the names of those products they came in contact with which

contained the more highly toxic forms of asbestos.[110]  Judge Hodges in *Garlock* explained this

---

[107]  The 17 states include Alabama, Arizona, Georgia, Iowa, Kansas, Michigan, Mississippi, North Carolina, North Dakota, Ohio, Oklahoma, South Dakota, Tennessee, Texas, Utah, West Virginia and Wisconsin. All but three of these statutes were enacted post-*Garlock*.

[108]  87 Fordham L. Rev. 107 (2018).

[109]  *Id.* at 120.

[110]  *Id.*

40

loss of memory, noting that "[t]he 30 to 40 year latency period between exposure and onset of disease means that a plaintiff may have had many exposures over a long period of time, many of which were in the distant past," and thus "the plaintiff may not be able to specifically identify the responsible tortfeasors."[111]  "Consequently, in many instances, the exposure evidence is under the control of the plaintiffs' lawyer rather than the plaintiff."[112]  Judge Hodges further noted that the "disappearance" in the tort system of evidence of exposure to insulation products is abetted by the practices I have described in ¶ 14 which I referred to as the Baron & Budd Script Memo detailing how the firm's paralegals would instruct the firm's clients how to testify with regard to their exposures and, where necessary, would "implant false memories" so they would have for each client a product "ID for every manufacturer that we needed to get ID for."[113]  Coupled with that is the control that plaintiffs' counsel have exercised over the content of the TDPs, discussed in ¶¶ 20–30, designed to suppress defendants' ability to obtain exposure evidence from the trusts to which plaintiffs have submitted claims.  And finally, as Judge Hodges noted, it is "a regular practice by many plaintiffs' firms to delay filing Trust claims for their clients so that remaining tort system defendants would not have that information."[114]  Mr. Behrens adds:

> A separate 2015 report revealed additional instances of "inconsistent claiming behavior and allegations between the tort and trust systems" by plaintiffs.  For example, a West Virginia plaintiff recalled the products of more than a dozen noninsulation defendants but could not remember the asbestos-containing thermal insulation products to which he alleged exposure.  Plaintiffs' counsel eventually "filed claims against 20 trusts, a majority of which represent predecessor companies

---

[111]  *Garlock*, 504 B.R. at 82.

[112]  *Id.*

[113]  *Id.* at 84.

[114]  *Id.*

JA04262

that once engaged in the manufacturing, distribution or installation of asbestos-containing thermal insulation products."[115]

Mr. Behrens then cites 2016 and 2017 studies revealing further instances of plaintiffs being unable to recall exposures when questioned in tort cases, only to later file trust claims against entities not identified during the tort system litigation.[116]  The evidence is compelling that asbestos defendants' attempts to conduct discovery of plaintiffs' asbestos exposures are simply being overwhelmed by plaintiff counsel's scheme to suppress that exposure evidence.  It is therefore not surprising that state legislatures have not been persuaded by the argument that the exposure histories are available through discovery in the tort system.

61.     Of course, the fact that only slightly more than one-third of the states have enacted trust transparency statutes, plus the fact that some of those statutes only apply to claims brought after the statute was enacted, means that these statutes are insufficient to ensure that most of the alleged 14,000 pending Kaiser asbestos claims will not be fraudulently inflated in the tort system.  Indeed, according to Truck data, only approximately 300 pending lawsuits of the many thousands were filed in states that have enacted transparency statutes.  Moreover, of the 890 cases that have reactivated since the automatic stay was lifted, only five are in states with transparency statutes, which suggests that plaintiffs' lawyers have less interest in litigating the cases in states where full disclosures are mandated.

62.     The structure of the Joint Plan, which mandates that all insured claims be resolved in the tort system, as opposed to through a funded trust that could include fraud prevention measures as in *Garlock* and *Maremont* and in the proposed Joint Plan but only applicable to

---

[115]   Behrens*, Asbestos Trust Transparency*, 87 Fordham L. Rev. at 115–16 (quoting Peter Kelso & Marc Scarella, *The Waiting Game: Delay and Non-Disclosure of Asbestos Trust Claims*, U.S. Chamber Inst. For Legal Reform, 8–9 (2015)).

[116]   *Id.* at 116.

JA04263

uninsured claims, seems specifically designed to pave the way for the preservation of the scheme

to withhold exposure evidence and to visit fraud upon the insurers.  I concur with this Court that

"a federal court doesn't normally want to put its stamp of approval on any course that would

naturally lead to sharp practices or fraud."[117]  There is, however, a way to address the Court's

expressed concern that any plan it approves should minimize the possibility that the debtors'

asbestos claims will be resolved in the tort system at fraudulent levels.  I understand Truck has

proposed that all claimants who want to resolve their asbestos claims in the tort system be

required, prior to proceeding with their litigation, to provide Truck with the types of disclosures

and authorizations required of trust claimants in *Garlock* and *Maremont*, and that are proposed to

be required from uninsured Kaiser claimants.  In addition, Truck has also proposed that it be

provided with the right to periodically audit the disclosures to be sure that claims are not later

filed with trusts which are not identified by the claimants.  Adoption of these proposed

requirements will help prevent claimants from receiving fraudulently elevated payments,

whether from the insurers or from the Kaiser Trust with respect to the deductibles.  Conversely,

the failure to impose these types of requirements on claimants is almost certain to facilitate the

payment of fraudulent claims.  Indeed, the fact that 99.5 percent of the cases that have

reactivated since the lifting of the stay are in the jurisdictions that lack transparency statutes is

compelling evidence of the need to ensure that Kaiser's asbestos claimants are required to fully

disclose their exposures.

---

[117]  Sept. 4, 2019 Tr. at 51.

JA04264

Dated: February _20_, 2020

Respectfully submitted,

Lester Brickman
Emeritus Professor of Law

JA04265

# EXHIBIT A

JA04266

## Brickman Exhibit A — Materials Relied Upon

Below is a list of materials I relied upon in reaching my opinions.  Should I identify any

additional materials that were omitted from this list, I will supplement accordingly.

- Lloyd Dixon *et al.*, *Asbestos Bankruptcy Trusts: An Overview of Trust Structure and Activity with Detailed Reports on the Largest Trusts*, RAND Inst. for Civil Justice (2010)

- Peter Kelso, "*The State of the Bankruptcy Trusts*," Nat'l Asbestos Litigation Conference (Oct. 1-3, 2018)

- Mary M. Gay and Sarah Beth Jones, *A Matter of Trust? How Access to Asbestos Trust Claims Information Affects Cases in New York Courts*, www.NYCJL.org (Oct. 2019)

- Andrew T. Berry, *Asbestos Personal Injury Compensation and the Tort System: Beyond "Fix It 'Cause It's Broke*," 13 Cardozo L. Rev. 1949 (1992)

- Lester Brickman, *On the Theory Class's Theories of Asbestos Litigation: The Disconnect Between Scholarship and Reality*, 31 Pepp. L. Rev. 33 (2003)

- Mark Davidson *et al.*, *Asbestos Bankruptcy Trusts and Their Impact on the Tort System,* 7 J.L. Econ. & Pol'y 281 (2010)

- Victor E. Schwartz, *A Letter to the Nations Trial Judges: Asbestos Litigation, Major Progress Made over the Past Decade and Hurdles You Can Vault in the Next*, 36 Am. J. Trial Advoc. 1 (2012)

- Lester Brickman, *Fraud and Abuse in Mesothelioma Litigation*, 88 Tul. L. Rev. 1106 (2014)

- Mark Behrens, *Asbestos Trust Transparency*, 87 Fordham L. Rev. 107 (2018)

- Lester Brickman, *Civil RICO: An Effective Deterrent to Fraudulent Asbestos Litigation?*, 40 Cardozo L. Rev. 2301 (2019)

- U.S. Gov't Accountability Office, Report to the Chairman, H. Comm. on the Judiciary, *Asbestos Injury Compensation:  The Role and Administration of Asbestos Trusts*, GAO-11-819 (Sept. 2011)

- Senate Rep. No. 108-118 (2003)

- *How Fraud and Abuse in the Asbestos Compensation System Affect Victims, Jobs, the Economy, and the Legal System: Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 112th Cong. (2011) (statement of James L. Stengel, Orrick, Herrington & Sutcliffe LLP)

JA04267

- *How Fraud and Abuse in the Asbestos Compensation System Affect Victims, Jobs, the Economy, and the Legal System: Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 112th Cong. (2011) (statement of Lester Brickman, Benjamin N. Cardozo School of Law)

- *Furthering Asbestos Claim Transparency (FACT) Act of 2012: Hearing on H.R. 4369 Before the Subcomm. on Courts, Commercial & Admin. Law of the H. Comm. on the Judiciary*, 112th Cong. (2012) (statement of Marc Scarcella)

- *Furthering Asbestos Claims Transparency (FACT) Act of 2012: Hearing on RR. 4369 Before the Subcomm. on Courts, Commercial & Admin. Law of the H. Comm. on the Judiciary*, 112th Cong. (2012) (testimony of Leigh Ann Schell)

- *Furthering Asbestos Claims Transparency (FACT) Act of 2012: Hearing on RR. 4369 Before the Subcomm. on Courts, Commercial & Admin. Law of the H. Comm. on the Judiciary*, 112th Cong. (2012) (Pretrial Hearing Transcript, *In re Asbestos Litig. Ltd. to Montgomery*, No. 09C-11-217 ASB (Del. Super. Ct. Nov. 7, 2011))

- *Furthering Asbestos Claim Transparency (FACT) Act of 2013: Hearing on H.R. 982 Before the Subcomm. on Regulatory Reform, Commercial & Antitrust Law of the H. Comm. on the Judiciary,* 113th Cong. (2013) (prepared statement of Elihu Inselbuch, Member, Caplin & Drysdale)

- *Furthering Asbestos Claim Transparency (FACT)Act of 2013: Hearing on H.R. 982 Before the Subcomm. on Regulatory Reform, Commercial & Antitrust Law of the H. Comm. on the Judiciary,* 113th Cong. (2013) (statement of Judge Peggy L. Ableman (retired), Del. Super. Ct.)

- *Silicosis Ruling Could Revamp Legal Landscape*, NPR.org (Mar. 6, 2006), https://www.npr.org/templates/story/story.php?storyId=5244935

- Order No. 29: Addressing Subject-Matter Jurisdiction, Expert Testimony, and Sanctions, *In re Silica Prods. Liab. Litig.*, 2:03-md-01553, Dkt. No. 1902 (S.D. Tex. June 30, 2005)

- *In re Garlock Sealing Techs., LLC*, 504 B.R. 71 (Bankr. W.D.N.C. 2014)

- *Garlock Sealing Techs., LLC v Shein*, No. 3:14-cv-137, 2015 WL 5155362 (W.D.N.C. Sept. 2, 2015)

- Expert Report of Lester Brickman, Esq. in *In re Garlock Sealing Technologies LLC. Et al.*, Case No. 10-BK-31607 (Apr. 23, 2013)

- *In re E. & S. Districts Asbestos Litig.*, 772 F. Supp. 1380, 1398 (E.D.N.Y. 1991), *aff'd in part, rev'd in part sub nom. In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831 (2d Cir. 1992)

- Standing Order No. 1 ¶ 7(k), *In re Asbestos Litig.*, No. 77C-ASB-2 (Del. Super. Ct. Oct. 10, 2013)

JA04268

- Order & Opinion, *Kananian¸* No. CV 442750 (Ct. Comm. PI. Cuyahoga Cty., Ohio, Jan. 18, 2007)

- June 13, 2019 Tr. (Dkt. No. 1742)

- Sept. 4, 2019 Tr. (Dkt. No. 1785)

- Sept. 26, 2019 Tr. (Dkt. No. 1826)

- Third Amended Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc. (Dkt. No. 1868)

- Fifth Amended Chapter 11 Plan of Reorganization for Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc., Proposed by Truck Insurance Exchange (Dkt. No. 1665) and Disclosure Statement (Dkt. No. 1666)

- Kaiser/HPCI Settlement Facility Claims Resolution Procedures (Dkt. No. 1272-2)

- Notice of Filing of (A) Amended Asbestos Personal Injury Trust Distribution Procedures and (B) Redline of Asbestos Personal Injury Trust Distribution Procedures (Dkt. No. 1818)

- Statement of Interest on Behalf of the United States of America Regarding Plans of Reorganization for Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc. (Dkt. No. 1150)

- United States' Objection to Debtors' Motion for an Order (I) Approving Their Disclosure Statement, (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Proposed Joint Plan of reorganization and (III) Scheduling a Hearing on Confirmation of Proposed Joint Plan of Reorganization and Approving Related Notice Procedures (Dkt. No. 1299)

- United States' Supplemental Objection to Debtors' Motion for an Order (I) Approving Their Disclosure Statement, (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Proposed Joint Plan of reorganization and (III) Scheduling a Hearing on Confirmation of Proposed Joint Plan of Reorganization and Approving Related Notice Procedures (Dkt. No. 1364)

- Truck Insurance Exchange's Complaint for Declaratory Relief, *Truck Insurance Exchange v. Kaiser Gypsum Company, Inc., et al.*, Adversary Proceeding No. 19-03052, Dkt. No. 1 (Bankr. W.D.N.C. Aug. 28, 2019)

- Second Amended and Restated Armstrong World Industries Inc. Asbestos Personal Injury Settlement Trust Distribution Procedures (July 31, 2015),

JA04269

http://www.armstrongworldasbestostrust.com/wp-content/uploads/2015/11/AWI-Second-Amended-and-Restated-Trust-Distribution-Procedures-TDP-as-of-July-31-2015.pdf

- Objection of the Acting United States Trustee to the Disclosure Statement and Joint Prepackaged Plan of Reorganization of Maremont Corp., *Maremont*, No. 19-10118-KJC, Dkt. No. 112, (Bankr. D. Del.)

- March 18, 2019 Tr., *Maremont*, No. 19-10118-KJC, Dkt. No. 166 (Bankr. D. Del.)

- Maremont Asbestos Personal Injury Trust Distribution Procedures, *Maremont*, No. 19-10118-KJC, Dkt. No. 222-2 (Bankr. D. Del.).

- Settlement Facility Claims Resolution Procedures, *Garlock*, No. 3:17-cv-000275, Dkt. No. 13-1, at Ex. B. (W.D.N.C.)

- Settlement Facility Amended And Restated Claims Resolution Procedures (Amended and Restated as of June 19, 2018) (adopted as part of the Modified Joint Plan of Reorganization of Garlock Sealing Technologies LLC, et al. and OldCo, LLC, Successor by Merger to Coltec Industries Inc.)

- *Toxic Justice*, Dallas Observer (Aug. 23, 1998), https://www.dallasobserver.com/news/toxic-justice-6406744

- Daniel Fisher, *Double-Dippers*, Forbes (Aug. 19, 2006), https://www.forbes.com/free_forbes/2006/0904/136.html

- Kimberly A. Strassel, Op-Ed., *Trusts Busted*, Wall St. J. (Dec. 5, 2006), https://www.wsj.com/articles/SB116527814374340591

- Editorial, *Cuyahoga Comeuppance*, Wall St. J. (Jan 22, 2007), https://www.wsj.com/articles/SB116942159908683141

- James F. McCarty, *Judge Becomes National Legal Star, Bars Firm from Court Over Deceit*, Cleveland Plain Dealer, at B1 (Jan. 25, 2007)

JA04270

# EXHIBIT B

JA04271

### Brickman Exhibit B — Statement of Qualifications of Lester Brickman

Below I provide a statement of my qualifications to submit an expert report in connection with ongoing asbestos personal injury litigation between Truck Insurance Exchange and Truck's insureds, Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc. as well as related bankruptcy proceedings filed by the insureds.

1.      I began my research on asbestos litigation in 1990. On the basis of my expertise in the areas of attorney ethics and lawyers' fees, I was hired by the Keene Corporation, an asbestos defendant, to help devise a system to reduce defense costs by creating a software package to standardize billing by defense counsel. This package was designed to enable Keene to compare the relevant time units devoted by different firms to such tasks as legal research and attending depositions and to make other relevant comparisons in order to manage its defense costs in a meaningful way.[1]  I was also asked to offer informal observations and analyses of ethical and legal issues raised by asbestos litigation.

2.      As part of my consultancy with Keene, I was provided with access to all corporate files, case files, and data about asbestos claiming that Keene had compiled and was able to attend meetings with Keene's attorneys including quarterly meetings with the dozen or more outside counsel that represented Keene in asbestos litigations around the country.  Because Keene was a member of the Center for Claims Resolution, I also had access to information regarding other leading asbestos defendants.

3.      Based on the knowledge and expertise I acquired, in 1991, I was requested by the Administrative Conference of the United States, an agency in the executive branch of the federal government, to draft a proposed administrative alternative to asbestos litigation and to organize a

---

[1] *See* 13 Cardozo L. Rev. 1819, at n.72.

JA04272

colloquy to consider and debate that proposal. As stated by the Chairman of the Administrative

Conference:

> [W]e asked Professor Lester Brickman to prepare a paper proposing an administrative claims solution for comment and criticism by the panel, and we look forward to comments by the audience. Let me introduce Professor Brickman, who teaches law at Cardozo Law School, Yeshiva University. He is a leading authority in the area of attorney's fees and has written numerous articles on the subject. Professor Brickman became interested in the subject of asbestos litigation some years ago when he was hired as a consultant by one of the defendants in the asbestos litigation to review contingent fee issues. He has since had the opportunity to extensively review empirical data, case files, and other materials on the subject. Because of his work in this area, we asked Professor Brickman to draft a proposed administrative solution which our panelists have been invited to criticize.

Administrative Conference of the United States, Colloquy: *An Administrative Alternative To Tort*

*Litigation To Resolve Asbestos Claims,* October 31, 1991, Transcript at 4.

To participate in the colloquy, I invited: U.S. District Court Judge Jack Weinstein;

Deborah Hensler, a senior social scientist at the Rand Institute for Civil Justice; Ronald Motley,

a leading plaintiffs' attorney; Andrew Berry, a leading defendants' attorney; Howard D. Samuel,

President, Industrial Union Department of the AFL-CIO; and Judge G. Mervin Bober, Associate

Chief Administrative Law Judge, U.S. Department of Labor.

4.      On the basis of the expertise I had developed and the work I did for the

Administrative Conference, as well as additional research I undertook which included accessing

then unpublished data compiled by the Manville Trust and the RAND Foundation, I published

two law review articles in 1992, which are listed below. The first one listed is an analysis of

asbestos litigation and has been cited by the U.S. Supreme Court, federal courts of appeals, state

courts, casebooks and scores of scholarly articles as indicated in my Curriculum Vitae ("CV")

which is also appended as an Exhibit.

2

5.      In the other article I generated for the colloquy, I set forth the proposed legislation which I drafted. Under that proposal, all claims of injury due to exposure to asbestos-containing products would be removed from the tort system and channeled to an industry-financed trust fund to pay claims to those injured and impaired by exposure to such products. The proposal included the establishment of an Asbestos Claims Management Board within the Office of Workers Compensation of the U.S. Department of Labor to promulgate medical criteria for eligibility and to create and administer a claims procedure in accordance with the provisions of the proposed act. In preparing the proposal, I consulted other proposals for setting up an administrative process as an alternative to the tort system. In addition, in the article, I analyzed constitutional and policy questions raised by interposing an administrative agency for payment of claims in place of the tort system.

6.      Including the two articles described above, I have published eleven articles on asbestos litigation:  *The Asbestos Litigation Crisis*:  *Is There A Need For An Administrative Alternative?,* 13 CARDOZO L. REV. 1819 (1992); *The Asbestos Claims Management Act of 1991*: *A Proposal To The United States Congress,* 13 CARDOZO L. REV. 1819 (1992); *Lawyers' Ethics And Fiduciary Obligation In The Brave New World Of Aggregative Litigation,* 26 WM. & MARY ENVTL. L. & POL'Y REV. 243, 272-98 (2001); *On The Theory Class's Theories of Asbestos Litigation: The Disconnect Between Scholarship and Reality,* 31 PEPP. L. REV. 33 (2004); *Ethical Issues In Asbestos Litigation,* 33 HOFSTRA L. REV. 31 (2005); *An Analysis of the Financial Impact of* S. 852: *The Fairness In Asbestos Injury Resolution Act of 2005,* 27 CARDOZO L. REV. 991 (2005); *On The Applicability of The Silica MDL Proceeding To Asbestos Litigation*, 12 CONN. INS. L.J. 35 (2006); *Disparities Between Asbestosis and Silicosis Claims Generated by Litigation Screenings and Clinical Studies*, 29 CARDOZO L. REV. 513 (2007), *The*

JA04274

*Use of Litigation Screenings in Mass Torts:  A Formula For Fraud?,* 61 SMU L. REV. 1221

(2008); *Fraud and Abuse in Mesthelioma Litigation*, 88 TULANE L. REV. 1071 (2014); and *Civil

RICO: An Effective Deterrent to Fraudulent Asbestos Litigation?*, 40 CARDOZO L. REV. 2301

(2019).  In the first seven of these articles, I discuss:  the nature of asbestos-related disease; the

history of asbestos litigation, including the rise of an entrepreneurial model and screening

enterprises; the use of mass screenings to generate mass filings of unimpaired claims;

"diagnoses" of asbestosis by a comparative handful of B Readers and other doctors who were

responding to substantial financial incentives rather than engaged in good faith medical practice;

the use of witness preparation techniques with regard to product identification as a means of

constantly renewing the supply of solvent defendants to replace and supplement those that have

declared bankruptcy; the effects of forum selection on claim values; the impact of judicial

responses to mass filings including mass consolidations and joinders on asbestos litigation; the

resort to "inventory" and other settlement strategies in response to these aggregations; the role of

contingency fees in the claiming process; ethical issues in asbestos litigation with a specific

focus on asbestos bankruptcy proceedings; an analysis of the costs that would be incurred for

resolution of personal injury asbestos claims as a result of enactment of S.852 (the "FAIR" Act);

and the applicability of U.S. District Court Judge Janis Jack's report in the silica MDL to

asbestos litigation and how that validates the entrepreneurial model that I have described.

7.    My eighth article was published in December 2007, and is titled:  *Disparities

Between Asbestosis and Silicosis Claims Generated by Litigation Screenings and Clinical

Studies*, 29 Cardozo L. Rev. 513 (2007).  In that article, I review data generated in the course of

both the MDL 1553 (silica) and MDL 875 (asbestos) litigations as well as from other sources.  I

conclude on the basis of this data that a few handfuls of doctors regularly selected by plaintiffs'

JA04275

lawyers in asbestos litigation read 50%-90% of the X-rays generated by litigation screenings as

positive for pulmonary fibrosis and provide findings that these readings are "consistent with

asbestosis."  In addition, I provide the data which supports my estimate that these same doctors,

as well as a small number of others, diagnose at least 80% of those with positive X-rays as

having asbestosis within a degree of medical certainty.  Among these litigation doctors, Dr. Ray

Harron (deceased) stands out as having, by far, the highest number of medical reports (over

100,000) filed in support of asbestos claims and the highest percentages of positive X-ray

readings and diagnoses of asbestosis.

a)    To properly understand the significance of this data, I present the results

of a review of over 60 clinical studies of the prevalence of fibrosis among workers

occupationally exposed to asbestos that show that the litigation doctors' x-ray reads and

diagnoses were unrealizable if not fraudulent.

b)    I also summarize the results of six clinical studies and equivalents in

which X-rays generated by litigation screenings and read as positive for fibrosis were re-

read by independent medical experts. This comparison indicates that the litigation

doctors' error rates range from 62% to 97.5%.  Dr. Harron's error rate was in the 80-90%

range.

c)    Another facet of litigation screenings that I examine in the article is the

administration of pulmonary function tests to determine the degree of lung impairment

and qualify the litigant for increased compensation.  I summarize the findings in medical

literature and compare that to the outcomes of the pulmonary function tests administered

in litigation screenings.  Based upon the data presented, I conclude that the substantial

majority of lung function tests performed by litigation screening companies are

5

JA04276

maladministered in order to generate false findings of lung impairment.

d)     I also compare the pandemic of nonmalignant asbestos-related disease
claims which were filed in the 1990-2004 period in the tort system and asbestos
bankruptcy trusts with the number of hospitalizations primarily for asbestosis in that
period.  The data on hospitalizations is compelling.  In the 15 year period, 1990-2004,
during which about 475,000 new claimants each filed claims against 25-75 defendants
and asbestos bankruptcy trusts alleging asbestosis or other nonmalignant condition
caused by asbestos exposure, a study of approximately 4,500,000 randomly selected
medical records of persons discharged from hospitals indicated that a total of 57
hospitalizations were primarily due to asbestosis.

8.     My ninth article was published in December 2008 and is titled *The Use of
Litigation Screenings in Mass Torts:  A Formula For Fraud?*  In this article, I discuss how mass
numbers of claims have been generated in five mass torts: asbestos, silica, silicone breast
implants, fen-phen (the diet drugs) and welding fumes.   I explain that mass claim generation is
done by "litigation screenings" undertaken to sign up potential litigants by the tens of thousands.
These "litigation screenings" have no intended medical benefit.  Screenings are mostly held in
motels, shopping center parking lots, local union offices and lawyers' offices.  There, an
occupational history is taken by persons with no medical training, a doctor may do a cursory
physical exam, and medical technicians administer tests, including X-rays, pulmonary function
tests, echocardiograms and blood tests.  The sole purpose of screenings is to generate "medical"
evidence of the existence of an injury to be attributed to exposure to or ingestion of defendants'
products.  Usually a handful of doctors ("litigation doctors" including most prominently, Dr. Ray

6

Harron) have provided the vast majority of the thousands and tens of thousands of medical reports prepared for these litigations.

a)      By my count, approximately 1,500,000 potential litigants have been screened in these five litigations.  Litigation doctors found that approximately 1,000,000 of those screened had the requisite condition that could qualify for compensation, such as asbestosis, silicosis, moderate mitral or mild aortic value regurgitation or a neurological disorder.  I further estimate that lawyers have spent at least $500 million and as much as $1 billion to conduct these litigation screenings, paying litigation doctors and screening companies well in excess of $250 million, and obtaining contingency fees well in excess of $13 billion.

b)      On the basis of the evidence I review in this article, I conclude that the vast majority of the 1,000,000 claims generated were based on "diagnoses" of the type that U.S. District Court Judge Janis Jack found, referring to the work of Dr. Harron and other litigation doctors in the silica MDL, were "manufactured for money."

c)      Despite the considerable evidence I review that most of the "medical" evidence produced by litigation screenings is at least specious, I find that there is no effective mechanism in the civil justice system for reliably detecting or deterring this claim generation process.  Indeed, I demonstrate how the civil justice system erects significant impediments to even exposing the specious claim generation methods used in litigation screenings.  I also present evidence that the criminal justice system has effectively conferred immunity on the litigation doctors and the lawyers that hire them, granting them a special dispensation to advance specious claims.  Finally, I discuss various strategies that need to be adopted to counter this assault on the integrity of the

7

civil justice system.

9.      My tenth article, *Fraud and Abuse in Mesothelioma Litigation*, was published in
May 2014 and is based, in significant part, on the research I did for my expert report and
testimony in the *Garlock* bankruptcy.[2]

      a)      Approximately sixty companies of the more than 100 that have been
bankrupted by asbestos litigation have emerged from bankruptcy, channeling their
asbestos liabilities to trusts funded with their assets and insurance coverage. After having
paid out close to $20 billion in claims, these trusts still have assets exceeding $30 billion.

      b)      Asbestos litigation today differs in two major respects from what it was in
the 1985-2003 period. First, hundreds of thousands of nonmalignant claims generated by
litigation screenings have been replaced by 2500-3000 claims of mesothelioma filed
annually and several thousand lung cancer claims that are rapidly increasing in number.
Second, there are now dual compensation tracks: suits brought mostly in state courts
alleging personal injuries and claims filed with the trusts.  This Article is about the
interplay between trust payments to asbestos claimants and suits against solvent
defendants in the tort system.

      c)      In previous publications, I have laid bare the massively fraudulent
enterprise that lawyers, litigation screening companies and doctors perpetrated in
nonmalignant asbestos litigation — findings that were largely corroborated in a report by
U.S. District Court Judge Janis Jack who found that the litigation doctors hired by
asbestos lawyers had "manufactured diagnoses for money."

      d)      In this article, I lay bare the scheme used by lawyers in "big-dollar"

---

[2]  *In re Garlock Sealing Techs., LLC*, 504 B.R. 71 (Bankr. W.D.N.C. 2014).

JA04279

mesothelioma cases to maximize tort recoveries by suppressing the fact that the plaintiffs

they represent have claimed and will claim "meaningful and credible" exposures to the

products of 20-25 reorganized companies when filing trust claims even as they deny,

"under penalty of perjury," all such exposures in the course of discovery and trial of their

tort claims. Plaintiffs' counsel are able to effectuate such a scheme because of (1) their

effective control over the production of evidence of exposure to asbestos-containing

products; and (2) their control over the creation and administration of asbestos

bankruptcy trusts and their use of that control to include provisions in the trusts'

Distribution Procedures designed to limit, if not preclude, defendants' ability to use

discovery to access evidence that tort plaintiffs have filed multiple trust claims

contradicting their sworn discovery responses and trial testimony.

     e)     U.S. Bankruptcy Judge George R. Hodges substantially relied on my

expert report and exhibits thereto as well as my testimony in his estimation order of

January 10, 2014 in the Garlock bankruptcy.  For example, Judge Hodges fully

subscribed to my testimony that the settlements that Garlock had entered into in 2005-

2010, just prior to its bankruptcy, could not be relied in as did plaintiffs' counsel's

leading expert, for projection of future claims and values because these settlements had

been *infected* by suppression of evidence of claimants' prior exposures to the products of

companies that had been bankrupted in 2000-2001.  Judge Hodges' approval of the

discovery he allowed Garlock in 15 cases has enabled us to peer behind the heretofore

impermeable asbestos curtain that has shrouded the inner workings of the highly

successful scheme to use the judicial system to defraud asbestos defendants in

mesothelioma litigation out of billions of dollars.

JA04280

10.     My eleventh article, *Civil RICO: An Effective Deterrent to Fraudulent Asbestos Litigation?*, 40 CARDOZO L. REV. 2301 (2019), is the complement to my tenth article which focused on the fraudulent scheme instituted by plaintiffs' mesothelioma counsel which was laid bare in the Garlock bankruptcy.  In this article, I closely examine five RICO actions brought by asbestos defendants against plaintiffs' counsel and medical professionals to show both the strengths and weaknesses of RICO as a deterrent to mass tort fraud.  I also point out how the civil justice system has not only failed to deter mass tort fraud but actually facilitates fraudulent testimony by doctors in such litigations and how bankruptcy courts have inadvertently facilitated fraudulent practices by plaintiffs' counsel in asbestos litigation by rulings that have effectively legitimated those practices.

11.     In addition, I present a detailed analysis of the RICO actions brought by Garlock against four of the leading law firms specializing in mesothelioma actions.  In each of those actions, Garlock alleged that the defendant firms had engaged in a deliberate and ongoing scheme to defraud Garlock by conspiring with their clients to conceal material evidence of their clients' exposure to asbestos products of the companies bankrupted in the 2000-2001 bankruptcy wave.  Judge Graham C. Mullen, presiding over the RICO actions, characterized Judge Hodges' findings as concluding that in the 15 cases, plaintiffs' counsel committed fraud.  Judge Mullen repeatedly denied defendants' motions to dismiss the RICO actions.  Ensuing discovery in these RICO actions would have constituted a clear threat to the continuation of the fraudulent scheme that pervades mesothelioma litigation.

12.     After extensive negotiations, Garlock was the beneficiary of a consensual plan of reorganization that allowed Garlock to preserve sufficient equity so it could emerge as a viable company.  As a condition of the Asbestos Claimants Committees' approval of that plan, Garlock

JA04281

had to agree to and did dismiss the RICO actions.

13.     In October 1991, I was invited to testify before a subcommittee of the Judiciary

Committee of the House of Representatives which was holding hearings on the asbestos

litigation crisis.  My prepared remarks were titled: *Effects Of Asbestos Injury Litigation On

Federal And State Courts.* I was not retained for that purpose and received no compensation for

my testimony.

14.     In a 2001 law review article on aggregative litigation, the third article listed in ¶6

of this Appendix, I devoted approximately 30 pages to a discussion of asbestos litigation. For

this article, I conducted extensive research on asbestos claiming behavior and the resulting

impact on asbestos trusts. I examined how typical "exposure only" asbestos cases are developed

and processed; the origin of the Manville Trust, the first bankruptcy trust, which was created in

the aftermath of the bankruptcy of the Johns-Manville Corporation; the trust distribution

procedures ("TDP") which it adopted and which became a model for subsequent asbestos trusts;

the Trust's later attempt to develop and apply an audit program to identify and weed out claims

which lacked minimally requisite medical documentation and which reflected extraordinarily

high incidences of misdiagnoses by a handful of B Readers; and conflicts of interest created by

plaintiff lawyers' contingency fee arrangements.

In that same article, I also examined the recent trend towards aggregating litigations,

including asbestos litigation; the enormous financial incentives unleashed by such aggregations;

and the effect of those financial incentives on litigation behavior, in particular, the coercive

effect on defendants and the perverse effects on the generation of claims because of the

incentives for lawyers to recruit new claimants to replenish their "inventories" of claims.

JA04282

15.     In 1994, I was retained by the American Tort Reform Association to file an amicus brief on its behalf in *Cimino* v. *Pittsburgh Corning,* an asbestos proceeding, which was then on appeal in the Fifth Circuit.

16.     In April, 2003, I was invited to be one of fifteen panelists to present at a symposium on *ASBESTOS LITIGATION* & *TORT LAW: TRENDS, ETHICS, AND SOLUTIONS,* at the Pepperdine Law School. Among the panelists and speakers were the Hon. Alfred Chiantelli, formerly Coordinator of Asbestos Litigation for the San Francisco Superior Court; Professor Roger Cramton of the Cornell Law School; Professor Deborah Hensler of the Stanford Law School, co-author of the RAND Corporation reports on asbestos litigation; Professor Frances McGovern of the Duke University School of Law, Professor George Priest of the Yale Law School, Victor Schwartz, of Shook, Hardy, & Bacon; the Hon. Griffin B. Bell of King & Spalding, and formerly Attorney General of the United States; Steven Kazan of Kazan, McClain, Edises, Abrams, Fernandez, Lyons & Farrise; and Alan Brayton of Brayton Purcell.

17.     In the article that I prepared for the April 2003 symposium, which was published in January 2004, I analyzed asbestos litigation including an extensive empirical description and analysis of attorney-sponsored asbestos screenings and the role that such client recruitment efforts play in the litigation. To do so, I consulted the deposition testimony of approximately forty screening company principals, their key employees and the B Readers and other doctors they retained (including Dr. Ray Harron), as well as numerous other litigation documents. I addressed, *inter alia,* the fact that attorney sponsored asbestos screenings have no medical purpose and are undertaken for the sole purpose of generating an inventory of clients for the lawyers underwriting the screening. I further addressed the financial incentives that pervade this mass recruitment process and how those incentives influence and are reflected in: (1) the actions

JA04283

of B Readers, including Dr. Ray Harron and other doctors involved in rendering diagnoses and

producing medical evidence in support of the claimants so recruited; and (2) the administration

of pulmonary function tests by the screening enterprises to generate further support for the

claims that were generated. On the basis of the documentary evidence I consulted, I was able to

reach the conclusion that asbestos screening companies routinely failed to adhere to American

Thoracic Society standards in administering pulmonary function tests; I also discussed the

consequences of their failure to do so. (I have since obtained copies of analyses by leading

medical experts of the accuracy of pulmonary function tests administered by screening

enterprises which fully corroborate the conclusions I reached).  I also considered the efforts of

the Manville Trust to amend its Trust Distribution Procedures to implement an audit procedure in

response to tens of thousands of asbestos injury claims presented with inadequate medical

documentation or with spurious documentation provided by a select few B Readers, whose

diagnoses and reports, according to most neutral medical experts and scientists, lacked

credibility.  I also considered how other asbestos trusts have been plagued with similar volumes

of abusive claims and why attempts to resolve the inadequacies of the bankruptcy trust

distribution procedures have foundered.

  18. In June 2003, I was requested by the staff of the U.S. Senate Committee on the

Judiciary to allow them to review parts of the draft article in connection with hearings that were

being planned on legislation addressing the asbestos litigation crisis.  Senator Jon Kyl of Arizona

cited the forthcoming article, with approval, in the Report of the U.S. Senate Committee on the

Judiciary on S.1125.

  19. In researching both asbestos litigation and the formation of asbestos bankruptcy

trusts, I have focused on the role of financial incentives in: generating the medical data used in

JA04284

asbestos claiming; determining the structure of the trusts; and the nature of administration of the

trusts and their TDPs.  I have been aided in this endeavor by my previous teaching and research

on the effect of financial incentives, in particular, contingency fees, on the tort system.  For most

of the 20 years prior to my retirement in 2016, I had been teaching a three-credit seminar titled:

*The Legal Ethics of Legal Fees and Its Effect On the Tort System.*  In that seminar, I directly

addressed the effect of fee structures and fee incentives on the tort system, using articles that I

had authored and co-authored and other research I had undertaken. To my knowledge, this was

the only such course offered in a law school.  In addition, I published a book expounding on the

impact of contingency fee financing of tort litigation on our civil justice system.  *See* Lester

Brickman, Lawyer Barons: What Their Contingency Fees Really Cost America

(Cambridge Univ. Press, 2011).

20.     In 2003, I was retained as a consultant by counsel for an insurance company to

prepare an expert report which was filed in the Western Asbestos Company bankruptcy.  *In re*

*Western Asbestos Co., et al., Debtors,* Bankr. N.D. Calif., No. 02-46284 (LT).  In that report, I

presented an overview of asbestos litigation, the resort to inventory settlements, an analysis of

bankruptcy trusts including extensive discussion of the Manville Trust, the lessons to be drawn

from the experiences of the Manville Trust and other asbestos bankruptcy trusts and an analysis

of the proposed plan of reorganization with a focus on the trust distribution procedures being

proposed. My qualifications as an expert on these matters were challenged by plan proponents in

the form of a *Daubert* motion. The bankruptcy court rejected the challenge.  *In re Western*

*Asbestos Co., et. al.,* Debtors, 2003 Bankr. LEXIS 1894, at *3 (Oct. 31, 2003).[3]

---

[3]  In her decision rejecting the motion, Judge Leslie Tchaikovsky stated that "I may not testify about the meaning
of any provision of the Bankruptcy Code, any other statute, or any provision in an insurance policy.
Additionally, . . .  [I] may not advise the Court about the holdings of any court decisions published or unpublished,
or the substance of legislative history." Memorandum of Decision Re Miscellaneous Pre-Confirmation Motions, *In*

JA04285

21.     In May, 2004, I testified before the Committee on Judiciary of the Ohio Senate on

Ohio H.B. 292, to reform asbestos litigation, which was subsequently enacted into law.   I was

paid a fee for studying the bill and preparing my testimony.

22.     In July 2004, I testified before the Subcommittee on Commercial And

Administrative Law of the U. S. House of Representatives Committee on the Judiciary. I focused

my remarks on the process of administering the bankruptcies of former producers and sellers of

asbestos containing products. More specifically, I provided the subcommittee with an overview

of asbestos litigation and a summary of my research findings.   In addition, I addressed the

formation and administration of asbestos bankruptcy trusts, the effect of the adoption of §524(g)

of the Bankruptcy Code on the development of plans of reorganization, the abuses prevalent in

prepackaged bankruptcies, and an analysis of conflicts of interest that had become endemic in

asbestos bankruptcy proceedings.   I received no compensation for my testimony.

23.     In past years, I had been invited to appear as a panelist or presenter at numerous

conferences and programs on asbestos litigation. I declined most of these invitations because of

my teaching schedule and other responsibilities. In 2004, I accepted two invitations.   In one, I

was a presenting panelist at the HarrisMartin "Conference on Asbestos Allocation:

Apportionment Liability In Asbestos Litigation." My topic was "Ethical Issues in Asbestos

Litigation." (The article on Ethical Issues in Asbestos Litigation that I list in ¶1 is an outgrowth

of that presentation).   I also was a presenting panelist at the Mealey's National Asbestos

Conference in September 2004, and spoke on the failure of asbestos screenings to adhere to a

---

*re Western Asbestos Co.,* et al., No. 02-46284, -85, -86 (Bankr. N.D. Calif.), October 29, 2003, at 2.  I had not
addressed any of these issues in my expert report. Specifically, I was not offered as an expert on the Bankruptcy
Code and did not seek to advise the court as to the meaning of any provision in the Bankruptcy Code. I also did not
seek to advise the court on the meaning of any insurance policies. Finally, I did not address in my expert report nor
did I seek to advise the court about case holdings or legislative history.

JA04286

medical model for screening of an exposed population.  In 2005, I was a panelist at a conference

on "Asbestos:  Anatomy of a Mass Tort," held at the University of Connecticut Law School.  My

remarks became the basis for publication of the seventh article listed in ¶6, *On The Applicability*

*of the Silica MDL Proceeding to Asbestos Litigation*, which was published in the Connecticut

Insurance Law Journal. In 2006, I was a panelist at the ALI-ABA Conference on "Asbestos

Litigation in the 21st Century" and spoke on Asbestos Screenings.  I was also a panelist at a

Mealey's Silica & Asbestos Claims Conference and spoke on "The Mass Screening of Silica &

Asbestos Claims:  The Fallout from Judge Jack's Decision."  Finally, in 2007, I was a presenter

at the Mealey's Asbestos Medicine Conference and spoke on "The Ethics of Diagnosis."

24.     In January, 2005, I was invited by the President of the United States, George W.

Bush, to join him on stage at an event in McComb County, Michigan, to explain to a "town hall"

audience the abuses that had developed in asbestos litigation. A transcript of that event is

available at www.whitehouse.gov/news/releases/2005/01/20050107-8.html#.

25.     In 2004, I was retained by counsel for a group of banks to prepare an expert report

which was filed in the Owens Corning bankruptcy.[4]  In that report, I presented an overview of

asbestos litigation, the rise of what I termed an entrepreneurial model of asbestos claiming, the

components of which include: mass screenings by enterprises hired by attorneys; the use of a

comparative handful of B Readers who consistently find very high rates of asbestosis even

though neutral medical experts find that only a very small fraction of the X-rays are consistent

with asbestosis; the routine maladministration of pulmonary function tests by screening

enterprises in order to generate false evidence of impairment; the use of witness preparation

techniques to implant false memories; mass filings of claims generated by the screenings; the

---

[4]  *In re Owens Corning et al., Debtors*, No. 003837 (Bankr. D. Del).

JA04287

judicial resort to aggregations in response to the mass filings; leading to the rational but futile

resort to "inventory" settlements of claims even though there was often no evidence of actual

illness or significant product exposure. I also questioned the accuracy of projections of future

numbers of asbestos claimants based upon historical settlement patterns and discussed recent

changes in the tort system which have resulted in dramatic decreases in the number of

nonmalignant asbestos claims.

26.     Once again, my qualifications to testify as an expert on the matters related above

were challenged by Plan Proponents in the form of a *Daubert* motion and once again, the court

rejected the challenge. *Owens Corning et al.,* v. *Credit Suisse First Boston, et al.,* Order, Jan. 10,

2005, Bankr. D. Del. No. 0400-905.

27.     I also testified in the Owens Corning proceeding before Judge John P. Fullam.

Judge Fullam's decision acknowledged a number of the issues that I raised in my expert report

and in my testimony. *Owens Corning et al.,* v. *Credit Suisse First Boston,* et al., Memorandum

And Order, at "Litigation History," March 31, 2005, Bankr D. Del. No. 04-00905.

28.     In June-July 2005, I provided an expert report and written declaration in lieu *of*

testimony in *In re J.T. Thorpe, et al., Debtors,* Bankr. Cent. Dist. Calif., No. LA-02-14216-BB.

My qualifications to testify as an expert were not challenged. In that report and testimony, I

provided an overview of asbestos litigation; the rise of the entrepreneurial model including the

use of a comparative handful of B Readers and diagnosing doctors to support meritless claims;

the substantiation *of* that analysis and conclusion offered by the silica MDL proceeding presided

over by U.S. District court Judge Janis Jack; an overview of asbestos bankruptcy trusts, their

failure to adopt trust distribution procedures that would enable the trusts to reject meritless

JA04288

claims, and the conclusions to be drawn from that experience; and an analysis of the trust

distribution procedures being proposed in the Thorpe bankruptcy.

29.     On February 2, 2005, I testified before the U.S. Senate Judiciary Committee

which was holding hearings on the Fairness in Asbestos Injury Resolution (FAIR) Act of 2005.

In my testimony, I related how some plaintiff lawyers had recycled thousands of previous claims

of asbestosis as silicosis claims even though the four doctors who testified at the hearing stated

that they had virtually never encountered someone who had both asbestosis and silicosis.  I

included exhibits with my testimony of medical reports prepared by Dr. Ray Harron to support

my conclusions.   I did not receive any compensation for my testimony.  My testimony was the

subject of an article on the front page of the Business section of in the New York Times which

appeared on the morning of the hearing.  *See* Jonathan D. Glater, *Companies get Weapon in*

*Injury Suits,* NEW YORK TIMES, February 2, 2005, at CI.  My testimony also formed the basis for

an extensive analysis of the silicosis "epidemic" which appeared in Fortune Magazine in July

2005. Roger Parloff, *Diagnosis For Dollars,* FORTUNE, June 13, 2005, at 97.  Both Mr. Parloff

and Mr. Glater observed that the real significance of the information generated through the

extensive discovery permitted by Judge Jack extended well beyond the conclusion that most of

the approximately 10,000 silicosis claims were simply unsupportable and likely fraudulent.

Rather, the significance was that it cast substantial doubt on the validity of tens of thousands of

claims of asbestosis which generated hundreds of millions of dollars in settlement payments --

claims which were recruited by the same screening enterprises and supported by medical

evidence generated by the same doctors that Judge Jack excoriated.

30.     In 2006, I provided an expert report and testimony in the Armstrong World

Industries bankruptcy proceeding**.**  My qualifications to testify as an expert on: the history of

JA04289

asbestos litigation; the development of an illegitimate entrepreneurial model for nonmalignant

asbestos claim generation including the use of litigation screenings; the improper methods of

generating medical and product exposure evidence; the effect of judicial aggregations of claims;

and the development and operation of asbestos bankruptcy trusts, were challenged in a *Daubert*

motion.  U.S. District Court Judge Eduardo C. Robreno rejected the challenge, stating:

> Dr. Brickman has been shown to be qualified as an expert in the history
> of asbestos litigation, he has been studying the subject for 15 years, he has
> published at least seven articles  on the subject and has testified three times
> before congressional committees on asbestos litigation and asbestos
> bankruptcy and has been qualified by at least two federal judges as an expert
> on the history of asbestos litigation and he has supplied a full and complete
> written expert testimony in a third asbestos bankruptcy proceeding.
> Therefore, I think that under Rule 702, he is qualified by virtue of skill,
> education, experience to aid the Court in -- in this case.

> Secondly, the opinions rendered in the report appear to be reliable.  Dr.
> Brickman relies on sources and data which are recently relied [on] by experts
> in his field and others have relied upon. . . his opinion.  So, I find his opinion
> to be reliable. . . .

> [P]lacing the issues in this case. . . in the historical context of asbestos
> litigation and claim settlement, will provide the Court with a greater
> understanding of the debtor's future liability.  A good deal of the testimony
> in this case has involved a change in the lay of the land in the last few years
> and how that will affect the debtor's future liability.  And . . I believe that the
> testimony of Professor will be helpful to the Court and . . . that his testimony
> fits well with the facts of the case. . . ."

*In The Matter of Armstrong World Industries*, Bankr., E.D. Pa., No. 00-CV-4471.  Transcript of

Hearing of May 25, 2006 (Judge Eduardo C. Robreno).

31.     In 2012, a *Daubert* challenge was raised as to my qualifications to testify about

how the practices of a law firm and a litigation doctor it hired to read over 20,000 x-rays were

consistent with the entrepreneurial model I presented and constituted a scheme to generate false

medical evidence used to defraud the CSX Railroad.  CSX Transp. v. Robert N. Pierce, Jr. et al.,

U.S.D.C., N.D. W.Va., civil action no. 5:05-cv-202.  The challenge was dismissed as moot.  *CSX Transp. v. Gilkison, et al.*, 2013 WL 85253 (N.D. W.Va., 1/7/2013).  A jury found  the law firm principals and the litigation doctor liable for violating the RICO Act by conducting or participating in the conduct of an enterprise's affairs through a pattern of racketeering activity.

32.    On September 9, 2011, I testified before the Subcommittee on the Constitution of the U.S. House of Representatives Committee on The Judiciary. The focus of my testimony was: the profitability of litigation screenings in the 1988-2000 period and its effects on claim filings in that period; (2) the disconnect between nonmalignant claim filings with asbestos bankruptcy trusts and in the tort system; and (3) the value of nonmalignant claims being filed with asbestos bankruptcy trusts and the significance of the aggregate value of those filings.

33.    In 2011, I was consulted by the U.S. Government Accountability Office which had been tasked by the Committee on the Judiciary of the U.S. House of Representatives to study asbestos bankruptcy trusts.  In its report, the GAO referred to me as one of two law professors it consulted in preparing its report "who have published and are well-known experts in the areas of asbestos litigation and bankruptcy trusts." U.S. Gov't Accountability Office, Report to the Chairman, H. Comm. on the Judiciary, *Asbestos Injury Compensation: The Role and Administration of Asbestos Trusts* at 5, GAO-11-819 (Sept. 2011).

34.    As noted, I was retained as an expert witness in the Garlock bankruptcy on behalf of the debtor.  I rendered on expert report on April 13, 2013 and testified at the Estimation trial on July 26, 2013.  As noted in my discussion of my tenth article (¶ 9), I testified in the estimation proceeding in the Garlock bankruptcy about the fraudulent scheme practiced by plaintiffs' mesothelioma counsel to have their clients provide perjurious testimony in tort litigation denying any exposure to the products of ten asbestos manufacturers that had gone bankrupt in the early

JA04291

2000s while also filing claims with the asbestos bankruptcy trusts set by in these bankruptcies,

providing "under penalty of perjury" that these claimants had had "meaningful and credible

exposure" to the products of these companies.  As I noted, U.S. Bankruptcy Counsel Judge

George Hodges substantially relied on my expert report including exhibits as well as my

testimony for his findings that in the fifteen cases that were the subject of my expert report and

testimony, there was "a startling pattern of misrepresentation."  *See* Order Estimating Aggregate

Liability., *In re* Garlock Sealing Techs., LLC, 504 B.R. 71, 86 (Bankr. W.D.N.C. 2014).  As I

also noted, U.S. District Court Judge Graham C. Mullen, presiding over four RICO cases

brought by Garlock against plaintiffs' counsel characterized Judge Hodges' findings as

concluding that plaintiffs' counsel in the fifteen cases had committed fraud.  *Garlock Sealing

Techs, LLC v. Shein*, No. 3:14-CV-137, 2015 WL 5155362 at *2.

35.     On February 4, 2015, I testified before the Subcommittee on Regulatory Reform,

Commercial and Antitrust Law of the U.S. House Judiciary Committee, on H.R. 526, the

"Furthering Asbestos Claims Transparency (FACT) Act of 2015."  In my Written Statement and

oral testimony, I laid bare the inner workings of the highly successful scheme by plaintiffs'

counsel in mesothelioma litigation to use the judicial system to defraud asbestos defendants and

their insurers out of billions of dollars by suppressing evidence of plaintiffs' exposures to the

products of companies that had filed for bankruptcy in the 2000-2001 bankruptcy wave.  Despite

mesothelioma plaintiffs testifying under oath that they never had any exposure to the products of

such reorganized companies as Owens Corning, Fiberboard, GAF, U.S. Gypsum, W.R. Grace,

Babock & Wilcox, Federal Mogul, Armstrong World Industries and others, and their counsel so

arguing to the jury, in virtually every such case, their counsel had filed previously or filed during

the trial or thereafter that their clients had "meaningful and credible exposure" to the products of

JA04292

these very same companies when filing trust claims.

36.      On December 2, 2016, I submitted a Declaration on behalf of John Crane, Inc.

which had retained me in its RICO action against a prominent mesothelioma firm.[5]  My

declaration provided a brief history of asbestos litigation and how plaintiffs' counsel had

engaged in abusive litigation behavior.

---

[5]  *John Crane Inc. v. Shein Law Center, LTD and Benjamin P. Shein*, Case No. 1:16-CV-05913, Declaration of
Lester Brickman (U.S.D.C., N.D. Ill. Dec. 2, 2016).

JA04293

# EXHIBIT C

JA04294

BRICKMAN EXHIBIT C — CURRICULUM VITAE OF LESTER BRICKMAN

## LESTER BRICKMAN

## CONTACT INFO

Cardozo Law School
55 Fifth Avenue
New York, N.Y. 10003

Telephone: (212) 790-0327
Fax:        (212) 790-0205
E-Mail:      brickman@yu.edu
Web Page: www.lesterbrickman.com
SSRN Page: http://ssrn.com/author=40172

## EDUCATION

Carnegie Tech, B.S. in Chemistry, 1961 (4-year scholarship)
University of Florida, LL.B., 1964 (Law Review, Order of the Coif)
Yale University, LL.M., 1965 (Sterling Fellow)

## PROFESSIONAL STATUS

Formerly Member of the New York Bar; U.S. Courts of Appeals for the Third and Fifth
Circuits

## EMPLOYMENT

Sibley, Giblin, King & Levenson: Summer, 1964
Louisiana State University Law School: Summer, 1969
Council on Legal Education: 1969-1970
University of Toledo Law School: 1965-1969, 1970-1976
Cardozo Law School: 1976-2016 (Acting Dean 1980-82)
Oxford University, Visiting Fellow, Centre for Socio-Legal Studies, May-June 1997
Fordham Law School, 1999-2000 (Adjunct Faculty)

## RANK

Professor Emeritus of Law

## SUBJECTS TAUGHT

LongTerm:   Contracts, Professional Responsibility, The Legal Profession, Land Use.

Past:        Family Law, Federal Jurisdiction, Jurisprudence, Law & Poverty,
             Housing Law, Consumer Problems of the Poor, Legal Process, Municipal
             Corporations, Workmen's Compensation Seminar, Community Land Use
             Game Seminar, Social Indicators Seminar, Negotiation, and seminars
             on legal services delivery systems.

JA04295

## LAW SCHOOL COMMITTEES

Appointments and Promotions, Budget, Educational Policy, ABA Accreditation and Self-Study, AALS Accreditation, Placement, Academic Standards, Faculty Rules.

## UNIVERSITY COMMITTEES

Faculty Review Committee.

## PROFESSIONAL ACTIVITIES

**Page**

A.  General ......................................................................................2

B.  Congressional Testimony (Federal and State) .................................3

C.  Citations in Congressional Documents ..........................................4

D.  Citations in Legal Practice Journals..............................................4

E.  Citations in Legal Briefs, Pleadings and Motions ...........................5

F.  Conferences And Other Presentations ...........................................5

G.  Consulting Activities (Public Institutions)......................................9

H.  Publications.......................................................................... 10

I.  Short-Length Publications ........................................................ 33

J.  Amicus Briefs and Cert. Petitions .............................................. 36

K.  Op-Eds (Accessible on homepage by clicking on the "Op-Eds" hyperlink) ........ 36

L.  National and Professional Press................................................. 38

M.  Popular Press — Other............................................................. 41

## A.   General

U.S. Chamber of Commerce Institute For Law Reform 2004 Research Award.
Professional Responsibility, Legal Ethics & Legal Education Practice Group Executive Committee, The Federalist Society (1997-1998).
Committee on Professional and Judicial Ethics of the Ass'n of the Bar of the City of NY (1994-1997).
Association of Professional Responsibility Lawyers (1991-02).
Committee on Professional Responsibility of the Ass'n of the Bar of the City of NY (1990-93).
New York State Bar Association Committee on Professional Ethics, 1985-87.
Law and Economics Institute, summer 1986.
Mayor's Committee on the Judiciary (New York City) (1981-82).
Lecturer on Professional Responsibility of Government Lawyers and Para-professionals, Legal Education Institute of the U.S. Civil Service Commission.
Proposal Reader - U.S. Office of Education (1978-1990).
Pre-1980 listings available

2

**B.** **Congressional Testimony (Federal and State)**

Hearing on H.R. 526: Furthering Asbestos Claim Transparency (FACT) Act of 2015. Testimony before the Subcommittee on Regulatory Reform, Commercial and Antitrust Law of the U.S. House Committee on the Judiciary (statement of Lester Brickman), Feb. 4, 2015, available at http://www.ustream.tv/recorded/58433258; 2015 WLNR 3578295. **Cited in:** 34 Am. Bankr. Inst. J. 12 (March 2015).

How Fraud and Abuse in the Asbestos Compensation System Affect Victims, Jobs, The Economy and the Legal System. Testimony before the Subcommittee on the Constitution of the U.S. House Committee on the Judiciary, Sept. 9, 2011 (Statement of Lester Brickman); *available at* http://judiciary.house.gov/_files/hearings/pdf/Brickman%2009092011.pdf. **Cited in:** 23 Widener L. Rev. 725 at 729 n.24, 762 n.22 (2014).

Asbestos: Mixed Dust and FELA Issues, testimony on the proposed FAIR Act and the effect of mass filings of silicosis claims, Committee on the Judiciary, U.S. Senate, (Feb. 2, 2005). **Cited In:** 2-9 Mealey's Tort Ref. Update 16 (Apr. 2005); 20-6 Mealey's Litig. Rep. Asb. 17 (Apr. 2005); 3-8 Mealey's Litig. Rep. Silica 11 (Apr. 2005); 3-9 Mealey's Litig. Rep. Silica 11 (May 2005); 20-9 Mealey's Litig. Rep. Asb. 26 (June 2005); 12 Conn. Ins. L.J. 477 at 494 (2005-2006); 37 St. Mary's L.J. 283, at 290 (2006); 31 U. Dayton L. Rev. 173 at 194 (2006); 58 Admin. L. Rev. 269 at 344, 350 (2006); 30 Am. J. Trial Advoc. 295 at 300 (2006); 17 J. Bankr. L. & Prac. 2 Art. 3 n.125 (2008).

Oversight Hearing On The Administration of Large Business Bankruptcy Reorganizations: Has Competition For Big Cases Corrupted The Bankruptcy System, testimony on administration of asbestos bankruptcies, Subcommittee on Commercial and Administrative Law of the House Judiciary Committee (108th Cong., July 21, 2004). **Cited In:** 4-1 Mealey's Asb. Bankr. Rep. 10 (Aug. 2004); 19-13 Mealey's Litig. Rep. Asb. 6 (Aug. 2004); 43 Bankr. Ct. Dec. News 1,7 (2004); 2-6 Mealey's Intl. Asb. Liab. Rep. 8 (Aug. 2004); 80 Notre Dame L. Rev. 1187, at 1188, 1196, 1208, 1210 (2005); 14 J. Bankr. L. & Proc. 1 n.43 (2005); 25 Bankr. L. Letter 1 (2005); 74 U.M.K.C. L. Rev. 585 at 604 (2006); 62 N.Y.U. Ann. Surv. Am. L. 271 at 288, 292, 319 (2006); 6-12 Mealey's Bankr. Rep. 22 n.29, 30 (July 2007); 3 Envtl. Ins. Litig. L. & Prac. §27:20 at 503 (2006), §§ 26:39, 26:40 (2009).

Hearings on Ohio H.B. 292 (to reform asbestos litigation), Committee On Judiciary Of The Ohio Senate, May 5, 2004.

Attorney Fees and the Proposed Global Tobacco Settlement before the Subcommittee on Courts and Intellectual Property of the House Committee on the Judiciary, 105th Congress (Dec. 10, 1997) (statement of Lester Brickman.) **Cited In:** 109 Yale L.J. 1496 (2000); 51 De Paul L. Rev. 319 (2001); 44 Wake Forrest L.R. 923, 932 n.58 (2009); 32 Andrews Asb. Litig. Rep. 11 (2009); 27 Andrews Toxic Torts Litig. Rep. 12 (2009); 16 Andrews Class Action Litig. Rep. 3  (2009);23 Geo. J. Legal Ethics 603 at 612 n.53 (2010); 25 Andrews Tobacco Ind. Litig. Rep. 8 (2010).

Product Liability Reform and How the Legal Fee Structure Affects Consumer Compensation Before the Subcommittee On Telecommunications, Trade, and Consumer Protection of the House Comm. on Commerce, 105th Cong. 105-31 (Apr. 30, 1997) (statement of Lester

Brickman.) **Cited In:** 11 Geo. J. Legal Ethics 233, at 238 (1998).

Contingency Fee Abuses:   Hearing on Examining Certain Contingency Fee Abuses and Their Effect On The Tort System Before the Senate Comm. on the Judiciary, 104th Congress, 1st Sess. (Nov. 7, 1995) (statement of Lester Brickman).   **Cited In:**  47 DePaul L. Rev. 268 (1998); 47 DePaul L. Rev. 341 (1998); 11 Geo. S. Legal Ethics 238 (1998); Singapore Academic L. J. 76 at 76-77 n.1, 114 n.150, 117 n.162, 152 n.274 (2004).

Effects of Asbestos Injury Litigation on Federal and State Courts Before Subcommittee on Intellectual Property and Judicial Administration of the House Committee on the Judiciary, 102nd Congress, 1st Sess. (Oct. 24, 1991) (statement of Lester Brickman). **Cited In:** *Lippe v. Bairnco Corp.,* 2002 WL 34342589 at n.31 (SDNY, Feb. 1, 2002); 88 N.W. L. Rev. 527-28 (1994); 24 J. of Environmental Affairs 631 (1997); Schwartz & Lorber, 24 Am. J. Trial Advocacy 251 (2000); 6 Tex. Rev. Law & Pol. 137 at n.158 (2001); 53 So. Car. L. Rev. 815 at 823 (2002); 3-3 MEALEY'S ASB. BANKR. REP. 24 (Oct. 2003); 62 NYU Ann. Surv. Am. L. 223 at 235 (2006); 59 Stan. L. Rev. 1671 at 1729 (2007).

**D.**     **Citations in Legal Practice Journals**

**Los Angeles Daily Journal:** Oct. 4, 1989, at sec. II, p.1, Oct. 23, 1997 at 1, Nov. 2, 1994 at 1, Mar. 20, 1998 at xx; **Lloyd's Asbestos Litigation Reporter**, April 5, 2018; **New Jersey Law Journal:** May 2, 1994 at 15, Dec. 30, 1995 at 5, Jan. 29, 1998 at 29, June 30, 1997 at 6, Aug. 4, 1997 at 4, Mar. 23, 1998 at xx, May 19, 2003, Oct. 24, 2005 at 17, Feb. 13, 2006 at 1; **New York Law Journal:** Feb. 7, 1994 at 1, Mar. 21, 1994 at 1, Apr. 28, 1994 at 5, June 27, 1994 at 2, Sept. 22, 1994 at 5, Jan. 26, 1995 at 5, Feb. 23, 1995 at 5, June 15, 1995 at 5, Aug. 7, 1995 at 2, Oct. 5, 1995 at 5,  Jan. 4, 1996 at 5, June 4, 1996 at 1, June 12, 1996 at 3, Oct. 10, 1996 at 5, July 17, 1997 at 5, June 1, 1998 at 2, Nov. 30 1998 at 1, Dec. 11, 1998 at 1, Dec. 28, 1998 at A4, Feb. 2, 1999 at 8, Apr. 15, 1999 at 5, July 6, 1999 at 1, May 15, 2000 at 1, May 19, 2000 at 8, May 24, 2001 at 5, Dec. 3, 2001 at 1, Jan. 17, 2002 at 1, May 7, 2003 at 1, Sept.13, 2004 at 3, May 5, 2005 at 1, Mar. 6, 2006 at 23; **Pennsylvania Record:** Jan. 19, 2012; **Southeast Texas Record:** Oct. 15, 2008, Oct. 27, 2008, Nov. 1, 2008, Aug. 5, 2009, Aug. 17, 2009, Aug. 27, 2009, May 5, 2009 (2), May 3, 2010, May 8, 2010, Nov. 5, 2010, Jan. 14, 2014, Jan. 28, 2014; **West Virginia Record:** Nov. 24 2008, Aug. 27, 2009, Sep. 2, 2011, Dec. 14, 2012, Sep. 18, 2014; **Texas Lawyer:**, Feb. 13, 1995 at 1, Feb. 5, 1996 at 29, Mar. 16, 1998 at 37, July 11, 2005 at 1, July 10, 2006 at 7.

**C.**     **Citations in Congressional Documents**

135 Cong. Rec. (no. 149) E. 3679; 135 Cong. Rec. (no. 165) S.16888; 138 Cong. Rec. (no. 120) S.12851; 141 Cong. Rec. (no. 141) H2663; 141 Cong. Rec. (no. 67) S.; 144 Cong. Rec. (no. 78) S.6364; 144 Cong. Rec. (no. 76) S. 6373; 144 Cong. Rec. (no. 75) S. 6149; 144 Cong. Rec. (no. 64) S.5097; 149 Cong. Rec. (n. 58) S. 5175; 150 Cong. Rec. (no. 150) S. 5767; 150 Cong. Rec. (no. 51) S. 4127; 150 Cong. Rec. (no.53) S.4247; 150 Cong. Rec. (no. 31) S. 2651; 151 Cong. Rec. (no. 9) D49 (Senate); 152 Cong. Rec. (no. 13) S.738; 152 Cong. Rec. (no. 152) S. 837; 104 S. Rpt. 280 (1995); 108 S. Rpt. 118 nn.2, 43, 76 (2003); 109 S. Rpt. 97 nn.2, 22 (2005); 2013 Legis. Bill Hist. US H.B. 982, nn.50, 57, 62; 102 H. Rpt. 1085; 107 H. Rpt. 693 nn.101-02 (2002); 108 H. Rpt. 32 nn.116-117 (2003); 108 H. Rpt. 805; 109 H. Rpt. 123 (2005); 112 H. Rpt. 174 (2011); 112 H. Rpt. 352 (2011); 112 H. Rpt. 562; 112 H. Rpt. 687 (2012) nn.21, 24, 26, 33, 40, 41, 57, 73; 112; 112 H. Rpt. 747; 112 H. Rpt. 687, nn.24, 26; 114 H. Rpt. 352 (2015); 2011 Legis. Bill Hist. US H.B. 4369 nn.34, 62; 2011 Legis.

Bill Hist. US H.B. 966 n.55; 2013 Legis. Bill Hist. US H.B. 2655 n.54.; 2013 Legis. Bill Hist. US H.B. 982 nn. 48, 50; 2015 Legis. Bill Hist. US H.B. 526 at 56, nn.40, 42, 44, 47, 49, 56, 63, 64, 118, 133, 134; 2017 Legis. Bill Hist. US H.B.906 (Feb. 24, 2017); 115 H. Rpt. 18 (Feb. 24, 2017).

## E.    Citations in Legal Briefs, Pleadings and Motions

I have been cited approximately 525 times in legal briefs, pleadings and motions filed in state and federal trial and appellate courts as of Jan. 30, 2018  A listing can be found in LEXIS.

## F.    Conferences And Other Presentations

| | |
|---|---|
| Presenter: | New York County Lawyers' Ass'n Committee on Fee Disputes And Conciliation, Training Session for Fee Arbitrators, N.Y., N.Y., Oct. 3, 2018. |
| Panelist: | AALS Annual Meeting, Section on Litigation, "American-Style Litigation:   A Force for Good or Ill?" San Diego, CA, Jan. 5, 2018. |
| Featured Speaker: | DRI Asbestos Medicine Conf., Los Vegas, NV Nov. 3, 2017 "Civil Rico: An Effective Deterrent to Fraudulent Asbestos Litigation?" |
| Moderator: | Law Reform Ass'n of New York CLE Program on Asbestos Litigation, New York, NY June 19, 2017. |
| Featured Speaker: | Yale Political Union, "Disincentivizing Tort Litigation," New Haven, CT, Nov. 17 2015. |
| Featured Speaker: | Law Reform Ass'n of New York CLE Program on Asbestos Litigation. "Ten Practices Designed to Defraud Defendants in Asbestos Litigation." New York, NY, June 30, 2015. |
| Debate: | The Private Attorney-General:  Good or Bad, Fed. Soc'y 17th Annual Faculty Conf., Wash., D.C., Jan. 3, 2015. |
| Podcast: | Fraud and Abuse in Mesothelioma Litigation, Federalist Society, Oct. 20, 2014. |
| Panelist: | Class Action Suits, Manhattan Institute, Jan. 23, 2014, New York, NY.  Available on C-SPAN, Jan. 24, 2014. |
| Presenter: | New York County Lawyers' Ass'n Joint Committee on Fee Disputes and Conciliation, Training Session for Fee Arbitrators, N.Y., N.Y., Feb. 11, 2013. |
| Panelist: | Federalist Society National Lawyers Convention, Panel on Attorney Fees in Class Actions, Wash., D.C., Nov. 10, 2011. |
| Presenter: | New York County Lawyers' Ass'n Joint Committee on Fee Disputes and Conciliation, Training Session for Fee Arbitrators, N.Y., N.Y., November 9, 2010. |
| Debate: | Columbia Law School, Oct. 12, 2010 with Professor Brian Fitzpatrick of Vanderbilt Law School:  "Do Class Action Lawyers Make Too Much Money?" |
| Debate: | Western New England Law School, Sept. 1, 2010 with Professor Brian Fitzpatrick of Vanderbilt Law School:  "Do Class Action Lawyers Make Too Much Money?" |
| Panelist: | Institute of Advanced Legal Studies Conference on Regulating and Deregulating Lawyers, paper: "The Collaborative Effort of Judges and Rent-Seeking Lawyers in Expanding Tort Liability: A Modest Proposal for Reform," London, June 3-4, 2010. |
| Panelist: | George Washington University Law School Conference on: Aggregate Litigation: Critical Perspectives, "Anatomy of an Aggregate Settlement:    The |

5

Triumph of Temptation Over Ethics," Washington, D.C., March 12, 2010.

Presenter: New York County Lawyers' Ass'n Joint Committee on Fee Disputes and Conciliation, Training Session for Fee Arbitrators, N.Y., N.Y., December 2, 2008.

Featured Speaker: Medical Grand Rounds, Long Island Jewish Medical Center, "Physician Involvement in Mass Tort Fraud," Long Island, N.Y., Sept. 12, 2008.

Featured Speaker: American Tort Reform Ass'n Annual Meeting, "What Is the Significance of the Prosecutions of Milberg Weiss and Dickie Scruggs for Civil Justice Reform Prospects?", Washington, D.C., Mar. 11, 2008.

Presenter: Mealey's Asbestos Medicine Conference, "The Ethics of Diagnosis," Philadelphia, Apr.16, 2007.

Panelist: AEI-Brookings Judicial Symposium on Civil Justice Issues, "Toxic Torts and Mass Screening," Washington, D.C., December 7, 2006. **Cited In:** 85 Tex. L. Rev. 1465 at n.182 (2007).

Panelist: ALI-ABA Conference on Asbestos Litigation in the 21st Century, "Asbestos Screenings: Dead or Just Napping," New Orleans, LA, Nov. 30-Dec. 1, 2006.

Panelist: Mealey's Silica & Asbestos Claims Conference, "The Mass Screening of Silica & Asbestos Claims:  The Fallout from Judge Jack's Decision," Philadelphia, PA, Nov. 9, 2006.

Panelist: U.S. Chamber of Commerce Inst. for Legal Reform, Annual Legal Reform Summit, "Latest Adaptations in the Plaintiffs' Bar Business Model," Washington, D.C., Oct. 26, 2006.

Presenter: Federalist Society, "Mass Fraud in Mass Torts?," Washington D.C., Oct. 12, 2006.

Panelist: American Enterprise Inst. for Public Policy Research, "Will The FAIR Act Fix The Asbestos Mess," Washington, D.C., Jan.19, 2006.

Panelist: Conference on "Asbestos: Anatomy of a Mass Tort", Univ. of Connecticut Law School, Hartford, Ct., Nov. 3, 2005.

Speaker: Annual Meeting of Ass'n of American Physicians and Surgeons, "The Silica Story And Its Significance," Arlington, Va., Sept. 23, 2005.

Speaker: Rotary Club of New York, "Silicosis: Son of Asbestosis?,"  New York, N.Y., August  23, 2005.

Panelist: Colloquy on Legislation To Resolve Asbestos Litigation – A Conversation with President George Bush, McComb County, Michigan, January 7, 2005.

Featured Speaker: American Tort Reform Ass'n Annual Legislative Conference, "A Look at Asbestos Litigation," New Orleans, LA., November 16, 2004.

Presenter: New York County Lawyers' Ass'n Joint Committee on Fee Disputes and Conciliation, Training Session for Fee Arbitrators, N.Y., N.Y., October 20, 2004.

Discussant: American Enterprise Institute for Public Policy Research, "What Do We Know About Contingency Fees?," Wash. D.C., Sept. 22, 2004. **Cited In:** 85 Tex. L. Rev. 1465 at n.182 (2007).

Panelist: Mealey's National Asbestos Litigation Conference, "Ethical Issues Related to Screening," Philadelphia, Sept. 20-21, 2004.

Presenter: Conference On Asbestos Allocation: Apportionment Liability In Asbestos Litigation, "Ethical Issues In Asbestos Litigation," San Francisco, June 17-18, 2004.

Featured Speaker: Insurance Federation of New York, New York, An Update on Asbestos Litigation, May 13, 2004.

Featured Speaker: Manhattan Inst. Center For Legal Policy, "On The Theory Class's Theories of Asbestos Litigation: The Disconnect Between Scholarship And

Reality," New York, Mar. 10, 2004. **Cited In:** 72 Def. Couns. J. 241, at 242 (2005); 40 The Advoc. (Texas) 80 at n. 8 (2009).

Moderator:    Ass'n of Bar of City of New York, "Litigation Reform & The 9/11 Victim Compensation Fund," N.Y., N.Y., Sept. 18, 2003.

Presenter:    New York County Lawyers' Ass'n Joint Committee on Fee Disputes and Conciliation, Training Session for Fee Arbitrators, N.Y., N.Y. May 5, 2003.

Panelist:    Pepperdine Law School, "Asbestos Litigation & Tort Law: Trends, Ethics, and Solutions," Malibu, California, Apr. 4-5, 2003.

Panelist:    Ass'n of the Bar of the City of New York, "Asbestos:  What Went Wrong?," New York, N.Y., Oct. 21, 2002.

Panelist:    U.S. Chamber Institute for Legal Reform and Manhattan Institute Center for Legal Policy, "Magnet Courts & Class Actions:  The Empirical Evidence," Washington, D.C., June 17, 2002.

Featured Speaker:   Forum of the Center for Legal Policy at the Manhattan Institute, "Asbestos Litigation:  Malignancy in the Courts?," New York, N.Y., May 2, 2002.

Panelist:    Univ. of Ill. Law School Conf. on "Ethics 2000 and Beyond:  Reform or Professional Responsibility as Usual?" Champaign, Ill., Apr. 5, 2002.

Panelist:    ABA Nat'l Conf. on Professional Responsibility, "The Ethics of Hourly Rate Billing," Miami Beach, Fla., May 31, 2001.

Keynoter:    Minnesota State Bar CLE 2001 Business Law Institute, "The Role of Financial Self-Interest in the Governance and Operation of the Bar," Minneapolis, Apr. 27, 2001.

Panelist:    William & Mary Law School Conf. on Toxic Torts, Panel on Ethical and Settlement Issues in Mass Tort Litigation, Williamsburg, Va., Mar. 23-24, 2001.

Presenter:    New York State Unified Court System, Training Session, Fee Dispute Arbitration in Domestic Relations Cases, N.Y., Jan. 23, 2001.

Panelist:    ABA National Inst. on Class Actions, "Current Ethical Issues in Class Actions," New York, Oct. 13, 2000.

Testimony:    ABA Commission on Evaluation of the Rules of Professional Conduct ("Ethics 2000"), New Orleans, LA., June 2, 2000.

Panelist:    Hudson Inst., U.S. Chamber of Commerce, Federalist Soc'y, Conf. On Excessive Legal Fees, "The Scope of the Problem and Responses by the Judiciary and Bar," Washington, D.C., May 25, 2000. **Cited In:** 18 Geo. J. Ethics 1343, at 1356 (2005).

Presenter:    New York State Unified Court System, Training Session, Fee Dispute Arbitration in Domestic Relations Cases, N.Y., May 23, 2000.

Panelist:    Federalist Society Nat'l Lawyers Convention, "Class Action Ethics & Abuse," Washington, D.C., Nov. 11, 1999.

Panelist:    The Federalist Society, Manhattan Inst., and U.S. Chamber Inst. for Legal Reform (joint program), "The New Business of Government-Sponsored Litigation:  State Attorneys General & Big City Lawsuits," Washington, D.C., June 22, 1999.

Debate    :    NYU Federalist Society, "Tort Reform and Federalism," New York, Apr. 15, 1999.

Presenter:    American Tort Reform Foundation Forum, "Contingency Fee Lawyers and States' Attorneys General: Partnerships For Private Gain or Public Good," Washington D.C., February 25, 1999.

Presenter:    Fordham University School of Law, "The Tobacco Litigation & Attorneys' Fees," New York, Feb. 4, 1999.

Presenter:    Manhattan Inst., "Order in the Court:  A Fresh Look at Litigation Reform in

America," New York, Jan. 20, 1999.

Featured Speaker:   American Swiss Foundation Forum, "Contingency Fees and Class Actions," New York, Feb. 10, 1998.

Presenter:   Federalist Society Lawyers' Convention, "What Drives Legal Ethics?" Wash., D.C., Oct. 18, 1997.  (Broadcast on C-Span).

Keynoter:   American Legislative Exchange Council Civil Justice Task Force meeting, "Tort Reform," Austin, Texas, Apr. 12, 1997.

Featured Speaker:   Manhattan Inst. Center for Judicial Studies luncheon forum, "Civil Justice Reform as Consumer Protection," New York, Mar. 27, 1997. **Cited In**: 71 N.Y.S. Bar Ass'n J. 51 (Apr. 1999).

Featured Speaker:   Invitation-only meeting of ABA leaders and a group of general counsels, "Seeking Common Ground:  A Dialogue Between General Counsel and the ABA," Washington, D.C., June 26, 1996.

Featured Speaker:   Forbes CEO Forum, on tort reform, Toronto, June 21, 1996.

Panelist:   Ass'n of American Law Schools Professional Responsibility, "Institutional Choices in the Regulation of Lawyers," San Antonio, Tex., Jan. 7, 1996.

Panelist:   ABA Section on Business Law, "Securities Class Actions:  Is Legislation Necessary?," Chicago, Aug. 8, 1995.

Panelist:   Ass'n of Bar of the City of New York, "Proposed Contract with America Legislative Changes," New York, June 12, 1995.

Presenter:   American Bar Ass'n 21st Nat'l Conference on Professional Responsibility, plenary session panel on Contingency Fees, San Diego, June 2, 1995.

Presenter:   American Tort Reform Association Annual Meeting of Coalition Leaders, "on the effects of contingency fees on the tort system," Chicago, Ill., Oct 4, 1994.

Featured Speaker:   NYU Institute of Judicial Administration Appellate Judges Seminar luncheon, "a proposal to reform contingency fee abuses," N.Y., June 28, 1994.

Featured Speaker:   NYU Institute of Judicial Administration Board of Directors meeting, "a proposal to reform contingency fee abuses," Washington, D.C., May 17, 1994.

Presenter:   New York Criminal Bar Ass'n, "Legal Fees After the Court of Appeals Recent Decision Prohibiting Non-Refundable Retainers:  The Impact of Cooperman on 'Flat,' 'Minimum' and other Non-Hourly Fee Arrangements," N.Y., Apr. 26, 1994.

Featured Speaker:   National Employment Lawyers Association of New York "ethical issues relevant to employment law," N.Y., Dec. 10, 1993.

Presenter:   Cardozo Law Review Symposium on "Scientific Evidence After the Death of Frye," "The Irrelevance of Scientific Evidence:  Tort System Outcomes Are Principally Determined by Lawyers' Rates of Return," New York, Oct. 25, 1993.

Presenter:   Ass'n of Professional Responsibility Lawyers, "Nonrefundable Retainers," New York, August 7, 1993.

Panelist:   New York State Association of Disciplinary Attorneys, "Nonrefundable Retainers," Brooklyn, N.Y., May 25, 1993.

Presenter:   Ass'n of the Bar of the City of New York, "New Approaches in Controlling Legal Fees and Contingency Agreements," presentation titled:  A Proposal To Bring The Contingency Fee System Into Line With Its Ethical Mandates and Policy Roots. New York, May 18, 1993.

Presenter:   Practicing Law Institute, "The Attorney-Client Relationship After Kaye, Scholer," presentation titled:  Has the Office of Thrift Supervision Changed the Relevant Ethical Rules by its Actions in the Kaye, Scholer Matter?, Washington D.C., June 15, 1992.

Presenter:   Symposium on Bankruptcy, South Carolina, Law Review, "attorney fees in bankruptcy," Columbia, S.C., Mar. 20, 1992.

JA04302

Presenter:       Institute for Continuing Legal Education of Loyola Law School, Conference on
                 the Longshore and Harbor Workers' Compensation Act; presented a proposal
                 for an industry-financed benefits pool for asbestos claimants, New Orleans, Feb.
                 7, 1992.
Moderator/Organizer:       Colloquy on an Administrative Solution to the Asbestos Litigation
                 Crisis, Administrative Conference of the United States, Washington, D.C., Oct.
                 31, 1991 (for which I authored the proposal that was the subject of the
                 conference).
Testimony:       Fairness Hearing held in reorganization of Manville Settlement Trust (on
                 attorney fees), U.S.D.C., New York, January 2, 1991.  **Cited In:** *In re Joint
                 E.&.S. Dists. Asbestos Litigation (Findley v. Blinken),* 129 B.R. 710, at 863-4
                 (E. & S.D.N.Y. 1991); 88 N.W. L. Rev. 527 (1994).
Testimony:       ABA Commission on Evaluation of Disciplinary Enforcement hearing, New
                 Orleans, La., **June 8, 1990.**
Pre-1990 listings available


## G.    <u>Consulting Activities</u> (Public Institutions)

        (1)    Administrative Conference of the United States (to organize a colloquium to
evaluate a plan for an administrative alternative to asbestos litigation, 1991); U.S. Office of
Education (to evaluate applications for clinical legal education grants, 1978-88); The Legal
Education Institute of the U.S. Civil Service Commission as a lecturer on professional
responsibility of government attorneys, 1977-1980); The National Science Foundation (to
construct a research agenda for improving the delivery of legal services to middle class
consumers, 1975-78); ABA Special Committee on Specialization (1975); Law Enforcement
Assistance Administration (to add clinical programs in prosecutors offices, 1974); The Ford
Foundation (for which I prepared a year-long field report on legal paraprofessionals, 1970-
71); The North Central Association (a regional accrediting agency for which I evaluated a law
school for accreditation purposes, 1972); the Housing Committee of the Toledo Model Cities
Program (1968-69).
        (2)    The Council on Legal Education for Professional Responsibility -- activities
included evaluation of programs, the organization of workshops on clinical legal education and
related areas, and the writing up of these workshops for the CLEPR Newsletter (1970-1980).

        (3)    I have consulted for a number of law schools on matters of curricular design in
the clinical area, e.g., L.S.U., Cleveland State, Temple.

        (4)    I have been a consultant to Lear Siegler, Volt Technical Services, NLADA,
Auerbach Associates, American Technical Assistance Corporation, and the Quincy Corporation
to provide evaluations of and technical advice and assistance to OEO Legal Services programs.
In the 1968-75 period I evaluated approximately 70 programs.

        (5)    In 1966-67, I was Deputy Director of, and consultant to, the Student Wave
Survey, a $30,000 research project funded by the Association of American Law Schools for
the purpose of (1) ascertaining the demand for legal education through 1985, and (2)
ascertaining the needs of society for lawyers through 1985.  My own efforts were directed
primarily towards the "demands" aspect and particularly the data accumulation phase, over
which I had complete charge.  In addition, I issued a number of interim reports and published
several newsletters.

JA04303

## H.        Publications

**SSRN** http://ssrn.com/author=40172. (As of 4/1/2019 based on 21 publications) Downloads: 10,297; Washington Univer. Open Scholarship (as of 6/2019) Downloads: 464 (based on 29 papers); **BePress** (as of 6/5/17), (based on 6 publications):   Downloads: 4025. **ResearchGate** (as of 12/11/18, based on 12 publications):  Downloads: 1420.

**Civil RICO: An Effective Deterrent To Fraudulent Asbestos Litigation?**, 40 CARDOZO L. REV. 2301 (2019). accessible at https://ssrn.com/abstract=3232988. **Downloads:** SSRN: 67.

**FRAUD AND ABUSE IN MESOTHELIOMA LITIGATION,** 88 Tulane L. Rev. 1072-1152 (2014), accessible at: http://ssrn.com/abstract=2458144. **Downloads:**  SSRN-307.   **Cited In:**  88 Tulane L. Rev. 1021 at 1027, n.32, 1036 n.70 (2014); Bloomberg BNA Toxic Law Rep. v.29, no. 10 at 1 (3/6/14); 56 DRI For Def. 10 (May 2014); 34 Miss. C.L. Rev. 13 at n.230 (2015); 28 Yale J.L. & Human. 105 at 118, n.55 (2016); The Need For Transparency in the Asbestos Trusts, Hearing Before the U.S. Senate Com. on the Judiciary on 114 H.R. 1927 (statement of Mark Behrens at n.170); 32-4 Mealey's Litig. Rep. Abs. 20 at nn 2,44-45, 52, 54 (2017); Toxic Torts and Envir. L., 59 No. DRI for Def. 50 (2017); 87 Ford. L. Rev. 107 at 111 n.15, 113 n.40, 121 n.108 (2018); 85 Def. Couns. L.J. 1 at *2 (Oct. 2018).

**LAWYER BARONS: WHAT THEIR CONTINGENCY FEES REALLY COST AMERICA**, Cambridge Univ. Press, Feb. 2011 (584 pages).   **Reviewed by:** Judge Dennis Jacobs, N.Y.L.J., Jan. 27, 2011 at p. 6 col. 4; Daniel Fisher, *Contingency Fees, Self-Regulation Make Lawyering Expensive For Us*, FORBES.COM (Feb. 17, 2011, 2:24 PM), accessible at http://www.forbes.com/sites/danielfisher/2011/02/17/contingency-fees-regulation-make-lawyering-expensive-for-us/; Margaret Little, *Engage*, vol. 12 issue 1 at 128 (June 2011), accessible at Peg Little Review in Engage.pdf; Andrew Trask, Oct. 20, 2011 accessible at: http://practiceview.muzeview.com/l+inks/index.php?id=3229702; Peter Schuck, *Lawyers Behaving Badly*, LITIGATION 2011 (Supplement to The American Lawyer) 11/1/2011 at 82; Richard Moorhead, 71 Cambridge L.J. 729 (Nov. 1, 2012); Michael Legg, *Litigation nation — Revisiting contingency fees, litigation funding and class action fees in Australia – Book Review of Lawyer Barons:  What Their Contingency Fees Really Cost America by Lester Brickman,* 20 TORT LAW JOURNAL 21 (2012) (Australia). **Cited in:**  JOHN T. NOONAN, JR. & RICHARD W. PAINTER, PROFESSIONAL AND PERSONAL RESPONSIBILITIES OF THE LAWYER 93 (3rd ed. 2011); 13 Loy. J. Pub. Int. L. 61 at 106 n.222 (2011); C. Hodges, J. Paysner and A. Nurse, *Litigation Funding: Status And Issues* 114 n.302, 136 nn.343-44) (Jan. 2012); 35 Harv. J.L. & Pub. Pol'y 681 at 707 n.171 (2012); 63 S.C.L. Rev. 637 at 637 n. 17 (2012), 11 IUS Gentium 287 at 290 n. 6, 298 n. 32 (2012); 2012 Colum. Bus. L. Rev. 427 at 429 n.7, 496 (2012);13 *Enterprise & Soc'y* 862 at 873 n.28 (2012); 37 Law & Soc. Inquiry 768 at 769 (2012); Podcast with Prof. Brickman and Prof. Peter Schuck (Yale Law School) at http://www.fed-soc.org/publications/detail/lawyer-barons-what-their-contingency-fees-really-cost-america-faculty-book-podcast; 63 South Carolina L. Rev. 637 at 639 n. 17 (2012); 64 Ala. L. Rev. 335 at 344-45 nn. 29-33 (2013); DEBORAH RHODE, DAVID LUBAN & SCOTT CUMMINGS, LEGAL ETHICS at 801 n. 137 (6th ed. 2013); TED FRANK, CLASS ACTIONS, ARBITRATION AND CONSUMER RIGHTS, Manhattan Inst. Legal Policy Report no. 16 Feb. 2013 at nn. 48, 91, 104 (2013); 65 Stan. L. Rev. 633 at 678 n.233 (2013); 91 N.C. L. Rev. 387 at 414 n.107 (2013); 32 Rev. of Litigation 299 at 305 n.38 (2013); 61 Clev. St. L. Rev. 391 at 396 n.20 (2013); 38 LAW & SOC. INQUIRY

836 at 838 (2013); 23 Widener L.J. 299, 304 at n.21 (2013); 38 Law & Soc. Inq. 836, 939 (2013); 32 Miss. C. L. Rev. 247, 264 n.83 (2013); 23 Widener L.J. 299, 303 n.21 (2013); 61 Clev. St. L. Rev. 391 at 396 n.20 (2013); talk zone.com, accessible at http://www.talkzone.com/mp3FlashPlayer.php?channelid=199&showid= 1647&Eid=3206& Sid=11212 (May 24, 2013); 55 Canadian Bus. L.J. 133 at 139 n.10, 157 n.69 (2014); 63 DePaul L. Rev. 265 at 276-77 nn.25, 27-29 (2014); 88 Tulane L. Rev. 1211 at 1231 n.116, 1235 n.137 (2014); 39 J. Legal Prof. 25 at 39 n.96 (2014); 2015 U. Ill. L. Rev. 1563 at 1568 n.19 (2015); 84 Rev. Jur. U.P.R. 803 at 821 n.71 (2015); 63 DePaul L. Rev. 265 at 276-77 nn.25, 27, 29 (2015); 103 Geo. L.J. 465 at 481 n.96, 492 n.147 (2015); 39 Harv. J.L. & Pub. Pol'y 769 at 771 n.6 (2016); 52 Tulsa L. Rev. 511 at 514 n.21 (2017); 102 Cornell L. Rev. 1319 at 1343 n.91 (2017); Ark. Teacher Ret. Sys. v. State St. Bank, 232 F. Supp. 3d 189 at 203 (2017); 61 Clev. St. L. Rev. 391 at 396 n.20 (2018); 24 Stan. J.L. Bus.&Fin. 1 at 19, n.77, 24 n.109 (2019).

**Introduction to Lawyer Barons: What Their Contingency Fees Really Cost America**, accessible at:  http://ssrn.com/abstract=1773796.  **Downloads**:  SSRN-267.

**Anatomy of an Aggregate Settlement: The Triumph of Temptation Over Ethics,** 79 George Wash. L. Rev. 700-716 (2011), accessible at: http://ssrn.com/abstract=1649509. **Downloads:**  SSRN-419.  **Cited In:**  79 Geo. Wash. Rev. 754 at 766-67 (2011); 79 Geo. Wash. L. Rev. 628 at 667 (2011); 80 Fordham L. Rev. 319 at 322, n.14, 325 n.35 (2011); 28 Ariz. J. Int'l. & Comp. L. 569 at 577 n. 48 (2012); 87 N.Y.U.L. Rev. 960, at 993 n. 124, 998 n. 143, 1020 n. 236 (2012); 66 Vand. L. Rev. 1183 at 1211 nn.107-108 (2013); 35 Cardozo L. Rev. 267 at 304 n.192 (2013); 19 Harv. Negot. L. Rev. 213 at 235 n.82 (2014); 103 Geo. L.J. 466 at 481, n.96, 492 n.147 (2015); 68 Ark. L. Rev. 511 at 517 n.45 (2015); 101 Va. L. Rev. 129 at n.142 (2015); Class Action Playbook §1.03 (2016).

**Unmasking the Powerful Force that Has Mis-Shaped the American Civil Justice System**, 4 Global Competition Litigation Review no. 3, 169-173 (2010), accessible at: http://ssrn.com/abstract=1737893.  **Downloads:**  SSRN-251.

**The Use of Litigation Screenings in Mass Torts: A Formula for Fraud?,** 61 SMU L. Rev. 1221-1354 (2008), accessible at http://ssrn.com/abstract=1217620. **Downloads:**  SSRN-711, Bepress-323.  **Cited In:**  7-2 Mealey's Litig. Rep. Silica 10 (Oct. 2008); 23-17 Mealey's litig. Rep. Asb. 16 (Oct. 2008); 8-3 Mealey's Asbestos Litig. Rep. 11 (Oct. 2008); 1-9 Mealey's Diet Drug Rep. 11 (Oct. 2008); 28 Rev. Litig. 501; 63 Vand. L. Rev. 107 at 163-64 nn.171-174 (2010); 73 Albany L. Rev. 521, 533 at n. 94 (2010); 51 Wm. & Mary L. Rev. 1997 at 2061 n. 280 (2010); 64 Vand. L. Rev. 61 at 63 (2011); 3 Toxic Torts Litig. Guide §32:1 (2011), §32:5 (2011), §32:6 (2012); 90 Texas L. Rev. 571 at 634 n.306 (2012); 56 St. Louis U. L.J. 1231 at 1263 n. 207 (2012); Report of the U.S. House of Rep. Comm. on the Jud. on Furthering Asbestos Claim Transparency (FACT) Act of 2012, 112th Cong. 2nd Session No. 112-687 at 5 n.21 (Sept. 21, 2012); 61 Buff. L. Rev. 537 at 574 n.174 (2013); 88 Notre Dame L. Rev. 2457 at 2512 n.188 (2013); 88 Notre Dame L. Rev. 2457 at 2488 n.119 (2013); 23 Widener L.J. 299, 302 at n.17 (2013); 23 Widener L.J. 97 at 121 n.144 (2013); Toxic Torts Litig. Guide §§ 32:1, 32:5 (2014); 46 Ariz. St. L.J. 1057 at n.101 (2014).

**Disparities Between Asbestosis and Silicosis Claims Generated By Litigation Screenings and Clinical Studies**, 29 Cardozo L. Rev. 513-622 (2007), accessible at

11

http://ssrn.com/abstract=970993. **Downloads:** SSRN-795, Bepress-1587. **Cited In:** 37 Sw. U. L. Rev. 691 at 697 (2008); 37 Sw. U. L. Rev. 671 at 676 (2008); 37 Sw. U. L. Rev. 575 at 587, 588, 590 (2008); 37 Sw. U. L. Rev. 479 at 482 (2008); 37 Sw. U. L. Rev. 459 at L466 (2008); 74 Brook. L. Rev. 51 at 59 n.34 (2008); 2008 Colum. Bus. L. Rev. 841 at n.131 (2008); Linda Mullinex, Mass Tort Litigation 914 (2d ed. 2008); 28 Rev. Litig. 501 at 518, 520 (2009); 69 Md. L. Rev. 162 at 167 nn. 52-53, 191 n. 238, 192 n. 249 (2009); 26 T.M. Cooley L. Rev. 721 at 749 (2009); 33 Am. J. Trial Advoc. 315 at 339 n.13, 340 nn.119-22 (2009); 10 Engage 35 at n.6 (2009); 73 Albany L. Rev. 521, 530 at n.76 (2010); 64 Vand. L. Rev. 61 at 63 (2011); 27-7 Mealey's Litig. Rep. Asb. 28 at n. 11 (2012); 8 J.L. Econ. & Pol'y 701 at 738 n. 66 (2012); 36 Am. J. Trial Advoc. 1 at 12 n. 61 (2012); 88 Notre Dame L. Rev. 2457 at 2512 n.188 (2013); 34 Miss C.L. Rev. 13 at n.218 (2015); *Spann v. Ill. Workers' Comp. Comm'n*, 2018 Ill. App. Unpup. LEXIS 1755 at *6.

**On The Applicability of the Silica MDL Proceeding To Asbestos Litigation,** 12 Conn. Ins. L.J. 289-314 (2005-06). Accessible at: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=916534. **Downloads:** SSRN-670. **Reprinted in:** ALI-ABA Course of Study:  Asbestos Litigation in the 21st Century at 1815, Nov. 30-Dec. 1, 2006. **Cited In:**  12 Conn. Ins. L.J. 349 at 421, 439 (2005-2006); 2 Envtl. Ins. Lit. L. & Prac. § 27:1 at n.3 (2006); 30 m. J. Trial Advoc. 295 at 299 (2006); 6-7 Mealey's Asb. Bankr. Rep. 20 (Feb. 2007); 85 Tex. L. Rev. 1465 at n.157 (2007); 59 Stan. L. Rev. 1671 at 1683, 1709 (2007); 6-12 Mealey's Asb. Bankr. Rep. at 22 (2007); 17 J. Bankr. L. & Prac. 2 Art. 3 at n.129 (2008); 37 Sw. U. L. Rev. 575 at 587, 590 (2008); 37 Sw. U. L. Rev. 479 at 482 (2008); 37 Sw. U. L. Rev. 459 at 466 (2008); 74 Brook. L. Rev. 51 at 59 n.34 (2008); Linda Mullinex, Mass Tort Litigation 913 (2d ed 2008); 28 Rev. Litig. 501 at 518, 520 (2009); 69 Md. L. Rev. 162 at 174 n. 104, 176 n.123 (2009); 26 T.M. Cooley L. Rev. 721 at 722 (2009); 33 Am. J. Trial Advoc. 315 at 339 n.113 (2009); 73 Albany L. Rev. 521, 530 at n. 76 (2010); 64 Vand. L. Rev. 61 at 63 (2011); 8 Rutgers J.L. & Pub. Pol'y 50 at n.74 (2011); *Conn. Gen. Statutes Ann*. §20-435 (Asbestos Contractors); *Conn. Gen. Statutes Ann.* Title 22A, Chap. 445 (Hazardous Waste); 3 Conn. Prac. Construction Law, App. A (2011-12); 3 Envtl. Ins. Litig.: L. & Prac. *App.* 26A (2011); 27-7 Mealey's Litig. Rep. Asb. 28 at n. 9 (2012); 46 U. Mich. J.L. Reform 1279 at 136 n.142 (2013); Report of the U.S. House of Rep. Comm. on the Jud. on Furthering Asbestos Claim Transparency (FACT) Act of 2012, 112th Cong. 2nd Session No. 112-687 at 7 n.41 (Sept. 21, 2012); Norton Bankr. L. & Prac. 3d § 179.21 (2015).

**An Analysis of the Financial Impact of S.852: The Fairness In Asbestos Injury Resolution Act of 2005,** 27 Cardozo L. Rev. 991-1033 (2005).   Accessible at: http://ssrn.com/abstract=796884.  **Downloads:** SSRN-560.  **Cited In:** 12 Conn. Ins. L.J. 517 at 543 (2005-2006);19 Geo J. Legal Ethics 741 at 755 (2006); 62 NYU Ann. Surv. Am. L. 271 at 282-83 (2006); 62 NYU Ann. Surv. Am. L. 223 at 240, 258 (2006); 85 Tex. L. Rev. 1465 at n.160 (2007); 2008 U. Ill. L. Rev. 1101, at 1102, 1106-1110, 1112, 1120-1121 (2008); *Doug Satterfield v. Breeding Insulation Co. et al*, 266 S.W.3d 347 at n.54 (Tenn. Sept. 9, 2008); 37 Sw. U. L. Rev. 691 at 692, 693 (2008); 9 Engage 109 at n.72 (2008); 78 UMKC L. Rev. 1, 4 n.24, 5 nn.26, 32, 85 n. 493 (2009); 69 Md. L. Rev. 162 at 194 n. 262 (2009); 18 J.L. & Pol'y 295 at 361 n.256, 376-77, nn.316-319 (2009); 96 Minn. L. Rev. 28 at 79 n.222 (2011); 81 Ford. L. Rev. 451 at 470 n. 175 (2012); 23 Duke J. Comp. & Int'lL. 1 at *59 n. 184 (2012).

**Ethical Issues In Asbestos Litigation**, 33 Hofstra L. Rev. 833-932 (2005).  Accessible at: http://ssrn.com/abstract=754188. **Downloads:** SSRN-919.  **Cited In:**
**Law Reviews, Treatises:**  12 Conn. Ins. L.J. 477 at 477 (2005-2006); 31 U. Dayton L. Rev.

173 at 189 (2006); 19 Geo J. Legal Ethics 741 at 754 (2006); 62 NYU Ann. Surv. Am. L. 271 at 286, 289, 292, 326-27 (2006); 62 NYU Ann. Surv. Am. L. 223 at 224, 250, 263 (2006); 7 Nev. L.J. 73 at 76 (2006); 30 Am. J. Trial Advoc. 295 at 297 (2006); 79 Temp. L. Rev. 773 at 775, 787 (2006); 13 Clinic. L. Rev.659 at 705 (2007); 48 Wm. & Mary L. Rev. 2043 at 2046 (2007); 75 Fordham L. Rev. 855 at 2858 (2007); 85 Tex. L. Rev. 1495 at n.157 (2007); 60 Ark. L. Rev. 437 at 455 (2007); 93 Va. L. Rev. 1389 at 1431 (2007); 106 Mich. L. Rev. 1213 at 1214, 1227 (2008); 17 J. Bankr. L. & Prac. 2 Art. 3 at n.90 (2008); 83 N.Y.U. L. Rev. 501 at 521, 529 (2008); 16 J.L. & Pol'y 589 at 597 (2008); 106 Mich. L. Rev. 1213 at 1214 (2008); 59 Ala. L. Rev. 771 at 774 (2008); 42 U. Mich. J. L. Reform 71 at 90 (2008); 37 Sw. U. L. Rev. 691 at 693 (2008); 37 Sw. U. L. Rev. 511 at 512, 514, 518, 520, 521 (2008); 2008 Colum. Bus. L. Rev. 841 at n.60 (2008); 76 Def. Couns. J. 54 at n.145 (2009); 28 Rev. Litig. 501 at 505 (2009); 40 The Advoc. (Texas) 80 at nn. 6-7 (2009); 33 Am. J. Trial Advoc. 13 at 43 n.152 (2010); 79 Geo. Wash. L. Rev. 506 at 516 (2011); 62 Hastings L.J. 1729 at 1732 n.8 (2011); 72 La. L. Rev. 757 at 781 n.189 (2012); 91 N.C.L. Rev. 387 at 436 n. 190 (2012); *Hearn v. Snapka*, 2012 Tex. App. LEXIS 10788 (Ct. App. Tex. Dec. 28, 2012); Report of the U.S. House of Rep. Comm. on the Jud. on Furthering Asbestos Claim Transparency (FACT) Act of 2012, 112th Cong. 2nd Session No. 112-687 at 7 n.41, 9 n.57, 10 n.73 (Sept. 21, 2012); 36 Am. J. Trial Advoc. 307 at 309 n.11 (2013); 91 N.C. L. Rev. 387 at 435 n.190 (2013); 81 Fordham L. Rev. 3233 at 3241 n.47, 3247 n.77 (2013); 9 NORTON BANKR. L.& PRAC. 3d § 179:21 (2008, 2009, 2010, 2011, 2013); 47 Int'l Law. 325 at 326 n.6 (2013); 88 Tulane L. Rev. 1242 n.175, 1245 n.200 (2014); 23 Widener L. Rev. 725 at 759 nn.207, 209-10, 760 n.215, 761 nn.216-17 (2014); 87 Temple L. Rev. 176 at 178 nn.14, 16, 179, n.20 (2014); 87 Temp. L. Rev. 193 at 195 n.14, 196 n.16 (2014); 22 B.U.J. Sci. & Tech. L. 187 at 207 n.140 (2016); 20 Chap. L. Rev. 255 at 262 n. 41 (2017); 69 Rutgers L. Rev. 1139 at 1158 n. 157 (2017); 87 Ford L. Rev. 107 at 121 n.102 (2018).

**Cases:** *Hearn v. Snapka*, 2012 Tex. App. LEXIS 10788 at *34 (Tex. Ct. App. 2012).

**Litigation Reports**:  3 TOXIC TORTS LIT. GUIDE § 33:18 (2005); 4-3 MEALEY'S LITIG. REP. SILICA 12 (Nov. 2005); 20-19  MEALEY'S LITIG. REP. ASB. 15 (Nov. 2005); 20-22 MEALEY'S LITIG. REP. ASB. 24 (Dec. 2005); 4-8 MEALEY'S LITIG. REP. SILICA 13 (Apr. 2006); 21-7 MEALEY'S LITIG. REP. ASB. 27 (May 3, 2006).

**Statutes**: 11 USCA §524: Title II.  Bankruptcy, Chap. 5. Creditors, the Debtor, and the Estate, Sub Chap. II.  Debtor's Duties and Benefits.


**A Rejoinder to the Rejoinder to 'On the Theory Class's Theories of Asbestos Litigation'**, 32 Pepp. L. Rev 781-792 (2005).  Accessible at: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=761845.  **Downloads:**  SSRN-91 **Cited In:** 37 Sw. U. L. Rev. 459 at 468 (2008); 2010 Mich. St. L. Rev. 423 at 436 n.51 (2010).


**On The Theory Class's Theories Of Asbestos Litigation: The Disconnect Between Scholarship And Reality,** 31 Pepp. L. Rev. 33-170 (2004). Accessible at: http://www.ssrn.com/abstract=490682.  **Downloads:**  SSRN-1657; ResearchGate:  1175. **Cited In: <u>Law Reviews, Bar Ass'n Opinions, Litigation Reports and Others:</u>** Report of the U.S. Senate Comm. On the Jud. on S.1125, "The Fairness in Asbestos Injury Resolution Act of 2003" at 83 nn.5, 10, 95 n.45, 97 nn.52-53 (July 21, 2003);12 Am. Bankr. Inst. L. Rev. 441, at 468 (2004); 28 Am. J. Trial Adv. 295 at 310 (2004); 3-7 MEALEY'S ASB. BANKR. REP. 20 (Feb. 2004); 20-2 MEALEY'S LITIG. REP. ASB. 33 (Feb. 2005); 45 Santa Clara L. Rev. 1, at 6 (2005); 2-9 MEALEY'S TORT REF. UPDATE 16 (Apr. 2005); 20-6 MEALEY'S LITIG. REP. ASB. 17 (Apr. 2005); 3-8 MEALEY'S LITIG. REP. SILICA 11 (Apr. 2005); 3-9 MEALEY'S LITIG. REP. SILICA

JA04307

11 (May 2005); 20-9 MEALEY'S LITIG. REP. ASB. 26 (June 2005); 4-3 MEALEY'S LITIG. REP. SILICA 12 (Nov. 2005); 20-19 MEALEY'S LITIG. REP. ASB. 15 (Nov. 2005); 14 J. Bankr. L. & Prac.1 at nn. 7, 241 (2005); 20-22 MEALEY'S LITIG. REP. ASB. 24 (Dec. 2005); 72 Def. Couns. J. 241, at 242 (2005); 20-5 MEALEY'S LITIG. REP. INS. 10 (Dec. 2005); 16-15 MEALEY'S LITIG. REP. REINSURANCE 10 (Dec. 2005); 25 Bankr. L. Letter 1 (2005); 12 Conn. Ins. L.J. 477 at 480 (2005-2006); 37 St. Mary's L.J. 283 at 290 (2006); 31 U. Dayton L. Rev. 173 at 189 (2006); 24 Miss. C.L. Rev. 285 at 296 (2006); 20-23 MEALEY'S LITIG. REP. ASB. 19 (January 10, 2006); 3-6 MEALEY'S TORT REF. UPDATE 12 (Jan. 2006); 21-1 MEALEY'S LITIG. REP. ASB. 20 (February 1, 2006); 4-8 MEALEY'S LITIG. REP. SILICA 13 (Apr. 2006); 21-7 MEALEY'S LITIG. REP. ASB. 27 (May 3, 2006); 62 NYU Ann. Surv. Am. L. 271 at 283 (2006); 62 NYU Surv. Am. L. 223 at 225, 229, 230, 235, 249, 252 (2006); 58 Admin. L. Rev. 269 at 336, 343-44, 346-48 (2006); 30 Ann. J. Trial Advoc. 295 at 311 (2006); 95 Geo. L.J. 693 at 730 (2007); 48 Wm. & Mary L. Rev. 2043 at 2052, 2063 (2007); 62 NYU Ann. Surv. Am. L. 525 at 529, 531, 542, 548 (2007); 75 Fordham L. Rev. 2855 at 2858 (2007); 59 Stan. L. Rev. 1671 at 1683, 1709, 1730 (2007); 26 Miss. C. L. Rev. 253 at 268, nn.13, 82, 87, 122 (2006-2007); 2008 U. Ill. L. Rev. 1101, at 1103 – 1110, 1112 (2008); 12 Tex. Rev. L. & Pol. 477 at 478, 516 (2008); 16 J.L. & Pol'y 589 at 597 (2008); 85 U. Det. Mercy L. Rev. 407 at n.44 (2008); 37 Sw. U. L. Rev. 557 at 574 (2008); 37 Sw. U. L. Rev. 479 at 494, 509 (2008); 2008 Colum. Bus. L. Rev. 841 at n.29 (2008); 28 Rev. Litig. 501 at 504, 527 (2009); 59 Am. U.L. Rev. 49 at 58 (2009); 69 Md. L. Rev. 162 at 187 n. 212, 193 n. 257 (2009); 26 T.M. Cooley L. Rev. 721 at 721-22, 736 (2009); 59 Duke L.J. 1321, at 1336 n.48 (2010); 33 Am. J. Trial Advoc. 13 at 43 n.152 (2010); 38 Hastings Const. L.Q. 1007 at 1008 n.6 (2011); 27-7 Mealey's Litig. Rep. Asb. 28 nn. 3,10, 13-17 (2012); 22 Kan. J.L. & Pub. Pol'y 1 at 3 n. 8 (2012); 36 Am. J. Trial Advoc. 1 at n. 5, 6 n. 31, 9 n. 47 (2012); Report of the U.S. House of Rep. Comm. on the Jud. on Furthering Asbestos Claim Transparency (FACT) Act of 2012, 112 Cong. 2nd Session No. 112-687 at 5 n.24, 7 n.34 (Sept. 21, 2012); 28 WL J. Tobacco Ind. 10 (Oct. 5, 2012); 34 WL J. Asb. 1 (Sept. 28, 2012); 30 WL J. Toxic Torts 1 (Sept. 10, 2012); 46 U. Mich. J.L. Reform 1279 at 1281 n.45 (2013); 61 Buff. L. Rev. 537 at 573 nn.169-172 (2013); *WIGEVEE* S 1.4.1 (2013); 23 Widener L.J. 299, 311 at n.62 (2013); 23 Widener L.J. 97 at 104 nn.31, 33, 37-39, 105 n.40 (2013); 88 Tulane L. Rev. 1211 at 1238 n.158, 1255 n.266 (2014); 82 Def. Couns. J. 91 at 101 n.11 (2015); 88 Temp. L. Rev. 383 at 389, nn.56, 58-59, 390 n.64 (2016); 86 UMKC L. Rev. 295 at 297 n.10 (2017); 77 Md. L. Rev. 1166 at 1166 n.10 (2018); 87 Ford L. Rev. 107 at 120 n.102 (2018); 52 Ga. L. Rev. 719 at 733 n.49 (2018); 121 W.V. L. Rev. 27 at 44 n.97 (2018);

97 Ore. L. Rev. 307 at 309 n.4, 321 n.51, 325 n.79, 346 n.164 (2019).

**Casebooks and Treatises**: 2 ENVTL. INS. LIT.: L. & PRAC. § 27-1 at n.2, § 27-7 at 492-93, § 26:33 (2006); GEOFFREY HAZARD, SUSAN KONIAK, ROGER CRAMTON, GEORGE COHEN & W. BRADLEY WENDEL, THE LAW AND ETHICS OF LAWYERING 700 (4th ed. 2005), 704 (5th ed. 2010); 3 Envtl. Ins. Litig.: L. & Prac. § 26:33 (2009, 2011), § 26.25 at n.10 (2010, 2011), Appendix 26A (2013).
**Cases:** *Doug Satterfield v. Breeding Insulation Co. et al*, 266 S.W.3d 347 at 369 n.50 (Sup. Ct. Tenn. Sept. 9, 2008).

**The Market For Contingent Fee-Financed Tort Litigation: Is It Price Competitive?,** 25 Cardozo L. Rev. 65-128 (2003). Accessible at: http://www.ssrn.com/abstract=463226.
**Downloads:** SSRN-737. **Cited In:**
**Law Reviews, Bar Ass'n Opinions and Others:** 28 J. Legal Prof. 283 at 285 (2003-04); 39 Tort Trial & Ins. Prac. L.J. 869 at 874 (2004); 36 Ariz. St. L.J. 551 at 580 (2004); 28 J. Legal Prof. 283 at 285 (2004); 30 Am. J. L. & Med. 69 at 72 (2004); 58 Consumer Fin. L.Q. 347, at 348 (2004); 54 Duke L.J. 447, at 467 (2004); 2004 Wis. L. Rev. 1161 at 1232 (2004); 39 Val. L. Rev. 27 at 46 (2004); 57 Vand. L. Rev. 1571 at 1598 (2004); 70 Mo. L. Rev. 307

at 326 (2005); 114 Yale L. J. 697 at 738-39 (2005); 8 The Green Bag 2d 377 at 377-380 (2005); 67 U. Pitt. L. Rev. 1 at 57 (2005); 27 Cardozo L. Rev. 2433 at 2434 (2006); 8 Am. L. & Econ. Rev. 20 at 31 (2006); 91 Minn. L. Rev. 265 at 275 (2006), 155 U. Pa. L. Rev. 503 at 516 (2006); 56 DePaul L. Rev. 293 at 305 (2007); 56 DePaul L. Rev. 261 at 290 (2007); 10 Am. Law & Econ. Rev 185 at 239 (2008); 18 Health Matrix 373 at n.152 (2008); 17 Mich. St. J. Int'l L. 165 at 184, n.135 (2008-09); 18 Health Matrix 373, 405 n.152 (2008); 2009 Emerging Issues 4729, Aviation Accident Litigation (2009); 39 J. Legal Studies 245 at 246, 251 (2010); 54 N.Y. L. Sch. L. Rev. 773 at 800 (2010); 38 Pepp. L. Rev. 551 at 566 (2011); 79 Geo. Wash. L. Rev. 754 at 767 (2011); 74 L. & Contemp. Prob. 1 at 3 n.11, 9 n.26, 10 nn.31, 35 (2011); 86 N.Y.U. L. Rev. 805 at 849 (2011); 8 Rutgers J.L. & Pub. Pol'y 567 at n.14 (2011); 2012 ABA Prof. Law. 79 at 88 n.39 (2012); 15 U. Pa. J. Bus. L. 1075 at 1077 n.13 (2013); 65 Vand. L. Rev. 829 at 838 n.29 (2012); 64 Okla. L. Rev. 325 at 331 (2012); 2012 ABA Prof. Law. 79 at n. 39 (2012); 2012 Prof. Law. 79 at 88 n.39; 39 Fla. St. U.L. Rev. 1003 at 1052 n. 128 (2012); 15 U. Pa. J. Bus. L. 1075 at 1077 n.13 (2013); 65 Stan. L. Rev. 633 at 667 n.188, 668 n.190, 678 nn.233-34 (2013); *N.J. Adv. Comm. Prof. Eth. Op.* 727, 2013 WL5345476 (Sept. 19, 2013); 22 Cardozo J. Int'l & Comp. L. 399 at 427 n.224 (2014); 63 DePaul L. Rev. 377 at 413 n.150, 415 n.152 (2014); 36 Cardozo L. Rev. 861 at 894 n.191 (2015); 2015 U. Ill. L. Rev. 1563 at 1568 n.19 (2015); 101 Iowa L. Rev. 1323 at 1345 n.102 (2016); 91 N.Y.U. L. Rev. 496 at 504 n.37, 520 n.114 (2016).

**Cases:** *Kress v. Food Employers Labor Relations Ass'n*, 391 F.3d 563, at 570 (C/A-4, 2004); *In re Zyprexa Prods. Liab. Lit.,* 424 F. Supp. 2d 488 at 494, 496 (E.D.N.Y. 2006).


**Effective Hourly Rates of Contingency Fee Lawyers: Competing Data and Non-Competitive Fees,** 81 Wash. U. L.Q. 653-736 (2003). Accessible at: http://www.ssrn.com/abstract=488808. **Downloads:** SSRN-922. BePress-1395. **Cited In: Law Reviews, Bar Ass'n Opinions and Others:** 2004 Utah Bar J. 6, at 8 (2004); 57 Vand. L. Rev. 2087, at 2096 (2004); 58 Consumer Fin. L. Q. 347, at 347 (2004); 83 N.C.L. Rev. 411, at 442 (2005); 54 Duke L.J. 447, at 467 (2004); 57 Vand. L. Rev. 1975, at 1994 (2004); 64 Md. L. Rev. 613, at 683 (2005); 8 The Green Bag 2d 377, at 377-380 (2005) 800-01 (5th ed. 2010); 35 N. Mex. L. Rev. 260 at 264, 275 (2005); 59 Vand. L. Rev. 155, at 156 (2006); 63 Wash. & Lee L. Rev. 603 at 627 (2006); 8 Am. L. & Econ. Rev. 20, at 31 (2006); 59 Vand. L. Rev. 1457 at 1478 (2006); 59 Vand. L. Rev. 729 at 768 (2006); 7 Nev. L. J. 73 at 104 (2006); 85 Tex. L. Rev. 1465 at nn.136, 141, 148, 154, 155 (2007); 32 Wm. & Mary Envtl. L. & Pol'y Rev. 169 at 210-211 (2007); 121 Harv. L. Rev. 1465 at 1496 (2008); 41 U. Mich. J.L. Reform 813 at 821 n.36 (2008); 49 B.C. L. Rev. 913 at 965 n.330 (2008); 17 Mich. St. J. Int'l L. 165 at 184, n.135 (2008-09); 93 Minn. L. Rev. 1147, 1151 n.20 (2009); 22 Geo. J. Legal Ethics 1485, 1528 n.282, 1541 n.340 (2009); 33 J. Legal Prof. 301 at 302 nn. 14-16, 305 nn. 33-35, 38 (2009); 63 Vand. L. Rev. 55 at 91 n.99 (2010); 39 J. Legal Studies 245 at 250 (2010); 54 N.Y. L. Sch. L. Rev. 773 at 778 (2010); 104 Nw. U. L. Rev. 233 at 245 n.69 (2010); 62 S. Carolina L. Rev. 201 at 258 (2010); 74 L. & Contemp. Prob. 1 at 4 n.12, 10 n.35 (2011); 34 Am. J. Trial Advocacy 377 at 377 n.2 (2011); 66 Vand. L. Rev. 257 at 286 n.156 (2012); 65 Stan. L. Rev. 633 at 692 n.298 (2013); NJ Adv. Com. on Prof. Ethics Op. 727 (Sept. 19, 2013); 64 Ala. L. Rev. 335 at 344-45 nn. 26-28 (2013); 6 J. Tort L. 173 at 182 n.65 (2013); *Aspatore* at n.196, 2014 WL 2355616 at *7 (June 2014); 63 DePaul L. Rev. 265 at 276 n.28 (2014); 46 Conn. L. Rev. 1513 at 1539 n. 105-06 (2014); 2015 U. Ill. L. Rev. 1563 at 1568 n.19 (2015); 63 DePaul L. Rev. 265 at 276 n.28 (2015); 91 N.Y.U. L. Rev. 496 at 520 nn.113, 115, 118 (2016); 20 NYU J. Legis & Pub. Pol'y 375 at 376 n.3 (2017); 48 Tex. Enutl. L.J. 277 at 292 n.129 (2018).

**Casebooks, Treatises, Restatements, etc:** RONALD ROTUNDA & JOHN S. DZIENKOWSKI, PROFESSIONAL RESPONSIBILITY - A STUDENT GUIDE 145 (2005); RONALD D. ROTUNDA & JOHN S.

DZIENKOWSKI, *CLIENT-LAWYER RELATIONSHIPS,* LEGAL ETHICS, LAW. DESKBK. PROF. RESP. § 1.5-1 (2005-06 ed.), § 1.5-1 (2006-07 ed.), § 1.5-1 at n.48 (2007-08 ed.), § 1.5-1 at n.23 (2009-10, 2010-11, 2011-12 eds.); ANNOTATED MODEL RULES OF PROF. CONDUCT § 1:5 (8th ed.); GEOFFREY HAZARD, SUSAN KONIAK, ROGER CRAMTON, GEORGE COHEN & W. BRADLEY WENDEL, THE LAW AND ETHICS OF LAWYERING 787-88 (4TH ed. 2005), 800-01 (5th ed. 2010). DEBORAH L. RHODE, DAVID LUBAN, SCOTT L. CUMMINGS, NORA FREEMAN ENGSTROM, LEGAL ETHICS 821 (7th ed. 2016).
**Cases:**   *Fernandez v. Victoria Secret Stores, LLC,* 2008 LEXIS 123546 (U.S.D.C., C.D. CA, July 21, 2008); *David v. Bartel Enterprises,* 856 N.W. 2d 271 at 276 (Minn. Sup. Ct. 2014); *Davis v. Cole*, 2015 WL 7015328 at *5 U.S.D.C. N.D. CA 2015); *Clark v. General Motors, LLC*, 161 F. Supp. 3d 752, at 762, 764 (U.S.D.C. W.D. Mo. 2015); *Komoroski v. Util. Serv. Partners Private Label, Inc.*, 2017 U.S. Dist. LEXIS 187259 at *7 n.2 (Nov. 9, 2017); *Verhulst v. Util. Serv.*, 2017 U.S. Dist. LEXIS 185609 (Nov. 9, 2017).


**The Continuing Assault on the Citadel of Fiduciary Protection:  Ethics 2000's Revision of Model Rule 1.5**, 2003 U. Ill. L. Rev.  1181-1216 (2003).  Accessible at: ssrn.com/abstract=702021. **Downloads:**  SSRN-463. **Cited In:** 44 Ariz. L. Rev. 829, at 865 (2002); 83 N.C.L. Rev. 411, at 418 (2005); 58 Ala. L. Rev. 1041 at n.27 (2007); 49 Wm. & Mary L. Rev 569 at 573, 609 (2007); ABA ANNO. MODEL RULES OF PROF. CONDUCT 81, (6th ed. 2007); 39 McGeorge L. Rev. 737, 737, 738 (2008); 59 Ala. L. Rev. 453, at 493 (2008); 29 Hamline J. Pub. L. & Pol'y 331 at 334, 343 (2008); 39 McGeorge L. Rev. 737 at 737 n.3 (2008); 61 Baylor L. Rev. 174 at 186 n.52 (2009); 53 St. Louis U. L.J. 553, 554 n.3 (2009); *Kansas Ethics Handbook* Appendix 7A (2009); *Ill. Sup. Ct. Rules*, Art. VIII, Ill. Rules of Prof. Conduct of 2010; 39 J. Legal Studies 245 at 247 (2010); 79 U. Cin. L. Rev. 697 at 714 n.91 (2010); 51 Santa Clara L. Rev. 853 at 876 n.87 (2011); GA. LAW OF TORTS PREP. FOR TRIAL §4:4 (2011 ed.); 26 Geo. J. Legal Ethics 59 at 77 n.62 (2013); 44 Hofstra L. Rev. 441 at 455, n.104, 456 nn.106, 108, 457 n.112 (2016); 65 Drake L. Rev. 179 at 198 n.131 (2016); 70 S.C.L. Rev. 261 at 267 n.19 (2018).


**Anatomy of a Madison County (Illinois) Class Action: A Study of Pathology**, Civil Justice Report No. 6, Center for Legal Policy at the Manhattan Institute (Aug. 2002). Accessible at:ssrn.com/abstract=327001. **Downloads:** SSRN-480. **Cited In:** 91 Ill. B.J. 230, at n.23 (May 2003); 27 N.C. Cent. L.J. 130, at 166 (2005); 55 Emory L.J. 279 at 337 (2006); 45 Tex. Int. L.J. 537, at 567 n.138 (2010); 86 Tulane L. Rev. 1 at 45 n.154 (2011); 2013 Annual AAJ-Papers 69 (2013); 19 Harv. Negot. L. Rev. 213 at 235 n.32 (2014); 66 Hastings L.J. 233 at 270 n.223 (2014); 68 Ark. L. Rev. 511 at 517 n.45 (2015).


**Lawyers' Ethics and Fiduciary Obligation in the Brave New World of Aggregative Litigation**, 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243-322 (2001). **Cited In:  Law Reviews:** 54 Baylor L. Rev. 331, at 332 (2002); 69 Def. Couns. J. 539, at 542 (2002); 27 Harv. Envtl. L. Rev. 519, at 536 (2003); 44 S. Tex. L. Rev. 925, at 929 (200 3); 27 Harv. Envtl. L. Rev. 519, at 536 (2003); 44 S. Tex. L. Rev. 1013, at 1018 (2003); 1 Geo. J. L. & Pub. Pol. 327, at 331, 335 (2003); 56 Vand. L. Rev. 1949, at 1952, 1966-67 (2003); 31 Pepp. L. Rev. 175, at 177, 181, 183-4, 186 (2004); 31 Pepp. L. Rev. 203, at 226 (2004); 31 Pepp. L. Rev. 271, at 299 (2004); 46 Wm. & Mary L. Rev. 127, at 154 (2004); 54 Duke L.J. 221 at 225 (2004); 24 Rev. Litig. 253, at 255, 257 (2005); 14 J. Bankr. L. & Prac. 1 at fn 10 (2005); 47 DRI For Def. 48 (2005); 12 Conn. Ins. L.J. 477 at 479 (2005-2006); 19 Geo. J. Legal Ethics 741 at 743 (2006); 26 Rev. Litig. 583 at 603 (2007); 16 J.L. & Pol'y 589 at 598 (2008); 1 Penn St. Envtl. L. Rev. 1 at 22, 24, 26 (2008); IADC Prod. Liab. Newsletter 2 ( Dec. 2008); 43 Akron L. Rev. 1107 at 1114 n.46 (2010); 45 Wake Forest L. Rev. 1157 at 1161 n.25 (2010); 43 Akron L.

Rev. 1107, at 1114 n.46 (2010); 36 Am. J. Trial Advoc. 1 at 6 n. 32 (2012); 34 Miss. C.L. Rev. 13 at n.210 (2015); 67 U. Kan. L. Rev. 195 at 221 n.139, 222 at nn.140, 144 (2018).

**Casebooks, Treatises, Restatements, Litigation Reports, Congressional Reports:** Report of the U.S. Senate on "The Fairness in Asbestos Injury Resolution Act of 2003," S.1125 at 95 n.43, 96 n.46 (July 21, 2003); 25 No. 14 Andrews Asbestos Lit. Rep. 12 (May 22, 2003); 10 No. 5 Andrews Class Action Litig. Rep. 26 (June 2003); 46 TEX. PRAC., ENVIRONMENTAL LAW § 28.3 (2d ed. 2004, 2011); 3-6 MEALEY'S TORT REF. UPDATE 12 (Jan. 2006); 20-23 MEALEY'S LITIG. REP. ASB. 19 (January 10, 2006); DEBORAH RHODE & GEOFFREY HAZARD, PROFESSIONAL RESPONSIBILITY AND REGULATION 197 (2002) at 216 (2d. ed. 2007); LINDA MULLINEX, MASS TORT LITIGATION 476 (2nd ed. 2008); 1 ATLA'S LITIGATING TORT CASES § 3:10, n.3 (2004, 2009, 2011, 2013, 2017); GEOFFREY HAZARD, SUSAN KONIAK, ROGER CRAMTON, GEORGE COHEN & W. BRADLEY WENDEL, THE LAW AND ETHICS OF LAWYERING 699 (4th ed., 2005), 702 (5th ed. 2010); Report of the U.S. House of Rep. Comm. on the Jud. on Furthering Asbestos Claim Transparency (FACT) Act of 2012,112th Cong. 2nd Session, No. 112-687 at 6 n.26 (Sept. 21, 2012).

**Cases:** *In re Zyprexa Prods. Liab. Lit.*, 424 F. Supp. 2d 488 at 494 (E.D.N.Y. 2006); *Genuine Parts Co. v. Cepec*, 137 A.3d 123 at *146 n.122 (Del. Sup. Ct., 2016).

**Mandatory Fee Arbitration Under New York's Matrimonial Rules,** 3 Cardozo Online J. of Conflict Resolution 1-45 (2001); Accessible at http://ssrn.com/abstract=1012084. **Downloads**: SSRN-268.  **Cited In:** 38 Vt. L. Rev. 339 at 371 n.232 (2013).

**Remarks at the Fordham University Law Review Panel Discussion:** The Tobacco Litigation and Attorney's Fees**,** 67 Fordham L. Rev. 2827-2858 (1999), with other authors. **Cited In**: 113 Harv. L. Rev. 1841 (2000); 109 Yale L.J. 1472 (2000); 34 Univ. Cal. Davis L. Rev. 35 (2000); 50 DePaul L. Rev. 780, 782-83, 785, 787-89, (2000); *Daynard v. Ness Motley*, 188 F. Supp.2d 115, at 117. (USDC, D. Mass., 2002); 2010 Mich. St. L. Rev. 423 at 435 n.47, 436 n.51 (2010).

**Game Theory and Nonrefundable Retainers:  A Response to Professors Croson and Mnookin**, 2 Harv. Negotiation L. Rev. 69-86 (1997), co-authored with Lawrence Cunningham. **Cited In:** *Cotton v. Kronenberg*, 111 Wn. App. 258 at 270 (2002); 57 Bus. Lawyer 1421 at 1449 (2002); *Agusta & Ross v. Trancamp Contracting Corp.*, 751 N.Y.S. 2d 155, at 158 (N.Y.C. Civ. Ct. 2002); 10 Harv. Negotiation L. Rev.1 at 8 (2005); JOHN W. HALL, JR., PROFESSIONAL RESPONSIBILITY IN CRIMINAL DEFENSE PRACTICE § 7:9 at n.1 (2005, 2011 eds.); GEOFFREY HAZARD, SUSAN KONIAK, ROGER, CRAMTON, GEORGE COHEN & W. BRADLEY WENDEL, THE LAW AND ETHICS OF LAWYERING 786 (5th ed. 2010); 2012 Mich. St. L. Rev. 347 at 387 n.59 (2012); 3 Envtl. Ins. Litig.: L. and Prac. §26:40 (2018).

**Contingency Fee Abuses, Ethical Mandates and the Disciplinary System: The Case Against Case-by-Case Enforcement,** 53 Wash. & Lee L. Rev. 1339-1379 (1996).  **Cited In:**

**Law Reviews, Bar Ass'n Opinions and Others**:  47 DePaul L. Rev. 439 (1998); 47 DePaul L. Rev. 371, at 400, 402 (1998); 66 Fordham L. Rev. 1431 (1998); 11 Geo. J. Legal Ethics 238, at 241 (1998); 47 DePaul L. Rev. 373 (1998); 47 DePaul L. Rev. 439 (1998); KANSAS BAR ASS'N ETHICS OP. LEO 98-06 (9/25/98); 41 Boston College L. Rev. 20 (1999); 67 U. Chicago L. Rev. 207 (2000); DEBORAH RHODE, IN THE INTERESTS OF JUSTICE 174  (2000); 87 Iowa L. Rev. 971, at 1022 (2002); 44 Ariz. L. Rev. 829, at 862,  865 (2002); 16 Geo. J.LE. 767 at 783 (2003); 2003 U. Ill. L. Rev. 1505, at 1517 (2003); 37 Ind. L. Rev. 65, at 135 (2003); 37 Ind. L. Rev. 65, at 135 (2003); 1 Geo. J. L. & Pub. Pol. 327, at 329-30, 335 (2003); 27 J. Legal Prof. 131, at 137 (2003); 27 J. Legal Prof. 131, at 137 (2003); 82 North Carolina L. Rev. 759,

at 790 (2004); 37 Creighton L. Rev. 305, 334 (2004); 82 N.C. L. Rev. 759 at 790 (2004); 27 Seattle L. Rev. 805, at 826 (2004); 54 DePaul L. Rev. 233, at 245 (2005); 12 Conn. Ins. L.J. 349 at 421, 439 (2005-2006); 60 Okla. L. Rev. 647 at 697 (2007); ABA ANNO. MODEL RULES OF PROF. CONDUCT 81, (6th ed. 2007); 61 S. Carolina L. Rev. 287 at 330 n.301 (2009); 54 N.Y. L. Sch. L. Rev. 773 at 805, 806 (2010); 39 J. Legal Studies 245 at 247 (2010); 77 Tenn. L. Rev. 653 at 658 nn.54-55, 660 nn.71-73, 79-80, 662 n.98, 666 nn.134-142, 667 nn.146-147, 149-150, 669 nn.170-177 (2010); 74 L. & Contemp. Prob. 1 at 2 n.4, 29 n.81 (2011); 86 N.Y.U. L. Rev. 805 at 855 (2011); 87 N.Y.U. L. Rev. 1273 at 1330 n. 276 (2012); 63 DePaul L. Rev. 377 at 438 n.234 (2014); 2016 Prof. Law. 129 at 130 n.6 (2016); 48 Tex Envtl. L.J. 277 at 292 nn. 121, 123 (2018).

**Casebooks, Treatises, Restatements, etc.:** GEOFFREY HAZARD & WILLIAM HODES, THE LAW OF LAWYERING (3d. ed.) 8-69 (2003 Supp.); NATHAN CRYSTAL, PROFESSIONAL RESPONSIBILITY 222 (3d. ed. 2004); MARC A. FRANKLIN, ROBERT L. RABIN & MICHAEL D. GREEN, TORT LAW AND ALTERNATIVES – CASES AND MATERIALS 718 (8th ed. 2006); DEBORAH RHODE & GEOFFREY HAZARD, PROFESSIONAL RESPONSIBILITY AND REGULATION 197 (2002), 216 (2d. ed. 2007); ABA ANNO. MODEL RULES OF PROF. CONDUCT, Rule 1.5 at subsection (c) (6th ed. 2007); GEOFFREY HAZARD, SUSAN KONIAK, ROGER CRAMTON, GEORGE COHEN & W. BRADLEY WENDEL, THE LAW AND ETHICS OF LAWYERING 515 (1999), 770 (4th ed. 2005), 798 (5th ed. 2010); DEBORAH RHODE, DAVID LUBAN & SCOTT CUMMINGS, LEGAL ETHICS 689 (3d. ed. 2001), 805 (4th ed. 2004), 839 (5th ed. 2009), 801 (6th ed. 2013).

**Cases:** *Schweizer v. Mulvehill*, 93 F. Supp. 376 (S.D.N.Y., 2000); *In re: Sulzer Hip Prosthesis and Knee Prosthesis Liability Litigation*, 290 F. Supp.2d 840, at 851 n.13 (N.D. Ohio, 2003); *Riddle v. Nat'l R.R. Passenger Corp.* (AMTRAK), 2014 WL 5783825 at *5 (U.S.D.C. S.D.CA, 2014).

**ABA Regulation of Contingency Fees:  Money Talks, Ethics Walks**, 65 Fordham L. Rev. 247-335 (1996). **Cited In:**

**Law Reviews, Bar Ass'n Opinions and Others:** 65 Fordham L. Rev. 39, at 242, 337, 469 (1996); 49 Rutgers L. Rev. 549 (1997); 47 DePaul L. Rev. 439 (1998); NYU Ann. Inst. Fed. Tax. 56-1 § 1.03 (1998); Class Actions: Five Principals 1.04-1; 47 DePaul L. Rev. 272 (1998); 47 DePaul L. Rev. 372, at 381, 404-07, 410 (1998); 11 Geo. J. Legal Ethics 239, 242-244 (1998); 47 DePaul L. Rev. 373 (1998); 47 DePaul L. Rev. 439 (1998); 22 Seattle Univ. L. Rev. 83 (1998); Wash. U.L.Q. 1413 (1998); 1 Legal Ethics 70 at 74 (1998); 47 Kan. L. Rev. 822 (1999); 2 J. Inst. Stud. Legal Eth. 255, at 264 (1999); 50 Case W. L. Rev. 9 (1999); 109 Yale L.J. 1444 (2000); 31 Loy. U. Chi. L.J. 613 (2000); 84 Minn. L. Rev. 1127 (2000); 28 BNA Products Safety & Liability Rep., at 917 (Oct. 2, 2000); 74 Tul. L. Rev. 2089, at n.91 (2000); 33 Ariz. St. L.J. 455 (2000); 24 Harv. J. L. & Pub. Pol'y 398 (2001); 64 Law & Contemp. Prob. 175 (2001); 50 Drake L. Rev. 315, at 321 (2002); 49 UCLA L. Rev. 991, at 1043, 1098 (2002); 30 Hofstra L. Rev. 767, at 771 (2002); 80 Texas L. Rev. 1829, at 1830 (2002); 15 Georgetown J. Legal Ethics 759, at n.86 (2002); 81 Texas L. Rev. 405 at 442 (2002); 80 Wash. U.L.Q. 739, 739 n.3, 757 n.60 (2002); 16 Geo. J.L.E. 223 at 247 (2003); 24 Cardozo L. Rev. 1361, at 1382 (2003); 37 U.C. Davis L. Rev. 567, at 591 (2003); 82 North Carolina L. Rev. 759, at 790 (2004); 37 Creighton L. Rev. 305, at 334 (2004); 82 N.C. L. Rev. 759, at 790 (2004); 54 Duke L.J. 447, at 482 (2004); 2005 U. Ill. L. Rev. 903, at 903 (2005); 34 Common Law World Rev. 201, 202 (2005); 57 Rutgers L. Rev. 839, at 866 (2005); 35 Hofstra L. Rev. 437 at 512 (2006); 31 Geneva Papers on Risk and Insurance — Issues and Practice 304 at 308 (April 1, 2006); 19 Geo. J. Legal Ethics 111 at 136 (2006); 35 Hofstra L. Rev. 437 at n.395 (2006); 29 Sydney (Australia) L. Rev. 5 at 34 (2007); 85 Tex. L. Rev. 1465 at n.136 (2007); 86 Or. L. Rev. 533 at 578 (2007); 25 Santa Clara Computer & High Tech. L. J. 159 at 166 n.20 (2008); 25 Santa Clara Computer & High Tech. LJ. 159 at 166 n.20 (2008); 39 J. Legal Studies 245 at 247 (2010); 54 N.Y. L. Sch. L. Rev. 773 at 780, 789, 797 (2010); 158

U. Pa. L. Rev. 2043, at 2045 n.9 (2010); 35 J. Legal Prof. 157 at 166 n.77 (2010); 37 Fla. St. U.L. Rev. 717 at 729 n.75 (2010); 74 L. & Contemp. Prob. 1 at 10, n.35 (2011); Benj. Barton, The Lawyer-Judge Bias in the American Legal System 156 n.77 (2011); 41 Pub. Cont. L.J. 813 at 843, n. 251 (2012); 61 Am. U.L. Rev. 1729 at 1758 n. 169, 1763 n. 198 (2012); 41 Pub. Cont. L.J. 813 at 843 n. 251 (2012); 44 Ariz. St. L.J. 1575 at 1593 n. 125 (2012); 92 Tex. L. Rev. 2075 at 2093 n.72 (2014); 69 N.Y.U. Ann. Surv. AM. L. 417 at 437 nn.138, 140-142 (2014); 103 Geo. L.J. 1061 at 1063 n. 8 (2015); 80 Brook. L. Rev. 743 at n.380 (2015); 2015 U.Ill L. Rev. 1563 at 1566 n.6 (2015); 15 Nev. L.J. 1455 at 1476 n.117 (2015). 83 U.Chi. L. Rev. 693 at 707 n.35 (2016); 52 Tort Trial & Ins. Prac. L.J. 119 at 127 n.34 (2016); 2016 Prof. Law 129 at *130 (2016); 72 Bus. Law 917 at 937 n.78 (2017); 65 Buff. L. Rev. 915 at 962-3, nn.270-271 (2017); 59 B.C. L. Rev. 1357 at 1364 n.42 (2018); 83 Univ. Chicago L. Rev. 693 at 707 n.35 (2018).

**Casebooks, Treatises, Restatements etc.:** Cochran, Jr. & Collett, The Rules of the Legal Profession 261 (1996); New York University Annual Institute on Federal Taxation 56-1 §1.03 (1998); Thomas Morgan & Ronald Rotunda, Professional Responsibility 166 (7th ed. 2000); Deborah Rhode, In the Interests of Justice 179 (2000); Cochran, Jr. & Collett, The Legal Profession 251 (2nd ed. 2003); Geoffrey Hazard & William Hodes, The Law of Lawyering (3d. ed.) 8-70 (2003 Supp.); Nathan Crystal, Professional Responsibility 222 (3d. ed. 2004); Ronald D. Rotunda & John S. Dzienkowski, Professional Responsibility - A Student Guide 156 (2005); ABA Anno. Model Rules of Prof. Conduct 82, (6th ed. 2007); Margaret Raymond, The Law and Ethics of Law Practice 321 (2009); Stephen Gillers, Regulation of Lawyers 181 (6th ed. 2002),148 (7th ed. 2005), 174 (8th ed. 2009); John Oakley & Vikram Amer, American Civil Procedure:  A Guide to Civil Adjudication in U.S. Courts at 219 n.3 (2009); Geoffrey Hazard, Susan Koniak, Roger Cramton,  George Cohen & W. Bradley Wendell, The Law and Ethics of Lawyering 518 (1999), 789 (4th ed. 2005), 802 (5th ed. 2010); Ronald Rotunda & John Dzienkowski, Legal Ethics, Law. Deskbk. Prof. Resp. § 6.33 (2002-03 ed.), § 1.5-3 (2006-07 ed.), § 1.5-3 (2009-2010, 2010-11, 2011-12 eds.); Class Actions:  Five Principles § 1.04-1 (The Class-Action Debate) (2014); 59 B.C.L. Rev. 1357 (2018).

**Cases:** *In re: Sulzer Hip Prosthesis and Knee Prosthesis Liability Litigation*, 290 F. Supp.2d 840, at 852 n.15 (N.D. Ohio, 2003); *Skannal v. Jones Odom Davis & Politz, L.L.P.,* 124 So. 3d 500 at 513, (La. Ct. of Appeals, 2nd Circuit Sept. 25, 2013);  *Howell v. Phoenix Life Ins. Co.,* U.S.D.C. N.D.GA (March 26, 2013), 2013 WL 12200650 at *6; *Campbell Harrison & Dagley, L.L.P. v. Hill,* No. 3:12-CV-4599-L, 2014 WL 2207211, at *14 (U.S.D.C. N.D. Tex. 2014), *aff'd in part, rev'd part*, 782 F.3d 240 (5th Cir. 2015); *Angino & Rovner v. Jeffrey R. Lessin & Assocs.,* 131 A. 3d 502, 2016 WL 81848 at *4 (Pa. Super Ct., Jan. 5, 2016).


**Nonrefundable Retainers:  A Response to Critics of the Absolute Ban,** 64 U. Cin. L. Rev. 11-70 (1995), co-authored with Lawrence Cunningham.  **Downloads:** SSRN-163. **Cited In:**

**Law Reviews and Bar Ass'n Opinions:** Ohio Bd. Com. Griev. Disp. Opinion 96-4 (June 14, 1996);  100 Dick. L. Rev. 511 (1996); 47 DePaul L. Rev. 387 (1998); Report and Recommendation*,* 22 J. Legal Prof. 367-369 (1998); 67 Fordham L. Rev. 450 (1998); 12 Geo. J. L.E. 479 (1999); 1 Fla. Coastal L.J. 293, at 296, 297 (1999*)*; 3 Mealey's Attorney Fees no. 4, at 22 (Nov. 2000); 33 Vand. J. Transnat'l L. 827 (2000); 57 Bus. Lawyer 1421, at 1449 (2002); Am. Bus. L.J. 173 at 195 (2006); 23 Emory Int'l L. Rev. 469, at 548 n.228 (2009); 61 S. Carolina L. Rev. 287 at 319 nn.234-236 (2009); 23 Geo. J. Legal Ethics 701 at 701 n.6, 702 n.15, 703 nn.24-25, 705 nn.42, 45-46, 709 nn.82-83, 714 nn.113-115 (2010); 2012 Mich. St. L. Rev. 347 at 387 n.59 (2012) ); *Maine Professional Ethics Commission Op.* 206 (Dec. 12, 2012); 41 West. S.U. L. Rev. 411 at 424 n.84 (2014); 41 W. St. U.L. Rev. 411 at 424 n.84 (2014); 52-Dec. Ariz. Att'y 42 at n.32 (2015).

JA04313

**Casebooks and Treatises**: ANDREW KAUFMAN & DAVID WILKINS, PROBLEMS IN PROFESSIONAL RESPONSIBILITY FOR A CHANGING PROFESSION 504-05 (4th ed. 2002); Robert Rossi, 1 ATTORNEYS' FEES § 1.3 at n.1; 102 ALR 5th 253 (2002); GEOFFREY HAZARD & WILLIAM HODES, THE LAW OF LAWYERING 8-66 (3d. ed. 2002 Supp.); 43 JOHN W. HALL, JR., PROFESSIONAL RESPONSIBILITY IN CRIMINAL DEFENSE PRACTICE § 7:9 at n.1 (2005, 2011 eds.); ABA ANNO. MODEL RULES OF PROF. CONDUCT, Rule 1.5 at subsection (b) (6th ed. 2007, 8th ed. 2015); 11-60 CORBIN ON CONTRACTS § 60.9 at n.37 (2009); STEPHEN GILLERS, REGULATION OF LAWYERS 164-65 (8th ed. 2009); GEOFFREY HAZARD, SUSAN KONIAK, ROGER CRAMTON, GEORGE COHEN & W. BRADLEY WENDELL, THE LAW AND ETHICS OF LAWYERING 786 (5th ed. 2010); EXPERT TESTIMONY: A GUIDE FOR EXPERT WITNESSES § 9.5.3 (3rd ed. 2014); 41 Western S.U.L. Rev 411 at (2014); 3 Envtl. Ins.: L. & Prac. §26:40 (2018).

**Cases:** *Kelly v. MD Buyline, Inc.*, 2 F. Supp.2d 420 at 445-47, 449-50 (S.D.N.Y. 1998); *Levisohn, Lerner, Berger & Langsam v. Medical Taping Systems, Inc.*, 20 F. Supp. 2d 645, at 650, 652, 654 (S.D.N.Y. 1998); *In re Dawson*, 8 P.3d 856, at 859 (2000); *Agusta & Ross v. Trancamp Contracting Corp.*, 751 N.Y.S. 2d 155, at 158 (N.Y.C. Civ. Ct. 2002); *Michigan Att'y Discipline Board v. Cooper*, Case No. 06-36-GA at 25 n.48, (Sept. 17, 2007); *McQueen, Rains & Tresch LLP v. CITGO Petroleum Corp.*, Case No. 07-CV-0314-CVE-PJC, 2008 WL 199895 at *9 (Jan. 22, 2008).

**Living with the Ban on Nonrefundable Retainers:  Cooperman's Scope, Meaning and Consequences**, 66 N.Y.S. BAR J. 50-54 (1994), co-authored with Lawrence Cunningham. **Cited In:** 17 Cardozo L. Rev. 725 (1996); Report and Recommendation, *Kelly v. MD Buyline, Inc.,* 2 F. Supp. 2d 420, at 449 (1998); 22 J. Legal Prof. 366 (1998); 6 Hawaii Bar J. 6, at n.14 (Mar. 2002); 7 N.Y. JUR. 2D. ATTORNEYS AT LAW §185 at n.61 (2003); 102 ALR 5th 253 (2002).

**On The Relevance of the Admissibility of Scientific Evidence:  Tort System Outcomes Are Principally Determined by Lawyers' Rates of Return,**  15 Cardozo L. Rev. 1755-1797 (1994). **Cited In:** 22 Hofstra L. Rev. 627 (1994); *Matter of Rhone-Poulenc Rorer, Inc.,* 51 F. 3d 1293, at 1298 (7th Cir. 1995); 2 Geo. Mason L. Rev. 163 at n.13 (1995); 64 Ford. L. Rev. 2353 (1996); 45 Emory L. Rev. 524, at 527, 533, 546, 569, 571, at 581 (1996); 21 Yale J. Int'l Law 179 (1996); 167 F.R.D. 519 (1996); 91 N.W. U.L. Rev. 1089 (1997); Wisc. Lawyer 11 (Aug. 1997); 47 De Paul L. Rev. 229 (1998); 47 DePaul L. Rev. 268 (1998); 32 Val. L. Rev. 954 (1998); 101 W. Va. L. Rev. 337 (1998); 1998 19 N.W. J. Int. Law & Business 298 (1999); 4 Mich. St. U. J. Med. & L. 1 at 7 n.157 (1999); 1 Nevada L.J. 274 at 318 (2001); 80 Texas L. Rev. 1943, at 1976 (2002); 80 Wash. U.L.Q. 739, 739 n.3 (2002); 71 Geo. Wash. L. Rev. 1, at 65 (2003); ROBERT JOOST, AUTO INSUR. AND NO-FAULT LAW 2d § 3:2 at n.5 (2002); 78 N.Y.U.L. Rev. 1357, at 1411, 1428 (2003); 55 Emory L.J. 279 at 324 (2006); 27 Cardozo L. Rev. 2433 at 2434 (2006); 79 Temp. L. Rev. 773 at 775 (2006); 56 DePaul L. Rev. 293 at 305 (2007); 85 Tex. L. Rev. 1465 at n.136 (2007); SN009 ALI-ABA CLE 2303 at 2375 n.5 (July 2007); 33 Law & Soc. Inquiry 1045 at 1046 (2008); 37 Sw. U. L. Rev. 691 at 696 (2008); 57 Buff. L. Rev. 959 at 1005, n.240 (2009), 42 Cornell In'tl L.J. 241, 268 n. 265 (2009); 33 J. Legal Prof. 301 at 301 n. 6 (2009); 39 J. Legal Studies 245 at 247 (2010); 96 Minn. L. Rev. 28 at 36 n.47 (2011); 37 Brook J. Int'l L. 751 at 779 n. 160 (2012); 2012 U. Ill. L. Rev. 1787 at 1789 n. 7 (2012).

**Rethinking Contingency Fees:  A Proposal To Align The Contingency Fee System with its Policy Roots and Ethical Mandates,** (1994), monograph co-authored with Michael Horowitz and Jeffery O'Connell: **Cited In:**
**Law Reviews and Bar Ass'n Opinions and Others:** 88 N.W. L. Rev. 528 (1994); Trial,

Apr. 1994 at 7; Best's Review P/C 38 (July 1994); 44 Case West.  L. Rev. 713 (1994); 74 B.U. L. Rev. 775 (1994); 854 PLI 447 (1994); 61 Def. Couns. L. Rev. 184 (1994); 68 Tulane L. Rev. 1409, at 1455 (1994); Trial, Oct. 1994, at 9; 80 ABA J. 12 (1994); Testimony of Arthur Levitt, Jr., Chairman SEC, before the Subcommittee on Telecommunications & Finance of the House Committee on Energy and Commerce, July 22, 1994; ABA Formal Op. 94-389, at 8,10; 74 Boston Univ. L. Rev. 150 (1994); 74 B.U.L. Rev. 748 (1994); Army Lawyer 60 (Aug. 1994); 6 S. Carolina Lawyer 8 (1994); PLI No. B4-7070 (Aug. 15-16, 1994); 61 J. Risk & Ins. 732 (1994); 47 Rutgers L. Rev. 1177(1995); C 977 ALI-ABA 170 (1995); 907 PLI/Corp 221, at n.47 (Nov. 1995); 44 Emory L.J. 173, at 193 (1995); 1 Ct. Ins. L.J. 33, at n.58 (1995); 80 Cornell L. Rev. 978, 983 (1995); 71 Chicago-Kent L. Rev. 628, at 631, 651 (1995); 51 Bus. Law. 337, at (1996); 15 Health Affairs 209 (1996); 30 Ga. L. Rev. 678 (1996); 25 J. Legal Stud. 530 (1996); 71 NYU L. Rev. 306, 352  (1996); 49 SMU L. Rev. 1640, 1643, 1660, 1666-68 (1996); 15 Yale L. & Policy L. Rev. 234 (1996); 49 Ark. L. Rev. 722 (1997); 1997 Wisc. L. Rev. 771 (1997); 26 J. Legal Stud. 275 (1997); 23 Wm. Mitchell L. Rev. 48 (1997); 62 Alb. L. Rev. 667 (1998); 52 U. Miami L. Rev. 810 (1998); 32  Val. L. Rev. 943 (1998); 47 DePaul L. Rev. 229 (1998); 47 DePaul L. Rev. 468 (1998); 47 DePaul L. Rev. 426, at  441 (1998); 47 DePaul L. Rev. 268 (1998); 47 DePaul L. Rev. 373, 376, 380, 392, 404, 408 (1998); 71 S. Cal. L. Rev. 1273 (1998); 84 Va. L. Rev. 1029 (1998); 37 Washburn L. Rev. 323 (1998); 11 Geo. J. Legal Ethics 232, at 235 (1998); 1998 Wis. L. Rev. 87 (1998); 16 Yale L. & Pol'y Rev. 276 (1998); 47 DePaul L. Rev. 427, 441 (1998); 101 W. Va. L. Rev. 328, 335, 337, 374, 378, (1998); 71 N.Y.S. Bar Ass'n J. 51, 54 (Apr. 1999); 35 Hous. L. Rev. 1630 (1999); 47 Kan. L. Rev. 822 (1999); 19 N.W. J.Int. Law & Bus. 275, 279, 292, 293, 295, 298, 299 (1999); 2 J. Inst. Stud. Leg. Ethics 223 (1999); 16 Ariz. J. Int. & Comp. L. 389 (1999); 49 DePaul L. Rev. 495 (1999); 33 Law & Soc'y Rev. 751 (1999); 14 Notre Dame J. Law, Ethics & Pub. Pol. 624-26, 628-29, 631, 647 (2000); 109 Yale L.J. 1444, 1472, 1490 (2000); 31 Loy. U.Chi. L.J. 616, at  626 (2000); Ct. Ins. L.J. 425, at 431 (2000);148 U. Pa. L. Rev. 2123 (2000); 24 Harv. J.L. & Pub. Pol'y 399 (2001); 76 N.Y.U.L. Rev. 689 (2001); 64 Law & Contemp. Prob. 175, at 191-92 (2001); 87 Cornell L. Rev. 122 (2001); 76 Notre Dame L. Rev. 1076 (2001); 50 Drake L. Rev. 315, at 318, 321 (2002); 80 Texas L. Rev. 1829, at 1831 (2002); 80 Texas L. Rev. 1943, at 1976 (2002); 88 Va. L. Rev. 1989, 2007, at n.40 (2002); 80 Wash. U.L.Q. 739, at 739 n.3, 777 n.97 (2002); 81 Texas L. Rev. 405 at 442 (2002); 78 N.Y.U.L. Rev. 1357, at 1430 (2003); 27 Seattle L. Rev. 805, at 820 (2004); 54 Duke L.J. 447, at 467, 482 (2004); Singapore Academic L.J. 76 at 76 n.1, 110-11 n.137, 114 n.149, 169 n. 119 (2004); 88 Marq. L. Rev. 1013, at 1026 (2005); 6 Sedona Conf. J. 173 (2005); 24 Quinn. L. Rev. 423, at 426 (2006); 19 Geo J. Legal Ethics 111 at 136, 140 (2006); 31 J. Health Pol. Pol'y & L. 531 at 531 (2006); 31 Law & Soc. Inquiry 711 at 713 (2006); 51 N.Y.L.S. L. Rev. 345 at 367 (2006-07); 85 Tex. L. Rev. 1465 at n.136 (2007); 54 N.Y. L. Sch. L. Rev. 773 at 775, 789, 805, 806 (2010); 37 Fla. St. U.L. Rev. 717 at 727 n. 62, 729 n.75 (2010); 99 Geo. L.J. 65, at 84 n.91 (2010); TSUI03 ALI-ABA 43, Nov. 1, 2012 at n. 84 (2012); 85 Temp L. Rev. 185 at 196 n. 117 (2012); 2 J.L.:  Periodical Laboratory of Leg. Scholarship 349 at n. 53 (2012); 2013041SP NYCBAR 130 (2013); 6 J. Tort L. 3 at 22 n.79 (2013); 2015 U. Ill. L. Rev. 1563 at 1573 n.38, 1590 n.49 (2015); 56 Wm. & Mary L. Rev. 833 at 845 n.50 (2015).

**Casebooks, Treatises, Restatements, etc.:** DEBORAH RHODE, PROFESSIONAL RESPONSIBILITY 855 (1994); MARY ANN GLENDON, A NATION UNDER LAWYERS 54 (300) (1994); ROY SIMON & MURRAY SCHWARTZ, LAWYERS AND THE LEGAL PROFESSION 588-89 (1994); JACK B. WEINSTEIN, INDIVIDUAL JUSTICE IN MASS TORT LITIGATION 74 n.142, 80 n.171, 81 nn.174-175, 169 n.22 (1995); C977 ALI-ABA 141 at n.36 (Jan. 12, 1995); ABA/BNA Lawyer's Man. of Prof. Conduct 41:920 (1995); 907 PLI/Corp 221, at 247 (Nov. 1995); NATHAN CRYSTAL, PROFESSIONAL RESPONSIBILITY 268-69 (1996); SCHWARTZ, WYDICK & PERSCHBACHER, PROBLEMS IN LEGAL ETHICS 133, 135 (4th ed. 1997);  BELL & O'CONNELL, ACCIDENTAL JUSTICE 216 (1997); PAUL G. HASKELL, WHY LAWYERS BEHAVE

21

As They Do 103 (1998); Deborah Rhode, In the Interests of Justice 180 (2000); Robert Kagan, Adversarial Legalism 290 (2001); Richard A. Zitrin & Carol M. Langford, Legal Ethics In the Practice of Law 101 (2nd ed. 200l); Richard Epstein, Cases And Materials on Torts 300 (6th ed. 1995), 803 (8th ed. 2004); Steven Shavell, Foundations of Economic Analysis of Law 437 (2004); Ronald D. Rotunda & John S. Dzienkowski, Professional Responsibility-A Student Guide 156 (2005), Thomas Morgan & Ronald Rotunda, Professional Responsibility 115 (6th ed. 1995), 143 (7th ed. 2000), 108 (8th ed. 2003), 111 (9th ed. 2006); Deborah Rhode & Geoffrey Hazard Jr., Professional Responsibility and Regulation 216, 218 (2d. ed. 2007); Stephen C. Yeazell, Civil Procedure 295 (6th ed. 2004), 300 (7th ed. 2008); Stephen Gillers, Regulation of Lawyers 148, 151 (4th ed. 1995), 180-81 (6th ed. 2002), 147-48 (7th ed. 2005), 173 (8th ed. 2009); Geoffrey Hazard, Susan Koniak, Roger Cramton, George Cohen & W. Bradley Wendell, The Law and Ethics of Lawyering 517 (1999), 788 (4th ed. 2005); 801 (5th ed. 2010); Russell Pearce, Daniel Capra & Bruce Green, Professional Responsibility:  A Contemporary Approach 251 (2011); John Noonan & Richard Painter, Professional and Personal Responsibilities of the Lawyer 70 (2nd ed. 2001), 94-95 (3rd ed. 2011); 2 Successful Partnering Between Inside and Outside Counsel § 43:16 (2011); Deborah Rhode, David Luban & Scott Cummings, Legal Ethics 699, 701, 702 (2d ed. 1995), 689 (3d ed. 2001), 805 (4th ed. 2004), 839 (5th ed. 2009), 801 (6th ed. 2013); Ronald Rotunda & John Dzienkowski, Legal Ethics, Law. Deskbk. Prof. Resp. § 6-3.3 (2002-03 ed.), § 1.5-3 (2005-06, 2006-07, 2009-2010, 2010-11, 2011-12, 2013-14 eds.); Expert Testimony: A Guide for Expert Witnesses § 9.5.3 (3rd ed. 2014).

**Cases:**  *In re Joint E. & S. Dist. Asbestos Litigation*, 878 F. Supp. 473, at 558, 559, 561 (1995); *Riddle v. Nat'l R.R. Passenger Corp. (AMTRAK)*, 2014 WL 5783825 *5 (U.S.D.C. S.D. CA 2014).


**Nonrefundable Retainers Revisited**, 72 N.C. L. Rev. 1-54 (1993), co-authored with Lawrence Cunningham.  Cited In**:**
**Law Reviews, Bar Ass'n Opinions and Other:**  46 Mercer L. Rev. 311, at 320 (1994); *Virginia Legal Ethics Op. 1606 (Nov. 22, 1994)*; 19 J. Legal Prof. 395, at 399 (1994); 71 Chicago-Kent L. Rev. 666 (1995);18 UALR L. Rev. 107, at 107-111, 113, 114, 119 (1995); 9 Georgetown J. Legal Ethics 588, 590, 591 (1996); *Dist. Col. Bar Op. 264* (Mar. 1996); 17 Cardozo L. Rev. 723-25, 728-29, 731, 735 (1996); 1996 Ohio Griev. Discip. LEXIS 5, Opinion 96-4 (Nov. 1994); 1 Harv. Negotiation L. Rev. 72 (1996); *Ohio Bd. Com. Griev. Disp. Opinion 96-4 (June 14, 1996)*; Dist. Columbia Ethics Op. 264 (Feb. 14, 1996); 16 No. 2 FairShare 3 (1996); 16 No. 4 FairShare 4 (1996); 22 J. Legal Prof. 365, 368 (1998); 101 W. Va. L. Rev. 376 (1998); 1998 Ark. Notes 21 at 23 n.21 (1998); 67 Fordham L. Rev. 450 (1998); 35 Hous. L. Rev. 1561 (1999); 19 N.W. J. Int. Law & Bus. 305 (1999); PLI No. H0-003Q (June 1999); 12 Geo J. L.E. 479 (1999); 1 Fla. Coastal L.J. 293-95, 299, 342-43, 358 (1999); 1999 Utah L. Rev. 240 (1999); 3 Mealey's Attorney Fees no. 4, at 22 (Nov. 2000); 33 Vand. Transnat'l L. 827 (2000); 25 J. Legal Prof. 196, 198 (2001); 81 Tex. L. Rev. 405, at 515 (2002); 57 Bus. Lawyer 1421, at 1449 (2002); 2008 WL 199895 at *4, *9 (2008); *Okla. Bar Ass'n Ethics Op* 317 at n.8 (Dec. 13, 2002); 61 Baylor L. Rev. 174, 186 n.56 (2009); 61 S. Carolina L. Rev. 287 at 318 n.225 (2009); 23 Geo. J. Legal Ethics 701 at 701 n.6, 705 n.42, 706 n.53 (2010); *Maine Professional Ethics Commission Op.* 206 (Dec. 12, 2012); 52 Am. Crim. L. Rev. 25 at 31 n.32 (2015); 44 Hofstra L. Rev. 441 at 456 n.109 (2016).
**Casebooks, Treatises, Restatements, etc.:** ABA/BNA Lawyers' Manual on Professional Conduct 45:111 (1993); ABA/BNA Lawyers' Manual on Professional Conduct Current Rep. Mar. 23, 1994 at 54; BNA Criminal Practice Manual, Current Rep. Apr. 13, 1994 at 172, 174; ABA/BNA Lawyers' Manual on Professional Conduct Current Rep. June 15, 1994 at 150; Thomas Morgan & Ronald Rotunda, Professional Responsibility 136 (6th ed. 1995), 167 (7th

ed. 2000);  ALI Restatement of the Law, The Law Governing Lawyers, Ch. 3, §34, comment e at 254 (2000); Deborah Rhode & Geoffrey Hazard, Professional Responsibility and Regulation 196-97 (2002); Geoffrey Hazard & William Hodes, The Law of Lawyering III (2nd ed. 1993), 8-66 (3d ed., 2002 Supp.); Robert Rossi, Attorneys' Fees § 1.3 at n.1 (2003); 102 ALR 5th 253 (2002); 2A; North Carolina Index 4th Attorneys at Law § 56 at n.64 (2003); Nathan Crystal, Professional Responsibility 277 (1996), 80 (3d. ed. 2004); Lisa Lerman & Philip Schrag, Ethical Problems in the Practice of Law 449 (2005); John W. Hall, Jr., Professional Responsibility in Criminal Defense Practice § 7:9 at fn 1  (2005, 2011 eds.); ABA Anno. Model Rules of Prof. Conduct 80, (6th ed. 2007); Stephen Gillers, Regulation of Lawyers 134, 137 (4th ed. 1995), 170 (6th ed. 2002), 141 (7th ed. 2005), 164 (8th ed. 2009); Geoffrey Hazard, Susan Koniak, Roger Cramton, George M. Cohen & W. Bradley Wendel, The Law and Ethics of Lawyering 502 (1st ed. 1999), 772 (4th ed. 2005), 786 (5th ed. 2010);11-60 Corbin on Contracts § 60.9 at n.37 (2009); John Noonan & Richard Painter, Professional and Personal Responsibility of the Lawyer 64 (2nd ed. 2001), 90 (3d ed. 2011); 4 Marital Litigation in South Carolina §13-B-2-c (2012); Expert Testimony:  A Guide for Expert Witnesses §9.5.3 (3rd ed. 2014); 2 Commercial Damages:  Remedies in Business Litig. § 36.03 (2015); Marital Litigation in South Carolina § 13-B-2-c, Attorneys' Fees and Litigation Expenses, B. Recovering Fees from Clients (2015); Deborah Rhode & David Luban, Legal Ethics 683 (3d. ed. 2001), 797 (4th ed. 2004), 831 (5th ed. 2009), 792 (6th ed. 2013, 811 (7th ed. 2016).

**Cases**_: Kin Cheung Wong v. Kennedy_, 853 F. Supp. 79, at 80 (1994*); Matter of Cooperman*, 83 NY2d 465, at 472, 476 (N.Y.Ct. App. 1994); *Cohen v. Radio-Elec. Off. Union*, 275 N.J. Super. 241, at 265, 266 (1994); *In re: Gray's Run Technologies*, 217 B.R. 48 at 52, 55 (1997); *Iowa Sup. Ct. Bd. Prof. Ethics & Conduct v. Aplands*, 577 N.W. 2d 50, at 54-57 (1998); Report and Recommendation, *Kelly v. MD Buyline, Inc.*, 2 F. Supp. 2d 420, at 445-451 (S.D.N.Y. 1998*); Levisohn, Lerner, Berger & Langsam v. Medical Taping Systems, Inc.*, 20 F. Supp. 2d 645, at 650-654 (S.D. N.Y. 1998); *In re Miles*, 516 S.E.2d 661, at 664 (S.C. Sup. Ct. 1999*); In re Hayes*, 183 F. 3d 162, at 170 (2d Cir. 1999); *In re Sather*, 3P.3d 403, at 410, 411 (Colo. Sup. Ct. 2000); *Agusta & Ross v. Trancamp Contracting Corp.*, 751 N.Y.S. 2d 155, at 158 (N.Y.C. Civ. Ct. 2002); *Iowa Supreme Court Bd. of Prof. Ethics & Conduct v. Frerichs*, 671 N.W.2d, at 476, 477 (Ia. 2003); *U.S.A v. Parker*, 2006 U.S. App. LEXIS 4092, at *48 (2006); *McQueen, Rains & Tresch, LLP v, CITGO Petroleum Corp.,* 2008 U.S. Dist. LEXIS 4952, at *10, *28 (Jan. 22, 2008); *Hinkson v. Bernhoft*, 2009 WL 10711918 at *3 n.6, *4 (U.S.D.C., D. Idaho 2009).  *Meyer, Suozzi, English & Klein, P.C., v. Vista Maro, LLC*, N.Y. Sup. Ct. Nassau Cnty., Jan. 12, 2011, 2011 N.Y. Misc. LEXIS 582 at **7 (Jan. 18, 2011); In re: The New York Racing Ass'n, Inc., 2016 WL 6081087 at *4 (2016).

**Has the Office of Thrift Supervision Changed the Relevant Ethics Rules by its Actions in the Kaye, Scholer Matter?,** in The Attorney-Client Relationship After Kaye, Scholer, Practicing Law Institute 79-91 (1992).  **Cited In:**  66 So. Calif. L. Rev. 1020 (1993); 66 So. Calif. L. Rev. 1014 (1993); 66 So. Calif. L. Rev. 1171, at 1189 (1993); 66 Geo. Wash. L. Rev. 296 (1994); 82 Calif. L. Rev. 716 (1994); 63 Geo. Wash. L. Rev. 221, at 236 (1995); 57 Bus. Law. 1421 at 1430 at (2002).

**The Asbestos Claims Management Act of 1991:  A Proposal To The United States Congress,** 13 Cardozo L. Rev. 1891-1917 (1992).  **Cited In:** 2 Legal Malpractice Rep. 17 (1991); 6-20 Mealey's Litig. Rep. Asb. 7 (Nov. 1991); 6-21 Mealey's Litig. Rep. Asb. 26 (Dec. 1991); 13 Card. L. Rev. 1919 (1992); 13 Card. L. Rev. 1949 (1992); 13 Card. L. Rev. 1958, at 1962, 1964 (1992); 13 Card. L. Rev. 1967, at 1987 (1992); 44 Stanford L. Rev. 817 (1992); 15 Harv. J. Law & Pub. Policy 593 (1992); 59 Bklyn L. Rev. 963 (1993); 31 Col. J. Transnational Law 226 (1993); 15 Card. L. Rev. 2217 (1994); Jack B. Weinstein, Individual

23

JUSTICE IN MASS TORT LITIGATION 164 n.6, 165, 168 n.18, 303 n.7 (1995); LINDA MULLINEX, MASS TORT LITIGATION 1029 (1996); 64 Ford. L. Rev. 2365 (1996); 94 Mich. L. Rev. 978 (1996); 71 N.Y.U. L. Rev. 302 (1996); 85 Geo. L. Rev. 312 (1996); 47 DePaul L. Rev. 433 (1998); 87 Geo. L.J. 2019 (1999); 148 U. Pa. L. Rev. 2192 (2000); 36 Wake Forest L. Rev. 942 (2001); 56 Vand. L. Rev. 1949 at 1976-77 (2003); 72 Fordham L. Rev. 1219, at 1267 (2004); 72 Fordham L. Rev. 1219, at 1267-68 (2004); 62 NYU Ann. Surv. Am. L. 223 at 231 (2006); 2 ENVTL. INS. LIT. L. & PRAC. § 27:8 at 498-500 (2006); 26 Rev. Litig. 583 at 598 (2007); 34 Law & Soc. Inquiry 5 at 5 (2009); 3NEW YORK PRACTICE GUIDE: NEGLIGENCE UNIT III MAJOR CAUSES OF ACTION CHAPTER 29.  Products Liability (2015); 71 Vand. L. Rev 121 at 144 n.107 (2018); N.Y. Practice Guide, Negligence §29.27 (2019).

**The Asbestos Litigation Crisis:  Is There a Need for An Administrative Alternative?,** 13 Cardozo L. Rev. 1819-1889 (1992).  **Cited In:**
**Law Reviews, Bar Ass'n Opinions and Other**:  13 Card. L. Rev. 1963 (1992);  44 Stanford L. Rev. 817 (1992); 15 Harv. J. Law & Pub. Policy 541, at 558, 566 (1992); 26 Ga. L. Rev. 652 (1992); 42 Duke L. J. 39 (1992); 61 Ford. L. Rev. 620, at 621 (1992); 31 Col. J. Transnational Law 226 (1993); 68 Tul. L. Rev. 240 (1993); 30 S.D.L. Rev. 279 (1993); 30 Harv. J. Legis. 388, 390, 394, 400 (1993); 52 Md. L. Rev. 951 at 952 n.6 (1993); 52 Md. L. Rev. 1011 931 at (1993); 59 Bklyn L. Rev. 1092 (1993); 88 N.W. L. Rev. 527 (1994); 41 UCLA L. Rev. 1337, 1362, 1396 (1994); 15 Card. L. Rev. 2217 (1994); 20 Am. J. L. & Med. 257 (1994); 104 Yale L.J. 376 (1994); 19 J. Law & Soc. Inquiry 58 (1994); 73 Oregon L. Rev. 506, 528 (1994); 39 Vill. L. Rev. 420, at 421 (1994); 73 Tex. L. Rev. 1633, 1645 (1995); 32 Am. Bus. L. J. 625 (1995); 80 Cornell L.R. 973 (1995); 80 Cornell L.R. 1176, 1212 (1995); 17 Cardozo L. Rev. 586, at 618-19 (1996); 41 N.Y.L.Sch. L. Rev. 526 (1997); 16 Quin. L. Rev. 365 (1997); 97 Colum. L. Rev. 2145 (1997); 31 Loyola L.A. L. Rev. 528 (1998); 1998 Det. C.L. Rev. 15 (1998); 87 Geo. L.J. 2019 (1999); 34 Wake Forrest L. Rev. 1077 (1999); 24 Am. J. Trial Advocacy 252 (2000); 24 Harv. J.L. & Pub. Pol'y 400 (2001); 50 Emory L. Rev. 631, at 641 (2001); 11 Duke J. Comp. & Int'l L. 408 (2001); 33 Tex. Tech. L. Rev. 1, at n.29 (2001); 71 Miss. L.J. 1 at 6 (2001); 87 Cornell L. Rev. 616, at 638 (2002); SH043 ALI-ABA 119, at n.10 (2002); 80 Texas L. Rev. 1943, at 1976 (2002); 22 JNAALJ 195, at n.184 (2002); 76 St. Johns L. Rev. 397, at n.2 (2002); 33 Seton Hall L. Rev. 109, at n.61 (2002); 56 Vand. L. Rev. 1949, at 1952, 1966, 1969, 1972-3, 1993 (2003); 25 No. 14 Andrews Asbestos Litig. Rep. 12 at n.2 (May 22, 2003); 10 No. 5 Andrews Class Action Litig. Rep. 26 at n.2 (June 2003); 31 Pepp. L. Rev. 11 at 12 (2004); 31 Pepp. L. Rev. 175 at 176 (2004); 79 Ind. L. Rev. 567 at 570 (2004); 46 Wm. & Mary L. Rev. 127, at 152 (2004); 15 Ind. Int. & Comp. L. Rev. 583, at 597,600 (2005); 35 N. Mex. L. Rev. 260 at 295 (2005); 70 Mo. L. Rev. 349, at 380 (2005); 33 Pepp. L. Rev. 227, at 260 (2006); 62 NYU Ann. Surv. Am. L. 223 at 231-32, 245 (2006); 75 U. Cin. L. Rev. 213 at 217 (2006); 7 Nev. L.J. 73 at 77, 90 (2006); 48 Wm. & Mary L. Rev. 2043 at 2052 (2007); 26 Rev. Litig. 583 at 587 (2007); 16 Tul. J. Int'l. & Comp. L. 157 at 162 (2007); 2008 U. Ill. L. Rev. 1101 at 1102, 1108 (2008); 41 U.C. Davis L. Rev. 1613 at 1618–1622, 1629, 1642 (2008); 34 Law & Soc. Inquiry 5 at 25 (2009); 60 Ala. L. Rev. 649, 675 n.104 (2009); 2009 U. Ill. L. Rev. 895 at 896 n.1 (2009); 51 Wm. & Mary L. Rev. 1997 at 2040 n.193 (2010); 46 U. Mich. J.L. Reform 1279 at 1286 n.42; 23 Widener L.J. 97, 102 n.20 (2013); 88 Tulane L. Rev. 1211 at 1216 n.19, 1227 at n.90,1238 at n.158, 1238 at n.158 (2014); 113 Mich. L. Rev. 607 at 619 n.55 (2015); 36 B.C. J.L. & Soc. Justice 27 at 35 n.67 (2016); 23 Geo. Mason L. Rev. 697, 721 n.202 (2016); 39 Cardozo L. Rev. 245 at 272 n.125 (2017).
**Casebooks, Treatises, Restatements, etc.:** JACK B. WEINSTEIN, INDIVIDUAL JUSTICE IN  MASS TORT LITIGATION 169 n.22 (1995);  LINDA MULLENIX, MASS TORT LITIGATION 650 (1996); ROBERT KAGAN, ADVERSARIAL LEGALISM 127 (2001); 4 MOD. SCI. EVIDENCE §38-11 (2d. ed., 2003 pocket

part); 1 TOXIC TORTS LITIG. GUIDE § 1:4 (2011), 2 TOXIC TORTS LITIG. GUIDE § § 14:21, 14:22, 14:46, (2011); TOXIC TORTS LITIG. GUIDE §§ 5:62, 7:29, 1420:22, 14:46 (2014); 3 *New York Practice Guide: Negligence* § 29.27 (2015).  N.Y. Practice Guide: Negligence §29.27 (2019).
**Cases**:  *Abate v. A.C.&S. Inc.,* No. 89236704 slip op. (Md. Cir. Ct. Baltimore City Dec. 9, 1992); *TXO Prod. Corp. v. Alliance Res. Corp*., 113 S. Ct. 27 (1993); *Dunn v. Hovic*, 1 F.3d 1371, at 1397 (3rd Cir. 1993); Cimino et al. v. Raymark Industries..., 151 F.3d. 297, at 336 (5th Cir. 1998); *Abadie v. Metropolitan Life Ins. Co.*, 784 So. 2d 46, at n.34 (2001); *USA v. Weintraub*, 273 F.3d 139, at 150 (2nd Cir. 2001); *Lippe v. Bairnco Corp.* et al., 2002 WL 34342589 at nn.38, 42, 52-54 (SDNY, Feb. 1, 2002)(Expert Report and Affidavit); *Robinson v. Crown Cork & Seal Co.*, 335 S.W. 3d 126 at 185 (Tex. Sup. Ct. 2010).

**The Use of Advance Fee Attorney Retainer Agreements in Bankruptcy:  Another Special Law for Lawyers?,** 43 S.C. L. Rev. 1037-1101 (1992), co-authored with Jonathan Klein.  **Cited In:   Law Reviews, Bar Ass'n Opinions and Other**:  70 N.C. L. Rev. 443 (1992); 71 Wash. L.Q. 811, at 832 (1993); 78 Minn. L. Rev. 1082, at 1088, 1089, 1090, 1096, 1098 (1994); 49 The Record (of the Bar Ass'n of the City of N.Y.) 664 (1994); *In re Mills*, 170 B.R. 404, at 407-408 (Bankr. D. Ariz. 1994); 68 Am. Bank. L.J. 425 (1994); 15 Card. L. Rev. 2370 (1994); THOMAS MORGAN & RONALD ROTUNDA, PROFESSIONAL RESPONSIBILITY 137 (6th ed. 1995); 18 UALR L. Rev. 119 (1995); 9 Geo. J. Legal Ethics 589 (1996); 22 J. of Legal Prof. 309 (1998*);* 102 ALR 5th 253, at 257 (2002); 2 SOUTH CAROLINA BUS. ATTORNEY FEES § 83; 18 DCBA Brief 24, at 28, 30 (2006); 61 S. Carolina L. Rev. 287 at 288 n.13 (2009).
**Cases:** *Raymark Indus. v. Butera, Beausang, Cohen & Brennan*, 1997 U.S. Dist. LEXIS 19070 at *42 (E.D. Pa., Dec. 1,. 1997); *In re Datesman*, 1999 WL 608856 at *6 nn.8-10, *8 n.14 (Bankr. E.D. Pa., 1999); *Bethea v. Robert J. Adams & Assoc*. (In re Bethea), 275 B.R. 284, at 293 (Bankr. N.D. Ill., 2002); *Ark. Teacher Ret. Sys. v. State St. Bank & Trust Co.*, 2017 U.S. Dist. LEXIS 66660 at *16-17 (May 2, 2017).

**Setting the Fee when the Client Discharges a Contingent Fee Attorney,** 41 Emory L.J. 367-401 (1992). **Cited In:**
**Law Reviews, Treatises, ABA and Bar Ass'n Opinions and Other**: 19 Vt. Bar J. 15, at n.26 (Aug. 1993); 72 Or L. Rev. 872 (1993); N.Y.L.J. at 3, col. 3 (Sept. 7, 1993); THOMAS MORGAN & RONALD ROTUNDA, PROFESSIONAL RESPONSIBILITY 136 (6th ed. 1995); 89 Nw. L. Rev. 1449 (1995); 71 Chicago-Kent L. Rev. 655, 674 (1995); Adams v. Med-Force, 682 So.2d 323, at 325 (1996). NATHAN CRYSTAL, PROFESSIONAL RESPONSIBILITY 286 (1996); 9 Geo J. Legal Ethics 589 (1996); 47 De Paul L. Rev. 386, at 388 (1998); 11 Geo J. Legal Ethics 244 (1998); 67 Fordham L. Rev. 458 (1998); THOMAS MORGAN & RONALD ROTUNDA, PROFESSIONAL RESPONSIBILITY 166 (7th ed. 2000); JOHN NOONAN & RICHARD PAINTER, PROFESSIONAL AND PERSONAL RESPONSIBILITIES OF THE LAWYER 69 (2nd ed. 2001); GEOFFREY HAZARD & WILLIAM HODES, THE LAW OF LAWYERING (3d. ed.) 8-92 (2003 Supp.); 27 U.A.L.R. L. Rev. 169, at 181 (2004); 90 Iowa L. Rev. 475, at 491 (2005); ABA ANNO. MODEL RULES OF PROF. CONDUCT, Rule 1.5 at subsection (c) (6th ed. 2007); 39 St. Mary's L.J. 539, at 545, 548 (2008); 11-60 CORBIN ON CONTRACTS § 60.9 at n.99 (2008); 11-6054 N.Y. L. Sch. L. Rev. 773 at 795 (2010); 126 Harv. L. Rev. 486 at 518 n. 138 (2012); 108 Nw. U.L. Rev. 311, 337 n.188 (2013; 108 Nw. L. Rev. 311 at 337 nn. 188-90 (2014); 90 N.Y.U.L. Rev. 71 at 130 n.309 (2015); 2 COMMERCIAL DAMAGES: REMEDIES IN BUSINESS LITIG. § 36.03 (2015); 70 Vand. L. Rev. 67 at 148 n.396 (2017).
**Cases:** *Opert v. Mellios*, 614 N.E.2d 996, at 997 (Mass. 1993); *Reid, Johnson et al. v. Lansberry*, 629 N.E.2d 431, at 436 (Ohio Sup. Ct. 1994); *Robinson v. Nussbaum*, 11 F.2d. 1, at 5 (1997); *Campbell v. Bozeman Investors*, 964 P.2d 41, at 44 (Mont. 1998); *Avery v. Manitowoc Cty. et al.,* 428 F. Supp. 2d 891 at 895 (E.D. Wis. 2006); *Baker v. Shapero*, 203 S.W. 3d 697 at 699 (Ky. 2006);  *Bonar v. Waite, Schneider, Bayless & Chesley Co., L.P.A.*,

2009 Ky. App. LEXIS 201 at *23–*24 (Ky. Ct. App. Oct. 16, 2009); *Freeman et al. v. Clarke Cty.,* 2012 WL 6569378 at *9 (S.D. Miss. Dec. 16, 2012); *Angino & Rovner v. Jeffrey R. Levin & Assocs.,* 131 A.3d 502 at 508, 509 (Pa. Super. Ct., Jan. 5, 2016).

**Collateral Estoppel As a Basis for Attorney Discipline:  The Next Step**, 5 Geo. J. Legal Ethics 1-33 (1991), co-authored with J. Bibona.  **Cited In:** 61 Tenn. L. Rev. 67 (1993); 35 S. Tex. L. Rev. 642 (1994); 36 S. Tex. L. Rev. 789 (1995) *In Matter of Applicant*, A 3 Ca. St. Bar Ct. Rptr. 318, at 328 (1995); *In Matter of Applicant A*, 3 Cal. St. Bar Ct. Rptr. 318, at 328 (1995); N.Y.L.J., July 27, 1998 at 7; *In re  Capoccia*, 709 N.Y.S.2d 640, at 650 (N.Y. App. Div. 3rd Dept., 2000); RESTATEMENT  OF THE LAW GOVERNING LAWYERS 3rd, §5, cmt g. (2000); GEOFFREY HAZARD & WILLIAM HODES, THE LAW OF LAWYERING 955 (2d ed. 1993), 8-95 (2003 Supp.); 22 Geo. J. Legal Ethics 949 at 950 n.8 (2009); PROFESSIONAL RESPONSIBILITY IN CRIMINAL DEFENSE PRACTICE 3d § 32.21 (2011 ed.).

**A Massachusetts Debacle:  Gagnon v. Shoblom**, 12 Cardozo L. Rev. 1417 (1991).  **Cited In:**  *In re Joint E. & S. Dists. Asbestos Litigation (Findley v. Blinken),* 129 B.R. 710, at 867 (Bank. Ct. E. & S. D.N.Y. 1991); DEBORAH RHODE & DAVID LUBAN, LEGAL ETHICS 774 (1992); LEO LEVIN, PHILLIP SHUCHMAN & CHARLES YABLON, CIVIL PROCEDURE 481 (1992); 49 SMU L. Rev. 1660 (1996); 47 DePaul L. Rev. 402 (1998); 41 Boston College L. Rev. 39 (7th ed. 1999); 31 Loy. U. Chi. L.J. 631 (2000); STEPHEN GILLERS, REGULATION OF LAWYERS 120 (3d. ed. 1992),184 (6th ed. 2002); RICHARD A. ZITRIN & CAROL M. LANGFORD, LEGAL ETHICS IN THE PRACTICE OF LAW 101 (2nd ed. 2001); GEOFFREY HAZARD & WILLIAM HODES, THE LAW OF LAWYERING 118; LAWYERS 151 (4th ed. 1995), 8-67 (3d. ed. 2003 Supp.); GEOFFREY HAZARD, SUSAN KONIAK, ROGER CRAMTON, GEORGE COHEN, AND W. BRADLEY WENDEL,  THE LAW AND ETHICS OF LAWYERING 516 (1999), 784 (4th ed. 2005), 798 (5th ed. 2010).

**Attorneys at Law,** in WARREN'S WEED NEW YORK REAL PROPERTY vol. 1, pp. 1-99 (Matthew Bender, 1991).

**Attorney-Client Fee Arbitration:  A Dissenting View**, 1990 Utah L. Rev. 277-307 (1990).  **Cited In:**  2 Legal Malpractice Rep. 17 (1991); DEBORAH RHODE & DAVID LUBAN, LEGAL ETHICS 764, 766 (1992); 6 Geo. J. of Legal Ethics 11234 (1992); 1992 J. Disp. Res. 341, 346-48, 355 (1992); 13 Card. L. Rev. 2147 (1992); 46 S.M.U. L. Rev. 2031, 2040, 2051, 2052, 2061, 2062 (1993); 49 The Record of the Ass'n of the Bar of the City of N.Y. 292 (1994); 44 Case-West. L. Rev. 680, 714, 736 (1994); 107 Harv. L. Rev. 1605 (1994); 107 Harv. L. Rev. 1666 (1994); THOMAS MORGAN & RONALD ROTUNDA, PROFESSIONAL RESPONSIBILITY; DEBORAH RHODE & DAVID LUBAN, LEGAL ETHICS 693, 695, 696 (2d ed. 1995); The Domestic Relations Fee Arbitration Program: A Report to the Chief Judge and Chief Administrative Judge (N.Y. Unified Court System 2, Nov. 1996); 38 S. Tex. L. Rev. 519, 630, 631, 633 (1997); 1998 J. Disp. Resol. 101 (1998); 77 North Carolina L. Rev. 967, 1027 (1999); 84 Iowa L. Rev. 828, 831-33, 837, 839-840,843-48,  857 (7th ed.  1999); THOMAS MORGAN & RONALD ROTUNDA, PROFESSIONAL RESPONSIBILITY, 137 (6th ed. 1995), 167 (1999); 84 Iowa L. Rev. 828, at 831-32, 835-40, 844-48 850, 857 (1999); 12 ABA Prof. Lawyer 24 (Spring 2001); 85 Marquette L. Rev. 975, at 980, 988 (2002); 33 St. Mary's L.J. 909 at 957-58 (2002); 80 Texas L. Rev. 1213, at 1253 (2002); GEOFFREY HAZARD & WILLIAM HODES, THE LAW OF LAWYERING 93 (1992 Supp.), 8-95 (2003 Supp.); 72 Fordham L. Rev. 849, at 874 (2004); 19 Geo. J. Legal Ethics 59 at 83 (2006); 35 Hofstra L. Rev. 327 at 336, 341-42 (2006); ABA ANNO. MODEL RULES OF PROF. CONDUCT 80, (6th ed. 2007); *Kansas Ethics Handbook* Appendix 7A (2009); UTAH REAL PROP. LAW § 16.07, nn.186, 194 (2010); 38 Vt. L. R. 339 at 372 n.237 (2013).

**Contingent Fees Without Contingencies: Hamlet Without the Prince of Denmark?**, 37

UCLA L. Rev. 29-137 (1989).  **Cited In**:

**Law Reviews, Bar Ass'n Opinions and Other:** 37 UCLA L. Rev. 949, 953, 954, 956, 980 (1990); 70 Boston U.L. Rev. 628 (1990); 23 Akron L. Rev. 334 (1990); 58 U. Chicago L. Rev. 24 (1991); 44 Rutgers L. Rev. 11 (1991); 1991 U. Ill. L. Rev. 269, at 294, 297 (1991); 54 Law & Contemp. Probs. 101 (1991); 90 Mich. L. Rev. 349 (1991); 43 Stan. L. Rev. 538 (1991); 60 U. Cin. L. Rev. 83 (1991); 82 J. Crim. Law & Criminology 503, 517, 526, 527, 529, 530, 531 (1991); 70 Texas L. Rev. 865, 902, 912, 914 (1992); 15 Harv. J. Law & Pub. Policy 558 (1992); 61 Ford. L. Rev. 620, 621 (1992); 27 Tex. Int. L.J. 755 at n.196 (1992); 93 Columbia L. Rev. 603, 605, 609, 610, 613, 621 (1993); 106 Harv. L. Rev. 1186 (1993); 107 Harv. L. Rev. 459 (1993); 67 St. Johns L. Rev. 877, at n.129 (1993); 42 Am. Univ. L. Rev. 1617, 1636 (1993); 12 Rev. Litig. 301 at 11* (1993); 72 Or. L. Rev. 863, 864, 865, 869, 871, 885, 886, 889, 890 (1993); 59 Bklyn L. Rev. 1087, at 1092 (1993); 88 N.W. L. Rev. 527-28 (1994); C949 ALI-ABA 37 (1994); 29 Land & Water L. Rev. 216, at 217, 225, 226 (1994); 44 Case-West. L. Rev 713-14, 736 (1994); 59 Brooklyn L. Rev. 1694 (1994); 77 Judicature 191 (Jan. Feb. 1994); ABA Formal Op. 94-389 at 2, 14 (1994); 12 N.Y.L. Sch. J. Hum. Rts 2 (1994); C 949 ALI-ABA 57 (Aug. 19, 1994); 72 Tex L. Rev. 1485 (1994); 18 Law & Psychol Rev. 189 at n.68 (1994); 50 The Record of the Ass'n of the Bar of the City of N.Y. 260, 262 (Apr. 1995); 95 Colum. L Rev 1375-6, 1419 (1995); 166 N. J. Lawyer 32 (1995); 72 U. Det. Mercy L. Rev. 322 (1995); 47 Adminis. L. Rev. 132 (1995); 44 Emory L.J. 173 (1995); 80 Cornell L. Rev. 1167, 1207 (1995); 71 Chicago-Kent L. Rev. 628, 639, 640, 646, 648, 649, 650, 656, 659, 662, 664, 666, 671, 678, 681 (1995); 44 UCLA L. Rev. 84 (1996) 94 Mich. L. Rev. 936 (1996); 31 Wake For. L. Rev. 215 (1996); J. Legal Stud. 530 (1996); 49 SMU L. Rev. 1661, 1663, 1664 (1996); 55 Md. L. Rev. 1223 (1996); 15 Yale L. & Pol'y Rev. 233 (1996); 49 Rutgers L. Rev. 499-500 (1997); 49 Ark. L. Rev. 722 (1997); 73 Ind. L. J. (1997); 58 U. Pitt. L. Rev. 713 (1997); 70 Wisc. Lawyer 11 (1997); Board of Veterans' Appeals:  Rules of Practice—Attorney Fee Matters, 62 FR 64790-01, 28 CFR Part 20 (Dec. 9, 1997); 47 DePaul L. Rev. 268, at 280 (1998), 47 DePaul L. Rev. 371, at 372, 378, 394, 403 (1998); 47 DePaul L. Rev. 426, 434 (1998); 47 DePaul L. Rev. 373 (1998); 37 Washburn L. Rev. 323 (1998); 32 Val. L. Rev. 942 (1998); 67 Rev. Jur. U.P.R. 800 (1998); 101 W. Va. L. Rev. 335, 337, 338 (1998);1 Legal Ethics 70 at 74 (1998); 2 Colum. Bus. L. Rev. 330 (1999); 84 Cornell L. Rev. 1138 (1999); 47 Kan. L. Rev. 822 (1999); N.Y.L.J., Oct. 25, 1999, at 2 (1999); 19 N.W. J. Int. Law & Bus. 275, 279, 292-95, 298, 299 (1999); San Francisco Legal Ethics Committee, Formal Op. (1999-1); 2 J. Inst. Stud. Leg. Eth. 223 (1999); 33 Law & Soc'y Rev. 751 (1999); 41 Boston College L. Rev. 29 (1999); 21 Law & Policy 348 (1999); 13 Geo J. Legal Ethics 291 (2000); 31 Loy. U. Chi. L.J. 631 (2000); ABA Formal Op. 00-418 (Jul. 7, 2000) at 4; 1258 PLI/Corp. 705, at n.9 (2000); 148 U. Pa. L. Rev. 2164 (2000); 15 Quinn. Prof. Law J. 173, at  n.223 (2000); 76 N.Y.U.L. Rev. 681, 689 (2001); 64 Law & Contemp. Prob. 177, 184-86, 189 (2001); 87 Cornell L. Rev. 123 (2001); 87 Va. L. Rev. 1915 (2001) 28 S.U. L. Rev. 111 (2001); Co. Bar Legal Ethics Ops. LEXIS 1 (May 19, 2001); 13 The Prof. Lawyer 1 (Winter, 2002); 50 Drake L. Rev. 315 at 321 (2002); 102 Colum. L. Rev. 650 at 671-72 (2002); 115 Harv. L. Rev. 2357, at 2363 (2002); 30 Hofstra L. Rev. 767 at 769, 771 (2002); 80 Texas L. Rev. 1829, at 1830-31 (2002); 80 Texas L. Rev. 1943, at 1976, 1979 (2002); 80 Texas L. Rev. 1985, at 1986 (2002); 20 Penn St. Int'l L. Rev. 505, at n.71 (2002); 80 Wash. U.L.Q. 739, 739 n.3 (2002); 15 Loy. Consumer L. Rev. 1, at 48 (2002); 81 Texas L. Rev. 405 at 441 (2002); 16 Geo. J.L.E. 223, at 247 (2003); 34 St. Mary's L.J. 795 at 802, 804 (2003); 17 St. John's J. Legal Com. 313, at 325 (2003); 2004 Utah Bar J. 6, at 8 (2004); 37 Creighton L. Rev. 305, at 334 (2004); 17 Geo. J.L.E. 795, at 797-98,  810 (2004); 27 U.A.L.R.L. Rev. 169 at 174, 177 (2004); Singapore Academic L. J. 76 at 76 n.1, 90 n.63, 91 n.66, 111  n. 138, 113 n.146, 114 nn.148-149 (2004); 29 J. Legal Prof. 1, at 10 (2004/05); 42 Harv. J. on Legis. 299, at 308 (2005); 15 Ind. Int. & Comp. L. Rev. 583, at 593-94, 599,

612 (2005); 58 Vand. L. Rev. 1885, at 1888 (2005); 34 Common Law World Rev. 201, at 204, 215 (2005); 24 Quinn L. Rev. 423, at 427-29 (2005); New Mexico Advisory Op. 2005-2 (May 30, 2005);  33 N. Ky. L. Rev. 115 at 135-36 (2006);  15 Widener L. J. 253, at 262 (2006); 56 Duke L. J. 611 at 624 (2006); 51 N.Y.L.S.L. Rev. 345 at 367 (2006-07); 31 Vt. L. Rev. 615 at 625, 657 (2007); 85 Tex. L. Rev. 1465 at n.136 (2007); 49 Wm. & Mary L. Rev. 569 at 574, 590, 601, 613 (2007); 35911 NBI-CLE 103 at n.1 (2007); 156 U. Penn L. Rev. 229 at 267 (2007); 22 St. John's J. Legal Comment 775 at 767 (2007); 25 Wash. U. J.L. & Pol'y 119 at 138 (2007); 22 St. John's J.L. Comm. 755 at 767 (2008); 39 St. Mary's L.J. 539, at 554 (2008); 62 U. Miami L. Rev. 913 at 924, 925 (2008); 37 Sw. U. L. Rev. 511 at 524 (2008); 50 Wm. & Mary L. Rev 1261 at 1301 (2009); 44 Wake Forrest L. Rev. 923, 932 n.61 (2009); 61 S. Carolina L. Rev. 287 at 309 n.165 (2009); 12 Un. Penn. J. Cons't. L. 659, at 726 n.420 (2010); 39 J. Legal Studies 245 at 246, 250-51 (2010); 23 Pac. McGeorge Global Bus. & Dev. L.J. 187 at n.53 (2010); 3 J. Int'l Media & Ent. L. 175 at n.29 (2010); 124 Harv. L. Rev. 350 at 357 n.74 (2010); 79 U. Cin. L. Rev. 697 at 713 n.87 (2010); 38 Pepp. L. Rev. 551 at 565-66 (2011); 79 Ford. L. Rev. 1833 at 1838 n.10 (2011); 74 L. & Contemp. Prob. 1 at 3, n.9 (2011); 12 Fla. Coastal L. Rev. 357, 367 n.74 (2011); 86 N.Y.U. L. Rev. 805 at 865 (2011); 31 Rev. Litig. 209 at nn.6, 61-67, 74, 88-89, 92, 120 (2012); 80 Fordham L. Rev. 2791 at 2835 n. 260; 7 J. Bus. & Tech. L. 387, at 399 n. 150 (2012); 8 J.L. Econ. & Pol'y 613 at 636 n. 89 (2012); 46 U. Mich. J.L. Reform 303 at 326 n. 163 (2012); 2012 Mich. St. L. Rev. 307 at 318 n.35 (2012); 111 Mich. L. Rev. 1283 at 1326 n.237 (2013); 98 Iowa L. Rev. 1763 at 1788 n.156 (2013); 67 Vand. L. Rev. 151 at 163 notes 32, 36 (2014); 63 Emory L.J. 489 at 519 n.201 (2013); 89 Chi-Kent L. Rev. 289 at 304 n.96 (2014); 63 DePaul L. Rev. 265 at 276 n.28 (2014); 48 U.C. Davis L. Rev. 337 at 384 n.225 (2014); 28 Geo. J. Legal Ethics 272 at 293-93 nn.109, 113 (2015); 68 Vand. L. Rev. 855 at 905-06, nn.178-180, 907 at n.185 (2015); 7 Cybaris An Intell. Prop. Rev. 1 at *7 n.15 (2015); 63 DePaul L. Rev. 265 at 276 n.28 (2015); 2016 Prof. Law 129 at 130 n.6 (2016); 85 Ford. L. Rev. 2151 at 2167 n.73 (2017).

**Casebooks, Treatises, Restatements, etc.:**   II ENTERPRISE RESPONSIBILITY FOR PERSONAL INJURY Ch. 10, 298, 302 (ALI, Apr. 15, 1991); DEBORAH RHODE & DAVID LUBAN, LEGAL ETHICS 774, 775 (1992); GEOFFREY HAZARD & DEBORAH RHODE, THE LEGAL PROFESSION:  RESPONSIBILITY AND REGULATION 375 (3d ed. 1994); ABA/BNA LAWYERS' MANUAL OF PROFESSIONAL CONDUCT 41:914 (1994); DEBORAH RHODE, PROFESSIONAL RESPONSIBILITY 855 (1994); JACK B. WEINSTEIN, INDIVIDUAL JUSTICE IN MASS TORT LITIGATION 79 nn.160, 162, 136 n.107, 139 n.139, 155 n.228, 169 n.22 (1995); DEBORAH RHODE & DAVID LUBAN, LEGAL ETHICS 700 (2D ED. 1995); WILLIAM G. ROSS, THE HONEST HOUR 14 (1996); GEOFFREY HAZARD, SUSAN KONIAK & ROGER CRAMTON, THE LAW AND ETHICS OF LAWYERING 513, 517 (1999); LEO LEVIN, PHILLIP SHUCHMAN & CHARLES YABLON, CIVIL PROCEDURE 457-58, 481-82 (1992), 524, 557-58 (4th ed. 2000); THOMAS MORGAN & RONALD ROTUNDA, PROFESSIONAL RESPONSIBILITY  136 (6th ed. 1995), 116 (7th ed. 2000); MARCUS, REDISH & SHERMON, CIVIL PROCEDURE 101 (2nd ed. 1995),104 (3d. ed. 2000); ALI RESTATEMENT OF THE LAW, THE LAW GOVERNING LAWYERS, Ch. 2, § 18, cmt d, Ch. 3, §35, cmt. c at 262 (2000); DEBORAH RHODE, IN THE INTERESTS OF JUSTICE 178 (2000); COLORADO ETHICS HANDBOOK §4.84 (2001); GEOFFREY HAZARD & WILLIAM HODES, THE LAW OF LAWYERING 119 (2nd ed. 1993), 8-68 (3d. ed., 2003 Supp.); RICHARD ZITRIN & CAROL LANGFORD, LEGAL ETHICS IN THE PRACTICE OF LAW 86 (2nd ed. 2002); NATHAN CRYSTAL, PROFESSIONAL RESPONSIBILITY 268 (1996), 221 (3d. ed. 2004); LISA LERMAN & PHILIP SCHRAG, ETHICAL PROBLEMS IN THE PRACTICE OF LAW 443 (2005); LINDA MULLINEX, MASS TORT LITIGATION 650, 1029 (1996), 1268 (2d ed. 2008); RONALD A. ROTUNDA & JOHN DZIENKOWSKI, PROFESSIONAL RESPONSIBILITY - A STUDENT GUIDE 153, 157 (2005); STEPHEN GILLERS, REGULATION OF LAWYERS 119 (3d. ed. 1992), 184 (6th ed. 2002), 149 (7th ed. 2006), 175 (8th ed. 2009); 17 Mich. St. J. Int'l L. 165 at 184, n.135 (2008-09); John Oakley & Vikram Amer, AMERICAN CIVIL PROCEDURE:  A GUIDE TO CIVIL ADJUDICATION IN U.S. COURTS at 219 n.5 (2009); 39

JA04322

J. Legal Studies at 246, 250-51, (2010); JOHN NOONAN & RICHARD PAINTER, PROFESSIONAL AND PERSONAL RESPONSIBILITIES OF THE LAWYER 67 (2nd ed. 2001), 92 (3rd ed. 2011); COLORADO ETHICS HANDBOOK 4.84 (2011); 2 TOXIC TORTS LITIG. GUIDE § 14:8 (2011); RONALD ROTUNDA & JOHN DZIENKOWSKI, LEGAL ETHICS, LAW. DESKBK. PROF. RESP. § 6-3.3 (2002-03 ed.), § 1.5-3 (2005-06, 2006-07, 2007-08, 2009-10, 2010-11, 2011-12, 2013-14 eds.); 28 Geo. J. Legal Ethics 271 at 292 n.109, 293 n.113 (2015); 52 Tort Trial & Ins. Prac. L.J. 119 at 127 n.34 (2016); 85 Fordham L. Rev. 2151 at 2167 n.73 (2017).

**Cases:** *In re Oracle Securities Litigation*, 136 F.R.D. 639, at 645 (1991*); In re Joint E. & S. Dist. Asbestos Litigation (Findley v. Blinken),* 129 B.R. 710, at 865 (Bankr. E. & S.D.N.Y., 1991); *In re Keene Corp.*, 205 B.R. 690, at 701 (Bankr. S.D.N.Y. 1997); *In re Synthroid Marketing Litigation*, 201 F.Supp.2d 861 at 876 (N.D. Ill., 2002); *Schoonmaker et al. v. Brunoli, Inc. et al.,* 828 A. 2d. 64, 106 (Sup. Ct. Conn., 2003); *In re: Sulzer Hip Prosthesis and Knee Prosthesis Liability Litigation*, 290 F.Supp.2d 840, at 850 (N.D. Ohio, 2003); *In re: Serzone Products Liability Litigation*, MDL No. 1477, 2004 U.S. Dist. LEXIS 28296, at*6-*7(Nov. 8, 2004*); Hoover Slovacek LLP v. Walton*, 206 S.W. 3d 557 at 561 (Tex. Sup. Ct. 2006); *Skannal v. Jones Odom Davis & Politz, L.L.P.,* 124 So. 3d 500 at 513 (2013), (La. Ct. of Appeals, 2nd Circuit Sept. 25, 2013); *Riddle v. Nat'l R.R. Passenger Corp. (AMTRAK)*, 2014 WL 5783825 at *5 (U.S.D.C. S.D. CA, 2014); *Campbell Harrison & Dagley, L.L.P. v. Hill,* No. 3:12-CV-4599-L, 2014 WL 2207211, at *14 (N.D. Tex. 2014), *aff'd in part, rev'd part*, 782 F.3d 240 (5th Cir. 2015).

**The Advance Fee Payment Dilemma: Should Payments Be Deposited to the Client Trust Account or to the General Office Account**, 10 Card. L. Rev. 647-675 (1988). **Reprinted in:** 5 Banking Law Anthology (1989).   **Cited In:**
**Law Reviews, Bar Ass'n Opinions and Other:** 138 U. Pa. L. Rev. 785, 792 (1990); 15 J. Legal Profession 399 (1990); 19 Cal. Bank. J. 63 (WL) (1991); 1991 Annual Survey of Bankruptcy Law 104-05; 78 Minn. L. Rev. 1098 (1994); ABA/BNA LAWYERS' MANUAL OF PROFESSIONAL CONDUCT 45:110 (1993); 47 Admin. L. Rev. 132 (1995); 18 UALR L. Rev. 105, 106, 120 (1995); 9 Geo J. Legal Ethics 589 (1996); 1998 Ark. L. Notes 21 at 23, n.21 (1998); 1 Fla. Coastal L. J. 294-96, 339, 343, 356 (1999); 14 Regent L. Rev. 97, at 139 (2002); 74 Mo. L. Rev. 447 at n. 76 (2009), 74 Miss. L. Rev. 447, 457 n. 76, 459 n. 94 (2009); 61 S. Carolina L. Rev. 287 at 317 n.220, 318 n.223 (2009); *Iowa Sup. Ct. Atty. Disc. Bd. v. Turner*, 918 N.W. 2d 130 at 149 note 4 (Iowa S.C. 2018).
**Casebooks, Treatises, Restatements, etc.:** Thomas MORGAN & RONALD ROTUNDA, PROFESSIONAL RESPONSIBILITY 137 (6th ed. 1995); Wylick & Perschbacher, California Legal Ethics 155 (2d ed. 1997); ABA/ BNA LAWYERS' MANUAL OF PROFESSIONAL CONDUCT, Current Reports, Oct. 13, 1999 at 490; RONALD MORGAN & THOMAS ROTUNDA, PROFESSIONAL RESPONSIBILITY 167 (7th ed. 2000); RESTATEMENT OF THE LAW GOVERNING LAWYERS, Chap. 3, §44, Cmt. f (2000); SCHWARTZ, WYDICK & PERSCHBACHER, PROBLEMS IN LEGAL ETHICS 131 (5th ed. 2001); JOHN W. HALL, JR., PROFESSIONAL RESPONSIBILITY IN CRIMINAL DEFENSE PRACTICE § 7:9 at fns. 1, 3 and 7 (2005, 2011, 2013 eds.); Iowa Prac., Lawyer and Judicial Ethics § 5:5(f)(3) (2009, 2010, 2011 eds.), 5:5 (f)(4) (2011, 2013 eds.), § 5:15(b) (2009 ed., n.2 2010, 2011, 2013 eds.); GEOFFREY HAZARD, SUSAN KONIAK, ROGER CRAMTON, GEORGE M. COHEN & W. BRADLEY WENDEL, THE LAW AND ETHICS OF LAWYERING 589 (2d ed. 1994) 772 (4th ed. 2005), 786 (5th ed. 2010).
**Cases:** *In re McDonald Bros. Construction, Inc.,* 114 B.R. 989, 998 n.11, 1001 (Bankr. N.D. Ill., 1990); *In re D.L.I.C., Inc.,* 120 B.R. 348, at 351 (Bankr. S.D.N.Y., 1990); *In re Dixon*, 143 B.R. 671, 678 (Bankr. N.D. Tex. 1992); *People v. Shidler*, 901 P.2d 477, at 479 (Colo. 1995); *People v. Varallo*, 913 P.2D 1 at *11–*12 (1996); *In re: Grey's Run Technologies*, 217 B.R. 48 at 53, 56 (1997); *Iowa Sup. Ct. Bd. Prof. Ethics & Conduct v. Apland*, 577 N.W.2d 50 at 54 - 56 (1998); *In re* Radulovic, 2006 WL 6810999 at *3 n.7 (9th Cir. BAP (Wash. 2006));

*In re King,* 392 B.R. 62, 71 (Bankr. Ct. S.D.N.Y., 2008); *Iowa Supreme Court Disciplinary Board v. Piazza*, 756 N.W.2d 690 at 697 (Iowa Oct. 30, 2008); *In re Shihai*, 392 B.R. 62, Bankr. S.D. N.Y. (2008); *In re Mance,* 980 A. 2d 1196, at 1203 (D.C. Ct. App., 2009); *In re Pagaduan* et al., 429 B.R. 752, 765 (Bankr. D. Nev., 2009.

**Nonrefundable Retainers: Impermissible Under Fiduciary, Statutory and Contract Law,** 57 Fordham L. Rev. 149-190 (1988), co-authored with Lawrence Cunningham.  **Cited In**:
**Law Reviews, Books, Statutes, Others**: 19 Cal. Bank. J. 63 (WL) (1991); 82 J. Crim. Law & Criminology 532, 533, 534 (1991); 44 Rutgers L. Rev. 10 (1991); 68 Notre Dame L. Rev. 217 (1992); L. CAPLAN, SKADDEN: POWER, MONEY AND THE RISE OF A LEGAL EMPIRE 83-84 (1993); 67 St. Johns L. Rev. 694, 698,700 (1993); 46 Mercer L. Rev. 311, 320 (1994); 71 Chicago-Kent L. Rev. 640 (1995); 18 UALR L. Rev. 107, 108, 113, 117 (1995); 9 Georgetown J. Legal Ethics 588, 589 (1996); WILLIAM G. ROSS, THE HONEST HOUR 13 (1996); 17 Cardozo L. Rev. 724, 728, 735 (1996); 1 Harv. Negotiation L. Rev. 72 (1996); 1999 Utah L. Rev. 240 (1999); 12 Geo J.L.E. 479 (1999); 1 Fla. Coastal L.J. 293, 295 (1999); *NY Jud. Law* §474, Chap. 30, Art. 15 (Attorneys and Counsellors); 37 San Diego L. Rev. 406, 414, 483-84 (2000); 57 Bus. Lawyer 1441 at 1449 (2002); 81 Tex. L. Rev. 405 at 515 (2002); 72 Fordham L. Rev. 849, at 870 (2004); 19 Geo. J. Legal Ethics 59 at 87- 88 (2006); 43 Am. Bus. L.J. 173 at 195 (2006); 49 Wm. & Mary L. Rev. 569 at 601, 611 (2007); 61 S. Carolina L. Rev. 287 at 317 n.219, 319 nn.230-232 (2009); 23 Geo. J. Legal Ethics 701 at 701 n.6, 705 n.42 (2010); 67 Vand. L. Rev. 151 at 163 n.35 (2014); 27 Geo J. Legal Ethics 655 at 656 n.6 (2014).
**Bar Ass'n Opinions And Reports:** *N.Y. State Bar Ass'n Op.* 599 (1989); *N.Y.C Bar Ass'n Formal Opinion* 1991-3 (1991); ABA/BNA LAWYER'S MANUAL OF PROFESSIONAL CONDUCT 45:111 (1993); Report of the New York State Committee to Examine Lawyer Conduct in Matrimonial Actions 18 (May 4, 1993); 18 DCBA Brief 24, at 28, 30 (2006); Report and Recommendation, 22 J. Legal Prof. 368 (1998); 67 Fordham L. Rev. 446, 450-51 (1998); IOWA PRAC., LAWYER AND JUDICIAL ETHICS § 5:5(f)(4) (2009, 2010, 2011, 2013 eds.); *Maine Professional Ethics Commission Op.* 206 (Dec. 12, 2012).
**Casebooks:**  THOMAS MORGAN & RONALD ROTUNDA, PROFESSIONAL RESPONSIBILITY 137 (6th ed. 1995), 167 (7th ed. 2000); ANDREW KAUFMAN & DAVID WILKINS, PROBLEMS IN PROFESSIONAL RESPONSIBILITY FOR A CHANGING PROFESSION 504 (4th ed. 2002); DEBORAH RHODE, DAVID LUBAN & SCOTT CUMMINGS, LEGAL ETHICS 500 (3d. ed. 2001), 599 (6th ed. 2013).
**Treatises, Restatements of the Law:**  A. FARNSWORTH, 2 CONTRACTS § 8.14 n.1, p. 427, n.18, p. 431, 3 CONTRACTS, § 12.18, n.36, p.294, p. 573 (1990); BNA CRIMINAL PRACTICE MAN. CURRENT REP., Ap. 13, 1994 at 176; ALI RESTATEMENT OF THE LAW, THE LAW GOVERNING LAWYERS, ch. 3, §34, cmt e at 254, §38 cmt. g, §39 at 285 (2000); RONALD ROTUNDA, PROFESSIONAL RESPONSIBILITY 108 (6th ed. 2002); 11-60 CORBIN ON CONTRACTS § 60.9 at nn.12, 40, 47 (2009); JOHN W. HALL, JR., PROFESSIONAL RESPONSIBILITY IN CRIMINAL DEFENSE PRACTICE 3d § 7:9 at fns 1,2 and 4 (2005, 2011); RONALD D. ROTUNDA & JOHN S. DZIENKOWSKI, LEGAL ETHICS, LAW. DESKBK. PROF. RESP. § 6-165 (2002-03 ed.), § 1.5-1 at n.22 (2007-08 ed.), § 1.5-1 at n.23 (2009-10, 2010-11, 2011-12 eds.), §1.5-1 at n.24 (2013-14 ed.); Iowa Prac. Lawyer and Jud. Ethics §§5:5(f), 5:15(b) (2018).
**Cases:** *Zack v. NCR*, 738 F. Supp. 933, 936 (E.D. Pa. 1990); *AFLAC, Inc. v. Williams*, 264 Ga. 351, at 353 (Ga. Sup. Ct. 1994); *Wright v. Arnold*, 877 P. 2d 616, at 619 (Okla. Ct. App. 1994); *Iowa Sup. Ct. Bd. Prof. Ethics & Conduct v. Apland,* 577 N.W.2d 50, at 57-58 (1998); *Kelly v. MD Buyline, Inc.*, 2 F. Supp. 2d 420 at 445, 451 (S.D.N.Y. 1998); *Agusta & Ross v. Trancamp Contracting Corp.,* 751 N.Y.S. 2d 155, 158 (N.Y.C. Civ. Ct. 2002).

**The Education and Licensing of Lawyers:  Current Proposals to Improve the**

**Competence of Lawyers**, in THE EDUCATION AND LICENSING OF LAWYERS 11-42 (CLEPR, 1976).
**Cited In:**   422 F. Supp. 2 (appendix) (1977); PROFESSIONAL RESPONSIBILITY: A GUIDE FOR ATTORNEYS 71 (ABA, 1978); 78 Fed. Rules Dec. 254 (1978).
Special Editor:  Learning and The Law, no. 3, no. 2 (summer 1976) dealing with the education and training of lawyers for competency before admission to practice.  **Cited In:**  PROFESSIONAL RESPONSIBILITY: A GUIDE FOR ATTORNEYS 71, 73 (ABA, 1978).

**Transcript of Proceedings:   Conference on Determining a Research Agenda for Improving the Delivery of Legal Services**, (Co-edited with Richard Lempert), in THE ROLE OF RESEARCH IN THE DELIVERY OF LEGAL SERVICES:  WORKING PAPERS AND CONFERENCE PROCEEDINGS (1976); reprinted in 11 Law & Society Rev. 319-386 (1976).  **Cited In**:  26 Catholic Law Rev. 685 (1977).

The Role of Research in the Delivery of Legal Services:  Working Papers and Conference Proceedings (1976, co-edited with Richard Lempert); reprinted as 11 Law & Soc. Rev. no. 2 (Special Issue 1976) of which I was Guest Co-Editor.  **Cited In:**  CURRAN, THE LEGAL NEEDS OF THE PUBLIC 275 (ABF, 1977).

**Of Arterial Passageways Through the Legal Process:  The Right of Universal Access to Courts and Lawyering Services,** 48 New York Univ. Law Review 595-668 (1973).
**Reprinted in**:   "Prepaid Legal Services Plans," Report of the Hearings Before the Subcommittee on Representation of Citizen Interests of the U.S. Senate Committee on the Judiciary, May 14-15, 1974, at pp. 238-312 (1974).  **Reprinted in part:**  16 Law Office Econ. & Mgmt. 86-105 (1975).  **Cited In**:
**Law Reviews, Bar Ass'n Opinions and Others**: 65 The J. Crim. Law & Criminology 277 (1974); 1974 Duke L.J. 538, 558-59, 567; 51 Chicago-Kent L. Rev. 46, 48-49 (1974); 5 U. Tol. L. Rev. 562 (1974); 17 Ariz. L. Rev. 291 (1975); 74 Mich. L. Rev. 260 (1975); 27 Stanford L. Rev. 335 (1975); 1975 Utah L. Rev. 50 (1975); MONROE FREEDMAN, LAWYERS' ETHICS IN AN ADVERSARY SYSTEM 265 (Bobbs-Merrill, 1975); Tunney & Frank, "Epilogue:  A Congressional Role in Lawyer Reform?" in NADER & GREEN (eds.), VERDICTS ON LAWYERS 296 (1976); ROSENBERG, WEINSTEIN, SMIT & KORN, ELEMENTS OF CIVIL PROCEDURE 43 (Foundation, 1976); COUNTRYMAN, FINMAN, & SCHNEYER, THE LAWYER IN MODERN SOCIETY 568, 576 (Little Brown 2nd ed. 1976); 29 Okla. L. Rev. 622, at 18 (1976); 27 Labor L.J. 304 (1976); 28 J. Legal Ed. 251, 274 (1977); 29 Stanford L. Rev. 3 (1976); 66 Georgetown L.J. 128 (1977); 41(1) Law & Contemp. Prob. 255 (1977); 13 Gonz. L. Rev. 919 (1978); 28 Buffalo L. Rev. 111, 123 (1979); 34 Stan. L. Rev. 1, 71 (1981); 67 Cornell L. Rev. 1021, at 1038 (1982); 34 Stan. L. Rev. 1183, 1199 (1982); 12 Stetson L. Rev. 369 (1983); 45 Ohio St. L.J. 9 (1984); 63 Tex. L. Rev. 579, 597 (1984); 137 U. Penn L. Rev. 1920 (1989); 37 UCLA L. Rev. 949, at 975 (1990); 19 Hofstra L. Rev. 870 (1990); 24 U.S.F. L. Rev. 255 (1990); DEBORAH RHODE & DAVID LUBAN, LEGAL ETHICS 813 (1992); 45 Rutgers L. Rev. 64 (1992); 67 Ind. L.J. 1109-11 (1992); 41 UCLA L. Rev. 187, 198 (1993); 12 N.Y. Law Sch. J. Human Rts. at n.7 (1994); 50 The Record of the Ass'n of the Bar of the City of N.Y. 263 (Apr. 1995); 13 St. Johns J. Legal Com. 498-99 (1999); 34 Gonz. L. Rev. 343, 355 (1999); 29 N.M.L. Rev. 149 (1999); THOMAS MORGAN & RONALD ROTUNDA, PROFESSIONAL RESPONSIBILITY at 92 (Foundation, 1976), 618 (7th ed. 2000); 114 Harv. L. Rev. 961 at 1168 (2001); 2001 B.Y.U. L. Rev. 2 at 52, 69 (2001); 40 Conn. L. Rev. 1477 at 1485 n.31 (2008); 56 St. Louis U. L.J. 917 at 964 n. 163 (2012).
**Cases:** Wilson v. Beame, 380 F.Supp. 1242 (1974); Carter v. Univ. of Washington, 536 P. 2d 622, at 624 (1975); State Bar v. Cramer, 249 N.W.2d 1, at 18 (Mich. 1976).

**CLEPR and Clinical Education:  A Review and Analysis**, in CLINICAL EDUCATION FOR THE LAW

31

STUDENT: LEGAL EDUCATION IN A SERVICE SETTING, pp. 56-93 (1973). **Cited In**: 27 Vand. L. Rev. 273 (1974); 50 Denver L.J. 417 (1974); GEE & JACKSON, FOLLOWING THE LEADER? THE UNEXAMINED CONSENSUS IN LAW SCHOOL CURRICULA 42 (1975), VERNON COUNTRYMAN, TED FINMAN & TED SCHNEYER, THE LAWYER IN MODERN SOCIETY 718, 721 (Little Brown 2nd ed. 1976); 1977 Brigham Young L. Rev. 883, 890 (1977); Report of the ABA Task Force on Lawyer Competency:  The Role of the Law Schools 12 (1979); 60 U. Cin. L. Rev. 92 (1991); 1 Clinical L. Rev. 7 (1994); 4 J.L. & Pol'y 446 (1996); 62 Bklyn L. Rev. 885 (1996); 75 Neb. L. Rev. 872 at 873 n.1, 888 n.48 (1996); 64 Tenn. L. Rev. 1108 (1997); 12 Wm. & Mary Bill Rts. J. 873, at 876 (2004); 43 Brandeis L.J. 325, at 347 (2005); 48 Suffolk U.L. Rev. 751 at 760 n.34 (2015).

**Legal Delivery Systems-A Bibliography,** 4 U. Tol. L. Rev. 465-552 (1973).  **Cited In:** 15 Law Office Econ. & Mgmt. 327 (1974); 51 Chi.-Kent L. Rev. 45 (1974); 4 Hofstra L. Rev. 4, at 7 (1975); VERNON COUNTRYMAN, TED FINMAN & TED SCHNEYER, THE LAWYER IN MODERN SOCIETY 575-6, 606, 625 (Little Brown, 2nd ed. 1976); 44 G.W. L. Rev. 765 (1976); Curran, The Legal Needs of the Public 275 (ABF, 1977); 26 Wayne L. Rev. 1161 (1980).

**Contributions of Clinical Programs to Training for Professionalism,** 4 Connecticut Law Review 437-446 (1971-72).  **Cited In:** *Conn. Gen. Stat. Ann.* Title 51, Ch. 876; 50 Denver L.J. 449 (1974); 5 Cumberland-San. L.R. 238 (1974-75); 30 U. Miami L. Rev. 962, at 970 (1976); 4 Ohio North. L. Rev. 800 (1977); 1979 Wis. L. Rev. 373, at  403; 69 Neb. L. Rev. 556 (1990); 45 Am. U. L. Rev. 874 (1996); 3 Clinical L. Rev. 247 (1996); 64 Tenn. L. Rev. 1017 (1997); 37 San Diego L. Rev. 167, at n.130 (2000); 26 J. Legal Prof. 149, at n.10 (2002); 13 Clinical L. Rev. 231 at 237 (2006).

**Legal Paraprofessionalism and Its Implications:  A Bibliography,** 24 Vand. L.R. 1213-1239 (1971).  **Cited In:** 24 Vand. L. Rev. 1121, 1186 (1971); 62 Ill. B.J. 432 (1974); 11 Am. Bus. L.F. 107, 110 (1974); 48 Fla. Bar. J. 746 (1974); MORAND PAULSEN, THE AVAILABILITY OF LEGAL SERVICES 64 (1972); 26 Wayne L.R. 1174 (1980).

**Clinical Legal Education And Legal Aide – The Canadian Experience,** Council on Legal Education For Professional Responsibility, Vol. VI, No.13 (1974), co-authored with Frederick H. Zemans.

**Expansion of the Lawyering Process through a New Delivery System:  The Emergence and State of Legal Paraprofessionalism,** 71 Columbia Law Review 1153-1255 (1971); reprinted in The Lawyer's Secretary, Practicing Law Institute Course Handbook, 4th ed. at 489 (1972), 5th ed. at 361 (1974).  **Cited In:**
Law Reviews, Bar Ass'n Opinions and Others:  72 Colum. L. Rev. 465 (1972); 7 Real Prop., Probate & Trust J. 738 (1972); 81 Yale L.J. 1206 (1972); 22 Cleve. S.L. Rev. 435 (1973); 58 Mass. L.Q. 260 (1973); 4 U. Tol. L. Rev. 396, 440 (1973); 59 Va. L. Rev. 433 (1973); 11 Harv. J. of Legislation 86 (1973); 11 Am. Bus. L.J. 103, 107 (1974); 3 Capital U. L. Rev. 2 (1974); 3 Anglo-American L. Rev. 18, 23 (1974); 34 Md. L. Rev 541, 551 (1974); 50 Denver L.J. 415, 417 (1974); 15 Law Office Econ. & Mgmt. 346, 348, 352 (1974); 5 U. Tol. L. Rev. 562 (1974); 49 Fla. Bar J. 151 (1975); 44 G.W. L. Rev. 765 (1976); 24 U.C.L.A. L. Rev. 519 (1977); 62 Cornell L. Rev. 1043 (1977); 1977 ABF Res. J. 827, at 832 (1977); 28 J. Legal Ed. 274 (1977); 2 New Directions in Legal Services 83, 90 (1977); 26 Catholic U. L. Rev. 684 (1977); 27 Buffalo L. Rev. 279 (1978); 53 N.Y.U. L. Rev. 452 (1978); 15 Houston L. Rev. 504 (1978); 30 J. Legal Ed. 57 (1979); 1978 Utah L. Rev. 649, 656; 8 Vt. L. Rev. 1, 26 (1978); 54 N.Y.U. L. Rev. 1049, 1060 (1979); 1979 A.B.F. Res. J. 185; 26 Wayne L. Rev. 1174 (1980); 14 Val. U. L. Rev. 179, 236 (1980); 15 Georgia L. Rev. 632 (1981); 34 Stan. L. Rev. 1, at 79 (1981); 59 Tex. L. Rev. 689, 701 (1981); 67 Cornell L. Rev. 1021, 1037

JA04326

(1982); 75 Calif. L. Rev. 1125 (1987); 24 U.S.F. L. Rev. 255 (1990); 67 Fordham L. Rev. 2773 (1999).

**Casebooks, Treatises, Restatements, etc.:**  REPORT OF THE A.A.L.S. CURRICULUM STUDY PROJECT COMMITTEE, "TRAINING FOR THE PUBLIC PROFESSIONS OF THE LAW: 1971" 154-155 (A.A.L.S. 1971 Proceedings. p. 1, §2); CLARK & STRONG, LAW OFFICE MANAGEMENT 81, 100 (West, 1974); DOROTHY NELSON, JUDICIAL ADMINISTRATION AND THE ADMINISTRATION OF JUSTICE 955 (West, 1974); MONRAD PAULSEN, THE AVAILABILITY OF LEGAL SERVICES 54-56, 64 (1972); PIRSIG & KIRWIN, PROFESSIONAL RESPONSIBILITY 165 (West, 3rd ed., 1976); ELI JARMEL & ROBERT YEGGE (eds.), LEGAL EDUCATION FACES A NEW PROBLEM:  NEW SYSTEMS FOR DELIVERY OF LEGAL SERVICES 2 (U. Denver, 1975); ELI JARMEL, LEGAL REPRESENTATION OF THE POOR 3-12 (Matthew Bender, 1975); RONALD MORGAN & THOMAS ROTUNDA, PROFESSIONAL RESPONSIBILITY 132 (Foundation, 1976); PARALEGAL ASSISTANTS, HEARINGS BEFORE U.S. SENATE SUBCOMMITTEE ON THE JUDICIARY 213, 217 (July 23, 1974); A LAWYER AT A PRICE PEOPLE CAN AFFORD 39 (New York Bar Foundation, 1975); VERNON COUNTRYMAN, TED FINMAN & TED SCHNEYER, THE LAWYER IN MODERN SOCIETY 519, 738 (Little, Brown, 2nd ed. 1976).

**Cases:**   *Arif v. McGrath*, 71-C-1388, at 21 (Dec. 8, 1971); *Martinez v. Procunier*, 354 F. Supp. 1092, at 1098  (1973); *City of Detroit v. Grinnell Corp.*, 356 F. Supp. 1390 (1973); *In re Christianson*, 215 N.W.2d  920, at 926 (N.D., 1974); *State Bar v. Cramer*, 249 N.W.2d 1, at 16 (Mich. 1976); *Florida Bar v. Moses*, 380 So.2d 412, at 417 (1980); *Matter of Wilkinson*, 834 P.2d 1356, at 1361 (Kan. 1992).

## I.    Short-Length Publications

Furthering Asbestos Claim Transparency Act, Hearing Before the Subcommittee on Regulatory Reform, Commercial and Anti-Trust Law of the Com. On the Judiciary, House of Representative, 114th Cong. (Feb. 4, 2015) statement of Lester Brickman) *available at* 2015 WLNR 3578295.
**Cited In:**  The Need For Transparency in the Asbestos Trusts, Hearing on 114 H.R. 1927, Furthering Asbestos Claim Transparency Act (FACTA, Feb. 23, 2016 (state as Mark Behren at n. 172).

Introduction to Lawyer Barons:  What Their Contingency Fees Really Cost America.  Accessible at:  http://ssrn.com/abstract=1773796.  **Downloads:** (SSRN): 191.

Fraud and Abuse in Asbestos Litigation, testimony before the Subcommittee on the Constitution of the House Judiciary Committee, Sept. 9, 2011. Accessible at http://www.cardozo.yu.edu/uploadedFiles/Cardozo/Profiles/brickman-436/TESTIMONY%20SEPT.%209%2C%202011%282%29.pdf. **Cited In:**  Report of the U.S. House of Rep. Comm. on the Jud. on Furthering Asbestos Claim Transparency (FACT) Act of 2012, 112th Cong. 2nd Session No. 112-687 at 7 n.41 (Sept. 21, 2012); 23 Widener L.J. 725 at 729 n.24 (2014).

A Response to Stephanie Mencimer (Apr. 2007).   A response to Stephanie Mencimers' remarks about Professor Brickman in BLOCKING THE COURTHOUSE DOOR.  Accessible at: http://www.cardozo.yu.edu/uploadedFiles/Cardozo/Profiles/brickman-436/A%20Response%20to%20StephanieMencimerMarch022007.pdf.

A Response to Bryan O. Blevins, Jr., Provost Umphrey, LLP (Dec. 2006).  A response to the presentation of Bryan O. Blevins, Jr. at the AEI-Brookings First Annual Judicial Symposium on Civil Justice Issues, December 7, 2006.  Accessible at:

JA04327

http://www.cardozo.yu.edu/uploadedFiles/Cardozo/Profiles/brickman-436/Response%20to%20Bryan%20Blevins%20including%20Appendices%20A%20to%20F.pdf.

Comments' on NIOSH's Proposed B Reader Code of Ethics, submitted on December 22, 2005. Accessible at: www.ssrn.com/abstract=871965. **Downloads**: SSRN-230. **Cited In**: 20-24 Mealey's Litig. Rep. Asb. 4 (January 24, 2006); 4-5 Mealey's Litig. Rep. Silica 9 (Jan. 2006); 58 Admin. L. Rev. 269 at 351-52 (2006).

Asbestos Kills, National Review, Jan. 31, 2005, at 39 (with Harvey D. Shapiro). Accessible at: http://www.thefreelibrary.com/Asbestos+kills:+and+more+than+just+people:+jobs,+ethics,+and...-a0131003854. **Cited In:** Report of the U.S. House of Rep. Comm. on the Jud. on Furthering Asbestos Claim Transparency (FACT) Act of 2012, 112th Cong. 2nd Session No. 112-687 at 6 n.33 (Sept. 21, 2012).

"Early Offers:" A Proposal To Counter Attorney Fee Gouging By Aligning The Contingent Fee System With Its Policy Roots And Ethical Mandates, Point of Law.Com., Aug. 17, 2004, 11:46 EST, accessible at: www.pointoflaw.com/feature/archives/000434.php. **Cited In:** 77 Tenn. L. Rev. 653 at 655 n.24, 656 nn.28, 30-31, 34, 657 nn.40-44, 658 n.56, 659 n.63, 660 n.70, 663 nn.102-109, 665 nn.125-128, 667 n.145.

Making Lawyers Compete, Regulation 30 (Summer 2004). Accessible at: www.ssrn.com/abstract=568304. **Downloads**: SSRN-272. **Cited In:** 8 The Green Bag 2d 377, at 377, 381 (2005); 65 Stan. L. Rev. 633 at 679 n.235, 692 n.298 (2013). Administration Of Asbestos Bankruptcies, testimony before the Subcommittee on Commercial and Administrative Law of the House Judiciary Committee, July 21, 2004; 2015 U. Ill. L. Rev. 1563 at 1568 n.19 (2015).

Asbestos Litigation:  Malignancy in the Courts?, Civil Justice Forum No. 40., Center For Legal Policy at the Manhattan Institute, Aug. 2002.  Accessible at: http://ssrn.com/abstract=568309.  **Reprinted in:**  Hearing before the Committee on the Judiciary, U.S. Senate, 107th Congress, 2nd session Sept. 25, 2002 at 226; **Cited In**: Memorandum and Order, *In Re Joint Eastern and Southern Districts Asbestos Litigation* (*Findley et al. v. Trustees of the Manville Personal Injury Settlement Trust*), 237 F. Supp. 2d 297, at 302, 309,332 (E.D.N.Y., Dec. 12, 2002);18-20 Mealey's Litig. Rep. Asb. 23 (Nov. 2003); 2-4 Mealey's Litig. Rep. Silica 11 (Dec. 2003); Richard Epstein, Cases And Materials on Torts 888 (8th ed. 2004); Report of the Comm. on the Jud., U.S. Senate, on S. 1125, "The Fairness In Asbestos Injury Resolution Act of 2003," at 65, Additional View of Senator Kyl at 95 n.43, 96 n.46; 81 n.2, 84 n.13, 89 n.24 (July 21, 2013); 23 J. Bankr. L. & Prac. NL Art. 5 (2014).

Letter (Testimony) to ABA Ethics 2000 Commission Hearing, New Orleans, La., Mar. 23, 2000. **Cited In:** 16 Geo. J.L.E. 767 at 773, 775-6, 783 (2003).

Regulation By Litigation: The New Wave Of Government Sponsored Litigation, Remarks at Manhattan Inst. and U.S. Chamber of Commerce conference, (June 22, 1999).  **Cited In:** 148 U. Pa. L. Rev. 2188 (2000); 101 Colum. L. Rev. 1998, at 1999 (2001).

Class Action Reform:   Beyond *Rhone-Poulenc Rorer*, Manhattan Institute Research Memorandum, No. 10, Oct. 1995.  **Cited In:**  Bell & O'Connell, Accidental Justice 225-228

(1997).

"Should Plaintiff Lawyers in the Tobacco Settlement Receive Billions of Dollars?  No:  Congress Should Set the Fees for this Unique Case," A.B.A.J. Sept. 1997 at 75.

Limiting Lawyers' Unearned Windfall Fees, N.Y.L.J., August 4, 1994 at 5.

Dedication to Karl Krastin, 14 Nova L. Rev. 3-6 (1989).  Accessible at: http://www.cardozo.yu.edu/uploadedFiles/Cardozo/Profiles/brickman-436/Dedication%20to%20Karl%20Krastin.pdf.

"Legal Specialization:   An Overview of Goals and Ethical Considerations," in Legal Specialization 5-19, Special Committee on Specialization Monograph No. 2 (ABA, 1976); 45 S. Car. L. Rev. 1056 (1994).

"Advertising:  A Business Technique for Lawyers?"  24 Virginia Bar News 15-21 (1975), paper delivered to the 1975 Annual Meeting of the Virginia State Bar Association. **Cited In**:  18 Law Office Econ. & Mgmt. 323 (1977); 65 Stan. L. Rev. 633 at 645 n.58 (2013).

"Evaluation:  Needs and Techniques and "An Outline for Evaluation of a Full Time Legal Aid Law Office," in Conference on Legal Aid, Report and Proceedings 65-76 (Canadian Council on Social Development, Mar. 1975).

"Should Lawyers Be Permitted To Advertise?  Yes, but...," paper delivered to the National Conference of Bar Presidents and reprinted in part in 1 The Bar Leader 18-19 (May-June, 1975); **Cited In:** 51 Calif. S. B.J. 330 (1976) and 22 The Alumnus of the University of Toledo 12-14 (June-July, 1975).

"Legal Services in the 70's:  The Shape of the Future," 4 U. Tol. L. Rev. 361 (1973).  **Cited In:**  15 Law Office Econ. & Mgmt. 325 (1974); 14 J. Fam. Law 412 (1975-76).  Book Review (Training for the Public Professions of the Law:  1971; A Report to the Association of American Law Schools), 24 U. of Ill. L. Forum 843-54 (1972); 27 Vand. L. Rev. 287 (1974); ELI JARMEL & ROBERT YEGGE (eds.), LEGAL EDUCATION FACES A NEW PROBLEM 38 (1975).

I have authored several issues of the Newsletter of the Council on Legal Education for Professional Responsibility including:  no. 2 (Nov. 1969), no. 6 (Jan. 1970), no. 9 (Apr. 1970) and no. 11 (May, 1970) of vol. 1; no. 3 (Nov. 1970) and no. 4 (Jan. 1971) of vol. 3; no. 1 (July, 1971) of vol. 4; no. 8 (Nov. 1974) of vol. 7; and no. 3 (Feb. 1978) of vol. 10.  In addition, I authored the following newsletters of the Council that are of "short article" length:

Clinical Education--Polemics and Pragmatics, v. 3, no. 5 (Feb. 1971); **Cited In:** 30 J. Legal Ed. 57 (1979);Report on Paraprofessional Workshops, v. 4, no. 10 (Mar., 1972); CLEPR Conference on Clinical Teaching, v. 5, no. 2 (July, 1972); Clinical Work in the First and Second Year of Law School, v. 6, no. 7 (Dec. 1973); Clinical Legal Education and Legal Aid--The Canadian Experience (co-authored), no. 6, no. 13 (May, 1974); Clinical Education:  The Student Perspective (co-authored), v. 7, no.1 (July, 1974); Group Legal Services and Clinical Legal Education, v. 7, no. 6 (Oct.1974); The Education and Licensing of Lawyers, v. 9, no. 2 (Feb. 1974), reprinted in 46 The Bar Examiner 63 (1977); Growing Pains in Law School Tax Clinics, v. 10, no. 4 (Mar. 1978), **Cited In:** 35 Vanderbilt Law Review 352 (1982); Is Law School a Full Time Enterprise?, v. 10, no. 6 (May 1978); Highlights of Conference on Title XI,

JA04329

no. 10, no. 7 (May 1978).

In 1966-67, as Deputy Director of the AALS-funded Student Wave Survey, I published several newsletters which listed and commented on the interim results of the Survey.  In 1967-69, I published a quarterly journal titled Law & Poverty which was a commentary on local socio-legal issues.

**J.**    **Amicus Briefs and Cert. Petitions**

Brief for Appellant Joshua Blackman at 18, Gascho v. Global Fitness Holdings, LLC, 822 F.3d 269 (6th Cir. 2014) (No. 14-3798, 14-3761).

Brief for Lester Brickman & Richard Esenberg as Amicus Curiae supporting Respondents, Repub. of Argentina v. NML Capitol, Ltd., 134 S.Ct. 201 (2013) (No. 12-842) (affirmed, 134 S.Ct. 2250).

Brief for Lester Brickman as Amicus Curiae supporting Petitioners, Int'l Precious Metals et al. v. Waters, et al., 120 S. Ct. 2237 (2000) (99-1560).

Petition for Certiorari at 4, 7, 26, Dunn v. Hovic, 1 F.3d 1371 (3rd Cir. 1993) (No. 93-658).

Brief for Lester Brickman & Lawrence Cunningham as Amicus Curiae supporting Petitioner-Appellee, Matter of Edward M. Cooperman, Grievance Committee for the Tenth Judicial District v. Edward M. Cooperman, 83 N.Y.2d 465 (N.Y. Court of Appeals 1993) **Cited In:** Kelly v. MD Buyline, Inc., 2 F. Supp. 2d 420, at 447-48 (S.D.N.Y. 1998).

*Cimino v. Pittsburgh Corning, Inc.*, 151 F.3d 297 (5th Cir. 1998) (filed in 1994 on behalf of the American Tort Reform Association).

**K.**    **Op-Eds** (Accessible on homepage by clicking on the "Op-Eds" hyperlink)

"In the BP Case, the Rule of Law is on Trial," The Hill, Nov. 10, 2014 available at http://thehill.com/blogs/congress-blog/judicial/223524-in-the-bp-case-the-rule-of-law-is-on-trial.

"The BP Oil Spill and the Rule of Law (or the Rule of Lawyers), The Washington Times, Nov. 13, 2014.  Reprinted in the Brazil Sun, Nov. 20, 2014.

"No Recession For Tort Lawyers," Forbes.com, July 23, 2009 available at http://www.forbes.com/2009/07/23/tort-lawyers-class-action-opinions-contributors-lester-brickman.html.  **Cited In:**  48 Duq. L. Rev. 423, 435 n.67 (2010).

"DOJ's Free Pass For Tort Fraud," Wall Street Journal, Dec. 26, 2007 at A11.  **Cited In:**  73 Albany L. Rev. 521, 537 n. 125 (2010).

"Contingency-Fee Con-Men," Wall Street Journal, Sept. 25, 2007 at A18.  **Cited In:** SN029 ALI-ABA  CLE 841 at *28 (November 2007 – December 2007); Business Law Today, May/June 2008 at 30; SP003 ALI-ABA CLE 33 (July 24 – 26, 2008); ALI-ABA Course of Study Materials, Current Developments in Employment Law Vol. I (July 2008); SP024 ALI-ABA CLE 1995 (Dec. 4-6, 2008); SN029, ALI-ABA 841 (Sept. 25, 2007); 63 Vand. L. Rev. 107 at 133 n.90 (2010);

JA04330

102 Cornell L. Rev. 1445 n. 243 (2017).

"False Witness," Wall Street Journal, December 2-3, 2006 at A9.  **Cited In:**  85 Tex. L. Rev. 1465 at n.159 (2007); 31 Whittier L. Rev. 47 at 69 nn.176, 178 (2009).

"What Did Those Asbestos X-Rays Really Show?" Wall Street Journal, Nov. 5, 2005, at A9. **Cited In**:  Practicing Law Institute, PLI Order No. 8412, May 2006; 62 NYU Ann. Survey, Am. L. 271 at 283 (2006); 58 Admin. L. Rev. 269 at 270 (2006); 31 Whittier L. Rev. 47 at 69-70 nn.178-186 (2009).

"The Great Asbestos Swindle," Wall Street Journal, Jan. 6, 2003 at A18.  **Cited In:**  56 Vand. L. Rev. 1949, at 1957, 1980 (2003); 18-20 MEALEY'S LITIG. REP. ASB. 23 (Nov. 2003); 2-4 MEALEY'S LITIG. REP. SILICA 11 (Dec. 2003); 31 Pepp. L. Rev. 1, at 1 (2004); 31 Pepp. L. Rev. 175, at 177 (2004).

"Wal-Mart's Outrageous Lawsuit," Charlotte Observer, Aug. 5, 2002, at 3E.

"Lawyers Put Profit Above People," N.Y. Post, June 27, 2001 at 33.

"The James Gang Robbed Banks.  Lawyers Today Have A Better Idea," (on proposed legislation to restrict fees in tobacco litigation to reasonable amounts), St. Louis Post-Dispatch, Apr. 27, 2001 at  C17.

"Want To Be a Billionaire? Sue a Tobacco Company," Wall Street Journal, Dec. 30 1998 at A10.  **Cited In:** 29 Cumb. L. Rev. 580 (1999); 49 DePaul L. Rev. 500 (1999); 23 Seattle L. Rev. 282 (1999); 19 N. Ill. L. Rev. 333 at 333 (1999); Bus. L. Monographs C3-C3-1, § 103; 109 Yale L.J.1472 (2000); 74 Tul. L. Rev. 1809 at n.72 (2000); 5 Yale J. Health Pol'y L. & Ethics 341 at 348 (2005); 38 Pepp. L. Rev. 283 at 286 (2011).

"Will Legal Ethics Go Up in Smoke?," Wall Street Journal, June 16, 1998 at A18.  **Cited In**: 109 Yale L.J. 1472 (2000); DEBORAH RHODE, IN THE INTERESTS OF JUSTICE 178 (2000); DEBORAH RHODE & DAVID LUBAN, LEGAL ETHICS 691 (3d ed. 2001); DEBORAH RHODE & GEOFFREY HAZARD, PROFESSIONAL RESPONSIBILITY AND REGULATION 197 (2002).

Ethics Go Up in Smoke, Legal Times, Mar. 9, 1998 at 33.  **Cited In:**  2 J. Inst. Stud. Legal Eth. 264 (1999).

"When Witnesses Are Told What to Say," Washington Post, Jan. 13, 1998 at A15.  (co-authored with Ron Rotunda); **Cited In:**  12 Geo. J.L.E. 468 (1999); 30 Tex. Tech. L. Rev. 1401 (1999); DEBORAH RHODE, IN THE INTERESTS OF JUSTICE 97 (2000); 70 Ford. L. Rev. 1599 at 1614 (2002); *Lippe v. Bairnco Corp. et al.*, 2002 WL 34342589 at n.45 (SDNY, Feb. 1, 2002); 31 Pepp. L. Rev. 175, at 185, 188 (2004); THOMAS MORGAN & RONALD ROTUNDA, PROFESSIONAL RESPONSIBILITY 450 (9th ed. 2006); IADC Prod. Liab. Newsletter 2 (Dec. 2008); RONALD ROTUNDA & JOHN DZIENKOWSKI, LEGAL ETHICS, LAW. DESKBK. PROF. RESP. § 25-3 (2002-03 ed.), § 3.4-3 (2005-06, 2006-07, 2009-2010, 2010-11, 2011-12 eds.); 44 Akron L. Rev. 679 at 688 (2011).

"Contingency Fees: a peril to nation's health?" Corpus Christi Caller Times, Aug. 22, 1997.

"Curb Legal Feeding Frenzy," USA Today, Jan. 10, 1996 at p.11A.  **Cited In**: 49 SMU L. Rev.

1640, 1655 (1996); 47 DePaul L. Rev. 468 (1998).

"Foster's Papers:  What Executive Privilege?" The New York Times, Aug. 2, 1995, p. A19. **Cited In**: 76 Geo. Wash. L. Rev. 197, 199 (2008) (Reprinted in the Baltimore Evening Sun, St. Louis Post-Dispatch, Minnesota Star Tribune, Buffalo News, Sacramento Bee, Houston Chronicle and Raleigh News & Observer).

"Does America Need Tort Reform?  Yes, To Curb Lawyers' Greed," N.Y. Daily News, May 5, 1995, p. 33.

"After Asbestos, the Next Tort-Law Fiasco," Wall St. J., Oct. 21, 1992, p. A17, col. 4. Reprinted in 7 Issues of Injury 4 (1993). **Cited In:** 1998 Det. C.L. Rev. 197 (1998).

"Keeping Quiet in the Face of Fraud," Los Angeles Times, Mar. 12, 1992, p. A11. **Cited In:** 25 Ariz. St. L. J. 545 (1993); 20 Ford. Urb. L.J. 872 (1993); 72 Wash. L. Rev. 467 (1997).

"Lawyers' Fee Frenzy," The Washington Post, Aug. 16, 1991, p.A29, col. 3. **Cited In:** Hatton v. Asbestos Corp., 1991 U.S. Dist. Lexis 13345, at *4 (N.D. Ill. Sept. 23, 1991); Wells v. Asbestos Corp., 1991 U.S. Dist. Lexis 13388, at *4 (N.D. Ill. Sept. 23, 1991); Auberdene Conway v. Asbestos Corp Ltd., 1991 WL 195800 (N.D. Ill. Sept. 23, 1991).

## L.    National and Professional Press

I have been cited or quoted in:  **ABA/BNA Lawyers' Manual on Professional Conduct, Current Reports**, March 2, 2011 at 128, June 7, 2000 at 278-79, Feb. 18, 1998 at 50, 53, Feb. 4, 1998 at 20-21, June 28, 1995 at 180-81, Feb. 8, 1995 at 14, Feb. 23, 1994 at 31-32; **ABA Journal**, Feb. 2007 at 38, 60, Jan. 2005 at 16, October 2004 at 34, Mar. 2004 at 37, Dec. 1997 at 33, Sept. 1997 at 74-75, Aug. 1997 at 28, Jan. 1997 at 40, May 1996 at 28, Apr. 1994 at 12; Feb. 1994 at 26; **ABA Journal E-Report**, July 15, 2004, Nov. 12, 2004, Oct. 8, 2004; **ABC News** May 12, 2004; **ABC News 20/20**, Mar. 16, 1998, Trans No. 98031603-J11; **AOLNEWS.COM**, July 28, 2010, **The American Lawyer**, Oct. 2005 supp., Aug. 2004 at 146, Sept. 10, 1998 at 1, May 1998 at 50, Oct. 1997 at 34-35; American Lawyer Media, The Recorder, Feb. 16, 1998 at 1, Feb. 9, 1998 at 1; **The American Spectator**, Mar. 2005 at , Mar. 1994 at 61, Sept. 1990 at 18-19; **Associated Press**, March 24, 2010 at 4:00 p.m. PDT, Jan. 7, 2005 at 21:42:06, Nov. 25, 2004 at 01:50:03, Nov. 24, 2004 at 19:00:15, Feb. 4, 2003 at 16:45:00, June 12, 1998 at 10:35:08-0400, June 11, 1998 (1998 WL 6679634), Apr. 10, 1998 (1998  WL 7403502), Jan. 10, 1977 at 18:24:23, Dec. 18, 1996 at 20:08:19, July 14 and 17, 1992, (picked up by several hundred newspapers); **Atlanta Jour. & Constitution**, July 7, 2004 at 6A, June 7, 1998 at 5G; **Baltimore Sun**, Feb. 5, 2003, Oct. 15, 1999 at 1A; **Barron's**, Dec. 2, 1991 at 10; **Bloomberg. Com.**, Apr. 10, 2007; **Bloomberg BNA**, March 21, 2016; **Bloomberg News**, Apr. 10, 2007, June 20, 2002, Jan. 27, 1995; **BNA Civil Trial Manual, Current Reports**, Feb. 15, 1995 at 40, Feb. 1, 1995 at 24; **BNA Class Action Litigation Report**, v.3, No. 17, 9/13/02; **Bloomberg Criminal Law Reporter**, Aug. 30, 2017; **BNA Criminal Practice Manual, Current Reports**, Ap. 13, 1994 at 172, 176; **BNA Toxics Law Reporter**, v. 29, 3/6/14; **Boston Globe**, Nov. 7, 2010 at 10, Aug. 10, 2001 at A1, June 9, 1998 at C4; **Business Week**, Apr. 29, 1996 at 86; **CBS MarketWatch**, Feb. 2, 2005; Jan. 7, 2005; **Chicago Sun-Times**, Apr. 11, 2007 at 59, Nov. 26, 2004 at 50, June 15, 1998 at 26; **Chicago Tribune**, Apr. 11, 2007 at C3,June 23, 2004 at C1, Mar. 8, 2004 at 1, Sept. 24, 2003 at C1, Aug. 16, 2002 at 1, June 5, 1998 at 23; **Chief Executive**, Jan. Feb. 1995 at 60; **Chief Legal Executive,** Winter 2003 at 26; **Christian**

38

**Science Monitor**, July 24, 2000 at 2, Apr. 13, 1998 at 3; **Cincinnati Enquirer**, June 19, 2011 at A1, Dec. 10, 1998 at B1, June 7, 1998 at E1, Dec. 29, 1997 at B1, Dec. 11, 1997 at A2, Oct. 12, 1997 at A1, May 5, 1996 at F1; **City Journal** (Manhattan Institute), Autumn 2002, p. 74; **Cleveland Plain Dealer**, Jan. 15, 2005 at C1,  Mar. 1, 2000 at 8B, Feb. 29, 2000 at 1A, July 15, 1992 at 3E, Feb. 27, 1994 at 1C; **Common Cause Magazine**, Fall 1993 at 14-20; **Congressional Quarterly News**, Nov. 21, 2107; **Congressional Record** -- Senate, 105th Cong., 2d sess., June 16, 1998, S6367, S6374, S6378, June 11, 1998, 144 Cong. Rec. S6149 at 6159, 6160, 6172-73, May 19, 1998, S5103, S5106, S5108; **Corriere della Serra** (Milan, It.) Nov. 26, 2004; **CQ Researcher**, 3308 (Nov. 5, 2007), 397 (May 2, 2003), 640 (March 15, 2003), 6, 9 (March 26, 2003), 137 (Feb. 4, 2003), 599 (July 27, 2001), 18 (May 22, 1992); **Crain's Chicago Business**, Feb. 28, 2005 at 35, Jan. 12, 2004; **Crain's New York Business**, Feb. 28, 2005 at 25, Aug. 14, 2000 at 16, Feb. 7, 2000 at 14, May 24, 1999 at 3, Nov. 3, 1997 at 14, July 7, 1997 at 1, June 9, 1997 at 45, June 2, 1997 at 35, Apr. 22, 1996 at 3; **Daily Deal**, Feb. 16, 2006; **Dallas Morning News**, July 20, 2003 at 1A, June 13, 1998 at 2F, Mar. 14, 1998 at 6A, Dec. 11, 1997 at 1D, Oct. 24, 1997 at A1; Feb. 11, 1994 at 6A; **Denver Post**, Apr. 5, 1995 at A2; **Detroit News**, 12/10/00 at B1; **Detroit Free Press**, Jan. 8, 2005 at 3A, Jan. 22, 2004 at 1A; **Dow Jones News Service**, Dec. 17, 2003 (12:33:00) March 13, 2017; **The Economist**, Jan. 29, 2005, Feb. 13, 1999 at 28; **The Evening Standard** (London), Mar. 31, 1999 at 2; **Fifth Estate** (Canadian Broadcasting Co.), Jan. 22, 2003; **Financial Times** (London), Feb. 5, 2005 at 1, June 24, 2004 at 8, Jan. 20, 2004 at 23,  Sept. 9, 2002 at 27, May 14, 2002 at 15, Apr. 6, 2000 at 6,9, 5; July 17, 1998 at 21; **Financial World**, Oct. 10, 1995 at 28; Nov. 3, 1997 at 14; **Forbes**, Jan. 08, 2008 at 36, Sept. 4, 2006 at 136, July 21, 2003 at 64, 67, Apr. 16, 2001 at 62, Oct. 16, 2000 at   , May 1, 2000 at 69, July 7, 1997 at 43, Feb. 12, 1996 at 47, Nov. 6, 1995 at 140, Feb. 19, 1990, at 130, Oct. 16, 1989, at 197; **Forbes.com**, Aug. 15, 2018, Aug. 15, 2018, April 13, 2015 at 38, July 14, 2010, 3:10 p.m.; **Fortune**, June 13, 2005 at 96, Apr. 18, 2005 at 190, Mar. 3, 2003 at 110, Aug. 26, 1991 at 86; **Fox News**, Stossel show, 6/16/2011, Dec. 15, 1997, Nov. 5, 1997; **The Guardian** (London), Nov. 4, 1997 at 17; **Houston Chronicle**, Oct. 3, 2004 at A1, June 14, 1998 at 2, Mar. 14, 1998 at A29; **Insurance Information Inst. Rep.**, Nov. 1994 (R. Gastel, Ed. "The Liability System"), Aug. 1994; **International Herald Tribune**, Apr. 11, 2007 at 15, Feb. 3, 2005 at 15, Mar. 20, 2003 at 13, Dec. 12, 1997, at 3, Aug. 3, 1995; **Inside Counsel**, July 2014, Feb. 2008 at 16; **Investor's Business Daily**, Jan. 10, 2005 at A18, Jan. 23, 2002 at A18, Sept. 12, 1996, at A1, Mar. 22, 1996 at A2, Mar. 11, 1996 at A1, Aug. 15, 1995 at A1, Oct. 12, 1994 at A1, Feb. 21, 1992 at 2, Mar. 4, 1992 at 10, Oct. 12, 1994 at A1; **J. of Legal Prof.** at 301 (Spring 2009); **Law 360,** May 3, 2019, May 29, 2018,  Nov. 16, 2017; **Lawyer's Weekly USA**, Aug. 21, 2000 at 19, July 28, 1997 at 19, Mar. 10, 1997 at 1, Aug. 26, 1996 at 9, June 17, 1996 at 17, Nov. 6, 1995 at 22, Oct. 23 1995 at 10, Dec. 19, 1994 at 1,15, Apr. 11, 1994; **Lawyer's Monthly**, Sept. 1990, at 1,7; **The Legal Intelligencer**, Oct. 17, 2005 at 3**; Legal Times**, July 12, 2004 at 54, June 14, 2004 at 1, Mar. 9, 1998 at 33, Mar. 1, 1996 at 21, Jan. 29 1996 at 23, Feb. 13, 1995 at; **London Times**, May 17, 1994; **Los Angeles Times**, Jan. 9, 2005 at A31, Mar. 9, 1999 at C5; Dec. 11, 1997 at D7, Mar. 24, 1996 at B1, Mar. 22, 1996 at A3, Sept. 29, 1995 at A1; **Mealey's Litigation Reports: Asbestos**, Oct. 17, 1997; **Miami Herald**, Jan. 8, 2005 at 5A, June 12, 1998 at 19A, Apr. 19, 1998 at 12A; **NBC Nightly News**, Nov. 10, 1996; **National Law Journal**, Mar. 23, 2009 at 4, Aug. 21, 2006 at 4, July 11, 2005 at 4,  Feb. 28, 2005 at 1, July 26, 2004 at 7, May 12, 2003 at 6, Feb. 18, 2002 at A8, Dec. 17, 2001 at A17, Dec. 20, 1999 at A1, Oct. 25, 1999 at A1, July 19, 1999 at A5, Dec. 28, 1998 at A4, Sept. 14, 1998 at A6, May 25, 1998 at A6, Feb. 9, 1998 at A20, Dec. 22, 1997 at A9, May 12, 1997 at 20, June 19, 1995 at A6, Jan. 30, 1995 at A7, Jan. 16, 1995 at A6, Feb. 14, 1994, at 15, June 7, 1993 at 3; **National Journal**, May 17, 2008 at 17, July 10, 2004, Jan. 3, 2004 at 8, July

29, 2000 at 2439,  Nov. 13, 1999 at 3292, May 30, 1998 at 1222; Apr. 18, 1998 at 862, Mar. 12, 1994 at 577, 580, Dec. 8, 1990, at 2963; **Nat'l Public Radio**, Feb. 4, 2014 available at http://www.npr.org/2014/02/04/271542406/case-sheds-light-on-the-murky-world-of-abestos-litigation; Jan. 4, 2005 "Marketplace;" Sept. 2001 ("All Things Considered"), July 20, 2000 ("Morning Edition"), July 6, 1999 ("All Things Considered"), June 25, 1997, TR97062502-210, May 21, 1996, Tr.#1872-10, Aug. 6, 1995, TR1135-3; **National Review**, Aug. 29, 2005 at 34, June 14, 2004 at 26,  June 22, 1998 at 28, Feb. 24, 1997 at 38; **Newsweek**, July 20, 1998 at 53, Nov. 13, 1995 at 75; **New York Daily News**, Dec. 17, 2014 at 29; Jan. 16, 2005 at 6, July 10, 2000 at 28; **New York Post**, March 15, 2015 at 18; June 5, 2013, at 74; July 8, 2012 at, Feb. 4, 2003 at, Oct. 13, 2002 at ; June 14, 1998 at 75, Aug. 10, 1994 at 18; **New York Times**, Jan. 12, 2014 at SP2, Dec. 3, 2013 at A27, Nov. 7, 2010 at A1, Feb. 19, 2009 at A15, Mar. 30, 2008 at A23, Aug. 27, 2007 at A10, Feb. 2, 2005 at C1, Jan. 7, 2005 (Nat'l Ed.), Nov. 26, 2004 at A 29, Aug. 28, 2004 at A8, May 18, 2004 at C1, C6, July 4, 2003 at A16, May 26, 2003 at A10, Mar. 19, 2003 at C11, Mar. 27, 2003 at C1, Dec. 31, 2002 at C1, Dec. 15, 2002 at B4,  Nov. 7, 2002 at C1, Nov. 3, 2002 at  § 3, p. 1, Aug. 20, 2002 at A2, Aug. 15, 2002 at A14, Apr. 13, 2002 at C1, C14, Apr. 10, 2002 at A1, Aug. 8, 2001 at A12, Sep. 3, 2000 at §3, p. 12, Feb. 14, 1999 at WK5, July 28, 1998 at A1, June 17, 1998 at 1, Dec. 11, 1997 at A19, Oct. 24, 1997 at B1, Oct. 11, 1997, at A8, Sept. 11, 1997 at A27, July 10, 1997 at D2, Nov. 7, 1996 at D1, May 2, 1996 at D2, Feb. 22, 1996 at D2, Jan. 25, 1996 at D2, Mar. 24, 1995 at B6, Mar. 23, 1995 at D2, May 6, 1994 at B18, Mar. 18, 1994 at A22, Feb. 25, 1994 at A28, Feb. 11, 1994 at 1A, Mar. 2, 1993 at B5, Oct. 6, 1989 at B35; **New Zealand Herald**, Nov. 26, 2004 at B3; **PBS**, Nov. 25, 2005 ("Journal Report"); **Philadelphia Inquirer**, Jan. 8, 2005 at A12, Mar. 31, 1999 at A01; **Reuters News**, July 18, 2012 at 5:14 a.m.,  April 2, 2010 (2:06 p.m.), Mar. 8, 2005 (4:29 p.m.), Feb. 2, 2005; **Rocky Mtn News**, Feb. 3, 2006 at 37A,  June 10, 2005 at 42A, June 12, 1998 at 42A, June 10, 1998 at 43A, Jan. 29, 1995 at 66A; **Roll Call**, Sept. 26, 1994 (Sen. Mitch McConnell, 'Incremental' Health Reform Must Include Changes to Liability System); **St. Louis Post-Dispatch**, Jan. 26, 2005 at A1, Jan. 8, 2005 at 20, Dec. 12, 2004 at B1, Dec. 6, 2004 at B1, Oct. 18, 2004 at B1, Sept. 10, 2004 at B2, June 23, 2004, Feb. 22, 2004 at C1, Jan. 14, 2004 at B1, Apr. 6, 2003 at E1, Sep. 10, 2000 at C1, July 6, 1998 at A9; **San Diego Union-Trib.**, Sept. 24, 2003 at C1, June 12, 1998 at A8, Dec. 15, 1997 at B6, Mar. 17, 1996 at A3, Oct. 17, 1993 at G-1; **San Francisco Chronicle**, June 17, 1998 at A1; **Seattle Times**, Nov. 25, 2004 at A10, June 23, 2004 at D1, Sept. 24, 2003 at E1, Dec. 11, 1997 at A8, Dec. 19, 1996, Apr. 17, 1995, July 28, 1992 at A3; **Smart Money**, Oct. 1992, p.89; **Suddeutsche Zeitung** (Germany), June 14, 2004 at 19; **Star Tribune** (Minneapolis), Feb. 14, 1999 at 11A; **Taipei Times**, Apr. 14, 2002 at 11; **UPI**, Jan. 7, 2005 (5:04 PM EST); **USA Today**, Mar. 8, 2004 at 1A, Dec. 11 1997 at 6A, Dec. 9, 1997 at 14A, Jan. 18, 1996 at 10A, Aug. 9, 1995 at 9A, July 10, 1995 at 11A; **U.S. News & World Report**, Nov. 1, 1999 at 36, Jan. 30, 1995 at 51, 56; **Wall St. Journal**, March 15, 2017 at B3, Oct. 31, 2011 at B1, Nov. 3, 2008 at A5, Apr. 24, 2006 at B1, Feb. 23, 2006 at A8, Feb. 14, 2006 at A22, July 19, 1999 at A15, June 22, 1998 at B7C, June 3, 1998 at A18, Mar. 19, 1998 at A18, Jan. 28, 1998 at B, Dec. 11, 1997 at A6, Oct. 7, 1997 at A23, Feb. 12, 1997 at B9, Mar. 20, 1996 at A15, Jan. 15, 1996 at B5, Nov. 20, 1995 at B14, Jan. 24, 1995 at A22, July 29, 1994 at B8, Mar. 18, 1994 at B10, Feb. 17, 1994 at A1, Oct. 13, 1993 at B5, Oct. 12, 1993 at B1, Mar. 19, 1993 at B12, Jan. 29, 1993 at B9, Nov. 14, 1990 at A17; **Wall St. J. Online**, April 15, 2013; **Washington Post**, Jan. 28, 2008 at D1, July 25, 2005 at D1, Jan. 8, 2005 at A4, Aug. 12, 2002, at E1, Aug. 11, 2002 at A4, Apr. 8, 2002 at E1, May 13, 1999 at A21, June 3, 1998 at A23, Dec. 11, 1997 at A6, June 23, 1996 at A10; Apr. 8, 2008 at D01; **Washington Times**, Aug. 8, 2005 at A18, May 13, 1999 at A21, Dec. 12, 1998 at A1, July 20, 1998 at 30, June 7, 1998 at A1, May 28, 1996 at A13; **The Weekly Standard**, Sept. 23, 1996 at 21, Sept. 18, 1995 at 49;

JA04334

**WNBC** (N.Y.) News, June 29, 2001.

## M.    **Popular Press — Other**

Akron Beacon Journal, Feb. 3, 2005 at D1, Apr. 16,1995 at G1; (Albany) Times Union, Jan. 1, 2012 at A1, Aug. 1, 2003 at A1, May 25, 2003 at C1, Oct. 24, 2002 at B1; The (Allentown) Morning Call, Dec. 11, 1997 at A1; American Agent & Broker, Mar. 1997 at 20; American Political Network, Inc. Health Line, Dec. 11, 1997, Oct. 13, 1993; Arkansas Democrat-Gazette, Dec. 19 1999 at 13B, June 5, 1998 at B8; Austin American Statesman, Feb. 7, 1999 at B1, Jan. 9, 1999 at B1, Mar. 14, 1998 at B1; Baton Rouge Advocate, Nov. 21, 2004 at 26, June 12, 1998 at 6A; Bergen Record, Dec. 28, 2003 at A15, Mar. 22, 1998 at A1, Mar. 1, 1998 at A1; Best's Review P/C, July 1994 at 38; BestWire, Jan. 19, 2004; Buffalo News, June 12, 1998 at A7; Business Insurance, Nov. 11, 1991 at 1; Capital Times (Madison, WI.), May 15, 1999 at 2A, June 12, 1998 at 11A; Charleston Daily Mail, Apr. 20, 1998 at 4A; Charleston Gazette, Nov. 25, 2004 at 1A, Dec. 19 1999 at 13B, Apr. 5, 1999 at 4A, June 12, 1998 at 2A, Apr. 17, 1998 at 2C; (Charleston) Post and Courier, Aug. 3, 2003 at 1A, July 12, 2003 at 1A, Aug. 3, 1998 at 12; Charlotte Observer (N.C.), Nov. 25, 2004 at 22A; Chattanooga Free Press, June 12, 1998 at B3; Chattanooga Times, June 23, 2004 at A1, June 12, 1998 at A9; Chicago Daily Herald, Feb. 17, 1999 at 10; Cincinnati Post, Nov. 25, 2004 at A2;  Clarion-Ledger (Jackson, MS), Jan. 27, 2008 at 1G, Dec. 15, 2005 at 1B, Mar. 6, 2005 at 1A,  July 9, 2003 at 11A; Colorado Springs Gazette, May 7, 2000; Conn. L. Trib., Jan. 29, 1996 at 9; Corpus Christi Caller-Times,  July 2, 2005 at A1; Des Moines Register, Mar. 11, 1999 at 13, June 12, 1998 at 7; Fla. Times Union, Nov. 25, 2004 at A7, June 12, 1998 at A9, Dec. 11 1997; Fresno Bee, Feb. 28, 1994 at B6; Grand Rapids Press, June 12, 1998 at A5; News & Record (Greensboro, N.C.), Mar. 14, 1999 at F1; Sunday Record (Hackensack), Mar. 22, 1998 at A1; Harrisburg Patriot, May 23, 1998 at B1, Apr. 9, 1998 at A1; Hartford Courant, Feb. 2, 2005, Jan. 26, 2003 at D1, Sept., 5, 1997 at A20, Aug. 31, 1997 at A16, Mar. 8, 1994 at B10, July 25, 1994 at D1; Hattiesburg American (MS), Jan. 27, 2008 at editorial; 15 Health Affairs 209 (1996); Honolulu Star, February 23, 1994 at A12; InformationWeek, July 21, 1997; Journal of Commerce, Oct. 24, 1991; Kansas City Star, Nov. 26, 2004 at C2, Nov. 25, 2004 at A10,  June 23, 2004 at 1A; Kentucky Inquirer, Dec. 23, 1997 at B1; (Lakeland, FL) The Ledger, Feb. 7, 2003, Feb. 4, 2003; Lancaster New Era (Pa.), Jan. 10, 2000 at A-8; Lexington Herald-Leader (KY), May 10, 2008; (Madison, WI) Capital Times, July 16, 1999 at 12A, May 15, 1999 at 2A; (Mesa, AZ) East Valley Tribune, Nov. 4, 2000; Medical Economics, Nov. 4, 2005 at 71,  Aug. 1994 at 10, Sept. 13, 1993 at 92; Medical Tribune, Jan. 25, 1990 at 1; The (Memphis) Commercial Appeal, Mar. 27, 1996 at 4B; Miami Daily Bus. Rev., Apr. 2, 1999 at A5; Milwaukee Journal Sentinel, Jan. 11, 2004 at 4D, June 23, 1999 at 1, May 15, 1999 at 2, Dec. 3, 1998 at 2; Minn. Star Tribune, Feb. 3, 2005, Feb. 14, 1999 at 11A, Jan. 11, 1997 at D1; Mobile Register, Apr. 4, 2004 at 4A, Mar. 28, 2004 at 1A, 4A, 6F;  Nashville Tennessean, Feb. 14, 1999; Newark Star-Ledger, May 19, 2004 at 21; New Haven Register, Apr. 2, 1995; New York Sun, Dec. 7, 2006 at 1, Aug. 8, 2006 at 9, May 31, 2006 at 1, Feb. 24, 2006 at 1, Feb. 8, 2006 at 5, Jan. 18, 2005 at 7; Okla. City Journal Record, Mar. 25, 1995; Orange Cty Register, Dec. 11, 1997 at A19, Nov. 23, 1997 at  , Mar. 27, 1996 at C3; Orlando Sentinel, Apr. 14, 2002 at H10, Sept. 29, 1996 at G1; Palm Beach Post, Apr. 3, 1995 at 3, Nov. 28, 1993 at 1F; Palmetto (S.C.) Business Daily, March 19, 2015; Portland Oregonian, June 12, 1998 at 12A; (Quincy, MA) The Patriot Ledger, Feb. 5, 2003 at 6; (Raleigh) News and Observer, June 12, 1998 at A4, Feb. 3, 1996 at A9; Richmond Times-Dispatch, Dec. 11, 1997 at A-25, Oct. 12, 1997 at A3, Apr. 16, 1993 at E-1; Sacramento Bee, June 23, 2004, Mar. 8, 1994 at B6; Salt Lake Tribune, May 25, 2003 at E1, Oct. 13, 1997 at A7; San Antonio Express-News, June 12, 1998 at 7A; San Diego Business J., Nov. 4, 2002 at 55; San Francisco Daily

41

J., Dec. 9, 1997 at, Oct. 22, 1997 at 1; The (San Francisco) Reporter, Jan. 14, 1992, at 10; St. Paul Pioneer, Nov. 28, 2004 at 14A; St. Petersburg Times, June 5, 1995 at E11; Salt Lake Tribune, Oct. 13, 1997 at A7, Apr. 5, 1995 at B8; Selma Times-Journal, Mar. 13, 1996; Star-Ledger (Newark), Mar. 28, 1999 at 1, June 12, 1998 at 5; Sun Sentinel, (Ft. Lauderdale), Mar. 1, 1999 at 19A, June 12, 1998 at 3A; Tacoma (Wash.) Morning News, Apr. 5, 1995 at E6; Telegraph-Herald, June 13, 1998 at 1; Toledo Blade, Oct. 29, 2006 at F 1,  Oct. 29, 2000 at 1A, July 2, 2000 at A1, Dec. 16, 1998 at 1, Apr. 2, 1995 at E1; Tulsa World, Nov. 25, 2004 at A25, June 12, 1998 at 6; Tucson Citizen, June 12, 1998 at 2A; Press Journal (Vero Beach, FL), Oct. 17, 1998 at A9; Virginia Lawyers Weekly, Apr. 13, 2009; Washington Examiner (Va. ed.), Sept. 20, 2005 (editorial); Waterbury Republican-American, Sept. 17, 2002; Waukesha (WI) Freeman, Nov. 7, 2002; Wichita Eagle, Apr. 23, 1995 at 2E; (Wilmington) News Journal, Mar. 24, 1998 at B1; Wisconsin State Journal, July 13, 1999 at 1A, Mar. 21, 1999 at 1A; Forbes, Jan. 7, 2008 at 181.

JA04336

# EXHIBIT C

JA04337

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| KAISER GYPSUM COMPANY, INC., et al[1] | |
| Debtors | Case No. 16-31602 |

**EXPERT REPORT OF CHARLES E. BATES, PHD**

**February 20, 2020**

---

[1] The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Kaiser Gypsum Company, Inc. (0188), and Hanson Permanente Cement, Inc. (7313). The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

Expert Report of Charles E. Bates, PhD

# Table of contents

I. Summary of qualifications and experience ..................................................................................... 1

II. Scope of charge ............................................................................................................................ 3

III. Introduction and Summary of opinions ....................................................................................... 4

IV. Kaiser's asbestos litigation background and history .................................................................... 9

V. Judge Hodges' findings regarding exposure omissions were based on a large number Garlock claims .......... 13

VI. Analysis of the overlap between Garlock's asbestos claims history and Kaiser's asbestos claims history ...... 21

VII. Analysis of the effect of exposure omissions in Kaiser claims using publicly available data ......................... 24

    VII.A. Analysis of exposure omissions by Kaiser claimants using available trust claims and ballots data ..... 24

    VII.B. Effect of non-disclosure of trust claims on Kaiser settlement amounts paid to plaintiffs ...................... 28

    VII.C. Analysis of claims and law firms withholding information in the Garlock matter ................................... 29

Appendix A. Asbestos claims databases used in the analysis .......................................................... A-1

Appendix B. Curriculum vitae of Charles E. Bates, PhD ................................................................. B-1

Appendix C. Materials relied upon ................................................................................................. C-1

Expert Report of Charles E. Bates, PhD

# List of figures

Figure 1. Kaiser's payments to claimants by disease category ............................................................................10

Figure 2. Comparison of average Garlock payment amounts to mesothelioma claimants for RFA and non-RFA law firms..........................................................................................................................................................18

Figure 3. Garlock forecasts based on different information regimes according to claimants' disclosure of exposures ..................................................................................................................................................................19

Figure 4. Payments to mesothelioma claimants against Garlock and Kaiser by year of payment ........................22

Figure 5. Overlap of mesothelioma claims between Kaiser and Garlock through June 5, 2010 ...........................23

Expert Report of Charles E. Bates, PhD

# List of tables

Table 1: Proportion of exposures identified or omitted in tort discovery against Kaiser .........................................25

Table 2: Summary statistics for former codefendants with available ballots or trust claims information for Garlock claims filed after 1999...................................................................................................................................26

Table 3: Former codefendants with available ballots and trust claims information for Kaiser claims filed after 1999...................................................................................................................................................................27

Table 4: Kaiser resolution amounts for mesothelioma claims filed and resolved after DCPF trusts began paying claims ......................................................................................................................................................28

Table 5: Summary of RFA and non-RFA law firms for Kaiser mesothelioma claims............................................30

Table 6: Kaiser historical claims by alleged disease and status.........................................................................A-2

Expert Report of Charles E. Bates, PhD

# I. Summary of qualifications and experience

(1)   I am Chairman of Bates White, LLC, which is an economic consulting firm with its primary office located in Washington, DC.  I specialize in the application of statistics and computer modeling to economic and financial issues, and I have extensive experience working on asbestos-related claims and liability valuation issues.  I have more than 25 years of experience in a wide range of litigation and commercial consulting areas.

(2)   I received my PhD and MA in Economics from the University of Rochester, and my BA in Economics and Mathematics, with high honors, from the University of California, San Diego.  I have taught courses in advanced statistical economic analysis and trade theory while on the faculty at Johns Hopkins University, and I have published papers on advanced topics in estimation theory in peer-reviewed journals.

(3)   Prior to founding Bates White, I was a Vice President at A.T. Kearney. Prior to that, I was the Partner in Charge of the Economic Analysis Group at KPMG.

(4)   I have been retained as an asbestos and tort claims valuation and estimation methodology expert; and as detailed in my curriculum vitae (attached to this Report as Appendix A), I have valued asbestos-related expenditures in numerous bankruptcy and other proceedings, including Bestwall, Garlock, SPHC (a.k.a. Bondex), Motors Liquidation (a.k.a. General Motors), National Gypsum Company, United States Gypsum Corporation, Federal Mogul Corp., GAF Corporation, Turner & Newall, Kaiser Aluminum Corp., Congoleum Corporation, ASARCO LLC, Plibrico Company, The Babcock & Wilcox Company, W.R. Grace and Company, Western MacArthur Company, and Owens Corning. Some highlights of my previous involvement in asbestos-related matters include the following:

- Currently serving as an asbestos claims valuation and estimation methodology expert on behalf of the Debtors in Bestwall.

- Served as an expert in asbestos claims valuation for financial reporting purposes on behalf of certain Halliburton stockholders regarding Halliburton's financial disclosures of its asbestos liabilities after its acquisition of Dresser in 1998.

- Served as an expert in asbestos claims valuation, estimation methodology, and asbestos reinsurance billing on behalf of American Re-Insurance Company and Ace regarding the proper reinsurance bill associated with USF&G's reinsurance bill of its asbestos-related payments to Western MacArthur.

- Served as an asbestos claims valuation and estimation methodology expert on behalf of the Debtors in Garlock Sealing Technologies.

Expert Report of Charles E. Bates, PhD

- Served as an asbestos claims valuation and estimation methodology expert on behalf of the Debtors in Specialty Products Holding Corp. and Bondex International, Inc.

- Served as an asbestos claims valuation and estimation methodology expert on behalf of the Official Committee of Unsecured Creditors of ASARCO LLC in the ASARCO bankruptcy proceedings.

- Served as an asbestos claims valuation and estimation methodology expert on behalf of Liberty Mutual in the Plibrico bankruptcy proceedings.

- Conducted an analysis to determine whether asbestos trusts would have sufficient funds to pay future asbestos claimants.

- Conducted due diligence evaluations of asbestos liability in the context of mergers and acquisitions.

- Testified before the US Senate Judiciary Committee on the economic viability of the Trust Fund proposed under S.852, the Fairness in Asbestos Injury Resolution (FAIR) Act of 2005.

- Served as an asbestos claims valuation and estimation methodology expert in proceedings on behalf of the Insurers Joint Defense Group in Babcock & Wilcox's asbestos-related bankruptcy and developed a claims criteria evaluation framework for use in assessing asbestos liability forecasts and trust distribution procedures.

- Served as an asbestos claims valuation and estimation methodology expert on behalf of the Hartford Financial Services Group in the asbestos-related bankruptcy of MacArthur Company and Western MacArthur Company.

- Served as an asbestos claims valuation and estimation methodology expert on behalf of Sealed Air in the fraudulent conveyance matter regarding the 1998 acquisition of Cryovac from W.R. Grace.  This matter stemmed from Grace's asbestos-related bankruptcy.

- Served as an asbestos claims valuation and estimation methodology expert on behalf of CSX Transportation for arbitration proceedings of *CSX Transportation v. Lloyd's, London*.

- Served as an expert on asbestos claims and mathematics on behalf of the Center for Claims Resolution in the arbitration proceedings of *GAF v. Center for Claims Resolution*.

(5)   In addition to other relevant experience, my vitae includes a listing of all of the publications I have authored within the past 10 years and all the cases in which I have testified, either at trial or deposition, within the past five years.  Bates White is being paid $1,150 per hour for the time I bill to this matter.  In addition to my time, I directed the work of other professionals on my staff in performing these analyses.  Neither my compensation nor Bates White's compensation is contingent on the outcome of this matter.

Expert Report of Charles E. Bates, PhD

## II. Scope of charge

(6)  Bates White has been retained by Truck Insurance Exchange ("Truck") in connection with the above-captioned restructuring proceeding.  I submit this Expert Report at the request of Truck's counsel, Gibson Dunn, in connection with Truck's objections to the Debtors' Plan of Reorganization, and its related Confirmation Hearing.

(7)  Truck's counsel requested me to perform and present the following:

- Evaluate and opine upon whether the evidence gathered and presented in the *Garlock* estimation proceeding demonstrated that the withholding of exposure evidence was a pervasive problem for asbestos cases against Garlock.

- Analyze Kaiser's claims data to assess whether and to what extent Kaiser has faced the same exposure evidence withholding practices uncovered and demonstrated in *Garlock*.

Expert Report of Charles E. Bates, PhD

# III. Introduction and Summary of opinions

(8)    In the Garlock bankruptcy, Judge Hodges found that claimants' exposure omissions against Garlock were widespread and pervasive across claims that had potential for trial risk, which further infected the settlements of thousands of other claims, including those alleging mesothelioma and other diseases.  Notably, Judge Hodges found that

> [t]he effect of withholding exposure evidence ***extended well beyond the individual cases involved*** because it was concentrated in high-dollar "driver" cases. Garlock's settlement of cases was not a series of isolated individual events, but rather a more unified practice developed over years of dealing with a finite group of plaintiffs' lawyers on a regular basis…thus, [the driver cases] impact was compounded well beyond the individual "driver" case itself.[2] [emphasis added]

(9)    In the instant matter, there have been incorrect statements made to the Court regarding how applicable Judge Hodges' findings are to the bulk of Garlock claims and to other asbestos defendants such as Kaiser.  In particular, Mr. Kevin Maclay, a representative of the Asbestos Claimants Committee (ACC), stated that "the fact that a cherry-picked selection of 15 cases out of 600,000 or more […] really demonstrates the opposite, your Honor.  It demonstrates there really isn't a widespread fraud problem with the benefit of a vast database of collected information-…."[3] This statement and others that convey the same message are incorrect.

(10)    First, Mr. Maclay's statement contradicts Judge Hodges' findings.  The following is paragraph 66 of Judge Hodges' Estimation Order.

> These fifteen cases are just a minute portion of the thousands that were resolved by Garlock in the tort system.  And they are not purported to be a random or representative sample. But, the fact that *each and every one of them* contains such demonstrable misrepresentation is surprising and persuasive. More important is the fact that the pattern exposed in those cases appears to have been sufficiently widespread to have a significant impact on Garlock's settlement practices and results.   Garlock identified 205 additional cases where the plaintiff's discovery responses conflicted with one of the Trust claim processing facilities or balloting in

---

[2]    *See* Order Estimating Aggregate Liability, *In re Garlock Sealing Technologies, LLC*, No. 10-31607 (Bankr. W.D.N.C., Jan. 10, 2014), at 97 (the "Estimation Order"), ¶ 70.

[3]    Transcript of Proceedings before the Honorable J. Craig Whitely, *In re Kaiser Gypsum Company, Inc.*,No. 16-31602 (Bankr. W.D.N.C., Jun. 13, 2019). at p. 239:23-240:6.  In this Court participation, Mr. Maclay also states that the information collected in the Garlock matter cost "hundreds of millions of dollars" (240:6-9).  That statement, like other statements cited in the text above by Mr. Maclay, is factually incorrect.  Mr. Maclay is mistaken about the cost of the data collected in the Garlock matter by two orders of magnitude.  First, Garlock did not spend "hundreds of millions of dollars" in its bankruptcy proceedings, as can be seen in EnPro's financial statements (*see* EnPro Form 10-Q, June 30, 2017). Second, most of the expense in the bankruptcy proceedings was for attorney and professional fees related to many other aspects of the case, not the data collection effort.

---

Expert Report of Charles E. Bates, PhD

bankruptcy cases. Garlock's corporate parent's general counsel identified 161 cases during the relevant period where Garlock paid recoveries of $250,000 or more. The limited discovery allowed by the court demonstrated that almost *half* of those cases involved misrepresentation of exposure evidence. **It appears certain that more extensive discovery would show more extensive abuse. But that is not necessary because the startling pattern of misrepresentation that has been shown is sufficiently persuasive**. [emphasis in bold added]

(11)   Whereas Mr. Maclay asserts that the limitations on the number of cases for which discovery was granted by Judge Hodges "demonstrates there really isn't a widespread fraud problem," Judge Hodges' Estimation Order says the opposite. Specifically, he says "that [additional discovery] is not necessary because the startling pattern of misrepresentation that has been shown is sufficiently persuasive."[4]

(12)   Second, Mr. Maclay misrepresents the basis of Judge Hodges' order, portraying Judge Hodges conclusions as being based only on 15 "cherry-picked" cases. Clearly, Judge Hodges' knew that the 15 cases were not a random sample. But, as is also clear in Judge Hodges' order, many more cases were analyzed (Judge Hodges' cites to 205 others) that confirmed the pervasive pattern of exposure omissions found in the 15 cases.

(13)   Third, Mr. Maclay's comparison to the 600,000 Garlock historical claims is further misleading and incorrect. The 15 cases cited are unlike the vast majority of the 600,000 cases to which Mr. Maclay refers. The largest group of these 600,000 claims was comprised of more than 540,000 cases alleging non-malignant diseases or for which the disease category was not known to Garlock. These were part of the veritable avalanche of cases filed against Garlock starting from the late 1980s through the early 2000s. By the beginning of the 2000s, Garlock was receiving tens of thousands of such non-malignant claims that are now known to be fraudulent.[5] These claims, which were recruited *en masse* for litigation purposes and had no real medical diagnoses,[6] flooded the courts. They also overwhelmed the ability of dozens of companies to defend against the onslaught of lawsuits, which resulted in the wave of asbestos-related bankruptcies between 2000 and 2002.[7] Until the mid-2000s

---

[4]   Estimation Order, ¶ 66.

[5]   U.S. District Court Judge Jack, in a 2005 hearing, found that the medical diagnoses of those claims "were driven neither by health nor justice; they were manufactured for money." *See* Janis Graham Jack, U.S. District Judge, *In re Silica Products Liability Litig.,* No. 1553 (S.D. Tex., June 30, 2005);

[6]   Following Judge Jack's decision in the silica MDL, several asbestos bankruptcy trusts issued letters suspending the acceptance of medical reports from doctors implicated in the silica fraud investigation (Memorandum re: Suspension of Acceptance of Medical Reports (Manville Trust), from David Austern – President of CRMC, Sept. 12, 2005); Notice of Trust Policy Regarding Acceptance of Medical Reports, *In re Celotex Asbestos Settlement Trust,* Oct. 18, 2005; Letter Regarding Claims Allowance and Qualified Physicians, *In re Eagle-Picher Personal Injury Settlement Trust*, Oct. 19, 2005.

[7]   Charles Bates and Charles Mullin, "The Bankruptcy Wave of 2000: Companies Sunk by an Ocean of Recruited Asbestos Claims," *Mealey's Litigation Report: Asbestos* 21, no. 24 (2007): 39–44.

---

Expert Report of Charles E. Bates, PhD

Garlock resolved these cases for an average of $1,400 each. By the time of Garlock's petition date, it was well known that such claims had no merit; by that date, Garlock resolved such claims for less than $300 on average, if at all. Such claims were not the subject of inquiry related to the more than 200 claims to which Judge Hodges referred.

(14)   The second largest group of claims in the 600,000 cases to which Mr. Maclay refers were also not a claim type of relevance for the Garlock Bankruptcy. They were comprised of almost 38,000 claims that alleged lung and other cancer diseases, of which all but 18 cases (99.95%) were resolved at an average of less than $4,000 each because of the competing factors that cause those diseases (such as smoking) and the tenuous scientific relationship between those diseases and asbestos exposure. Such claims were also not the subject of inquiry related to the more than 200 claims to which Judge Hodges referred.

(15)   This leaves 23,000 resolved Garlock mesothelioma claims of which 7,000 were resolved prior to 2000. These earlier mesothelioma claims were also not the subject of inquiry related to the more than 200 claims to which Judge Hodges referred because claimants, during that time, were pursuing and willingly espousing exposures to high-dose asbestos products as part of their tort litigation. Of the remaining 16,000 mesothelioma cases, only a few hundred were cases for which Garlock had sought discovery in their tort system litigation. The rest were settled to avoid litigation costs, including the costs of discovery.

(16)   Thus, there are only a few hundred cases that can provide the basis for any analysis of information withholding practices by claimants, as only the cases that the claimants litigate through discovery can be cases where any information withholding practices will be codified in the record created. That is, we can only evaluate the prevalence of claimants' exposure omission practices by using claims for which discovery was sought and for which files with discovery are available. The more than 200 cases cited by Judge Hodges are a large portion of the relevant cases of any such enquiry. As I explain in detail in this Report, I used all of the data from available claim files and discovery in the Garlock matter to test the conclusions derived from the 15 cases with the most extensive discovery. I found that both the 15 exemplar cases and the more than 200 additional cases cited by Judge Hodges are a good representation of the prevalence of claimants' exposure omission practices that Garlock faced while in the tort system.

(17)   The relevance of the analysis of the cases with discovery data for cases without such information available is that the amount Garlock (or any other defendant, including Kaiser) paid is driven in large part by its expected costs to litigate. The information withholding practices revealed by the cases with discovery drive up those expected costs, directly raising the settlement amounts claimants extract from a defendant so that a defendant can avoid further defense costs on cases.

Expert Report of Charles E. Bates, PhD

(18)   My analysis in this Report shows that the pervasive pattern of exposure omissions and the resulting misrepresentation of exposure evidence found by Judge Hodges against Garlock applies to Kaiser as well.  This is not surprising.  Kaiser and Garlock are both low-dose defendants of convenience whose cost to defend and settle rose dramatically through and after the bankruptcy wave of asbestos defendants from the late 1990s into the early 2000s.  Though their asbestos products were very different and were used in different settings, they were sued by many of the same plaintiffs represented by the same law firms; fully 80%, and up to 85% by the mid-2000s, of the Kaiser mesothelioma claims filed before June 5, 2010 were found in the Garlock Analytical Database.  Such a large overlap would not be surprising if the actual cause of mesothelioma for many of these claimants were high-temperature insulation, as Garlock's gaskets were often used in steam fittings surrounded by high-temperature asbestos insulation.

(19)   There were 205 Kaiser claims overlapping with the Garlock claims for which Garlock had conducted both discovery in the tort system and, several years later, discovery in its bankruptcy proceedings on asbestos trust filings and bankruptcy ballots for those same claimants.  Fully 63% of these claimants exposures to the products of Kaiser's former codefendants that exited the tort system through bankruptcy reorganization were not disclosed in tort litigation.  Though each of these 205 claimants typically identified 26 defendants on average in their tort discovery, predominantly other low-dose product manufacturers, they omitted 11 additional exposure sources on average from former codefendants that exited the tort system through bankruptcy reorganization, of which at least 5 were associated with high-dose asbestos thermal insulation products.

(20)   This pattern of exposure omissions frustrated Kaiser's defenses and increased its costs to defend.  This had the direct effect of increasing Kaiser's settlements, as it dealt with the new litigation environment where claimants were no longer actively espousing their exposures to the prior codefendants' asbestos products, particularly thermal insulation, like similarly situated claimants had done just a few years before.  The increase was dramatic.  In the two decades prior to 1998 (the year Owens Corning, the most prominent and active litigating defendant in the tort system at the time and producer of Kaylo asbestos insulation, launched its National Settlement Program), Kaiser paid claimants less than $10 million in total to resolve over 5,000 claims.  That situation changed dramatically with the bankruptcy wave of asbestos defendants over the next few years with Kaiser's settlement costs raising to tens of millions of dollars **per year** by the mid-2000s.

(21)   The value of even some of the omitted exposure information is apparent by a comparison of the costs for Kaiser to resolve claims with and without that information.  A natural experiment that reveals some of that value was created in the mid-2000s when a number of the Delaware Claims Processing Facilities (DCPF) trust entities started paying claims after 2005.  There are 857 Kaiser mesothelioma claims resolved after 2005, which are part of the overlapping claims in which Garlock received

Expert Report of Charles E. Bates, PhD

discovery from the DCPF trusts.  Approximately half of those claims were resolved by Kaiser before the claimant filed claims with a DCPF trust.  The remaining claimants filed afterward.  Those that filed with a DCPF trust after resolving their Kaiser claim received on average 60% more than claimants who filed with DCPF trusts before resolving their Kaiser claim.

(22)    The impact of the claimant's exposure omission practices on Kaiser revealed by my analysis of Kaiser's claims that overlap with Garlock claims that have sufficient discovery from both the tort system and from its bankruptcy proceedings extends far beyond the cases studied.  The law firms that represent the claimants with sufficient discovery account for more than half of the mesothelioma claims filed against Kaiser, and those law firms have received more than half of Kaiser's total payments to plaintiffs.  Furthermore, including a certain prominent law firm against Kaiser (which has been found withholding information in asbestos matters and sanctioned) results in that more than 65% of Kaiser's total payments to plaintiffs were made to law firms that have demonstratively engaged in strategic withholding of exposure information.  These practices raise Kaiser's costs to defend cases and hence raise its costs to settle all cases that are resolved for the purpose of avoiding further litigation costs.  Kaiser's costs to resolve claims would be greatly reduced if claimants were required to disclose all their exposure sources, their claims to asbestos trusts, and their claims in asbestos bankruptcies before resolving their case with Kaiser.

(23)    My opinions in this Report are based on decades of study of asbestos litigation and on my direct participation in the Garlock case as the asbestos claims valuation expert for the Debtors in the matter. In Section V, I explain how the testimony presented to Judge Hodges was based on hundreds of claims (not on only 15 claims) and testimony about how these hundreds of claims affected the settlement amounts of thousands of other cases against Garlock.  In Section VI, I describe the similarities between Garlock's asbestos claims history and Kaiser's asbestos claims history and demonstrate that both claiming populations overlapped significantly when both defendants were in the tort system.  In Section VII, using the overlapping claims between Garlock and Kaiser and the publicly available data from the Garlock matter, I recreate several of the analyses that I presented in the Garlock matter to show the extent and effect of plaintiffs' withholding of exposure histories from defendants.

(24)    For ease of exposition in this Report, I use the term "Kaiser" to refer to both Debtors in the present matter: Kaiser Gypsum Company and Hanson Permanente Cement Inc.

Expert Report of Charles E. Bates, PhD

# IV. Kaiser's asbestos litigation background and history

(25) Prior to the 2000s, asbestos claimants focused on the top-tier asbestos defendants mainly associated
with high-dose asbestos containing products, such as thermal insulation, which represented the vast
majority of asbestos exposure health risks.[8]  Culminating in the "Bankruptcy Wave" of the late 1990s
and early 2000s, virtually all of the dozens of high-dose defendants had filed for bankruptcy
reorganization and exited the tort system.[9]  This Bankruptcy Wave resulted in one of the most
significant changes to the asbestos litigation environment.

(26) Following the Bankruptcy Wave, plaintiff attorneys shifted their focus from the traditional high-dose
defendants toward low-dose defendants of convenience, which included previously peripheral
defendants and other new low-dose defendants.[10]  Such defendants had little or no asbestos tort risk
prior to the bankruptcy filing of the defendants because their products caused little, if any, asbestos
health risks, which was obvious when the plaintiffs explained in their litigations their exposure to
high-risk asbestos products.  However, these low-dose defendants saw a significant increase in the
number of lawsuits in which they were named, as well as the frequency with which their products and
operations were identified during discovery as sources of asbestos exposure.  Simultaneously,
plaintiffs stopped affirmatively asserting their exposures to many of the high exposure products and
activities associated with defendants that had bankruptcy filing protection.  Notably, asbestos
claimants asserting they had claims against the reorganizing companies were not required to identify
themselves publicly while the companies were reorganizing.[11]  As a result, the litigation pressure on
peripheral and new defendants increased.

(27) Kaiser was a peripheral defendant in the first decades of the asbestos litigation.  Kaiser principally
manufactured low-dose chrysotile cement products[12] and wallboard accessories[13].  Because of the
types of asbestos-containing products it manufactured, Kaiser was not among the top-tier asbestos
defendants when the asbestos litigation started in the late 1970s.

---

[8]    For example, this includes Johns-Manville, Owens-Corning, Fibreboard, and Pittsburgh Corning.

[9]    The companies that filed for Chapter 11 protection during the Bankruptcy Wave included AC&S, Armstrong World
Industries, USG, Owens Corning/Fibreboard, Federal-Mogul, G-I Holdings, Combustion Engineering, etc. For a
detailed list of all the Bankruptcy Wave debtors, see Mark D. Plevin, Paul W. Kalish, and Kelly R. Cusick,
"Commentary: Where Are They Now, Part Four: A Continuing History of the Companies That Have Sought Bankruptcy
Protection Due to Asbestos Claims," *Mealey's Asbestos Bankruptcy Report*. 6, no. 7 (2007): 1–41.

[10]   For example, products such as gaskets (Garlock), automotive friction products (Motors Liquidation), and residential
construction products (Kaiser, Bondex, and Bestwall), among many others.

[11]   *In re Motions for Access of Garlock Sealing Technologies LLC,* No. 11-1130 (D. Del. 2013).

[12]   "'[M]asonry cement,' and 'plastic cement.'"  Declaration of Charles E. McChesney II in Support of First Day Pleadings.
*In re Kaiser Gypsum Company, Inc.,* No 16-31602 (Bankr. W.D.N.C., Sep. 30, 2016) (the "McChesney Declaration"), ¶
24.

[13]   "[J]oint compounds, texture paints and other similar products used to laminate wallboard or cover radiant heat surfaces
and cables."  McChesney Declaration, ¶ 26.

---

Expert Report of Charles E. Bates, PhD

(28)  However, because individuals who used Kaiser's asbestos-containing products also were exposed to other asbestos-containing products, Kaiser was named in and had to defend asbestos cases starting in the mid-1980s.  Prior to 1998, Kaiser paid claimants less than $10 million in total to resolve over 5,000 claims.  This situation changed dramatically with the Bankruptcy Wave.  Kaiser began being targeted as if it were a primary source of many plaintiffs' asbestos exposure, increasing its expenditures to resolve asbestos claims to tens of millions of dollars per year by the mid 2000s.  The following figure illustrates Kaiser's payments to plaintiffs from the onset of its involvement with asbestos litigation in 1978 to its bankruptcy filing in 2016.

**Figure 1. Kaiser's payments to claimants by disease category**



Note: Includes claims through Kaiser's Petition Date of September 30, 2016

(29)  This sudden change was caused by the shifting litigation environment created by the bankruptcy filings of its most prominent codefendants.  With the increasing pattern of plaintiff's failing to identify fully their exposures to high-dose products, Kaiser began to have its primary defenses on cases frustrated.  As for other low-dose chrysotile defendants like Kaiser, in cases with some credible allegation of exposure to Kaiser's asbestos-containing products, Kaiser's best defense before the

Expert Report of Charles E. Bates, PhD

Bankruptcy Wave of the early 2000s was that Kaiser's relative contribution to plaintiffs' exposures was negligible and did not contribute to their disease. Historically, when top-tier defendants were an active part of the tort case alongside Kaiser, plaintiffs effectively made Kaiser's and other low-dose defendants' case by simply describing in detail all of their exposures to those companies' asbestos-containing products.

(30)   Following this Bankruptcy Wave, plaintiffs' practices increased the costs to Kaiser of establishing the full extent of the plaintiffs' exposures. This problem was particularly acute because, in many cases, the source of much of the exposure information was the plaintiff. As explained in Section V, Judge Hodges' Garlock Estimation Order discussed 15 examples of this situation, founded in extensive discovery about those cases.[14] Further, the debtor's informational brief in Bestwall's bankruptcy matter,[15] a close codefendant of Kaiser, discussed five case examples of the same situation (using the publicly available information from the Garlock matter). Notably, in at least two of the five Bestwall exemplars, Kaiser was a codefendant.[16]

(31)   Approximately half of Kaiser's payments were to the more than 98% of plaintiffs whose claims resolved for no payment or at values up to $300,000, at an average resolution amount of $8,300. Although those posed little to no trial risk, if not settled, they had the potential of resulting in substantial additional defense expenses that would have significantly exceeded the settlement amounts. Prior to the Bankruptcy Wave, there was only one claim every few years that required a payment of more than $300,000. After 2001, the number of such claims jumped to 16 such high-value cases per year and then continued to increase over the next few years to about 34 such cases per year since 2010. These high value cases were resolved for an average payment to claimants of $570,000. They represent the cases for which Kaiser faced actual trial risk. These Kaiser cases embody the type of cases called "driver" cases by asbestos defendants.

(32)   As I explain in Section V and as found by Judge Hodges in his Garlock Estimation Order[17], "driver" cases are cases resolved for high amounts that can have effects beyond the cases themselves. Such high-value cases can increase ("drive up") settlement amounts for other less risky cases in an environment in which the plaintiffs' lawyers have much more information about their clients than the defendants have (even after discovery is conducted). In some jurisdictions like New York City, the effect of the driver cases is further increased due to the rules in which cases are scheduled for trial. For example, in that jurisdiction cases are scheduled in groups, *ad seriatim*, which means that the defendant knows the name of the claimant and the potential trial order; however, the defendant does not know whether any of the scheduled cases will be withdrawn just before trial begins. Therefore, a

---

[14]   Estimation Order, ¶¶ 65-66.

[15]   *See* Informational Brief of Bestwall filed Nov. 2, 2017, Doc. 12.

[16]   *See* Informational Brief of Bestwall filed Nov. 2, 2017, Doc. 12 pp. 28–34.

[17]   Estimation Order, ¶ 70.

Expert Report of Charles E. Bates, PhD

defendant has to be prepared to defend at trial every case of the potentially many cases scheduled for trial, but the plaintiff attorney only has to prepare the cases he knows he will pursue through trial. Then, if a plaintiff's lawyer is able to convince a defendant through a driver case that he may have more cases with those characteristics in the upcoming trial docket, the defendant will have to prepare all cases for trial.

Expert Report of Charles E. Bates, PhD

# V. Judge Hodges' findings regarding exposure omissions were based on a large number Garlock claims

(33)    In his Garlock Bankruptcy Estimation Order, Judge Hodges found that, after the exit of the front-line asbestos defendants during the Bankruptcy Wave, Garlock's defenses suffered due to "the fact that often the evidence of exposure to those insulation companies' products also 'disappeared.'"[18]  The omission of exposure evidence "was a result of the effort by some plaintiffs and their lawyers to withhold evidence of exposure to other asbestos products and to delay filing claims against bankrupt defendants' asbestos trusts until after obtaining recoveries from Garlock."[19]  This practice was not concentrated in a few cases—quite the contrary.  A large amount of testimony was presented throughout the Mesothelioma Estimation Trial, which was the basis for Judge Hodges' Estimation Order.  Below I describe several aspects and examples of such testimony.

(34)    Deposition testimony taken in the Garlock bankruptcy from prominent plaintiff law firms (against both Garlock and Kaiser) clearly indicates that delaying or concealing trust disclosures in the tort system was a regular business practice, instead of just an error in a few cases.  Benjamin P. Shein stated that "we file trust claims after the completion of the tort litigation."[20]  Mr. Shein further stated that "[m]y duty to these clients to maximize their recovery, okay, and the best way for me to maximize their recovery is to proceed against solvent viable non-bankrupt defendants first, and then, if appropriate, to proceed against bankrupt companies."[21]  Peter A. Kraus stated that, "if in my judgment it would benefit the litigation case to delay the filing of a [trust] claim, and it was lawful to delay filing the claim, we would do that."[22]  Judge Hodges provided additional examples such as the infamous Baron & Budd memorandum in which attorneys from that law firm were coaching claimants to provide inaccurate or incomplete exposure information to increase the value of their case against tort defendants.[23]  Kaiser paid $41 million to resolve claims of approximately 550 plaintiffs represented by these three law firms since 2002.  Prior to the Bankruptcy Wave Kaiser never paid plaintiffs of these law firms, including the 65 claims filed by the Baron & Budd firm extending back to the 1980s.

(35)    Judge Hodges further stated that "[i]t was a regular practice by many plaintiffs' firms to delay filing Trust claims for their clients so that remaining tort system defendants would not have that

---

[18]    Estimation Order, ¶ 58.

[19]    Estimation Order, ¶ 58.

[20]    Garlock video deposition of Benjamin P. Shein, Jan. 16, 2013, "SHEIN 43-20 TO 44-16.mpg"

[21]    Garlock video deposition of Benjamin P. Shein, Jan. 16, 2013, "SHEIN 43-20 TO 44-16.mpg", and Estimation Order, ¶ 58.

[22]    Garlock video deposition of Peter A. Kraus, Jan. 14, 2013, "KRAUS 41-05 TO 42-14.mpg".

[23]    Estimation Order, ¶ 58.a; Expert Report of Lester Brickman, *In re Garlock Sealing Technologies, LLC*, No.10-31607 (Bankr. W.D.N.C, Apr. 23, 2013), GST-0969_redacted, ¶¶ 8, 27, and 54 (the "Garlock Brickman Report").

Expert Report of Charles E. Bates, PhD

information."[24]  Some plaintiff law firms' practices exacerbated the problem in obtaining the
plaintiffs' trust claim filing information by having trust claims handled by one law firm and tort
claims handled by a separate trial specialist law firm that may not be informed of the plaintiffs' trust
filings. For example, lawyers from the Brayton Purcell law firm were prohibited from further
practicing law in Judge Hannah's Ohio Court for following this practice.[25]  Kaiser paid over $50
million to resolve nearly 1,600 Brayton claims since 2002.  Prior to the Bankruptcy Wave, Kaiser
only paid $2.4 million to resolve over 430 Brayton claims.

(36)    Further complicating and frustrating Kaiser's defenses (and other defendants'), this practice of
strategically withholding trust claims has been enabled by the Asbestos Claimants Committees in
other bankruptcies by including provisions in Trust Distribution Procedures (TDPs) that allowed
claimants to delay the filing of their trust claims until after they had resolved their tort claims.[26]
Further, these TDPs also explicitly allow claimants to deny exposure to the asbestos products covered
by the trusts while resolving their tort claims and then to assert claims and collect from the trusts
despite the contradictory claim information.[27]

(37)    To investigate the extent of the withholding of exposure information, Garlock sought extensive
discovery on hundreds of its settlements.  Over the objections to any discovery by the asbestos
plaintiffs, the Garlock Court allowed full discovery (including permission to depose plaintiff
attorneys on their settlement practices) on only 15 closed cases represented by 5 major law firms
(including those led by Messrs. Shein and Kraus, quoted above).  Discovery on every one of those 15
cases confirmed Garlock's suspicions.  In each, the Court found that important exposure evidence
was withheld.[28]  On average, these 15 plaintiffs disclosed exposure evidence for approximately 2
companies but *did not* disclose exposure evidence for approximately 19 companies.  Judge Hodges
noted that these cases were not "purported to be a random or representative sample" but that the
"pattern exposed in those cases appears to have been sufficiently widespread."[29]  The fact that the
sample was not random means the quantification of evidence suppression in these 15 cases may not
be representative of the actual average number of undisclosed exposures.  However, the deposed
plaintiff lawyers confirmed that to be their business practice, not examples of clerical mistakes, or a
rare practice.  Simply, exposure evidence omissions were not only limited to these 15 cases.  Further

---

[24]    Estimation Order, ¶ 58.b.

[25]    *See* Order and Opinion by Judge Harry A. Hanna, *In Re Kananian v. Lorillard Tobacco Co.*, Case No. CV442750 (Ohio
Ct. Com. Pl. Cuyahoga Cty, Jan. 18, 2007.

[26]    Amended and Restated Armstrong World Industries, Inc. Asbestos Personal Injury Settlement Trust Distribution
Procedures, Section 5.1(a)(2) Effect of Statutes of Limitations and Repose, 8 (2012).

[27]    For example, "Similarly, failure to identify B&W products in the claimant's underlying tort action, or to other
bankruptcy trusts, does not preclude the claimant from recovering from the PI Trust, provided the claimant otherwise
satisfies the medical and exposure requirements of this TDP."  The Babcock & Wilcox Company Asbestos PI
Settlement Trust Distribution Procedures, Section 5.7(b)(3) B&W Exposure, 48 (2011).

[28]    Estimation Order, ¶ 65.

[29]    Estimation Order, ¶ 66.

Expert Report of Charles E. Bates, PhD

discovery was employed in the Garlock matter to quantify more broadly the number of exposure omissions of typical cases.

(38)    Based on partial discovery granted by Judge Hodges on additional cases and the limited number of cases where Garlock had obtained discovery in the underlying tort litigation of those individual cases, Garlock identified almost 200 additional cases (for a total of 210 cases) where plaintiffs' discovery responses conflicted with Trust claim filings or ballots filed in a bankruptcy.[30]  Judge Hodges concluded that "more extensive discovery would show more extensive abuse… the startling pattern of misrepresentation that has been shown is sufficiently persuasive."[31]

(39)    It is important to explain three fundamental points about these cases.  First, the 210 cases that withheld information mentioned by Judge Hodges, although not randomly selected, constituted the central part of Garlock's litigation after the Bankruptcy Wave.  Though they do not represent a large fraction of the cases filed against Garlock, they do represent a large portion of cases for which Garlock was the primary trial target of plaintiffs.  Second, these included the driver cases identified by Garlock's counsel.  Thus, those cases had significant effect on the value of the other cases represented by those plaintiff law firms.  Third, the partial discovery granted, limited to only some of the asbestos trusts, hindered the efforts to identify the full extent of the withholding of information in Garlock cases.  Notwithstanding the discovery limitations, my analysis demonstrated reliably a widespread pattern of withholding of exposure information that significantly increased Garlock's settlement amounts and cost of defense.  I expound on each of these points in what follows.

(40)    The 210 cases cited by Judge Hodges in his Estimation Order, although not a random sample of all mesothelioma cases resolved with payment by Garlock, are exemplars of the information withholding practices of plaintiffs that Garlock faced after the Bankruptcy Wave.  The 210 cases were selected through an iterative process described by Professor Brickman in his Garlock report.[32]  The claims were selected because they had payment values above average, including the highest settlements paid by Garlock in its post-Bankruptcy Wave litigation experience.  Those cases then were searched within the ballots and the DCPF discovery data.[33]  Additionally, Garlock gathered all discovery it received in the tort litigation for the case that it had available.  Bates White and Garlock's counsel compared the exposure allegations made by claimants in their tort discovery[34] to the ballots and DCPF trusts' data

---

[30]    Garlock, as is typical with tort defendants including Kaiser, rarely obtained significant discovery in every case it settled. The primary purpose of the vast majority of settlements is avoiding the costs of obtaining that discovery.

[31]    Estimation Order, ¶ 66.

[32]    Garlock Brickman Report, ¶ 65.

[33]    The Garlock Court granted trust discovery for settled cases only from DCP. In addition, the Garlock Court granted discovery on other bankruptcy ballots. *See* Appendix A.2.

[34]    Bates White and Garlock's Counsel performed a detailed review of those claims' tort files to record all exposure allegations stated by the claimant or his attorney, in the documents available to Garlock.  The documents reviewed included interrogatories, depositions, complaints, and other documents related with the case. *See* Expert Report of Dr. Jorge Gallardo-Garcia, *In re Garlock Sealing Technologies, LLC*, No. 10-31607 (Bankr. W.D.N.C., Feb. 15, 2013), GST-8004, ¶ 54 (the "Garlock Gallardo-Garcia Report").

Expert Report of Charles E. Bates, PhD

to identify discrepancies.  Cases for which there was not sufficient information to determine if information was withheld could not be included in my analysis.  In particular, there is no basis to determine if information was withheld for cases that did not appear within the DCPF discovery data, the ballots data, or for which Garlock was not able to collect key discovery documents.  Likely, discovery from trusts beyond those managed by DCPF would have allowed the identification of a larger number of claims with withholding of information from Garlock.  As stated by Judge Hodges and cited above, "[M]ore extensive discovery would show more extensive abuse… the startling pattern of misrepresentation that has been shown is sufficiently persuasive."[35]

(41)   The 210 claims identified through this process were included in a document from the Garlock matter titled "Supplemental RFA List #1, RFA List #2, and RFA List #1.A to the Debtors' Amended Responses to Requests for Admission Nos. 1 and 2 of the Official Committee of Asbestos Claimants' First Set of Requests for Admission and Supplemental Interrogatory Responses and Document Requests Pursuant to Stipulation" (Jan. 16, 2013) (the "RFA Lists").[36]

(42)   As mentioned before, although cases in the RFA Lists were not randomly selected and did not include all cases resolved for large amounts, they did include a large number of cases from the main law firms that Garlock faced in its litigation.  Judge Hodges found (Estimation Order, ¶66) that of the 161 cases that paid more than $250,000 between 2006 and Garlock's petition date, almost half of the cases misrepresented exposure evidence.

(43)   Judge Hodges also found that these high-value cases had an effect well beyond the cases themselves.  As Richard Magee[37] explained to the Garlock court, plaintiff lawyers used the high value cases to push for higher settlement amounts for their other cases.  Mr. Magee called these the "driver" cases.[38] Judge Hodges agreed and adopted Mr. Magee's terminology:[39]

> The effect of withholding exposure evidence extended well beyond the individual cases involved because it was concentrated in high-dollar "driver" cases. Garlock's settlement of cases was not a series of isolated individual events, but rather a more unified practice developed over years of dealing with a finite group of plaintiffs' lawyers on a regular basis. Cases often were settled in groups for one sum that was to be divided among the group by the plaintiffs' lawyers without regard for a liability determination in any one case. But, cases of significant potential liability were often settled as part of such a group settlement. Such

---

[35]   Estimation order, ¶ 66.

[36]   For exposition, I refer to the RFA List #1 as "RFA1" and to the RFA List #1.A as "RFA1A." The claims in the RFA List #2 were included within the RFA1 and/or the RFA1A lists.

[37]   Mr. Magee is EnPro's former General Counsel and has been principal manager of Garlock's asbestos litigation in the tort system for more than a decade leading to Garlock's bankruptcy petition.

[38]   Magee Trial Testimony, "08-01-13_Garlock_Vol 09_Confidential_redacted," 2590:15-2591:14.

[39]   Estimation Order, ¶ 70.

Expert Report of Charles E. Bates, PhD

"driver" cases would be specifically negotiated with an additional amount to be
spread among the rest of the group.  Whether settled individually or with a group
or tried to verdict, the cases of large potential liability had a significant effect on
other pending and future cases.  Thus, their impact was compounded well beyond
the individual "driver" case itself.

(44)   The law firms representing the RFA claims included those representing the 15 cases in which full
discovery was granted.  These are the law firms led by the plaintiff attorneys who, as cited above,
testified that their practice was to withhold information from defendants to maximize their clients'
recoveries.

(45)   My testimony in the Garlock Estimation Trial corroborates Mr. Magee and Judge Hodges' statements.
The Garlock Analytical Database shows that the RFA law firms received higher average
mesothelioma payments than non-RFA law firms.  Figure 2 shows that non-RFA law firms received
average amounts of about $45,000 per paid mesothelioma claim, whereas RFA1 law firms received
more than $80,000 per paid claim and RFA1A law firms received more than $150,000 per paid claim.
Furthermore, the RFA law firms not only received the higher amounts but also received almost 65%
of Garlock's payments to mesothelioma claims historically.[40]

---

[40]   These figures are based on my work matching the RFA Lists (Omissions in RFA-1 Cases Based on DCPF and Ballot
Data Only, GST-8001_redacted, *In re Garlock Sealing Technologies, LLC*, No.10-31607 (Bankr. W.D.N.C.).) to the
Garlock Analytical Database.

**Figure 2. Comparison of average Garlock payment amounts to mesothelioma claimants for RFA and non-RFA law firms**[41]



(46)    Based on the data and the testimony provided in court, I further analyzed the effect of those higher RFA1 and RFA1A law firms on a tort system forecast that I presented to the Court as a correction to the forecasts presented by the ACC and Future Claimants Representative (FCR) experts.  Figure 3 shows the range of Garlock future mesothelioma forecasts depending on the information regime determined by the disclosure of alternative sources of exposure.  In particular, notice that a forecast based on the tort system conditions as of Garlock's petition date was more than $750 million in net present value, which assumed that the RFA and other law firms would continue with their disclosure practices.  However, assuming that the RFA law firms received the same average amounts as the non-RFA law firms resulted in a reduction of the forecast to a range between slightly above $400 million to slightly above $500 million, approximately a 30%–45% reduction.  Figure 3 also shows a tort system forecast based on the assumption that no withholding of information would continue into the future, which resulted in a range between $140 million and $200 million net present value, about 25% of the forecast that assumed that the withholding of information against Garlock continued into the future.

---

41    Rebuttal Testimony of Dr. Charles E. Bates, *In re Garlock Sealing Technologies, LLC*, No. 10-31607 (Bankr. W.D.N.C., Aug. 22, 2013), GST-8026 (the "Garlock Rebuttal Testimony"), p. 37.

---

Expert Report of Charles E. Bates, PhD

**Figure 3. Garlock forecasts based on different information regimes according to claimants' disclosure of exposures[42]**



(47) In my Garlock Rebuttal Report, I performed several statistical analyses that showed exposure information withholding in cases well beyond those listed in the RFA Lists.[43] In Section VII, I explain those analyses and present the results using Garlock claims and Kaiser claims. The analyses consisted of comparing claimants' exposure allegations in their tort system discovery to the exposures alleged through filing trust claims and casting ballots in other bankruptcies. The results were striking. There were substantial numbers of companies (including insulation manufacturers and distributors) that were not disclosed by claimants in their tort system discovery responses. Because discovery included only 10[44] of the about 40 then operating asbestos trusts, those analyses were based on trust filings in only a subset of the operating trusts; the results, although remarkable, did not show the full extent of the claimants' withholding of information. This was demonstrated by the discovery granted in the Garlock matter for pending claims only (not settled claims). The Personal Injury Questionnaire (PIQ) responses regarding trust filings showed that claimants typically file about 22 trust claims.[45] Therefore, claimants not included in the DCPF trust discovery likely filed claims against other trusts

---

[42]   Garlock Rebuttal Testimony, p. 44.

[43]   Rebuttal Report of Dr. Charles Bates, *In re Garlock Sealing Technologies, LLC*, No. 10-31607 (Bankr. W.D.N.C., Apr. 23, 2013), GST-0997 (the "Garlock Rebuttal Report"), Sections II.3.2.2-II.3.2.4.

[44]   Per Garlock Court's discovery order, claims data were provided for 10 of the 11 DCPF trusts as part of the discovery in the Garlock matter. *See* Garlock Rebuttal Report ¶ 147.

[45]   *See* Expert Report of Dr. Charles Bates, *In re Garlock Sealing Technologies, LLC*, No. 10-31607 (Bankr. W.D.N.C., Feb. 15, 2013), GST-0996 (the "Garlock Report"), ¶ 200; Estimation Order, ¶¶ 101–02.

Expert Report of Charles E. Bates, PhD

and did not disclose such information to Garlock either.  The 22 trust filings statistic was central in my estimation of Garlock's legal liability, as accepted by Judge Hodges in his Estimation Order.

(48)   In summary, Judge Hodges' Estimation Order, testimony of Garlock representatives and prominent plaintiff lawyers, and my own testimony demonstrated that the withholding of information in cases against Garlock had an effect well beyond the 15 full discovery cases and even beyond the 210 cases included in the RFA Lists.

Expert Report of Charles E. Bates, PhD

# VI. Analysis of the overlap between Garlock's asbestos claims history and Kaiser's asbestos claims history

(49)    Unlike in *Garlock,* there has been no discovery taken with respect to paid cases resolved by Kaiser. Nevertheless, and as shown in this section below, the substantial overlap between claims against Kaiser and claims against Garlock allows me to rely upon the Garlock discovery to reach conclusions with respect to the claims against Kaiser.  As detailed above, discovery in the Garlock matter showed the large effect of the strategic withholding of exposure information by plaintiffs.  As I show in Section VII, discovery from the Garlock matter on the overlapping claims reveals that Kaiser too was greatly impacted by the strategic withholding of exposure information by plaintiffs.  This is not surprising.  Kaiser, like Garlock, was a manufacturer of low-dose chrysotile asbestos-containing products.[46]  And both Garlock and Kaiser were peripheral asbestos defendants, well known to asbestos plaintiff law firms for many years before the Bankruptcy Wave.  Both were defendants of convenience after that Bankruptcy Wave, companies with identifiable brands and easy to accuse. Most importantly, both had their cost of defense increase dramatically, as the plaintiffs that sued them after their high-dose codefendants exited the tort system via bankruptcy reorganization filing told a different story regarding their asbestos exposure than did similarly situated plaintiffs of previous years, a story of asbestos exposure that did not include the names of the asbestos products of many of the formerly common codefendants.  As the discovery in the Garlock matter revealed, the asbestos exposure patterns of plaintiffs did not change significantly through the Bankruptcy Wave, just the elaboration of those exposures by the plaintiffs.

(50)    Garlock, like Kaiser, saw a large increase in the number of claims it faced and in the payments to plaintiffs it had to make once claimants began to target it in the late 1990s. For both defendants, mesothelioma filings increased rapidly in the late 1990s, as prominent asbestos defendants started to file for bankruptcy protection.  Importantly, the pattern of mesothelioma claims filed against Garlock and Kaiser from 2000 to Garlock's Petition Date are substantially the same.  Figure 4 shows the profile of payments to mesothelioma claimants by Garlock (left) and Kaiser (right) starting in 1990. This figure further shows the similarities in experience for Garlock and Kaiser after the Bankruptcy Wave of the early 2000s.  As the top-tier asbestos defendants abandoned the tort system, the cost to defend for peripheral defendants increased as peripheral defendants sought ways to establish the full extent of plaintiffs' asbestos exposure from plaintiffs who no longer willingly espoused their exposure to high-dose asbestos products as plaintiffs had done in prior years.  As I testified to the Garlock court, a rapid rise in defense costs resulted in a rapid and dramatic increase in the amounts Garlock paid to resolve claims.  Figure 4 shows that the amount Kaiser paid to plaintiffs also rose dramatically after the Bankruptcy Wave, just as it did for Garlock.  Like Garlock, Kaiser's costs to

---

[46]    *See* Estimation Order, ¶ 10; McChesney Declaration, ¶¶ 24 and 26.

Expert Report of Charles E. Bates, PhD

defend cases rose through the Bankruptcy Wave as it also sought ways to establish the full extent of its plaintiffs' asbestos exposures.

**Figure 4. Payments to mesothelioma claimants against Garlock and Kaiser by year of payment**



\*  Includes claims through Garlock's petition date of June 5, 2010
\*\* Includes claims through Kaiser's Petition Date of September 30, 2016

(51)   As part of my analysis, using standard computer algorithms,[47] I joined the publicly available Garlock Analytical Database[48] and Kaiser's claims database[49] to determine the overlap between the two claiming populations.  My analysis shows that 80% of the Kaiser mesothelioma claims filed before June 5, 2010, were found in the Garlock Analytical Database. As mesothelioma filings rose against Kaiser in the mid 2000s, the overlap in claims with Garlock increased to a peak of 85%.  Figure 5 below shows the overlap of claims between Kaiser and Garlock over time.  Given the large overlap of claim filings, the exposure data attained through discovery in the Garlock matter is germane to the instant matter.

(52)   This is a remarkably large overlap in claimants given that Garlock produced asbestos gaskets and packing in high-temperature industrial settings (environments where high-temperature asbestos insulation was used) and Kaiser produced joint compound used in construction projects.  It is, however, the pattern I would expect to see if the actual cause of mesothelioma for Kaiser claimants was high-dose asbestos insulations.  Individuals who had both Kaiser joint compound exposure (low-dose asbestos) and exposure from high-temperature insulation (high-dose asbestos) would also have been in the presence of gaskets that were used in high-temperature steam fittings.  As the manufacturers of asbestos insulation exited the tort system, Kaiser and Garlock are both defendants of convenience for the same individual with mesothelioma caused by his exposure to high-temperature asbestos insulation.  It is natural that Garlock was named by claimants for whom the cause of their mesotheliomas is actually high-temperature asbestos insulation because Garlock's products were used

---

[47]   *See* Appendix A.3.

[48]   *See* Appendix A.2.

[49]   *See* Appendix A.1.

Expert Report of Charles E. Bates, PhD

in the same environments as high-temperature insulation; therefore, Kaiser claims alleging mesothelioma that overlap with Garlock claims are likely the result of exposure to high-temperature insulation, not the result of exposure to low-dose chrysotile asbestos-containing products.

**Figure 5. Overlap of mesothelioma claims between Kaiser and Garlock through June 5, 2010**



Note: Includes claims through Garlock's petition date of June 5, 2010

(53)   In Section VII, I present several analyses using the overlap between Kaiser and Garlock claims.  In particular, I show that many of the Kaiser claims are among those mentioned by Judge Hodges in his Garlock Estimation Order regarding withholding of information from Garlock.[50]  Further, many other Kaiser claims overlapped with Garlock claims for which asbestos trusts' discovery and other available information was provided in the Garlock case; I use that information in my analysis.

---

50   *See* Estimation Order, ¶ 66.

Expert Report of Charles E. Bates, PhD

# VII. Analysis of the effect of exposure omissions in Kaiser claims using publicly available data

(54)    As I discussed in Section V, exposure omissions were widespread across Garlock claims.  A combination of the changing tort environment as a result of the Bankruptcy Wave, the rules written into the TDPs, and the withholding practices by plaintiff law firms all contributed.  In the rebuttal report I submitted in the Garlock matter[51] and in my court testimony,[52] I presented several analyses that showed the significant effect that the withholding of information had on Garlock's litigation experience.  In this section, I use the overlap analysis from Section VI to compare the results of the Garlock omission analyses and the overlapping Kaiser claims.  The analyses presented in this section are an approximation based on the overlap between the Garlock Analytical Database and the Kaiser claims database.  The data to estimate and calculate more precise statistics are not available in the instant matter because the extensive discovery of trusts' data, plaintiff questionnaires, and access to full claim files for Kaiser claims authorized in *Garlock* has not taken place in the Kaiser bankruptcy.  However, the results below show the same patterns between Kaiser claims that appear in the Garlock Analytical Database and the Garlock claims analyses that I presented in the Garlock Estimation Trial.  Further, the overlap of claims and the similarity of the patterns provide sufficient foundation for the opinions I have been asked to render in this case.

## VII.A. Analysis of exposure omissions by Kaiser claimants using available trust claims and ballots data

(55)    DCPF trusts data and bankruptcy ballots were provided as part of the discovery record in the Garlock matter.[53]  I compared the parties that claimants identified in depositions and interrogatories with the ballots they cast and trust claims they filed.  I classify a defendant as omitted from a claimant's testimony if such defendant's name or products were not identified as sources of asbestos exposure in the claim file materials but the claimant voted in such defendant's bankruptcy or filed a trust claim in that defendant's asbestos trust.  Because the trust and bankruptcy discovery in Garlock was granted and obtained several years after the resolution of many Garlock claims, that data are useful to evaluate the extent to which claimants' exposures to prior prominent codefendants were not revealed to active tort system defendants such as Garlock or Kaiser.  Table 1 shows that, for the 205 overlapping Kaiser claims for which Garlock discovery data were available, 63% of the exposures to

---

[51]    Garlock Rebuttal Report, Sections II.3.2.2-II.3.2.4.

[52]    Garlock Rebuttal Testimony, p. 36-38, 44.

[53]    In addition, the Garlock Court allowed a Personal Injury Questionnaire that collected information about trust filings for pending Garlock claims.  *See* Appendix A.2.

Expert Report of Charles E. Bates, PhD

asbestos defendants represented in the DCPF trusts or in the available ballots were omitted by plaintiffs in their tort discovery after the bankruptcy wave (2000–2010).

**Table 1: Proportion of exposures identified or omitted in tort discovery against Kaiser**

| Exposure identification | Filed 2000–2010 |
|---|---|
| Exposure identified | 37% |
| Exposure omitted | 63% |
| Total | 100% |

(56)   Table 2 shows summary statistics about exposures disclosed and withheld by claimants listed in the RFA Lists[54], using the DCPF trust claims' filings and bankruptcy ballots.[55]  The table compares the results I presented in my Garlock Rebuttal Report and the results for Kaiser claims that appeared in the RFA Lists.  The first column shows the number of identified exposures[56] to the DCPF former defendants or the defendants for which ballots were available by RFA claimants in their testimony.[57] The second column shows the number of votes in those defendants' bankruptcies or DCPF trust claims filed by the RFA claimants.  Comparing these two columns shows that the number of trust claims and ballots is three times the number of exposure identifications of those companies during tort discovery, both for all Garlock RFA Lists claims and for the Kaiser claims that appear in the RFA Lists.  The third, fourth, and fifth columns pertain to the claimants who identified exposures to companies' products through tort discovery, ballots, or trust claims: the average number of defendants identified by such claimants in their tort discovery, the average number of defendants (within the DCPF and ballots' entities) omitted by those claimants in their tort discovery, and the average number of thermal insulation defendants (within the DCPF and ballots' entities) omitted by those claimants in their tort discovery.  Comparing the top row of the third, fourth, and fifth columns shows that although Garlock claimants identified about 22 defendants on average in their tort discovery, claimants omitted about 9 DCPF and ballot defendants on average, of which at least 4 were associated with thermal insulation products.  The same comparison for the bottom row shows that although the 41 Kaiser claimants for which information is available identified 24 defendants on average in their tort discovery, they omitted about 11 DCPF and ballot defendants on average, of which at 5 were associated with thermal insulation products.

---

[54]   "Supplemental RFA List #1, RFA List #2, and RFA List #1.A to the Debtors' Amended Responses to Requests for Admission Nos. 1 and 2 of the Official Committee of Asbestos Claimants' First Set of Requests for Admission and Supplemental Interrogatory Responses and Document Requests Pursuant to Stipulation" (Jan. 16, 2013) (Trial exhibit ACC-535) (hereinafter the "RFA Lists").

[55]   Garlock Rebuttal Report, ¶ 140.

[56]   Limited to one exposure identification per defendant for each claimant.

[57]   The defendants are listed in Table 3.

Expert Report of Charles E. Bates, PhD

**Table 2: Summary statistics for former codefendants with available ballots or trust claims information for Garlock claims filed after 1999**

| Claim group | Number of exposure IDs | Number of ballots/trust claims filed | Average number of exposure companies' IDs | Average number of omitted companies' IDs | Average number of omitted insulation companies' IDs |
|---|---|---|---|---|---|
| Garlock RFA claims[58] | 604 | 1,810 | 22 | 9 | 4 |
| Kaiser claims found in RFA Lists | 155 | 478 | 24 | 11 | 5 |

(57)   The omission results above are limited to the DCPF trusts' data and the ballots data obtained in discovery from the Garlock matter.  Additional trust data would likely show higher percentages of omissions in the 2000s.  This was observed in the results presented at the Garlock Estimation Trial for the 15 claims for which extensive trust claims discovery was obtained.[59]

(58)   In my Garlock Rebuttal Report, I extended the analysis performed in Table 2 beyond the RFA Lists to a broader sample of claims: all claims for which a claim file review was performed, including all the resolved claims that were reviewed and all the PIQ claims for which a claim file review was performed.[60]  The results showed essentially the same results for the broader sample of claims: the number of ballots and trust claims filed greatly exceed the number of instances in which the listed companies were identified in tort discovery.[61]  Replicating that analysis on the 205 overlapping Kaiser/Garlock claims for which information is available yields the same results.  Table 3 shows that, for the overlapping Kaiser claims, the number of ballots and trust claims filed greatly exceed the instances in which those companies were identified as sources of exposure in tort system discovery. An interesting example of the stark difference between disclosures and exposures is that of US Gypsum in Table 3: even when claimants named Kaiser, they disclosed exposures to US Gypsum (a prominent former Kaiser codefendant) less than half of the time.  Furthermore, performing the analysis presented in Table 2 for the 205 Kaiser overlapping claims with available trusts and ballots information shows that, although those claimants identified 26 defendants on average in their tort discovery, they omitted about 11 DCPF and ballot defendants on average, of which 5 were associated with thermal insulation products.

---

[58]   Garlock Rebuttal Report, Exhibit 31.

[59]   *See* Estimation Order, ¶ 58.c and Section V above. Also, *see* Memorandum of Robinson, Bradshaw & Hinson P.A., *In re Garlock Sealing Technologies, LLC*, Feb. 8, 2013.

[60]   Garlock Rebuttal Report, ¶ 142.

[61]   Garlock Rebuttal Report, ¶ 142 and Exhibit 32.

Expert Report of Charles E. Bates, PhD

**Table 3: Former codefendants with available ballots and trust claims information for Kaiser claims filed after 1999**

| Company | Number of exposure IDs | Number of ballots/trust claims filed |
|---|---|---|
| ABB Lummus | 4 | 22 |
| AC&S | 20 | 109 |
| AP Green | 27 | 19 |
| Artra | 14 | 57 |
| Asarco | 23 | 83 |
| AWI | 80 | 157 |
| Babcock & Wilcox | 76 | 163 |
| Burns & Roe | 6 | 18 |
| Combustion Engineering | 47 | 62 |
| Congoleum | 19 | 69 |
| Federal Mogul Prod. | 23 | 49 |
| Ferodo | 3 | 40 |
| Fibreboard | 61 | 170 |
| Flexitallic | 48 | 86 |
| Flintkote | 37 | 102 |
| GAF | 39 | 40 |
| Halliburton | 66 | 131 |
| Harbison Walker | 30 | 91 |
| Kaiser Alum. & Chem. | 54 | 63 |
| Leslie Controls | 24 | 23 |
| Narco | 17 | 29 |
| Owens Corning | 77 | 168 |
| Pittsburgh Corning | 25 | 112 |
| Quigley | 24 | 85 |
| Shook & Fletcher | 1 | 14 |
| THAN | 15 | 89 |
| Turner & Newall | 23 | 66 |
| US Gypsum | 71 | 164 |
| US Mineral Products | 11 | 21 |
| WR Grace | 34 | 49 |
| Total | 999 | 2,351 |

(59)    The analyses in this section show two main points.  First, the omissions cited by Judge Hodges in his Estimation Order were applicable to a larger set of claims than just the 15 cases that people, without direct knowledge of the case, often cite.  Second, the omissions observed in Garlock claims are also observed in Kaiser claims, when the data are available.

Expert Report of Charles E. Bates, PhD

## VII.B. Effect of non-disclosure of trust claims on Kaiser settlement amounts paid to plaintiffs

(60)   In the Garlock bankruptcy matter, I analyzed the difference on settlement amounts paid by Garlock between claimants who had filed trusts claims before and after settling their Garlock claim.  On average, claimants who filed with DCPF trusts before resolving their Garlock claim settled with Garlock for just over half the amount that Garlock paid claimants who resolved their Garlock claim before their DCPF trust filings.  That illustrates that when defendants do not have information about a claimant's alternative sources of exposure, the claimant will likely be able to extract a larger settlement.

(61)   This result also applies to Kaiser's settlements for the overlapping claims.  Table 4 compares the average resolution amount for 857 Kaiser mesothelioma claims resolved by Kaiser after 2005.  Kaiser claimants who resolved their tort claims before filing against a DCPF trust, on average, extracted more than 60% higher amounts from Kaiser than those who resolved their Kaiser claims after filing with DCPF trusts.  As with the previous analyses, these results are limited by the data available for Kaiser claims and by the availability of DCPF trusts' data.  Importantly, it is not possible to perform this analysis on claims that resolved with Kaiser after Garlock's petition date due to the lack of data.

**Table 4: Kaiser resolution amounts for mesothelioma claims filed and resolved after DCPF trusts began paying claims**

| Trust filing/Kaiser resolution order | Average resolution value | Count of claims |
|---|---|---|
| Kaiser claim resolved after | $27,000 | 425 |
| Kaiser claim resolved before | $44,000 | 432 |
| Combined average | $35,000 | 857 |

Expert Report of Charles E. Bates, PhD

## VII.C. Analysis of claims and law firms withholding information in the Garlock matter

(62)    As I discussed in Section V, Judge Hodges found exposure omissions in a significant group of claims that drove Garlock's litigation.  The RFA Lists constructed by Garlock identified such claims.[62] Using my overlapping analysis of the Kaiser and Garlock data, I found that 48 of the RFA claims were also filed against Kaiser; 16 of those cases resolved with Kaiser for a total of $3.2 million, 3 cases remain open, and the remaining 29 were dismissed.

(63)    Given that these cases were found to have exposure omissions, that plaintiff law firms are largely in control of the exposure evidence, and that, as described above in Section V, plaintiff lawyers follow similar practices regarding disclosure of exposure information for their cases, I analyzed the extent to which the law firms representing the RFA claims also represented claims against Kaiser, beyond the 48 RFA claims identified above.  Table 5 shows the prominence of the RFA law firms in Kaiser's tort history.  The RFA law firms filed approximately 37% of all claims and approximately 53% of mesothelioma claims against Kaiser.  In terms of payments to plaintiffs, the RFA law firms represent approximately 51% of all payments and approximately 58% of payments to mesothelioma claims.  In addition, these RFA law firms represent approximately 46% of all the unresolved claim records and approximately 53% of the unresolved mesothelioma claim records in the Kaiser claims database. Note that the Brayton Purcell law firm was not included within the Garlock RFA law firms; however, as I discussed in Section V, this law firm, as described by Judge Hanna, has withheld exposure information.  Table 5 shows that the Brayton Purcell law firm received almost $24 million for mesothelioma claims from Kaiser.  Thus, the mesothelioma payments to RFA law firms and Brayton Purcell together represent 65% of Kaiser payments for mesothelioma claims and 54% of Kaiser's unresolved mesothelioma claims as of its petition date.  I also segregate the Weitz & Luxenberg law firm in Table 5 below because this law firm files claims mainly in New York City, where the rules of scheduling cases for trial allow it to impose high costs on defendants in cases that Weitz & Luxenberg would not pursue through trial.[63]

---

[62]   *See* RFA Lists.

[63]   *See* paragraph (32) above.

Expert Report of Charles E. Bates, PhD

**Table 5: Summary of RFA and non-RFA law firms for Kaiser mesothelioma claims**

| Law firm | Claims resolved with payment | Total payments to claimants | Pending records |
|---|---|---|---|
| Baron & Budd | 32 | $9,741,504 | 26 |
| Peter Angelos | 37 | $25,615,000 | 109 |
| Simon Greenstone Panatier | 68 | $19,090,000 | 5 |
| Waters, Kraus & Paul | 82 | $25,801,503 | 6 |
| Williams Kherkher | 1 | $225,000 | 0 |
| Shein Law | 19 | $3,615,000 | 1 |
| Belluck & Fox | 62 | $20,777,000 | 54 |
| Other RFA law firms | 475 | $95,042,848 | 725 |
| *Total RFA law firms* | *776* | *$199,907,855* | *926* |
| Weitz & Luxenberg | 100 | $27,055,000 | 131 |
| Brayton Purcell | 98 | $23,690,000 | 15 |
| Other non-RFA law firms | 557 | $95,629,700 | 676 |
| *Total non-RFA law firms* | *755* | *$146,374,700* | *822* |
| Total | 1,531 | $346,282,555 | 1,748 |

(64) These law firms' practice of withholding exposure information from defendants, including Kaiser, greatly increases the defense expenses in all cases because defendants have to attempt to substitute what would have been a plaintiff's admission with alternative testimony that may be expensive to develop without the plaintiff's cooperation. In many cases, even if the defendant is able to spend large amounts of money on trying to substitute the plaintiff's information about his exposures from indirect sources, such evidence is not as useful as the plaintiff himself espousing those alternative sources of exposure. Therefore, when plaintiff law firms withhold exposure information from defendants, both the cost of defending and the trial risk increase. As a consequence, defendants are willing to pay more to avoid the additional costs and risks, which results in higher settlement amounts for those law firms.

Expert Report of Charles E. Bates, PhD

_____

Name

February 20, 2020

_____

Date

Expert Report of Charles E. Bates, PhD

# Appendix A. Asbestos claims databases used in the analysis

(65)    My analysis discussed in Section VII relies on the combination of two data sources—Kaiser's historical claims data and the publicly available Garlock Analytical Database. This section describes each of those data sources and the process I used to combine the data for my analysis

## A.1. Kaiser's historical claims data

(66)    I understand that Truck maintains a database of information about the asbestos litigation histories for Kaiser.  Truck provided that data to Bates White in one MS Excel file *2017-0331 BiacReport.XLS* (the "BIAC Report").  I understand that Truck generated that report from a database it maintains about asbestos litigation against Kaiser.

(67)    The BIAC Report includes 38,373 claim records with information about claimants and their claims against Kaiser.  Among that information is claimant names, alleged disease, service date (filing date), law firm, state of filing, claim status, resolution date, and amount.  The BIAC Report includes records with filing dates from 1978 through September 2016 and resolutions from July 1980 through December 2016.[64]  Bates White processed the BIAC Report to generate the summary statistics and analyses presented in this Report.

(68)    In particular, Bates White processed and standardized the BIAC Report by:

- Parsing the names of the claimants into first name, middle name (or middle initial), last name, and suffix (if available)

- Formatting birth, death, and filing/service dates

- Standardizing alleged diseases and claim status into categories

- Standardizing law firm names to match the law firm naming convention in the Garlock Analytical Database

(69)    After standardizing the data, I analyzed it for potential duplicate records.  Claimants could appear with multiple records for the same disease.  I used standard computer algorithms along with combinations of the available personal identifying information (e.g., first and last names and birth and death dates) in the Kaiser data to identify potential duplicate records.  After identifying potential

---

[64]    There are 2 records with resolution dates in February 2017.

Expert Report of Charles E. Bates, PhD

duplicate records, I preserved only one record per claimant and alleged disease, by compiling the most complete available information across records and the most advanced status, as follows:

- Paid records were preserved over dismissed and pending records with the same alleged disease

- The most recent claim was preserved if there was more than one pending record with the same alleged disease

- If a pending and a dismissed record were present, the record with the most recent filing date was preserved

(70)    Through this process, Bates White identified 761 duplicate records.  Table 6 summarizes the alleged diseases and claim statuses for the processed Kaiser historical claims data.

**Table 6: Kaiser historical claims by alleged disease and status**

| Disease | Dismissed | Pending | Settled | Defense verdict | Plaintiff verdict | Total |
|---|---|---|---|---|---|---|
| Mesothelioma | 5,500 | 1,731 | 1,525 | 12 | 7 | 8,775 |
| Lung cancer | 3,460 | 2,636 | 622 | 2 | 3 | 6,723 |
| Other cancer | 560 | 738 | 109 | 0 | 0 | 1,407 |
| Non-malignant | 8,379 | 5,871 | 1,732 | 4 | 0 | 15,986 |
| Unknown | 3,501 | 1,216 | 4 | 0 | 0 | 4,721 |
| Total | 21,400 | 12,192 | 3,992 | 18 | 10 | 37,612 |

# A.2. The Garlock Analytical Database

(71)    The Garlock Analytical Database is the database that I used in my analysis for Garlock's Mesothelioma Liability Estimation Trial.[65]  Judge Hodges described the Garlock Analytical Database as "the most extensive database about asbestos claims and claimants that has been produced to date."[66]  Judge Hodges made the database publicly available.[67]

(72)    The Garlock Court allowed discovery to supplement Garlock's historical claims data.  This included subpoenas to several balloting agencies for production of ballot records from a number of bankruptcy proceedings involving other asbestos defendants and trust records from DCPF.  I highlight the key sources used in the construction of the Garlock Analytical Database below.

---

[65]    *See* Garlock Gallardo-Garcia Report for a detailed description of the construction and sources comprising the Garlock Analytical Database.

[66]    Estimation Order, ¶ 97.

[67]    Order on Motions to Seal Materials in Record of Estimation Proceeding and Protocol for Redaction of Record, *In re Garlock Sealing Technologies, LLC*, No.10-31607 (Bankr. W.D.N.C. Oct. 31, 2014).

Expert Report of Charles E. Bates, PhD

- **Garlock's historical claims data**.  Electronic database that contains the most complete record available of claims filed against Garlock from the 1980's through the bankruptcy protection petition date of June 5, 2010.[68]

- **Mesothelioma Personal Injury Questionnaire**.  The Garlock Court authorized Garlock to require claimants who had unresolved mesothelioma claims in the Garlock claims database to answer a questionnaire with information regarding their identifying information, their exposure histories and their claims.[69]

- **Asbestos trusts' discovery data**.  The Garlock Court ordered DCPF to provide Garlock with data related to mesothelioma claimants who settled with Garlock between 1999 and 2010 and who had filed trust claims with trusts managed by the DCPF.[70]

- **Historical Garlock claims claim file review**.  Bates White drew a random sample of historically resolved mesothelioma claims from the Garlock claims database.  Garlock gathered the claim files for those claims and Bates White recorded relevant exposure and work histories information, among other pieces of information, for analysis.[71]

- **Garlock's verdicts list**.  A list of Garlock's cases that were resolved through plaintiff or defense verdict.[72]

- **Ballots and voting data from other bankruptcies**.  The Garlock Court ordered several balloting agencies to provide ballot and voting records from 23 bankruptcy proceedings involving asbestos defendants.[73]

(73)  The Garlock Analytical Database is a relational database composed of four separate tables: (1) a claim-level table; (2) an exposure-level table; (3) a party-level table; and (4) an expense-level table.[74]

# A.3. Identification of the overlap between Kaiser and Garlock claims

(74)  To match the Kaiser claims data with the Garlock Analytical Database, Bates White used a standard matching algorithm that relies on a sequential series of matching rounds that find records in both databases that share the same claimant and claim identifying information, according to some criteria or "rules," as described below.

---

[68]  Garlock Gallardo-Garcia Report, Section II.2.
[69]  Garlock Gallardo-Garcia Report, Section II.3.
[70]  Garlock Gallardo-Garcia Report, Section II.4.
[71]  Garlock Gallardo-Garcia Report, Section II.5.
[72]  Garlock Gallardo-Garcia Report, Section II.6.
[73]  Garlock Gallardo-Garcia Report, Section II.7.
[74]  Garlock Gallardo-Garcia Report, Section III.1.

Expert Report of Charles E. Bates, PhD

(75)    In total, Bates White used nine matching rules, based on various combinations of the claimant and
claim identifying fields available in the Kaiser claims data.  The information used in a given rule
determines the strength of a match.  For example, the highest matching rule included matching on a
claimant's last name, first name, claimant lawyer, filing state, birth date, and death date.  The lowest
matching rule was a match only using the claimant's last and first names.

(76)    Generally, the matching algorithm first identifies a potential match by comparing the identifying
criteria across the data sets.  Then a series of more restrictive tests evaluate the validity of the
potential matches.  This multistep process relies on a combination of computer code and expert
judgment to ensure the reliability of matches.  Within each matching round, the algorithm proceeds in
three steps:

■    Step 1: Identify potential matches by comparing a combination of the data fields considered
across the two data sets.  In this step, we only allow matches on records that have available
information on all of the matching data fields considered in the matching round.  For example,
records that share the same state of filing/residency, last name, and birth year are considered a
potential match.  In this example, not including the first name allows us to identify potential
matches with some first name variations such as Will and William, or if a spouse was filing on
the claimant's behalf.

■    Step 2: The algorithm compares additional fields to identify potential conflicts in other data
fields.  For instance, in this matching round, an algorithm that checks for conflicts in the death
dates would confirm that the death dates in the Kaiser and Garlock data are reasonably close, e.g.,
within the same year.  In this step, the computer algorithms reject potential matches identified in
Step 1 by testing conflicts on other fields.

■    Step 3: The algorithm identifies records that should be visually inspected to confirm or reject
matches.  This step is part of the quality control process of the matching of data sets, and it is
essential to ensure that most matching records are identified through the matching algorithm
while minimizing the number of potential false positives.

(77)    After the matching process is completed, the resulting database is a claims database that includes all
claims included in the Garlock Analytical Database and the Kaiser claims database, with only one
record per claimant and alleged disease combination.  Then the "Combined Database" includes three
groups of claims: (1) claims filed both against Kaiser and Garlock (the "overlapping claims"); (2)
claims filed against Kaiser but not found in the Garlock Analytical Database; and (3) claims filed
against Garlock but not found in Kaiser's claims database.  The analyses I present in Sections VI and
VII focus on the overlapping claims group.

Expert Report of Charles E. Bates, PhD

# Appendix B. Curriculum vitae of Charles E. Bates, PhD

(78)    Charles E. Bates, PhD, has extensive experience in statistics, econometric modeling, and economic analysis.  He specializes in the application of statistics and computer modeling to economic and financial issues.  Dr. Bates has more than 25 years of experience and provides clients with a wide range of litigation and commercial consulting services, including expert testimony and guidance on economic and statistical issues.

(79)    Dr. Bates is a recognized expert in asbestos-related matters. He speaks in national and international forums on the asbestos litigation environment and estimation issues.  Dr. Bates is frequently retained to serve as an expert on such matters in large litigations and has testified before the US Senate Judiciary Committee and Federal Bankruptcy Court.

## B.1. Education

- Advanced Seminar in Pharmacoeconomics, Harvard School of Public Health

- PhD, Economics, University of Rochester

- MA, Economics, University of Rochester

- BA, Economics and Mathematics (high honors), University of California, San Diego

## B.2. Professional experience

(80)    Prior to founding Bates White, Dr. Bates served as a Vice President of A.T. Kearney.  Previously, he was the Partner in Charge of the Economic Analysis group at KPMG.  Dr. Bates began his career on the faculty of Johns Hopkins University's Department of Economics, where he taught courses in advanced statistical economic analysis and trade theory.

## B.3. Selected asbestos and product liability experience

- Retained as an asbestos liability valuation expert on behalf of Bestwall LLC in its bankruptcy proceedings.

- Served as an asbestos liability valuation expert on behalf of Garlock Sealing Technologies in its bankruptcy proceedings.  Testified before the US Bankruptcy Court for the Western District of North Carolina both in preliminary case hearings and at trial.

JA04377

Expert Report of Charles E. Bates, PhD

- Served as an expert in asbestos claims valuation for financial reporting purposes in *Erica P. John Fund Inc. et al. v. Halliburton Company et al.* on behalf of certain Halliburton stockholders regarding Halliburton's financial disclosures of its asbestos liabilities after its acquisition of Dresser in 1998.

- Served as the Individual Claimant Representative on behalf of potential future No Notice Individual Creditors as part of the Amending Scheme of Arrangement for OIC Run-Off Limited (formerly the Orion Insurance Company plc).

- Authored expert reports and provided testimony in *United States Fid. & Guar. Co. v. American Re-Insurance Company* in asbestos claims valuation, estimation methodology, and asbestos reinsurance billing regarding the proper reinsurance bill associated with USF&G's reinsurance bill of its asbestos-related payments to Western MacArthur.

- Served as an asbestos liability valuation expert on behalf of Specialty Products Holding Corp./Bondex International in its bankruptcy proceedings.

- Retained as an asbestos liability valuation expert on behalf of the Official Committee of Unsecured Creditors of Motors Liquidation Company (f/k/a General Motors Corporation) in its bankruptcy proceedings.

- Authored expert report and provided deposition testimony regarding the value of diacetyl claims on behalf of the Official Committee of Equity Security Holders in the Chemtura Corporation bankruptcy proceedings.

- Testified in deposition on behalf of the ASARCO Unsecured Creditors Committee in the ASARCO bankruptcy proceedings regarding the valuation of past and future asbestos-related personal injury claims.

- Authored expert report and provided deposition testimony on behalf of the policyholder in *In re Imo Industries, Inc. v. Transamerica Corp.*

- Currently retained as an expert by Fortune 500 companies to produce asbestos expenditure estimates for annual and quarterly financial statements.  Estimations aid clients with Sarbanes-Oxley compliance.

- Currently retained as an expert in asbestos estimation and insurance valuation, for numerous asbestos litigation matters, on behalf of insurance companies, corporations, and financial creditors' committees of federal bankruptcy proceedings.

- Testified before the Senate Judiciary Committee on the economic viability of the Trust Fund proposed under S.852, the Fairness in Asbestos Injury Resolution (FAIR) Act of 2005.  Testimony clarified Bates White's independent analysis on the estimate of potential entitlements created by the administrative no-fault trust fund that uses medical criteria for claims-filing eligibility.

Expert Report of Charles E. Bates, PhD

- Testified in deposition on behalf of Liberty Mutual Insurance Company in the Plibrico bankruptcy proceedings regarding the valuation of past and future asbestos personal injury claims and exposure criteria in plan proponents proposed trust distribution procedures.

- Testified at deposition on behalf of the joint insurers' defense committee to address the fraction of expenditures associated with the company's asbestos installation operations in *Owens Corning v. Birmingham Fire Insurance Company of Pennsylvania.*

- Testified in the Babcock & Wilcox bankruptcy confirmation hearing on behalf of the Insurers Joint Defense Group to address asbestos liability.  Developed claims criteria evaluation framework to assess asbestos liability forecasts and trust distribution procedures.

- Testified at deposition on behalf of Sealed Air in the fraudulent conveyance matter regarding the 1998 acquisition of Cryovac from W.R. Grace.  Directed estimation of foreseeable asbestos liability for fraudulent conveyance matter to advise the debtor in the bankruptcy of a defendant with over $200 million in annual asbestos payments.  Developed asbestos liability forecasting model and software. Directed industry research and interviewed industry experts.

- Testified at deposition on behalf of Hartford Financial Services Group to address the asbestos liability of MacArthur Company and Western MacArthur Company.  Estimated asbestos liability in the context of bankruptcy proceedings.

- Testified at deposition on behalf of the Center for Claims Resolution in arbitration proceedings of *GAF v. Center for Claims Resolution*.

- Served as testifying expert on behalf of CSX Transportation on the suitability of asbestos claim settlements for arbitration proceedings of *CSX Transportation, Inc. v. Lloyd's, London*.

- Developed an econometric model of property damage lawsuits for estimating the future liability of a former asbestos manufacturer arising from the presence of its asbestos products in buildings.


## B.4. Selected litigation and consulting experience

- Testified in US Tax Court on behalf of the taxpayers on the statistical basis and accuracy of shrinkage accruals in *Kroger v. Commissioner*.

- Served as consulting expert and performed statistical and quantitative analyses to assess the merits of a class action alleging payment of fees to mortgage brokers for referral of federally related mortgage loans.

- Testified in US Tax Court on behalf of the taxpayer analyzing the statistical prediction of bond ratings using company financial data in *Nestlé Holdings Inc. v. Commissioner*.

Expert Report of Charles E. Bates, PhD

- Submitted written expert testimony on the statistical and financial analysis of option transactions and an analysis of alternative stock option hedges in *McMahon, Brafman, and Morgan v. Commissioner*.

- Testified in US Tax Court on behalf of the taxpayers of IRS experts on the statistical basis and accuracy of shrinkage accruals in *Wal-Mart v. Commissioner*.

- Served as consulting expert and analyzed the racial composition for a large manufacturing corporation using EEO data and employed sophisticated statistical analysis and modeling to determine the validity and strength of an employment discrimination claim.

- Testified on behalf of VNC in the arbitration hearing of *VNC v. MedPartners*.

- Provided expert testimony in California Superior Court on the validity of economic comparability adjustments for pipeline easement rents in *Southern Pacific Transportation Corp. v. Santa Fe Pacific Corp*.

- Served as statistical expert and developed detailed statistical analysis of customs trade data for use in criminal transfer-pricing litigation.

- Submitted written testimony in US Tax Court on the beneficial life of company credit card in a tax matter for a large retailer drawing on the company's point-of-sale data, credit card data, and customer demographic information.

- Developed state-of-the-art models to account for default correlation for underwriting credit insurance; models became the standard tools for the country's largest credit insurance firm.

- Led a team of economists that provided litigation-consulting services in one of the largest US price-fixing cases. Case involved the development of state-of-the-art economic models, damages' analyses, client presentations, pretrial discovery, industry research, preparation of evidence and testimony, depositions, and a critique of opposing expert analyses and reports.

- For a start-up global telecommunications enterprise, provided consulting services and developed a comprehensive computer model to evaluate the firm's financial plan. Model incorporated marketing, pricing, and communications traffic in a single modeling framework to facilitate sensitivity analysis by creditors and to evaluate the risk associated with the strategic business plan.

- Served as senior economic advisor on issues of analytical methodology for numerous pharmacoeconometric and health outcomes research projects. Provided expertise in the development of decision tools and the creative use of modeling applications for pharmacoeconomics and outcomes research.

Expert Report of Charles E. Bates, PhD

# B.5. Publications

- Bates, Charles E., Charles H. Mullin, and Marc C. Scarcella.  "The Claiming Game."  *Mealey's Litigation Report: Asbestos 25*, no. 1 (February 3, 2010).

- Bates, Charles E., Charles H. Mullin, and A. Rachel Marquardt.  "The Naming Game."  *Mealey's Litigation Report: Asbestos 24*, no. 15 (September 2, 2009).

- Bates, Charles E., and Charles H. Mullin.  "State of the Asbestos Litigation Environment-October 2008.'  *Mealey's Litigation Report: Asbestos 23, no. 19* (November 3, 2008).

- Bates, Charles E., and Charles H. Mullin.  "Show Me The Money."  *Mealey's Litigation Report: Asbestos 22*, no. 21 (December 3, 2007).

- Bates, Charles E., and Charles H. Mullin.  "The Bankruptcy Wave of 2000-Companies Sunk By An Ocean Of Recruited Asbestos Claims."  *Mealey's Litigation Report: Asbestos 21*, no. 24 (January 24, 2007).

- Bates, Charles E., and Charles H. Mullin.  "Having Your Tort and Eating It Too?"  *Mealey's Asbestos Bankruptcy Report 6*, no. 4 (November 2006).

- Bates, Charles E., and Halbert White.  "Determination of Estimator with Minimum Asymptotic Covariance Matrices."  *Econometric Theory* 9 (1993).

- Bates, Charles E., and Halbert White.  "Efficient Instrumental Variables Estimation of Systems of Implicit Heterogeneous Nonlinear Dynamic Models with Nonspherical Errors."  In *International Symposia in Economic Theory and Econometrics*, vol. 3, edited by W.A. Barnett, E.R. Berndt and H. White. New York: Cambridge University Press, 1988.

- Bates, Charles E.  "Instrumental Variables."  In *The New Palgrave: A Dictionary of Economics*, edited by John Eatwell, Murray Milgate, and Peter Newman. London: Macmillan, 1987.

- Bates, Charles E., and Halbert White.  "An Asymptotic Theory of Consistent Estimation for Parametric Models."  *Econometric Theory* 1 (1985).

# B.6. Selected speaking engagements

- "The Top Emerging Trends in 2015 Asbestos Litigation."  Perrin Conferences Cutting-Edge Issues in Asbestos Litigation Conference, March 15-17, 2015.

- "Asbestos Bankruptcy: A Discussion of the Top Trends in Today's Chapter 11 Cases."  Perrin Conferences Asbestos Litigation Conference: A National Overview & Outlook, Sept. 8-10, 2014.

- "An Asbestos Defendant's Legal Liability-The Experience in Garlock's Bankruptcy Asbestos Estimation Trial."  Bates White webinar, July 29, 2014.

JA04381

Expert Report of Charles E. Bates, PhD

- "Concussion Suits against the NFL, NCAA, and Uniform Equipment Manufacturers." Perrin Conferences' Legal Webinar Series, May 24, 2012.

- "An Update on US Mass Tort Claims." Perrin Conferences' Emerging Risks on Dual Frontiers: Perspectives on Potential Liabilities in the New Decade, April 12-13, 2012, London, United Kingdom.

- "The Next Chapter of Asbestos Bankruptcy: New Filings, Confirmations, & Estimations." Perrin Conferences' Asbestos Litigation Conference: A National Overview & Outlook, September 13-15, 2010, San Francisco, CA.

- "Trust Online: The Impact of Asbestos Bankruptcies on the Tort System." Perrin Conferences' Asbestos Bankruptcy Conference: Featuring a Judicial Roundtable on Asbestos Compensation, June 21, 2010, Chicago, IL.

- "Current Litigation Trends that are Impacting Asbestos Plaintiffs, Defendants, & Insurers." Perrin Conferences' Asbestos Litigation Mega Conference, September 14-16, 2009, San Francisco, CA.

- "Verdicts, Settlements, and the Future of Values: Where Are We Heading? A Roundtable Discussion." HB Litigation Conferences' Emerging Trends in Asbestos Litigation, March 9-11, 2009, Los Angeles, CA.

- "Role of Bankruptcy Trusts in Civil Asbestos." Mealey's Emerging Trends in Asbestos Litigation Conference, March 3-5, 2008, Los Angeles, CA.

- "The Intersection between Traditional Litigation & the New Bankruptcy Trusts." Mealey's Asbestos Bankruptcy Conference, June 7-8, 2007, Chicago, IL.

- ABA's Insurance Coverage Litigation Committee Conference, March 1-4, 2007, Tucson, AZ.

- Mealey's Asbestos Conference: The New Face of Asbestos Litigation, February 8-9, 2007, Washington, DC.

- Mealey's Asbestos Bankruptcy Conference, December 4-5, 2006, Philadelphia, PA.

- "Seeking Solutions to European Asbestos Claiming: Will it be FAIR?" Keynote address, Mealey's International Asbestos Conference, November 1-2, 2006, London, United Kingdom.

- Mealey's Asbestos Bankruptcy Conference, June 9, 2006, Chicago, IL.

- Harris Martin Publishing Asbestos Litigation Conference, March 2, 2006, Washington, DC.

- Mealey's Wall Street Forum: Asbestos Conference, February 8, 2006, New York, NY.

- Mealey's Asbestos Legislation Teleconference, February 7, 2006.

Expert Report of Charles E. Bates, PhD

# B.7. Professional associations

- National Association of Business Economists

- American Economic Association

- Econometric Society

Expert Report of Charles E. Bates, PhD

# Appendix C. Materials relied upon

(81)   Below is a list of materials I relied upon in reaching my opinions.  Should I identify any additional materials that were omitted from this list, I will supplement accordingly.

## C.1. Documents and materials related to *In re Kaiser Gyspum Company, Inc., et al.*

■   Transcript of Proceedings before the Honorable J. Craig Whitely. *In re Kaiser Gypsum Company, Inc., et al.,* No. 16-31602 (Bankr. W.D.N.C. Jun. 13, 2019).

■   Declaration of Charles E. McChesney II in Support of First Day Pleadings. *In re Kaiser Gypsum Company, Inc., et al.,* No 16-31602 (Bankr. W.D.N.C. Sep. 30, 2016).

## C.2. Documents and materials related to *In re Garlock Sealing Technolgies LLC, et al.*

■   "Testimony of Dr. Charles E. Bates." Presentation, *In re Garlock Sealing Technologies LLC, et al.,* No. 10-31607 (Bankr. W.D.N.C. 2013) (Trial exhibit GST-8005).

■   Expert Report of Charles E. Bates, PhD. *In re Garlock Sealing Technologies LLC, et al.,* No. 10-31607 (Bankr. W.D.N.C. Feb. 15, 2013) (Trial exhibit GST-0996).

■   Rebuttal Report of Charles E. Bates, PhD. *In re Garlock Sealing Technologies LLC, et al.,* No. 10-31607 (Bankr. W.D.N.C. Apr. 23, 2013) (Trial exhibit GST-0997).

■   Expert Report of Jorge Gallardo-García, PhD. *In re Garlock Sealing Technologies LLC*, et al., No. 10-31607 (Bankr. W.D.N.C. Feb. 15, 2013) (Trial exhibit GST-8004).

■   Order Estimating Aggregate Liability. *In re Garlock Sealing Technologies LLC*, et al., No. 10-31607 (Bankr. W.D.N.C. Jan. 10, 2014), Doc 3296.

■   Expert Report of Lester Brickman, *In re Garlock Sealing Technologies, LLC, et al.,* No.10-31607 (Bankr. W.D.N.C. Apr. 23, 2013) (Trial exhibit GST-0969).

■   Order on Motions to Seal Materials in Record of Estimation Proceeding and Protocol for Redaction of Record. *In re Garlock Sealing Technologies, LLC, et al.,* No.10-31607 (Bankr. W.D.N.C. Oct. 31, 2014).

Confidential

Expert Report of Charles E. Bates, PhD

- Debtors' Amended Responses to Requests for Admission Nos. 1 and 2 of the Official Committee of Asbestos Claimants' First Set of Requests for Admission and Supplemental Interrogatory Responses and Document Requests Pursuant to Stipulation. *In re Garlock Sealing Technologies, LLC, et al.,* No.10-31607 (Bankr. W.D.N.C. Jan. 16, 2013) (Trial Exhibit ACC-535).

- Memorandum of Robinson, Bradshaw & Hinson P.A., *In re Garlock Sealing Technologies, LLC, et al.,* No.10-31607 (Bankr. W.D.N.C. Feb. 8, 2013).

- Magee Trial Testimony, "08-01-13_Garlock_Vol 09_Confidential_redacted

- *In re Motions for Access of Garlock Sealing Technologies LLC*, No. 11-1130 (D. Del. 2013).

- Garlock Video Deposition of Benjamin P. Shein. *In re Garlock Sealing Technologies, LLC, et al.,* No. 10-31607 (Bankr. W.D.N.C. Jan. 16, 2013), "SHEIN 43-20 TO 44-16.mpg."

- Garlock Video Deposition of Peter A. Kraus. *In re Garlock Sealing Technologies, LLC, et al.,* No. 10-31607 (Bankr. W.D.N.C. Jan. 14, 2013), "KRAUS 41-05 TO 42-14.mpg."

## C.3. Documents and materials in other legal matters

- *In re Silica Products Liability Litig.*, 398 F. Supp. 2d 563 (S.D. Tex., June 30, 2005).

- Notice of Trust Policy Regarding Acceptance of Medical Reports, *In re Celotex Asbestos Settlement Trust*, Oct. 18, 2005

- Letter Regarding Claims Allowance and Qualified Physicians. *In re Eagle-Picher Personal Injury Settlement Trust,*89 B.R. 681 (1995).

- Order and Opinion. *In re Kananian v. Lorillard Tobacco Co.*, No. CV442750 (Ohio Ct. Com. Pl. Cuyahoga Cty., Jan. 18, 2007).

- Informational Brief of Bestwall LLC, Nov. 2, 2017, Doc 12.

## C.4. Data

- Kaiser Historical Claims Data. *2017-0331 BiacReport.xls*

- DCPF and Ballot Data Only, GST-8001_redacted, *In re Garlock Sealing Technologies, LLC*, No.10-31607 (Bankr. W.D.N.C.)

- Public Garlock Analytical Data. *In re Garlock Sealing Technologies LLC*, *et al.* No. 10-31607 (Bankr. W.D.N.C. 2015).

# C.5. Publicly available documents

■ EnPro Industries. Performance Report (Form 10-Q) (June 30, 2017).

■ Memorandum re: Suspension of Acceptance of Medical Reports (Manville Trust), from David Austern – President of CRMC, Sept. 12, 2005.

■ Bates, Charles, and Charles Mullin. "The Bankruptcy Wave of 2000: Companies Sunk by an Ocean of Recruited Asbestos Claims." *Mealey's Litigation Report: Asbestos* 21, no. 24 (2007).

■ Plevin, Mark D., Paul W. Kalish, and Kelly R. Cusick. "Commentary: Where Are They Now? Part Four: A Continuing History of the Companies That Have Sought Bankruptcy Protection Due to Asbestos Claims." *Mealey's Asbestos Bankruptcy Report* 6, no. 7 (2007).

■ Amended and Restated Armstrong World Industries, Inc. Asbestos Personal Injury Settlement Trust Distribution Procedures, Section 5.1(a)(2) Effect of Statutes of Limitations and Repose, 8 (2012).

■ The Babcock & Wilcox Company Asbestos PI Settlement Trust Distribution Procedures, Section 5.7(b)(3) B&W Exposure, 48 (2011).

# EXHIBIT D

JA04387

1                    DEPONENT

2    defending uninsured claims, correct?

3         A      Yes.

4         Q      At the time of the bankruptcy

5    filing, I think it's been represented that

6    there were about 14,000 pending asbestos claims

7    against Kaiser?

8         A      Yes, it's 13900 something.

9         Q      What number or approximate

10   number, percentage of those claims were

11   uninsured claims?

12        A      So, with the caveat that I'm not

13   familiar with each and every one of those

14   claims, I can tell you that in Kaiser's history

15   the null of uninsured claims that have

16   ultimately resolved in some form of settlement

17   or payment is in the single digits.

18        Q      And uninsured claims would just

19   to be clear, would be claims that arose outside

20   of the policy periods?

21        A      So, it would include claims

22   where a claimant allegation a date of first

23   exposure to a Kaiser asbestos product at

24   present after the last date that a Truck policy

25   was in effect which if I am remembering

16

1                          DEPONENT

2      correctly is April 1, 1983, or maybe it's March

3      31, 1983.

4              Q       We are really just talking at

5      least as of the time of the bankruptcy filing,

6      about a handful of such claims?

7              A       I don't know as I sit here that

8      any of those 13, 900 claims was an uninsured

9      claims, I'm not aware of that.

10             Q       If you could please find Exhibit

11     31 from your Exhibit stack.

12             Q       Exhibit 31 is your first day

13     declaration?

14             A       Okay.

15             A       I've got it.

16             Q       If you turn first to paragraph

17     22?

18             A       I've got it.

19             Q       In paragraph 22 you state that

20     the Debtor's asbestos related liabilities arise

21     from their manufacture and sale of certain

22     products that decades ago contained small

23     amounts of asbestos, do you see that?

24             A       I do.

25             Q       And that the asbestos was

JA04389

```
 1                          DEPONENT

 2   without revealing the substance of common

 3   interest and privileged communications.

 4          Q     Nor would you be able to testify

 5   as to whether there were any discussions about

 6   the potential for the Debtor's insured

 7   liabilities to be resolved at inflated amounts

 8   in the tort system due to the withholding of

 9   exposure evidence?

10               MR. RASMUSSEN:  Objection on

11          privileged grounds.

12               MR. PHILLIPS:  Objection.

13               THE WITNESS:  Everybody done?

14          A     I do not answer that question

15   without revealing the substance of common

16   interest and privilege protected

17   communications.

18          Q     And to shorten this up a bit,

19   would that be the same answer you would give to

20   any question I were to ask you about what was

21   discussed in the negotiations?

22          A     Any question about the substance

23   of those negotiations or discussions at those

24   meetings I would expect my counsel to object on

25   the grounds of common interest, attorney-client
```

176

```
 1                    DEPONENT

 2   work product protections and I would not

 3   disclose that.

 4              MR. KRAKOW:  37.

 5              (The above described document was

 6         marked Exhibit 37 for identification as of

 7         this date.)

 8         Q    Mr. Might be, I am handing you

 9   Exhibit 37, which is a chain of e-mails, the

10   last of which is dated July 20, 2017 from

11   Philip cook to Robert Horkovich and the first

12   of which is an e-mail dated July 18, 2017 from

13   Mr. Horkovich to Mr. Cook.

14              Do you see that?

15         A    (.

16         A    Yes, I do.

17         Q    If I could turn your attention,

18   please, to the July 18, 2017 e-mail from

19   Mr. Horkovich to Mr. Cook?

20              Are you with me there?

21         A    Yes.

22         Q    Mr. Horkovich represents whom?

23         A    Mr. Horkovich is special

24   insurance counsel to both the ACC and the FCR.

25         Q    And would does Mr. Cook
```

1                          DEPONENT

2       with what your counsel stated there?

3                    MR. RASMUSSEN:  Objection to the

4           form.

5                    MR. PHILLIPS:  Objection to the

6           form of the question.

7                    MR. HORKOVICH:  Same objections.

8       A       So, I think the first sentence

9       of the highlighted portion that you read is

10      Mr. Gordon's assessment of and response to

11      arguments that Truck made at that hearing with

12      respect to the findings in the Garlock case.

13                    I've testified previously that I

14      have not read the Garlock opinion, I don't know

15      what the judge did or did not find, I do not

16      know what evidence the judge did or did not

17      hear.

18                    Mr. Gordon is much closer to the

19      Garlock hearing.

20                    I don't think that the Debtors

21      can weigh in at all on the relevance,

22      applicability, rightness or wrong necessary of

23      whatever was ruled in Garlock.

24                    So I would say that's

25      Mr. Gordon's statement that's not the Debtors'

```
 1                        DEPONENT

 2   statement, the rest of what he said I would

 3   agree within the highlighted section.

 4        Q     And by the rest, you are

 5   referring to the fact that the Debtors did not

 6   believe they were treated fairly in the tort

 7   system?

 8        A     Let me read what he said.

 9             MR. HORKOVICH:  Same objections.

10        A     The rest of what he said was we

11   didn't think we were treated fairly either.  It

12   is what it is, we have settled and this

13   agreement takes the Debtors out of the tort

14   system and that's the only -- the only point

15   that matters from an estate perspective.

16             The Debtors agreed with that

17   statement.

18             MR. KRAKOW:  Let's take a short

19             break.  I am actually skipping past a

20             lot of what I had prepared, so we will

21             be done pretty soon.

22             (At this point in the proceedings

23             there was a recess, after which the

24             deposition continued as follows:)

25        Q     Mr. McChesney, could you please
```

```
 1                          DEPONENT

 2          A       I was.

 3          Q       And you heard his testimony with

 4   regard to this document?

 5          A       I heard his testimony as to this

 6   document, I will profess that I may have been

 7   reading e-mails and doing other things while he

 8   was testifying.

 9          Q       That's not allowed.

10          A       But yes, I was listening during

11   his testimony I just don't know that I could

12   recite verbatim what it was he did or didn't

13   say.

14          Q       Do you know why the provisions

15   of 5.5(b) 1 -- I'm sorry, 5.5 -- strike that.

16          Q       Do you know why the provisions

17   of 5.5(b)(ii) and all of its subparts were

18   added to the trust distribution procedures?

19          A       Under the terms of the term

20   sheet, February 28, 2018, the drafting of the

21   trust distribution procedures was to be the

22   province of the ACC and the FCR.

23                  I did not participate in the

24   drafting of the trust distribution procedures,

25   so I cannot answer your question as to why any
```

```
 1                        DEPONENT

 2   particular provision was or was not added.

 3          Q      Do you understand that the

 4   provisions that were added provide certain

 5   protections to the trust from potential

 6   fraudulent claims?

 7                 MR. RASMUSSEN:  Objection to the

 8          form of the question.

 9                 MR. PHILLIPS:  I object to the

10          form.

11          A      I understand that section

12   5.5(b)(ii) which is titled additional

13   documentation and information for extraordinary

14   claim review requires the submission of certain

15   additional information to the trust when an

16   asbestos -- an uninsured asbestos claim has

17   been presented that that claimant deems an

18   extraordinary claim.

19          Q      And my question with respect to

20   that is with respect to those extraordinary

21   claims, do you understand that these provisions

22   of 5.5(b)(ii) are designed to ensure that the

23   trust has full exposure evidence to use in

24   evaluating and potentially defending against

25   that claim?
```

213

```
 1                      DEPONENT

 2                MR. RASMUSSEN:  Objection to the

 3           form.

 4                MR. PHILLIPS:  Objection to form

 5           and TDP speaks for itself.

 6                MR. HORKOVICH:  Objection to

 7           form.

 8           A      Again,, the drafting of the

 9      trust distribution procedures per the term

10      sheet was the province of the ACC and the FCR,

11      I did not participate in the drafting of these,

12      I have no understanding of why particular

13      provisions were or were not added to the TDPs.

14           Q      Truck is requesting that the

15      Bankruptcy Court as a condition to confirming

16      your plan, include disclosures, authorizations

17      and certifications similar to what are found in

18      5.5(b)(ii), placing such obligations on all

19      claimants who desire to return to the tort

20      system to resolve their claims.

21                Do the Debtors oppose the

22      addition of those terms?

23                MR. RASMUSSEN:  Objection to the

24           form of the question.

25           A      I am aware that Truck has made
```

# EXHIBIT E

JA04397

1

2   UNITED STATES BANKRUPTCY COURT

3   WESTERN DISTRICT OF NORTH CAROLINA

4   CHARLOTTE DIVISION

5   -----------------------------------------x

6   In Re:

7   KAISER GYPSUM COMPANY, et al.

8                   Debtors,

9                        Chapter 11

10                       Case no. 16-316-2 (JCW)

11   -----------------------------------------x

12                   9:10 a.m.

                     February 18, 2020

13

                     250 Vesey Street

14                   New York, New York

15

16          DEPOSITION of LAWRENCE FITZPATRICK, a

17   Witness in the above entitled matter, pursuant to

18   Notice, before Stephen J. Moore, a Registered

19   Professional Reporter, Certified Realtime Reporter

20   and Notary Public of the State of New York.

21

22

23

24

25

                                        Page 1

```
1                    LAWRENCE FITZPATRICK
2         Q         It gives the trust the ability,
3    the Kaiser Trust the ability to go to all other
4    trusts and settlement facilities and say did
5    claimant Joe Smith with this Social Security
6    number submit a claim to you?
7         A         I believe that's accurate.
8         Q         And in the last sentence of
9    5.5(b)(ii)(3) provides that these
10   authorizations will be used not only to verify
11   information provided in connection with
12   particular extraordinary claims, but also in
13   connection with the asbestos trust periodic
14   audits for fraud.
15                  Do you see that?
16        A         Yes.
17        Q         Mr. Fitzpatrick, these mandatory
18   disclosure and authorization provisions were
19   not in earlier versions of the Kaiser Trust
20   procedures, correct?
21        A         I believe that's correct.
22        Q         They were added after Judge
23   Whitley raised a concern that without these
24   types of procedures, the trust could be
25   victimized by fraud, correct?
```

Page 36

```
 1                     LAWRENCE FITZPATRICK
 2               MR. HARRON:  I object to form.
 3         A      I don't really know how to
 4  answer that.  It could have been Judge Whitley,
 5  but the trust distribution procedures are an
 6  evolutionary process, and there are continually
 7  being things added, or subtracted for that
 8  matter.
 9               So it could have just been the
10  result of natural, the natural progression of
11  the trust distribution procedures.
12         Q      So what's your understanding of
13  why these procedures were added?
14         A      I'm really not sure.
15         Q      Are you aware that there are
16  similar authorization and disclosure provisions
17  that are part of the Garlock Trust procedures?
18         A      No, I'm not aware of that.
19  Garlock was not my case.
20         Q      Are you aware that similar
21  procedures and authorizations have been added
22  to the Maremont Trust procedures?
23         A      Yes.
24         Q      And are you aware that that
25  occurred after the bankruptcy judge in the
```

Page 37

1                    LAWRENCE FITZPATRICK

2      authorizations?

3                         MR. WEHNER:  I object to form.

4           Q       No repository requirements for

5      the trust?

6                         MR. HARRON:  I object to form.

7           A       Your question is what would be

8      the problem?

9           Q       Yes.

10          A       I have to think about that.

11          Q       Preventing fraud in the tort

12     system would not be a bad thing, correct?

13                        MR. HARRON:  I object to form.

14          A       We are talking the tort system,

15     but yes, preventing fraud in the tort system

16     would not be a bad thing.

17          Q       It's a good thing?

18          A       Yes.

19          Q       When were you first contacted

20     about potentially serving as Future Claims

21     Representative in connection with the Kaiser

22     Gypsum bankruptcy?

23          A       Friday, August 30, 2016, 6:00

24     p.m. Eastern Standard Time.

25                        Is that specific enough?

                                    Page 81

JA04401

# EXHIBIT F

JA04402

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

| | |
|---|---|
| In re | Bankruptcy Case No. 16-31602 |
| KAISER GYPSUM COMPANY, INC., et al., | Chapter 11 |
| Debtors. | (Jointly Administered) |
| | |
| TRUCK INSURANCE EXCHANGE | |
| Plaintiff, | Adversary Proceeding No.: 19-3052 |
| v. | |
| KAISER GYPSUM COMPANY, INC. and HANSON PERMANENTE CEMENT, INC., | |
| Defendants. | |

## TRUCK INSURANCE EXCHANGE'S MOTION TO WITHDRAW THE REFERENCE OF ADVERSARY PROCEEDING TO THE BANKRUPTCY COURT

1

Plaintiff Truck Insurance Exchange ("Truck") hereby submits this Motion, pursuant to 28 U.S.C. § 157(d) and Rule 5011 of the Federal Rules of Bankruptcy Procedure, requesting entry of an order withdrawing the reference to the United States Bankruptcy Court for the Western District of North Carolina (the "Bankruptcy Court") of the above-captioned adversary proceeding (the "Adversary Proceeding") currently pending before the Bankruptcy Court. In support of this Motion, Truck respectfully represents as follows:

Truck has filed contemporaneously herewith and incorporates herein its *Memorandum of Law in Support of Truck Insurance Exchange's Motion to Withdraw the Reference of Adversary Proceeding to the Bankruptcy Court* (the "Memorandum").

As set forth in its Memorandum, withdrawal of the reference is appropriate in this case. The claims asserted in the Adversary Proceeding are "non-core" within the meaning of 28 U.S.C. § 157(b), and the Bankruptcy Court therefore lacks authority to enter a final order in this proceeding. Moreover, each of the other elements established in the Fourth Circuit for withdrawal of the reference are satisfied, and the request for withdrawal is timely in the circumstances of this Adversary Proceeding.

WHEREFORE, Truck respectfully requests that the Court withdraw the reference of the

Adversary Proceeding pursuant to 28 U.S.C. § 157(d) and grant such other relief as is just and

proper.

Respectfully submitted,

Dated: September 19, 2019        */s/ Michael L. Martinez*
                                 GRIER WRIGHT MARTINEZ, PA
                                 Michael L. Martinez (N.C. State Bar No. 39885)
                                 101 North Tryon Street, Suite 1240
                                 Charlotte, NC 28246
                                 Phone:  (704) 332-0209; Fax:  (704) 332-0215
                                 Email:  mmartinez@grierlaw.com

                                 – and –

                                 GIBSON, DUNN & CRUTCHER LLP
                                 Michael A. Rosenthal (admitted *pro hac vice*)
                                 Robert B. Krakow (admitted *pro hac vice*)
                                 Alan Moskowitz (admitted *pro hac vice*)
                                 Matthew G. Bouslog (admitted *pro hac vice*)
                                 Dylan S. Cassidy (admitted *pro hac vice*)
                                 200 Park Avenue
                                 New York, NY 10166-0193
                                 Phone:  (212) 351-4000; Fax:  (212) 351-4035
                                 Email:  MRosenthal@gibsondunn.com
                                 Email:  RKrakow@gibsondunn.com
                                 Email:  AMoskowitz@gibsondunn.com
                                 Email:  MBouslog@gibsondunn.com
                                 Email:  DCassidy@gibsondunn.com

                                 – and –

                                 PIA ANDERSON MOSS HOYT, LLC
                                 Scott R. Hoyt (admitted *pro hac vice*)
                                 136 E. South Temple, 19th Floor
                                 Salt Lake City, UT 84111
                                 Phone: (817) 454-5678; Fax: (801) 350-9010
                                 Email: SHoyt@pamhlaw.com

                                 *Counsel for Truck Insurance Exchange*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**Charlotte Division**

| | |
|---|---|
| In re | Bankruptcy Case No. 16-31602 |
| KAISER GYPSUM COMPANY, INC., et al., | Chapter 11 |
| Debtors. | (Jointly Administered) |
| TRUCK INSURANCE EXCHANGE | |
| Plaintiff, | Adversary Proceeding No.: 19-3052 |
| v. | |
| KAISER GYPSUM COMPANY, INC. and HANSON PERMANENTE CEMENT, INC., | |
| Defendants. | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that copies of the foregoing *Truck Insurance Exchange's Motion to Withdraw the Reference of Adversary Proceeding to the Bankruptcy Court* and *Memorandum of Law* in support thereof were served on those parties requesting notice in this case via ECF and via U.S. mail, postage prepaid, on the parties listed below at the addresses indicated.

John R. Miller, Jr.
Rayburn Cooper & Durham, P.A.
227 W. Trade St., Ste. 1200
Charlotte, NC 28202

Gregory M. Gordon
Jones Day
2727 N. Harwood Street
Dallas, TX 75201

This is the 19th day of September, 2019.

 */s/ Michael L. Martinez*
Michael L. Martinez (N.C. Bar No. 39885)
Grier Wright Martinez, PA
101 North Tryon Street, Suite 1240
Charlotte, NC 28246
Phone:  704/375.3720; Fax:  704/332.0215
Email:  mmartinez@grierlaw.com

*Counsel for Truck Insurance Exchange*

Case 16-31602   Doc 2072-6   Filed 02/24/20   Entered 02/24/20 17:20:43   Desc
Case 3:19-cv-00467   Document 1-1   Filed 09/20/19   Page 1 of 31
Exhibit F For Law   Page 6 of 36
Memorandum of Law   Page 1 of 31

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**Charlotte Division**

| | |
|---|---|
| In re | Bankruptcy Case No. 16-31602 |
| KAISER GYPSUM COMPANY, INC., et al., | Chapter 11 |
| Debtors. | (Jointly Administered) |
| TRUCK INSURANCE EXCHANGE | |
| Plaintiff, | Adversary Proceeding No.: 19-3052 |
| v. | |
| KAISER GYPSUM COMPANY, INC. and HANSON PERMANENTE CEMENT, INC., | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF TRUCK INSURANCE EXCHANGE'S**
**MOTION TO WITHDRAW THE REFERENCE OF ADVERSARY PROCEEDING**
**TO THE BANKRUPTCY COURT**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ..................................................................................................................... 2

ARGUMENT ......................................................................................................................... 9

I.      Cause Exists to Withdraw the Reference to the Bankruptcy Court for This Adversary
        Proceeding ................................................................................................................... 9

        A.      Withdrawal of the Reference is Proper Because Truck's Declaratory-Judgment
                Claims Fall Outside the Bankruptcy Court's Core Jurisdiction ........................... 10

        B.      All Other Factors Courts Assess to Determine Whether to Withdraw the
                Reference Favor Withdrawal. ............................................................................. 19

                1.      Withdrawal would not adversely affect the uniform administration of the
                        bankruptcy proceedings because the adversary proceeding does not raise
                        substantive issues of bankruptcy law. ..................................................... 19

                2.      Withdrawal would expedite the bankruptcy process and promote both
                        judicial economy and efficient use of the parties' resources. .................. 20

                3.      Withdrawal would not increase the risk of forum shopping. .................... 22

                4.      Withdrawal will preserve Truck's constitutional right to a jury trial on its
                        declaratory-judgment claims. .................................................................. 22

CONCLUSION ...................................................................................................................... 24

   JA04408

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Admiral Ins. Co. v. SONICblue Inc.*,
No. 07-4185, 2008 WL 2543360 (N.D. Cal. June 20, 2008)...................................................19

*Allen v. Nat'l City Mortg. Co.*,
No. 2:04-mc-188, 2006 WL 3899997 (S.D. W. Va. July 13, 2006)...............................9, 20, 21

*In re Am. Capital Equip.*
688 F. 3d 145 (3rd. Cir. 2012) ...............................................................................................18

*In re American Capital Equipment, LLC*,
325 B.R. 372 (W.D. Penn. 2005)......................................................................................17, 18

*In re Apex Exp. Corp.*,
190 F.3d 624 (4th Cir. 1999) ...........................................................................................16, 17

*In re Babcock & Wilcox Co.*,
No. 01-1187, 2001 WL 1018366 (E.D. La. July 2, 2001) .................................................15, 21

*Beard v. Braunstein*,
914 F.2d 434 (3d Cir. 1990).....................................................................................................13

*Bell v. Hood*,
327 U.S. 678 (1946)..................................................................................................................11

*Bergstrom v. Dalkon Shield Claimants Trust (In re A.H. Robins Co.)*,
86 F.3d 364 (4th Cir. 1996) ..............................................................................12, 13, 15, 17

*Blake v. Vanderbilt Mortg. & Fin., Inc. (In re Blake)*,
No. 5:14-mc-00148, 2014 WL 7186934 (S.D. W. Va. Dec. 16, 2014) ...........................21, 22

*Bowles v. Massey Energy Co.*,
No. 2:12-cv-05997, 2012 WL 6628953 (S.D.W. Va. Dec. 19, 2012) ...............................14, 17

*Catholic Bishop of N. Alaska v. Continental Ins. Co. (In re Catholic Bishop of N. Alaska)*,
No. F08-90019, 2008 WL 8657847 (Bankr. D. Alaska Sept. 16, 2008) .................................14

*Celanese Acetate, LLC v. Lexcor, Ltd.*,
632 F. Supp. 2d 544 (W.D.N.C. 2009) ...................................................................................24

*In re Celotex Corp.*,
152 B.R. 667 (Bankr. M.D. Fla. 1993) ...................................................................................17

*In Re Coe–Truman Techs., Inc.*,
    214 B.R. 183 (N.D. Ill. 1997) .................................................19

*Collier v. Land & Sea Rest. Co.*,
    LLC, No. 7:13-cv-0104, 2015 WL 4873300 (W.D. Va. Aug. 13, 2015) ...............................23

*Farmer v. Macy's Inc.*,
    No. AP-LSS-16-0350, 2017 WL 3493129 (D. Md. Aug. 14, 2017) ........................................9

*G-I Holdings, Inc. v. Hartford Accident & Indemn. Co. (In re G-I Holdings Inc.)*,
    278 B.R. 376 (Bankr. D. Del. 2002) ..................................................13, 14, 16, 17

*In re Garlock Sealing Technologies, LLC*,
    504 B.R. 71 (Bankr. W.D.N.C. 2014)............................................................2

*In re Grabill Corp.*,
    967 F.2d 1152 (7th Cir. 1992) .................................................23

*Haigler v. Dozier (In re Dozier Fin., Inc.)*,
    No. 4:18-cv-1888, 2019 WL 1075072 (D.S.C. Mar. 7, 2019).................................9, 20, 21, 22

*Harleysville Mut. Ins. Co. v. Hill (In re Hammocks, LLC)*,
    No. 1:09-cv-377, 2010 WL 3783952 (W.D.N.C. Sept. 28, 2010)....................................21, 22

*Joseph DelGreco & Co. v. DLA Piper (In re Joseph DelGreco & Co.)*,
    No. 10-cv-6422, 2011 WL 350281 (S.D.N.Y. Jan. 26, 2011) .................................22

*K V Oil & Gas, Inc. v. Ctr. Equities, Inc. (In re Three Rivers Cos.)*,
    No. 2:09-cv-00188, 2009 WL 2762062 (S.D. W. Va. Aug. 27, 2009)............................20, 21

*Kartzman v. Utica Nat'l Ins. Co. (In re John A. Rocco Co.)*,
    12-01277, 2015 WL 1727474 (Bankr. D.N.J. Apr. 13, 2015) .................................14

*In re Lockheed Martin Corp.*,
    503 F.3d 351 (4th Cir. 2007) .................................................23

*Logan v. Westchester Fire Ins. Co. (In re PRS Ins. Grp.)*,
    445 B.R. 402 (Bankr. D. Del. 2011) .................................................14

*McGuire v. Jim Walter Homes, LLC (In re McGuire)*,
    No. 5:13-mc-00128, 2013 WL 6628620 (S.D. W. Va. Dec. 16, 2013) ...........................20, 21

*McMahon v. Providence Capital Enters., Inc. (In re McMahon)*,
    222 B.R. 205 (S.D.N.Y. 1998) .................................................22

*NACM-New England, Inc. v. Nat'l Ass'n of Credit Mgmt., Inc.*,
    927 F.3d 1 (1st Cir. 2019)........................................................23

Case 16-31602  Doc 2072-6  Filed 09/24/20  Entered 09/24/20 17:20:43  Desc
Exhibit F  Page 10 of 36
Case 3:19-cv-00467-GCM  Document 1-1  Filed 09/20/19  Page 5 of 31

Memorandum of Law  Page 5 of 5

*Nat'l Century Fin. Enters. v. Gulf Ins. Co. (In re Nat'l Century Fin. Enters.)*,
312 B.R. 344 (Bankr. S.D. Ohio 2004).................................................................14

*Nickless v. Haws & Mill Street, Inc. (In re Fusco)*,
No. 10-46416, 2013 WL 2477268 (Bankr. D. Mass. June 10, 2013).....................24

*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*,
458 U.S. 50 (1982)..............................................................................10, 11, 13, 16

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*,
4 F.3d 1095 (2d Cir. 1993)..............................................................................13, 19

*Personette v. Kennedy (In re Midgard Corp.)*,
204 B.R. 764 (10th Cir. BAP 1997) .......................................................................13

*Simler v. Conner*,
372 U.S. 221 (1963).................................................................................................23

*Stern v. Marshall*,
564 U.S. 462 (2011).................................................................................................11

*Tavenner v. Sigler*,
No. 3:17-cv-502, 2018 WL 1511733 (E.D. Va. Mar. 27, 2018).............................19

*Terry v. Chauffeurs, Teamsters & Helpers, Local 391*,
863 F.2d 334 (4th Cir. 1988), *aff'd,* 494 U.S. 558 (1990) .....................................23

*Travelers Indemnity Co. v. Babcock & Wilcox Co.*,
No. 01-cv-3387, 2002 WL 100625 (E.D. La. Jan. 23, 2002) .................................15

*In re U.S. Brass Corp.*,
110 F.3d 1261 (7th Cir. 1997) .......................................................................12, 14

*U.S. Lines, Inc. v. Am. Steamship Owners Mut. Protection & Indemnity Assoc. (In
re U.S. Lines Inc.)*,
197 F.3d 631 (2d Cir. 1999).................................................................13, 16, 17

*Wellman Thermal Sys. Corp. v. Columbia Cas. Co.*,
No. AP-05-100, 2005 WL 4880619 (S.D. Ind. Oct. 5, 2005).............................14, 23

*Wood v. Wood (In re Wood)*,
825 F.2d 90 (5th Cir. 1987) .........................................................................11, 12, 13

**Statutes**

28 U.S.C. § 157(b)(1) ......................................................................................10, 11, 12

28 U.S.C. § 157(b)(2) .................................................................................................11

28 U.S.C. § 157(b)(3) ...........................................................................................................11

28 U.S.C. § 157(c) ...............................................................................................................10

28 U.S.C. § 157(c)(1)............................................................................................................21

28 U.S.C. § 1331...................................................................................................................11

**Rules**

Fed. R. Bankr. P. 5011 ...........................................................................................................9

v

Case 16-31602   Doc 2072-6   Filed 02/24/20   Entered 02/24/20 17:20:43   Desc
Case 3:19-cv-00467   Document 1   Filed 09/19/19   Page 7 of 31
Memorandum of Law   Page 12 of 36

Truck Insurance Exchange ("***Truck***") hereby files this memorandum of law in support of

its motion to withdraw the reference to the Bankruptcy Court of an adversary proceeding filed by

Truck against Defendants Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc.

(together, the "***Defendants***," or "***Insureds***").

## PRELIMINARY STATEMENT

This dispute arises out of the Insureds' breaches of various insurance contracts they entered

into between 33 and 52 years prior to filing for bankruptcy relief. The conduct that gives rise to

the breaches likewise began before the filing of the bankruptcy cases and has continued throughout

the bankruptcy. In short, having realized that they were being victimized by unscrupulous

practices of asbestos plaintiffs' lawyers to suppress evidence of exposure to asbestos products of

other manufacturers so as to inflate the Insureds' liabilities in the tort system, the Insureds

approached Truck about working together, primarily at Truck's expense, to achieve a resolution

of their asbestos bodily injury liabilities at their real values, as opposed to fraudulently inflated

values. However, after billing Truck for millions of dollars of professional fees and other

expenses, the Insureds suddenly abandoned the joint effort, filed these bankruptcy cases, and then

proceeded to negotiate and enter into a collusive agreement on a plan of reorganization with the

perpetrators of the fraud, an agreement that shields the Insureds and their solvent parent from the

future effects of the fraud while leaving their insurers, primarily Truck, fully exposed to the fraud.

During the bankruptcy, Truck has repeatedly attempted to engage the Insureds and the

representatives of the asbestos plaintiffs' bar in discussions of ways to amend or revise the plan

deal so as to protect Truck and the other insurers from future fraud, but has been rebuffed at every

turn. In April 2019, Truck put the Insureds on formal notice that failure to amend their plan to

protect Truck from the fraud could give rise to a denial of coverage for breach of the Insureds'

duty to cooperate and assist under the policies.

Rather than attempt to address the important issues raised by Truck, the Insureds instead amended their plan to require as a condition to confirmation a finding that nothing they did prior to or during the bankruptcy cases, including their negotiations and deal with the fraud perpetrators, constitutes a breach of their policy obligations. This rather transparent ploy to preempt Truck from challenging coverage and to use a plan confirmation hearing to effectively resolve a complex insurance coverage dispute potentially involving far more than a hundred million dollars of liability, necessitated the filing of this adversary proceeding. Only through an adversary proceeding can there be assurance that this controversy is resolved in accordance with the rules of civil procedure as applied to adversary proceedings, and that Truck's right to a jury trial is preserved.

Because (a) this case is properly brought as an adversary proceeding under Federal Rule of Rule Procedure 7001, which mandates the filing of an adversary proceeding to resolve disputes as to a debtor's interest in property (Bankr. R. 7001(2)); (b) Truck is entitled to a jury trial, which can only be conducted by this Court absent the consent of the parties; and (c) the fundamental nature of this dispute as to insurance coverage rights raises non-core issues that must be resolved by an Article III court, withdrawal of the reference of this proceeding is appropriate and necessary.

## BACKGROUND

As set forth in detail in the attached Complaint for Declaratory Relief, the origins of this dispute date back to a seminal ruling by Judge George R. Hodges in *In re Garlock Sealing Technologies, LLC,* 504 B.R. 71 (Bankr. W.D.N.C. 2014). Judge Hodges found a shocking pattern of evidence suppression by plaintiffs' lawyers in asbestos bodily injury cases. In an asbestos lawsuit, the liability of any one defendant is heavily dependent on the number of different asbestos

products to which the plaintiffs were exposed.  Simply stated, the greater the number of asbestos

product exposures, the lower the liability of any one defendant, so that plaintiffs do not recover

multiples of their actual damages.  In addition, because certain types of asbestos are dramatically

more toxic than other types of asbestos, manufacturers of a less toxic asbestos may have a complete

defense if the plaintiff was also exposed to the more toxic asbestos.

The evidence presented by Garlock to Judge Hodges revealed a systematic scheme by

various plaintiffs' lawyers to falsely deny and otherwise suppress evidence of exposures to other

asbestos products.  The lynchpin to this scheme is the fact that scores of asbestos defendants have

sought bankruptcy relief and then emerged from bankruptcy with a plan that transfers their

asbestos liabilities to trusts that resolve the liabilities administratively, and not in the tort system.

The trusts have strict confidentiality provisions that prevent tort system defendants from

discovering what other payments have been received by a particular plaintiff on account of his or

her asbestos exposure and illness.  In addition, many plaintiffs delay even filing their trust claims

until after their litigation claims have been tried or settled, all the while denying exposure to

products to which that they then assert they were exposed in later-filed trust filings.  Making

matters even worse, Garlock was a producer of a less toxic asbestos product, and the evidence

revealed cases where plaintiffs falsely denied exposure to the more toxic type of asbestos.  As a

result, Garlock often paid substantial sums to resolve cases where it may not have had any liability.

In the *Garlock* estimation proceeding, asbestos plaintiffs' representatives had argued that

Garlock's likely liability for current and future asbestos claims exceeded $1 billion, a calculation

premised on the assumption that amounts historically paid by Garlock in the tort system should be

used to calculate its ongoing and future liability.  However, because of the evidence suppression

scheme, Judge Hodges found that historical payments were not a reliable predictor of actual

liability, and instead agreed with Garlock's expert that a proper estimation of the current and future

liabilities was $100 million.  Following the ruling, an agreement was reached with the plaintiffs'

representatives to fund a settlement trust with an amount in excess of the $100 million finding but

still dramatically less than the $1 billion+ amount suggested by historical payments.  Agreement

was also reached on mandatory disclosures and authorizations by claimants for trusts to release

claims information so that there would be no continuation of the evidence suppression scheme.

The Insureds, like Garlock, produced products for a relatively short period of time that

contained the less toxic type of asbestos.  Like Garlock, they had seen a dramatic increase in the

number of asbestos lawsuits filed against them as more and more asbestos defendants sought

bankruptcy relief and established trusts.  And like Garlock, they believed they were being

victimized by the same fraudulent scheme—indeed, in several of the specific cases examined in

the *Garlock* proceeding, the plaintiffs found to have falsely testified as to their exposures had also

brought claims against the Insureds.

So, shortly after Judge Hodges issued his ruling, the Insureds approached Truck about

working together to negotiate with the plaintiffs' bar a resolution of the Insured's asbestos bodily

injury liabilities, based upon the type of econometric model employed by Garlock's expert

economist, *i.e.*, one that would estimate the Insured's true liability with full exposure evidence.

The concept proposed by the Insureds was to pre-negotiate a resolution of the liabilities, then file

for bankruptcy relief and quickly move to confirmation and the establishment of a settlement trust.

Under the Truck policies, Truck is the primary insurer of the Insureds' asbestos bodily

injury liabilities.  The policies provide generally that Truck is liable for the first $500,000 of

liability, less a $5,000 deductible, with no aggregate payment limit, and obligate Truck to pay the

costs of defending asbestos claims brought against the Insureds.  The policies also include a

number of conditions to Truck's coverage obligations. One of those conditions is titled Assistance
and Cooperation of the Insured.  It provides:

> The insured shall cooperate with [Truck], and upon [Truck's] request, shall attend
> hearings and trials **and shall assist in effecting settlements, securing and giving
> evidence**, obtaining the attendance of witnesses and in the conduct of suits.  The
> insured shall not, except at [its] own cost, voluntarily make any payment, assume
> any obligation or incur any expense other than for such immediate medical and
> surgical relief to others as shall be imperative at the time of the occurrence.

Complaint at 5 ¶ 17 (19-03052, Dkt. No. 1) (emphasis added).

The Insureds' stated desire to reach a proper resolution of their asbestos liabilities, based
on actual and not fraudulently inflated amounts, was consistent with these enumerated duties.
Although Truck is not primarily liable for the Insureds' asbestos liabilities, Truck is the Insureds'
primary insurer for such liabilities.  Accordingly, Truck is the primary economic victim of the
fraud directed at the Insureds.  For this reason, the Insureds asked Truck to pay the great majority
of the professional fees and other expenses related to attempting to negotiate a pre-bankruptcy
resolution.  The Insureds and Truck entered into a Cost Sharing Agreement in June 2015, whereby
Truck agreed to pay 90% of the first $1 million of fees and expenses and up to 82% of the first $5
million.

Fifteen months after the Cost Sharing Agreement was entered into, and after incurring
millions of dollars of professional fees and expenses chargeable to Truck, the Insureds informed
Truck that rather than attempt a pre-bankruptcy settlement, they instead would be filing for
bankruptcy relief by the end of September 2016.  On September 30, 2016, the bankruptcy cases
were filed.  Contrary to their stated intention when inducing Truck to enter into the Cost Sharing
Agreement, the Insureds never even commenced negotiations with the claimant representatives
prior to filing for bankruptcy.

The Insureds informed Truck that they expected post-filing professional fees and expenses

would run $4.5 million during the first six months of the bankruptcy cases and more than $24 million over two years.  The Insureds indicated that they expected Truck to bear 95% of these costs, and threatened to strike a deal with the plaintiffs' lawyers that excluded Truck and resolved only the Insureds' limited liability for deductibles and uninsured claims if Truck were unwilling to pay the costs of their bankruptcy. While Truck was open to bearing a significant part of the costs if the end result was to be consistent with the original pre-bankruptcy goal, *i.e.*, a plan of reorganization that resolved the claims in a way that protected Truck from continued fraud, Truck was unwilling to make an unconditional promise to pay upwards of a million dollars per month.

The Insureds then made good on their threat.  They excluded Truck from negotiations with the plaintiffs' representatives and struck a deal with the plaintiffs that protected themselves and their non-bankrupt parent from any future fraud, but left Truck fully exposed for the Insureds' asbestos liabilities.  The deal was announced in March 2018.  It provided for (1) an immediate lift of the automatic stay imposed by section 362 of the Bankruptcy Code to allow the 14,000 asbestos cases pending against the Insureds at the time of the bankruptcy filing to resume in the tort system and an immediate elimination of any bar to the filing of additional cases; (2) an agreement by the plaintiffs to collect on any judgment or settlement of an insured claim only from insurance; and (3) an agreement that any uninsured amounts such as punitive damage awards, claims that arose outside the period covered by the insurance policies or deductible amounts not paid by Truck on insured claims would be solely recoverable from a trust established by a plan to be proposed by the Insureds and the claimants' representatives (the "***Joint Plan***") and funded by a lump sum received from the Insureds ($1 million note) and their parent ($49 million cash).

Pursuant to their deal, the Insureds then filed a motion to lift the automatic stay to permit the asbestos cases to proceed in the tort system.  Truck objected, in large part due to the fact that

this would allow the resumption of the fraudulent scheme.  At the May 10, 2018 hearing on the

motion to lift the stay, the Insureds' response was rather brazen:  They did not deny that the Joint

Plan will perpetuate fraud, but said that *they did not care* because the Insureds were protected.  As

stated by their counsel:

> [D]o the debtors think they . . . were fairly treated in the tort system?  No . . . .  [A]re
> the debtors suspicious that maybe they were subject of misconduct in the tort
> system?  Yes.  But the…important point is, Your Honor, that we've negotiated an
> agreement . . . .  So, you know, a lot can be said about fraud, a lot . . . of references
> can be made to *Garlock* and the like, but the point is there's nothing inconsistent in
> that regard.  We don't think we were treated fairly either.  It is what it is.  We've
> settled and this agreement takes the debtors out of the tort system.  And that's the
> only . . . point that matters from an estate perspective.

Tr. of May 10, 2018 Hearing at 41:18–42:8 (16-31602, Dkt. No. 950).

The rather obvious problem with this position is that it ignores the Insureds' duty to

cooperate and assist as provided in the policies.  For the better part of the next year, Truck

attempted in a variety of ways to identify alternative resolutions that would address the fraud issue.

Truck filed a chapter 11 plan on behalf of the Insureds (after the Insureds' exclusive period to file

a plan expired) that would have established and funded a settlement trust authorized to settle the

asbestos liabilities at their actual and not inflated amounts; Truck attempted to engage the Insureds

and the claimants through a mediator to negotiate a consensual resolution that could have taken

various forms to guard against a continuation of the fraud; and Truck attempted to persuade the

Insureds to insert fraud protection measures into their own Joint Plan.  Truck was rebuffed at every

turn.

Finally, in April 2019, Truck placed the Insureds on notice through a reservation of rights

letter that the Insureds' collusive agreement with the plaintiffs and failure to cooperate with Truck

put their coverage at risk.  The letter (1) reminded the Insureds of their obligation under the Truck

Policies to cooperate and assist Truck in "effecting settlement" and "securing and giving

evidence"; (2) noted that the bankruptcy filing presented an opportunity to obtain the disclosures and authorizations necessary to prevent a continuation of the manipulation of exposure evidence that had inflated recoveries against Garlock and the Insureds; (3) noted that the Truck-filed plan contained such fraud-prevention measures but the Joint Plan filed by the Insureds under their agreement with asbestos plaintiffs' lawyers did not; (4) stated that the agreement with the plaintiffs' lawyers and subsequent Joint Plan, which shields the Insureds and their related entities from future fraudulent conduct by the claimants' lawyers but leaves Truck and other insurers fully exposed to the fraud, appears to be collusive and in violation of the Insureds' duty to cooperate and assist; and finally (5) reserved Truck's right to deny coverage if the Joint Plan were not modified to comply with the duty to cooperate and assist.

No direct response to the reservation of rights letter was made by the Insureds. They neither contested the position asserted by Truck nor took any steps to address Truck's concerns with the Joint Plan. Instead, they amended the Joint Plan to add a proposed confirmation finding by the Bankruptcy Court that was rather transparently designed to shield them from Truck's enforcement of its common law rights under the policies. The proposed finding would effectively preclude any post-bankruptcy action by Truck to deny coverage based upon the Insureds' violations of the duty to cooperate, both prior to and during the bankruptcy cases:

> The Debtors' conduct in connection with and throughout these Reorganization Cases, including, but not limited to, their negotiations with the ad hoc committee of asbestos personal injury claimants and the prepetition future claimants' representative, and the commencement of these Reorganization Cases, as well as the drafting, negotiation, proposing, confirmation and consummation of the Plan, and their opposition to any other plan of reorganization, does not and has not violated any Asbestos Insurer Cooperation Obligations contained in any Asbestos Insurance Policies.

Third Am. Joint Plan of Reorganization at 51 § VII.A.3.u (16-31602, Dkt. No. 1772). The Insureds' attempt to resolve a complex insurance coverage dispute potentially impacting $100 million+ of coverage through a routine finding at their confirmation hearing mandates that this

dispute be resolved now through a declaratory judgment case, and Truck has therefore commenced

this adversary proceeding.  For the reasons set forth below, the dispute must be tried in the District

Court, hence, Truck submits this motion to withdraw the reference.

## ARGUMENT

I.   **Cause Exists to Withdraw the Reference to the Bankruptcy Court for This Adversary Proceeding.**

    Even though this adversary proceeding has been referred by standing order to the

Bankruptcy Court, 28 U.S.C. § 157(d) empowers this Court to withdraw that reference "on timely

motion of any party, for cause shown."[1]  This Court "has broad discretion in deciding whether

reference should be withdrawn for cause shown."  *Farmer v. Macy's Inc.*, No. AP-LSS-16-0350,

2017 WL 3493129, at *2 (D. Md. Aug. 14, 2017).

    While the Bankruptcy Code does not define what constitutes "cause," courts in this Circuit

consider the following six factors when deciding whether to grant discretionary withdrawal of the

reference:  (1) whether the proceeding is core or non-core; (2) the uniform administration of

bankruptcy proceedings; (3) expediting the bankruptcy process and promoting judicial economy;

(4) efficient use of both the debtors' and creditors' resources; (5) the reduction of forum shopping;

and (6) the preservation of the right to a jury trial.  *See, e.g.*, *Haigler v. Dozier (In re Dozier Fin.,*

*Inc.)*, No. 4:18-cv-1888, 2019 WL 1075072, at *4 (D.S.C. Mar. 7, 2019); *Allen v. Nat'l City Mortg.*

*Co.*, No. 2:04-mc-188, 2006 WL 3899997, at *2 (S.D. W. Va. July 13, 2006).

    Each of the above factors favors withdrawal of the reference.  The claims at issue in this

---

[1] Federal Rule of Bankruptcy Procedure 5011(a) provides that a motion to withdraw the reference shall be heard by the district court.  *See also* Fed. R. Bankr. P. 5011 advisory committee's note ("Section 157(d) permits the district court to order withdrawal on its own motion or the motion of a party.  Subdivision (a) of this rule makes it clear that the bankruptcy judge will not conduct hearings on a withdrawal motion.  The withdrawal decision is committed exclusively to the district court.").

proceeding—state-law breach-of-contract claims alleging that the defendants breached pre-petition contracts through conduct that occurred both pre- and post-petition—are quintessentially non-core. Plus, Truck has demanded a jury trial on those claims and does not consent to that trial being conducted by the Bankruptcy Court. In light of these circumstances, withdrawal of the reference will promote efficiency, judicial economy, and uniformity while also allowing this proceeding to be litigated in the forum where it will ultimately be tried

### A. Withdrawal of the Reference is Proper Because Truck's Declaratory-Judgment Claims Fall Outside the Bankruptcy Court's Core Jurisdiction.

Truck's state-law breach-of-contract claims are non-core claims: They do not arise under Title 11, and they are not claims that could only have arisen in the context of a bankruptcy case.

Bankruptcy courts' jurisdiction is bifurcated between "core" proceedings over which bankruptcy courts exercise full judicial power and "non-core" proceedings over which bankruptcy courts exercise only limited power. In core proceedings, bankruptcy courts have authority to enter all appropriate orders and final judgments. *See* 28 U.S.C. § 157(b)(1). In non-core proceedings, the bankruptcy court's authority is limited (in the absence of consent from the parties) to submitting proposed findings of fact and conclusions of law to the district court; any final order or judgment must be entered by the district court. *See id.* § 157(c).

The statutory distinction between core and non-core proceedings is a response to the Supreme Court's holding in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.* that bankruptcy courts may issue final judgments only in proceedings that lie "at the core of the federal bankruptcy power," such as "the restructuring of debtor-creditor relations." 458 U.S. 50, 71 (1982) (plurality op.). The source of this restriction is the distinction between "public rights" and "private rights." Only proceedings involving "public rights" created by Congress may be adjudicated by Article I bankruptcy courts. *Id.* at 69–70. "Private-rights disputes, on the other hand, lie at the

core of the historically recognized judicial power." *Id.* at 70. The "adjudication of state-created private rights, such as the right to recover contract damages," must take place in Article III courts. *Id.* at 71. Congress enacted 28 U.S.C. § 157 to implement *Marathon*'s command that bankruptcy courts' authority to issue final judgments must be limited to proceedings that lie at the core of the federal bankruptcy power.

Section 157(b)(1) limits the definition of core proceedings to two different types of proceedings: (1) "proceedings arising under title 11" and (2) proceedings "arising in a case under title 11." 28 U.S.C. § 157(b)(1); *see also Stern v. Marshall*, 564 U.S. 462, 476 (2011) ("core proceedings are those that arise in a bankruptcy case or under Title 11"). Section 157(b)(2) lists sixteen examples of proceedings that fall within these categories, but this is list is not exclusive. *See* 28 U.S.C. § 157(b)(2) ("Core proceedings include, but are not limited to," sixteen examples). A claim that neither arises under Title 11 nor arises in a case under Title 11 but is "otherwise related to a case under title 11" is a non-core claim that must be adjudicated before an Article III district court. *Id.* § 157(b)(3)

The breach-of-contract claims at issue in this adversary proceeding do not fit within either of the categories of core proceedings under section 157(b)(1). Plainly, those claims are not "proceedings arising under title 11." *See* 28 U.S.C. § 157(b)(1). "Congress used the phrase 'arising under title 11' to describe those proceedings that involve a cause of action created or determined by a statutory provision of title 11." *Wood v. Wood (In re Wood)*, 825 F.2d 90, 96 (5th Cir. 1987). Section 157(b)(1) borrows the "well-accepted meaning" of the phrase "arising under" from the general federal question jurisdiction statute, *id.* at 96-97 (citing 28 U.S.C. § 1331), under which a claim arises under federal law only if it is "so drawn as to seek recovery directly under" federal law, *Bell v. Hood*, 327 U.S. 678, 681 (1946). Truck's breach-of-contract claims seek

recovery under California law, not under Title 11. Those claims involve causes of action created

by state law and will be determined without reference to any provision of the Bankruptcy Code.

As such, they do not arise under Title 11.

Nor are Truck's breach-of-contract claims "proceedings . . . arising in a case under title

11." *See* 28 U.S.C. § 157(b)(1). The Fourth Circuit has held that "[p]roceedings 'arising in' Title

11 are those proceedings that 'are not based on any right expressly created by Title 11, but

nevertheless, would have no existence outside of the bankruptcy.'" *Bergstrom v. Dalkon Shield

Claimants Trust (In re A.H. Robins Co.)*, 86 F.3d 364, 372 (4th Cir. 1996) (citing *In re Wood*, 825

F.2d at 97). To meet this test, the proceeding must be one "that, by its nature, could arise only in

the context of a bankruptcy case." *In re Wood*, 825 F.2d at 97. Examples of proceedings that arise

in a case under Title 11 in this sense include "the filing of a proof of claim or an objection to the

discharge of a particular debt," *id.*; "an action to set aside a preference," *In re U.S. Brass Corp.*,

110 F.3d 1261, 1268 (7th Cir. 1997); and claims arising under the bankruptcy-related provisions

of Title 28, such as 28 U.S.C. § 959(b) (requiring a trustee or debtor-in-possession to manage

property of the estate according to applicable state-law requirements) and 28 U.S.C. § 960

(obligating all bankruptcy officers to pay all taxes applicable to the business they conduct). The

common thread between these examples is an inextricable nexus between the claim asserted and

the existence of the bankruptcy case: It is literally not possible to file a proof of claim, seek to set

aside a preference, or manage the property of a bankruptcy estate if a bankruptcy case has not been

filed.

By contrast, proceedings do not arise under Title 11 (and are therefore non-core) if they

"do not depend on the bankruptcy laws for their existence" and "could proceed in another court

even in the absence of bankruptcy." *In re Wood*, 825 F.2d at 96. If the claim would have some

"existence outside of the bankruptcy," it does not arise in a case under Title 11 within the meaning

of section 157(b)(1). *See In re A.H. Robins*, 86 F.3d at 372; *accord Personette v. Kennedy (In re*

*Midgard Corp.),* 204 B.R. 764, 770 n.6 (10th Cir. BAP 1997).

The quintessential example of a proceeding that does not arise in a case under Title 11 is a

state-law breach-of-contract claim for breach of a contract that was formed pre-petition. *See, e.g.*,

*In re Wood*, 825 F.2d at 97 ("a state contract action that, had there been no bankruptcy, could have

proceeded in state court" is a non-core proceeding). In a breach-of-contract case, the key to the

core vs. non-core determination is the timing of the contract's formation, not the timing of the

breach. *See U.S. Lines, Inc. v. Am. Steamship Owners Mut. Protection & Indemnity Assoc. (In re*

*U.S. Lines Inc.)*, 197 F.3d 631, 637 (2d Cir. 1999) ("[T]he critical question in determining whether

a contractual dispute is core by virtue of timing is not whether the *cause of action* accrued post-

petition, but whether the *contract* was formed post-petition."). As long as the contract was formed

pre-petition, a proceeding alleging a breach of that contract is almost invariably non-core. This is

true when the breach occurred pre-petition. *See, e.g.*, *Marathon*, 458 U.S. at 56. It is true when

breaches occurred both pre- and post-petition. *G-I Holdings, Inc. v. Hartford Accident & Indemn.*

*Co. (In re G-I Holdings Inc.)*, 278 B.R. 376, 383 (Bankr. D. Del. 2002) ("an action 'involving pre-

petition contracts, allegedly breached both before and after the filing of the petition, is entirely a

non-core matter" (quoting *Beard v. Braunstein*, 914 F.2d 434, 445 (3d Cir. 1990))). And it is true

when the breach occurred post-petition. *In re U.S. Lines*, 197 F.3d at 638 (an action alleging a

post-petition breach of a pre-petition contract "will usually not be rendered core simply because

the cause of action could only arise post-petition"); *see, e.g.*, *Orion Pictures Corp. v. Showtime*

*Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1097, 1102 (2d Cir. 1993) (claim for

anticipatory breach of a pre-petition contract was non-core even though the alleged breach

3A04425

occurred post-petition).

Federal courts around the country routinely apply this rule to contractual disputes between debtors/insureds and insurers, holding that claims alleging a breach of—or seeking a declaration of coverage rights and obligations under—pre-petition insurance contracts are non-core proceedings. *See, e.g.*, *In re U.S. Brass*, 110 F.3d at 1268 (a "claimed right to insurance coverage is a creation of state contract law and one that could be vindicated in an ordinary breach of contract suit if [the debtor] were not a bankrupt"); *Kartzman v. Utica Nat'l Ins. Co. (In re John A. Rocco Co.)*, 12-01277, 2015 WL 1727474, at *4 (Bankr. D.N.J. Apr. 13, 2015) ("Because the issue of coverage under an insurance policy is a question of state law that routinely arises outside the context of a bankruptcy case, claims for insurance coverage are typically considered non-core.").[2]

In one particularly analogous case, the district court held that an adversary proceeding was non-core where insurers sought a declaratory judgment that the debtor had forfeited its right to insurance coverage for asbestos bodily injury claims as a result of its conduct during a chapter 11

---

[2] *Accord Bowles v. Massey Energy Co.*, No. 2:12-cv-05997, 2012 WL 6628953, at *5 (S.D. W. Va. Dec. 19, 2012) ("[b]y their nature, pre-petition contractual disputes"—such as a claim requesting "a declaration of rights under insurance contracts that were entered into prior to the filing of the bankruptcy petition"—"commonly do not invoke substantive rights provided by Title 11"); *Logan v. Westchester Fire Ins. Co.* (*In re PRS Ins. Grp.*), 445 B.R. 402, 404–05 (Bankr. D. Del. 2011) (coverage disputes between debtors and their insurers "arise under state law" and do not "involve a dispute that could arise only in the context of a bankruptcy case"); *Catholic Bishop of N. Alaska v. Continental Ins. Co. (In re Catholic Bishop of N. Alaska)*, No. F08-90019, 2008 WL 8657847, at *3 (Bankr. D. Alaska Sept. 16, 2008) (claims seeking "a declaration regarding . . . scope of [insurance] coverage . . . don't depend on the Bankruptcy Code for their existence and could proceed in another court" and therefore "are non-core proceedings"); *Wellman Thermal Sys. Corp. v. Columbia Cas. Co.*, No. AP-05-100, 2005 WL 4880619, at *2 (S.D. Ind. Oct. 5, 2005) ("where the issue is the scope of coverage of insurance policies the matter is a noncore proceeding"); *Nat'l Century Fin. Enters. v. Gulf Ins. Co. (In re Nat'l Century Fin. Enters.)*, 312 B.R. 344, 355 (Bankr. S.D. Ohio 2004) (finding that an adversary proceeding requesting a declaration of rights in pre-petition insurance contracts was non-core); *In re G-I Holdings*, 278 B.R. at 381–82 (an action seeking a declaratory judgment concerning scope of coverage under pre-petition insurance contracts was a non-core proceeding).

3A-04426

reorganization proceeding.  *In re Babcock & Wilcox Co.*, No. 01-1187, 2001 WL 1018366 (E.D. La. July 2, 2001).  The insurers alleged that "after the Debtor filed for relief under chapter 11, the Debtor" had breached its insurance contract by "disclosing coverage information to representatives of the asbestos claimants and proposing in a plan of reorganization to assign the management of claims under the policies to a trust."  *Id.* at *1.  The district court accepted the argument that the dispute was "simply over a right to insurance coverage that could be resolved in a breach of contract suit if the Debtor were not bankrupt," reasoning that the "contract action was a creature of state law and does not involve rights created by bankruptcy law."  *Id.* at *4.  Accordingly, the court held that the proceeding was non-core and granted the insurers' motion to withdraw the reference.  *Id.* at *5–*6; *accord Travelers Indemnity Co. v. Babcock & Wilcox Co.*, No. 01-cv-3387, 2002 WL 100625 (E.D. La. Jan. 23, 2002) (granting a motion to withdraw the reference filed in the same bankruptcy case by another insurer).

As these cases make clear, Truck's adversary proceeding is a non-core proceeding.  Truck seeks a declaration of its rights under contracts of insurance that were issued decades before the bankruptcy petitions were filed.  The fact that some of the Insureds' breaches occurred post-petition in connection with negotiating the Joint Plan is of no moment.  The Insureds' alleged breaches of the contracts began before the bankruptcy petitions were filed and have continued post-petition.  Truck's claims arise under California law.  They do not seek relief under the Bankruptcy Code, and they are not claims that "would have no existence outside of the bankruptcy.'"  *See In re A.H. Robins* 86 F.3d at 372.  There is no necessary connection between a bankruptcy case and an action seeking a declaration under state law of an insurer's coverage obligations under pre-petition insurance contracts; insurers regularly seek declarations of their coverage obligations under insurance contracts in state-court proceedings unconnected to any

bankruptcy proceeding. Indeed, a coverage action seeking a declaratory judgment under pre-petition insurance contracts "bears no resemblance" to core proceedings. *In re G–I Holdings*, 278 B.R. at 382. There is no sense in which this case involves "public rights" created by Congress under federal law. *Contra Marathon*, 458 U.S. at 69–70. It is a quintessential "[p]rivate-rights dispute[]" involving the "adjudication of state-created private rights" under a contract. *Id.* at 71. As the Fourth Circuit has explained, "courts treating pre-petition contract-based claims as 'core' proceedings pay insufficient attention to the public rights/private rights distinction which was a key aspect of *Northern Pipeline*." *In re Apex Exp. Corp.*, 190 F.3d 624, 632 (4th Cir. 1999)

The few cases to reach a contrary result are inapplicable here. In *U.S. Lines*, the Second Circuit held that a coverage dispute was a core proceeding because the insurance coverage was so essential to the estate's ability to pay claims that the coverage dispute's effect on the administration of the estate was bound to be significant. *See* 197 F.3d at 638–39. There, however, the proceeds of the insurance policies represented "the only potential source of cash available to" personal injury claimants. *Id.* at 638. In addition, the insurance contracts contained a "pay first" provision that required the debtor to pay out personal-injury claims before it could obtain coverage. *Id.* at 635. If the debtor paid out the claims only to learn later that the insurance contracts did not cover the claims, "the result would be an inequitable distribution among the creditors," so the proceedings to determine coverage "directly affect[ed] the bankruptcy court's core administrative function of asset allocation among creditors" and therefore were core proceedings. *Id.* at 639. Neither of those circumstances is present here. There is no "pay first" provision in the insurance contracts between Truck and the Insureds, so the resolution of this coverage proceeding will not have the same kind of direct effect on the allocation of assets among creditors. And Truck's coverage is not essential to the payment of the Insureds' asbestos claimants. The Insureds' Joint

Plan specifically contemplates the possibility that the Insureds might lose their coverage due to a

violation of the duty to cooperate and provides that, in that event, the Insureds will assume the

obligation to pay asbestos claims and their parent, Lehigh Hanson, will guarantee that obligation.

Lehigh Hanson is solvent and part of an international conglomerate known as HeidelbergCement

Group.  There is no reason to believe that Lehigh Hanson cannot assume the asbestos payment

obligations in full.  Finally, *U.S. Lines* has little persuasive value to this Court: the Fourth Circuit

and the Second Circuit have adopted different tests for determining what constitutes a core

proceeding:  The Second Circuit has "held that 'core proceedings' should be given a broad

interpretation," *In re U.S. Lines*, 197 F.3d at 636–37, while the "Fourth Circuit has cautioned

against an expansive reading" of "what constitutes a core proceeding," *Bowles*, 2012 WL 6628953,

at *5.  The broader, more flexible test the Second Circuit applied in *U.S. Lines* looks to factors that

are irrelevant under the Fourth Circuit's more restrictive test.  *In re G-I Holdings*, 278 B.R. at 382.[3]

   *In re American Capital Equipment, LLC*, 325 B.R. 372 (W.D. Penn. 2005), is likewise

---

[3] While *G-I Holdings* applies Third Circuit law, the Third Circuit and the Fourth Circuit have
adopted the same test (borrowed from the Fifth Circuit's decision in *In re Wood*) for determining
whether a proceeding is core or non-core.  *Compare id.* at 380 (quoting *Wood*), *with  In re A.H.
Robins,* 86 F.3d at 372 (quoting *Wood*).

   The court in *In re Celotex Corp.*, 152 B.R. 667 (Bankr. M.D. Fla. 1993) also based its core–
non-core determination on a factor the Fourth Circuit has expressly rejected.  *Celotex* was an action
seeking a declaratory judgment of coverage under various pre-petition insurance policies, *id.* at
670, and the court concluded that the action was core because the insurance "policies and proceeds,
especially considering their intended use to fund the major class of Debtor's claimants, are property
of the estate under § 541 of the Bankruptcy Code," *id.* at 675.  The Court explained that its "finding
that the insurance policies are property of the estate raises the presumption this adversary
proceeding is a core proceeding. This presumption is the credenda"—*i.e.*, the central tenet—"of
this entire [core–non-core] analysis."  *Id.* at 676.  But the "Fourth Circuit has specifically declined
to treat pre-petition contract claims as core merely because they 'are in some sense the property of
the bankruptcy estate and because the outcome of the claims will affect the bankruptcy estate (by
altering its size)."  *Bowles*, 2012 WL 6628953, at *7 (brackets omitted) (quoting *In re Apex
Express Corp.,* 190 F.3d at 632).  In addition, and as explained above, Truck's coverage is not
essential to the payment of the asbestos claims against the Insureds.

inapposite.  There, an insurer filed an adversary proceeding alleging that the debtor had forfeited

insurance coverage for asbestos claims because (a) the debtor had breached the insurance policy

by negotiating a consensual reorganization plan with the asbestos claimants and (b) the plan itself

and the trust disposition procedures violated various terms of the policies.  *Id.* at 374.  The district

court concluded that the adversary proceeding was core because the insurer "had framed the issues

in its declaratory judgment complaint such that the claims and rights that it asserts could arise only

in the context of this bankruptcy case" by claiming that it would be "excused from its duty to

defend and indemnify [the debtor] *only if* [the debtor's] actions in negotiating and formulating a

plan of reorganization in the bankruptcy case violate the insurance policies."  *Id.* at 376 (emphasis

added).[4]  Here, by contrast, Truck does not assert that the Insureds' negotiation of a plan with the

asbestos claimants was in and of itself a violation of the insurance policies.  Indeed, the acts that

give rise to the challenges to coverage include acts that pre-date the filing of the bankruptcy

petition.  And in any event, by focusing on the factual underpinnings of the claim at issue rather

than on the legal nature of the claim, *American Capital Equipment* misapplied the test for

---

[4]  Even after reaching this conclusion, though, the court's holding was limited and provisional.  Acknowledging that the case could not be tried to a jury before the bankruptcy court, the district court left the reference in place only until the case was ready for trial.  *See* 325 B.R. at 378.  But the adversary proceeding in *American Capital Equipment* never advanced beyond the pleadings stage because the bankruptcy court converted the case to chapter 7 after finding that the debtors' plan was not in good faith.  The court so ruled because, among other things, the plan was the product of a collusive agreement between the debtor and the asbestos claimants that violated the terms of the insurance policies.  *See In re Am. Capital Equip.* 688 F. 3d 145, 158-61 (3rd. Cir. 2012).  The district court affirmed.  The Third Circuit agreed that "collusive plans are not in good faith and do not meet the good faith requirement of §1129(a)(3)."  *Id.* at 158.  The court further found that although it was not convinced that the plan was collusive because the insurers had not pointed to any evidence of an agreement to defraud the insurers, the agreement nevertheless created an inherent conflict of interest that rendered the plan not in good faith and therefore not confirmable.  *Id.*  Here, having already acknowledged that their deal with the claimants was designed to shield them but not the insurers from a resumption of the fraud, the Debtors have all but admitted that their plan is based upon a collusive agreement.

determining whether a proceeding is core or non-core and therefore is not persuasive.

Because Truck's state-law breach-of-contract claims in this adversary proceeding neither arise under Title 11 nor arise in a case under Title 11, they are non-core.  And their status as non-core claims weighs heavily in favor of a withdrawal of the reference.  *See, e.g.*, *Tavenner v. Sigler*, No. 3:17-cv-502, 2018 WL 1511733, at *6 (E.D. Va. Mar. 27, 2018) ("The core/non-core factor, although not dispositive, carries profound weight . . . because 'it is upon this issue that questions of efficiency and uniformity will turn'" (quoting *In re Orion Pictures*, 4 F.3d at 1101)); *In Re Coe–Truman Techs., Inc.*, 214 B.R. 183, 187 (N.D. Ill. 1997) ("whether the adversary proceeding sought to be withdrawn is core or non-core" is the "most important of" the discretionary-withdrawal factors); *Admiral Ins. Co. v. SONICblue Inc.*, No. 07-4185, 2008 WL 2543360, at *3 (N.D. Cal. June 20, 2008) ("where non-core issues predominate judicial efficiency is served by withdrawal").

**B.**     **All Other Factors Courts Assess to Determine Whether to Withdraw the Reference Favor Withdrawal.**

Aside from the non-core nature of the claims, courts in the Fourth Circuit assess several additional factors in determining whether to withdraw the reference, and each one favors withdrawal of the reference in this case.  Withdrawal would not adversely affect the uniform administration of the bankruptcy proceedings, all while expediting the bankruptcy process, promoting judicial economy, fostering the efficient use of the parties' resources, reducing forum shopping, and preserving Truck's constitutional right to a jury trial.

**1.**     **Withdrawal would not adversely affect the uniform administration of the bankruptcy proceedings because the adversary proceeding does not raise substantive issues of bankruptcy law.**

None of the claims in this adversary proceeding invoke substantive bankruptcy law. Rather, Truck seeks a declaratory judgment that the Insureds breached both the insurance policies' express condition that the Insureds assist and cooperate with Truck and the policies' implied

covenant of good faith and fair dealing.  Resolving these claims—each grounded in policies pre-dating the bankruptcy petition—will turn solely on application of state-law contract principles; bankruptcy law will have no bearing.  And "where the causes of action involve exclusively or almost exclusively state law and non-bankruptcy federal law issues, courts in this Circuit have held adjudication of the adversary complaint in district court will not result in the uneven administration of bankruptcy proceedings."  *In re Dozier Fin.*, 2019 WL 1075072, at *5; *see also K V Oil & Gas, Inc. v. Ctr. Equities, Inc. (In re Three Rivers Cos.)*, No. 2:09-cv-00188, 2009 WL 2762062, at *4 (S.D. W. Va. Aug. 27, 2009) ("Withdrawing the reference certainly will not affect the uniform administration of bankruptcy law because the Complaint raises issues governed by non-title 11 law."); *Allen*, 2006 WL 3899997, at *2 (same).

### 2. Withdrawal would expedite the bankruptcy process and promote both judicial economy and efficient use of the parties' resources.

Having this Court preside over this adversary proceeding similarly makes sense from an efficiency perspective, for all involved.  "[J]udicial economy favors withdrawal in light of the early procedural posture of this case (i.e., prior to the beginning of discovery)"; indeed, an answer has yet to even be filed.  *In re Dozier Fin.*,, 2019 WL 1075072, at *5.  Because this adversary proceeding is before the Bankruptcy Court on reference, keeping it there "will ultimately require submission of proposed findings of fact and conclusion of law by the Bankruptcy Judge"—only for this Court to then undertake its own de novo review.  *McGuire v. Jim Walter Homes, LLC (In re McGuire)*, No. 5:13-mc-00128, 2013 WL 6628620, at *2 (S.D. W. Va. Dec. 16, 2013).  Truck "will likely incur extra cost and experience delays by having to multiply proceedings when initial findings made by the Bankruptcy Court are reviewed by the District Court."  *In re Dozier Fin.*, 2019 WL 1075072, at *5.  "Removing the reference now and, thus, facilitating this Court's earlier review, will promote judicial economy and facilitate the most efficient use of the parties'

resources." *In re McGuire*, 2013 WL 6628620, at *2; *see also In re Dozier Fin.*, 2019 WL 1075072, at *5 ("this extra cost and delay weighs in favor of withdrawal").[5]

Indeed, because Truck has demanded a jury trial—which must be heard by this Court absent the parties' consent—on all issues in this adversary proceeding, "expediting the bankruptcy process and promoting judicial economy is best served by withdrawing the case now, rather than waiting for the case to be ready for trial." *In re Dozier Fin.*, 2019 WL 1075072, at *5; *see also Blake v. Vanderbilt Mortg. & Fin., Inc. (In re Blake)*, No. 5:14-mc-00148, 2014 WL 7186934, at *6 (S.D. W. Va. Dec. 16, 2014) (because there was no consent to jury trial, or waiver of that right, "judicial economy, conservation of the parties resources, and preservation of the right to a jury trial weigh in favor of withdrawing the reference"); *In re Three Rivers Cos.*, 2009 WL 2762062, at *4 ("As argued by XTO, because this court must necessarily conduct the jury trial, withdrawing the reference would promote judicial economy and more efficiently use the parties' resources."). Though this Court could "continue the referral for pretrial matters and then withdraw reference for the conduct of the trial," this is "not . . . an efficient use of judicial resources"—"[s]uch a scenario could lead to repeated requests for *de novo* review by this Court and thus give rise to unnecessary costs and delay. *Harleysville Mut. Ins. Co. v. Hill (In re Hammocks, LLC)*, No. 1:09-cv-377, 2010 WL 3783952, at *4 (W.D.N.C. Sept. 28, 2010); *see also In re Babcock & Wilcox*, 2001 WL 1018366, at *6 ("Resolution of the insurance issues in one proceeding before this Court will obviate the inevitable appeal of the bankruptcy court's ruling and will bring the matter to a more expeditious resolution."). Moreover, the bankruptcy case has been ongoing for three years, and

---

[5] *Allen*, 2006 WL 3899997, at *2 ("Because it is a non-core proceeding, the bankruptcy court's decision would be subject to de novo review in this court. [Fed. R. Bankr. P.] § 157(c)(1). Therefore, withdrawing the reference would promote judicial economy and more efficiently use the parties' resources.")

3A04433

nothing will prevent its continuance while this Court resolves the adversary proceeding. *In re Dozier Fin.*, 2019 WL 1075072, at *5 ("Further, the bankruptcy case has been ongoing for three years, and can proceed while this case is before this Court.").

### 3. Withdrawal would not increase the risk of forum shopping.

When Truck "issued the insurance polic[ies] in question, it had no reason to believe that any disputes stemming from it would be resolved in bankruptcy court; thus, there is no danger of forum shopping." *In re Hammocks*, 2010 WL 3783952, at *4; *see also McMahon v. Providence Capital Enters., Inc. (In re McMahon)*, 222 B.R. 205, 208 (S.D.N.Y. 1998) ("Forum shopping would not be encouraged by granting the Defendant's motion as this case involves a non-core proceeding that could have and probably should have been brought in a district court originally."). Truck's "exercise of its right to engage in motion practice before this court does not constitute forum shopping." *In re Blake*, 2014 WL 7186934, at *6. Rather, Truck simply has "a desire for one court to hear and oversee the entire adversary proceeding"—the court bearing ultimate responsibility for overseeing resolution of, and entering judgment on, Truck's claims. *In re Dozier Fin.*, 2019 WL 1075072, at *5. And, as set forth below, only this Court can conduct a jury trial.

### 4. Withdrawal will preserve Truck's constitutional right to a jury trial on its declaratory-judgment claims.

As district courts—including those in this Circuit—have found, "the right to a jury trial, coupled with the [party's] refusal to consent to a jury trial in the bankruptcy court, weighs heavily in favor of withdrawing the reference." *In re Dozier Fin.*, 2019 WL 1075072, at *5. Indeed, some courts have found that an adversary proceeding consisting entirely of non-core claims with a demand for a jury trial may create cause to withdraw the reference independent of the other factors. *See, e.g., Joseph DelGreco & Co. v. DLA Piper (In re Joseph DelGreco & Co.)*, No. 10-cv-6422, 2011 WL 350281 at *4 (S.D.N.Y. Jan. 26, 2011) (noting that in this scenario, a district court may

Case 1:16-31608 Doc 2072-6 Filed 02/24/20 Entered 02/24/20 17:20:43 Desc
Memorandum of Law Page 34 of 36
Case 3:19-cv-00467-GCM Document 1-1 Filed 09/20/19 Page 29 of 31

find the inability of the bankruptcy court to hold the trial constitutes cause to withdraw the

reference); *Wellman Thermal Sys.*, 2005 WL 4880619, at *3 ("the right to a jury trial is sufficient

cause to withdraw the reference to the bankruptcy court" (citing *In re Grabill Corp.,* 967 F.2d

1152, 1156 (7th Cir. 1992))).

The claims Truck asserts in this adversary proceeding—one alleging breach of contract

(*i.e.*, the policies) and another the breach of the implied covenant of good faith and fair dealing

inherent in that contract—are fundamentally "legal" claims as to which there is a Seventh

Amendment right to jury trial.  That Truck's requested relief takes the form of various declaratory

judgments concerning the Insureds' breaches does deprive the claims of their "legal" status.  As

the Supreme Court has cautioned, "[t]he fact that the action is in form a declaratory judgment case

should not obscure the essentially legal nature of the action."  *Simler v. Conner*, 372 U.S. 221, 223

(1963).  Instead, the question is "whether there would have been a right to a jury trial had the action

proceeded without the declaratory judgment vehicle."  *In re Lockheed Martin Corp.*, 503 F.3d 351,

355 (4th Cir. 2007).  If the claims would have nonetheless materialized as breach-of-contract suits

absent the declaratory action, the right to a jury trial attaches to the declaratory action in the first

instance.  *See, id.*, at 359–60 (holding that right to jury trial attached to declaratory action seeking

declaration of rights under insurance contract); *see also NACM-New England, Inc. v. Nat'l Ass'n

of Credit Mgmt., Inc.*, 927 F.3d 1, 8 (1st Cir. 2019) ("An order of declaratory relief on a claim for

breach of contract is essentially legal in nature.  Thus, by entering the declaratory judgment on the

breach of contract claim without a jury trial, the District Court violated NACM's Seventh

Amendment rights.").[6]  Accordingly, in the context of the bankruptcy proceedings, where the

---

[6]    *Terry v. Chauffeurs, Teamsters & Helpers, Local 391*, 863 F.2d 334, 335–39 (4th Cir. 1988), *aff'd,* 494 U.S.
558 (1990) (holding that right to jury trial attached to declaratory action that "raise[d] legal issues that may well require
both a determination by the court of the meaning of the collective bargaining agreement and a resolution by the jury
of disputed facts concerning whether that agreement was breached"); *Collier v. Land & Sea Rest. Co.*, LLC, No. 7:13-

"cause of action which forms the basis for the declaratory judgment count is breach of a prepetition contract, . . . a jury trial right attaches." *Nickless v. Haws & Mill Street, Inc. (In re Fusco)*, No. 10-46416, 2013 WL 2477268, at \*5 (Bankr. D. Mass. June 10, 2013).

## CONCLUSION

For all of these reasons, the Court should withdraw the reference.

---

cv-0104, 2015 WL 4873300, at \*1 (W.D. Va. Aug. 13, 2015) (holding that right to jury trial attached to declaratory-judgment claim seeking declaration of duty to defend and indemnify under a contract because "claims for breach of contact are historically 'legal'"); *Celanese Acetate, LLC v. Lexcor, Ltd.*, 632 F. Supp. 2d 544, 551 (W.D.N.C. 2009) (stating in the context of a declaratory-judgment action, "This action being a basic dispute over contract interpretation, Defendant has the right to a trial by jury if it so desires.").

Case 16-31602  Doc 2072-6  Filed 09/24/20  Entered 09/24/20 17:20:43  Desc
Case 3:19-cv-00467-GCM  Document 1-1  Filed 09/20/19  Page 36 of 31
Memorandum of Law  Page 36 of 36

Respectfully submitted,

Dated: September 19, 2019

*/s/ Michael L. Martinez*
GRIER WRIGHT MARTINEZ, PA
Michael L. Martinez (N.C. State Bar No. 39885)
101 North Tryon Street, Suite 1240
Charlotte, NC 28246
Phone:  (704) 332-0209; Fax:  (704) 332-0215
Email:  mmartinez@grierlaw.com

– and –

GIBSON, DUNN & CRUTCHER LLP
Michael A. Rosenthal (admitted *pro hac vice*)
Robert B. Krakow (admitted *pro hac vice*)
Alan Moskowitz (admitted *pro hac vice*)
Matthew G. Bouslog (admitted *pro hac vice*)
Dylan S. Cassidy (admitted *pro hac vice*)
200 Park Avenue
New York, NY 10166-0193
Phone:  (212) 351-4000; Fax:  (212) 351-4035
Email:  MRosenthal@gibsondunn.com
Email:  RKrakow@gibsondunn.com
Email:  AMoskowitz@gibsondunn.com
Email:  MBouslog@gibsondunn.com
Email:  DCassidy@gibsondunn.com

– and –

PIA ANDERSON MOSS HOYT, LLC
Scott R. Hoyt (admitted *pro hac vice*)
136 E. South Temple, 19th Floor
Salt Lake City, UT 84111
Phone: (817) 454-5678; Fax: (801) 350-9010
Email: SHoyt@pamhlaw.com

*Counsel for Truck Insurance Exchange*

# EXHIBIT G

JA04438

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division
Case No. 3:19-CV-467-GCM**

| | |
|---|---|
| In re | Bankruptcy Case No. 16-31602 |
| KAISER GYPSUM COMPANY, INC., et al., | Chapter 11 |
| Debtors. | (Jointly Administered) |
| TRUCK INSURANCE EXCHANGE | Adversary Proceeding No.: 19-3052 |
| Plaintiff, | |
| v. | |
| KAISER GYPSUM COMPANY, INC. and HANSON PERMANENTE CEMENT, INC., | |
| Defendants. | |

<u>**REPLY IN SUPPORT OF MOTION FOR RECONSIDERATION OF STAY ORDER**</u>

Truck Insurance Exchange ("***Truck***") hereby files this reply in support of its motion for reconsideration of the Court's *sua sponte* order staying this adversary proceeding (the "***Motion for Reconsideration***") and respectfully states as follows:[1]

The central question presented by Truck's Motion for Reconsideration is a question of timing: When should the determination be made of whether the coverage dispute that gives rise to this adversary proceeding—Truck's request for a declaratory judgment that Defendants have breached the insurance policies issued by Truck, thereby forfeiting their coverage under those policies—is a non-core matter on which Truck has a constitutional right to trial by jury? The better approach, by far, would be for this Court to make that determination now. After all, if the Stay

---

[1] Capitalized terms used and not otherwise defined herein have the meanings ascribed to them in the Motion for Reconsideration.

Order remained in place, the determination of whether this adversary proceeding raises non-core issues that must be tried to a jury would not be made until the confirmation hearing. Postponing that determination until confirmation would create a significant risk of inefficiency, delay, and prejudice—regardless of what the Bankruptcy Court determined at confirmation.

On the one hand, Defendants suggest that "[i]f the Bankruptcy Court finds a right to a jury trial exists, Truck's claims will be brought before this Court." Debtors' Response to Truck Insurance Exchange's Motion for Reconsideration of Stay Order ("***Response***") at 3. But if the Bankruptcy Court made that finding at the confirmation hearing, confirmation would have to be postponed until a jury trial could be held in this Court. The result would be months of delay—delay that could easily be prevented by allowing this adversary proceeding to proceed in parallel to the confirmation process so that the coverage dispute can be resolved at or near the same time as the confirmation hearing.

On the other hand, Defendants suggest that "[i]f the Bankruptcy Court finds no right to a jury trial exists, Truck may raise the issue with this Court as part of its appeal of the confirmation order." Response at 3. But if the Bankruptcy Court erroneously determined that the issues presented here were core and adjudicated them as part of confirmation, only for this Court to determine that the issues were non-core, the issues would have to be tried again, in this Court—before a jury[2]—after the parties had already litigated the issues at the confirmation hearing.

Either way, the approach Defendants advocate would result in delay, duplicative proceedings, and a waste of party and judicial resources. In the end, Defendants' Response

---

[2] Defendants are mistaken to suggest that in the event this Court sided with Truck in a post-confirmation appeal, there would still be some benefit to the Bankruptcy Court's creating "a fully-developed record" on Truck's claims or issuing "proposed findings of fact" at confirmation. *Contra* Response at 3. Because Truck has a right to trial by jury on its state-law breach-of-contract claims, the record would have to be developed at trial, and any material facts would have to be found by a jury.

2

JA04440

suggests that the Court *could* postpone its ruling on the Motion to Withdraw the Reference, but it offers no compelling reason why the Court *should* do so. Why wait until after a confirmation hearing has taken place to get this Court's ruling on the jury-trial question? Why run the risk of a significant delay of confirmation while the adversary proceeding is tried in this Court? Why not avoid any prospect of having to redo some or all of the confirmation hearing if the Bankruptcy Court erroneously determines that Truck is not entitled to a jury trial? The more efficient, sensible, and pragmatic course is for this Court to lift the stay and decide the Motion to Withdraw the Reference now, well in advance of confirmation.

I. **The Court may reconsider the Stay Order under Federal Rule of Civil Procedure 54(b) and under its inherent authority to manage and control its docket.**

From the outset, Defendants erroneously frame the relevant inquiry by invoking an inapposite legal standard. The Stay Order is an interlocutory ruling, not a final judgment. Thus, Defendants' reliance on Federal Rule of Civil Procedure 59(e)—which by its terms addresses only "motion[s] to alter or amend a *judgment*" (emphasis added)—is misplaced. As the Fourth Circuit has explained, "[m]otions for reconsideration of interlocutory orders are not subject to the strict standards applicable to motions for reconsideration of a final judgment." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514 (4th Cir. 2003); *accord Saint Anne's Dev. Co. v. Trabich*, 443 F. App'x 829, 831–33 (4th Cir. 2011) (a district court's discretion "to reconsider or modify interlocutory rulings . . . is not cabined by the heightened standards for reconsideration governing final orders" (internal quotation marks omitted)).

Instead, Rule 54(b) supplies the applicable standard: "any order or other decision … that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties … may be revised at any time before the entry of a judgment." Fed. R. Civ. P. 54(b); *accord Am. Canoe Ass'n*, 326 F.3d at 514–15. To be sure, the Fourth Circuit has held that the standard under

3

JA04441

Rule 54(b) for reconsideration of interlocutory orders that resolve questions of law and thereby establish the law of the case "closely resembles the standard applicable to motions to reconsider final orders pursuant to Rule 59(e)." *Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017). But generally speaking, "Rule 54(b)'s approach involves broader flexibility to revise interlocutory orders before final judgment." *Id.*; *Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1473 (4th Cir. 1991) ("Interlocutory orders ... are left within the plenary power of the court that rendered them to afford such relief from them as justice requires." (cleaned up)).

A district court's discretion to reconsider an interlocutory order is at its broadest where, as here, the order relates to the court's inherent authority to manage and control its own docket. *See, e.g.*, *Clinton v. Jones*, 520 U.S. 681, 706–07 (1997) ("The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket."). The district courts' discretionary "control over management of their dockets" "is and must be particularly broad" and "wide-ranging." *United States v. Janati*, 374 F.3d 263, 273 (4th Cir. 2004). And here, the Court entered the Stay Order *sua sponte*, without receiving briefing from the parties. There is no difference between the Motion for Reconsideration and a motion to lift the stay, and "the decision to grant or lift a stay is committed to the sound discretion of the Court," *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 2011 WL 334477, at *2 (W.D. Pa. Jan. 31, 2011); *accord Follis v. Minnesota*, 2009 WL 3644843, at *2 (D. Minn. Oct. 30, 2009); *In re Blackwell*, 162 B.R. 117, 119 (E.D. Pa. 1993). Thus, the Court has authority to reconsider the Stay Order on any grounds it sees fit, including the grounds of economy and efficiency raised in the Motion for Reconsideration.

## II. Defendants' arguments against withdrawing the reference are irrelevant to the Motion for Reconsideration and, in any event, unpersuasive.

Defendants' Response does not seriously dispute that considerations of efficiency and sound docket management weigh heavily in favor of lifting the stay. In fact, Defendants devote

the bulk of their Response to arguing the core-vs-non-core and jury-trial issues raised in the Motion

to Withdraw the Reference.  In doing so, Defendants only prove Truck's point:  Those issues

should be considered and decided now.  By focusing more than half of their Response on the core-

vs.-non-core determination, Defendants acknowledge the central importance of that determination.

That importance is precisely why the Court should lift the stay and take up the issues presented by

the Motion to Withdraw the Reference before the bankruptcy cases proceed to confirmation.

But the Court should not decide those issues based on truncated briefing on a motion for

reconsideration.  The Court should lift the stay so that the parties can fully brief and argue the

issues presented in the Motion to Withdraw the Reference.  Nonetheless, out of an abundance of

caution in the event that Court decides to address those issues now, Truck responds here to the

arguments raised in the Response that go to the merits of the Motion to Withdraw the Reference.

A.     **Truck's claims must be resolved in an adversary proceeding.**

Federal Rule of Bankruptcy Procedure 7001(2) *requires* an adversary proceeding to

determine the "validity, priority, or extent of a lien or other interest in property." Fed. R. Bankr.

P. 7001(2).  Defendants are wrong to assume that Bankruptcy Rule 7001(2) would apply only if

Truck were challenging Defendants' ownership of the insurance policies Truck issued to insure

certain of Defendants' asbestos bodily injury claims.  Defendants claim a contractual right to

receive the benefit of insurance proceeds under the insurance policies issued by Truck.  It is

hornbook law that a "contractual right to receive property is itself a property right." *United States*

*v. Nat'l Bank of Commerce*, 472 U.S. 713, 725 (1985) (quotation omitted); *Blanchette v. Conn.*

*Gen. Ins. Corps.*, 419 U.S. 102, 135 (1974) (rights conferred on "the beneficiaries" of "insurance

contracts" are "vested property rights"); *In re Marriage of Brown*, 544 P.2d 561, 565 (Cal. 1976)

("a contractual right" is "a form of property").  By alleging that Defendants' breaches of their

duties under the insurance policies have vitiated the policies and forfeited any right to coverage, Truck's breach-of-contract claims challenge the validity of Defendants' rights under the policies. Complaint (ECF 1) ¶¶ 3, 65–68, 75–77.  Because those rights are a species of property, Bankruptcy Rule 7001(2) requires Truck's challenge to the existence and legitimacy of that right to be resolved in an adversary proceeding.  *Cf. In re Hill*, 166 B.R. 444, 445 (Bankr. D.N.M. 1993) ) (a claim seeking "a declaration that a [an interest in property] is void" seeks a determination of "the validity of" that property interest within the meaning of Bankruptcy Rule 7001(2)).[3]

Defendants' reliance on *In re U.S. Brass Corp.*, 110 F.3d 1216 (7th Cir. 1997), is misplaced.  In *U.S. Brass*, the insurers did not challenge the debtor's property interest in coverage under the policies; they merely contended that the policies did not apply to the liabilities at issue. *See id.* at 1264.  The dispute concerned the scope of the debtor's right to coverage under the insurance policies, *id.* at 1268, not the validity of the policies themselves.  Here, by contrast, Truck's claims challenge the validity of Defendants' claimed property rights under the insurance policies, bringing Truck's claims within the scope of Bankruptcy Rule 7001(2).  *Cf. In re Beard*, 112 B.R. 951, 955 (Bankr. N.D. Ind. 1990) (a challenge to "the existence or legitimacy of the [property interest] itself" is a challenge to "the validity of [an interest in property]").[4]

### B.    Truck's state-law claims for breach of pre-petition contracts are non-core.

Truck's state-law claims for breach of contracts that were formed pre-petition are plainly

---

[3] This is why coverage disputes are routinely brought and decided as adversary proceedings. *See, e.g.*, *In re Lenders Abstract & Settlement Serv.*, 439 B.R. 365, 390 (E.D.N.Y. 2013); *BCE West, L.P.*, 2006 WL 8422206 at *5 (D. Ariz. Sept. 20, 2006); *In re Spree.com Corp.*, 2012 WL 1586274, at *1 (E.D. Pa. June 20, 2002).

[4] There is no merit to Defendants' brief contention—pressed only in a footnote and not supported by any citation to authority—that Truck has waived its right to a jury trial by filing proofs of claim in the underlying bankruptcy cases. *Contra* Response at 7 n.8. Truck has proofs of claim on unrelated issues, not on the breach-of-contract claims at issue here, and therefore has done nothing to voluntarily submit those claims to the Bankruptcy Court's equitable jurisdiction. *See generally Germain v. Conn. Nat'l Bank*, 988 F.2d 1323, 1327–28 (2d Cir. 1993).

non-core.  Claims are "core" only if they are "proceedings arising under title 11" or proceedings

"arising in a case under title 11."  28 U.S.C. § 157(b)(1).  Defendants do not seriously contend that

Truck's claims arise under title 11.  The Response makes the conclusory assertion that Truck's

claims "arise under the Bankruptcy Code" (Response at 14), but that assertion—which is supported

by neither argument nor authority—is wrong.  "Congress used the phrase 'arising under title 11'

to describe those proceedings that involve a cause of action created or determined by a statutory

provision of title 11," *Wood v. Wood (In re Wood)*, 825 F.2d 90, 96 (5th Cir. 1987), and Truck's

breach-of-contract claims were created by, and will be determined under, California law.

Instead, Defendants contend that Truck's claims arise in a case under title 11.  *Id.*  But

Defendants' explanation of why these claims arise in a case under title 11—that some of the

conduct through which Defendants breached the Truck Policies "occurred in connection with the

Debtors' Bankruptcy Cases, including their negotiating, prosecuting, and (if confirmed)

consummating the Joint Plan (Response at 9)—misfires both on the law and on the facts.

On the law, the test for whether a claim arises in a case under title 11 focuses on the legal

nature of the claim, not on the claim's factual underpinnings:  Core claims are those that "depend

on the bankruptcy *laws* for their existence."  *In re Wood*, 825 F.2d at 96 (emphasis added).[5]  To

meet this test, the claim must be one "that, *by its nature*, could arise only in the context of a

bankruptcy case."  *Id.* at 97 (emphasis added).  Thus, if a claim could have arisen in a non-

bankruptcy context, the fact that it happened to arise in the context of a particular bankruptcy case

does not make it a claim "arising in a case under title 11."  *See* 28 U.S.C. § 157(b)(1).  Some of

Defendants' breaches may have occurred during the Bankruptcy Cases, but that does not change

---

[5] The Fourth Circuit adopted *Wood*'s core-vs-non-core test in *Bergstrom v. Dalkon Shield Claimants Trust (In re A.H. Robins Co.)*, 86 F.3d 364, 372 (4th Cir. 1996).

7

the fact that Truck's claims are state-law claims for breach of pre-petition contracts. The Response does not even attempt to address the many cases cited in the Motion to Withdraw the Reference that hold that such claims are non-core. *E.g.*, *In re Babcock & Wilcox Co.*, No. 01-1187, 2001 WL 1018366 (E.D. La. July 2, 2001) (adversary proceeding was non-core where insurers sought a declaration that the debtor's conduct during a chapter 11 proceeding forfeited its insurance coverage for asbestos claims); *see also* Motion to Withdraw the Reference at 13–16 & n.2.

On the facts, Defendants incorrectly assert that "each alleged breach of the Truck Policies occurred in connection with the Debtors' Bankruptcy Cases." Response at 9. Truck's complaint alleges that Defendants' first breach of the Truck Policies occurred *before* the Bankruptcy Cases were filed. *See* Complaint ¶ 37. And it is well-settled that "an action 'involving pre-petition contracts, allegedly breached both before and after the filing of the petition, is entirely a non-core matter." *G-I Holdings, Inc. v. Hartford Accident & Indemn. Co. (In re G-I Holdings Inc.)*, 278 B.R. 376, 383 (Bankr. D. Del. 2002) (quoting *Beard v. Braunstein*, 914 F.2d 434, 445 (3d Cir. 1990)). As the Fourth Circuit has emphasized, "courts treating pre-petition contract-based claims as 'core' proceedings pay insufficient attention to the public rights/private rights distinction which was a key aspect of *Northern Pipeline*." *In re Apex Exp. Corp.*, 190 F.3d 624, 632 (4th Cir. 1999).

The primary authority on which Defendants rely—*In re American Capital Equipment, LLC*, 325 B.R. 372 (W.D. Penn. 2005)—is inapposite for the reasons explained in the Motion to Withdraw the Reference. *See* Mem. of Law [ECF No. 1-1] at 17–19. Most simply, and as explained above, Truck's claims against Defendants rely on events that occurred both pre- and post-petition. "The reasoning of *American Capital*" is "not dispositive" where, as here, the insurer "asserts that its defenses to coverage are not based exclusively on events that occurred during these bankruptcy proceedings." *In re Longview Power, LLC*, 515 B.R. 107, 115 (Bankr. D. Del. 2014).

In addition, *American Capital* erred by basing its core-vs-non-core determination on the factual circumstances of the claims rather than on their legal nature. As such, its reasoning is not persuasive, and this Court should not follow it. Finally, in *American Capital* the insurer's theory was that the debtor had breached its insurance policies simply by "negotiating independently with the asbestos claimants" over a "consensual plan" of reorganization. 325 B.R. at 374. On that theory, it would have been impossible for the debtor to reorganize under Chapter 11 without breaching its insurance policies, and any claim based on that theory of breach could only arise in a Chapter 11 case. Here, Truck's theory of breach is specific to the fraudulent and collusive nature of Defendants' negotiations with the ACC and the FCR (had Defendants negotiated a non-collusive plan that protected Truck from fraud, there would have been no breach), and claims based on that theory could arise in a variety of contexts (fraudulent and collusive agreements with litigation adversaries violate the Truck Policies regardless of where they are made).

Finally, there is no merit to Defendants' contention that Truck's claims are core because the Bankruptcy Court will have to resolve Truck's claims as part of the confirmation process. Response at 11–14. Truck *never* claimed that the Joint Plan was unconfirmable due to Defendants' breaches of the Truck-issued insurance policies. Nor did Truck contend that Defendants had breached the policies by failing to support Truck's plan. The truth of the matter is that it is Defendants who have attempted to wed the coverage issues with confirmation of the Joint Plan.

Truck consistently sought to postpone any issues relating to insurance coverage until *after* confirmation, in the hope that a consensual plan could be negotiated that would obviate any need to litigate coverage. The language quoted on page 12 of the Response was Truck's objection to purported insurance-neutrality language that *Defendants* inserted into the Joint Plan—language designed to prevent Truck from bringing post-confirmation coverage litigation alleging that

Defendants had breached the policies during the negotiation and drafting of the Joint Plan.  In other words, Truck objected to confirmation based not on Defendants' breaches of the Truck policies, but rather on the inclusion of language in the Joint Plan that would have impaired Truck's ability to litigate those breaches after confirmation.

After Truck raised this objection, Defendants went one step further and explicitly sought to force Truck to litigate all coverage issues at the confirmation hearing.  Defendants acknowledge that they injected the coverage dispute into the plan-confirmation process by making "resolution of Truck's [coverage] claims in the Debtor's favor [] a condition precedent to confirmation of the Joint Plan." *Id.* at 13.  What Defendants do not acknowledge is that they added this finding as a condition precedent to confirmation only *after* Truck objected to the Joint Plan's purported insurance-neutrality language.  Moreover, after Defendants inserted the coverage finding into the Joint Plan, Truck initiated this adversary proceeding to protect its right to a jury trial on the coverage issues (and not, as Defendants suggest at page 4 of the Response, because Truck had clairvoyant powers to predict how the Court would rule on the Disclosure Statement motions).

At bottom, then, Defendants assert that because Defendants (not Truck) asked the Bankruptcy Court to make a finding at confirmation that would resolve the coverage claims in Defendants' favor, Truck somehow waived its constitutional right to try those non-core claims before a jury.  But a debtor cannot take a non-core claim on which there is a Seventh Amendment right to trial by jury and transform it into a core claim to which no jury-trial right attaches simply by making resolution of the claim a condition precedent to confirmation.  To hold otherwise would eviscerate any meaningful constitutional limitation on the bankruptcy courts' jurisdiction.

<div align="center">**CONCLUSION**</div>

For all of these reasons, Truck respectfully requests that the Court grant the relief requested herein, reconsider, the Stay Order, and rule on the Motion to Withdraw the Reference.

<div align="center">10</div>

Respectfully submitted,

Dated: October 30, 2019

*/s/ Michael L. Martinez*

GRIER WRIGHT MARTINEZ, PA
Michael L. Martinez (N.C. State Bar No. 39885)
521 East Morehead Street, Suite 440
Charlotte, NC 28202
Phone:  (704) 332-0209; Fax:  (704) 332-0215
Email:  mmartinez@grierlaw.com

– and –

GIBSON, DUNN & CRUTCHER LLP
Michael A. Rosenthal (admitted *pro hac vice*)
Robert B. Krakow (admitted *pro hac vice*)
Alan Moskowitz (admitted *pro hac vice*)
Matthew G. Bouslog (admitted *pro hac vice*)
Dylan S. Cassidy (admitted *pro hac vice*)
200 Park Avenue
New York, NY 10166-0193
Phone:  (212) 351-4000; Fax:  (212) 351-4035
Email:  MRosenthal@gibsondunn.com
Email:  RKrakow@gibsondunn.com
Email:  AMoskowitz@gibsondunn.com
Email:  MBouslog@gibsondunn.com
Email:  DCassidy@gibsondunn.com

– and –

PIA ANDERSON MOSS HOYT, LLC
Scott R. Hoyt (admitted *pro hac vice*)
136 E. South Temple, 19th Floor
Salt Lake City, UT 84111
Phone: (817) 454-5678; Fax: (801) 350-9010
Email: SHoyt@pamhlaw.com

*Counsel for Truck Insurance Exchange*

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2019, the foregoing document was served on counsel

of record for Defendants through the Court's CM/ECF system.

_/s/ Michael L. Martinez_____
Michael L. Martinez

# EXHIBIT H

JA04451

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

| | |
|---|---|
| **In re** | **Case No. 16-31602** |
| **KAISER GYPSUM COMPANY, INC., et al.,**[1] | **Chapter 11** |
| **Debtors.** | (Jointly Administered) |

### TRUCK INSURANCE EXCHANGE'S FIRST SET OF REQUESTS FOR ADMISSIONS TO KAISER GYPSUM COMPANY, INC.

Truck Insurance Exchange ("Truck"), by and through undersigned counsel, hereby serves these First Requests for Admissions ("Requests") on Debtor Kaiser Gypsum Company, Inc. ("Kaiser"). Truck requests that Kaiser answer the following Requests in accordance with the definitions and instructions set forth below, separately and fully, in writing no later than 30 days after the date of service as required by Federal Rule of Civil Procedure 36, as made applicable to this proceeding by Federal Rules of Bankruptcy Procedure 3020(b)(1), 9014(c), and 7036.

### I. Instructions

1) Truck hereby requests admissions concerning the truth of each matter specifically identified below.

2) Each matter to which an admission is requested is admitted unless You serve upon Truck's counsel a written answer or objection addressed to each request separately, signed by You or Your counsel, under oath.

---

[1] The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Kaiser Gypsum Company, Inc. (0188); and Hanson Permanente Cement, Inc. (7313). The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

JA04452

3)      If You object to any request, You must state with specificity the reasons for each
such objection.

4)      If You do not admit a request, You must specifically deny each such request or set
forth in particular detail the reasons why You cannot truthfully admit or deny it.

5)      If You deny any request, the denial must fairly meet the substance of the request,
and when good faith requires You to qualify Your answer or deny only part of the matter of which
an admission is requested, You must specify so much of it as true and qualify or deny the
remainder.

6)      A refusal to admit or deny without a specific denial or detailed reasons why You
cannot truthfully admit or deny is the equivalent of an admission; if the truth can be reasonably
ascertained by reasonably inquiry, You must admit or deny each request separately.

7)      You may not give lack of information or knowledge as a reason for failure to admit
or deny unless You state that You have made reasonable inquiry and that the information known
or readily obtainable by You is insufficient to enable You to admit or deny the request.

8)      You may not object to a request simply because You consider the matter to be a
genuine issue for trial; You must deny the matter or set forth specific reasons why You cannot
admit or deny it.

9)      Answers to these requests that are untruthful or are not set forth with specificity do
not comply with the requirements of Rule 36 of the Federal Rules of Civil Procedure.

10)     A denial coupled with a general objection of doubtful import will constitute an
admission.

11)     If You fail to admit the truth of any matter set forth in any request below, and if
Truck ultimately proves the truth of any matter so identified below, Truck may apply to the Court

- 2 -

JA04453

for an Order requiring You to pay the reasonable expenses incurred in making that proof, including

reasonable attorney's fees.  The Court may make the Order unless it finds that there was a good

reason for Your failure to admit.

12)     If, in answering these Requests, you encounter any ambiguities when construing a

request, instruction, or definition, please set forth the matter that you find to be ambiguous and

explain the construction you used in responding.

## II.  Definitions

Notwithstanding any definition set forth below, each word, term, or phrase used in these

Requests is intended to have the broadest meaning permitted under the Federal Rules of

Bankruptcy Procedure and the Federal Rules of Civil Procedure.  As used in these Requests, the

following terms are to be interpreted in accordance with these definitions.

1)     The Definitions in Truck's First Set of Request for Production of Documents to

Kaiser, dated October 28, 2019, are incorporated by reference into and shall apply to these

Requests.

2)     "*Garlock* Decision" means the estimation ruling by Judge Luther Hodges in *In re

Garlock Sealing Technologies*, 504 B.R. 71 (Bankr. W.D.N.C. 2014) ("*Garlock*").

3)     "Garlock" means the debtor in *Garlock.*

4)     "*Maremont*" means the Chapter 11 reorganization proceeding for Maremont

Corporation, case no 1:19-bk-10118-LSS in the United States Bankruptcy Court for the District of

Delaware.

5)     "Fraudulent Claims" means claims brought by plaintiffs alleging exposure to

asbestos products in which evidence of plaintiff's exposure to asbestos products manufactured or

distributed by entities not named in the tort system cases has been suppressed because plaintiff's

- 3 -

JA04454

liabilities are being satisfied by trusts arising out of bankruptcy cases filed by those entities.

6)    "Disclosure Requirements" means the Additional Documentation and Information for Extraordinary Claim Review requirements set forth in Section 5.5(b)(2)(i-iv) of the Kaiser Gypsum Asbestos Personal Injury Trust Distribution Procedures ("TDP").

7)    "Cooperate" means to act or work together with another person(s) or entity(ies) for the purpose of achieving a shared objective.

8)    "Fraud Prevention Procedures" means procedures similar to those agreed to and approved in *Garlock* and *Maremont*, which, among other things: (A) require identification of and information concerning other claims filed or resolved which relate to the claims asserted against the 524(g) trust; (B) require certifications under penalty of perjury by the claimant or the claimant's attorney that a full investigation has been made of the injuries that form the basis of the claim against the trust  and that no basis exists to bring additional claims against any entity not identified; (C) require execution of a release-of-information form authorizing all other asbestos trusts to release to the *Garlock* and *Maremont* trusts, respectively, all information submitted to the other trusts concerning the claimant; and (D) authorize the imposition of sanctions in the event that false or fraudulent information has been provided to the trust.

### III. Requests for Admission

1)    Admit that one of the reasons You selected the United States Bankruptcy Court for the Western District of North Carolina for the filing of the Chapter 11 Cases was that You believed that, like Garlock, You had been victimized in the tort system by suppression of evidence of plaintiffs' exposures to the asbestos products of entities whose asbestos liabilities were being resolved outside the tort system by trusts.

2)    Admit that before filing the Chapter 11 Cases in the United States Bankruptcy Court

- 4 -

for the Western District of North Carolina, You believed that there had been Fraudulent Claims

filed against You in the tort system, including claims by those seeking duplicative recoveries from

You and other manufacturers of asbestos-containing products or their 524(g) trusts.

3)      Admit that before You filed the Chapter 11 Cases, You believed that if the findings

in the *Garlock* Decision were applied to Your Chapter 11 Case, Your exposure to Fraudulent

Claims would be reduced.

4)      Admit that before You filed the Chapter 11 Cases, You believed that if the findings

in the *Garlock* Decision were applied to Your Chapter 11 Case, Truck's insurance liability for your

exposure to Fraudulent Claims would be reduced.

5)      Admit that in the course of discussions or negotiations with Truck before the filing

of the Chapter 11 Cases, Your attorneys represented to Truck that You intended to file the Chapter

11 Cases in the United States Bankruptcy Court for the Western District of North Carolina in part

to seek the benefit of application of the findings in the *Garlock* Decision.

6)      Admit that after you commenced negotiations with the ACC and the FCR, Truck

was never invited to participate, directly or indirectly, in any of the negotiations of the Joint Plan.

7)      Admit that the Disclosure Requirements were added to the TDP due to the Court's

stated concern about the absence of Fraud Prevention Procedures.

8)      Admit that the Disclosure Requirements are designed and intended to protect the

Trust against Fraudulent Claims

9)      Admit that in Your discussions with the ACC and the FCR about the Disclosure

Requirements, You did not request that the Disclosure Requirements or similar protections be

made applicable to claimants seeking to recover from Truck in the tort system.

10)     Admit that the type of information to be provided to the Trust under the Disclosure

- 5 -

Requirements would, if also provided to Truck by claimants who pursue their claims in the tort system, help protect Truck from Fraudulent Claims.

11)     Admit that at no time during the negotiation of the Joint Plan did You secure or attempt to secure any evidence of claimants' exposures to asbestos-containing products manufactured, sold, or distributed by entities other than You (or any of Your related entities) for use in the defense of Asbestos Bodily Injury Claims.

12)     Admit that during the negotiation of the Joint Plan, you, the ACC, and the FCR considered Truck to be a common enemy.

13)     Admit that since the conclusion of the negotiations that led to the Joint Plan, you, the ACC, and the FCR have treated Truck as a common enemy.

14)     Admit that You are Cooperating with the ACC in the Chapter 11 Cases.

15)     Admit that You are Cooperating with the FCR in the Chapter 11 Cases.

DATED: December 26, 2019          _/s/ Michael L. Martinez_____

GRIER WRIGHT MARTINEZ, PA
Michael L. Martinez (N.C. Bar No. 39885)
521 E. Morehead Street, Suite 440
Charlotte, NC 28202
Phone:  704/332.0209; Fax:  704/332.0215
Email:  mmartinez@grierlaw.com

—and—

GIBSON, DUNN & CRUTCHER, LLP
Michael A. Rosenthal (admitted *pro hac vice*)
Robert B. Krakow (admitted *pro hac vice*)
Alan Moskowitz (admitted *pro hac vice*)
Matthew G. Bouslog (admitted *pro hac vice*)
Dylan S. Cassidy (admitted *pro hac vice*)
200 Park Avenue
New York, NY 10166-0193
Phone:  (212) 351-4000; Fax:  (212) 351-4035

- 6 -

Email:  MRosenthal@gibsondunn.com
Email:  RKrakow@gibsondunn.com
Email:  AMoskowitz@gibsondunn.com
Email:  MBouslog@gibsondunn.com
Email:  DCassidy@gibsondunn.com

*Counsel for Truck Insurance Exchange*

JA04458

## CERTIFICATION OF SERVICE

I, Michael L. Martinez, hereby certify that on December 26, 2019, I served a copy of the foregoing discovery instrument by e-mail, as agreed to in writing by the recipients thereof, on counsel of record for the party to whom the discovery is addressed.


DATED: December 26, 2019             */s/ Michael L. Martinez*
                                      Michael L. Martinez

# EXHIBIT I

JA04460

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division**

| | |
|---|---|
| **In re** | **Case No. 16-31602** |
| **KAISER GYPSUM COMPANY, INC., et al.,[1]** | **Chapter 11** |
| **Debtors.** | (Jointly Administered) |

**TRUCK INSURANCE EXCHANGE'S FIRST SET OF INTERROGATORIES
TO KAISER GYPSUM COMPANY, INC.**

Truck Insurance Exchange ("Truck"), by and through undersigned counsel, hereby serves these First Set of Interrogatories ("Interrogatories") on Debtor Kaiser Gypsum Company, Inc. ("Kaiser").  Truck requests that Kaiser respond to the Interrogatories at the offices of Grier Wright Martinez, PA, 521 E. Morehead Street, Suite 440, Charlotte, NC 28202, Attention Michael Martinez, no later than 30 days after the date of service as required by Federal Rule of Civil Procedure 33, as made applicable to this proceeding by Federal Rules of Bankruptcy Procedure 3020(b)(1), 9014(c), and 7033.

## I.  Instructions

1)       The definitions, instructions, and rules of construction set forth in Federal Rule of Civil Procedure 33 are incorporated herein by reference.

2)       If, in responding to these Interrogatories, you encounter any ambiguities, your response shall set forth the matter deemed ambiguous and the construction used in responding.

---

[1]  The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  Kaiser Gypsum Company, Inc. (0188); and Hanson Permanente Cement, Inc. (7313).  The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

JA04461

3)      In construing these Interrogatories, the present tense includes the past and future tenses, the singular includes the plural, and the plural includes the singular.

4)      These Interrogatories are continuing in nature, up to and during the adversary proceeding.  Your response must be supplemented as you obtain or discover any additional information affecting your response.

5)      If you object to any part of the Interrogatories, answer all parts to which you do not object.

6)      If you cannot answer all or part of the Interrogatories in full after exercising due diligence to secure the full information to do so, so state and answer to the extent possible, specifying your inability to answer the remainder, stating whatever information or knowledge you have concerning the unanswered portion, and detailing what you did in attempting to secure the unknown information.

7)      If you are withholding a document or information under claim of privilege or the work product doctrine, please provide the basis for withholding the document or information and provide the information set for in Federal Rule of Civil Procedure 26(b)(5), which applies in adversary proceedings under Federal Rule of Bankruptcy Procedure 7026.

   a.  For documents:  If you are withholding the document or information under claim of privilege or the work product doctrine, please provide the information set forth in Fed. R. Civ. P. 26(b)(5), including the type of documents, the general subject matter of the document, including, where appropriate, the author, addressee, custodian, and any other recipient of the document, and where not apparent, the relationship of the author, addressee, custodian, and any other recipient to each other, in a manner that, without

- 2 -

revealing the information claimed to be protected, will enable the FTC to

assess the applicability of the privilege or protection claimed by you;

b.   For oral communications: (1) the name of the person making the

communication, the names of the person present while the communication

was made and, where not apparent, the relationship of the persons present to

the person making the communication, (2) the date and place of the

communication, and (3) the general subject matter of the communication.

8)      If you are withholding the document or information for any other reason than a

claim of privilege or the work product doctrine, provide the reason for withholding the

document.

9)      If a responsive document or information contains non-privileged material as well

as material you contend is privileged, you must disclose the non-privileged material to the fullest

extent possible without disclosing the privileged material.  You must clearly indicate the portions

of the document or information as to which privilege is claimed.  If you redact or alter a

document, identify the reason for the redaction or alteration.  Any redactions must be clearly

visible on the redacted document.

## II. Definitions

Notwithstanding any definition set forth below, each word, term, or phrase used in these

Interrogatories is intended to have the broadest meaning permitted under the Federal Rules of

Bankruptcy Procedure and the Federal Rules of Civil Procedure.  As used in these Interrogatories,

the following terms are to be interpreted in accordance with these definitions.

1)      The Definitions in Truck's First Set of Request for Production of Documents to

Kaiser, dated October 28, 2019, are incorporated by reference into and shall apply to these

JA04463

Requests.

2)      The Definitions in Truck's First Set of Request for Admission to Kaiser, dated December 26, 2019, are incorporated by reference into and shall apply to these Requests.

### III.  Interrogatories

1)      If Your response to RFA No. 1 was other than an unqualified admission, fully identify the basis for Your denial, including: the name, employment position, and contact information for persons with knowledge of facts relevant to Your denial; all reasons and/or facts showing why You selected the United States Bankruptcy Court for the Western District of North Carolina for the filing of the Chapter 11 Cases; and any other facts forming the basis for Your denial.

2)      If Your response to RFA No. 2 was other than an unqualified admission, fully identify the basis for Your denial, including: the name, employment position, and contact information for persons with knowledge of facts relevant to Your denial; any analysis by You before filing the Chapter 11 Cases concerning Fraudulent Claims against You, including any discussion about Fraudulent Claims; All Documents concerning the same; and any other facts forming the basis for Your denial.

3)      If Your response to RFA No. 3 was other than an unqualified admission, fully identify the basis for Your denial, including: the name, employment position, and contact information for persons with knowledge of facts relevant to Your denial (including any persons with knowledge of any pre-bankruptcy analysis or discussion by You related to or concerning the *Garlock* Decision and/or Fraudulent Claims against You); all pre-bankruptcy Documents and Communications analyzing or discussing Fraudulent Claims against You and/or the actual or

- 4 -

JA04464

potential impact of, or otherwise relating to, the *Garlock* Decision; and any other facts forming the basis for Your denial.

4)      If Your response to RFA No. 4 was other than an unqualified admission, fully identify the basis for Your denial, including the name, employment position, and contact information for persons with knowledge of facts relevant to Your denial and all facts forming the basis for Your denial.

5)      If Your response to RFA No. 5 was other than an unqualified admission, fully identify the basis for Your denial, including: the name, employment position, and contact information for persons with knowledge of facts relevant to Your denial; All Documents and Communications evidencing, related to, or concerning representations You made to Truck during Your pre-bankruptcy discussions or negotiations with Truck; and any other facts forming the basis for Your denial.

6)      If Your response to RFA No. 6 was other than an unqualified admission, fully identify the basis for Your denial, including: the name, employment position, and contact information for persons with knowledge of facts relevant to Your denial; All Documents and Communications evidencing, related to, or concerning an invitation to Truck to participate in or provide input, directly or indirectly, to the negotiation of the Joint Plan; and all facts forming the basis for Your denial.

7)      If Your response to RFA No. 7 was other than an unqualified admission, fully identify the basis for Your denial, including: the name, employment position, and contact information for persons with knowledge of facts relevant to Your denial; All Documents and Communications evidencing, related to, or concerning the addition of the Disclosure Requirements to the TDP; and all facts forming the basis for Your denial.

JA04465

8)      If Your response to RFA No. 8 was other than an unqualified admission, fully
identify the basis for Your denial, including: the name, employment position, and contact
information for persons with knowledge of facts relevant to Your denial; every purpose the
Disclosure Requirements are designed and intend to serve; and any other facts forming the basis
for your denial.

9)      If Your response to RFA No. 9 was other than an unqualified admission, fully
identify the basis for Your denial, including: the name, employment position, and contact
information for persons with knowledge of facts relevant to Your denial; All Documents and
Communications evidencing, related to, or concerning each request made by You that the
Disclosure Requirements apply to claimants seeking to recover from Truck in the tort system;
and any other facts forming the basis for Your denial.

10)      If Your response to RFA No. 10 was other than an unqualified admission, fully
identify the basis for Your denial, including the name, employment position, and contact
information for persons with knowledge of facts relevant to Your denial and all facts forming the
basis for Your denial.

11)      If Your response to RFA No. 11 was other than an unqualified admission, fully
identify the basis for Your denial, including: the name, employment position, and contact
information for persons with knowledge of facts relevant to Your denial; All Documents and
Communications evidencing, related to, or concerning evidence of claimants' exposures to
asbestos-containing products manufactured, sold, or distributed by entities other than You (or
any of Your related entities) that You secured or attempted to secure during the negotiation of
the Joint Plan; and any other facts forming the basis for Your denial.

- 6 -

JA04466

12)     If Your response to RFA No. 12 was other than an unqualified admission, fully identify the basis for Your denial, including the name, employment position, and contact information for persons with knowledge of facts relevant to Your denial and all facts forming the basis for Your denial.

13)     If Your response to RFA No. 13 was other than an unqualified admission, fully identify the basis for Your denial, including the name, employment position, and contact information for persons with knowledge of facts relevant to Your denial and all facts forming the basis for Your denial.

14)     If Your response to RFA No. 14 was other than an unqualified admission, fully identify the basis for Your denial, including: the name, employment position, and contact information for persons with knowledge of facts relevant to Your denial; the nature of your relationship with the ACC in the Chapter 11 Cases; and any other facts forming the basis for Your denial.

15)     If Your response to RFA No. 15 was other than an unqualified admission, fully identify the basis for Your denial, including: the name, employment position, and contact information for persons with knowledge of facts relevant to Your denial; the nature of your relationship with the FCR in the Chapter 11 Cases; and any other facts forming the basis for Your denial.

16)     Identify all witnesses you intend to call at the Joint Plan confirmation hearing and the subject matter of their anticipated testimony.

JA04467

DATED: December 26, 2019          */s/ Michael L. Martinez*_____

GRIER WRIGHT MARTINEZ, PA
Michael L. Martinez (N.C. Bar No. 39885)
521 E. Morehead Street, Suite 440
Charlotte, NC 28202
Phone:  704/332.0209; Fax:  704/332.0215
Email:  mmartinez@grierlaw.com

—and—

GIBSON, DUNN & CRUTCHER, LLP
Michael A. Rosenthal (admitted *pro hac vice*)
Robert B. Krakow (admitted *pro hac vice*)
Alan Moskowitz (admitted *pro hac vice*)
Matthew G. Bouslog (admitted *pro hac vice*)
Dylan S. Cassidy (admitted *pro hac vice*)
200 Park Avenue
New York, NY 10166-0193
Phone:  (212) 351-4000; Fax:  (212) 351-4035
Email:  MRosenthal@gibsondunn.com
Email:  RKrakow@gibsondunn.com
Email:  AMoskowitz@gibsondunn.com
Email:  MBouslog@gibsondunn.com
Email:  DCassidy@gibsondunn.com

*Counsel for Truck Insurance Exchange*

JA04468

## CERTIFICATION OF SERVICE

I, Michael L. Martinez, hereby certify that on December 26, 2019, I served a copy of the foregoing discovery instrument by e-mail, as agreed to in writing by the recipients thereof, on counsel of record for the party to whom the discovery is addressed.


DATED: December 26, 2019          _/s/ Michael L. Martinez_____
                                  Michael L. Martinez

# EXHIBIT J

JA04470

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division

| | |
|---|---|
| In re | Case No. 16-31602 |
| KAISER GYPSUM COMPANY, INC., et al.,[1] | Chapter 11 |
| Debtors. | (Jointly Administered) |

TRUCK INSURANCE EXCHANGE'S FIRST SET OF REQUESTS FOR PRODUCTION
TO KAISER GYPSUM COMPANY, INC.

Truck Insurance Exchange ("Truck"), by and through undersigned counsel, hereby serves

these First Requests for Production ("Requests") on Debtor Kaiser Gypsum Company, Inc.

("Kaiser").  Truck requests that Kaiser respond to the Requests and produce for inspection and

copying the documents requested herein at the offices of Grier Wright Martinez, PA, 521 E.

Morehead Street, Suite 440, Charlotte, NC 28202, Attention Michael Martinez, no later than 30

days after the date of service as required by Federal Rule of Civil Procedure 34, as made applicable

to this proceeding by Federal Rules of Bankruptcy Procedure 3020(b)(1), 9014(c), and 7034.

## I. Instructions

1)      The definitions, instructions, and rules of construction set forth in Federal Rule of

Civil Procedure 34 are incorporated herein by reference.

2)      These instructions and definitions should be construed to require responses based

upon the information available to you and others acting on your behalf.  In responding to these

---

[1] The Debtors are the following entities (the last four digits of their respective taxpayer
identification numbers follow in parentheses):  Kaiser Gypsum Company, Inc. (0188); and
Hanson Permanente Cement, Inc. (7313).  The Debtors' address is 300 E. John Carpenter
Freeway, Irving, Texas 75062.

- 1 -

Requests, you shall produce All Documents in your possession, custody, or control, and all documents reasonably available to you.

3)    These Requests shall not be deemed to call for identical copies of Documents. "Identical" means precisely the same in all respects; for example, a Document with handwritten notes or editing marks shall not be deemed identical to one without such notes or marks.

4)    In the event you are able to produce only some of the Documents called for in a particular Request, please promptly produce all the Documents available and state the reason(s) for your inability to produce the remainder.

5)    If You are unable to produce a Document requested, please state in writing why you cannot produce the Document and, if your inability to produce the Document is because it is not in your possession or the possession of a Person or entity from whom you could reasonably obtain it, state the name, address, and telephone number of any Person you believe may have the original or a copy of any such Document.

6)    If there are no Documents responsive to a category in these Requests, please state so in writing.  If a Document requested is no longer existing or available, please state so in writing.

7)    If you object to a portion of any Request, please state the grounds of your objection with specificity and produce All Documents called for by that portion of the Request to which you do not object.

8)    If, in answering these Requests, you encounter any ambiguities when construing a request, instruction, or definition, please set forth the matter that you find to be ambiguous and explain the construction you used in responding.

9)    If a claim of privilege is asserted in objecting to any Request, please identify the nature of the privilege that is being claimed and the privilege rule being invoked, and for All

- 2 -

JA04472

Documents withheld, please provide the information set forth in Federal Rule of Civil Procedure 26(b)(5), including the type of Document, the general subject matter of the Document, including, where appropriate, the author, addressee, custodian, and any other recipient of the Document, and where not apparent, the relationship of the author, addressee, custodian, and any other recipient to each other in a manner that, without revealing the information claimed to be protected, will enable Truck Insurance to assess the applicability of the privilege claimed.

10)    If you are withholding the Document or information for any reason other than a claim of privilege or work product doctrine, please provide the reason for withholding the Document.

11)    If a responsive Document or information contains non-privileged material as well as material you contend is privileged, you must disclose the non-privileged material to the fullest extent possible without disclosing the privileged material.  You must clearly indicate the portions of the Document or information to which privilege is claimed.  If you redact or alter a Document, identify the reason for the redaction or alteration.  Any redactions must be clearly visible on the redacted Document.

12)    If You object to production of any requested Document(s) on the grounds that production is unduly burdensome, please describe the burden or expense.

13)    Electronically stored information should be produced in the form described in Exhibit 1, attached hereto, unless otherwise agreed to by the parties.

14)    These Requests are continuing requests, and Documents and information that are responsive should be promptly produced upon discovery in the same manner, and at the same address, as the initial production.

15)    Unless otherwise stated herein, the date range for the Requests shall begin at

- 3 -

January 1, 2014, and continue through the present.

## II. Definitions

Notwithstanding any definition set forth below, each word, term, or phrase used in these Interrogatories is intended to have the broadest meaning permitted under the Federal Rules of Bankruptcy Procedure and the Federal Rules of Civil Procedure.  As used in these Requests, the following terms are to be interpreted in accordance with these definitions.

1)      "Document" or "Documents" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Federal Rule of Civil Procedure 34(a)(1)(A) and includes, without limitation, any written material, whether typed, handwritten, printed or otherwise recorded, and whether in draft or final form, of any kind or nature, or any photograph, scan, microfilm or other reproduction thereof, and any audio or video recordings or transcripts thereof.  Any draft or non-identical copy of a Document is a separate Document.

2)      "Communication" or "Communications" includes, without limitation, any transmission or transfer of information of any kind, whether orally, electronically, in writing, or in any other manner, at any time or place, and under any circumstances whatsoever.

3)      "All Documents" means each and every Document, within your custody, possession or control, whether an original or copy known to you, and every such Document you can locate or discover by reasonably diligent efforts.

4)      "Kaiser" and "You" mean Debtor Kaiser Gypsum Company, Inc., and include all persons and entities who are acting or have acted as its agents or otherwise on its behalf, including without limitation its employees, officers, directors, assigns, representatives, and attorneys.

5)      "HPCI" means Debtor Hanson Permanente Cement, Inc. and includes all persons

- 4 -

JA04474

and entities who are acting or have acted as its agents or otherwise on its behalf, including without limitation its employees, officers, directors, assigns, representatives, and attorneys.

6)    "Debtors" means both HPCI and Kaiser.

7)    "Lehigh Hanson" means Lehigh Hanson, Inc. and includes all persons and entities who are acting or have acted as its agents or otherwise on its behalf, including without limitation its employees, officers, directors, assigns, representatives, and attorneys.

8)    "Truck Policies" means any insurance policy issued by Truck to either of the Debtors under which any Debtor or affiliate of the Debtors has or had indemnity, defense, or other insurance coverage, whether known or unknown, that actually or potentially provides insurance coverage for any Asbestos Claim

9)    "Chapter 11 Cases" means the above-captioned cases in which these Requests are served.

10)    "ACC" means the Official Committee of Asbestos Personal Injury Claimants appointed in the Chapter 11 Cases.

11)    "FCR" means Lawrence Fitzpatrick (or any court-appointed successor), appointed pursuant to the *Order Appointing Lawrence Fitzpatrick as Legal Representative for Future Claimants* [Docket No. 99].

12)    "Asbestos Bodily Injury Claims" means any claim of any type asserted against either Debtor or both Debtors arising out of or related to alleged exposure to asbestos-containing products that either Debtor or both Debtors—including their predecessors, successors, and assigns—allegedly manufactured, distributed, sold, or are otherwise responsible for.

13)    "Joint Plan" means the plan of reorganization jointly proposed by the Debtors, the ACC, and the FCR.

JA04475

14)     "Confirmation Hearing" means the hearing on confirmation of the Joint Plan, which is currently scheduled to begin on March 30, 2020 [Docket No. 1875].

*15)*     "Motion to Lift Stay" means the *Motion of the Debtors, the Official Committee of Asbestos Personal Injury Claimants and the Future Claims Representative to Lift the Stay Pursuant to 11 U.S.C. § 362 as to Certain Asbestos Personal Injury Claims* [Docket No. 881].

16)     "Plan Finding" means the finding requested in section VIII.A.3.u of the *Third Amended Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc.* [Docket No. 1868].

17)     "Common Interest Agreement" means the Common Interest and Confidentiality Agreement entered into on  June 23, 2014, among HPCI, Kaiser, and Truck.

18)     "Cost Sharing Agreement" means the Cost Sharing Agreement entered into on June 15, 2015, among Kaiser, HPCI, and Truck and includes the First Amendment thereto dated as of September 30, 2016.

### III.  Requests for Production

1)     Organizational charts or other Documents sufficient to show lines of authority or personnel reporting requirements within Kaiser for all personnel with decision-making authority over, or other involvement in, the Chapter 11 Cases.

2)     All Documents You intend to introduce or otherwise rely on at the Confirmation Hearing.

3)     All agreements between You and the ACC.

4)     All Communications between You and the ACC.

5)     All Documents reflecting, related to, or concerning negotiations between You and the ACC over the Joint Plan.

JA04476

6)      All Documents reflecting, related to, or concerning negotiations between You and the ACC over any other potential plan of reorganization under 11 U.S.C. § 524(g).

7)      All agreements between You and the FCR

8)      All Communications between You and the FCR.

9)      All Documents reflecting, related to, or concerning negotiations between You and the FCR over the Joint Plan.

10)     All Documents reflecting, related to, or concerning negotiations between You and the FCR over any other potential plan of reorganization under 11 U.S.C. § 524(g).

11)     All agreements between You and Lehigh Hanson related to the Chapter 11 Cases.

12)     All Documents reflecting, related to, or concerning misrepresentation or withholding of exposure evidence in, or with respect to, Asbestos Bodily Injury Claims.

13)     All Documents reflecting, related to, or concerning any estimation, valuation, or other analysis of Your asbestos bodily injury liabilities conducted by You or by a consultant retained by You, including without limitation any analysis performed by National Economic Research Associates or NERA Economic Consulting, Inc.

14)     All Documents related to the estimation decision issued by this Court in the Garlock bankruptcy reported at *In re Garlock Sealing Technologies*, 504 B.R. 71 (Bankr. W.D.N.C. 2014).

15)     All Documents related to the Common Interest Agreement.

16)     All Documents related to the Cost Sharing Agreement.

17)     All Documents reflecting, relating to, or concerning the decision to abandon the effort to negotiate a prepackaged bankruptcy as reflected in the Cost Share Agreement.

18)     Documents sufficient to show all Bankruptcy Costs (as that term is defined in the Cost Sharing Agreement) incurred during the period in which the Cost Sharing Agreement was in

- 7 -

effect.

19)    All documents reflecting the payment of Bankruptcy Costs (as that term is defined in the Cost Sharing Agreement) by Truck or the charging of such Bankruptcy Costs to Truck.

20)    All Documents reflecting, related to, or concerning Your decision to reincorporate as a North Carolina corporation in May 2016.

21)    All documents reflecting, relating to, or concerning the decision to file the Chapter 11 Cases on September 30, 2016.

22)    All Documents reflecting, related to, or concerning the decision to file the Motion to Lift Stay.

23)    All Documents related to the Plan Finding.

24)    All Documents related to Your obligation under the Truck Policies to assist in effecting settlements of Asbestos Bodily Injury Claims.

25)    All Documents related to Your obligation under the Truck Policies to assist in securing and giving evidence in Asbestos Bodily Injury Claims.

DATED: October 28, 2019

GRIER WRIGHT MARTINEZ, PA
Michael L. Martinez (N.C. Bar No. 39885)
521 E. Morehead Street, Suite 440
Charlotte, NC 28202
Phone:  704/332.0209; Fax:  704/332.0215
Email:  mmartinez@grierlaw.com

—and—

GIBSON, DUNN & CRUTCHER, LLP
Michael A. Rosenthal (admitted *pro hac vice*)
Robert B. Krakow (admitted *pro hac vice*)
Alan Moskowitz (admitted *pro hac vice*)
Matthew G. Bouslog (admitted *pro hac vice*)
Dylan S. Cassidy (admitted *pro hac vice*)

- 8 -

200 Park Avenue
New York, NY 10166-0193
Phone: (212) 351-4000; Fax: (212) 351-4035
Email: MRosenthal@gibsondunn.com
Email: RKrakow@gibsondunn.com
Email: AMoskowitz@gibsondunn.com
Email: MBouslog@gibsondunn.com
Email: DCassidy@gibsondunn.com

*Counsel for Truck Insurance Exchange*

JA04479

## CERTIFICATE OF SERVICE

I hereby certify that, on October 28, 2019, the foregoing document was served on counsel of record for Debtor Kaiser Gypsum Company, Inc. in the above-captioned bankruptcy case by depositing copies thereof in the U.S. Mail, postage prepaid, and addressed as set forth below.

John R. Miller, Jr.
Rayburn Cooper & Durham, P.A.
227 W. Trade St., Ste. 1200
Charlotte, NC 28202

Gregory M. Gordon
Jones Day
2727 N. Harwood Street
Dallas, TX 75201

This is the 28th day of October, 2019.

Michael L. Martinez (N.C. Bar No. 39885)
Grier Wright Martinez, PA
521 East Morehead Street, Suite 440
Charlotte, NC 28202
Phone:  704/375.3720; Fax:  704/332.0215
Email:  mmartinez@grierlaw.com

*Counsel for Truck Insurance Exchange*

# EXHIBIT K

JA04481

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division**

| | |
|---|---|
| **In re** | **Case No. 16-31602** |
| **KAISER GYPSUM COMPANY, INC., et al.,**[1] | **Chapter 11** |
| **Debtors.** | (Jointly Administered) |

**TRUCK INSURANCE EXCHANGE'S FIRST SET OF REQUESTS FOR PRODUCTION
TO KAISER GYPSUM COMPANY, INC.**

Truck Insurance Exchange ("Truck"), by and through undersigned counsel, hereby serves these First Requests for Production ("Requests") on Debtor Kaiser Gypsum Company, Inc. ("Kaiser"). Truck requests that Kaiser respond to the Requests and produce for inspection and copying the documents requested herein at the offices of Grier Wright Martinez, PA, 521 E. Morehead Street, Suite 440, Charlotte, NC 28202, Attention Michael Martinez, no later than 30 days after the date of service as required by Federal Rule of Civil Procedure 34, as made applicable to this proceeding by Federal Rules of Bankruptcy Procedure 3020(b)(1), 9014(c), and 7034.

**I. Instructions**

1) The Definitions in Truck's First Set of Request for Production of Documents to Kaiser, dated October 28, 2019, are incorporated by reference into and shall apply to these Requests.

---

[1] The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Kaiser Gypsum Company, Inc. (0188); and Hanson Permanente Cement, Inc. (7313). The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

JA04482

## II. Definitions

1)      The Definitions in Truck's First Set of Request for Production of Documents to Kaiser, dated October 28, 2019, are incorporated by reference into and shall apply to these Requests.

2)      The Definitions in Truck's First Set of Request for Admission to Kaiser, dated December 26, 2019, are incorporated by reference into and shall apply to these Requests.

## III. Requests for Production

26)      All Documents reflecting, relating to, or concerning Your decision to file the Chapter 11 Cases in the United States Bankruptcy Court for the Western District of North Carolina.

27)      All Documents reflecting, relating to, or concerning any pre-bankruptcy analysis by You of the scope or number of pending or anticipated Fraudulent Claims against You.

28)      All Documents reflecting, relating to, or concerning the impact of the *Garlock* Decision on the Chapter 11 Cases, including your decision to file the Chapter 11 Cases.

29)      Documents sufficient to identify each negotiating session you scheduled or held with the ACC before filing the Chapter 11 Cases.

30)      Documents sufficient to identify each invitation or request for input You made to Truck before the filing of the Chapter 11 Cases to participate in the negotiation of the Joint Plan.

31)      All Documents reflecting, relating to, or concerning any request You made to the ACC before the Chapter 11 Cases were filed that the ACC not speak with Truck.

32)      Documents sufficient to identify each invitation or request for input You made to Truck after the filing of the Chapter 11 Cases to participate in the negotiation of the Joint Plan.

33)      Documents sufficient to show each attempt You have made during the Chapter 11 Cases to secure evidence for use in the defense of Asbestos Bodily Injury Claims.

JA04483

34)     Documents sufficient to show each request or proposal You have made to the ACC or the FCR to include Fraud Prevention Procedures in the Joint Plan.

35)     Documents related to or concerning the addition of the Disclosure Requirements to the TDP.

36)     All Documents and Communications that you relied upon, considered, or reviewed in connection with the preparation of your responses to Truck's First Set of Interrogatories and First Requests for Admissions, served concurrently.

DATED: December 26, 2019          _/s/ Michael L. Martinez_

GRIER WRIGHT MARTINEZ, PA
Michael L. Martinez (N.C. Bar No. 39885)
521 E. Morehead Street, Suite 440
Charlotte, NC 28202
Phone:  704/332.0209; Fax:  704/332.0215
Email:  mmartinez@grierlaw.com

—and—

GIBSON, DUNN & CRUTCHER, LLP
Michael A. Rosenthal (admitted *pro hac vice*)
Robert B. Krakow (admitted *pro hac vice*)
Alan Moskowitz (admitted *pro hac vice*)
Matthew G. Bouslog (admitted *pro hac vice*)
Dylan S. Cassidy (admitted *pro hac vice*)
200 Park Avenue
New York, NY 10166-0193
Phone:  (212) 351-4000; Fax:  (212) 351-4035
Email:  MRosenthal@gibsondunn.com
Email:  RKrakow@gibsondunn.com
Email:  AMoskowitz@gibsondunn.com
Email:  MBouslog@gibsondunn.com
Email:  DCassidy@gibsondunn.com

*Counsel for Truck Insurance Exchange*

JA04484

## CERTIFICATION OF SERVICE

I, Michael L. Martinez, hereby certify that on December 26, 2019, I served a copy of the foregoing discovery instrument by e-mail, as agreed to in writing by the recipients thereof, on counsel of record for the party to whom the discovery is addressed.


DATED: December 26, 2019              _/s/ Michael L. Martinez_____
                                      Michael L. Martinez

JA04485

# EXHIBIT L

JA04486

ULTRA COMPREHENSIVE LIABILITY POLICY

T R U C K   I N S U R A N C E   E X C H A N G E

Los Angeles, California 90054

Agent: #90-99-01                          Policy Number 350-40-00

DECLARATIONS

Item 1. Named Insured:  KAISER CEMENT & GYPSUM CORPORATION
                        and
                        SUBSIDIARIES

        Address:        300 Lakeside Drive
                        Oakland, California 94612

        Legal Entity:   Corporations

        Business:       Manufacture and sale of Construction and
                        Building Materials.

Item 2. Effective:      From December 31, 1964 at 12:01 A.M.
                        until Cancelled, Standard Time at the address
                        of the Named Insured as stated herein.

Item 3. Coverages:      A. Bodily Injury Liability  - Automobile
                        B. Bodily Injury Liability  - Except Automobile
                        C. Property Damage Liability- Automobile
                        D. Property Damage Liability- Except Automobile
                        E. Professional Liability
                        F. Personal Injury Liability

Item 4. Limits of
        Liability:      (a) Bodily Injury Liability -
                            $100,000 each person
                            $300,000 each occurrence
                            $300,000 aggregate Products

                        (b) Property Damage Liability -
                            $100,000 each occurrence
                            $300,000 aggregate Products

                        (c) Professional Liability -
                            $100,000 each claim                D
                            $300,000 aggregate                 E
                                                               F

Place of Issuance:      Los Angeles, California

Date of Issuance:       August 6, 1965

Countersigned - Authorized Representative

TRUCK INSURANCE EXCHANGE

TRK0000001

PR0657

PR01056



ULTRA COMPREHENSIVE LIABILITY POLICY

TRUCK INSURANCE EXCHANGE
Los Angeles, California 90054
(Hereinafter sometimes referred to as Company)

In consideration of payment of the premium and subject to all the terms of this policy, the Company agrees with the Insured named herein to pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of:

### INSURING AGREEMENTS

I. COVERAGE A - BODILY INJURY LIABILITY - AUTOMOBILE:
bodily injury, sustained by any person and arising out of the ownership, maintenance or use of any automobile;

COVERAGE B - BODILY INJURY LIABILITY - EXCEPT AUTOMOBILE:
bodily injury, sustained by any person from causes other than ownership, maintenance or use of an automobile;

COVERAGE C - PROPERTY DAMAGE LIABILITY - AUTOMOBILE:
injury to or destruction of property, including the loss of use thereof, and arising out of the ownership, maintenance or use of any automobile;

COVERAGE D - PROPERTY DAMAGE LIABILITY - EXCEPT AUTOMOBILE:
injury to or destruction of property, including the loss of use thereof, from causes other than ownership, maintenance or use of an automobile;

COVERAGE E - PROFESSIONAL LIABILITY:
injury arising out of malpractice, error, or mistake of the Insured or of a person for whose acts or omissions the Insured is legally responsible in rendering or failing to render professional services; and

COVERAGE F - PERSONAL INJURY LIABILITY:
injury arising out of false arrest, malicious prosecution, wilful detention or imprisonment, libel, slander or defamation of character, humiliation or discrimination, invasion of privacy, wrongful eviction or wrongful entry, wrongful conversion or disparagement.

II. DEFENSE, SETTLEMENT, SUPPLEMENTARY PAYMENTS:
With respect to such insurance as is afforded by this policy, the Company shall:

(1) investigate and defend any claim or suit against the Insured alleging such injury, sickness, disease, or destruction and seeking damages on account thereof, even if such claim or suit is groundless, false or fraudulent. Except under Coverage E, the Company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient; under Coverage E the Company will not settle or compromise any claim or suit covered hereunder, except with the written consent of the Insured;

Countersigned

TRUCK INSURANCE EXCHANGE

- 1 -

TRK0000002

PR0658

PR01057



(2) (a) Pay all premiums on bonds to release attachments for an amount not in excess of the applicable limit of liability of this policy, all premiums on appeal bonds required in any such defended suit, the cost of bail bonds required of the Insured in the event of automobile accident or automobile traffic law violation during the policy period, not to exceed $250. per bail bond, but without any obligation to apply for or furnish any such bonds;

(b) pay all expenses incurred by the Company, all costs taxed against the Insured in any such suit and all interest accruing after entry of judgment, until the Company has paid or tendered or deposited in court such part of such judgment as does not exceed the limit of the Company's liability thereon;

(c) pay expenses incurred by the Insured, except under Coverage E, for emergency medical and surgical relief to others at the time of the occurrence;

(d) reimburse the Insured for all reasonable expenses, other than loss of earnings, incurred at the Company's request;

and the amounts so incurred, except settlements of claims and suits, are payable by the Company in addition to the applicable limit of liability of this policy.

III. DEFINITION OF "INSURED":

the unqualified word "Insured" includes the Named Insured and also includes:

(1) COVERAGES A, B, C, D and F.
Any individual, firm, co-partnership, corporation or other entity for whom the Named Insured has contracted, or during the currency of this policy may contract, under written contract usual or incidental to the Named Insured's business to procure insurance afforded by this policy, but only to the extent and in the amount for which the Named Insured has contracted to procure such insurance, and in no event contrary to the terms and conditions of or exceeding the limits of liability set forth in this policy.

(2) COVERAGES B, D and F.

(a) Any executive officer, director, partner, stockholder or employee thereof while acting within the scope of his duties as such and any organization or proprietor with respect to real estate management for the Named Insured; provided as respects any employee, the policy shall apply to such employee as an insured only if the Named Insured

(i) elects to have the insurance afforded by this policy apply to such employee,

(ii) gives the Company written notice of such election within 45 days after claim or suit has been made against such employee, whichever date is later, and

(iii) pays the Company an additional premium of $100.00;

Countersigned

- 2 -

TRUCK INSURANCE EXCHANGE

TRK0000003

PR0659

PR01058

Appellant's Appendix 0485

TRUCK0000408



(b) any person while using an owned or hired watercraft of the pleasure type and not rented to others and any person or organization legally responsible for its use, provided actual use is by the Named Insured or with its permission and any executive officer, director, partner, stockholder or employee of the Named Insured with respect to the use of non-owned watercraft in the business of the Named Insured. The insurance with respect to any person or organization other than the Named Insured does not apply:

    (i) with respect to any hired watercraft, to the owner or lessee thereof other than the Named Insured or to any agent or employee of such owner or lessee;

    (ii) with respect to any non-owned watercraft, to any executive officer, partner, director, stockholder, or employee if such watercraft is owned in full or in part by him or a member of his household; and

    (iii) to any employee with respect to injury to or sickness, disease or death of another employee of the same employer injured in the course of such employment in an accident arising out of the maintenance or use of watercraft in the business of such employer unless the Named Insured (1) elects to have the insurance afforded by this policy apply to such employee, (2) gives the Company written notice of such election within 45 days after claim or suit has been made against such employee, whichever date is later, and (3) pays the Company an additional premium of $100.00.

(3) COVERAGES A and C.

    (a) Any person while using an owned automobile or a hired automobile provided the actual use of the automobile is by the Named Insured or with his permission;

    (b) any executive officer, director, partner, stockholder or employee of the Named Insured with respect to the use of a non-owned automobile in the business of the Named Insured; and

    (c) any person or organization legally responsible for the use of an owned or hired automobile provided the use of the automobile is with the permission of the Named Insured but only if the Named Insured (1) elects to have the insurance afforded by this policy apply to such other person or organization, (2) gives the Company written notice within 45 days after claim or suit has been made against such other person or organization, whichever date is later, and (3) pays the Company an additional premium of $100.00.

(4) The insurance with respect to any person or organization other than the Named Insured does not apply under Division (3) of this Insuring Agreement:

    (a) to any person or organization, or to any agent or employee thereof, operating an automobile repair shop, storage garage, sales agency, service station or public parking place, with respect to any accident arising out of the operation thereof;

Countersigned

TRUCK INSURANCE EXCHANGE

- 3 -

TRK0000004

PR0660

PR01059

Appellant's Appendix 02154
JA04490
TRUCK0000409



(b) with respect to any hired automobile, to the owner thereof, or any agent or employee of such owner, except that the insurance afforded by the policy under Coverages A and C shall apply to the Lessor of an automobile leased to the Insured for use in business under a written contract of 30 days or more duration if which the Insured agrees to procure automobile liability insurance for the benefit of such Lessor but only to the extent and in the amount for which the Insured has contracted to procure such insurance, and in no event contrary to the terms and conditions of or exceeding the limits of liability as set forth in this policy;

(c) with respect to any non-owned automobile, to any executive officer, partner, director, stockholder or employee, if such automobile is owned in full or in part by him or a member of his household; and

(d) except as respects any executive officer, partner, director or stock-holder, to any employee with respect to injury to or sickness, disease or death of another employee of the same employer injured in the course of such employment, in an accident arising out of the maintenance or use of an automobile in the business of such employer, unless the Named Insured (1) elects to have the insurance afforded by this policy apply to such employee, (2) gives the Company written notice of such election within 45 days after claim or suit has been made against such employee, whichever date is later, and (3) pays the Company an additional premium of $100.00; provided

   (i) $16,000 shall be deducted (in lieu of any other deductible mentioned in this policy) from the total amount the Company shall become obligated to pay as damages, plus allocated loss adjustment expenses, on behalf of the Insured for each occurrence;

   (ii) the terms of the policy, including those with respect to notice of occurrence and notice of claim or suit apply irrespective of the application of the deductible amount; and

   (iii) the Company may pay part or all of the deductible amount to effect settlement of any claim or suit and, upon notification of the action taken, the Named Insured shall promptly reimburse the Company for such part of the deductible amount as has been paid by the Company.

(5) Under Coverage E, any physician, surgeon, dentist or nurse while acting in his or her capacity as an employee of the Named Insured.

IV.  POLICY PERIOD, TERRITORY, LIMITS, INDEMNITY AND DEFENSE.

  A. Policy Period and Territory

  This policy applies only to occurrences which occur during the policy period, and which

   (1) occur anywhere in the world, provided claim is made, or suit on the merits of the claim, is originally brought within the continental limits of the United States of America, its territories or possessions (other than Guam), or Canada;

- 4 -

TRUCK INSURANCE EXCHANGE

TRK0000005

PR0661

PR01060

TRUCK0000410
JTX04455



(2) occur in Guam or elsewhere in the world, excluding countries in the Soviet Union, East Germany (except Berlin), Poland, Czechoslovakia, Hungary, Yugoslavia, Albania, Bulgaria, Romania, North Korea, Tibet, Communist China, North Vietnam and Cuba, except that the insurance afforded by the policy does not apply to claims to the extent coverage is afforded under St. Paul Mercury Insurance Company's Policy #COL-12509 or any renewals or replacements thereof;

(3) arise out of operations of the Insured or subsidiary Mexican companies or corporations conducted primarily at San Marcos Island, Mexico, including the ownership, maintenance or use of automobiles in connection therewith except that the insurance afforded by the policy shall be excess of Policy R.C.G.-809 of LaInteramericana, S.A. Compania de Seguros or any renewal or replacement thereof; and

(4) arise out of the ownership, maintenance or use of the vessels called "Angelito", "Ricardo" and "Theresa", except that the insurance afforded by the policy shall be excess of coverage afforded under Policy No. J.M.I. 131 of LaInteramericana, S.A. Compania de Seguros or any renewals or replacements thereof.

B. Limits

(1) With respect to insurance afforded under sub-paragraphs (1) and (3) of Part A of this Section, the limits of the Company's liability stated in the Declarations shall apply.

(2) With respect to insurance afforded under sub-paragraph (2) of Part A of this Section, the limits of the Company's liability shall be as stated below and not as stated in the Declarations:

Coverage A - $25,000 each person
            $25,000 each occurrence

Coverage B - $25,000 each person
            $25,000 each occurrence
            $25,000 aggregate Products

Coverage C -$100,000 each occurrence

Coverage D -$100,000 each occurrence
            $100,000 aggregate Products;

(3) With respect to insurance afforded under sub-paragraph (4) of Part A of this Section, Company's limit of liability under Coverages B and D shall be $75,000 excess of $25,000 each occurrence.

C. Indemnity

(1) With respect to the insurance afforded under sub-paragraphs (2), (3) and (4) of Part A of this Section, in Coverages A, B,C,D,E and F, the words "to pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay" are amended to read, "to indemnify the Insured for all sums which the Insured has been held legally obligated to pay."

(2) Conditions 6 and 8 do not apply to sub-paragraphs (2), (3) and (4) of Part A of this Section.

Countersigned

- 5 -

TRUCK INSURANCE EXCHANGE

TRK0000006

PR0662

PR01061

JA04492
Appellant's Appendix TRK0000411



D. Defense

(1) Insuring Agreement II applies to insurance afforded under sub-paragraph (1) of Part A of this Section.

(2) As respects sub-paragraphs (2), (3) and (4) of Part A of this Section, the Company shall indemnify the Insured for costs of defense and supplementary payments as set forth in Insuring Agreement II.

## EXCLUSIONS

This policy does not apply:

(1) To liability assumed by the Insured under contract or agreement, except under Coverages B, D and F to (a) a contract as defined herein or (b) as respects the insurance which is afforded for the Products Hazard as defined, a warranty of goods or products;

(2) to injury, sickness, disease, death or destruction due to war, whether or not declared, civil war, insurrection, rebellion or revolution; or to any act or condition incident to any of the foregoing with respect to (a) liability assumed by the Insured under any contract or agreement or (b) expenses under Insuring Agreement II (2) (c);

(3) except as respects Coverages E and F, to injury, sickness, disease, death or destruction caused intentionally by or at the direction of the Insured;

(4) under Coverages B and D, except with respect to operations performed by independent contractors and except with respect to liability assumed by the Insured under a contract as defined herein, to the ownership, maintenance or use, including loading or unloading, of (a) automobiles if the occurrence takes place away from premises owned, rented or controlled by the Insured, or the ways immediately adjoining, or (b) aircraft owned or used by or in the interest of the Named Insured, or (c) self-propelled watercraft, other than tugboats, in excess of 300 horsepower if the occurrence takes place away from the premises owned, rented or controlled by the Named Insured; but Part (a) of this Exclusion shall not apply to an occurrence away from such premises arising out of loading or unloading as a completed operation within the definition in Part (2) of sub-paragraph (f) of Condition 3;

(5) under Coverages A and B, to any obligation for which the Insured or any carrier as his insurer may be held liable under any workmen's compensation, unemployment compensation or disability benefit law, or under any similar law;

(6) under Coverages A and C, to injury, sickness, disease, death or destruction which arises out of the loading or unloading of an automobile, if the accident occurs on premises (including the ways immediately adjoining) owned, rented or controlled either by the person or by the employer of the person against whom claim is made or suit is brought for such injury,

Countersigned

TRUCK INSURANCE EXCHANGE

- 6 -

TRK0000007

PR0663

PR01062

sickness, disease, death or destruction; but this limitation does not
apply with respect to claims made or suits brought against the following
Insureds:

(a) the Named Insured;

(b) a bailee or borrower of the automobile or an employee of either of
them or of the Named Insured;

(c) if the Named Insured is classified and rated as a truckman, any person
or organization, or any agent or employee thereof, engaged in the
business of transporting property by automobile for the Named Insured
or for others; subject nevertheless to the limitations of any endorse-
ment made a part of the policy and specifically applicable to truckmen;

(d) any other person or organization but only with respect to his or its
liability because of acts or omissions of an Insured under (a), (b) or
(c) above;

(7) under Coverage A, to bodily injury to or sickness, disease or death of any
employee of the Insured arising out of and in the course of (a) domestic
employment by the Insured, if benefits therefor are in whole or in part
either payable or required to be provided under any workmen's compensation
law, or (b) other employment by the Insured;

(8) under Coverage B, except with respect to liability assumed by the Insured
under a contract as defined herein, to bodily injury to or sickness,
disease or death of any employee of the Insured arising out of and in the
course of his employment by the Insured, other than such injury caused by
malpractice, error or mistake in the rendering of medical services;

(9) under Coverage C, to injury to or destruction of property, owned or trans-
ported by the Insured or, as respects the first $25,000 of coverage,
property rented to or in charge of the Insured other than a residence or
private garage damaged or destroyed by a private passenger automobile
covered by this policy;

(10) under Coverage D, to injury to or destruction of: (a) property of others
in the care or custody of the Insured for storage, or for sale, or
(b) that particular part of any property upon which the Insured is or has
been working caused by the faulty manner in which the work has been per-
formed; ("storage" means storage when performed for a money consideration
or as a bailee for hire or as a normal service in the business of the
Named Insured);

(11) under Coverage E, no insurance is afforded with respect to any liability
of an Insured if there is in force for the Insured or for his benefit a
valid and collectible Workmen's Compensation and Employer's Liability or
similar policy which would cover any part of such liability (other than
statutory Workmen's Compensation coverage) except for an "other insurance"
clause or similar clause;

(12) under Coverages A, B and F, to injury caused by the wilful violation of a
penal statute or ordinance committed by or with the knowledge or consent
of an Insured;

Countersigned

- 7 -

TRUCK INSURANCE EXCHANGE

TRK0000008

PR0664

PR01063

TRUCK0000413

Appellant's Appendix 02158
IA04494



(13) under Coverages B   and F, to acts committed in connection with advertising, broadcasting, or telecasting by or in the interest of the Named Insured;

(14) under any Liability Coverage, to injury, sickness, disease, death or destruction

    (a) with respect to which an Insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    (b) resulting from the hazardous properties of nuclear material and with respect to which (i) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (ii) the Insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization;

(15) under any Supplementary Payments provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization;

(16) under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if

    (a) the nuclear material (i) is at any nuclear facility owned by, or operated by or on behalf of, an Insured or (ii) has been discharged or dispersed therefrom;

    (b) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an Insured; or

    (c) the injury, sickness, disease, death or destruction arises out of the furnishing by an Insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

Countersigned

TRUCK INSURANCE EXCHANGE

- 8 -

TRK0000009

PR0665

PR01064



## CONDITIONS

Conditions 4 and 6 apply only to the Coverage or Coverages noted thereunder. Other Conditions apply to the entire policy.

1. **PREMIUM:** When used as a premium basis the word "remuneration" means the entire remuneration earned during the policy period by proprietors and by all employees of the Named Insured, subject to any overtime earnings or limitation of remuneration rule applicable in accordance with the manuals in use by the Company.

2. **INSPECTION AND AUDIT:** The Company shall be permitted to inspect the insured premises, operations, automobiles and elevators and to examine and audit the Insured's books and records at any time during the policy period and any extension thereof and within three years after the final termination of this policy, as far as they relate to the premium basis or the subject matter of this insurance.

3. **DEFINITIONS:**

   (a) **Contract.** The word "contract" means, if in writing, or under verbal agreement reduced to written form within 90 days from the date of the first agreement, any contract or agreement under which the Insured has assumed the liability of others.

   (b) **Automobile.** Except where stated to the contrary, the word "automobile" means a land motor vehicle or trailer as follows:

      (1) Owned Automobile – an automobile owned by the Named Insured;
      (2) **Hired Automobile** – an automobile used under contract in behalf of, or loaned to, the Named Insured provided such automobile is not owned by or registered in the name of (i) the Named Insured or (ii) an executive officer thereof or (iii) an employee or agent of the Named Insured who is granted an operating allowance of any sort for the use of such automobile;

      (3) Non Owned Automobile – any other automobile.

   The following described equipment shall be deemed an automobile while towed by or carried on an automobile not so described, but not otherwise: if of the crawler-type, any tractor, power crane or shovel, ditch or trench digger; any farm-type tractor; any concrete mixer other than of the mix-in-transit type; any grader, scraper, roller or farm implement; and, if not subject to motor vehicle registration, any other equipment not specified below, which is designed for use principally off public roads. The following described equipment shall be deemed an automobile while towed by or carried on an automobile, as above defined, solely for purposes of transportation or while being operated solely for locomotion, but not otherwise: if of the non-crawler type, any power crane or shovel, ditch or trench digger, and any air-compressing, building or vacuum cleaning, spraying or welding equipment or well drilling machinery.

   (c) **Semi-Trailer.** The word "trailer" includes semi-trailer.

_Countersigned_

TRUCK INSURANCE EXCHANGE

- 9 -

TRK0000010

PR0666

PR01065

JA04496
Appellant's Appendix TRK0000415



(d) Two or More Automobiles. The terms of this policy apply separately to each automobile insured hereunder, but a motor vehicle and a trailer or trailers attached thereto shall be held to be one automobile as respects limits of liability.

(e) Use. Use of an automobile or watercraft includes the loading and unloading thereof.

(f) Products Hazard. The term "products hazard" means

(1) goods or products manufactured, sold, handled or distributed by the Named Insured or by others trading under his name, if the occurrence or accident occurs after possession of such goods or products has been relinquished to others by the Named Insured or by others trading under his name and if such occurrence or accident occurs away from premises owned, rented or controlled by the Named Insured; provided, such goods or products shall be deemed to include any container thereof, other than a vehicle, but shall not include any vending machine or any property, other than such container, rented to or located for use of others but not sold; and

(2) operations, if the occurrence or accident occurs after such operations have been completed or abandoned and occurs away from premises owned, rented or controlled by the Named Insured; provided, operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to an agreement; provided further, the following shall not be deemed to be "operations" within the meaning of this paragraph: (i) Pickup or delivery, except from or onto a railroad car, (ii) the maintenance of vehicles owned or used by or in behalf of the Insured, (iii) the existence of tools, uninstalled equipment and abandoned or unused materials.

(g) Occurrence. With respect to Coverages A, B, C, D and F, means an event or series of events or continuous or repeated exposure to conditions which results in legal liability, regardless of the number of persons, vehicles or objects affected by such act or acts or omission. As respects the Products Hazard, an occurrence shall be deemed to have taken place at the time of the injury or damage to the claimant and not at the time of the act of the Insured giving rise to liability. With respect to Coverage E, an occurrence shall be considered to have taken place at the time of the professional act(s) giving rise to the injury. All damages arising out of one prepared or acquired lot of goods or products shall be considered as arising out of one occurrence.

(h) Malpractice. Means malpractice, error or mistake in rendering or failing to render professional services in the practice of the Insured's profession as a physician, surgeon, dentist or nurse, while acting within the scope of his or her employment by the Named Insured or for emergency treatment rendered outside the scope of such employment.

(i) Owned Watercraft. Watercraft owned by the Named Insured.

_J O Hoster_
Countersigned

— 10 —

TRUCK INSURANCE EXCHANGE

TRK0000011

PR0667

PR01066



(j) **Hired Watercraft.** Watercraft used under contract in behalf of, or loaned to, the Named Insured provided such watercraft is not owned by or registered in the name of (1) the Named Insured or (2) an executive officer thereof or (3) an employee or agent of the Named Insured who is granted an operating allowance of any sort for the use of such watercraft.

(k) **Non-Owned Watercraft.** Any other watercraft.

(l) **Bodily Injury.** Means bodily injury, sickness or disease, including death at any time resulting therefrom, and also includes mental injury, mental anguish and shock.

(m) **Hazardous Properties.** Include radioactive, toxic or explosive properties.

(n) **Nuclear Material.** Means source material, special nuclear material or by-product material.

(o) **Source Material, Special Nuclear Material and Byproduct Material.** Have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

(p) **Spent Fuel.** Means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor.

(q) **Waste.** Means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under Item (1) or (2) thereof.

(r) **Nuclear Facility.** Means

    (1) any nuclear reactor;
    (2) any equipment or device designed or used for (i) separating the isotopes of uranium or plutonium, (ii) processing or utilizing spent fuel, or (iii) handling, processing or packaging waste;
    (3) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the Insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; and
    (4) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

(s) **Nuclear Reactor.** Means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

(t) With respect to injury to or destruction of property, the word INJURY or DESTRUCTION includes all forms of radioactive contamination of property.

Countersigned

TRUCK INSURANCE EXCHANGE

- 11 -

TRK0000012

PR0668

PR01067



4. **LIMITS OF LIABILITY:**

(a) COVERAGES A and B: The limit of Bodily Injury liability stated in the Declarations as applicable to "each person" is the limit of the Company's liability for all damages, including damages for care and loss of services, arising out of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by one person as the result of any one occurrence under Coverages A and B. The limit of such liability stated in the Declarations as applicable to "each occurrence" is, subject to the above provision respecting each person, the total limit of the Company's liability for all damages, including damages for care and loss of services, arising out of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by two or more persons in any one occurrence.

(b) COVERAGES C and D: The limit of Property Damage liability stated in the Declarations as applicable to "each occurrence" is the total limit of the Company's liability for all damages arising out of injury to or destruction of all property of one or more persons or organizations, including the loss of use thereof, in any one occurrence.

(c) COVERAGES B and D–PRODUCTS: The limits of Bodily Injury liability and Property Damage liability stated in the Declarations as "aggregate products" are respectively the total limits of the Company's liability for all damages arising out of the products hazard during the twelve-month period beginning with the effective date of the products hazard coverage, and during the policy period, and the same aggregate limit shall apply during each succeeding twelve-month period for which such coverage may be in force. All such damages arising out of one lot of goods or products prepared or acquired by the Named Insured or by another trading under his name shall be considered as arising out of one occurrence.

(d) COVERAGE E: The limit of liability stated in the Declarations as applicable to "each claim" is the total limit of the Company's liability for all damages on account of each claim or suit. The limit of liability stated in the Declarations as "aggregate" is, subject to the foregoing provision respecting each claim, the total limit of the Company's liability for all damages in any one policy year.

(e) COVERAGE F: The limit of liability stated in the Declarations as applicable to "each person" is the limit of the Company's liability for all damages on account of injury sustained by one person or organization. The limit of liability stated in the Declarations as "aggregate" is, subject to the provision respecting "each person", the total limit of the Company's liability for all damages in any one policy year. The foregoing limits apply to all damages covered hereunder, whether or not the policy applies to such damages in the absence of this coverage.

5. **SEVERABILITY OF INTERESTS:**

The inclusion of more than one corporation, person, organization, firm or entity as Insured under this policy shall not in any way affect the rights of any such corporation, person, organization, firm or entity as respects any claim, demand, suit or judgment made or brought by or in favor of any other Insured, or by or in favor of any employee of such other Insured. This policy

- 12 -

TRUCK INSURANCE EXCHANGE

TRK0000013

PR0669

PR01068

Appellant's Appendix 04100

TRUCK0000418



shall protect each corporation, person, organization, firm or entity in the
same manner as though a separate policy had been issued to each. However, this
shall not operate to increase the Company's liability, except under Coverage I
wherein the limits of liability shall apply separately to each Insured. Limits
of insurance afforded hereunder shall apply first to the Named Insured under
this policy and remainder, if any, to additional insureds.

6. **FINANCIAL RESPONSIBILITY LAWS – COVERAGES A and C:**

When this policy is certified as proof of financial responsibility for the
future under the provisions of the motor vehicle financial responsibility law
of any state or province, such insurance as is afforded by this policy for
bodily injury liability or for property damage liability shall comply with the
provisions of such law which shall be applicable with respect to any such lia-
bility arising out of the ownership, maintenance or use during the policy
period of any automobile insured hereunder, to the extent of the coverage and
limits of liability required by such law, but in no event in excess of the
limits of liability stated in this policy. The Insured agrees to reimburse
the Company for any payment made by the Company which it would not have been
obligated to make under the terms of this policy except for the agreement
contained in this paragraph.

7. **NOTICE OF OCCURRENCE – CLAIM OR SUIT:**

In the event of accident or occurrence, written notice shall be given by or
on behalf of the Insured to the Company or any of its authorized agents as
soon as practicable after the manager of the insurance department of the Named
Insured has knowledge of an event or occurrence which, in the opinion of the
manager of the insurance department or any such designated employee, is likely
to result in a claim under this policy. Such notice shall contain particulars
sufficient to identify the Insured and also reasonably obtainable information
respecting the time, place and circumstances of the occurrence, the name and
address of the injured and of available witnesses.

If claim is made or suit is brought against the Insured, the Insured shall
promptly forward to the Company every demand, notice, summons or other process
received by him or his representative.

8. **ASSISTANCE AND COOPERATION OF THE INSURED:**

The Insured shall cooperate with the Company and, upon the Company's request,
shall attend hearings and trials and shall assist in effecting settlements,
securing and giving evidence, obtaining the attendance of witnesses and in the
conduct of suits. The Insured shall not, except at his own cost, voluntarily
make any payment, assume any obligation or incur any expense, except under
Coverages A, B, C and D, for emergency medical and surgical relief to others
at the time of the occurrence.

9. **ACTION AGAINST COMPANY:**

No action shall lie against the Company unless, as a condition precedent
thereto, the Insured shall have fully complied with all the terms of this
policy, nor until the amount of the Insured's obligation to pay shall have
been finally determined either by judgment against the Insured after actual
trial or by written agreement of the Insured, the claimant and the Company.


Countersigned


TRUCK INSURANCE EXCHANGE

– 13 –

TRK0000014

PR0670

PR01069

JA04500
Appellant's Appendix 03044 TRK0000419

9. (Continued) Any person or organization or the legal representative thereof
who has secured such judgment or written agreement shall thereafter be entitled
to recover under this policy to the extent of the insurance afforded by this
policy. Nothing contained in this policy shall give any person or organization
any right to join the Company as a co-defendant in any action against the In-
sured to determine the Insured's liability.

Bankruptcy or insolvency of the Insured or of the Insured's estate shall not
relieve the Company of any of its obligations hereunder.

10. OTHER INSURANCE:

If the Insured is insured by any other policy or policies of insurance against
loss covered by this policy, this policy shall provide excess insurance over
and above the amount paid by such other valid and collectible insurance; but
if the carrier or carriers of such other insurance shall deny liability there-
for in its entirety or as to any portion of the insurance granted by such
coverage, then and in that event this Company shall handle such loss or claim
under this policy in the same manner and to the same extent as though such
other insurance did not exist, and the Insured shall assign to this Company all
rights against the carrier or carriers of such other insurance, and execute
all papers necessary to secure to this Company such rights or shall in its own
name whenever requested by the Company, and at the Company's expense, institute
any demand or legal proceedings which the Company deems necessary against the
carrier or carriers of such other insurance.

As respects bodily injury and property damage liability arising out of the
ownership, maintenance or use of watercraft, no insurance is afforded by this
policy with respect to any loss against which other insurance is available to
the Insured, where, but for the existence of this policy, such other insurance
would apply as primary insurance to such loss. If for any reason other than
the existence of this policy such other insurance is not available to the In-
sured as respects such loss, or after such other insurance available to the
Insured has been exhausted, then, in either event, this policy shall apply.

11. WAIVER OF SUBROGATION:

The Company waives its right of subrogation (a) against any person, firm or
corporation, subsidiary of, or allied or affiliated with the Insured,
(b) against any person, firm or corporation, with which the Insured is
associated as a joint venturer or otherwise in any business enterprise,
(c) against any person, firm or corporation for whom the Insured is performing
work, (d) against any other Insured and/or any stockholder of any corporate
insured, except to the extent that such persons, firms or corporations jointly
or severally are insured under valid and collectible policies.

12. TERMS OF POLICY CONFORMED TO STATUTE:

Terms of this policy which are in conflict with the statutes of the state
wherein this policy is issued are hereby amended to conform to such statutes.

- 14 -

TRUCK INSURANCE EXCHANGE

TRK0000015

PR0671

PR01070

TRUCK0000420

Appellant's Appendix 045



13. **CHANGES:**

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy, or estop the Company from asserting any right under the terms of this policy; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy.

14. **ASSIGNMENT:**

Assignment of interest under this policy shall not bind the Company until its consent is endorsed hereon; if, however, the Named Insured shall be adjudged bankrupt, this policy shall cover (a) the Named Insured's legal representative as the Named Insured, and (b) under Coverages A and C, subject otherwise to the provisions of Insuring Agreement III, any person having proper temporary custody of any owned automobile or hired automobile, as an Insured, until the appointment and qualification of such legal representative. As respects Coverage E, if the Insured shall die or be adjudged incompetent, this insurance shall thereupon terminate but shall cover the Insured's legal representative as the Insured with respect to liability previously incurred and covered hereunder. Notice of cancellation addressed to the Insured named in the Declarations and mailed to the address shown in this policy shall be sufficient notice to effect cancellation of this policy.

15. **CANCELLATION:**

This policy may be cancelled by the Named Insured by surrender thereof to the Company or any of its authorized agents or by mailing to the Company written notice stating when thereafter the cancellation shall be effective. This policy may be cancelled by the Company by mailing to the Named Insured at the address shown in this policy written notice stating when, not less than thirty days thereafter, such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. The effective date of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the Named Insured or by the Company shall be equivalent to mailing. If the Named Insured cancels, earned premium shall be computed in accordance with the customary short rate table and procedure. If the Company cancels, earned premium shall be computed pro rata. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

16. **DECLARATIONS:**

By acceptance of this policy the Named Insured agrees that the statements in the Declarations are his agreements and representations, that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between the Insured and the Company or any of its agents relating to this insurance.

17. KAISER CEMENT & GYPSUM CORPORATION, or order, shall be deemed the sole and irrevocable agent of each Insured named hereunder for the purposes of issuing instructions for altering or cancelling this policy, for agreeing upon settlement of loss, for receiving and receipting for payment of claims or for making premium adjustments.


Countersigned

TRUCK INSURANCE EXCHANGE

— 15 —

TRK0000016

PR0672

PR01071

JA04502
Appellant's Appendix 02466
TRUCK0000421

18. RECIPROCAL PROVISIONS:

This policy is made and accepted in consideration of the payment of the Premium Deposit herein provided, the Declarations made in the application for the Policy, and the execution of a power of attorney to Truck Underwriters Association, herein called the "Association", authorizing it to execute inter-insurance policies between the holder of this policy, herein called the "Named Insured", and other subscribers to the Truck Insurance Exchange.

No term or condition of the policy is intended to create, creates, or shall be construed to create a partnership or mutual insurance association, or to give rise to or create any joint liability.

To enforce any claims arising under this policy the Exchange shall be sued or sue in its own name as in the case of an individual. Service of process in any such suit against the Exchange shall be upon the Truck Underwriters Association Atty.-in-fact.

Membership Fees paid for membership in the Exchange are not part of the premium and are fully earned upon membership being granted and coverage effected and are not returnable but may be applied as a credit to Membership Fees required of the Named Insured for insurance accepted by the Exchange.

The annual meeting of the members of the Exchange shall be held at the Home Office of the Exchange at Los Angeles, California, on the first Tuesday following the first Monday following the 15th day of March of each year, at the hour of 2:00 P.M., unless the Board of Governors shall elect to change the time and place of such meeting, in which case, but not otherwise, written or printed notice shall be mailed each member at his last known address at least ten days prior thereto. The Board of Governors shall be chosen by the subscribers from among themselves, at the annual meeting, or any special meeting held for that purpose, and shall have full power and authority to establish rules and regulations for the management of the Exchange not inconsistent with subscribers' agreements.

The Premium Deposit for this policy and all payments made for its continuance shall be payable to the Exchange at the Home Office of the Exchange. The funds so paid shall be placed to the credit of the Named Insured upon the records of the Exchange and applied to the payment of Insured's proportion of losses and expenses and to the establishment of reserves and general surplus. All such funds may be deposited and withdrawn or invested and re-invested as the Board of Governors or its Executive Committee designates. The Insured agrees that any amount allocated to the surplus fund of the Exchange by the Board of Governors may be retained by the Exchange and applied, after providing for the payment of all liabilities of the Exchange, to any purpose deemed proper and advantageous to policyholders.

This policy is non-assessable.

_____
Countersigned

- 15 -

TRUCK INSURANCE EXCHANGE

TRK0000017

PR0673

PR01072

TRUCK0000422



Effective: December 31, 1964

Policy #350-40-00
Endorsement #1

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

## DEFINITION OF NAMED INSURED

In consideration of the premium, it is agreed that the Named
Insured in Item 1 of the Declarations is designated as:

KAISER CEMENT & GYPSUM CORPORATION,
GLACIER SAND & GRAVEL COMPANY,
GYPSUM CARRIER, INC. OF PANAMA, R.P.,
KAISER GYPSUM COMPANY, INC.,
PERMANENTE STEAMSHIP CORPORATION,
PERMANENTE TRUCKING COMPANY, and
Their Owned or Controlled or Subsidiary Companies or
Corporations as is now or may hereafter be constituted,
Jointly and Severally.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000018

PR0674

PR01073

TRK0000423

Effective: December 31, 1964

Policy #350-40-00
Endorsement #2

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### SPECIAL PROVISIONS

In consideration of the premium, it is agreed as follows:

1. Sponsored Organizations as Additional Insureds.

   Such insurance as is afforded by the policy applies also to social clubs or organizations sponsored by the Named Insured as Additional Named Insureds, subject to the following provisions:

   a. Under Coverages B and D the unqualified phrase "Additional Named Insured" includes any member of such club or organization, but only as respects his liability for activities of such club or organization or activities performed by such member on behalf of such club or or organization."

   b. "Additional Named Insured" shall be understood to mean the same as "Named Insured" as respects Coverages A and C.

2. California Financial Responsibility Filing.

   In the event of cancellation of the policy by the Company, written notice shall be given to Department of Motor Vehicles, Financial Responsibility, P.O. Box 2431, Sacramento, California, ten (10) days before such cancellation becomes effective.

3. Excess Coverage Over Other Specific Insurance.

   The insurance afforded under this policy shall be excess to the extent coverage is afforded under Fireman's Fund Insurance Company's policies Numbers PC-277-677 and 417-441 or any renewal or replacement thereof.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000019

PR0675

PR01074

TRUCK0000424

Effective:   December 31, 1964

Policy #350-40-00
Endorsement #3

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### REMOVAL OF WRECKAGE

The policy applies also to liability for cost or expenses of, or incidental to, the removal of the wreck of vessels when such removal is compulsory by law, provided, however, that

a) There shall be deducted from such claim for cost or expenses, the value of any salvage from or which might have been recovered from the wreck, insuring, or which might have insured, to the benefit of the Insured.

b) The Company shall not be liable for such costs or expenses which would be covered by full insurance under the present standard form of policy on hull, machinery, etc., issued by the American Marine Insurance Syndicate.

c) The Company shall not be liable for such costs or expenses when the vessel was wrecked by or in consequence of hostilities or warlike operations, whether before or after declaration of war.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000020

PR0676

PR01075

JA04506
Appellant's Appendix 03710
TRK0000425

Effective: December 31, 1964

Policy #350-40-00
Endorsement #4

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### $5,000 DEDUCTIBLE ENDORSEMENT

As respects each occurrence or one malpractice act, error or mistake regardless of the number of claims emanating therefrom, the Insured agrees to assume the first $5,000 of loss and related adjustment expense under any one or combination of coverages. The Company shall tabulate the amounts so paid which are thus recoverable from the Insured and shall bill the Insured monthly for the accumulated total. The Insured shall reimburse the Company promptly.

There will be two types of loss adjustment expense which shall be defined and computed as follows:

1. Allocated Adjustment Expense - Exact items of expense directly incurred by the Company and chargeable to a particular claim. (Examples: Legal fees, court costs, medical examiner's fees, photographer bills, etc.).

2. Unallocated Adjustment Expense - A charge to cover all general claims administration costs. (Examples: Services of salaried adjusters, claim examiners, clerical service, stationery, office rent, and other overhead items).

In addition to reimbursement for paid losses as defined above, the Insured agrees to reimburse the Company for a share of both Allocated and Unallocated Adjustment Expense incurred by the Company in the settlement of losses and in the settlement of claims closed for no payment.

Reimbursement to the Company of loss adjustment expense shall be determined as follows:

1. Allocated Adjustment Expense.

    (a) Allocated Adjustment Expense shall be reimbursed in the same proportion that the deductible loss bears to the total loss.

    (b) On claims closed with no payment, Allocated Adjustment Expense shall be reimbursed in the proportion that $5,000 bears to the last reserve on the claim prior to closing.

2. Unallocated Adjustment Expense.

    (a) 12% of the Insured's portion of loss under Coverages A, B, E and F in territories served by the Company's salaried claims representatives.

    (b) 5% of the Insured's portion of loss under Coverages C and D in territories served by the Company's salaried claims representatives.

    (c) 5% of the Insured's portion of loss under any Coverage in territories not served by the Company's salaried claims representatives.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000021

PR0677

PR01076

Effective: December 31, 1964

Policy #350-40-00
Endorsement #5

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### PREMIUM ADJUSTMENT ENDORSEMENT

DEPOSIT PREMIUM to be maintained $4,725.00

As respects the first $10,000 aggregate liability from one occurrence, it is agreed that on or before the 25th day of each month during the currency of this policy the Named Insured shall render to The Company a statement showing the total remuneration earned by its employees during the preceding month (being the amount of remuneration upon which the Named Insured's Workmen's Compensation premium for the same period is predicated including similarly adjusted payroll in states where Workmen's Compensation is self-insured) computed at the following rates per $100.00 of the total remuneration so reported:

| Standard | (Basic) |
|----------|---------|
| $.255 | ($.17) |

Such earned premium shall be payable to the Company forthwith and shall be subject to such adjustments as are provided for in that certain Premium Determination Agreement entered into between the Named Insured and the Exchange dated December 31, 1964.

For policy limits in excess of $10,000.00 aggregate as respects any one occurrence, and not subject to adjustment under said Premium Determination Agreement, premium shall be payable monthly at the rate of $.051 per $100.00 of the total remuneration so reported.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000022

PR0678

PR01077

TRK0000427

## ENDORSEMENT

☐ FARMERS
INSURANCE
EXCHANGE

☒ TRUCK
INSURANCE
EXCHANGE

☐ FIRE
INSURANCE
EXCHANGE

☐ MID-CENTURY
INSURANCE CO.

Endorsement #6

Effective Date    December 31, 1964                    350-40-00
                                                        Policy Number
                                                        of the Company I'd show

### GLACIER SAND AND GRAVEL COMPANY

ADDITIONAL INSURED - DeLONG CORPORATION

In consideration of the premium, it is agreed that such in-
surance as is afforded by this policy for Bodily Injury and
Property Damage Liability coverages is hereby extended to

DE LONG CORPORATION
29 Broadway
New York 12, New York

as an "Insured" as defined in the policy, but only as respects
claims arising out of certain property at Tongue Point Air
Station, Astoria, Oregon used by the Named Insured in connection
with the operation of a batch plant.

This endorsement, when countersigned, becomes part of the above numbered policy and supersedes and controls anything in the policy contrary hereto but
is otherwise subject to the declarations, insuring agreements, exclusions and conditions thereof.

Countersigned _____    AUTHORIZED REPRESENTATIVE

ACT-ST-3 5-54 SET        50   (090)

TRK0000023

PR0679

PR01078

Appellant's Appendix 04599
TRUCK0000428



## ENDORSEMENT

| FARMERS<br>☐ INSURANCE<br>EXCHANGE | TRUCK<br>☒ INSURANCE<br>EXCHANGE | FIRE<br>☐ INSURANCE<br>EXCHANGE | MID-CENTURY<br>☐ INSURANCE CO.<br>Endorsement #7 |
|---|---|---|---|

Effective Date    December 31, 1964    350-40-00
Policy Number
of the Company I'd above

### KAISER CEMENT & GYPSUM CORPORATION

### ADDITIONAL INSURED - HARDESTY TRANSPORTATION

In consideration of the premium, it is agreed that such insurance
as is afforded by this policy for Automobile Bodily Injury and
Property Damage Liability coverages is hereby extended to apply to

HARDESTY TRANSPORTATION
10215 Bartee Avenue
Pacoima, California

as an "Insured" as defined in the policy, but only as respects
claims arising out of the ownership, maintenance or use of automotive
equipment while leased by HARDESTY TRANSPORTATION to Kaiser Cement
& Gypsum Corporation.

This endorsement, when countersigned, becomes part of the above numbered policy and supersedes and controls anything in the policy contrary hereto but is otherwise subject to the declarations, insuring agreements, exclusions and conditions thereof.

Countersigned
ACT-EY-3 date inter    AUTHORIZED REPRESENTATIVE
ES    (200)

TRK0000024

PR0680

PR01079

TRUCK0000429



## ENDORSEMENT

| ☐ FARMERS INSURANCE EXCHANGE | ☒ TRUCK INSURANCE EXCHANGE | ☐ FIRE INSURANCE EXCHANGE | ☐ MID-CENTURY INSURANCE CO. |
|---|---|---|---|
| | | | Endorsement #8 |

Effective Date___December 31, 1964___          350-40-00
                                              Policy Number
                                              of the Company #1 above

### KAISER CEMENT & GYPSUM CORPORATION

### ADDITIONAL INSURED - HAWAIIAN LAND CO., LTD.

In consideration of the premium, it is agreed that such insurance
as is afforded by this policy for Bodily Injury and Property
Damage Liability coverages is hereby extended to apply to

        HAWAIIAN LAND CO., LTD.
        1441 Kapiolani Boulevard
        Honolulu, Hawaii

as an "Insured" as defined in the policy, but only as respects
claims arising out of the lease to the Named Insured of land
adjacent to Pier 32, Honolulu, Hawaii.

This endorsement, when countersigned, becomes part of the above numbered policy and supersedes and controls anything in the policy contrary hereto but
is otherwise subject to the declarations, insuring agreements, exclusions and conditions thereof.

Countersigned _____
    _____
    Authorized Representative

TRK0000025

PR0681

PR01080

TRUCK0000430

ENDORSEMENT

☐ FARMERS
INSURANCE
EXCHANGE

☒ TRUCK
INSURANCE
EXCHANGE

☐ FIRE
INSURANCE
EXCHANGE

☐ MID-CENTURY
INSURANCE CO.

Endorsement #9

Effective Date    December 31, 1964    350-40-00
Policy Number
of the Company I'd above

KAISER CEMENT & GYPSUM CORPORATION

ADDITIONAL INSURED - HILTON HOTELS CORPORATION

In consideration of the premium, it is agreed that such insurance
as is afforded by this policy for Bodily Injury and Property
Damage Liability coverages is hereby extended to apply to

HILTON HOTELS CORPORATION
900 Wilshire Boulevard
Los Angeles, California

as an "Insured" as defined in the policy, but only as respects
claims arising out of the lease of premises to the Named Insured.

This endorsement, when countersigned, becomes part of the above numbered policy and supersedes and controls anything in the policy contrary hereto but
is otherwise subject to the declarations, insuring agreements, exclusions and conditions thereof.

Countersigned _____
AST-47.4 3-64 5,000          by          Agency

TRK0000026

PR0682

PR01081

JA04512
Appellant's Appendix
TRK0000431



---

## ENDORSEMENT

☐ FARMERS INSURANCE EXCHANGE   ☒ TRUCK INSURANCE EXCHANGE   ☐ FIRE INSURANCE EXCHANGE   ☐ MID-CENTURY INSURANCE CO.
Endorsement #10

Effective Date   December 31, 1964                    350-40-00
                                                     *Policy Number of the Company if's above*

KAISER CEMENT & GYPSUM CORPORATION

ADDITIONAL INSURED - JOHN E. HOPKINS, ET AL.

In consideration of the premium, it is agreed that such insurance as is afforded by this policy for Bodily Injury and Property Damage Liability coverages is hereby extended to apply to

JOHN E. HOPKINS and ANNA L. HOPKINS
and ESTATE OF JOHN SHELDON HOPKINS
c/o Kirby & Elliott
P.O. Box 151, 700 Texas Street
Fairfield, California

as an "Insured" as defined in the policy, but only as respects claims arising out of the ownership, maintenance or use of 36 Foot Converted Navy LCD, named "Twnny", Coast Guard Registry #28Y521 by the Named Insured.

This endorsement, when countersigned, becomes part of the above numbered policy and supersedes and controls anything in the policy contrary hereto but is otherwise subject to the declarations, insuring agreements, exclusions and conditions thereof.

Countersigned _____   AUTHORIZED REPRESENTATIVE

ACT-ET-3 A-64 1001          A2   (896)

TRK0000027

PR0683

PR01082



## ENDORSEMENT

| FARMERS<br>☐ INSURANCE<br>EXCHANGE | TRUCK<br>☒ INSURANCE<br>EXCHANGE | FIRE<br>☐ INSURANCE<br>EXCHANGE | MID-CENTURY<br>☐ INSURANCE CO.<br>Endorsement #11 |
|---|---|---|---|

Effective Date    December 31, 1964

350-40-00
Policy Number
of the Company #4 above

### KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### ADDITIONAL INSURED - MILES and SONS TRUCKING SERVICE

In consideration of the premium at which this policy is written for
Automobile Bodily Injury and Automobile Property Damage Liability in-
surance, it is hereby agreed that MILES and SONS TRUCKING SERVICE
whose business address is P.O. Box 859, Merced, California, is an
Additional Insured with respect to the existence, ownership, maintenance,
or use of automobiles leased, or rented by the Named Insured to the
above mentioned Additional Insured, or while the Named Insured is acting
as Sub-hauler for the above mentioned Additional Insured.

The Company hereby agrees to void any wording in any insuring agreement,
exclusion, or condition of this policy depriving the Additional Named
Insured herein of coverage afforded hereby.

It is also agreed that such insurance protection as is extended to the
above named Additional Insured shall be primary insurance and any other
protection available to such Additional Insured shall be excess over
such primary insurance.

It is further agreed that the Company will not cancel, or reduce Automobile
Bodily Injury Liability or Automobile Property Damage Liability coverages
under this policy without first giving the above mentioned Additional In-
sured ten (10) days advance notice of such action.

This endorsement, when countersigned, becomes part of the above numbered policy and supersedes and controls anything in the policy contrary hereto but
is otherwise subject to the declarations, insuring agreements, exclusions and conditions thereof.

Countersigned

AUTHORIZED REPRESENTATIVE

TRK0000028

PR0684

PR01083

JA04514
Appellant's Appendix  TRK0000433



KAISER CEMENT & GYPSUM CORPORATION, ET AL.

CONTRACTUAL LIABILITY - NORTHERN PACIFIC RAILWAY COMPANY

Effective: December 31, 1954

Policy #350-40-00
Endorsement # 12

It is agreed that:

A. No provision or exclusion appearing in this policy or any endorsements attached hereto eliminating coverage for any obligation or liability assumed by the Insured under any contract or agreement, or for damage or injury to or destruction of property rented to, occupied or used by, or in the care, custody or control of the Insured shall apply to that certain permit from NORTHERN PACIFIC RAILWAY COMPANY, hereinafter called "Railway Company", to GLACIER SAND AND GRAVEL COMPANY numbered 84293 and dated April 15, 1958.

B. Such insurance as is afforded by the policy with respect to liability assumed by the Insured under contract applies also to that part of a contract between the Named Insured and Northern Pacific Railway Company, hereinafter called "Railway Company" dated April 15, 1958, reading:

3 - Should the right of way be fenced at the location described, Permittee shall construct and maintain crossing gates at Permittee's expense. Said gates shall be constructed in accordance with Railway Company's standard plan shown below or equal and shall be kept closed and locked excepting when necessary to be opened for travel. Permittee agrees to assume all damages of every kind whatsoever resulting from Permittee's failure to keep gates closed and locked as agreed in this paragraph.

6 - Permittee agrees to indemnify and hold harmless Railway Company from any and all loss, cost, damage or injury to persons, including death resulting therefrom, or to property arising or growing out of the existence or use of said private road upon Railway Company's property or arising or growing out of said private road crossing Railway Company's track, regardless of how such loss, cost, damage, injury or death may arise, and notwithstanding that it may arise in whole or in part from the negligence of Railway Company's employees, agents or servants.

7 - It is agreed that the provisions of paragraph 3 and 6 are for the equal protection of any other railroad company or companies heretofore or hereafter granted the joint use of Railway Company's property upon which said private road crossing is located.

C. The Railway Company and any other railroad company or companies heretofore or hereafter granted the joint use of the Railway Company's property are named as Additional Insureds under this policy, but only as respects coverage provided for in the above-mentioned permit.

D. In consideration of the premium charged, it is agreed that solely as respects the agreement between NORTHERN PACIFIC RAILWAY COMPANY and GLACIER SAND AND GRAVEL COMPANY numbered 84293 dated April 15, 1958 relative to an easement agreement at Steilacoom, Washington, the Limits of Liability, Coverage D, Property Damage Liability Other Than Automobile is hereby amended to read as follows:

Coverage D - Property Damage Liability    $100,000 Each Occurrence
              Other Than Automobile        $200,000 Aggregate operations

TRK0000029

PR0685

PR01084



## ENDORSEMENT

| FARMERS INSURANCE EXCHANGE | TRUCK INSURANCE EXCHANGE | FIRE INSURANCE EXCHANGE | MID-CENTURY INSURANCE CO. |
|---|---|---|---|
| ☐ | ☒ | ☐ | ☐ Endorsement #13 |

Effective Date    December 31, 1964            350-40-00
                                            Policy Number
                                        of the Company if above

### GLACIER SAND AND GRAVEL COMPANY

### ADDITIONAL INSURED - RAY OSOLIN, dba FLOATING MARINE WAYS

In consideration of the premium, it is agreed that such insurance as
is afforded by this policy for Bodily Injury and Property Damage Lia-
bility coverages is hereby extended to apply to

   RAY OSOLIN, dba FLOATING MARINE WAYS
   Foot of North New York Avenue
   Portland, Oregon

as an "Insured" as defined in the policy, but only as respects claims
arising out of the operation, maintenance or use of Barge Z owned by
Ray Osolin, dba Floating Marine Ways while said barge is leased to
Glacier Sand and Gravel Company.

This endorsement, when countersigned, becomes part of the above numbered policy and supersedes and amends anything in the policy contrary hereto but
is otherwise subject to the declarations, insuring agreements, exclusions and conditions thereof.

Countersigned _____
               AUTHORIZED REPRESENTATIVE

TRK0000030

PR0686

PR01085



## ENDORSEMENT

| | | | |
|---|---|---|---|
| FARMERS<br>☐ INSURANCE<br>EXCHANGE | TRUCK<br>☒ INSURANCE<br>EXCHANGE | FIRE<br>☐ INSURANCE<br>EXCHANGE | MID-CENTURY<br>☐ INSURANCE CO.<br>Endorsement #14 |

Effective Date    December 31, 1964

350-40-00
Policy Number
of the Company I'd above

### KAISER CEMENT & GYPSUM CORPORATION

### ADDITIONAL INSURED - CITY OF REDWOOD CITY, ET AL.

In consideration of the premium, it is agreed that such insurance
as is afforded by this policy for Bodily Injury and Property
Damage Liability coverages is hereby extended to apply to

CITY OF REDWOOD CITY, THE BOARD OF PORT COMMISSIONERS
OF THE CITY OF REDWOOD CITY, THE PORT OF REDWOOD CITY,
THE PORT COMMISSIONERS, THE COUNCILMEN and all
OFFICERS, AGENTS AND EMPLOYEES THEREOF
Redwood City, California

as an "Insured" as defined in the policy, but only as respects
claims arising out of the lease of premises to the Named Insured.

This endorsement, when countersigned, becomes part of the above numbered policy and supersedes and controls anything to the policy contrary herein but
is otherwise subject to the declarations, insuring agreements, exclusions and conditions thereof.

Countersigned _____

ACL.ET.J 5-64 15M                    AUTHORIZED REPRESENTATIVE
                                              65    12061

TRK0000031

PR0687

PR01086

Appellant's Appendix 037
JA04587
TRUCK0000436



## ENDORSEMENT

| | | | |
|---|---|---|---|
| ☐ FARMERS INSURANCE EXCHANGE | ☒ TRUCK INSURANCE EXCHANGE | ☐ FIRE INSURANCE EXCHANGE | ☐ MID-CENTURY INSURANCE CO. Endorsement #15 |

Effective Date  December 31, 1964

350-40-00
Policy Number
of the Company EX above

### KAISER CEMENT & GYPSUM CORPORATION

### ADDITIONAL INSURED - U.S. DEPARTMENT OF THE NAVY

Should the above mentioned policy be cancelled, assigned or changed
during the above named policy period in such manner as to affect
this Certificate, the Company will give thirty (30) days written
notice to the Officer in Charge of Construction, Bureau of Yards &
Docks Contract, Marianas Navy Co. 926, Fleet Post Office,
San Francisco, California.

It is agreed that the United States of America (Department of the
Navy) is an Additional Insured with respect to the Named Insured's
operations conducted on Cabras Island situated in Apra Harbor,
Island of Guam. It is also agreed that the Named Insured waives
any rights of subrogation against the United States of America
which might arise by reason of any payment under the policy arising
out of the Named Insured's operations conducted on Cabras Island,
situated in Apra Harbor, Island of Guam.

This endorsement, when countersigned, becomes part of the above numbered policy and supersedes and amends anything in the policy contrary hereto, but
is otherwise subject to the declarations, insuring agreements, exclusions and conditions thereof.

Countersigned _____

AUTHORIZED REPRESENTATIVE
ACY-SET-2  (rev 1-64)      R4    11-90)

TRK0000032

PR0688

PR01087

JA04518
Appellant's Appendix 03182      TRK0420000437



## ENDORSEMENT

| | | | |
|---|---|---|---|
| FARMERS ☐ INSURANCE EXCHANGE | TRUCK ☒ INSURANCE EXCHANGE | FIRE ☐ INSURANCE EXCHANGE | MID-CENTURY ☐ INSURANCE CO. Endorsement #16 |

Effective Date    December 31, 1964

350-40-00
Policy Number
of the Company I'd above

### KAISER CEMENT & GYPSUM CORPORATION

### ADDITIONAL INSURED - YOUNG BROTHERS, LIMITED

In consideration of the premium, it is agreed that such insurance as is afforded by this policy for Bodily Injury and Property Damage Liability coverages is hereby extended to apply to

YOUNG BROTHERS, LIMITED
325 North King Street
Honolulu, Hawaii

as an "Insured" as defined in the policy, but only as respects claims arising out of the installation of the equipment and other facilities on four barges by Kaiser Cement & Gypsum Corporation and the loading and unloading operations by Kaiser, its agents or servants or employees, of said barges operated by Young Brothers, Limited, for the purpose of transporting bulk cement to the Named Insured's premises in the Hawaiian Islands.

This endorsement, when countersigned, becomes part of the above numbered policy and supersedes and controls anything in the policy contrary hereto but is otherwise subject to the declarations, insuring agreements, exclusions and conditions thereof.

Countersigned _____
ACT-21-2 1-63  1466                  AUTHORIZED REPRESENTATIVE
(160)

TRK0000033

PR0689

PR01088

TRUCK0000438



## ENDORSEMENT

| | | | |
|---|---|---|---|
| ☐ FARMERS INSURANCE EXCHANGE | ☒ TRUCK INSURANCE EXCHANGE | ☐ FIRE INSURANCE EXCHANGE | ☐ MID-CENTURY INSURANCE CO. Endorsement #17 |

Effective Date __December 31, 1964__

350-40-00
Policy Number
of the Company X'd above

### KAISER CEMENT & GYPSUM CORPORATION and GLACIER SAND AND GRAVEL COMPANY

### ADDITIONAL INSURED - ZIDELL MACHINERY & SUPPLY COMPANY, ET AL.

In consideration of the premium, it is agreed that such insurance as is afforded by this policy for Bodily Injury and Property Damage Liability coverages is hereby extended to apply to

    ZIDELL MACHINERY & SUPPLY COMPANY and
    ZIDELL EXPLORATIONS INC.
    8/N Bond Street
    Portland, Oregon

as an "Insured" as defined in the policy, but only as respects claims arising out of the operation, maintenance or use of barges owned by Zidell Machinery & Supply Company and Zidell Explorations Inc. while said barges are used by the Named Insured.

This endorsement, when countersigned, becomes part of the above numbered policy and supersedes and controls anything in the policy contrary hereto but is otherwise subject to the declarations, insuring agreements, exclusions and conditions thereof.

Countersigned _____

ACT-EY-3 A-64 LHps        OO        (S.M.)

TRK0000034

PR0690

PR01089

JA04520
Appellant's Appendix 02464
TRUCK0000439



ENDORSEMENT

| FARMERS ☐ INSURANCE EXCHANGE | TRUCK ☒ INSURANCE EXCHANGE | FIRE ☐ INSURANCE EXCHANGE | MID-CENTURY ☐ INSURANCE CO. Endorsement #18 |

Effective Date    January 15, 1965                    350-40-00
                                                      Policy Number
                                                      of the Company if shown

KAISER CEMENT & GYPSUM CORPORATION

ADDITIONAL INSURED - FRANK A. JESSUP

In consideration of the premium, it is agreed that such insurance
as is afforded by this policy for Bodily Injury and Property
Damage Liability coverages is hereby extended to apply to

FRANK A. JESSUP

as an "Insured" as defined in the policy, but only as respects
claims arising out of his performance of consulting services for
Kaiser Cement & Gypsum Corporation.

This endorsement, when countersigned, becomes part of the above numbered policy and supersedes and cancels anything in the policy contrary hereto but is otherwise subject to the declarations, insuring agreements, exclusions and conditions thereof.

Countersigned _____
ACT-EV-1 1-65 1-965    AUTHORIZED REPRESENTATIVE

TRK0000035

PR0691

PR01090

Appellant's Appendix JA04521
TRUCK0000440

## ENDORSEMENT

☐ FARMERS INSURANCE EXCHANGE   ☒ TRUCK INSURANCE EXCHANGE   ☐ FIRE INSURANCE EXCHANGE   ☐ MID-CENTURY INSURANCE CO.
Endorsement #19

Effective Date  January 22, 1965        350-40-00
Policy Number
of the Company I'd above

KAISER CEMENT AND GYPSUM CORPORATION and
KAISER GYPSUM COMPANY, INC.

ADDITIONAL INSURED - REALSMITH REALTORS

In consideration of the premium, it is agreed that such insurance
as is afforded by this policy for Bodily Injury and Property Damage
Liability coverages is hereby extended to

REALSMITH REALTORS
2902 "E" Street
Eureka, California

as an "Insured" as defined in the policy, but only as respects
claims arising out of the management of property located at
4060 Walnut Drive, Eureka, California.

It is further understood and agreed that this policy will not be
cancelled or reduced in coverage until after ten days written
notice of such cancellation or reduction in coverage shall have
been mailed to Realsmith Realtors at the address stated above.

This endorsement, when countersigned, becomes part of the above numbered policy and supersedes and controls anything in the policy contrary hereto but
is otherwise subject to the declarations, insuring agreements, exclusions and conditions thereof.

Countersigned
ACT-97.5 1-56 1964

TRK0000036

PR0692

PR01091

JA04522
Appellant's Appendix 02186
TRUCK0000441



ENDORSEMENT

| FARMERS ☐ INSURANCE EXCHANGE | TRUCK ☒ INSURANCE EXCHANGE | FIRE ☐ INSURANCE EXCHANGE | MID-CENTURY ☐ INSURANCE CO. Endorsement #20 |

Effective Date: May 7, 1965                                      350-40-00
                                                                 Policy Number
                                                                 of the Company Ed above

PACIFIC BUILDING MATERIALS DIVISION OF
GLACIER SAND & GRAVEL COMPANY

ADDITIONAL INSURED - THE WHITE MOTOR COMPANY and REX CHAIN BELT CO.

In consideration of the premium, it is agreed that such insurance as
is afforded by this policy for Automobile Bodily Injury and Property
Damage Liability coverages is hereby extended to apply to

        THE WHITE MOTOR COMPANY and REX CHAIN BELT CO.
        Cleveland
        Ohio

as an Additional Insured as defined in the policy, but only as respects
claims arising out of the use of White Freightliner Demonstrator
Model WFHT 6264, Serial #C10 8713, while on loan to Pacific Building
Materials Division of Glacier Sand & Gravel Company.

This endorsement, when countersigned, becomes part of the above numbered policy and supersedes and controls anything in the policy contrary hereto but
is otherwise subject to the declarations, insuring agreements, exclusions and conditions thereof.

Countersigned _____
ACV-2713 A-64 2001        ed    (2nd)

TRK0000037

PR0693

PR01092

Appellant's Appendix A04523
TRUCK0000442

## ENDORSEMENT

Effective Date  July 1, 1965

350-40-00
Policy Number
Endorsement #21

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

ADDITIONAL INSURED - COMMERCIAL CREDIT INDUSTRIAL CORP.

In consideration of the premium, it is agreed that such in-
surance as is afforded by this policy for Automobile Bodily
Injury and Property Damage Liability coverages is hereby ex-
tended to apply to

COMMERCIAL CREDIT INDUSTRIAL CORP.
300 St. Paul Place
Baltimore, Maryland 21202

as an Additional Insured as defined in the policy; but only
as respects claims arising out of vehicles leased to KAISER
GYPSUM COMPANY, INC.

This endorsement, when countersigned, becomes part of the policy to which it is attached and supersedes and controls anything in the
policy contrary hereto but is otherwise subject to the declarations, insuring agreements, exclusions and conditions thereof.

TRUCK INSURANCE EXCHANGE
Truck Underwriters Association, Atty. in fact

Countersigned _____
AUTHORIZED REPRESENTATIVE

By _____
President

TRK0000038

PR0694

PR01093

## ENDORSEMENT

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### COVERAGE G - EMPLOYEE BENEFITS LIABILITY

Effective Date    July 14, 1965

Policy Number
350-40-00
Endorsement #22
Page 1

#### LIMITS OF LIABILITY

$100,000 each claim
$100,000 annual aggregate

#### INSURING AGREEMENTS

In consideration of an additional premium to be determined and in reliance upon the statements in the Application and subject to the terms of this endorsement and of the Policy to which this endorsement is attached, the Company agrees with the Insured named in the Declarations of the Policy as follows:

I. COVERAGE.  The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages on account of any claim made against the Insured by any employee, former employee or the beneficiaries or legal representatives thereof for injury caused by any negligent act, error or omission of the Insured, or any other person for whose acts the Insured is legally liable in the administration of Employee Benefits as defined herein.

II. DEDUCTIBLE.  $1,000 shall be deducted from the amount of each claim covered under the terms of this endorsement, and the Company shall be liable for loss only in excess of that amount.

III. The DEFENSE, SETTLEMENT, SUPPLEMENTARY PAYMENTS provisions of the policy shall apply as respects the insurance hereby afforded, except that the Company shall not make settlement or compromise any claim or suit without the written consent of the Named Insured.

IV. POLICY PERIOD AND TERRITORY.  This insurance applies only to claims brought against the Named Insured during the policy period within the United States of America, its territories or possessions or Canada, resulting from negligent acts, errors or omissions in the administration of Employee Benefits, provided the Named Insured, at the effective date of the policy, had no knowledge of or could not have reasonably foreseen any circumstances which might result in such claim.

#### DEFINITIONS

"INSURED".  The unqualified word "Insured" wherever used in relation to the insurance afforded hereby, includes not only the Named Insured, but also any partner, executive officer, director, stockholder or employee, provided such employee is authorized to act in the administration of the Employee Benefits.

"EMPLOYEE BENEFITS".  The term "Employee Benefits" shall mean group life insurance, group accident and health insurance, profit sharing plans, pension plans, employee stock subscription plans, workmen's compensation, unemployment insurance.

This endorsement, when attached to COVERAGE G EMPLOYEE BENEFITS LIABILITY policy forms a part thereof and cancels everything in the policy contrary hereto but is otherwise subject to the declarations, insuring agreements, exclusions and conditions thereof.

TRUCK INSURANCE EXCHANGE
Truck Underwriters Association, Atty. in fact

President

TRK0000039

PR0695

PR01094

TRUCK0000444

## ENDORSEMENT

### KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### COVERAGE G - EMPLOYEE BENEFITS LIABILITY

Effective Date   July 14, 1965

350-40-00
Policy Number
Endorsement #22
Page 2

### DEFINITIONS (Continued)

"ADMINISTRATION". As respects the insurance afforded hereby, the unqualified
word "administration", wherever used shall mean:
(a) Giving counsel to employees with respect to the Employee Benefits;
(b) Interpreting Employee Benefits;
(c) Handling of records in connection with Employee Benefits;
(d) Effective enrollment, termination or cancellation of employees under
    Employee Benefit Programs;

performed by a person authorized by the Named Insured to do such acts.

### EXCLUSIONS

The insurance afforded by this endorsement does not apply:
(a) To any dishonest, fraudulent, criminal or malicious act, libel, slander,
    discrimination, or humiliation;
(b) To bodily injury to, or sickness, disease, or death, of any person, or to
    injury to or destruction of any tangible property, including the loss of
    use thereof;
(c) To any claim for failure of performance of contract by any Insurer;
(d) To any claim based upon the Named Insured's failure to comply with any law
    concerning workmen's compensation, unemployment insurance, social security
    or disability benefits;
(e) To any claim based upon failure of stock to perform as represented by an
    Insured;
(f) To any claim based upon advice given by an Insured to participate or not
    to participate in stock subscription plans.

### CONDITIONS

The conditions of the policy entitled "Assistance and Co-operation of the Insured",
"Action Against Company", "Other Insurance", "Subrogation", "Changes, Assignment",
"Cancellation" apply to the insurance afforded hereby and the following Conditions
apply:

A. LIMITS OF LIABILITY. The Limit of Liability stated above as applicable to
   "each claim" is the limit of the Company's liability for all damages in-
   curred on account of any claim covered hereunder; the limit of liability
   stated above as "aggregate" is, subject to the above provision respecting
   each claim, the total limit of the Company's liability for all claims
   covered hereunder and occurring during each annual endorsement period.
   The inclusion herein of more than one Insured shall not operate to increase
   the limits of the Company's liability.
B. NOTICE OF CLAIM OR SUIT. Irrespective of the application of the deductible
   amount, written notice of any claim or alleged negligent act, error or omission
   shall be given by or on behalf of the Insured to the Company. If suit is

This endorsement, when countersigned, becomes part of the policy to which it is attached and supersedes and rescinds anything in the
policy necessary hereto but is otherwise subject to the declarations, insuring agreements, conditions and conditions thereof.

TRUCK INSURANCE EXCHANGE
Truck Underwriters Association, Atty. in fact

Countersigned _____
             AUTHORIZED REPRESENTATIVE

by _____
        President

TRK0000040

PR0696

PR01095

Appellant's Appendix 02490

JA04526

TRK0K0000445

ENDORSEMENT

KAISER CEMENT & GYPSUM CORPORATION, ET AL.
COVERAGE G - EMPLOYEE BENEFITS LIABILITY

350-40-00
Policy Number
Endorsement #22
Page 3

Effective Date    July 14, 1965

CONDITIONS (Continued)

brought, the Insured shall immediately forward to the Company every
summons or other process received by him.

This endorsement, when countersigned, becomes part of the policy to which it is attached and supersedes and controls anything in the
policy contrary hereto but is otherwise subject to the declarations, insuring agreements, exclusions and conditions thereof.

TRUCK INSURANCE EXCHANGE
Truck Underwriters Association, Atty. in fact

Countersigned _____    by _____
AUTHORIZED REPRESENTATIVE                       President

TRK0000041

PR0697

PR01096

Appellant's Appendix 02491
JA04527
TRUCK0000446

ENDORSEMENT

Effective Date   July 14, 1965

350-40-00
Policy Number

Endorsement #3

### KAISER CEMENT & GYPSUM CORPORATION, ET AL.

#### PREMIUM ADJUSTMENT ENDORSEMENT

DEPOSIT PREMIUM to be maintained $4,725.00.

As respects the first $10,000 aggregate liability from one occurrence, it is agreed that on or before the 25th day of each month during the currency of this policy the Named Insured shall render to the Company a statement showing the total remuneration earned by its employees during the preceding month (being the amount of remuneration upon which the Named Insured's Workman's Compensation premium for the same period is predicated including similarly adjusted payroll in states where Workmen's Compensation is self-insured) computed at the following rates per $100.00 of the total remuneration so reported:

| Standard | (Basic) |
|----------|---------|
| $.2625 | ($.175) |

Such earned premium shall be payable to the Company forthwith and shall be subject to such adjustments as are provided for in that certain Premium Determination Agreement entered into between the Named Insured and the Exchange dated December 31, 1964.

For policy limits in excess of $10,000.00 aggregate as respects any one occurrence, and not subject to adjustment under said Premium Determination Agreement, premium shall be payable monthly at the rate of $ .0535 per $100.00 of the total remuneration so reported.

This endorsement, when countersigned, becomes part of the policy to which it is attached and supersedes and cancels anything in the policy contrary hereto but is otherwise subject to the declarations, insuring agreements, exclusions and conditions thereof.

TRUCK INSURANCE EXCHANGE
Truck Underwriters Association, Atty. in fact

By _R. H. Wenzel_
President

TRK0000042

PR0698

PR01097

JA04528
Appellant's Appendix 002GK0000447

## ENDORSEMENT



Effective Date ____July 1, 1965____

350-40-00
Policy Number
Endorsement #24

KAISER CEMENT & GYPSUM CORPORATION
and
KAISER GYPSUM COMPANY, INC.

ADDITIONAL INSURED - COMMERCIAL CREDIT INDUSTRIAL CORP.
(In lieu of Endorsement #21)

In consideration of the premium, it is agreed that such insurance
as is afforded by this policy for Automobile Bodily Injury and
Property Damage Liability coverages is hereby extended to apply
to

COMMERCIAL CREDIT INDUSTRIAL CORP.
300 St. Paul Place
Baltimore, Maryland 21202

as an Additional Insured as defined in the policy but only as
respects claims arising out of vehicles leased to the Named In-
sured and the sale or disposition of automobiles in behalf of the
Named Insured.

This endorsement, when countersigned, becomes part of the policy to which it is attached and supersedes and cancels anything in the
policy contrary hereto but is otherwise subject to the declarations, insuring agreement, exclusions and conditions thereof.

TRUCK INSURANCE EXCHANGE
Truck Underwriters Associates, Atty. in fact

Countersigned _Carl F. Swaren_____
AUTHORIZED REPRESENTATIVE

By _R.H. Wenger_____
President

TRK0000043

PR0699

PR01098

Appellant's Appendix JA04529
TRUCK0000448

ENDORSEMENT

| FARMERS ☐ INSURANCE EXCHANGE | TRUCK ☒ INSURANCE EXCHANGE | FIRE ☐ INSURANCE EXCHANGE | MID-CENTURY ☐ INSURANCE CO. |

Endorsement #25

Effective Date    January 3, 1966

350-40-00
Policy Number
of the Company it's above

KAISER CEMENT & GYPSUM CORPORATION

ADDITIONAL INSURED - AUTREY & COLLINS, A PARTNERSHIP

In consideration of the premium, it is agreed that such insurance as is
afforded by this policy for Bodily Injury and Property Damage Liability
coverages other than Automobile is hereby extended to

AUTREY & COLLINS, A Partnership
1330 San Pedro, N.E.
Albuquerque, New Mexico

as an "Insured" as defined in the policy, but only as respects claims
arising out of the use or occupancy by the Named Insured of Suite 104,
Autrey Plaza, 1330 San Pedro, N.E., Albuquerque, New Mexico.

It is further understood and agreed that this policy will not be can-
celled or reduced in coverage until after ten days written notice of
such cancellation or reduction in coverage shall have been mailed to
Autrey & Collins at the address shown above.

This endorsement, when countersigned, becomes part of the above numbered policy and supersedes and controls anything in the policy contrary hereto but
is otherwise subject to the declarations, insuring agreements, exclusions and conditions thereof.

Countersigned

AUTHORIZED REPRESENTATIVE
ACT-ET-5 8-38 1964    ........ 00    (345.)

TRK0000044

PR0700

PR01099

JA04530
Appellant's Appendix TRK0000449

Effective: December 31, 1964

Policy #350-40-00
Endorsement #26

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### AMENDATORY ENDORSEMENT

In consideration of the premium, it is agreed as follows:

**A. Territory**

Insuring Agreement IV, Part A, Paragraph (2) is amended to read:

"occur in Guam or elsewhere in the world, excluding Mexico and countries in the Soviet Union, East Germany (except Berlin), Poland, Czechoslovakia, Hungary, Yugoslavia, Albania, Bulgaria, Romania, North Korea, Tibet, Communist China, North Vietnam and Cuba, except that the insurance afforded by the policy does not apply to claims to the extent coverage is afforded under St. Paul Mercury Insurance Company's Policy #OGL-12509 or any renewals or replacements thereof;"

**B. Limits of Liability**

In Insuring Agreement IV Part B, Paragraph (2), the following is added to the schedule of limits:

Coverage E - $25,000 each person
$25,000 aggregate

Coverage F - $25,000 each person
$25,000 aggregate

**C. Loading and Unloading Coverage**

Exclusion (6) is hereby changed to read:

"(6) Under Coverages A and C, to injury, sickness, disease, death or destruction which arises out of the loading or unloading of an automobile, if the accident occurs on premises (including the ways immediately adjoining) owned, rented or controlled either by the person or by the employer of the person against whom claim is made or suit is brought for such injury, sickness, disease, death or destruction, except as provided under Insuring Agreement III 3. (c); but this limitation does not apply with respect to claims made or suits brought against the following Insureds:

(a) the Named Insured;

(b) a bailee or borrower of the automobile or an employee of either of them or of the Named Insured;

(c) if the Named Insured is classified and rated as a truckman, any person or organization, or any agent or employee thereof, engaged in the business of transporting property by automobile for the Named Insured or for others; subject nevertheless to the limitations of any endorsement made a part of the policy and specifically applicable to truckmen;

(d) any other person or organization but only with respect to his or its liability because of acts or omissions of an Insured under (a), (b) or (c) above;

**D. Assistance and Cooperation of the Insured**

The second sentence of Condition 8 is hereby changed to read:  "The Insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense, except under Coverages A and B for emergency medical and surgical relief to others at the time of the occurrence; unless, however, the loss or claim is subject to adjustment under the $5,000 Deductible Endorsement #4."

TRK0000045

PR0701

PR01100

Appellant's Appendix
JA04531
TRUCK0000450

Effective:  December 31, 1964

Policy #350-40-00
Endorsement #26
Page 2

### KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### AMENDATORY ENDORSEMENT

#### D. Assistance and Cooperation of the Insured

The second sentence of Condition 8 is hereby changed to read:

"The Insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense, except under Coverages A and B for emergency medical and surgical relief to others at the time of the occurrence:  unless, however, the loss or claim is subject to adjustment under the $5,000 Deductible Endorsement #4."

#### E. Specific Insurance

In Endorsement #2, the title of Part 3 is changed from

"Kaiser Center Premises Excess Coverage" to "Excess Coverage over other Specific Insurance."

Countersigned - Authorized Representative

TRUCK INSURANCE EXCHANGE

TRK0000046

PR0702

PR01101

Effective: October 27, 1965

Policy #350-40-00
Endorsement #27

## GLACIER SAND AND GRAVEL COMPANY

### ADDITIONAL INSURED - RAY OSOLIN, dba FLOATING MARINE WAYS

In consideration of the premium, it is agreed that such in-
surance as is afforded by this policy for Bodily Injury and
Property Damage Liability coverages is hereby extended to
apply to

RAY OSOLIN, dba FLOATING MARINE WAYS
Foot of North New York Avenue
Portland, Oregon

as an "Insured" as defined in the policy, but only as respects
claims arising out of the operation, maintenance or use of
Barge Z and Barge FBM #1 owned by Ray Osolin, dba Floating Marine
Ways while said barges are leased to Glacier Sand and Gravel
Company.

Countersigned - Authorized Representative

TRUCK INSURANCE EXCHANGE

TRK0000047

PR0703

PR01102

Appellant's Appendix 02197
JA04533
TRUCK0000452

# ENDORSEMENT

| Effective Date | August 26, 1965 to November 10, 1965 | | 50-99-01 | 350-40-00 |
|---|---|---|---|---|
| | | | Agent | Policy Number |

Endorsement #28

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

## LONGHORN PORTLAND CEMENT COMPANY

In consideration of an additional monthly premium of $75.00 (Basic $30.00, Standard $45.00, Excess $30.00), it is agreed that

LONGHORN PORTLAND CEMENT COMPANY

is designated as a Named Insured hereunder except to the extent that coverage is afforded under any other insurance available to Longhorn Portland Cement Company.

This endorsement when countersigned, becomes part of the policy to which it is attached and supersedes and controls anything in the policy contrary hereto but is otherwise subject to the declarations, insuring agreements, exclusions and conditions thereof.

TRUCK INSURANCE EXCHANGE
Truck Underwriters Association, Atty. in fact

By _____
President

TRK0000048

PR0704

PR01103

JA04534
Appellant's Appendix 02456
TRUCK0000453



ENDORSEMENT

Effective Date    November 10, 1965



| 50-99-01 | 350-40-00 |
| Agent | Policy Number |

Endorsement #69

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

TEXAS COVERAGE



In consideration of an additional monthly premium of $75.00
(Basic $30.00, Standard $45.00, Excess $30.00), it is agreed
that the coverage afforded under this policy for Texas
operations of

KAISER CEMENT & GYPSUM CORPORATION
and
LONGHORN PORTLAND CEMENT COMPANY, Division of
Kaiser Cement & Gypsum Corporation

shall be excess of and not contributing with any coverage under
any other insurance available to said Named Insureds.

Coverage for other Named Insureds hereunder is not altered by
this Endorsement.

7.50 Commission



This endorsement when countersigned, becomes part of the policy to which it is attached and supersedes and controls anything in the
policy contrary hereto but is otherwise subject to the declarations, insuring agreements, exclusions and conditions thereof.

Countersigned _____

_____
AUTHORIZED REPRESENTATIVE

TRUCK INSURANCE EXCHANGE
Truck Underwriters Association, Atty. in fact

By _____
President

TRK0000049

PR0705

PR01104

ENDORSEMENT

Effective Date  JANUARY 1, 1966

| 90-99-01 | 350-40-00 |
|----------|-----------|
| Agent | Policy Number |

Endorsement #30

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### RATE ENDORSEMENT

It is agreed that the premium for the first $10,000.00 aggregate liability limit under this policy shall be calculated at the Basic Rate set forth in Endorsements #23 and #29.

This endorsement, when countersigned, becomes part of the policy to which it is attached and supersedes and controls anything in the policy contrary hereto but is otherwise subject to the declarations, insuring agreements, exclusions and conditions thereof.

TRUCK INSURANCE EXCHANGE
Truck Underwriters Association, Att: in fact

Countersigned _____

By _____
President

TRK0000050

PR0706

PR01105

JA04536
Appellant's Appendix 04266
TRUCK0000455



TRK0000051

PR0707

PR01106

ENDORSEMENT

May 2, 1956

| | | |
|---|---|---|
| 50-59-53 | 350-40-00 | |
| Agent | Policy Number | |

Endorsement #32

## TRUCK COMPANY & SYSTEM CORPORATION

## ADDITIONAL INSURED - C.R.B. LEASING COMPANY

In consideration of the premium, it is agreed that such insurance as is afforded by this policy for Automobile Bodily Injury and Property Damage Liability coverages is hereby extended to apply to

    C.R.B. LEASING COMPANY
    52 Dapplegray Lane
    Rolling Hills Estates, California

as an Additional Insured as defined in the policy but only as respects claims arising out of vehicles leased to the Named Insured and the sale or disposition of automobiles in behalf of the Named Insured.

This endorsement, when countersigned, becomes part of the policy to which it is attached and supersedes and controls anything in the policy contrary hereto but is otherwise subject to the declarations, insuring agreements, exclusions and conditions thereof.

TRUCK INSURANCE EXCHANGE
Truck Underwriters Association, Atty. in fact

By _R.H. Wenzel_
    President

Countersigned _____
AUTHORIZED REPRESENTATIVE

TRK0000052

PR0708

PR01107

JA04538
Appellant's Appendix TRK000000457

ENDORSEMENT

Effective Date    May 1, 1966

90-99-98
Agency

350-40-00
Policy Number

Endorsement #33

## KAISER CEMENT & GYPSUM CORPORATION

### TEXAS COVERAGE

In consideration of the inclusion of the payroll
of the LONGHORN PORTLAND CEMENT COMPANY Division
of Kaiser Cement & Gypsum Corporation in the
determination of the premium for this policy, it
is agreed that Endorsement #29 is hereby can-
celled.

This endorsement, when countersigned, becomes part of the policy to which it is attached and supersedes and controls anything in the
policy contrary hereto but is otherwise subject to the declarations, insuring agreements, exclusions and conditions thereof.

TRUCK INSURANCE EXCHANGE
Truck Underwriters Association, Atty. in fact

By

TRK0000053

PR0709

PR01108

Appellant's Appendix 04539
TRUCK0000458

Effective: March 6, 1966

Policy #350-40-00
Endorsement #34

## KAISER CEMENT & GYPSUM CORPORATION

### DEFINITION OF NAMED INSURED
(In Lieu of Endorsement #1 )

In consideration of the premium, it is agreed that the Named
Insured in Item 1 of the Declarations is designated as:

KAISER CEMENT & GYPSUM CORPORATION,
GLACIER SAND & GRAVEL COMPANY,
GYPSUM CARRIER, INC. OF PANAMA, R.P.,
KAISER GYPSUM COMPANY, INC.
PERMANENTE STEAMSHIP CORPORATION,
PERMANENTE TRUCKING COMPANY,
SOUTHWEST MATERIALS, INC. and
Their Owned or Controlled or Subsidiary Companies or
Corporations as is now or may hereafter be constituted,
Jointly and Severally.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000054

PR0710

PR01109

Appellant's Appendix        JA04540
TRUCK0000459

Effective: April 22, 1966

Policy #350-40-00
Endorsement #35

## KAISER CEMENT & GYPSUM CORPORATION

### ADDITIONAL INSURED - ACE BARGE COMPANY, ET AL.
(In lieu of Endorsement #31)

In consideration of the premium, it is agreed that such insurance as is afforded by this policy for Bodily Injury and Property Damage Liability coverages is hereby extended to apply to

ACE BARGE COMPANY and
CROWLEY LAUNCH AND TUGBOAT COMPANY
and affiliated and inter-related companies
including vessels
Pier 32, San Francisco, California

As an "Insured" as defined in the policy, but only as respects claims arising out of the operation, maintenance or use of barges while said barges are leased to Kaiser Cement & Gypsum Corporation or Permanente Steamship Corporation.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000055

PR0711

PR01110

Appellant's Appendix 04541
TRUCK0000460

Effective: December 13, 1966

Policy #350-40-00
Endorsement #36
(In Lieu of End. #9)

## KAISER CEMENT & GYPSUM CORPORATION

## ADDITIONAL INSURED - HILTON HOTELS CORPORATION

In consideration of the premium, it is agreed that such
insurance as is afforded by this policy for Bodily Injury
and Property Damage Liability is hereby extended to apply
to

HILTON HOTELS CORPORATION
900 Wilshire Boulevard
Los Angeles, California

as an "Insured" as defined in the policy but only as respects
claims arising out of the lease of certain premises at the
above location.

The Company hereby agrees to void any wording in any insuring
agreement, exclusion or condition of this policy depriving
the herein named Additional Insured of the coverage described
above.

It is also agreed that such insurance protection extended to
the above named Additional Insured under this endorsement
shall be primary insurance and any other protection available
to such Additional Insured shall be excess over such primary
insurance.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000056

PR0712

PR01111

Appellant's Appendix

JA04542

TRUCK0000461



Effective:  June 1, 1966                            Policy #350-40-00
                                                    Endorsement #37


KAISER CEMENT & GYPSUM CORPORATION

ADDITIONAL INSURED - TIDEWATER TERMINAL COMPANY


In consideration of the premium, it is agreed that such
insurance as is afforded by this policy for Bodily Injury
and Property Damage Liability coverages is hereby extended
to apply to

        TIDEWATER TERMINAL COMPANY
        2609 N.E. Marine Drive
        Portland, Oregon  97211

as an "Insured" as defined in the policy, but only as
respects claims arising out of the lease of premises at
East Pasco, Washington, to the Named Insured.


Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000057

PR0713

PR01112

TRUCK0000462

Effective:  January 18, 1967

Policy #350-40-00
Endorsement #38

## KAISER CEMENT & GYPSUM CORPORATION

## ADDITIONAL INSURED - THE IRVINE COMPANY

In consideration of the premium, it is agreed that this policy
shall afford to The Irvine Company, San Joaquin Rancho, Irvine,
California, the insurance coverage described below:

Bodily Injury Liability:    Each Person       $50,000
                            Each Occurrence  $100,000

Property Damage Liability:  Each Person       $50,000
                            Each Occurrence   $50,000

as an "Insured" as defined in the policy, but only as respects
claims arising out of the entry by the Named Insured in to any
property owned by The Irvine Company.

Countersigned

TRUCK INSURANCE EXCHANGE

TRJK0000058

PR0714

PR01113

JA04544
Appellant's Appendix 02308
TRUCK0000463

Effective: January 1, 1967

Policy #350-40-00
Endorsement #39
(Corrected)

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

## PREMIUM ADJUSTMENT ENDORSEMENT

DEPOSIT PREMIUM to be maintained: $4,725.00.

A. As respects the first $10,000 aggregate liability from one occurrence,
it is agreed that on or before the 25th day of January 1968, the Named
Insured shall render to the Company a statement showing the total
remuneration earned by its employees during the period January 1, 1967
to January 1, 1968 (being the amount of remuneration upon which the
Named Insured's Workmen's Compensation premium for the same period is
predicated including similarly adjusted payroll in states where
Workmen's Compensation is self-insured or insured in a State Fund),
and the earned premium shall be computed at the following rates per
$100.00 of the total remuneration so reported:

| Standard | (Basic) |
|----------|---------|
| $.289 | ($.193) |

B. Such earned premium shall be payable to the Company forthwith and
shall be subject to such adjustments as are provided for in that certain
Premium Determination Agreement entered into between the Named Insured
and the Exchange dated December 31, 1964.

C. For policy limits in excess of $10,000.00 aggregate as respects any one
occurrence, and not subject to adjustment under said Premium Determination
Agreement, premium shall be payable at the rate of $.059 per $100.00 of
the total remuneration so reported.

D. Furthermore, the Named Insured shall pay to the Company the sum of
$5,000.00 on or before the 10th day of each month during the currency of
this policy, such sums to be credited to the earned premium determined
by the premium adjustment as provided in Parts A, B and C, above.

E. In addition, the Named Insured will submit a semi-annual report of
remuneration to serve as the basis for any adjustment of the monthly
flat charge.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000059

PR0715

PR01114

Appellant's Appendix 0454

TRUCK0000464

Effective: January 1, 1967

Policy #350-40-00
Endorsement #40

### KAISER CEMENT & GYPSUM CORPORATION, ET AL.
(In Lieu of Endorsement #4)

### $5,000 DEDUCTIBLE ENDORSEMENT

As respects each occurrence or one malpractice act, error or mistake regardless of the number of claims emanating therefrom, the Insured agrees to assume the first $5,000 of loss and related adjustment expense under any one or combination of coverages. The Company shall tabulate the amounts so paid which are thus recoverable from the Insured and shall bill the Insured monthly for the accumulated total. The Insured shall reimburse the Company promptly.

There will be two types of loss adjustment expense which shall be defined and computed as follows:

1. Allocated Adjustment Expense - Exact items of expense directly incurred by the Company and chargeable to a particular claim. (Examples: legal fees, court costs, medical examiner's fees, photographer bills, etc.) Services of independent adjusters are excluded.

2. Unallocated Adjustment Expense. - A charge to cover all general claims administration costs. (Examples: Services of salaried and independent adjusters, claim examiners, clerical service, stationery, office rent, and other overhead items).

In addition to reimbursement for paid losses as defined above, the Insured agrees to reimburse the Company for a share of both Allocated and Unallocated Adjustment Expense incurred by the Company in the settlement of losses and in the settlement of claims closed for no payment.

1. Allocated Adjustment Expense.
   (a) Allocated Adjustment Expense shall be reimbursed in the same proportion that the deductible loss bears to the total loss.

   (b) On claims closed with no payment, Allocated Adjustment Expense shall be reimbursed in the proportion that $5,000 bears to the last reserve on the claim prior to closing.

2. Unallocated Adjustment Expense.
   (a) 12% of the Insured's portion of loss under Coverages A, B, E and F.

   (b) 5% of the Insured's portion of loss under Coverages C and D.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000060

PR0716

PR01115

JA04546
Appellant's Appendix 02210    TRUCK0000465

A-1

LC 619-B

## Standard Form of Endorsement Prescribed by the Public Utilities Commission of the State of California

### TO BE ATTACHED TO AND MADE A PART OF ALL POLICIES INSURING MOTOR VEHICLES SUBJECT TO REGULATION BY THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

(Separate all endorsements heretofore required by said Commission)

The policy to which this endorsement is attached is an Automobile Bodily Injury Liability and Property Damage Liability policy and is hereby amended to assure compliance by the insured, as a motor carrier of property, with General Order No. 100-Series and the pertinent rules and regulations of the Public Utilities Commission of the State of California.

In consideration of the premises stated in the policy to which this endorsement is attached, the Company hereby agrees to pay, within the limits of liability hereinafter provided, any final judgment rendered against the insured for bodily injury to or death of any person, or loss of or damage to property of others (excluding injury to or death of the insured's employees while engaged in the course of their employment, and loss or damage to property owned by, rented to, in charge of, or transported by the insured), resulting from the operation, maintenance, or use of motor vehicles for which a certificate of public convenience and necessity or permit is required or has been issued to the insured by the Public Utilities Commission of the State of California, regardless of whether such motor vehicles are specifically described in the policy or not.

Within the limits of liability hereinafter provided it is further understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, or any other endorsement thereon, or violation thereof, or of this endorsement, by the insured, shall relieve the Company from liability hereunder or from the payment of any such final judgment, irrespective of the financial responsibility or lack thereof or insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which this endorsement is attached are to remain in full force and effect as binding between the insured and the Company, and the insured agrees to reimburse the Company for any payment made by the Company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the Company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

It is understood and agreed that, upon failure of the Company to pay any final judgment rendered against the insured herein, the judgment credit may maintain an action in any court of competent jurisdiction against the Company to compel such payment.

The liability of the Company for the amounts provided in this endorsement apply separately to each accident and any payment under the policy because of any one accident shall not operate to reduce the liability of the Company for the payment of final judgments resulting from any other accident.

### Schedule of Limits
Bodily Injury Liability and Property Damage Liability

For bodily injuries to or death of one person . . . . . . . . . . . . . . . . $25,000

For bodily injuries to or death of all persons injured or killed
(subject to a maximum of $25,000 for bodily injuries to or death of one person) . . . $100,000

For loss or damage to property of others (excluding cargo) . . . . . . . . . $10,000

Nothing in this endorsement shall be construed to limit or restrict any coverage otherwise provided by the policy of which this endorsement is made a part.

Whenever required by the Commission, the Company agrees to furnish to the Commission a duplicate original of said policy and all endorsements thereon.

The Company further agrees that such insurance as is afforded by the policy and this endorsement against liability for injuries to or death of persons and damage to or destruction of property shall not be cancelled, rescinded, or suspended, nor shall the cancellation, rescission, or suspension of the policy or this endorsement take effect, nor shall the policy or this endorsement become void for any reason whatsoever until the Company shall have first given thirty (30) days' notice in writing to the Public Utilities Commission of the State of California at its office, San Francisco, California, said thirty (30) days' notice to commence to run from the date notice is actually received in the office of said Commission.

The Company further agrees that if the policy shall be cancelled or suspended or otherwise terminated, and final thereafter be reinstated, notice in writing of such reinstatement shall immediately be given by the Company to said Commission at its said office.

When countersigned by an authorized representative of the Company this endorsement becomes a part of Policy
No. 350-40-00  issued by ____ TRUCK INSURANCE EXCHANGE ____  A-1

(herein called Company) of ____ LOS ANGELES, CALIFORNIA

to ____ PERMANENTE TRUCKING COMPANY, 300 Lakeside Drive, Oakland, California  94612

effective ____ December 31, 1964 ____

Countersigned at Los Angeles, California  this 6th day of January  1965

By (Signature) ____

Name of Person Signing ____

ACP-60-65T-100 Rev. 113  Supp. [illegible]

TRK0000061

PR0717

TRIAL EX. 300
Page 61

PR01116



A-2

### Standard Form of Endorsement Prescribed by the Public Utilities Commission of the State of California

TO BE ATTACHED TO AND MADE A PART OF ALL POLICIES INSURING MOTOR VEHICLES SUBJECT TO REGULATION BY THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

Applicable to

Petroleum irregular route carriers, petroleum contract carriers, city carriers, and highway common carriers of petroleum and petroleum products in bulk in tank trucks and/or tank trailers.

(LC 725-B)

The policy to which this endorsement is attached is an Automobile Bodily Injury Liability and Property Damage Liability policy and is hereby amended to assure compliance by the insured, as a motor carrier of bulk petroleum products in tank trucks and/or tank trailers, with General Order No. 100-Series and the pertinent rules and regulations of the Public Utilities Commission of the State of California.

In consideration of the premium stated in the policy to which this endorsement is attached, the Company hereby agrees to pay, within the limits of liability hereinafter provided, any final judgment rendered against the insured for bodily injury to or death of any person, or loss of or damage to property of others (excluding injury to or death of the insured's employees while engaged in the course of their employment, and loss or damage to property owned by, rented to, in charge of, or transported by the insured), resulting from the operation, maintenance, or use of motor vehicles for which a certificate of public convenience and necessity or permit is required or has been issued to the insured by the Public Utilities Commission of the State of California, regardless of whether such motor vehicles are specifically described in the policy or not.

Within the limits of liability hereinafter provided it is further understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, or any other endorsement thereon or violation thereof, or of this endorsement, by the insured, shall relieve the Company from liability hereunder or from the payment of any such final judgment, irrespective of the financial responsibility or lack thereof or insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which this endorsement is attached are to remain in full force and effect as binding between the insured and the Company, and the insured agrees to reimburse the Company for any payment made by the Company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the Company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

It is understood and agreed that, upon failure of the Company to pay any final judgment rendered against the insured as provided herein, the judgment creditor may maintain an action in any court of competent jurisdiction against the Company to compel such payment.

The liability of the Company for the amounts provided in this endorsement apply separately to each accident and any payment under the policy because of any one accident shall not operate to reduce the liability of the Company for the payment of final judgments resulting from any other accident.

Schedule of Limits
Bodily Injury Liability and Property Damage Liability

TRK0000062

PR0718

PR01117

JA04548
Appellant's Appendix 03212
TRUCK0000467

Form Nevada 51. Revised 1951

A-3

ENDORSEMENT FOR MOTOR CARRIER POLICIES OF INSURANCE FOR BODILY INJURY LIABILITY, AND PROPERTY DAMAGE LIABILITY, UNDER CHAPTER 355, STATUTES OF NEVADA, 1957.

The policy to which this endorsement is attached is an automobile bodily injury liability and property damage liability policy, and is hereby amended to assure compliance by the insured, as a motor carrier of passengers or property, with Chapter 355, Statutes of Nevada, 1957, and the pertinent joint rules and regulations of the Public Service Commission of Nevada and Department of Motor Vehicles.

In consideration of the premium stated in the policy to which this endorsement is attached, the Company hereby agrees to pay any final judgment recovered against the insured for bodily injury to or the death of any person or loss of or damage to property of others (excluding injury to or death of the insured's employees while engaged in the course of their employment, and loss of or damage to property of the insured, and property transported by the insured, designated as cargo), resulting from the negligent operation, maintenance, or use of motor vehicles under certificate of public convenience and necessity or permit issued to the insured by the Public Service Commission of Nevada, within the limits of liability hereinafter provided, regardless of whether such motor vehicles are specifically described in the policy or not. It is understood and agreed that upon failure of the Company to pay any such final judgment recovered against the insured, the judgment creditor may maintain an action in any court of competent jurisdiction against the Company to compel such payment. The bankruptcy or insolvency of the insured shall not relieve the Company of any of its obligations hereunder. The liability of the Company extends to such losses, damages, injuries, or deaths whether occurring on the route or in the territory authorized to be served by the insured or elsewhere within the State of Nevada.

The liability of the Company on each motor vehicle for the following limits shall be a continuing one notwithstanding any recovery hereunder:

### SCHEDULE OF LIMITS
MOTOR CARRIERS—BODILY INJURY LIABILITY—PROPERTY DAMAGE LIABILITY

| (1) Kind of Equipment | (2) Limit for bodily injuries to or death of any one person | (3) Limit for bodily injuries to or death of all persons killed in any one accident (subject to limitation of first column) | (4) Limit for damage to any one accident to property of others (excluding cargo) |
|---|---|---|---|
| **Passenger Equipment: (seating capacity)** | | | |
| 7 passengers or less | $25,000 | $100,000 | $10,000 |
| 8 to 12 passengers, inclusive | 25,000 | 150,000 | 10,000 |
| 13 to 20 passengers, inclusive | 25,000 | 200,000 | 10,000 |
| 21 to 30 passengers, inclusive | 25,000 | 250,000 | 10,000 |
| 31 passengers or more | 25,000 | 300,000 | 10,000 |
| **Freight Equipment:** | | | |
| All motor vehicles used in the transportation of property | $25,000 | $100,000 | $10,000 |

Nothing contained in the policy or any other endorsement thereon, nor the violation of any of the provisions of the policy or of any endorsement thereon by the insured, shall relieve the Company from liability hereunder or from the payment of any such final judgment.

The insured agrees to reimburse the Company for any payment made by the Company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the Company would not have been obligated to make under the provisions of the policy, except for the agreement contained in this endorsement.

This endorsement may not be canceled without cancelation of the policy to which it is attached. Such cancelation may be effected by the Company or the insured giving thirty (30) days' notice in writing to the Public Service Commission of Nevada at its office in Carson City, Nev., said thirty (30) days' notice to commence to run from the date notice is actually received at the office of said Commission.

A-3

Attached to and forming part of policy No. ___35___ issued

by the      TRUCK INSURANCE EXCHANGE      (herein called Company)

of   LOS ANGELES, CALIFORNIA   to   KAISER CEMENT & GYPSUM CORPORATION

of   300 Lakeside Drive, Oakland, California   94612

Dated at   Reno, Nevada   this   6th   day of   January   19 65

ED - Effective: December 31, 1964                TRUCK INSURANCE EXCHANGE
                                                 Truck Underwriters Association, Atty. in fact

Countersigned by   John W. Stass

TRK0000063

PR0719

PR01118



OREGON PUBLIC UTILITIES COMMISSIONER

ENDORSEMENT FOR MOTOR CARRIER POLICIES OF INSURANCE FOR BODILY INJURY LIABILITY AND
PROPERTY DAMAGE LIABILITY — AUTOMATIC COVERAGE

The policy to which this endorsement is attached is an automobile bodily injury liability and property damage liability policy, and is hereby amended to secure compliance by the named insured, as a motor carrier of passengers or property with appropriate provisions of the Motor Transportation Code of Oregon, as amended, and the pertinent rules and regulations of the Public Utilities Commissioner of Oregon, promulgated in accordance with the provisions of the Motor Transportation Code of Oregon.

In consideration of the premium stated in the policy to which this endorsement is attached, or becomes a part, when duly countersigned, the company hereby agrees to pay any final judgment recovered against the named insured for bodily injury to or the death of any persons or loss of or damage to property of others (excluding injury to or death of the named insured's employees while engaged in the course of their employment, and loss of or damage to property owned or operated by or in the care, custody or control of the named insured, and property transported by the named insured, designated as cargo, and to any obligation for which the named insured may be held liable under any workmen's compensation law), resulting from the negligent operation, maintenance, ownership, or use of motor vehicles under permit issued to the named insured by the Public Utilities Commissioner of Oregon, or otherwise under the Oregon Motor Transportation Code, within the limits of liability hereinafter provided, regardless of whether such motor vehicles are specifically described in the policy or not. It is understood and agreed that upon failure of the company to pay any such final judgment recovered against the named insured, the judgment creditor may maintain an action in any court of competent jurisdiction against the company to compel such payment. The bankruptcy or insolvency of the named insured shall not relieve the company of any of its obligations hereunder. The liability of the company extends to such losses, damages, injuries, or deaths whether occurring on the route or in the territory authorized to be served by the named insured or elsewhere, within the State of Oregon, but as respects this endorsement only while operating under the provisions of the Motor Transportation Code of Oregon.

The liability of the company on each motor vehicle for the following limits shall be a continuing one notwithstanding any recovery hereunder, in the following minimum amounts:

| Type of Motor Vehicle | Bodily Injury Liability Limit for Each Person | Liability Limit for Each Accident | Property Damage Liability Limit for Each Accident |
|---|---|---|---|
| Each motor vehicle authorized for use in the transportation of property or persons | $10,000 | $20,000 | $10,000 |

In the event the policy to which this endorsement is attached is issued for limits greater than those prescribed herein, the terms and conditions of this endorsement shall apply only to the minimum limits set forth in this endorsement.

Nothing contained in the policy or any endorsements thereon, nor the violation of any of the provisions of the policy or of any endorsement thereon by the named insured, shall relieve the company from liability hereunder or from the payment of any such final judgment, but as respects any equipment of the named insured while being operated by others under an interchange of equipment agreement or requirement, the insurance afforded by this policy shall be excess over any other valid and collectible insurance available to the named insured.

The named insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy, except for the agreement contained in this endorsement.

Cancellation of this endorsement or of the policy to which it is attached may be effected by the company or the named insured giving not less than 15 days' notice in writing to the Public Utilities Commissioner of Oregon at his office in Salem, Oregon, said notice to commence to run from the date notice is actually received at the office of said Commissioner.

Attached to and forming part of Policy No. 350-40-00 issued by the TRUCK INSURANCE EXCHANGE (herein called company)

of LOS ANGELES, CALIFORNIA, to _____ KAISER CEMENT & GYPSUM CORPORATION and GLACIER SAND AND GRAVEL COMPANY _____
300 Lakeside Drive, Oakland, California 94612

Dated at _____ Portland, Oregon _____ this _____ 15th _____ day of _____ January _____ 19 _____ 65

*Frank Leibman*
AUTHORIZED COMPANY REPRESENTATIVE

TRK0000064

PR0720

PR01119

TRK0000469
TRK0000469

BODILY INJURY LIABILITY AND PROPERTY DAMAGE LIABILITY

CERTIFICATE OF INSURANCE

FOR OVERSIZE-OVERWEIGHT VEHICLE PERMITS

Filed with
STATE HIGHWAY COMMISSION OF OREGON
Salem, Oregon

A-5

THIS IS TO CERTIFY, that the _____ TRUCK INSURANCE EXCHANGE _____
(Name of Company)

(hereinafter called company) of _____ Los Angeles, California _____
(Home Office Address of Company)

has issued to ___ KAISER CEMENT & GYPSUM CORPORATION ___
(Name of Insured)

of ___ 300 Lakeside Drive, Oakland, California  94612 ___
(Address of Insured)

its policy of automobile bodily injury liability and property damage liability insurance herein described, which by the attachment of endorsement approved by the State Highway Commission of Oregon, Form No. X331, has been amended to provide the coverage or security for the protection of the public required with respect to the operation, maintenance, ownership, or use of motor vehicles under permit issued to the named insured by the State Highway Commission of Oregon, or otherwise under ORS 483.301 through ORS 483.595, and the pertinent rules, regulations, and permit provisions of the State Highway Commission of Oregon incident to the issuance of a permit granting the insured permission to operate vehicles and transport loads which would otherwise be unlawful, on motor vehicles hereinafter described:

| Make | Year | Model | Motor Number |
|------|------|-------|--------------|

If policy covers all operated vehicles and individual description is waived—as indicate and waive description ☒

The limits of liability under said policy are as follows:

| | | | | |
|---|---|---|---|---|
| Bodily Injury Liability | . . . . . . . . . | Each person | $ 50,000. |
| | | Each accident | $ 100,000. |
| Property Damage Liability | . . . . . . . . . | Each accident | $ 25,000. |

Whenever requested by the Commission, the company agrees to furnish to the Commission a duplicate original of said policy and all endorsements thereon.

This certificate effective from __ December 31, 1964 __ "A" to __ Until Cancelled __ "B"
(12:01 A.M., standard time at the address of the named insured as stated in said policy)

Issued under policy No. ___ 350-40-00 ___

Countersigned at __ Portland, Oregon __ this 6th day of __ January __ 19 65

Frank Leithauer
Authorized Company Representative

TRK0000065

PR0721

PR01120

BODILY INJURY LIABILITY AND PROPERTY DAMAGE LIABILITY

CERTIFICATE OF INSURANCE

FOR OVERSIZE-OVERWEIGHT VEHICLE PERMITS

Filed with
STATE HIGHWAY COMMISSION OF OREGON
Salem, Oregon

A-5

THIS IS TO CERTIFY, that the ___ TRUCK INSURANCE EXCHANGE
(Name of Company)

(hereinafter called company) of ___ Los Angeles, California
(Home Office Address of Company)

has issued to ___ GLACIER SAND and GRAVEL COMPANY
(Name of Insured)

of ___ 300 Lakeside Drive, Oakland, California 94612
(Address of Insured)

the policy of automobile bodily injury liability and property damage liability insurance herein described, which by the attachment of endorsement approved by the State Highway Commission of Oregon, Form No. X351, has been amended to provide the coverage or security for the protection of the public required with respect to the operation, maintenance, ownership, or use of motor vehicles under permit issued to the named insured by the State Highway Commission of Oregon, or otherwise under ORS 483.502 through ORS 483.536, and the pertinent rules, regulations, and permit provisions of the State Highway Commission of Oregon incident to the issuance of a permit granting the insured permission to operate vehicles and transport loads which would otherwise be unlawful, on motor vehicles hereinafter described:

| Make | Year Model | Motor Number |
|---|---|---|
| | | |

If policy covers all operated vehicles and individual description is waived—so indicate and waive description ☒

The limits of liability under said policy are as follows:

| | | | |
|---|---|---|---|
| Bodily Injury Liability | . . . . . . . . . . | Each person | $ 50,000. |
| | | Each accident | $ 100,000. |
| Property Damage Liability | . . . . . . . . . . | Each accident | $ 25,000. |

Whenever requested by the Commission, the company agrees to furnish to the Commission a duplicate original of said policy and all endorsements thereon.

This certificate effective from ___ December 31, 1964 ___ 19__ to ___ Until Cancelled ___ 19__
(12:01 A.M. standard time at the address of the named insured as stated in said policy)

Issued under policy No. ___ 350-40-00

Countersigned at ___ Portland, Oregon ___ this ___ 6th ___ day of ___ January ___ 19 65
PO

___ *Frank Leikman* ___
Authorized Company Representative

MCT-73-7, M-24 4-42 (13)     PRINTED IN U.S.A.

TRK0000066

PR0722

PR01121

JA04552
Appellant's Appendix TRK0000471



A-7

## ENDORSEMENT FOR OVERSIZE-OVERWEIGHT VEHICLE PERMITS

This endorsement is attached to the policy described below to assure compliance by the insured with appropriate provisions of ORS 483.302 through ORS 483.336, and the pertinent rules, regulations, and permit provisions of Multnomah County, Oregon, incident to the issuance of a permit granting the insured permission to operate vehicles and transport loads which would otherwise be unlawful.

The Company hereby amends the policy described below accordingly and in accordance with all applicable Oregon Statutes, but this amendment shall apply only while the insured is operating the vehicles described below within Multnomah County and incident to the said permit but nothing contained in the policy or any endorsements thereon, nor the violation of any provisions of the permit issued, for which this endorsement is a condition precedent, such as time, routes, descriptions, terms, provisions, conditions, stipulations, rules, regulations or requirements of this permit, nor the violation of any of the provisions of the policy or of any endorsement thereon by the named insured, shall relieve the company from liability hereunder or from the payment of any final judgment resulting therefrom.

The primary named insured agrees to reimburse the company for any payment by the company on account of any accident, claim or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy, except for the agreement contained in this endorsement.

Multnomah County, Oregon, its officers, agents and employees are hereby included as named insureds in the below-numbered policy, except as to claims against the primary named insured for injury to their persons or damage to any of its or their property.

Cancellation of this endorsement or of the policy to which it is attached may be effected by agreement of the parties hereto or by the company or the named insured giving not less than 30 days' notice in writing to the Board of County Commissioners of Multnomah County, Oregon, at its office in the County Courthouse, Portland, Oregon, said notice to commence to run from the date notice is actually received at the office of said Board of County Commissioners.

The limit of liability of the company for the operation of each vehicle or each motive power unit and trailer, semi-trailer, listed below, or other towed vehicle, whether said other towed vehicle is described below or not, shall be as follows:   A-7

Bodily Injury Liability . . . . . . . . . . . . . .   Each person . . . $ 50,000.
                                                      Each accident . . $100,000.
Property Damage Liability . . . . . . . . . . . .   Each accident . . $ 25,000.

Limits provided herein are the minimum limits required by Multnomah County, Oregon, and shall in no way be considered a reduction in limits as originally provided in this policy.

Description of vehicles under Permit:

(Must include complete description of each unit and units used in combination)

| Year (Model) | Make | Motor Number or Serial Number |
| --- | --- | --- |
| | | |
| | | |

(Signed additional list may be attached if insufficient space hereon)

If policy covers all operated vehicles and individual description is waived—so indicate and omit description ☐

This endorsement shall be effective as of the _31st_ day of _December_ in _64_

Attached to and forming part of Policy No. _150-40-00_ issued by the **TRUCK INSURANCE EXCHANGE**

4680 Wilshire Boulevard, Los Angeles, California 90054   (herein

called company) of

_ELMER COMETT & GIBSON CORPORATION_   of   809 Lakeside Drive
                                            Oakland, California 94612

Dated at Portland, Oregon   this 11th day of _January_   19 65

_Truck Exchange_
Authorized Company Representative

Form No. KM-323  1-20-61

TRK0000067

PR0723

PR01122

TRUCK0000472

## ENDORSEMENT FOR OVERSIZE-OVERWEIGHT VEHICLE PERMITS

This endorsement is attached to the policy described below to assure compliance by the insured with appropriate provisions of ORS 483.502 through ORS 483.506, and the pertinent rules, regulations, and permit provisions of Multnomah County, Oregon, incidental to the issuance of a permit granting the insured permission to operate vehicles and transport loads which would otherwise be unlawful.

The Company hereby amends the policy described below accordingly and in accordance with all applicable Oregon Statutes, but this amendment shall apply only while the insured is operating the vehicles described below within Multnomah County and incidental to the said permit but nothing contained in the policy or any endorsements thereon, nor the violation of any provisions of the permit issued, for which this endorsement is a condition precedent, such as time, routes, descriptions, terms, provisions, conditions, stipulations, rules, regulations or requirements of this permit, nor the violation of any of the provisions of the policy or of any endorsement thereon by the named insured, shall relieve the company from liability hereunder or from the payment of any final judgment resulting therefrom.

The primary named insured agrees to reimburse the company for any payment by the company on account of any accident, claim or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy, except for the Agreement contained in this endorsement.

Multnomah County, Oregon, its officers, agents and employees are hereby included as named insureds in the below-numbered policy, except as to claims against the primary named insured for injury to their persons or damage to any of its or their property.

Cancellation of this endorsement or of the policy to which it is attached may be effected by agreement of the parties hereto or by the company or the named insured giving not less than 30 days' notice in writing to the Board of County Commissioners of Multnomah County, Oregon, at its office in the County Courthouse, Portland, Oregon, said notice to commence to run from the date notice is actually received at the office of said Board of County Commissioners.

The limit of liability of the company for the operation of each vehicle or each motive power unit and trailer, semi-trailer, listed below, or other towed vehicle, whether said other towed vehicle is described below or not, shall be as follows:

| | | | |
|---|---|---|---|
| Bodily Injury Liability | Each person | $ | 50,000. |
| | Each accident | $ | 100,000. |
| Property Damage Liability | Each accident | $ | 25,000. |

Limits provided herein are the minimum limits required by Multnomah County, Oregon, and shall in no way be considered a reduction in limits as originally provided in this policy.

Description of vehicles under Permit:

(Must include complete description of each unit and units used in combination)

| Year Model | Make | Motor Number or Serial Number |
|---|---|---|
| | | |

(Signed additional list may be attached if insufficient space hereon)

If policy covers all operated vehicles and individual description is waived—so indicate and omit description ☐

This endorsement shall be effective as of the 31st day of December 19 64

Attached to and forming part of Policy No. 750-40-00 issued by the TRUCK INSURANCE EXCHANGE

4680 Wilshire Boulevard, Los Angeles, California 90054

called company of _____ To _____

GLACIER SAND AND GRAVEL COMPANY        300 Lakeside Drive
                                        Oakland, California 94612

Dated at Portland, Oregon this 7th day of January 19 65

Frank Letteman
Authorized Company Representative

Form No. 104-175  1-12-48

TRK0000068

PR0724

PR01123

Appellant's Appendix 04218
TRUCK0000473

Policy No. _____ ) )-00 _____ A-9

Named Insured: KAISER CEMENT & GYPSUM
CORPORATION

## OVERSIZE-OVERWEIGHT PERMIT ENDORSEMENT

1. This endorsement is attached to the policy described below to assure compliance by the named insured with appropriate provisions of Division 15 of the California Vehicle Code and the pertinent rules, regulations and permit provisions of the State of California, Department of Public Works, Division of Highways and its officers, agents and employees and of any city, county or city and county and its or their officers, agents and employees (hereinafter referred to collectively as the Permittors) incident to the issuance of a permit granting the named insured permission to operate vehicles and transport loads which would otherwise be unlawful.

2. The Company hereby amends the policy described below accordingly and in accordance with all applicable California statutes, but this amendment shall apply only while the named insured is operating the vehicles described below within the State of California and incident to the said permit but nothing contained in the policy or any endorsements thereon, nor the violation of any provisions of the permit issued, for which this endorsement is a condition precedent, such as time, routes, descriptions, terms, provisions, conditions, stipulations, rules, regulations or requirements of this permit, nor the violation of any of the provisions of the policy or of any endorsement thereon by the named insured, shall relieve the Company from liability hereunder or from the payment of any final judgment resulting therefrom.

3. The named insured agrees to reimburse the Company for any payment by the Company on account of any accident, claim or suit involving a breach of the terms of the policy, and for any payment that the Company would not have been obligated to make under the provisions of the policy, except for the agreement contained in this endorsement.

4. The Permittors are hereby declared to be additional insureds in the below-numbered policy insofar as they may be held liable as a consequence of the issuance of the permit hereinbefore referred to.

5. Cancellation of this endorsement may be effected by the Company giving not less than 30 days notice in writing to

____County of Santa Clara, Department of Public Works_____

at its office in ___20 West Hedding, San Jose, California_____

6. The limit of liability of the Company for the operation of each vehicle or each motive power unit and trailer, semi-trailer, listed below, or other towed vehicle, whether said other towed vehicle is described below or not, shall be as follows:

Automobile Bodily Injury and       Bodily Injury - each person   $100,000.
Property Damage Liability                               Each Accident   300,000.
                                   Property Damage - each acc.   $100,000.

7. Description of vehicles under Permit:
  THIS POLICY IS ISSUED WITH RESPECT TO ALL VEHICLES OPERATED BY THE INSURED
This endorsement, countersigned by an authorized representative of the Company becomes
applicable under policy number   350-40-00

Effective   July 22, 1965 until Cancelled

Of Policy Number   350-40-00

Issued to   KAISER CEMENT & GYPSUM   of   300 Lakeside Drive, Oakland,
                   CORPORATION                           California 94612
By _____   Truck Insurance Exchange _____ Herein called the Company.

Countersigned _____
                   Authorized Representative

TRK0000069

PR0725

PR01124

CERTIFICATE OF INSURANCE

To: Commercial Credit Industrial Corp.
Insurance Department
300 St. Paul Place
Baltimore, Maryland 21202

KAISER CEMENT AND GYPSUM CORPORATION AND
KAISER GYPSUM COMPANY, INC.

We provide coverage to ................................................
Named Insured

of 300 Lakeside Drive, Oakland, California 94612
................................................
Address

under our policy number 350-40-00 . This coverage applies to all
vehicles leased by the named insured from Commercial Credit Industrial Corp. and,
as respects such leased vehicles on which the name insured has agreed to secure
coverage, covers as additional insured Commercial Credit Industrial Corp.

The following minimum coverage is provided:

Automobile Bodily Injury Liability          $100,000 each person

Automobile Bodily Injury Liability          $300,000 each accident

Automobile Property Damage Liability        $ 50,000 each accident

Policy inception date   December 31, 1964     (See Additional Insured
.....................................          Endorsement #24 attached)

Policy expiration date  Continuous until cancelled
.....................................

If this policy is to be cancelled, endorsed or changed in any manner, notice
of such cancellation or change will be given direct to Commercial Credit
Industrial Corp. TEN DAYS prior to the effective date of the cancellation or
change. Further, if the policy is not to be renewed notice will be given to
Commercial Credit Industrial Corp. as soon as the Insurance Company named below
has knowledge that the policy will not be renewed.

TRUCK INSURANCE EXCHANGE
................................................
Insurance Company

4680 Wilshire Boulevard, Los Angeles, California
................................................
Address          90054

Truck Underwriters Association, Attorney-in-Fact
By ................................................
Authorized Representative
Carl L. Svanson,  Underwriting Supervisor

TRK0000070

PR0726

PR01125

JA04556
Appellant's Appendix 02220
TRUCK0000475

# EXHIBIT M

JA04557

ULTRA COMPREHENSIVE LIABILITY POLICY

### TRUCK INSURANCE EXCHANGE

Agent #90-99-01
Policy #350-40-00

Los Angeles, California

#### DECLARATIONS

Item 1. Named Insured: KAISER CEMENT & GYPSUM CORPORATION and SUBSIDIARIES
Address: 300 Lakeside Drive
Oakland, California 94612

Legal Entity : Corporations

Business: Manufacture and sale of Construction and Building Materials.

Item 2. Effective: From January 1, 1968 at 12:01 A.M. until cancelled, Standard Time at the address of the Named Insured as stated herein.

Item 3. Coverages:
A. Bodily Injury Liability - Automobile
B. Bodily Injury Liability - Except Automobile
C. Property Damage Liability-Automobile
D. Property Damage Liability-Except Automobile
E. Professional Liability
F. Personal Injury Liability
G. Employee Benefits Liability

Item 4. Limits of Liability:
Coverage A. $100,000 each person
$300,000 each occurrence

Coverage B. $100,000 each person
$300,000 each occurrence
$300,000 aggregate Products

Coverage C. $100,000 each occurrence
Coverage D. $100,000 each occurrence
$100,000 aggregate Products

Coverage E. $100,000 each claim
$300,000 aggregate

Coverage F. $100,000 each person
$300,000 aggregate

Coverage G. $100,000 each claim
$100,000 annual aggregate

Place of Issuance: Los Angeles, California

Date of Issuance : February 20, 1968

Countersigned Authorized Representative



TRUCK INSURANCE EXCHANGE

TRK0000071

PR0727

PR01127

Appellant's Appendix 02222
JA04558
TRUCK0000476



ULTRA COMPREHENSIVE LIABILITY POLICY

TRUCK INSURANCE EXCHANGE

Los Angeles, California · 90054
(Hereinafter sometimes referred to as Company)

In consideration of payment of the premium and subject to all the terms of this policy, the Company agrees with the Insured named herein to pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of:

## INSURING AGREEMENTS

I. COVERAGE A - BODILY INJURY LIABILITY - AUTOMOBILE:
bodily injury, sustained by any person and arising out of the ownership, maintenance or use of any automobile;

COVERAGE B - BODILY INJURY LIABILITY - EXCEPT AUTOMOBILE:
bodily injury, sustained by any person from causes other than ownership, maintenance or use of an automobile;

COVERAGE C - PROPERTY DAMAGE LIABILITY - AUTOMOBILE:
injury to or destruction of property, including the loss of use thereof, and arising out of the ownership, maintenance or use of any automobile;

COVERAGE D - PROPERTY DAMAGE LIABILITY - EXCEPT AUTOMOBILE:
injury to or destruction of property, including the loss of use thereof, from causes other than ownership, maintenance or use of an automobile;

COVERAGE E - PROFESSIONAL LIABILITY:
injury arising out of malpractice, error, or mistake of the Insured or of a person for whose acts or omissions the Insured is legally responsible in rendering or failing to render professional services;

COVERAGE F - PERSONAL INJURY LIABILITY:
injury arising out of false arrest, malicious prosecution, wilful detention or imprisonment, libel, slander or defamation of character, humiliation or discrimination, invasion of privacy, wrongful eviction or wrongful entry, wrongful conversion or disparagement; and

COVERAGE G - EMPLOYEE BENEFITS LIABILITY:
any claim made against the Insured by any employee, former employee or the beneficiaries or legal representatives thereof for injury caused by any negligent act, error or omission of the Insured, or any other person for whose acts the Insured is legally liable in the administration of Employee Benefits as defined herein.

II. DEFENSE, SETTLEMENT, SUPPLEMENTARY PAYMENTS:
With respect to such insurance as is afforded by this policy, the Company shall:

(1) investigate and defend any claim or suit against the Insured alleging such injury, sickness, disease, or destruction and seeking damages on account thereof, even if such claim or suit is groundless, false or fraudulent. Except under Coverage E, the Company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient; under Coverages E and G the Company will not settle or compromise any claim or suit covered hereunder, except with the written consent of the Insured.

- 1 -

TRUCK INSURANCE EXCHANGE

TRK0000072

PR0728

PR01128

Appellant's Appendix A02459
TRUCK0000477



(2) (a) Pay all premiums on bonds to release attachments for an amount not in excess of the applicable limit of liability of this policy, all premiums on appeal bonds required in any such defended suit, the cost of bail bonds required of the Insured in the event of automobile accident or automobile traffic law violation during the policy period, not to exceed $250. per bail bond, but without any obligation to apply for or furnish any such bonds;

(b) pay all expenses incurred by the Company, all costs taxed against the Insured in any such suit and all interest accruing after entry of judgment, until the Company has paid or tendered or deposited in court such part of such judgment as does not exceed the limit of the Company's liability thereon;

(c) pay expenses incurred by the Insured, except under Coverage E, for emergency medical and surgical relief to others at the time of the occurrence;

(d) reimburse the Insured for all reasonable expenses, other than loss of earnings, incurred at the Company's request;

and the amounts so incurred, except settlements of claims and suits, are payable by the Company in addition to the applicable limit of liability of this policy.

III. **DEFINITION OF "INSURED":**

the unqualified word "Insured" includes the Named Insured and also includes:

(1) COVERAGES A, B, C, D, and F,
Any individual, firm, co-partnership, corporation or other entity for whom the Named Insured has contracted, or during the currency of this policy may contract, under written contract usual or incidental to the Named Insured's business to procure insurance afforded by this policy, but only to the extent and in the amount for which the Named Insured has contracted to procure such insurance, and in no event contrary to the terms and conditions of or exceeding the limits of liability set forth in this policy.

(2) COVERAGES E, D and F,
(a) Any executive officer, director, partner, stockholder or employee thereof while acting within the scope of his duties as such and any organization or proprietor with respect to real estate management for the Named Insured; provided as respects any employee, the policy shall apply to such employee as an insured only if the Named Insured
(i) elects to have the insurance afforded by this policy apply to such employee,
(ii) gives the Company written notice of such election within 45 days after claim or suit has been made against such employee, whichever date is later, and
(iii) pays the Company an additional premium of $100.00;

TRK0000073

PR0729

PR01129

TRIAL EX. 301
Page 3

Appellant's Appendix 02224
JA04560
TRUCK0000478



(b) any person while using an owned or hired watercraft of the pleasure type and not rented to others and any person or organization legally responsible for its use, provided actual use is by the Named Insured or with its permission and any executive officer, director, partner, stockholder or employee of the Named Insured with respect to the use of non-owned watercraft in the business of the Named Insured. The insurance with respect to any person or organization other than the Named Insured does not apply:

(i) with respect to any hired watercraft, to the owner or lessee thereof other than the Named Insured or to any agent or employee of such owner or lessee;

(ii) with respect to any non-owned watercraft, to any executive officer, partner, director, stockholder or employee if such watercraft is owned in full or in part by him or a member of his household; and

(iii) to any employee with respect to injury to or sickness, disease or death of another employee of the same employer injured in the course of such employment in an accident arising out of the maintenance or use of watercraft in the business of such employer unless the Named Insured (1) elects to have the insurance afforded by this policy apply to such employee, (2) gives the Company written notice of such election within 45 days after claim or suit has been made against such employee, whichever date is later, and (3) pays the Company an additional premium of $100.00.

(3) COVERAGES A and C.

(a) Any person while using an owned automobile or a hired automobile provided the actual use of the automobile is by the Named Insured or with his permission;

(b) any executive officer, director, partner, stockholder or employee of the Named Insured with respect to the use of a non-owned automobile in the business of the Named Insured; and

(c) any person or organization legally responsible for the use of an owned or hired automobile provided the use of the automobile is with the permission of the Named Insured but only if the Named Insured (1) elects to have the insurance afforded by this policy apply to such person or organization, (2) gives the Company written notice within 45 days after claim or suit has been made against such other person or organization, whichever date is later, and (3) pays the Company an additional premium of $100.00.

(4) The insurance with respect to any person or organization other than the Named Insured does not apply under Division (3) of the Insuring Agreement:

(a) to any person or organization, or to any agent or employee thereof, operating an automobile repair shop, storage garage, sales agency, service station or public parking place, with respect to any accident arising out of the operation thereof;

TRUCK INSURANCE EXCHANGE

TRK000(

PR0730

PR01130

Appellant's Appendix JA04561
TRUCK0000479



(b) with respect to any hired automobile, to the owner thereof, or any agent or employee of such owner, except that the insurance afforded by the policy under Coverages A and C shall apply to the Lessor of an automobile leased to the Insured for use in business under a written contract of 30 days or more duration in which the Insured agrees to procure automobile liability insurance for the benefit of such Lessor but only to the extent and in the amount for which the Insured has contracted to procure such insurance, and in no event contrary to the terms and conditions of or exceeding the limits of liability as set forth in this policy.

(c) with respect to any non-owned automobile, to any executive officer, partner, director, stockholder or employee, if such automobile is owned in full or in part by him or a member of his household; and

(d) except as respects any executive officer, partner, director or stockholder, to any employee with respect to injury to or sickness, disease or death of another employee of the same employer injured in the course of such employment, in an accident arising out of the maintenance or use of an automobile in the business of such employer, unless the Named Insured (1) elects to have the insurance afforded by this policy apply to such employee, (2) gives the Company written notice of such election within 45 days after claim or suit has been made against such employee, whichever date is later, and (3) pays the Company an additional premium of $100.00; provided ........ 17 ...

    (i) $15,000 shall be deducted (in lieu of any other deductible mentioned in this policy) from the total amount the Company shall become obligated to pay as damages, plus allocated loss adjustment expenses, on behalf of the Insured for each occurrence;

    (ii) the terms of the policy, including those with respect to notice of occurrence and notice of claim or suit, apply irrespective of the application of the deductible amount;and

    (iii) the Company may pay part or all of the deductible amount to effect settlement of any claim or suit and, upon notification of the action taken, the Named Insured shall promptly reimburse the Company for such part of the deductible amount as has been paid by the Company.

(5) Under Coverage E, any physician, surgeon, dentist or nurse while acting in his or her capacity as an employee of the Named Insured.

(6) Under Coverage G -

"INSURED" the unqualified word "Insured" wherever used in relation to the insurance afforded hereby, includes not only the Named Insured, but also any partner, executive officer, director, stockholder or employee, provided such employee is authorized to act in the administration of the Employee Benefits.

"EMPLOYEE BENEFITS" The term "Employee Benefits" shall mean group life insurance, group accident and health insurance, profit sharing plans, pension plans, employee stock subscription plans, workmen's compensation, unemployment insurance, social security and disability benefits insurance.

TRK0000075

PR0731

PR01131

Appellant's Appendix 02226
JA04562
TRUCK0000480



"ADMINISTRATION": As respects the insurance afforded hereby, the un-
qualified word "administration" wherever used shall mean:

(a) Giving counsel to employees with respect to the Employee Benefits;
(b) Interpreting Employee Benefits;
(c) Handling of records in connection with Employee Benefits;
(d) Effective enrollment, termination or cancellation of employees
    under Employee Benefit Programs;
performed by a person authorized by the Named Insured to do such acts.

IV. POLICY PERIOD, TERRITORY, LIMITS, INDEMNITY AND DEFENSE:

A. Policy Period and Territory –
   This policy applies only to occurrences which occur during the policy
   period, and which

   (1) occur anywhere in the world, provided claim is made, or suit on the
       merits of the claim, is originally brought within the continental
       limits of the United States of America, its territories or
       possessions (other than Guam), or Canada;

   (2) occur in Guam or elsewhere in the world, excluding
       countries in the Soviet Union, East Germany (except Berlin), Poland,
       Czechoslovakia, Hungary, Yugoslavia, Albania, Bulgaria, Romania,
       North Korea, Tibet, Communist China, North Vietnam and Cuba, except
       that the insurance afforded by the policy does not apply to claims
       to the extent coverage is afforded under St. Paul Mercury Insurance
       Company's Policy #CCL-14868 or any renewals or replacements thereof;

   (3) arise out of operations of the Insured or subsidiary Mexican
       companies or corporations conducted in Mexico, except that the in-
       surance afforded by the policy shall be excess of Policy R.C.G.-809
       of LaInteramericana, S.A. Compania de Seguros or any renewal or
       replacement thereof; and

   (4) arise out of the ownership, maintenance or use of the vessels
       called "Angelito", "Ricardo" and "Theresa", except that the in-
       surance afforded by the policy shall be excess of coverage afforded
       under Policy No. J.H.H. 131 of LaInteramericana, S.A. Compania de
       Seguros or any renewals or replacements thereof.

B. LIMITS

   (1) With respect to insurance afforded under sub-paragraphs (1) and
       (3) of Part A of this Section, the limits of the Company's
       liability stated in the Declarations shall apply. _See, ::_

– 5 –

TRUCK INSURANCE EXCHANGE

TRK0000076

PR0732

PR01132

TRIAL EX. 301
Page 6

Appellant's Appendix
JA04563

TRUCK0000481

(2) With respect to insurance afforded under sub-paragraph (2) of Part A of this Section, the limits of the Company's liability shall be as stated below and not as stated in the Declarations:

Coverage A - $25,000 each person
$25,000 each occurrence

Coverage B - $25,000 each person
$25,000 each occurrence
$25,000 aggregate Products

Coverage C - $100,000 each occurrence

Coverage D - $100,000 each occurrence
$100,000 aggregate Products

Coverage E - $25,000 each person
$25,000 aggregate

Coverage F - $25,000 each person
$25,000 aggregate

Coverage G - $100,000 each claim
$100,000 annual aggregate

(3) With respect to insurance afforded under sub-paragraph (4) of Part A of this Section, Company's limit of liability under Coverages B and D shall be $75,000 excess of $25,000 each occurrence.

C. Indemnity

(1) With respect to the insurance afforded under sub-paragraphs (2), (3) and (4) of Part A of this Section, in Coverages A, B,C,D, E, F and G, the words "to pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay" are amended to read, "to indemnify the Insured for all sums which the Insured has been held legally obligated to pay."

(2) Conditions 6 and 8 do not apply to sub-paragraphs (2), (3) and (4) of Part A of this Section.

D. Defense

(1) Insuring Agreement II applies to insurance afforded under sub-paragraph (1) of Part A of this Section.

(2) As respects sub-paragraphs (2), (3) and (4) of Part A of this Section, the Company shall indemnify the Insured for costs of defense and supplementary payments as set forth in Insuring Agreement II.

TRUCK INSURANCE EXCHANGE

TRK0000077

PR0733

PR01133

TRIAL EX. 301
Page 7

Appellant's Appendix 02228
JA04564
TRUCK0000482



## EXCLUSIONS

This policy does not apply:

(1) to liability assumed by the Insured under contract or agreement, except under Coverages B, D and F to (a) a contract as defined herein or (b) as respects the insurance which is afforded for the Products Hazard as defined, a warranty of goods or products;

(2) to injury, sickness, disease, death or destruction due to war, whether or not declared, civil war, insurrection, rebellion or revolution, or to any act or condition incident to any of the foregoing with respect to (a) liability assumed by the Insured under any contract or agreement or (b) expenses under Insuring Agreement II (2) (c);

(3) except as respects Coverages E and F, to injury, sickness, disease, death or destruction caused intentionally by or at the direction of the Insured;

(4) under Coverages B and D, except with respect to operations performed by independent contractors and except with respect to liability assumed by the Insured under a contract as defined herein, to the ownership, maintenance or use, including loading or unloading, of (a) automobiles if the occurrence takes place away from premises owned, rented or controlled by the Insured, or the ways immediately adjoining, or (b) aircraft owned or used by or in the interest of the Named Insured, or (c) self-propelled watercraft, other than tugboats, in excess of 500 horsepower if the occurrence takes place away from the premises owned, rented or controlled by the Named Insured; but Part (a) of this Exclusion shall not apply to an occurrence away from such premises arising out of loading or unloading as a completed operation within the definition in Part (2) of sub-paragraph (f) of Condition 3;

(5) under Coverages A and B, to any obligation for which the Insured or any carrier as his insurer may be held liable under any workmen's compensation, unemployment compensation or disability benefits law, or under any similar law;

(6) Under Coverages A and C, to injury, sickness, disease, death or destruction which arises out of the loading or unloading of an automobile, if the accident occurs on premises (including the ways immediately adjoining) owned, rented or controlled either by the person or by the employer of the person against whom claim is made or suit is brought for such injury, sickness, disease, death or destruction, except as provided under Insuring Agreement III 3.(c); but this limitation does not apply with respect to claims made or suits brought against the following Insureds:

(a) the Named Insured;
(b) a bailee or borrower of the automobile or an employee of either of them or of the Named Insured;
(c) if the Named Insured is classified and rated as a truckman, any person or organisation, or any agent or employee thereof, engaged in the business of transporting property by automobile for the Named Insured or for others; subject nevertheless to the limitations of any endorsement made a part of the policy and specifically applicable to truckmen;
(d) any other person or organization but only with respect to his or its liability because of acts or omissions of an Insured under (a), (b) or (c) above.

TRUCK INSURANCE EXCHANGE

TRK0000078

PR0734

PR01134

Appellant's Appendix A024365
TRUCK0000483



(7) under Coverage A, to bodily injury to or sickness, disease or death of
any employee of the Insured arising out of and in the course of
(a) domestic employment by the Insured, if benefits therefor are in
whole or in part either payable or required to be provided under any
workmen's compensation law, or (b) other employment by the Insured;

(8) under Coverage B, except with respect to liability assumed by the In-
sured under a contract as defined herein, to bodily injury to or sick-
ness, disease or death of any employee of the Insured arising out of
and in the course of his employment by the Insured, other than such
injury caused by malpractice, error or mistake in the rendering of
medical services;

(9) under Coverage C, to injury to or destruction of property, owned or
transported by the Insured or, as respects the first $25,000 of coverage
property rented to or in charge of the Insured other than a residence
or private garage damaged or destroyed by a private passenger automobile
covered by this policy;

(10) under Coverage D, to injury to or destruction of (a) property of others
in the care or custody of the Insured for storage, or for sale, or
(b) that particular part of any property upon which the Insured is or has
been working caused by the faulty manner in which the work has been per-
formed; ("storage" means storage when performed for a money consideration
or as a bailee for hire or as a normal service in the business of the
Named Insured);

(11) under Coverage E, no insurance is afforded with respect to any lia-
bility of an Insured if there is in force for the Insured or for his
benefit a valid and collectible Workmen's Compensation and Employer's
Liability or similar policy which would cover any part of such lia-
bility (other than statutory Workmen's Compensation coverage) except
for an "other insurance" clause or similar clause;

(12) under Coverages A, B and F, to injury caused by the wilful violation of
a penal statute or ordinance committed by or with the knowledge or
consent of an Insured;

(13) under Coverages B and F, to acts committed in connection with adver-
tising, broadcasting, or telecasting by or in the interest of the
Named Insured;

(14) under any Liability Coverage, to injury, sickness, disease, death or
destruction
(a) with respect to which an Insured under the policy is also an in-
sured under a nuclear energy liability policy issued by Nuclear
Energy Liability Insurance Association, Mutual Atomic Energy Lia-
bility Underwriters or Nuclear Insurance Association of Canada, or
would be an Insured under any such policy but for its termination
upon exhaustion of its limit of liability; or
(b) resulting from the hazardous properties of nuclear material and with
respect to which (i) any person or organization is required to main-
tain financial protection pursuant to the Atomic Energy Act of 1954,



TRK0000079

PR0735

PR01135

Appellant's Appendix 02230

JA04566
TRUCK0000484

or any law amendatory thereof, or (ii) the Insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization;

(15) under any Supplementary Payments provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization;

(16) under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if

(a) the nuclear material (i) is at any nuclear facility owned by, or operated by or on behalf of, an Insured or (ii) has been discharged or dispersed therefrom;

(b) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an Insured; or

(c) the injury, sickness, disease, death or destruction arises out of the furnishing by an Insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

(17) under Coverage G -

(a) to any dishonest, fraudulent, criminal or malicious act, libel, slander, discrimination, or humiliation;

(b) to bodily injury to, or sickness, disease, or death, of any person, or to injury to or destruction of any tangible property, including the loss of use thereof;

(c) to any claim for failure of performance of contract by any Insurer;

(d) to any claim based upon the Named Insured's failure to comply with any law concerning workmen's compensation, unemployment insurance, social security or disability benefits;

(e) to any claim based upon failure of stock to perform as represented by an Insured;

(f) to any claim based upon advice given by an Insured to participate or not to participate in stock subscription plans.

(18) When the Insured's product must be replaced, to claims made against the Insured for the Insured's selling price of the particular part of the product manufactured by the Insured which gave rise to the claim or claims.

TRUCK INSURANCE EXCHANGE

TRK0000080

PR0736

PR01136

Appellant's Appendix 02231
JA04567
TRUCK0000485

## CONDITIONS

Conditions 4 and 6 apply only to the Coverage or Coverages noted thereunder. Other Conditions apply to the entire policy.

1. **PREMIUM.** When used as a premium basis the word "remuneration" means the entire remuneration earned during the policy period by proprietors and by all employees of the Named Insured, subject to any overtime earnings or limitation of remuneration rule applicable in accordance with the manuals in use by the Company.

2. **INSPECTION AND AUDIT.** The Company shall be permitted to inspect the insured premises, operations, automobiles and elevators and to examine and audit the Insured's books and records at any time during the policy period and any extension thereof and within three years after the final termination of this policy, as far as they relate to the premium basis or the subject matter of this insurance.

3. **DEFINITIONS.**

   (a) **Contract.** The word "contract" means, if in writing, or under verbal agreement reduced to written form within 120 days from the date of the first agreement, any contract or agreement under which the Insured has assumed the liability of others.

   (b) **Automobile.** Except where stated to the contrary, the word "automobile" means a land motor vehicle or trailer as follows:

   (1) **Owned Automobile** - an automobile owned by the Named Insured;

   (2) **Hired Automobile** - an automobile used under contract in behalf of, or loaned to, the Named Insured provided such automobile is not owned by or registered in the name of (i) the Named Insured or (ii) an executive officer thereof or (iii) an employee or agent of the Named Insured who is granted an operating allowance of any sort for the use of such automobile.

   (3) **Non Owned Automobile** - any other automobile.

   The following described equipment shall be deemed as automobile while towed by or carried on an automobile not so described, but not otherwise: if of the crawler-type, any tractor, power crane or shovel, ditch or trench digger; any farm-type tractor; any concrete mixer other than of the mix-in-transit type; any grader, scraper, roller or farm implement; and, if not subject to motor vehicle registration, any other equipment not specified below, which is designed for use principally off public roads. The following described equipment shall be deemed an automobile while towed by or carried on an automobile, as above defined, solely for purposes of transportation or while being operated solely for locomotion, but not otherwise: if of the non-crawler type, any power crane or shovel, ditch or trench digger, and any air-compressing, building or vacuum cleaning, spraying or welding equipment or well drilling machinery.

   (c) **Semi-trailer.** The word "trailer" includes semi-trailer.

   (d) **Two or More Automobiles.** The terms of this policy apply separately to each automobile insured hereunder, but a motor vehicle and a trailer or trailers attached thereto shall be held to be one automobile as respects limits of liability.

- 10 -



TRUCK INSURANCE EXCHANGE

TRK0000081

PR0737

PR01137

Appellant's Appendix 02232

JA04568
TRK0000486



(e) Use. Use of an automobile or watercraft includes the loading and unloading thereof.

(f) Products and Completed Operations Hazard -

(1) Named Insured's Products means goods or products manufactured, sold, handled or distributed by the Named Insured or by others trading under his name, including any container thereof (other than a vehicle), but "named insured's products" shall not include a vending machine or any property other than such container, rented to or located for use of others but not sold.

(2) Products Hazard includes bodily injury and property damage arising out of the Named Insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs away from premises owned by or rented to the Named Insured and after physical possession of such products has been relinquished to others.

(3) Completed Operations Hazard includes bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the Named Insured.

"Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:
(a) when all operations to be performed by or on behalf of the Named Insured under the contract have been completed,
(b) when all operations to be performed by or on behalf of the Named Insured at the site of the operations have been completed, or
(c) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as part of the same project.

Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed.

The completed operations hazard does not include bodily injury or property damage arising out of
(a) operations in connection with the transportation of property, unless the bodily injury or property damage arises out of a condition in or on a vehicle created by the loading or unloading thereof,
(b) the existence of tools, uninstalled equipment or abandoned or unused materials, or
(c) operations for which the classification stated in the policy or in the Company's manual specified "including completed operations."

(g) Occurrence.  With respect to Coverages A,B,C,D,F and G means an event or series of events or continuous or repeated exposure to conditions which results in legal liability, regardless of the number of persons, vehicles or objects affected by such act or acts or omission. As respects the Products Hazard, an occurrence shall be deemed to have taken place at the time of the injury or damage to the claimant and not at the time of the act of the Insured giving rise to liability. With respect to Coverage E, an

IOWA INSURANCE EXCHANGE

TRK0000082

PR0738

PR01138

Appellant's Appendix 02239
JA04569
TRUCK0000487



occurrence shall be considered to have taken place at the time of the
professional act(s) giving rise to the injury. All damages arising out of
one prepared or acquired lot of goods or products shall be considered as
arising out of one occurrence.

(h) Malpractice. Means malpractice, error or mistake in rendering or failing
to render professional services in the practice of the Insured's profession
as a physician, surgeon, dentist or nurse, while acting within the scope of
his or her employment by the Named Insured or for emergency treatment ren-
dered outside the scope of such employment.

(i) Owned Watercraft. Watercraft owned by the Named Insured.

(j) Hired Watercraft. Watercraft used under contract in behalf of, or loaned
to, the Named Insured provided such watercraft is not owned by or register-
ed in the name of (1) the Named Insured or (2) an executive officer thereof
or (3) an employee or agent of the Named Insured who is granted an operat-
ing allowance of any sort for the use of such watercraft.

(k) Non-Owned Watercraft. Any other watercraft.

(l) Bodily Injury. Means bodily injury, sickness or disease, including death
at any time resulting therefrom, and also includes mental injury, mental
anguish and shock.

(m) Hazardous Properties. Include radioactive, toxic or explosive properties.

(n) Nuclear Material. Means source material, special nuclear material or by-
product material.

(o) Source Material, Special Nuclear Material and By-product Material. Have the
meanings given them in the Atomic Energy Act of 1954 or in any law amend-
atory thereof.

(p) Spent Fuel. Means any fuel element or fuel component, solid or liquid,
which has been used or exposed to radiation in a nuclear reactor.

(q) Waste. Means any waste material (1) containing by-product material and
(2) resulting from the operation by any person or organization of any
nuclear facility under Item (1) or (2) thereof.

(r) Nuclear Facility. Means –
    (1) any nuclear reactor;
    (2) any equipment or device designed or used for (i) separating the iso-
    topes of uranium or plutonium, (ii) processing or utilizing spent fuel, or
    (iii) handling, processing or packaging waste; .
    (3) any equipment or device used for the processing, fabricating or alloy-
    ing of special nuclear material if at any time the total amount of such
    material is in the custody of the Insured at the premises where such equipment
    or device is located consists of or contains more than 25 grams of plutonium
    or uranium 233 or any combination thereof, or more than 250 grams of
    uranium 235; and
    (4) any structure, basin, excavation, premises or place prepared or used
    for the storage or disposal of waste, and includes the site on which any of
    the foregoing is located, all operations conducted on such site and all
    premises used for such operations.

(s) Nuclear Reactor. Means any apparatus designed or used to sustain nuclear
fission in a self-supporting chain reaction or to contain a critical mass
of fissionable material.

(t) With respect to injury to or destruction of property, the word INJURY or
DESTRUCTION includes all forms of radioactive contamination of property.

- 12 -

TRUCK INSURANCE EXCHANGE

TRK0000083

PR0739

PR01139

Appellant's Appendix 02234

JA04570
TRUCK0000488



**4.  LIMITS OF LIABILITY**

(a) COVERAGES A and B:  The limit of Bodily Injury liability stated in the Declarations as applicable to "each person" is the limit of the Company's liability for all damages, including damages for care and loss of services, arising out of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by one person as the result of any one occurrence under Coverages A and B.  The limit of such liability stated in the Declarations as applicable to "each occurrence" is, subject to the above provision respecting each person, the total limit of the Company's liability for all damages, including damages for care and loss of services, arising out of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by two or more persons in any one occurrence.

(b) COVERAGES C and D: The limit of Property Damage liability stated in the Declarations as applicable to "each occurrence" is the total limit of the Company's liability for all damages arising out of injury to or destruction of all property of one or more persons or organizations, including the loss of use thereof, in any one occurrence.

(c) COVERAGES B and D -PRODUCTS:  The limits of Bodily Injury liability and Property Damage liability stated in the Declarations as "aggregate products" are respectively the total limits of the Company's liability for all damages arising out of the products hazard during the twelve-month period beginning with the effective date of the products hazard coverage, and during the policy period, and the same aggregate limit shall apply during each succeeding twelve-month period for which such coverage may be in force.  All such damages arising out of one lot of goods or products prepared or acquired by the Named Insured or by another trading under his name shall be considered as arising out of one occurrence.

(d) COVERAGE E:  The limit of liability stated in the Declarations as applicable to "each claim" is the total limit of the Company's liability for all damages on account of each claim or suit.  The limit of liability stated in the Declarations as "aggregate" is, subject to the foregoing provision respecting each claim, the total limit of the Company's liability for all damages in any one policy year.

(e) COVERAGE F:  The limit of liability stated in the Declarations as applicable to "each person" is the limit of the Company's liability for all damages on account of injury sustained by one person or organization.  The limit of liability stated in the Declarations as "aggregate" is, subject to the provision respecting "each person", the total limit of the Company's liability for all damages in any one policy year.  The foregoing limits apply to all damages covered hereunder, whether or not the policy applies to such damages in the absence of this coverage.

(f) COVERAGE G:  The limit of liability stated above as applicable to "each claim" is the limit of the Company's liability for all damages incurred on account of any claim covered hereunder; the limit of liability stated above as "aggregate" is, subject to the above provision respecting each claim, the total limit of the Company's liability for all claims covered hereunder and occurring during each annual endorsement period.  The inclusion herein of more than one Insured shall not operate to increase the limits of the Company's liability.

- 13 -

TOWER INSURANCE EXCHANGE

TRK0000084

PR0740

PR01140

Appellant's Appendix 02335

JA04571

TRUCK0000489



**5. SEVERABILITY OF INTEREST:**

The inclusion of more than one corporation, person, organization, firm or entity as Insured under this policy shall not in any way affect the rights of any such corporation, person, organization, firm or entity as respects any claim, demand, suit or judgment made or brought by or in favor of any other Insured, or by or in favor of any employee of such other Insured. This policy shall protect each corporation, person, organization, firm or entity in the same manner as though a separate policy had been issued to each. However, this shall not operate to increase the Company's liability except under Coverage E wherein the limits of liability shall apply separately to each Insured. Limits of insurance afforded hereunder shall apply first to the Named Insured under this policy and the remainder, if any, to additional insureds.

**6. FINANCIAL RESPONSIBILITY LAWS—COVERAGES A and C:**

When this policy is certified as proof of financial responsibility for the future under the provisions of the motor vehicle financial responsibility law of any state or province, such insurance as is afforded by this policy for bodily injury liability or for property damage liability shall comply with the provisions of such law which shall be applicable with respect to any such liability arising out of the ownership, maintenance or use during the policy period of any automobile insured hereunder, to the extent of the coverage and limits of liability required by such law, but in no event in excess of the limits of liability stated in this policy. The Insured agrees to reimburse the Company for any payment made by the Company which it would not have been obligated to make under the terms of this policy except for the agreement contained in this paragraph.

**7. NOTICE OF OCCURRENCE - CLAIM OR SUIT:**

In the event of any claim or alleged negligent act, error or omission, accident or occurrence, written notice shall be given by or on behalf of the Insured to the Company or any of its authorized agents as soon as practicable after the manager of the insurance department of the Named Insured has knowledge of an event or occurrence which, in the opinion of the manager of the insurance department or any such designated employee, is likely to result in a claim under this policy. Such notice shall contain particulars sufficient to identify the Insured and also reasonably obtainable information respecting the time, place and circumstances of the occurrence, the name and address of the injured and of available witnesses.

If claim is made or suit is brought against the Insured, the Insured shall promptly forward to the Company every demand, notice, summons or other process received by his or his representative.

**8. ASSISTANCE AND COOPERATION OF THE INSURED:**

The Insured shall cooperate with the Company and, upon the Company's request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits. The Insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense, except under Coverages A and B for emergency medical and surgical relief to others at the time of the occurrence; unless, however, the loss or claim is subject to adjustment under the $5,000 Deductible Endorsement #5.

**9. ACTION AGAINST COMPANY:**

No action shall lie against the Company unless, as a condition precedent thereto, the Insured shall have fully complied with all the terms of this policy, nor until the amount of the Insured's obligation to pay shall have been finally determined either by judgment against the Insured after actual trial or by written agreement of the Insured, the claimant and the Company.

TRUCK INSURANCE EXCHANGE

TRK0000085

PR0741

PR01141

Appellant's Appendix 02236
JA04572
TRUCK0000490

9. (Continued) Any person or organization or the legal representative thereof
who has secured such judgment or written agreement shall thereafter be entitled
to recover under this policy to the extent of the insurance afforded by this
policy. Nothing contained in this policy shall give any person or organization
any right to join the Company as a co-defendant in any action against the In-
sured to determine the Insured's liability.

Bankruptcy or insolvency of the Insured or of the Insured's estate shall not
relieve the Company of any of its obligations hereunder.

10. OTHER INSURANCE:

If the Insured is insured by any other policy or policies of insurance against
loss covered by this policy, this policy shall provide excess insurance over
and above the amount paid by such other valid and collectible insurance; but
if the carrier or carriers of such other insurance shall deny liability there-
for in its entirety or as to any portion of the insurance granted by such
coverage, then and in that event this Company shall handle such loss or claim
under this policy in the same manner and to the same extent as though such
other insurance did not exist, and the Insured shall assign to this Company all
rights against the carrier or carriers of such other insurance, and execute
all papers necessary to secure to this Company such rights or shall in its own
name whenever requested by the Company, and at the Company's expense, institute
any demand or legal proceedings which the Company deems necessary against the
carrier or carriers of such other insurance.

As respects bodily injury and property damage liability arising out of the
ownership, maintenance or use of watercraft, no insurance is afforded by this
policy with respect to any loss against which other insurance is available to
the Insured, where, but for the existence of this policy, such other insurance
would apply as primary insurance to such loss. If for any reason other than
the existence of this policy such other insurance is not available to the In-
sured as respects such loss, or after such other insurance available to the
Insured has been exhausted, then, in either event, this policy shall apply.

11. WAIVER OF SUBROGATION:

The Company waives its right of subrogation (a) against any person, firm or
corporation, subsidiary of, or allied or affiliated with the Insured,
(b) against any person, firm or corporation, with which the Insured is
associated as a joint venturer or otherwise in any business enterprise,
(c) against any person, firm or corporation for whom the Insured is performing
work, (d) against any other Insured and/or any stockholder of any corporate
insured, except to the extent that such persons, firms or corporations jointly
or severally are insured under valid and collectible policies, (e) against em-
ployees of the Insured providing waiver of subrogation in writing is
submitted to the company by the Insured.

12. TERMS OF POLICY CONFORMED TO STATUTE:

Terms of this policy which are in conflict with the statutes of the state
wherein this policy is issued are hereby amended to conform to such
statutes.

TRK0000086

PR0742

PR01142

TRIAL EX. 301
Page 16

Appellant's Appendix 02237

JA04573
TRUCK00000491



13. **CHANGES:**

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or estop the Company from asserting any right under the terms of this policy; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy.

14. **ASSIGNMENT:**

Assignment of interest under this policy shall not bind the Company until its consent is endorsed hereon; if, however, the Named Insured shall be adjudged bankrupt, this policy shall cover (a) the Named Insured's legal representative as the Named Insured, and (b) under Coverages A and C, subject otherwise to the provisions of Insuring Agreement III, any person having proper temporary custody of any owned automobile or hired automobile, as an Insured, until the appointment and qualification of such legal representative. As respects Coverage E, if the Insured shall die or be adjudged incompetent, this insurance shall thereupon terminate but shall cover the Insured's legal representative as the Insured with respect to liability previously incurred and covered hereunder. Notice of cancellation addressed to the Insured named in the Declarations and mailed to the address shown in this policy shall be sufficient notice to affect cancellation of this policy.

15. **CANCELLATION:**

This policy may be cancelled by the Named Insured by surrender thereof to the Company or any of its authorized agents or by mailing to the Company written notice stating when thereafter the cancellation shall be effective. This policy may be cancelled by the Company by mailing to the Named Insured at the address shown in this policy written notice stating when, not less than ninety days thereafter, such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. The effective date of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the Named Insured or by the Company shall be equivalent to mailing. If the Named Insured cancels, earned premium shall be computed in accordance with the customary short rate table and procedure. If the Company cancels, earned premium shall be computed pro rata. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

16. **DECLARATIONS:**

By acceptance of this policy the Named Insured agrees that the statements in the Declarations are his agreements and representations, that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between the Insured and the Company or any of its agents relating to this insurance.

17. **KAISER CEMENT & GYPSUM CORPORATION,** or order, shall be deemed the sole and irrevocable agent of each Insured named hereunder for the purposes of issuing instructions for altering or cancelling this policy, for agreeing upon settlement of loss, for receiving and receipting for payment of claims or for making premium adjustments.

TRUCK INSURANCE EXCHANGE

- 16 -

TRK0000087

PR0743

PR01143

Appellant's Appendix 02238

JA04574
TRUCK0000492



**X8. RECIPROCAL PROVISIONS:**

This policy is made and accepted in consideration of the payment of the Premium Deposit herein provided, the Declarations made in the application for the Policy, and the execution of a power of attorney to Truck Underwriters Association, herein called the "Association", authorizing it to execute inter-insurance policies between the holder of this policy, herein called the "Named Insured", and other subscribers to the Truck Insurance Exchange.

No term or condition of the policy is intended to create, creates, or shall be construed to create a partnership or mutual insurance association, or to give rise to or create any joint liability.

To enforce any claims arising under this policy the Exchange shall be sued or sue in its own name as in the case of an individual. Service of process in any such suit against the Exchange shall be upon the Truck Underwriters Association, Attorney-in-Fact.

Membership Fees paid for membership in the Exchange are not part of the premium and are fully earned upon membership being granted and coverage effected and are not returnable but may be applied as a credit to Membership Fees required of the Named Insured for insurance accepted by the Exchange.

The annual meeting of the members of the Exchange shall be held at the Home Office of the Exchange at Los Angeles, California, on the first Tuesday following the first Monday following the 15th day of March of each year, at the hour of 2:00 P.M., unless the Board of Governors shall elect to change the time and place of such meeting, in which case, but not otherwise, written or printed notice shall be mailed each member at his last known address at least ten days prior thereto. The Board of Governors shall be chosen by the subscribers from among themselves, at the annual meeting, or any special meeting held for that purpose, and shall have full power and authority to establish rules and regulations for the management of the Exchange not inconsistent with subscribers' agreements.

The Premium Deposit for this policy and all payments made for its continuance shall be payable to the Exchange at the Home Office of the Exchange. The funds so paid shall be placed to the credit of the Named Insured upon the records of the Exchange and applied to the payment of the Insured's proportion of losses and expenses and to the establishment of reserves and general surplus. All such funds may be deposited and withdrawn or invested and re-invested as the Board of Governors or its Executive Committee designates. The Insured agrees that any amount allocated to the surplus fund of the Exchange by the Board of Governors may be retained by the Exchange and applied, after providing for the payment of all liabilities of the Exchange, to any purpose deemed proper and advantageous to policyholders.

This policy is non-assessable.

_Bill A. Cramer_
Countersigned

- 17 -

TRUCK INSURANCE EXCHANGE

TRK0000088

PR0744

PR01144

Appellant's Appendix 02239

JA04575
TRUCK0000493

Effective: January 1, 1968

Policy #350-40-00
Endorsement #1

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

SUPERSEDING POLICY

In consideration of the premium for, and of the
acceptance and retention of this policy by the
Named Insured, it is agreed that this policy
cancels and supersedes any previous policy of the
same number issued by the Company and is effective
as indicated.

Bill A. Cramer

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000089

PR0745

PR01145

Appellant's Appendix 02240
JA04576
TRUCK0000494

Effective:  March 1, 1968

Policy #350-40-00
Endorsement #24
2

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### DEFINITION OF NAMED INSURED
(In Lieu of Endorsement #2 )

In consideration of the premium, it is agreed that the
Named Insured in Item 1 of the Declarations is designated
as:

KAISER CEMENT & GYPSUM CORPORATION,
GLACIER SAND & GRAVEL COMPANY,
GYPSUM CARRIER, INC. OF PANAMA, R.P.,
KAISER GYPSUM COMPANY, INC.,
KAISER OKINAWA CO. LTD.,
PERMANENTE STEAMSHIP CORPORATION,
PERMANENTE TRUCKING COMPANY,
SOUTHWEST MATERIALS, INC.,
TEXAS READY MIX, and

(1) Any Division or Subsidiary Company;
(2) Any Divisions or Subsidiaries of (1) above;
(3) Any Company under the Named Insured's control
    or of which it assumes active management;
(4) Any Partnership or Joint Venture under the
    operational control or sponsorship of (1),
    (2) or (3) above.

_Bill A Craswel_
COUNTERSIGNED

TRUCK INSURANCE EXCHANGE

TRK0000090

PR0746

PR01146

TRUCK0000495

Appellant's Appendix A04577
JA04577

Effective: January 1, 1970                    Policy: 850-40-00
                                              Endorsement #3

                                                      Corrected

KAISER CEMENT & GYPSUM CORPORATION, ET AL

SPECIAL PROVISIONS

In consideration of the premium, it is agreed as follows:

1. Sponsored Organizations as Additional Insureds.

   Such insurance as is afforded by the policy applies also to social
   clubs or organizations sponsored by the Named Insured as Additional
   Named Insureds, subject to the following provisions:

   a. Under Coverages B and D the unqualified phrase "Additional Named
      Insured" includes any member of such club or organization, but
      only as respects his liability for activities of such club or
      organization or activities performed by such member on behalf of
      such club or organization."

   b. "Additional Named Insured" shall be understood to mean the same
      as "Named Insured" as respects Coverages A and C.

2. California Financial Responsibility Filing.

   In the event of cancellation of the policy by the Company, written
   notice shall be given to Department of Motor Vehicles, Financial
   Responsibility, P.O. Box 2431, Sacramento, California, ten (10) days
   before such cancellation becomes effective.

Countersigned

TOWER INSURANCE EXCHANGE

TRK0000091

PR0747

PR01147

TRIAL EX. 301
Page 21

Appellant's Appendix 02242

JA04578
04578R0000496

Effective: January 1, 1968

Policy #350-40-00
Endorsement #3

### KAISER CEMENT & GYPSUM CORPORATION, ET AL.

#### SPECIAL PROVISIONS

In consideration of the premium, it is agreed as follows:

1. **Sponsored Organizations as Additional Insureds.**

   Such insurance as is afforded by the policy applies also to social clubs or organizations sponsored by the Named Insured as Additional Named Insureds, subject to the following provisions:

   a. Under Coverages B and D the unqualified phrase "Additional Named Insured" includes any member of such club or organization, but only as respects his liability for activities of such club or organization or activities performed by such member on behalf of such club or organization."

   b. "Additional Named Insured" shall be understood to mean the same as "Named Insured" as respects Coverages A and C.

2. **California Financial Responsibility Filing.**

   In the event of cancellation of the policy by the Company, written notice shall be given to Department of Motor Vehicles, Financial Responsibility, P.O. Box 2431, Sacramento, California, ten (10) days before such cancellation becomes effective.

3. **Excess Coverage Over Other Specific Insurance.**

   The insurance afforded under this policy shall be excess to the extent coverage is afforded under Truck Insurance Exchange policy #1155-63-65 and Fireman's Fund Insurance Company policy #PC1-334436 or any renewal or replacement thereof.

*Bill A. Cresner*
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000092

PR0748

PR01148

Appellant's Appendix 02243
JA04579
TRUCK0000497

Effective: January 1, 1968

Policy #350-40-00
Endorsement #4

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

REMOVAL OF WRECKAGE

The policy applies also to liability for cost or expenses of, or, incidental to, the removal of the wreck of vessels when such removal is compulsory by law, provided, however, that

a) There shall be deducted from such claim for cost or expenses, the value of any salvage from or which might have been recovered from the wreck, insuring, or which might have insured, to the benefit of the Insured.

b) The Company shall not be liable for such costs or expenses which would be covered by full insurance under the present standard form of policy on hull, machinery, etc., issued by the American Marine Insurance Syndicate.

c) The Company shall not be liable for such costs or expenses when the vessel was wrecked by or in consequence of hostilities or warlike operations, whether before or after declaration of war.

_Lila A. Cramer_
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000093

PR0749

PR01149

TRIAL EX. 301
Page 23

Appellant's Appendix 02244

JA04580
0000498

Effective:    January 1, 1968                                        Policy 350-40-00
                                                                     Endorsement #5

### KAISER CEMENT & GYPSUM CORPORATION, ET AL.
### DEDUCTIBLE COVERAGES A, B, C, D, E, F AND G

As respects each occurrence or one malpractice act, error or mistake regardless of
the number of claims emanating therefrom, the Insured agrees to assume the first
$5,000 ($15,000 as respects Products hazard as defined under Condition 3, Defini-
tion (f) (2) ) and related adjustment expense under any one or combination of
coverages. The Company shall tabulate the amounts so paid which are thus recover-
able from the Insured and shall bill the Insured monthly for the accumulated total.
The Insured shall reimburse the Company promptly.

There will be two types of loss adjustment expense which shall be defined and com-
puted as follows:

1. Allocated Adjustment Expense - Exact items of expense directly incurred by
   the Company and chargeable to a particular claim. (Examples: Legal fees,
   court costs, medical examiner's fees, photographer bills, etc.). Services
   of independent adjusters are excluded.

2. Unallocated Adjustment Expense - A charge to cover all general claims adminis-
   tration costs. (Examples: Services of salaried and independent adjusters,
   claim examiners, clerical service, stationery, office rent and other overhead
   items).

In addition to reimbursement for paid losses as defined above, the Insured agrees
to reimburse the Company for a share of both Allocated and Unallocated Adjustment
Expense incurred by the Company in the settlement of losses and in the settlement
of claims closed for no payment.

1. Allocated Adjustment Expense.
   (a) Allocated Adjustment Expense shall be reimbursed in the same proportion
       that the deductible loss bears to the total loss.

   (b) On claims closed with no payment, Allocated Adjustment Expense shall be
       reimbursed in the proportion that the deductible amount bears to the last
       reserve on the claim prior to closing.

2. Unallocated Adjustment Expense.
   (a) 12% of the Insured's portion of loss under Coverages A, B, E, F and G.
   (b) 6% of the Insured's portion of loss under Coverages C and D.

                  COVERAGE D - $1,000 Deductible

        $1,000 shall be deducted from the amount of each claim
        covered under the terms of this endorsement, and the
        Company shall be liable for loss only in excess of that
        amount.

_Billa Cramer_
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000094

PR0750

PR01150

Effective: January 1, 1968

Policy #350-40-00
Endorsement #

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

PREMIUM ADJUSTMENT ENDORSEMENT

DEPOSIT PREMIUM to be maintained: $4,725.00.

A. As respects the first $10,000 aggregate liability from one occurrence, it is agreed that on or before the 25th day of January 1969, the Named Insured shall render to the Company a statement showing the total remuneration earned by its employees during the period January 1, 1968 to January 1, 1969 (being the amount of remuneration upon which the Named Insured's Workmen's Compensation premium for the same period is predicated including similarly adjusted payroll in states where Workmen's Compensation is self-insured or insured in a State Fund), and the earned premium shall be computed at the following rates per $100.00 of the total remuneration so reported:

| Standard | (Basic) |
|----------|---------|
| $.225    | ($.150) |

B. Such earned premium shall be payable to the Company forthwith and shall be subject to such adjustments as are provided for in that certain Premium Determination Agreement entered into between the Named Insured and the Exchange effective January 1, 1968.

C. For policy limits in excess of $10,000.00 aggregate as respects any one occurrence, and not subject to adjustment under said Premium Determination Agreement, premium shall be payable at the rate of $.059 per $100.00 of the total remuneration so reported.

D. Furthermore, the Named Insured shall pay to the Company the sum of $5,000.00 on or before the 10th day of each month during the currency of this policy, such sums to be credited to the earned premium determined by the premium adjustment as provided in Parts A, B and C, above.

E. In addition, the Named Insured will submit a semi-annual report of remuneration to serve as the basis for any adjustment of the monthly flat charge.

Bill A. Cramer
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000095

PR0751

PR01151

Appellant's Appendix 02246
JA04582
TRUCK0000500

TRIAL EX. 301
Page 25

Effective:  December 1, 1969                    Endorsement #7
                                                CORRECTED

                                                330-40-00

KAISER CEMENT & GYPSUM CORPORATION, ET AL

AGREEMENT DELETING BENEFITS FOR BODILY INJURY AND PROPERTY
DAMAGE LIABILITY CAUSED BY UNINSURED MOTOR VEHICLES

In consideration of the deletion of the premium with respect thereto,
it is agreed by the Exchange and the Named Insured, each shown in this
endorsement that all provisions covering Bodily Injury and Property
Damage Liability caused by an Uninsured Motor Vehicle under this policy
applied for and any subsequent renewal thereof are hereby  deleted
and shall be of no force or effect with respect to any person or insured,
named or otherwise.

Truck Insurance Exchange

                                        Dated December 1, 1969

                                        Kaiser Cement & Gypsum Corporation,
                                        et al

                                        Signature of Named Insured

                                        [signature]
                                        Countersigned

                                                TRUCK INSURANCE EXCHANGE

TRK0000096

PR0752

PR01152

Appellant's Appendix 02247
JA04583
TRUCK0000501

Effective: January 1, 1968                    Policy #350-40-00
                                              Endorsement #7

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### AGREEMENT DELETING NECESSITIES FOR BODILY INJURY CAUSED BY UNINSURED MOTOR VEHICLES

In consideration of the deletion of the premium with respect thereto, it
is agreed by the insurer indicated below and the undersigned named In-
sured that all provisions covering bodily injury caused by an uninsured
motor vehicle under the policy applied for and any subsequent renewal
thereof are hereby deleted and shall be of no force or effect with respect
to any person or insured, named or otherwise.

☐ Farmers Insurance Exchange

☒ Truck Insurance Exchange

☐ Mid-Century Insurance Company

Dated:  January 1, 1968

Kaiser Cement & Gypsum Corporation, Et Al.

(Signature of Named Insured)

_Bill A Cramer_
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000097

PR0753

PR01153

Appellant's Appendix 02248

JA04584


Effective: January 1, 1968

Policy #350-40-00
Endorsement #8

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

## ADDITIONAL INSURED - MILES and SONS TRUCKING SERVICE

In consideration of the premium at which this policy is written for
Automobile Bodily Injury and Automobile Property Damage Liability in-
surance, it is hereby agreed that MILES and SONS TRUCKING SERVICE
whose business address is P.O. Box 859, Merced, California, is an
Additional Insured with respect to the existence, ownership, maintenance,
or use of automobiles leased, or rented by the Named Insured to the
above mentioned Additional Insured, or while the Named Insured is acting
as Sub-hauler for the above mentioned Additional Insured.

The Company hereby agrees to void any wording in any insuring agreement,
exclusion, or condition of this policy depriving the Additional Named
Insured herein of coverage afforded hereby.

It is also agreed that such insurance protection as is extended to the
above named Additional Insured shall be primary insurance and any other
protection available to such Additional Insured shall be excess over
such primary insurance.

It is further agreed that the Company will not cancel, or reduce Automobile
Bodily Injury Liability or Automobile Property Damage Liability coverages
under this policy without first giving the above mentioned Additional In-
sured ten (10) days advance notice of such action.

Bill A. Cramer
COUNTERSIGNED

TRUCK INSURANCE EXCHANGE

TRK0000098

PR0754

PR01154

Appellant's Appendix 03494585
TRUCK0000503



Effective: January 1, 1968                          Policy #350-40-00
                                                    Endorsement #9

KAISER CEMENT & GYPSUM CORPORATION, ET AL.
CONTRACTUAL LIABILITY - NORTHERN PACIFIC RAILWAY COMPANY

It is agreed that:

A. No provision or exclusion appearing in this policy or any endorsements
   attached hereto eliminating coverage for any obligation or liability
   assumed by the Insured under any contract or agreement, or for damage
   or injury to or destruction of property rented to, occupied or used by,
   or in the care, custody or control of the Insured shall apply to that
   certain permit from NORTHERN PACIFIC RAILWAY COMPANY, hereinafter called
   "Railway Company", to GLACIER SAND AND GRAVEL COMPANY numbered 84293 and
   dated April 15, 1958.

B. Such insurance as is afforded by the policy with respect to liability
   assumed by the Insured under contract applies also to that part of a
   contract between the Named Insured and Northern Pacific Railway Company,
   hereinafter called "Railway Company" dated April 15, 1958, reading:

   3 - Should the right of way be fenced at the location described,
       Permittee shall construct and maintain crossing gates at Permittee's
       expense. Said gates shall be constructed in accordance with Railway
       Company's standard plan shown below or equal and shall be kept
       closed and locked excepting when necessary to be opened for travel.
       Permittee agrees to assume all damages of every kind whatsoever
       resulting from Permittee's failure to keep gates closed and locked
       as agreed in this paragraph.

   6 - Permittee agrees to indemnify and hold harmless Railway Company from
       any and all loss, cost, damage or injury to persons, including death
       resulting therefrom, or to property arising or growing out of the
       existence or use of said private road upon Railway Company's property
       or arising or growing out of said private road crossing Railway
       Company's track, regardless of how such loss, cost, damage, injury
       or death may arise, and notwithstanding that it may arise in whole
       or in part from the negligence of Railway Company's employees, agents
       or servants.

   7 - It is agreed that the provisions of paragraph 3 and 6 are for the
       equal protection of any other railroad company or companies here-
       tofore or hereafter granted the joint use of Railway Company's
       property upon which said private road crossing is located.

C. The Railway Company and any other railroad company or companies heretofore
   or hereafter granted the joint use of the Railway Company's property are
   named as Additional Insureds under this policy, but only as respects
   coverage provided for in the above-mentioned permit.

        Bill A Cramer
        Countersigned

                                            TRUCK INSURANCE EXCHANGE

                                    TRK0000099

                                    PR0755

                                    PR01155

Effective: January 1, 1968

Policy #350-40-00
Endorsement #9
Page 2

### KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### CONTRACTUAL LIABILITY - NORTHERN PACIFIC RAILWAY COMPANY

D. In consideration of the premium charged, it is agreed that solely as respects the agreement between NORTHERN PACIFIC RAILWAY COMPANY and GLACIER SAND AND GRAVEL COMPANY numbered 84293 dated April 15, 1958 relative to an easement agreement at Steilacoom, Washington, the Limits of Liability, Coverage D, Property Damage Liability Other Than Automobile is hereby amended to read as follows:

Coverage D - Property Damage Liability        $100,000 Each Occurrence
            Other Than Automobile            $200,000 Aggregate operations
                                             $200,000 Aggregate contractual

_____
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000100

PR0756

PR01156

Appellant's Appendix A04587
TRUCK0000505

Effective:  January 1, 1968

Policy #350-40-00
Endorsement #10

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

ADDITIONAL INSURED - JOHN E, HOPKINS, ET AL.

In consideration of the premium, it is agreed that such insurance
as is afforded by this policy for Bodily Injury and Property
Damage Liability coverages is hereby extended to apply to

JOHN R. HOPKINS and ANNA L. HOPKINS
and ESTATE OF JOHN SHELDON HOPKINS
c/o Kirby & Elliott
P.O. Box 151, 700 Texas Street
Fairfield, California

as an "Insured" as defined in the policy, but only as respects
claims arising out of the ownership, maintenance or use of 36
Foot Converted Navy LCP, named "Denny", Coast Guard Registry
#267521 by the Named Insured.

_Bill A. Cramer_
Countersigned

TRK0000101

PR0757

PR01157



Effective: January 1, 1968                          Policy #350-40-00
                                                    Endorsement #11

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

ADDITIONAL INSURED - CITY OF REDWOOD CITY, ET AL.

In consideration of the premium, it is agreed that such insurance
as is afforded by this policy for Bodily Injury and Property
Damage Liability coverages is hereby extended to apply to

        CITY OF REDWOOD CITY, THE BOARD OF PORT COMMISSIONERS
        OF THE CITY OF REDWOOD CITY, THE PORT OF REDWOOD CITY,
        THE PORT COMMISSIONERS, THE COUNCILMEN and all
        OFFICERS, AGENTS AND EMPLOYEES THEREOF
        Redwood City, California

as an "Insured" as defined in the policy, but only as respects
claims arising out of the lease of premises to the Named Insured.

_Bill A Cramer_
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000102

PR0758

PR01158

Effective: January 1, 1968

Policy #330-40-00
Endorsement #12

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

## ADDITIONAL INSURED - U.S. DEPARTMENT OF THE NAVY

Should the above mentioned policy be cancelled, assigned or changed during the above named policy period in such manner as to affect this Certificate, the Company will give thirty (30) days written notice to the Officer in Charge of Construction, Bureau of Yards & Docks Contract, Marianas Navy Co. 526, Fleet Post Office, San Francisco, California.

It is agreed that the United States of America (Department of the Navy) is an Additional Insured with respect to the Named Insured's operations conducted on Cabras Island situated in Apra Harbor, Island of Guam. It is also agreed that the Named Insured waives any rights of subrogation against the United States of America which might arise by reason of any payment under the policy arising out of the Named Insured's operations conducted on Cabras Island, situated in Apra Harbor, Island of Guam.

*Bill A. Epson*

TRUCK INSURANCE EXCHANGE

TRK0000103

PR0759

PR01159

Appellant's Appendix 02254

JA04590
TRUCK0000508

Effective: January 1, 1968

Policy #350-40-00
Endorsement #13

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### ADDITIONAL INSURED - YOUNG BROTHERS, LIMITED

In consideration of the premium, it is agreed that such in-
surance as is afforded by this policy for Bodily Injury and
Property Damage Liability coverages is hereby extended to
apply to

YOUNG BROTHERS, LIMITED
325 North King Street
Honolulu, Hawaii

as an "Insured" as defined in the policy, but only as respects
claims arising out of the installation of the equipment and
other facilities on barges by Kaiser Cement & Gypsum Corporation
and the loading and unloading operations by Kaiser, its agents
or servants or employees, of said barges operated by Young
Brothers, Limited, for the purpose of transporting bulk cement
to the Named Insured's premises in the Hawaiian Islands.

*Billie R. Cramer*
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000104

PR0760

PR01160

TRUCK0000509

Effective: January 1, 1968

Policy #350-40-00
Endorsement #14

KAISER CEMENT & GYPSUM CORPORATION and GLACIER SAND AND GRAVEL COMPANY

ADDITIONAL INSURED - ZIDELL MACHINERY & SUPPLY COMPANY, ET AL.

In consideration of the premium, it is agreed that such in-
surance as is afforded by this policy for Bodily Injury and
Property Damage Liability coverages is hereby extended to
apply to

            ZIDELL MACHINERY & SUPPLY COMPANY and
            ZIDELL EXPLORATIONS INC.
            S/V Bond Street
            Portland, Oregon

as an "Insured" as defined in the policy, but only as respects
claims arising out of the operation, maintenance or use of
barges owned by Zidell Machinery & Supply Company and Zidell
Explorations Inc. while said barges are used by the Named Insured.

_Bill a Crane_
Countersigned

ISPICE INSURANCE EXCHANGE

TRK0000105

PR0761

PR01161

Appellant's Appendix 02256

JA04592
TRUCK0000510

Effective:  January 1, 1968

Policy #350-40-00
Endorsement #15

KAISER CEMENT & GYPSUM CORPORATION
and KAISER GYPSUM COMPANY, INC.

ADDITIONAL INSURED - COMMERCIAL CREDIT INDUSTRIAL CORP.

In consideration of the premium; it is agreed that such
insurance as is afforded by this policy for Automobile
Bodily Injury and Property Damage Liability coverages is
hereby extended to apply to

COMMERCIAL CREDIT INDUSTRIAL CORP.
300 St. Paul Place
Baltimore, Maryland  21202

as an Additional Insured as defined in the policy but
only as respects claims arising out of vehicles leased
to the Named Insured and the sale or disposition of
automobiles in behalf of the Named Insured.

_Bill A Cramer_
Countersigned

TRK0000106

PR0762

PR01162

Effective:   January 1, 1968

Policy #350-40-00
Endorsement #16

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

## ADDITIONAL INSURED - HERBERT ALEMBU

In consideration of the premium, it is agreed that such
insurance as is afforded by this policy for Bodily Injury
and Property Damage Liability coverage is hereby ex-
tended to apply to

HERBERT ALEMBU
1535 Byron Street
Palo Alto, California

as an "Insured" as defined in the policy, but only as
respects claims arising out of engineering services per-
formed for the Named Insured under contract No. C 677-2
dated August 15, 1967.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000107

PR0763

PR01163

Appellant's Appendix 02258

JA04594
TRUCK0000512

Effective:  December 1; 1969                    Policy #150-40-00
                                                Amended Endorsement #17

### KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### ADDITIONAL INSURED - ACE BARGE COMPANY, ET AL.
(In Lieu of Original Endorsement #17 dated January 1, 1968).

In consideration of the premium, it is agreed that such insurance as is
afforded by this policy for Bodily Injury and Property Damage Liability
coverages is hereby extended to apply to

        ACE BARGE COMPANY and
        CROWLEY LAUNCH and TUGBOAT COMPANY
        and Affiliated and Inter-related Companies
        including vessels
        Pier 32, San Francisco, California

as an "Insured" as defined in the policy, but only as respects claims
arising out of the operation, maintenance or use of barges while said
barges are leased to Kaiser Cement & Gypsum Corporation or Permanente
Steamship Corporation.

It is further agreed that with respect to the towing agreement between
the insured and Crowley Launch & Tugboat Co. as respects towage of the
barges, "Anchorage" and "Seward", that notwithstanding any implied
warranties by either party, of workmanlike service or otherwise, it is
agreed that all loss, damage and liability which may result from joint
or concurrent negligence or other fault by both parties shall be borne
and/or allocated by and/or between them in accordance with maritime
principles of mutual fault, as if no such warranties existed.

_____
Countersigned

TRK0000108

PR0764

PR01164

TRIAL EX. 301
Page 38

Appellant's Appendix 02259

JA04595
TRUCK0000513



Effective:  January 1, 1968                    Policy #350-40-00
                                               Endorsement #1B

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

ADDITIONAL INSURED - C.R.B. LEASING COMPANY

In consideration of the premium, it is agreed that such in-
surance as is afforded by this policy for Automobile Bodily
Injury and Property Damage Liability coverages is hereby
extended to apply to

          C.R.B. LEASING COMPANY
          52 Dapplegray Lane
          Rolling Hills Estates, California

as an Additional Insured as defined in the policy but only
as respects claims arising out of vehicles leased to the
Named Insured and the sale or disposition of automobiles in
behalf of the Named Insured.

Bill A Creamer
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000109

PR0765

PR01165

Appellant's Appendix 02360
JA04596
TRUCK0000514

Effective: January 1, 1968

Policy #350-40-00
Endorsement #19

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

ADDITIONAL INSURED - KILPON HOTELS CORPORATION

In consideration of the premium, it is agreed that such in-
surance as is afforded by this policy for Bodily Injury and
Property Damage Liability is hereby extended to apply to

KILPON HOTELS CORPORATION
900 Wilshire Boulevard
Los Angeles, California

as an "Insured" as defined in the policy but only as respects
claims arising out of the lease of certain premises at the
above location.

The Company hereby agrees to void any wording in any insuring
agreement, exclusion or condition of this policy depriving
the herein named Additional Insured of the coverage described
above.

It is also agreed that such insurance protection extended to
the above named Additional Insured under this endorsement
shall be primary insurance and any other protection available
to such Additional Insured shall be excess over such primary
insurance.

_Bill A. Crane_
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000110

PR0766

PR01166



Effective:  January 1, 1968                    Policy #350-40-00
                                               Endorsement #20

### KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### ADDITIONAL INSURED - TIDEWATER TERMINAL COMPANY

In consideration of the premium, it is agreed that such in-
surance as is afforded by this policy for Bodily Injury and
Property Damage Liability coverage is hereby extended to
apply to

        TIDEWATER TERMINAL COMPANY
        2609 N.E. Marine Drive
        Portland, Oregon  97211

as an "Insured" as defined in the policy, but only as respects
claims arising out of the lease of premises at East Pasco,
Washington, to the Named Insured.

Bill A. Cramer
    Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000111

PR0767

PR01167

TRIAL EX. 301
Page 41

Appellant's Appendix 02262
JA04598
TRUCK0000516



Effective:  January 1, 1968                    Policy #350-43-00
                                               Endorsement #21

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

ADDITIONAL INSURED.- STATE OF HAWAII, HARBORS DIVISION - DEPT. OF TRANSP.

In consideration of the premium, it is agreed that such insurance as is
afforded by this policy for Bodily Injury and Property Damage Liability
coverages is hereby extended to apply to

                STATE OF HAWAII, HARBORS DIVISION
                DEPARTMENT OF TRANSPORTATION
                P.O. Box 397
                Honolulu, Hawaii  96813

as an "Insured" as defined in the policy, but only as respects claims
arising out of the lease to the Named Insured of land adjacent to
Pier 32, Honolulu, Hawaii.

Bill A. Cramer
     Countersigned

TRK0000112

PR0768

PR01168

Appellant's Appendix  JA04599
TRUCK0000517

Effective: January 1, 1958

Policy #350-40-00
Endorsement #22

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

ADDITIONAL INSURED - HOFFMAN CONSTRUCTION CO.

In consideration of the premium, it is agreed that such in-
surance as is afforded by this policy for Bodily Injury and
Property Damage Liability coverages is hereby extended to

HOFFMAN CONSTRUCTION CO.
715 S.W. Columbia Street
Portland, Oregon 97201

as an "Insured" as defined in the policy, but only as respects
claims arising out of use of property at 4120 S.W. Macadam
Avenue, Portland, Oregon by PACIFIC BUILDING MATERIALS DIVISION
of GLACIER SAND & GRAVEL COMPANY.

*Bill A Crane*
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000113

PR0769

PR01169

Appellant's Appendix 02264

JA04600
TRUCK0000518

Effective: January 1, 1968

Policy #350-40-00
Endorsement #23

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

## ADDITIONAL INSURED - COTTON PROPERTY MANAGEMENT CO.

In consideration of the premium, it is agreed that such insurance
as is afforded by this policy for Bodily Injury and Property
Damage Liability coverages is hereby extended to apply to

    COTTON PROPERTY MANAGEMENT CO.
    233 A Street
    San Diego, California 92101

as an "Insured" as defined in this policy, but only as respects
claims arising out of management of property located at
4401 Twain Avenue, San Diego, California.

Countersigned

TRK0000114

PR0770

PR01170

Appellant's Appendix 04801

JA02801

TRUCK0000519

Effective:  January 1, 1968

Policy #350-40-20
Endorsement #26
(Corrected)

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

ADDITIONAL INSURED - UNITED STATES LEASING CORPORATION and THE BANK OF AMERICA

In consideration of the premium, it is agreed that such insurance
as is afforded by this policy for Bodily Injury and Property
Damage Liability coverages is hereby extended to apply to

UNITED STATES LEASING CORPORATION
633 Battery Street
San Francisco, California  94111

and

THE BANK OF AMERICA NT & SA
485 California Street
San Francisco, California.

as an "Insured" as defined in the policy, but only as respects claims
arising out of leasing of electric data processing equipment to the
Named Insured.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000115

PR0771

PR01171

TRIAL EX. 301
Page 45

Appellant's Appendix 02266

JA04602
TRUCK0000520

Effective:  January 1, 1968

Policy #350-40-00
Endorsement #25

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

ADDITIONAL INSURED - DEPARTMENT OF TRANSPORTATION, STATE OF HAWAII

In consideration of the premium, it is agreed that such insurance
as is afforded by this policy for Bodily Injury and Property
Damage Liability coverages is hereby extended to apply to

STATE OF HAWAII
Department of Transportation
Harbors Division
869 Punchbowl Street
Honolulu, Hawaii  96813

as an "Insured" as defined in the policy, but only as respects
claims arising out of lease of 20,000 square feet of land
situated at Kawaihae Harbor, Kawaihae, Hawaii.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000116

PR0772

PR01172

TRIAL EX. 301
Page 46

Appellant's Appendix JA04603

TRUCK0000521

Effective: January 1, 1968

Policy #350-40-00
Endorsement #26

## KAISER CEMENT A GYPSUM CORPORATION, ET AL.

## ADDITIONAL INSURED - CECIL B. LAFAYETTE and C. RAYMOND MILLS and VIOLET I. MILLS

In consideration of the premium, it is agreed that such insurance as is
afforded by this policy for Bodily Injury and Property Damage Liability
coverages is hereby extended to apply to

CECIL B. LAFAYETTE
2136 S. Hathaway
Santa Ana, California

and

C. RAYMOND MILLS and VIOLET I. MILLS
2136 S. Hathaway
Santa Ana, California

as an "Insured" as defined in the policy, but only as respects claims arising
out of the lease of a manufacturing plant situated at 2136 S. Hathaway,
Santa Ana, California.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000117

PR0773

PR01173

Appellant's Appendix 02268
JA04604
TRUCK0000522

Effective: February 19, 1968

Policy #350-40-00
Endorsement #27

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### ADDITIONAL INSURED - KAISER ALUMINUM & CHEMICAL CORPORATION

In consideration of the premium, it is agreed that such insurance as is afforded by this policy for Bodily Injury and Property Damage Liability coverages is hereby extended to apply to

KAISER ALUMINUM & CHEMICAL CORPORATION
300 Lakeside Drive
Oakland, California 94604

as an "Insured" as defined in the policy, but only as respects claims arising out of the lease of approximately seven (7) acres of land at Tacoma, Washington, to the Named Insured.

Bill A. Cramer

TRK0000118

PR0774

PR01174

TRUCK0000523

Appellant's Appendix A04605



Effective: March 18, 1968

Policy #350-40-00
Endorsement #28

### KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### ADDITIONAL INSURED - CITY OF REDWOOD CITY, ET AL.

In consideration of the premium, it is agreed that such insurance as is afforded by this policy for Bodily Injury and Property Damage Liability coverages is hereby extended to apply to:

    CITY OF REDWOOD CITY, THE BOARD OF PORT COMMISSIONERS
    OF THE CITY OF REDWOOD CITY, THE PORT OF REDWOOD CITY,
    THE PORT COMMISSIONERS, THE COUNCILMEN AND ALL
    OFFICERS, AGENTS AND EMPLOYEES THEREOF
    Redwood City, California

as an "Insured" as defined in the policy, but only as respects claims arising out of the lease of premises to the Named Insured.

As respects claims against any Insured under this policy, other Insureds or the employees of other Insureds shall be deemed to be members of the public. The term "the Insured" is used severally and not collectively, but the inclusion herein of more than one insured shall not increase the limits of the Exchange's liability.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000119

PR0775

PR01175

Appellant's Appendix 02270

JA04606
TRUCK0000524

Effective: March 1, 1968

Policy #350-43-00
Endorsement #29

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

## DEFINITION OF NAMED INSURED

In consideration of the premium, it is agreed that the Named.
Insured in Item 1 of the Declarations is designated as:

KAISER CEMENT & GYPSUM CORPORATION,
COMPANIA INDUSTRIAL KAISER, S.A. ,
GLACIER SAND & GRAVEL COMPANY,
GYPSUM CARRIER, INC. OF PANAMA, R.P.,
KAISER GYPSUM COMPANY, INC.,
KAISER OKINAWA CO. LTD.,
PERMANENTE STEAMSHIP CORPORATION,
PERMANENTE TRUCKING COMPANY,
SOUTHWEST MATERIALS, INC.
TEXAS READY MIX, and

(1) Any Division or Subsidiary Company;
(2) Any Divisions or Subsidiaries of (1) above;
(3) Any Company under the Named Insured's control
    or of which it assumes active management;
(4) Any Partnership or Joint Venture under the
    operational control or sponsorship of (1), (2) or
    (3) above.

_Bill A. Cramer_
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000120

PR0776

PR01176

Effective: April 17, 1968

Policy #350-40-00
Endorsement #30

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### ADDITIONAL INSURED - THE CITY OF LONG BEACH, ET AL.

In consideration of the premium it is agreed that such insurance
afforded by this policy for Bodily Injury and Property Damage
Liability coverages is hereby extended to apply to:

THE CITY OF LONG BEACH, THE BOARD OF HARBOR COMMISSIONERS, .
AND THEIR OFFICERS AND EMPLOYEES, while acting within the
scope of their authority
P.O. Box 570
Long Beach, California  90801

as an "Insured" as defined in the policy, but only as respects
claims arising out of the lease of property located at 1390 West
Broadway, Long Beach, California, to be used as a parking lot
by KAISER GYPSUM COMPANY, INC.

The inclusion of more than one corporation, person, organization,
firm or entity as Insured under this policy shall not in any way
affect the rights of any such corporation, person, organization,
firm or entity as respects any claim, demand, suit or judgment made
or brought by or in favor of any other Insured, or by or in favor
of any Employee of such other Insured.

This policy shall protect such corporation, person, organization,
firm or entity in the same manner as though a separate policy had
been issued to each. However, this shall not operate to increase
the Company's liability.

It is agreed that the Exchange will not cancel or reduce any of the
Bodily Injury and Property Damage Liability coverages under this
policy without first giving a thirty (30) day advance written
notice to the above-mentioned Additional Insured.

_Dick A Cramer_
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000121

PR0777

PR01177

Appellant's Appendix 02272

JA04608
TRUCK0000526



Effective: May 13, 1968                              Policy #350-4D-00
                                                     Endorsement #31

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

ADDITIONAL INSURED - COASTWIDE LEASING COMPANY


It is agreed that the Automobile insurance coverage described
below and afforded by this policy shall be extended to apply
to

        COASTWIDE LEASING COMPANY
        1440 Broadway
        Oakland, California

as an Additional Insured as defined in the policy but only in
regard to those claims arising out of the use of an International
DCO-405 Tractor #E3701085, and a Trailmobile./flatbed Trailer #200641,
while leased to the Named Insured.

It is also agreed that the Automobile insurance extended herein
and afforded by this policy shall comply and be in accordance with
that certain Truck Lease and Service Agreement entered into
between the Named Insured and COASTWIDE LEASING COMPANY, dated
May 13, 1968.

Bill A Crane

TRUCK INSURANCE EXCHANGE

<u>TRK</u>00001:

PR0778

PR01178

Appellant's Appendix 02273
JA04609
TRUCK0000527



Effective: May 13, 194                                    Policy #350-40-00
                                                          Endorsement #32

### KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### ADDITIONAL INSURED - WESTERN TRUCK MANPOWER, INC.

It is agreed that such insurance afforded by this policy for
Bodily Injury and Property Damage Liability shall be extended
to apply to

      WESTERN TRUCK MANPOWER, INC.
      1360 Lincoln Avenue
      San Rafael, California

as an "Insured" as defined in the policy but only in regard to
those claims arising out of the services of truck drivers and
helpers supplied by WESTERN TRUCK MANPOWER, INC. to the Named
Insured in connection with its trucking operations.

TRK0000123

PR0779

PR01179

Appellant's Appendix 02274
JA04610
TRUCK0000528



Effective: August 12, 1968

Policy #350-40-00
Endorsement #33

### KAISER CEMENT & GYPSUM CORPORATION

### ENDORSEMENT CANCELLING ENDORSEMENTS

In consideration of the premium, it is agreed that the
following Endorsements are cancelled from this policy:

Endorsement #31 - Coastwide Leasing Company
Endorsement #32 - Western Truck Manpower, Inc.

Countersigned

TRK0000124

PR0780

PR01180

Appellant's Appendix JA0461
TRUCK0000529



Effective: October 1, 1968

Policy #350-40-00
Endorsement #34

### KAISER CEMENT & GYPSUM CORPORATION

#### AMENDATORY ENDORSEMENT

In consideration of the premium it is agreed that Section IV, Policy Period, Territory, Limits, Indemnity and Defense Paragraph B Limits (2) as pertains to Coverage E and F is amended to read:

Coverage E    $100,000 each person
$100,000 aggregate

Coverage F    $100,000 each person
$100,000 aggregate

TRK0000125

PR0781

PR01181

Appellant's Appendix 02276

JA04612

TRUCK0000530

Effective: December 31, 1968

Policy #350-40-00
Endorsement #35

### KAISER CEMENT & GYPSUM CORPORATION, ET AL.

#### DEFINITION OF NAMED INSURED
(In Lieu of Endorsement #29)

In consideration of the premium, it is agreed that the Named
Insured in Item 1 of the Declarations is designated as:

KAISER CEMENT & GYPSUM CORPORATION,
COMPANIA INDUSTRIAL KAISER, S.A.,
GLACIER SAND & GRAVEL COMPANY,
GYPSUM CARRIER, INC. OF PANAMA, R.P.,
KAISER GYPSUM COMPANY, INC.,
KAISER OKINAWA CO. LTD.,
PERMANENTE STEAMSHIP CORPORATION,
PERMANENTE TRUCKING COMPANY,
SOUTHWEST MATERIALS, INC.
TEXAS READY MIX,
ALBA GYPSUM COMPANY, LTD., and

(1) Any Division or Subsidiary Company;
(2) Any Divisions or Subsidiaries of (1) above;
(3) Any Company under the Named Insured's control
    or of which it assumes active management;
(4) Any Partnership or Joint Venture under the
    operational control or sponsorship of (1), (2) or
    (3) above.

Countersigned

TRK0000126

PR0782

PR01182

Appellant's Appendix JA04613

TRUCK0000531

Effective:  January 1, 1969          Policy #350-40-00
                                      Endorsement #36

AM 1: H 54

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

PREMIUM ADJUSTMENT ENDORSEMENT

DEPOSIT PREMIUM to be maintained:  $4,725.00.

A. As respects the first $20,000. aggregate liability from one occurrence, it
   is agreed that on or before the 25th day of January 1970, the Named Insured
   shall render to the Company a statement showing the total remuneration
   earned by its employees during the period January 1, 1969 to January 1, 1970
   (being the amount of remuneration upon which the Named Insured's Workmen's
   Compensation premium for the same period is predicated including similarly
   adjusted payroll in states where Workmen's Compensation is self-insured or
   insured in a State Fund), and the earned premium shall be computed at the
   following rates per $100.00 of the total remuneration so reported:

                    Standard        (Basic)
                    $.180          ($.120)

B. Such earned premium shall be payable to the Company forthwith and shall be
   subject to such adjustments as are provided for in that certain Premium
   Determination Agreement entered into between the Named Insured and the Ex-
   change effective January 1, 1969.

C. For policy limits in excess of $20,000. aggregate as respects any one
   occurrence, and not subject to adjustment under said Premium Determination
   Agreement, premium shall be payable at the rate of $.050 per $100.00 of the
   total remuneration so reported.

D. Furthermore, the Named Insured shall pay to the Company the sum of $3,500.
   00 or before the 10th day of each month during the currency of this policy,
   such sums to be credited to the earned premium determined by the premium
   adjustment as provided in Parts A, B and C, above.

E. In addition, the Named Insured will submit a semi-annual report of remunera-
   tion to serve as the basis for any adjustment of the monthly flat charge.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000127

PR0783

PR01183

Appellant's Appendix 02278
JA04614
TRUCK0000532

Effective: January 1, 1969

Policy #350-60-00
Endorsement #37

KAISER CEMENT & GYPSUM CORPORATION, ET AL:

It is agreed that Section (1) of paragraph (d) under Insuring Agreement III (4), shall be amended to read as follows:

(1) $25,000. shall be deducted (in lieu of any other deductible mentioned in this policy) from the total amount the Company shall become obligated to pay as damages, plus allocated loss adjustment expenses, on behalf of the Insured for each occurrence.

Countersigned

TRUCK INSURANCE EXCHANGE

<u>TRK</u>0000128

PR0784

PR01184

TRIAL EX. 301
Page 58

Appellant's Appendix 02279

JA04615
TRUCK0000533

Effective:  January 1, 1969                          Policy #350-60-00
                                                     Endorsement #38

### KAISER CEMENT & GYPSUM CORPORATION; ET AL.

It is agreed that the first sentence in paragraph one of
Endorsement #5, shall be amended to read as follows:

As respects each occurrence or one malpractice act,
error or mistake regardless of the number of claims
emanating therefrom, the Insured agrees to assume
the first $5,000. and related adjustment expense
under any one or combination of coverages.

Bill A Crime
Countersigned

TRUCE INSURANCE EXCHANGE

TRK0000129

PR0785

PR01185

Effective:   January 1, 1969

Policy #350-40-00
Endorsement #39

KAISER CEMENT & GYPSUM CORPORATION, ET AL

CLARIFICATION ENDORSEMENT

In consideration of the premium, it is agreed that any claim
made in connection with activities and operations which were
conducted prior to January 1, 1969, shall come under the retro-
spective premium determination agreement in force at the time
of the activity or operation giving rise to such claim.

_Bill A Cramer_
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000130

PR0786

PR01186

Effective: March 26, 1969

Policy #350-40-00
Endorsement #40

## KAISER CEMENT & GYPSUM CORPORATION, ET AL

### DEFINITION OF NAMED INSURED
(In Lieu of Endorsement #35)

It is agreed that the Named Insured in Item 1 of the Declarations shall be designated as:

> KAISER CEMENT & GYPSUM CORPORATION,
> COMPANIA OCCIDENTAL MEXICANA, S.A.,
> COMPANIA INDUSTRIAL KAISER, S.A.,
> GLACIER SAND & GRAVEL COMPANY,
> GYPSUM CARRIER, INC. OF PANAMA, R.P.
> KAISER GYPSUM COMPANY, INC.,
> OKINAWA KAISER COMPANY, LTD.
> PERMANENTE STEAMSHIP CORPORATION,
> PERMANENTE TRUCKING COMPANY,
> SOUTHWEST MATERIALS, INC.,
> TEXAS READY MIX,
> ALBA GYPSUM COMPANY, LIMITED
> KAISER URBAN CORPORATION,
> PACIFIC GYPSUM COMPANY, and
> (1) Any Division or Subsidiary Company;
> (2) Any Divisions or Subsidiaries of (1) above;
> (3) Any Company under the Named Insured's control
> or of which it assumes active management;
> (4) Any Partnership or Joint Venture under the
> operational control or sponsorship of (1), (2) or
> (3) above.

Bill A Craws

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000131

PR0787

PR01187

TRIAL EX. 301
Page 61

Appellant's Appendix 02282
JA04618
TRUCK0000536

Effective: August 19, 1969

Policy #350-40-00
Endorsement #41

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

## ADDITIONAL INSURED - DR. G. GORDON HALLIDAY

In consideration of the premium, it is agreed that such insurance as is afforded by this policy for Bodily Injury and Property Damage Liability coverages is hereby extended to apply to

DR. G. GORDON HALLIDAY
778 ALTOS OAKS DRIVE
LOS ALTOS, CALIFORNIA

as an "Insured" as defined in the policy, but only as respects claims arising out of medical services performed for the Named Insured at their Permanente Plant.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000132

PR0788

PR01188

Appellant's Appendix 02283
JA04619
TRUCK0000537



Policy #350-40-00
Endorsement #42

Effective Date:  12-1-69

### KAISER CEMENT & GYPSUM CORPORATION, ET AL

It is hereby agreed that Agreement IV A(4) as shown on page 5
of the policy shall be amended to read as follows.

### IV. POLICY PERIOD TERRITORY, LIMITS, INDEMNITY AND DEFENSE:

(4)  arise out of the ownership, maintenance or use of the vessels
called "Angelito" and "Theresa", except that the insurance
afforded by the policy shall be excess of coverage afforded
under Policy No. J.M.H. 138 of LaInteramericana, S.A. Compania
de Seguros or any renewals or replacements thereof.

Countersigned

TRK0000133

PR0789

PR01189

Appellant's Appendix 02384

JA04620

TRUCK0000538

Effective: January 19, 1970

Policy #350-40-00
Endorsement #43

Corrected

## KAISER CEMENT & GYPSUM CORPORATION, ET AL

### DEFINITION OF NAMED INSURED
(In Lieu of Endorsement #40)

It is agreed that the Named Insured in Item 1 of the Declarations shall
be designated as:

KAISER CEMENT & GYPSUM CORPORATION.
COMPANIA OCCIDENTAL MEXICANA, S.A.
COMPANIA INDUSTRIAL KAISER, S.A.
GLACIER SAND & GRAVEL COMPANY,
GYPSUM CARRIER, INC., OF PANAMA, R.P.
KAISER GYPSUM COMPANY, INC.,
OKINAWA KAISER CO., LTD.,
PACIFIC GYPSUM COMPANY
PERMANENTE STEAMSHIP CORPORATION,
PERMANENTE TRUCKING COMPANY
SOUTHWEST MATERIALS, INC.,
TEXAS READY MIX,
ALBA GYPSUM COMPANY, LTD.,
KAISER URBAN CORPORATION,
KAISER INTERNATIONAL SERVICES, INCORPORATED, AND
(1) Any Division or Subsidiary Company
(2) Any Divisions or Subsidiaries of (1) above:
(3) Any Company under the Named Insured's control
    or of which it assumes active management;
(4) Any Partnership or joint Venture under the
    operational control or sponsorship of (1), (2) or
    (3) above.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000134

PR0790

PR01190

Appellant's Appendix 0JA04621
TRUCK0000539



Effective   June 1  1972                    Policy  No. 40  A
                                            Accrue. Ant  44

#### ..sb. CITIES & ... 1962 RATI...  .T.

#### PREMIUM ADJUSTMENT ENDORSEMENT

It is agreed that paragraphs _ and ' of policy endorsement #36 are amended as follows:

. For policy limits in excess of $25,000.00 aggregate as respects any one occurrence, and not subject to adjustment under said terms. determination a premium premium shall be payable at the rate of $.042 per $100.00 of the total remuneration so reported.

.. Furthermore, the named insured shall pay to the Company the sum of $6,000.00 on or before the 10th day of each month during the currency of this policy, such sums to be credited to the earned premium determined by the premium adjustment as provided in Parts A, B and C, above.

Countersigned

ROYCE INSURANCE EXCHANGE.

TRK0000135

PR0791

PR01191

Appellant's Appendix 02286
JA04622
TRUCK0000540

Effective:  January 1, 1971          Policy #350-40-00
                                      Endorsement #65

KAISER CEMENT & GYPSUM CORPORATION, ET AL
PREMIUM ADJUSTMENT ENDORSEMENT

DEPOSIT PREMIUM to be maintained:  $4,725.00

A.  As respects the first $25,000 aggregate liability from one occurrence, it
    is agreed that on or before the 25th day of January 1972, the Named Insured
    shall render to the Company a statement showing the total remuneration
    earned by its employees during the period January 1, 1971 to January 1,
    1972 (being the amount of remuneration upon which the Named Insured's
    Workmen's Compensation premium for the same period is predicated including
    similarly adjusted payroll in states where Workmen's Compensation is self-
    insured or insured in a State Fund), and the earned premium shall be
    computed at the following rates per $100.00 of the total remuneration so
    reported:

                  Standard                    (Basic)
                   $.269                       ($.166)

B.  Such earned premium shall be payable to the Company forthwith and shall
    be subject to such adjustments as are provided for in that certain Premium
    Determination Agreement entered into between the Named Insured and the
    Exchange effective January 1, 1969.

C.  For policy limits in excess of $25,000 aggregate as respects any one
    occurrence, and not subject to adjustment under said Premium Determination
    Agreement, premium shall be payable at the rate of $.094 per $100.00 of
    the total remuneration so reported.

D.  Furthermore, the Named Insured shall pay to the Company the sum of $6,000
    on or before the 10th day of each month during the currency of this policy,
    such sums to be credited to the earned premium determined by the premium
    adjustment as provided in Parts A, B and C, above.

E.  In addition, the Named Insured will submit a semi-annual report of
    remuneration to serve as the basis for any adjustment of the monthly flat
    charge.

Countersigned

FIRE INSURANCE EXCHANGE

TRK0000136

PR0792

PR01192

TRUCK0000541

Effective:  January 1, 1971

Policy #350-40-00
Endorsement #46

### KAISER CEMENT & GYPSUM CORPORATION, ET AL

#### EXCLUSION

ET-308

[Contamination or Pollution—Description of Operations]

This endorsement becomes a part of your policy effective from its date of issue unless the policy is being renewed, in which event this endorsement becomes effective with the date shown on the enclosed renewal notice.

Except with respect to the ownership, maintenance or use of any automobile, it is agreed that the insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental. However, if, with respect to operations described in this endorsement there is a discharge, dispersal, release or escape of oil or other petroleum substance or derivative (including any oil refuse or oil mixed with wastes) into or upon any watercourse or body of, water, the insurance does not apply to bodily injury or property damage arising out of such discharge, dispersal, release or escape whether or not sudden and accidental.

Description of Operations

- Gas Lease Operators—natural gas
- Gasoline Recovery—from casing head or natural gas
- Non-operating working interests
- Oil or Gas Well Sounding
- Oil or Gas Wells—acidizing
- Oil or Gas Wells—cementing
- Oil or Gas Wells—cleaning or recabbing—by contractors
- Oil or Gas Wells—drilling or redrilling, installation or recovery of casing
- Oil or Gas Wells—instrument logging or survey work in wells
- Oil or Gas Wells—perforating of casing
- Oil Lease Operators
- Oil Pipe Lines—operation, including maintenance
- Oil Rig or Derrick Erecting or Dismantling—wood or metal—including construction of installations or structures or foundations of equipment

This endorsement becomes part of the policy to which it is attached and supersedes and controls anything to the policy contrary herein, but is otherwise subject to the Declarations, Insuring Agreements, Exclusions and Conditions thereof.

TRUCK INSURANCE EXCHANGE, by Truck Underwriters Association, Attorney-in-fact
and CENTURY INSURANCE COMPANY

Secretary

W. J. Baddeck
President

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000137

PR0793

PR01193

Appellant's Appendix 02288

JA04624
TRUCK0000542

FIRST ADDENDUM

TO

PREMIUM DETERMINATION AGREEMENT

This Addendum attaches to, and forms a part of that certain Premium
Determination Agreement entered into between "Truck Insurance
Exchange" hereinafter referred to as the "Exchange" and

KAISER CEMENT & GYPSUM CORPORATION

hereinafter referred to as the "Insured" on January 1, 1969.

It is hereby agreed that as and from January 30, 1971, Condition
4, (h) Retrospective Retention of the Agreement shall be amended
to read:

(h)  RETROSPECTIVE RETENTION - For purposes of premium
     determination in accordance with this agreement,
     the aggregate of actual paid losses and reserves
     for unpaid losses arising out of any single occur-
     rence or accident chargeable to "Incurred Losses"
     shall not exceed $65,000, which sum shall be de-
     fined as the "Retrospective Retention". No Adjust-
     ment Expense shall be included in determining the
     amount of any loss for purposes of the Retrospec-
     tive Retention.

All other terms and conditions of the Agreement shall remain
unchanged.

Executed at Los Angeles, California. Dated February 3, 1971

                              TRUCK INSURANCE EXCHANGE
                              Truck Underwriters Association, Attorney-in-Fact

                    By_____

Accepted for the Insured
By_____
Title_____

TRK0000138

PR0794

PR01194

Appellant's Appendix 02289
JA04625
TRUCK0000543

Effective: January 30, 1971

Policy #350-40-00
Endorsement #47

## KAISER CEMENT & GYPSUM CORPORATION, ET AL
## PREMIUM ADJUSTMENT ENDORSEMENT

DEPOSIT PREMIUM to be maintained: $4,225.00

A. As respects the first $50,000 aggregate liability from one occurrence, it is agreed that on or before the 25th day of January 1972, the Named Insured shall render to the Company a statement showing the total remuneration earned by its employees during the period January 30, 1971 to January 1, 1972 (being the amount of remuneration upon which the Named Insured's Workmen's Compensation premium for the same period is predicated including similarly adjusted payroll in states where Workman's Compensation is self-insured or insured in a State Fund), and the earned premium shall be computed at the following rates per $100.00 of the total remuneration so reported:

| Standard | (Basic) |
|----------|---------|
| $.307 | ($.205) |

B. Such earned premium shall be payable to the Company forthwith and shall be subject to such adjustments as are provided for in that certain Premium Determination Agreement entered into between the Named Insured and the Exchange effective January 1, 1969.

C. For policy limits in excess of $50,000 aggregate as respects any one occurrence, and not subject to adjustment under said Premium Determination Agreement, premium shall be payable at the rate of $.109 per $100.00 of the total remuneration so reported.

D. Furthermore, the Named Insured shall pay to the Company the sum of $6,000 on or before the 10th day of each month during the currency of this policy, such sums to be credited to the earned premium determined by the premium adjustment as provided in Parts A, B and C, above.

E. In addition, the Named Insured will submit a semi-annual report of remuneration to serve as the basis for any adjustment of the monthly flat charge.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000139

PR0795

PR01195

Appellant's Appendix 02290
JA04626
TRUCK0000544

Effective: January 30, 1971

Policy #350-40-00
Endorsement #48

## KAISER CEMENT & GYPSUM CORPORATION, ET AL

### LIMIT OF LIABILITY ENDORSEMENT

Subject to all of the policy provisions having reference thereto, the limit of the company's liability as respects any one occurrence involving one or any combination of the hazards or perils insured against shall not exceed $500,000 aggregate sum.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000140

PR0796

PR01196

Appellant's Appendix 02291

JA04627

TRUCK0000545

Effective: January 30, 1971

Policy #350-40-00
Endorsement #49

In consideration of the premium, it is agreed that the Declarations are amended as follows:

## DECLARATIONS

Item 1. Named Insured: KAISER CEMENT & GYPSUM CORPORATION and SUBSIDIARIES
Address: 300 Lakeside Drive
Oakland, California 94612

Legal Entity : Corporations

Business : Manufacture and sale of Construction and
Building Materials.

Item 2. Effective : From January 30, 1971 at 12:01 A.M. until cancelled,
Standard Time at the address of the Named Insured
as stated herein.

Item 3. Coverages : A. Bodily Injury Liability - Automobile
B. Bodily Injury Liability - Except Automobile
C. Property Damage Liability - Automobile
D. Property Damage Liability - Except Automobile
E. Professional Liability
F. Personal Injury Liability
G. Employee Benefits Liability

Item 4. Limits of
Liability : $500,000. aggregate each occurrence involving
one or any combination of the hazards
or perils insured against

Place of Issuance : Los Angeles, California

Date of Issuance : April 14, 1971

Countersigned - Authorized Representative

TRUCK INSURANCE EXCHANGE

TRK0000141

PR0797

PR01197

Appellant's Appendix 02292
JA04628
TRUCK0000546

NOTICE OF CANCELLATION AND REISSUANCE
ENDORSEMENT

Named Insured:    KAISER CEMENT & GYPSUM CORP.          End. #30
Address:          300 Lakeside Drive                    J30-44-00
                  Oakland, Calif. 94612

                  October 1, 1971                       November 1, 1971
Effective Date                                Expiration Date

In consideration of the acceptance and retention of this notice by the named insured, it is agreed that the policy to which it is attached is cancelled effective at 12.01 A.M., Standard Time, on the effective date shown above. Said policy is thereafter reissued on the same date and time for a term of one month which term shall expire at 12.01 A.M. Standard Time, at the address of the named insured as stated herein on the expiration date shown above. The policy may be renewed for an additional term of one month each time the Company offers to renew by sending an invoice, and the insured pays the required renewal premium.

Accepted By _____

EFFECTIVE (If no other time exists 12.01 A.M.) on the effective date shown above, this endorsement, when countersigned, becomes part of the above mentioned policy issued by the Company designated in the Declarations, and supersedes and controls anything in the policy contrary hereto but is otherwise subject to the Declarations, Insuring Agreements, Exclusions and Conditions thereof.

Countersigned _____
                                  AUTHORIZED REPRESENTATIVE

TRK0000142

PR0798

PR01198

Effective:  May 20, 1971

Endorsement #51
Policy #350-40-00

### KAISER CEMENT & GYPSUM CORPORATION, ET AL

#### DEFINITION OF NAMED INSURED
(In Lieu of Endorsement (43))

It is agreed that the Named Insured in Item #3 of the Declarations shall be de-
signated as:

> KAISER CEMENT & GYPSUM CORPORATION,
> COMPANIA INDUSTRIAL KAISER, S. A.,
> GLACIER SAND & GRAVEL COMPANY,
> GYPSUM CARRIER, INC. OF PANAMA, R. P.,
> ASIAN CARRIERS, INC.,
> KAISER GYPSUM COMPANY, INC.,
> KAISER OKINAWA CO., LTD.,
> PERMANENTE STEAMSHIP CORPORATION,
> PERMANENTE TRUCKING COMPANY,
> SOUTHWEST MATERIALS, INC.,
> TEXAS READY MIX,
> ALBA GYPSUM COMPANY, LTD.,
> KAISER UKRAM CORPORATION,
> KAISER INTERNATIONAL SERVICES, INCORPORATED, AND
> (1)  Any Division or Subsidiary Company
> (2)  Any Divisions or Subsidiaries of (1) above;
> (3)  Any Company under the Named Insured's control
>       or of which it assumes active management;
> (4)  Any Partnership or Joint Venture under the
>       operational control or sponsorship of (1), (2)
>       or (3) above.

Countersigned

TRUCE INSURANCE EXCHANGE

TRK0000143

PR0799

PR01199

Appellant's Appendix 02294

JA04630
TRUCK0000548

Effective: May 20, 1971

Endorsement #52
Policy #350-40-00

KAISER CEMENT & GYPSUM CORPORATION, ET AL

DEFINITION OF NAMED INSURED
(In Lieu of Endorsement #51)

It is agreed that the Named Insured in Item #1 of the Declarations shall be designated as:

KAISER CEMENT & GYPSUM CORPORATION,
COMPANIA INDUSTRIAL KAISER, S. A.,
GLACIER SAND & GRAVEL COMPANY,
GYPSUM CARRIER, INC. OF PANAMA, R. P.,
ASIAN CARRIERS, INC.,
KAISER GYPSUM COMPANY, INC.,
KAISER OKINAWA CO., LTD.
PERMANENTE STEAMSHIP CORPORATION,
PERMANENTE TRUCKING COMPANY,
SOUTHWEST MATERIALS, INC.,
TEXAS READY MIX,
ALBA-GYPSUM COMPANY, LTD.,
KAISER URBAN CORPORATION,
KAISER BRAMALEA CORPORATION (effective 2-5-71)
KAISER INTERNATIONAL SERVICES, INCORPORATED, AND
(1)  Any Division or Subsidiary Company
(2)  Any Divisions or Subsidiaries of (1) above;
(3)  Any Company under the Named Insured's control
     or of which it assumes active management;
(4)  Any Partnership or Joint Venture under the
     operational control or sponsorship of (1), (2)
     or (3) above.

Countersigned

TRK0000144

PR0800

PR01200

Appellant's Appendix JA04631
TRUCK0000549

Effective:  January 1, 1972

Endorsement #53
Policy #350-40-00

## KAISER CEMENT & GYPSUM CORPORATION, ET AL

### DEFINITION OF NAMED INSURED

It is agreed that the Named Insured in Item #1 of the Declarations shall be designated as:

KAISER CEMENT & GYPSUM CORPORATION,
KAISER ARAMLEA CORPORATION,
GLACIER SAND & GRAVEL COMPANY,
GYPSUM CARRIER, INC, OF PANAMA, R.P.
KAISER GYPSUM COMPANY, INC.,
PACIFIC GYPSUM COMPANY,
PERMANENTE STEAMSHIP CORPORATION,
PERMANENTE TRUCKING COMPANY,
SOUTHWEST MATERIALS, INC.,
TEXAS READY MIX,
ALBA GYPSUM COMPANY, LTD.,
KAISER URBAN CORPORATION,
KAISER INTERNATIONAL SERVICES, INCORPORATED,
ASIAN CARRIERS, INC.,
COMPANIA OCCIDENTAL MEXICANA, S.A.,
OKINAWA KAISER COMPANY, LTD.,
COMPANIA INDUSTRIAL KAISER, S.A.,
RYUKYU CEMENT COMPANY, LTD.,
P. T. SEMEN TJIBINONG, and
(1) Any Division or Subsidiary Company
(2) Any Divisions or Subsidiaries or (1) above;
(3) Any Company under the Named Insured's control
    or of which it assumes active management;
(4) Any Partnership or Joint Venture under the
    operational control or sponsorship of (1),
    (2) or (3) above.

Countersigned

TRK0000145

PR0801

PR01201

JA04632
TRUCK0000550

Effective: January 1, 1972

Policy #35D-40-00
Endorsement #54

## KAISER CEMENT & GYPSUM CORPORATION, ET AL
## PREMIUM ADJUSTMENT ENDORSEMENT

DEPOSIT PREMIUM to be maintained: $4,725.00

A.  As respects the first $5,000 aggregate liability from one occurrence, it is
agreed that on or before the 25th day of January 1973, the Named Insured
shall render to the Company a statement showing the total remuneration
earned by its employees during the period January 1, 1972 to January 1, 1973
(being the amount of remuneration upon which the Named Insured's Workmen's
Compensation for the same period is predicated including similarly adjusted
payroll in states where Workmen's Compensation is self-insured or insured
in a State Fund), and the earned premium shall be computed at the rate of
$0.050 per $100.00 of the total remuneration so reported.

B.  As respects $45,000 aggregate liability from one occurrence, in excess of
$5,000 aggregate liability per occurrence, the earned premium shall be
computed at the following rates per $100.00 of the total remuneration so
reported:

| Standard | Basic |
|----------|-------|
| $.300 | $.200 |

C.  Such earned premium shall be payable to the Company forthwith and shall be
subject to such adjustments as are provided for in that certain Premium
Determination Agreement entered into between the Named Insured and the
Exchange effective January 1, 1972.

D.  For policy limits in excess of $50,000 aggregate as respects any one
occurrence, and not subject to adjustment under said Premium Determination
Agreement, premium shall be payable at the rate of $.110 per $100.00 of
the total remuneration so reported.

E.  Furthermore, the Named Insured shall pay to the Company the sum of $27,000
each quarter on or before the 10th day of the month following each such
quarter during the currency of this policy, such sums to be credited to the
earned premium determined by the premium adjustment as provided in Parts A,
B, C, and D above.

F.  In addition, the Named Insured will submit a semi-annual report of
remuneration to serve as the basis for any adjustment of the monthly flat
charge.

*Superseded by*
*Endt. 58*

Countersigned

TRK0000146

PR0802

PR01202

Appellant's Appendix 0JA004633
TRUCK0000551



April 1, 1972

Endorsement #55
Policy #350-60-00

KAISER CEMENT & GYPSUM CORPORATION et al.

In consideration of the premium it is agreed that the
name of KAISER BRAMALEA CORPORATION is hereby changed to
KAISER PACIFIC DEVELOPMENT CORPORATION.

Countersigned

TRK0000147

PR0803

PR01203

Appellant's Appendix 02298
JA04634
TRUCK0000552

Effective: January 26, 1972

Endorsement #56
Policy #350-40-00

## KAISER CEMENT & GYPSUM CORPORATION, ET AL

### DEFINITION OF NAMED INSURED

It is agreed that the Named Insured in Item #1 of the Declarations shall be designated as:

KAISER CEMENT & GYPSUM CORPORATION,
KAISER PACIFIC DEVELOPMENT CORPORATION,
GLACIER SAND & GRAVEL COMPANY,
GYPSUM CARRIER, INC. OF PANAMA, R.P.
KAISER GYPSUM COMPANY, INC.
PACIFIC GYPSUM COMPANY,
PERMANENTE STEAMSHIP CORPORATION,
PERMANENTE TRUCKING COMPANY,
SOUTHWEST MATERIALS, INC.,
TEXAS READY MIX,
ALBA GYPSUM COMPANY, LTD.,
KAISER PACIFIC PROPERTIES CORPORATION
KAISER URBAN CORPORATION,
KAISER INTERNATIONAL SERVICES, INCORPORATED,
ASIAN CARRIERS, INC.,
COMPAÑIA OCCIDENTAL MEXICANA, S.A.,
OKINAWA KAISER COMPANY, LTD.,
COMPAÑIA INDUSTRIAL KAISER, S.A.,
KYUKYU CEMENT COMPANY, LTD.,
P.T. SEMEN TJIBINONG, and
(1) Any Division or Subsidiary Company
(2) Any Divisions or Subsidiaries of (1) above;
(3) Any Company under the Named Insured's control
   or of which it assumes active management;
(4) Any Partnership or Joint Venture under the
   operational control or sponsorship of (1),
   (2) or (3) above.

Countersigned

TOWER INSURANCE EXCHANGE

TRK0000148

PR0804

PR01204



Effective: January 26, 1972

Endorsement #56
Policy #350-40-00

### KAISER CEMENT & GYPSUM CORPORATION, ET AL

#### DEFINITION OF NAMED INSURED

It is agreed that the Named Insured in Item #1 of the Declarations shall be designated as:

KAISER CEMENT & GYPSUM CORPORATION,
KAISER PACIFIC DEVELOPMENT CORPORATION,
GLACIER SAND & GRAVEL COMPANY,
GYPSUM CARRIER, INC. OF PANAMA, S.P.
KAISER GYPSUM COMPANY, INC.
PACIFIC GYPSUM COMPANY,
PERMANENTE STEAMSHIP CORPORATION,
PERMANENTE TRUCKING COMPANY,
SOUTHWEST MATERIALS, INC.,
TEXAS READY MIX,
ALBA GYPSUM COMPANY, LTD.,
KAISER PACIFIC PROPERTIES CORPORATION
KAISER URBAN CORPORATION,
KAISER INTERNATIONAL SERVICES, INCORPORATED,
ASIAN CARRIERS, INC.,
COMPANIA OCCIDENTAL MEXICANA, S.A.,
OKINAWA KAISER COMPANY, LTD.,
COMPANIA INDUSTRIAL KAISER, N.A.,
KYUKYU CEMENT COMPANY, LTD.,
P.T. SEMEN TJIBINONG, and
(1)   Any Division or Subsidiary Company
(2)   Any Divisions or Subsidiaries or (1) above;
(3)   Any Company under the Named Insured's control
      or of which it assumes active management;
(4)   Any Partnership or Joint Venture under the
      operational control or sponsorship of (1),
      (2) or (3) above.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000149

PR0805

PR01205

Appellant's Appendix 02300

JA04636
TRUCK0000554

Policy #350-40-00
Endorsement #57

Effective: May 15, 1972

KAISER CEMENT & GYPSUM CORPORATION, ET AL

ADDITIONAL INSURED - ACE BARGE COMPANY, ET AL
(In Lieu of Endorsement #17 Amended dated December 1, 1969)

In consideration of the premium, it is agreed that such insurance as is
afforded by this policy for Bodily Injury and Property Damage Liability
coverages is hereby extended to apply to

ACE BARGE COMPANY and
CROWLEY LAUNCH and TUGBOAT COMPANY
and Affiliated and Inter-related Companies
including vessels
Pier 32, San Francisco, California

as an "Insured" as defined in the policy, but only as respects claims
arising out of the operation, maintenance or use of barges while said
barges are leased to Kaiser Cement & Gypsum Corporation or Permanente
Steamship Corporation.

It is further agreed that with respect to the towing agreement between
the insured and Crowley Launch & Tugboat Co. as respects towage of the
barges, "Permanente 272" and "Seward", that notwithstanding any implied
warranties by either party, of workmanlike service or otherwise, it is
agreed that all loss, damage and liability which may result from joint
or concurrent negligence or other fault by both parties shall be borne
and/or allocated by and/or between them in accordance with maritime
principles of mutual fault, as if no such warranties existed.

COUNTERSIGNED

TRK0000150

PR0806

PR01206

TRUCK0000555

Appellant's Appendix JA04637

Effective: January 1, 1973                    Policy #350-60-00
                                              Endorsement #58

KAISER CEMENT & GYPSUM CORPORATION, ET AL
PREMIUM ADJUSTMENT ENDORSEMENT

DEPOSIT PREMIUM to be maintained: $16,000.00

A.  As respects the first $5,000 aggregate liability from one occurrence, it is
    agreed that on or before the 25th day of January 1974, the Named Insured
    shall render to the Company a statement showing the total remuneration
    earned by its employees during the period January 1, 1973 to January 1, 1974
    (being the amount of remuneration upon which the Named Insured's Workmen's
    Compensation for the same period is predicated including similarly adjusted
    payroll in states where Workmen's Compensation is self-insured or insured
    in a State Fund), and the earned premium shall be computed at the rate of
    $0.030 per $100.00 of the total remuneration so reported.

B.  As respects $45,000 aggregate liability from one occurrence, in excess of
    $5,000 aggregate liability per occurrence, the earned premium shall be
    computed at the following rates per $100.00 of the total remuneration so
    reported:

                    Standard          Basic
                    $.225.            $.150

C.  Such earned premium shall be payable to the Company forthwith and shall be
    subject to such adjustments as are provided for in that certain Premium
    Determination Agreement entered into between the Named Insured and the
    Exchange effective January 1, 1972.

D.  For policy limits in excess of $50,000 aggregate any one occurrence, and not
    subject to adjustment under said Premium Determination Agreement, premium
    shall be payable at the rate of $.150 per $100.00 of the total remuneration so
    reported.

E.  Furthermore, the Named Insured shall pay to the Company the sum of $27,000
    each quarter on or before the 10th day of the month following each such
    quarter during the currency of this policy, such sums to be credited to the
    earned premium determined by the premium adjustment as provided in Parts A,
    B, C, and D above.

F.  In addition, the Named Insured will submit a semi-annual report of
    remuneration to serve as the basis for any adjustment of the monthly flat
    charge.

Countersigned

TRK0000151

PR0807

PR01207

TRIAL EX. 301
Page 81

Appellant's Appendix 02302

JA04638
TRUCK0000556

Effective: October 18, 1972

Endorsement #59
Policy #350-60-00

## KAISER CEMENT & GYPSUM CORPORATION, ET AL

### DEFINITION OF NAMED INSURED

It is agreed that the Named Insured in Item #1 of the Declarations shall be designated as:

KAISER CEMENT & GYPSUM CORPORATION,
KAISER PACIFIC DEVELOPMENT CORPORATION, delete
GLACIER SAND & GRAVEL COMPANY,
GYPSUM CARRIER, INC. OF PANAMA, R.P.
KAISER GYPSUM COMPANY, INC.
PACIFIC GYPSUM COMPANY,
PERMANENTE STEAMSHIP CORPORATION,
PERMANENTE TRUCKING COMPANY,
SOUTHWEST MATERIALS, INC.,
TEXAS READY MIX,
AMISTAD FUEL COMPANY,
ALBA GYPSUM COMPANY, LTD.,
KAISER PACIFIC PROPERTIES CORPORATION
KAISER URBAN CORPORATION,
KAISER INTERNATIONAL SERVICES, INCORPORATED,
ASIAN CARRIERS, INC.,
COMPANIA OCCIDENTAL MEXICANA, S.A.,
OKINAWA KAISER COMPANY, LTD.,
COMPANIA INDUSTRIAL KAISER, S.A.,
RYUKYU CEMENT COMPANY, LTD.,
P.T. SEMEN TJIBINONG, AND  CIBINING
(1) Any Division or Subsidiary Company
(2) Any Divisions or Subsidiaries of (1) above;
(3) Any Company under the Named Insured's control
    or of which it assumes active management;
(4) Any Partnership or Joint Venture under the
    operational control or sponsorship of (1),
    (2) or (3) above.

Daniel T. Leckey
Countersigned

TRK0000152

PR0808

PR01208

TRIAL EX. 301
Page 82

Appellant's Appendix 008804639
JA004639
TRUCK0000557

Effective: September 11, 1973

Endorsement #60
Policy #350-40-00

## KAISER CEMENT & GYPSUM CORPORATION, ET AL

### DEFINITION OF NAMED INSURED

It is agreed that the Named Insured in Item #1 of the Declarations
shall be designated as:

KAISER CEMENT & GYPSUM CORPORATION,
KAISER PACIFIC DEVELOPMENT CORPORATION,
GLACIER SAND & GRAVEL COMPANY,
GYPSUM CARRIER, INC. OF PANAMA, R.P.
KAISER GYPSUM COMPANY, INC.,
PACIFIC GYPSUM COMPANY,
PERMANENTE STEAMSHIP CORPORATION,
PERMANENTE TRUCKING COMPANY,
SOUTHWEST MATERIALS, INC.,
TEXAS READY MIX,
AMISTAD FUEL COMPANY,
ALBA GYPSUM COMPANY, LTD.,
BANITVOGLIO PAPER STOCK COMPANY,
KAISER PACIFIC PROPERTIES CORPORATION,
KAISER URBAN CORPORATION,
KAISER INTERNATIONAL SERVICES, INCORPORATED,
ASIAN CARRIERS, INC.,
COMPANIA OCCIDENTAL MEXICANA, S.A.,
OKINAWA KAISER COMPANY, LTD.,
COMPANIA INDUSTRIAL KAISER, S.A.,
RYUKYU CEMENT COMPANY, LTD.,
P.T. SEMEN TJIBINONG, AND
(1)  Any Division or Subsidiary Company
(2)  Any Divisions or Subsidiaries of (1) above;
(3)  Any Company under the Named Insured's control
     or of which it assumes active management;
(4)  Any Partnership or Joint Venture under the
     operational control or sponsorship of (1),
     (2) or (3) above.

David T. Keating
Countersigned

*JOYCE INSURANCE EXCHANGE*

TRK0000153

PR0809

PR01209

Effective: January 1, 1974

Policy #350-40-00
Endorsement #61

### KAISER CEMENT & GYPSUM CORPORATION, ET AL
### PREMIUM ADJUSTMENT ENDORSEMENT

DEPOSIT PREMIUM to be maintained: $16,000.00

A. As respects the first $5,000 aggregate liability from one occurrence, it is agreed that on or before the 25th day of January 1975, the Named Insured shall render to the Company a statement showing the total remuneration earned by its employees during the period January 1, 1974 to January 1, 1975 (being the amount of remuneration upon which the Named Insured's Workmen's Compensation for the same period is predicated including similarly adjusted payroll in states where Workmen's Compensation is self-insured or insured in a State Fund), and the earned premium shall be computed at the rate of $0.030 per $100.00 of the total remuneration so reported.

B. As respects $45,000 aggregate liability from one occurrence, in excess of $5,000 aggregate liability per occurrence, the earned premium shall be computed at the following rates per $100.00 of the total remuneration so reported:

| Standard | Basic |
|----------|-------|
| 5.24     | 5.25  |

C. Such earned premium shall be payable to the Company forthwith and shall be subject to such adjustments as are provided for in that certain Premium Determination Agreement entered into between the Named Insured and the Exchange effective January 1, 1972.

D. For policy limits in excess of $50,000 aggregate as respects any one occurrence, and not subject to adjustment under said Premium Determination Agreement, premium shall be payable at the rate of $.150 per $100.00 of the total remuneration so reported.

E. Furthermore, the Named Insured shall pay to the Company the sum of $29,500 each quarter on or before the 10th day of the month following each such quarter during the currency of this policy, such sums to be credited to the earned premium determined by the premium adjustment as provided in Parts A, B, C, and D above.

F. In addition, the Named Insured will submit a semi-annual report of remuneration to serve as the basis for any adjustment of the monthly flat charge.

*David T. Kutey*

Countersigned

TRK0000154

PR0810

PR01210

TRUCK0000559



TRUCK INSURANCE EXCHANGE
4680 Wilshire Boulevard    Los Angeles, California 90010

RETROSPECTIVE PREMIUM DETERMINATION AGREEMENT

PLAN III

WHEREAS the TRUCK INSURANCE EXCHANGE, hereinafter called the "Exchange" has
issued a certain policy of insurance to

KAISER CEMENT & GYPSUM CORPORATION

hereinafter called the "Insured" and

WHEREAS the Exchange and the Insured desire to determine and adjust the earned
premium upon such policy as herein provided;

NOW, THEREFORE, in consideration of the payment of the premium provided for in
said policy and the mutual acceptance of the terms set forth herein, the parties
agree as follows:

1.  PERIOD OF AGREEMENT. This agreement shall take effect __January 1, 1972__
    and shall terminate . . . . . . . . . . . . . . . __January 1, 1975__
    at 12:01 A.M. Standard Time at the principal office of the Insured as of
    each of said dates, unless terminated earlier by the cancellation of
    said policy or as provided hereinafter in this agreement.

2.  INSURANCE POLICY. This agreement shall apply to policy __350-40-04__
    and the earned premium on such policy shall be utilized in computing the
    earned premium under this agreement. The term "Policy" shall include
    "policies" when there are more than one subject to this agreement.

3.  ACCIDENT REPORTS. The Insured agrees to report to the Exchange as soon as
    practicable all accidents or losses insured under said policy.

4.  DEFINITIONS. For the purpose of this agreement the words and phrases set
    forth below shall be defined as follows:

    (a) __STANDARD PREMIUM__ - The premium computed in accordance with the provis.
        of the policy, other than this agreement.

    (b) __BASIC PREMIUM__ - __Sixty-six and 66/100ths__    per cent (66.66)
        of the Standard Premium.

    (c) __RETROSPECTIVE SURCHARGE__ - __Fifty and 60/100ths__    per cent (50.60)
        of the Basic Premium.

    (d) __SERVICE FEE__ - __Twenty-three and 19/100ths__    per cent (23.19)
        of the Basic Premium.

    (e) __PREMIUM TAXES__ - The amount of premium taxes required to be paid to any
        state and other governmental bodies on such portion of the premium
        earned on this policy that is subject to adjustment by this agreement.

PRA 111

TRK0000155

PR0811

PR01211

Appellant's Appendix 02306
JA04642
TRUCK0000560



*incurred*
*+ Service fee*
*+ TAXES*

(d) RETROSPECTIVE PREMIUM - The earned premium according to this agreement, computed as the sum of the Incurred Losses plus Service Fee, plus Premium Taxes, in no event to exceed the Standard Premium.

*Read from*

(a) INCURRED LOSSES - The sum of:

*PAID LOSS*
*+ RESERVES*
*+ ADJUST EXP*
*+ IBNR*
*Incurred*

  (1) Actual losses paid by the Exchange, including loss adjustment expense, and

  (2) Reserves as estimated by the Exchange to liquidate unpaid losses and loss adjustment expense on claims reported to the Exchange, and

  (3) Reserves as estimated by the Exchange for unreported losses and loss adjustment expense.

(b) RETROSPECTIVE RETENTION - For purposes of premium determination in accordance with this agreement, the aggregate of actual paid losses and reserves for unpaid losses arising out of any single occurrence or accident chargeable to "Incurred Losses" shall not exceed $ 45,000. which sum shall be defined as the "Retrospective Retention". No Adjustment Expense shall be included in determining the amount of any loss for purposes of the Retrospective Retention.

(c) ADJUSTMENT EXPENSE - There will be two types of loss adjustment expense which shall be defined and computed as follows:

  (1) Allocated Adjustment Expense - Exact items of expense directly incurred by the Exchange and chargeable to a particular claim. (Examples: Legal fees, court costs, medical examiner's fees, photographer bills, etc.)

  (2) Unallocated Adjustment Expense - A charge to cover all general claims administration costs. (Examples: Services of salaried adjusters and independent adjusters, claims examiners, clerical service, stationery, office rent, and other overhead items.) The charge to be 17 % of all paid Bodily Injury Liability claims and 8 % of all other paid claims.

5. DISTRIBUTION OF ADJUSTMENT EXPENSE. All Adjustment Expense shall be chargeable to Incurred Losses, except as follows:

(a) If the amount of loss from any single occurrence or accident exceeds the amount of the Retrospective Retention,

  (1) Allocated Adjustment Expense shall be charged to Incurred Losses in the same proportion that the Retrospective Retention bears to the total amount of the loss; and

  (2) No Unallocated Adjustment Expense shall be charged on that portion of any such loss in excess of the Retrospective Retention.

(b) If any claim presented to the Exchange is finally closed without payment,

  (1) Any Allocated Adjustment Expense incurred in the settlement of such claim shall be charged to Incurred Losses in an amount not to exceed the amount of the Retrospective Retention as respects all such claims arising out of any single occurrence; and

  (2) No Unallocated Adjustment Expense shall be charged for any claim which is settled without payment.

PJM 111

TRK0000156

PR0812

PR01212

TRUCK0000561



6. PREMIUM PAYMENT. Premium for the policy subject to this agreement shall be paid in quarterly installments and, initially, at the Basic rate. Once each quarter period of this agreement a ratio shall be calculated between Incurred Losses, as defined herein, and the premium charged, less premium refunds. As long as the loss ratio so calculated remains at 60% or less, premium shall continue to be paid at the Basic rate.

7. COLLECTION OF RETROSPECTIVE SURCHARGE. At any such quarterly calculation the loss ratio so derived shall exceed 60%, the Insured shall pay upon demand the difference between premium paid for the preceding period or periods and an amount sufficient to bring the loss ratio to 60%, not to exceed the Standard Premium for the period this agreement has been in force, and shall pay premium for succeeding quarterly periods at the Standard rate, but only as long as the loss ratio exceeds 60%.

8. SUSPENSION OF RETROSPECTIVE SURCHARGE. If, at any quarterly calculation, the loss ratio shall fall below 60%, the Basic rate shall be reinstated and the preceding provisions shall apply as from the beginning. Any suspension of collection shall not constitute a waiver of the Right to collect the Retrospective Surcharge so suspended; but the suspension shall act only as a postponement of billing until such time as the Surcharge may be required.

9. INTERIM ACCOUNTING. The Exchange shall make a preliminary accounting to the Insured as of the end of the 12-months and 24-months periods of this agreement and at those times, if the Retrospective Premium for the latest 12-months period is less than the total premium paid, the Exchange shall credit the difference to the account of the Insured or will refund such difference at these times to the Insured in accordance with his request.

10. MINIMUM PREMIUM. The minimum earned premium for the period of this agreement shall not be less than the Service Fee plus Premium Taxes.

11. MAXIMUM PREMIUM. The maximum earned premium for the period of this agreement shall not exceed the Standard Premium.

12. COMPUTATION OF PREMIUM. The Retrospective Premium shall be computed as follows:
   (a) As of sixty days after the termination of the agreement the Exchange shall make the initial computation of the earned premium.

   (b) At intervals of six months, twelve months, twenty-four months and thirty-six months after the termination of the agreement the Exchange shall recompute the Retrospective Premium on the basis of the Exchange's determination of the amount of Incurred Losses.

   (c) The Retrospective Premium determined by the fifth recomputation shall be the final earned premium for the policy, only by mutual consent of both parties to this agreement.

13. ADJUSTMENT OF PREMIUM. After computing the Retrospective Premium at the 60-day, 6-months, 12-months, 24-months and 36-months periods, and provided the Retrospective Premium for the term of this agreement is less than all premium paid to the Exchange upon said policy, the Exchange shall, after each such computation, credit the excess premium paid to subsequent policies issued to or subsequent premium determination entered into with the Insured, or refund such excess premium to the Insured in accordance with his request.

FUL 111

TRK0000157

PR0813

PR01213

Appellant's Appendix 02308

JA04644
TRUCK0000562



14.   REIMBURSEMENT BY INSURED. Upon the making of any settlement prior to the
final settlement, if the Retrospective Premium on subsequent premium determination is greater than the Retrospective Premium developed on the last
settlement date, the Insured will pay to the Exchange, upon demand, the
amount of the difference between the newly-developed Retrospective Premium
and the Retrospective Premium developed on the last settlement date.

15.   CANCELLATION. This agreement may be cancelled by the Insured, or by the
Exchange, at any time, by giving thirty days (30) advance written notice
the other party. In event of cancellation the minimum earned premium
shall be the Retrospective Premium.

16.   POLICY CONDITIONS. Nothing in this agreement shall be construed to supersede, modify or amend any of the terms or conditions of the policies of
insurance issued to the Insured and referred to herein, except as respects
the determination of the amount and method of premium payable as provided
for in this agreement.

Executed at  Los Angeles, California          Date    February 8, 1977

                              TRUCK INSURANCE EXCHANGE
                          Truck Underwriters Association, Attorney-in-Fact

                          By _____
                                      Officer in Charge
                                  National Accounts Division

Accepted for the Insured:

          By  _____

          Title  _____

PDA 131

TRK000015!

PR0814

PR01214

TRIAL EX. 301
Page 88

Appellant's Appendix A04645
TRUCK0000563

Effective: January ___, 1976          Po___ No. 350-40-00
                                       Endorsement #25

KAISER CEMENT & GYPSUM CORPORATION, ET AL

T.I.E. ADMINISTERED DEDUCTIBLE ENDORSEMENT

The Company may pay any part or all of the deductible amount to effect settlement
of any claim or suit and, upon notification of the action taken, the Named Insured
shall promptly reimburse the Company for such part of the deductible amount as has
been paid by the Company. Company shall also be reimbursed for adjustment expenses
incurred in settling losses under the deductible amount.

The Company shall tabulate the amounts so paid which are thus recoverable from the
Insured and shall bill the insured monthly for the accumulated total. Reimburse-
ment by the Insured shall be made promptly.

A deposit of $50,000. shall be maintained. As of the end of each third month period
the average deductible recoveries will be recomputed and adjustment in the deposit
will be made to approximate the average monthly deductible recoveries.

A surety bond in the amount of $150,000., as issued by an insurance institution of
the Insured's choice, shall be furnished to the Company as a further guarantee of
future reimbursements for these claims and claims adjustment expenses as may be
paid under the deductible portion of this policy.

The service charge for administration of the deductible program shall be calculated
at a rate of $0.060 per $100 of annual payroll.

There will be two types of loss adjustment expenses which shall be defined and
computed as follows:

    1.  Allocated Adjustment Expenses - exact items of expense directly
        incurred by the Company and chargeable to a particular claim.
        (Example: legal fees, court costs, medical examiner's fees,
        photographer bills, etc.)

        Allocated adjustment expense shall be reimbursed in the same
        proportion that the deductible bears to the total loss.

    2.  Unallocated Adjustment Expense - a charge to cover all general
        claims administration costs. (Example: services of adjusters,
        claims examiners, clerical service, stationery, office rent and
        other overhead items.)

The charge shall be as follows:

    1.  Seventeen (17%) percent of all paid bodily injury claims
    2.  Eight (8%) percent of all other claims

Countersigned: _____

Accepted by: _____
             For Kaiser Cement & Gypsum Corporation
             and all other Named Insureds covered by
             this policy contract

TRK0000159

PR0815

PR01215

Appellant's Appendix 02310
JA04646
TRUCK0000564



Effective: January 1, 1974                    Policy #356-411-00
                                              Endorsement #2

KAISER CEMENT & GYPSUM CORPORATION, ET AL.
PREMIUM ADJUSTMENT ENDORSEMENT

DEPOSIT PREMIUM to be maintained: $16,000.00

A.   As respects the first $5,000 aggregate liability from one occurrence, it is
     agreed that on or before the 25th day of January 1975, the Named Insured
     shall render to the Company a statement showing the total remuneration
     earned by its employees during the period January 1, 1974 to January 1,
     1975 (being the amount of remuneration upon which the Named Insured's
     Workmen's Compensation for the same period is predicated including similarly
     adjusted payroll in states where Workmen's Compensation is self-insured or
     insured in a State Fund), and the earned premium shall be computed at the
     rate of $0.030 per $100.00 of the total remuneration so reported.

B.   As respects $45,000 aggregate liability from one occurrence, in excess of
     $5,000 aggregate liability per occurrence, the earned premium shall be
     computed at the following rates per $100.00 of the total remuneration so
     reported:

                    Standard          Basic
                     $.76             $.20

C.   Such earned premium shall be payable to the Company forthwith and shall be
     subject to such adjustments as are provided for in that certain Premium
     Determination agreement entered into between the Named Insured and the
     Exchange effective January 1, 1972.

D.   For policy limits in excess of $50,000 aggregate as respects any one
     occurrence, and not subject to adjustment under said Premium Determination
     Agreement, premium shall be payable at the rate of $.150 per $100.00 of
     the total remuneration so reported.

E.   Furthermore, the Named Insured shall pay to the Company the sum of $29,500
     each quarter on or before the 10th day of the month following each such
     quarter during the currency of this policy, such sums to be credited to the
     earned premium determined by the premium adjustment as provided in Parts A,
     B, C, and D above.

F.   In addition, the Named Insured will submit a semi-annual report of
     remuneration to serve as the basis for any adjustment of the monthly flat
     charge.

Countersigned.

TRK0000160

PR0816

PR01216

Appellant's Appendix A04647
TRUCK0000565

G. L. file

THIRD ADDENDUM

TO

PREMIUM DETERMINATION AGREEMENT

This Addendum attaches to and forms a part of that certain Premium
Determination Agreement entered into between

TRUCK INSURANCE EXCHANGE

hereinafter referred to as the "Exchange" and

KAISER CEMENT & GYPSUM CORPORATION

hereinafter referred to as the "Insured" on February 8, 1972.

It is hereby agreed that as and from January 1, 1975, the Agreement is
amended as follows:

        The Period of Agreement specified in Article 1.
        is extended one year, from January 1, 1975 to
        January 1, 1976.

All other terms and conditions of the Agreement remain unchanged.

Dated at Los Angeles, California this 27th day of December 1974.

                        TRUCK INSURANCE EXCHANGE
                        Truck Underwriters Association, Attorney-in-Fact

                    by_____
                            Officer-in-Charge
                            National Accounts Division

Accepted for the Insured

    by  GAM

    Title  Ins Mgr.

TRK0000161

PR0817

PR01217

Appellant's Appendix 02312

JA04648

TRUCK0000566

Standard Form of Endorsement Prescribed by the Public Utilities Commission
of the State of California

TO BE ATTACHED TO AND MADE A PART OF ALL POLICIES INSURING MOTOR VEHICLES SUB-
JECT TO REGULATION BY THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

Applicable to

Petroleum Irregular route carriers, petroleum contract carriers, city carriers, and
highway common carriers of petroleum and petroleum products
in bulk in tank trucks and/or tank trailers.

The policy to which this endorsement is attached is an Automobile Bodily Injury Liability and Property Damage
Liability policy and is hereby amended to assure compliance by the insured, as a motor carrier of bulk petroleum
products in tank trucks and/or tank trailers, with General Order No. 100-Series and the pertinent rules and regu-
lations of the Public Utilities Commission of the State of California.

In consideration of the premium stated in the policy to which this endorsement is attached, the Company hereby
agrees to pay, within the limits of liability hereinafter provided, any final judgment rendered against the insured
for bodily injury to or death of any person, or loss of or damage to property of others (excluding injury to or death
of the insured's employees while engaged in the course of their employment, and loss or damage to property
owned by, rented to, in charge of, or transported by the insured), resulting from the operation, maintenance, or
use of motor vehicles for which a certificate of public convenience and necessity or permit is required or has
been issued to the insured by the Public Utilities Commission of the State of California, regardless of whether such
motor vehicles are specifically described in the policy or not.

Within the limits of liability hereinafter provided it is further understood and agreed that no condition, provi-
sion, stipulation, or limitation contained in the policy, or any other endorsement thereon or violation thereof, or of
this endorsement, by the insured, shall relieve the Company from liability hereunder or from the payment of any
such final judgment, irrespective of the financial responsibility or lack thereof or insolvency or bankruptcy
of the insured. However, all terms, conditions, and limitations in the policy to which this endorsement is attached
are to remain in full force and effect as binding between the insured and the Company, and the insured agrees to
reimburse the Company for any payment made by the Company on account of any accident, claim, or suit involv-
ing a breach of the terms of the policy, and for any payment that the Company would not have been obligated to
make under the provisions of the policy except for the agreement contained in this endorsement.

It is understood and agreed that, upon failure of the Company to pay any final judgment rendered against the
insured as provided herein, the judgment credit may maintain an action in any court of competent jurisdiction
against the Company to compel such payment.

The liability of the Company for the amounts provided in this endorsement apply separately to each accident
and any payment under the policy because of any one accident shall not operate to reduce the liability of the
Company for the payment of final judgments resulting from any other accident.

Schedule of Limits
Bodily Injury Liability and Property Damage Liability

| | |
|---|---|
| For bodily injuries to or death of one person . . . . . . . . . . . . . . . . | $200,000 |
| For bodily injuries to or death of all persons injured or killed | $600,000 |
| (subject to a maximum of $200,000 for bodily injuries to or death of one person) | |
| For loss or damage to property of others (excluding cargo) . . . . . . . . . | $100,000 |

Nothing in this endorsement shall be construed to limit or restrict any coverage otherwise provided by the
policy of which this endorsement is made a part.

Whenever required by the Commission, the Company agrees to furnish to the Commission a duplicate original
of said policy and all endorsements thereon.

The Company further agrees that such insurance as is afforded by the policy and this endorsement against
liability for injuries to or death of persons and damage to or destruction of property shall not be cancelled, re-
scinded, or suspended, nor shall the cancellation, rescission, or suspension of the policy or this endorsement take
effect, nor shall the policy or this endorsement become void for any reason whatsoever until the Company shall
have first given thirty (30) days' notice in writing to the Public Utilities Commission of the State of California at
its office, San Francisco, California, said thirty (30) days' notice to commence to run from the date notice is
actually received in the office of said Commission.

The Company further agrees that if the policy shall be cancelled or surrendered or otherwise terminated, and
shall thereafter be reinstated, amended or ......, written notice of such reinstatement shall be given by the Company
to said Commission at its said office.

When countersigned by an authorized representative of the Company this endorsement becomes a part of

Policy No. _330-40-00_____ issued by _____TRUCK INSURANCE EXCHANGE_____

[Insured [name] Company] of _____LOS ANGELES, CALIFORNIA_____

to ___PERMANENTE STEELING COMPANY, 300 Lakeside Drive, Oakland, California   94333_____

effective ___November 9, 1968_____

Countersigned at _Los Angeles, California___ this __9th__ day of ___November_____ 19 68
20

By (Signature) _____

Name of Person Signing ___Bill A. Grant_____

TRK0000162

PR0818

PR01218

TRIAL EX. 301
Page 92

JA04649
Appellant's Appendix 02313
TRUCK0000567



ORIGINAL

E I C #
2459

KAISER CEMENT & GYPSUM CORPORATION
and
SUBSIDIARIES

ULTRA-COMPREHENSIVE LIABILITY POLICY
#350-40-00

Cancelled & rewritten
2/1/74

**EMPLOYER'S INSURANCE CERTIFICATE**
CALIFORNIA FINANCIAL RESPONSIBILITY LAW   No. E.I.C. 2459

TRUCK INSURANCE EXCHANGE
4680 Wilshire Boulevard
Los Angeles, California 90054

350-40-00

December 31, 1969

TRK0000163

PR0819

PR01219

JA04650
TRUCK0000568

# REED STENHOUSE

Reed Stenhouse Inc. of California
International Insurance Brokers
Three Embarcadero Center, Suite 2400
San Francisco, California 94111
415 986-1122 Telex 340801

October 19, 1981

RECEIVED
OCT 21 1981
RISK MANAGEMENT DEPT.

Mr. Kenneth J. Kwidzinski
Risk Manager
Kaiser Cement Corporation
300 Lakeside Drive
Oakland, CA 94612

Re: Kaiser Cement Corporation, Et Al
TIE Policy #350-40-00

Dear Ken:

With reference to my letter of August 20, 1981, I am pleased to enclose the
following documents:

1. Fourth Addendum to Premium Adjustment Agreement, effective January 1, 1972 limiting
the allocated adjustment expense to the amount of the retrospective retention.
Please sign and return a copy of this addendum for my transmittal to TIE.

2. Endorsement 49 amending Endorsement 25 by inclusion of a limitation of the
allocated adjustment expense to the amount of the deductible, effective January
1, 1976 which is the date the retrospective retention was discontinued and re-
placed with a straight $50,000 deductible.

3. Endorsement 16 to the current policy (effective 4/1/81), also limiting the
adjustment expense. I tried for a $50,000 maximum allocated adjustment expense
under item 1 (b) however, underwriters are unwilling to limit this expense to a
lesser amount than they agreed to on the Kaiser Steel account.

If you have any questions in connection with the attached material, please let me
know.

Sincerely,

Bill Conner
Bill Conner

lC/kh

Encl.

TRK00001

PR0820

PR01220

TRIAL EX. 301
Page 94

Appellant's Appendix JA04651
TRUCK0000569



FOURTH ADDENDUM

TO

PREMIUM DETERMINATION AGREEMENT

This Addendum attaches to and forms a part of that certain Premium
Determination Agreement entered into between

TRUCK INSURANCE EXCHANGE

hereinafter referred to as the "Exchange" and

KAISER CEMENT & GYPSUM CORPORATION

hereinafter referred to as the "Insured" on February 8, 1972.

It is hereby agreed that as and from January 1, 1977, the following
paragraph (c) shall be added to Condition 5, Distribution of
Adjustment Expense:

(c) In no event shall allocated adjustment expense alone from
any single occurrence or accident exceed an amount greater
that the Retrospective Retention.

All other terms and conditions of the Agreement remain unchanged.

Dated at Los Angeles, California this 14th day of October, 1981.

TRUCK INSURANCE EXCHANGE

Truck Underwriters Association, Attorney-in-Fact

by _____
Edward E. Mathews, Asst. Secretary

Accepted for the Insured

by _____

Title _____

TRK0000165

PR0821

PR01221

Appellant's Appendix 02316
JA04652
TRUCK0000570

JA04653
TRUCK0000571

# EXHIBIT N

JA04654



ULTRA COMPREHENSIVE LIABILITY POLICY

T R U C K   I N S U R A N C E   E X C H A N G E

Agent #90-99-01                    Los Angeles, California
Policy #350-40-00

DECLARATIONS

Item 1. Named Insured:  KAISER CEMENT & GYPSUM CORPORATION and SUBSIDIARIES
        Address:  300 Lakeside Drive
                  Oakland, California  94612

        Legal Entity :  Corporation.

        Business:  Manufacture and sale of Construction and
                   Building Materials.

Item 2. Effective:  From January 1, 1968 at 12:01 A.M. until cancelled,
                    Standard Time at the address of the Named Insured
                    as stated herein.

Item 3. Coverages:  A.  Bodily Injury Liability - Automobile
                    B.  Bodily Injury Liability - Except Automobile
                    C.  Property Damage Liability-Automobile
                    D.  Property Damage Liability-Except Automobile
                    E.  Professional Liability
                    F.  Personal Injury Liability
                    G.  Employee Benefits Liability

Item 4. Limits of      Coverage A.  $100,000 each person
        Liability:                  $300,000 each occurrence

                       Coverage B.  $100,000 each person
                                    $300,000 each occurrence
                                    $300,000 aggregate Products

                       Coverage C.  $100,000 each occurrence
                       Coverage D.  $100,000 each occurrence
                                    $100,000 aggregate Products

                       Coverage E.  $100,000 each claim
                                    $300,000 aggregate

                       Coverage F.  $100,000 each person
                                    $300,000 aggregate

                       Coverage G.  $100,000 each claim
                                    $100,000 annual aggregate

Place of Issuance:  Los Angeles, California

Date of Issuance :  February 20, 1968

_Bill A. Crawer_
Countersigned Authorized Representative

TRUCK INSURANCE EXCHANGE

TRK0000071

PR0727

PR01127

Appellant's Appendix 02222
JA04655
TRUCK0000476



## ULTRA COMPREHENSIVE LIABILITY POLICY

### TRUCK INSURANCE EXCHANGE
Los Angeles, California · 90054
(Hereinafter sometimes referred to as Company)

In consideration of payment of the premium and subject to all the terms of this policy, the Company agrees with the Insured named herein to pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of:

### INSURING AGREEMENTS

I. COVERAGE A - BODILY INJURY LIABILITY - AUTOMOBILE:
bodily injury, sustained by any person and arising out of the ownership, maintenance or use of any automobile;

COVERAGE B - BODILY INJURY LIABILITY - EXCEPT AUTOMOBILE:
bodily injury, sustained by any person from causes other than ownership, maintenance or use of an automobile;

COVERAGE C - PROPERTY DAMAGE LIABILITY - AUTOMOBILE:
injury to or destruction of property, including the loss of use thereof, and arising out of the ownership, maintenance or use of any automobile;

COVERAGE D - PROPERTY DAMAGE LIABILITY - EXCEPT AUTOMOBILE:
injury to or destruction of property, including the loss of use thereof, from causes other than ownership, maintenance or use of an automobile;

COVERAGE E - PROFESSIONAL LIABILITY:
injury arising out of malpractice, error, or mistake of the Insured or of a person for whose acts or omissions the Insured is legally responsible in rendering or failing to render professional services;

COVERAGE F - PERSONAL INJURY LIABILITY:
injury arising out of false arrest, malicious prosecution, wilful detention or imprisonment, libel, slander or defamation of character, humiliation or discrimination, invasion of privacy, wrongful eviction or wrongful entry, wrongful conversion or disparagement; and

COVERAGE G - EMPLOYEE BENEFITS LIABILITY:
any claim made against the Insured by any employee, former employee or the beneficiaries or legal representatives thereof for injury caused by any negligent act, error or omission of the Insured, or any other person for whose acts the Insured is legally liable in the administration of Employee Benefits as defined herein.

II. DEFENSE, SETTLEMENT, SUPPLEMENTARY PAYMENTS:
With respect to such insurance as is afforded by this policy, the Company shall:

(1) investigate and defend any claim or suit against the Insured alleging such injury, sickness, disease, or destruction and seeking damages on account thereof, even if such claim or suit is groundless, false or fraudulent. Except under Coverage E, the Company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient; under Coverages E and G the Company will not settle or compromise any claim or suit covered hereunder, except with the written consent of the Insured.

- 1 -

TRUCK INSURANCE EXCHANGE

TRK0000072

PR0728

PR01128

TRUCK0000477

Appellant's Appendix A724856

(2) (a) Pay all premiums on bonds to release attachments for an amount not in excess of the applicable limit of liability of this policy, all premiums on appeal bonds required in any such defended suit, the cost of bail bonds required of the Insured in the event of automobile accident or automobile traffic law violation during the policy period, not to exceed $250. per bail bond, but without any obligation to apply for or furnish any such bonds;

(b) pay all expenses incurred by the Company, all costs taxed against the Insured in any such suit and all interest accruing after entry of judgment, until the Company has paid or tendered or deposited in court such part of such judgment as does not exceed the limit of the Company's liability thereon;

(c) pay expenses incurred by the Insured, except under Coverage E, for emergency medical and surgical relief to others at the time of the occurrence;

(d) reimburse the Insured for all reasonable expenses, other than loss of earnings, incurred at the Company's request;

and the amounts so incurred, except settlements of claims and suits, are payable by the Company *in addition* to the applicable limit of liability of this policy.

III. **DEFINITION OF "INSURED":**

the unqualified word "Insured" includes the Named Insured and also includes:

(1) COVERAGES A, B, C, D, and F,

Any individual, firm, co-partnership, corporation or other entity for whom the Named Insured has contracted, or during the currency of this policy may contract, under written contract usual or incidental to the Named Insured's business to procure insurance afforded by this policy, but only to the extent and in the amount for which the Named Insured has contracted to procure such insurance, and in no event contrary to the terms and conditions of or exceeding the limits of liability set forth in this policy.

(2) COVERAGES B, D and F,

(a) Any executive officer, director, partner, stockholder or employee thereof while acting within the scope of his duties as such and any organization or proprietor with respect to real estate management for the Named Insured; provided as respects any employee, the policy shall apply to such employee as an Insured only if the Named Insured

(i) elects to have the insurance afforded by this policy apply to such employee,

(ii) gives the Company written notice of such election within 45 days after claim or suit has been made against such employee, whichever date is later, and

(iii) pays the Company an additional premium of $100.00;

TRUCK INSURANCE EXCHANGE

TRK0000073

PR0729

PR01129

Appellant's Appendix 02224
JA04657
TRUCK0000478



(b) any person while using an owned or hired watercraft of the pleasure type and not rented to others and any person or organization legally responsible for its use, provided actual use is by the Named Insured or with its permission and any executive officer, director, partner, stockholder or employee of the Named Insured with respect to the use of non-owned watercraft in the business of the Named Insured. The insurance with respect to any person or organization other than the Named Insured does not apply:

   (i) with respect to any hired watercraft, to the owner or lessee thereof other than the Named Insured or to any agent or employee of such owner or lessee;

   (ii) with respect to any non-owned watercraft, to any executive officer, partner, director, stockholder or employee if such watercraft is owned in full or in part by him or a member of his household; and

   (iii) to any employee with respect to injury to or sickness, disease or death of another employee of the same employer injured in the course of such employment in an accident arising out of the maintenance or use of watercraft in the business of such employer unless the Named Insured (1) elects to have the insurance afforded by this policy apply to such employee, (2) gives the Company written notice of such election within 45 days after claim or suit has been made against such employee, whichever date is later, and (3) pays the Company an additional premium of $100.00.

(3) COVERAGES A and C.

   (a) Any person while using an owned automobile or a hired automobile provided the actual use of the automobile is by the Named Insured or with his permission;

   (b) any executive officer, director, partner, stockholder or employee of the Named Insured with respect to the use of a non-owned automobile in the business of the Named Insured; and

   (c) any person or organization legally responsible for the use of an owned or hired automobile provided the use of the automobile is with the permission of the Named Insured but only if the Named Insured (1) elects to have the insurance afforded by this policy apply to such other person or organization, (2) gives the Company written notice within 45 days after claim or suit has been made against such other person or organization, whichever date is later, and (3) pays the Company an additional premium of $100.00.

(4) The insurance with respect to any person or organization other than the Named Insured does not apply under Division (3) of this Insuring Agreement:

   (a) to any person or organization, or to any agent or employee thereof, operating an automobile repair shop, storage garage, sales agency, service station or public parking place, with respect to any accident arising out of the operation thereof;

TRUCK INSURANCE EXCHANGE

TRK000

PR0730

PR01130

Appellant's Appendix
JA04658
TRUCK0000479



(b) with respect to any hired automobile, to the owner thereof, or any
agent or employee of such owner, except that the insurance afforded
by the policy under Coverages A and C shall apply to the Lessor of
an automobile leased to the Insured for use in business under a
written contract of 30 days or more duration in which the Insured
agrees to procure automobile liability insurance for the benefit of
such Lessor but only to the extent and in the amount for which the
Insured has contracted to procure such insurance, and in no event
contrary to the terms and conditions of or exceeding the limits of
liability as set forth in this policy.

(c) with respect to any non-owned automobile, to any executive officer,
partner, director, stockholder or employee, if such automobile is
owned in full or in part by him or a member of his household; and

(d) except as respects any executive officer, partner, director or
stockholder, to any employee with respect to injury to or sickness,
disease or death of another employee of the same employer injured
in the course of such employment, in an accident arising out of the
maintenance or use of an automobile in the business of such em-
ployer, unless the Named Insured (1) elects to have the insurance
afforded by this policy apply to such employee, (2) gives the Com-
pany written notice of such election within 45 days after claim or
suit has been made against such employee, whichever date is later,
and (3) pays the Company an additional premium of $100.00;
provided ; at' 17 .; '.

(i)  $15,000 shall be deducted (in lieu of any other deductible
mentioned in this policy) from the total amount the Company
shall become obligated to pay as damages, plus allocated
loss adjustment expenses, on behalf of the Insured for each
occurrence;

(ii)  the terms of the policy, including those with respect to
notice of occurrence and notice of claim or suit, apply
irrespective of the application of the deductible amount;and

(iii)  the Company may pay part or all of the deductible amount to
effect settlement of any claim or suit and, upon notifica-
tion of the action taken, the Named Insured shall promptly
reimburse the Company for such part of the deductible amount
as has been paid by the Company.

(5) Under Coverage E, any physician, surgeon, dentist or nurse while
acting in his or her capacity as an employee of the Named Insured.

(6) Under Coverage 0 -
"INSURED" The unqualified word "Insured" wherever used in relation
to the insurance afforded hereby, includes not only the Named Insured,
but also any partner, executive officer, director, stockholder or
employee, provided such employee is authorized to act in the adminis-
tration of the Employee Benefits.

"EMPLOYEE BENEFITS" The term "Employee Benefits" shall mean group
life insurance, group accident and health insurance, profit sharing
plans, pension plans, employee stock subscription plans, workmen's
compensation, unemployment insurance, social security and disability
benefits insurance.

TRUCK INSURANCE EXCHANGE

TRK0000075

PR0731

PR01131

TRIAL EX. 301
Page 5

Appellant's Appendix 02226
JA04659
TRUCK0000480



"ADMINISTRATION": As respects the insurance afforded hereby, the un-
qualified word "administration" wherever used shall mean:

(a) Giving counsel to employees with respect to the Employee Benefits;
(b) Interpreting Employee Benefits;
(c) Handling of records in connection with Employee Benefits;
(d) Effective enrollment, termination or cancellation of employees
   under Employee Benefit Programs;
performed by a person authorized by the Named Insured to do such acts.

IV. POLICY PERIOD, TERRITORY, LIMITS, INDEMNITY AND DEFENSE:

A. Policy Period and Territory –
   This policy applies only to occurrences which occur during the policy
   period, and which

   (1) occur anywhere in the world, provided claim is made, or suit on the
      merits of the claim, is originally brought within the continental
      limits of the United States of America, its territories or
      possessions (other than Guam), or Canada;

   (2) occur in Guam or elsewhere in the world, excluding
      countries in the Soviet Union, East Germany (except Berlin), Poland,
      Czechoslovakia, Hungary, Yugoslavia, Albania, Bulgaria, Romania,
      North Korea, Tibet, Communist China, North Vietnam and Cuba, except
      that the insurance afforded by the policy does not apply to claims
      to the extent coverage is afforded under St. Paul Mercury Insurance
      Company's Policy #CCL-14868 or any renewals or replacements thereof;

   (3) arise out of operations of the Insured or subsidiary Mexican
      companies or corporations conducted in Mexico, except that the in-
      surance afforded by the policy shall be excess of Policy R.C.G.-809
      of LaInteramericana, S.A. Compania de Seguros or any renewal or
      replacement thereof; and

   (4) arise out of the ownership, maintenance or use of the vessels
      called "Angelito", "Ricardo" and "Theresa", except that the in-
      surance afforded by the policy shall be excess of coverage afforded
      under Policy No. J.K.H. 131 of LaInteramericana, S.A. Compania de
      Seguros or any renewals or replacements thereof.

B. LIMITS

   (1) With respect to insurance afforded under sub-paragraphs (1) and
      (3) of Part A of this Section, the limits of the Company's
      liability stated in the Declarations shall apply. *See;;;*

- 5 -

TEXAS INSURANCE EXCHANGE

<u>TRK</u>0000076

PR0732

PR01132

(2) With respect to insurance afforded under sub-paragraph (2) of Part A of this Section, the limits of the Company's liability shall be as stated below and not as stated in the Declarations:

Coverage A - $25,000 each person
$25,000 each occurrence

Coverage B - $25,000 each person
$25,000 each occurrence
$25,000 aggregate Products

Coverage C -$100,000 each occurrence

Coverage D -$100,000 each occurrence
$100,000 aggregate Products

Coverage E - $25,000 each person
$25,000 aggregate

Coverage F - $25,000 each person
$25,000 aggregate

Coverage G -$100,000 each claim
$100,000 annual aggregate

(3) With respect to insurance afforded under sub-paragraph (4) of Part A of this Section, Company's limit of liability under Coverages B and D shall be $75,000 excess of $25,000 each occurrence.

C. Indemnity

(1) With respect to the insurance afforded under sub-paragraphs (2), (3) and (4) of Part A of this Section, in Coverages A, B,C,D, E, F and G, the words "to pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay" are amended to read, "to indemnify the Insured for all sums which the Insured has been held legally obligated to pay."

(2) Conditions 6 and 8 do not apply to sub-paragraphs (2), (3) and (4) of Part A of this Section.

D. Defense

(1) Insuring Agreement II applies to insurance afforded under sub-paragraph (1) of Part A of this Section.

(2) As respects sub-paragraphs (2), (3) and (4) of Part A of this Section, the Company shall indemnify the Insured for costs of defense and supplementary payments as set forth in Insuring Agreement II.

TRUCK INSURANCE EXCHANGE

<u>TRK</u>0000077

PR0733

PR01133

Appellant's Appendix 02228
JA04661
TRUCK0000482

## EXCLUSIONS

This policy does not apply:

(1) To liability assumed by the Insured under contract or agreement, except under Coverages B, D and F to (a) a contract as defined herein or (b) as respects the insurance which is afforded for the Products Hazard as defined, a warranty of goods or products;

(2) to injury, sickness, disease, death or destruction due to war, whether or not declared, civil war, insurrection, rebellion or revolution, or to any act or condition incident to any of the foregoing with respect to (a) liability assumed by the Insured under any contract or agreement or (b) expenses under Insuring Agreement II (2) (c);

(3) except as respects Coverages E and F, to injury, sickness, disease, death or destruction caused intentionally by or at the direction of the Insured;

(4) under Coverages B and D, except with respect to operations performed by independent contractors and except with respect to liability assumed by the Insured under a contract as defined herein, to the ownership, maintenance or use, including loading or unloading, of (a) automobiles if the occurrence takes place away from premises owned, rented or controlled by the Insured, or the ways immediately adjoining, or (b) aircraft owned or used by or in the interest of the Named Insured, or (c) self-propelled watercraft, other than tugboats, in excess of 300 horsepower if the occurrence takes place away from the premises owned, rented or controlled by the Named Insured; but Part (a) of this Exclusion shall not apply to an occurrence away from such premises arising out of loading or unloading as a completed operation within the definition in Part (2) of sub-paragraph (f) of Condition 3;

(5) under Coverages A and B, to any obligation for which the Insured or any carrier as his insurer may be held liable under any workmen's compensation, unemployment compensation or disability benefits law, or under any similar law;

(6) Under Coverages A and C, to injury, sickness, disease, death or destruction which arises out of the loading or unloading of an automobile, if the accident occurs on premises (including the ways immediately adjoining) owned, rented or controlled either by the employer of the person or by the employer of the person against whom claim is made or suit is brought for such injury, sickness, disease, death or destruction, except as provided under Insuring Agreement III 3.(c); but this limitation does not apply with respect to claims made or suits brought against the following Insureds:

(a) the Named Insured;
(b) a bailee or borrower of the automobile or an employee of either of them or of the Named Insured;
(c) if the Named Insured is classified and rated as a truckman, any person or organization, or any agent or employee thereof, engaged in the business of transporting property by automobile for the Named Insured or for others; subject nevertheless to the limitations of any endorsement made a part of the policy and specifically applicable to truckmen;
(d) any other person or organization but only with respect to his or its liability because of acts or omissions of an Insured under (a), (b) or (c) above.



TRUCK INSURANCE EXCHANGE

TRK0000078

PR0734

PR01134

Appellant's Appendix A02462
TRUCK0000483



(7) under Coverage A, to bodily injury to or sickness, disease or death of any employee of the Insured arising out of and in the course of (a) domestic employment by the Insured, if benefits therefor are in whole or in part either payable or required to be provided under any workmen's compensation law, or (b) other employment by the Insured;

(8) under Coverage B, except with respect to liability assumed by the Insured under a contract as defined herein, to bodily injury to or sickness, disease or death of any employee of the Insured arising out of and in the course of his employment by the Insured, other than such injury caused by malpractice, error or mistake in the rendering of medical services;

(9) under Coverage C, to injury to or destruction of property, owned or transported by the Insured or, as respects the first $25,000 of coverage property rented to or in charge of the Insured other than a residence or private garage damaged or destroyed by a private passenger automobile covered by this policy;

(10) under Coverage D, to injury to or destruction of (a) property of others in the care or custody of the Insured for storage, or for sale, or (b) that particular part of any property upon which the Insured is or has been working caused by the faulty manner in which the work has been performed; ("storage" means storage when performed for a money consideration or as a bailee for hire or as a normal service in the business of the Named Insured);

(11) under Coverage E, no insurance is afforded with respect to any liability of an Insured if there is in force for the Insured or for his benefit a valid and collectible Workmen's Compensation and Employers' Liability or similar policy which would cover any part of such liability (other than statutory Workmen's Compensation coverage) except for an "other insurance" clause or similar clause;

(12) under Coverages A, B and F, to injury caused by the wilful violation of a penal statute or ordinance committed by or with the knowledge or consent of an Insured;

(13) under Coverages B and F, to acts committed in connection with advertising, broadcasting, or telecasting by or in the interest of the Named Insured;

(14) under any Liability Coverage, to injury, sickness, disease, death or destruction

(a) with respect to which an Insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(b) resulting from the hazardous properties of nuclear material and with respect to which (i) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954,



TRK0000079

PR0735

PR01135

JA04663
TRUCK0000484

TRIAL EX. 301
Page 9

Appellant's Appendix 02230



or any law amendatory thereof, or (ii) the Insured is, or had this
policy not been issued would be, entitled to indemnity from the
United States of America, or any agency thereof, under any agreement
entered into by the United States of America, or any agency thereof,
with any person or organization;

(15) under any Supplementary Payments provision relating to immediate medical
or surgical relief, to expenses incurred with respect to bodily injury,
sickness, disease or death resulting from the hazardous properties of
nuclear material and arising out of the operation of a nuclear facility
by any person or organization;

(16) under any Liability Coverage, to injury, sickness, disease, death or
destruction resulting from the hazardous properties of nuclear material,
if

  (a) the nuclear material (i) is at any nuclear facility owned by, or
    operated by or on behalf of, an Insured or (ii) has been discharged
    or dispersed therefrom;

  (b) the nuclear material is contained in spent fuel or waste at any
    time possessed, handled, used, processed, stored, transported or
    disposed of by or on behalf of an Insured; or

  (c) the injury, sickness, disease, death or destruction arises out of
    the furnishing by an Insured of services, materials, parts or equip-
    ment in connection with the planning, construction, maintenance,
    operation or use of any nuclear facility, but if such facility is
    located within the United States of America, its territories or
    possessions or Canada, this Exclusion (c) applies only to injury to
    or destruction of property at such nuclear facility.

(17) under Coverage G -
  (a) to any dishonest, fraudulent, criminal or malicious act, libel,
    slander, discrimination, or humiliation;
  (b) to bodily injury to, or sickness, disease, or death, of any person,
    or to injury to or destruction of any tangible property, including
    the loss of use thereof;
  (c) to any claim for failure of performance of contract by any Insurer;
  (d) to any claim based upon the Named Insured's failure to comply with
    any law concerning workmen's compensation, unemployment insurance,
    social security or disability benefits;
  (e) to any claim based upon failure of stock to perform as represented
    by an Insured;
  (f) to any claim based upon advice given by an Insured to participate
    or not to participate in stock subscription plans.

(18) When the Insured's product must be replaced, to claims made against
the Insured for the Insured's selling price of the particular part
of the product manufactured by the Insured which gave rise to the
claim or claims.

TRUCK INSURANCE EXCHANGE

- 6 -

TRK0000080

PR0736

PR01136

TRIAL EX. 301
Page 10

Appellant's Appendix 02231

JA04664
TRUCK0000485



## CONDITIONS

Conditions 4 and 6 apply only to the Coverage or Coverages noted thereunder. Other Conditions apply to the entire policy.

1. **PREMIUM:** When used as a premium basis the word "remuneration" means the entire remuneration earned during the policy period by proprietors and by all employees of the Named Insured, subject to any overtime earnings or limitation of remuneration rule applicable in accordance with the manuals in use by the Company.

2. **INSPECTION AND AUDIT:** The Company shall be permitted to inspect the insured premises, operations, automobiles and elevators and to examine and audit the Insured's books and records at any time during the policy period and any extension thereof and within three years after the final termination of this policy, as far as they relate to the premium basis or the subject matter of this insurance.

3. **DEFINITIONS:**
   (a) Contract. The word "contract" means, if in writing, or under verbal agreement reduced to written form within 120 days from the date of the first agreement, any contract or agreement under which the Insured has assumed the liability of others.
   (b) Automobile. Except where stated to the contrary, the word "automobile" means a land motor vehicle or trailer as follows:
      (1) Owned Automobile - an automobile owned by the Named Insured;
      (2) Hired Automobile - an automobile used under contract in behalf of, or loaned to, the Named Insured provided such automobile is not owned by or registered in the name of (i) the Named Insured or (ii) an executive officer thereof or (iii) an employee or agent of the Named Insured who is granted an operating allowance of any sort for the use of such automobile.
      (3) Non Owned Automobile - any other automobile.

   The following described equipment shall be deemed an automobile while towed by or carried on an automobile not so described, but not otherwise: if of the crawler-type, any tractor, power crane or shovel, ditch or trench digger; any farm-type tractor; any concrete mixer other than of the mix-in-transit type; any grader, scraper, roller or farm implement; and, if not subject to motor vehicle registration, any other equipment not specified below, which is designed for use principally off public roads.  The following described equipment shall be deemed an automobile while towed by or carried on an automobile, as above defined, solely for purposes of transportation or while being operated solely for locomotion, but not otherwise: if of the non-crawler type, any power crane or shovel, ditch or trench digger, and any air-compressing, building or vacuum cleaning, spraying or welding equipment or well drilling machinery.

   (c) Semi-trailer. The word "trailer" includes semi-trailer.
   (d) Two or More Automobiles. The terms of this policy apply separately to each automobile insured hereunder, but a motor vehicle and a trailer or trailers attached thereto shall be held to be one automobile as respects limits of liability.

- 10 -



TRK0000081

PR0737

PR01137

TRIAL EX. 301
Page 11

Appellant's Appendix 02232

JA04665
TRKOR0000486



(e) use. Use of an automobile or watercraft includes the loading and unloading thereof.

(f) Products and Completed Operations Hazard -
(1) Named Insured's Products means goods or products manufactured, sold, handled or distributed by the Named Insured or by others trading under his name, including any container thereof (other than a vehicle), but "named insured's products" shall not include a vending machine or any property other than such container, rented to or located for use of others but not sold.

(2) Products Hazard includes bodily injury and property damage arising out of the Named Insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs away from premises owned by or rented to the Named Insured and after physical possession of such products has been relinquished to others.

(3) Completed Operations Hazard includes bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the Named Insured.

"Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:
(a) when all operations to be performed by or on behalf of the Named Insured under the contract have been completed,
(b) when all operations to be performed by or on behalf of the Named Insured at the site of the operations have been completed, or
(c) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as part of the same project.

Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed.

The completed operations hazard does not include bodily injury or property damage arising out of
(a) operations in connection with the transportation of property, unless the bodily injury or property damage arises out of a condition in or on a vehicle created by the loading or unloading thereof,
(b) the existence of tools, uninstalled equipment or abandoned or unused materials, or
(c) operations for which the classification stated in the policy or in the Company's manual specified "including completed operations."

(g) Occurrence. With respect to Coverages A,B,C,D,F and G means an event or series of events or continuous or repeated exposure to conditions which results in legal liability, regardless of the number of persons, vehicles or objects affected by such act or acts or omission. As respects the Products Hazard, an occurrence shall be deemed to have taken place at the time of the injury or damage to the claimant and not at the time of the act of the insured giving rise to liability. With respect to Coverage E, an

TRUCK INSURANCE EXCHANGE

TRK0000082

PR0738

PR01138

TRIAL EX. 301
Page 12

Appellant's Appendix 02239
JA04666
TRUCK0000487



occurrence shall be considered to have taken place at the time of the professional act(s) giving rise to the injury. All damages arising out of one prepared or acquired lot of goods or products shall be considered as arising out of one occurrence.

(h) **Malpractice.** Means malpractice, error or mistake in rendering or failing to render professional services in the practice of the Insured's profession as a physician, surgeon, dentist or nurse, while acting within the scope of his or her employment by the Named Insured or for emergency treatment rendered outside the scope of such employment.

(i) **Owned Watercraft.** Watercraft owned by the Named Insured.

(j) **Hired Watercraft.** Watercraft used under contract in behalf of, or loaned to, the Named Insured provided such watercraft is not owned by or registered in the name of (1) the Named Insured or (2) an executive officer thereof or (3) an employee or agent of the Named Insured who is granted an operating allowance of any sort for the use of such watercraft.

(k) **Non-Owned Watercraft.** Any other watercraft.

(l) **Bodily Injury.** Means bodily injury, sickness or disease, including death at any time resulting therefrom, and also includes mental injury, mental anguish and shock.

(m) **Hazardous Properties.** Include radioactive, toxic or explosive properties.

(n) **Nuclear Material.** Means source material, special nuclear material or by-product material.

(o) **Source Material, Special Nuclear Material and By-product Material.** Have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

(p) **Spent Fuel.** Means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor.

(q) **Waste.** Means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility under Item (1) or (2) thereof.

(r) **Nuclear Facility.** Means –
  (1) any nuclear reactor;
  (2) any equipment or device designed or used for (i) separating the isotopes of uranium or plutonium, (ii) processing or utilizing spent fuel, or (iii) handling, processing or packaging waste; .
  (3) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the Insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; and
  (4) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

(s) **Nuclear Reactor.** Means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

(t) With respect to injury to or destruction of property, the word INJURY or DESTRUCTION includes all forms of radioactive contamination of property.

- 12 -

TRUCK INSURANCE EXCHANGE

TRK0000083

PR0739

PR01139

Appellant's Appendix 02234

JA04667




4. **LIMITS OF LIABILITY**

(a) COVERAGES A and B:  The limit of Bodily Injury liability stated in the Declarations as applicable to "each person" is the limit of the Company's liability for all damages, including damages for care and loss of services, arising out of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by one person as the result of any one occurrence under Coverages A and B.  The limit of such liability stated in the Declarations as applicable to "each occurrence" is, subject to the above provision respecting each person, the total limit of the Company's liability for all damages, including damages for care and loss of services, arising out of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by two or more persons in any one occurrence.

(b) COVERAGES C and D: The limit of Property Damage liability stated in the Declarations as applicable to "each occurrence" is the total limit of the Company's liability for all damages arising out of injury to or destruction of all property of one or more persons or organizations, including the loss of use thereof, in any one occurrence.

(c) COVERAGES B and D-PRODUCTS:  The limits of Bodily Injury liability and Property Damage liability stated in the Declarations as "aggregate products" are respectively the total limits of the Company's liability for all damages arising out of the products hazard during the twelve-month period beginning with the effective date of the products hazard coverage, and during the policy period, and the same aggregate limit shall apply during each succeeding twelve-month period for which such coverage may be in force.  All such damages arising out of one lot of goods or products prepared or acquired by the Named Insured or by another trading under his name shall be considered as arising out of one occurrence.

(d) COVERAGE E:  The limit of liability stated in the Declarations as applicable to "each claim" is the total limit of the Company's liability for all damages on account of each claim or suit.  The limit of liability stated in the Declarations as "aggregate" is, subject to the foregoing provision respecting each claim, the total limit of the Company's liability for all damages in any one policy year.

(e) COVERAGE F:  The limit of liability stated in the Declarations as applicable to "each person" is the limit of the Company's liability for all damages on account of injury sustained by one person or organization. The limit of liability stated in the Declarations as "aggregate" is, subject to the provision respecting "each person", the total limit of the Company's liability for all damages in any one policy year.  The foregoing limits apply to all damages covered hereunder, whether or not the policy applies to such damages in the absence of this coverage.

(f) COVERAGE G:  The Limit of Liability stated above as applicable to "each claim" is the limit of the Company's liability for all damages incurred on account of any claim covered hereunder; the limit of liability stated above as "aggregate" is, subject to the above provision respecting each claim, the total limit of the Company's liability for all claims covered hereunder and occurring during each annual endorsement period.  The inclusion herein of more than one Insured shall not operate to increase the limits of the Company's Liability.

- 13 -

TRUCK INSURANCE EXCHANGE

TRK0000084

PR0740

PR01140

JA04668
TRUCK0000489



**5. SEVERABILITY OF INTEREST:**
The inclusion of more than one corporation, person, organization, firm or entity as Insured under this policy shall not in any way affect the rights of any such corporation, person, organization, firm or entity as respects any claim, demand, suit or judgment made or brought by or in favor of any other Insured, or by or in favor of any employee of such other Insured. This policy shall protect each corporation, person, organization, firm or entity in the same manner as though a separate policy had been issued to each. However, this shall not operate to increase the Company's liability except under Coverage X wherein the limits of liability shall apply separately to each Insured. Limits of insurance afforded hereunder shall apply first to the Named Insured under this policy and the remainder, if any, to additional insureds.

**6. FINANCIAL RESPONSIBILITY LAWS-COVERAGES A and C:**
When this policy is certified as proof of financial responsibility for the future under the provisions of the motor vehicle financial responsibility law of any state or province, such insurance as is afforded by this policy for bodily injury liability or for property damage liability shall comply with the provisions of such law which shall be applicable with respect to any such liability arising out of the ownership, maintenance or use during the policy period of any automobile insured hereunder, to the extent of the coverage and limits of liability required by such law, but in no event in excess of the limits of liability stated in this policy. The Insured agrees to reimburse the Company for any payment made by the Company which it would not have been obligated to make under the terms of this policy except for the agreement contained in this paragraph.

**7. NOTICE OF OCCURRENCE - CLAIM OR SUIT:**
In the event of any claim or alleged negligent act, error or omission, accident or occurrence, written notice shall be given by or on behalf of the Insured to the Company or any of its authorized agents as soon as practicable after the manager of the insurance department of the Named Insured has knowledge of an event or occurrence which, in the opinion of the manager of the insurance department or any such designated employee, is likely to result in a claim under this policy. Such notice shall contain particulars sufficient to identify the Insured and also reasonably obtainable information respecting the time, place and circumstances of the occurrence, the name and address of the injured and of available witnesses.

If claim is made or suit is brought against the Insured, the Insured shall promptly forward to the Company every demand, notice, summons or other process received by him or his representative.

**8. ASSISTANCE AND COOPERATION OF THE INSURED:**
The Insured shall cooperate with the Company and, upon the Company's request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits. The Insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense, except under Coverage A and B for emergency medical and surgical relief to others at the time of the occurrence; unless, however, the loss or claim is subject to adjustment under the $5,000 Deductible Endorsement #5.

**9. ACTION AGAINST COMPANY:**
No action shall lie against the Company unless, as a condition precedent thereto, the Insured shall have fully complied with all the terms of this policy, nor until the amount of the Insured's obligation to pay shall have been finally determined either by judgment against the Insured after actual trial or by written agreement of the Insured, the claimant and the Company.

TRUCK INSURANCE EXCHANGE

- 14 -

TRK0000085

PR0741

PR01141

Appellant's Appendix 02236
JA04669
TRUCK0000490

9. (Continued) Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. Nothing contained in this policy shall give any person or organization any right to join the Company as a co-defendant in any action against the Insured to determine the Insured's liability.

Bankruptcy or insolvency of the Insured or of the Insured's estate shall not relieve the Company of any of its obligations hereunder.

10. OTHER INSURANCE:

If the Insured is insured by any other policy or policies of insurance against loss covered by this policy, this policy shall provide excess insurance over and above the amount paid by such other valid and collectible insurance; but if the carrier or carriers of such other insurance shall deny liability therefor in its entirety or as to any portion of the insurance granted by such coverage, then and in that event this Company shall handle such loss or claim under this policy in the same manner and to the same extent as though such other insurance did not exist, and the Insured shall assign to this Company all rights against the carrier or carriers of such other insurance, and execute all papers necessary to secure to this Company such rights or shall in its own name whenever requested by the Company, and at the Company's expense, institute any demand or legal proceedings which the Company deems necessary against the carrier or carriers of such other insurance.

As respects bodily injury and property damage liability arising out of the ownership, maintenance or use of watercraft, no insurance is afforded by this policy with respect to any loss against which other insurance is available to the Insured, where, but for the existence of this policy, such other insurance would apply as primary insurance to such loss. If for any reason other than the existence of this policy such other insurance is not available to the Insured as respects such loss, or after such other insurance available to the Insured has been exhausted, then, in either event, this policy shall apply.

11. WAIVER OF SUBROGATION:

The Company waives its right of subrogation (a) against any person, firm or corporation; subsidiary of, or allied or affiliated with the Insured, (b) against any person, firm or corporation, with which the Insured is associated as a joint venturer or otherwise in any business enterprise, (c) against any person, firm or corporation for whom the Insured is performing work, (d) against any other Insured and/or any stockholder of any corporate insured, except to the extent that such persons, firms or corporations jointly or severally are insured under valid and collectible policies, (e) against employees of the Insured providing waiver of subrogation in writing is submitted to the company by the Insured.

12. TERMS OF POLICY CONFORMED TO STATUTE:

Terms of this policy which are in conflict with the statutes of the state wherein this policy is issued are hereby amended to conform to such statutes.

TRK0000086

PR0742

PR01142

Appellant's Appendix 02237

JA04670
TRUCK0000491

13. **CHANGES:**

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or estop the Company from asserting any right under the terms of this policy; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy.

14. **ASSIGNMENT:**

Assignment of interest under this policy shall not bind the Company until its consent is endorsed hereon; if, however, the Named Insured shall be adjudged bankrupt, this policy shall cover (a) the Named Insured's legal representative as the Named Insured, and (b) under Coverages A and C, subject otherwise to the provisions of Insuring Agreement III, any person having proper temporary custody of any owned automobile or hired automobile, as an Insured, until the appointment and qualification of such legal representative. As respects Coverage E, if the Insured shall die or be adjudged incompetent, this insurance shall thereupon terminate but shall cover the Insured's legal representative as the Insured with respect to liability previously incurred and covered hereunder. Notice of cancellation addressed to the Insured named in the Declarations and mailed to the address shown in this policy shall be sufficient notice to effect cancellation of this policy.

15. **CANCELLATION:**

This policy may be cancelled by the Named Insured by surrender thereof to the Company or any of its authorized agents or by mailing to the Company written notice stating when thereafter the cancellation shall be effective. This policy may be cancelled by the Company by mailing to the Named Insured at the address shown in this policy written notice stating when, not less than NINETY days thereafter, such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. The effective date of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the Named Insured or by the Company shall be equivalent to mailing. If the Named Insured cancels, earned premium shall be computed in accordance with the customary short rate table and procedure. If the Company cancels, earned premium shall be computed pro rata. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

16. **DECLARATIONS:**

By acceptance of this policy the Named Insured agrees that the statements in the Declarations are his agreements and representations, that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between the Insured and the Company or any of its agents relating to this insurance.

17. **KAISER CEMENT & GYPSUM CORPORATION**, or order, shall be deemed the sole and irrevocable agent of each Insured named hereunder for the purposes of issuing instructions for altering or cancelling this policy, for agreeing upon settlement of loss, for receiving and receipting for payment of claims or for making premium adjustments.



TRUCK INSURANCE EXCHANGE

- 16 -

TRK0000087

PR0743

PR01143

Appellant's Appendix 02238

JA04671
TRUCK0000492



**18. RECIPROCAL PROVISIONS:**

This policy is made and accepted in consideration of the payment of the Premium Deposit herein provided, the Declarations made in the application for the Policy, and the execution of a power of attorney to Truck Underwriters Association, herein called the "Association", authorizing it to execute inter-insurance policies between the holder of this policy, herein called the "Named Insured", and other subscribers to the Truck Insurance Exchange.

No term or conditions of the policy is intended to create, creates, or shall be construed to create a partnership or mutual insurance association, or to give rise to or create any joint liability.

To enforce any claims arising under this policy the Exchange shall be sued or sue in its own name as in the case of an individual. Service of process in any such suit against the Exchange shall be upon the Truck Underwriters Association, Attorney-in-Fact.

Membership Fees paid for membership in the Exchange are not part of the premium and are fully earned upon membership being granted and coverage effected and are not returnable but may be applied as a credit to Membership Fees required of the Named Insured for insurance accepted by the Exchange.

The annual meeting of the members of the Exchange shall be held at the Home Office of the Exchange at Los Angeles, California, on the first Tuesday following the first Monday following the 15th day of March of each year, at the hour of 2:00 P.M., unless the Board of Governors shall elect to change the time and place of such meeting, in which case, but not otherwise, written or printed notice shall be mailed each member at his last known address at least ten days prior thereto. The Board of Governors shall be chosen by the subscribers from among themselves, at the annual meeting, or any special meeting held for that purpose, and shall have full power and authority to establish rules and regulations for the management of the Exchange not inconsistent with subscribers' agreements.

The Premium Deposit for this policy and all payments made for its continuance shall be payable to the Exchange at the Home Office of the Exchange. The funds so paid shall be placed to the credit of the Named Insured upon the records of the Exchange and applied to the payment of the Insured's proportion of losses and expenses and to the establishment of reserves and general surplus. All such funds may be deposited and withdrawn or invested and re-invested as the Board of Governors or its Executive Committee designate. The Insured agrees that any amount allocated to the surplus fund of the Exchange by the Board of Governors may be retained by the Exchange and applied, after providing for the payment of all liabilities of the Exchange, to any purpose deemed proper and advantageous to policyholders.

This policy is non-assessable.

_Bill A Cramer_
Countersigned

- 17 -

TRUCK INSURANCE EXCHANGE

TRK0000088

PR0744

PR01144

Appellant's Appendix 02239

JA04672
TRUCK0000493

Effective: January 1, 1968

Policy #350-40-00
Endorsement #1

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

SUPERSEDING POLICY

In consideration of the premium for, and of the
acceptance and retention of this policy by the
Named Insured, it is agreed that this policy
cancels and supersedes any previous policy of the
same number issued by the Company and is effective
as indicated.

*Bill A. Cramer*

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000089

PR0745

PR01145

Appellant's Appendix 02240
JA04673
TRUCK0000494

Effective:  March 1, 1968

Policy #350-40-00
Endorsement #24
2

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### DEFINITION OF NAMED INSURED
(In Lieu of Endorsement #2 )

In consideration of the premium, it is agreed that the
Named Insured in Item 1 of the Declarations is designated
as:

KAISER CEMENT & GYPSUM CORPORATION,
GLACIER SAND & GRAVEL COMPANY,
GYPSUM CARRIER, INC. OF PANAMA, R.P.,
KAISER GYPSUM COMPANY, INC.,
KAISER OKINAWA CO. LTD.,
PERMANENTE STEAMSHIP CORPORATION,
PERMANENTE TRUCKING COMPANY,
SOUTHWEST MATERIALS, INC.,
TEXAS READY MIX, and

(1) Any Division or Subsidiary Company;
(2) Any Divisions or Subsidiaries of (1) above;
(3) Any Company under the Named Insured's control
    or of which it assumes active management;
(4) Any Partnership or Joint Venture under the
    operational control or sponsorship of (1),
    (2) or (3) above.

*Bill A Crawie*
COUNTERSIGNED

TRUCK INSURANCE EXCHANGE

TRK0000090

PR0746

PR01146

TRUCK0000495

Effective: January 1, 1970

Policy: 850-40-00
Endorsement #3

Corrected

### KAISER CEMENT & GYPSUM CORPORATION, ET AL

#### SPECIAL PROVISIONS

In consideration of the premium, it is agreed as follows:

1. **Sponsored Organizations as Additional Insureds.**

   Such insurance as is afforded by the policy applies also to social clubs or organizations sponsored by the Named Insured as Additional Named Insureds, subject to the following provisions:

   a. Under Coverages B and D the unqualified phrase "Additional Named Insured" includes any member of such club or organization, but only as respects his liability for activities of such club or organization or activities performed by such member on behalf of such club or organization."

   b. "Additional Named Insured" shall be understood to mean the same as "Named Insured" as respects Coverages A and C.

2. **California Financial Responsibility Filing.**

   In the event of cancellation of the policy by the Company, written notice shall be given to Department of Motor Vehicles, Financial Responsibility, P.O. Box 2431, Sacramento, California, ten (10) days before such cancellation becomes effective.

_____
Countersigned

TOWER INSURANCE EXCHANGE

TRK0000091

PR0747

PR01147

TRIAL EX. 301
Page 21

Appellant's Appendix 02242

JA04675
TRK0000496

Effective: January 1, 1968

Policy #350-40-00
Endorsement #3

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

## SPECIAL PROVISIONS

In consideration of the premium, it is agreed as follows:

1. **Sponsored Organizations as Additional Insureds.**

   Such insurance as is afforded by the policy applies also to social clubs or organizations sponsored by the Named Insured as Additional Named Insureds, subject to the following provisions:

   a. Under Coverages B and D the unqualified phrase "Additional Named Insured" includes any member of such club or organization, but only as respects his liability for activities of such club or organization or activities performed by such member on behalf of such club or organization."

   b. "Additional Named Insured" shall be understood to mean the same as "Named Insured" as respects Coverages A and C.

2. **California Financial Responsibility Filing.**

   In the event of cancellation of the policy by the Company, written notice shall be given to Department of Motor Vehicles, Financial Responsibility, P.O. Box 2431, Sacramento, California, ten (10) days before such cancellation becomes effective.

3. **Excess Coverage Over Other Specific Insurance.**

   The insurance afforded under this policy shall be excess to the extent coverage is afforded under Truck Insurance Exchange policy #1155-63-65 and Fireman's Fund Insurance Company Policy #PCL-334436 or any renewal or replacement thereof.

*Bill A. Cramer*
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000092

PR0748

PR01148

Appellant's Appendix 02243
JA04676
TRUCK0000497



Policy #350-40-00
Endorsement #4

Effective: January 1, 1968

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

REMOVAL OF WRECKAGE

The policy applies also to liability for cost or expenses of, or incidental to, the removal of the wreck of vessels when such removal is compulsory by law, provided, however, that

a) There shall be deducted from such claim for cost or expenses, the value of any salvage from or which might have been recovered from the wreck, insuring, or which might have insured, to the benefit of the Insured.

b) The Company shall not be liable for such costs or expenses which would be covered by full insurance under the present standard form of policy on hull, machinery, etc., issued by the American Marine Insurance Syndicate.

c) The Company shall not be liable for such costs or expenses when the vessel was wrecked by or in consequence of hostilities or warlike operations, whether before or after declaration of war.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000093

PR0749

PR01149

Appellant's Appendix 02244

JA04677

Effective: January 1, 1968

Policy 350-40-00
Endorsement #5

### KAISER CEMENT & GYPSUM CORPORATION, ET AL.
### DEDUCTIBLE COVERAGES A, B, C, D, E, F AND G

As respects each occurrence or one malpractice act, error or mistake regardless of the number of claims emanating therefrom, the Insured agrees to assume the first $5,000 ($15,000 as respects Products hazard as defined under Condition 3, Definition (f) (2) ) and related adjustment expense under any one or combination of coverages. The Company shall tabulate the amounts so paid which are thus recoverable from the Insured and shall bill the Insured monthly for the accumulated total. The Insured shall reimburse the Company promptly.

There will be two types of loss adjustment expense which shall be defined and computed as follows:

1. Allocated Adjustment Expense - Exact items of expense directly incurred by the Company and chargeable to a particular claim. (Examples: Legal fees, court costs, medical examiner's fees, photographer bills, etc.). Services of independent adjusters are excluded.

2. Unallocated Adjustment Expense - A charge to cover all general claims administration costs. (Examples: Services of salaried and independent adjusters, claim examiners, clerical service, stationery, office rent and other overhead items).

In addition to reimbursement for paid losses as defined above, the Insured agrees to reimburse the Company for a share of both Allocated and Unallocated Adjustment Expense incurred by the Company in the settlement of losses and in the settlement of claims closed for no payment.

1. Allocated Adjustment Expense.
   (a) Allocated Adjustment Expense shall be reimbursed in the same proportion that the deductible loss bears to the total loss.

   (b) On claims closed with no payment, Allocated Adjustment Expense shall be reimbursed in the proportion that the deductible amount bears to the last reserve on the claim prior to closing.

2. Unallocated Adjustment Expense.
   (a) 12% of the Insured's portion of loss under Coverages A, B, E, F and G.
   (b) 6% of the Insured's portion of loss under Coverages C and D.

#### COVERAGE D - $1,000 Deductible

$1,000 shall be deducted from the amount of each claim covered under the terms of this endorsement, and the Company shall be liable for loss only in excess of that amount.

_Bill Cramer_
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000094

PR0750

PR01150

Effective: January 1, 1968

Policy #350-40-00
Endorsement #

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

PREMIUM ADJUSTMENT ENDORSEMENT

DEPOSIT PREMIUM to be maintained:  $4,725.00.

A. As respects the first $10,000 aggregate liability from one occurrence,
it is agreed that on or before the 25th day of January 1969, the Named
Insured shall render to the Company a statement showing the total
remuneration earned by its employees during the period January 1, 1968
to January 1, 1969 (being the amount of remuneration upon which the
Named Insured's Workmen's Compensation premium for the same period is
predicated including similarly adjusted payroll in states where
Workmen's Compensation is self-insured or insured in a State Fund),
and the earned premium shall be computed at the following rates per
$100.00 of the total remuneration so reported:

| Standard | (Basic) |
|----------|---------|
| $.225    | ($.150) |

B. Such earned premium shall be payable to the Company forthwith and
shall be subject to such adjustments as are provided for in that certain
Premium Determination Agreement entered into between the Named Insured
and the Exchange effective January 1, 1968.

C. For policy limits in excess of $10,000.00 aggregate as respects any one
occurrence, and not subject to adjustment under said Premium Determination
Agreement, premium shall be payable at the rate of $.059 per $100.00 of
the total remuneration so reported.

D. Furthermore, the Named Insured shall pay to the Company the sum of
$5,000.00 on or before the 10th day of each month during the currency of
this policy, such sums to be credited to the earned premium determined
by the premium adjustment as provided in Parts A, B and C, above.

E. In addition, the Named Insured will submit a semi-annual report of
remuneration to serve as the basis for any adjustment of the monthly
flat charge.

Bill A. Cramer
Countersigned

TRUCK INSURANCE EXCHANGE

_TRK_0000095

PR0751

PR01151

Appellant's Appendix 02246
JA04679
TRUCK0000500

Effective:  December 1, 1969                    Endorsement #7
                                                CORRECTED

                                                330-40-00

KAISER CEMENT & GYPSUM CORPORATION, ET AL

AGREEMENT DELETING BENEFITS FOR BODILY INJURY AND PROPERTY
DAMAGE LIABILITY CAUSED BY UNINSURED MOTOR VEHICLES

In consideration of the deletion of the premium with respect thereto,
it is agreed by the Exchange and the Named Insured, each shown in this
endorsement that all provisions covering Bodily Injury and Property
Damage Liability caused by an Uninsured Motor Vehicle under this policy
applied for and any subsequent renewal thereof are hereby  deleted
and shall be of no force or effect with respect to any person or insured,
named or otherwise.

Truck Insurance Exchange

                              Dated December 1, 1969

                              Kaiser Cement & Gypsum Corporation,
                              et al

                              Signature of Named Insured

                              [signature]
                              Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000096

PR0752

PR01152

Appellant's Appendix 02247

JA04680

TRUCK0000501

Effective: January 1, 1968                         Policy #350-40-00
                                                   Endorsement #7

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

AGREEMENT DELETING NECESSITES FOR BODILY INJURY CAUSED BY UNINSURED MOTOR
                              VEHICLES

In consideration of the deletion of the premium with respect thereto, it
is agreed by the insurer indicated below and the undersigned named In-
sured that all provisions covering bodily injury caused by an uninsured
motor vehicle under the policy applied for and any subsequent renewal
thereof are hereby deleted and shall be of no force or effect with respect
to any person or insured, named or otherwise.

☐ Farmers Insurance Exchange

☒ Truck Insurance Exchange

☐ Mid-Century Insurance Company

                              Dated:  January 1, 1968

                              Kaiser Cement & Gypsum Corporation, Et Al.

                              (Signature of Named Insured)

Countersigned

                                        TRUCK INSURANCE EXCHANGE

TRK0000097

PR0753

PR01153

Appellant's Appendix 02248

JA04681
TRUCK0000502

Effective: January 1, 1968                          Policy #350-40-00
                                                    Endorsement #8

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

ADDITIONAL INSURED - MILES and SONS TRUCKING SERVICE

In consideration of the premium at which this policy is written for
Automobile Bodily Injury and Automobile Property Damage Liability in-
surance, it is hereby agreed that MILES and SONS TRUCKING SERVICE
whose business address is P.O. Box 859, Merced, California, is an
Additional Insured with respect to the existence, ownership, maintenance,
or use of automobiles leased, or rented by the Named Insured to the
above mentioned Additional Insured, or while the Named Insured is acting
as Sub-hauler for the above mentioned Additional Insured.

The Company hereby agrees to void any wording in any insuring agreement,
exclusion, or condition of this policy depriving the Additional Named
Insured herein of coverage afforded hereby.

It is also agreed that such insurance protection as is extended to the
above named Additional Insured shall be primary insurance and any other
protection available to such Additional Insured shall be excess over
such primary insurance.

It is further agreed that the Company will not cancel, or reduce Automobile
Bodily Injury Liability or Automobile Property Damage Liability coverages
under this policy without first giving the above mentioned Additional In-
sured ten (10) days advance notice of such action.

Bill A Cramer
COUNTERSIGNED

TRUCK INSURANCE EXCHANGE

TRK0000098

PR0754

PR01154

Appellant's Appendix 032404682
TRUCK0000503

Effective: January 1, 1968

Policy #350-40-00
Endorsement #9

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.
### CONTRACTUAL LIABILITY - NORTHERN PACIFIC RAILWAY COMPANY

It is agreed that:

A. No provision or exclusion appearing in this policy or any endorsements attached hereto eliminating coverage for any obligation or liability assumed by the Insured under any contract or agreement, or for damage or injury to or destruction of property rented to, occupied or used by, or in the care, custody or control of the Insured shall apply to that certain permit from NORTHERN PACIFIC RAILWAY COMPANY, hereinafter called "Railway Company", to GLACIER SAND AND GRAVEL COMPANY numbered 84293 and dated April 15, 1958.

B. Such insurance as is afforded by the policy with respect to liability assumed by the Insured under contract applies also to that part of a contract between the Named Insured and Northern Pacific Railway Company, hereinafter called "Railway Company" dated April 15, 1958, reading:

3 - Should the right of way be fenced at the location described, Permittee shall construct and maintain crossing gates at Permittee's expense. Said gates shall be constructed in accordance with Railway Company's standard plan shown below or equal and shall be kept closed and locked excepting when necessary to be opened for travel. Permittee agrees to assume all damages of every kind whatsoever resulting from Permittee's failure to keep gates closed and locked as agreed in this paragraph.

6 - Permittee agrees to indemnify and hold harmless Railway Company from any and all loss, cost, damage or injury to persons, including death resulting therefrom, or to property arising or growing out of the existence or use of said private road upon Railway Company's property or arising or growing out of said private road crossing Railway Company's track, regardless of how such loss, cost, damage, injury or death may arise, and notwithstanding that it may arise in whole or in part from the negligence of Railway Company's employees, agents or servants.

7 - It is agreed that the provisions of paragraph 3 and 6 are for the equal protection of any other railroad company or companies heretofore or hereafter granted the joint use of Railway Company's property upon which said private road crossing is located.

C. The Railway Company and any other railroad company or companies heretofore or hereafter granted the joint use of the Railway Company's property are named as Additional Insureds under this policy, but only as respects coverage provided for in the above-mentioned permit.

*Bill A Cramer*
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000099

PR0755

PR01155

Effective: January 1, 1968

Policy #350-40-00
Endorsement #9
Page 2

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

CONTRACTUAL LIABILITY - NORTHERN PACIFIC RAILWAY COMPANY

D. In consideration of the premium charged, it is agreed that solely as
respects the agreement between NORTHERN PACIFIC RAILWAY COMPANY and
GLACIER SAND AND GRAVEL COMPANY numbered 84293 dated April 15, 1958
relative to an easement agreement at Steilacoom, Washington, the Limits
of Liability, Coverage D, Property Damage Liability Other Than Automo-
bile is hereby amended to read as follows:

Coverage D - Property Damage Liability       $100,000 Each Occurrence
Other Than Automobile        $200,000 Aggregate operations
$200,000 Aggregate contractual

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000100

PR0756

PR01156

TRUCK0000505

Effective:  January 1, 1968

Policy #35-AO-OO
Endorsement #10

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### ADDITIONAL INSURED - JOHN K. HOPKINS, ET AL.

In consideration of the premium, it is agreed that such insurance
as is afforded by this policy for Bodily Injury and Property
Damage Liability coverages is hereby extended to apply to

JOHN R. HOPKINS and ANNA L. HOPKINS
and ESTATE OF JOHN KHELDON HOPKINS
c/o Kirby & Elliott
P.O. Box 151, 700 Texas Street
Fairfield, California

as an "Insured" as defined in the policy, but only as respects
claims arising out of the ownership, maintenance or use of 36
Foot Converted Navy LCD, named "Denny", Coast Guard Registry
#267521 by the Named Insured.

_Bill A. Craxon_
Countersigned

TRK0000101

PR0757

PR01157

Appellant's Appendix 02252
JA04685
TRUCK0000506

Effective:  January 1, 1968                    Policy #350-40-00
                                               Endorsement #11


            KAISER CEMENT & GYPSUM CORPORATION, ET AL.

            ADDITIONAL INSURED - CITY OF REDWOOD CITY, ET AL.


       In consideration of the premium, it is agreed that such insurance
    as is afforded by this policy for Bodily Injury and Property
    Damage Liability coverages is hereby extended to apply to

            CITY OF REDWOOD CITY, THE BOARD OF PORT COMMISSIONERS
            OF THE CITY OF REDWOOD CITY, THE PORT OF REDWOOD CITY,
            THE PORT COMMISSIONERS, THE COUNCILMEN and all
            OFFICERS, AGENTS AND EMPLOYEES THEREOF
            Redwood City, California

    as an "Insured" as defined in the policy, but only as respects
    claims arising out of the lease of premises to the Named Insured.




            Bill A. Cramer
            Countersigned.

                                        TRUCK INSURANCE EXCHANGE

TRK0000102

PR0758

PR01158

Effective: January 1, 1968

Policy #330-40-00
Endorsement #12

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### ADDITIONAL INSURED - U.S. DEPARTMENT OF THE NAVY

Should the above mentioned policy be cancelled, assigned or changed
during the above named policy period in such manner as to affect
this Certificate, the Company will give thirty (30) days written
notice to the Officer in Charge of Construction, Bureau of Yards &
Docks Contract, Marianas Navy Co. 526, Fleet Post Office,
San Francisco, California.

It is agreed that the United States of America (Department of the
Navy) is an Additional Insured with respect to the Named Insured's
operations conducted on Cabras Island situated in Apra Harbor,
Island of Guam.  It is also agreed that the Named Insured waives
any rights of subrogation against the United States of America
which might arise by reason of any payment under the policy arising
out of the Named Insured's operations conducted on Cabras Island,
situated in Apra Harbor, Island of Guam.

*Bill A. Gipson*

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000103

PR0759

PR01159

Appellant's Appendix 02254

JA04687
TRUCK0000508

TRIAL EX. 301
Page 33

Effective:  January 1, 1968                    Policy #350-40-00
                                               Endorsement #13

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

ADDITIONAL INSURED  ·  YOUNG BROTHERS, LIMITED

In consideration of the premium, it is agreed that such in-
surance as is afforded by this policy for Bodily Injury and
Property Damage Liability coverages is hereby extended to
apply to

        YOUNG BROTHERS, LIMITED
        325 North King Street
        Honolulu, Hawaii

as an "Insured" as defined in the policy, but only as respects
claims arising out of the installation of the equipment and
other facilities on barges by Kaiser Cement & Gypsum Corporation
and the loading and unloading operations by Kaiser, its agents
or servants or employees, of said barges operated by Young
Brothers, Limited, for the purpose of transporting bulk cement
to the Named Insured's premises in the Hawaiian Islands.

_Billie R. Craven_
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000104

PR0760

PR01160

Appellant's Appendix A04688
TRUCK0000509

Effective: January 1, 1968                          Policy #150-40-00
                                                    Endorsement #14

KAISER CEMENT & GYPSUM CORPORATION and GLACIER SAND AND GRAVEL COMPANY

ADDITIONAL INSURED  -  ZIDELL MACHINERY & SUPPLY COMPANY, ET AL.

In consideration of the premium, it is agreed that such in-
surance as is afforded by this policy for Bodily Injury and
Property Damage Liability coverages is hereby extended to
apply to
            ZIDELL MACHINERY & SUPPLY COMPANY and
            ZIDELL EXPLORATIONS INC.
            S/W Bond Street
            Portland, Oregon

as an "Insured" as defined in the policy, but only as respects
claims arising out of the operation, maintenance or use of
barges owned by Zidell Machinery & Supply Company and Zidell
Explorations Inc. while said barges are used by the Named Insured.

Bill a Crane
Countersigned

JOYCE INSURANCE EXCHANGE

TRK0000105

PR0761

PR01161

Appellant's Appendix 02256

JA04689
TRUCK0000510

Effective: January 1, 1968

Policy #350-40-00
Endorsement #15

KAISER CEMENT & GYPSUM CORPORATION
and KAISER GYPSUM COMPANY, INC.

ADDITIONAL INSURED - COMMERCIAL CREDIT INDUSTRIAL CORP.

In consideration of the premium; it is agreed that such
insurance as is afforded by this policy for Automobile
Bodily Injury and Property Damage Liability coverages is
hereby extended to apply to

COMMERCIAL CREDIT INDUSTRIAL CORP.
300 St. Paul Place
Baltimore, Maryland 21202

as an Additional Insured as defined in the policy but
only as respects claims arising out of vehicles leased
to the Named Insured and the sale or disposition of
automobiles in behalf of the Named Insured.

Bill A Cramer
Countersigned

TRK0000106

PR0762

PR01162

TRIAL EX. 301
Page 36

Appellant's Appendix 00267690
JA04690
TRUCK0000511

Effective:  January 1, 1968

Policy #350-40-00
Endorsement #16

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

## ADDITIONAL INSURED - HERBERT ALEXXU

In consideration of the premium, it is agreed that such
insurance as is afforded by this policy for Bodily Injury
and Property Damage Liability coverages is hereby ex-
tended to apply to

HERBERT ALEXXU
1535 Byron Street
Palo Alto, California

as an "Insured" as defined in the policy, but only as
respects claims arising out of engineering services per-
formed for the Named Insured under contract No. C 677-2
dated August 15, 1967.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000107

PR0763

PR01163

Appellant's Appendix 02258
JA04691
TRUCK0000512

Effective: December 1, 1969

Policy #150-40-00
Amended Endorsement #17

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

ADDITIONAL INSURED — ACE BARGE COMPANY, ET AL.
(In Lieu of Original Endorsement #17 dated January 1, 1968).

In consideration of the premium, it is agreed that such insurance as is
afforded by this policy for Bodily Injury and Property Damage Liability
coverages is hereby extended to apply to

ACE BARGE COMPANY and
CROWLEY LAUNCH and TUGBOAT COMPANY
and Affiliated and Inter-related Companies
including vessels
Pier 32, San Francisco, California

as an "Insured" as defined in the policy, but only as respects claims
arising out of the operation, maintenance or use of barges while said
barges are leased to Kaiser Cement & Gypsum Corporation or Permanente
Steamship Corporation.

It is further agreed that with respect to the towing agreement between
the insured and Crowley Launch & Tugboat Co. as respects towage of the
barges, "Anchorage" and "Seward", that notwithstanding any implied
warranties by either party, of workmanlike service or otherwise, it is
agreed that all loss, damage and liability which may result from joint
or concurrent negligence or other fault by both parties shall be borne
and/or allocated by and/or between them in accordance with maritime
principles of mutual fault, as if no such warranties existed.

_Bill A. Cassure_
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000108

PR0764

PR01164

Appellant's Appendix 02259
JA04692
TRUCK0000513



Effective:  January 1, 1968

Policy #350-40-00
Endorsement #1B

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

## ADDITIONAL INSURED - C.R.B. LEASING COMPANY

In consideration of the premium, it is agreed that such in-
surance as is afforded by this policy for Automobile Bodily
Injury and Property Damage Liability coverages is hereby
extended to apply to

C.R.B. LEASING COMPANY
52 Dapplegray Lane
Rolling Hills Estates, California

as an Additional Insured as defined in the policy but only
as respects claims arising out of vehicles leased to the
Named Insured and the sale or disposition of automobiles in
behalf of the Named Insured.

_Bill A. Cresman_
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000109

PR0765

PR01165

Effective: January 1, 1968

Policy #350-40-00
Endorsement #19

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

ADDITIONAL INSURED - KILTON HOTELS CORPORATION

In consideration of the premium, it is agreed that such in-
surance as is afforded by this policy for Bodily Injury and
Property Damage Liability is hereby extended to apply to

KILTON HOTELS CORPORATION
900 Wilshire Boulevard
Los Angeles, California

as an "Insured" as defined in the policy but only as respects
claims arising out of the lease of certain premises at the
above location.

The Company hereby agrees to void any wording in any insuring
agreement, exclusion or condition of this policy depriving
the herein named Additional Insured of the coverage described
above.

It is also agreed that such insurance protection extended to
the above named Additional Insured under this endorsement
shall be primary insurance and any other protection available
to such Additional Insured shall be excess over such primary
insurance.

Bill A. Crane
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000110

PR0766

PR01166



Effective: January 1, 1968

Policy #350-40-00
Endorsement #20

### KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### ADDITIONAL INSURED - TIDEWATER TERMINAL COMPANY

In consideration of the premium, it is agreed that such in-
surance as is afforded by this policy for Bodily Injury and
Property Damage Liability coverage is hereby extended to
apply to

TIDEWATER TERMINAL COMPANY
2609 N.E. Marine Drive
Portland, Oregon 97211

as an "Insured" as defined in the policy, but only as respects
claims arising out of the lease of premises at East Pasco,
Washington, to the Named Insured.

Bill A. Cramer
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000111

PR0767

PR01167

Appellant's Appendix 02262
JA04695
TRUCK0000516



Effective:  January 1, 1968

Policy #350-43-00
Endorsement #21

### KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### ADDITIONAL INSURED - STATE OF HAWAII, HARBORS DIVISION - DEPT. OF TRANSP.

In consideration of the premium, it is agreed that such insurance as is
afforded by this policy for Bodily Injury and Property Damage Liability
coverages is hereby extended to apply to

STATE OF HAWAII, HARBORS DIVISION
DEPARTMENT OF TRANSPORTATION
P.O. Box 397
Honolulu, Hawaii  96813

as an "Insured" as defined in the policy, but only as respects claims
arising out of the lease to the Named Insured of land adjacent to
Pier 32, Honolulu, Hawaii.

_Bill A. Cramer_
Countersigned

TRUCK INSURANCE EXCHANGE

<span style="text-decoration: underline;">TRK</span>0000112

PR0768

PR01168

Appellant's Appendix JA04896
TRUCK0000517



Effective: January 1, 1968

Policy #350-40-00
Endorsement #22

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

ADDITIONAL INSURED - HOFFMAN CONSTRUCTION CO.

In consideration of the premium, it is agreed that such in-
surance as is afforded by this policy for Bodily Injury and
Property Damage Liability coverages is hereby extended to

HOFFMAN CONSTRUCTION CO.
715 S.W. Columbia Street
Portland, Oregon  97201

as an "Insured" as defined in the policy, but only as respects
claims arising out of use of property at 4120 S.W. Macadam
Avenue, Portland, Oregon by PACIFIC BUILDING MATERIALS DIVISION
of GLACIER SAND & GRAVEL COMPANY.

*Bill A. Crane*
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000113

PR0769

PR01169

Appellant's Appendix 02264
JA04697
TRUCK0000518

Effective:  January 1, 1968                     Policy #350-40-00
                                                Endorsement #23


### KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### ADDITIONAL INSURED - COTTON PROPERTY MANAGEMENT CO.


In consideration of the premium, it is agreed that such insurance
as is afforded by this policy for Bodily Injury and Property
Damage Liability coverages is hereby extended to apply to

            COTTON PROPERTY MANAGEMENT CO.
            233 A Street
            San Diego, California  92101

as an "Insured" as defined in this policy, but only as respects
claims arising out of management of property located at
4401 Twain Avenue, San Diego, California.


_Bill A. Cramer_
Counter)signed

TRUCK INSURANCE EXCHANGE

_TRK_0000114

PR0770

PR01170

Appellant's Appendix 024698
TRUCK0000519

Effective:  January 1, 1968

Policy #350-40-90
Endorsement #26
(Corrected)

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

ADDITIONAL INSURED - UNITED STATES LEASING CORPORATION and THE BANK OF AMERICA

In consideration of the premium, it is agreed that such insurance
as is afforded by this policy for Bodily Injury and Property
Damage Liability coverages is hereby extended to apply to

UNITED STATES LEASING CORPORATION
633 Battery Street
San Francisco, California  94111

and

THE BANK OF AMERICA NT & SA
435 California Street
San Francisco, California.

as an "Insured" as defined in the policy, but only as respects claims
arising out of leasing of electric data processing equipment to the
Named Insured.

_Bill A. Cearns_
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000115

PR0771

PR01171

JA04699
TRUCK0000520

Appellant's Appendix 02266

Effective: January 1, 1968

Policy #350-40-00
Endorsement #25

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

ADDITIONAL INSURED - DEPARTMENT OF TRANSPORTATION, STATE OF HAWAII

In consideration of the premium, it is agreed that such insurance
as is afforded by this policy for Bodily Injury and Property
Damage Liability coverage is hereby extended to apply to

STATE OF HAWAII
Department of Transportation
Harbors Division
869 Punchbowl Street
Honolulu, Hawaii 96813

as an "Insured" as defined in the policy, but only as respects
claims arising out of lease of 20,000 square feet of land
situated at Kawaihae Harbor, Kawaihae, Hawaii.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000116

PR0772

PR01172

Appellant's Appendix JA04700
TRUCK0000521

Effective: January 1, 1968

Policy #350-40-00
Endorsement #26

### KAISER CEMENT A GYPSUM CORPORATION, ET AL.

### ADDITIONAL INSURED - CECIL B. LAFAYETTE and C. RAYMOND MILLS and VIOLET I. MILLS

In consideration of the premium, it is agreed that such insurance as is
afforded by this policy for Bodily Injury and Property Damage Liability
coverages is hereby extended to apply to

CECIL B. LAFAYETTE
2136 S. Hathaway
Santa Ana, California

and

C. RAYMOND MILLS and VIOLET I. MILLS
2136 S. Hathaway
Santa Ana, California

as an "Insured" as defined in the policy, but only as respects claims arising
out of the lease of a manufacturing plant situated at 2136 S. Hathaway,
Santa Ana, California.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000117

PR0773

PR01173

Appellant's Appendix 02268
JA04701
TRUCK0000522

Effective: February 19, 1968

Policy #350-40-00
Endorsement #27

### KAISER CEMENT & GYPSUM CORPORATION, ET AL.

#### ADDITIONAL INSURED - KAISER ALUMINUM & CHEMICAL CORPORATION

In consideration of the premium, it is agreed that such insurance as is afforded by this policy for Bodily Injury and Property Damage Liability coverages is hereby extended to apply to

KAISER ALUMINUM & CHEMICAL CORPORATION
300 Lakeside Drive
Oakland, California 94604

as an "Insured" as defined in the policy, but only as respects claims arising out of the lease of approximately seven (7) acres of land at Tacoma, Washington, to the Named Insured.

*Dick A. Cramer*

TRUCK INSURANCE EXCHANGE

TRK0000118

PR0774

PR01174

Appellant's Appendix A04702
TRUCK0000523



Effective: March 18, 1968

Policy #350-40-00
Endorsement #28

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### ADDITIONAL INSURED - CITY OF REDWOOD CITY, ET AL.

In consideration of the premium, it is agreed that such insurance as is afforded by this policy for Bodily Injury and Property Damage Liability coverages is hereby extended to apply to:

    CITY OF REDWOOD CITY, THE BOARD OF PORT COMMISSIONERS
    OF THE CITY OF REDWOOD CITY, THE PORT OF REDWOOD CITY,
    THE PORT COMMISSIONERS, THE COUNCILMEN AND ALL
    OFFICERS, AGENTS AND EMPLOYEES THEREOF
    Redwood City, California

as an "Insured" as defined in the policy, but only as respects claims arising out of the lease of premises to the Named Insured.

As respects claims against any Insured under this policy, other Insureds or the employees of other Insureds shall be deemed to be members of the public. The term "the Insured" is used severally and not collectively, but the inclusion herein of more than one insured shall not increase the limits of the Exchange's liability.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000119

PR0775

PR01175

Appellant's Appendix 02270

JA04703
TRUCK0000524

Effective: March 1, 1968

Policy #350-40-00
Endorsement #29

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### DEFINITION OF NAMED INSURED

In consideration of the premium, it is agreed that the Named.
Insured in Item 1 of the Declarations is designated as:

KAISER CEMENT & GYPSUM CORPORATION,
COMPAÑIA INDUSTRIAL KAISER, S.A. ,
GLACIER SAND & GRAVEL COMPANY,
GYPSUM CARRIER, INC. OF PANAMA, R.P.,
KAISER GYPSUM COMPANY, INC.,
KAISER OKINAWA CO. LTD.,
PERMANENTE STEAMSHIP CORPORATION,
PERMANENTE TRUCKING COMPANY,
SOUTHWEST MATERIALS, INC.
TEXAS READY MIX, and

(1) Any Division or Subsidiary Company;
(2) Any Divisions or Subsidiaries of (1) above;
(3) Any Company under the Named Insured's control
    or of which it assumes active management;
(4) Any Partnership or Joint Venture under the
    operational control or sponsorship of (1), (2) or
    (3) above.

_Bill A. Cramer_
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000120

PR0776

PR01176

TRUCK0000525

Appellant's Appendix 04704

Effective: April 17, 1968

Policy #350-40-00
Endorsement #30

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

## ADDITIONAL INSURED  -  THE CITY OF LONG BEACH, ET AL.

In consideration of the premium it is agreed that such insurance afforded by this policy for Bodily Injury and Property Damage Liability coverages is hereby extended to apply to:

THE CITY OF LONG BEACH, THE BOARD OF HARBOR COMMISSIONERS, AND THEIR OFFICERS AND EMPLOYEES, while acting within the scope of their authority
P.O. Box 570
Long Beach, California  90801

as an "Insured" as defined in the policy, but only as respects claims arising out of the lease of property located at 1390 West Broadway, Long Beach, California, to be used as a parking lot by KAISER GYPSUM COMPANY, INC.

The inclusion of more than one corporation, person, organization, firm or entity as Insured under this policy shall not in any way affect the rights of any such corporation, person, organization, firm or entity as respects any claim, demand, suit or judgment made or brought by or in favor of any other Insured, or by or in favor of any Employee of such other Insured.

This policy shall protect such corporation, person, organization, firm or entity in the same manner as though a separate policy had been issued to each. However, this shall not operate to increase the Company's liability.

It is agreed that the Exchange will not cancel or reduce any of the Bodily Injury and Property Damage Liability coverages under this policy without first giving a thirty (30) day advance written notice to the above-mentioned Additional Insured.

_Richard Cramer_
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000121

PR0777

PR01177

Appellant's Appendix 02272

JA04705
TRUCK0000526



Effective: May 13, 1968

Policy #350-40-00
Endorsement #31

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### ADDITIONAL INSURED - COASTWIDE LEASING COMPANY

It is agreed that the Automobile insurance coverage described below and afforded by this policy shall be extended to apply to

COASTWIDE LEASING COMPANY
1440 Broadway
Oakland, California

as an Additional Insured as defined in the policy but only in regard to those claims arising out of the use of an International ICO-405 Tractor #E3701025, and a Trailmobile./flatbed Trailer #200641, while leased to the Named Insured.

It is also agreed that the Automobile insurance extended herein and afforded by this policy shall comply and be in accordance with that certain Truck Lease and Service Agreement entered into between the Named Insured and COASTWIDE LEASING COMPANY, dated May 13, .1968.

Bill A Crane

TRUCK INSURANCE EXCHANGE

TRK00001:

PR0778

PR01178

Appellant's Appendix 02273
JA04706
TRUCK0000527



Effective: May 13, 194                    Policy #350-40-00
                                          Endorsement #32

### KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### ADDITIONAL INSURED - WESTERN TRUCK MANPOWER, INC.

It is agreed that such insurance afforded by this policy for
Bodily Injury and Property Damage Liability shall be extended
to apply to

              WESTERN TRUCK MANPOWER, INC.
              1360 Lincoln Avenue
              San Rafael, California

as an "Insured" as defined in the policy but only in regard to
those claims arising out of the services of truck drivers and
helpers supplied by WESTERN TRUCK MANPOWER, INC. to the Named
Insured in connection with its trucking operations.

TRK0000123

PR0779

PR01179

Appellant's Appendix 02274
JA04707
TRUCK0000528



Effective: August 12, 1968

Policy #350-40-00
Endorsement #33

## KAISER CEMENT & GYPSUM CORPORATION

### ENDORSEMENT CANCELLING ENDORSEMENTS

In consideration of the premium, it is agreed that the following Endorsements are cancelled from this policy:

Endorsement #31 – Coastwide Leasing Company
Endorsement #32 – Western Truck Manpower, Inc.

Countersigned

TRK0000124

PR0780

PR01180

Appellant's Appendix
JA04708
TRUCK0000529



Effective: October 1, 1968

Policy #350-40-00
Endorsement #34

### KAISER CEMENT & GYPSUM CORPORATION

### AMENDATORY ENDORSEMENT

In consideration of the premium it is agreed that Section IV, Policy Period, Territory, Limits, Indemnity and Defense Paragraph B Limits (2) as pertains to Coverage E and F is amended to read:

Coverage E    $100,000 each person
$100,000 aggregate

Coverage F    $100,000 each person
$100,000 aggregate

TRK0000125

PR0781

PR01181

Appellant's Appendix 02276

JA04709
TRUCK0000530

Effective: December 31, 1968

Policy #350-40-00
Endorsement #35

## KAISER CEMENT & GYPSUM CORPORATION, ET AL.

### DEFINITION OF NAMED INSURED
(In Lieu of Endorsement #29)

In consideration of the premium, it is agreed that the Named
Insured in Item 1 of the Declarations is designated as:

KAISER CEMENT & GYPSUM CORPORATION,
COMPANIA INDUSTRIAL KAISER, S.A.,
GLACIER SAND & GRAVEL COMPANY,
GYPSUM CARRIER, INC. OF PANAMA, R.P.,
KAISER GYPSUM COMPANY, INC.,
KAISER OKINAWA CO. LTD.,
PERMANENTE STEAMSHIP CORPORATION,
PERMANENTE TRUCKING COMPANY,
SOUTHWEST MATERIALS, INC.
TEXAS READY MIX,
ALBA GYPSUM COMPANY, LTD., and

(1) Any Division or Subsidiary Company;
(2) Any Divisions or Subsidiaries of (1) above;
(3) Any Company under the Named Insured's control
    or of which it assumes active management;
(4) Any Partnership or Joint Venture under the
    operational control or sponsorship of (1), (2) or
    (3) above.

Countersigned

TRK0000126

PR0782

PR01182

Appellant's Appendix 04710

TRUCK0000531



Effective: January 1, 1969                    Policy #350-40-00
                                              Endorsement #36

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

PREMIUM ADJUSTMENT ENDORSEMENT

DEPOSIT PREMIUM to be maintained: $4,725.00.

A. As respects the first $20,000. aggregate liability from one occurrence, it
   is agreed that on or before the 25th day of January 1970, the Named Insured
   shall render to the Company a statement showing the total remuneration
   earned by its employees during the period January 1, 1969 to January 1, 1970
   (being the amount of remuneration upon which the Named Insured's Workmen's
   Compensation premium for the same period is predicated including similarly
   adjusted payroll in states where Workmen's Compensation is self-insured or
   insured in a State Fund), and the earned premium shall be computed at the
   following rates per $100.00 of the total remuneration so reported:

                    Standard        (Basic)
                     $.180          ($.120)

B. Such earned premium shall be payable to the Company forthwith and shall be
   subject to such adjustments as are provided for in that certain Premium
   Determination Agreement entered into between the Named Insured and the Ex-
   change effective January 1, 1969.

C. For policy limits in excess of $20,000. aggregate as respects any one
   occurrence, and not subject to adjustment under said Premium Determination
   Agreement, premium shall be payable at the rate of $.050 per $100.00 of the
   total remuneration so reported.

D. Furthermore, the Named Insured shall pay to the Company the sum of $3,500.
   00 on or before the 10th day of each month during the currency of this policy,
   such sums to be credited to the earned premium determined by the premium
   adjustment as provided in Parts A, B and C, above.

E. In addition, the Named Insured will submit a semi-annual report of remunera-
   tion to serve as the basis for any adjustment of the monthly flat charge.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000127

PR0783

PR01183

Appellant's Appendix 02278

JA04711
TRUCK0000532

Effective: January 1, 1969

Policy #350-60-00
Endorsement #37

## KAISER CEMENT & GYPSUM CORPORATION, ET AL:

It is agreed that Section (1) of paragraph (4) under Insuring Agreement III (4), shall be amended to read as follows:

(1) $25,000. shall be deducted (in lieu of any other deductible mentioned in this policy) from the total amount the Company shall become obligated to pay as damages, plus allocated loss adjustment expenses, on behalf of the Insured for each occurrence.

Countersigned

TRAVEL INSURANCE EXCHANGE

TRK0000128

PR0784

PR01184

Appellant's Appendix 02279
JA04712
TRUCK0000533

Effective: January 1, 1969

Policy #350-60-00
Endorsement #38

### KAISER CEMENT & GYPSUM CORPORATION; ET AL.

It is agreed that the first sentence in paragraph one of
Endorsement #5, shall be amended to read as follows:

As respects each occurrence or one malpractice act,
error or mistake regardless of the number of claims
emanating therefrom, the Insured agrees to assume
the first $5,000. and related adjustment expense
under any one or combination of coverages,

Bill A Crow

Countersigned

TRK0000129

PR0785

PR01185

Appellant's Appendix 02280

JA04713
TRUCK0000534

Effective:  January 1, 1969                          Policy #350-40-00
                                                     Endorsement #39

### KAISER CEMENT & GYPSUM CORPORATION, ET AL

### CLARIFICATION ENDORSEMENT

In consideration of the premium, it is agreed that any claim
made in connection with activities and operations which were
conducted prior to January 1, 1969, shall come under the retro-
spective premium determination agreement in force at the time
of the activity or operation giving rise to such claim.

Bill A Cramer
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000130

PR0786

PR01186

Appellant's Appendix JA04714
TRUCK0000535

Effective:  March 26, 1969

Policy #350-40-00
Endorsement #40

## KAISER CEMENT & GYPSUM CORPORATION, ET AL

### DEFINITION OF NAMED INSURED
(In Lieu of Endorsement #35)

It is agreed that the Named Insured in Item 1 of the Declarations shall
be designated as:

KAISER CEMENT & GYPSUM CORPORATION,
COMPANIA OCCIDENTAL MEXICANA, S.A.,
COMPANIA INDUSTRIAL KAISER, S.A.,
GLACIER SAND & GRAVEL COMPANY,
GYPSUM CARRIER, INC. OF PANAMA, R.P.
KAISER GYPSUM COMPANY, INC.,
OKINAWA KAISER COMPANY, LTD.
PERMANENTE STEAMSHIP CORPORATION,
PERMANENTE TRUCKING COMPANY,
SOUTHWEST MATERIALS, INC.,
TEXAS READY MIX,
ALBA GYPSUM COMPANY, LIMITED
KAISER URBAN CORPORATION,
PACIFIC GYPSUM COMPANY, and
(1) Any Division or Subsidiary Company;
(2) Any Divisions or Subsidiaries of (1) above;
(3) Any Company under the Named Insured's control
    or of which it assumes active management;
(4) Any Partnership or Joint Venture under the
    operational control or sponsorship of (1), (2) or
    (3) above.

*Bill A. Cramer*
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000131

PR0787

PR01187

Appellant's Appendix 02282
JA04715
TRUCK0000536

Effective: August 19, 1969

Policy #350-40-00
Endorsement #41

KAISER CEMENT & GYPSUM CORPORATION, ET AL.

ADDITIONAL INSURED - DR. G. GORDON HALLIDAY

In consideration of the premium, it is agreed that such insurance as is
afforded by this policy for Bodily Injury and Property Damage Liability
coverages is hereby extended to apply to

DR. G. GORDON HALLIDAY
778 ALTOS OAKS DRIVE
LOS ALTOS, CALIFORNIA

as an "Insured" as defined in the policy, but only as respects claims
arising out of medical services performed for the Named Insured at their
Permanente Plant.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000132

PR0788

PR01188

Appellant's Appendix 02283

JA04716

TRUCK0000537



Policy #350-60-00
Endorsement #62

Effective Date: 12-1-69

## KAISER CEMENT & GYPSUM CORPORATION, ET AL

It is hereby agreed that Agreement IV A(4) as shown on page 5
of the policy shall be amended to read as follows:

## IV. POLICY PERIOD TERRITORY, LIMITS, INDEMNITY AND DEFENSE:

(4)   arise out of the ownership, maintenance or use of the vessels
called "Angelito" and "Theresa", except that the insurance
afforded by the policy shall be excess of coverage afforded
under Policy No. J.M.B. 138 of LaInteramericana, S.A. Compania
de Seguros or any renewals or replacements thereof.

Countersigned

TRK0000133

PR0789

PR01189

Appellant's Appendix 02284
JA04717
TRUCK0000538

Effective: January 19, 1970

Policy #350-40-00
Endorsement #43

Corrected

## KAISER CEMENT & GYPSUM CORPORATION, ET AL

### DEFINITION OF NAMED INSURED
(In Lieu of Endorsement #40)

It is agreed that the Named Insured in Item 1 of the Declarations shall be designated as:

KAISER CEMENT & GYPSUM CORPORATION,
COMPANIA OCCIDENTAL MEXICANA, S.A.
COMPANIA INDUSTRIAL KAISER, S.A.
GLACIER SAND & GRAVEL COMPANY,
GYPSUM CARRIER, INC., OF PANAMA, R.P.
KAISER GYPSUM COMPANY, INC.,
OKINAWA KAISER CO., LTD.,
PACIFIC GYPSUM COMPANY
PERMANENTE STEAMSHIP CORPORATION,
PERMANENTE TRUCKING COMPANY
SOUTHWEST MATERIALS, INC.,
TEXAS READY MIX,
ALBA GYPSUM COMPANY, LTD.,
KAISER URBAN CORPORATION,
KAISER INTERNATIONAL SERVICES, INCORPORATED, AND
(1) Any Division or Subsidiary Company
(2) Any Divisions or Subsidiaries of (1) above;
(3) Any Company under the Named Insured's control
    or of which it assumes active management;
(4) Any Partnership or joint Venture under the
    operational control or sponsorship of (1), (2) or
    (3) above.

_Ecil A Crane_
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000134

PR0790

PR01190

TRIAL EX. 301
Page 64

Appellant's Appendix 0JA04718

TRUCK0000539



Effective June 1 1972                          Policy 817 40 A
                                               . Accrew. Ent  44

LLOY'S. OF NEW & COMPANY 1982 WATERS DATA

PREMIUM ADJUSTMENT ENDORSEMENT

It is agreed that paragraphs 2 and 3 of policy endorsement #36 are amended as follows

. For policy limits in excess of $25,000.00 aggregate as respects any one occurrence, and not subject to adjustment under said terms... determination a recent. premium will be payable at the rate of $0.0?s per $100.00 of the total remuneration so reported.

.. Furthermore, the named insured shall pay to the Company the sum of $6 500.00 on or before the last day of each month during the currency of this policy, such sums to be credited to the earned premium determined by the premium adjustment as provided in Parts A. B and C. above.

Countersigned

TRK0000135

PR0791

PR01191

TRIAL EX. 301
Page 65

Appellant's Appendix 02286

JA04719
TRUCK0000540

Effective:  January 1, 1971                    Policy #350-40-00
                                               Endorsement #65

KAISER CEMENT & GYPSUM CORPORATION, ET AL
PREMIUM ADJUSTMENT ENDORSEMENT

DEPOSIT PREMIUM to be maintained:  $4,725.00

A.  As respects the first $25,000 aggregate liability from one occurrence, it
    is agreed that on or before the 25th day of January 1972, the Named Insured
    shall render to the Company a statement showing the total remuneration
    earned by its employees during the period January 1, 1971 to January 1,
    1972 (being the amount of remuneration upon which the Named Insured's
    Workmen's Compensation premium for the same period is predicated including
    similarly adjusted payroll in states where Workmen's Compensation is self-
    insured or insured in a State Fund), and the earned premium shall be
    computed at the following rates per $100.00 of the total remuneration so
    reported:

                   Standard                    (Basic)
                   $.269                       ($.166)

B.  Such earned premium shall be payable to the Company forthwith and shall
    be subject to such adjustments as are provided for in that certain Premium
    Determination Agreement entered into between the Named Insured and the
    Exchange effective January 1, 1969.

C.  For policy limits in excess of $25,000 aggregate as respects any one
    occurrence, and not subject to adjustment under said Premium Determination
    Agreement, premium shall be payable at the rate of $.094 per $100.00 of
    the total remuneration so reported.

D.  Furthermore, the Named Insured shall pay to the Company the sum of $6,000
    on or before the 10th day of each month during the currency of this policy,
    such sums to be credited to the earned premium determined by the premium
    adjustment as provided in Parts A, B and C, above.

E.  In addition, the Named Insured will submit a semi-annual report of
    remuneration to serve as the basis for any adjustment of the monthly flat
    charge.

                              Countersigned

                                             FIRE INSURANCE EXCHANGE

TRK0000136

PR0792

PR01192

TRIAL EX. 301
Page 66

Appellant's Appendix JA04720
TRUCK0000541

Effective:  January 1, 1971

Policy #350-40-00
Endorsement #46

## KAISER CEMENT & GYPSUM CORPORATION, ET AL

### EXCLUSION
[Contamination or Pollution—Description of Operations]

ET-308

This endorsement becomes a part of your policy effective from its date of issue unless the policy is being renewed, in which event this endorsement becomes effective with the date shown on the enclosed renewal notice.

Except with respect to the ownership, maintenance or use of any automobile, it is agreed that the insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental. However, if, with respect to operations described in this endorsement there is a discharge, dispersal, release or escape of oil or other petroleum substance or derivative (including any oil refuse or oil mixed with wastes) into or upon any watercourse or body of water, the insurance does not apply to bodily injury or property damage arising out of such discharge, dispersal, release or escape whether or not sudden and accidental.

Description of Operations

- Gas Lease Operators—natural gas
- Gasoline Recovery—from casing head or natural gas
- Non-operating working interest
- Oil or Gas Well foundry
- Oil or Gas Well—cutoffing
- Oil or Gas Wells—cementing
- Oil or Gas Wells—cleaning or reabbing—by contractors
- Oil or Gas Well—drilling or redrilling, installation or recovery of casing
- Oil or Gas Well—instrument logging or survey work in wells
- Oil or Gas Well—perforating of casing
- Oil Lease Operators
- Oil Pipe Lines—operation, including maintenance
- Oil Rig or Derrick Erecting or Dismantling—wood or metal—including construction of foundations or structures or installation of equipment

This endorsement becomes part of the policy to which it is attached and supersedes and controls anything in the policy contrary hereto, but is otherwise subject to the Declarations, Insuring Agreements, Exclusions and Conditions thereof.

TRUCK INSURANCE EXCHANGE, by Truck Underwriters Association, Attorney-in-fact
MID-CENTURY INSURANCE COMPANY

Secretary

W. J. Baddock
President

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000137

PR0793

PR01193

FIRST ADDENDUM

TO

PREMIUM DETERMINATION AGREEMENT

This Addendum attaches to, and forms a part of that certain Premium
Determination Agreement entered into between "Truck Insurance
Exchange" hereinafter referred to as the "Exchange" and

KAISER CEMENT & GYPSUM CORPORATION

hereinafter referred to as the "Insured" on January 1, 1969.

It is hereby agreed that as and from January 30, 1971, Condition
4, (h) Retrospective Retention of the Agreement shall be amended
to read:

(h)  RETROSPECTIVE RETENTION - For purposes of premium
determination in accordance with this agreement,
the aggregate of actual paid losses and reserves
for unpaid losses arising out of any single occur-
rence or accident chargeable to "Incurred Losses"
shall not exceed $65,000, which sum shall be de-
fined as the "Retrospective Retention". No Adjust-
ment Expense shall be included in determining the
amount of any loss for purposes of the Retrospec-
tive Retention.

All other terms and conditions of the Agreement shall remain
unchanged.

Executed at Los Angeles, California.  Dated February 3, 1971

TRUCK INSURANCE EXCHANGE
Truck Underwriters Association, Attorney-in-Fact

By _____

Accepted for the Insured

By _____

Title _____

TRK0000138

PR0794

PR01194

Appellant's Appendix 02289

JA04722

TRUCK0000543

Effective: January 30, 1971

Policy #350-40-00
Endorsement #47

## KAISER CEMENT & GYPSUM CORPORATION, ET AL
## PREMIUM ADJUSTMENT ENDORSEMENT

DEPOSIT PREMIUM to be maintained: $4,725.00

A. As respects the first $50,000 aggregate liability from one occurrence, it is agreed that on or before the 25th day of January 1972, the Named Insured shall render to the Company a statement showing the total remuneration earned by its employees during the period January 30, 1971 to January 1, 1972 (being the amount of remuneration upon which the Named Insured's Workmen's Compensation premium for the same period is predicated including similarly adjusted payroll in states where Workman's Compensation is self-insured or insured in a State Fund), and the earned premium shall be computed at the following rates per $100.00 of the total remuneration so reported:

| Standard | (Basic) |
|----------|---------|
| $.307 | ($.205) |

B. Such earned premium shall be payable to the Company forthwith and shall be subject to such adjustments as are provided for in that certain Premium Determination Agreement entered into between the Named Insured and the Exchange effective January 1, 1969.

C. For policy limits in excess of $50,000 aggregate as respects any one occurrence, and not subject to adjustment under said Premium Determination Agreement, premium shall be payable at the rate of $.109 per $100.00 of the total remuneration so reported.

D. Furthermore, the Named Insured shall pay to the Company the sum of $6,000 on or before the 10th day of each month during the currency of this policy, such sums to be credited to the earned premium determined by the premium adjustment as provided in Parts A, B and C, above.

E. In addition, the Named Insured will submit a semi-annual report of remuneration to serve as the basis for any adjustment of the monthly flat charge.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000139

PR0795

PR01195

Appellant's Appendix 02290
JA04723
TRUCK0000544

Effective: January 30, 1971                 Policy #350-40-00
                                            Endorsement #48

KAISER CEMENT & GYPSUM CORPORATION, ET AL

LIMIT OF LIABILITY ENDORSEMENT

Subject to all of the policy provisions having reference thereto, the
limit of the company's liability as respects any one occurrence involving
one or any combination of the hazards or perils insured against shall not
exceed $500,000 aggregate sum.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000140

PR0796

PR01196

Appellant's Appendix 02291

JA04724

TRUCK0000545

Effective: January 30, 1971

Policy #350-40-00
Endorsement #49

In consideration of the premium, it is agreed that the Declarations are amended as follows:

## DECLARATIONS

Item 1. Named Insured:  KAISER CEMENT & GYPSUM CORPORATION and SUBSIDIARIES
         Address:    300 Lakeside Drive
                     Oakland, California 94612

Legal Entity :  Corporations

Business     :  Manufacture and sale of Construction and
                Building Materials.

Item 2. Effective   :  From January 30, 1971 at 12:01 A.M. until cancelled,
                       Standard Time at the address of the Named Insured
                       as stated herein.

Item 3. Coverages   :  A.  Bodily Injury Liability - Automobile
                       B.  Bodily Injury Liability - Except Automobile
                       C.  Property Damage Liability - Automobile
                       D.  Property Damage Liability - Except Automobile
                       E.  Professional Liability
                       F.  Personal Injury Liability
                       G.  Employee Benefits Liability

Item 4. Limits of
         Liability   :  $500,000. aggregate each occurrence involving
                        one or any combination of the hazards
                        or perils insured against

Place of Issuance   :  Los Angeles, California

Date of Issuance    :  April 14, 1971

Countersigned - Authorized Representative

TRUCK INSURANCE EXCHANGE

TRK0000141

PR0797

PR01197

NOTICE OF CANCELLATION AND REISSUANCE
ENDORSEMENT

KAISER CEMENT & GYPSUM CORP.
300 Lakeside Drive
Oakland, Cal. 94612

Eng. #30
J50-44-00

October 1, 1971

November 1, 1971

In consideration of the acceptance and retention of this notice by the named insured, it is agreed that the policy to which it is attached is cancelled effective at 12.01 A.M., Standard Time, on the effective date shown above. Said policy is thereafter reissued on the same date and time for a term of one month which term shall expire at 12.01 A.M., Standard Time, at the address of the named insured as stated herein on the expiration date shown above. The policy may be renewed for an additional term of one month each time the Company offers to renew by sending an invoice, and the insured pays the required renewal premium.

Accepted by _____

EFFECTIVE (if no other time stated: 12.01 A.M.) on the effective date shown above, this endorsement, when countersigned, becomes part of the above numbered policy issued by the Company designated in the Declarations, and supersedes and controls anything in the policy contrary hereto but is otherwise subject to the Declarations, Insuring Agreements, Exclusions and Conditions thereof.

Countersigned _____
AUTHORIZED REPRESENTATIVE

TRK0000142

PR0798

PR01198

Appellant's Appendix
JA04723
TRUCK0000547

Endorsement #51
Policy #350-40-00

Effective:  May 20, 1971

### KAISER CEMENT & GYPSUM CORPORATION, ET AL

#### DEFINITION OF NAMED INSURED
(In Lieu of Endorsement (43))

It is agreed that the Named Insured in Item #1 of the Declarations shall be de-
signated as:-

> KAISER CEMENT & GYPSUM CORPORATION,
> COMPANIA INDUSTRIAL KAISER, S. A.,
> GLACIER SAND & GRAVEL COMPANY,
> GYPSUM CARRIER, INC. OF PANAMA, R. P.,
> ASIAN CARRIERS, INC.,
> KAISER GYPSUM COMPANY, INC.,
> KAISER OKINAWA CO., LTD.,
> PERMANENTE STEAMSHIP CORPORATION,
> PERMANENTE TRUCKING COMPANY,
> SOUTHWEST MATERIALS, INC.,
> TEXAS READY MIX,
> ALBA GYPSUM COMPANY, LTD.,
> KAISER WERAN CORPORATION,
> KAISER INTERNATIONAL SERVICES, INCORPORATED, AND
> (1)  Any Division or Subsidiary Company
> (2)  Any Divisions or Subsidiaries of (1) above;
> (3)  Any Company under the Named Insured's control
>      or of which it assumes active management;
> (4)  Any Partnership or Joint Venture under the
>      operational control or sponsorship of (1), (2)
>      or (3) above.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000143

PR0799

PR01199

Appellant's Appendix 02294
JA04727
TRUCK0000548

Effective: May 20, 1971

Endorsement #52
Policy #350-40-00

KAISER CEMENT & GYPSUM CORPORATION, ET AL

DEFINITION OF NAMED INSURED
(In Lieu of Endorsement #51)

It is agreed that the Named Insured in Item #1 of the Declarations shall be
designated as:

KAISER CEMENT & GYPSUM CORPORATION,
COMPANIA INDUSTRIAL KAISER, S. A.,
GLACIER SAND & GRAVEL COMPANY,
GYPSUM CARRIER, INC. OF PANAMA, R. P.,
ASIAN CARRIERS, INC.,
KAISER GYPSUM COMPANY, INC.,
KAISER OKINAWA CO., LTD.
PERMANENTE STEAMSHIP CORPORATION,
PERMANENTE TRUCKING COMPANY,
SOUTHWEST MATERIALS, INC.,
TEXAS READY MIX,
ALBA-GYPSUM COMPANY, LTD.,
KAISER URBAN CORPORATION,
KAISER BRAMALEA CORPORATION (effective 2-5-71)
KAISER INTERNATIONAL SERVICES, INCORPORATED, AND
(1) Any Division or Subsidiary Company
(2) Any Divisions or Subsidiaries of (1) above;
(3) Any Company under the Named Insured's control
    or of which it assumes active management;
(4) Any Partnership or Joint Venture under the
    operational control or sponsorship of (1), (2)
    or (3) above.

Countersigned

TRK0000144

PR0800

PR01200

Appellant's Appendix 04628
TRUCK0000549

Effective: January 1, 1972                    Endorsement #53
                                              Policy #350-40-00

KAISER CEMENT & GYPSUM CORPORATION, ET AL

DEFINITION OF NAMED INSURED

It is agreed that the Named Insured in Item #1 of the Declarations
shall be designated as:

        KAISER CEMENT & GYPSUM CORPORATION,
        KAISER ARAMALEA CORPORATION,
        GLACIER SAND & GRAVEL COMPANY,
        GYPSUM CARRIER, INC, OF PANAMA, R.P.
        KAISER GYPSUM COMPANY, INC.,
        PACIFIC GYPSUM COMPANY,
        PERMANENTE STEAMSHIP CORPORATION,
        PERMANENTE TRUCKING COMPANY,
        SOUTHWEST MATERIALS, INC.,
        TEXAS READY MIX,
        ALBA GYPSUM COMPANY, LTD.,
        KAISER URBAN CORPORATION,
        KAISER INTERNATIONAL SERVICES, INCORPORATED,
        ASIAN CARRIERS, INC.,
        COMPANIA OCCIDENTAL MEXICANA, S.A.,
        OKINAWA KAISER COMPANY, LTD.,
        COMPANIA INDUSTRIAL KAISER, S.A.,
        RYUKYU CEMENT COMPANY, LTD.,
        P. Z. SEMEN TJIBINONG, and
        (1) Any Division or Subsidiary Company
        (2) Any Divisions or Subsidiaries or (1) above;
        (3) Any Company under the Named Insured's control
            or of which it assumes active management;
        (4) Any Partnership or Joint Venture under the
            operational control or sponsorship of (1),
            (2) or (3) above.

_____
Countersigned

TRK0000145

PR0801

PR01201

Appellant's Appendix 02296
JA04729
TRUCK0000550

Effective: January 1, 1972

Policy #35D-40-00
Endorsement #54

## KAISER CEMENT & GYPSUM CORPORATION, ET AL
## PREMIUM ADJUSTMENT ENDORSEMENT

DEPOSIT PREMIUM to be maintained: $4,725.00

A.  As respects the first $5,000 aggregate liability from one occurrence, it is
agreed that on or before the 25th day of January 1973, the Named Insured
shall render to the Company a statement showing the total remuneration
earned by its employees during the period January 1, 1972 to January 1, 1973
(being the amount of remuneration upon which the Named Insured's Workmen's
Compensation for the same period is predicated including similarly adjusted
payroll in states where Workmen's Compensation is self-insured or insured
in a State Fund), and the earned premium shall be computed at the rate of
$0.050 per $100.00 of the total remuneration so reported.

B.  As respects $45,000 aggregate liability from one occurrence, in excess of
$5,000 aggregate liability per occurrence, the earned premium shall be
computed at the following rates per $100.00 of the total remuneration so
reported:

| Standard | Basic |
|----------|-------|
| $.300    | $.200 |

C.  Such earned premium shall be payable to the Company forthwith and shall be
subject to such adjustments as are provided for in that certain Premium
Determination Agreement entered into between the Named Insured and the
Exchange effective January 1, 1972.

D.  For policy limits in excess of $50,000 aggregate as respects any one
occurrence, and not subject to adjustment under said Premium Determination
Agreement, premium shall be payable at the rate of $.110 per $100.00 of
the total remuneration so reported.

E.  Furthermore, the Named Insured shall pay to the Company the sum of $27,000
each quarter on or before the 10th day of the month following each such
quarter during the currency of this policy, such sums to be credited to the
earned premium determined by the premium adjustment as provided in Parts A,
B, C, and D above.

F.  In addition, the Named Insured will submit a semi-annual report of
remuneration to serve as the basis for any adjustment of the monthly flat
charge.

*Superseded by*
*Endt. 58*

Countersigned

TRK0000146

PR0802

PR01202

JA04730
TRUCK0000551



Endorsement #55
Policy #350-60-00

April 1, 1972

KAISER CEMENT & GYPSUM CORPORATION et al.

In consideration of the premium it is agreed that the
name of KAISER BRAMALEA CORPORATION is hereby changed to
KAISER PACIFIC DEVELOPMENT CORPORATION.

Countersigned

TRK0000147

PR0803

PR01203

Effective: January 26, 1972                Endorsement #56
                                           Policy #350-40-00

KAISER CEMENT & GYPSUM CORPORATION, ET AL

DEFINITION OF NAMED INSURED

It is agreed that the Named Insured in Item #1 of the Declarations
shall be designated as:

            KAISER CEMENT & GYPSUM CORPORATION,
            KAISER PACIFIC DEVELOPMENT CORPORATION,
            GLACIER SAND & GRAVEL COMPANY,
            GYPSUM CARRIER, INC. OF PANAMA, R.P.
            KAISER GYPSUM COMPANY, INC.
            PACIFIC GYPSUM COMPANY,
            PERMANENTE STEAMSHIP CORPORATION,
            PERMANENTE TRUCKING COMPANY,
            SOUTHWEST MATERIALS, INC.,
            TEXAS READY MIX,
            ALBA GYPSUM COMPANY, LTD.,
            KAISER PACIFIC PROPERTIES CORPORATION
            KAISER URBAN CORPORATION,
            KAISER INTERNATIONAL SERVICES, INCORPORATED,
            ASIAN CARRIERS, INC.,
            COMPANIA OCCIDENTAL MEXICANA, S.A.,
            OKINAWA KAISER COMPANY, LTD.,
            COMPANIA INDUSTRIAL KAISER, S.A.,
            RYUKYU CEMENT COMPANY, LTD.,
            P.T. SEMEN TJIBINONG, and
            (1)  Any Division or Subsidiary Company
            (2)  Any Divisions or Subsidiaries or (1) above;
            (3)  Any Company under the Named Insured's control
                 or of which it assumes active management;
            (4)  Any Partnership or Joint Venture under the
                 operational control or sponsorship of (1),
                 (2) or (3) above.

Countersigned

TOWER INSURANCE EXCHANGE

TRK0000148

PR0804

PR01204

Appellant's Appendix JA04732
TRUCK0000553



Effective: January 26, 1972                    Endorsement #36
                                               Policy #350-40-00

## KAISER CEMENT & GYPSUM CORPORATION, ET AL

## DEFINITION OF NAMED INSURED

It is agreed that the Named Insured in Item #1 of the Declarations
shall be designated as:

        KAISER CEMENT & GYPSUM CORPORATION,
        KAISER PACIFIC DEVELOPMENT CORPORATION,
        GLACIER SAND & GRAVEL COMPANY,
        GYPSUM CARRIER, INC. OF PANAMA, R.P.
        KAISER GYPSUM COMPANY, INC.
        PACIFIC GYPSUM COMPANY,
        PERMANENTE STEAMSHIP CORPORATION,
        PERMANENTE TRUCKING COMPANY,
        SOUTHWEST MATERIALS, INC.,
        TEXAS READY MIX,
        ALBA GYPSUM COMPANY, LTD.,
        KAISER PACIFIC PROPERTIES CORPORATION
        KAISER URBAN CORPORATION,
        KAISER INTERNATIONAL SERVICES, INCORPORATED,
        ASIAN CARRIERS, INC.,
        COMPANIA OCCIDENTAL MEXICANA, S.A.,
        OKINAWA KAISER COMPANY, LTD.,
        COMPANIA INDUSTRIAL KAISER, N.A.,
        KYUKYU CEMENT COMPANY, LTD.,
        P.T. SEMEN TJIBINONG, and
        (1)  Any Division or Subsidiary Company
        (2)  Any Divisions or Subsidiaries of (1) above;
        (3)  Any Company under the Named Insured's control
             or of which it assumes active management;
        (4)  Any Partnership or Joint Venture under the
             operational control or sponsorship of (1),
             (2) or (3) above.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000149

PR0805

PR01205

Appellant's Appendix 02300

JA04733
TRUCK0000554

Policy #350-40-00
Endorsement #57

Effective: May 15, 1972

KAISER CEMENT & GYPSUM CORPORATION, ET AL

ADDITIONAL INSURED - ACE BARGE COMPANY, ET AL
(In Lieu of Endorsement #17 Amended dated December 1, 1969)

In consideration of the premium, it is agreed that such insurance as is
afforded by this policy for Bodily Injury and Property Damage Liability
coverages is hereby extended to apply to

ACE BARGE COMPANY and
CROWLEY LAUNCH and TUGBOAT COMPANY
and Affiliated and Inter-related Companies
including vessels
Pier 32, San Francisco, California

as an "Insured" as defined in the policy, but only as respects claims
arising out of the operation, maintenance or use of barges while said
barges are leased to Kaiser Cement & Gypsum Corporation or Permanente
Steamship Corporation.

It is further agreed that with respect to the towing agreement between
the insured and Crowley Launch & Tugboat Co. as respects towage of the
barges, "Permanente 272" and "Seward", that notwithstanding any implied
warranties by either party, of workmanlike service or otherwise, it is
agreed that all loss, damage and liability which may result from joint
or concurrent negligence or other fault by both parties shall be borne
and/or allocated by and/or between them in accordance with maritime
principles of mutual fault, as if no such warranties existed.

COUNTERSIGNED

TRK0000150

PR0806

PR01206

Appellant's Appendix    JA04734
TRUCK0000555

Effective: January 1, 1973

Policy #350-60-00
Endorsement #58

### KAISER CEMENT & GYPSUM CORPORATION, ET AL
### PREMIUM ADJUSTMENT ENDORSEMENT

DEPOSIT PREMIUM to be maintained: $16,000.00

A.  As respects the first $5,000 aggregate liability from one occurrence, it is agreed that on or before the 25th day of January 1974, the Named Insured shall render to the Company a statement showing the total remuneration earned by its employees during the period January 1, 1973 to January 1, 1974 (being the amount of remuneration upon which the Named Insured's Workmen's Compensation for the same period is predicated including similarly adjusted payroll in states where Workmen's Compensation is self-insured or insured in a State Fund), and the earned premium shall be computed at the rate of $0.030 per $100.00 of the total remuneration so reported.

B.  As respects $45,000 aggregate liability from one occurrence, in excess of $5,000 aggregate liability per occurrence, the earned premium shall be computed at the following rates per $100.00 of the total remuneration so reported:

|  Standard  |  Basic  |
|------------|---------|
|  $.225     |  $.150  |

C.  Such earned premium shall be payable to the Company forthwith and shall be subject to such adjustments as are provided for in that certain Premium Determination Agreement entered into between the Named Insured and the Exchange effective January 1, 1972.

D.  For policy limits in excess of $50,000 aggregate any one occurrence, and not subject to adjustment under said Premium Determination Agreement, premium shall be payable at the rate of $.150 per $100.00 of the total remuneration so reported.

E.  Furthermore, the Named Insured shall pay to the Company the sum of $27,000 each quarter on or before the 10th day of the month following each such quarter during the currency of this policy, such sums to be credited to the earned premium determined by the premium adjustment as provided in Parts A, B, C, and D above.

F.  In addition, the Named Insured will submit a semi-annual report of remuneration to serve as the basis for any adjustment of the monthly flat charge.

Countersigned

TRK0000151

PR0807

PR01207

Appellant's Appendix 02302

JA04735
TRUCK0000556

Effective: October 18, 1972

Endorsement #59
Policy #350-60-00

## KAISER CEMENT & GYPSUM CORPORATION, ET AL

### DEFINITION OF NAMED INSURED

It is agreed that the Named Insured in Item #1 of the Declarations shall be designated as:

KAISER CEMENT & GYPSUM CORPORATION,
KAISER PACIFIC DEVELOPMENT CORPORATION, *delete*
GLACIER SAND & GRAVEL COMPANY,
GYPSUM CARRIER, INC. OF PANAMA, R.P.
KAISER GYPSUM COMPANY, INC.
PACIFIC GYPSUM COMPANY,
PERMANENTE STEAMSHIP CORPORATION,
PERMANENTE TRUCKING COMPANY,
SOUTHWEST MATERIALS, INC.,
TEXAS READY MIX,
AMISTAD FUEL COMPANY,
ALBA GYPSUM COMPANY, LTD.,
KAISER PACIFIC PROPERTIES CORPORATION
KAISER URBAN CORPORATION,
KAISER INTERNATIONAL SERVICES, INCORPORATED,
ASIAN CARRIERS, INC.,
COMPANIA OCCIDENTAL MEXICANA, S.A.,
OKINAWA KAISER COMPANY, LTD.,
COMPANIA INDUSTRIAL KAISER, S.A.,
RYUKYU CEMENT COMPANY, LTD.,
P.T. SEMEN TJIBINONG, AND    CIBINONG
(1)  Any Division or Subsidiary Company
(2)  Any Divisions or Subsidiaries of (1) above;
(3)  Any Company under the Named Insured's control
     or of which it assumes active management;
(4)  Any Partnership or Joint Venture under the
     operational control or sponsorship of (1),
     (2) or (3) above.

Countersigned

TRK0000152

PR0808

PR01208

TRIAL EX. 301
Page 82

Appellant's Appendix 02804736
TRUCK0000557

Effective: September 11, 1973

Endorsement #60
Policy #350-40-00

## KAISER CEMENT & GYPSUM CORPORATION, ET AL

### DEFINITION OF NAMED INSURED

It is agreed that the Named Insured in Item #1 of the Declarations shall be designated as:

KAISER CEMENT & GYPSUM CORPORATION,
KAISER PACIFIC DEVELOPMENT CORPORATION,
GLACIER SAND & GRAVEL COMPANY,
GYPSUM CARRIER, INC. OF PANAMA, R.P.
KAISER GYPSUM COMPANY, INC.,
PACIFIC GYPSUM COMPANY,
PERMANENTE STEAMSHIP CORPORATION,
PERMANENTE TRUCKING COMPANY,
SOUTHWEST MATERIALS, INC.,
TEXAS READY MIX,
AMISTAD FUEL COMPANY,
ALBA GYPSUM COMPANY, LTD.,
BANITVOGLIO PAPER STOCK COMPANY,
KAISER PACIFIC PROPERTIES CORPORATION,
KAISER URBAN CORPORATION,
KAISER INTERNATIONAL SERVICES, INCORPORATED,
ASIAN CARRIERS, INC.,
COMPANIA OCCIDENTAL MEXICANA, S.A.,
OKINAWA KAISER COMPANY, LTD.,
COMPANIA INDUSTRIAL KAISER, S.A.,
RYUKYU CEMENT COMPANY, LTD.,
P.T. SEMEN DJIWABIONG, AND
(1) Any Division or Subsidiary Company
(2) Any Divisions or Subsidiaries of (1) above;
(3) Any Company under the Named Insured's control or of which it assumes active management;
(4) Any Partnership or Joint Venture under the operational control or sponsorship of (1), (2) or (3) above.

David T. Keating
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000153

PR0809

PR01209

Effective: January 1, 1974

Policy #350-40-00
Endorsement #61

## KAISER CEMENT & GYPSUM CORPORATION, ET AL
## PREMIUM ADJUSTMENT ENDORSEMENT

DEPOSIT PREMIUM to be maintained: $16,000.00

A. As respects the first $5,000 aggregate liability from one occurrence, it is agreed that on or before the 25th day of January 1975, the Named Insured shall render to the Company a statement showing the total remuneration earned by its employees during the period January 1, 1974 to January 1, 1975 (being the amount of remuneration upon which the Named Insured's Workmen's Compensation for the same period is predicated including similarly adjusted payroll in states where Workmen's Compensation is self-insured or insured in a State Fund), and the earned premium shall be computed at the rate of $0.030 per $100.00 of the total remuneration so reported.

B. As respects $45,000 aggregate liability from one occurrence, in excess of $5,000 aggregate liability per occurrence, the earned premium shall be computed at the following rates per $100.00 of the total remuneration so reported:

| Standard | Basic |
|----------|-------|
| $.24 | $.20 |

C. Such earned premium shall be payable to the Company forthwith and shall be subject to such adjustments as are provided for in that certain Premium Determination Agreement entered into between the Named Insured and the Exchange effective January 1, 1972.

D. For policy limits in excess of $50,000 aggregate as respects any one occurrence, and not subject to adjustment under said Premium Determination Agreement, premium shall be payable at the rate of $.150 per $100.00 of the total remuneration so reported.

E. Furthermore, the Named Insured shall pay to the Company the sum of $29,500 each quarter on or before the 10th day of the month following each such quarter during the currency of this policy, such sums to be credited to the earned premium determined by the premium adjustment as provided in Parts A, B, C, and D above.

F. In addition, the Named Insured will submit a semi-annual report of remuneration to serve as the basis for any adjustment of the monthly flat charge.

_David T. Kutey_
Countersigned

TRK0000154

PR0810

PR01210

Appellant's Appendix 02393

JA04738

TRUCK0000559



TRUCK INSURANCE EXCHANGE
4680 Wilshire Boulevard   Los Angeles, California 90010

RETROSPECTIVE PREMIUM DETERMINATION AGREEMENT

PLAN III

WHEREAS the TRUCK INSURANCE EXCHANGE, hereinafter called the "Exchange" has
issued a certain policy of insurance to

KAISER CEMENT & GYPSUM CORPORATION

hereinafter called the "Insured" and

WHEREAS the Exchange and the Insured desire to determine and adjust the earned
premium upon such policy as herein provided;

NOW, THEREFORE, in consideration of the payment of the premium provided for in
said policy and the mutual acceptance of the terms set forth herein, the parties
agree as follows:

1.  PERIOD OF AGREEMENT. This agreement shall take effect   January 1, 1973
    and shall terminate . . . . . . . . . . . . . . .   January 1, 1975
    at 12:01 A.M. Standard Time at the principal office of the Insured as of
    each of said dates, unless terminated earlier by the cancellation of
    said policy or as provided hereinafter in this agreement.

2.  INSURANCE POLICY. This agreement shall apply to policy   350-40-60
    and the earned premium on such policy shall be utilized in computing the
    earned premium under this agreement. The term "Policy" shall include
    "policies" when there are more than one subject to this agreement.

3.  ACCIDENT REPORTS. The Insured agrees to report to the Exchange as soon as
    practicable all accidents or losses insured under said policy.

4.  DEFINITIONS. For the purpose of this agreement the words and phrases set
    forth below shall be defined as follows:

    (a)  STANDARD PREMIUM - The premium computed in accordance with the provis.
         of the policy, other than this agreement.

    (b)  BASIC PREMIUM -   Sixty-six and 66/100ths   per cent (66.66)
         of the Standard Premium.

    (c)  RETROSPECTIVE SURCHARGE -  Fifty and 60/100ths   per cent (50.60)
         of the Basic Premium.

    (d)  SERVICE FEE -   Twenty-three and 19/100ths   per cent (23.19)
         of the Basic Premium.

    (e)  PREMIUM TAXES - The amount of premium taxes required to be paid to any
         state and other governmental bodies on such portion of the premium
         earned on this policy that is subject to adjustment by this agreement.

PRM 111

TRK0000155

PR0811

PR01211

TRIAL EX. 301
Page 85

Appellant's Appendix 02306
JA04739
TRUCK0000560



*incurred*
*+ Service*
*+ Taxes*
*Read from*

(f) RETROSPECTIVE PREMIUM - The earned premium according to this agreement, computed as the sum of the Incurred Losses plus Service Fee, plus Premium Taxes, in no event to exceed the Standard Premium.

*PAID LOSS*
*+ RESERVES*
*+ ADJUST Exp*
*+ IBNR*
*= Incurred*

(g) INCURRED LOSSES - The sum of:
(1) Actual losses paid by the Exchange, including loss adjustment expense, and
(2) Reserves as estimated by the Exchange to liquidate unpaid losses and loss adjustment expense on claims reported to the Exchange, and
(3) Reserves as estimated by the Exchange for unreported losses and loss adjustment expense.

(h) RETROSPECTIVE RETENTION - For purposes of premium determination in accordance with this agreement, the aggregate of actual paid losses and reserves for unpaid losses arising out of any single occurrence or accident chargeable to "Incurred Losses" shall not exceed $ 45,000.  which sum shall be defined as the "Retrospective Retention". No Adjustment Expense shall be included in determining the amount of any loss for purposes of the Retrospective Retention.

(i) ADJUSTMENT EXPENSE - There will be two types of loss adjustment expense which shall be defined and computed as follows:
(1) Allocated Adjustment Expense - Exact items of expense directly incurred by the Exchange and chargeable to a particular claim. (Examples: Legal fees, court costs, medical examiner's fees, photographer bills, etc.)

(2) Unallocated Adjustment Expense - A charge to cover all general claims administration costs. (Examples: Services of salaried adjusters and independent adjusters, claims examiners, clerical service, stationery, office rent, and other overhead items.) The charge to be  17  % of all paid Bodily Injury Liability claims and   8  % of all other paid claims.

5.  DISTRIBUTION OF ADJUSTMENT EXPENSE.  All Adjustment Expense shall be chargeable to Incurred Losses, except as follows:

(a) If the amount of loss from any single occurrence or accident exceeds the amount of the Retrospective Retention,
(1) Allocated Adjustment Expense shall be charged to Incurred Losses in the same proportion that the Retrospective Retention bears to the total amount of the loss; and
(2) No Unallocated Adjustment Expense shall be charged on that portion of any such loss in excess of the Retrospective Retention.

(b) If any claim presented to the Exchange is finally closed without payment,
(1) Any Allocated Adjustment Expense incurred in the settlement of such claim shall be charged to Incurred Losses in an amount not to exceed the amount of the Retrospective Retention as respects all such claims arising out of any single occurrence; and
(2) No Unallocated Adjustment Expense shall be charged for any claim which is settled without payment.

PAM 111

TRK0000156

PR0812

PR01212

Appellant's Appendix 00-         JA04740
TRUCK0000561



6. PREMIUM PAYMENT. Premium for the policy subject to this agreement shall be paid in quarterly installments and, initially, at the Basic rate. Once each quarter period of this agreement a ratio shall be calculated between Incurred Losses, as defined herein, and the premium charged, less premium refunds. As long as the loss ratio so calculated remains at 60% or less, premium shall continue to be paid at the Basic rate.

7. COLLECTION OF RETROSPECTIVE SURCHARGE. At any such quarterly calculation the loss ratio so derived shall exceed 60%, the Insured shall pay upon demand the difference between premium paid for the preceding period or periods and an amount sufficient to bring the loss ratio to 60%, not to exceed the Standard Premium for the period this agreement has been in force, and shall pay premium for succeeding quarterly periods at the Standard rate, but only as long as the loss ratio exceeds 60%.

8. SUSPENSION OF RETROSPECTIVE SURCHARGE. If, at any quarterly calculation, the loss ratio shall fall below 60%, the Basic rate shall be reinstated and the preceding provisions shall apply as from the beginning. Any suspension of collection shall not constitute a waiver of the right to collect the Retrospective Surcharge so suspended; but the suspension shall act only as a postponement of billing until such time as the Surcharge may be required.

9. INTERIM ACCOUNTING. The Exchange shall make a preliminary accounting to the Insured as of the end of the 12-months and 24-months periods of this agreement and at those times, if the Retrospective Premium for the latest 12-months period is less than the total premium paid, the Exchange shall credit the difference to the account of the Insured or will refund such difference at these times to the Insured in accordance with his request.

10. MINIMUM PREMIUM. The minimum earned premium for the period of this agreement shall not be less than the Service Fee plus Premium Taxes.

11. MAXIMUM PREMIUM. The maximum earned premium for the period of this agreement shall not exceed the Standard Premium.

12. COMPUTATION OF PREMIUM. The Retrospective Premium shall be computed as follows:

(a) As of sixty days after the termination of the agreement the Exchange shall make the initial computation of the earned premium.

(b) At intervals of six months, twelve months, twenty-four months and thirty six months after the termination of the agreement the Exchange shall recompute the Retrospective Premium on the basis of the Exchange's determination of the amount of Incurred Losses.

(c) The Retrospective Premium determined by the fifth recomputation shall be the final earned premium for the policy, only by mutual consent of both parties to this agreement.

13. ADJUSTMENT OF PREMIUM. After computing the Retrospective Premium at the 60-day, 6-months, 12-months, 24-months and 36-months periods, and provided the Retrospective Premium for the term of this agreement is less than all premium paid to the Exchange upon said policy, the Exchange shall, after each such computation, credit the excess premium paid to subsequent policies issued to or subsequent premium determination entered into with the Insured, or refund such excess premium to the Insured in accordance with his request.

FDA 111

TRK0000157

PR0813

PR01213

Appellant's Appendix 02308

JA04741
TRUCK0000562



14. REIMBURSEMENT BY INSURED. Upon the making of any settlement prior to the final settlement, if the Retrospective Premium on subsequent premium determination is greater than the Retrospective Premium developed on the last settlement date, the Insured will pay to the Exchange, upon demand, the amount of the difference between the newly-developed Retrospective Premium and the Retrospective Premium developed on the last settlement date.

15. CANCELLATION. This agreement may be cancelled by the Insured, or by the Exchange, at any time, by giving thirty days (30) advance written notice the other party. In event of cancellation the minimum earned premium shall be the Retrospective Premium.

16. POLICY CONDITIONS. Nothing in this agreement shall be construed to any sede, modify or amend any of the terms or conditions of the policies of insurance issued to the Insured and referred to herein, except as respec the determination of the amount and method of premium payable as provide for in this agreement.


Executed at __Los Angeles, California__          Date ___February 8, 1977___


                              TRUCK INSURANCE EXCHANGE
                    Truck Underwriters Association, Attorney-in-Fa

                              By_____
                                      Officer in Charge
                                  National Accounts Division


Accepted for the Insured:

         By _____

         Title _____

PDA 111

TRK000015!

PR0814

PR01214

Appellant's Appendix  JA04742
TRUCK0000563

Effective: January &, 1976

Po. No. 350-40-00
Endorsement #25

KAISER CEMENT & GYPSUM CORPORATION, ET AL

T.I.E. ADMINISTERED DEDUCTIBLE ENDORSEMENT

The Company may pay any part or all of the deductible amount to effect settlement of any claim or suit and, upon notification of the action taken, the Named Insured shall promptly reimburse the Company for such part of the deductible amount as has been paid by the Company. Company shall also be reimbursed for adjustment expenses incurred in settling losses under the deductible amount.

The Company shall tabulate the amounts so paid which are thus recoverable from the Insured and shall bill the Insured monthly for the accumulated total. Reimbursement by the Insured shall be made promptly.

A deposit of $50,000. shall be maintained. As of the end of each third month period the average deductible recoveries will be recomputed and adjustment in the deposit will be made to approximate the average monthly deductible recoveries.

A surety bond in the amount of $150,000., as issued by an insurance institution of the Insured's choice, shall be furnished to the Company as a further guarantee of future reimbursements for these claims and claims adjustment expenses as may be paid under the deductible portion of this policy.

The service charge for administration of the deductible program shall be calculated at a rate of $0.060 per $100 of annual payroll.

There will be two types of loss adjustment expenses which shall be defined and computed as follows:

   1.  Allocated Adjustment Expenses - exact items of expense directly incurred by the Company and chargeable to a particular claim. (Example: legal fees, court costs, medical examiner's fees, photographer bills, etc.)

      Allocated adjustment expense shall be reimbursed in the same proportion that the deductible bears to the total loss.

   2.  Unallocated Adjustment Expense - a charge to cover all general claims administration costs. (Example: services of adjusters, claims examiners, clerical service, stationery, office rent and other overhead items.)

The charge shall be as follows:

   1.  Seventeen (17%) percent of all paid bodily injury claims
   2.  Eight (8%) percent of all other claims

Countersigned: _____


Accepted by: _____
      For Kaiser Cement & Gypsum Corporation
      and all other Named Insureds covered by
      this policy contract

TRK0000159

PR0815

PR01215

Appellant's Appendix 02310
JA04743
TRUCK0000564



Effective: January 1, 1974                     Policy #356-611-00
                                               Endorsement #2

KAISER CEMENT & GYPSUM CORPORATION, ET AL.
PREMIUM ADJUSTMENT ENDORSEMENT

DEPOSIT PREMIUM to be maintained:  $16,000.00

A.   As respects the first $5,000 aggregate liability from one occurrence, it is
     agreed that on or before the 25th day of January 1975, the Named Insured
     shall render to the Company a statement showing the total remuneration
     earned by its employees during the period January 1, 1974 to January 1,
     1975 (being the amount of remuneration upon which the Named Insured's
     Workmen's Compensation for the same period is predicated including similarly
     adjusted payroll in states where Workmen's Compensation is self-insured or
     insured in a State Fund), and the earned premium shall be computed at the
     rate of $0.030 per $100.00 of the total remuneration so reported.

B.   As respects $45,000 aggregate liability from one occurrence, in excess of
     $5,000 aggregate liability per occurrence, the earned premium shall be
     computed at the following rates per $100.00 of the total remuneration so
     reported:

                    Standard          Basic
                    $.76              $.20

C.   Such earned premium shall be payable to the Company forthwith and shall be
     subject to such adjustments as are provided for in that certain Premium
     Determination agreement entered into between the Named Insured and the
     Exchange effective January 1, 1972.

D.   For policy limits in excess of $50,000 aggregate as respects any one
     occurrence, and not subject to adjustment under said Premium Determination
     Agreement, premium shall be payable at the rate of $.150 per $100.00 of
     the total remuneration so reported.

E.   Furthermore, the Named Insured shall pay to the Company the sum of $29,500
     each quarter on or before the 10th day of the month following each such
     quarter during the currency of this policy, such sums to be credited to the
     earned premium determined by the premium adjustment as provided in Parts A,
     B, C, and D above.

F.   In addition, the Named Insured will submit a semi-annual report of
     remuneration to serve as the basis for any adjustment of the monthly flat
     charge.

Countersigned.

TRK0000160

PR0816

PR01216

Appellant's Appendix 04744
TRUCK0000565

G. L file

THIRD ADDENDUM

TO

PREMIUM DETERMINATION AGREEMENT

This Addendum attaches to and forms a part of that certain Premium
Determination Agreement entered into between

TRUCK INSURANCE EXCHANGE

hereinafter referred to as the "Exchange" and

KAISER CEMENT & GYPSUM CORPORATION

hereinafter referred to as the "Insured" on February 8, 1972.

It is hereby agreed that as and from January 1, 1975, the Agreement is
amended as follows:

The Period of Agreement specified in Article 1.
is extended one year, from January 1, 1975 to
January 1, 1976.

All other terms and conditions of the Agreement remain unchanged.

Dated at Los Angeles, California this 27th day of December 1974.

TRUCK INSURANCE EXCHANGE
Truck Underwriters Association, Attorney-in-Fact

by_____
Officer-in-Charge
National Accounts Division

Accepted for the Insured

By  GAM

Title  Ins Mgr.

TRK0000161

PR0817

PR01217

Appellant's Appendix 02312
JA04745
TRUCK0000566

Standard Form of Endorsement Prescribed by the Public Utilities Commission
of the State of California

TO BE ATTACHED TO AND MADE A PART OF ALL POLICIES INSURING MOTOR VEHICLES SUB-
JECT TO REGULATION BY THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

Applicable to
Petroleum Irregular route carrier, petroleum contract carrier, city carrier, and
highway common carrier of petroleum and petroleum products
in bulk in tank trucks and/or tank trailers

The policy to which this endorsement is attached is an Automobile Bodily Injury Liability and Property Damage
Liability policy and is hereby amended to assure compliance by the insured, as a motor carrier of bulk petroleum
products in tank trucks and/or tank trailers, with General Order No. 100-Series and the pertinent rules and regu-
lations of the Public Utilities Commission of the State of California.

In consideration of the premium stated in the policy to which this endorsement is attached, the Company hereby
agrees to pay, within the limits of liability hereinafter provided, any final judgment rendered against the insured
for bodily injury to or death of any person, or loss of or damage to property of others (excluding injury to or death
of the insured's employees while engaged in the course of their employment, and loss or damage to property
owned by, rented to, in charge of, or transported by the insured), resulting from the operation, maintenance, or
use of motor vehicles for which a certificate of public convenience and necessity or permit is required or has
been issued to the insured by the Public Utilities Commission of the State of California, regardless of whether such
motor vehicles are specifically described in the policy or not.

Within the limits of liability hereinafter provided it is further understood and agreed that no condition, provi-
sion, stipulation, or limitation contained in the policy, or any other endorsement thereon or violation thereof, or of
this endorsement, by the insured, shall relieve the Company from liability hereunder or from the payment of any
such final judgment, irrespective of the financial responsibility or lack thereof or insolvency or bankruptcy
of the insured. However, all terms, conditions, and limitations in the policy to which this endorsement is attached
are to remain in full force and effect as binding between the insured and the Company, and the insured agrees to
reimburse the Company for any payment made by the Company on account of any accident, claim, or suit involv-
ing a breach of the terms of the policy, and for any payment that the Company would not have been obligated to
make under the provisions of this policy except for the agreement contained in this endorsement.

It is understood and agreed that, upon failure of the Company to pay any final judgment rendered against the
insured as provided herein, the judgment credit may maintain an action in any court of competent jurisdiction
against the Company to compel such payment.

The liability of the Company for the amounts provided in this endorsement apply separately to each accident
and any payment under the policy because of any one accident shall not operate to reduce the liability of the
Company for the payment of final judgments resulting from any other accident.

Schedule of Limits
Bodily Injury Liability and Property Damage Liability

| | |
|---|---|
| For bodily injuries to or death of one person . . . . . . . . . . | $200,000 |
| For bodily injuries to or death of all persons injured or killed (subject to a maximum of $300,000 for bodily injuries to or death of one person) . . . . . . . . | $600,000 |
| For loss or damage to property of others (excluding cargo) . . . . . . . . | $100,000 |

Nothing in this endorsement shall be construed to limit or restrict any coverage otherwise provided by the
policy of which the endorsement is made a part.

Whenever required by the Commission, the Company agrees to furnish to the Commission a duplicate original
of said policy and all endorsements thereon.

The Company further agrees that such insurance as is afforded by the policy and this endorsement against
liability for injuries to or death of persons and damage to or destruction of property shall not be cancelled, re-
scinded, or suspended, nor shall the cancellation, rescission, or suspension of the policy or this endorsement take
effect, nor shall the policy or this endorsement become void for any reason whatsoever until the Company shall
have first given thirty (30) days' notice in writing to the Public Utilities Commission of the State of California at
its offices, San Francisco, California, said thirty (30) days' notice to commence to run from the date notice is
actually received in the office of said Commission.

The Company further agrees that if the policy shall be cancelled or suspended or otherwise terminated, and
shall thereafter be reinstated, continue in writing of such reinstatement shall immediately be given by the Company
to said Commission at its said office.

When countersigned by an authorized representative of the Company this endorsement becomes a part of
Policy No.  390-40-00  issued by  TRUCK INSURANCE EXCHANGE
[Insurer called Company] of  LOS ANGELES, CALIFORNIA
to  PERMANENTE TRUCKING COMPANY, 300 Lakeside Drive, Oakland, California  94432
effective

Countersigned at  Los Angeles, California  this  6th  day of  November  19 68

By (Signature)  Bill K Cann

Name of Person Signing  Bill A. Grant

TRK0000162

PR0818

PR01218

TRIAL EX. 301
Page 92

JA04746
Appellant's Appendix 02313
TRUCK0000567



ORIGINAL

EIC #
2459

KAISER CEMENT & GYPSUM CORPORATION
and
SUBSIDIARIES

ULTRA-COMPREHENSIVE LIABILITY POLICY
#350-40-00

Cancelled & rewritten
2/1/74

EMPLOYER'S INSURANCE CERTIFICATE
CALIFORNIA FINANCIAL RESPONSIBILITY LAW    No. E.I.C. 2459

TRUCK INSURANCE EXCHANGE
4680 Wilshire Boulevard
Los Angeles, California 90054

350-40-00

December 31, 1965

TRK0000163

PR0819

PR01219

Appellant's Appendix 02314
JA04747
TRUCK0000568

# REED STENHOUSE

Reed Stenhouse Inc. of California
International Insurance Brokers
Three Embarcadero Center, Suite 2400
San Francisco, California 94111
415 986-1122 Telex 340801

October 19, 1981

RECEIVED
OCT 21 1981
RISK MANAGEMENT DEPT.

Mr. Kenneth J. Kwidzinski
Risk Manager
Kaiser Cement Corporation
300 Lakeside Drive
Oakland, CA 94612

Re: Kaiser Cement Corporation, Et Al
    TIE Policy #350-40-00

Dear Ken:

With reference to my letter of August 20, 1981, I am pleased to enclose the following documents:

1. Fourth Addendum to Premium Adjustment Agreement, effective January 1, 1972 limiting the allocated adjustment expense to the amount of the retrospective retention. Please sign and return a copy of this addendum for my transmittal to TIE.

2. Endorsement 49 amending Endorsement 25 by inclusion of a limitation of the allocated adjustment expense to the amount of the deductible, effective January 1, 1976 which is the date the retrospective retention was discontinued and replaced with a straight $50,000 deductible.

3. Endorsement 16 to the current policy (effective 4/1/81), also limiting the adjustment expense. I tried for a $50,000 maximum allocated adjustment expense under item 1 (b) however, underwriters are unwilling to limit this expense to a lesser amount than they agreed to on the Kaiser Steel account.

If you have any questions in connection with the attached material, please let me know.

Sincerely,

Bill Conner
Lise Conner

LC/kh

Encl.

TRK00001

PR0820

PR01220

TRUCK0000569



FOURTH ADDENDUM

TO

PREMIUM DETERMINATION AGREEMENT

This Addendum attaches to and forms a part of that certain Premium
Determination Agreement entered into between

TRUCK INSURANCE EXCHANGE

hereinafter referred to as the "Exchange" and

KAISER CEMENT & GYPSUM CORPORATION

hereinafter referred to as the "Insured" on February 8, 1972.

It is hereby agreed that as and from January 1, 1977, the following
paragraph (c) shall be added to Condition 5, Distribution of
Adjustment Expense:

(c) In no event shall allocated adjustment expense alone from
any single occurrence or accident exceed an amount greater
that the Retrospective Retention.

All other terms and conditions of the Agreement remain unchanged.

Dated at Los Angeles, California this 14th day of October, 1981.

TRUCK INSURANCE EXCHANGE

Truck Underwriters Association, Attorney-in-Fact

by _____
Edward E. Mathews, Asst. Secretary

Accepted for the Insured

by _____
Title _____

TRK0000165

PR0821

PR01221

Appellant's Appendix 02316
JA04749
TRUCK0000570

JA04750
TRUCK0000571

# EXHIBIT O

JA04751



TRUCK INSURANCE
EXCHANGE

KAISER CEMENT CORPORATION

COMPREHENSIVE LIABILITY POLICY.

Policy No. 3306000

N00034000

per end # 17

TRK0000240

PR0896

PR01298

Appellant's Appendix 02397
JA04752
TRUCK0000646

# TRUCK INSURANCE EXCHANGE
Comprehensive Liability Policy

Policy No. 3504000

## DECLARATIONS

Item 1.    Named Insured:

    A.    KAISER CEMENT CORPORATION and

    B.    (1) Any Division or Subsidiary Company;
        (2) Any Divisions or Subsidiaries of (1) above;
        (3) Any Company under the Named Insured's control or of
            which it assumes active management;
        (4) Any Partnership or Joint Venture under the operational
            control or sponsorship of any of the above.

    C.    Address:  300 Lakeside Drive
                 Oakland, CA 94612

Item 2.    Policy Period:  April 1, 1981, 12:01 A.M. Pacific Standard
                     Time until cancelled.

Item 3.    COVERAGE                    LIMIT OF LIABILITY

Personal Injury Liability)   ($   500,000 per occurrence and
      and/or          ) ( $1,500,000 all occurrences annual
Property Damage Liability)  (        aggregate as respects
                            Products Hazard and
                            Completed Operations
                            Hazards
                    ($1,000,000 per occurrence - Automobile

Item 4.    DEDUCTIBLE

$100,000 shall be deducted from the total amount to be paid for
all damages which the Insured becomes legally obligated to pay
on account of each occurrence.

Item 5.    ADVANCE PREMIUM

As per Endorsement Attached.

_Carl L. Swanson_
Countersigned

TRK000024)

PR0897

PR01299

Appellant's Appendix 02298
JA04753
TRUCK0000647

The Truck Insurance Exchange (an inter-insurance exchange, hereinafter sometimes referred to as Company) agrees with the insured, named in the Declarations made a part hereof, in consideration of the payment of the total premium when due and in reliance upon the statements in the Declarations and subject to the Limits of Liability, Exclusions, Conditions and other terms of this policy:

## INSURING AGREEMENTS

1. **COVERAGE:**

   To pay on behalf of the insured all sums which the insured shall become obligated to pay, as damages or otherwise, by reason of the liability imposed upon him by law, assumed by him under contract as defined, or by reason of any other legal liability of the insured however arising or created or alleged to have risen or to have been created because of:

   A. Personal injury, sickness, disease, including death;

   B. Injury to or destruction of property including all loss resulting therefrom.

   The company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent. The company may make such investigation and settlement of any claim or suit as it deems expedient. As respects malpractice liability and employee benefits liability the company will neither settle nor compromise any claim or suit covered hereunder, except with the written consent of the insured. In no event shall the company be obligated to pay any claim or judgment or to defend any suit after the applicable limit of liability has been exhausted by payment of judgments or settlement.

11. **SUPPLEMENTARY PAYMENTS:**

   With respect to such insurance as is afforded by this policy, the company shall:

   A. Pay all premiums on bonds to release attachments for an amount not in excess of the applicable limit of liability of this policy, all premiums on appeal bonds required in any such defended suit, the cost of bail bonds required of the insured in the event of automobile accident or automobile traffic law violation during the policy period, not to exceed $250 per bail bond, but without any obligation to apply for or furnish any such bonds;

KC2/A2                                    -2-                          TRUCK INSURANCE EXCHANGE

TRK0000242

PR0898

PR01300

TRIAL EX. 303
Page 3

Appellant's Appendix 02399

JA04754
TRUCK0000648

B. Pay all expenses incurred by the company, all costs taxed
against the insured in any such suit and all interest accruing
after entry of judgment until the company has paid or tendered
or deposited in court such part of such judgment as does not
exceed the limit of the company's liability thereon;

C. Pay expenses incurred by the insured for all immediate medical
and surgical relief to others as shall be imperative at the
time of the occurrence;

D. reimburse the insured for all reasonable expenses, other than
loss of earnings, incurred at the company's request;

and the amounts so incurred, except settlements of claims and suits,
are payable by the company in addition to the applicable limit of
liability of this policy.

III. PERSONS INSURED:

The unqualified word "insured" includes the named insured and also
includes:

A. Any individual, firm, co-partnership, corporation or other
entity for whom the named insured has contracted, or during the
currency of this policy may contract, under a contract usual or
incidental to the named insured's business to procure insurance
afforded by this policy, but only to the extent and in the
amount for which the named insured has contracted to procure
such insurance, and in no event contrary to the terms and
conditions or exceeding the limits of liability set forth in
this policy.

B. Any social club or organization sponsored by the named insured
and any member or officer as respects his or her activities as
a member or officer of such social club or organization. Such
persons or organizations shall be deemed "named insureds."

C. Except for liability arising out of the ownership, maintenance
or use of automobiles any executive officer, director, or
employee thereof while acting within the scope of his duties as
such, and any organization or proprietor with respect to real
estate management for the named insured.

D. Any person while using an owned watercraft or a hired watercraft
of the pleasure type and any person or organization legally
responsible for the use thereof, provided the actual use of the
watercraft is by the named insured or with his permission, and

TRUCK INSURANCE EXCHANGE

KC2/A3                           -3-

TRK0000243

PR0899

PR01301

TRIAL EX. 303
Page 4

Appellant's Appendix 02400
JA04755
TRUCK0000649

any executive officer, director, partner, stockholder or employee of the named insured with respect to the use of non-owned watercraft in the business of the named insured. The insurance with respect to any person or organization other than the named insured does not apply:

1. with respect to any hired watercraft, to the owner or lessee thereof other than the named insured or to any agent or employee of such owner or lessee;

2. with respect to any non-owned watercraft, to any executive officer, partner, director, stockholder, or employee if such watercraft is owned in full or in part by him or a member of his household;

3. to any employee with respect to injury to or sickness, disease or death of another employee of the same employer injured in the course of such employment in an accident arising out of the maintenance or use of watercraft in the business of such employer, unless the named insured requests in writing, upon a claim being made against such employee, that this exclusion shall not apply.

E. As respects claims arising out of ownership, maintenance or use of automobiles, each of the following is an insured to the extent set forth below:

1. the named insured;

2. any partner, executive officer, director, stockholder, trustee, but with respect to a non-owned automobile only while such automobile is being used in the business of the named insured;

3. any other person using an owned or hired automobile provided such use is by the named insured or with his permission, expressed or implied, and within the scope of such permission but with respect to bodily injury or property damage arising out of the loading or unloading thereof or arising out of the use of such automobiles in connection with the loading or unloading thereof, such other person shall be an insured only if he is:

a. a lessee or borrower of the automobile, or

b. an employee of the named insured or of such lessee or borrower

KC2/A4                                                                    -4-

TRUCK INSURANCE EXCHANGE

TRK0000244

PR0900

PR01302

Appellant's Appendix 02401

JA04756
TRUCK0000650

4.    any other person or organization but only with respect to
his or its liability because of acts or omissions of an
insured under 1., 2., or 3. above,

F.    The insurance with respect to any person or organization other
than the named insured does not apply under division E. of this
Insuring Agreement:

1.    to any person, or to any agent or employee thereof, em-
ployed or otherwise engaged in the business of selling,
repairing, servicing, delivering, testing, road testing,
parking, or storing automobiles with respect to any ac-
cident arising out of the maintenance or use of a motor
vehicle in connection therewith.

2.    with respect to any hired automobile, to the owner thereof,
or any agent or employee of such owner, except that the
insurance afforded by the policy shall apply to the lessor
of an automobile leased to the insured for use in business
under a written contract of 30 days or more duration in
which the insured agrees to procure automobile liability
insurance for the benefit of such lessor but only to the
extent and in the amount for which the insured has con-
tracted to procure such insurance, and in no event contrary
to the terms and conditions or exceeding the limits of
liability as set forth in this policy.

3.    with respect to any non-owned automobile, to any executive
officer, partner, director, stockholder, if such automobile
is owned in full or in part by him or a member of his
household.

4.    except as respects any executive officer, partner, director
or stockholder, to any employee with respect to injury to
or sickness, disease or death of another employee of the
same employer injured in the course of such employment, in
an accident arising out of the maintenance or use of an
automobile in the business of such employer, unless the
named insured requests in writing, upon a claim being made
against such employee that this exclusion shall not apply.

G.    As respects liability arising out of the administration of
employee benefits, any partner, executive officer, director,
stockholder or employee who is authorized to act in the admin-
istration of the insured's employee benefit programs.

KC2/A5                                        -5-

TRUCK INSURANCE EXCHANGE

TRK0000245

PR0901

PR01303

Appellant's Appendix 02402

JA04757
TRUCK0000651

H.  As respects malpractice liability, any physician, surgeon, dentist, nurse, physical therapist, optician, or optical technician while acting in his or her capacity as an employee or agent of the named insured.

IV.  POLICY PERIOD, TERRITORY, LIMITS:

A.  Policy Period and Territory

This policy applies only to occurrences during the policy period and which occur anywhere in the world, except Cuba, Albania, Bulgaria, Czechoslovakia, East Germany, Estonia, Guam, Hungary, Latvia, Lithuania, Poland, Rumania, Soviet Union, Yugoslavia, China, Tibet, North Vietnam, South Vietnam, Cambodia, North Korea, Outer Mongolia and Laos; provided claim is made, or suit on the merits of the claim, is originally brought within the continental limits of the United States of America, its territories or possessions (other than Guam), or Canada.

B.  Limits

The limit of liability stated in this policy as applicable "per occurrence" is the limit of the company's liability for each occurrence.

The limits of personal injury liability and property damage liability stated in the declarations as "aggregate limits" are respectively the total limits of the Company's liability for all damages arising out of the products hazard and completed operations hazard during the twelve month period beginning with the effective date of such coverage provided the personal injury or property damage occurs while the policy is in force. Such aggregate limits shall apply during each succeeding twelve month period following renewal of the policy by payment of the required premium when due.

### EXCLUSIONS

This policy does not apply:

1.  to liability assumed by the insured under contract or agreement except a contract as defined herein;

2.  to the ownership, maintenance, operation, use, loading or unloading of (a) aircraft, or (b) watercraft, but this exclusion does not apply

KC2/A6                    -6-

TRUCK INSURANCE EXCHANGE

TRK0000246

PR0902

PR01304

Appellant's Appendix 02403

JA04758
TRUCK0000652



(1) to watercraft of the pleasure type,
(2) to watercraft while ashore on premises owned by, rented to or controlled by the named insured,

3. to any obligation for which the insured or any carrier as his insurer may be held liable under any workmen's compensation, unemployment compensation or disability benefits law, or under any similar law;

4. except with respect to liability assumed by the insured, under contract as defined herein, to bodily injury to or sickness, disease or death of any employee of the insured arising out of and in the course of his employment by the insured; other than such injury caused by malpractice, error or mistake in the rendering of medical services;

5. to injury to or destruction of (a) property owned or transported by the insured, (b) property of others in the care or custody of the insured for storage, or for sale;

6. for claims made against the insured;

a. for the insured's selling price of the particular part of the product which gave rise to the claim or claims;

b. for damage to that particular part of any property upon which the insured is or has been working caused by the faulty manner in which the work has been performed;

7. to loss of use of tangible property which has not been physically injured or destroyed resulting from

a. a delay in or lack of performance by or on behalf of the named insured of any contract or agreement, or

b. the failure of the named insured's products or work performed by or on behalf of the named insured to meet the level of performance, quality, fitness or durability warranted or represented by the named insured;

but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the named insured's product or work performed by or on behalf of the named insured after such products or work have been put to use by any person or organization other than an insured;

KE2/A7                                    -7-                          TRUCK INSURANCE EXCHANGE

TRK0000247

PR0903

PR01305

Appellant's Appendix 02494
JA04759
TRUCK0000653



8.    to liability arising out of matter used in connection with
advertising, broadcasting by or in the interest of the named
insured;

9.    as respects personal injury arising out of discrimination by
reason of age, sex, religion or natural or racial origin:

a.    to fines or penalties;

b.    to amounts claimed or awarded (whether as damages or
otherwise) for wages, salaries or other financial benefits
or advantages that the injured person would have received,
but for the discrimination, as an employee or prospective
employee of any insured;

c.    to class actions or to any individual claim for damages
which is included within or is a part of any class action;

d.    to the cost of any affirmative action program required to
be entered into by the insured because of its alleged
discrimination against employees or prospective employees;

e.    to any discrimination suit or claim by or on behalf of any
State or Federal Agency;

10.   as respects liability arising out of the administration of
employee benefits:

a.    to any claim for failure of performance of contract by any
insurer;

b.    to any claim based upon the insured's failure to comply
with any law concerning Workmen's Compensation, Unemploy-
ment Insurance, Social Security or Disability Benefits;

c.    to any claim based upon failure of stock to perform as
represented by an insured;

d.    to any claim based upon advice given by an insured to
participate or not to participate in stock subscription
plans;

11.   to bodily injury or property damage arising out of the discharge,
dispersal, release or escape of smoke, vapors, soot, fumes,

TRUCK INSURANCE EXCHANGE

rr2/80                      -8-

TRK0000248

PR0904

PR01306



acids, alkalis, toxic chemicals, liquids or gases, waste mate-
rials or other irritants, contaminants or pollutants into or
upon land, the atmosphere or any watercourse or body of water;
but this exclusion does not apply if such discharge, dispersal,
release or escape is sudden and accidental. However, if with
respect to the following described operations there is a dis-
charge, dispersal, release or escape of oil or other petroleum
substance or derivative (including any oil refuse or oil mixed
with wastes) into or upon any watercourse or body of water, the
insurance does not apply to bodily injury or property damage
arising out of such discharge, dispersal, release or escape
whether or not sudden and accidental.

Description of Operations:

Gas Lease Operators - natural gas
Gasoline Recovery - from casing head or natural gas
Non-Operating working interest
Oil or Gas Well Shooting
Oil or Gas Wells - acidizing
Oil or Gas Wells - cementing
Oil or Gas Wells - cleaning or swabbing by contractors
Oil or Gas Wells - drilling or redrilling, installation or
    recovery of casing
Oil or Gas Wells - instrument logging or survey work in wells
Oil or Gas Wells - perforating of casing
Oil Lease Operators
Oil Pipe Lines - operation, including maintenance
Oil Rig or Derrick Erecting or Dismantling - wood or metal -
    including construction of foundation or structures or
    installation of equipment;

12.  under any Liability Coverage, to injury, sickness, disease,
     death or destruction:

     a.  with respect to which an insured under the policy is also
         an insured under a nuclear energy liability policy issued
         by Nuclear Energy Liability Insurance Association, Mutual
         Atomic Energy Liability Underwriters or Nuclear Insurance
         Association of Canada, or would be an insured under any
         such policy but for its termination upon exhaustion of its
         limit of liability; or

     b.  resulting from the hazardous properties of nuclear material
         and with respect to which (1) any person or organization
         is required to maintain financial protection pursuant to
         the Atomic Energy Act of 1954, or any law amendatory
         thereof, or (2) the insured is, or had this policy not

KC2/A9                        -9-              TRUCK INSURANCE EXCHANGE

TRK0000249

PR0905

PR01307

TRIAL EX. 303
Page 10

Appellant's Appendix 02406
JA04761
TRUCK0000655



been issued would be, entitled to indemnity from the
United States of America, or any agency thereof, under any
agreement entered into by the United States of America, or
any agency thereof, with any person or organization.

Under any Medical Payments Coverage, or under any Supplementary
Payments provision relating to immediate medical or surgical
relief, to expenses incurred with respect to bodily injury,
sickness, disease or death resulting from the hazardous
properties of nuclear material and arising out of the operation
of a nuclear facility by any person or organization.

Under any Liability Coverage, to injury, sickness, disease,
death or destruction resulting from the hazardous properties of
nuclear material, if

a.  the nuclear material (1) is at any nuclear facility owned
    by, or operated by or on behalf of, an insured or (2) has
    been discharged or dispersed therefrom;

b.  the nuclear material is contained in spent fuel or waste
    at any time possessed, handled, used, processed, stored,
    transported or disposed of by or on behalf of an insured;

c.  the injury, sickness, disease, death or destruction arises
    out of the furnishing by an insured of services, materials,
    parts or equipment in connection with the planning, con-
    struction, maintenance, operation or use of any nuclear
    facility, but if such facility is located within the
    United States of America, its territories or possessions
    or Canada, this exclusion (1) applies only to injury to or
    destruction of property at such nuclear facility.

As used in this exclusion:

"hazardous properties" include radioactive, toxic or explosive
properties;

"nuclear material" means source material, special nuclear
material or by-product material;

"source material", "special nuclear material," and "by-product
material" have the meanings given them in the Atomic Energy Act
of 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or
liquid, which has been used or exposed to radiation in a nuclear
reactor;

KC2/AJO                          -10-

TRUCK INSURANCE EXCHANGE

TRK0000250

PR0906

PR01308

Appellant's Appendix 02407
JA04762
TRUCK0000656

"waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph a. or b. thereof;

"nuclear facility" means:

a.  any nuclear reactor,

b.  any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

c.  any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

d.  any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

## DEFINITIONS:

1.  CONTRACT.  The word "contract" means any contract or agreement, if in writing, or under verbal agreement reduced to a written form within 120 days from the date of the first agreement, usual to the insured's business including any contract or agreement under which the insured has assumed the liability of others.

2.  AUTOMOBILE.  Except where stated to the contrary, the word "automobile" means a land motor vehicle or trailer as follows:

KCZ/A11                    -11-

TRUCK INSURANCE EXCHANGE

TRK0000251

PR0907

PR01309



a. Owned Automobile - an automobile owned by the named insured.

b. Hired Automobile - an automobile used under contract in behalf of, or loaned to, the named insured provided such automobile is not owned by or registered in the name of (1) the named insured or (2) an executive officer thereof or (3) an employee or agent of the named insured who is granted an operating allowance of any sort for the use of such automobile.

c. Non-Owned Automobile - any other automobile.

The following described equipment shall be deemed an automobile while towed by or carried on an automobile not so described, but not otherwise: if of the crawler-type, any tractor, power crane or shovel, ditch or trench digger; any farm-type tractor; any concrete mixer other than the mix-in-transit type; any grader, scraper, roller or farm implement; and, if not subject to motor vehicle registration, any other equipment not specified below, which is designed for use principally off public roads. The following described equipment shall be deemed an automobile while towed by or carried on an automobile, as above defined solely for purposes of locomotion, but not otherwise; if of the non-crawler type, any power crane or shovel, ditch or trench digger, and any air-compressing, building or vacuum cleaning, spraying or welding equipment or well drilling machinery.

3.   SEMI-TRAILER.   The word "trailer" includes semi-trailer.

4.   TWO OR MORE AUTOMOBILES.   The terms of this policy apply separately to each automobile insured hereunder, but a motor vehicle and a trailer or trailers attached thereto shall be held to be one automobile as respects limits of liability.

5.   USE.   Use of an automobile or watercraft includes the loading and unloading thereof.

6.   OWNED WATERCRAFT.   Watercraft owned by the named insured.

7.   HIRED WATERCRAFT.   Watercraft used under contract in behalf of, or loaned to, the named insured provided such watercraft is not owned by or registered in the name of (a) the named insured or (b) an executive officer thereof or (c) an employee or agent of the named insured who is granted an operating allowance of any sort for the use of such watercraft.

. TRUCK INSURANCE EXCHANGE

KC2/A12                        -12-

TRK0000252

PR0908

PR01310

TRIAL EX. 303
Page 13

Appellant's Appendix 02409

JA04764
TRUCK0000658

8.  NON-OWNED WATERCRAFT. Any other watercraft.

9.  OCCURRENCE. Except with respect to malpractice liability, the word "occurrence" means an event, or continuous or repeated exposure to conditions which results in personal injury or property damage during the policy period. All such exposure to substantially the same general conditions existing at or emanating from each premises location shall be deemed one occurrence.

    With respect to malpractice liability the word "occurrence" shall be deemed to mean a claim or suit for injury occurring during the policy period and covered hereby.

10. PERSONAL INJURY. Means bodily injury, sickness or disease, including death at any time resulting therefrom; and also includes mental injury, mental anguish and shock, malpractice, false arrest, malicious prosecution, willful detention or imprisonment, libel, slander or defamation of character, invasion of privacy, wrongful eviction or wrongful entry, wrongful conversion or disparagement, humiliation or discrimination, and employee benefits liability.

11. MALPRACTICE. Means medical malpractice, error or mistake in rendering or failing to render professional services in the practice of the insured's profession as, including but not limited to, a physician, surgeon, dentist, nurse, physical therapist, optician or optical technician, but only while acting in his or her capacity as an employee or agent of the named insured including any emergency treatment rendered outside the scope of such employment.

12. EMPLOYEE BENEFITS LIABILITY. Means liability arising out of any negligent act, error or omission of the insured, or any other person for whose acts the insured is legally liable in the administrations of the insured's employee benefit programs.

13. PRODUCTS HAZARD. Includes personal injury and property damage arising out of the named insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the personal injury or property damage occurs away from premises owned by or rented to the named insured and after physical possession of such products has been relinquished to others;

14. COMPLETED OPERATIONS HAZARD. Includes personal injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the personal injury or property damage occurs

KC2/A13                                    -13-

TRUCK INSURANCE EXCHANGE

TRK0000253

PR0909

PR01311

Appellant's Appendix 04465

TRUCK0000659

after such operations have been completed or abandoned and occurs away from premises owned by or rented to the named insured. "Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:

a.   when all operations to be performed by or on behalf of the named insured under the contract have been completed;

b.   when all operations to be performed by or on behalf of the named insured at the site of the operations have been completed; or

c.   when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed.

The completed operations hazard does not include personal injury or property damage arising out of:

(1)   operations in connection with the transportation of property, unless the personal injury or property damage arises out of a condition in or on a vehicle created by the loading or unloading thereof;

(2)   the existence of tools, uninstalled equipment or abandoned or unused materials, or

(3)   operations for which the classification stated in the policy or in the Company's manual specifies "including completed operations."

15.   PROPERTY DAMAGE. Means (a) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

KC2/AJ4                              -14-

TRUCK INSURANCE EXCHANGE

TRK0000254

PR0910

PR01312

TRIAL EX. 303
Page 15

Appellant's Appendix 02411

JA04766
TRUCK0000660

CONDITIONS:

1. **PREMIUM:** The advance premium stated in the Premium Endorsement is an estimated premium only. At the end of each policy year, or upon termination of this policy, the earned premium shall be computed in accordance with the company's rules, rates, rating plans, premiums and minimum premiums applicable to this insurance. If the earned premium thus computed exceeds the estimated advance premium paid, the named insured shall pay the excess to the company; if less, the company shall return to the named insured the unearned portion paid by such insured.

2. **INSPECTION AND AUDIT:** The company shall be permitted to inspect the insured's premises, operations, automobiles and elevators and to examine and audit the insured's books and records at any time during the policy period and any extension thereof and within three years after the final termination of this policy, as far as they relate to the premium basis of the subject matter of this insurance.

3. **SEVERABILITY OF INTERESTS:** The inclusion of more than one corporation, person, organization, firm or entity as insured under this policy shall not in any way affect the rights of any such corporation, person, organization, firm or entity as respects any claim, demand, suit or judgment made or brought by or in favor of any other insured, or by or in favor of any employee of such other insured. This policy shall protect each corporation, person, organization, firm or entity in the same manner as though a separate policy had been issued to each; but nothing herein shall operate to increase the company's liability as set forth elsewhere in this policy beyond the amount or amounts for which the company would have been liable if only one person or interest had been named as insured. Limits of liability afforded hereunder shall apply first to the named insured under this policy and remainder, if any, to additional insureds.

4. **FINANCIAL RESPONSIBILITY LAWS:** When this policy is certified as proof of financial responsibility for the future under the provisions of the motor vehicle financial responsibility law of any state or province, such insurance as is afforded by this policy for bodily injury liability or for property damage liability shall comply with the provisions of such law which shall be applicable with respect to any such liability arising out of the ownership, maintenance or use during the policy period of any automobile insured hereunder, to the extent of the coverage and limits of liability required by such law, but in no event in excess of the limits of liability stated in this

KCZ/A15                    -15-

TRUCK INSURANCE EXCHANGE

TRK0000255

PR0911

PR01313

Appellant's Appendix 02412

JA04767
TRUCK0000661



policy. The insured agrees to reimburse the company for any payment made by the company which it would not have been obligated to make under the terms of this policy except for the agreement contained in this paragraph.

The Company agrees that this policy shall be deemed endorsed to comply with the minimum requirements of any Motor Vehicle "No Fault" or "Modified No Fault" Federal law or the minimum requirements of any Motor Vehicle "No Fault" or "Modified No Fault" law of any state, province or territory in which the Named Insured has resident employees.

5.  NOTICE OF OCCURRENCE:  When an occurrence takes place, written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable after the named insured's Corporate Risk Manager has knowledge thereof when, in his opinion, it is likely to result in a claim under this policy.  Such notice shall contain particulars sufficient to identify the insured and also reasonably obtainable information respecting time, place and circumstances of the occurrence, the names and addresses of the injured and of available witnesses.

6.  NOTICE OF CLAIM OR SUIT:  If claim is made or suit is brought against the insured, the insured shall promptly forward to the company or its authorized agent every demand, notice, summons or other process received by him or his representative.

7.  ASSISTANCE AND COOPERATION OF THE INSURED:  The insured shall cooperate with the company, and upon the company's request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits.  The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of the occurrence.

8.  ACTION AGAINST COMPANY:  No action shall lie against the company unless, as a condition precedent thereto, the insured or his legal representative shall have fully complied with all the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall there-

KC2/A16                    -16-

TRUCK INSURANCE EXCHANGE

TRK0000256

PR0912

PR01314

Appellant's Appendix 02413

JA04768
TRUCK0000662

after be entitled to recover under this policy to the extent of the insurance afforded by this policy. Nothing contained in this policy shall give any person or organization any right to join the company as a codefendant in any action against the insured to determine the insured's liability.

Bankruptcy or insolvency of the insured or of the insured's estate shall not relieve the company of any of its obligations hereunder.

9. OTHER INSURANCE: If the insured has other insurance against a loss covered by this policy, the insurance under this policy shall be excess insurance over all such other valid and collectible insurance; but if the carrier or carriers of such other insurance shall deny liability therefor in its entirety or as to any portion of such other insurance, then and in that event this company shall handle such loss or claim under this policy in the same manner and to the same extent as though such other insurance did not exist, and the insured shall assign to this company all rights against the carrier or carriers of such other insurance, and execute all papers necessary to secure to this company such rights or shall in its own name whenever requested by the company, and at the company's expense, institute any demand or legal proceedings which this company deems necessary against the carrier or carriers of such other insurance.

10. SUBROGATION: In the event of any payment under this policy, the company shall be subrogated to all the insured's rights of recovery therefor against any person or organization and the insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The insured shall do nothing after loss to prejudice such rights. The company waives its right of subrogation (a) against any person, firm or corporation, subsidiary of, or allied or affiliated with the insured, (b) against any person, firm or corporation, with which the insured is associated as a joint venturer or otherwise in any business enterprise, (c) against any person, firm or corporation for whom the insured is performing work, (d) against any other insured and/or any stockholder of any corporate insured, except to the extent that such persons, firms, or corporations jointly or severally are insured under valid and collectible policies and (e) against employees of the insured.

11. CONTINUOUS POLICY: Computation and adjustment of earned premium shall be made at the end of each annual period.

EC2/A17                                    -17-

TRUCK INSURANCE EXCHANGE

TRK0000257

PR0913

PR01315

Appellant's Appendix 02414
JA04769
TRUCK0000663

12. TERMS OF POLICY CONFORMED TO STATUTE: Terms of this policy which are in conflict with the statutes of any state or province are hereby amended to conform to such statutes.

13. CHANGES: Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or estop the company from asserting any right under the terms of this policy; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy.

14. ASSIGNMENT: Assignment of interest under this policy shall not bind the company until its consent is endorsed hereon.

15. CANCELLATION: This policy may be cancelled by the named insured by surrender thereof to the company or any of its authorized agents or by mailing to the company written notice stating when thereafter the cancellation shall be effective.

This policy may be cancelled by the company by mailing to the named insured at the address shown in this policy written notice stating when not less than ninety days thereafter such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. The effective date of cancellation stated in the notice shall be the end of the policy period. Delivery of such written notice either by the named insured or by the company shall be equivalent to mailing.

If the named insured cancels, earned premiums shall be computed in accordance with the customary short rate table and procedure. If the Company cancels, or reduces coverage, earned premiums shall be computed pro rata. Premium adjustment may be made at the time cancellation or reduction is effected and, if not then made, shall be made as soon as practicable after cancellation or reduction becomes effective. The Company's check or the check of its representative mailed or delivered as aforesaid shall be a sufficient tender of any refund or premium due the named insured.

16. RECIPROCAL PROVISIONS: This policy is made and accepted in consideration of the payment of the Premium Deposit herein provided, the declarations made in the application of the Policy, and the execution of a power of attorney to Truck Underwriters Association, herein called the "Association," authorizing it to execute inter-insurance policies between the holder of this policy, herein called the "named insured," and other subscribers to the Truck Insurance Exchange. No term or

KCZ/A18                                                          -18-

TRUCK INSURANCE EXCHANGE

TRK0000258

PR0914

PR01316

JA04770
TRUCK0000664

condition of the policy is intended to create, creates, or
shall be construed to create a partnership or mutual insurance
association, or to give rise to or create any joint liability.

To enforce any claims arising under this policy the Exchange
shall be sued or sue in its own name as in the case of an
individual. Service of process in any such suit against the
Exchange shall be upon the Truck Underwriters Association,
Atty. in Fact.

Membership Fees paid for membership in the Exchange are not
part of the premium and are fully earned upon membership being
granted and coverage effected and are not returnable but may be
applied as a credit to Membership Fees required of the insured
named in the Declarations of insurance accepted by the Exchange.

The entire policy shall automatically and immediately become
cancelled and void upon the expiration date of any current
term, if the named insured defaults in making payment of amounts
required to maintain the premium deposit.

The annual meeting of the members of the Exchange shall be held
at the Home Office of the Exchange at Los Angeles, California,
on the first Tuesday following the first Monday following the
15th day of March of each year, at the hour of 2 P.M., unless
the Board of Governors shall elect to change the time and place
of such meeting, in which case, but not otherwise, written or
printed notice shall be mailed each member at his last known
address at least ten days prior thereto. The Board of Governors
shall be chosen by the subscribers from among themselves, at
the annual meeting, or any special meeting held for that pur-
pose and shall have full power and authority to establish rules
and regulations for the management of the Exchange not incon-
sistent with subscribers' agreements.

The Premium Deposit for this policy and all payments made for
its continuance shall be payable to the Exchange at the Home
Office of the Exchange. The funds so paid shall be placed to
the credit of the named insured upon the records of the Exchange
and applied to the payment of the insured's proportion of
losses and expenses and to the establishment of reserves and
general surplus. All such funds may be deposited and withdrawn
or invested and reinvested as the Board of Governors or its
Executive Committee designates. The insured agrees that any
amount allocated to the surplus fund of the Exchange by the
Board of Governors may be retained by the Exchange and applied,
after providing for the payment of all liabilities of the
Exchange, to any purpose deemed proper and advantageous to
policyholders.

TRUCK INSURANCE EXCHANGE

ECP/A19                    -19-

TRK0000259

PR0915

PR01317

Appellant's Appendix 02416
JA04771
TRUCK0000665



This policy is non-assessable.

IN WITNESS WHEREOF, the Company executed these presents; but this policy
shall not be valid unless countersigned on the Declarations page by a
duly authorized representative of the Company.

TRUCK INSURANCE EXCHANGE
by Insull Underwriters Association, Atty. in fact

*Secretary*

*President*

TRUCK INSURANCE EXCHANGE

TRK0000260

PR0916

PR01318

Appellant's Appendix 02417

JA04772
TRUCK0000666



Effective: April 1, 1981

Policy No. 350-40-00
Endorsement No. 1

-- KAISER CEMENT CORPORATION, ET AL.

SUPERSEDING POLICY

In consideration of the premium for, and of the acceptance and retention
of this policy by the Named Insured, it is agreed that this policy cancels
and supersedes any previous policy of the same number issued by the
Company and is effective as indicated.

Carl F. Swanson
Countersigned

TRUCK INSURANCE EXCHANGE

KCZ/C1

TRK0000261

PR0917

PR01319

Appellant's Appendix 02418
JA04773
TRUCK0000667

Effective: April 1, 1981                  Policy No. 350-40-00
                                          Endorsement No. 2

KAISER CEMENT CORPORATION

DEDUCTIBLE PROVISIONS

As respects each occurrence, regardless of the number of claims emanating therefrom, the Insured assumes and agrees to pay the first $100,000. of any one occurrence and the Company shall be liable only for the difference between the deductible amount and the limit of liability stated in the policy.

The Company may pay any part or all of the deductible amount to effect settlement of any claim or suit and, upon notification of the action taken, the Insured shall promptly reimburse the Company for such part of the deductible amount as has been paid by the Company. The Company shall also be reimbursed for adjustment expenses incurred in settling losses under the deductible amount.

The Company shall tabulate the amounts so paid which are thus recoverable from the Insured and shall bill the Insured monthly for the accumulated total.

A deposit of $50,000. shall be maintained. As of the end of each third month period, the average deductible recoveries will be recomputed and adjustment in the deposit will be made to approximate the average monthly deductible recoveries.

A surety bond in the amount of $150,000., as issued by an insurance institution of the Insured's choice, shall be furnished to the Company as a further guarantee of future reimbursements for those claims and claims adjustment expenses as may be paid under the deductible portion of this policy.

There will be two types of loss adjustment expenses which shall be defined and computed as follows:

  1. Allocated Adjustment Expenses - exact items of expense directly incurred by the Company and chargeable to a particular claim. (Example: legal fees, court costs, medical examiner's fees, photographer bills, etc.)

  2. Unallocated Adjustment Expense - a charge to cover all general claims administration costs. (Example: service of adjusters, claims examiners, clerical service, stationery, office rent and other overhead items.)

TRUCK INSURANCE EXCHANGE

TRK0000262

PR0918

PR01320

Appellant's Appendix 02419

JA04774
TRUCK0000668

Effective: April 1, 1981

Policy No. 350-40-00
Endorsement No. 2
Page 2

DEDUCTIBLE PROVISION (contd.)

The adjustment expense charge shall be as follows:

1. Allocated Adjustment Expense - Expenses shall be
   reimbursed in the same proportion that the deductible
   amount bears to the total loss.

2. Unallocated Adjustment Expense - Expenses shall be:

   a. Seventeen (17%) percent of all paid bodily injury
      claims; and

   b. Eight (8%) percent of all other claims.

Carl L. Swanson
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000263

PR0919

PR01321

Appellant's Appendix 02420
JA04775
TRUCK0000669

Effective Date: April 1, 1981

Policy No. J50-4D-00
Endorsement No. 3

## KAISER CEMENT CORPORATION, ET AL.

### PREMIUM ADJUSTMENT ENDORSEMENT

DEPOSIT PREMIUM to be maintained: $16,000.

A.  It is agreed that on or before the 1st day of July, 1982, the Named
    Insured shall render to the Company a statement showing the total
    remuneration earned by its employees during the period April 1, 1981
    to April 1, 1982 (being the amount of remuneration upon which the
    Named Insured's Workers' Compensation for the same period is
    predicated, including similarly adjusted payroll in states where
    Workers' Compensation is self-insured or insured in a State Fund),
    and the earned premium shall be computed at the rate of $0.64 per
    $100 of the total remuneration so reported.

B.  The Named Insured shall pay to the Company the sum of $60,000. each
    quarter on or before the 10th of the month following each such
    quarter during the currency of the policy.

_Carl T. Swanson_
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000264

PR0920

PR01322

Appellant's Appendix 02421
JA04776
TRUCK0000670

KAISER CEMENT CORPORATION, ET AL.

. 300 Lakeside Drive
. Oakland, California

Effective April 1, 1981

Endorsement No. 4

90-01-02    350-40-00
Agent's No.    Policy Number

## AGREEMENT DELETING UNINSURED MOTORIST COVERAGE

### READ CAREFULLY BEFORE SIGNING

The California Insurance Code requires an insurer to provide uninsured motorists coverage in each bodily injury liability insurance policy it issues covering liability arising out of the ownership, maintenance, or use of a motor vehicle. Such section also permits the insurer and the applicant to delete such coverage completely or with respect to one or more natural persons designated by name when operating a motor vehicle. Uninsured motorists coverage insures the insured, his heirs, or legal representatives for all sums within the financial responsibility limits which such person or persons are legally entitled to recover as damages for bodily injury, including any resulting sickness, disease, or death, to him from the owner or operator of an uninsured motor vehicle not owned or operated by the insured.

In consideration of the deletion of the premium with respect thereto, it is agreed by the Truck Insurance Exchange and the undersigned named insured that all provisions of the policy applied for (including any subsequent renewal thereof or superseding policy) with respect to Uninsured Motorists Coverage are hereby deleted and shall be of no force or effect as to any person or insured named, or otherwise.

Exception: Uninsured Motorists Coverage will apply only to the automobiles indicated by an "X" below.

☐ any owned private passenger automobile    ☐ any automobile described below    ☐

YEAR, MODEL & TRADE NAME    IDENTIFICATION NUMBER    last 3
digits shown

Refer to prior policy for signature

TRUCK INSURANCE EXCHANGE

TRK0000265

PR0921

PR01323

Appellant's Appendix 04777

TRUCK0000671



Endorsement No. 5

Standard Form of Endorsement Prescribed by the Public Utilities Commission
of the State of California

TO BE ATTACHED TO AND MADE A PART OF ALL POLICIES INSURING MOTOR VEHICLES SUBJECT TO REGULATION BY THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

(Supersedes all endorsements heretofore required by said Commission)

The policy to which this endorsement is attached is an Automobile Bodily Injured Liability and Property Damage Liability policy and is hereby amended to assure compliance by the insured, as a motor carrier of property with General Order No. 100-Series and the pertinent rules and regulations of the Public Utilities Commission of the State of California.

In consideration of the premium stated in the policy to which this endorsement is attached, the Company hereby agrees to pay, within the limits of liability hereinafter provided, any final judgment rendered against the insured for bodily injury to or death of any person, or loss of or damage to property of others (excluding injury to or death of the insured's employees while engaged in the course of their employment, and loss or damage to property owned by, rented to, in charge of, or transported by the insured), resulting from the operation, maintenance, or use of motor vehicles for which a certificate of public convenience and necessity or permit is required or has been issued to the insured by the Public Utilities Commission of the State of California, regardless of whether such motor vehicles are specifically described in the policy or not.

Within the limits of liability hereinbefore provided it is further understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, or any other endorsement thereon or violation thereof, or of this endorsement, by the insured, shall relieve the Company from liability hereunder or from the payment of any such final judgment, irrespective of the financial responsibility or lack thereof or insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which this endorsement is attached are to remain in full force and effect as binding between the insured and the Company, and the insured agrees to reimburse the Company for any payment made by the Company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the Company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

It is understood and agreed that, upon failure of the Company to pay any final judgment rendered against the insured as provided herein, the judgment creditor may maintain an action in any court of competent jurisdiction against the Company to compel such payment.

The liability of the Company for the amounts provided in this endorsement apply separately to each accident and any payment under the policy because of any one accident shall not operate to reduce the liability of the Company for the payment of final judgments resulting from any other accident.

Schedule of Limits
Bodily Injury Liability and Property Damage Liability

| | |
|---|---|
| For bodily injuries to or death of one person ........................... | $250,000 |
| For bodily injuries to or death of all persons injured or killed | |
| subject to a maximum of $250,000 for bodily injuries to or death of one person ..... | $500,000 |
| For loss or damage to property of others (excluding cargo) ................... | $100,000 |
| | |
| Combined Single Limit ......................................... | $400,000 |

Nothing in this endorsement shall be construed to limit or restrict any coverage otherwise provided by the policy of which this endorsement is made a part.

Whenever requested by the Commission, the Company agrees to furnish to the Commission a duplicate original of said policy and all endorsements thereon.

The Company further agrees that such insurance as is afforded by the policy and this endorsement against liability for injuries to or death of persons and damage to or destruction of property shall not be cancelled, or suspended, nor shall the cancellation, rescission, or suspension of this policy or this endorsement take effect, nor shall the policy or this endorsement become void for any reason whatsoever until the Company shall have first given thirty (30) days' notice in writing to the Public Utilities Commission of the State of California at its office, San Francisco, California, said thirty (30) days' notice to commence to run from the date notice is actually received at the office of said Commission.

The Company further agrees that if the policy shall be cancelled or suspended or otherwise terminated, and shall thereafter be reinstated, notice in writing of each reinstatement shall immediately be given by the Company to said Commission at its said office.

When countersigned by an authorized representative of the Company this endorsement becomes a part of
Policy No. 350-4000    issued by    TRUCK INSURANCE EXCHANGE
    LOS ANGELES, CALIFORNIA

Named Company issued to Hallier Leasing Corporation

Effective    April 1, 1981

Countersigned at Los Angeles, California    Date April 3, 1981

by

Name of Person Signing Carl L. Swanson

TRK0000266

PR0922

PR01324



Effective Date:  April 1, 1981.                    Policy No. 305-40-00
                                                   Endorsement No. 6

                    KAISER CEMENT CORPORATION, ET AL.

It is understood and agreed that the insurance afforded by this policy
shall be excess insurance over the policy(ies) issued to Kaiser Center
Medical Department.

It is further agreed that liability shall only attach to the Exchange
after the Primary Insurer has paid or has been held liable to pay the
full amount of the Primary Insurer's ultimate net loss of $1,000,000.

The words "ultimate net loss" shall be understood to mean the sums paid
in settlement of losses for which the insured is liable after making
deduction for all recoveries, salvages and other insurances (other than
recoveries under the policy(ies) of the Primary Insurer), whether
recoverable or not, and shall exclude all expenses and "costs".

The word "costs" shall be understood to mean interest on judgments,
investigation, adjustment and legal expenses (excluding, however, all
expenses for salaried employees and retained counsel of and all office
expenses of the insured.)

Carl J. Swanson
        Countersigned

                                              TRUCK INSURANCE EXCHANGE.

KC2/C10

TRK0000267

PR0923

PR01325

Appellant's Appendix 0779

TRUCK0000673



Effective: April 1, 1981

Policy No. 35D-40-00
Endorsement No. 7

### KAISER CEMENT CORPORATION

#### CONTRACTUAL LIABILITY

#### Burlingame Northern Railway Company

This policy is extended to cover the liability for bodily injuries,
including resulting death and damage to property, which liability the
insured has assumed by virtue of the following wording contained in an
agreement entered into between the insured and Burlington Northern Inc.,
numbered 234, 391 and dated May 1, 1980;

It is agreed that Kaiser Cement Corporation (Permittee) shall and hereby
does release and discharge Railroad of and from any and all liability for
damage to or destruction of the said roadway, or any property of Permittee
thereon; and shall and hereby does assume any and all liability for
injury to or death of persons, or loss of or damage to property in any
manner arising from or during the construction, use maintenance, repair
or removal of said roadway, however such injury, death, loss, damage or
destruction may occur or be caused; and shall and hereby does
indemnify and save harmless Railroad of and from any and all claims,
demands, suits, actions, damages, with any such injury, death loss,
damage or destruction aforesaid. Permittee further agrees to appear and
defend in the name of Railroad any suits or actions at law brought
against it on account of any such personal injuries, death or damage to
property, and to pay and satisfy any final judgment that may be rendered
against the Railroad in any such suit or action. The liability assumed
by Permittee herein shall not be affected or diminished by the fact, if
it be a fact, that any such suit or action brought against Railroad may
arise out of negligence of Railroad, its officers, agents, servants or
employees, or be contributed to by such negligence. Notwithstanding the
foregoing, nothing herein contained is to be construed as an indemnifi-
cation against the sole negligence of Railroad, its officers, employees
or agents.

*Carl L. Aronson*

Countersigned

TRUCK INSURANCE EXCHANGE

KC2/CII

<u>TRK</u>0000268

PR0924

PR01326

Effective: April 1, 1981

Policy No. 350-40-00
Endorsement No. 8

## KAISER CEMENT CORPORATION, ET AL.

## ADDITIONAL INSURED - CITY OF REDWOOD CITY, ET AL.

In consideration of the premium, it is agreed that such insurance as is
afforded by this policy for Personal Injury and/or Property Damage
Liability coverage is hereby extended to apply to:

CITY OF REDWOOD CITY, THE BOARD OF PORT COMMISSIONERS
OF THE CITY OF REDWOOD CITY, THE PORT OF REDWOOD CITY,
THE PORT COMMISSIONERS, THE COUNCILMEN AND ALL OFFICERS,
AGENTS AND EMPLOYEES THEREOF Redwood City, California

as an Additional Insured, but only as respects the terms and conditions
of the lease of premises between the Named Insured and the City of
Redwood City.

The term "the Insured" is used severally and not collectively, but
the inclusion herein of more than one insured shall not increase the
limits of the Exchange's liability.

_C. A. F. Swanson_
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000269

PR0925

PR01327

Appellant's Appendix 03426
3A04781
TRUCK0000675

Effective: April 1, 1981

Policy No. 350-40-00
Endorsement No. 9

KAISER CEMENT CORPORATION, ET AL.

It is understood and agreed that such insurance as is afforded by this
policy for Personal Injury and/or Property Damage liability is hereby
extended to apply to:

CNA Casualty of California
600 South Commonwealth Avenue
Los Angeles, CA  90005

as an Additional Insured, but only as respects the terms and conditions
of the lease of premises agreement between the Named Insured and CNA
Casualty of California at the above location.

_Carl J. Swanson_
Countersigned

TRUCK INSURANCE EXCHANGE

KC2/C9

TRK0000270

PR0926

PR01328

Effective: April 1, 1981

Policy No. 350-4D-00
Endorsement No. 10

### KAISER CEMENT CORPORATION, ET AL.

### ADDITIONAL INSURED - COMMERCIAL CREDIT INDUSTRIAL CORP.

In consideration of the premium, it is agreed that such insurance as is
afforded by this policy for Automobile Personal Injury and/or Property
Damage Liability coverages is hereby extended to apply to

COMMERCIAL CREDIT INDUSTRIAL CORP.
300 St. Paul Place
Baltimore, Maryland  21202

as an Additional Insured, but only as respects the terms and conditions
of the agreement for lease of automobiles and the sale or disposition of
automobiles, on behalf of the Named Insured.

_____
Countersigned

TRUCK INSURANCE EXCHANGE

KC2/C3

TRK0000271

PR0927

PR01329



Effective: April 1, 1982

Policy No. 350-40-00
Endorsement No. 21

## KAISER CEMENT CORPORATION, ET AL.

### ADDITIONAL INSURED - McCULLAGH LEASING, INC.

In consideration of the premium, it is agreed that such insurance as is afforded by this policy for Personal Injury and/or Property Damage Liability is hereby extended to apply to:

McCullagh Leasing, Inc.
30803 Little Mack Avenue
Roseville, Michigan 48066

as an Additional Insured, but only as respects the terms and conditions of the Lease Agreement for vehicles between the Named Insured and McCullagh Leasing, Inc.

Countersigned

KC2/C7

TRUCK INSURANCE EXCHANGE

TRK0000272

PR0928

PR01330



Effective: April 1, 1981

Policy No. 350-40-00
Endorsement No. 12

### KAISER CEMENT CORPORATION, ET AL.

### ADDITIONAL INSURED - TIDEWATER TERMINAL COMPANY

In consideration of the premium, it is agreed that such insurance as
is afforded by this policy for Personal Injury and/or Property Damage
Liability coverages is hereby extended to apply to

TIDEWATER TERMINAL COMPANY
2609 N. E. Marine Drive
Portland, Oregon 97211

as an Additional Insured, but only as respects the terms and conditions
of the lease of premises at East Pasco, Washington, between the Named
Insured and Tidewater Terminal Company.

Carl L. Swanson
Countersigned

TRUCK INSURANCE EXCHANGE

KC2/C4

<u>TRK</u>0000273

PR0929

PR01331

Effective: April 1, 1981

Policy No. 350-40-00
Endorsement No. 13

KAISER CEMENT CORPORATION, ET AL.

ADDITIONAL INSURED - DEPARTMENT OF TRANSPORTATION, STATE OF HAWAII

In consideration of the premium, it is agreed that such insurance as is
afforded by this policy for Personal Injury and/or Property Damage
Liability coverages is hereby extended to apply to

STATE OF HAWAII
Department of Transportation
Harbors Division
869 Punchbowl Street
Honolulu, Hawaii 96813

as an Additional Insured, but only as respects the terms and conditions
of the lease of premises between the Named Insured and the State of
Hawaii at the following locations:

(1) Land adjacent to Pier 32, Honolulu, Hawaii; and

(2) Land situated at Hawaihae Harbor, Hawaihae, Hawaii.

*Carl L. Swanson*
Countersigned

KC2/C5

TRUCK INSURANCE EXCHANGE

TRK0000274

PR0930

PR01332

TRIAL EX. 303
Page 35

Appellant's Appendix 02431

JA04786
TRUCK0000680

Effective: April 1, 1981

Policy No. 350-40-DO
Endorsement No. 14

## KAISER CEMENT CORPORATION, ET AL.

### ADDITIONAL INSURED - DEPARTMENT OF TRANSPORTATION, STATE OF HAWAII

In consideration of the premium, it is agreed that such insurance as is
afforded by this policy for Personal Injury and/or Property Damage
Liability coverages is hereby extended to apply to

STATE OF HAWAII
Department of Transportation
Harbors Division
869 Punchbowl Street
Honolulu, Hawaii 96813

as an Additional Insured, but only as respects the terms and conditions
of the lease of premises between the Named Insured and the State of
Hawaii at the following locations:

(1)  Land adjacent to Pier 32, Honolulu, Hawaii;

(2)  Land situated at Kawaihae Harbor, Kawaihae, Hawaii; and

(3)  Land situated at Kahului, Maui, Hawaii.

Countersigned

TRUCK INSURANCE EXCHANGE

<u>TRK</u>0000275

PR0931

PR01333



Effective: October 1, 1981

Policy No. 350-40-00
Endorsement No. 15

## KAISER CEMENT CORPORATION, ET AL

It is understood and agreed that such insurance as is afforded by this
policy for Personal Injury and/or Property Damage liability is hereby
extended to apply to:

The Richlar Partnership
The Richlar Plaza
12233 West Olympic Boulevard
Los Angeles, CA  90064

as an Additional Insured, but only as respects the terms and conditions
of the lease of premises agreement between the Named Insured and The
Richlar Partnership at the above location.

It is further understood that Endorsement No. 9 is deleted in its entirety.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000276

PR0932

PR01334

Effective: April 1, 1981

Policy No. 350-40-00
Endorsement No. 16

## KAISER CEMENT CORPORATION, et al

In consideration of the premium, it is understood and agreed that
Endorsement No. 2, page 2, is amended as follows:

The adjustment expense charge shall be as follows:

1. Allocated Adjustment Expense - Expenses shall be
   reimbursed in the same proportion that the deductible
   amount bears to the total incurred loss, subject to
   the following additional provisions:

   (a) If a claim is closed without payment, Allocated
       Adjustment Expense shall not exceed the amount
       of the deductible.

   (b) If loss payment is made the maximum Allocated
       Adjustment Expense chargeable shall be $75,000
       per claim.

2. Unallocated Adjustment Expense - Expenses shall be:

   (a) Seventeen percent (17%) of all paid bodily injury
       claims to a maximum Unallocated Adjustment Expense
       of $10,000 per claim.

   (b) Eight percent (8%) of all other paid claims to a
       maximum Unallocated Adjustment Expense of $5,000
       per claim.

Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000277

PR0933

PR01335

ENDORSEMENT

Effective Date    4-1-82

Insured    KAISER CEMENT CORPORATION

R 00 03 4000
Amended Policy Number of the
Company designated in the
Declarations

ENDORSEMENT # 17

CHANGE OF POLICY NUMBER ENDORSEMENT

The Company, the above named Insured, and any additional Insureds under this policy
mutually agree that the policy number in effect prior to this endorsement is changed from

350-40-00          to     R 00 03 4000

as of the effective date of this endorsement. All other terms of the Declarations, Insuring
Agreements, Exclusions, Conditions and Endorsements in effect prior to this Endorsement are
unchanged and will remain in effect.

Countersigned    Carl F. Lorenson
                 AUTHORIZED REPRESENTATIVE

TRK0000278

PR0934

PR01336

TRIAL EX. 303
Page 39

Appellant's Appendix 02435

JA04790
TRUCK0000684

Effective Date:  April 1, 1982

Policy No. WO003 4000

Endorsement No.18

### KAISER CEMENT CORPORATION, ET AL

### PREMIUM ADJUSTMENT ENDORSEMENT

ADVANCE PREMIUM to be maintained: $16,000.

A.  It is agreed that on or before the 1st day of July, 1983, the
Named Insured shall render to the Company a statement showing
the total remuneration earned by its employees during the
period April 1, 1982 to April 1, 1983 (being the amount of
remuneration upon which the Named Insured's Workers' Compen-
sation for the same period is predicated, including similarly
adjusted payroll in states where Workers' Compensation is self-
insured or insured in a State Fund), and the earned premium
shall be computed at the rate of $0.54 per $100 of the total
remuneration so reported.

B.  The Named Insured shall pay to the Company the sum of $54,000,
each quarter on or before the 10th of the month following each
such quarter during the currency of the policy.

Carl F. Svanson
Countersigned

TRUCK INSURANCE EXCHANGE

TRK0000279

PR0935

PR01337

Appellant's Appendix 02436
JA04791
TRUCK0000685



TRK0000280

PR0936

PR01338

Appellant's Appendix 02437
JA04792
TRUCK0000686

Exhibit O Page 43 of 47

SPECIAL STATE PROVISIONS

TRK0000281

PR0937

PR01339

TRIAL EX. 303
Page 42

Appellant's Appendix 02438
JA04793
TRUCK0000687



ENDORSEMENT CANCELLING AN ENDORSEMENT

ENDORSEMENT #20          E-8
10TH EDITION

KAISER CEMENT CORP.

Effective    4-1-82                    90-01-02    WDO 03 4000

In consideration of the premium it is agreed that the endorsement

#4  AGREEMENT DELETING UNINSURED MOTORISTS COVERAGE
(Coverage and Endorsement No.)

and applicable to the policy numbered above is hereby cancelled.

EFFECTIVE not prior to time applied for (12:01 A.M. Standard Time in California, Oregon and North Dakota) on the ef-
fective date shown above this endorsement, when countersigned becomes part of the above numbered policy, issued by
the Company designated in the Declarations, and supersedes and controls anything in the policy contrary hereto but is
otherwise subject to the Declarations, Insuring Agreements, Exclusions and Conditions thereof.

Countersigned    Carl F Levanson
                 Authorized Representative

TRK0000282

PR0938

PR01340

TRIAL EX. 303
Page 43

Appellant's Appendix 02439

JA04794
TRUCK0000688

AGREEMENT... TING UNINSURED MOTORISTS Co... T FROM THE POLICY

READ CAREFULLY BEFORE SIGNING

KAISER CEMENT CORP.                           ENDORSEMENT #21

90-01-02      KOO 03 6000

Agent's No.        Policy Number

Required California Provision (Applicable to Calif. residents). The California Insurance Code requires an insurer to provide uninsured motorists coverage in each bodily injury liability insurance policy it issues covering liability arising out of the ownership, maintenance, or use of a motor vehicle. Such section also permits the insurer and the applicant to delete such coverage completely or with respect to one or more natural persons designated by name when operating a motor vehicle. Uninsured motorists coverage insures the insured, his heirs, or legal representatives for all sums within the financial responsibility limits which such person or persons are legally entitled, to recover as damages for bodily injury, including any resulting sickness, disease, or death, to him from the owner or operator of an uninsured motor vehicle not owned or operated by the insured.

In consideration of the deletion of the premium with respect thereto, it is agreed by the insurer indicated above, and the undersigned named insured that all provisions of the policy applied for (including any subsequent renewal thereof or superseding policy) with respect to Uninsured Motorists Coverage are hereby deleted and shall be of no force or effect as to any person or insured, named or otherwise.

The undersigned named insured further understands that by executing this form, he is relinquishing coverage which would compensate him and occupants of his automobile for damages they are legally entitled to recover as a result of injury caused by the negligence of a person driving an automobile without liability insurance or caused by a hit and run driver.

(Indicate those vehicles to be covered.)

☐ any owned private passenger automobile

☒ UNINSURED MOTORIST COVERAGE APPLIES TO VEHICLES IN STATES WHERE THE
any automobile described below     COVERAGE IS MANDATORY.

YEAR MODEL & TRADE NAME                         IDENTIFICATION NUMBER

Lot 2
(8g to 'above

Dated ___ Dec 29 ___ 19 82      _____
                                 (SIGNATURE OF NAMED INSURED?)

66-5030   6-80   333   RPD   Printed in USA

TRK0000283

PR0939

PR01341

Effective:  8-13-82

Endorsement No. 22
Policy No. N0003-60-00

### KAISER CEMENT CORPORATION

It is understood and agreed that such insurance as is afforded by the policy shall also name as additional insureds Bay Cities Transportation Co., but only as respects operations of Kaiser Cement Corporation.

The coverage provided hereby shall be primary without right of contribution from similar policies maintained by Bay Cities Transportation Co., and the Insurer shall give thirty (30) days notice of an cancellation of, or material change in the policy.

The Insurer waives all rights of subrogation against Bay Cities Transportation Co. for claims or injuries or death to persons or damages to property sustained in performing the contract between the Named Insured and Bay Cities Transportation Co.

It is understood and agreed that the Named Insured does not hereby assume responsibility for the active sole negligence, intentional misconduct or fraud of Bay Cities Transportation Co.

Countersigned  _Carl F. Swanson_
Authorized Representative

TRUCK INSURANCE EXCHANGE

TRK0000284

PR0940

PR01342

Appellant's Appendix 02441

JA04796
TRUCK0000690

JA04797
TRUCK0000691

# EXHIBIT P

JA04798

**United States Bankruptcy Court, Western District of North Carolina**

| Fill in this information to identify the case (Select only one Debtor per claim form): |
| --- |
| ☒ Kaiser Gypsum Company, Inc. (16-31602) |
| ☐ Hanson Permanente Cement, Inc. (16-31614) |

Official Form 410

# Proof of Claim

**4/16**

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

Truck Insurance Exchange

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☒ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

David L. Neale, Esq.
Levene, Neale, Bender, Yoo & Brill L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, CA 90067

Contact phone  (310) 229-1234

Contact email  DLN@LNBYB.com

**Where should payments to the creditor be sent?** (if different)

Dennis Patterson
30151 Agoura Road
Westlake Village, CA 91361

Contact phone _____

Contact email  dennis_patterson@farmersinsurance.com

**4. Does this claim amend one already filed?**

☒ No
☐ Yes.  Claim number on court claims registry (if known)_____

Filed on _____
        MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☒ No
☐ Yes. Who made the earlier filing? _____

Claim Number 42

JA04799

**Part 2:**   **Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| **6. Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |

**7. How much is the claim?**   $ 583,216.04; see attachment .   **Does this amount include interest or other charges?**
☒ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Unpaid Insurance Deductibles

**9. Is all or part of the claim secured?**

☑ No
☐ Yes. The claim is secured by a lien on property.

**Nature of property:**
☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:** _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**   $_____

**Amount of the claim that is secured:**   $_____

**Amount of the claim that is unsecured:**   $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $_____

**Annual Interest Rate** (when case was filed)_____%
☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $_____

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

JA04800

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(____) that applies. | $_____ |

* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:   Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Signature: */s/ Dennis J. Patterson*
/s/ Dennis J. Patterson (Sep 13, 2017)

Email:  dln@lnbyb.com

_____
Signature

**Name of the person who is completing and signing this claim:**

Name    Dennis J. Patterson
_____
First name          Middle name          Last name

Title    High Exposure Manager, Environmental & Specialized Claims
_____

Company    Truck Insurance Exchange
_____
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address    30151 Agoura Road
_____
Number      Street
Westlake Village                         CA        91361
_____
City                                      State     ZIP Code

Contact phone    _____    Email    dennis_patterson@farmersinsurance.com

Attach Supporting Documentation (limited to a single PDF attachment that is less than 5 megabytes in size and under 100 pages):

☒ I have supporting documentation.
   (attach below)

☐ I do not have supporting documentation.

**Attachment**

PLEASE REVIEW YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTS AND REDACT ACCORDINGLY PRIOR TO UPLOADING THEM. PROOFS OF CLAIM AND ATTACHMENTS ARE PUBLIC DOCUMENTS THAT WILL BE AVAILABLE FOR ANYONE TO VIEW ONLINE.

IMPORTANT NOTE REGARDING REDACTING YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTATION When you submit a proof of claim and any supporting documentation you must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. The responsibility for redacting personal data identifiers (as defined in Federal Rule of Bankruptcy Procedure 9037) rests solely with the party submitting the documentation and their counsel. Prime Clerk and the Clerk of the Court will not review any document for redaction or compliance with this Rule and you hereby release and agree to hold harmless Prime Clerk and the Clerk of the Court from the disclosure of any personal data identifiers included in your submission. In the event Prime Clerk or the Clerk of the Court discover that personal identifier data or information concerning a minor individual has been included in a pleading, Prime Clerk and the Clerk of the Court are authorized, in their sole discretion, to redact all such information from the text of the filing and make an entry indicating the correction.

JA04802

<u>Official Form 410</u>

# Instructions for Proof of Claim

United States Bankruptcy Court                                                    12/15

**These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.**

> **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**
> 18 U.S.C. §§ 152, 157 and 3571.

## How to fill out this form

- **Fill in all of the information about the claim as of the date the case was filed.**

- **Select the applicable Debtor at the top of the form.**

- **If the claim has been acquired from someone else, then state the identity of the last party** who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- **Attach any supporting documents to this form.**
  Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of *redaction* on the next page.)

  Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

- **Do not attach original documents because attachments may be destroyed after scanning.**

- **If the claim is based on delivering health care goods or services, do not disclose confidential health care information. Leave out or redact confidential information both in the claim and in the attached documents.**

- **A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth.** See Bankruptcy Rule 9037.

- **For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian.** For example, write *A.B., a minor child* (*John Doe, parent, 123 Main St., City, State*). See Bankruptcy Rule 9037.

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, enclose a stamped self-addressed envelope and a copy of this form. Claimants who submit proofs of claim through Prime Clerk's website interface will receive an email confirmation of such submissions. You may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at http://cases.primeclerk.com/kaisergypsum.

## Understand the terms used in this form

**Administrative expense:** Generally, an expense that arises after a bankruptcy case is filed in connection with operating, liquidating, or distributing the bankruptcy estate. 11 U.S.C. § 503.

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

JA04803

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. §101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**Evidence of perfection:** Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Priority claim:** A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. §507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Redaction of information:** Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. §506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Setoff:** Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

## Please send completed Proof(s) of Claim to:

Kaiser Gypsum Company, Inc. Claims Processing Center
c/o Prime Clerk LLC
830 3rd Avenue, 3rd Floor
New York, NY 10022

> **Do not file these instructions with your form**

JA04804

**Fill in this information to identify the case:**

Debtor 1    Kaiser Gypsum Company, Inc.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:   Western District of North Carolina

Case number   16-31602 (JCW)

Official Form 410

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
| --- | --- |

| | | |
| --- | --- | --- |
| 1. Who is the current creditor? | Truck Insurance Exchange | |
| | Name of the current creditor (the person or entity to be paid for this claim) | |
| | Other names the creditor used with the debtor | |
| 2. Has this claim been acquired from someone else? | ☑ No | |
| | ☐ Yes.  From whom? | |
| 3. Where should notices and payments to the creditor be sent? | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent? (if different)** |
| Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | David L. Neale, Esq., Levene, Neale, Bender, Yoo & Brill L.L.P. | Dennis Patterson |
| | Name | Name |
| | 10250 Constellation Blvd., Suite 1700 | 30151 Agoura Road |
| | Number       Street | Number       Street |
| | Los Angeles       CA       90067 | Westlake Village       CA       91361 |
| | City       State       ZIP Code | City       State       ZIP Code |
| | Contact phone (310) 229-1234 | Contact phone |
| | Contact email DLN@LNBYB.COM | Contact email dennis_patterson@farmersinsurance.com |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one): | |
| | _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | |
| 4. Does this claim amend one already filed? | ☑ No | |
| | ☐ Yes.  Claim number on court claims registry (if known) _____ | Filed on _____ MM / DD / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No | |
| | ☐ Yes.  Who made the earlier filing? _____ | |

JA04805

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---------|--------------------------------------------------------------------|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$_____ 583,216.04 . Does this amount include interest or other charges?

plus additional unpaid deductibles, subject to future determination; see attachment

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Unpaid insurance deductibles

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

Basis for perfection: _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $_____

Amount of the claim that is secured: $_____

Amount of the claim that is unsecured: $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition: $_____

Annual Interest Rate (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition. $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

JA04806

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | | |
|---|---|---|---|
| | A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No | |
| | | ☐ Yes. *Check one:* | **Amount entitled to priority** |
| | | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| | | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| | | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| | | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| | | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| | | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $ _____ |
| | | * Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3:    Sign Below

The person completing this proof of claim must sign and date it.
FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.
☑ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date **09/11/2017**
MM / DD / YYYY

_Signature_

Print the name of the person who is completing and signing this claim:

| | | |
|---|---|---|
| Name | Dennis J. Patterson | |
| | First name          Middle name          Last name | |
| Title | High Exposure Manager, Environmental & Specialized Claims | |
| Company | Truck Insurance Exchange | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | |
| Address | 30151 Agoura Road | |
| | Number          Street | |
| | Westlake Village          CA          91361 | |
| | City          State          ZIP Code | |
| Contact phone | _____ | Email dennis_patterson@farmersinsurance.com |

JA04807

<u>Attachment to Proof of Claim of Truck Insurance Exchange</u>

In further support of its proof of claim (the "Claim"), Truck Insurance Exchange ("Claimant"), states as follows:

1.      Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc. (collectively, the "Debtors") are defendants in various asbestos-related bodily injury lawsuits ("ABIC Claims") filed in various state courts.  Those lawsuits are covered by general liability insurance, subject to certain limited exclusions and deductibles (the "Deductibles").  Claimant, an affiliate of Farmers Insurance, issued primary liability policies to the Debtors that cover ABIC Claims (collectively, the "Truck Policies").  The Truck Policies obligate Claimant to defend the ABIC Claims and pay the costs of defense.

2.      As of September 30, 2016 (the "Petition Date"), the Debtors were jointly and severally liable to Claimant for unpaid Deductibles totaling $2,770,000 (the "Unpaid Deductibles").  Furthermore, as additional ABIC Claims are asserted against the Debtors, additional Deductibles shall be payable by the Debtors.  The amount of the Deductibles payable to Claimant with respect to future ABIC Claims is, as of the date hereof, unliquidated (the "Future Deductibles").

3.      Prior to the Petition Date, the Debtors and Claimant entered into a cost sharing agreement (the "Original Cost Sharing Agreement"), pursuant to which, among other things, Claimant agreed to reimburse the Debtors for a portion of the costs incurred by them in connection with their efforts to permanently resolve all ABIC Claims, including the reasonable fees and expenses of professionals retained by the Debtors and by representatives of present and future asbestos claimants.  By its terms, the Original Cost Sharing Agreement terminated on the Petition Date.

JA04808

4.      On the Petition Date, Claimant and the Debtors entered into a first amendment to the Original Cost Sharing Agreement (the "Amended Cost Sharing Agreement"), pursuant to which, among other things, the term of the Original Cost Sharing Agreement was extended for an additional 30 days following the Petition Date.

5.      The Amended Cost Sharing Agreement provided, *inter alia*, that certain costs covered by that agreement that would otherwise be payable by Claimant would be offset against the Unpaid Deductibles until the Unpaid Deductibles were paid in full.

6.      On October 28, 2016, the Debtors filed the *Debtors' Motion for an Order Authorizing Them to Enter Into Interim Cost Sharing Agreement* [Doc. No. 176] (the "Motion"). Attached as Exhibit A to the Motion were the Original Cost Sharing Agreement and the Amended Cost Sharing Agreement.

7.      By order entered on November 23, 2016 [Doc. No. 258], the Bankruptcy Court granted the Motion and authorized the Debtors to enter into the Amended Cost Sharing Agreement, and specifically approved those provisions of the Amended Cost Sharing Agreement permitting Claimant to setoff the Unpaid Deductibles against the costs Claimant agreed to cover under the Amended Cost Sharing Agreement.

8.      As of the termination date of the Amended Cost Sharing Agreement, the total amount of costs for which Claimant had assumed liability was $2,186,783.96 (the "Covered Costs"). After offsetting the Covered Costs from the Unpaid Deductibles, the balance due and payable to Claimant as of October 30, 2016 (the termination date of the Amended Cost Sharing Agreement) was $583,216.04 (the "Net Deductible Obligation").

2

9.      As of the date of this Proof of Claim, the Debtors are liable to Claimant for (a) the Net Deductible Obligation, and (b) the Future Deductibles in a currently unknown and unliquidated amount.

10.      In filing this Proof of Claim, Claimant does not submit itself to the jurisdiction of the Bankruptcy Court for any purpose other than with respect to this Proof of Claim.

11.      The execution and filing of this Proof of Claim is not: (i) a waiver or release of any rights of Claimant against any other entity or person for all or part of the claim asserted hereby; (ii) a consent by Claimant to the jurisdiction of the Bankruptcy Court with respect to any proceeding commenced in this case against or otherwise involving Claimant; (iii) a waiver of the right by Claimant to withdraw the reference with respect to the subject matter of the claims asserted hereby, any objection or other proceedings commenced with respect thereto or any other proceeding commenced in these cases against or otherwise involving Claimant; or (iv) an election of remedies by Claimant that waives or otherwise affects any other remedy available at law or equity to Claimant.  This Proof of Claim is made without prejudice to the rights of Claimant under the Bankruptcy Code or otherwise.

12.      Claimant does not waive any right to amounts due for any claim asserted hereby by not stating a specific amount due for any such claim at this time.  Claimant expressly reserves all of its rights, including, without limitation, the rights of any of them: (i) to file a separate proof of claim with respect to any claim set forth herein or otherwise (which proof of claim, if so filed, shall not be deemed to supersede this Proof of Claim unless expressly so stated therein); (ii) to amend, modify or supplement this Proof of Claim; (iii) to file additional proofs of claim against third parties, including, without limitation, any affiliates of the Debtors.  The filing of this Proof of Claim shall not constitute or be construed to effect a waiver by Claimant of any rights, claims,

3

JA04810

causes of action, setoffs, recoupments, netting or defenses (or remedies with respect thereto) which Claimant may have against or with respect to any person or entity, including, without limitation, the Debtors and their respective affiliates.

13.    In the event that any order of the Bankruptcy Court is entered which effects: (i) a recharacterization or subordination of claims, including, without limitation, the claim asserted hereby; (ii) substantive consolidation of the Debtors with any other party or entity; or (iii) any other similar remedy, the right of Claimant to file one or more additional proof(s) of claim or amended proofs of claim against the Debtors is specifically reserved.

14.    Claimant reserves all rights to prepetition and postpetition interest, costs and attorneys' fees with respect to the claims asserted hereby to the maximum extent permitted by law.

15.    Claimant additionally asserts any and all other rights and remedies arising as a matter of law or equity against the Debtors, or either of them, or pursuant to any contract or other arrangement between Claimant and the Debtors, or either of them, whether or not such contract or other arrangement is specifically identified herein.

16.    Claimant reserves all rights to have the claim asserted hereby and any other defenses, counterclaims, or objections thereto determined before any other judicial or administrative body having jurisdiction, and, to the extent necessary to preserve such rights, makes demand therefor.

17.    This claim is not intended, nor shall it be deemed, to waive Claimant's right to have final orders in non-core matters and those in core matters otherwise covered by the holding of *Stern v. Marshall*, 564 U.S. 462 (2011) entered only after *de novo* review by a higher court.

JA04811

18.    This Proof of Claim is without prejudice to Claimant's right to assert that: (i) some or all of the claims asserted hereby are entitled to be treated as administrative claims against one or more of the Debtors pursuant to 11 U.S.C. § 503(b) and § 507(a); or (ii) Claimant holds other claims, rights and remedies against the Debtors that are entitled to be treated as administrative claims against one or more of the Debtors pursuant to 11 U.S.C. § 503(b) and § 507(a).

JA04812



# Electronic Proof of Claim

Adobe Sign Document History                                    09/13/2017

| | |
|---|---|
| Created: | 09/13/2017 |
| By: | Prime Clerk (epoc@primeclerk.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA1C14fXNfhe8g_9DRikGmyPj6XlX1pcMp |

## "Electronic Proof of Claim" History

Widget created by Prime Clerk (epoc@primeclerk.com)
09/13/2017 - 2:12:52 PM EDT

/s/ Dennis J. Patterson (dln@lnbyb.com) uploaded the following supporting documents:
   Attachment
09/13/2017 - 2:26:26 PM EDT

Widget filled in by /s/ Dennis J. Patterson (dln@lnbyb.com)
09/13/2017 - 2:26:26 PM EDT- IP address: 209.234.189.130

(User email address provided through API User-Agent: Mozilla/5.0 (Windows NT 10.0; WOW64; rv:55.0) Gecko/20100101 Firefox/55.0)
09/13/2017 - 2:26:28 PM EDT- IP address: 209.234.189.130

Signed document emailed to /s/ Dennis J. Patterson (dln@lnbyb.com) and Prime Clerk (epoc@primeclerk.com)
09/13/2017 - 2:26:28 PM EDT

Prime Clerk    POWERED BY
Adobe Sign

JA04813

# EXHIBIT Q

JA04814

**NOT APPROVED FOR PUBLICATION WITHOUT THE APPROVAL OF THE COMMITTEE ON OPINIONS**

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION MIDDLESEX COUNTY
NICHOLAS J. STROUMSTOS, JR., J.S.C.

DOCKET NO. MID-L-8908-01

---------------------------------------------------------

CONGOLEUM CORPORATION,

        *Plaintiff*

    vs.

ACE AMERICAN INSURANCE CO., *et. al.*,

        *Defendants*

**Decision and Judgment**

---------------------------------------------------------

**FINDINGS OF LAW AND FACT:  TRIAL PHASE I**

    This Declaratory Judgment action has been bifurcated into three phases.  Phase 1, which is the subject of the foregoing, concerns:

> [a]ll issues and claims relating to whether the defendant insurers are obligated to provide coverage under the policies at issue in this litigation for the [Claimant's Agreement] entered into by Congoleum including but not limited to all issues and claims relating to both Congoleum's decision and conduct in entering into the Claimant Agreement and filing a prepackaged bankruptcy, and the insurance company defendants' decisions and conduct in opposing the Claimant Agreement and Congoleum's pre-packaged bankruptcy, the

JA04815

reasonableness and good faith of the Claimant Agreement, whether the
Claimant Agreement breached any insurance policies-and, if so, whether the
insurance companies suffered any prejudice, and whether the insurance
companies' opposition to the Claimant Agreement and bankruptcy and various
other conduct by the insurers has breached their duties of good faith and fair
dealing such that they are precluded from asserting that Congoleum's decision
to enter into the Claimant Agreement constitutes any breach(es) on the part of
Congoleum.  (Case Management Order Number V, Paragraph 5.)

## FINDINGS OF MATERIAL FACT

The Court finds the following facts.  Plaintiff Congoleum Corporation is a longtime
manufacturer of flooring products.  Years ago, before 1974 for tile products and before 1983 for
vinyl products, certain of their products contained asbestos.  The asbestos was encapsulated
within the products during the manufacturing process.

Congoleum was first named defendant in an asbestos-related bodily injury claim in 1981.
Over the next 21 years, from 1981 to 2002, over 70,000 claimants filed suit against Congoleum.
Of all of those, Congoleum's primary insurers resolved over 33,000 claims for approximately
$13.5 million.  The majority of the claims were dismissed without payment.

Liberty Mutual Insurance Co. ("Liberty") and Employers Insurance Co. of Wausau
("Wasau") issued primary general liability insurance to Congoleum, and defended and
indemnified Congoleum against the underlying claims until 2001 and 2002, respectively.  Liberty
provided Congoleum with primary liability insurance from January 1, 1954 to December 1, 1972
and March 1, 1976 to August 19, 1987.  It is disputed whether Liberty issued policies prior to
1954.  Wasau provided Congoleum with primary liability insurance from January 1, 1973
through March 1, 1976.  Congoleum also has approximately $1.3 billion in excess coverage
limits for the asbestos-related bodily injury claims from numerous other carriers.  Notably,
approximately 30% of the available coverage limits were issued by insurance companies that are

now insolvent.

By February 2001, Liberty alleged it had exhausted its limits of liability and advised Congoleum that it no longer would indemnify them in relation to the underlying asbestos claims. In claiming exhaustion, Liberty relied on a non-cumulation provision in its policies that it believed limited its obligations to a single limit of liability even though the underlying claims triggered multiple policies and Liberty acknowledged primary coverage for least 30 years dating back to 1955.

After Liberty withdrew, Wasau continued to pay claims until August 28, 2002, at which time they advised Congoleum that they had its primary limits of liability.

In July 2001, Congoleum, concerned with being tagged a primary defendant in asbestos suits around the county, convened a meeting of its excess carriers to discuss the transition from its primary to access coverage, many of which were supervised by the Honorable Mark Epstein. At the conclusion of that meeting, Congoleum made a proposal to its first layer excess carriers. Those first layer excess carriers declined to agree to Congoleum's proposal because, in their collective view, Congoleum had not yet exhausted its primary coverage. The excess carriers relied on the decision made in <u>Spalding Composites Co. Inc. v. Aetna Cas. & Sur. Co.</u>, 176 N.J. 25 (2003). The majority of the first layer insurers responded to Congoleum by not admitting coverage or offering to participate in the defense subject to a reservation of rights.

On September 15, 2001, Certain Underwriters at Lloyd's of London and Certain London Market Insurance Companies brought this action against Congoleum and its other insurers seeking a declaration of all their rights and obligations to Congoleum for the underlying asbestos claims. Lloyd's sought a declaration that the policies they issued did not provide coverage for the asbestos claims. In their pleadings, all of Congoleum's excess insurers disputed the contractual obligations to provide coverage for Congoleum's asbestos liabilities. In addition, the excess insurers raised affirmative defenses. Defendants, Old Republic Insurance Company, First Aid

Insurance Company and Twin City Fire Insurance Co., in particular, wrote letters denying

coverage.

Congoleum responded by including a demand for relief against the insurers.  On April 16, 2002,

the parties were realigned, with Congoleum named plaintiff.

Around the period concerning the inception of this litigation, Congoleum conducted a

mock trial in New York City through DecisionQuest.  Congoleum claims that the jurors generally

rejected their low-dose encapsulation defense and product identification defense.  From the mock

trial, Congoleum claims it concluded that it would have an extremely difficult time litigating the

case in trial, with a particularly difficult task of avoiding a reckless disregard finding.  In general,

Congoleum claims that the mock trial demonstrated that their proposed defenses would not work

in this type of litigation.  Accordingly, Congoleum thought it was in their best interest to

negotiate a settlement.

Also around this time period, Congoleum claims they supplied the first layer insurers with

an edited version of a report prepared by Ernst & Young, an outside consulting firm retained by

Congoleum to analyze its estimated future asbestos liabilities for 2000 and 2001.  That report

projected Congoleum's future asbestos liability at $44 million to $250 million.  However,

Congoleum claims that they specifically advised the insurers that, in *their view*, those estimations

probably understated the future liabilities by a significant degree; and that after making

adjustments to correct certain errors and to utilize more current information, Congoleum advised

the insurers that the report should be doubled or tripled.  Consequently, Congoleum estimated

their future liability at a figure close to $500 million.

Congoleum argued that that figure was quantified in an actuarial report of Congoleum's pending

asbestos liabilities prepared by Navigant Consulting.  Navigant estimated that the minimum

amount necessary to settle the claims as of December 31, 2002 would be at least $309 million.  In

reaching this conclusion, Navigant assumed that 60% of the pending claims would be dismissed without payment.  Also, Thomas Vazquez, Congoleum's economic expert made a calculation for total future liability which ranged from $1.9 billion ($1 billion net present value), and $2.7 billion ($1.4 billion net present value).

Unbeknownst to any of the insurers, by late September 2002, Congoleum began to explore the possibility of a prepackaged bankruptcy.  According to Congoleum, it began to explore this option because a damages-only verdict was entered in two claims, <u>Cook</u> and <u>Arsenault</u>, resulting in substantial damages of $18.2 million and $15.8 million, respectively. The liability trail was looming and  in the view of Congoleum, the excess insurers had abandoned it. Accordingly, they began a chin of events which culminated in  a negotiation of the Claimant Agreement which incorporated the prepackaged bankruptcy plan.  Congoleum saw the bankruptcy plan as the most effective way to combat the liability incurred by virtue of the asbestos litigation, particularly after they became a primary target for asbestos plaintiffs.

The planning of the prepackaged bankruptcy began on September 23, 2002, when Howard Feist, Congoleum's CFO, met with Perry Weitz, a plaintiffs' lawyer who represented the plaintiffs in the <u>Cook</u> and <u>Arsenault</u> matters.  Congoleum claims that their representatives met with Weitz to try to convince him that Congoleum did not have the financial resources to pay a settlement  of 20 million dollars he was  demanding in the underlying cases.  Congoleum claims that despite those representations, Weitz still refused to lower his demand.

Weitz then suggested that Congoleum should consider an exit strategy for its asbestos liability. Consequntly, the plan to enter into a prepackaged bankruptcy was born.  It is undisputed that Weitz recommended that Congoleum seek out Scott Gilbert as an attorney, describing him as a prepackaged bankruptcy expert.  Mr. Gilbert was co-counsel with Weitz in other  asbestos litigation.

On September 24, 2002, Richard Marcus, Congoleum's Vice Chairman, spoke with Gilbert by phone. During that conversation, Marcus told Gilbert that Congoleum had approximately $1 billion of insurance. Marcus also said that Feist had met with Weitz who suggested that Congoleum retain Gilbert. On September 26, 2002, Marcus met with Weitz and during those meetings Marcus told Weitz that Congoleum was going to meet with Mr. Gilbert on October 1, 2002.

On October 1, 2002, Congoleum met with Gilbert in Washington, DC. There, Feist, Richard Marcus (Congoleum's vice chairman) and Roger Marcus (Congoleum's CEO), retained Gilbert and his firm, Gilbert Heintz and Randolph ("GHR") to represent Congoleum in pursuing a prepackaged bankruptcy. On that day, Gilbert called Weitz to resolve the <u>Cook</u> and <u>Arsenault</u> for $16 million.

The excess insurance carriers refused to pay claims even after <u>Cook</u> and <u>Arsenault</u> were settled. Congoleum tried unsuccessfully to secure a coverage-in-place agreement. Despite requests for the first layer insurance to provide a group response to the coverage-in-place agreement, Congoleum never received a commitment. Instead, while Congoleum had settlement discussions with some of its insurers, the insurers continued to reserve their rights and directed Congoleum to act reasonably and in its own best interests. On November 1, 2002, Congoleum prepared a draft release announcing its intention to file a prepackaged bankruptcy.

On November 8, 2002, Gilbert, Craig Litherand, Bette Orr and Heather Keele of GHR met with Dominic Pacitti, Jeffrey Hampton, and Norman Pernick of Saul Ewing, Congoleum's initial bankruptcy counsel, and Jan Baker and Mark Chehi of Skadden Arps Slate Meagher & Flom, bankruptcy counsel for Congoleum's parent, American Biltrite, Inc. ("ABI"), to discuss the bankruptcy plan. On November 19, 2002, Gilbert and Orr met with Joe Rice and Weitz in New York to discuss the bankruptcy. Rice became involved because he could recruit enough

JA04820

claimants to ensure that 75% of the asbestos claimants would support Congoleum's prepackaged

plan (as per section 524(g) of the bankruptcy code).  Moreover, Rice had been involved with

Gilbert and Weitz in other prepackaged bankruptcies.

By November 2002, Michael Rooney, a partner of the Kenesis Group, retained on the

recommendation of GHR, had been engaged and began work on the global settlement.  At that

time, Kenesis was majority owned by GHR.  The next year, they merged with Clearinghouse, a

claim reviewing firm then owned by Joe Rice's paralegal on leave, Benee Wallace.  Congoleum

assigned Mr. Rooney to negotiate the medical criteria to be incorporated in the global settlement.

Congoleum and GHR further contemplated that Kenesis/Clearinghouse would later assume

responsibility for reviewing claims.  They were compensated on a per claim basis.

On December 10, 2002 and December 12, 2002 Congoleum met with its lender, Congress

Financial Bank, to discuss financing options for the bankruptcy.  The notes taken during that

meeting reflect that Congoleum discussed a facilitation fee for Rice and Weitz, that Congoleum

was expected contribution of a "few million" dollars, and that Congoleum recognized its insurers

would not be willing participants to the settlement.  Michael Strack of Congress Financial

testified that during the meeting they had with Congoleum's representatives, Congoleum's

representatives characterized the proposed fee to be paid to Weitz and Rice as a "payoff".

On January 9, 2003 and January 10, 2003, Gilbert, Orr and in Rooney met with Weitz and

Rice in Palm Beach, Florida.. No Congoleum representative nor insurance carrier was present. A

large part of the meeting was devoted to a discussion of the "facilitation fee".  Three days later,

on January 13, 2003, Congoleum issued a press release revealing that it was actively engaged in

negotiations toward a goal global resolution of its asbestos liabilities, and that upon successful

completion of these negotiations Congoleum intended to file a prepackaged bankruptcy.

Until seeing the January 13, 2003 press release, none of Congoleum's insurers knew that

JA04821

Congoleum was considering a private prepackaged bankruptcy plan. Prior to the press release, the first-layer excess carriers believed they were negotiating a coverage-in-place agreement. One first layer excess carrier even sent Congoleum's coverage counsel a letter on November 15, 2002 asking why no was returning his calls. Congoleum responded later that afternoon by saying that the delay was caused by office illnesses, but never mentioned that Congoleum was negotiating a global settlement and a prepackaged bankruptcy plan.

After issuing its press release, Congoleum concluded its negotiations with Weitz and Rice for the global settlement agreement of the underlying asbestos claims. The global settlement agreement was executed on April 10, 2003.

On October 16, 2003, Congoleum tendered to the insurers $203,323,000 in claims allowed and liquidated under the Claimant Agreement. By February 26, 2004, that number grew to $465,606,000.

On December 31, 2003, Congoleum filed its Chapter 11 bankruptcy petition and the prepackaged plan of reorganization in the United States Bankruptcy Court for the District of New Jersey. On October 13, 2005, the United States Court of Appeals for the Third Circuit reversed the Bankruptcy Court's order approving the retention of GHR as one of the law firms representing Congoleum. The Third Circuit found, among other things, that GHR had an actual conflict in representing Congoleum because GHR, by virtue of its co-counsel arrangements, represented thousands of the same claimants who would be compensated as a result of the negotiations with Congoleum. Accordingly, GHR's conflicts prevented it from being completely loyal to Congoleum's interests. The Bankruptcy Court subsequently entered an order requiring GHR disgorge more than $9 million in fees.

<u>CONCLUSIONS OF LAW AND FACT</u>

In the first phase of this trial, defendants collectively have offered three separate and independent grounds in seeking a judgment that they have no coverage obligations for the Claimant Agreement at issue. First, they argue that the Claimant Agreement was not entered in good faith and is unreasonable. Second, they argue that the insurers had a reasonable, good faith basis to withhold consent to the Claimant Agreement. Finally, they argue that the asbestos claimants participating in this Claimant Agreement released Congoleum from any obligations relating to the settlement monies.

<u>Reasonableness and Good Faith of the Claimant Agreement  and Good Faith Basis to Withhold Consent</u>

Under New Jersey law, a settlement entered into without the consent of insurers may be enforced against those insurers only if the settlement is reasonable and entered in good faith. <u>See Griggs v. Bertram</u>, 88 N.J. 347 (1983); <u>see also Fireman's Fund Ins. Co. v. Imbesi</u>, 361 N.J. Super. 539 (App. Div. 2003). If either prong is not satisfied, the Court should not enforce a settlement. <u>Imbesi</u>, 361 N.J. Super. at 564. In this situation, the burden of proof lies on the insured, <i>i.e.</i>, the burden to produce evidence to support the reasonableness and good faith of the settlement. <u>Id.</u> at 565. Assuming that the insured can meet this initial burden, the burden of persuasion then shifts to the defendants. <u>Id.</u>

In support of the reasonableness of the Claimant Agreement, Congoleum argues that there is no evidence in this case that the insurers could have negotiated a more favorable settlement in April 2003 than Weitz and Rice achieved with Congoleum's negotiators.  Moreover, they reject the insurers' argument that Congoleum paid little or nothing as a part of this global settlement is mistaken as they have contributed cash, rights to insurance coverage for asbestos claims, and stock value at the time of confirmation.  Finally, they claim Congoleum has put company control at risk as part of this bankruptcy.

The Court finds, however, consistent with the defendants' position, that the defendant insurers, upon learning of Congoleum's pursuit of a prepackaged bankruptcy, asked to be allowed to meet and participate.  GHR, Rice and Weitz invited the insurers to meetings on March 13, 2003 in South Carolina and March 20, 2003 in New York; however, no real negotiations took place at that meeting.  One meeting was delayed while Scott Gilbert and Joe Rice were enjoying the afternoon looking at custom made motorcycles. In addition at each of the meeting the insurance carriers were told discussions would advance only after they agreed to tender their policies.   The insurers did not receive a draft of the Claimant Agreement until March 7, 2003.  Congoleum later provided the insurers with revised drafts of the settlement documents, but only after an agreement in principle had been reached with Weitz and Rice without consulting the insurers.

The defendant insurers then reasonably declined to provide coverage to Congoleum for the Claimant Agreement on multiple grounds, including: (1) the fact that Congoleum excluded the insurers from participating in negotiations leading to the Claimant Agreement; (2) Congoleum entered into the settlement without the carriers' consent and over their objections; (3) the Claimant Agreement was the product of negotiations by conflicted counsel; (4) the use of Kenesis as the claims reviewer; (5) the payment of $1 million each to Weitz and Rice; (6) the

Claimant Agreement would result in the payment of claims that would not be paid in the tort system; and (8) the Claimant Agreement contained weak exposure and medical causation requirements, yet provided claims values that vastly exceeded Congoleum's historical average payments.  In the Court's view, these factors constitute reasonable grounds on the part of the defendant insurers to decline to provide coverage under the circumstances.  Moreover, the defendants' decision to decline to provide coverage was a decision made in good faith, given the factors listed above.

Moreover, the Court further finds that GHR colluded with Rice and Weitz to create a framework that would provide Congoleum with both the insurance money and also protect against the asbestos liability, while leaving the insurance companies to bear the costs.  The negotiated settlement clearly harmed the interests of the absent, non-participating insurance companies, who were never meaningful contributors to the terms of the settlement.

The Court also finds the prepackaged bankruptcy plan enabled the conflicted plaintiffs' lawyers to liquidate their claims before Congoleum filed a bankruptcy petition, thereby giving them an unfair priority in relation to Congoleum's other creditors.  As such, this was not an arrangement that would have been agreeable to the insurance companies.  In fact, Congoleum acknowledged that the defendants would not consent to the Claimant Agreement.  The insurers made clear that one of the reasons the settlement was improper because the Claimant Agreement would attract and pay claims that would not have ordinarily been paid in the tort system, thereby dramatically increasing the asbestos liability.  Consequently, the insurers in good faith, reasonably objected because the agreement was intended to harm their interest by increasing its asbestos liabilities.

Even more disconcerting is that Congoleum entered the Claimant Agreement on advice of outside counsel, GHR, who had an actual conflict of interest because of its relationship with

Weitz and his law firm, including their joint representation of claimants with claims against Congoleum.

Also, the Claimant Agreement significantly abandons viable defenses in the tort system, including requirements of product identification, statute of limitations, and the existence of deferred dockets for claims of unimpaired claimants in certain states.  It is worth noting that Congoleum was dismissed without payment in a substantial number of claims tried against it, though the Court is conscious that Congoleum had only recently been "tagged" a primary asbestos defendant.

The Court is also concerned by the fact that the Claimant Agreement is structured in a way that Congoleum would avoid its *Carter-Wallace* share while still retaining its ownership of the company.  The agreement expressly provided that claim should be paid entirely out of the insurance proceeds.  Also, once Congoleum assigned its rights to insurance, Congoleum avoided paying the share it would have been obligated to pay under New Jersey law for uninsured and solvent periods.  Accordingly, Claimant Agreement is also unfair in that aspect.

Equally concerning under the reasonableness prong of the *Griggs/Imbesi* tests is that the Claimant Agreement allows time-barred claims.  Notably, the agreement contains no statute of limitations provisions.  Moreover, the Claimant Agreement also contains no meaningful exposure requirement.  The exposure requirement merely required a claimant to sign a statement that he or she was exposed to an asbestos-containing product for which Congoleum has legal liability in order to recover under the agreement.  This provision was so lax that any individual could file a claim and it would be virtually impossible to challenge the exposure to the product since no details of any kind were required.

The Claimant Agreement also contains no meaningful provisions to ferret out fraudulent claims. Kinesis allowed a multitude of claims to be processed in assembly line fashion which

produced inherently fraudulent claims which Congoleum attempted to address by modifying its

bankruptcy plan to include a provision of further review. However, the plan which is the subject

matter of this litigation does not contain a further review of this type.

Moreover, the Court has already found that the upper layer insurance defendant's answers

in affirmative defenses do not constitute denials of coverage, and accordingly did not constitute a

breach toward their obligations to Congoleum.  The non-breaching carriers can have no coverage

obligations for the Claimant Agreement if they had a reasonable, good-faith basis to withhold

consent to the settlement, regardless of whether the Claimant Agreement was reasonable or

entered into in good faith pursuant to Radio Taxi Serv. Inc. v. Lincoln Mutual Ins. Co., 31 N.J.

299 (1960).  Under that case, Congoleum would bear the burden of proving that the defendants

breached their obligations under New Jersey law.  Congoleum would essentially have to prove

that the insurance companies failed to fairly and honestly consider the Claimant Agreement

before withholding consent.  Given the Court's findings of fact in this case, Congoleum cannot

make that showing.

Defendants fairly and honestly considered the Claimant Agreement and outlined the

specific  Accordingly, they did have a good-faith basis to withhold consent.  The evidence at trial

showed that defendants withheld consent for plainly legitimate reasons, discussed in detail

above.

Moreover, the court also finds Congoleum's argument as to this point unconvincing.  Congoleum

argued that the evidence shows that the defendants would have objected to any agreement entered

in connection with the prepackaged bankruptcy plan.  Specifically, they pointed to minutes of the

meetings of the American Insurance Association ("AIA") where various insurance company

representatives expressed concerned about prepackaged bankruptcies.  According to Congoleum

those minutes showed that defendants would have withheld consent for any settlement entered

into in conjunction with a prepackaged bankruptcy, even a reasonable one negotiated arm's-length.  The Court agrees with defendants insofar as they argue that the AIA minutes merely reflect a general concern among the participating insurers that prepackaged bankruptcies merely present an opportunity for abuse.  The fact that the insurers had general concerns about the opportunity for abuse does not mean that their objections to the Claimant Agreement were improper or that they did not really consider the Claimant Agreement.

<div align="center">

-

-

-

## Legal Obligation to Pay

-

</div>

The Court will briefly address the argument of the insurers regarding Congoleum's failure to meet its burden of proving that the insurers are legally obligated to pay the claims settled under the Claimant Agreement. The terms of the carriers' policies included language which would be equivalent to "legally obligated to pay."  It is not for this Court to alter the contract of the parties if in fact this language is clear and unambiguous. <u>Pickett v. Lloyds</u>, 131 N.J 457, 458 (1993).

Mr. Gilbert, in response to the Courts questioning, stated that the claimants who signed the claimant agreement would have no recourse against Congoleum.  In addition the Claimant Agreement language which was alluded to by Ms. Orr does not persuade this Court that Congoleum was obligated to pay these claims. The Court understood from the testimony of Gilbert, which was confirmed by Weitz, Feist, and Richard Marcus, that the releases were non-recourse whether or not anyone recovered insurance proceeds.

## CONCLUSION

For the aforementioned reasons, the Court concludes that the Claimant Agreement is an unreasonable agreement, not made in good faith. Moreover, the defendants' opposition to the Claimant Agreement and bankruptcy were well-founded. Therefore the defendants have no coverage obligations for the Claimant Agreement under New Jersey law.

Therefore for the foregoing reasons it is **Order and Adjudged**

          **On this 18th day of May 18, 2007**

There is no Insurance obligation or coverage for the Claimant Agreement which is the subject matter of this litigation.

May 18, 2007                       /s/ Nicholas J. Stroumtsos, Jr. J.S.C.

                                      Nicholas J. Stroumtsos Jr. J.S.C..

JA04829

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
|  | : | Case No. 16-31602 (JCW) |
| KAISER GYPSUM COMPANY, INC., *et al.*,[1] | : |  |
|  | : | (Jointly Administered) |
| Debtors. | : |  |
|  | : |  |

**MOTION IN *LIMINE* OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL**
**INJURY CLAIMANTS AND THE FUTURE CLAIMANTS' REPRESENTATIVE TO**
**EXCLUDE CERTAIN PROPOSED EXPERT TESTIMONY**

The Official Committee of Asbestos Personal Injury Claimants (the "**ACC**") and the Future

Claimants' Representative (the "**FCR**") hereby file this Motion in *Limine* regarding Certain

Proposed Expert Testimony (the "**Motion**").  In support of this Motion, the ACC and FCR

respectfully state as follows:

**PRELIMINARY STATEMENT**

In connection with confirmation of the Third Amended Joint Plan of Reorganization of

Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc. ("**Joint Plan**"), Truck

Insurance Exchange ("**Truck**") has proposed Mr. Lester Brickman and Dr. Charles Bates as expert

witnesses and has provided Rule 26(a)(2)(B) reports disclosing their proposed testimony.[2]  Mr.

---

[1]    The Debtors are the following entities (the last four digits of their respective taxpayer
identification numbers follow in parentheses):  Kaiser Gypsum Company, Inc. (0188) and Hanson
Permanente Cement, Inc. (7313).  The Debtors' address is 300 E. John Carpenter Freeway, Irving,
Texas 75062.

[2]    Expert Report of Lester Brickman, Esq. dated Feb. 20, 2020 ("**Brickman Report**"), attached
hereto as **Exhibit 1**; Expert Report of Charles E. Bates, Ph.D. dated Feb. 20, 2020 ("**Bates
Report**"), attached hereto as **Exhibit 2**.

Brickman's and Dr. Bates's proposed testimony each fail the tests for admissible expert testimony set out in the Federal Rules of Evidence and relevant case law, and should be precluded.[3]

## BACKGROUND

The fundamental argument of both Mr. Brickman's and Dr. Bates's proposed testimony is that the American civil justice system is unfair and that Truck, in its role as insurer to the Debtors, should not be subjected to it. In service of that argument, Mr. Brickman and Dr. Bates undertake to review this Court's decision in *In re Garlock Sealing Technologies, LLC*, 504 B.R. 71 (Bankr. W.D.N.C. 2014), among other legal authorities, and to explain to the Court the supposed import of those cases here.

### Mr. Brickman's Proposed Testimony

Mr. Brickman is a former law professor who has published articles on the history of asbestos litigation and other topics. As he explains in the first pages of his report, "[f]or the past 30 years, I have studied asbestos litigation and the unscrupulous practices of asbestos plaintiffs' lawyers motivated by the potential for billions of dollars in fees." Brickman Report at 3.

Mr. Brickman's report opens with a round-up of articles, cases and opinion pieces describing alleged practices of the plaintiffs' bar that Mr. Brickman has found objectionable over the many decades of his teaching career. These include "the use of unreliable medical evidence" (Brickman Report at 3), "ginning up phony asbestosis claims" (Brickman Report at 7), and "implanting false memories" (Brickman Report at 9).

---

[3]   Discovery regarding this expert testimony is ongoing and the depositions of Mr. Brickman and Dr. Bates have not yet occurred. However, in light of the limited time before the confirmation hearing and the nature of the objections here, the ACC and FCR have brought this motion immediately. The ACC and FCR reserve the right to object to the proposed testimony of Mr. Brickman and Dr. Bates on grounds beyond the grounds set out herein.

JA04831

Mr. Brickman then turns to the *Garlock* estimation decision, explaining that he will "detail herein some of Judge Hodges's key findings, including those that unequivocally refute the false suggestion made to this Court that wrongdoing was only found as to 15 claims against Garlock." (Brickman Report at 21).  He provides pages of his interpretation of the *Garlock* decision and plan documents.  (Brickman Report at 21-36).  He then reviews the recent trust distribution procedures ("**TDP**") in *In re Maremont Corp.*, No. 19-10118-KJC (Bankr. D. Del.) and the proposed TDP in this case, offering his views on the forces he believes shaped those documents and their shortcomings in protecting Truck from the civil justice system as it exists.  (Brickman Report at 36-38).

Finally, Mr. Brickman purports to assess the current justice system and declares it inadequate, concluding that the allegedly fraudulent practices of the plaintiffs' bar "cannot be fully combatted in the tort system."  (Brickman Report at 38-43).

### Dr. Bates's Proposed Testimony

Dr. Bates is the head of a Washington DC-based economic consulting firm who has provided testimony about various industries and areas, including asbestos litigation.

Dr. Bates opens his report by recounting arguments made in a hearing in this case by counsel for the ACC about *In re Garlock Sealing Techs, LLC*, 504 B.R. 71, arguments with which Dr. Bates disagrees.  Bates Report at 4-5.  After some observations about the Debtors' asbestos litigation history (Bates Report at 9-12), Dr. Bates returns to the *Garlock* case, explaining in detail his views on what Judge Hodges' found, with numerous citations to *Garlock*, other case law, and various court filings and discovery materials from *Garlock*.  He reprises his own 2013 hearing testimony in *Garlock*, including reprints of PowerPoint slides he used in 2013.  Bates Report at 13-20.

3

JA04832

Dr. Bates then uses data from the *Garlock* case, notes certain asbestos personal injury cases in which the Debtors were also named, and claims that the data reveals that the Debtors suffered from similar alleged withholding of exposure information that Garlock allegedly did. Bates Report at 24-30. As a result, Dr. Bates concludes that defendants, including the Debtors, had to spend funds to defend cases beyond what they would have had to spend in a different civil justice system in which the disclosures he describes were mandated. *Id.* at 30. That defense cost, he explains, makes defendants more willing to pay higher settlement amounts than they would under a different justice system in which those disclosures were required. *Id.*

## ARGUMENT

In the Fourth Circuit, expert testimony is only admissible where it is both reliable and relevant. *See PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 123 (4th Cir. 2011) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)); Fed. R. Evid. 402 advisory committee's note to 1972 proposed rules ("Evidence which is not relevant is not admissible."). Expert testimony must also have the potential to "help the trier of fact to . . . determine a fact *in issue*." Fed. R. Evid. 702 (emphasis added). "In other words, Fed. R. Evid 702 requires a valid scientific connection between the expert's testimony and the pertinent inquiry before the court as a *precondition* to admissibility." *Garlinger v. Hardee's Food Sys., Inc.*, 16 F. App'x 232, 235 (4th Cir. 2001) (per curiam) (emphasis added) (citing *Daubert*, 509 U.S. at 591-93). Here, the reports and proposed testimony of Mr. Brickman and Dr. Bates do not satisfy these requirements, and should be precluded.

## I.    THE COURT SHOULD PRECLUDE TESTIMONY THAT THE AMERICAN CIVIL JUSTICE SYSTEM IS UNFAIR TO TRUCK OR SHOULD BE DIFFERENT THAN IT IS

Mr. Brickman's and Dr. Bates's proposed testimony that the American civil justice system is unfair to Truck is not relevant to any issue before the Court. It therefore does not "fit" and

4

should be precluded.   The Fourth Circuit recently held that expert testimony attacking the "legitimacy and logic" of existing law was properly excluded.   *See United States v. Ancient Coin Collectors Guild*, 899 F.3d 295, 319 (4th Cir. 2018) (holding that trial court properly limited expert testimony to evidence that "fit" the questions presented to the Court by *precluding* "generalized evidence" that could only serve to attack the legitimacy of the regulations that applied in the case), *cert. denied*, 139 S. Ct. 1191 (2019).

Here, the issue before the Court during the confirmation proceedings is whether the Joint Plan satisfies the statutory requirements for confirmation.   Mr. Brickman's and Dr. Bates's testimony focuses instead on Truck's attacks on the legitimacy of asbestos litigation in the civil justice system.

For example, Mr. Brickman notes that "17 states have enacted trust transparency statutes" but maintains "these statutes are insufficient to ensure that most of the alleged 14,000 pending Kaiser asbestos claims will not be fraudulently inflated."  Brickman Report at 40, 42.  Dr. Bates similarly opines that defendants in the civil justice system as it exists today will decide to pay settlement values higher than they would in one in which the disclosures he describes were required.  Bates Report at 30.

These complaints about the civil justice system have no relevance to the confirmation of the Joint Plan.  *Cf. Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450 (2007) (explaining that the Supreme Court has "long recognized that the basic federal rule in bankruptcy is that state law governs the substance of claims" (internal quotation marks omitted)). It may be that under a different justice system, asbestos claims could be resolved at a lower cost to asbestos defendants.  But there is no requirement in the Bankruptcy Code that the justice system as it actually exists conform to any particular litigant's view of what is desirable.

5

Mr. Brickman and Dr. Bates have both testified before legislative bodies advocating for changes in the law relating to asbestos claims. Brickman Report, CV at 3; Bates Report at B-2. This Court, however, is not a legislative body with the power to create a new justice system, and what might (or might not) be relevant to Congress or a state legislature is not relevant in this confirmation proceeding. As a consequence, Mr. Brickman's and Dr. Bates's testimony that the existing civil justice system will harm Truck, or that Truck would fare better in a different one, must be precluded.

Mr. Brickman's and Dr. Bates's proposed testimony is simply not tied to any valid confirmation objection. Courts have confirmed many "pass-through" plan structures that expressly allow asbestos victims to continue to prosecute their claims in the tort system after confirmation to recover the value of insurance proceeds.[4] In *Plant*, for instance, the District Court for the Northern District of California, faced with similar objections from insurers, stated explicitly that § 524(g) "does not suggest, as . . . [insurers] seem to think, that asbestos claims may not be returned to the tort system, where appropriate, as part of the reorganization Plan." *In re Plant Insulation Co.*, 485 B.R. 203, 231 (N.D. Cal. 2012), *rev'd on other grounds*, 734 F.3d 900 (9th Cir.), *and aff'd*, 544 F. App'x 669 (9th Cir. 2013). And this Court has itself already rejected

---

[4]   *See, e.g.*, *In re Burns & Roe Enters., Inc.*, No. 08-4191(GEB), 2009 WL 438694, at *4 (D.N.J. Feb. 23, 2009) (explaining that under the plan, the Trust could "authorize individual claimants, whose claims are potentially covered by policies issued by . . . [a non-settling insurer], to commence litigation in the tort system"). *See also* Order Confirming Sixth Am. Joint Plan of Reorganization of Thorpe Insulation Co. and Pacific Insulation Co. (Following Remand) § 5.1.6, *In re Thorpe Insulation Co.*, Case No. 2:07-bk-19271-BB (Bankr. C.D. Cal. May 8, 2013) (Docket No. 3429) (providing that asbestos claimants may commence actions to "obtain the benefit of Asbestos Insurance Coverage" in the tort system post confirmation) (copy attached as **Exhibit 3**); Order Confirming Am. and Restated Second Am. Plan of Reorganization of Plant Insulation Co. as Modified § 5.2.6, *In re Plant Insulation Co.*, Case No. 09-31347 (Bankr. N.D. Cal. Mar. 3, 2014) (Docket No. 2722) (providing that post-confirmation, asbestos claimants may "commence suit against the Reorganized Debtor and pursue their Claims in the tort system to obtain the benefit of Asbestos Insurance Coverage") (copy attached as **Exhibit 4**).

JA04835

Truck's argument that sending cases back into the American civil justice system could somehow constitute "bad faith." Hr'g Tr. 52:7-9; 71:6-75:22, Sept. 4, 2019.

Accordingly, Mr. Brickman's and Dr. Bates's proposed testimony is not tied to any cognizable confirmation objection and is not relevant to any issue before the Court. This alone is sufficient reason for the Court to exclude their testimony.

## II.    THE COURT SHOULD PRECLUDE THE TESTIMONY BECAUSE IT IS LEGAL ARGUMENT

The Court should exclude Mr. Brickman's and Dr. Bates's proposed testimony for the further reason that their testimony amounts to legal argument. Mr. Brickman's and Dr. Bates's proposed testimony, and their reports, purport to explain to the Court how *Garlock* applies here and to emphasize for the Court certain other legal decisions and secondary authorities that Mr. Brickman and Dr. Bates view as support for Truck's positions. Indeed, both of their reports contain extensive citations to legal precedents and court documents from this and other cases. Brickman Report at 21-36; Bates Report at 13-20.

For example, Mr. Brickman explains he "will detail herein some of Judge Hodges's key findings." Brickman Report at 21. And Dr. Bates similarly opens his "Introduction and Summary of opinions" section with "[i]n the Garlock bankruptcy, Judge Hodges found . . . ." Bates Report at 4. Large parts of Mr. Brickman's and Dr. Bates's reports are constructed explicitly as a reply brief to arguments made by counsel to the ACC about *Garlock* at a hearing. In Dr. Bates's next paragraph, he takes issue with a contrary interpretation offered by counsel for the ACC: "In the instant matter, there have been incorrect statements made to the Court regarding how applicable Judge Hodges' findings are to the bulk of Garlock claims and to other asbestos defendants such as Kaiser. In particular, Mr. Kevin Maclay, a representative of the Asbestos Claimants Committee (ACC) stated that . . . ." *Id.*

JA04836

Courts have held unequivocally that Rule 702 does not permit expert testimony about legal issues. "Expert testimony as to the proper interpretation of applicable domestic law is inadmissible." *Teague v. Bakker*, 35 F.3d 978, 993 n.21 (4th Cir. 1994) (noting that it was "grave error" for trial court to admit expert testimony regarding the interpretation and application of applicable law). *See also In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) (experts may not testify on issues of law). Similarly, expert testimony describing the status of the law is generally inadmissible. *See United States v. McIver*, 470 F.3d 550, 561-62 (4th Cir. 2006) ("[O]pinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible.").

Even in a bench trial, there is "no compelling reason" to allow live testimony by experts on the law as such testimony "does nothing more than give an attorney a redundant means of presenting legal argument to the Court." *United States v. Cortez*, 205 F. Supp. 3d 768, 776 (E.D. Va. 2016). Expert testimony discussing case law and applying that case law to the facts before the Court "invades the province of the trial court to determine the law" and "constitutes inadmissible legal opinion." *Pinal Creek Grp. v. Newmont Mining Corp.*, 352 F. Supp. 2d 1037, 1044-45 (D. Ariz. 2005). In that case, the court found:

> The first portion of Professor Haas' report reads like a legal brief which discusses in detail the *Bestfoods* decision and applies that case to the Pinal Creek litigation. . . . The Court finds that Professor Haas' detailed discussion of *Bestfoods* and the application of that case to the facts before the Court constitutes inadmissible legal opinion because it invades the province of the trial court to determine the law.

*Id.*

Here, as in *Cortez* and *Pinal Creek*, Mr. Brickman's and Dr. Bates's opinions are redundant of Truck's own legal argument, and their expert reports are, like the reports in *Pinal Creek*, little more than legal briefs that attempt to apply the *Garlock* decision to the litigation before the Court.

8

Indeed, these expert reports respond directly to arguments raised by counsel for Truck's opponents. *See, e.g.*, Bates Report at 4. The Court should thus preclude Mr. Brickman's and Dr. Bates's reports and proposed testimony as inadmissible legal opinion. Truck is already well supplied with capable lawyers who can (and have) argued about what *Garlock* means and the alleged impact that that decision and others should have on this proceeding.

## **CONCLUSION**

Accordingly, for the reasons set forth above, the ACC and the FCR respectfully request that the Court grant the Motion and preclude the testimony of Mr. Brickman and Dr. Bates at the upcoming confirmation hearing.

Dated: February 27, 2020

CAPLIN & DRYSDALE, CHARTERED

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Kevin C. Maclay*
Kevin C. Maclay (admitted *pro hac vice*)
James P. Wehner (admitted *pro hac vice*)
Todd E. Phillips (admitted *pro hac vice*)
One Thomas Circle, NW, Suite 1100
Washington, DC 20005
Telephone: (202) 862-5000
kmaclay@capdale.com
jwehner@capdale.com
tphillips@capdale.com

*/s/ Edwin J. Harron*
Edwin J. Harron (DE Bar No. 3396) (admitted *pro hac vice*)
Sharon M. Zieg (NC Bar No. 29536)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
eharron@ycst.com
szieg@ycst.com

-and-

-and-

HIGGINS & OWENS, PLLC
Sara (Sally) W. Higgins (NC Bar No. 22111)
Raymond E. Owens, Jr.
524 East Blvd
Charlotte, NC 28203
Telephone:  (704) 366-4607
shiggins@higginsowens.com
rowens@higginsowens.com

HULL & CHANDLER, P.A.
Felton E. Parrish (NC Bar No. 25448)
1001 Morehead Square Drive, Suite 450
Charlotte, NC 28203
Telephone: (704) 375-8488
fparrish@lawyercarolina.com

*Counsel for the Official Committee of Asbestos Personal Injury Claimants*

*Counsel for Lawrence Fitzpatrick, the Future Claimants' Representative*

JA04838

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| KAISER GYPSUM COMPANY, INC., *et al.*,[1] | : | Case No. 16-31602 (JCW) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

**DECLARATION OF KEVIN O'NEAL HOLDEMAN, CPA, IN SUPPORT**
**OF CONFIRMATION OF THIRD AMENDED JOINT PLAN OF REORGANIZATION**

I, Kevin O'Neal Holdeman, hereby declare pursuant to 28 U.S.C. § 1746, as follows:

1.      I currently am employed as a Technical Accounting Manager at Lehigh Hanson Services, LLC ("LHS LLC"), the employee services subsidiary of Lehigh Hanson, Inc. ("Lehigh Hanson"). I have worked at Lehigh Hanson for approximately 11 ½ years, first through Lehigh Hanson directly and then, starting on January 1, 2017, through LHS LLC. I have been Technical Accounting Manager since April of 2016. My previous position at Lehigh Hanson was Corporate Accounting Manager in the corporate accounting department. Prior to my employment at Lehigh Hanson, I worked as an audit manager at Ernst & Young for approximately six years, during which time my job responsibilities included audit work for publicly held corporations. I am a licensed Certified Public Accountant. In 2002 I earned a Bachelor's Degree in Accounting and a Master's Degree in Finance, both from Texas A & M University. I obtained my CPA certification in Texas in 2003.

2.      Lehigh Hanson, a Delaware corporation, is a holding company which directly and indirectly owns multiple and various wholly-owned operating subsidiaries, including Debtor

---

[1]      The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Kaiser Gypsum Company, Inc. (0188) and Hanson Permanente Cement, Inc. (7313). The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

Kaiser Gypsum Company, Inc. ("KG"), Debtor Hanson Permanente Cement, Inc. ("HPCI") and

non-debtor Lehigh Southwest Cement Company ("LSCC"). Lehigh Hanson is itself an indirect,

wholly-owned subsidiary of Heidelberg Cement AG, a publicly traded German company.

Lehigh Hanson's subsidiaries produce and supply building materials and aggregates throughout

North America.

    3.    My current job responsibilities as a Technical Accounting Manager at Lehigh

Hanson primarily include financial reporting and technical accounting research with respect to

Lehigh Hanson and its various subsidiaries and affiliates, including but not limited to KG, HPCI

and LSCC. In my capacity as Technical Accounting Manager at Lehigh Hanson, I am familiar

with the financial and accounting records and related documents of Lehigh Hanson, KG, HPCI,

LSCC and various other affiliated entities, and I have custodial power over such financial and

accounting records and related documents.

    4.    I submit this declaration in support of the Third Amended Joint Plan of

Reorganization (the "Joint Plan").  All facts set forth in this declaration are based upon (a) my

personal knowledge, (b) information supplied to me by other employees of Lehigh Hanson or its

affiliates, as well as its management or professionals, (c) my review of relevant accounting

records and documents, or (d) my opinion based upon my knowledge of and experience

regarding the operations and financial and accounting records and related documents of Lehigh

Hanson and its affiliates.  If called to testify, I could and would testify competently as to the facts

set forth herein.

    5.    Separate financial and accounting records are maintained for each of the various

affiliated subsidiary entities directly and indirectly owned by Lehigh Hanson.  Financial

reporting and analysis of Lehigh Hanson and its U.S. subsidiaries also is prepared on a

consolidated basis.  Lehigh Hanson management generally evaluates the financial performance

of Lehigh Hanson and its various affiliated subsidiaries collectively – that is, on a consolidated basis.

6.      At the time the Debtors filed their bankruptcy petitions in 2016, their books and records reflected various old intercompany payables and receivables to and from certain affiliated Lehigh Hanson entities, as applicable.  To my knowledge these old intercompany payables and receivables had been reflected in the separate books and records of KG, HPCI, LSCC and other Lehigh Hanson subsidiaries, where and as applicable, for many years, and no cash payments had ever been sought or received in respect of these intercompany receivables and payables.  Other pre-petition intercompany payables and receivables on the books of the Debtors did fluctuate up and down as charges were incurred between the Debtors and their affiliates (one such example would be the annual service fee charged to the Debtors for legal and environmental management services provided by affiliate Three Rivers Management, Inc.).  In either case, however, there was and is no incentive or business reason to demand or pay cash with respect to these intercompany payables and receivable within the consolidated group of affiliated entities.  Each such intercompany payable on the financial records of a given affiliate within the group is offset by a corresponding intercompany receivable in the appropriate affiliate's financial records, such that, on a consolidated basis, the two corresponding entries have a net zero effect to the group.  As a result, such intercompany payables and receivables have remained on the books and records of the affiliated entities (and, in many cases, have remained unchanged for many years) despite the absence of any intention of any of the affiliated parties to pursue cash collection of them.

7.      Pursuant to several written agreements dated July 1, 2008 (collectively, the "Lease Agreement"), Debtor HPCI owns and leases to affiliated non-debtor LSCC a cement plant, rock plant, and quarry (including the minerals) located in Santa Clara County, California

CHAR2\2255789v5

JA04841

(collectively, the "Permanente Plant").  Pursuant to the Lease Agreement, LSCC manages and operates the Permanente Plant.  Under the Lease Agreement, (a) LSCC is obligated to pay rent, royalties, reclamation fees, and other amounts to HPCI and also is responsible for the ongoing operating costs of the Permanente Plant and (b) HPCI is obligated to fund capital expenditures and reclamation obligations related to the Permanente Plant.  Prior to the filing of the bankruptcy petitions, the various obligations owed by LSCC to HPCI and by HPCI to LSCC under the Lease Agreement were recorded as intercompany payables and receivables, and no movements of cash occurred between the two affiliates.

8.       In order that HPCI would have sufficient funds to pay for its bankruptcy-related expenses, and since the filing of the bankruptcy petitions, HPCI has not been paying the capital expenditure obligations and reclamation obligations related to the Permanente Plant that are HPCI's responsibility under the Lease Agreements.  Instead, LSCC has been paying them.  As a result, HPCI has been accruing a post-petition intercompany payable to LSCC for such capital expenditure advances made by LSCC (the "CapEx Payable") and a post-petition intercompany payable to LSCC for such reclamation expenditures advances made by LSCC (the "Reclamation Payable").  This arrangement was approved by the Bankruptcy Court pursuant to the Agreed Order Amending the Interim DIP Financing Order [Dkt. 444, 04/10/17].

9.       Under the Joint Plan, Lehigh Hanson is obligated to provide funding for certain payments to be made on account of claims asserted against the Debtors, including but not limited to contributing to the Debtors up to approximately $28.15 million for payment of Allowed General Unsecured Claims asserted against the Debtors and, in conjunction with the Debtors, paying an aggregate of $49 million into the Asbestos Personal Injury Trust created under the Joint Plan with respect to current and future asbestos claims asserted against the Debtors.   If the

4

JA04842

Joint Plan is confirmed and becomes effective, the Debtors will incur an intercompany payable to Lehigh Hanson in an amount up to $77.15 million (the "Plan Funding Payable").

10.     Upon and following the effectiveness of the Joint Plan, the CapEx Payable, the Reclamation Payable and Plan Funding Payable each will appear on the separate books and records of KG, HPCI, LSCC and other affiliated entities, where and as applicable – as intercompany payables of the Debtor(s), with corresponding matching entries as receivables in the financial records of the applicable affiliate.  However, viewing all of the various affiliated Lehigh Hanson subsidiaries collectively, on a consolidated basis, there will continue to be no incentive or business reason for any one affiliate within the consolidated group of Lehigh Hanson entities to pursue cash collection of the CapEx Payable, the Reclamation Payable and Plan Funding Payable (or any other intercompany payable or receivable) against any other affiliate within the group.  Instead, all such intercompany payables and receivables simply would remain in place on the post Effective Date books and records of the various affiliated Lehigh Hanson entities, and there would be no expectation or reason for any of such affiliated parties to pursue cash collection of them.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 9, 2020.


_____*/s/ Kevin O'Neal Holdeman*_____
Kevin O'Neal Holdeman

CHAR2\2255789v5

JA04843

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| KAISER GYPSUM COMPANY, INC., *et al.*, | : | Case No. 16-31602 (JCW) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

**CERTIFICATE OF SERVICE**

I, the undersigned of MOORE & VAN ALLEN, PLLC, hereby certify that I am, and at all times hereafter mentioned was, more than 18 years of age; that on this day I caused a copy of the foregoing **DECLARATION OF KEVIN O'NEAL HOLDEMAN, CPA, IN SUPPORT OF CONFIRMATION OF THIRD AMENDED JOINT PLAN OF REORGANIZATION** to be served via electronic notification pursuant to CM/ECF to those parties registered to receive notices for this case.

I certify that the foregoing is true and correct.

This 13th day of March, 2020.

_____ */s/  Douglas R. Ghidina* _____

CHAR2\2255789v5

JA04844